IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| UNITED STATES *ex rel.* BRIAN BURKE<br><br>　　　　Appellant,<br><br>　vs.<br><br>Records Press, Inc.,<br><br>　　　　Appellee. | **No**. 14-7077<br><br>**Related Case No.** 1:08-cv-364(EGS)(DAR)<br><br>**Judge:** |

### FIRST CORRECTED OPPOSITION TO APPELEE'S MOTION FOR SUMMARY AFFIRMANCE

　　　　Pursuant to Fed. R. App. P. 27, and this Court's Local Rules 27 and 32(b), Appellant, the United States of America *ex rel*. Brian Burke, hereby files this response in opposition to Appellee's Motion for Summary Affirmance.

### STATEMENT OF FACTS

1. On July 5, 2007, Appellant reported to Lloyd Rawls of GPO's Inspector General's Office that fraud was being committed by Record Press against the GPO, U.S. Attorney's Office, U.S. Taxpayers and, potentially, plaintiff.

2. Appellant stated that Record Press were charging the government, *et. al.*, ten times the correct amount for "collating & trimming" than allowed in the 2231-S Contract (the "Contract"). *Ex. A, Contract.*

3. Section II, on page 14, of the Contract includes a term for "collating, trimming to size, and binding per 100 pages" and also stipulates twice that a "running rate" of "per 10 pages" is applied to items under section II.

4. As admitted by Appellee in the District Court, Appellee applied the 10-copy running rate to other terms under Section II, but did not apply the 10-copy running rate to Section II(D) for collating, trimming to size, and binding per 100 pages. *Ex. F, Trial Tr. Part I. 40:5-6.*

5. Appellant believes the United States has been overcharged by Appellee because they charged this line item for every copy of each brief or appendix prepared, rather than per 10 copies as specified in the contract.

6. Appellant believes the 10-copy running rate was applied to this section since most, if not all, documents being copied under this section required at least 10 copies. *See Ex. D, Past Invoices By Appellee*. At trial, the president of Appellee's company, Mr. Hugh Wilmot, testified that Appellee had, at some point, "issue[d] invoices pursuant to this contract that called for a number of copies less than 10." *Ex. F, Trial Transcript Part I. 23:10-12*.

7. When Appellant attempted to impeach the witness by providing a chronological "stack" of past invoices whereby no invoice charged for less than 10 copies, the Court denied the use of the past invoices by first stating

that "the Court [had previously] ordered[1] that at issue here -- the invoice at issue would be confined to -- invoices at issue are confined to two" to which Appellant reminded the judge that the previous order was in regards to whether all past invoices or only the two (2) invoices directly affecting Appellant would be "at issue" in the trial, rather than what Appellant was currently using the past invoices for, which was to examine and impeach a witness. *Ex. F, Trial Transcript Part I. 24:14-25, 25:1-16; See Also Ex. D, Past Invoices By Appellee*

8. The issue of whether the invoices could be used for impeachment was never addressed by the Court at this hearing. *Ex. F, Trial Transcript Part I. 25:8-16.*

9. Appellee then objected to the use of the past invoices on the grounds of relevance, to which Appellant explained the relevance of using the documents to contradict the witnesses' testimony, but to which the Court sustained the objection because it found the past invoices were "not relevant, given the most recent orders that the Court entered with respect to the issues in the case and the evidence which would be admitted. So [the Court] will suggest that [Appellant] turn [his] attention to the questions regarding the

---

[1] Referring to the February 3, 2011 Minute Order by Magistrate Judge Deborah A. Robinson.

two invoices which are plainly admissible." *Ex. F, Trial Transcript Part I. 25: 24-25, 26:1-20*.

10. Also at trial, a branch chief of the Commercial Billing Section of the GPO, Mr. Calvin Adgerson, testified that he had been told from his section chief, Ms. Rosa Smith, that she had been told from an unnamed contracting attorney that the 10-copy running rate did not apply to Section II(D), which, even if it were true, would have merely been that particular unnamed contracting attorney's interpretation at that moment and not necessary the government's actual interpretation of the Contract, nor would it have been evidence of the government's interpretation of the Contract at the time it was made and/or at the time the false claims were submitted.

## LEGAL STANDARD

Summary affirmance is appropriate where the merits are so clear as to justify summary action. Cascade Broadcasting Group, Ltd. v. FCC, 822 F.2d 1172, 1174 (D.C. Cir. 1987) (per curiam) (summary disposition is appropriate, "only where the moving party has carried the heavy burden of demonstrating that the record and the motion papers comprise a basis adequate to allow the fullest consideration necessary to a just determination"); see also Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987) (per curiam). see e.g., Fortner, 455 F.3d at 754

(denying the government's motion for summary affirmance and chastising the government for "wast[ing] the resources of [the] court"). Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987) ("A party seeking summary disposition bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."). See also D.C. Circuit Handbook at 36 ("Parties should avoid requesting summary disposition of issues of first impression for the Court.").

## ARGUMENT

**I. Appellee's Motion for Summary Affirmance Should Be Denied Because Appellee Has Not Demonstrated That The Merits Clearly Favor The Appellee.**

   A. **The District Court's findings of fact were clearly erroneous because the District Court did not consider the text of the unambiguous subject contract.**

Appellee states that, "the district court's findings are not only plausible, they are the only findings that are supported by the evidence." However, the relevant order does not even mention of the text of the subject contract, which had been entered into evidence, and which both parties claimed was unambigous. Additionally, there is no explanation for why the text of the contract was not being considered at all by the District Court, even though neither side argued that the contract was incorrect or ambiguous.

In fact, the contract was not ambiguous, but clearly states on page 14 as a header of Section II that "RUNNING RATE IS PER 10 COPIES. *[sic]*"  *See attached Exhibit A, Contract, pg 14*.  Moreover, the Contract provides, "Running Per 10 Copies" at the top of the column listing the prices.  *Id*.  Accordingly, the District Court erred and /or abused its discretion by failing to consider the most important piece of evidence, which was the text of the unambiguous Contract.

It is plain that this Court will not consider outside evidence when asked to interpret an unambiguous contract. In  E.P. Hinkel & Co. v. Manhattan Co., 506 F.2d 201, 204 (D.C.Cir.1974) the Court ruled that "where the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties".  The District Court did not follow this legal standard because it reviewed extrinsic evidence in order to interpret the Contract.

Furthermore, in Hinkel this Court ruled that, "this jurisdiction follows the general rule that the court interprets unambiguous contractual provisions.  In so doing, the court does not consider extrinsic evidence, but finds the intention of the parties in the language used to express their agreement.  See Vogel v. Tenneco Oil Co., 150 U.S.App.D.C. 383, 465 F.2d 563 (1972); Henson Creek Development Co. v. Richards, 296 F.Supp. 915 (D.D.C.1969); Burbridge v. Howard University, 305 A.2d 245 (D.C.App.1973); Minmar Builders, Inc. v. Beltway Excavators, Inc., 246

A.2d 784 (D.C.App.1968); <u>Gagnon v. Wright</u>, 200 A.2d 196 (D.C.App.1964). By looking to the intent of the parties and to other reports and testimony outside of the four corners of the contract, the District Court erred in its application of its legal standard.

  B. **The District Court's findings of fact were clearly erroneous because the findings did not consider evidence of past invoices that should have been admissible to examine a witness, but had been improperly denied.**

In response to "[Appellant's] claims that the district court erred in denying him the opportunity to present evidence of past invoices and instead allowed him to present only one invoice," Appellee states that, "[a]t the pre-trial conference, Burke and Record Press agreed that the trial would concern only those two invoices" and that "[Appellant's] counsel further confirmed at trial that [Appellant] did not intend to offer any other invoices into evidence." *Motion for Summary Affirmance, fn 4*.

Appellee misstates the issue because, at the trial, Appellant presented the invoices only after Hugh Wilmot provided impeachable testimony that there existed past invoices that "called for a number of copies less than 10", *Ex. F, Trial Tr.*[2] *Part I. 23:10-15, 25:8-10*. Appellee provided hundreds of invoices, which it claimed were the invoices issued under the subject contract, but not a single one of

---

[2] Transcript of Bench Trial (Document No. 89 on the district court's docket)

those invoices charged for a run of less then ten (10) copies. This fact is crucial to the case because it shows (1) that Mr. Wilmot is not a credible witness and (2) that Appellee's claim that the subject contract allowed for charging per copy rather than charging per ten (10) copies is not corroborated by the invoices issued under the contract, since no invoice ever charged for an increment of copies less than ten (10).

Appellee objected to the use of the past invoices on the grounds of relevance. *Ex. F, Trial Tr. Part I, 25:21-22*. The credibility of Mr. Wilmot as a key witness in the case is material by itself as his testimony would be relied upon by the fact finder. Moreover Appellant explained the relevance and material nature of the fact being questioned in regards to interpreting the contract at issue in this case[3]. It has been well documented by this Court that when a fact is relevant to the merits of the case extrinsic evidence is admissible regarding that fact.[4] Rather than determining whether the extrinsic evidence should be admitted as relevant for

---

[3] Specifically, Appellant stated that the fact of whether past invoices were for less than 10 copies was relevant and material because the fact was "related to whether or not the contract that calls for the running rate of 10 would imply that the running rate applies to these invoices" since "every single invoice is for a number of copies greater than 10". *Ex. F, Trial Transcript. Part 1. 26:1-12*.

[4] Rowland v. United States, 840 A 2d. 664, 680 (D.C.C. 2000) which states: "Thus, [T]he matter is non-collateral and extrinsic evidence consequently admissible if the matter is itself relevant to a fact of consequence on the historical merits of the case. When the fact is logically relevant to the merits of the case as well as the witness's credibility, it is worth[y] of the additional court time entailed in hearing extrinsic evidence"

purposes of determining the merits of the case, the District Court sustained the objection claiming the documents were "not relevant, given the most recent orders that the Court entered with respect to the issues in the case." *Ex. F, Trial Transcript Part I. 25: 24-25, 26:1-20*. However, the February 3, 2011, Court Order that the District Court was referring to related to whether other invoices were "at issue" and not whether they were admissible to impeach a witness or were admissible as extrinsic evidence (where no invoice was for less than 10 copies) of whether the 10-copy running rate term applied to Section II(D) of the Contract. Accordingly the District Court erred and/or abused its discretion by prohibiting Appellant from using the invoices at trial and as a result the District Court's findings of fact were clearly erroneous because they were based on an incomplete record of material facts.

C. **The District Court's findings of fact were clearly erroneous because the District Court did not consider the contradictions in Appellee's witness' testimony.**

Mr. Wilmot's testimony was inconsistent with his own previous statements and with the text of the Contract itself. Namely, Mr. Wilmot testified, with respect to Roman numeral II of the contract, that Appellee was expected to charge the running rate for II(A) and (B), but was not expected to charge the running rate for II(D). *Ex. F, Trial Transcript Part I. 39: 17-20*. Mr. Wilmot's explanation was that Section II(D) of the contract stipulated the price was $12.25 "per 100 pages".

However this statement is inconsistent with his past statement that section II(B) of the contract should have the running rate applied even though section II(B) also stipulated that the cost was "per page." Accordingly, Mr. Wilmot's testimony that the running rate should have applied to II(B), but not II(D), was inconsistent with the clear language of the Contract, inconsistent with his own rationale, and was not included in the District Court's findings of fact.

> D. **The District Court's findings of fact were clearly erroneous because the District Court did not consider Appellant's expert witness.**

The District Court made no mention of Mr. Morris Gocial's testimony in the June 12, 2013 Order. *See Exhibit B*. At the trial, Mr. Morris Gocial testified as an expert witness and concluded based on his analysis that Appellee had in fact overcharged Appellant by exactly ten times the amount he should have been charged for "collating, trimming to size, and binding charge" *Ex. G, Trial Tr. Part II. 12:11-16*. Accordingly, the Trial Court was clearly erroneous and/or abused its discretion by not considering relevant evidence presented at trial.

> E. **The District Court's Findings of Fact were clearly erroneous because they relied primarily on the testimony of a government officer.**
>
>> i. **The District Court improperly relied on the testimony of a government officer who had no authority to vitiate a false claim.**

The District Court's findings of fact were primarily based on government officer Calvin Adgerson's testimony about what the contracting attorney had

indirectly told him by stating that, "[I]ndeed, the alleged victim, through the agency official who appeared in Plaintiff's case-in-chief, testified that there was no fraud," and that, "Plaintiff offered no evidence to the contrary." *See attached Exhibit B, June 12, 2013 District Court Order*.  However, this reasoning is improper because contracting officers are, "not authorize[d] . . . to settle, compromise, pay, or otherwise adjust any claim involving fraud."  41 U.S.C.A. § 7103; See also United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956) ("In such palming off as we have here we do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute.")  Further, although the contracting officer has the authority to modify a contract, a retroactive modification under such circumstances was, "void as against public policy."Id.

Additionally, "This Court has noted that mere acquiescence (rather than approval) by government employees is not sufficient to avoid liability, as requiring mere acquiescence would preclude FCA liability any time a government employee and a defendant were in cahoots. United States ex rel Tyson v. Amerigroup Illinois, Inc., 488 F.Supp.2d 719 (2007)(Citing U.S. ex rel. Asch v. Teller, Levit & Silver-trust, P.C., 2004 WL 1093784 at *3 (N.D.Ill. May 7, 2004).  Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct." Nat'l Wholesalers at 950; See Also United States v.

Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 771 (N.D. Tex. 2002) ("A violation of the rights of the United States may not be waived or ratified by the unauthorized acts of its agents."); United States ex rel. Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995) ("[A] government officer cannot authorize a contractor to violate federal regulations."); United States v. Cripps, 460 F. Supp. 969, 973-74 (E.D. Mich. 1978) (stating that a federal employee who urges someone to defraud the government acts ultra vires).  Because they lack the authority to waive fraud, acquisition officials cannot "ratify" such conduct. See Cibinic, Nash & Nagle, Administration of Government Contracts (4th ed. 2006) supra note 150, at 48 ("[I]llegal actions cannot be ratified because officials lack the authority to enter into illegal agreements."); cf. Winter v. Cath-DR/Balti Joint Venture, 497 F.3d 1339, 1347 (Fed. Cir. 2007) (noting that authority is a prerequisite to ratification).

Moreover, the Federal Acquisition Regulation (FAR) also contains express limitations on contracting officer authority when a claim is suspected to be false or tainted by fraud.  Pursuant to FAR 33.210(b), the contracting officer has no authority to settle, compromise, pay or adjust "any claim involving fraud."  Section 605(a) of the Contract Disputes Act removes any authority from the head of an agency "to settle, compromise, pay, or otherwise adjust any claim involving fraud."  This statutory restriction on agency heads extends downward to subordinate

agency procurement officials. see also United States v. United Techs. Corp., No. 5:92-CV-375 (EBB), 1996 WL 653620, at *2 (D. Conn. Oct. 11, 1996) ("The statute's restriction on the authority of agency heads should be read as encompassing their subordinates."); cf. Contract Disputes Act of 1978, S. REP. NO. 95-1118, at 19 (1978), as reprinted in 1978 U.S.C.C.A.N. 5235, 5253 ("[I]t is not the intent of this section to authorize Agency heads, contracting officers, or agency boards to settle or compromise claims independent of their legal or contractual merits . . . ."). Accordingly, the District Court erred in relying primarily on the testimony of Mr. Adgerson to establish that he, or the unnamed contracting attorney, had the authority to dictate the intent of the government now, or at the time the contract was entered into.

> ii. **The District Court improperly invoked the Government Knowledge Defense by citing the knowledge of the Government official, rather than citing the knowledge of the Appellee regarding what Appellee allegedly thought the Government knew or did not know.**

The District Court mistakenly relied on the testimony of Mr. Adgerson as evidence of the government's knowledge when the knowledge at issue under the Government Knowledge Defense is not the knowledge of a government official, but rather is the contractor's knowledge of what the contractor believed the government knew. See U.S. ex rel. Hagood v. Sonoma Cnty. Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991)("The requisite intent is the knowing presentation of what is known to be false. That the relevant government officials know of the

falsity is not in itself a defense.")(Citing United States v. Ehrlich, 643 F.2d 634, 638–639 (9th Cir.1981)); 31 U.S.C. § 3729(a)(1-2)(what constitutes the offense is not intent to deceive but knowing presentation of a claim that is either "fraudulent" or simply "false.").

Appellee states that Appellant's claim fails as a matter of law because the requisite intent to establish False Claim Act liability 'cannot be inferred from the mere assertion that [the contractor's] interpretation . . . was incorrect." *Motion for Summary Affirmance, pg 10* (citing Mass. Housing Fin. Agency, 456 F. Supp. 2d 46 at 62). However, Defendant must have known that the claim was false because no questions were asked by defendant of contracting officers, see also Crane Helicopter Servs., Inc. v. United States, 45 Fed. Cl. 410, 433 (1999) ("[The FCA's knowing standard was designed to address] 'the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know'" and to reach "those who ignore obvious warning signs.") see also SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 7 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272 ("But the Committee does believe the civil False Claims Act should recognize that those doing business with the Government have an obligation to make a limited inquiry to ensure the claims they submit are accurate.")

Here, Mr. Wilmot, president of the Appellee company, admitted in his deposition that he never discussed with any GPO representative "any preliminary discourse regarding the definitions or meanings of any of the terms in the contract", nor any subsequent discourse regarding "the meaning of any of these contract", including admitting that he did not "speak with [a GPO representative] about this particular contract or about this particular case" after the case had been filed. See Exhibit E, Wilmot Deposition, 75:3-22; 76:1-22; 77: 1-15.

   iii. **The District Court improperly invoked the Government Knowledge Defense, by relying on testimony about what was allegedly known after the claim had been raised by Appellant, when it should have considered whether the Government had knowledge at the time of the alleged fraud years earlier**.

The United States Court of Appeals for the Ninth Circuit determined that "the test of whether a claim is false must be as of the date when the claim is made." National Wholesalers at 950. Accordingly, "every one of the invoices prior to [when the contracting officer learned of the mislabeling] was false when made." Id. Moreover, an FCA defendant should not benefit if someone from the government learns of the falsity and simply does nothing about it, see Southland Mgmt. Corp., 326 F.3d 669, 682 n.9 (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the claimant was colluding with the government employee to submit a false claim . . . ." (citing United States ex rel Durcholz vs. FKW Inc., 189 F.3d 542, 544-45 (7th

Cir. 1999)). The Seventh Circuit has held that mere governmental acquiescence is insufficient to sustain a government knowledge defense. Durcholz at 546. The government must both know of, and approve, the particular claim before it is submitted. The opinions of other circuit courts appear to have adopted a similar standard, see The Government Knowledge Defense To The Civil False Claims Act: A Misnomer By Any Other Name Does Not Sound As Sweet, 4 Idaho L. Rev. 41.

Under the case law cited above regarding Defendant's Government Knowledge Defense, this 'meeting of minds' must occur *prior* to submitted false claim. Here, the only evidence cited by the District Court in support of the government's intent was based on the hearsay evidence of an unknown contracting attorney who may or may not have interpreted the contract correctly or even consistently in accordance to the intent of the United States when the contract was entered into. Accordingly, every one of the invoices prior to [when the contracting officer learned of the mislabeling] was false when made."

CONCLUSION

Appellee's Motion for Summary Affirmance should be denied because Appellant has provided items from the record and arguments based thereon, which defeat Appellee's position that the merits are clearly in its favor, since they show that (1) the District Court erred and/or abused its discretion by refusing to allow

Appellant to use all the relevant invoices at trial based on the District Court's conclusion that only two invoices were "at issue" and by failing to consider extrinsic evidence in favor of Appellant, (2) the District Court erred and/or abused its discretion by not making any findings regarding the actual language of the unambiguous subject contract, and (3) the District Court erred and/or abused its discretion by improperly invoking the Government Knowledge Defense.

WHEREFORE, Appellant respectfully requests this Court deny Appellee's Motion for Summary; and grant Plaintiff costs of this matter, including attorney fees; and grant such other relief as this court deems appropriate.

DATED:  July 31, 2014

              Respectfully Submitted,

              /s/_____
              Tyler Jay King, Esq.
              Franklin Square Law Group
              1225 Eye St, NW, Suite 601
              Washington, DC  20005
              Bar No. 55396
              (202) 779-9711
              *Counsel for Appellant Brian Burke*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 31, 2014, a copy of the foregoing was served to the Appellee Record Press by first class mail to Appellee's counsel at counsel's address of record:

John W. Lomas, Jr.
McKenna Long & Aldridge LLP
1900 K Street NW
Washington, DC  20006
jlomas@mckennalong.com

The undersigned also filed a copy of the foregoing through this Court's appellate CM/ECF system.

Respectfully Submitted,

/s/_____
Tyler Jay King, Esq.