# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  :
ex rel. BRIAN BURKE, Relator  :   Case No.:
c/o Davis, Cowell & Bowe, LLP  :
1701 K Street NW, Suite 210  :
Washington, DC 20006,  :   **VERIFIED COMPLAINT**
   :
   Plaintiff,  :
   :   **Filed Under Seal**
   v.  :   pursuant to 31 U.S.C. § 3730(b)(2)
   :
RECORD PRESS, INC.  :   **JURY TRIAL DEMANDED**
229 West 36th Street, 8th Floor  :
New York, NY 10018,  :
   :
   Defendant.  :
_____ :

Mark Hanna, Esq.
Joni S. Jacobs, Esq.
Keira M. McNett, Esq.
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax:(202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

Attorneys for Relator

00000001

## NATURE OF THE ACTION

1.  Qui Tam Relator Brian Burke ("Relator" or "Mr. Burke") brings this action in the name of the United States Government for false claims that were submitted or caused to be submitted to the United States Government by Defendant Record Press, Inc. ("Record Press" or "Defendant").

2.  This case is brought pursuant to the qui tam provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.,* to recover treble damages and civil penalties on behalf of the United States of America, arising from false or fraudulent claims for printing and binding services provided by Record Press to the Government Printing Office ("GPO").

## PARTIES

3.  Relator Brian Burke is a resident of New York.  He became aware of Record Press's submission of false or fraudulent claims when the U.S. Attorneys' Office served him with an Itemized and Verified Bill of Costs pursuant to an action in which he was a *pro se* litigant before the U.S. Court of Appeals for the Second Circuit.  Upon receiving this bill, which summarized charges to the Government for printing and binding appellate briefs and appendices, Mr. Burke investigated and discovered that Defendant was overcharging the Government nearly 10 times the rate specified by its contract with GPO.

4.  Defendant Record Press is a privately-held New York corporation specializing in printing and production of legal briefs and appendices for submission to state and federal courts.  Its annual sales revenue is approximately $4.7 million.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confer jurisdiction to this Court over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

2

00000002

6.   This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because Record Press has submitted and continues to submit bills to the GPO office in this jurisdiction, and acts prohibited by 31 U.S.C. § 3729 occurred in this judicial district.

7.   Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because at least one act proscribed by 31 U.S.C. § 3729 occurred in this district.

8.   In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed under seal and will remain under seal for a period of at least 60 days from its filing date, and shall not be served upon the Defendant until after the Court so orders.

9.   The Court has jurisdiction over this action pursuant to 31 U.S.C. § 3730(e)(4)(A), because, to the extent that there has been a public disclosure of the information upon which the allegations of this Complaint are based, Relator is an original source of this information as defined in 31 U.S.C. § 3730(e)(4)(B).  Relator possesses direct and independent knowledge of the information in this Complaint.  Relator voluntarily provided the Government with his information prior to filing this action and prior to any amendments thereto, pursuant to 31 U.S.C. § 3730(e)(4).

## FACTS

10.  Record Press has a contract with the Government Printing Office ("GPO") ("the GPO contract") whereby it prints and binds appellate briefs and appendices filed by the U.S. Attorneys' Office in all criminal and civil appeals arising out of the U.S. District Court for the Southern District of New York.

11.  Record Press obtained its contract with GPO pursuant to a request for proposal (Program 2231-S) that sets forth maximum rates contractors could charge GPO for various printing and document preparation services.  Under this program, the maximum price that could be charged for "collating, trimming to size and binding" briefs and appendices is $14.00 per 100 pages for a 10-copy run of the document being prepared.

3

00000003

12. Record Press's contract with GPO incorporated the terms, conditions and specifications set forth in the request for proposal ("RFP"), and sets the cost for binding a 10-copy run of a brief or appendix at $12.50 per 100 pages.

13. In violation of the GPO contract, Record Press has billed and continues to bill the Government the binding charge for each copy of each brief or appendix that it prepares, rather than for a 10-copy run of the document being prepared.

14. Relator discovered Record Press's violation of the GPO contract when he was ordered to pay the U.S. Attorneys' costs for printing the Government's appendix and brief in a *pro se* action he brought against the Secretary of Commerce in the U.S. District Court for the Southern District of New York (Case No. 04-cv-7593).

15. In that action, the U.S. Attorneys' Office filed a bill of costs that itemized the fees Record Press charged for printing the appendix and the brief. Record Press billed the Government $1,483.77 for "collating and trimming" 20 copies of a 566-page appendix. Record Press billed the Government $398.47 for "collating and trimming" 40 copies of a 76-page brief. The high charges for "collating and trimming" listed in the U.S. Attorneys' Itemized and Verified Bill of Costs prompted Mr. Burke to investigate.

16. During his investigation, on July 5, 2007, Relator spoke on the telephone with someone at Record Press who identified himself as "Hugh" and described himself as the contract and billing contact for Record Express. Relator alleges this person was Hugh Wilmot, who is the President of Record Press.

17. During the conversation with Relator, Mr. Wilmot explained that Record Press had been doing business with the Government for 50 years. Relator had subsequent conversations with GPO employees who likewise referred to Record Press as a long-time Government contractor.

18. Mr. Wilmot stated to Relator that the bills Record Press submitted to GPO in Relator's litigation with the Government were in accordance with the GPO contract,

4

indicating that this was not an isolated incident or mistaken overbilling, but rather, that it was Defendant's standard practice with respect to its Government contracts.

19. Further investigation by the Relator confirmed that Record Press's billing practices violate the GPO contract. For example, Calvin Anderson, Chief of the Commercial Examination Section in the GPO's Office of the Controller's Procurement Accounting Division, confirmed that the binding charge must be billed only for a 10-copy run of the document, not for each copy of the document, as Record Press charged.

20. Although Relator received information from Record Press that this billing scheme is its standard practice with respect to its Government contracts, Relator does not have access to Record Press's contracts. Nor does Relator have access to Record Press's invoices for all jobs performed pursuant to its contract(s) with GPO. These documents are in the possession of the Defendant.

21. By charging GPO $12.50 per 100 pages for each brief bound, in violation of its contract with the Government, which clearly specifies that binding charges are per 10 copies, Record Press intentionally and knowingly overcharged the Government.

22. In Relator's litigation alone, Record Press overbilled the Government approximately $1,700.00, nearly ten times the amount it was authorized to charge under the GPO contract.

23. In the RFP for the one-year Record Press contract, GPO specifies that it expects to require approximately 300 orders of briefs, with an average of 40 copies of an average 40-page brief per order. The RFP specifies an estimated 150 orders of appendices, with an average of 20 copies per order of appendices ranging from 8 to 1,334 pages each.

24. Based on Mr. Wilmot's statements that it is Record Press's practice to charge the Government on a per-copy basis for binding, and applying this overcharge to GPO's estimated requirements in the RFP, Record Press overcharged the Government more than $280,000.00 in one contract year. Because Record Press is a long-time GPO

5

00000005

contractor, the total overbilling is likely many times greater than the one-year estimate.

## COUNT I
### (False Claims Act - Presentation of False Claims)
### [31 U.S.C. § 3729(a)(1)]

25.    Relator incorporates by reference Paragraphs 1 through 24 of the Complaint as though set forth herein in full.

26.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant Record Press has knowingly presented or caused to be presented to officers or employees of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

## COUNT II
### (False Claims Act: Making or Using False
### Record or Statement to Cause Claim to be Paid)
### [31 U.S.C. § 3729(a)(2)]

27.    Relator incorporates by reference Paragraphs 1 through 26 of the Complaint as though set forth herein in full.

28.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged, Defendant Record Press knowingly made, used, or caused to be made or used false or fraudulent records or statements, to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Relator Brian Burke requests that judgment be entered against Defendant Record Press ordering that:

1.    Defendant cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

6

00000006

2.  Defendant pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendant's actions;

3.  Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

4.  Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

5.  Defendant be enjoined from concealing, removing, encumbering or disposing of assets that may be required to pay the civil monetary penalties imposed by the Court;

6.  Defendant disgorge all sums by which it has been enriched unjustly by its wrongful conduct; and

7.  The United States and Relator recover such other relief as the Court deems just and proper.

Respectfully submitted,

Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
Keira M. McNett (DC Bar 482199)
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

7

00000007

## REQUEST FOR TRIAL BY JURY

Relator hereby demands a trial by jury.

Respectfully submitted,

Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
Keira M. McNett (DC Bar 482199)
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

8

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of February, 2008, I caused a true and correct copy of the preceding to be served via first-class mail, postage pre-paid, upon the following:

Michael B. Mukasey
Attorney General of the United States
c/o Joyce R. Branda
United States Department of Justice
Patrick Henry Building
601 D Street, NW, Room 9902
Washington, DC 20004
Telephone: (202) 307-0231

Jeffrey A. Taylor
United States Attorney
c/o Keith V. Morgan
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530
Telephone: (202) 514-7566

Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
Keira M. McNett (DC Bar 482199)
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

9

00000009

## RELATOR'S VERIFICATION

The undersigned, being duly sworn, deposes and says that I, Brian Burke, am the Plaintiff/Relator herein, and I have read the foregoing pleading to be filed on my behalf. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true facts as stated herein.

Dated: _____

_____
Brian Burke

Subscribed and sworn before me this _____ day of _____, 2008.

_____
Notary Public

**ARTHUR GREEBLER**
Notary Public, State of New York
No. 01GR4713317
Qualified in Queens County
Commission Expires October 31, 2010

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:08-CV-00364 (EGS) |
| Ex rel. BRIAN BURKE, | ) | |
|  | ) | |
| Plaintiff, | ) | **ANSWER TO** |
|  | ) | **PLAINTIFF'S VERIFIED** |
| -against- | ) | **COMPLAINT** |
|  | ) | |
| RECORD PRESS, INC., | ) | |
|  | ) | |
| Defendant. | ) | |

Defendant Record Press, Inc. ("Record Press"), by and through undersigned counsel, files this Answer to the Verified Complaint ("Complaint") by Plaintiff Brian Burke ("Burke") and states as follows:

1.     Defendant denies the allegations in paragraph 1 of the Complaint, but admits that Plaintiff alleges and purports to bring this action in the name of the United States Government.

2.     Defendant denies the allegations in paragraph 2 of the Complaint, but admits that Plaintiff alleges and purports to bring this action pursuant to the Federal False Claims Act and seeks treble damages and civil penalties.

3.     Defendant denies it submitted false or fraudulent claims and denies knowledge or information sufficient to form a belief as to the truth of the allegations in the balance of paragraph 3 of the Complaint.

4.     Defendant denies the allegations in paragraph 4 of the Complaint but admits defendant is a privately held corporation located in New York and is a printer for Court matters.

5.      Defendant denies the allegations in paragraph 5 of the Complaint and respectfully refers all questions of law to the Court, but admits that Plaintiff alleges that jurisdiction is proper under the cited statutes.

6.      Defendant denies the allegations in paragraph 6 of the Complaint, but admits that Plaintiff alleges that jurisdiction is proper under the cited statutes.

7.      Defendant denies the allegations in paragraph 7 of the Complaint, but admits that Plaintiff alleges that venue is proper under the cited statutes.

8.      Defendant denies knowledge or information as to the allegations in paragraph 8 that Plaintiff purportedly filed the Complaint under seal and that the Complaint had been under seal for at least 60 days and was not served until the Court so ordered.

9.      Defendant denies the allegations in paragraph 9 of the Complaint, but admits that Plaintiff alleges that jurisdiction is proper under the cited statutes.

10.      Defendant denies the allegations in paragraph 10 of the Complaint, but admits it has a contract with the U.S. Government Printing Office ("GPO") for the printing and binding of appellate briefs and appendices filed by the United States Attorney's Office for the Southern District of New York ("Contract").

11.      Defendant denies the allegations in paragraph 11 of the Complaint, but admits that it submitted a bid in response to the GPO's Request For Proposal ("RFP").

12.      Defendant denies the allegations in paragraph 12 of the Complaint, but admits that its Contract with the GPO incorporated the terms, conditions, and specifications of the RFP.

2

13.    Defendant denies the allegations in paragraph 13 of the Complaint, but admits that it has billed the GPO in accordance with the terms of the Contract.

14.    Defendant denies the allegations in paragraph 14 of the Complaint.

15.    Defendant denies the allegations in paragraph 15 of the Complaint, but admits that it billed the GPO for printing and binding services provided in the action entitled *Brian T. Burke v. Donald L. Evans* (Docket No. 06-1917-cv) in the United States Court of Appeals for the Second Circuit.

16.    Defendant denies the allegations in paragraph 16 of the Complaint, but admits that Hugh Wilmot of Record Press spoke on the telephone with Plaintiff.

17.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint, but admits that Hugh Wilmot of Record Press spoke on the telephone with Plaintiff.

18.    Defendant denies the allegations in paragraph 18 of the Complaint, but admits that Hugh Wilmot of Record Press spoke on the telephone with the Plaintiff.

19.    Defendant denies the allegations pertaining to Defendant's purported violation of the "GPO contract" in paragraph 19 of the Complaint, and denies knowledge or information sufficient to form a belief as to the truth of the other allegations in the same paragraph.

20.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint, but admits that it is in possession of its invoices to and contract with the GPO.

3

00000013

21.    Defendant denies the allegations in paragraph 21 of the Complaint.

22.    Defendant denies the allegations in paragraph 22 of the Complaint.

23.    Defendant denies the allegations in paragraph 23 of the Complaint and respectfully refers the Court to the RFP for its true, complete and accurate contents.

24.    Defendant denies the allegations in paragraph 24 of the Complaint, but admits that it is a contractor of the GPO.

**ANSWERING COUNT I**

25.    Defendant incorporates its responses to paragraphs 1 through 24 of the Complaint as if the same were fully set forth herein.

26.    Defendant denies the allegations in paragraph 26 of the Complaint, and respectfully refers all questions of law to the Court.

**ANSWERING COUNT II**

27.    Defendant incorporates its responses to paragraphs 1 through 26 of the Complaint as if the same were fully set forth herein.

28.    Defendant denies the allegations in paragraph 27 of the Complaint, and respectfully refers all questions of law to the Court.

4

00000014

**<u>Affirmative Defenses</u>**

**<u>FIRST AFFIRMATIVE DEFENSE</u>**

Plaintiff's Complaint is barred and fails to state a cause of action because all or some of Plaintiff's claims against Defendant are barred by the applicable statute of limitations.

**<u>SECOND AFFIRMATIVE DEFENSE</u>**

Plaintiff's Complaint is barred and fails to state a cause of action due to improper and/or inconvenient venue.

**<u>THIRD AFFIRMATIVE DEFENSE</u>**

Plaintiff's Complaint is barred and fails to state a cause of action because Plaintiff has unclean hands as a result of his acts and omissions in the matters referenced in and related to the Complaint.

**<u>FOURTH AFFIRMATIVE DEFENSE</u>**

Plaintiff's Complaint is barred and fails to state a cause of action because Plaintiff made fraudulent misrepresentations and/or omissions regarding the matters referenced in and related to the Complaint.

**<u>FIFTH AFFIRMATIVE DEFENSE</u>**

Plaintiff's Complaint is barred and fails to state a cause of action because Plaintiff lacks standing.

00000015

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred because it fails to state a claim upon which relief can be granted.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because this action is based upon a public disclosure and Plaintiff is not the original source.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because some or all of Plaintiff's claims are barred by estoppel.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because some or all of Plaintiff's claims are barred by laches.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because some or all of Plaintiff's claims are barred by the Government's knowledge. *See*, *e.g.*, *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002).

Defendant reserves the right to assert additional affirmative defenses in this action.

Wherefore, Defendant denies all allegations in the Complaint that are not specifically admitted herein, and denies that Plaintiff is entitled to any relief whatsoever. Defendant

00000016

respectfully prays that the Complaint be dismissed with prejudice; that Defendant be awarded its reasonable attorneys' fees and costs; and for such other and further relief as the Court deems appropriate.

<div align="center">**COUNTERCLAIMS**</div>

Defendant Record Press, by and through its undersigned counsel, brings the following Counterclaims and allege as follows:

1.    The counterclaims herein are asserted by Defendant against Plaintiff Brian Burke.

2.    Jurisdiction over the counterclaims is proper in this Court under 28 U.S.C. § 1367 and venue is proper under 28 U.S.C. § 1391.

<div align="center">**COUNT I**
**TORTIOUS INTERFERENCE WITH**
**PROSPECTIVE ECONOMIC ADVANTAGE**</div>

3.    Defendant incorporates by reference the foregoing paragraphs of its Counterclaims as if the same were fully set forth herein.

4.    Defendant had and has a business relationship with the GPO, exemplified by Defendant's Contract with the GPO.  Based on that relationship, including the fact that the GPO awarded Defendant the Contract, there was a probability and expectancy of future economic benefit to Defendant in the form of continued expanding business with the GPO.

5.    Plaintiff knew of Defendant's relationship with GPO and its expectancy of continued expansion of business with GPO.

<div align="center">7</div>

6.    Plaintiff contacted the GPO and other government agencies and falsely accused Defendant of improprieties for the purpose of harming Defendant and seeking to injure and/or end Defendant's business relationship with the GPO.

7.    As such, Defendant has been damaged by Plaintiff's willful, wanton, and intentional interference, by improper methods, with its prospective economic advantage.

WHEREFORE, Defendant seeks compensatory and punitive damages in an amount to be proved at trial.

00000018

Dated:    Washington, D.C.
          July 28, 2008

                                        Respectfully submitted,

                                        McKenna Long & Aldridge LLP


                                        By: /s/ William T. O'Brien
                                            Jack Horan (DC Bar No. 417729)
                                            William O'Brien (DC Bar No. 450891)
                                            1900 K Street, NW
                                            Washington, D.C.  20006
                                            (202) 496-7500


                                        and

                                        Of Counsel:

                                        Malcolm I. Lewin
                                        Morrison Cohen LLP
                                        909 Third Avenue
                                        New York, New York 10022
                                        (212) 735-8600
                                        *Attorneys for Defendant*
                                          *Record Press, Inc.*

9

00000019

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2008, I served the foregoing Answer to Plaintiff's

Verified Complaint via first class mail, postage prepaid on:

>Mark Hanna, Esq.
>Keira M. McNett, Esq.
>Joni S. Jacobs, Esq.
>DAVIS COWELL & BOWE LLP
>1701 K Street, N.W., Suite 210
>Washington, D.C.  20006


>Darrell C. Valdez, Esq.
>U.S. Attorney's Office
>Judiciary Center Building
>555 Fourth Street, N.W.
>Washington, D.C.  20530


and via the Court's Electronic Case Filing System ("ECF").

>/s/ William T. O'Brien
>William T. O'Brien

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES ex rel.** | ) | |
| **BRIAN BURKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:08-CV-00364 (EGS)** |
| **v.** | ) | |
| | ) | |
| **RECORD PRESS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## RECORD PRESS, INC.'S MOTION FOR SUMMARY JUDGMENT

Defendant Record Press, Inc. ("Record Press"), pursuant to Federal Rule of Civil Procedure 56 and Local Civ. R. 56.1, respectfully moves for an Order granting Record Press summary judgment on all of Plaintiff's claims.

The reasons for this Motion, as set forth more fully in Record Press' Memorandum in Support of its Motion for Summary Judgment, are that there is no genuine issue of material fact regarding Plaintiff's claims and Record Press is entitled to judgment on the claims as a matter of law. A statement of undisputed material facts is also attached.

00000021

Respectfully submitted,


    /s/ William T. O'Brien          
John Horan (DC Bar No. 417729)
William T. O'Brien (DC Bar No. 450891)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C.  20006
Phone: (202) 496-7500
Facsimile: (202) 496-7756
Malcolm I. Lewin

Morrison Cohen LLP
909 Third Avenue
New York, New York 10022
(212) 735-8600
Attorneys for Defendant
Record Press, Inc.

Dated:  October 1, 2008          *Attorneys for Defendant Record Press, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES ex rel. | ) | |
| BRIAN BURKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:08-CV-00364 (EGS) |
| v. | ) | |
| | ) | |
| RECORD PRESS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT TO DISMISS THE COMPLAINT**

Defendant Record Press, Inc. ("Record Press") respectfully submits this memorandum in support of its motion pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civ. R. 56.1, for summary judgment to dismiss Plaintiff Brian Burke's ("Burke") Verified Complaint ("Complaint").

**Preliminary Statement**

This action arises out of a thoroughly misguided attempt by Burke to make money by recklessly and falsely accusing Record Press as having made false billing claims to the Government. After losing his 2004 employment case against the Government at both the trial and appellate levels, Burke turned on the company which printed the Government's appellate papers. The Government's printing costs were clearly delineated in Record Press' Request For Proposal ("RFP") with the Government, which is also its contract, and in its invoices. Burke ignored these documents when he filed his Complaint. In fact he did not even have them as he later admitted. This failure to properly investigate resulted in allegations that have no basis in

fact and which are directly refuted by the very documents on which they are supposed to be based.

<u>**Background**</u>

The relevant facts are simple, documented, and beyond dispute. They are set out in the Moving Declaration dated September 29, 2008 of Hugh Wilmot, President of Record Press. References here to "Exhibit __" are to the exhibits attached to Mr. Wilmot's Moving Declaration ("Wilmot Decl.).

Record Press, for a number of years has been a contracting party with the Government to produce appellate and related briefs for the United States Attorney's Office in the Southern District of New York ("U.S. Attorney's Office"). Wilmot Decl. ¶ 4. Each year during its contract tenure with the Government, Record Press has been a successful bidder on the Government's requests for proposals for such work ("RFP"). (Exhibit 5).

In 2004, Burke brought a *pro se* action in New York Federal Court against the United States Department of Commerce claiming that he was supposed to have been hired permanently as an "enumerator" for the 2000 Census, instead of being hired on a temporary basis. Wilmot Decl. ¶3. After losing the case, Burke appealed and lost again.

Burke then commenced this purported *qui tam* action (with a "verified" complaint alleging knowledge, not alleging his complaint on information and belief) based on incomplete and inaccurate documents and on faulty reasoning. Wilmot Decl. ¶ 3. Exhibit 1. The Government, according to the records of this Court, declined to intervene. Wilmot Decl. ¶ 3.

Neither Burke's lawyers nor their client had ever seen Record Press' bid or the invoices submitted by Record Press (Exhibit 6), but sued based on a blank RFP, and on bills <u>not</u> from Record Press, but on bills submitted by the U.S. Attorney's Office in New York, which were

1

based on the GPO's bills to the New York U.S. Attorney which included the GPO's 7%
surcharge (Exhibit 7).

### Argument

**A.    Legal Standard**

Summary judgment is appropriate when a court concludes that there is no genuine issue
of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.
P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Summary judgment "is properly regarded . .
. as an integral part of the Federal Rules as a whole, which are designed to 'secure the just,
speedy and inexpensive determination of every action."  *Celotex*, 477 U.S. at 327.  On a
summary judgment motion, the court performs "the threshold inquiry of determining whether
there is the need for a trial – whether, in other words, there are any genuine factual issues that
properly can be resolved only by a finder of fact because they may reasonably be resolved in
favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if any, show that there is no genuine issue as
to any material fact and that the moving party is entitled to a judgment as a matter of law."
*Anderson*, 477 U.S. at 247.  To be material, the factual assertion must be capable of affecting the
substantive outcome of the litigation.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43
(D.C. Cir. 1987).  To be genuine, the issue must be supported by sufficient admissible evidence
that a reasonable trier-of-fact could find for the nonmoving party.  *Id.*

Once the moving party has met its initial burden of demonstrating the absence of a
disputed issue of material fact, the burden shifts to the nonmoving party to present "specific facts

2

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the evidence favoring the nonmoving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Mulhall v. District of Columbia*, 747 F. Supp. 15, 19 (D.D.C. 1990), *citing Anderson*, 477 U.S. at 249-50.

Burke's complaint was not based on information and belief. It is also "verified." Presumably it was based on a proper, ethical investigation. Nevertheless, it is completely off the mark. It does not come close to the reality of Record Press' contract relationship with the Government, or its bills to the Government. The single premise of the complaint is that Record Press allegedly over billed the Government. This is demonstrably false and there are no facts that Plaintiff can produce to avoid summary judgment dismissing his Complaint.

**B.     The Documentary Evidence Refutes Plaintiff's Allegations**

Courts have consistently held that where documentary evidence clearly contradicts the allegations in a complaint, dismissal of the complaint is appropriate. *See, e.g.*, *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."); *CC-Aventura, Inc. v. Weitz Co., LLC*, 2007 U.S. Dist. LEXIS 1916 at * 16 (S.D. Fl. Jan. 10, 2007) ("While normally on a motion to dismiss the Court must accept the facts alleged in a complaint as true, if an allegation in the complaint is contradicted by a document incorporated by reference therein and which reveals facts foreclosing recovery as a matter of law, dismissal is appropriate."); *Payne v. DeLuca*, 2006 U.S. Dist. LEXIS 89251 at * 28, n. 5 (W.D. Pa. Dec. 11, 2006) ("[A] court is not required to accept conclusory allegations in a complaint when those allegations are contradicted by documents incorporated in the pleadings."); *Henik v. LaBranche*, 433 F. Supp. 2d 372, 376 (S.D.N.Y. 2006) ("Furthermore, the truth of factual allegations that are

3

contradicted by documents properly considered on a motion to dismiss need not be accepted.");
*Allen v. Honeywell Ret. Earnings Plan*, 382 F. Supp. 2d 1139, 1148 (D. Ariz. 2005) ("For the purposes of the Defendants' Motion to Dismiss, the Court assumes that the facts alleged in Plaintiffs' Complaint are true, unless such allegations are contradicted by documents referenced in the Complaint.").

Burke's complaint is based on three documents; the RFP and two invoices, none of which Burke even saw before he sued. These documents flat-out contradict Burke's allegations, leaving no room for dispute. The Government accepted Record Press' bills as consistent with its contract, and thus proper and thus paid on that basis. The government has also declined to intervene in this case. There has been no fraud or deception of the Government. A summary comparison of Burke's allegations and the contract bears this out.

Complaint paragraph 11 (Exhibit 1) alleges, incorrectly, that the Government's contract with Record Press provides that the maximum price to be charged for collating, trimming to size and binding briefs and appendices is $14.00 per hundred pages for a 10 copy run. The RFP contract (Exhibit 5) and Record Press' bills (Exhibit 6), show that the price for collating, trimming to size and binding briefs and appendices is $12.25 per 100 pages (or .01225 per page).

The complaint makes another fundamental error in paragraph 12 where it alleges that the RFP cost for binding a 10-copy run of a brief or appendix is $12.50 per hundred pages. (Exhibit 1). The RFP does not provide for a separate binding charge. (Exhibit 5).

Burke has also misstated the RFP in his reference to a 10-copy run. The RPF's reference to "running per 10 copies" (Exhibit 5, p. 14) means that the bid price should be based on printing a minimum of 10 copies of each ordered "book," which provides equality in the bidding process by ensuring that all vendors bid using the same run count, thus making it easier to compare the

4

numbers.  The RFP clearly states what the price is to be for collating, trimming to size and binding (Exhibit 5).

The allegations in Complaint paragraph 13 is further proof of Burke's misstatements. There, Burke erroneously accuses Record Press of violating the RFP, claiming that Record Press bills the Government the binding charge for each copy of each brief or appendix, rather than for a 10-copy run (Exhibit 1).  Again, a 10-copy run refers only to cover and text per page, not the billing for the particular printing job (Exhibits 5 and 6).  Complaint paragraph 15 is also completely wrong, as shown by the Record Press bills (Exhibits 5 and 6).

This Complaint, "based" on a blank contract form and on bills from the GPO, not from Record Press, is an invention.  Because the documents submitted with this motion indisputably undermine and disprove Burke's allegations and there exists no other basis for this action, and there are no disputed material facts, the Complaint should be dismissed, with prejudice and with costs to defendant.

<u>**Conclusion**</u>

For all the foregoing reasons, Defendant Record Press respectfully requests that its motion for summary judgment to dismiss the Complaint be granted in all respects, with costs.

Date:   October 1, 2008                    Respectfully submitted,

                              _____/s/ William T. O'Brien_____
                              John Horan (DC Bar No. 417729)
                              William T. O'Brien (DC Bar No. 450891)
                              MCKENNA LONG & ALDRIDGE LLP
                              1900 K Street, N.W.
                              Washington, D.C.  20006
                              Phone: (202) 496-7500
                              Facsimile: (202) 496-7756

                              Malcolm I. Lewin
                              MORRISON COHEN LLP
                              909 Third Avenue

00000028

New York, New York 10022
(212) 735-8600

*Attorneys for Defendant Record Press, Inc.*

00000029

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES ex rel. | ) | |
| BRIAN BURKE, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | **Civil Action No. 1:08-CV-00364 (EGS)** |
|     v. | ) | |
| | ) | |
| RECORD PRESS, INC., | ) | |
| | ) | |
|     Defendant. | ) | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

In support of its Motion for Summary Judgment, Record Press, Inc. submits the following statement of undisputed material facts:

1.    Record Press, Inc. has for a number of years been a contracting party with the United States Government to produce appellate and related briefs for the United States Attorney's Office in the Southern District of New York. ("U.S. Attorney's Office.) *See* Moving Declaration of Mr. Hugh Wilmot "Wilmot Decl." at ¶ 4. Each year during its contract tenure with the Government, Record Press has been a successful bidder on the Government's request for proposals for such work ("RFP"). (Exhibit 5 to Wilmot Decl.; all references herein to "Exhibit __" are to the exhibits attached to the Wilmot Decl.)

2.    Record Press, Inc. was the successful bidder for Government Printing Office ("GPO") Program 2231-S, for the printing of briefs. The pricing terms for this printing job were contained in the RFP. (Exhibit 5).

3.    The RFP shows that the price for collating, trimming to size and binding briefs, per 100 pages, is $12.25. The "Running Per 10 Copies" caption applies only to the line-items

entitled "Complete cover" and "Text per page", not to collating, trimming to size and binding. (Exhibit 5).

4.    Record Press, Inc. submitted two invoices to GPO for these services. As its invoices show, Record Press charged the GPO exactly in accordance with the terms of the RFP. (Exhibit 6).

5.    Only services that are related to "Complete cover" and "Text per page" are charged at a rate of a 10-copy run.  (Exhibit 5).

6.    Record Press' invoice shows the GPO was charged $1,386.70 for collating, trimming to size and binding at the contract – RFP rate of $12.25 per 100 pages.  (Exhibit 6).

7.    The U.S. Attorney's Office was billed $372.40 for collating, trimming to size and binding for 40 copies of its brief in accordance with the contract – RFP.  (Exhibit 6).


Dated:  October 1, 2008                    Respectfully submitted,


                                           ____/s/ William T. O'Brien_____
                                           John Horan (DC Bar No. 417729)
                                           William T. O'Brien (DC Bar No. 450891)
                                           MCKENNA LONG & ALDRIDGE LLP
                                           1900 K Street, N.W.
                                           Washington, D.C.  20006
                                           Phone: (202) 496-7500
                                           Facsimile: (202) 496-7756

                                           Malcolm I. Lewin
                                           MORRISON COHEN LLP
                                           909 Third Avenue
                                           New York, New York 10022
                                           (212) 735-8600
                                           Attorneys for Defendant
                                           Record Press, Inc.

                                           *Attorneys for Defendant Record Press, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

UNITED STATES OF AMERICA,                    :     Case No. 1:08-CV-00364 (EGS)
Ex rel. BRIAN BURKE,
                                             :

                          Plaintiff,         :          **DEFENDANT'S**
                                                      **DECLARATION IN**
       -against-                             :     **SUPPORT OF ITS MOTION**
                                                       **FOR SUMMARY**
RECORD PRESS, INC.,                          :     **JUDGMENT TO DISMISS**
                                                      **THE COMPLAINT**
                          Defendant.         :

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

       Hugh Wilmot, declares the following to be true under penalties of perjury:

       1.      I am the president of defendant, Record Press, Inc. ("Record Press") and I
have personal knowledge of the facts in this matter.  I respectfully submit this declaration in
support of Record Press' motion for summary judgment to dismiss this complaint (copy attached
as Exhibit 1) on the ground that it fails to state a claim for relief and that Record Press' defenses
are fully supported by incontrovertible documents which this plaintiff was given shortly after he
served Record Press.  Record Press' answer is attached as Exhibit 2.

       2.      Although plaintiff ("Burke") has claimed Record Press overcharged the
Government for appellate printing, Burke did not even have Record Press' bills to the
Government, or Record Press' contract with the Government.  All he had was a blank contract
form and another government document which was incorrect.  Nevertheless, Burke filed his
("verified") complaint based on his unconditional allegations that Record Press' bills were
wrong.  Burke and his lawyers failed to do even a minimal investigation.  If they had, they would

#1404781 v1 \007123 \0013

00000032

have learned (as we recently told them) that Record Press' bills were exactly consistent with its agreement with the Government and were always accepted by the Government as entirely consistent with the Government's agreement with Record Press.

       3.    In 2006, when Burke lost his New York Federal Court *pro se* action against the Commerce Department [1] claiming he was supposed to have been hired permanently as an "enumerator" for the 2000 Census, instead of being hired on a temporary basis, he appealed and he lost again. [2]  Apparently upset at the notion of losing twice, he commenced this purported *qui tam* action (verifying his complaint, alleging it on knowledge, not alleging any part of his complaint on information and belief) based on the wrong documents and on faulty reasoning. The Government, according to the records of this Court, declined to intervene.

       4.    The relevant facts are simple, and documented, and I believe, beyond dispute.  Record Press, for over twenty years, has been a contracting party with the Government to produce Appellate and related briefs for the United States Attorney's Office in the Southern District of New York and in other jurisdictions.  Each year during its contract tenure with the Government, Record Press has been a successful bidder on the Government's requests for proposals for such work ("RFP").  A copy of Record Press' 2006 RFP contract which covers the time period (hence the events) set forth in Burke's complaint, and which is the relevant printing contract between Record Press and the Government, is attached as Exhibit 5.

---

[1]     Attached as Exhibit 3 is the docket sheet in <u>Burke v. Evans</u> (Docket No. 07593/04 (PRC)).
[2]     Attached as Exhibit 4, for background purposes, is a copy of the cover and pages 1-21 from the Government's brief as Defendant-Appellee in the U.S. Court of Appeals, Second Circuit, which sets forth the Government's description of the facts.

#1404781 v1 \007123 \0013

2

5.      When the U.S. Attorney in the Southern District of New York was required to deal with Burke's appeal from that Court's dismissal of Burke's complaint, that U.S. Attorney's office, pursuant to the Government's contract with Record Press, had Record Press print its brief and appendix. Remarkably, Burke sued Record Press without ever seeing these bills, or the actual contract.

6.      Attached as Exhibit 6 are Record Press' two, detailed bills to the Government, in connection with Burke's case, both dated December 12, 2006. The first bill (Invoice #A 71700) is for the Government's brief. The second bill (Invoice #A71701) is for the Government's appendix. These bills are precisely in accord with Record Press' government contract (Exhibit 5) and accepted by the Government as accurate and proper.

7.      Attached as Exhibit 7 is a copy of the U.S. Attorneys' Office "Itemized and Verified Bill of Costs," dated June 21, 2007, as filed in Burke's New York action including the GPO's May 31, 2007 letter setting forth costs for printing, etc., and reflecting a GPO mark up of 7% over what Record Press charged the Government. Exhibit 8 is the Second Circuit Court of Appeals order dated August 2, 2007 denying costs to the Government in Burke's appeal.

8.      Obviously Burke jumped to the incorrect conclusion that the GPO statement on which the U.S. Attorney's office in New York based its bill of costs in Burke's New York case accurately reflected what Record Press charged the Government. Obviously it did not, and Burke, who jumped to the wrong conclusion, never investigated the facts. Therefore, Burke invoked this Court's jurisdiction and has, under penalties of perjury, wrongfully accused my company of a fraud – when he had the wrong facts.

#1404781 v1 \007123 \0013

3

00000034

9.    Because Record Press' bills are precisely in accordance with its contract with the Government and the Government has acknowledged that by paying Record Press, there has been no fraud and no investigation.

## Conclusion

10.    For these reasons, this complaint should be dismissed with prejudice, and defendant's counterclaim severed, with costs to defendant.

Dated: New York, New York
September 29, 2008

Hugh Wilmot

#1404781 v1 \007123 \0013

4

00000035

# Exhibit 1

00000036

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           :
ex rel. BRIAN BURKE, Relator        :     Case No.:
c/o Davis, Cowell & Bowe, LLP       :
1701 K Street NW, Suite 210         :
Washington, DC 20006,               :     **VERIFIED COMPLAINT**

        Plaintiff,        :
                     :     **<u>Filed Under Seal</u>**
                     :     pursuant to 31 U.S.C. § 3730(b)(2)
        v.                :

RECORD PRESS, INC.                  :     **JURY TRIAL DEMANDED**
229 West 36th Street, 8th Floor     :
New York, NY 10018,                 :

        Defendant.        :
                     :

Case: 1:08-cv-00364
Assigned To : Sullivan, Emmet G.
Assign. Date : 2/29/2008
Description: General Civil

Mark Hanna, Esq.
Joni S. Jacobs, Esq.
Keira M. McNett, Esq.
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax:(202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

Attorneys for Relator

## NATURE OF THE ACTION

1.  Qui Tam Relator Brian Burke ("Relator" or "Mr. Burke") brings this action in the name of the United States Government for false claims that were submitted or caused to be submitted to the United States Government by Defendant Record Press, Inc. ("Record Press" or "Defendant").

2.  This case is brought pursuant to the qui tam provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.,* to recover treble damages and civil penalties on behalf of the United States of America, arising from false or fraudulent claims for printing and binding services provided by Record Press to the Government Printing Office ("GPO").

## PARTIES

3.  Relator Brian Burke is a resident of New York. He became aware of Record Press's submission of false or fraudulent claims when the U.S. Attorneys' Office served him with an Itemized and Verified Bill of Costs pursuant to an action in which he was a *pro se* litigant before the U.S. Court of Appeals for the Second Circuit. Upon receiving this bill, which summarized charges to the Government for printing and binding appellate briefs and appendices, Mr. Burke investigated and discovered that Defendant was overcharging the Government nearly 10 times the rate specified by its contract with GPO.

4.  Defendant Record Press is a privately-held New York corporation specializing in printing and production of legal briefs and appendices for submission to state and federal courts. Its annual sales revenue is approximately $4.7 million.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confer jurisdiction to this Court over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

2

00000038

6.  This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because Record Press has submitted and continues to submit bills to the GPO office in this jurisdiction, and acts prohibited by 31 U.S.C. § 3729 occurred in this judicial district.

7.  Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because at least one act proscribed by 31 U.S.C. § 3729 occurred in this district.

8.  In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed under seal and will remain under seal for a period of at least 60 days from its filing date, and shall not be served upon the Defendant until after the Court so orders.

9.  The Court has jurisdiction over this action pursuant to 31 U.S.C. § 3730(e)(4)(A), because, to the extent that there has been a public disclosure of the information upon which the allegations of this Complaint are based, Relator is an original source of this information as defined in 31 U.S.C. § 3730(e)(4)(B). Relator possesses direct and independent knowledge of the information in this Complaint. Relator voluntarily provided the Government with his information prior to filing this action and prior to any amendments thereto, pursuant to 31 U.S.C. § 3730(e)(4).

## FACTS

10. Record Press has a contract with the Government Printing Office ("GPO") ("the GPO contract") whereby it prints and binds appellate briefs and appendices filed by the U.S. Attorneys' Office in all criminal and civil appeals arising out of the U.S. District Court for the Southern District of New York.

11. Record Press obtained its contract with GPO pursuant to a request for proposal (Program 2231-S) that sets forth maximum rates contractors could charge GPO for various printing and document preparation services. Under this program, the maximum price that could be charged for "collating, trimming to size and binding" briefs and appendices is $14.00 per 100 pages for a 10-copy run of the document being prepared.

3

00000039

12. Record Press's contract with GPO incorporated the terms, conditions and specifications set forth in the request for proposal ("RFP"), and sets the cost for binding a 10-copy run of a brief or appendix at $12.50 per 100 pages.

13. In violation of the GPO contract, Record Press has billed and continues to bill the Government the binding charge for each copy of each brief or appendix that it prepares, rather than for a 10-copy run of the document being prepared.

14. Relator discovered Record Press's violation of the GPO contract when he was ordered to pay the U.S. Attorneys' costs for printing the Government's appendix and brief in a *pro se* action he brought against the Secretary of Commerce in the U.S. District Court for the Southern District of New York (Case No. 04-cv-7593).

15. In that action, the U.S. Attorneys' Office filed a bill of costs that itemized the fees Record Press charged for printing the appendix and the brief. Record Press billed the Government $1,483.77 for "collating and trimming" 20 copies of a 566-page appendix. Record Press billed the Government $398.47 for "collating and trimming" 40 copies of a 76-page brief. The high charges for "collating and trimming" listed in the U.S. Attorneys' Itemized and Verified Bill of Costs prompted Mr. Burke to investigate.

16. During his investigation, on July 5, 2007, Relator spoke on the telephone with someone at Record Press who identified himself as "Hugh" and described himself as the contract and billing contact for Record Express. Relator alleges this person was Hugh Wilmot, who is the President of Record Press.

17. During the conversation with Relator, Mr. Wilmot explained that Record Press had been doing business with the Government for 50 years. Relator had subsequent conversations with GPO employees who likewise referred to Record Press as a long-time Government contractor.

18. Mr. Wilmot stated to Relator that the bills Record Press submitted to GPO in Relator's litigation with the Government were in accordance with the GPO contract,

4

00000040

indicating that this was not an isolated incident or mistaken overbilling, but rather, that it was Defendant's standard practice with respect to its Government contracts.

19. Further investigation by the Relator confirmed that Record Press's billing practices violate the GPO contract. For example, Calvin Anderson, Chief of the Commercial Examination Section in the GPO's Office of the Controller's Procurement Accounting Division, confirmed that the binding charge must be billed only for a 10-copy run of the document, not for each copy of the document, as Record Press charged.

20. Although Relator received information from Record Press that this billing scheme is its standard practice with respect to its Government contracts, Relator does not have access to Record Press's contracts. Nor does Relator have access to Record Press's invoices for all jobs performed pursuant to its contract(s) with GPO. These documents are in the possession of the Defendant.

21. By charging GPO $12.50 per 100 pages for each brief bound, in violation of its contract with the Government, which clearly specifies that binding charges are per 10 copies, Record Press intentionally and knowingly overcharged the Government.

22. In Relator's litigation alone, Record Press overbilled the Government approximately $1,700.00, nearly ten times the amount it was authorized to charge under the GPO contract.

23. In the RFP for the one-year Record Press contract, GPO specifies that it expects to require approximately 300 orders of briefs, with an average of 40 copies of an average 40-page brief per order. The RFP specifies an estimated 150 orders of appendices, with an average of 20 copies per order of appendices ranging from 8 to 1,334 pages each.

24. Based on Mr. Wilmot's statements that it is Record Press's practice to charge the Government on a per-copy basis for binding, and applying this overcharge to GPO's estimated requirements in the RFP, Record Press overcharged the Government more than $280,000.00 in one contract year. Because Record Press is a long-time GPO

5

00000041

contractor, the total overbilling is likely many times greater than the one-year estimate.

## COUNT I
### (False Claims Act - Presentation of False Claims)
### [31 U.S.C. § 3729(a)(1)]

25.  Relator incorporates by reference Paragraphs 1 through 24 of the Complaint as though set forth herein in full.

26.  As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant Record Press has knowingly presented or caused to be presented to officers or employees of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

## COUNT II
### (False Claims Act: Making or Using False
### Record or Statement to Cause Claim to be Paid)
### [31 U.S.C. § 3729(a)(2)]

27.  Relator incorporates by reference Paragraphs 1 through 26 of the Complaint as though set forth herein in full.

28.  As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged, Defendant Record Press knowingly made, used, or caused to be made or used false or fraudulent records or statements, to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Relator Brian Burke requests that judgment be entered against Defendant Record Press ordering that:

1.  Defendant cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

6

00000042

2. Defendant pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendant's actions;

3. Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

4. Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

5. Defendant be enjoined from concealing, removing, encumbering or disposing of assets that may be required to pay the civil monetary penalties imposed by the Court;

6. Defendant disgorge all sums by which it has been enriched unjustly by its wrongful conduct; and

7. The United States and Relator recover such other relief as the Court deems just and proper.

Respectfully submitted,

*Keira M. McNett*

Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
Keira M. McNett (DC Bar 482199)
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

7

00000043

## REQUEST FOR TRIAL BY JURY

Relator hereby demands a trial by jury.

Respectfully submitted,

Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
Keira M. McNett (DC Bar 482199)
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

8

00000044

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of February, 2008, I caused a true and correct copy of the preceding to be served via first-class mail, postage pre-paid, upon the following:

Michael B. Mukasey
Attorney General of the United States
c/o Joyce R. Branda
United States Department of Justice
Patrick Henry Building
601 D Street, NW, Room 9902
Washington, DC 20004
Telephone: (202) 307-0231

Jeffrey A. Taylor
United States Attorney
c/o Keith V. Morgan
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530
Telephone: (202) 514-7566

*Keira McNett*

Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
Keira M. McNett (DC Bar 482199)
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

9

00000045

## RELATOR'S VERIFICATION

The undersigned, being duly sworn, deposes and says that I, Brian Burke, am the Plaintiff/Relator herein, and I have read the foregoing pleading to be filed on my behalf. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true facts as stated herein.

Dated: _____

_____
Brian Burke

Subscribed and sworn before me this _____ day of _____, 2008.

_____
Notary Public

**ARTHUR GREEBLER**
Notary Public, State of New York
No. 01GR4713317
Qualified in Queens County
Commission Expires October 31, 2010

00000046

# EXHIBIT 2

00000047

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>Ex rel. BRIAN BURKE, | Case No. 1:08-CV-00364 (EGS) |
| Plaintiff, | **ANSWER TO<br>PLAINTIFF'S VERIFIED<br>COMPLAINT** |
| -against- | |
| RECORD PRESS, INC., | |
| Defendant. | |

Defendant Record Press, Inc. ("Record Press"), by and through undersigned counsel, files this Answer to the Verified Complaint ("Complaint") by Plaintiff Brian Burke ("Burke") and states as follows:

1.    Defendant denies the allegations in paragraph 1 of the Complaint, but admits that Plaintiff alleges and purports to bring this action in the name of the United States Government.

2.    Defendant denies the allegations in paragraph 2 of the Complaint, but admits that Plaintiff alleges and purports to bring this action pursuant to the Federal False Claims Act and seeks treble damages and civil penalties.

3.    Defendant denies it submitted false or fraudulent claims and denies knowledge or information sufficient to form a belief as to the truth of the allegations in the balance of paragraph 3 of the Complaint.

4.    Defendant denies the allegations in paragraph 4 of the Complaint but admits defendant is a privately held corporation located in New York and is a printer for Court matters.

5.      Defendant denies the allegations in paragraph 5 of the Complaint and respectfully refers all questions of law to the Court, but admits that Plaintiff alleges that jurisdiction is proper under the cited statutes.

6.      Defendant denies the allegations in paragraph 6 of the Complaint, but admits that Plaintiff alleges that jurisdiction is proper under the cited statutes.

7.      Defendant denies the allegations in paragraph 7 of the Complaint, but admits that Plaintiff alleges that venue is proper under the cited statutes.

8.      Defendant denies knowledge or information as to the allegations in paragraph 8 that Plaintiff purportedly filed the Complaint under seal and that the Complaint had been under seal for at least 60 days and was not served until the Court so ordered.

9.      Defendant denies the allegations in paragraph 9 of the Complaint, but admits that Plaintiff alleges that jurisdiction is proper under the cited statutes.

10.     Defendant denies the allegations in paragraph 10 of the Complaint, but admits it has a contract with the U.S. Government Printing Office ("GPO") for the printing and binding of appellate briefs and appendices filed by the United States Attorney's Office for the Southern District of New York ("Contract").

11.     Defendant denies the allegations in paragraph 11 of the Complaint, but admits that it submitted a bid in response to the GPO's Request For Proposal ("RFP").

12.     Defendant denies the allegations in paragraph 12 of the Complaint, but admits that its Contract with the GPO incorporated the terms, conditions, and specifications of the RFP.

00000049

13.    Defendant denies the allegations in paragraph 13 of the Complaint, but admits that it has billed the GPO in accordance with the terms of the Contract.

14.    Defendant denies the allegations in paragraph 14 of the Complaint.

15.    Defendant denies the allegations in paragraph 15 of the Complaint, but admits that it billed the GPO for printing and binding services provided in the action entitled *Brian T. Burke v. Donald L. Evans* (Docket No. 06-1917-cv) in the United States Court of Appeals for the Second Circuit.

16.    Defendant denies the allegations in paragraph 16 of the Complaint, but admits that Hugh Wilmot of Record Press spoke on the telephone with Plaintiff.

17.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint, but admits that Hugh Wilmot of Record Press spoke on the telephone with Plaintiff.

18.    Defendant denies the allegations in paragraph 18 of the Complaint, but admits that Hugh Wilmot of Record Press spoke on the telephone with the Plaintiff.

19.    Defendant denies the allegations pertaining to Defendant's purported violation of the "GPO contract" in paragraph 19 of the Complaint, and denies knowledge or information sufficient to form a belief as to the truth of the other allegations in the same paragraph.

20.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint, but admits that it is in possession of its invoices to and contract with the GPO.

3

00000050

21.     Defendant denies the allegations in paragraph 21 of the Complaint.

22.     Defendant denies the allegations in paragraph 22 of the Complaint.

23.     Defendant denies the allegations in paragraph 23 of the Complaint and respectfully refers the Court to the RFP for its true, complete and accurate contents.

24.     Defendant denies the allegations in paragraph 24 of the Complaint, but admits that it is a contractor of the GPO.

**ANSWERING COUNT I**

25.     Defendant incorporates its responses to paragraphs 1 through 24 of the Complaint as if the same were fully set forth herein.

26.     Defendant denies the allegations in paragraph 26 of the Complaint, and respectfully refers all questions of law to the Court.

**ANSWERING COUNT II**

27.     Defendant incorporates its responses to paragraphs 1 through 26 of the Complaint as if the same were fully set forth herein.

28.     Defendant denies the allegations in paragraph 27 of the Complaint, and respectfully refers all questions of law to the Court.

4

00000051

**Affirmative Defenses**

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because all or some of Plaintiff's claims against Defendant are barred by the applicable statute of limitations.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action due to improper and/or inconvenient venue.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because Plaintiff has unclean hands as a result of his acts and omissions in the matters referenced in and related to the Complaint.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because Plaintiff made fraudulent misrepresentations and/or omissions regarding the matters referenced in and related to the Complaint.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because Plaintiff lacks standing.

5

00000052

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred because it fails to state a claim upon which relief can be granted.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because this action is based upon a public disclosure and Plaintiff is not the original source.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because some or all of Plaintiff's claims are barred by estoppel.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because some or all of Plaintiff's claims are barred by laches.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because some or all of Plaintiff's claims are barred by the Government's knowledge. *See, e.g., United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002).

Defendant reserves the right to assert additional affirmative defenses in this action.

Wherefore, Defendant denies all allegations in the Complaint that are not specifically admitted herein, and denies that Plaintiff is entitled to any relief whatsoever.  Defendant

6

00000053

respectfully prays that the Complaint be dismissed with prejudice; that Defendant be awarded its

reasonable attorneys' fees and costs; and for such other and further relief as the Court deems

appropriate.

## COUNTERCLAIMS

Defendant Record Press, by and through its undersigned counsel, brings the following

Counterclaims and allege as follows:

1.      The counterclaims herein are asserted by Defendant against Plaintiff Brian Burke.

2.      Jurisdiction over the counterclaims is proper in this Court under 28 U.S.C. § 1367

and venue is proper under 28 U.S.C. § 1391.

## COUNT I
## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE

3.      Defendant incorporates by reference the foregoing paragraphs of its

Counterclaims as if the same were fully set forth herein.

4.      Defendant had and has a business relationship with the GPO, exemplified by

Defendant's Contract with the GPO.  Based on that relationship, including the fact that the GPO

awarded Defendant the Contract, there was a probability and expectancy of future economic

benefit to Defendant in the form of continued expanding business with the GPO.

5.      Plaintiff knew of Defendant's relationship with GPO and its expectancy of

continued expansion of business with GPO.

7

6.     Plaintiff contacted the GPO and other government agencies and falsely accused Defendant of improprieties for the purpose of harming Defendant and seeking to injure and/or end Defendant's business relationship with the GPO.

7.     As such, Defendant has been damaged by Plaintiff's willful, wanton, and intentional interference, by improper methods, with its prospective economic advantage.

WHEREFORE, Defendant seeks compensatory and punitive damages in an amount to be proved at trial.

8

00000055

Dated:    Washington, D.C.
          July 28, 2008

                          Respectfully submitted,

                          McKenna Long & Aldridge LLP


                          By: /s/ William T. O'Brien
                              Jack Horan (DC Bar No. 417729)
                              William O'Brien (DC Bar No. 450891)
                              1900 K Street, NW
                              Washington, D.C.  20006
                              (202) 496-7500


                          and

                          Of Counsel:

                          Malcolm I. Lewin
                          Morrison Cohen LLP
                          909 Third Avenue
                          New York, New York 10022
                          (212) 735-8600
                          *Attorneys for Defendant*
                            *Record Press, Inc.*

9

00000056

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2008, I served the foregoing Answer to Plaintiff's

Verified Complaint via first class mail, postage prepaid on:

> Mark Hanna, Esq.
> Keira M. McNett, Esq.
> Joni S. Jacobs, Esq.
> DAVIS COWELL & BOWE LLP
> 1701 K Street, N.W., Suite 210
> Washington, D.C. 20006

> Darrell C. Valdez, Esq.
> U.S. Attorney's Office
> Judiciary Center Building
> 555 Fourth Street, N.W.
> Washington, D.C. 20530

and via the Court's Electronic Case Filing System ("ECF").

/s/ William T. O'Brien
William T. O'Brien

00000057

# Exhibit 3

00000058

CLOSED

# U.S. District Court
# United States District Court for the Southern District of New York (Foley Square)
# CIVIL DOCKET FOR CASE #: 1:04-cv-07593-PKC

Burke v. Evans et al
Assigned to: Judge P. Kevin Castel
Case in other court: U.S.C.A. 2nd Circuit, 06-01917
Cause: 42:2000e Job Discrimination (Employment)

Date Filed: 09/24/2004
Date Terminated: 01/17/2006
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Brian T. Burke**                    represented by    **Brian T. Burke**
                                                        145 East 23 St.
                                                        #4-R
                                                        New York, NY 10010
                                                        PRO SE

V.

**Defendant**

**Donald L. Evans**                   represented by    **Kristin Lynn Vassallo**
*Secretary*                                             U.S. Attorney's Office, SDNY (Chambers
                                                        Street)
                                                        86 Chambers Street
                                                        New York, NY 10007
                                                        (212)-637-2822
                                                        Fax: (212)-637-2730
                                                        Email: kristin.vassallo@usdoj.gov
                                                        *LEAD ATTORNEY*

**Defendant**

**United States of Commerce**         represented by    **Kristin Lynn Vassallo**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 09/24/2004 | 1 | COMPLAINT against Donald L. Evans, United States of Commerce. (Filing Fee $ 150.00, Receipt Number 520560)Document filed by Brian T. Burke.(laq, ) (Entered: 09/27/2004) |
| 09/24/2004 |   | SUMMONS ISSUED as to Donald L. Evans, United States of Commerce. (laq, ) (Entered: 09/27/2004) |

8

7/23/2008 12:15 PM

00000059

| | | |
|---|---|---|
| 09/24/2004 | | Magistrate Judge Andrew J. Peck is so designated. (laq, ) (Entered: 09/27/2004) |
| 10/18/2004 | 2 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for general pretrial. Referred to Magistrate Judge Andrew J. Peck. (Signed by Judge P. Kevin Castel on 10/14/04) (dg, ) (Entered: 10/21/2004) |
| 10/19/2004 | 3 | ORDER TO PRO SE PLAINTIFF TO SERVE COMPLAINT, plntf must make arrangements to have the summons and complaint promptly serve on all defts. Plntf must provide a copy of this Order (and the enclosed Rules) to deft's counsel either along with the summons and complaint or once counsel has appeared for deft. If service is not made upon the deft(s) by 1/24/05 (which is 120 days from filing of this complaint), I will recommend to Judge Castel that the action be dismissed, as further set forth in this document. (Signed by Judge Andrew J. Peck on 10/18/04) copies sent by chambers(cd, ) (Entered: 10/22/2004) |
| 11/04/2004 | 4 | SUMMONS RETURNED EXECUTED Summons and Complaint served. Donald L. Evans served on 11/1/2004, answer due 11/22/2004; United States of Commerce served on 11/1/2004, answer due 11/22/2004. Service was accepted by Julia Nuniz. Document filed by Brian T. Burke. (db, ) (Entered: 11/08/2004) |
| 11/12/2004 | 5 | ORDER RE SCHEDULING AND INITIAL PRETRIAL CONFERENCE:... If such a consent order is not filed within the time provided,... Initial Conference set for 11/19/2004 09:30 AM before Magistrate Judge Andrew J. Peck. (Signed by Judge Andrew J. Peck on 11/9/2004) copies faxed by chambers.(jsa, ) (Entered: 11/12/2004) |
| 11/19/2004 | | Minute Entry for proceedings held before Judge Andrew J. Peck: Initial Pretrial Conference held on 11/19/2004. Gov't answer due 1/5/05. Discovery due 3/31/05 (expert reports 3/1/05), mandatory disclosure due 1/14/05, Summary Judgment notice due 4/4/05, Summary Judgment motion or PTO due 4/22/05. Next status conference set for 1/18/05 at 9:30 a.m. (db, ) (Entered: 01/05/2005) |
| 11/23/2004 | 6 | Rule 16 Initial pretrial conference order; The government's answer is due January 5, 2005. All fact and expert discovery must be completed by 03/31/05. Expert reports must be served by 03/01/05. Mandatory disclosure purs to Rule 26(a), FRCP is due by 01/14/05; Each party will notify the Court by April 4, 2005 as to whether it intends to move for summary judgment. Summary judgment motions must be filed by 04/22/05; Parties are to submit a joint proposed pretrial order, in conformance with the FRCP, the Local Rules of this Court and the chamber rules of the District Judge to whom this case is assigned, by April 22, 2005, if neither party is moving for summary judgment, or 30 days after decision on the summary judgment motion. The case will be considered trial ready on 24-hours notice after the pretrial order has been submitted. A status conference will be held before the undersigned on January 18, 2005 at 9:30 a.m. in Courtromm 20D (500 Pearl Street). (Signed by Judge Andrew J. Peck on 11/22/04) copies forwarded by Chambers.(djc, ) (Entered: 11/24/2004) |
| 11/23/2004 | | Set Deadlines/Hearings: Donald L. Evans answer due 1/5/2005; United States of Commerce answer due 1/5/2005. Discovery due by 3/31/2005. Motions due by 4/22/2005. Status Conference set for 1/18/2005 09:30 AM before P. Kevin Castel. (djc, ) (Entered: 11/24/2004) |
| 12/22/2004 | | Set Deadlines/Hearings: Discovery due by 3/31/2005. Motions due by 4/22/2005. Pretrial Order due by 4/22/2005. Status Conference set for 1/18/2005 09:30 AM before Magistrate Judge Andrew J. Peck. (db, ) (Entered: 12/28/2004) |

| 01/03/2005 | 8 | ANSWER to Complaint. Document filed by Donald L. Evans, United States of Commerce.(dle, ) (Entered: 01/06/2005) |
| 01/06/2005 | 7 | TRANSCRIPT of proceedings held on 11/19/04 before Mag. Judge Andrew J. Peck. (es, ) (Entered: 01/06/2005) |
| 01/18/2005 | | MEMORANDUM TO THE DOCKET CLERK: Status conference held January 18, 2005. Next status conference scheduled for March 1, 2005 at 9:30 a.m. (rw, ) (Entered: 03/01/2005) |
| 01/19/2005 | 9 | ORDER: Status Conference set for 3/1/2005 at 09:30 AM before Magistrate Judge Andrew J. Peck in ctrm 20D (500 Pearl Street). (Signed by Judge Andrew J. Peck on 1/18/05) Copies Mailed By Chambers.(kw, ) (Entered: 01/25/2005) |
| 01/19/2005 | 10 | CONFIDENTIALITY ORDER: regarding procedures that will govern the handling of ?Confidential Information?. (Signed by Judge Andrew J. Peck on 1/18/05) Copies Faxed By Chambers.(kw, ) (Entered: 01/25/2005) |
| 01/19/2005 | 11 | PRIVACY ACT ORDER: any objection to the production and use of such documents and information on the ground that they are protected by the Privacy Act is overruled. This Order is without prejudice to any other objections the parties may have to producing or using such documents and information. (Signed by Judge Andrew J. Peck on 1/18/05) Copies Faxed By Chambers.(kw, ) (Entered: 01/25/2005) |
| 02/14/2005 | 12 | ENDORSED LETTER addressed to Magistrate Judge Andrew J. Peck from Kristin L. Vassallo dated 2/14/05 re: the deposition of former Secretary Evans is QUASHED (subject to reconsideration if plaintiff Burke can show good cause for the deposition). (Signed by Judge Andrew J. Peck on 2/14/05) Copies Faxed by Chambers.(db, ) (Entered: 02/16/2005) |
| 02/14/2005 | 13 | ENDORSED LETTER addressed to Magistrate Judge Andrew J. Peck from Brian T. Burke dated 2/11/05 re: the Court agrees that in cases where plaintiff's claim for emotional distress is, as the cases call it, "plain vanilla", there will not be discovery of medical/psychological records. The Court accepts plaintiff's represention of no mental health treatment and limits plaintiff's proof at trial to plain vanilla emotional distress. However, because plaintiff also claims disability (visual accuity), he must produce (or provide releases for) all medical records re: his vision/visual accuity. (Signed by Judge Andrew J. Peck on 2/14/05) (db, ) (Entered: 02/17/2005) |
| 02/15/2005 | 14 | ENDORSED LETTER addressed to Magistrate Judge Peck from Brian T. Burke dated 2/14/2005 re: requests abjuration of request for all employment records. The request is denied. (Signed by Judge Andrew J. Peck on 2/14/2005) copies faxed by Chambers.(jsa, ) (Entered: 02/17/2005) |
| 02/16/2005 | 15 | ENDORSED LETTER addressed to Maqgistrate Judge Andrew J. Peck from Brian T. Burke dated 2/16/05 re: treating this as a request for reconsideration, it is DENIED. While it is true Evans is former head of the agency, there is no allegation he has unique or personal information not available from lower level supervisor. (Signed by Judge Andrew J. Peck on 2/16/05) Copies Faxed by Chambers.(db, ) (Entered: 02/22/2005) |
| 02/16/2005 | 16 | ENDORSED LETTER addressed to Magistrate Judge Andrew J. Peck from Kristin L. Vassallo dated 2/15/05 re: if plaintiff Burke does not properly respond to the outstanding interrogatories, etc. and do Rule 26(a) mandatory disclosure, before his deposition, then the defendant will be allowed a 2nd day of deposition if necessary. |

8

| | | |
|---|---|---|
| | | Other sanctions also may apply for failure to do Rule 26(a) mandatory disclosures - including precluding plaintiff from producing any witnesses except himself, etc. Ms. Vassallo is to FedEx this Order to Mr. Burke. (Signed by Judge Andrew J. Peck on 2/16/05) Copies Faxed by Chambers.(db, ) (Entered: 02/22/2005) |
| 02/22/2005 | 18 | MOTION to Compel Attendance at Deposition and to Quash Deposition Subpoena. Document filed by Brian T. Burke. (cd, ) (Entered: 03/02/2005) |
| 02/23/2005 | 17 | TRANSCRIPT of proceedings held on January 18, 2005, 9:30 a.m. before Judge Andrew J. Peck. (dt, ) (Entered: 02/23/2005) |
| 02/24/2005 | 19 | ORDER terminating 18 Motion to Compel; The court adheres to its prior rulings quashing the deposition of former Secretary Evans. If plaintiff wants to depose the Dept. of Commerce, he can seek the deposition of the Dep't pursuant to Rule 30(b)96) or he can depose a more "junior" supervisor; plaintiff's deposition shall go forward. The motion to quash as to it is denied . (Signed by Judge Andrew J. Peck on 2/23/05) (dle, ) (Entered: 03/02/2005) |
| 03/01/2005 | | Minute Entry for proceedings held before Judge Andrew J. Peck : Status Conference held on 3/1/2005. Next status conference set for 3/18/05 at 9:30 a.m. (db, ) (Entered: 03/03/2005) |
| 03/02/2005 | 20 | NOTICE of appeal to District Court Judge. Document filed by Brian T. Burke. (kw, ) (Entered: 03/09/2005) |
| 03/11/2005 | 23 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court for an order purs. to FRCP 33 & 34 & LCR 26.3 & 33.3 of USDC for the Southern District, compelling attendance of Carlos M. Gutierrez Sec. of Commerce & Charles L. Kincannon Director Bureau of Census, and/or upholding objections to defts. interrogatory on pltff.. Document filed by Brian T. Burke. Copies of Appeal of Magistrate Judge Decision to District Court mailed to Attorney(s) of Record: Kristin L. Vassallo, AUSA. (pr, ) (Entered: 03/22/2005) |
| 03/16/2005 | 21 | LETTER addressed to Judge Castel from AUSA Kristin L. Vassallo dated 3/15/2005 re: Response to plaintiff's motion, dated March 11, 2005, which seeks review of an oral decision of Magistrate Judge Peck. Document filed by Donald L. Evans, United States of Commerce.(D'Agostino, Andrew) (Entered: 03/16/2005) |
| 03/17/2005 | 22 | ENDORSED LETTER addressed to Magistrate Judge Peck from Kristin L. Vassallo dated 3/16/2005 re: Plaintiff Burke is to reimburse the Gov't $125.00 for the missed deposition reporter's fee by 3/22/2005. Burke is to appear at defense counsel's office on 3/22/2005 at 10:00am for his deposition. If he fails to appear, his case will be dismissed, and or monetary or other sanctions will be impmosed. Any other issues will be resolved at the 3/18/2005 conference. Copy faxed to counsel for defendant and mailed regular and certified mail to Brian T. Burke by chambers. (Signed by Judge Andrew J. Peck on 3/17/2005) (jsa, ) (Entered: 03/21/2005) |
| 03/18/2005 | | Minute Entry for proceedings held before Judge Andrew J. Peck : Status Conference held on 3/18/2005. Parties to contact if any discovery disputes. (db, ) (Entered: 03/25/2005) |
| 03/22/2005 | | Copy of Notice of Appeal to District Court Judge Ommibus Motion. Document filed by Brian T. Burke. (pr, ) (Entered: 03/22/2005) |

00000062

| 03/24/2005 | | MEMO ENDORSEMENT on re: 20 Notice (Other) filed by Brian T. Burke. I decline to set aside or modify the Order of February 23, 2005. I have examined Judge Peck's Order and the papers on which it was based. I agree that plaintiff has not given an adequate basis to examine former Secretary Evans There is no showing that he has any personal knowledge of the basis for plaintiff's claims or that another individual's testimony would not adequately suffice. The order is neither clearly erroneous nor contrary to law Rule 72(a) Fed.R.Civ.P. So Ordered. (Signed by Judge P. Kevin Castel on 3/22/2005) Copies Mailed by chambers. (D'Agostino, Andrew) (Entered: 03/24/2005) |
|---|---|---|
| 03/24/2005 | 24 | MEMO ENDORSEMENT in re: 23 Appeal of Magistrate Judge Decision to District Court, filed by Brian T. Burke, I decline to modify Magistrate Judge Peck's rulings regarding the depositions of Secretary Gutierrez and Director Kincannon and overuling the plaintiff's objection to defendant's interrogatories and document requests. Plaintiff has not demonstrated an adequate need for the depositions of those government officials. The interrogatories and dockets requests are reasonable. The Magistrate Judge's Rulings are neither clearly erroneous nor contrary to law. (Signed by Judge P. Kevin Castel on 3/22/2005) Copies Mailed by chambers. (D'Agostino, Andrew) (Entered: 03/24/2005) |
| 03/28/2005 | 25 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court from 24 Memo Endorsement. Document filed by Brian T. Burke. Copies of Appeal of Magistrate Judge Decision to District Court mailed to Attorney(s) of Record: Kristin L. Vassallo. Affidavit of Brian T. Burke along with Exhibit and Affirmation of service are attached. (tp, ) (Entered: 03/30/2005) |
| 03/28/2005 | 26 | MOTION for Extension of Time to Complete Discovery in the Interest of Justice. Document filed by Brian T. Burke. Return Date set for 4/6/2005 09:30 AM. (jmi, ) (Entered: 04/01/2005) |
| 03/29/2005 | 28 | MOTION to Compel Deposition & Extend Discovery. Document filed by Brian T. Burke. Return Date set for 4/6/2005 09:30 AM. (jco, ) (Entered: 04/06/2005) |
| 03/30/2005 | 27 | MEMO ENDORSEMENT on (COURTESY COPY)Motions terminated: 26 MOTION for Extension of Time to Complete Discovery filed by Brian T. Burke. Discovery due by 4/15/2005. Summary Motions due by 4/29/2005. No further extensions are likely. (Signed by Judge Andrew J. Peck on 3/29/05) (sac, ) (Entered: 04/06/2005) |
| 04/04/2005 | 29 | ORDER denying 28 Motion to Compel Request to again extend discovery is denied. The Court has extended it to 4/15/2005. Plaintiff may not depose defense counsel. Defense counsel has represented that they are working out the 30 (b)(6) depo if it is amicably resolved, plaintiff may renew the application.Copies faxed by chambers to Kristin Vassallo and mailed to Brian T. Burke regular and certified by chambers.. (Signed by Judge Andrew J. Peck on 3/31/2005) (jsa, ) Modified on 4/6/2005 (jsa, ). (Entered: 04/06/2005) |
| 04/04/2005 | 31 | LETTER addressed to Chief Magistrate Judge Andrew J. Peck from Kristin L. Vassallo dated 3/30/05 re: Reponse to Plaintiff's Motion, dated March 29, 2005, which seeks an order (1) compelling the Dept. of Commerce to appear at a deposition on April 6, 2005; and (2) extending teh discovery period in this action. Document filed by Donald L. Evans, United States of Commerce.(ps, ) (Entered: 04/08/2005) |
| 04/07/2005 | 30 | TRANSCRIPT of proceedings held on 3/1/05 before Judge Andrew J. Peck. (lma, ) (Entered: 04/07/2005) |

7/23/2008 12:15 PM

00000063

| 04/15/2005 | 32 | ENDORSED LETTER addressed to Judge Peck from Kristin L. Vassallo dated 4/14/05 re: Government's intention to move for summary judgment, request for a 2 week extension of time in which to do so and an extension for discovery. The Court will not further extend the discovery deadline. SJ motion extended to 5/13/2005 - no further extensions. To be fair to plaintiff Burke, his time to file opposition papers is 6/3/2005, and the gov't's reply is due 6/3/2005 (Signed by Judge Andrew J. Peck on 4/14/05) Copies sent by Chambers.(yv, ) (Entered: 04/19/2005) |
|---|---|---|
| 05/04/2005 | 33 | ENDORSED LETTER addressed to Judge Andrew J. Peck from Kristin L. Vassallo dated 5/3/05 re: Counsel for the Government writes to request permission to submit a summary judgment brief in excess of the 25-page limitation. The motion will be before Judge Castel, and your will need to address this request to him. So Ordered. (Signed by Judge Andrew J. Peck on 5/3/05) (jco, ) (Entered: 05/05/2005) |
| 05/06/2005 | 34 | ENDORSED LETTER addressed to Judge Castel from AUSA Kristin L. Vassallo dated 5/5/2005 re: Requesting an additional fifteen pages in order to brief its motion for summary judgment. Application for 40 pages is granted. Plaintiff may have 40 pages in response and defendant may have 25 pages in reply. (Signed by Judge P. Kevin Castel on 5/5/2005) Copies mailed by Chambers.(D'Agostino, Andrew) (Entered: 05/06/2005) |
| 05/13/2005 | 35 | NOTICE of to Pro Se Litigant Opposing Motion for Summary Judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 36 | RULE 56.1 STATEMENT. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 37 | DECLARATION of David Brown in Support of the Government's Motion for summary judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 38 | DECLARATION of Patricia Valle in Support of the Government's motion for summary judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 39 | MEMORANDUM OF LAW in Support of defendants' motion for summary judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 40 | DECLARATION of Kristin L. Vassallo to provide documents to the Court in connection with the defendants' motion for summary judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 49 | MOTION for Summary Judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 04/24/2006) |
| 05/17/2005 | | CASE NO LONGER REFERRED to Magistrate Judge Andrew J. Peck. Reason: Discovery closed - summary judgment motion pending. (rag, ) (Entered: 05/19/2005) |
| 05/25/2005 | 41 | TRANSCRIPT of proceedings held on 03/18/05 before Judge Andrew J. Peck. (es, ) (Entered: 05/25/2005) |
| 06/06/2005 | 42 | CROSS MOTION for Summary Judgment purs. to Rule 56 of FRCP. Document filed by Brian T. Burke. Return Date set for 6/16/2005 09:30 AM. (ae, ) (Entered: 06/09/2005) |
| 06/10/2005 | 44 | SUPPLEMENTAL DECLARATION of Kristin L. Vassallo. Document filed by Donald L. Evans, United States of Commerce. (jmi, ) (Entered: 06/15/2005) |

00000064

| 06/15/2005 | 43 | REPLY MEMORANDUM OF LAW in Support re: 42 MOTION for Summary Judgment.. Document filed by Donald L. Evans, United States of Commerce. (jmi, ) (Entered: 06/15/2005) |
|---|---|---|
| 01/12/2006 | 45 | ORDER; for the reasons set forth in this order, defendant's motion for summary judgment is GRANTED. The Clerk is directed to enter judgment in favor of defendants on all claims. (Signed by Judge P. Kevin Castel on 1/12/06) (kco, ) (Entered: 01/12/2006) |
| 01/12/2006 | | Transmission to Judgments and Orders Clerk. Transmitted re: 45 Order, to the Judgments and Orders Clerk. (kco, ) (Entered: 01/12/2006) |
| 01/17/2006 | 46 | CLERK'S JUDGMENT in favor of defendants as against plaintiff, granting defendants' motion for summary judgment, dismissing the complaint and closing the case. (Signed by J. Michael McMahon, Clerk on 1/13/06) (jf, ) (Entered: 01/17/2006) |
| 01/19/2006 | | Mailed notice of Right to Appeal re: 46 Clerk's Judgment to Pro Se Litigant(s): Brian T. Burke and to Attorney(s) of Record: Kristin Lynn Vassallo. (lma, ) (Entered: 01/19/2006) |
| 03/16/2006 | 47 | NOTICE OF APPEAL from 46 Clerk's Judgment. Document filed by Brian T. Burke. Filing fee $ 255.00, receipt number E 573169. Copies of Notice of Appeal mailed to Attorney(s) of Record: A.U.S.A. (tp, ) (Entered: 04/19/2006) |
| 04/19/2006 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 47 Notice of Appeal. (tp, ) (Entered: 04/19/2006) |
| 04/19/2006 | | Transmission of Notice of Appeal to the District Judge re: 47 Notice of Appeal. (tp, ) (Entered: 04/19/2006) |
| 04/20/2006 | 48 | Appeal Record Sent to USCA (Index). Notice that the Original index to the record on Appeal for 47 Notice of Appeal filed by Brian T. Burke, 3 Copies of the index, Certified Clerk Certificate and Certified Docket Sheet were transmitted to the U.S. Court of Appeals. (tp, ) (Entered: 04/20/2006) |
| 04/20/2006 | | Appeal Record Sent to USCA (File). Indexed record on Appeal Files for 47 Notice of Appeal filed by Brian T. Burke, were transmitted to the U.S. Court of Appeals on 4/21/06. (tp, ) (Entered: 04/20/2006) |
| 05/05/2006 | | USCA Case Number 06-1917 from the U.S.C.A. 2nd Circuit assigned to 47 Notice of Appeal filed by Brian T. Burke. (tp, ) (Entered: 05/22/2006) |
| 10/15/2007 | 50 | MANDATE of USCA (Certified Copy) as to 47 Notice of Appeal filed by Brian T. Burke USCA Case Number 06-1917-cv. Ordered, Adjudged and Decreed that the judgment of the District Court is AFFIRMED. Catherine O'Hagan Wolfe, Clerk USCA. Issued As Mandate: 10/10/2007. (nd) (Entered: 10/15/2007) |
| 10/15/2007 | | Transmission of USCA Mandate/Order to the District Judge re: 50 USCA Mandate,. (nd) (Entered: 10/15/2007) |
| 11/19/2007 | | Appeal Record Returned. Indexed record on Appeal Files for 25 Appeal of Magistrate Judge Decision to District Court, filed by Brian T. Burke, Appeal Record Sent to USCA - File, Transmission of USCA Mandate/Order to District Judge, 23 Appeal of Magistrate Judge Decision to District Court, filed by Brian T. Burke, 50 USCA Mandate, USCA Case Number 06-1917, returned from the U.S. Court of Appeals. (tp) (Entered: 12/05/2007) |

00000065

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/23/2008 12:11:28 | | |
| PACER Login: | rp0118 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:04-cv-07593-PKC |
| Billable Pages: | 6 | Cost: | 0.48 |

`8`

7/23/2008 12:15 PM

00000066

# EXHIBIT  4

00000067

# 06-1917-cv

*To Be Argued By*:
KRISTIN L. VASSALLO

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 06-1917-cv

BRIAN T. BURKE,

*Plaintiff-Appellant*,

—v.—

DONALD L. EVANS, SECRETARY,
UNITED STATES DEPARTMENT OF COMMERCE,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

MICHAEL J. GARCIA,
*United States Attorney for the
Southern District of New York,
Attorney for Defendants-Appellees.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2822

KRISTIN L. VASSALLO,
SARAH S. NORMAND,
  *Assistant United States Attorneys,
    Of Counsel.*

00000068

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 06-1917-cv

---

BRIAN T. BURKE,

Plaintiff-Appellant,

– v. –

DONALD L. EVANS, SECRETARY,[*]
UNITED STATES DEPARTMENT OF COMMERCE,

Defendants-Appellees.

---

**BRIEF FOR DEFENDANTS-APPELLEES**

---

## Preliminary Statement

Brian T. Burke ("plaintiff") appeals pro se from a judgment of the United States District Court for the Southern District of New York (Hon. P. Kevin Castel, J.) entered on January 17, 2006, granting summary judgment in favor of defendants Carlos Gutierrez and the United States Department of Commerce (collectively, "defendants" or the "Government") and dismissing plaintiff's

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Carlos M. Gutierrez, who succeeded Donald Evans as the Secretary of Commerce, should be substituted as defendant-appellee in this case.

complaint.  (DA 560).*  Plaintiff brought suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and the Rehabilitation Act, 29 U.S.C. §§ 701 et seq., alleging that the Census Bureau discriminated against him on the basis of his national origin, religion, sex, and disability, and retaliated against him for his Equal Employment Opportunity ("EEO") activity, when he was not assigned enumeration work after May 6, 2000.

Hired in March 2000 to take part in the 2000 Census, plaintiff was informed at the time he applied that the job was temporary and would terminate if work or funds ran out. Plaintiff received training and work assignments on thirteen days in March, April, and May 2000.  Thereafter, plaintiff, like many other enumerators in Manhattan, received no further work because a higher-than-expected percentage of residents responded to the census surveys by mail, and there consequently was not enough work to go around.  On June 24, 2000, the anticipated expiration date of his employment, plaintiff was officially terminated, due to the lack of available work.

Dissatisfied with the temporary nature of his employment, plaintiff speculates, without any competent evidence, that the Census Bureau's decision to terminate him resulted from

---

*  Citations to the Appendix for Defendants-Appellees appear herein as "DA _," with the relevant page numbers inserted.

2

00000070

discrimination on account of his national origin, religion, sex, and disability, and retaliation for his EEO activity.  The district court granted summary judgment to the Government with respect to each of plaintiff's claims, and dismissed plaintiff's complaint.

The district court's judgment should be affirmed.  Plaintiff failed to establish a _prima_ _facie_ case of discrimination because he did not demonstrate that he is disabled within the meaning of the Rehabilitation Act, or that an adverse employment action took place under circumstances giving rise to an inference of discrimination.  Further, plaintiff failed to rebut the Census Bureau's legitimate, non-discriminatory reason for not assigning him work.

Plaintiff's retaliation claim likewise was properly dismissed.  Plaintiff did not exhaust his retaliation claim during the administrative process, nor establish a nexus between his lack of work and any protected EEO activity, nor show that the Census Bureau's legitimate, non-retaliatory justification was a pretext for retaliation.

Finally, plaintiff vaguely challenges various discovery rulings made by the magistrate judge.  Plaintiff's discovery claims are barred because he either did not assert them to the magistrate judge in the first instance, or failed to seek review of the magistrate judge's rulings by the district judge.  Even if

3

00000071

plaintiff has not waived appellate review of the discovery
rulings mentioned in passing in his brief, each of them was well
within the magistrate judge's discretion, and should be affirmed.

### Issues Presented for Review

1.   Whether the district court properly dismissed
plaintiff's discrimination claims, where plaintiff failed either
to establish a <u>prima facie</u> case of sex, national origin,
religion, or disability discrimination, or to rebut the Census
Bureau's legitimate, non-discriminatory reason for not assigning
him work after May 6, 2000.

2.   Whether the district court properly dismissed
plaintiff's retaliation claim, where plaintiff did not exhaust
the claim during the administrative process, he cannot establish
a nexus between any adverse action and his protected EEO
activity, and he failed to rebut the Census Bureau's legitimate,
non-retaliatory justification for not assigning him work.

3.   Whether this Court should disturb the magistrate
judge's discovery rulings, where plaintiff failed either to raise
his claims in the first instance to the magistrate judge or to
object to the magistrate's rulings, and where none of the
discovery rulings alluded to in plaintiff's appellate brief was
an abuse of discretion.

4

## Statement of Facts

**A.    The Decennial Census**

The Census Bureau, an agency within the Department of Commerce, is responsible for conducting the Decennial Census, which, each decade, counts every individual living in the United States.  (DA 239).  To conduct the 2000 Census, the Census Bureau opened 520 local census offices ("LCOs") and hired people for more than 860,000 positions across the United States.  (DA 240). Each person hired to work in the 2000 Census was informed that his or her job was temporary, that there was no guarantee of work once he or she was trained, and that he or she could be terminated at any time for lack of funds or work.  (DA 250).  Of these temporary employees, a majority were hired to work as enumerators, the people responsible for locating households and conducting interviews with individuals responding to the census. (DA 240).  Applicants for enumerator positions were selected based on the scores they received on a written test, their geographic locations, and their hours of availability.  (Id.).

The 2000 Census, like all Decennial Censuses, was comprised of several distinct phases.  (Id.). In February and March 2000, census questionnaires were mailed to all United States households.  (DA 240-41).  Although most households in the United States mailed back the census questionnaires, some did not respond, which required the Census Bureau to hire temporary

5

00000073

enumerators to visit each non-responding household and interview a knowledgeable household member. (DA 241, 364). The operation during which enumerators conducted these personal interviews was called Nonresponse Followup ("NRFU"). (DA 241). The number of enumerators required for NRFU operations was inversely proportional to the number of questionnaires completed and returned on Census Day; that is, the more questionnaires returned, the fewer non-responding households, and, consequently, the fewer enumerators needed to visit non-responding households during NRFU operations. (Id.).

Staffing the Decennial Census presented a number of difficulties, including a high rate of employee turnover and a very short time frame in which to complete a great deal of work. (DA 242). To address these issues, the Census Bureau engaged in "frontloading" -- hiring more workers than ultimately would be needed to complete the work. (DA 242, 284, 298-99).

Once hired, enumerators received paid training for specific census operations, after which they might or might not receive actual census work. (DA 241). Following a training segment, each enumerator was assigned to a "crew" based on the area in which the enumerator lived. (Id.). The individual in charge of the crew, the crew leader, was responsible for, among other things, distributing assignments based on the availability of the enumerator, the specific area (or "census block") in which the

6

00000074

enumerator lived, and the amount of work that had to be
completed. (Id.). Generally, crew leaders gave enumeration
assignments (particularly NRFU assignments) to enumerators living
in the same census block as the assignments, because doing so
minimized travel time and because an enumerator living in the
neighborhood would be more familiar with the people residing
there. (DA 241-42, 272-73).

Whether an enumerator received work also depended on when he
or she was hired and assigned to a crew: if an enumerator was
assigned to a crew that already had been working together for
some time, he or she would be assigned work only if one of the
original crew members were discharged or became unavailable. (DA
242). This practice of using enumerators as "spares" helped
ensure that the pace of work would not be interrupted if a crew
member dropped out, and allowed the Census Bureau to meet its
deadlines. (Id.).

The Census Bureau adhered to its policy of frontloading when
it came time to hire employees for the 2000 Census in Manhattan.
(Id.). Historically, Manhattan had a very low census
questionnaire response rate, consistently averaging approximately
40 percent. (Id.). As a result, Manhattan typically required
enough enumerators to visit approximately 60 percent of
households in the borough. (Id.). In previous Decennial
Censuses, the Census Bureau had been forced to bring in

7

00000075

enumerators from all over the country to conduct NRFU operations in New York City. (Id.).

Anticipating a similarly low response rate for the 2000 Census, the Census Bureau implemented its frontloading policy, ultimately hiring 1.5 to 2 times as many enumerators as were necessary to count Manhattan households. (DA 243). The Census Bureau hired this many enumerators based on its expectation that Manhattan's questionnaire response rate would remain approximately 40 percent, requiring the majority of households to be interviewed by enumerators during NRFU operations. (Id.).

Due to a highly successful advertising campaign, Manhattan's rate of response to the 2000 census questionnaire far exceeded expectations, in some areas reaching 70 to 80 percent. (Id.). Instead of having a majority of households requiring enumeration, in many areas, there were far fewer households that needed to be visited during NRFU. (Id.). Coupled with the fact that the Census Bureau had hired 1.5 to 2 people for every expected enumerator position required, this much-higher-than-expected response rate meant that many people who were hired and trained for NRFU operations ultimately did not receive work. (Id.). Many of the people hired as NRFU enumerators thus became "spares," and their services were not required unless another enumerator in their crew quit, failed to appear for work, or did not perform up to standard. (Id.).

8

00000076

**B.    Plaintiff's Application for Employment as an Enumerator**

On January 10, 2000, plaintiff, an Irish-American man of Catholic faith, applied for temporary employment as an enumerator for the 2000 Census. (DA 96-97, 303-06). At the time he applied, plaintiff knew that the job of enumerator was a temporary position. (DA 97).

On March 13, 2000, plaintiff was hired by the Census Bureau as an enumerator and given a "not-to-exceed" or appointment expiration date of April 29, 2000. (DA 162). Before commencing work, plaintiff read and signed several documents, including a "Temporary Excepted Service Employment Agreement for the 2000 Decennial Census Staff," in which he acknowledged:

> This job is strictly <u>temporary</u>. Census operations are short. This appointment <u>cannot be made permanent</u>. You may be released from service with the Census Bureau before the not-to-exceed date for this appointment if work or funds are no longer available. You will have <u>no commitment</u> from the Census Bureau for another position.

(DA 97-98, 310-13 (emphasis in original)).

In addition, plaintiff received and reviewed several handbooks, including the Field Nonsupervisory Census Employee Handbook, which similarly provided:

> You are appointed to a time limited temporary appointment with a specific Not-to-Exceed (NTE) or expiration date. You may be released from service with the Census Bureau before the NTE date for this

9

00000077

appointment if work or funds are no longer available. The expiration date of your appointment does not guarantee the availability of work or your services.

(DA 100, 250).

## C.    Plaintiff's Employment with the Census Bureau

Plaintiff, who lived within the area covered by LCO 2233 in Manhattan, began working at that office on March 13, 2000. (DA 98, 102, 315). Over the next several weeks, from March 13, 2000 to April 1, 2000, plaintiff completed, and was paid for, 3.5 days of training and 3 full days of regular (i.e., non-training) work. (DA 104-06, 315-340). On April 18, 2000, plaintiff's employment as an enumerator was terminated for lack of work. (DA 106-07, 350). As plaintiff explained, "they were gearing up for the nonresponse followup . . . and apparently within that time period, there was a slack in the need for personnel." (DA 107).

Two weeks later, on May 1, 2000, plaintiff was rehired to take part in NRFU, and given a new not-to-exceed date of June 24, 2000. (DA 107-08, 352). Thereafter, from May 1, 2000 to May 6, 2000, plaintiff completed, and was paid for, six 4-5 hour training sessions. (DA 108-09, 341-46). Plaintiff did not

10

00000078

receive any regular work or training after May 6, 2000.⋆ (DA 109).

   According to plaintiff, following his training session on May 6, 2000, he was assigned to the crew overseen by David Brown. (DA 109, 114, 120). At that time, plaintiff claimed, Brown gave him and another man, William Sansom, "a voicemail [number] and said there would be plenty of work, that we would be in contact with him through his voicemail." (DA 109). Plaintiff alleged that although he called Brown approximately five times at that number, Brown never called him back. (DA 109-10).

   In the weeks following May 6, 2000, plaintiff called and visited LCO 2233 to inquire about the possibility of work. (Id.). On several occasions, plaintiff spoke with Field Operations Supervisor ("FOS") Jeffrey Lewis,⋆⋆ who informed plaintiff that there was no additional work available for him. (DA 110, 115, 172-73). According to plaintiff, he asked Lewis to be put on another crew, but Lewis refused. (DA 115).

_____

   ⋆ Four other enumerators who started on the same day as plaintiff had similar experiences. Faye Levine, William Sansom, and Anthony Gardiner did not work past May 2, May 3, and May 6, 2000, respectively. (DA 357-59). Likewise, Carolyn Taranto, who worked a total of ten days in March and April 2000, received no assignments after attending training in early May 2000. (DA 356).

   ⋆⋆ As a "floating" field operations supervisor, Lewis assisted other FOSs, but did not supervise crew leaders. (DA 166-67). Nor did Lewis directly assign work to enumerators; that job was handled by crew leaders. (DA 168-69).

11

00000079

Brown did not recall plaintiff and did not remember if plaintiff was assigned to his crew. (DA 63). Based on the dates of plaintiff's training in May 2000, however, Brown believed he already had a crew of enumerators in place before plaintiff would have been assigned to his crew. (<u>Id.</u>). Because Brown had no problems with any of the enumerators already on his crew, and there were more enumerators available than were needed to complete the NRFU work, Brown believed that plaintiff did not receive work because the enumerators already assigned to the crew were able to handle all the work he had to assign them. (<u>Id.</u>).

On June 24, 2000, plaintiff's not-to-exceed date, the Census Bureau officially terminated plaintiff for lack of work. (DA 111, 354).

**D.    Plaintiff's Discrimination and Retaliation Claims**

Plaintiff claims that he was denied work as an enumerator on account of his national origin, religion, sex, disability, and prior EEO activity. (DA 86, 96).

**1.    Plaintiff's Allegations of National Origin and Religious Discrimination**

Plaintiff's claim that he was denied work on account of his national origin and religion is based on the purported comments of two enumerators who also were not given work, William Sansom and Anthony Gardiner, and a crew leader, Kim Sweeney. (DA 86, 111, 117, 120, 129). According to plaintiff, he "believe[d] that" either Sweeney or Gardiner told him that David Brown "may

12

00000080

have used an epithet for people of Irish background," but plaintiff did not specify the "epithet." (DA 120-21). Plaintiff never personally heard Brown or Lewis make any derogatory remarks about Irish people. (DA 121). At his deposition, Brown testified that he had never used epithets to describe people of Irish descent, and "never would." (DA 514).

Plaintiff also testified at his deposition that he heard "[o]ne of the people in [his Census Bureau] group" speculate that a drunk homeless man "must be Irish" or remark that the homeless man "maybe . . . needed some more of that Wild Irish Rose." (DA 121-22). Plaintiff denied knowing who made the alleged comment. (DA 122). Plaintiff did not consider the alleged comment evidence of discrimination against him. (Id.). In fact, plaintiff did not even consider the alleged comment disparaging: "We laughed, it wasn't even anything that I would be bothered by." (Id.).

Plaintiff further alleges that Anthony Gardiner told him that he "had information that he was a witness to or that someone he knew was a witness to" that led him to believe that David

---

⋅ Despite this testimony, plaintiff later submitted, in opposition to the Government's motion for summary judgment, an unsworn letter to the Government's counsel in which he stated that "upon . . . information and belief" and "personal knowledge and information obtained after plaintiff's deposition . . . [and] David Brown's deposition," "David Brown is the individual referred to on pages 167 through 170 of plaintiff's deposition," thus apparently alleging that Brown made the asserted comment regarding the homeless person. (DA 383).

13

00000081

Brown "wanted people of certain backgrounds, and he was going to have less people of other backgrounds." (DA 122-23). However, plaintiff could not remember or relate what Gardiner told him or what information Gardiner claimed to have. (Id.). Plaintiff further claims that William Sansom, Kim Sweeney, and crew leader Edward Thompson suggested to him that Brown may have not given plaintiff work because of plaintiff's national origin, but none of these individuals provided any basis for this alleged suggestion. (DA 124-25).

Plaintiff offers no other evidence for his allegation that he was discriminated against on the basis of his Irish heritage. (DA 131). He asserts that the same evidence that shows discrimination on the basis of national origin also supports his claim of religious discrimination. (DA 129, 131).

### 2.   Plaintiff's Allegations of Sex Discrimination

Plaintiff's claim of sex discrimination is premised on his discovery, on his apartment door, of a note labeled "Census 2000 Notice of Visit," which stated, "My name is Gail," and provided a telephone number. (DA 118-19, 129, 192). By plaintiff's account, he "believe[d]" he called the number and spoke with a woman he "assume[d] . . . was Gail." (DA 119). Although plaintiff surmised that "Gail" worked under David Brown based on the fact that she came to his home to enumerate, plaintiff does not know this for certain. (DA 129-30). Other than the notice

14

00000082

from "Gail," plaintiff has no other evidence to support his belief that he was discriminated against on the basis of sex. (DA 130-31).

### 3.  Plaintiff's Allegations of Disability Discrimination

Plaintiff allegedly suffers from photophobia, a condition that makes his eyes "much more sensitive to light than . . . most people," and requires him to wear tinted glasses.  (DA 132). According to plaintiff, when he wears tinted glasses, "it's an absolute remedy"; he has "no problems at all" seeing, walking, working, or carrying out manual tasks.  (DA 133-34).

Plaintiff's claim that the Census Bureau discriminated against him on account of disability is based on an alleged conversation with Lewis's supervisor and Thompson, both of whom purportedly "threw . . . out" his photophobia as a possible reason why he was not given work.  (DA 130-31).  Plaintiff also allegedly spoke with Gardiner and Sansom, who "thought that maybe [Brown or Lewis] had a problem with [plaintiff's] disability." (DA 132).  Plaintiff testified that the basis for this speculation was Gardiner's and Sansom's "information and belief and life experience about people," but he could not identify any other reasons for their conjecture.  (Id.).

Plaintiff did not recall ever talking to Brown or Lewis about his photophobia.  (DA 133-34).  Brown did not know that plaintiff suffered from any disability.  (DA 63).

15

00000083

### 4. Plaintiff's Allegations of Retaliation

Plaintiff also contends that the Census Bureau retaliated against him because he complained about his allegedly discriminatory treatment. (DA 134-35). On May 26, 2000, after he stopped receiving enumeration work, plaintiff first contacted the Census Bureau's EEO Office regarding his lack of work. (DA 135, 196).

Plaintiff did not have any personal knowledge as to whether Lewis or Brown was aware of his EEO activity. (DA 135). Indeed, he thought it was "very unlikely" that he told Brown that he had contacted the EEO office, and he did not recall having such a conversation with Lewis. (Id.). Plaintiff speculated that "there might have been some conversation between management and one or both of [Brown and Lewis about the EEO complaint,] but not by [him]." (Id.).

### E. Plaintiff's Administrative Complaint

On July 4, 2000, plaintiff filed an administrative complaint with the Department of Commerce, alleging that he had been denied work on the basis of his race, color, religion, sex, national origin, age, and disability. (DA 113, 200-03). Plaintiff's administrative complaint did not contain any allegations of retaliation. (DA 200-03).

On January 23, 2004, an administrative law judge dismissed plaintiff's administrative complaint in its entirety. (DA 204-

16

00000084

13).  On June 25, 2004, the Equal Employment Opportunity
Commission ("EEOC"), Office of Federal Operations, affirmed the
dismissal of plaintiff's administrative complaint.  (DA 215-17).

**F.   Proceedings in District Court**

On September 24, 2004, plaintiff filed a complaint in
federal district court, alleging that he had been discriminated
against on the basis of his religion, national origin, and
disability.[*]  (DA 10-17).  Over the next several months,
plaintiff and defendants engaged in substantial discovery, with
plaintiff serving multiple discovery requests and ultimately
taking the depositions of four current and former Census Bureau
employees.  (DA 3-6, 19-58, 163-81, 437-535).

On May 13, 2005, the Government moved for summary judgment.
(DA 60-61).  In a memorandum and order dated January 12, 2006,

---

[*] Although the complaint alleged discrimination under the
Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C.
§§ 12112-12117, the federal government is not subject to suit
under that statute.  See 42 U.S.C. § 12111(5)(b); Rivera v.
Heyman, 157 F.3d 101, 103 (2d Cir. 1998).  However, in light of
plaintiff's pro se status, the district court construed the
complaint as asserting claims under the Rehabilitation Act, 29
U.S.C. § 791 et seq., which does apply to federal employees.  (DA
536 n.1 (citing Rivera, 157 F.3d at 103)).  Additionally, while
plaintiff stated in his complaint that he suffered discrimination
on the basis of his "race . . . i.e., . . . being an Irish-
American" (DA 12), he clarified at his deposition that he is
claiming national origin discrimination, not race or color
discrimination.  (DA 94-96).  Indeed, plaintiff withdrew his
claims of race and color discrimination during the administrative
process.  (DA 95, 220).

00000085

the district court granted the Government's motion in all respects, and dismissed plaintiff's complaint.[*]  (DA 536-59).

With respect to plaintiff's claims of discrimination based on sex, religion, and national origin, the district court concluded that plaintiff had failed to establish a <u>prima facie</u> case because his proffered evidence -- which consisted of "largely . . . vague recollections of conversations with third parties and unsupported conclusions drawn from documents produced by defendants" -- did not demonstrate "circumstances giving rise to an inference of discrimination."  (DA 545-46).  The court noted that, while plaintiff testified that either Gardiner or Sansom told him that David Brown "may have used an epithet for people of Irish background," plaintiff explicitly denied ever hearing Brown or Lewis make any disparaging remarks about Irish people.  (DA 546).  Even if such a remark had been made, the court concluded, it would not support an inference of discrimination.  (<u>Id.</u> (citing <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 468 (2d Cir. 2001))).

The court further held that plaintiff's testimony about the homeless man and the alleged comment referring to that person did not support an inference of discrimination because (1) plaintiff

---

[*]  The court held, as a threshold matter, that the only proper defendant in a Title VII or Rehabilitation Act case brought by a federal employee is the head of the relevant agency. (DA 536 n.2).  The Court accordingly dismissed plaintiff's claims against the Department of Commerce.  (<u>Id.</u>).

00000086

testified that he did not know who made the comment and did not
consider it evidence of discrimination; (2) plaintiff could not
rely on his belated, unsworn letter stating that Brown had made
the comment, and contradicting his deposition testimony, to
create an issue of fact; and (3) in any event, such a stray
remark could not prove a claim of discrimination.  (DA 546-47).
The court further concluded that plaintiff's "vague recollections
of conversations in which third parties are alleged to have made
admittedly unsubstantiated suggestions of discriminatory intent"
constituted inadmissible hearsay, and were thus insufficient to
make out a prima facie case of discrimination.  (DA 547-48).

The court determined that plaintiff's observation of other
enumerators working after May 6, 2000 and the "notice of visit"
form from "Gail" did not establish a prima facie case of
discrimination because plaintiff offered no evidence concerning
the specific characteristics of anyone working after May 6, 2000,
and could not show that "Gail" was similarly situated to him.
(DA 548-50).  The court also concluded that plaintiff had not
made out a prima facie case of disability discrimination because,
taking into account plaintiff's corrective lenses, no reasonable
jury could find that plaintiff was disabled within the meaning of
the Rehabilitation Act.  (DA 551-52).

Although the court concluded that plaintiff had failed to
establish a prima facie case of discrimination, the court

19

00000087

nonetheless considered whether the Government had proffered a
legitimate, non-discriminatory reason for plaintiff's lack of
work, and concluded that it had.  (DA 552-54).  Citing the
declarations of Patricia Valle and David Brown, the court held
that the Government had shown by undisputed evidence that
plaintiff did not receive work after May 6, 2000 "simply because
there was not enough work to go around."  (DA 553).
Specifically, the Census Bureau's policy of frontloading, coupled
with the higher-than-expected response rate, resulted in 1.5 to 2
times as many enumerators being hired than were necessary to
complete the census, and plaintiff's lack of work in May 2000
resulted from the fact that Brown already had a crew in place by
that time and did not encounter any problems requiring any of the
crew members to be replaced.  (Id.).

Addressing plaintiff's contentions, the court noted that
plaintiff merely alleged that the Valle and Brown declarations
constituted "purjury [sic]" unsupported by "actual evidence."
(DA 554).  Plaintiff's conclusory allegations, the court held,
were insufficient to rebut the Government's proffered legitimate,
non-discriminatory reason for his lack of work.  (Id.).  The
court further concluded that a document showing that LCO 2233
closed on September 30, 2000, after plaintiff's termination date,
"does not establish that there was, in fact, enumeration work

20

00000088

available up through that date, and does not provide any evidence
of discrimination." (DA 554-55).

   With respect to plaintiff's retaliation claim, the court
held, first, that plaintiff failed to exhaust this claim
administratively because he did not include it in his EEO
complaint. (DA 555-58). The court concluded that the
retaliation claim was not "reasonably related" to the
discrimination claims because it arose before the administrative
complaint was filed and could not reasonably be expected to "fall
within the scope of the EEOC investigation" with respect to the
discrimination charges that were made. (DA 557 (citing Deravin
v. Kerik, 335 F.3d 195, 200-01 (2d Cir. 2003)).

   Next, the court held that, even if plaintiff had exhausted
the claim, he failed to make out a prima facie case of
retaliation because he did not show any causal connection between
his initial contact with the EEO office on May 26, 2000, and
either his lack of work after May 6, 2000, or his official
termination on June 24, 2000. (DA 558-59). Finally, the court
concluded that, "[e]ven were a prima facie case somehow to be
divined from plaintiff's submissions to the court," he failed to
rebut the Government's proffered legitimate, non-retaliatory
justification, for the same reasons discussed with respect to the
discrimination claims. (DA 559).

   This appeal followed.

                              21

00000089

# EXHIBIT  5

GPO Form 910
(R 8-01) P.57021-4
Part 1
ORIGINAL

**U.S. GOVERNMENT PRINTING OFFICE**
**Printing Procurement Department**
# BID

All bids are subject to GPO Publication 310.2, Contract Terms (Rev. 6-01) which is incorporated by reference, and the representations and certifications on the reverse of part one of this GPO Form 910.

Shipment(s) will be made from: City _New York City_ , State _New York_

(The city(ies) indicated above will be used for evaluation of transportation charges when shipment f.o.b. contractor's city is specified. If no shipping point is indicated above, it will be deemed that the bidder has selected the city and state shown below in the address block and the bid will be evaluated and the contract awarded on that basis. If shipment is not made from evaluation point, contractor will be responsible for any additional shipping costs incurred.)

PROGRAM NO. _2231-5_           (BIDDER TO ATTACH SCHEDULE OF PRICES TO THIS BID FORM)

or

JACKET NO. _____

BID _____

Additional _____ Rate _____

Discounts are offered for prompt payment as follows: _____ percent, _____ calendar days.
See Provision 12 "Discounts" in GPO Contract Terms (Pub. 310.2).

**Bidder hereby acknowledges amendment(s) number(ed)** _____

In compliance with the above, the undersigned agrees, if this bid is accepted within _90_ calendar days (60 calendar days unless a different period is inserted by the bidder) from the date for receipt of bids, to furnish the specified items at the price set opposite each item, delivered at the designated point(s), in exact accordance with specifications.

| Notice: Failure to provide a 60 day bid acceptance period may result in expiration of your bid prior to award. |

**COMPANY SUBMITTING BID**

Company _Record Press, Inc._

Address _229 West 36th 8th Floor_

City _New York_    State _NY_ Zip _10018_

GPO Contractor Code (if known) _____

Telephone Number _212-619-4949_

**PERSON AUTHORIZED TO BID**

Name _Hugh A. Wilmot, Jr._

Title _President_

Signature _Hugh A. Wilmot, Jr._

Date _10/16/06_

Facsimile Number _212-608-3141_

Contracting Officer Review _____ Date _____ Certifier _____ Date _____
                          (Initials)                                        (Initials)

00000091

# Representations and Certifications

Exception to the certifications may render your bid nonresponsive. Submission of your bid without statement of except shall constitute certification of the six items.

**REPRESENTATIONS.**

R-1. Small business. By submission of a bid, the bidder represents that the bidder is a small business concern, unless the bid contains an affirmative representation that the bidder is not a small business concern.

R-2. Small Disadvantaged Business Concern. By submission of a bid, the bidder represents that the bidder is not a small disadvantaged business concern, unless the bid itself contains an affirmative representation that the bidder is a small disadvantaged business concern.

R-3. Women-Owned Small Business Concern. By submission of a bid, the bidder represents that the bidder is not a women-owned small business concern, unless the bid itself contains an affirmative representation that the bidder is a women-owned small business concern.

**CERTIFICATIONS.**

C-1. Covenant Against Contingent Fees. Submission of a bid without statement of exception shall constitute certification.

(a) The contractor warrants that no person or agency has been employed or retained to solicit or obtain a contract upon an agreement or understanding for a contingent fee, except a bona fide employee or agency. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or, in its discretion, to deduct from the contract price or consideration or otherwise recover, the full amount of the contingent fee.

(b) "Bona fide agency" means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.

"Bona fide employee" means a person, employed by a contractor and subject to the contractor's supervision and control as to time, place, and manner of performance, who neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds out as being able to obtain any Government contract or contracts through improper influence.

"Contingent fee" means any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.

"Improper influence" means any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter.

C-2. Buy American Certification. Except as may be listed in the bid itself, the bidder certifies with the submission of a bid that each end product is a domestic end product (as defined in clause 37 "Buy American Act" in Contract Clauses), and that components of unknown origin have been considered to have been mined, produced, or manufactured outside the United States. Any exception listed with the bid itself must list both the excluded end products and the country of origin of each.

C-3. Clean Air and Water. Submission of a bid without statement of exception shall constitute certification.

(Applicable if the bid or offer exceeds $100,000 or the Contracting Officer has determined that orders under an indefinite quantity contract in any year will exceed $100,000, or a facility to be used has been the subject of a conviction under the Clean Air Act (42 U.S.C. 7413 (C) (1)) or the Federal Water Pollution Control Act (33 U.S.C. 1319(c)) and is listed by EPA, or is not otherwise exempt.)

(a) Any facility to be utilized in the performance of the proposed contract has not been listed on the Environmental Protection Agency List of Violating Facilities.

(b) The Contracting Officer will be promptly notified, prior to award, of the receipt of any communication from the Director, Office of Federal Activities, Environmental Protection Agency, indicating that any facility which he/she proposes to use for the performance of the contract is under consideration to be listed on the EPA List of Violating Facilities.

(c) Bidder will include substantially this certification, including this paragraph (c), in every nonexempt subcontract.

C-4. Certificate of Independent Price Determination. Submission of a bid without statement of exception shall constitute certification.

(a) The offeror certifies that-
(1) The prices in the offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to(i) those prices; (ii) the intention to submit an offer; or (iii) the methods or factors used to calculate the prices offered.
(2) The prices in the offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law; and
(3) No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

(b) Each signature on the offer is considered to be a certification by the signatory that the signatory-
(1) Is the person in the offeror's organization responsible for determining the prices being offered in the bid or proposal, and that the signatory has not participated and will not participate in any action contrary to subparagraphs (a) (1) through (a) (3) of this provision; or
(2)(i) Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to subparagraphs (a) (1) through (a) (3) of this provision [insert full name of person(s) in the offeror's organization responsible for determining the prices offered in the bid or proposal, and the title of his or her position in the offeror's organization];
(ii) As an authorized agent, does certify that the principals named in subdivision

(b)(2)(i) of this provision have not participated, and will not participate, in any action trary to subparagraphs (a)(1) through (a)(3) of this provision; and
(iii) As an agent, has not personally participated, and will not participate, in action contrary to subparagraphs (a)(1) through (a)(3) of this provision.

(c) If the offeror deletes or modifies subparagraph (a)(2) of this provision, the must furnish with its offer a signed statement setting forth in detail the circumstan of the disclosure.

C-5. Certification Regarding Debarment, Suspension, Proposed Debarm and other Responsibility Matters (Jan. 1999). By submission of a bid-
(a)(1) The offeror certifies, to the best of its knowledge and belief, that-
(i) The offeror and/or any of its principals-
(A) Are not presently debarred, suspended, proposed for debarmen declared ineligible for the award of contracts by any Federal agency;
(B) Have not, within a three-year period preceding this offer, been convic or had a civil judgment rendered against them for: commission of fraud or a cri offense in connection with obtaining, attempting to obtain, or performing a p (Federal, state, or local) contract or subcontract; violation of Federal or state an statutes relating to the submission of offers; or commission of embezzlement, theft gery, bribery, falsification or destruction or records, making false statements, tax sion, or receiving stolen property; and
(C) Are not presently indicted for, or otherwise criminally or civilly charge a governmental entity with commission of any of the offenses enumerated in subdiv (a)(1)(i)(B) of this provision.
(ii) The offeror has not, within a three-year period preceding this offer, had or more contracts terminated for default by any Federal agency.
(2) "Principals," for the purposes of this certification, means officers; directors; ers; partners; and, persons having primary management or supervisory responsib within a business entity (e.g., general manager; plant manager; head of a subsid division or business segment, and similar positions).
This Certification Concerns a Matter Within the Jurisdiction of an Agency o United States and the Making of a False, Fictitious, or Fraudulent Certification Render the Maker Subject to Prosecution Under Section 1001, Title 18, United S Code.

(b) The offeror shall provide immediate written notice to the Contracting Officer any time prior to contract award, the offeror learns that its certification was erron when submitted or has become erroneous by reason of changed circumstances.

(c) A certification that any of the items in paragraph (a) of this provision exists w necessarily result in withholding of an award under the solicitation. However, the c cation will be considered in connection with a determination of the offeror's respon ity. Failure of the offeror to furnish a certification or provide such additional inform as requested by the Contracting Officer may render the offeror non-responsible.

(d) Nothing contained in the foregoing shall be construed to require establishme a system of records in order to render, in good faith, the certification required by graph (a) of this provision. The knowledge and information of an offeror is not req to exceed that which is normally possessed by a prudent person in the ordinary c of business dealings.

(e) The certification in paragraph (a) of this provision is a material representati fact upon which reliance was placed when making award. If it later determined tha offeror knowingly rendered an erroneous certification, in addition to other reme available to the Government, the Contracting Officer may terminate the contract r ing from the solicitation for default.

C-6. Certification of Nonsegregated Facilities (Jan. 1999). Submission of without statement of exception shall constitute certification.

(a) "Segregated facilities," as used in this provision, means any waiting rooms, areas, rest rooms and wash rooms, restaurants and other eating areas, time cl locker rooms and other storage or dressing areas, parking lots, drinking fountains, r ation or entertainment areas, transportation, and housing facilities provided for em ees, that are segregated by explicit directive or are in fact segregated on the bas race, color, religion, or national origin because of habit, local custom, or otherwise

(b) By submission of an offer, the offeror certifies that it does not and will not r tain or provide for its employees any segregated facilities at any of its establishm and that it does not and will not permit its employees to perform their services a location under its control where segregated facilities are maintained. The offeror ag that a breach of this certification is a violation of the Equal Opportunity clause in the tract.

(c) The offeror further agrees that (except where is has obtained identical cer tions from proposed subcontractors for specific time periods) it will-
(1) Obtain identical certifications from proposed subcontractors before the a of subcontracts under which the subcontractor will be subject to the Equal Opport clause;
(2) Retain the certifications in the files; and
(3) Forward the following notice to the proposed subcontractors (except proposed subcontractors have submitted identical certifications for specific time ods);

## NOTICE TO PROSPECTIVE SUBCONTRACTORS OF
## REQUIREMENT FOR CERTIFICATION OF
## NONSEGREGATED FACILITIES

A certification of Nonsegregated Facilities must be submitted before the award subcontract under which the subcontractor will be subject to the Equal Oppor clause. The certification may be submitted either for each subcontract or for all sub tracts during a period (i.e., quarterly, semiannually, or annually).
Note: The penalty for making false statements in offers is prescribed in 18 U.S 1001.

Specifications by IFL
Program 2231-S FORMERLY 1272-S
Issue date

## U.S. GOVERNMENT PRINTING OFFICE

### PHILADELPHIA , PA.

### GENERAL TERMS, CONDITIONS, AND SPECIFICATIONS

For the Procurement of

Appeals Briefs

as requisitioned from the U.S. Government Printing Office (GPO) by the

U.S. Department of Justice

Single Award

The term of this contract is for the period

beginning Date of Award (November 1,2006) and ending October 31, 2007
with an option for renewal from November 1, 2007 and ending October 31, 2008
with a second option for renewal from November 1, 2008 and ending October 31, 2009
with a third option for renewal from November 1, 2009 and ending October 31, 2010
and with a fourth option for renewal from November 1,2010 and ending October 31, 2011

OPTION TO EXTEND THE CONTRACT TERM: The Government may extend the term of this contract by written notice to the contractor not later than 30 days before the contract expires. If the Government exercises an option, the extended contract shall be considered to include this clause. The duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

Notwithstanding the above paragraph, at the request of the Government, the term of any contract resulting from this solicitation may be further extended for such period of time as may be mutually agreeable to the GPO and the contractor.

BID OPENING: Bids shall be publicly opened at 2:00 p.m., prevailing Philadelphia, PA time, on October 18,2006

RECOVERED MATERIALS PROGRAM: The Government Printing Office is promoting the use of recovered materials in its contracts to the maximum extent practicable, provided all specification requirements are met. Offerors are encouraged to supply paper and paper products that contain recovered materials even in the absence of a specific solicitation provision or contract clause requiring such materials.

RESTRICTION ON LOCATION OF PRODUCTION FACILITIES: All production facilities used in the manufacture of the product(s) ordered under this contract, in Category 1, must be located within the borough of Manhattan south of 59th Street to the Battery and East and West to the rivers.

Any bidder intending to use production facilities outside this area should furnish information, with the bid, which will on its face demonstrate ability to meet the schedule requirements. The determination by the Government of the acceptability of this information in no way relieves the successful bidder of the responsibility for compliance with these schedule requirements.

   BIDDERS, PLEASE NOTE: These specifications have been extensively revised; therefore, all bidders are cautioned to familiarize themselves with all provisions of these specifications before bidding.

   SEE MANDATORY PROCUREMENT INTEGRITY REQUIREMENTS ATTACHED

For information of a technical nature call Pamela Lewis (215) 364-6465 (No collect calls).

USCA Case #14-7077     Document #1530697          Filed: 01/07/2015     Page 94 of 604

## SECTION 1.- GENERAL TERMS AND CONDITIONS

GPO CONTRACT TERMS: Any contract which results from this Invitation for Bid will be subject to the applicable provisions, clauses, and supplemental specifications of GPO Contract Terms (GPO Pub. 310.2, effective December 1, 1987 (Rev. 9-88)) and GPO Contract Terms, Quality Assurance Through Attributes Program (GPO Pub. 310.1, effective May 1979 (revised December 1992)).

QUALITY ASSURANCE LEVELS AND STANDARDS: The following levels and standards shall apply to these specifications:

Product Quality Levels:
    (a) Printing Attributes -- Level IV.
    (b) Finishing Attributes -- Level IV.

Inspection Levels (from ANSI/ASQC Z1.4):
    (a) Non-destructive Tests - General Inspection Level I.
    (b) Destructive Tests    - Special Inspection Level S-2.

Specified Standards: The specified standards for the attributes requiring them shall be:

| Attribute | Specified Standard |
|---|---|
| P-7. Type Quality and Uniformity | Average type dimension in publication or camera copy |

SUBCONTRACTING: Subcontracting will not be permitted

EXTENSION OF CONTRACT TERM: At the request of the Government, the term of any contract resulting from this solicitation may be extended for such period of time as may be mutually agreeable to the GPO and the contractor.

DEFINITION OF RECOVERED MATERIALS IN PAPER PRODUCTS:

Waste Paper (when used in high grade bleached printing and writing papers) means any of the following "recovered materials":

(1) Postconsumer materials such as:

(a) Paper, paperboard, and fibrous wastes from retail stores, office buildings, homes, and so forth, after they have passed through their end usage as a consumer item; including: Used corrugated boxes, old newspapers; old magazines; mixed waste paper; tabulating cards, and used cordage; and

(b) All paper, paperboard, and fibrous waste that enter and are collected from municipal solid waste; and

(2) Manufacturing, forest residues, and other wastes such as:

(a) Dry paper and paperboard waste generated after completion of the papermaking process (that is, those manufacturing operations up to and including the cutting and trimming of the paper machine reel into smaller rolls or rough sheets) including envelope cuttings, bindery trimmings, and other paper and paperboard waste, resulting from printing, cutting, forming, and other converting operations; bag, box, and carton manufacturing wastes; and butt rolls, mill wrappers, and rejected unused stock; and

(b) Finished paper and paperboard from obsolete inventories of paper and paperboard manufacturers, merchants, wholesalers, dealers, printers, converters, or others.

(3) "Mill broke" is specifically excluded from the definition of waste paper. Mill broke means any paper waste generated in a paper mill prior to completion of the papermaking process.

MAINTENANCE OF RECORDS ON RECOVERED MATERIALS IN PAPER PRODUCTS: The contractor shall maintain manufacturer/mill accounting and record summaries on the fiber weight content used as feedstock, for purposes of Government audit, that will verify (i) the contractors certification of the minimum waste paper, post- consumer

00000094

USCA Case #14-7077    Document #1530697    Filed: 01/07/2015    Page 95 of 604

recovered materials, or recovered materials (cotton/linen) content, as applicable, used in performance of the contract, (ii) that the paper and paper products are in compliance with the specification requirements, and (iii) the paper is manufactured in accordance with the Environmental Protection Agency (EPA) Guideline for Federal Procurement of Paper and Paper Products Containing Recovered Materials, 40 CFR Part 250, whether the products are manufactured by the contractor or another paper mill. The contractor, if not the manufacturer, shall obtain this information from the paper manufacturer. The contractor shall maintain, and make available to the Government, these documents for one year after the expiration of the contract. Nothing in this clause shall excuse the contractor from furnishing the specified paper.

ECONOMIC PRICE ADJUSTMENT: The prices set forth in this contract shall be adjusted in accordance with the provisions of this clause, provided that, in no event will prices be revised to exceed the maximum permissible under any law existing as of the date of the contract or as may be hereafter promulgated.

Price adjustment period: For the purpose of this clause, the program years shall comply with the Contract Term clause. There shall be no price adjustment for orders placed during the first program year of this contract.

Price adjustment: The prices shall be adjusted on the basis of the "Consumer Price Index For All Urban Consumers - Commodities Less Food, Seasonally Adjusted," published monthly in the CPI Detailed Report by the Department of Labor, Bureau of Labor Statistics, in the following manner:

(1)    The contract price of orders placed during the adjusted period (excluding reimbursable postage or transportation costs) shall be adjusted by the percentage increase or decrease in the average, seasonally adjusted Consumer Price Index For All Urban Consumers - Commodities Less Food (seasonally adjusted) as follows: An index shall be calculated by averaging the 12 seasonally adjusted months ending 3 months prior to the expiration of the first period of the contract. This average is then compared with the average index for the 12-month period ending 3 months prior to the beginning of the contract, called the base index. The percentage increase or decrease by comparing these two indexes shall be applied to the contractor's invoices for orders placed during the price adjustment period.

(2)    The Government will notify the contractor in writing of the percentage increase or decrease to be applied to any invoices to be submitted for orders subject to price adjustment in accordance with this clause. Such percentage will be determined from the published index as set forth above. The contractor shall apply the percentage increase or decrease against the total price of the invoice less reimbursable postage or transportation costs. Any applicable discounts will be calculated on the basis of the invoice price as adjusted.

ASSIGNMENT OF JACKETS, PURCHASE AND PRINT ORDERS: A GPO jacket number will be assigned and a purchase order issued to the contractor to cover work performed. The purchase order will be supplemented by an individual "Print Order" for each job placed with the contractor. The print order, when issued, will indicate the quantity to be produced and any other information pertinent to the particular order.

PREAWARD SURVEY: In order to determine the responsibility of the prime con- tractor or any subcontractor, the Government reserves the right to conduct a preaward survey or to require other evidence of technical, production, mana-gerial, financial, and similar abilities to perform, prior to the award of a contract.

PRIOR TO AWARD: **A meeting will be held at the U.S. Attorney's Office, prior to actual award, to go over the provisions of the contract and establish initial contact with the Agency.**

**The Government may require, prior to award, the production of a brief as submitted by the Department to check contractor conformance with schedule and quality requirements.**

PAYMENT: The contractor shall submit a copy of their billing to.:

        U.S. Department of Justice, Appeals Unit

| For Criminal Briefs | For Civil Briefs |
|---|---|
| U.S. Department of Justice | U.S. Department of Justice |
| One St. Andrew's Plaza, Room 844 | 86 Chambers Street, 3rd Floor |
| New York, NY 10007 | New York, NY 10007 |

After review and approval submit vouchers to: Comptroller, Stop FMCE, Office of Financial Management, U.S. Government Printing Office, Washington, D.C. 20401.

NOTE:      ON EACH ORDER: One copy of the print order with a copy of contractor's billing must be sent to the U.S. Government Printing Office, New York Regional Procurement Office, 928 Jaymore Road Suite A-190; Southampton, PA 18966 ATTN: Program Section.

### PAYMENT BY ELECTRONIC FUNDS TRANSFER (EFT)

Public Law 104-134 requires that payments made under a contract or purchase order must be made electronically.

Companies (contractors) doing business with GPO should complete Standard Form 3881 (ACH Vendor/Miscellaneous Payment Enrollment Form) and submit it to the U.S. Government Printing Office, Examination and Billing Branch (FMCS), Washington, DC 20401.

SF-3881 is available from FMCS by calling (202) 512-0992or 0993 FAX (800) 245-5476 (no collect calls). Changes in company or financial institution information presently on file should be submitted to the same office.

Contractors that do not have an account at a financial institution or authorized payment agent must certify to such circumstances, in writing, to the Assistant Comptroller, Accounting Division, FMCS. The acceptance of these certificates by GPO will terminate on January 1, 1999, when all contractors will be paid through EFT.

LIMITATION OF PERFORMANCE AND CONTRACTOR OBLIGATIONS: Funds are available for performance of this contract for the first program period only.   The amount of funds at award is not considered sufficient for performance required for any program year other than the first program year.  When additional funds are available for the full requirements for the next succeeding program year, the Contracting Officer shall, not later than 60 calendar days before the expiration of the program year for which performance has been funded (unless a later day is agreed to), so notify the contractor in writing.  Notification that funds are not available shall effect cancellation of the contract.

The Government is not obligated to the contractor for any amount over requirements for which funds have been made available and as obligated by each print order.

The contractor is not obligated to incur costs for the performance required for any program year after the first unless and until written notification is received from the Contracting Officer of an increase in availability of funds. If so notified, the contractor's obligation shall increase only to the extent contract performance is required for the additional program year for which funds have been made available.

If this contract is terminated under the "Termination for Convenience of the Government" clause, "total contract price" in that clause means the amount available for performance of this contract, as provided for in this clause. The term "Work in Process" in that clause means the work under the program year requirements for which funds have been made available.  If the contract is terminated for default, the Government's rights under this contract shall apply to the entire multiyear requirements.

Notification to the contractor of an increase or decrease in the funds available for performance of the contract under another clause (e.g. the "Option" or "Changes" clause) shall not constitute the notification required by the first paragraph of this clause.

This procedure shall apply for each successive program year.

ORDERING: Items to be furnished under the contract shall be ordered by the issuance of print orders by the Government. Orders may be issued under the contract from Nov. 1, 2006 through Oct. 31,2007. All print orders issued hereunder are subject to the terms and conditions of the contract. The contract shall control in the event of conflict with any print order. A print order shall be "issued" for purposes of the contract, when it is either deposited in the U.S. Postal Service mail or otherwise furnished to the contractor in conformance with the schedule.

REQUIREMENTS: This is a requirements contract for the items and for the period specified herein. Shipment/delivery of items or performance of work shall be made only as authorized by orders issued in accordance with the clause entitled "Ordering". The quantities of items specified herein are estimates only, and are not purchased hereby. Except as may be otherwise provided in this contract, if the Government's requirements for the items set forth herein do not result in orders in the amounts or quantities described as "estimated", it shall not constitute the basis for an equitable price adjustment under this contract.

Except as otherwise provided in this contract, the Government shall order from the contractor all the items set forth which are required to be purchased by the Government activity identified on page 1.

The Government shall not be required to purchase from the contractor, requirements in excess of the limit on total orders under this contract, if any.

Orders issued during the effective period of this contract and not completed within that time shall be completed by the contractor within the time specified in the order, and the rights and obligations of the contractor and the Government respecting those orders shall be governed by the terms of this contract to the same extent as if completed during the effective period of this contract.

If shipment/delivery of any quantity of an item covered by the contract is required by reason of urgency prior to the earliest date that shipment/delivery may be specified under this contract, and if the contractor will not accept an order providing for the accelerated shipment/delivery, the Government may procure this requirement from another source.

The Government may issue orders which provide for shipment/delivery to or performance at multiple destinations.

Subject to any limitations elsewhere in this contract, the contractor shall furnish to the Government all items set forth herein which are called for by print orders issued in accordance with the "Ordering" clause of this contract.

00000097

USCA Case #14-7077     Document #1530697          Filed: 01/07/2015     Page 98 of 604

## SECTION 2.- SPECIFICATIONS

SCOPE: These specifications cover the production of appeals briefs and appendices requiring such operations as copy pickup, composition and makeup from department supplied diskette(s), preparation of indexes on some orders, printing, binding, packing, distribution and return of government furnished materials

TITLE: Appeals Briefs and Appendices

FREQUENCY OF ORDERS: Approximately 300 Briefs and 150 Appendices

BRIEFS—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 200 copies per order with an average of 40 copies per order. Approximately 10 to 132 pages plus cover per order with an average of 40 pages per order Approximately 1 to 20 pages of index or table of contents per order.

APPENDICES—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 40 copies per order with a average of 20 copies per order. Approximately 8 to 1334 pages per order plus cover per order.

GOVERNMENT TO FURNISH: typewritten manuscript copy with computer diskettes or the Government will send copy by modem. Contractor must have the ability to receive by 56-k modem, E-mail or the Internet. Software program WordPerfect 8.0 or later will be used at the Government's discretion. Camera copy for text of Appendices and occasionally for Briefs.

Contractor must have the equipment compatible for use with the above software program and must have sufficient back-up equipment.

Occasionally the Government will supply pre-printed 8-1/2 x 11" pages which the contractor will be required to collate, typeset a cover, trim to finished size and bind.

Identification markings such as register marks, ring folios, rubber stamped jacket numbers, commercial identification marks of any kind, etc., except GPO imprint, form number, and revision date, carried on copy or film, must not print on finished product.

CONTRACTOR TO FURNISH: All materials and operations, other than those listed under "Government to Furnish," necessary to produce the product(s) in accordance with these specifications.

COMPOSITION: The entirety of each category of composition (text, tabular and display) must be identical throughout the products ordered under these specifications.

Composition must be computer output via laser printer, imagesetter or by photocomposition.

     Output resolution for laser printers will be 300 to 625 dots per inch and imagesetters will be will be 1,200 to 3,500 dots per inch.

     Photocomposition includes all typesetting product by photographically creating the characters on sensitized film or paper.

Type Page Size: For Briefs, approximately 25 x 43 picas plus folio, facing pages can be one or two lines long or short to accommodate make up and page breaks.

Typefaces and Sizes: The contractor is required to furnish the following:

     Cover: 12 to 72 point Century and Spartan Heavy.
     Text, Index, Table of Contents, and Footnotes: 12 point Century with italic, bold, and small caps.
     Display: 14 point Spartan Heavy.

Composition will be required on covers, table of contents, and text of Briefs and covers and table of contents of Appendices. Camera copy will be furnished for text of Appendices and occasionally for a percentage of text for Briefs.

No alternate typefaces will be allowed; however, manufacturers' generic equivalents will be accepted for the above typefaces. Each bidder shall list in the bid the name of the generic equivalent typeface(s) and composing machine to be used.

The GPO reserves the right to require samples of any generic equivalent typefaces offered if it is deemed necessary in order to determine the suitability of the offered typefaces.

The contractor must hold all repro for 60 days after delivery for possible use in reprints. After 60 days it may be disposed of.

FILMS/REPRODUCIBLES: The contractor must make all films/reproducibles required.

PROOFS: During the normal workday the contractor must deliver one set of page proofs and any revised page proofs. The contractor must also be able to transmit proofs and receive corrected proofs by facsimile.

On occasion, representatives of the government will read proofs at the contractor's plant. A suitable work place will be provided by the contractor.

The contractor will be responsible for performing all necessary proofreading to ensure that the proofs are in conformity with the copy submitted.

Page reader's proofs must be clean on white paper, free of ink smudges, with all images clearly legible. All proofs must be collated in sets, numbered sequentially, and have a one-inch clear margin on all sides. Proofs must be identified with the jacket number, program number, print order number, and proof date, at least 1/2" from the type area. The contractor's firm name must not appear on any proofs.

Page and Revised Page Proofs: Proofs must be uniform in size and contain a single page to a sheet. When pages contain space allowance for illustrations, an identifying illustration number must be marked in the space allowed. Tables on one set of proofs must be completely ruled.

If any contractor's errors are serious enough in the opinion of the GPO to require revised proofs, the revised proofs are to be provided at no expense to the Government. No extra time can be allowed for this reproofing; such operations must be accomplished within the original production schedule allotted in the specifications.

The contractor must not print prior to receipt of an "OK to print." Contractor will receive OK by phone or by facsimile.

STOCK/PAPER: The specifications of all paper furnished must be in accordance with those listed herein or listed for the corresponding JCP Code numbers in the "Government Paper Specification Standards No. 10" dated July 1994.

All text paper used in each copy must be of a uniform shade. All cover paper must have the grain parallel to the spine.

Text: White Antique Book, grammage 67 g/m$^2$ (basis weight: 45 lbs per 500 sheets, 25 x 38"), equal to JCP Code A100.

Cover: White and Colored (usually, but not limited to, Red, Gray, Green, and Blue) Vellum-Finish Cover, grammage 175 g/m$^2$ (basis weight: 65 lbs per 500 sheets, 20 x 26"), equal to JCP Code L20.

Occasional orders may require the use of pressure sensitive cover stock (same as listed above) for the correction of minor errors, stock must have permanent adhesive. Stock to be equal to "Starliner" by Mactac with special permanent adhesive or Fasson "Crack 'n Peel" Plus with super permanent adhesive.

PRINTING: Print head to head in black ink. All orders may be printed by electro-static copying or by printing with direct image plates provided that the quality levels are maintained.

INK: If lithographic ink is used in the performance of this contract, the ink shall contain not less than the following percentages of vegetable oil: sheet- fed and forms ink, 20 percent.

For Appendices, the contractor will be required to mechanically number the pages. This shall be accomplished by a numbering machine consisting of 1 or 2 letters followed by up to 4 digits. All characters are to be 3/16" or 1/4" high. The numbered text is then used as camera copy.

MARGINS: Briefs: 1" on all sides.

BINDING: Perfect- or adhesive-bind products: Gather contractor printed and/or Department supplied printed material, perfect- or adhesive-bind with separate wraparound glued-on paper cover, and trim three sides. Covers trim flush.

PACKING: Pack in shipping containers. Each shipping container must not exceed 45 pounds when fully packed.

LABELING AND MARKING (Package and/or Container label): Reproduce shipping container label from furnished repro, fill in appropriate blanks and attach to shipping containers.

DISTRIBUTION: Deliver f.o.b. destination to the following addresses:

| U.S. Department of Justice | U.S. Department of Justice |
|---|---|
| One St. Andrew's Plaza | 86 Chambers Street , 3rd Floor |
| New York, NY 10007 | New York, NY 10007 |

INSIDE PICKUP AND DELIVERY TO ROOM NUMBER SPECIFIED IS REQUIRED.

There will be one additional address in Manhattan.

Complete addresses and quantities will be furnished with the print orders.
All expenses incidental to returning materials, submitting proofs, and furnishing sample copies must be borne by the contractor.

RETURN OF GOVERNMENT FURNISHED MATERIAL, ETC: The contractor shall within 10 days of delivery of each brief, return to the Department the corrected version (i.e., the version as printed) of each brief on 3.5" diskette. This corrected version (hereinafter "corrected version file") shall be in WordPerfect 8.0 or higher as directed by the Government.

Also .pdf file(s) in Acrobat 3.0 Reader for use in CD-ROM production, files must be identical to the printed version from contractor's application program files, e.g., using Macintosh platform, QuarkXPress, Adobe PageMaker, etc. or using Windows platform, QuarkXPress, Adobe PageMaker, Adobe FrameMaker, etc.

Required formatting of the corrected version file: Justification shall be Full or Left; Base Font shall be Courier; Line Spacing shall be one; paragraphs shall be separated by 2-points or more leading between lines and 6-points or more between paragraphs (tabular or spaced first-line indentations are permissible); lines within paragraphs shall end with Soft Returns, not Hard Returns; block quotations shall be left/right indented paragraphs; footnote markers in text and footnotes shall be in standard WordPerfect format.

Impermissible Formatting: Character font codes other than the Base Font shall be removed; center Justification codes shall be removed; other formatting codes added during the conversion process, if any, other than as required above, shall be removed.

SCHEDULE: Adherence to this schedule must be maintained. Contractor must not start production of any job prior to receipt of the individual print order (GPO Form 2511). No definite schedule for pickup of material can be predetermined. Furnished material and proofs must be picked up from and delivered to the addresses under DISTRIBUTION.

It should be noted that the performance period specified by the Government consists of contract  workdays Monday through Friday, from 9:00 a.m. to approximately 10:00 p.m..

The Contractor may be required to work on up to 4 briefs or appendices (up to 100 pages per order) in one day and maintain work schedules.

USCA Case #14-7077      Document #1530697          Filed: 01/07/2015      Page 101 of 604

Contractor will be notified for pick up of initial copy and/or diskette(s) or Government will notify contractor that copy will be sent by modem as set forth below.

## BRIEFS

Regular Schedule (non-Overtime): Contractor will be required to pickup copy and diskettes or be available to receive copy by electronic means between the hours of 9:00am to 12:00pm and to process copy and deliver typeset page proofs (up to 100 pages per brief) back to the agency within 4 hours.

Contractor will be required to pick up corrected page proofs or receive by facsimile during contract workday hours, make corrections and deliver (or facsimile) corrected set of page proofs back to the Department within one (1) hours of receipt.

Additional changes may be made by the agency up to 4 additional times per brief and the Contractor must turnaround each change within 30 minutes of receipt of change/

After receiving "OK to print," contractor will print, bind, and deliver 40 copies (up to 100 pages per brief) within 2 hours.

In the event that the contractor is responsible only for printing the cover and binding the brief, in one of two format, a copy of the text of the brief shall be provided by the Department to the contractor. After receiving the text of the brief and an "OK to print," the contractor shall make the requisite copies of the text of the brief and bind and trim to size and deliver 40 copies within 2 hours. Trim sizes will either be 8-1/2 x 11" or 6-1/8 x 9-1/4

## APPENDICES

Regular Schedule (Non-Overtime): The contractor will be required to pick up copy, typeset cover and table of contents, number pages, print, and deliver 20 copies of up to 500 pages.

This should be a 2-step process:
    1) Contractor prepares a "dummy" appendix (no cover or table of contents), just numbered pages in a temporary binding. This should take no more than 24 hours.
    2) When appendix is in final form (including cover and table of contents), contractor is given "OK" to print. Deliver 20 copies of up to 500 pages within 4 hours.

If receipt of material, from the Government, occurs such that contractor cannot perform above schedule during normal workday hours, contractor will perform such work during the following workday or on overtime if overtime is authorized by the Government.

**NOTE: Overtime shall apply to any work performed after 10:00pm or on weekends or Federal Holidays resulting from delays caused by the agency. No overtime payment will be paid because of contractor's failure to meet the schedule..**

**Overtime Schedule: When the Government requires that work be performed Monday thru Friday after 10:00pm Saturdays, Sundays, and Federal holidays, in order to meet delivery requirements, overtime payments will be paid for at the hourly overtime rate in accordance with the contractor's offered hourly rate in the "Schedule of Prices". Contractor and agency must agree on the number of hours of overtime necessary to complete the job and this must be shown on the print order or attachment. No overtime will be paid if proof of agreement on the number of hours is not attached to the print order.**

**CONTRACTORS PLEASE NOTE: CONTRACTOR MAY NOT REFUSE TO WORK OVERTIME.**

Appeals Briefs.
2231-S

SERVICE AND FILING OF BRIEFS AND APPENDICES BY CONTRACTOR: At Government's Option:

For each brief and/or appendix prepared by the Contractor with respect to which a request is made by the Government, the Contractor shall, in a manner consistent with the requirements of the United States Court of Appeals for the Second Circuit, serve two copies of the brief and/or 1 copy appendix on each party designated by the Government and timely file in the Court of Appeals the original and the appropriate number of copies of the brief and/or appendix. Service will generally be by mail, but personal service may be required. Absent a request by the Government that a particular brief and/or appendix be served and filed by the Contractor, the Contractor shall deliver to the Government the number of copies of the brief and/or appendix specified in the print order form.

If personal service is required, and the party is located more than 25 miles from the contractor's office, the Government will pay actual charges at cost without mark-up.

SECTION 3.- DETERMINATION OF AWARD

The Government will determine the lowest bid by applying the prices offered in the "Schedule of Prices" to the following units of production which are the estimated requirements to produce 12 months orders under this contract. These units do not constitute, nor are they to be construed as, a guarantee of the volume of work which may be ordered for a like period of time.

OVERTIME PAYMENTS: Orders requiring production on Saturdays, Sundays, Federal holidays, or Monday thru Friday after 10:00pm in order to meet delivery requirements will be paid for at the overtime rate in accordance with the contractor's offered hourly rate in the "Schedule of Prices".

All other orders will be placed with the required schedule and paid for at the basic prices offered.

It is estimated that 15% of the orders placed on this contract will require an overtime schedule and,

The following item designations correspond to those listed in the "Schedule of Prices".

CATEGORY 1

I. (a)(1)   310
     (2)   170
    (b)   106
    (c)   10106
    (d)   318
    (e)   15780
    (f)   34234
    (g)   2052
    (h)   200
    (i)   0
    (j)   50

II. (a)   1,327
    (b)   165,996
    (c)(1)   10
       (2)   0
    (d)   14

III. (a)   255
     (b)   348
     (c)   255

IV   100

USCA Case #14-7077      Document #1530697      Filed: 01/07/2015      Page 104 of 604

SECTION 4.- SCHEDULE OF PRICES

SUBMISSION OF OFFERS AND EVALUATION: The offer shall be based upon supplying paper that meets or exceeds the minimum percentage of waste paper as required by this solicitation. By submission of an offer, offerors are certifying that the paper to be supplied contains at least the minimum percentage specified. This certification concerns a matter within the jurisdiction of an agency of the United States, and the making of a false, fictitious, or fraudulent certificate on may render the maker subject to prosecution under Title 18, United States Code, Section 1001. he Government reserves the right to require proof of such certification prior to first delivery and thereafter as may be otherwise provided for under the provisions of the contract.

Bids offered are f.o.b. destination.

Prices must include the cost of all required materials and operations for each item listed in accordance with these specifications.

Bidder must make an entry in each of the spaces provided. Contractor must submit a price for all items. A No Charge or a No Bid may be cause for your bid to be declared nonresponsive. Bids submitted with any obliteration, revision, or alteration of the order and manner of submitting bids, may be declared nonresponsive.

Bids submitted with NB (No Bid) or blank spaces for an item may be declared nonresponsive.

The Contracting Officer reserves the right to reject any offer that contains prices for individual items of production (whether or not such items are included in the Determination of Award) that are inconsistent or unrealistic in regard to other prices in the same offer or to GPO prices for the same operation if such action would be in the best interest of the Government.

All vouchers submitted to the GPO shall be based on the most economical method of production.

Fractional parts of 10 will be prorated at the per 10 rate.

Prices must be submitted for the entire term of the contract and bids qualified for a lesser period will not be considered.

(Initials)

00000104

Appeals Briefs                                                 Page 13 of 15
2231-S

I.      COMPOSITION AND PAGE MAKEUP:

(a) Cover pages:

      (1) Brief (6-1/8 x 9-1/4")................per page...........$ 10.00

      (2) Appendix (8-1/2 x 11")..............per page...........$ 10.00

(b) Text page: Contractor set from manuscript copy.....per page.....$ 10.00

(c) Text page: Department supplied diskette(s)..per page...........$ 5.50

(d) Remake of pages due to editorial changes....per page...........$ 3.50

(e) Page proofs................................per page...........$ .25

(f) Authors alterations* (flat charge for access
    to file). Offer must include, and a charge
    will be allowed for, locating each deletion,
    change or addition in the file.............per alteration......$ .25

    *Alterations may consist of the addition or deletion of one or more words or phrases (groups of words within a
    single sentence), these will be considered as one alteration. <u>The maximum charge allowable for author's alterations
    on any one page shall be an amount equal to the cost of setting that page from manuscript copy.</u>

(g) Insertion of reference page numbers on
    Table of Contents or Index from edited
    page proofs................................per line...........$ .25

(h) Return to the Department the corrected version
    (i.e., the version as printed) of each brief
    on 3.5" diskette. This corrected version
    (hereinafter "corrected version file") shall
    be in WordPerfect 6.1.......................per diskette.......$ 1.75

(i) .pdf file production using Acrobat 3.0 Reader
    for use in CD-ROM production, files must be
    identical to the printed version of text....per page...........$ 5.50

(j) Diskette for .pdf file(s) above.............each................$ 1.75

_____
(Initials)

II.    COMPLETE PRODUCT: Prices offered shall include the cost of all required materials and operations (EXCEPT Items I. and III.) necessary for the complete production and distribution of the product listed in accordance with these specifications.

### NOTE: RUNNING RATE IS PER 10 COPIES

| | Running Per 10 Copies |
|---|---|

Includes makeready if required:

(a) Complete cover (wraparound)...........................$ 6.00

(b) Text per page........................... .........$ .35

(c) Pressure sensitive cover stock (up to 8-1/2 x 11"):

    (1) White...................per 100 leaves......$ 12.50

    (2) Colored...................per 100 leaves......$ 12.50

(d) Collating, trimming to size and binding    per 100 pages    $ 12.25

III. SERVICE AND FILING OF BRIEFS AND APPENDICES BY CONTRACTOR: At Government's Option:

(a) Filing brief and any appendices or attachments at court and on one party...................$ 50.00

(b) Each additional service........................$ 0.00

( c) Electronic filing of Briefs .........................$ 50.00

IV. OVERTIME PAYMENTS:

Hourly rate for work performed after 10:00pm on weekdays, Saturday, Sunday and Federal Holidays......per hour.............$ 95.00

It is estimated that 15% of the orders placed on this contract will require an overtime schedule .

SECTION 4.- TYPEFACES: If manufacturers generic equivalent typefaces are proposed, the bidder must list on the line of the same number as the preferred typeface, the name of the equivalent typeface and composing machine to be used.

Preferred Typefaces:

1. Century

2. Spartan Heavy

Manufacturers Generic
Equivalent Typefaces                Name of Composing Machine

1._____        _____

2._____        _____

BIDDERS NAME AND SIGNATURE: Fill out and return Two (2) copies of all pages in "Section 4.- Schedule of Prices", initial or sign each in the space provided and submit with GPO Form 910, "Bid". Do not enter bid prices on GPO Form 910. NOTE: The schedule of prices will prevail in instances where prices are inadvertently entered on GPO Form 910.

Bidder_____ _____

_____
            (City - State)

By_____ _____
     (Signature and title of person authorized to sign this bid)

_____
     (Person to be contacted)          (Telephone Number)

The contractor is cautioned not to perform any operation(s) or produce any product(s) for which a price has not been offered under the contract. Further, the contractor is not to accept print orders which are outside the scope of the contract. If such orders are placed, contractor is to notify GPO New York immediately. Failure to do so may result in nonpayment.

00000107

| ITEM NO. | DESCRIPTION | BASIS OF AWARD | NEW YORK UNIT RATE | COST | NEW YORK UNIT RATE | COST | NEW YORK UNIT RATE | COST | CONTRACT UNIT RATE | COST | UNIT RATE | COST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I |  COMPOSITION AND PAGE MAKEUP | | | | | | | | | | | |
| a | COVER PAGE | | | | | | | | | | | |
| 1 | BRIEF (8-1/8 X 8-1/4")   PER PAGE | 310 | 9.00 | 2,790.00 | 10.00 | 3,100.00 | 8.50 | 2,015.00 | 8.50 | 2,015.00 | | |
| 2 | APPENDIX (8-1/2 X 11")   PER PAGE | 170 | 9.00 | 1,530.00 | 10.00 | 1,700.00 | 6.50 | 1,105.00 | 6.50 | 1,105.00 | | |
| b | TEXT PAGE: MANUSCRIPT COPY   PER PAGE | 108 | 10.00 | 1,080.00 | 10.00 | 1,080.00 | 7.00 | 742.00 | 7.00 | 742.00 | | |
| c | TEXT PAGE: SUPPLIED DISK   PER PAGE | 10108 | 7.90 | 79,837.40 | 4.00 | 40,424.00 | 4.00 | 40,424.00 | 4.00 | 40,424.00 | | |
| d | REMAKE OF PAGES   PER PAGE | 318 N/C | | | 3.00 | 954.00 N/C | | N/C | | | | |
| e | PAGE PROOFS   PER PAGE | 15780 | 1.00 | 15,780.00 | 0.20 | 3,156.00 | 0.20 | 3,156.00 | 0.20 | 3,156.00 | | |
| f | AUTHOR'S ALTERATIONS   PER ALTERATION | 34234 N/C | | | 0.25 | 8,558.50 N/C | | N/C | | | | |
| g | INSERTION OF REFERENCE PAGE NUMBERS   PER U | 2052 N/C | | | 0.20 | 410.40 N/C | | N/C | | | | |
| h | RETURN TO THE DEPT. CORRECTED VERSION OF EACH BRIEF   PER DISKETTE | 200 N/C | | | 1.50 | 300.00 N/C | | N/C | | | | |
| i | PDF FILE PRODUCTION USING ACROBAT 3.0 | | | | | | | | | | | |
| j | READER FOR USE IN CD-ROM   PER PAGE / DISKETTE FOR PDF FILE ABOVE   EACH | 50 N/C | 0.25 | | 5.00 | 75.00 N/C | 5.00 | | 5.00 | | | |
| II | COMPLETE PRODUCT | | | | | | | | | | | |
| a | COMPLETE COVER   PER 10 COPIES | 1327 | 3.00 | 3,981.00 | 5.50 | 7,298.50 | 5.50 | 7,298.50 | 5.50 | 7,298.50 | | |
| b | TEXT PER PAGE   PER 10 COPIES | 165996 | 0.50 | 82,888.00 | 0.30 | 49,798.80 | 0.20 | 33,199.20 | 0.20 | 33,199.20 | | |
| c | PRESSURE SENSITIVE COVER STOCK | | | | | | | | | | | |
| 1 | WHITE   PER 100 LEAVES | 10 N/C | | | 12.00 | 120.00 N/C | | N/C | | | | |
| 2 | COLOR   PER 100 LEAVES | N/C | | | 12.00 | N/C | | N/C | | | | |
| d | COLLATING, TRIMMING TO SIZE AND BINDING   PER 100 PAGE | 14 | 6.50 | 91.00 | 12.00 | 168.00 | 5.00 | 70.00 | 5.00 | 70.00 | | |
| III | SERVICE AND FILING OF BRIEFS | | | | | | | | | | | |
| | FILING BRIEF AND ANY APPENDICES OR ATTACHMENTS AT COURT AND ON ONE PARTY | 255 | 20.00 | 5,100.00 | 50.00 | 12,750.00 N/C | | N/C | | | | |
| a | EACH ADDITIONAL SERVICE | 348 N/C | | | N/C | N/C | | N/C | | | | |
| b | ELECTRONIC FILING OF BRIEFS   EACH | 255 | 30.00 | 7,650.00 | 30.00 | 7,650.00 N/C | | N/C | | | | |
| IV | OVERTIME PAYMENT | | | | | | | | | | | |
| a | HOURLY RATE FOR WORK PERFORMED AFTER 10:00PM ON WEEKDAYS, SATURDAY, SUNDAY AND FEDERAL HOLIDAYS   PER HOUR | 100 | 150.00 | 15,000.00 | 95.00 | 9,500.00 N/C | | 70.00 | N/C | | | |
| | CONTRACTOR TOTALS | | | $208,187.40 | | $147,023.20 | | $86,009.70 | | $86,009.70 | | |
| | DISCOUNT | | | | 2.00% | | | $1,760.19 | | | | |
| | DISCOUNTED TOTALS | | | $208,187.40 | | $147,023.20 | | $86,249.51 | | $86,009.70 | | |

Page 1 of 1

# EXHIBIT 6

00000109



# RECORD PRESS INC.
Decades of Experience · Cutting Edge Technology
Since 1945

**229 West 36th Street, New York, NY 10018**

Phone (212) 619-4949    Fax (212) 608-3141
Federal I.D. Number 13-5654177

## INVOICE #A71700

Refer To Invoice # with Payment

**SOLD TO:**
COMPTROLLER-STOP FMCE (SD)
OFFICE OF FINANCIAL MANAGEMENT
U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| INVOICE DATE |
|---|
| 12/22/2006 |
| **CUSTOMER PHONE** |
| 202 512-0816 |
| **CUSTOMER FAX** |
| |

| PURCHASE ORDER No. | PRINT ORDER No. | Due Date | NET TER... | ACCT... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| | B0601 | 1/21/2007 | Net 30 | H | | 18092C |

### Burke v Evans

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | RE: Brian T. Burke v Donald L. Evans | | |
| | Docket No. 06-1917-cv / Print Order # 65213 | | |
| | For printing and binding 40 copies of the above Brief for | | |
| | Defendants-Appellees: | | |
| 1 | Typeset Cover @ $10.00 Per Page | 10.00 | 10.00 |
| 40 | Covers Printed @ $0.60 Per Cover | 0.60 | 24.00 |
| 3,040 | 76 Pages Text Printed x 40 Copies @ $0.035 Per Page | 0.035 | 106.40 |
| 3,040 | Collating, Trimming to Size and Binding Charge 3040 Pages @ $12.25 Per 100 Pages | 0.1225 | 372.40 |
| 1 | Party Served and Filed @ | 50.00 | 50.00 |
| 1 | Electronic Filing and Service of Brief @ | 30.00 | 30.00 |
| | | | 592.80 |
| | Postage @ | 7.10 | 7.10 |

| | |
|---|---|
| **SUBTOTAL** | $599.90 |
| **TAX (0.0%)** | $0.00 |
| **TOTAL** | $599.90 |
| **MONEY ON ACC'T** | $-599.90 |
| **BALANCE DUE** | $0.00 |

## Thank you for your business.

00000110



# RECORD PRESS INC.
Decades of Experience — Cutting Edge Technology
Since 1945

**229 West 36th Street, New York, NY 10018**

Phone (212) 619-4949     Fax (212) 608-3141
Federal I.D. Number 13-565...

PAID

## INVOICE #A71701

Refer To Invoice # with Payment

**SOLD TO:**
COMPTROLLER-STOP FMCE (SD)
OFFICE OF FINANCIAL MANAGEMENT
U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| INVOICE DATE |
|---|
| 12/22/2006 |
| **CUSTOMER PHONE** |
| 202 512-0816 |
| **CUSTOMER FAX** |
| |

| PURCHASE ORDER No. | PRINT ORDER No. | Due Date | NET TER... | ACCT... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| | B0601 | 1/21/2007 | Net 30 | H | | 18093C |

### Burke v Evans

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | RE: Brian T. Burke v Donald L. Evans | | |
| | Docket No. 06-1917-cv / Print Order # 65212 | | |
| | For printing and binding 20 copies of the above Appendix | | |
| | for Defendants-Appellees: | | |
| 1 | Typeset Cover @ $10.00 Per Page | 10.00 | 10.00 |
| 566 | Pages Text x 1 Proof Copy @ $0.25 Per Page | 0.25 | 141.50 |
| 20 | Covers Printed @ $0.60 Per Cover | 0.60 | 12.00 |
| 53 | Page Numbers Inserted in Table of Contents @ $0.25 | 0.25 | 13.25 |
| 11,320 | 566 Pages Text Printed x 20 Copies @ $0.035 Per Page | 0.035 | 396.20 |
| 11,320 | Collating, Trimming to Size and Binding Charge 11,320 | 0.1225 | 1,386.70 |
| | Pages @ $12.25 Per 100 Pages | | |
| 1 | Text Page @ $10.00 Per Page | 10.00 | 10.00 |
| | | | 1,969.65 |

| | |
|---|---|
| **SUBTOTAL** | $1,969.65 |
| **TAX (0.0%)** | $0.00 |
| **TOTAL** | $1,969.65 |
| **MONEY ON ACC'T** | $-1,969.65 |
| **BALANCE DUE** | $0.00 |

## Thank you for your business.

# EXHIBIT   7

00000112

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
------------------------------------------------ x
BRIAN BURKE,                                        :
                                                    :
             Plaintiff-Appellant,                   :
                                                    :        06-1917-cv
                                                    :
        v.                                          :
                                                    :        ITEMIZED AND VERIFIED
DONALD L. EVANS, SECRETARY,                         :        BILL OF COSTS
UNITED STATES DEPARTMENT OF                         :
COMMERCE,                                           :
                                                    :
             Defendants-Appellees.                  :
------------------------------------------------ x

        Counsel for defendants-appellees Donald L. Evans and the United

States Department of Commerce (collectively, "defendants-appellees"),

respectfully submit, pursuant to Rule 39 of the Federal Rules of Appellate

Procedure, the within bill of costs and request that the Clerk prepare an itemized

statement of costs taxed against plaintiff-appellant and in favor of defendants-

appellees for insertion in the mandate.

| | |
|---|---|
| Docketing Action | $ 0.00 |
| Costs of printing appendix (necessary 20 copies) | $ 2136.36 |
| Costs of printing brief (necessary 30 copies) | $ 419.95 |
| Costs of printing reply brief | $ 0.00 |
| TOTAL | $ 2556.31 |

        Pursuant to 28 U.S.C. § 1924, the above costs are correct and were

necessarily incurred in the litigation of this action for printing work actually and

necessarily performed, as shown by Exhibits A and B attached hereto, which is a true copy of the print orders and invoices relating to the printing of defendants-appellees' appendix and brief, respectively. Annexed hereto as Exhibit C is an explanation of the difference between the amount of the Exhibit B and the amount for which defendant-appellee seeks costs.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on:      New York, New York
                  June 21, 2007


KRISTIN L. VASSALLO
Assistant United States Attorney

- 2 -

00000114

**GPO 2511** *Desktop* **Print Order**

| Department | Req. No. | Date | Purchase Order No. | Print Order No. |
|---|---|---|---|---|
| Southern District | 7-00141 | 12-08-2006 | B-0601 | 65212 |

| Contractor | Jacket No. | Estimated Cost | Ship/Delivery Date |
|---|---|---|---|
| Appeals Brief/Appendices | 604-066 | | 12-18-2006 |

| Title | Object Class | State Code | Contractors Code | Program No. |
|---|---|---|---|---|
| Brian Burke V. Evans (06-1917) | 24:00 | 310 | 73951 | 2231-S |

| **Proofs** | Type of proof required | Sets | Days Gov't will hold | | | |
|---|---|---|---|---|---|---|
| | Gallery | X | | Furnished Electronic Media | BAC | Quantity |
| | | | | Qty: _____ | 4410-KD | 20 |
| | Page | 20 | | Qty: _____ | Quality Level | Trim Size |
| | | | | | *IV* | 8 1/2 x 11 |

| Materials Furnished to Contractor | | | | | |
|---|---|---|---|---|---|
| Manuscript | Halftones | Line Illus. | Camera Copy | Negatives | Other |
| X | | | | | |

| Text Stock | Cover Stock | No. of Text Pages (including blanks) | Fold-In Stock | Strip-Ins |
|---|---|---|---|---|
| White Antique Paper | 45 lbs Vellum 65 lbs | | | |

| Four Color Process Printing | | Cover Ink | Text Ink | Cover Prints | | | | Fold-Ins/Forms | | Negatives from Electronic media | Negatives from camera copy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Face | Back | Black | Black | 1 2 3 4 | | | | Face only | Face & Back | | |
| | | | | X | | | | | | | |

| **Binding** | | | | |
|---|---|---|---|---|
| | Saddle | Paste on Fold | Band Units of | Drill ___ holes _____ in diameter on _____ side _____ inches C. to C. |
| | f U/C | Trim 4 Sides | Shrinkwrap Units of | Center of holes _____ inches from _____ edge of sheet |
| | Side | Perf on Fold | Perf off fold | Pads of _____ sheets/sets each. Pad on the _____ side. **Chipboard required** |
| | Perfect | Tab seal | Fold to: | Pack _____ Per shipping container. **Pallets required.** |
| | Other | | | Pack _____ Per shipping container. |

Instructions and Distribution:

Return all Government furnished materials and/or negs. to:

Defendant Appellee's Appendix
(2004V03846)

*OE 4054     24 ||*
*2537         12/06*

*12/06*

*5/7/0-*

Appeals Brief
86 Chambers Street (SDNY)

| Specifications written by: John Ellwood    Sold by: _____ | Typed by: _____ | Date sent to contractor 12/08/2006 |
|---|---|---|

*Additional Shipping Instructions for Supt. of Docs. copies.*

| | |
|---|---|
| _____ US Government Printing Office–M/F: "Depository" _____ Depository Receiving Section 44 H St., NW, Loading Dock Washington, DC 20401    Item _____ | _____ US Government Printing Office–M/F: "Sales" Req. _____ Documents Warehouse 8610 Cherry Lane    M/F: "Subscription Stock" Req. _____ Laurel, MD 20707 |
| | Individual Printed Mailing Containers are Required |
| _____ Library of Congress Anglo-American Acquisitions Division Government Documents Section 101 Independence Ave., SE Washington, DC 20540-4172 Marked: File Copies | Stock No. _____ Sub. ID No. _____ ISBN No. _____ (Shipping labels for Supt. of Docs. "Sales" or "Subscription" copies must contain Stock No., Sub. ID No. and ISBN No. as indicated.) |



**U.S. GOVERNMENT PRINTING OFFICE**
KEEPING AMERICA INFORMED

May 31, 2007

United States Attorney
Civil Clerk's Office
Attn: John Ellwood
33 White Hall St., 7th Floor
New York, NY 10004

Dear Sir:

The following information is furnished in response to your request for a cost to the Government for 20 copies of Print Order 65212 Jacket 604-066.

<u>COMPOSITION CHARGE</u>

| Qty: | | Amount |
|---|---|---|
| 1 | Text Page(s) | 10.70 |
| | Combination Pages | |
| | (Text & Footnotes): | |
| 1 | Cover: | 10.70 |
| 53 | Index/Table of Contents: | 14.18 |
| 566 | Page Proofs: | 151.41 |
| | Pages Remake | |
| | Manuscript | |

<u>PRINTING AND ASSEMBLY APPENDIX/RECORD</u>

| | | Unit Price | Amount |
|---|---|---|---|
| 20 | Cover Page Per Unit | .64 | 12.80 |
| 11320 | Text Page Per Unit | .04 | 452.80 |
| 1 | Collating & Trimming | 1483.77 | 1483.77 |
| | Total | | 2136.36 |

00000116

Page 2

I trust this information will serve your needs. If you require additional information, please contact me on (202) 512-1197.

Sincerely,

AKIKO Z. WARD
Customer Service Controller
(Office of the Customer Service Controller)

**GPO 2511** *Desktop* **Print Order**

| Department | Req. No. | Date | Purchase Order No. | Print Order No. |
|---|---|---|---|---|
| Southern District | 7-00141 | 12-08-2006 | B-0601 | 65213 |

| Contractor | Jacket No. | Estimated Cost | Ship/Delivery Date |
|---|---|---|---|
| Appeals Brief/Appendices | 604-066 | | 12-18-2006 |

| Title | Object Class | State Code | Contractors Code | Program No. |
|---|---|---|---|---|
| Brian Burke V. Evans (06-1917) | 24:00 | 310 | 73951 | 2231-S |

**Proofs**

| Type of proof required | Sets | Days Gov't. will hold | Furnished Electronic Media | | BAC | Quantity |
|---|---|---|---|---|---|---|
| Gallery | X | | | Qty: ___ | 4410-KD | 40 |
| Page | 40 | | | Qty: ___ | Quality Level **IV** | Trim Size 8 1/2 x 11 |

**Materials Furnished to Contractor**

| Manuscript | Halftones | Line Illus. | Camera Copy | Negatives | Other |
|---|---|---|---|---|---|
| X | | | | | |

| Text Stock | | Cover Stock | | No. of Text Pages (including blanks) | Fold-In Stock | Strip-Ins |
|---|---|---|---|---|---|---|
| White Antique Paper | | 45 lbs Vellum 65 lbs | | | | |

| Four Color Process Printing | | Cover Stock | Text Ink | Cover Prints | | Fold-Ins/Forms | | Negatives from Electronic media | Negatives from camera copy |
|---|---|---|---|---|---|---|---|---|---|
| Face | Back | Cover Ink Black | Black | 1 2 3 4 X | | Face only | Face & Back | | |

**Binding**

| Saddle | Paste on Fold | Band Units of |
|---|---|---|
| I ULC | Trim 4 Sides | Shrinkwrap Units of |
| Side | Perf on Fold | Pari off fold |
| Perfect | Tab seal | Fold to: |
| Other | | |

Drill ___ holes ___ in diameter on ___ side ___ inches C. to C.
Center of holes ___ inches from ___ edge of sheet
Pads of ___ sheets/sets each. Pad on the ___ side. **Chipboard required**
Pack ___ Per shipping container.    Pallets required.

Instructions and Distribution:

Return all Government furnished materials and/or negs. to:

Defendant Appellee's Red Brief
(2004V03846)

*[handwritten]* OE-9054   2-41
*[handwritten]* 2538 .... 12/06

*[handwritten text]* Date Rec'd .... 12/06

*[signature]* Date 5/7/07

Appeals Brief
86 Chambers Street (SDNY)

| Specifications written by: John Ellwood *[signature]* Sold by: ___ Typed by: ___ | Date sent to contractor 12/08/2006 |
|---|---|

*Additional Shipping Instructions for Supt. of Docs. copies.*

US Government Printing Office–M/F: "Depository"
Depository Receiving Section
44 H St., NW, Loading Dock
Washington, DC 20401     Item ___

Library of Congress
Anglo-American Acquisitions Division
Government Documents Section
101 Independence Ave., SE
Washington, DC 20540–4172
Marked: File Copies

US Government Printing Office–M/F: "Sales" Req.
Documents Warehouse
8610 Cherry Lane   M/F: "Subscription Stock" Req. ___
Laurel, MD 20707

Individual Printed Mailing Containers are Required

Stock No. ___
Sub. ID No. ___
ISBN No. ___
(Shipping labels for Supt. of Docs. "Sales" or "Subscription" copies must contain Stock No., Sub. ID No. and ISBN No. as indicated.)



**U.S. GOVERNMENT PRINTING OFFICE**
KEEPING AMERICA INFORMED

May 31, 2007

United States Attorney
Civil Clerk's Office
Attn: John Ellwood
33 White Hall St., 7th Floor
New York, NY  10004

Dear Sir:

The following information is furnished in response to your
request for a cost to the Government for 40 copies of Print Order
65213 Jacket 604-066.

<u>COMPOSITION CHARGE</u>

| Qty: | | Amount |
|---|---|---|
| | Text Pages: | |
| | (Text & Footnotes): | |
| 1 | Cover: | 10.70 |
| | Index/Table of Contents: | |
| | Page Proofs: | |
| | Pages Remake: | |
| | Manuscript: | |

<u>PRINTING AND ASSEMBLY (BRIEFS)</u>

| | | Unit Price | Amount |
|---|---|---|---|
| 40 | Cover Pages Per Unit | .64 | 25.60 |
| 3040 | Text Page Per Unit | .04 | 121.60 |
| 1 | Collating & Trimming | 398.47 | 398.47 |
| | Total | | 556.37 |

00000119

Page 2


I trust this information will serve your needs. If you require additional information, please
contact me on (202) 512-1197.

Sincerely,

AKIKO Z. WARD
Customer Service Controller
(Office of the Customer Service Controller)

Total Allowable Cost of Printing Brief

Composition

| | |
|---|---|
| Text pages | |
| Cover | $ 10.70 |
| Index/Table of Contents | |
| Page Proofs | _____ |
| Subtotal for Composition: | $ 10.70 |

Printing and Assembly (based on 40 copies of cover page and text pages)

| | | |
|---|---|---|
| Cover page | ($25.60 x 3/4) | $ 19.20 |
| Text pages | ($121.60 x 3/4) | $ 91.20 |
| Collating & Trimming ($398.47 x 3/4) | | $ 298.85 |
| Subtotal for Printing and Assembly: | | $ 409.25 |

| | |
|---|---|
| Total Cost of Printing Brief | $ 419.95 |
| ($10.70 + 409.25) | |

Although the contract between this Office and its printer provides for a minimum run of forty copies, this Court's decision in Furman v. Cirrito, 782 F.2d 353, 356 (2d Cir. 1986), provides that printing costs for thirty copies of the brief are properly deemed taxable costs. Therefore, the "Cover Page Per Unit" and "Text Page Per Unit" charges under the heading "PRINTING AND ASSEMBLY (BRIEFS)" on the invoice contained in Exhibit B are discounted accordingly as set forth above.

The item listed on the invoice under the heading "COMPOSITION CHARGE," however, constitutes composition costs associated with setting the necessary type that remain the same regardless of how many copies are actually printed. It is therefore fully reimbursable under 28 U.S.C. § 1920(3).

00000121

## CERTIFICATE OF SERVICE

KRISTIN L. VASSALLO, an Assistant United States Attorney for the

Southern District of New York, hereby certifies that on June 21, 2007 I caused a

copy of the Itemized and Verified Bill of Costs to be served by Federal Express

upon the following:

Brian T. Burke
145 E. 23rd Street, Apt. 4R
New York, New York 10010


Dated: New York, New York
       June 21, 2007

                                   _____
                                   KRISTIN L. VASSALLO
                                   Assistant United States Attorney

# EXHIBIT 8

00000123

# UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

HON. DENNIS JACOBS
Chief Judge

CATHERINE O'HAGAN WOLFE
Clerk



Before:    Hon. Ralph K. Winter,
Hon. Barrington D. Parker,
*Circuit Judges,*
Hon. Louis F. Oberdorfer,*
*District Judge.*

BURKE v. EVANS              Docket No. 06-1917-cv

## ORDER

IT IS HEREBY ORDERED that the Appellees` itemized and verified bill of costs and the Appellant's opposition are construed as a motion to deny costs, and so construed, the motion to deny costs is GRANTED.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, Clerk
by

—————————————————————
Elizabeth Duwe
Motions Staff Attorney

AUG - 2 2007
Date

---

*The Honorable Louis F. Oberdorfer, Judge of the United States District Court for the District of Columbia, sitting by designation.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES ex rel.** | ) | |
| **BRIAN BURKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:08-CV-00364 (EGS)** |
| **v.** | ) | |
| | ) | |
| **RECORD PRESS, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**[PROPOSED] ORDER**

WHEREFORE, upon consideration of Record Press, Inc.'s Motion for Summary Judgment, it is hereby ORDERED that the Motion is GRANTED.


_____
Honorable Emmet G. Sullivan
United States District Judge

Dated: _____

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2008 I served the foregoing Defendant's Motion for Summary Judgment, Memorandum in Support of Motion for Summary Judgment, Statement of Undisputed Material Facts, and Declaration of Mr. Hugh Wilmot, including all exhibits thereto, via first class mail, postage prepaid on:

> Mark Hanna, Esq.
> Keira M. McNett, Esq.
> Joni S. Jacobs, Esq.
> DAVIS COWELL & BOWE LLP
> 1701 K Street, N.W., Suite 210
> Washington, D.C.  20006
>
>
> Darrell C. Valdez, Esq.
> U.S. Attorney's Office
> Judiciary Center Building
> 555 Fourth Street, N.W.
> Washington, D.C.  20530

and via the Court's Electronic Case Filing System ("ECF").

> _____/s/ William T. O'Brien_____
> William T. O'Brien

DC:50561507.2

00000126

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| ex rel. BRIAN BURKE | : | |
| | : | Civil Action No. 1:08-cv-364 (EGS) |
| Plaintiff/Relator, | : | |
| | : | |
| v. | : | |
| | : | |
| RECORD PRESS, INC. | : | |
| | : | |
| Defendant. | : | |
| | : | |

**RELATOR'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT TO DISMISS THE COMPLAINT**

Plaintiff/Relator Brian Burke ("Burke" or "Relator") respectfully opposes

Defendant Record Press, Inc.'s ("Record Press" or "Defendant") Motion for Summary

Judgment to Dismiss the Complaint, as set forth below. Relator's Statement of Genuine

Issues in Dispute and Relator's Objection to and Request To Strike Defendant's Evidence

In Support Of Its Motion For Summary Judgment are served and filed simultaneously

herewith.

**INTRODUCTION**

The issue in dispute is a narrow one: whether the term "per 10 copies" in

Defendant's contract with the Government applies to charges for collating, trimming and

binding that Defendant billed the Government when printing appellate briefs in the

Second Circuit. Relator alleges that the "per 10 copies" term does apply, based on the

1

00000127

plain language of the contract and his conversations with an official at the GPO, with the consequence being that Defendant has overcharged the Government by a factor of 10 for these services. Defendant contends that documentary evidence contradicts Relator's allegations, and that it should be granted summary judgment at this early stage of the lawsuit, before Relator has a chance to take any discovery.

Defendant's motion consists largely of incompetent, conclusory statements and *ad hominem* attacks on Relator, but it does not contain any evidence that supports its motion. Defendant has not presented any testimony or evidence from anyone at GPO – or anyone else – showing that Defendant's interpretation of the contract, which contradicts the face of the contract and statements made to Relator by GPO personnel, is correct. Even if Defendant had presented such evidence – which it has **not** – Defendant has brought its motion at the very outset of the case, before a scheduling conference has been held and before any discovery has been conducted. At a minimum, Relator should be given the opportunity to conduct limited discovery to oppose Defendant's motion.

Relator respectfully requests that this Court deny Defendant's motion for summary judgment or, alternatively, stay the motion and allow Relator to conduct limited discovery to oppose the motion. Relator also requests his reasonable attorneys' fees and costs incurred in defending against this premature motion for summary judgment.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

### I.    Relator's Discovery of Potential Fraud By Defendant.

Relator became aware of Defendant's potential overbilling of the Government when he received the US Attorney's bill of costs upon losing a *pro se* appeal before the

2

00000128

Second Circuit Court of Appeals.  Declaration of Brian Burke ("Burke Decl."), ¶¶ 2-3, 5.[1]

Attached to the Government's bill of costs was an itemized list of charges provided by

the GPO, in which the US Attorney's Office appeared to have been billed $1,882.24 for

"collating and trimming" the brief and appendix filed in Burke's case.  Burke Decl., ¶ 3.

This struck Relator as an excessively high charge for this service, and caused him to

investigate further.  Burke Decl., ¶ 4.

   Relator contacted various individuals at the GPO and learned that the

Government's briefs were printing by Record Press and that invoices were paid by the

GPO's main office in Washington, DC.  Burke Decl., ¶ 4.  Relator also obtained a copy

of the RFP on which Record Press's contract with the GPO was based.  Burke Decl., ¶ 5.

The relevant section reads as follows:

---

<u>NOTE: RUNNING RATE IS PER 10 COPIES</u>

|  |  |
|---|---|
|  | Running Per |
|  | 10 Copies |
| Includes makeready if required: | ----------- |
| (a) Complete cover (wraparound).............................$_____ | |
| (b) Text per page............................................    ........$_____ | |
| (c) Pressure sensitive cover stock (up to 8-1/2 x 11"): | |
|   (1) White...................................per 100 leaves......$_____ | |
|   (2) Colored.................................per 100 leaves......$_____ | |
| (d) Collating, trimming to size and binding    per 100 pages     $_____ | |

---

[1]       The appeal itself is wholly irrelevant to this lawsuit, and the Court should reject Defendant's improper focus on it to support its motion for summary judgment.  *See* Relator's Objection to and Request to Strike Defendant's Evidence in Support of Its Motion for Summary Judgment.

00000129

Burke Decl., Ex. B.  This matches the following section of the RFP that Defendant

concedes is its contract with the GPO:

NOTE: RUNNING RATE IS PER 10 COPIES

|  | Running Per 10 Copies |
|---|---|
| Includes makeready if required: | |
| (a) Complete cover (wraparound)..................$ | 6.00 |
| (b) Text per page...........................    $ | .35 |
| (c) Pressure sensitive cover stock (up to 8-1/2 x 11"): | |
| (1) White.....................per 100 leaves......$ | 12.50 |
| (2) Colored.................per 100 leaves.....$ | 12.50 |
| (d) Collating, trimming to size and binding   per 100 pages   $ | 12.25 |

Def. Mot., Wilmot Decl. [Dckt. #17], Ex. 5.

On the face of the RFP/contract, charges for binding, trimming and collating

appear to be applied per 100 pages *per 10-copy run*.  Calculated on a per page basis, the

rate is effectively $12.25 per 1,000 pages or $0.01225 per page.  Notably, Defendant

states that this is the correct rate on page 4 of its motion, but elsewhere claims that the

proper rate is $12.25 per 100 pages.  Def. Mot. [Dckt. #17], p. 4.

Relator spoke with Calvin Anderson, GPO's Chief of the Commercial

Examination Section in the Office of the Controller's Procurement Accounting Division,

to confirm his understanding that the charge for collating, trimming and binding is based

on a 10-copy run.  Burke Decl., ¶6.  Mr. Anderson told Relator that the rate for collating,

trimming and binding applies to each 10-copy run of the brief, not for each separate copy

of the brief.   Burke Decl., ¶6.

4

Based on this interpretation of the RFP (which Defendant concedes is also the relevant contract), Relator alleges that Record Press overcharged the GPO by exactly ten (10) times the contract rate for collating, trimming and binding the appendix and brief in his case and for all jobs under this contract in which it read out the 10-copy run language. Complaint, [Dckt. # 1], ¶¶ 22-24.  After the Government decided not to intervene in this action, [Dckt. # 5], the Complaint was served on Defendant.  [Dckt. # 7.]

## II.    Defendant Threatens Sanctions To Avoid Even Limited Discovery.

On August 1, 2008, Defendant answered the Complaint, alleging a counterclaim against Relator for tortious interference with prospective economic advantage [Dckt. # 5]. At the same time, Defendant served Relator with a Rule 11 letter threatening to seek sanctions if the Complaint was not withdrawn by August 28.  Declaration of Mark Hanna ("Hanna Decl."), ¶ 2, Ex. A.  Defendant took the position that the Complaint was full of errors, the most significant one being that the 10-copy run limitation did not apply to collating, trimming and binding charges, but rather only to the "Complete Cover" and "Text Per Page" specifications in Section II of the RFP.  Hanna Decl., Ex. A.

Counsel for Relator immediately contacted Defendant's counsel in a good-faith effort to clarify and narrow the issues in dispute.  Hanna Decl., ¶ 3, Ex. B.  Relator explained that the central issue was whether the term "running per 10 copies" applies to the charges for collating, trimming and binding, as the plain language of the RFP indicates.  Hanna Decl., Ex. B.  Counsel further acknowledged that the Complaint included a few minor errors, and indicated a willingness to amend the complaint to correct these minor errors if necessary.   Hanna Decl., ¶ 3, Ex. B.  Despite the fact that

00000131

these minor issues were essentially resolved in August, Defendant continues to raise them to support its motion for summary judgment. Def. Mot. [Dckt. #17], p. 4.

Relator sought Defendant's explanation regarding statements and documents contained in its August 1 letter. Hanna Decl., ¶ 3, Ex. B. Defendant responded by refusing to "engage in a dialogue" or "explain" anything. Hanna Decl., ¶ 4, Ex. C. Indeed, during the parties' Rule 26 conference, while Relator took the position that because of the narrow issues in dispute, only limited discovery would be necessary to resolve the case, Defendant adamantly insisted that no discovery was warranted. [Dckt # 16.]

Relator contacted Assistant US Attorney Daryl Valdez, the person monitoring this case for the Department of Justice, several times by telephone and letter, seeking information regarding the GPO's interpretation of the contract, in a good-faith effort to resolve the issues in dispute with judicial economy for all involved. Hanna Decl., ¶ 7, Ex. D. AUSA Valdez has declined to provide any information to Relator. Hanna Decl., ¶¶ 7, 8, 9, Ex. F.

## III.   DEFENDANT FILES FOR SUMMARY JUDGMENT.

Defendant filed its motion for summary judgment [Dckt #17] on October 1, 2008, before the parties' case management conference with the Court and before Relator had the opportunity to engage in any discovery. Just five days later, on October 6, Defendant served Relator with yet another Rule 11 letter, this time threatening to seek sanctions if Relator does not dismiss the Complaint by October 29. Hanna Decl., ¶ 10, Ex. G.

6

## ARGUMENT

### I. Defendant Has Not Met The Standard For Summary Judgment.

Summary Judgment is appropriate only if "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

In reviewing Defendant's motion for summary judgment, the facts and inferences to be drawn from the underlying facts should be viewed in the light most favorable to Relator. *White v. Fraternal Order of Police*, 909 F.2d 512, 516 (D.C. Cir. 1990), *citing United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Defendant bears the burden of "identifying evidence that demonstrates the absence of any genuine issue of material fact." *Greene v. Dalton*, 164 F3d. 671, 675 (D.C. Cir. 1999), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Defendant has not met this burden. The evidence is in dispute as to the application of the "per 10 copy run" limitation to binding and collating charges.

### A. The face of the contract contradicts Defendant's interpretation.

The central issue in this case and on this motion is whether Defendant may only charge collating, trimming and binding ("binding") fees per 10-copy run, rather than on a per-copy basis. Defendant claims that the 10-copy run specification "refers only to cover and text per page, not the billing for the particular print job." Def. Mot. [Dckt. #17], p. 5. However, Defendant does not cite any evidence to support this claim, and the face of the RFP does not support such an interpretation.

7

From the plain language of the RFP, the 10-copy run specification appears to apply to all line items in Section II, including collating, trimming to size and binding:

| NOTE: RUNNING RATE IS PER 10 COPIES | |
|---|---|
| | **Running Per 10 Copies** |
| Includes makeready if required: | |
| (a) Complete cover (wraparound)..........................$ | 6.00 |
| (b) Text per page.........................................$ | .35 |
| (c) Pressure sensitive cover stock (up to 8-1/2 x 11"): | |
| (1) White.......................per 100 leaves......$ | 12.50 |
| (2) Colored..................per 100 leaves......$ | 12.50 |
| (d) Collating, trimming to size and binding   per 100 pages   $ | 12.25 |

The top of Section II of the bid sheet clearly specifies: "RUNNING RATE IS PER 10 COPIES." This language – "Running Per 10 Copies" – is repeated again above the blank lines where bidders enter prices for each line item.

Nothing on the face of the document indicates that the specification "running per 10 copies" is limited only to certain parts of Section II, as Defendant argues. To the contrary, the face of the document applies that limitation to all terms within Section II. With respect to item (d) "Collating, trimming to size and binding." the RFP also indicates "per 100 pages," effectively bringing the price for binding to $12.25 per 1,000 pages ($0.01225 per page). This is consistent with Relator's interpretation of the contract, not Defendant's.

At a minimum, there are two reasonable interpretations of the essential term of the contract, and thus, summary judgment is not appropriate. *Rogers Corp. v. EPA*, 275 F.3d 1096, 1103 (D.C. Cir. 2002) ("Summary judgment is inappropriate when contradictory inferences may be drawn from the evidence."); *Farmland Indus., Inc. v. Grain Bd. of*

8

00000134

*Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990) (summary judgment is not appropriate where evidence supports more than one interpretation of a contract).

**B.    Defendant Produces No Undisputed Evidence As To The GPO's Interpretation Of The Contract.**

Defendant does not present any competent evidence that sheds light on the correct interpretation of the contract, let alone evidence that shows that there can be no dispute as to its interpretation. Notably, Defendant's sole witness, Company President Hugh Wilmot, does not testify that the "10 copy run" limitation applies only to portions of Section II of the RFP and not to the fee for collating, trimming and binding.

As explained in Relator's separately-filed Objection to and Request to Strike Defendant's Evidence in Support of Its Motion for Summary Judgment, nearly every statement in Wilmot's declaration is inadmissible, and the documents attached to it are not properly authenticated. Excluding these inadmissible statements and exhibits leaves only Wilmot's testimony that he is the President of Record Press, and that Record Press has been the successful bidder on the Government's successive RFPs, including a 2006 contract. This is not sufficient to support summary judgment here.

Defendant offers nothing but a self-serving assertion, made without any citation to any competent evidence in the record, that "[t]he Government accepted Record Press' bills as consistent with its contract, and thus proper and thus paid on that basis." Def. Mot. [Dckt. #17], p. 4. Defendant does not provide any evidence that the GPO even reviewed its bills, let alone that it made any determination whatsoever regarding the appropriateness of the charges for collating, trimming and binding. Despite repeated

00000135

requests from Relator, Defendant has never provided any evidence regarding the GPO's interpretation of the RFP/contract language.

Even so, the premise underlying Defendant's motion – that the "10 copy run" limitation does not apply to binding charges – is contradicted by other evidence in the record. As part of his initial investigation into this potential fraud, Relator was referred to and spoke with Calvin Anderson, the GPO's Chief of the Commercial Examination Section in the Office of the Controller's Procurement Accounting Division, who told Relator that the "per 10 copies" limitation applies to charges for binding. Burke Decl., ¶ 6. Relator has testified that Mr. Anderson specifically told him that the charge for binding applies to each 10-copy run of the brief, rather than for each separate copy of the brief. Burke Decl., ¶ 6. At a minimum, this creates a disputed material fact as to the GPO's interpretation of the contract. This makes summary judgment inappropriate.

### C.    Defendant's Other Claims Regarding Minor Errors In The Complaint Are Red Herrings.

Defendant raises other minor points that are wholly unrelated to the primary issue and appear to be intended to divert attention from Defendant's lack of evidence to support its position.

Defendant argues that Relator misalleged the rate Record Press charged for collating, trimming and binding, and wrongly implied that Record Press charged a separate, additional fee for binding. Def. Mot. [Dckt. #17], p. 4. On August 6, 2006, Relator informed Defendant that the Complaint contained minor, good-faith errors as to these issues, based on the information Relator had when drafting the Complaint, and that

00000136

Relator is willing to amend the complaint to correct these errors if necessary. Hanna Decl., ¶ 3. Defendant's continued focus on these non-issues does not support summary judgment. Importantly, neither of these minor issues has any bearing on the main question in this litigation: whether the language "running per 10 copies" and "RUNNING RATE IS PER 10 COPIES" applies to charges for collating, trimming and binding.

In summary, Defendant has not met its burden of showing that there is no material issue in dispute for purposes of granting summary judgment. Defendant's interpretation of the contract is contradicted by the face of the contract, and a factual dispute exists regarding the GPO's interpretation of the contract. Defendant's motion for summary judgment should be denied.

## II.    Alternatively, Relator Should Be Permitted to Conduct Limited Discovery.

If the Court does not deny Defendant's motion for summary judgment, Relator asks that it be held in abeyance pursuant to Fed. R. Civ. P. 56(f)(2) so that he may be permitted to take limited discovery to oppose the motion.

"The court has long recognized that a party opposing summary judgment needs a 'reasonable opportunity' to complete discovery before responding to a summary judgment motion and that 'insufficient time or opportunity to engage in discovery' is cause to defer decision on the motion." *Khan v. Parsons Global Serv., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005), *quoting Martin v. Malhoyt*, 830 F.2d 237, 256 (D.C. Cir. 1987). *Accord Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1046-47 (D.C. Cir. 2008) (abuse

11

00000137

of discretion to deny plaintiff's request for discovery in response to defendant's motion for summary judgment, and thus grant of motion was premature).

Relator should be given the opportunity to depose Defendant as to the statements contained in Mr. Wilmot's declaration, as well as to take the depositions of GPO personnel with knowledge of this contract. The position of the GPO with respect to the proper interpretation of the contract language is essential to this case. Relator has attempted several times to informally obtain information regarding the GPO's position from both AUSA Valdez and Defendant in an effort to resolve this dispute expeditiously, but his efforts have been rebuffed. Accordingly, Relator requests leave to depose the person(s) most knowledgeable at the GPO regarding the Record Press contract and the program under which the contract was bid and is managed, as well as Calvin Anderson, the GPO employee with whom Relator spoke prior to filing his Complaint. Relator submits the deposition notices and subpoenas he wishes to serve on these individuals, and seeks the Court's order allowing him to do so.

It is unfair to grant summary judgment against Relator before allowing him the chance to conduct limited discovery to defend against the motion, especially when he has made several efforts to obtain this information informally. Most recently, Relator sought AUSA Valdez's assistance in obtaining this information to oppose Defendant's summary judgment motion. Hanna Decl., ¶ 8, Ex. E. In response, AUSA Valdez has taken the position that because the Court has not set a discovery schedule, discovery is "premature," even to respond to a dispositive motion. Hanna Decl., ¶ 9, Ex. F. Given the factual disputes that exist in the record, it would be inappropriate to grant summary

12

judgment without allowing Relator to conduct the limited discovery he seeks to oppose the motion.

### III.    Relator Should Be Awarded His Reasonable Attorneys' Fees and Costs for Opposing This Frivolous and Premature Motion for Summary Judgment.

Defendant submitted this motion for summary judgment, without any supporting evidence, before Relator had an opportunity to conduct even minimal discovery.  Relator should be awarded his reasonable attorneys' fees and costs incurred in opposing Defendant's motion.

At worst, this motion and its accompanying declaration were submitted in bad faith as an aggressive litigation tactic meant to intimidate Relator and preempt any discovery into Defendant's alleged fraud.  Defendant's conduct in the short time since the Complaint was filed supports such a finding of bad faith.  Defendant has twice threatened a Rule 11 motion.  Despite attempts by Relator to cooperate with Defendant to narrow the issues, Defendant has insisted that there be no discovery while simultaneously refusing to provide any evidence to support its interpretation of the contract.  If the Court finds that the motion and Wilmot's accompanying declaration were submitted in bad faith, Relator should be awarded attorneys' fees and costs pursuant to Fed. R. Civ. P. 56(g).

Even if the Court does not find bad faith, however, this motion is clearly premature and unsupported by evidence.  Defendant should be required to pay Relator's reasonable attorneys' fees and costs necessitated by its filing of this frivolous motion at this juncture.

13

00000139

**CONCLUSION**

For the reasons stated herein, Relator respectfully requests the Court deny the

Defendant's motion for summary judgment, or alternatively, stay the motion and enter

the attached order, which will allow Relator to conduct minimal discovery.  Relator also

requests that the Court order Defendant to pay his reasonable attorneys' fees and costs

incurred in opposing this frivolous, premature motion for summary judgment.

Dated: October 14, 2008                         Respectfully submitted,


                                                s/ Mark Hanna
                                                Mark Hanna (DC Bar 471960)
                                                Keira M. McNett (DC Bar 482199)
                                                MURPHY ANDERSON PLLC
                                                1701 K Street, NW, Suite 210
                                                Washington, DC 20006
                                                Phone: (202) 223-1057
                                                Fax: (202) 223-8651
                                                *mhanna@murphypllc.com*
                                                *kmcnett@murphypllc.com*

                                                Attorneys for Relator

14

00000140

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> ex rel. BRIAN BURKE <br><br> Plaintiff/Relator, <br><br> v. <br><br> RECORD PRESS, INC. <br><br> Defendant. | : <br> : <br> :     Civil Action No. 1:08-cv-364 (EGS) <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

## STATEMENT OF GENUINE ISSUES IN DISUPTE

Pursuant to Local Civil Rule 56.1, and in support of his Opposition to Defendant's

Motion for Summary Judgment, Plaintiff/Relator Brian Burke ("Burke") submits the

following statement of material facts about which there is a genuine issue to be litigated:

1.  Whether Record Press, Inc's ("Record Press") RFP/contract with the

    Government Printing Office ("GPO") specifies a rate of $12.25 per 100 pages

    per 10-copy run  for collating, trimming to size and binding briefs and

    appendices, effectively a rate of $12.25 per 1,000 pages (or $0.01225 per

    page).[1]

2.  Whether Record Press charged the GPO in accordance with the terms of the

    applicable contract.

---

[1] Record Press asserts that it is undisputed that "Running Per 10 Copies" does not apply to the line item for collating, trimming to size and binding.  However, the plain language of the RFP/contract, which is the only evidence Record Press cites, supports Relator's interpretation, and Record Press's interpretation is contradicted by other evidence in the record.

Dated: October 14, 2008

Respectfully submitted,

s/ Mark Hanna
Mark Hanna (DC Bar 471960)
Keira M. McNett (DC Bar 482199)
MURPHY ANDERSON PLLC
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
*mhanna@murphypllc.com*
*kmcnett@murphypllc.com*

Attorneys for Relator

00000142

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. BRIAN BURKE        : <br><br>                     : <br>      Plaintiff/Relator,  : | Civil Action No. 1:08-cv-364 (EGS) |

UNITED STATES OF AMERICA,
ex rel. BRIAN BURKE          :

                    :      Civil Action No. 1:08-cv-364 (EGS)

      Plaintiff/Relator,  :

                    :

      v.                 :

                    :

RECORD PRESS, INC.          :

                    :

      Defendant.      :

                    :

## CERTIFICATE OF SERVICE

     I hereby certify that on October 14, 2008, I served the foregoing Relator's

Memorandum of Points and Authorities in Opposition to Defendant's Motion For

Summary Judgment to Dismiss the Complaint; and Relator's Objection to and Request to

Strike Defendant's Evidence in Support of Its Motion for Summary Judgment via first-

class mail on the following:

              Malcolm I. Lewin
              Morrison Cohen LLP
              909 Third Avenue
              New York, NY  10022

              Attorney for Defendant

     All other parties were served via the Court's electronic case filing system.

                       s/ Keira M. McNett

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
ex rel. BRIAN BURKE
:
:                    Civil Action No. 1:08-cv-364 (EGS)
              Relator/Plaintiff,
:
:
        v.
:
:
RECORD PRESS, INC.
:
:
              Defendant.
:

## DECLARATION OF BRIAN BURKE IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Brian Burke, hereby declare as follows:

1.     I am a resident of the state of New York and the Relator/Plaintiff in this

action. I make the following statements based on my personal knowledge and if called as

a witness could and would competently testify as follows:

2.     I brought a *pro se* action against the Secretary of Commerce in the United

States District Court for the Southern District of New York (Case No. 04-cv-7593). The

court granted summary judgment for the Government, and I appealed to the Second

Circuit (Case No. 06-cv-1917). My appeal was denied, and the U.S. Attorneys' Office

submitted its bill for costs for printing the Government's appendix and brief. Attached

hereto as Exhibit A is a true and correct copy of the Itemized and Verified Bill of Costs

that was served on me in connection with the appeal that I lost.

00000144

3.    My review of the cost bill led me to believe that the US Attorney's Office was charged $1,483.77 for "collating and trimming" 20 copies of a 566-page appendix and $398.47 for "collating and trimming" 40 copies of a 76-page brief, for a total "collating and trimming" charge of $1,882.24. I subsequently learned that the GPO adds an additional 7% surcharge to whatever the contractors bill.

4.    The charges for "collating and trimming" seemed high to me, so I decided to investigate. In July 2007, I spoke by telephone with Akiko Ward, the GPO Customer Service Controller who signed the itemization of charges, who verified that Record Press had billed and was paid by the GPO office in Washington, DC, for the charges contained on the cost bill submitted in my appeal.

5.    I then called Pamela Lewis and Catherine Miller in GPO's Philadelphia office. I asked them to send me a copy of the relevant Terms, Conditions and Specifications for the Procurement of Appeals Briefs, Program 2231-S, which I understood was the RFP for the 2006 Record Press contract. Attached hereto as Exhibit B is a true and correct copy of the RFP that I received from the GPO Philadelphia office in response to my request. My review of this document led me to believe that the GPO's contract with Record Press specifies that charges for binding, trimming and collating are per 100 pages per 10-copy run. My review of the cost bill submitted in my appeal led me to believe that Record Press has charged the fee on a per-copy basis, not on a per-10 copy basis.

6.    On July 5, 2007, I spoke with Calvin Anderson, GPO's Chief of the Commercial Examination Section in the Office of the Controller's Procurement

2

00000145

Accounting Division. I explained the charges that appeared on the bill submitted in my appeal. Mr. Anderson told me that the contract specifies that the rate for collating, trimming and binding applies to each 10-copy run of the brief, not for each separate copy of the brief, as Record Press had apparently charged. Mr. Anderson said that the 10-copy run specification was clearly stated in at least two places and highlighted in bold in Record Press's contact with GPO.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 14, 2008
New York, NY

Brian Burke

00000146

# EXHIBIT A

00000147

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
--------------------------------------------------x
BRIAN BURKE,

                    Plaintiff-Appellant,          06-1917-cv

           v.                                     ITEMIZED AND VERIFIED
                                                  BILL OF COSTS
DONALD L. EVANS, SECRETARY,
UNITED STATES DEPARTMENT OF
COMMERCE,

                    Defendants-Appellees.
--------------------------------------------------x

   Counsel for defendants-appellees Donald L. Evans and the United

States Department of Commerce (collectively, "defendants-appellees"),

respectfully submit, pursuant to Rule 39 of the Federal Rules of Appellate

Procedure, the within bill of costs and request that the Clerk prepare an itemized

statement of costs taxed against plaintiff-appellant and in favor of defendants-

appellees for insertion in the mandate.

| | |
|---|---|
| Docketing Action | $   0.00 |
| Costs of printing appendix (necessary 20 copies) | $ 2136.36 |
| Costs of printing brief (necessary 30 copies) | $  419.95 |
| Costs of printing reply brief | $   0.00 |
| TOTAL | $ 2556.31 |

   Pursuant to 28 U.S.C. § 1924, the above costs are correct and were

necessarily incurred in the litigation of this action for printing work actually and

necessarily performed, as shown by Exhibits A and B attached hereto, which is a true copy of the print orders and invoices relating to the printing of defendants-appellees' appendix and brief, respectively. Annexed hereto as Exhibit C is an explanation of the difference between the amount of the Exhibit B and the amount for which defendant-appellee seeks costs.

      I verify under penalty of perjury that the foregoing is true and correct.

Executed on:    New York, New York
                June 21, 2007

                                    KRISTIN L. VASSALLO
                                  Assistant United States Attorney

- 2 -

00000149

O 2511  *Desktop* **Print Order**

| Department | Req. No. | Date | | Purchase Order No. | Print Order No. |
|---|---|---|---|---|---|
| Southern District | 7-00141 | 12-08-2006 | | B-0601 | 65212 |

| Contractor | | Jacket No. | | Estimated Cost | Ship/Delivery Date |
|---|---|---|---|---|---|
| Appeals Brief/Appendices | | 604-066 | | | 12-18-2006 |

| Title Brian Burke V. Evans (06-1917) | Object Class | Class Code | Contractors Code | Program No. |
|---|---|---|---|---|
| | 24.00 | 310 | 73951 | 2231-S |

**Proofs**

| Type of proof required | Sets | Days Gov't will hold | Furnished Electronic Media | BAC | Quantity |
|---|---|---|---|---|---|
| Gallery | X | | | 4410-KD | 20 |
| Page | 20 | | Qty: | Quality Level | Trim Size |
| | | | Qty: | IV | 8 1/2 x 11 |

Materials Furnished to Contractor
| Manuscript X | Halftones | Line Illus. | Camera Copy | Negatives | Other |

| Text Block | Cover Stock | No. of Text Pages (including blanks) | Fold-in Stock | Strip-ins |
|---|---|---|---|---|
| White Antique Paper | 45 lbs Vellum 65 lbs | | | |

| Four Color Process Printing | Cover Ink | Text Ink | Cover Prints 1 2 3 4 | | Fold-ins/Forms Face only | Face & Back | Negatives from Electronic media | Negatives from camera copy |
|---|---|---|---|---|---|---|---|---|
| Face / Back | Black | Black | X | | | | | |

**Binding**

| Saddle | Paste on Fold | Band Units of |
|---|---|---|
| 1 ULC | Trim 4 Sides | Shrinkwrap Units of |
| Side | Perf on Fold | Perf off fold |
| Perfect | Tab seal | Fold to: |
| Other | | |

Drill ___ holes ___ in diameter on ___ side ___ inches C. to C.
Center ___ holes ___ inches from ___ edge of sheet
Pads of ___ sheets/sets each. Pad on the ___ side. Chipboard required ___
Pack ___ Per shipping container. Pallets required. ___

Instructions and Distribution:

Return all Government furnished materials and/or negs. to:
Defendant Appellee's Appendix
(2004V03846)

OE 4054    24 II
2537 ___ 12/08 ___
___ 12/06
___ 8/7/0-

Appeals Brief
86 Chambers Street (SDNY)

| Specifications written by: John Ellwood | Sold by: | Typed by: | Date sent to contractor 12/08/2006 |
|---|---|---|---|

*Additional Shipping Instructions for Supt. of Docs. copies.*

US Government Printing Office–M/F: "Depository"
Depository Receiving Section
44 H St., NW, Loading Dock          Item
Washington, DC 20401

Library of Congress
Anglo-American Acquisitions Division
Government Documents Section
101 Independence Ave., SE
Washington, DC 20540-4172
Marked: File Copies

US Government Printing Office–M/F: "Sales" Req.
Documents Warehouse
8610 Cherry Lane      M/F: "Subscription Stock" Req.
Laurel, MD 20707

Individual Printed Mailing Containers are Required

Stock No. _____
Sub. ID No. _____
ISBN No. _____
(Shipping labels for Supt. of Docs. "Sales" or "Subscription" copies must contain Stock No., Sub. ID No. and ISBN No. as indicated.)

00000150

**GPO**
**U.S. GOVERNMENT**
**PRINTING OFFICE**
KEEPING AMERICA INFORMED

May 31, 2007

United States Attorney
Civil Clerk's Office
Attn: John Ellwood
33 White Hall St., 7th Floor
New York, NY 10004

Dear Sir:

The following information is furnished in response to your
request for a cost to the Government for 20 copies of Print Order
65212 Jacket 604-066.

COMPOSITION CHARGE

| Qty: | | Amount |
|---|---|---|
| 1 | Text Page(s) | 10.70 |
| | Combination Pages | |
| | (Text & Footnotes): | |
| 1 | Cover: | 10.70 |
| 53 | Index/Table of Contents: | 14.18 |
| 566 | Page Proofs: | 151.41 |
| | Pages Remake | |
| | Manuscript | |

PRINTING AND ASSEMBLY APPENDIX/RECORD

| | | Unit Price | Amount |
|---|---|---|---|
| 20 | Cover Page Per Unit | .64 | 12.80 |
| 11320 | Text Page Per Unit | .04 | 452.80 |
| 1 | Collating & Trimming | 1483.77 | 1483.77 |
| | Total | | 2136.36 |

00000151

Page 2

I trust this information will serve your needs. If you require additional information, please contact me on (202) 512-1197.

Sincerely,

AKIKO Z. WARD
Customer Service Controller
(Office of the Customer Service Controller)

00000152

**PO 2511** *Desktop* **Print Order**

| Department | Req. No. | Date | Purchase Order No. | Print Order No. |
|---|---|---|---|---|
| Southern District | 7-00141 | 2-08-2006 | B-0601 | 65213 |

| Contractor | | | Estimated Cost | Ship/Delivery Date |
|---|---|---|---|---|
| Appeals Brief/Appendices | | 604-066 | | 12-18-2006 |

| Title  Brian Burke V. Evans (06-1917) | | 24:00 | 310 | Contractor's Code 73951 | Program No. 2231-S |
|---|---|---|---|---|---|

**Proofs**

| Type of proof required | Sets | Days Gov't. will hold | Furnished Electronic Media | SAC 4410-KD | Quantity 40 |
|---|---|---|---|---|---|
| Gallery | X | | | Quality Level | Trim Size |
| Page | 40 | | Qty: | IV | 8 1/2 x 11 |

Materials Furnished to Contractor
| Manuscript | Halftones | Line illus. | Camera Copy | Negatives | Other |
|---|---|---|---|---|---|
| X | | | | | |

| Text Stock | Cover Stock | No. of Text Pages (including blanks) | Fold-In Stock | Strip-Ins |
|---|---|---|---|---|
| White Antique Paper | 45 lbs Vellum 65 lbs | | | |

| Four Color Process Printing | | Cover Ink | Text Ink | Cover Prints | Fold-Ins/Forms Face only | Face & Back | Negatives from Electronic media | Negatives from camera copy |
|---|---|---|---|---|---|---|---|---|
| Face | Back | Black | Black | X | | | | |

**Binding**

| Saddle | Pasta on Fold | Band Units of | Drill ___ holes ___ in diameter on ___ side ___ inches C. to C. |
|---|---|---|---|
| 1 ULC | Trim 4 Sides | Shrinkwrap Units of | Center of holes ___ inches from ___ edge of sheet |
| Side | Part on Fold | Port of fold | Pads of ___ sheets/sets each. Pad on the ___ side.  Chipboard required |
| Perfect | Tab seal | Fold to: | Pack ___ Per shipping container.  Pallets required. |
| Other | | | |

Instructions and Distribution:

Return all Government furnished materials and/or negs. to:

Defendant Appellee's Red Brief
(2004V03846)

OE-9054 · 241
DCN 2538 ord num 12/08 rec'd 2-8

I certify that ___ submission described on the face of this order has been received in good condition

Date Received ___ 12/06

Date 5/7/07

Appeals Brief
86 Chambers Street (SDNY)

| Specifications written by: John Ellwood | Sold by: | Typed by: | Date sent to contractor 12/08/2006 |
|---|---|---|---|

*Additional Shipping Instructions for Supt. of Docs. copies.*

US Government Printing Office–M/F: "Depository" ___
Depository Receiving Section
44 H St., NW, Loading Dock          Item ___
Washington, DC 20401

Library of Congress
Anglo-American Acquisitions Division
Government Documents Section
101 Independence Ave., SE
Washington, DC 20540-4172
Marked: File Copies

US Government Printing Office–M/F: "Sales" Req. ___
Documents Warehouse
8610 Cherry Lane    M/F: "Subscription Stock" Req. ___
Laurel, MD 20707

Individual Printed Mailing Containers are Required

Stock No. ___
Sub. ID No. ___
ISBN No. ___
(Shipping labels for Supt. of Docs. "Sales" or "Subscription" copies must contain Stock No., Sub. ID No. and ISBN No. as indicated.)

00000153



May 31, 2007

United States Attorney
Civil Clerk's Office
Attn: John Ellwood
33 White Hall St., 7th Floor
New York, NY 10004

Dear Sir:

The following information is furnished in response to your request for a cost to the Government for 40 copies of Print Order 65213 Jacket 604-066.

### COMPOSITION CHARGE

| Qty: | | Amount |
|---|---|---|
| | Text Pages: | |
| | (Text & Footnotes): | |
| 1 | Cover: | 10.70 |
| | Index/Table of Contents: | |
| | Page Proofs: | |
| | Pages Remake: | |
| | Manuscript: | |

### PRINTING AND ASSEMBLY (BRIEFS)

| Qty | | Unit Price | Amount |
|---|---|---|---|
| 40 | Cover Pages Per Unit | .64 | 25.60 |
| 3040 | Text Page Per Unit | .04 | 121.60 |
| 1 | Collating & Trimming | 398.47 | 398.47 |
| | Total | | 556.37 |

00000154

Page 2

I trust this information will serve your needs. If you require additional information, please contact me on (202) 512-1197.

Sincerely,



AKIKO Z. WARD
Customer Service Controller
(Office of the Customer Service Controller)

00000155

Total Allowable Cost of Printing Brief

Composition

| | |
|---|---|
| Text pages | |
| Cover | $ 10.70 |
| Index/Table of Contents | |
| Page Proofs | _____ |
| Subtotal for Composition: | $ 10.70 |

Printing and Assembly (based on 40 copies of cover page and text pages)

| | | |
|---|---|---|
| Cover page | ($25.60 x 3/4) | $ 19.20 |
| Text pages | ($121.60 x 3/4) | $ 91.20 |
| Collating & Trimming ($398.47 x 3/4) | | $ 298.85 |
| Subtotal for Printing and Assembly: | | $ 409.25 |

| | |
|---|---|
| Total Cost of Printing Brief | $ 419.95 |
| ($10.70 + 409.25) | |

Although the contract between this Office and its printer provides for a minimum run of forty copies, this Court's decision in Furman v. Cirrito, 782 F.2d 353, 356 (2d Cir. 1986), provides that printing costs for thirty copies of the brief are properly deemed taxable costs. Therefore, the "Cover Page Per Unit" and "Text Page Per Unit" charges under the heading "PRINTING AND ASSEMBLY (BRIEFS)" on the invoice contained in Exhibit B are discounted accordingly as set forth above.

The item listed on the invoice under the heading "COMPOSITION CHARGE," however, constitutes composition costs associated with setting the necessary type that remain the same regardless of how many copies are actually printed. It is therefore fully reimbursable under 28 U.S.C. § 1920(3).

– 3 –

00000156

## CERTIFICATE OF SERVICE

KRISTIN L. VASSALLO, an Assistant United States Attorney for the

Southern District of New York, hereby certifies that on June 21, 2007 I caused a

copy of the Itemized and Verified Bill of Costs to be served by Federal Express

upon the following:

Brian T. Burke
145 E. 23rd Street, Apt. 4R
New York, New York 10010


Dated: New York, New York
        June 21, 2007


KRISTIN L. VASSALLO
Assistant United States Attorney

# EXHIBIT B

00000158

Program 2231-S

Specifications by IFL                                                                    Page 1 of
15

Issue date

FORMERLY 1272-S

<div align="center">

U.S. GOVERNMENT PRINTING OFFICE

PHILADELPHIA , PA.

GENERAL TERMS, CONDITIONS, AND SPECIFICATIONS

For the Procurement of

Appeals Briefs

as requisitioned from the U.S. Government Printing Office (GPO) by the

U.S. Department of Justice

Single Award

The term of this contract is for the period

beginning Date of Award (November 1,2006) and ending October 31, 2007

with an option for renewal from November 1, 2007 and ending October 31, 2008

with a second option for renewal from November 1, 2008 and ending October 31, 2009

with a third option for renewal from November 1, 2009 and ending October 31, 2010

and with a fourth option for renewal from November 1,2010 and ending October 31, 2011

</div>

OPTION TO EXTEND THE CONTRACT TERM: The Government may extend the term of this contract by written notice to the contractor not later than 30 days before the contract expires. If the Government exercises an option, the extended contract shall be considered to include this clause. The duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

Notwithstanding the above paragraph, at the request of the Government, the term of any contract resulting from this solicitation may be further extended for such period of time as may be mutually agreeable to the GPO and the contractor.

BID OPENING: Bids shall be publicly opened at **2:00 p.m.,** prevailing Philadelphia, PA time, on **October 18,2006**

RECOVERED MATERIALS PROGRAM: The Government Printing Office is promoting the use of recovered materials in its contracts to the maximum extent practicable, provided all specification requirements are met. Offerors are encouraged to supply paper and paper products that contain recovered materials even in the absence of a specific

00000159

solicitation provision or contract clause requiring such materials.

RESTRICTION ON LOCATION OF PRODUCTION FACILITIES: All production facilities used in the manufacture of the product(s) ordered under this contract, in Category 1, must be located within the borough of Manhattan south of 59th Street to the Battery and East and West to the rivers.

Any bidder intending to use production facilities outside this area should furnish information, with the bid, which will on its face demonstrate ability to meet the schedule requirements. The determination by the Government of the acceptability of this information in no way relieves the successful bidder of the responsibility for compliance with these schedule requirements.

BIDDERS, PLEASE NOTE: **These specifications have been extensively revised; therefore, all bidders are cautioned to familiarize themselves with all provisions of these specifications before bidding.**

SEE MANDATORY PROCUREMENT INTEGRITY REQUIREMENTS ATTACHED

For information of a technical nature call Pamela Lewis (215) 364-6465 (No collect calls).

## SECTION 1.- GENERAL TERMS AND CONDITIONS

GPO CONTRACT TERMS: Any contract which results from this Invitation for Bid will be subject to the applicable provisions, clauses, and supplemental specifications of GPO Contract Terms (GPO Pub. 310.2, effective December 1, 1987 (Rev. 9-88)) and GPO Contract Terms, Quality Assurance Through Attributes Program (GPO Pub. 310.1, effective May 1979 (revised December 1992)).

QUALITY ASSURANCE LEVELS AND STANDARDS: The following levels and standards shall apply to these specifications:

Product Quality Levels:

(a) Printing Attributes -- Level IV.

(b) Finishing Attributes -- Level IV.

Inspection Levels (from ANSI/ASQC Z1.4):

(a) Non-destructive Tests - General Inspection Level I.

(b) Destructive Tests    - Special Inspection Level S-2.

Specified Standards: The specified standards for the attributes requiring them shall be:

| Attribute | Specified Standard |
|---|---|
| | Average type dimension |
| P-7.   Type Quality and Uniformity | in publication or |
| | camera copy |

00000160

http://mail.google.com/mail/?attid=0.1&disp=vah&view=att&th=11397ed2db414286                    07/05/2007 06:01 PM

SUBCONTRACTING: Subcontracting will not be permitted

EXTENSION OF CONTRACT TERM: At the request of the Government, the term of any contract resulting from this solicitation may be extended for such period of time as may be mutually agreeable to the GPO and the contractor.

DEFINITION OF RECOVERED MATERIALS IN PAPER PRODUCTS:

Waste Paper (when used in high grade bleached printing and writing papers) means any of the following "recovered materials":

(1) Postconsumer materials such as:

(a) Paper, paperboard, and fibrous wastes from retail stores, office buildings, homes, and so forth, after they have passed through their end usage as a consumer item, including: Used corrugated boxes, old newspapers; old magazines; mixed waste paper; tabulating cards, and used cordage; and

(b) All paper, paperboard, and fibrous waste that enter and are collected from municipal solid waste; and

(2) Manufacturing, forest residues, and other wastes such as:

(a) Dry paper and paperboard waste generated after completion of the papermaking process (that is, those manufacturing operations up to and including the cutting and trimming of the paper machine reel into smaller rolls or rough sheets) including envelope cuttings, bindery trimmings, and other paper and paperboard waste, resulting from printing, cutting, forming, and other converting operations; bag, box, and carton manufacturing wastes; and butt rolls, mill wrappers, and rejected unused stock; and

(b) Finished paper and paperboard from obsolete inventories of paper and paperboard manufacturers, merchants, wholesalers, dealers, printers, converters, or others.

(3) "Mill broke" is specifically excluded from the definition of waste paper. Mill broke means any paper waste generated in a paper mill prior to completion of the papermaking process.

MAINTENANCE OF RECORDS ON RECOVERED MATERIALS IN PAPER PRODUCTS: The contractor shall maintain manufacturer/mill accounting and record summaries on the fiber weight content used as feedstock, for purposes of Government audit, that will verify (i) the contractors certification of the minimum waste paper, post- consumer recovered materials, or recovered materials (cotton/linen) content, as applicable, used in performance of the contract, (ii) that the paper and paper products are in compliance with the specification requirements, and (iii) the paper is manufactured in accordance with the Environmental Protection Agency (EPA) Guideline for Federal Procurement of Paper and Paper Products Containing Recovered Materials, 40 CFR Part 250, whether the products are manufactured by the contractor or another paper mill. The contractor, if not the manufacturer, shall obtain this information from the paper manufacturer. The contractor shall maintain, and make available to the Government, these documents for one year after the expiration of the contract. Nothing in this clause shall excuse the contractor from furnishing the specified paper.

ECONOMIC PRICE ADJUSTMENT: The prices set forth in this contract shall be adjusted in accordance with the provisions of this clause, provided that, in no event will prices be revised to exceed the maximum permissible under any law existing as of the date of the contract or as may be hereafter promulgated.

Price adjustment period: For the purpose of this clause, the program years shall comply with the Contract Term clause. There shall be no price adjustment for orders placed during the first program year of this contract.

00000161

http://mail.google.com/mail/?attid=0.1&disp=vah&view=att&th=11397ed2db414286

07/05/2007 06:01 PM

Price adjustment: The prices shall be adjusted on the basis of the "Consumer Price Index For All Urban Consumers - Commodities Less Food, Seasonally Adjusted," published monthly in the CPI Detailed Report by the Department of Labor, Bureau of Labor Statistics, in the following manner:

(1) The contract price of orders placed during the adjusted period (excluding reimbursable postage or transportation costs) shall be adjusted by the percentage increase or decrease in the average, seasonally adjusted Consumer Price Index For All Urban Consumers - Commodities Less Food (seasonally adjusted) as follows: An index shall be calculated by averaging the 12 seasonally adjusted months ending 3 months prior to the expiration of the first period of the contract.  This average is then compared with the average index for the 12-month period ending 3 months prior to the beginning of the contract, called the base index.  The percentage increase or decrease by comparing these two indexes shall be applied to the contractor's invoices for orders placed during the price adjustment period.

(2) The Government will notify the contractor in writing of the percentage increase or decrease to be applied to any invoices to be submitted for orders subject to price adjustment in accordance with this clause.  Such percentage will be determined from the published index as set forth above.  The contractor shall apply the percentage increase or decrease against the total price of the invoice less reimbursable postage or transportation costs.  Any applicable discounts will be calculated on the basis of the invoice price as adjusted.

ASSIGNMENT OF JACKETS, PURCHASE AND PRINT ORDERS: A GPO jacket number will be assigned and a purchase order issued to the contractor to cover work performed. The purchase order will be supplemented by an individual "Print Order" for each job placed with the contractor. The print order, when issued, will indicate the quantity to be produced and any other information pertinent to the particular order.

PREAWARD SURVEY: In order to determine the responsibility of the prime con- tractor or any subcontractor, the Government reserves the right to conduct a preaward survey or to require other evidence of technical, production, mana- gerial, financial, and similar abilities to perform, prior to the award of a contract.

PRIOR TO AWARD: **A meeting will be held at the U.S. Attorney's Office, prior to actual award, to go over the provisions of the contract and establish initial contact with the Agency.**

**The Government may require, prior to award, the production of a brief as submitted by the Department to check contractor conformance with schedule and quality requirements.**

PAYMENT: The contractor shall submit a copy of their billing to.:

U.S. Department of Justice, Appeals Unit

For Criminal Briefs                                For Civil Briefs

U.S. Department of Justice   U.S. Department of Justice

One St. Andrew's Plaza, Room 844  86 Chambers Street, 3rd Floor

New York, NY 10007   New York, NY 10007

After review and approval submit vouchers to: Comptroller, Stop FMCE, Office of Financial Management, U.S.

00000162

http://mail.google.com/mail/?attid=0.1&disp=vah&view=att&th=11397ed2db414286                07/05/2007 06:01 PM

Government Printing Office, Washington, D.C. 20401.

NOTE: ON EACH ORDER: One copy of the print order with a copy of contractor's billing must be sent to the U.S. Government Printing Office, New York Regional Procurement Office, 928 Jaymore Road Suite A-190; Southampton, PA 18966 ATTN: Program Section.

PAYMENT BY ELECTRONIC FUNDS TRANSFER (EFT)

Public Law 104-134 requires that payments made under a contract or purchase order must be made electronically.

Companies (contractors) doing business with GPO should complete Standard Form 3881 (ACH Vendor/Miscellaneous Payment Enrollment Form) and submit it to the U.S. Government Printing Office, Examination and Billing Branch (FMCS), Washington, DC 20401.

SF-3881 is available from FMCS by calling (202) 512-0992or 0993 FAX (800) 245-5476 (no collect calls). Changes in company or financial institution information presently on file should be submitted to the same office.

Contractors that do not have an account at a financial institution or authorized payment agent must certify to such circumstances, in writing, to the Assistant Comptroller, Accounting Division, FMCS. The acceptance of these certificates by GPO will terminate on January 1, 1999, when all contractors will be paid through EFT.

LIMITATION OF PERFORMANCE AND CONTRACTOR OBLIGATIONS: Funds are available for performance of this contract for the first program period only.  The amount of funds at award is not considered sufficient for performance required for any program year other than the first program year. When additional funds are available for the full requirements for the next succeeding program year, the Contracting Officer shall, not later than 60 calendar days before the expiration of the program year for which performance has been funded (unless a later day is agreed to), so notify the contractor in writing. Notification that funds are not available shall effect cancellation of the contract.

The Government is not obligated to the contractor for any amount over requirements for which funds have been made available and as obligated by each print order.

The contractor is not obligated to incur costs for the performance required for any program year after the first unless and until written notification is received from the Contracting Officer of an increase in availability of funds. If so notified, the contractor's obligation shall increase only to the extent contract performance is required for the additional program year for which funds have been made available.

If this contract is terminated under the "Termination for Convenience of the Government" clause, "total contract price" in that clause means the amount available for performance of this contract, as provided for in this clause. The term "Work in Process" in that clause means the work under the program year requirements for which funds have been made available.  If the contract is terminated for default, the Government's rights under this contract shall apply to the entire multiyear requirements.

Notification to the contractor of an increase or decrease in the funds available for performance of the contract under another clause (e.g. the "Option" or "Changes" clause) shall not constitute the notification required by the first paragraph of this clause.

This procedure shall apply for each successive program year.

00000163

http://mail.google.com/mail/?attid=0.1&disp=vah&view=att&th=11397ed2db414286
07/05/2007 06:01 PM

ORDERING: Items to be furnished under the contract shall be ordered by the issuance of print orders by the Government. Orders may be issued under the contract from Nov. 1, 2006 through Oct. 31,2007. All print orders issued hereunder are subject to the terms and conditions of the contract. The contract shall control in the event of conflict with any print order. A print order shall be "issued" for purposes of the contract, when it is either deposited in the U.S. Postal Service mail or otherwise furnished to the contractor in conformance with the schedule.

REQUIREMENTS: This is a requirements contract for the items and for the period specified herein. Shipment/delivery of items or performance of work shall be made only as authorized by orders issued in accordance with the clause entitled "Ordering". The quantities of items specified herein are estimates only, and are not purchased hereby. Except as may be otherwise provided in this contract, if the Government's requirements for the items set forth herein do not result in orders in the amounts or quantities described as "estimated", it shall not constitute the basis for an equitable price adjustment under this contract.

Except as otherwise provided in this contract, the Government shall order from the contractor all the items set forth which are required to be purchased by the Government activity identified on page 1.

The Government shall not be required to purchase from the contractor, requirements in excess of the limit on total orders under this contract, if any.

Orders issued during the effective period of this contract and not completed within that time shall be completed by the contractor within the time specified in the order, and the rights and obligations of the contractor and the Government respecting those orders shall be governed by the terms of this contract to the same extent as if completed during the effective period of this contract.

If shipment/delivery of any quantity of an item covered by the contract is required by reason of urgency prior to the earliest date that shipment/delivery may be specified under this contract, and if the contractor will not accept an order providing for the accelerated shipment/delivery, the Government may procure this requirement from another source.

The Government may issue orders which provide for shipment/delivery to or performance at multiple destinations.

Subject to any limitations elsewhere in this contract, the contractor shall furnish to the Government all items set forth herein which are called for by print orders issued in accordance with the "Ordering" clause of this contract.

SECTION 2.- SPECIFICATIONS

00000164

SCOPE: These specifications cover the production of appeals briefs and appendices requiring such operations as copy pickup, composition and makeup from department supplied diskette(s), preparation of indexes on some orders, printing, binding, packing, distribution and return of government furnished materials

TITLE: Appeals Briefs and Appendices

FREQUENCY OF ORDERS:  Approximately 300 Briefs and 150 Appendices

BRIEFS—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 200 copies per order with an average of 40 copies per order. Approximately 10 to 132 pages plus cover per order with an average of 40 pages per order Approximately 1 to 20 pages of index or table of contents per order.

APPENDICES—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 40 copies per order with a average of 20 copies per order. Approximately 8 to 1334 pages per order plus cover per order.

GOVERNMENT TO FURNISH: typewritten manuscript copy with computer diskettes or the Government will send copy by modem. Contractor must have the ability to receive by 56-k modem, E-mail or the Internet. Software program WordPerfect 8.0 or later will be used at the Government's discretion. Camera copy for text of Appendices and occasionally for Briefs.

Contractor must have the equipment compatible for use with the above software program and must have sufficient back-up equipment.

Occasionally the Government will supply pre-printed 8-1/2 x 11" pages which the contractor will be required to collate, typeset a cover, trim to finished size and bind.

Identification markings such as register marks, ring folios, rubber stamped jacket numbers, commercial identification marks of any kind, etc., except GPO imprint, form number, and revision date, carried on copy or film, must not print on finished product.

CONTRACTOR TO FURNISH: All materials and operations, other than those listed under "Government to Furnish," necessary to produce the product(s) in accordance with these specifications.

COMPOSITION: The entirety of each category of composition (text, tabular and display) must be identical throughout the products ordered under these specifications.

Composition must be computer output via laser printer, imagesetter or by photocomposition.

Output resolution for laser printers will be 300 to 625 dots per inch and imagesetters will be

will be 1,200 to 3,500 dots per inch.

Photocomposition includes all typesetting product by photographically creating the characters on sensitized film or paper.

Type Page Size: For Briefs, approximately 25 x 43 picas plus folio, facing pages can be one or two lines long or short to accommodate make up and page breaks.

Typefaces and Sizes: The contractor is required to furnish the following:

00000165

Cover: 12 to 72 point Century and Spartan Heavy.

Text, Index, Table of Contents, and Footnotes: 12 point Century with italic, bold, and small caps.

Display: 14 point Spartan Heavy.

Composition will be required on covers, table of contents, and text of Briefs and covers and table of contents of Appendices. Camera copy will be furnished for text of Appendices and occasionally for a percentage of text for Briefs.

No alternate typefaces will be allowed; however, manufacturers' generic equivalents will be accepted for the above typefaces. Each bidder shall list in the bid the name of the generic equivalent typeface(s) and composing machine to be used.

The GPO reserves the right to require samples of any generic equivalent typefaces offered if it is deemed necessary in order to determine the suitability of the offered typefaces.

The contractor must hold all repro for 60 days after delivery for possible use in reprints. After 60 days it may be disposed of.

FILMS/REPRODUCIBLES: The contractor must make all films/reproducibles required.

PROOFS: During the normal workday the contractor must deliver one set of page proofs and any revised page proofs. The contractor must also be able to transmit proofs and receive corrected proofs by facsimile.

On occasion, representatives of the government will read proofs at the contractor's plant. A suitable work place will be provided by the contractor.

The contractor will be responsible for performing all necessary proofreading to ensure that the proofs are in conformity with the copy submitted.

Page reader's proofs must be clean on white paper, free of ink smudges, with all images clearly legible. All proofs must be collated in sets, numbered sequentially, and have a one-inch clear margin on all sides. Proofs must be identified with the jacket number, program number, print order number, and proof date, at least 1/2" from the type area. The contractor's firm name must not appear on any proofs.

Page and Revised Page Proofs: Proofs must be uniform in size and contain a single page to a sheet. When pages contain space allowance for illustrations, an identifying illustration number must be marked in the space allowed. Tables on one set of proofs must be completely ruled.

If any contractor's errors are serious enough in the opinion of the GPO to require revised proofs, the revised proofs are to be provided at no expense to the Government. No extra time can be allowed for this reproofing; such operations must be accomplished within the original production schedule allotted in the specifications.

The contractor must not print prior to receipt of an "OK to print." Contractor will receive OK by phone or by facsimile.

STOCK/PAPER: The specifications of all paper furnished must be in accordance with those listed herein or listed for the corresponding JCP Code numbers in the "Government Paper Specification Standards No. 10" dated July 1994.

All text paper used in each copy must be of a uniform shade. All cover paper must have the grain parallel to the spine.

Text: White Antique Book, grammage 67 g/m$^2$ (basis weight: 45 lbs per 500 sheets, 25 x 38"), equal to JCP Code

00000166

A100.

Cover: White and Colored (usually, but not limited to, Red, Gray, Green, and Blue) Vellum-Finish Cover, grammage 175 g/m$^2$ (basis weight: 65 lbs per 500 sheets, 20 x 26"), equal to JCP Code L20.

Occasional orders may require the use of pressure sensitive cover stock (same as listed above) for the correction of minor errors, stock must have permanent adhesive. Stock to be equal to "Starliner" by Mactac with special permanent adhesive or Fasson "Crack 'n Peel" Plus with super permanent adhesive.

PRINTING: Print head to head in black ink. All orders may be printed by electro-static copying or by printing with direct image plates provided that the quality levels are maintained.

INK: If lithographic ink is used in the performance of this contract, the ink shall contain not less than the following percentages of vegetable oil: sheet- fed and forms ink, 20 percent.

For Appendices, the contractor will be required to mechanically number the pages. This shall be accomplished by a numbering machine consisting of 1 or 2 letters followed by up to 4 digits. All characters are to be 3/16" or 1/4" high. The numbered text is then used as camera copy.

MARGINS: Briefs: 1" on all sides.

BINDING: Perfect- or adhesive-bind products: Gather contractor printed and/or Department supplied printed material, perfect- or adhesive-bind with separate wraparound glued-on paper cover, and trim three sides. Covers trim flush.

PACKING: Pack in shipping containers. Each shipping container must not exceed 45 pounds when fully packed.

LABELING AND MARKING (Package and/or Container label): Reproduce shipping container label from furnished repro, fill in appropriate blanks and attach to shipping containers.

DISTRIBUTION: Deliver f.o.b. destination to the following addresses:

U.S. Department of Justice   U.S. Department of Justice

One St. Andrew's Plaza   86 Chambers Street , 3rd Floor

New York, NY 10007    New York, NY 10007

INSIDE PICKUP AND DELIVERY TO ROOM NUMBER SPECIFIED IS REQUIRED.

There will be one additional address in Manhattan.

Complete addresses and quantities will be furnished with the print orders.

All expenses incidental to returning materials, submitting proofs, and furnishing sample copies must be borne by the contractor.

RETURN OF GOVERNMENT FURNISHED MATERIAL, ETC: The contractor shall within 10 days of delivery of each brief, return to the Department the corrected version (i.e., the version as printed) of each brief on 3.5" diskette. This corrected version (hereinafter "corrected version file") shall be in WordPerfect 8.0 or higher as directed by the Government.

00000167

Also .pdf file(s) in Acrobat 3.0 Reader for use in CD-ROM production, files must be identical to the printed version from contractor's application program files, e.g., using Macintosh platform, QuarkXPress, Adobe PageMaker, etc. or using Windows platform, QuarkXPress, Adobe PageMaker, Adobe FrameMaker, etc.

Required formatting of the corrected version file: Justification shall be Full or Left; Base Font shall be Courier; Line Spacing shall be one; paragraphs shall be separated by 2-points or more leading between lines and 6-points or more between paragraphs (tabular or spaced first-line indentations are permissible); lines within paragraphs shall end with Soft Returns, not Hard Returns; block quotations shall be left/right indented paragraphs; footnote markers in text and footnotes shall be in standard WordPerfect format.

Impermissible Formatting: Character font codes other than the Base Font shall be removed; center Justification codes shall be removed; other formatting codes added during the conversion process, if any, other than as required above, shall be removed.

SCHEDULE: Adherence to this schedule must be maintained. Contractor must not start production of any job prior to receipt of the individual print order (GPO Form 2511). No definite schedule for pickup of material can be predetermined. Furnished material and proofs must be picked up from and delivered to the addresses under DISTRIBUTION.

It should be noted that the performance period specified by the Government consists of contract  workdays Monday through Friday, from 9:00 a.m. to approximately 10:00 p.m..

The Contractor may be required to work on up to 4 briefs or appendices (up to 100 pages per order) in one day and maintain work schedules.

Contractor will be notified for pick up of initial copy and/or diskette(s) or Government will notify contractor that copy will be sent by modem as set forth below.

<div align="center">BRIEFS</div>

Regular Schedule (non-Overtime): Contractor will be required to pickup copy and diskettes or be available to receive copy by electronic means between the hours of 9:00am to 12:00pm and to process copy and deliver typeset page proofs (up to 100 pages per brief) back to the agency within 4 hours.

Contractor will be required to pick up corrected page proofs or receive by facsimile during contract workday hours, make corrections and deliver (or facsimile) corrected set of page proofs back to the Department within one (1) hours of receipt.

Additional changes may be made by the agency up to 4 additional times per brief and the Contractor must turnaround each change within 30 minutes of receipt of change/

After receiving "OK to print," contractor will print, bind, and deliver 40 copies (up to 100 pages per brief) within 2 hours.

In the event that the contractor is responsible only for printing the cover and binding the brief, in one of two format, a copy of the text of the brief shall be provided by the Department to the contractor. After receiving the text of the

brief and an "OK to print," the contractor shall make the requisite copies of the text of the brief and bind and trim to size and deliver 40 copies within 2 hours. Trim sizes will either be 8-1/2 x 11" or 6-1/8 x 9-1/4

<div align="center">APPENDICES</div>

Regular Schedule (Non-Overtime): The contractor will be required to pick up copy, typeset cover and table of contents,

00000168

number pages, print, and deliver 20 copies of up to 500 pages.

This should be a 2-step process:

1) Contractor prepares a "dummy" appendix (no cover or table of contents), just numbered pages in a temporary binding. This should take no more than 24 hours.

2) When appendix is in final form (including cover and table of contents), contractor is given "OK" to print. Deliver 20 copies of up to 500 pages within 4 hours.

If receipt of material, from the Government, occurs such that contractor cannot perform above schedule during normal workday hours, contractor will perform such work during the following workday or on overtime if overtime is authorized by the Government.

**NOTE: Overtime shall apply to any work performed after 10:00pm or on weekends or Federal Holidays resulting from delays caused by the agency. No overtime payment will be paid because of contractor's failure to meet the schedule..**

**Overtime Schedule: When the Government requires that work be performed Monday thru Friday after 10:00pm Saturdays, Sundays, and Federal holidays, in order to meet delivery requirements, overtime payments will be paid for at the hourly overtime rate in accordance with the contractor's offered hourly rate in the "Schedule of Prices". Contractor and agency must agree on the number of hours of overtime necessary to complete the job and this must be shown on the print order or attachment. No overtime will be paid if proof of agreement on the number of hours is not attached to the print order.**

**CONTRACTORS PLEASE NOTE: CONTRACTOR MAY NOT REFUSE TO WORK OVERTIME.**


SERVICE AND FILING OF BRIEFS AND APPENDICES BY CONTRACTOR: At Government's Option:

For each brief and/or appendix prepared by the Contractor with respect to which a request is made by the Government, the Contractor shall, in a manner consistent with the requirements of the United States Court of Appeals for the Second Circuit, serve two copies of the brief and/or 1 copy appendix on each party designated by the Government and timely file in the Court of Appeals the original and the appropriate number of copies of the brief and/or appendix. Service will generally be by mail, but personal service may be required. Absent a request by the Government that a particular brief and/or appendix be served and filed by the Contractor, the Contractor shall deliver to the Government the number of copies of the brief and/or appendix specified in the print order form.

If personal service is required, and the party is located more than 25 miles from the contractor's office, the Government will pay actual charges at cost without mark-up.


SECTION 3.- DETERMINATION OF AWARD

The Government will determine the lowest bid by applying the prices offered in the "Schedule of Prices" to the following units of production which are the estimated requirements to produce 12 months orders under this contract. These units do not constitute, nor are they to be construed as, a guarantee of the volume of work which may be ordered for a like period of time.

OVERTIME PAYMENTS: Orders requiring production on Saturdays, Sundays, Federal holidays, or Monday thru Friday after 10:00pm in order to meet delivery requirements will be paid for at the overtime rate in accordance with the

00000169

http://mail.google.com/mail/?attid=0.1&disp=vah&view=att&th=11397ed2db414286                07/05/2007 06:01 PM

contractor's offered hourly rate in the "Schedule of Prices".

All other orders will be placed with the required schedule and paid for at the basic prices offered.

It is estimated that 15% of the orders placed on this contract will require an overtime schedule and,

The following item designations correspond to those listed in the "Schedule of Prices".

<div align="center">CATEGORY 1</div>

I. (a)(1)    310
   (2)       170
   (b)       106
   (c)       10106
   (d)       318
   (e)       15780
   (f)       34234
   (g)       2052
   h.        200
   i.        0
   (j)       50

II. (a)      1,327
    (b)      165,996
    (c)(1)   10
    (2)      0
    (d)  14

III. (a)  255
     b.       348
     c.       255

IV  100

00000170

### SECTION 4.- SCHEDULE OF PRICES

SUBMISSION OF OFFERS AND EVALUATION: The offer shall be based upon supplying paper that meets or exceeds the minimum percentage of waste paper as required by this solicitation. By submission of an offer, offerors are certifying that the paper to be supplied contains at least the minimum percentage specified. This certification concerns a matter within the jurisdiction of an agency of the United States, and the making of a false, fictitious, or fraudulent certificate on may render the maker subject to prosecution under Title 18, United States Code, Section 1001. he Government reserves the right to require proof of such certification prior to first delivery and thereafter as may be otherwise provided for under the provisions of the contract.

Bids offered are f.o.b. destination.

Prices must include the cost of all required materials and operations for each item listed in accordance with these specifications.

Bidder must make an entry in each of the spaces provided. Contractor must submit a price for all items. A No Charge or a No Bid may be cause for your bid to be declared nonresponsive. Bids submitted with any obliteration, revision, or alteration of the order and manner of submitting bids, may be declared nonresponsive.

Bids submitted with NB (No Bid) or blank spaces for an item may be declared nonresponsive.

The Contracting Officer reserves the right to reject any offer that contains prices for individual items of production (whether or not such items are included in the Determination of Award) that are inconsistent or unrealistic in regard to other prices in the same offer or to GPO prices for the same operation if such action would be in the best interest of the Government.

All vouchers submitted to the GPO shall be based on the most economical method of production.

Fractional parts of 10 will be prorated at the per 10 rate.

<u>Prices must be submitted for the entire term of the contract and bids qualified for a lesser period will not be considered.</u>

_____

(Initials)

### I. COMPOSITION AND PAGE MAKEUP:

(a) Cover pages:

     (1) Brief (6-1/8 x 9-1/4")..................per page............$_____

     (2) Appendix (8-1/2 x 11")..................per page............$_____

(b) Text page: Contractor set from manuscript copy.....per page.....$_____

00000171

(c) Text page: Department supplied diskette(s)..per page...........$_____

(d) Remake of pages due to editorial changes....per page...........$_____

(e) Page proofs.................................per page...........$_____

(f) Authors alterations* (flat charge for access

to file). Offer must include, and a charge

will be allowed for, locating each deletion,

change or addition in the file.............per alteration......$_____

*Alterations may consist of the addition or deletion of one or more words or phrases (groups of words within a single sentence), these will be considered as one alteration. <u>The maximum charge allowable for author's alterations on any one page shall be an amount equal to the cost of setting that page from manuscript copy.</u>

(g) Insertion of reference page numbers on

Table of Contents or Index from edited

page proofs.................................per line...........$_____

(h) Return to the Department the corrected version

(i.e., the version as printed) of each brief

on 3.5" diskette. This corrected version

(hereinafter "corrected version file") shall

be in WordPerfect 6.1.......................per diskette........$_____

(i) .pdf file production using Acrobat 3.0 Reader

for use in CD-ROM production, files must be

identical to the printed version of text....per page...........$_____

(j) Diskette for .pdf file(s) above.............each...............$_____

_____

(Initials)

00000172

II. COMPLETE PRODUCT: Prices offered shall include the cost of all required materials and operations (EXCEPT Items I. and III.) necessary for the complete production and distribution of the product listed in accordance with these specifications.

### NOTE: RUNNING RATE IS PER 10 COPIES

Running Per

10 Copies

Includes makeready if required:                    ----------

(a) Complete cover (wraparound)............................$_____

(b) Text per page..........................................   .........$_____

(c) Pressure sensitive cover stock (up to 8-1/2 x 11"):

   (1) White...................................per 100 leaves......$_____

   (2) Colored................................per 100 leaves......$_____

(d) Collating, trimming to size and binding    per 100 pages      $_____

III. SERVICE AND FILING OF BRIEFS AND APPENDICES BY CONTRACTOR: At Government's

  Option:

(a) Filing brief and any appendices or attachments

    at court and on one party.......................................$_____

(b) Each additional service.........................................$_____

( c) Electronic filing of Briefs ………………………$_____

IV. OVERTIME PAYMENTS:

Hourly rate for work performed after 10:00pm on weekdays,

Saturday, Sunday and Federal Holidays……per hour…………..$_____

    It is estimated that 15% of the orders placed on this contract will require an overtime schedule .

SECTION 4.- TYPEFACES: If manufacturers generic equivalent typefaces are proposed, the bidder must list on the line of the same number as the preferred typeface, the name of the equivalent typeface and composing machine to be used.

00000173

http://mail.google.com/mail/?attid=0.1&disp=vah&view=att&th=11397ed2db414286     07/05/2007 06:01 PM

Preferred Typefaces:

1. Century

2. Spartan Heavy

Manufacturers Generic

Equivalent Typefaces       Name of Composing Machine

1._____     _____

2._____     _____

BIDDERS NAME AND SIGNATURE: Fill out and return Two (2) copies of all pages in "Section 4.- Schedule of Prices", initial or sign each in the space provided and submit with GPO Form 910, "Bid". Do not enter bid prices on GPO Form 910. NOTE: The schedule of prices will prevail in instances where prices are inadvertently entered on GPO Form 910.

Bidder_____

_____

(City - State)

By_____

(Signature and title of person authorized to sign this bid)

_____

(Person to be contacted)       (Telephone Number)

The contractor is cautioned not to perform any operation(s) or produce any product(s) for which a price has not been offered under the contract. Further, the contractor is not to accept print orders which are outside the scope of the contract. If such orders are placed, contractor is to notify GPO New York immediately. Failure to do so may result in nonpayment.

00000174

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :
ex rel. BRIAN BURKE         :
                           :     Civil Action No. 1:08-cv-364 (EGS)
        Plaintiff/Relator,  :
                           :
        v.                :
                           :
RECORD PRESS, INC.       :
                           :
        Defendant.      :
                           :

## DECLARATION OF MARK HANNA IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Mark Hanna, hereby declare as follows:

1.     I am an attorney at law duly licensed to practice before this Court and counsel of record herein for Relator Brian Burke. I make the following statements based on my personal knowledge gained in that capacity and, if called to testify, could and would competently testify thereto.

2.     Attached hereto as Exhibit A is a true and correct copy of a letter (excluding attachments) dated August 1, 2008, from Malcolm I. Lewin, counsel of record herein for Defendant Record Press. Mr. Lewin's letter threatened my client with sanctions under Rule 11 if the Complaint was not withdrawn by August 28, 2008.

3.     On August 6, 2008, I responded to Mr. Lewin's letter. Attached hereto as Exhibit B is a true and correct copy of my letter to Mr. Lewin. In my letter, I acknowledged that the Complaint contained two minor errors that were made in good

1

00000175

faith based on the documents my client had available to him when drafting the Complaint. I indicated that my client was willing to amend the Complaint to correct these errors if necessary. I also raised some questions regarding a document that Mr. Lewin had included with his letter of August 1, and asked him to provide support for his client's interpretation of the underlying contract at issue – an interpretation which is contradicted by the face of the contract.

4.    In response to my requests, I received a letter from Mr. Lewin dated August 8, 2008. Attached hereto as Exhibit C is a true and correct copy of Mr. Lewin's letter to me of that date. In his letter, Mr. Lewin declined to "engage in a dialogue" with me or to "explain" anything relating to the underlying contract at issue.

5.    Relator's position, as reflected in the Joint Rule 16 Report filed with the Court, is that Relator is more than willing to limit discovery to litigate this case as efficiently as possible

6.    Mr. William O'Brien, Washington DC counsel stated in the Rule 16 Report that it is Defendant's position that no discovery was necessary or appropriate.

7.    Over the course of this litigation, I have made several attempts to contact Assistant US Attorney Daryl Valdez to seek information regarding the GPO's interpretation of the underlying contract. Attached hereto as Exhibit D is a true and correct copy of a letter I wrote to AUSA Valdez on August 11, 2008, seeking such information. I received no response to this letter. Nor have I received any information in response to several additional requests for information on the GPO's position.

00000176

8.      Attached hereto as Exhibit E is a true and correct copy of my letter to AUSA Valdez of October 6, 2008, seeking his assistance in obtaining information from the GPO.

9.      Attached hereto as Exhibit F is a true and correct copy of a letter dated October 10, 2008, from AUSA Valdez to me, declining to provide information and stating that discovery would be "premature" notwithstanding the pending dispositive motion.

10.      Attached hereto as Exhibit G is a true and correct copy of a letter dated October 6, 2008, from Mr. O'Brien to me (excluding attachments), again threatening Rule 11 sanctions if the Complaint is not withdrawn by October 29, 2008.

111.      Attached hereto as Exhibit H is a true and correct copy of my letter dated October 10, 2008, responding to Mr. O'Brien's second Rule 11 letter to me.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this ___ day of October, 2008, at Washington, DC.

_____
Mark Hanna

3

00000177

# EXHIBIT A

00000178

# MorrisonCohen LLP

Cbucher-l

Malcolm I. Lewin
(212) 735-8625
mlewin@morrisoncohen.com

August 1, 2008

**Via Facsimile and By First Class Mail**
**(202) 223-8651**

Mark Hanna, Esq.
Davis, Cowell & Bowe, LLP
1701 K Street, NW
Suite 210
Washington, D.C.  20006

      Re:     United States of America, ex rel. Brian Burke v. Record Press, Inc.
               (1:08cv 364 U.S. District Court, D.C.)

Dear Mr. Hanna:

      We represent Record Press, Inc. ("Record Press"), which has been named by your client as defendant in the referenced action.

      Pursuant to Federal Rule of Civil Procedure 11(c)(1), we hereby give notice that we will file a Rule 11 Motion on behalf of Record Press on or shortly after August 28, 2008 if you do not withdraw the Verified Complaint ("Complaint") in the referenced action which you filed in the U.S. District Court for the District of Columbia on February 29, 2008, and recently served on Record Press, following the government's election to decline intervention.

      Enclosed are three documents referred to and relied on in your Complaint (verified by Mr. Burke as true to his own knowledge, not alleged on information and belief) demonstrating that the allegations in the Complaint have no basis in fact and were made, we believe, without the investigation Rule 11 requires.  These documents are the Request for Proposals ("RFP") and Record Press' two bills.

      Among the errors in your Complaint which are directly refuted by the documents to which your complaint refers and relies on, are the following:

      1.     Complaint paragraph 11 states, incorrectly, that the maximum price to be charged for collating, trimming to size and binding briefs and appendices is $14.00 per hundred pages for a 10 copy run.  (The "Running Per 10 Copies" caption applies, obviously, to the two, subsequently listed line-items; "Complete cover" and "Text per page."  Charges for "Collating, trimming to size and binding" are listed as "per 100 pages" which means exactly what it says.)  The documents relied on in your Complaint (and enclosed with this letter) show that the price for collating, trimming to size and binding briefs, per hundred pages, is $12.25 (or .01225 per page) and this is restated and confirmed in the chart on the last page of the enclosed RFP entitled "Basis of Award."  This is what

MorrisonCohen LLP

Mark Hannah, Esq.
August 1, 2008
Page 2

Record Press billed as is shown in the enclosed invoice number A71700 which your client no doubt received.

2.       Complaint paragraph 12 alleges, again incorrectly, that the RFP cost for binding a 10 copy run of a brief or appendix is $12.50 for 100 pages (or 0.1225 per page).  The RFP does not provide a separate binding charge.  Neither does Record Press' bill.

3.       Complaint paragraph 13 alleges, again incorrectly, that "[i]n violation of the GPO contract" Record Press has billed and still bills the GPO "the binding charge for each copy of each brief or appendix that it prepares, rather than for a 10-copy run of the document being prepared." The charges relating to a "10-copy run" referred in the Complaint is found in Section II of the RFP and as seen, refers only to "Complete Cover" and "Text Per Page."   Again, this is confirmed on the "Basis of Award" page, in the RFP enclosed.

4.       Complaint paragraph 15 claims, incorrectly, that Record Press billed the government $1,483.77 for collating and trimming 20 copies of a 566 page appendix.  Your client had that bill  for some time and he should have been able to read it correctly.  Complaint paragraph 14 claims that Mr. Burke made his "discoveries" when he as the losing party in his action against the Government in the U.S. District Court, Southern District of New York and again in the Second Circuit Court of Appeals, was ordered to pay the U.S. Attorney's costs, etc.  Record Press' invoice number A71701, enclosed, referring to the printing and binding of the appendix, states that for 11,320 pages, the charge for collating, trimming to size and binding, at $12.25 per hundred pages was $1,386.70, not $1,483.77. Again, Record Press' bill is consistent with the RFP.

5.       Paragraph 15 of the Complaint also alleges incorrectly that Record Press billed the Government $398.47 for collating and trimming 40 copies of a 76-page brief.  In fact, Record Press' enclosed invoice, #A71700, states that the charge for collating, trimming to size and binding 3,040 pages (40 copies of a 76 page brief, also consistent with the RFP at $12.25 per hundred pages), is $372.40.  The simple and appropriate expedient of comparing the two bills of Record Press with the GPO's RFP, all of which documents are referred to and relied on and are stated to provide the basis for your Complaint, demonstrates that the Complaint lacks merit.

If the Complaint is not withdrawn, we will ask the Court to dismiss it and also to order you or your client to pay a monetary sanction, including but not limited to the fees and other costs incurred by our client in preparing and filing the Rule 11 and dismissal motions.

Very truly yours,

Malcolm I. Lewin

Enclosures

cc:     William O'Brien, Esq.
        Darrell C. Valdez, Esq.,
           Asst. U.S. Attorney

#1360397 v1 \007123 \0013

00000180

# EXHIBIT B

00000181

Counselors and Attorneys at Law

**Washington, DC**

1701 K Street, NW, Suite 210
Washington, DC 20006
202.223.2620
Fax 202.223.8651

George R. Murphy (DC)
Michael T. Anderson (DC, CA, MA, NV)
Mark Hanna (DC, VA, MI, NJ)
Arlus J. Stephens (DC, MD, OH, PA)
Joni S. Jacobs (DC, CA, NV, AZ)
Keira M. McNett (DC, CA)

**San Francisco**

595 Market Street, Suite 1400
San Francisco, California 94105
415.597.7200
Fax 415.597.7201

Barry S. Jellison (CA)
Steven L. Stemerman (CA, NV)
Richard G. McCracken (CA, NV)
W. David Holsberry (CA, NV)
Elizabeth Ann Lawrence (CA, NV, AZ)
Andrew J. Kahn (CA, NV, AZ)
John J. Davis, Jr. (CA)
Florence E. Culp (CA, NV)
Michael T. Anderson (CA, NV, DC, MA)
Kristin L. Martin (CA, HI, NV)
Eric B. Myers (CA, NV)
Michael C. Hughes (CA)
Paul L. More (CA, NV)
Winifred Kao (CA, DC)
Sarah Varela (CA)

Robert P. Cowell (1931-1980)

of counsel:
Philip Paul Bowe (CA)
J. Thomas Bowen (CA)
Mark Brooks (TN)

**Boston**

8 Beacon Street, 4th Floor
Boston, Massachusetts 02108
617.227.5720
Fax 617.227.5767

Michael T. Anderson (CA, NV, DC, MA)

**New Jersey**

1389 Broad Street
Clifton, New Jersey 07013
973.916.0999
Fax 973.916.0906

Mark Hanna (DC, VA, MI, NJ)

**McCracken, Stemerman
& Holsberry**

1630 S. Commerce Street, Suite A-1
Las Vegas, Nevada 89102
702.386.5107
Fax 702.386.9848

August 6, 2008

*Via Facsimile (212-735-8708) and First Class Mail*

Malcolm I. Lewin, Esq.
Morrison Cohen LLP
909 Third Avenue
New York, NY 10022-4784

Re:     United States, ex rel. Burke v. Record Press, Inc.
         (U.S. District Court, D.C. 1:08cv364)

Dear Mr. Lewin:

I write in response to your letter of August 1. It was unnecessary for you to engage us on this in the form of a Rule 11 letter, but nevertheless, we reply here to the issues you have raised.

As you know, the core of the Relator's claim is based on an interpretation of the plain language of what we understand to be Record Press's contract with GPO. Specifically, the Relator has alleged -- and you admit in your letter -- that Record Press charges the Government per 100 pages for "collating, trimming to size and binding" rather than per 100 pages *per 10-copy run*, as the plain language of the RFP appears to specify at page 14 of Record Press's bid.

We have never previously seen the chart you provided, which you claim supports your interpretation of the contract as limiting the "per 10 copies" specification to line items II(a) and (b) and excluding lines (c) (cover stock) and (d) (collating, trimming to size and binding).

In your letter, you refer to this chart as the "last page of the enclosed RFP." However, this chart does not in fact appear to be a part of the RFP. The RFP appears to end on "Page 15 of 15," which contains the signature block; whereas this chart is marked as "Page 1 of 1," indicating that it is a separate document. Can you provide us with more information about the source of this chart? Is it an attachment to the RFP? Is it a part of some other document? When and where was it created? Did GPO create this chart?

Malcolm I. Lewin, Esq.
August 6, 2008
Page 2

Clearly, the primary issue is whether the following terms of the bid on page 14 of the RFP apply to charges for "collating, trimming to size and binding": "RUNNING RATE IS PER 10 COPIES" and "Running Per 10 Copies." You assert that it does not apply. Can you provide us with any other support for this interpretation in addition to the chart discussed above?

With respect to the minor errors in the Complaint regarding the rate ($12.25 rather than $12.50) and the total amounts billed by Record Press ($1,386.70 rather than $1,483.77 and $372.40 rather than $398.47), the Relator did not previously have copies of either Record Press's bid or the original invoices submitted by Record Press. The Relator was relying on a copy of the blank RFP and the statements of charges submitted by the US Attorneys' Office as attachments to its Motion for Costs. These statements of charges were generated by GPO, and unbeknownst to the Relator at the time the Complaint was filed, they included GPO's 7% surcharge, which accounts for these errors in the Complaint. We are certainly willing to correct these minor errors with an amended complaint if it is necessary.

We look forward to hearing from you regarding our questions above, and we are available to further discuss any of the issues involved in this case.

Sincerely,

Mark Hanna

MH: kmm

cc:    William O'Brien, Esq.
       Assistant U.S. Attorney Darrell C. Valdez

# EXHIBIT C

00000184

# MorrisonCohen LLP

Partner
(212) 735-8625
mlewin@morrisoncohen.com

August 8, 2008

<u>Via Fax (202) 223-8651 and Mail</u>
Mark Hanna, Esq.
Davis, Cowell & Bowe, LLP
1701 K Street, NW
Suite 210
Washington, DC  20006

Re:  <u>Burke v. Record Press, Inc.</u>

Dear Mr. Hanna:

I have your August 6 2008 letter described as responding to mine of August 1 2008.

The second paragraph of your letter is incorrect in assuming my knowledge.

While this is neither the time nor the place to engage in a dialogue (nor did I solicit one in my August 1, 2008 letter) or answer questions which should have been fully addressed before you sued, I will, as a courtesy answer, noting that my August 1 2008 letter stands.

At best, I believe you and your client simply misread a very clear contract (while ignoring the actual bills of Record Press) and I do not believe there is anything open, as you wrote, for interpretation.  The chart that I sent you is part of the RFP as prepared by the government.

It is neither my role nor my inclination to explain the clear RFP language when you sued on that document, based on a verified representation of actual knowledge, and, pursuant to Rule 11, properly investigated.

I do not believe your pleading errors are "minor."  I believe they, too, undercut your complaint, in view of your belated conclusion that neither you nor your client had the very bills on which you based your claim.  Likewise, errors are not "minor" when they are used to extrapolate into a fraud claim and resulted from your now admitted failure to see Record Press' actual bills.

Very truly yours,

Malcolm I. Lewin

cc:     William O'Brien, Esq.
        Darrell C. Valdez, Esq.
        Assistant U.S. Attorney

#1396870 v1 \099999 \0001

909 Third Avenue, New York, NY 10022-4784 • p:212.735.8600 • f:212.735.8708 • www.morrisoncohen.com

# EXHIBIT D

00000186

# D A V I S ,   C O W E L L   &   B O W E ,  LLP

### Counselors and Attorneys at Law

**Washington, DC**

1701 K Street NW, Suite 210
Washington, DC 20006
202.223.2620
Fax 202.223.8651

George R. Murphy (DC)
Mark Hanna (DC, NJ, VA)
Arius J. Stephens (DC, MD, OH, PA)
Joni S. Jacobs (DC, AZ, CA, NV)

**San Francisco**

595 Market Street, Suite 1400
San Francisco, California 94105
415.597.7200
Fax 415.597.7201

Barry S. Jellison (CA)
J. Thomas Bowen (CA, NV)
Steven L. Stemerman (CA, NV)
Richard G. McCracken (CA, NV)
W. David Holsberry (CA, NV)
Elizabeth Ann Lawrence (CA, NV, AZ)
Andrew J. Kahn (CA, NV, AZ)
John J. Davis, Jr. (CA)
Florence E. Culp (CA, NV)
Michael T. Anderson (CA, NV, DC, MA)
Kristin L. Martin (CA, NV)
Eric B. Myers (CA, NV)
Michael C. Hughes (CA)
Paul L. More (CA)
Ramit Mizrahi (CA)

Robert P. Cowell (1931–1980)

of counsel:
Philip Paul Bowe (CA)
Mark Brooks (TN)

**Boston**

8 Beacon Street, 4th Floor
Boston, Massachusetts 02108
617.227.5720
Fax 617.227.5767

Michael T. Anderson (CA, NV, DC, MA)

**New Jersey**

1389 Broad Street
Clifton, NJ 07013
973.916.0999
Fax 973.916.0906

Mark Hanna (DC, NJ, VA)

**McCracken, Stemerman,
Bowen & Holsberry**

1630 S. Commerce Street, Suite A-1
Las Vegas, Nevada 89102
702.386.5107
Fax 702.386.9848

August 11, 2008

*Via Email (darrell.valdez@usdoj.gov) and First Class Mail*

Assistant U.S. Attorney Darrell C. Valdez
U.S. Department of Justice
Judiciary Center
555 Fourth Street, NW
Washington, DC 20530

> Re:     **United States, ex rel. Burke v. Record Press, Inc.**
>           **(U.S. District Court, D.C. 1:08cv364)**

Dear Mr. Valdez:

   I request the Government's assistance in clarifying an issue in the above-referenced False Claims Act case.  This issue has arisen in the course of the Relator's attempts to respond to Record Press's August 1 "Rule 11 letter," which you were copied on. The government's limited assistance in this matter could save significant time and resources for all parties to this litigation, including the Government.

   As stated in the Relator's Complaint, the Relator never had a copy of the GPO's contract with Record Press, but relied upon a blank copy of the RFP provided to him by the GPO.  The document provided by the GPO to the Relator indicated a price term that applied to a "10 copy run."

   Defendant's counsel has now provided a chart, a copy of which is enclosed, that Defendant represents to be a part of the RFP.  This chart seems to indicate that the price term at issue does not apply to a "10 copy run."  We have asked Defendant's counsel to clarify the source of the chart, as it does not on its face appear to be part of the RFP.  Defendant's counsel has refused to provide clarification, yet insists the chart is part of the RFP.

   The allegations of the Complaint are based on the plain language of the RFP provided to the Relator and additional information conveyed to him by persons at GPO.  However, as we have previously indicated to you, it is important to know the GPO's interpretation of the RFP terms specifying that the "running rate is per 10 copies."  Your assistance in this matter could be helpful in limiting the scope of the litigation for all sides.

Darrell C. Valdez, Esq.
August 11, 2008
Page 2

Specifically, we would appreciate it if you could inform us at your earliest
opportunity whether the enclosed chart is part of the RFP.  If not, could you please
identify it for us and explain whether it was created by the GPO.  Also, as
requested previously, any additional information you can provide regarding the
GPO's interpretation of the RFP, including a contact person at the GPO, would be
most appreciated.

Please feel free to contact me at 202-223-2620.  Thank you in advance for
any assistance you can provide.

Sincerely,

Mark Hanna

Enclosure

cc:    William O'Brien, Esq. (via e-mail)
       Malcolm I. Lewin, Esq. (via e-mail)

00000188

| ITEM NO. | DESCRIPTION | | BASIS OF AWARD | NEW YORK UNIT RATE | NEW YORK COST | NEW YORK UNIT RATE | NEW YORK COST | NEW YORK UNIT RATE | NEW YORK COST | CONTRACT UNIT RATE | CONTRACT COST | UNIT RATE | COST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | COMPOSITION AND PAGE MAKEUP | | | | | | | | | | | | |
| a | COVER PAGE | | | | | | | | | | | | |
| 1 | BRIEF (5-1/8 X 9-1/4") | PER PAGE | 310 | 9.00 | 2,790.00 | 10.00 | 3,100.00 | 6.50 | 2,015.00 | 6.50 | 2,015.00 | | |
| 2 | APPENDIX (8-1/2 X 11") | PER PAGE | 170 | 9.00 | 1,530.00 | 10.00 | 1,700.00 | 6.50 | 1,105.00 | 6.50 | 1,105.00 | | |
| b | TEXT PAGE MANUSCRIPT COPY | PER PAGE | 108 | 10.00 | 1,080.00 | 10.00 | 1,080.00 | 7.00 | 742.00 | 7.00 | 742.00 | | |
| c | TEXT PAGE SUPPLIED DISK | PER PAGE | 10106 | 7.90 | 79,837.40 | 4.00 | 40,424.00 | 4.00 | 40,424.00 | 4.00 | 40,424.00 | | |
| d | REMAKE OF PAGES | PER PAGE | 318 NIC | | | 3.00 | 954.00 NIC | | | | | | |
| e | PAGE PROOFS | PER PAGE | 15780 | 1.00 | 15,780.00 | 0.20 | 3,156.00 | 0.20 | 3,156.00 | 0.20 | 3,156.00 | | |
| f | AUTHOR'S ALTERATIONS | PER ALTERATION | 34234 NIC | | | 0.25 | 8,558.50 NIC | | | | | | |
| g | INSERTION OF REFERENCE PAGE NUMBERS | | | | | | | | | | | | |
| | RETURN TO THE DEPT. CORRECTED | PER LI | 2052 NIC | | | 0.20 | 410.40 NIC | | | | | | |
| h | VERSION OF EACH BRIEF | PER DISKETTE | 200 NIC | | | 1.50 | 300.00 NIC | | | | | | |
| i | PDF FILE PRODUCTION USING ACROBAT 3.0 | | | | | | | | | | | | |
| | READER FOR USE IN CD-ROM | PER PAGE | | 0.25 | | 5.00 | | 5.00 | | 5.00 | | | |
| j | DISKETTE FOR PDF FILE ABOVE | EACH | 50 NIC | | | 1.50 | 75.00 NIC | | | | | | |
| II | COMPLETE PRODUCT | | | | | | | | | | | | |
| a | COMPLETE COVER | PER 10 COPIES | 1327 | 3.00 | 3,981.00 | 5.50 | 7,298.50 | 5.50 | 7,298.50 | 5.50 | 7,298.50 | | |
| b | TEXT PER PAGE | PER 10 COPIES | 165996 | 0.50 | 82,998.00 | 0.30 | 49,798.80 | 0.20 | 33,199.20 | 0.20 | 33,199.20 | | |
| c | PRESSURE SENSITIVE COVER STOCK | PER | | | | | | | | | | | |
| 1 | WHITE | PER 100 LEAVES | 10 NIC | | | 12.00 | 120.00 NIC | | | | | | |
| 2 | COLOR | PER 100 LEAVES | NIC | | | 12.00 | | | | | | | |
| d | COLLATING, TRIMMING TO SIZE AND BINDING | PER 100 PAGE | 14 | 6.50 | 91.00 | 12.00 | 168.00 | 5.00 | 70.00 | 5.00 | 70.00 | | |
| III | SERVICE AND FILING OF BRIEFS | | | | | | | | | | | | |
| a | FILING BRIEF AND ANY APENDICES OR ATTACHMENTS AT COURT AND ON ONE PARTY | | 255 | 20.00 | 5,100.00 | 50.00 | 12,750.00 NIC | | | | | | |
| b | EACH ADDITIONAL SERVICE | | 348 NIC | | | | NIC | | | | | | |
| c | ELECTRONIC FILING OF BRIEFS EACH | | 255 | | | 30.00 | 7,650.00 NIC | | | | | | |
| IV | OVERTIME PAYMENT | | | | | | | | | | | | |
| a | HOURLY RATE FOR WORK PERFORMED AFTER 12:00PM ON WEEKDAYS, SATURDAY, SUNDAY AND FEDERAL HOLIDAYS PER HOUR | | 100 | 150.00 | 15,000.00 | 96.00 | 9,600.00 | 5.00 | 70.00 | | 70.00 | | |
| | CONTRACTORS TOTALS | | | | $206,187.40 | | $147,023.20 | | $88,005.70 | | $88,005.70 | | |
| | DISCOUNT | | | | | 2.00% | | | $1,760.19 | | | | |
| | DISCOUNTED TOTALS | | | | $206,187.40 | | $147,023.20 | | $86,245.51 | | $88,005.70 | | |

Page 1 of 1

# EXHIBIT E

00000190

# MurphyAnderson
### PLLC

**Washington**
1701 K Street NW, Suite 210
Washington, DC 20006
202.223.2620   Fax 202.223.8651

George R. Murphy | DC
Michael T. Anderson | DC, MA
Joni S. Jacobs | DC
Arius J. Stephens | DC, MD, OH, PA
Mark Hanna | DC, VA, NJ, MI
Keira M. McNett | DC, CA

**Boston**
111 Devonshire Street, 5th Floor
Boston, MA 02109
617.227.5720   Fax 617.227.5767

Michael T. Anderson | MA, DC

**New Jersey**
1389 Broad Street
Clifton, NJ 07013
973.916.0999   Fax 973.916.0906
Mark Hanna | NJ, DC, VA, MI

www.murphyandersonplic.com

October 6, 2008

*Via Email (darrell.valdez@usdoj.gov) and First Class Mail*

Assistant U.S. Attorney Darrell C. Valdez
U.S. Department of Justice
Judiciary Center
555 Fourth Street, NW
Washington, DC 20530

> **Re:    United States, ex rel. Burke v. Record Press, Inc.**
> **(U.S. District Court, D.C. 1:08cv364)**

Dear Mr. Valdez:

As you know, the Defendant has filed a Motion for Summary Judgment in this case. This Motion does not provide any evidence to support the Defendant's interpretation of the contract. Specifically, it does not include any representations from the GPO regarding the agency's understanding of the contract.

We intend to seek discovery from the GPO. We are writing to request the GPO's designation of its person(s) most knowledgeable regarding the following: 1) the November 1, 2006 contract between the GPO and Record Press, Inc.; 2) Program 2231-S, including contract bidding and administration; and 3) billing practices under the Record Press contract and contracts under Program 2231-S generally.

We would appreciate it if you could provide us with the name(s) and title(s) of the appropriate GPO official(s) by this Friday, October 10. Alternatively, please let us know if you and the GPO will consent to us contacting GPO's General Counsel directly.

Thank you for your assistance and we look forward to hearing from you. Please do not hesitate to call me with any questions or concerns.

Sincerely,

/s/ Mark Hanna

Mark Hanna

00000191

# EXHIBIT F

00000192



U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

---

*Judiciary Center
555 Fourth St., N.W.
Washington, D.C. 20530*

October 10, 2008

**Via E-Mail and First Class Mail**

Mark Hanna
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006

Re: <u>Burke v. Record Press</u>, 08cv364 (EGS)

Dear Mark;

I am writing in response to your e-mail and the attached correspondence dated Monday, October 6, 2008.

In your letter, you informed us that, in response to the defendant's Motion for Summary Judgment, you intend to seek discovery from the Government Printing Office (GPO) regarding their interpretation of the contract with Record Press. Particularly, you requested that the GPO identify the employee who is the most knowledgeable regarding the November 1, 2006 contract; the Program 2231-S, including contract bidding and administration; and the billing practices of Record Press under Program 2231-S.

After reviewing your request and the record before the District Court, we will decline to provide you with any such discovery at this time. First, it is our belief that the contact is unambiguous, and need not be interpreted by anyone in order to understand its meaning. Second, the above-captioned matter is currently pending a dispositive motion, and the District Court Judge has yet to issue a discovery schedule. Accordingly, any such discovery by either party at this time would be premature. If, in the future, the Court enters a discovery schedule, we will provide all relevant material within our possession to both parties.

If you have any questions, or need additional information, please feel free to call me at (202)307-2843.

Sincerely,

DARRELL C. VALDEZ
Assistant U.S. Attorney

cc:    Jack Horan
       William O'Brien
       McKenna, Long & Aldridge

00000194

# EXHIBIT G

00000195

McKenna Long
& Aldridge LLP
Attorneys at Law

| Albany | | New York |
| Atlanta | | Philadelphia |
| Brussels | | Sacramento |
| Denver | | San Diego |
| Los Angeles | | San Francisco |
| | | Washington, D.C. |

1900 K Street, NW • Washington, DC 20006-1108
Tel: 202.496.7500 • Fax: 202.496.7756
www.mckennalong.com

WILLIAM T. O'BRIEN
(202) 496-7107

EMAIL ADDRESS
wobrien@mckennalong.com

October 6, 2008

**BY HAND DELIVERY**

Mark Hanna, Esq.
Murphy Anderson PLLC
1701 K Street, NW
Suite 210
Washington, DC 20006

  *Re:* *Brian Burke v. Record Press, Inc. - Case No. 1:08-CV-00364 (EGS)*

Dear Mark:

  Pursuant to Federal Rule of Civil Procedure 11(c)(1), we hereby give notice that we will file a Rule 11 motion on October 29, 2008, if you do not withdraw your Complaint against Record Press, Inc.

  As set forth in the attached motion and accompanying memorandum, the allegations in the Complaint have no basis in fact and were made without the investigation Rule 11 requires. If the Complaint is not withdrawn, we will ask the Court to dismiss the Complaint with prejudice and to further order you or your client to pay a monetary sanction, including but not limited to the fees and other costs incurred by our client in preparing and filing the enclosed motion.

        Sincerely yours,

        William T. O'Brien

WTO/rtc
DC:50575899.1

00000196

# EXHIBIT H

00000197

# MurphyAnderson
### PLLC

**Washington**
1701 K Street NW, Suite 210
Washington, DC 20006
202.223.2620    Fax 202.223.8651

George R. Murphy | DC
Michael T. Anderson | DC, MA
Joni S. Jacobs | DC
Arlus J. Stephens | DC, MD, OH, PA
Mark Hanna | DC, VA, NJ, MI
Keira M. McNett | DC, CA

**Boston**
111 Devonshire Street, 5th Floor
Boston, MA 02109
617.227.5720    Fax 617.227.5767
Michael T. Anderson | MA, DC

**New Jersey**
1389 Broad Street
Clifton, NJ 07013
973.916.0999    Fax 973.916.0906
Mark Hanna | NJ, DC, VA, MI

www.murphyandersonpllc.com

October 10, 2008

VIA E-MAIL

William O'Brien
McKenna Long & Aldridge LLP
1900 K Street NW
Washington, DC  20006-1108

RE:    **Burke v. Record Press, Inc.**
         **Case No.: 08-cv-364 (EGS)**

Dear Will:

I am in receipt of your letter dated October 6.  I am disappointed that you are yet again threatening to file a Rule 11 motion, especially since we have had several seemingly productive conversations about the case after your co-counsel's original August 1 Rule 11 letter.

In my August 6 letter to Malcolm Lewin, I stated that Relator is willing to amend the Complaint to account for minor errors that do not go to the central issue in the case, that is, accounting for the GPO's 7% surcharge and identifying the rate as $12.50 rather than $12.25.  I explained that these errors were made in good faith based on the evidence Relator had available to him when the case was filed. Your continued focus on this extrinsic matter, not only in the Rule 11 motion but also in the summary judgment motion, is at best misleading and more likely bad faith.  As you know, and as we succinctly stated in our Rule 16 report, this case concerns only one thing:  the application of the "running per 10 copies/running rate is per 10 copies" specification to the collating, trimming and binding line item per the excerpt below from the RFP.

Furthermore, in our August 6 letter and in subsequent correspondence we have repeatedly asked you to provide support for your assertion that the "running per 10 copies" does not apply to collating, trimming and binding.  As we have explained and as you can see in the following excerpt from the RFP, the plain language does not support your client's position.

00000198

William O'Brien
October 10, 2008
Page 2

NOTE: RUNNING RATE IS PER 10 COPIES

Running Per

10 Copies

Includes makeready if required:                ----------

(a) Complete cover (wraparound)...........................$_____

(b) Text per page...........................................     .........$_____

(c) Pressure sensitive cover stock (up to 8-1/2 x 11"):

    (1) White...................................per 100 leaves......$_____

    (2) Colored...............................per 100 leaves......$_____

(d) Collating, trimming to size and binding    per 100 pages    $_____

Other than a self-serving declaration from your client, you have provided absolutely no support for your position.

If you file the Rule 11 motion, I will be forced to consider filing a Rule 11 motion in response. It is not my practice to file Rule 11 motions, but in my years of practicing law, I have never before faced such heavy-handed tactics.

Your premature filing of a frivolous motion for summary judgment appears to be yet another attempt to avoid answering the straightforward questions we have posed. I ask that you withdraw the premature motion and proceed to work with us to efficiently litigate this case in the normal course. Otherwise, Relator will seek attorneys' fees for opposing your summary judgment motion.

Again, I am disheartened with the unnecessarily hostile litigation strategy you are employing. It is wholly counterproductive to both of our clients' interest and judicial economy. We have repeatedly expressed our willingness to work cooperatively to narrow the issues involved in this matter and to limit discovery to save litigation costs for all parties. I can only hope that you will change your approach and extend us the civility that I believe our profession demands.

Sincerely,

/s/ Mark Hanna

Mark Hanna

cc:    Malcolm I. Lewin

00000199

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                          :
ex rel. BRIAN BURKE                                :
                                                   :      Civil Action No. 1:08-cv-364 (EGS)
　　　　Plaintiff/Relator,                          :
                                                   :
　　　　　　　v.                                    :
                                                   :
RECORD PRESS, INC.                                 :
                                                   :
　　　　Defendant.                                  :
                                                   :

## [PROPOSED] ORDER RE: DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Upon motion by Defendant Record Press, Inc. for summary judgment dismissing the Complaint, and upon consideration of the papers filed in support of and in opposition thereto, it is hereby this _____ day of _____, 2008

**ORDERED** that Defendant's motion is DENIED without prejudice.  The Court finds that Defendant has not shown that there is no genuine issue of material fact such that it is entitled to judgment as a matter of law.

Alternatively, it is **ORDERED** that Defendant's motion is STAYED pending Relator's ability to take discovery pursuant to the attached Subpoenas and Notices of Taking Deposition.

**So ordered**.

_____
　　　EMMET G. SULLIVAN
　　　United States District Judge

# ATTACHMENT A

00000201

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

### District of Columbia

| | |
|---|---|
| UNITED STATES ex rel. BRIAN BURKE<br><br>V.<br><br>RECORD PRESS, INC. | **SUBPOENA IN A CIVIL CASE**<br><br>Case Number:[1]  08-cv-00364 (EGS) |

TO: Calvin Anderson, Chief of Commercial Examination Office of
Controller's Procurement Account Division, US GPO
732 North Capitol Street, NW
Washington, DC  20401

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| | |
| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER | |
| | |

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

00000202

AO88  (Rev.  12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____                    _____
                        DATE                                SIGNATURE OF SERVER

                                                            _____
                                                            ADDRESS OF SERVER

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

**(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.**
    (1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
    (2) Command to Produce Materials or Permit Inspection.
        (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
        (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
            (i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
            (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
    (3) Quashing or Modifying a Subpoena.
        (A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
            (i) fails to allow a reasonable time to comply;
            (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
            (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
            (iv) subjects a person to undue burden.
        (B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
            (i) disclosing a trade secret or other confidential research, development, or commercial information; or
            (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
            (iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
        (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) DUTIES IN RESPONDING TO A SUBPOENA.**
    (1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
        (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
        (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
        (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
        (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
    (2) Claiming Privilege or Protection.
        (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
            (i) expressly make the claim; and
            (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
        (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may  promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) CONTEMPT.**
    The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                :
ex rel. BRIAN BURKE                      :
                                         :    Civil Action No. 1:08-cv-364 (EGS)
            Plaintiff/Relator,           :
                                         :
      v.                                 :
                                         :
RECORD PRESS, INC.                       :
                                         :
            Defendant.                   :
                                         :

### NOTICE OF TAKING DEPOSITION

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

        PLEASE TAKE NOTICE THAT Relator Brian Burke will take the deposition of Calvin

Anderson.  The deposition will take place on November ____, 2008, at 10:00 a.m. at the offices

of Murphy Anderson PLLC, 1701 K Street NW, Suite 210, Washington, DC 20006.  The

deposition will be taken before a deposition officer authorized to administer oaths in the District

of Columbia.  If the deposition is not completed on the noticed date, it will continue from day to

day until completed, Sundays, and holidays excepted.  PLEASE TAKE FURTHER NOTICE

that the deposition will be recorded by stenographic method.

Dated:  October ____, 2008                    Respectfully submitted,

                                              s/ Mark Hanna_____
                                              Mark Hanna (DC Bar 471960)
                                              Keira M. McNett (DC Bar 482199)
                                              MURPHY ANDERSON PLLC
                                              1701 K Street, NW, Suite 210
                                              Washington, DC 20006
                                              Phone: (202) 223-1057
                                              Fax: (202) 223-8651
                                              *mhanna@murphypllc.com*
                                              *kmcnett@murphypllc.com*

                                              Attorneys for Relator

00000204

# ATTACHMENT B

00000205

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
District of Columbia

UNITED STATES ex rel. BRIAN BURKE

V.

RECORD PRESS, INC.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  08-cv-00364 (EGS)

TO:  U.S. Government Printing Office
     732 North Capitol Street, NW
     Washington, DC  20401

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.  **Please see Attachment A for the topics of examination.**

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☐  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify.  Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

00000206

AO88 (Rev. 12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

| DATE | SIGNATURE OF SERVER |
|---|---|
| | |
| | ADDRESS OF SERVER |
| | |

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

**(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.**

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) DUTIES IN RESPONDING TO A SUBPOENA.**

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) CONTEMPT.**

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

00000207

## ATTACHMENT A

Pursuant to Federal Rule of Civil Procedure 30(b)(5), the U.S. Government Printing Office is required to designate and produce at the deposition those of its officers, directors, managing agents, employees, or agents who are most qualified to testify on its behalf as to the following matters:

1.    The Terms, Conditions and Specifications for the Procurement of Appeals Briefs, Program 2231-S, pursuant to which Record Press submitted a winning bid for printing appellate briefs and appendices for the U.S. Attorney's Office in the Second Circuit, including but not limited to the terms and conditions under which such RFPs are let and bid;

2.    The correct method for calculating charges pursuant to Section II of the RFP for the above-referenced program, including but not limited to the calculation of charges for collating, trimming and binding; and

3.    The creation, meaning and application to the document alleged to be Record Press's contract with the GPO, attached hereto as Exhibit A.

00000208

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  :
ex rel. BRIAN BURKE    :
            :   Civil Action No. 1:08-cv-364 (EGS)
   Plaintiff/Relator,  :
            :
   v.        :
            :
RECORD PRESS, INC.    :
            :
   Defendant.   :
            :

## NOTICE OF TAKING DEPOSITION OF
## THE UNITED STATES GOVERNMENT PRINTING OFFICE

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

   PLEASE TAKE NOTICE THAT Relator Brian Burke will take the deposition of

the person(s) most qualified to testify on behalf of the U.S. Government Printing Office,

pursuant to Fed.R.Civ.P. 30(b)(6).  The deposition will take place on November _____,

2008, at 10:00 a.m. at the offices of Murphy Anderson PLLC, 1701 K Street NW, Suite

210, Washington, DC 20006.  The deposition will be taken before a deposition officer

authorized to administer oaths in the District of Columbia.  If the deposition is not

completed on the noticed date, it will continue from day to day until completed, Sundays,

and holidays excepted.

   PLEASE TAKE FURTHER NOTICE that the deposition will be recorded by

stenographic method.

   Pursuant to Federal Rule of Civil Procedure 30(b)(5), the U.S. Government

Printing Office is required to designate and produce at the deposition those of its officers,

00000209

directors, managing agents, employees, or agents who are most qualified to testify on its behalf as to the following matters:

1. The Terms, Conditions and Specifications for the Procurement of Appeals Briefs, Program 2231-S, pursuant to which Record Press submitted a winning bid for printing appellate briefs and appendices for the U.S. Attorney's Office in the Second Circuit, including but not limited to the terms and conditions under which such RFPs are let and bid;

2. The correct method for calculating charges pursuant to Section II of the RFP for the above-referenced program, including but not limited to the calculation of charges for collating, trimming and binding; and

3. The creation, meaning and application to the document alleged to be Record Press's contract with the GPO, attached hereto as Exhibit A.

Dated:  October ____, 2008                    Respectfully submitted,

                                              s/ Mark Hanna_____
                                              Mark Hanna (DC Bar 471960)
                                              Keira M. McNett (DC Bar 482199)
                                              MURPHY ANDERSON PLLC
                                              1701 K Street, NW, Suite 210
                                              Washington, DC 20006
                                              Phone: (202) 223-1057
                                              Fax: (202) 223-8651
                                              *mhanna@murphypllc.com*
                                              *kmcnett@murphypllc.com*

                                              Attorneys for Relator

00000210

# ATTACHMENT C

00000211

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,          :
ex rel. BRIAN BURKE                :
                                   :          Civil Action No. 1:08-cv-364 (EGS)
          Plaintiff/Relator,       :
                                   :
          v.                       :
                                   :
RECORD PRESS, INC.                 :
                                   :
          Defendant.               :
_____:

**NOTICE OF TAKING DEPOSITION OF**
**DEFENDANT RECORD PRESS**

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT Relator Brian Burke will take the deposition of

the person(s) most qualified to testify on behalf of Defendant Record Press, Inc., pursuant

to Fed.R.Civ.P. 30(b)(6). The deposition will take place on November _____, 2008, at

10:00 a.m. at the offices of Murphy Anderson PLLC, 1701 K Street NW, Suite 210,

Washington, DC 20006. The deposition will be taken before a deposition officer

authorized to administer oaths in the District of Columbia. If the deposition is not

completed on the noticed date, it will continue from day to day until completed, Sundays,

and holidays excepted.

PLEASE TAKE FURTHER NOTICE that the deposition will be recorded by

stenographic method.

Pursuant to Federal Rule of Civil Procedure 30(b)(5), Defendant Record Press,

Inc., is required to designate and produce at the deposition those of its officers, directors,

00000212

managing agents, employees, or agents who are most qualified to testify on its behalf as to the following matters:

  1. The Terms, Conditions and Specifications for the Procurement of Appeals Briefs, Program 2231-S, pursuant to which Defendant Record Press submitted a winning bid for printing appellate briefs and appendices for the U.S. Attorney's Office in the Second Circuit, including but not limited to the terms and conditions under which such RFPs are let and bid;

  2. The correct method for calculating charges pursuant to Section II of the RFP for the above-referenced program, including but not limited to the calculation of charges for collating, trimming and binding;

  3. All Record Press' billing under this contract, including but not limited to amounts charged to the government for collating, trimming and binding; and

  4. The creation, meaning and application to the document alleged to be Record Press's contract with the GPO, attached hereto as Exhibit A.

Dated:  October 14, 2008    Respectfully submitted,

          s/ Mark Hanna
          Mark Hanna (DC Bar 471960)
          Keira M. McNett (DC Bar 482199)
          MURPHY ANDERSON PLLC
          1701 K Street, NW, Suite 210
          Washington, DC 20006
          Phone: (202) 223-1057
          Fax: (202) 223-8651
          *mhanna@murphypllc.com*
          *kmcnett@murphypllc.com*

          Attorneys for Relator

<div align="center">2</div>

00000213

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| ex rel. BRIAN BURKE : | |
| : | Civil Action No. 1:08-cv-364 (EGS) |
| Plaintiff/Relator, : | |
| : | |
| v. : | |
| : | |
| RECORD PRESS, INC. : | |
| : | |
| Defendant. : | |
| : | |

**RELATOR'S OBJECTION TO AND REQUEST TO STRIKE DEFENDANT'S**
**EVIDENCE IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Relator Brian Burke objects to Defendant's Declaration In Support Of Its Motion for Summary Judgment to Dismiss the Complaint, as follows. Relator respectfully requests that the Court sustain its objections and strike Defendant's evidence on the grounds stated.

| Defendant's Declaration | Grounds for Objection and Request to Strike |
|---|---|
| ¶2 | The first four sentences contain improper lay opinion and lack foundation as to the witness's personal knowledge. Fed.R.Evid. 602, 701. The fifth sentence lacks foundation as to the witness's personal knowledge of the Government's purported "acceptance," and contains improper argument, lay opinion and hearsay. Fed.R.Evid. 602, 701, 802. Further, to the extent the witness purports to testify to an "agreement" between the Government and Defendant other than the written contract Defendant has with the Government, there is no foundation as to the terms of such an agreement, and to the extent the "agreement" is written, the actual writing should be required. Fed.R.Evid. 1002. To the extent the "agreement" is the same as Defendant's written contract with the Government, the best evidence rule should apply to make inadmissible the witness's testimony regarding its terms. Fed.R.Evid. 1002, 1004. |

| ¶3 | The first sentence and the exhibits referred to lack relevance to any issue material to this lawsuit, foundation as to the witness's personal knowledge, and proper authentication of the exhibits. Fed.R.Evid. 402, 602, 901. The exhibits themselves are also hearsay with no exception established. Fed.R.Evid. 802. The second sentence contains improper lay opinion and lacks foundation as to the witness's personal knowledge. Fed.R.Evid. 602 and 701. |
|---|---|
| ¶4 | The first sentence contains improper argument and lay opinion. Fed.R.Evid. 701. The exhibit attached lacks proper authentication and is hearsay with no exception established. Fed.R.Evid. 802, 901. |
| ¶5 | The entire paragraph lacks foundation as to the witness's personal knowledge and relevance as to any issue material to this lawsuit. Fed.R.Evid. 402, 602. |
| ¶6 | The first three sentences and the exhibits referred to lack foundation as to the witness's personal knowledge and proper authentication as to the exhibits, and the exhibits are hearsay with no exception established. Fed.R.Evid. 602, 802, 901. The fourth contains improper argument, improper lay opinion, and hearsay, and lacks foundation as to personal knowledge as to the Government's purported "acceptance." Fed.R.Evid. 602, 701, 802. |
| ¶7 | The paragraph lacks foundation as to the witness's personal knowledge, and the exhibits attached lack proper authentication, are hearsay lack with no exception established, and lack relevance as to any issue material to this lawsuit. Fed.R.Evid. 402, 602, 802, 901. To the extent the exhibits are offered to show that the GPO applied a 7% mark-up to Defendant's invoices, this issue is immaterial and irrelevant to the issues in this lawsuit. Fed.R.Evid.402. Relator has conceded that Defendant's invoices to the Government did not include the 7% mark-up and that Defendant's alleged fraud does not include or involve the GPO's mark-up. *See* Declaration of Mark Hanna In Opposition To Defendant's Motion For Summary Judgment, served and filed herewith. |
| ¶8 | The entire paragraph contains improper argument and improper lay opinion, and lacks foundation as to the witness's personal knowledge of what he purports to testify to. Fed.R.Evid. 602, 701. |
| ¶9 | The entire paragraph contains improper argument and improper lay opinion, and lacks foundation as to the witness's personal knowledge of what he purports to testify to. Fed.R.Evid. 602, 701. |
| ¶10 | This paragraph contains no evidence but rather improper argument and lay opinion. Fed.R.Evid. 701. |

00000215

Dated: October 14, 2008

Respectfully submitted,

s/ Mark Hanna
Mark Hanna (DC Bar 471960)
Keira M. McNett (DC Bar 482199)
MURPHY ANDERSON PLLC
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
*mhanna@murphypllc.com*
*kmcnett@murphypllc.com*

Attorneys for Relator

3

00000216

<center>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

</center>

| | | |
|---|---|---|
| UNITED STATES ex rel. | ) | |
| BRIAN BURKE, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | **Civil Action No. 1:08-CV-00364 (EGS)** |
|     v. | ) | |
| | ) | |
| RECORD PRESS, INC., | ) | |
| | ) | |
|     Defendant. | ) | |

<center>

**CONSENT MOTION TO CONTINUE STATUS CONFERENCE**

</center>

Plaintiff, Brian Burke and Defendant Record Press, Inc. ("Record Press"), through its attorneys, hereby request that this Court continue the Status Conference currently scheduled for Thursday, September 24th at 10:00 a.m.  In support of this Motion, the Parties state the following:

1.     The Parties are  presently engaged in ongoing settlement negotiations which may resolve this matter.  Counsel last met on Monday, September 21;

2.     Counsel for the parties conferred and Counsel for the United States, who has consented to a continuation of the September 24th Status Conference.

Wherefore, the Parties respectfully requests that the Court continue the Status Conference until October 15, 2009 at 9:30 am.

Respectfully submitted,

\_\_\_\_/s/ William T. O'Brien_____
John Horan (DC Bar No. 417729)
William T. O'Brien (DC Bar No. 450891)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.

DC:50647728.1

00000217

Washington, D.C.  20006
Phone: (202) 496-7500
Facsimile: (202) 496-7756

Dated:  September 22, 2009             *Attorneys for Defendant Record Press, Inc.*

DC:50647728.1

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2009, I served the foregoing Consent Motion to Continue Status Conference, via first class mail, postage prepaid upon:

Mark Hanna, Esq.
Keira M. McNett, Esq.
Joni S. Jacobs, Esq.
MURPHY ANDERSON PLLC
1701 K Street, N.W., Suite 210
Washington, D.C.  20006

and

Darrell C. Valdez, Esq.
U.S. Attorney's Office
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C.  20530

/s/ William T. O'Brien
William T. O'Brien

DC:50588393.2

00000219

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES ex rel.** | ) | |
| **BRIAN BURKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:08-CV-00364 (EGS)** |
| **v.** | ) | |
| | ) | |
| **RECORD PRESS, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**[PROPOSED] ORDER**

WHEREFORE, upon consideration of the Plaintiff, Brian Burke and Defendant Record

Press, Inc.'s ("Record Press") Consent Motion to Continue Status Conference, it is hereby

ORDERED that the Motion is GRANTED and that Status Conference is continued until October

15, 2009 at 9:30 am.


_____
DEBORAH A. ROBINSON
United States Magistrate Judge


Dated: _____

00000220

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES ex rel.** | ) | |
| **BRIAN BURKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:08-CV-00364 (EGS)** |
| **v.** | ) | |
| | ) | |
| **RECORD PRESS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**JOINT MOTION TO CONTINUE EXPERT DISCOVERY**</u>

Plaintiff Brian Burke and Defendant Record Press, Inc. ("Record Press"), through its attorneys, hereby request that this Court continue the deadline for Record Press to designate its expert witnesses, which is currently scheduled for Thursday, April 15, 2010, and to postpone expert discovery until after dispositive motions are resolved.  In support of this Motion, the Parties state the following:

1. On April 1, 2010, Plaintiff identified the name of his expert witness, but did not per Fed. R. Civ. P. 26(a)(2) disclose any opinions that his expert planned to offer in this case or provide a written expert report, intending instead to disclose any expert opinions and provide an expert report after the conclusion of fact discovery;

2. Counsel for the parties conferred and agreed that Record Press would have no basis upon which to assess whether an expert witness is necessary to rebut Plaintiff's expert's opinions until Plaintiff's expert provided a written report disclosing any opinions he plans to offer in this case and the remaining disclosures required under Fed. R. Civ. P. 26(a)(2);

3. Counsel for the parties further agreed that any expert discovery in this case would be for purposes of trial and not for dispositive motions, and should be postponed until after the close of fact discovery and resolution of dispositive motions; and

00000221

4.     Counsel for the parties further agreed the deadline for fact discovery should remain as scheduled for May 25, 2010, and the deadline for dispositive motions should remain as scheduled for June 25, 2010.

Wherefore, the Parties respectfully request that the Court:

1.     Continue the deadline for Record Press to designate its expert witnesses until 21 days after Plaintiff serves a written expert report with the disclosures required under Fed. R. Civ. P. 26(a)(2);

2.     Set a deadline of September 21, 2010 for the Plaintiff to serve a written expert report with the disclosures required under Fed. R. Civ. P. 26(a)(2); and

3.     Continue the deadline for expert discovery until October 29, 2010.

Respectfully submitted,

_____/s/ John W. Lomas, Jr._____
William T. O'Brien (DC Bar No. 450891)
John W. Lomas, Jr. (DC Bar No. 976555)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C.  20006
Phone: (202) 496-7500
Facsimile: (202) 496-7756

*Attorneys for Defendant Record Press, Inc.*

_____/s/  Tyler Jay King_____
Tyler Jay King (DC Bar No. 959672)
TYLER JAY KING LAW
1400 K Street, N.W., Suite 706
Washington, D.C.  20005
Phone: (202) 436-2641

*Attorney for Plaintiff Brian Burke*

Dated:  April 15, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of April 2010, the foregoing Joint Motion to

Continue Expert Discovery was served via the Court's Electronic Filing System ("ECF") on:

Tyler Jay King, Esq.
Tyler Jay King Law
1400 K Street, N.W., Suite 706
Washington, D.C.  20005
Phone: (202) 436-2641
tyler@tylerkinglaw.com

Darrell C. Valdez, Esq.
U.S. Attorney's Office
Judiciary Center Building
555 Fourth Street
Washington, DC 20530
(202) 307-2843
darrell.valdez@usdoj.gov


  /s/ John W. Lomas, Jr.
John W. Lomas, Jr.

00000223

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES ex rel.** | ) | |
| **BRIAN BURKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:08-CV-00364 (EGS)** |
| **v.** | ) | |
| | ) | |
| **RECORD PRESS, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**[PROPOSED] ORDER**

WHEREFORE, upon consideration of the Plaintiff Brian Burke and Defendant Record Press, Inc.'s ("Record Press") Joint Motion to Continue Expert Discovery, it is hereby ORDERED that the Motion is GRANTED and that:

1.    The deadline for Record Press to designate its expert witnesses is continued until 21 days after Plaintiff submits a written expert report with the disclosures required under Fed. R. Civ. P. 26(a)(2);

2.    The deadline for the Plaintiff submit a written expert report with the disclosures required under Fed. R. Civ. P. 26(a)(2) is September 21, 2010; and

3.    The deadline for completing expert discovery is continued until October 29, 2010.

_____
DEBORAH A. ROBINSON
United States Magistrate Judge

Dated: _____

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES ex rel. | ) | |
| BRIAN BURKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:08-CV-00364 (EGS-DAR) |
| v. | ) | |
| | ) | |
| RECORD PRESS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

Defendant Record Press, Inc. ("Record Press") respectfully submits this memorandum in support of its motion pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civ. R. 7(h) for summary judgment in favor of Record Press on all counts brought by Relator Brian Burke ("Burke"). Because the Government itself has found that Record Press fully complied with the Contract at issue here, submitted proper invoices that were reviewed and approved by the Government, and made no false claims, Record Press is entitled to summary judgment as a matter of law.

PRELIMINARY STATEMENT

This is a simple case about a single pricing term for "collating, trimming to size and binding" in a contract between the United States Government Printing Office ("GPO") and Record Press for printing appellate briefs (the "Contract"). Record Press submitted two invoices totaling $2,569.55 pursuant to the Contract (the "Invoices"). As it has done for more than 20 years with Record Press, the GPO reviewed, approved and paid these invoices exactly per the contract terms. The Contract states that the price for "collating, trimming to size and binding" is $12.25 per 100 pages.

Although there is a "Running Per 10 Copies" caption on the same page of the Contract as the "collating, trimming to size, and binding" line-item, both the GPO and Record Press have confirmed that the caption applies only to the line-items entitled "Complete Cover" and "Text per page," not to "collating, trimming to size, and binding." (Sullivan Decl. ¶¶ 4, 9-11, Ex. A; Wilmot Tr. 70:21-72:2.) A spreadsheet that the GPO sent out with its invitation for bids make this perfectly clear:



(Lomas Decl., Ex. 2 at RP000069; *see* Wilmot Tr. 83:5-9.)

There is absolutely no dispute between the only two parties to the Contract, the GPO and Record Press, regarding the "collating, trimming to size, and binding" pricing term. Nonetheless, Burke has forced Record Press to spend huge sums of money defending against Burke's baseless claim that Record Press knowingly defrauded the government by billing the GPO the "collating, trimming to size, and binding" price to which the GPO and Record Press agreed, rather than some other, "per 10 copies" price that Burke believes should apply.[1]

---

[1] This case is therefore squarely frivolous and vexatious for purposes of awarding a defendant its attorneys' fees and expenses pursuant to § 3730(d)(4) of the FCA. *See, e.g., U.S., ex rel. Ubl v. IIF Data Solutions*, No. 1:06-cv-641, 2010 WL 1726767, *3 (E.D. Va. April 28, 2010) (awarding defendant attorneys' fees and expenses because the relator's case was based entirely on his own personal opinion, supposition and speculation); *U.S. ex rel. J. Cooper & Assocs., Inc. v. Bernard*

4

**Burke's Baseless Claims Against Record Press**

The genesis of Burke's claim is an earlier lawsuit that Burke filed *pro se* against the Secretary of Commerce (the "Secretary") and the United States Department of Commerce ("Commerce") in the United States District Court for the Southern District of New York.  Burke claimed that individuals at the Census Bureau, by whom he was employed in 2000, discriminated against him on the basis of his national origin, religion, sex, and disability, and also retaliated against him for filing a complaint with the Bureau's Equal Employment Opportunity Office. (Lomas Decl., Ex. 3, Transcript of Deposition of Brian Burke ("Burke Tr.") 28:9-30:16; Lomas Decl., Ex. 4. at p.7 ("Page 11").)  The Southern District granted summary judgment on all claims in favor of the Secretary and Department of Commerce.  (*Id*. at p.19 ("Page 23").)  The Court stressed that it viewed Burke's pleadings carefully and liberally to give him all benefit of the doubt, but nonetheless found that Burke "has come forth with nothing beyond the realm of conclusory assertions and speculation to support his claims."[2]  (*Id*. at p.12 ("Page 16").)

Burke appealed the dismissal to the United States Court of Appeals for the Second Circuit, which affirmed the District Court's decision in a summary order.  (Burke Tr. 30:21-31:5.)  The Assistant United States Attorney who represented the Secretary and Commerce sought to have the costs of printing the Secretary's and Commerce's appeal briefs and appendices, which were printed by Record Press, taxed against Burke.[3]  (Wilmot Decl. ¶ 7, Ex.

---

*Hodes Group, Inc*., 422 F. Supp. 2d 225 (D.D.C. 2006) (awarding defendants attorneys' fees and expenses because the relator filed and pursued FCA claims despite the government's awareness of the circumstances constituting the alleged FCA violation).

[2] The Court also found that Burke, in opposing the Secretary's and Commerce's motion for summary judgment, improperly attempted to rely on an affidavit that contradicted his prior sworn testimony.  (Lomas Decl., Ex. 4 at p.12 ("Page 16").)

[3] Ultimately, the Second Circuit did not tax Burke with the costs for the government's briefs and appendices.  (Burke Tr. 88:4-12.)

5

00000227

11.)  Thus, the GPO knew and expected that Record Press would bill $12.25 per 100 pages for "collating, trimming to size and binding."  It is undisputed that the Invoices charged the GPO $12.25 per 100 pages.  (Wilmot Decl., Ex. 6; Sullivan Decl. ¶ 5-6.)  The GPO reviewed and approved those invoices as consistent with the contract it had entered into with Record Press. (Wilmot Decl. ¶ 6; Sullivan Decl. ¶¶ 7.)

Not only is Record Press entitled to summary judgment under these circumstances, but these facts render Burke's claims in this case frivolous and vexatious under § 3730(d)(4) of the False Claims Act.  *See*, *e.g.*, *U.S. ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Group, Inc.*, 422 F. Supp. 2d 225 (awarding defendants attorneys' fees and expenses because the relator filed and pursued FCA claims despite the government's awareness of the circumstances constituting the alleged FCA violation).

## V.    GPO'S SATISFACTION WITH RECORD PRESS'S PERFORMANCE OF THE CONTRACT PRECLUDES A FINDING OF FCA LIABILITY

In government contracting FCA decisions, it has long been recognized that if the contracting agency's expectations are satisfied, there is no basis for alleging a violation of the FCA.  *See*, *e.g.*, *United States ex rel. Lidenthal v. General Dynamics Corp.*, 61 F.3d 1402, 1411-12 (9th Cir. 1995), cert. denied, 517 U.S. 1104 (1996) (affirming judgment in favor of defendants, finding that because the defendant had met the government's expectations and satisfied its contractual obligations, none of the claims at issue could be false).

There is no genuine issue concerning the fact that Record Press has satisfied GPO's expectations and fully complied with its contractual obligations.  (Sullivan Decl. ¶¶ 2-11; Wilmot Decl. 2, 6, 9.)  The GPO continues to this day to contract with Record Press for the procurement of appeals briefs and the GPO continues to approve and pay Record Press invoices that bill for "collating, trimming to size, and binding" on a per 100 page basis, and not on the

19

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES ex rel.** | ) | |
| **BRIAN BURKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:08-CV-00364 (EGS)** |
| **v.** | ) | |
| | ) | |
| **RECORD PRESS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DECLARATION OF THOMAS SULLIVAN, UNITED STATES GOVERNMENT PRINTING OFFICE, IN SUPPORT OF RECORD PRESS, INC.'S MOTION FOR SUMMARY JUDGMENT

I, Raymond Thomas Sullivan declare:

1. I am the Director, Major APS Acquisitions of the United States Government Printing Office's ("GPO") Agency Publishing Services. I submit this declaration in support of Record Press, Inc.'s Motion for Summary Judgment to dismiss the Complaint in this matter. I have worked in the GPO for 35 years.

2. In my current position, I have knowledge of and responsibility for the GPO's contracting with outside vendors to provide printing services. To procure such services from outside vendors, we issue invitations for bids ("IFBs"). I am familiar with the terms and conditions of the GPO's IFBs and the pricing requirements to be met by outside printing vendors. Likewise, I am aware of and have investigated the allegations made in this matter by Plaintiff Brian Burke against Record Press, Inc.

3. Record Press, Inc. was the successful bidder for GPO Program 2231-S for the printing of the briefs at issue in this matter. Consistent with GPO contracting

00000229

methods, the pricing terms for this printing job were contained in the IFB submitted by the successful bidder, Record Press, Inc. (Dkt. # 17, Exhibit 5 to Declaration of Hugh Wilmot.) Per GPO's methods, upon award, the response to the IFB becomes the contract between the GPO and the vendor. I have reviewed the response to the IFB submitted by Record Press, Inc. in this matter and am familiar with its terms and conditions and pricing.

4. The IFB states that the price for collating, trimming to size and binding briefs, per 100 pages, is $12.25. The "Running Per 10 Copies" caption applies only to the line-items entitled "Complete Cover" and "Text per page," not to collating, trimming to size and binding. (Dkt. # 17, Exhibit 5 to Declaration of Hugh Wilmot.)

5. Record Press, Inc. submitted two invoices to GPO for services provided under this IFB in connection with the printing of briefs and appendices for the *Brian T. Burke v. Donald L. Evans* matter. (Dkt. # 17, Exhibit 6 to the Declaration of Hugh Wilmot.) I have reviewed these invoices and compared them to the IFB, and determined that Record Press, Inc. properly charged the GPO fully in accordance with the terms and conditions of the IFB.

6. Record Press, Inc.'s invoice shows that it charged GPO $1,386.70 for collating, trimming to size and binding at the IFB rate of $12.25 per 100 pages. (Dkt. # 17, Exhibit 6 to the Declaration of Hugh Wilmot.) Likewise, Record Press, Inc. charged $372.40 for collating, trimming to size and biding for 40 copies of its brief in accordance with the IFB. (Dkt. # 17, Exhibit 6 to the Declaration of Hugh Wilmot.)

7. Record Press, Inc. properly charged for services for GPO program 2231-S for the printing of briefs, and fully abided its contractual obligations to GPO. I have found no evidence of fraud or overcharging by Record Press, Inc. in connection with this matter.

8. On September 21, 2009, I met with Counsel for Plaintiff Brian Burke, as well as with Counsel for Record Press, Inc. and the U.S. Attorney's office, and informed all of the participants in the meeting of the information I am providing in this declaration.

9. During that meeting, I provided the parties a copy of a spreadsheet the GPO compiled that identifies the bids received for the November, 1, 2006 through October 31, 2007 term of Program 2231-S and the current contractor's bid for the previous term of Program 2231-S. A true and correct copy of this spreadsheet is attached to my declaration as Exhibit A.

10. The spreadsheet identifies each line item of the Program 2231-S bid with the corresponding GPO basis of award, the contractor's price, and total cost of the contractor's bid for each line item. (Exhibit A). The total cost of the contractor's bid for each line item is calculated by multiplying the contractor's price by the basis of award.

11. As evidenced by the spreadsheet, a running rate "PER 10 COPIES" applies only to the line-items entitled "Complete Cover" and "Text per page," not to collating, trimming to size and binding. (Exhibit A.) Record Press's bid price for the collating, trimming to size and binding is noted on the spreadsheet as $12.25

"PER 100 PAGE." (Exhibit A.) This is consistent with how Record Press invoiced the GPO for the briefs and appendices at issue in this matter.

I declare under penalty of perjury under the laws of the United States of America and the District of Columbia that the foregoing is true and correct.

Executed on this 24 day of June 2010 at 12:15 PM

_Raymond T. Sullivan_
Raymond Thomas Sullivan

00000232

# EXHIBIT A

00000233

00000234

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of June 2010, the foregoing Declaration of Raymond

Thomas Sullivan, United States Government Printing Office, In Support Of Record Press, Inc.'s

Motion for Summary Judgment was served via the Court's Electronic Filing System ("ECF") on:

Tyler Jay King, Esq.
Tyler Jay King Law
1400 K Street, N.W., Suite 706
Washington, D.C. 20005
Phone: (202) 436-2641
tyler@tylerkinglaw.com

Darrell C. Valdez, Esq.
U.S. Attorney's Office
Judiciary Center Building
555 Fourth Street
Washington, DC 20530
(202) 307-2843
darrell.valdez@usdoj.gov

/s/ John W. Lomas, Jr.
John W. Lomas, Jr.

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

</div>

| | |
|---|---|
| **UNITED STATES ex rel.** | ) |
| **BRIAN BURKE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civil Action No. 1:08-CV-00364 (EGS-DAR)** |
| **v.** | ) |
| | ) |
| **RECORD PRESS, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

<div align="center">

**DECLARATION OF JOHN W. LOMAS, JR.**

</div>

I, John W. Lomas, Jr. declare:

1.      I am an attorney with McKenna Long & Aldridge LLP, counsel for Record Press, Inc. ("Record Press") in the above referenced case.  I am over the age of 18 years-old and have personal knowledge of about the facts described below.  If called as a witness, I could testify truthfully about the facts recited in this declaration under oath.  I make this declaration in support of Defendant Record Press, Inc.'s Motion for Summary Judgment.

2.      Attached hereto as Exhibit 1 is a true and correct copy of relevant excerpts of the transcript of the May 25, 2010 deposition of Mr. Hugh Wilmot.

3.      Attached as Exhibit 2 is a true and correct copy of Exhibit 1 to the May 25, 2010 deposition of Mr. Hugh Wilmot.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the transcript of the May 25, 2010 deposition of Mr. Brian Burke.

5.      Attached as Exhibit 4 is a true and correct copy of Exhibit 2 to the May 25, 2010 deposition of Mr. Brian Burke.

6.      Attached as Exhibit 5 is a true and correct copy of Exhibit 3 to the May 25, 2010 deposition of Mr. Brian Burke.

7.      Attached as Exhibit 6 is a true and correct copy of Exhibit 4 to the May 25, 2010 deposition of Mr. Brian Burke.

8.      Attached as Exhibit 7 is a true and correct copy of Exhibit 5 to the May 25, 2010 deposition of Mr. Brian Burke.

9.      Attached as Exhibit 8 is a true and correct copy of Exhibit 7 to the May 25, 2010 deposition of Mr. Brian Burke.

10.      Attached as Exhibit 9 is a true and correct copy of Relator's Initial Disclosures dated September 22, 2008.

11.      Attached as Exhibit 10 is a true and correct copy of Defendant's First Set of Requests for Admission to Relator Brian Burke.

12.      Attached as Exhibit 11 is a true and correct copy of Plaintiff's Response to Defendant's Requests for Admission.

I declare under penalty of perjury under the laws of the United States of America and the District of Columbia that the foregoing is true and correct.

Executed on this **24**th day of June 2010 at *Vashgtn DC*

_John W. Lomas, Jr._

00000237

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of June 2010, the foregoing Declaration of John W.

Lomas, Jr. was served via the Court's Electronic Filing System ("ECF") on:

Tyler Jay King, Esq.
Tyler Jay King Law
1400 K Street, N.W., Suite 706
Washington, D.C.  20005
Phone: (202) 436-2641
tyler@tylerkinglaw.com

Darrell C. Valdez, Esq.
U.S. Attorney's Office
Judiciary Center Building
555 Fourth Street
Washington, DC 20530
(202) 307-2843
darrell.valdez@usdoj.gov

 /s/ John W. Lomas, Jr.
John W. Lomas, Jr.

00000238

# EXHIBIT 1

00000239

Wilmot, Jr., Hugh                    CONFIDENTIAL                    May 25, 2010
                                     Washington, DC

Page 1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLUMBIA

3     - - - - - - - - - - - - - - - X

4     UNITED STATES ex rel.           :

5     BRIAN BURKE,                     :

6            Plaintiff,                :    Civil Action No.

7        v.                           :    1:08-CV-00364(EGS)

8     RECORD PRESS, INC.,              :    PORTIONS CONFIDENTIAL

9            Defendant.                :

10    - - - - - - - - - - - - - - - X

11                          Washington, D.C.

12                          May 25, 2010

13           Deposition of HUGH WILMOT, JR., a witness

14    herein, called for examination by counsel for

15    Plaintiff in the above-entitled matter, pursuant to

16    notice, the witness being duly sworn by SUSAN L.

17    CIMINELLI, a Notary Public in and for the District of

18    Columbia, taken at the offices of McKenna Long &

19    Aldridge, LLP, 1900 K Street, N.W., Washington, D.C.,

20    at 2:34 p.m., and the proceedings being taken down by

21    Stenotype by SUSAN L. CIMINELLI, CRR, RPR.

22

00000240

Wilmot, Jr., Hugh

CONFIDENTIAL
Washington, DC

May 25, 2010

---

**Page 2**

1  APPEARANCES:
2
3  On behalf of the Plaintiff:
4      TYLER JAY KING, ESQ.
5      1420 N Street, N.W.
6      Suite 706
7      Washington, D.C. 20005
8      202-436-2641
9      tylerking@gmail.com
10
11  On behalf of the Defendant:
12      JOHN W. LOMAS, ESQ.
13      WILLIAM T. O'BRIEN, ESQ.
14      McKenna Long & Aldridge, LLP
15      1900 K Street, N.W.
16      Washington, D.C. 20006
17      202-496-7183
18      jlomas@mckennalong.com
19      wobrien@mckennalong.com
20
21
22

---

**Page 4**

1              C O N T E N T S
2  WITNESS       EXAMINATION BY COUNSEL FOR
3  HUGH WILMOT,    JR.       PLAINTIFF
4   By Mr. King            5
5
6              E X H I B I T S
7  WILMOT EXHIBIT NO.            PAGE NO.
8  Exhibit 1 - RP000051-69 - Bid        37
9  Exhibit 2 - Record Press, Inc.'s Motion for   39
10     Sanctions Pursuant to Rule 11 of
11     the Federal Rules of Civil Procedure
12  Exhibit 3 - Chart                 82
13  Exhibit 4 - Chart                 85
14  Exhibit 5 - RP000001-16 - BID          86
15
16
17
18
19
20
21
22

---

**Page 3**

1
2  ALSO PRESENT:
3      Henry Kegan, Paralegal
4      Brian Burke, Relator
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

**Page 5**

1              P R O C E E D I N G S
2  Whereupon,
3          HUGH WILMOT, JR.,
4  was called as a witness by counsel for Plaintiff, and
5  having been duly sworn by the Notary Public, was
6  examined and testified as follows:
7          MR. LOMAS:  If you don't mind, I'd like to
8  make one statement for the record.  I just want to
9  note that there was no deposition notice served on
10  either Mr. Wilmot or Record Press, so Mr. Wilmot will
11  be here testifying in his individual capacity, not as
12  a corporate designee for Record Press.  And as we
13  discussed earlier, we talked about the deposition
14  going from about 2:30 to 5 today.
15          MR. KING:  Okay.
16      EXAMINATION BY COUNSEL FOR PLAINTIFF
17      BY MR. KING:
18      Q.   Mr. Wilmot, can you please state and spell
19  your full name for the record?
20      A.   Hugh Wilmot, Jr.  H-U-G-H, W-I-L-M-O-T,
21  Jr.
22      Q.   And can you tell us where you live?

---

2 (Pages 2 to 5)

00000241

Wilmot, Jr., Hugh | CONFIDENTIAL<br>Washington, DC | May 25, 2010

Page 6

1    A.    I live at 48 Prince Street, Hastings on
2  Hudson, New York.
3    Q.    And what's your date of birth?
4    A.    5-23-1969.
5    Q.    And Mr. Wilmot, are you taking any
6  medication or are you experiencing any physical
7  symptoms that would affect your competency to testify
8  today?
9    A.    No. I am not.
10    Q.    How long have you been with Record Press?
11    A.    Since September 2000.
12    Q.    Okay. And how long has Record Press, to
13  your knowledge, been in existence?
14    A.    Since 1945.
15    Q.    Did you say 1945?
16    A.    That's correct.
17    Q.    And when you started in 2000, was Record
18  Press doing business with the GPO?
19    A.    Yes, it was.
20    Q.    And do you know how long approximately
21  before that Record Press had been doing business with
22  the GPO?

Page 7

1    A.    Yes, I do.
2    Q.    And approximately how long is that?
3    A.    20 plus years.
4    Q.    20 plus years. When you started at Record
5  Press, what was your position?
6    A.    Chief technology officer.
7    Q.    And in what year did you become the
8  president of Record Press?
9        MR. LOMAS: Objection. Foundation.
10        THE WITNESS: 2003.
11        BY MR. KING:
12    Q.    And at the time you were the -- I'm sorry,
13  could you restate what your position was when you
14  started?
15    A.    Chief technology, CTO, chief technology
16  officer.
17    Q.    When you were the chief technology
18  officer, who had your position at that time?
19        MR. LOMAS: Objection. Vague.
20        BY MR. KING:
21    Q.    Your current position as president, who
22  had the position when you were the CTO?

Page 8

1    A.    John Farrell.
2    Q.    How was it that you came to be the
3  president after you were the CTO?
4        MR. LOMAS: Objection. Foundation.
5        THE WITNESS: My skills.
6        BY MR. KING:
7    Q.    Okay. Did you apply for the job as
8  president?
9    A.    No. I was appointed.
10    Q.    Do you know why Mr. Farrell left as the
11  president?
12        MR. LOMAS: Objection. Foundation.
13        THE WITNESS: I don't know.
14        BY MR. KING:
15    Q.    Do you have an ownership interest or any
16  other type of financial interest in Record Press
17  itself?
18    A.    Yes, I do.
19    Q.    And what's the nature of that interest?
20    A.    Record Press is an employee owned company,
21  an ESOP.
22    Q.    And do you have an estimate of what

Page 9

1  percentage ownership interest you have in Record
2  Press?
3    A.    I don't know.
4    Q.    Would you say that it's closer to 1
5  percent or 10 percent, 20 percent, 30 percent, if you
6  were going to do it in 10 -- increments of 10 like
7  that, do you think it's something like 1 percent, 10
8  percent, 20 percent?
9    A.    I don't know.
10        MR. LOMAS: Objection. Speculation.
11        BY MR. KING:
12    Q.    You don't know. Would you say that it's
13  less than 50 percent?
14        MR. LOMAS: Objection. Asked and
15  answered.
16        THE WITNESS: I don't know.
17        BY MR. KING:
18    Q.    Do you know whether or not -- so your
19  testimony is that you don't know whether or not you
20  have a greater than 50 percent ownership interest in
21  Record Press?
22    A.    I don't know.

3 (Pages 6 to 9)

00000242

Wilmot, Jr., Hugh                    CONFIDENTIAL                    May 25, 2010
                                     Washington, DC

Page 70

1      MR. LOMAS: Objection. Vague.
2      THE WITNESS: Correct. F refers to
3  alterations.
4      BY MR. KING:
5      Q.   Earlier we discussed the concept of make
6  ready. Is make ready, does make ready embody these
7  line items here under I?
8      MR. LOMAS: Objection. Vague.
9  Foundation.
10     THE WITNESS: Again, I'm sorry, rephrase
11 the question.
12     BY MR. KING:
13     Q.   Earlier we discussed make ready. Does
14 make ready embody these line items under I, under
15 Roman numeral I?
16     MR. LOMAS: Same objection.
17     THE WITNESS: Make ready is absolutely
18 included in the thought process, as outlined on page
19 67.
20     BY MR. KING:
21     Q.   Okay. Is a running rate relevant to any
22 of these line items?

Page 71

1      MR. LOMAS: Objection. Vague. Overbroad.
2  Calls for a legal conclusion.
3      THE WITNESS: Record Press, in response to
4  the government requests for RFP, won this contract
5  based on a running rate of 10 copies for line items,
6  complete cover, text per page only.
7      BY MR. KING:
8      Q.   Okay. How did you arrive at that
9  conclusion?
10     MR. LOMAS: Objection. Vague.
11     THE WITNESS: In response to this
12 contract, Record Press completed this RFP based on a
13 running rate of 10 copies for line items complete
14 cover and text per page only. That's how it was
15 submitted. That's how we won.
16     BY MR. KING:
17     Q.   How do you determine that the running rate
18 is only applicable to those two line items?
19     MR. LOMAS: Objection. Calls for legal
20 conclusion. Asked and answered. Lack of foundation.
21     THE WITNESS: Record Press, in response to
22 this contract, submitted a -- an estimate, competed

Page 72

1  RFP to reflect a running rate of 10 copies for
2  complete cover and text per page only.
3      BY MR. KING:
4      Q.   How does the running rate apply to A,
5  complete cover?
6      MR. LOMAS: Objection. Vague. Calls for
7  legal conclusion. Foundation.
8      THE WITNESS: Again, Record Press
9  submitted in request for this RFP, a number based on
10 the running rate of 10 copies of $6 for complete
11 cover and text per page 35 cents.
12     BY MR. KING:
13     Q.   The running rate, what is the purpose of
14 the running rate for purpose of this Roman numeral
15 here?
16     MR. LOMAS: Objection. Calls for legal
17 conclusion. Speculation. Record Press didn't write
18 this RFP.
19     THE WITNESS: Again, in submission of this
20 RFP to Record Press, we completed it based on a 10
21 copy run for complete cover and text per page only.
22     BY MR. KING:

Page 73

1      Q.   Does -- are the terms of this bid that are
2  executed by you final terms?
3      MR. LOMAS: Objection. Vague. Calls for
4  a legal conclusion. Foundation.
5      THE WITNESS: Could you rephrase the
6  question for me?
7      BY MR. KING:
8      Q.   Do you -- are the -- are the prices that
9  are put here, are these final prices?
10     MR. LOMAS: Objection. Calls for legal
11 conclusion. Vague. Foundation.
12     THE WITNESS: Again, just rephrase.
13     BY MR. KING:
14     Q.   Does this contract become -- or does this
15 RFP become a binding contract between you and the
16 GPO, between Record Press and the GPO?
17     MR. LOMAS: Objection. Calls for a legal
18 conclusion.
19     THE WITNESS: Once we submit, once we --
20 once this RFP is completed and submitted to the GPO,
21 it is up to the GPO to determine who is the winner.
22 And as such, we are informed if we have won or lost

19 (Pages 70 to 73)

Henderson Legal Services, Inc.

00000243

Wilmot, Jr., Hugh                      CONFIDENTIAL                      May 25, 2010
                                       Washington, DC

Page 74

1   the contract.  Period.  So --
2        BY MR. KING:
3        Q.   By winning, do you mean it becomes the
4   contract?
5        MR. LOMAS:  Objection.  Vague.  Calls for
6   a legal conclusion.
7        THE WITNESS:  Again, rephrase.
8        BY MR. KING:
9        Q.   When you say that Record Press wins the
10  contract, does that mean that it becomes the
11  contract?
12       MR. LOMAS:  Same objections.
13       THE WITNESS:  Yes.  We then become the
14  performing agent on that project.
15       BY MR. KING:
16       Q.   And are these prices here the final terms
17  of that contract?
18       MR. LOMAS:  Objection.  Asked and
19  answered.  Calls for a legal conclusion.  Foundation.
20       THE WITNESS:  If these numbers reflect
21  what was submitted on our RFP and the government
22  reviews it as such, and then chooses us to be the

Page 75

1   winner, yes, it's consistent.
2        BY MR. KING:
3        Q.   And are there ever occasions where the GPO
4   or Record Press modify this during the contract's
5   existence?
6        MR. LOMAS:  Objection.  Vague.  Compound.
7   Overbroad.  Calls for a legal conclusion.
8        THE WITNESS:  I have never seen that.
9        BY MR. KING:
10       Q.   Does the GPO and Record Press engage in
11  any preliminary discourse regarding the definitions
12  or meanings of any of the terms in the contract?
13       A.   I have never seen that.
14       Q.   So Record Press does not, and the GPO does
15  not discuss what any of this means before it's
16  awarded?
17       MR. LOMAS:  Objection.  Leading.
18  Foundation.
19       THE WITNESS:  I have never seen that.
20       BY MR. KING:
21       Q.   Are you familiar with Ira Fishken?
22       A.   Yes, I am.

Page 76

1        Q.   How -- have you ever spoken with Ira
2   Fishken?
3        A.   Yes, I have.
4        Q.   What were the -- how many times have you
5   spoken with him?
6        A.   I don't know.
7        Q.   More than a couple or close to a hundred?
8   Approximately how many?
9        MR. LOMAS:  Objection.  Argumentative.
10  Compound.
11       THE WITNESS:  Since being president of
12  Record Press, since 2003, I've spoken to Ira off and
13  on once or twice a year.
14       BY MR. KING:
15       Q.   And when you speak with Mr. Fishken, do
16  you discuss the meaning of any of these contracts?
17       MR. LOMAS:  Objection.  Vague.
18       THE WITNESS:  No.  When I speak to Ira,
19  it's generally on performance issues such as if a
20  U.S. attorney may have a particular issue on the -- a
21  job or so on and so forth, or the timeliness of a
22  job, period.  Never on contract terms.  The contracts

Page 77

1   I submitted by the GPO are unambiguous, period.  And
2   if there were any changes to a particular contract or
3   something you do not understand, it is a written
4   submission process.
5        BY MR. KING:
6        Q.   After this case was filed, did you speak
7   with him about this particular contract or about this
8   case?
9        MR. LOMAS:  Objection.  Vague.  Compound.
10       THE WITNESS:  Not at all.
11       BY MR. KING:
12       Q.   Did you speak with any GPO officials
13  regarding this case after it was filed?
14       A.   Not at all.  Can I add something for the
15  record?
16       Q.   Yes.  Please.
17       A.   Record Press's invoices are submitted to
18  Washington, D.C., along with Philadelphia, GPO's
19  office.  Washington does not pay our invoices unless
20  GPO in Philadelphia approves of them.  So that means
21  they must be in compliance before they are paid, so
22  there is a dual auditing going on on our invoices.

20 (Pages 74 to 77)

00000244

Wilmot, Jr., Hugh                        CONFIDENTIAL                          May 25, 2010
                                        Washington, DC

Page 82

1        MR. O'BRIEN:  Five minutes, 10 minutes.
2        MR. KING:  The shorter the better.  What
3   time is it now?
4        MR. O'BRIEN:  It's 25 to 5.
5        MR. KING:  Okay.
6        (Recess.)
7        BY MR. KING:
8   Q.   Could you please mark this Exhibit 3.
9        (Wilmot Exhibit No. 3 was
10       marked for identification.)
11       BY MR. KING:
12   Q.   Mr. Wilmot, do you see on the -- the
13  third, the third column from the description where it
14  says, contract number 1E4, and under that it says,
15  Record Press, New York.
16   A.   Yes, I do.
17       MR. LOMAS:  Just before we go forward, I
18  just want to note for the record that there is some
19  markups on this document, so circling a couple -- go
20  ahead.
21       MR. O'BRIEN:  Are they your markups,
22  Tyler?

Page 83

1        MR. KING:  No.
2        BY MR. KING:
3   Q.   Do you -- do you recognize this document?
4   A.   Yes, I do.
5   Q.   And what type of document is this?
6   A.   This document is a breakdown that
7   generally accompanies the RFP submitted by the GPO to
8   every vendor or potential contractor for this
9   particular program.
10   Q.   Okay.  And if you look down there for
11  Record Press under the columns for Record Press, and
12  you go down to where it says collating, trimming to
13  size, and binding per 100 pages, the basis of the
14  order 14, the unit rate of 1225, do you see that
15  that's written there?
16       MR. LOMAS:  Objection.  Compound.
17       THE WITNESS:  Correct.  I see it.
18       BY MR. KING:
19   Q.   And is it -- is it your testimony that
20  these particular entries under Record Press's column
21  are entries corresponding to the RFP that Record
22  Press submitted?

Page 84

1        MR. LOMAS:  Objection.  I don't believe he
2   testified to that at this point yet.
3        THE WITNESS:  I don't know.
4        BY MR. KING:
5   Q.   Okay.  So Mr. Wilmot, you didn't prepare
6   the document?
7   A.   That's correct.
8   Q.   And so you don't know whether or not the
9   entries in this document correspond to the RFP that
10  Record Press submitted?
11       MR. LOMAS:  Objection.  Leading.
12       THE WITNESS:  The previous question was,
13  did I prepare this document and this document being
14  this spreadsheet layout, no.  Record Press did not
15  create this.  This is not a Record Press product.
16  Record Press is not responsible for any numbers that
17  enters into this particular table, and the
18  interpretation of this particular table.  Record
19  Press ceases the line item and enters into an RFP to
20  win a particular contract based on its entries into
21  the line item.
22   Q.   And I'd like to enter another exhibit for

Page 85

1   the record.
2        (Wilmot Exhibit No. 4 was
3        marked for identification.)
4        BY MR. KING:
5   Q.   Mr. Wilmot, do you recognize this type of
6   document here?
7        MR. LOMAS:  Objection.
8        MR. O'BRIEN:  Can you say the exhibit
9   number, Tyler?
10       BY MR. KING:
11   Q.   Exhibit Number 4.
12       MR. LOMAS:  Are these documents, these
13  documents are in your possession, have you produced
14  these in the case?
15       MR. KING:  This was filed in your Rule 11
16  motion.
17       MR. LOMAS:  This one here was.
18       MR. KING:  Yes.
19       MR. LOMAS:  What about Exhibit 3?
20       MR. KING:  Exhibit 3 was provided to Mark
21  Hanna, plaintiff's prior counsel.
22       MR. O'BRIEN:  By who, Tyler?

22 (Pages 82 to 85)

Henderson Legal Services, Inc.

00000245

Wilmot, Jr., Hugh                    CONFIDENTIAL                    May 25, 2010
                                     Washington, DC

Page 90

1    running rate of 10 copies with a line item specified.
2         BY MR. KING:
3         Q.    Has Record Press in any way changed its
4    procedures for billing or invoicing which I
5    understand to be the same thing in relation to this
6    lawsuit?
7         MR. LOMAS: Objection. Foundation.
8    Vague. Compound.
9         THE WITNESS:  Absolutely not.
10        BY MR. KING:
11        Q.    Would Record Press change the way it
12   invoices or bills in the future in relation to the
13   way, in relation to this lawsuit?
14        MR. LOMAS: Objection. Foundation.
15   Speculative. Vague.
16        THE WITNESS:  Record Press's bill has been
17   consistent and will be consistent and the government
18   has, you know, essentially said that it's in
19   agreement with Record Press's billing.
20        BY MR. KING:
21        Q.    Does Record Press have a CEO?
22        A.    No.

Page 91

1         Q.    Does Record Press have a CFO?
2         A.    No.
3         Q.    Does Record Press have a COO?
4         A.    No.
5         Q.    Has -- have any of Record Press's invoices
6    other than this, the ones in this case, been
7    challenged?
8         MR. LOMAS: Objection. Vague.
9         BY MR. KING:
10        Q.    During your time as president with the
11   company?
12        A.    Never.
13        Q.    Do you recall a phone conversation with
14   the plaintiff in this case, Mr. Burke?
15        A.    Yes, I do.
16        Q.    And what did you do, if anything,
17   immediately thereafter to follow up on this phone
18   call?
19        MR. LOMAS: Objection. Foundation.
20        THE WITNESS:  I recall speaking to
21   Mr. Burke twice. The first time Mr. Burke called he
22   misrepresented himself as just someone making a

Page 92

1    general request on our pricing. Record Press's
2    pricing is confidential. Any time a request of that
3    nature comes in, that call immediately goes to a
4    salesperson or to me directly.
5         In this case, Evelyn Crespo is my billing
6    clerk. She answered that particular call and as
7    such, she then passed that call to me to answer and
8    it was a general inquiry on our pricing as to why we
9    are charging what we are charging, period. I never
10   knew this person to be Brian Burke, period.
11        Q.    And you said there was a second occasion
12   when you spoke with him?
13        A.    The second occasion when he called, that
14   information he directly requested me, okay? As such,
15   I spoke to him and he told me that he spoke to
16   someone in Washington who said explicitly that we are
17   billing and defrauding the government based on this
18   particular contract.
19        Q.    Did you do anything immediately thereafter
20   to follow up on this phone call?
21        A.    Immediately thereafter, I spoke -- I
22   tracked down as best as I could Mr. Adgerson, who

Page 93

1    then told me that he had no such conversation with
2    Mr. Burke.
3         Q.    And did you do anything thereafter after
4    that conversation with Adgerson to follow up?
5         A.    No. Because I was more or less concerned
6    that he could have set -- that Mr. Adgerson could
7    have made a claim like that that is baseless, so I
8    actually thought the entire argument was without
9    merit.
10        Q.    Had you ever spoken with Mr. Adgerson
11   before?
12        A.    Never. I just wanted to make a correction
13   for the record. I referred to Evelyn Crespo as my
14   billing clerk. Before that it was Miss Karen
15   Daniels.
16        Q.    Can you just briefly describe what's meant
17   by collating, binding and trimming?
18        MR. LOMAS: Objection. Calls for legal
19   conclusion. Vague. Overbroad. And it may have been
20   asked and answered previously.
21        THE WITNESS:  Rephrase the question,
22   please?

24 (Pages 90 to 93)

00000246

Wilmot, Jr., Hugh                    CONFIDENTIAL                         May 25, 2010
                                     Washington, DC

Page 94

```
1        BY MR. KING:
2        Q.   If we go back to Exhibit Number 1, you
3   look at page 67.  Under the line item for II D, it
4   refers to collating, trimming to size and binding.
5   Can you describe what that refers to?
6        MR. LOMAS:  Objection.  Calls for legal
7   conclusion.  It may have been asked and answered.
8        THE WITNESS:  Collating, trimming to size
9   and binding refers to in the production process of a
10  brief, a record or an appendix, when these documents
11  that could be voluminous are sent to the printer,
12  they must be collated in terms of document, complete
13  document sets.
14       Once they have been collated by the -- the
15  printing and finishing department, okay, it is
16  trimmed to size based on the guideline of the
17  particular court.  Once it's trimmed to size, it is
18  then brought over from the guillotine cutter to the
19  bindery department, okay, or the binder.
20       It is then placed in the binder and the
21  cover is fed in and in that process, a glue is placed
22  on the back of the book and the cover automatically
```

Page 95

```
1   wraps to the book.  It then drops to the bottom of
2   the bin.  It is then placed on a cart and brought
3   back after the complete number of books have been
4   bound that were ordered.  Once that process is done,
5   it is brought over to the guillotine cutter again and
6   then it is trimmed to final size to ensure that the
7   cover and the product is a perfect representation of
8   Record Press's abilities.
9        Q.   Do you ever do a run of only one copy?
10       MR. LOMAS:  Objection.  Vague.
11       THE WITNESS:  Absolutely.  That could fall
12  under, I want another copy or simple reprint of one
13  copy.
14       BY MR. KING:
15       Q.   A simple what?
16       A.   Reprint of one copy.
17       Q.   It's 5 o'clock, right?
18       MR. O'BRIEN:  Yes.
19       MR. KING:  No more questions.
20       MR. LOMAS:  I just want to reiterate
21  again, I think there were a couple of occasions where
22  we moved for a protective order with respect to the
```

Page 96

```
1   pricing or compensation so we'll want to talk about
2   that afterwards.
3        MR. KING:  Certainly.
4        MR. O'BRIEN:  Thank you very much.
5        MR. KING:  Mr. Wilmot, thanks a lot for
6   your time.
7        (Whereupon, at 5:03 p.m., the taking of
8   the deposition ceased.)
9
10
11                    _____
12                    Signature of the Witness
13  SUBSCRIBED AND SWORN to before me this _____ day
14  of _____, 2010.
15
16                    _____
17                    NOTARY PUBLIC
18  My Commission expires: _____
19
20
21
22
```

25 (Pages 94 to 96)

Henderson Legal Services, Inc.

202-220-4158                                          www.hendersonlegalservices.com

00000247

# EXHIBIT 2

00000248

RP000051

U.S. POSTAGE
METER
$.364207

US OCT-04-06 PA.

FIRST CLASS

OFFICIAL
BID
COPY

EXHIBIT
What
5/28/2012
PENGAD 800-631-6989

U.S. GOVERNMENT PRINTING OFFICE
PHILADELPHIA REGIONAL PRINTING PROCUREMENT OFFICE
928 JAYMOR ROAD, SUITE A-190
SOUTHAMPTON, PA 18966

OFFICIAL BUSINESS

310-73951 212-619-4949 F212-608-3141
RECORD PRESS, INC.
ROBERT P. WRIGHTSON
157 CHAMBER STREET
NEW YORK        NY 10007

U.S. GOVERNMENT BID INVITATION
PROGRAM 2231-S ( OCTOBER 18, 2006)



GPO Form 910
(R 8-01) P.57021-4
Part 1
ORIGINAL

**U.S. GOVERNMENT PRINTING OFFICE**
**Printing Procurement Department**
# BID

All bids are subject to GPO Publication 310.2, Contract Terms (Rev. 6-01) which is incorporated by reference, and the representations and certifications on the reverse of part one of this GPO Form 910.

Shipment(s) will be made from: City _New York City_ , State _NY_

(The city(ies) indicated above will be used for evaluation of transportation charges when shipment f.o.b. contractor's city is specified. If no shipping point is indicated above, it will be deemed that the bidder has selected the city and state shown below in the address block and the bid will be evaluated and the contract awarded on that basis. If shipment is not made from evaluation point, contractor will be responsible for any additional shipping costs incurred.)

PROGRAM NO. _2231 - S_        (BIDDER TO ATTACH SCHEDULE OF PRICES TO THIS BID FORM)

or

JACKET NO. _____

BID _____

Additional _____ Rate _____

Discounts are offered for prompt payment as follows: _____ percent, _____ calendar days.
See Provision 12 "Discounts" in GPO Contract Terms (Pub. 310.2).

Bidder hereby acknowledges amendment(s) number(ed) _____

In compliance with the above, the undersigned agrees, if this bid is accepted within _90_ calendar days (60 calendar days unless a different period is inserted by the bidder) from the date for receipt of bids, to furnish the specified items at the price set opposite each item, delivered at the designated point(s), in exact accordance with specifications.

| Notice: Failure to provide a 60 day bid acceptance period may result in expiration of your bid prior to award. |

**COMPANY SUBMITTING BID**                    **PERSON AUTHORIZED TO BID**

Company _Record Press, Inc._        Name _Hugh A. Wilmot, Jr_

Address _229 West 36th 8th Fl._      Title _President_

City _New York_ State _NY_ Zip _10018_    Signature _Hugh A. Wilmot, Jr_

GPO Contractor Code (if known) _____    Date _10/16/06_

Telephone Number _212-619-4949_    Facsimile Number _212-608-3141_

Contracting Officer Review _____ Date _____ Certifier _____ Date _____
                              (Initials)                              (Initials)

# Representations and Certifications

Exception to the certifications may render your bid nonresponsive. Submission of your bid without statement of except shall constitute certification of the six items.

**REPRESENTATIONS.**

R-1. Small business. By submission of a bid, the bidder represents that the bidder is a small business concern, unless the bid contains an affirmative representation that the bidder is not a small business concern.

R-2. Small Disadvantaged Business Concern. By submission of a bid, the bidder represents that the bidder is not a small disadvantaged business concern, unless the bid itself contains an affirmative representation that the bidder is a small disadvantaged business concern.

R-3. Women-Owned Small Business Concern. By submission of a bid, the bidder represents that the bidder is not a women-owned small business concern, unless the bid itself contains an affirmative representation that the bidder is a women-owned small business concern.

**CERTIFICATIONS.**

C-1. Covenant Against Contingent Fees. Submission of a bid without statement of exception shall constitute certification.

(a) The contractor warrants that no person or agency has been employed or retained to solicit or obtain a contract upon an agreement or understanding for a contingent fee, except a bona fide employee or agency. For breach or violation of this warranty, the Government shall have the right to annul the contract without liability or, in its discretion, to deduct from the contract price or consideration or otherwise recover, the full amount of the contingent fee.

(b) "Bona fide agency" means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.

"Bona fide employee" means a person, employed by a contractor and subject to the contractor's supervision and control as to time, place, and manner of performance, who neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds out as being able to obtain any Government contract or contracts through improper influence.

"Contingent fee" means any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.

"Improper influence" means any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter.

C-2. Buy American Certification. Except as may be listed with the bid itself, the bidder certifies with the submission of a bid that each end product is a domestic end product (as defined in clause 37 "Buy American Act" in Contract Clauses), and that components of unknown origin have been considered to have been mined, produced, or manufactured outside the United States. Any exception listed with the bid itself must list both the excluded end products and the country of origin of each.

C-3. Clean Air and Water. Submission of a bid without statement of exception shall constitute certification.

(Applicable if the bid or offer exceeds $100,000 or the Contracting Officer has determined that orders under an indefinite quantity contract in any year will exceed $100,000, or a facility to be used has been the subject of a conviction under the Clean Air Act (42 U.S.C. 7413 (C) (1)) or the Federal Water Pollution Control Act (33 U.S.C. 1319(c)) and is listed by EPA, or is not otherwise exempt.)

(a) Any facility to be utilized in the performance of the proposed contract has not been listed on the Environmental Protection Agency List of Violating Facilities.

(b) The Contracting Officer will be promptly notified, prior to award, of the receipt of any communication from the Director, Office of Federal Activities, Environmental Protection Agency, indicating that any facility which he/she proposes to use for the performance of the contract is under consideration to be listed on the EPA List of Violating Facilities.

(c) Bidder will include substantially this certification, including this paragraph (c), in every nonexempt subcontract.

C-4. Certificate of Independent Price Determination. Submission of a bid without statement of exception shall constitute certification.

(a) The offeror certifies that-

(1) The prices in the offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to(i) those prices; (ii) the intention to submit an offer; or (iii) the methods or factors used to calculate the prices offered.

(2) The prices in the offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law; and

(3) No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

(b) Each signature on the offer is considered to be a certification by the signatory that the signatory-

(1) Is the person in the offeror's organization responsible for determining the prices being offered in the bid or proposal, and that the signatory has not participated and will not participate in any action contrary to subparagraphs (a) (1) through (a) (3) of this provision; or

(2)(i) Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to subparagraphs (a) (1) through (a) (3) of this provision [insert full name of person(s) in the offeror's organization responsible for determining the prices offered in the bid or proposal, and the title of his or her position in the offeror's organization];

(ii) As an authorized agent, does certify that the principals named in subdivision

(b)(2)(i) of this provision have not participated, and will not participate, in any action trary to subparagraphs (a)(1) through (a)(3) of this provision; and

(c) If the offeror deletes or modifies subparagraph (a)(2) of this provision, the or must furnish with its offer a signed statement setting forth in detail the circumsta of the disclosure.

C-5. Certification Regarding Debarment, Suspension, Proposed Debarm and other Responsibility Matters (Jan. 1999). By submission of a bid-

(a)(1) The offeror certifies, to the best of its knowledge and belief, that-

(i) The offeror and/or any of its principals-

(A) Are not presently debarred, suspended, proposed for debarmen declared ineligible for the award of contracts by any Federal agency;

(B) Have not, within a 3-year period preceding this offer, been convict or had a civil judgment rendered against them for: commission of fraud or a cri offense in connection with obtaining, attempting to obtain, or performing a p (Federal, state, or local) contract or subcontract; violation of Federal or state ant statutes relating to the submission of offers; or commission of embezzlement, theft gery, bribery, falsification or destruction or records, making false statements, tax sion, or receiving stolen property; and

(C) Are not presently indicted for, or otherwise criminally or civilly charge a governmental entity with commission of any of the offenses enumerated in subdiv (a)(1)(i)(B) of this provision.

(ii) The offeror has not, within a three-year period preceding this offer, had or more contracts terminated for default by any Federal agency.

(2) "Principals," for the purposes of this certification, means officers; directors; ers; partners; and, persons having primary management or supervisory responsibi within a business entity (e.g., general manager; plant manager; head of a subsi division or business segment, and similar positions).

This Certification Concerns a Matter Within the Jurisdiction of an Agency o United States and the Making of a False, Fictitious, or Fraudulent Certification Render the Maker Subject to Prosecution Under Section 1001, Title 18, United S Code.

(b) The offeror shall provide immediate written notice to the Contracting Officer any time prior to contract award, the offeror learns that its certification was erron when submitted or has become erroneous by reason of changed circumstances.

(c) A certification that any of the items in paragraph (a) of this provision exists w necessarily result in withholding of an award under the solicitation. However, the c cation will be considered in connection with a determination of the offeror's respon ity. Failure of the offeror to furnish a certification or provide such additional inform as requested by the Contracting Officer may render the offeror non-responsible.

(d) Nothing contained in the foregoing shall be construed to require establishme a system of records in order to render, in good faith, the certification required in p graph (a) of this provision. The knowledge and information of an offeror is not req to exceed that which is normally possessed by a prudent person in the ordinary co of business dealings.

(e) The certification in paragraph (a) of this provision is a material representati fact upon which reliance was placed when making award. If it later determined that offeror knowingly rendered an erroneous certification, in addition to other reme available to the Government, the Contracting Officer may terminate the contract r ing from the solicitation for default.

C-6. Certification of Nonsegregated Facilities (Jan. 1999). Submission of without statement of exception shall constitute certification.

(a) "Segregated facilities," as used in this provision, means any waiting rooms, areas, rest rooms and wash rooms, restaurants and other eating areas, time cl locker rooms and other storage or dressing areas, parking lots, drinking fountains, r ation or entertainment areas, transportation, and housing facilities provided for em ees, that are segregated by explicit directive or are in fact segregated on the bas race, color, religion, or national origin because of habit, local custom, or otherwise

(b) By submission of an offer, the offeror certifies that it does not and will not r tain or provide for its employees any segregated facilities at any of its establishm and that it does not and will not permit its employees to perform their services a location under its control where segregated facilities are maintained. The offeror ag that a breach of this certification is a violation of the Equal Opportunity clause in the tract.

(c) The offeror further agrees that (except where is has obtained identical cer tions from proposed subcontractors for specific time periods) it will-

(1) Obtain identical certifications from proposed subcontractors before the a of subcontracts under which the subcontractor will be subject to the Equal Oppor clause;

(2) Retain the certifications in the files; and

(3) Forward the following notice to the proposed subcontractors (except proposed subcontractors have submitted identical certifications for specific time ods);

### NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATION OF NONSEGREGATED FACILITIES

A certification of Nonsegregated Facilities must be submitted before the awar subcontract under which the subcontractor will be subject to the Equal Oppor clause. The certification may be submitted before the award of subcontract or for all su tracts during a period (i.e., quarterly, semiannually, or annually).

Note: The penalty for making false statements in offers is prescribed in 18 U.S 1001.

Specifications by IFL                                                                                   Page 1 of 15
Program 2231-S FORMERLY 1272-S
Issue date

U.S. GOVERNMENT PRINTING OFFICE

PHILADELPHIA , PA.

GENERAL TERMS, CONDITIONS, AND SPECIFICATIONS

For the Procurement of

Appeals Briefs

as requisitioned from the U.S. Government Printing Office (GPO) by the

U.S. Department of Justice

Single Award

The term of this contract is for the period

beginning Date of Award (November 1,2006) and ending October 31, 2007
with an option for renewal from November 1, 2007 and ending October 31, 2008
with a second option for renewal from November 1, 2008 and ending October 31, 2009
with a third option for renewal from November 1, 2009 and ending October 31, 2010
and with a fourth option for renewal from November 1,2010 and ending October 31, 2011

OPTION TO EXTEND THE CONTRACT TERM: The Government may extend the term of this contract by written notice to the contractor not later than 30 days before the contract expires.  If the Government exercises an option, the extended contract shall be considered to include this clause.  The duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

Notwithstanding the above paragraph, at the request of the Government, the term of any contract resulting from this solicitation may be further extended for such period of time as may be mutually agreeable to the GPO and the contractor.

BID OPENING: Bids shall be publicly opened at **2:00 p.m.,** prevailing Philadelphia, PA  time, on **October 18,2006**

RECOVERED MATERIALS PROGRAM: The Government Printing Office is promoting the use of recovered materials in its contracts to the maximum extent practicable, provided all specification requirements are met. Offerors are encouraged to supply paper and paper products that contain recovered materials even in the absence of a specific solicitation provision or contract clause requiring such materials.

RESTRICTION ON LOCATION OF PRODUCTION FACILITIES: All production facilities used in the manufacture of the product(s) ordered under this contract, in Category 1, must be located within the borough of Manhattan south of 59th Street to the Battery and East and West to the rivers.

Any bidder intending to use production facilities outside this area should furnish information, with the bid, which will on its face demonstrate ability to meet the schedule requirements. The determination by the Government of the acceptability of this information in no way relieves the successful bidder of the responsibility for compliance with these schedule requirements.

BIDDERS, PLEASE NOTE: <u>These specifications have been extensively revised; therefore, all bidders are cautioned to familiarize themselves with all provisions of these specifications before bidding.</u>

SEE MANDATORY PROCUREMENT INTEGRITY REQUIREMENTS ATTACHED

For information of a technical nature call Pamela Lewis (215) 364-6465 (No collect calls).

SECTION 1.- GENERAL TERMS AND CONDITIONS

GPO CONTRACT TERMS: Any contract which results from this Invitation for Bid will be subject to the applicable provisions, clauses, and supplemental specifications of GPO Contract Terms (GPO Pub. 310.2, effective December 1, 1987 (Rev. 9-88)) and GPO Contract Terms, Quality Assurance Through Attributes Program (GPO Pub. 310.1, effective May 1979 (revised December 1992)).

QUALITY ASSURANCE LEVELS AND STANDARDS: The following levels and standards shall apply to these specifications:

Product Quality Levels:
    (a) Printing Attributes -- Level IV.
    (b) Finishing Attributes -- Level IV.

Inspection Levels (from ANSI/ASQC Z1.4):
    (a) Non-destructive Tests - General Inspection Level I.
    (b) Destructive Tests    - Special Inspection Level S-2.

Specified Standards: The specified standards for the attributes requiring them shall be:

| Attribute | Specified Standard |
|---|---|
| P-7. Type Quality and Uniformity | Average type dimension in publication or camera copy |

SUBCONTRACTING: Subcontracting will not be permitted

EXTENSION OF CONTRACT TERM: At the request of the Government, the term of any contract resulting from this solicitation may be extended for such period of time as may be mutually agreeable to the GPO and the contractor.

DEFINITION OF RECOVERED MATERIALS IN PAPER PRODUCTS:

Waste Paper (when used in high grade bleached printing and writing papers) means any of the following "recovered materials":

    (1) Postconsumer materials such as:

        (a) Paper, paperboard, and fibrous wastes from retail stores, office buildings, homes, and so forth, after they have passed through their end usage as a consumer item, including: Used corrugated boxes, old newspapers; old magazines; mixed waste paper; tabulating cards, and used cordage; and

        (b) All paper, paperboard, and fibrous waste that enter and are collected from municipal solid waste; and

    (2) Manufacturing, forest residues, and other wastes such as:

        (a) Dry paper and paperboard waste generated after completion of the papermaking process (that is, those manufacturing operations up to and including the cutting and trimming of the paper machine reel into smaller rolls or rough sheets) including envelope cuttings, bindery trimmings, and other paper and paperboard waste, resulting from printing, cutting, forming, and other converting operations; bag, box, and carton manufacturing wastes; and butt rolls, mill wrappers, and rejected unused stock; and

        (b) Finished paper and paperboard from obsolete inventories of paper and paperboard manufacturers, merchants, wholesalers, dealers, printers, converters, or others.

    (3) "Mill broke" is specifically excluded from the definition of waste paper. Mill broke means any paper waste generated in a paper mill prior to completion of the papermaking process.

MAINTENANCE OF RECORDS ON RECOVERED MATERIALS IN PAPER PRODUCTS: The contractor shall maintain manufacturer/mill accounting and record summaries on the fiber weight content used as feedstock, for purposes of Government audit, that will verify (i) the contractors certification of the minimum waste paper, post- consumer

recovered materials, or recovered materials (cotton/linen) content, as applicable, used in performance of the contract, (ii) that the paper and paper products are in compliance with the specification requirements, and (iii) the paper is manufactured in accordance with the Environmental Protection Agency (EPA) Guideline for Federal Procurement of Paper and Paper Products Containing Recovered Materials, 40 CFR Part 250, whether the products are manufactured by the contractor or another paper mill. The contractor, if not the manufacturer, shall obtain this information from the paper manufacturer. The contractor shall maintain, and make available to the Government, these documents for one year after the expiration of the contract. Nothing in this clause shall excuse the contractor from furnishing the specified paper.

ECONOMIC PRICE ADJUSTMENT: The prices set forth in this contract shall be adjusted in accordance with the provisions of this clause, provided that, in no event will prices be revised to exceed the maximum permissible under any law existing as of the date of the contract or as may be hereafter promulgated.

Price adjustment period: For the purpose of this clause, the program years shall comply with the Contract Term clause. There shall be no price adjustment for orders placed during the first program year of this contract.

Price adjustment: The prices shall be adjusted on the basis of the "Consumer Price Index For All Urban Consumers - Commodities Less Food, Seasonally Adjusted," published monthly in the CPI Detailed Report by the Department of Labor, Bureau of Labor Statistics, in the following manner:

(1)   The contract price of orders placed during the adjusted period (excluding reimbursable postage or transportation costs) shall be adjusted by the percentage increase or decrease in the average, seasonally adjusted Consumer Price Index For All Urban Consumers - Commodities Less Food (seasonally adjusted) as follows: An index shall be calculated by averaging the 12 seasonally adjusted months ending 3 months prior to the expiration of the first period of the contract. This average is then compared with the average index for the 12-month period ending 3 months prior to the beginning of the contract, called the base index. The percentage increase or decrease by comparing these two indexes shall be applied to the contractor's invoices for orders placed during the price adjustment period.

(2)   The Government will notify the contractor in writing of the percentage increase or decrease to be applied to any invoices to be submitted for orders subject to price adjustment in accordance with this clause. Such percentage will be determined from the published index as set forth above. The contractor shall apply the percentage increase or decrease against the total price of the invoice less reimbursable postage or transportation costs. Any applicable discounts will be calculated on the basis of the invoice price as adjusted.

ASSIGNMENT OF JACKETS, PURCHASE AND PRINT ORDERS: A GPO jacket number will be assigned and a purchase order issued to the contractor to cover work performed. The purchase order will be supplemented by an individual "Print Order" for each job placed with the contractor. The print order, when issued, will indicate the quantity to be produced and any other information pertinent to the particular order.

PREAWARD SURVEY: In order to determine the responsibility of the prime con- tractor or any subcontractor, the Government reserves the right to conduct a preaward survey or to require other evidence of technical, production, mana-gerial, financial, and similar abilities to perform, prior to the award of a contract.

PRIOR TO AWARD: A meeting will be held at the U.S. Attorney's Office, prior to actual award, to go over the provisions of the contract and establish initial contact with the Agency.

The Government may require, prior to award, the production of a brief as submitted by the Department to check contractor conformance with schedule and quality requirements.

PAYMENT: The contractor shall submit a copy of their billing to.:

U.S. Department of Justice, Appeals Unit

Appeals Briefs
2231-S

| For Criminal Briefs | For Civil Briefs |
|---|---|
| U.S. Department of Justice | U.S. Department of Justice |
| One St. Andrew's Plaza, Room 844 | 86 Chambers Street, 3rd Floor |
| New York, NY 10007 | New York, NY 10007 |

After review and approval submit vouchers to: Comptroller, Stop FMCE, Office of Financial Management, U.S. Government Printing Office, Washington, D.C. 20401.

NOTE:    ON EACH ORDER: One copy of the print order with a copy of contractor's billing must be sent to the U.S. Government Printing Office, New York Regional Procurement Office, 928 Jaymore Road Suite A-190; Southampton, PA 18966 ATTN: Program Section.

### PAYMENT BY ELECTRONIC FUNDS TRANSFER (EFT)

Public Law 104-134 requires that payments made under a contract or purchase order must be made electronically.

Companies (contractors) doing business with GPO should complete Standard Form 3881 (ACH Vendor/Miscellaneous Payment Enrollment Form) and submit it to the U.S. Government Printing Office, Examination and Billing Branch (FMCS), Washington, DC 20401.

SF-3881 is available from FMCS by calling (202) 512-0992or 0993 FAX (800) 245-5476 (no collect calls). Changes in company or financial institution information presently on file should be submitted to the same office.

Contractors that do not have an account at a financial institution or authorized payment agent must certify to such circumstances, in writing, to the Assistant Comptroller, Accounting Division, FMCS. The acceptance of these certificates by GPO will terminate on January 1, 1999, when all contractors will be paid through EFT.

LIMITATION OF PERFORMANCE AND CONTRACTOR OBLIGATIONS: Funds are available for performance of this contract for the first program period only.  The amount of funds at award is not considered sufficient for performance required for any program year other than the first program year.  When additional funds are available for the full requirements for the next succeeding program year, the Contracting Officer shall, not later than 60 calendar days before the expiration of the program year for which performance has been funded (unless a later day is agreed to), so notify the contractor in writing.  Notification that funds are not available shall effect cancellation of the contract.

The Government is not obligated to the contractor for any amount over requirements for which funds have been made available and as obligated by each print order.

The contractor is not obligated to incur costs for the performance required for any program year after the first unless and until written notification is received from the Contracting Officer of an increase in availability of funds. If so notified, the contractor's obligation shall increase only to the extent contract performance is required for the additional program year for which funds have been made available.

If this contract is terminated under the "Termination for Convenience of the Government" clause, "total contract price" in that clause means the amount available for performance of this contract, as provided for in this clause. The term "Work in Process" in that clause means the work under the program year requirements for which funds have been made available.  If the contract is terminated for default, the Government's rights under this contract shall apply to the entire multiyear requirements.

Notification to the contractor of an increase or decrease in the funds available for performance of the contract under another clause (e.g. the "Option" or "Changes" clause) shall not constitute the notification required by the first paragraph of this clause.

This procedure shall apply for each successive program year.

ORDERING: Items to be furnished under the contract shall be ordered by the issuance of print orders by the Government. Orders may be issued under the contract from Nov. 1, 2006 through Oct. 31,2007. All print orders issued hereunder are subject to the terms and conditions of the contract. The contract shall control in the event of conflict with any print order. A print order shall be "issued" for purposes of the contract, when it is either deposited in the U.S. Postal Service mail or otherwise furnished to the contractor in conformance with the schedule.

REQUIREMENTS: This is a requirements contract for the items and for the period specified herein. Shipment/delivery of items or performance of work shall be made only as authorized by orders issued in accordance with the clause entitled "Ordering". The quantities of items specified herein are estimates only, and are not purchased hereby. Except as may be otherwise provided in this contract, if the Government's requirements for the items set forth herein do not result in orders in the amounts or quantities described as "estimated", it shall not constitute the basis for an equitable price adjustment under this contract.

Except as otherwise provided in this contract, the Government shall order from the contractor all the items set forth which are required to be purchased by the Government activity identified on page 1.

The Government shall not be required to purchase from the contractor, requirements in excess of the limit on total orders under this contract, if any.

Orders issued during the effective period of this contract and not completed within that time shall be completed by the contractor within the time specified in the order, and the rights and obligations of the contractor and the Government respecting those orders shall be governed by the terms of this contract to the same extent as if completed during the effective period of this contract.

If shipment/delivery of any quantity of an item covered by the contract is required by reason of urgency prior to the earliest date that shipment/delivery may be specified under this contract, and if the contractor will not accept an order providing for the accelerated shipment/delivery, the Government may procure this requirement from another source.

The Government may issue orders which provide for shipment/delivery to or performance at multiple destinations.

Subject to any limitations elsewhere in this contract, the contractor shall furnish to the Government all items set forth herein which are called for by print orders issued in accordance with the "Ordering" clause of this contract.

## SECTION 2.- SPECIFICATIONS

SCOPE: These specifications cover the production of appeals briefs and appendices requiring such operations as copy pickup, composition and makeup from department supplied diskette(s), preparation of indexes on some orders, printing, binding, packing, distribution and return of government furnished materials

TITLE: Appeals Briefs and Appendices

FREQUENCY OF ORDERS: Approximately 300 Briefs and 150 Appendices

BRIEFS—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 200 copies per order with an average of 40 copies per order. Approximately 10 to 132 pages plus cover per order with an average of 40 pages per order Approximately 1 to 20 pages of index or table of contents per order.

APPENDICES—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 40 copies per order with a average of 20 copies per order. Approximately 8 to 1334 pages per order plus cover per order.

GOVERNMENT TO FURNISH: typewritten manuscript copy with computer diskettes or the Government will send copy by modem. Contractor must have the ability to receive by 56-k modem, E-mail or the Internet. Software program WordPerfect 8.0 or later will be used at the Government's discretion. Camera copy for text of Appendices and occasionally for Briefs.

Contractor must have the equipment compatible for use with the above software program and must have sufficient back-up equipment.

Occasionally the Government will supply pre-printed 8-1/2 x 11" pages which the contractor will be required to collate, typeset a cover, trim to finished size and bind.

Identification markings such as register marks, ring folios, rubber stamped jacket numbers, commercial identification marks of any kind, etc., except GPO imprint, form number, and revision date, carried on copy or film, must not print on finished product.

CONTRACTOR TO FURNISH: All materials and operations, other than those listed under "Government to Furnish," necessary to produce the product(s) in accordance with these specifications.

COMPOSITION: The entirety of each category of composition (text, tabular and display) must be identical throughout the products ordered under these specifications.

Composition must be computer output via laser printer, imagesetter or by photocomposition.

> Output resolution for laser printers will be 300 to 625 dots per inch and imagesetters will be will be 1,200 to 3,500 dots per inch.

> Photocomposition includes all typesetting product by photographically creating the characters on sensitized film or paper.

Type Page Size: For Briefs, approximately 25 x 43 picas plus folio, facing pages can be one or two lines long or short to accommodate make up and page breaks.

Typefaces and Sizes: The contractor is required to furnish the following:

> Cover: 12 to 72 point Century and Spartan Heavy.
> Text, Index, Table of Contents, and Footnotes: 12 point Century with italic, bold, and small caps.
> Display: 14 point Spartan Heavy.

00000257

Composition will be required on covers, table of contents, and text of Briefs and covers and table of contents of Appendices. Camera copy will be furnished for text of Appendices and occasionally for a percentage of text for Briefs.

No alternate typefaces will be allowed; however, manufacturers' generic equivalents will be accepted for the above typefaces. Each bidder shall list in the bid the name of the generic equivalent typeface(s) and composing machine to be used.

The GPO reserves the right to require samples of any generic equivalent typefaces offered if it is deemed necessary in order to determine the suitability of the offered typefaces.

The contractor must hold all repro for 60 days after delivery for possible use in reprints. After 60 days it may be disposed of.

FILMS/REPRODUCIBLES: The contractor must make all films/reproducibles required.

PROOFS: During the normal workday the contractor must deliver one set of page proofs and any revised page proofs. The contractor must also be able to transmit proofs and receive corrected proofs by facsimile.

On occasion, representatives of the government will read proofs at the contractor's plant. A suitable work place will be provided by the contractor.

The contractor will be responsible for performing all necessary proofreading to ensure that the proofs are in conformity with the copy submitted.

Page reader's proofs must be clean on white paper, free of ink smudges, with all images clearly legible. All proofs must be collated in sets, numbered sequentially, and have a one-inch clear margin on all sides. Proofs must be identified with the jacket number, program number, print order number, and proof date, at least 1/2" from the type area. The contractor's firm name must not appear on any proofs.

Page and Revised Page Proofs: Proofs must be uniform in size and contain a single page to a sheet. When pages contain space allowance for illustrations, an identifying illustration number must be marked in the space allowed. Tables on one set of proofs must be completely ruled.

If any contractor's errors are serious enough in the opinion of the GPO to require revised proofs, the revised proofs are to be provided at no expense to the Government. No extra time can be allowed for this reproofing; such operations must be accomplished within the original production schedule allotted in the specifications.

The contractor must not print prior to receipt of an "OK to print." Contractor will receive OK by phone or by facsimile.

STOCK/PAPER: The specifications of all paper furnished must be in accordance with those listed herein or listed for the corresponding JCP Code numbers in the "Government Paper Specification Standards No. 10" dated July 1994.

All text paper used in each copy must be of a uniform shade. All cover paper must have the grain parallel to the spine.

Text: White Antique Book, grammage 67 g/m$^2$ (basis weight: 45 lbs per 500 sheets, 25 x 38"), equal to JCP Code A100.

Cover: White and Colored (usually, but not limited to, Red, Gray, Green, and Blue) Vellum-Finish Cover, grammage 175 g/m$^2$ (basis weight: 65 lbs per 500 sheets, 20 x 26"), equal to JCP Code L20.

Occasional orders may require the use of pressure sensitive cover stock (same as listed above) for the correction of minor errors, stock must have permanent adhesive. Stock to be equal to "Starliner" by Mactac with special permanent adhesive or Fasson "Crack 'n Peel" Plus with super permanent adhesive.

RINTING: Print head to head in black ink. All orders may be printed by electro-static copying or by printing with irect image plates provided that the quality levels are maintained.

NK: If lithographic ink is used in the performance of this contract, the ink shall contain not less than the following ercentages of vegetable oil: sheet- fed and forms ink, 20 percent.

or Appendices, the contractor will be required to mechanically number the pages. This shall be accomplished by a umbering machine consisting of 1 or 2 letters followed by up to 4 digits. All characters are to be 3/16" or 1/4" high. The umbered text is then used as camera copy.

1ARGINS: Briefs: 1" on all sides.

INDING: Perfect- or adhesive-bind products: Gather contractor printed and/or Department supplied printed material, erfect- or adhesive-bind with separate wraparound glued-on paper cover, and trim three sides. Covers trim flush.

ACKING: Pack in shipping containers. Each shipping container must not exceed 45 pounds when fully packed.

ABELING AND MARKING (Package and/or Container label): Reproduce shipping container label from furnished pro, fill in appropriate blanks and attach to shipping containers.

ISTRIBUTION: Deliver f.o.b. destination to the following addresses:

U.S. Department of Justice       U.S. Department of Justice
One St. Andrew's Plaza            86 Chambers Street , 3rd Floor
New York, NY 10007               New York, NY 10007

SIDE PICKUP AND DELIVERY TO ROOM NUMBER SPECIFIED IS REQUIRED.

1ere will be one additional address in Manhattan.

)mplete addresses and quantities will be furnished with the print orders.

l expenses incidental to returning materials, submitting proofs, and furnishing sample copies must be borne by the ntractor.

ETURN OF GOVERNMENT FURNISHED MATERIAL, ETC: The contractor shall within 10 days of delivery of :h brief, return to the Department the corrected version (i.e., the version as printed) of each brief on 3.5" diskette. This rrected version (hereinafter "corrected version file") shall be in WordPerfect 8.0 or higher as directed by the vernment.

so .pdf file(s) in Acrobat 3.0 Reader for use in CD-ROM production, files must be identical to the printed version from ntractor's application program files, e.g., using Macintosh platform, QuarkXPress, Adobe PageMaker, etc. or using ndows platform, QuarkXPress, Adobe PageMaker, Adobe FrameMaker, etc.

quired formatting of the corrected version file: Justification shall be Full or Left; Base Font shall be Courier; Line acing shall be one; paragraphs shall be separated by 2-points or more leading between lines and 6-points or more ween paragraphs (tabular or spaced first-line indentations are permissible); lines within paragraphs shall end with Soft :urns, not Hard Returns; block quotations shall be left/right indented paragraphs; footnote markers in text and )tnotes shall be in standard WordPerfect format.

permissible Formatting: Character font codes other than the Base Font shall be removed; center Justification codes all be removed; other formatting codes added during the conversion process, if any, other than as required above, shall removed.

HEDULE: Adherence to this schedule must be maintained. Contractor must not start production of any job prior to eipt of the individual print order (GPO Form 2511). No definite schedule for pickup of material can be predetermined. nished material and proofs must be picked up from and delivered to the addresses under DISTRIBUTION.

hould be noted that the performance period specified by the Government consists of contract  workdays Monday )ugh Friday, from 9:00 a.m. to approximately 10:00 p.m..

: Contractor may be required to work on up to 4 briefs or appendices (up to 100 pages per order) in one day and ntain work schedules.

Contractor will be notified for pick up of initial copy and/or diskette(s) or Government will notify contractor that copy will be sent by modem as set forth below.

### BRIEFS

Regular Schedule (non-Overtime): Contractor will be required to pickup copy and diskettes or be available to receive copy by electronic means between the hours of 9:00am to 12:00pm and to process copy and deliver typeset page proofs (up to 100 pages per brief) back to the agency within 4 hours.

Contractor will be required to pick up corrected page proofs or receive by facsimile during contract workday hours, make corrections and deliver (or facsimile) corrected set of page proofs back to the Department within one (1) hours of receipt.

Additional changes may be made by the agency up to 4 additional times per brief and the Contractor must turnaround each change within 30 minutes of receipt of change/

After receiving "OK to print," contractor will print, bind, and deliver 40 copies (up to 100 pages per brief) within 2 hours.

In the event that the contractor is responsible only for printing the cover and binding the brief, in one of two format, a copy of the text of the brief shall be provided by the Department to the contractor. After receiving the text of the brief and an "OK to print," the contractor shall make the requisite copies of the text of the brief and bind and trim to size and deliver 40 copies within 2 hours. Trim sizes will either be 8-1/2 x 11" or 6-1/8 x 9-1/4

### APPENDICES

Regular Schedule (Non-Overtime): The contractor will be required to pick up copy, typeset cover and table of contents, number pages, print, and deliver 20 copies of up to 500 pages.

This should be a 2-step process:
    1) Contractor prepares a "dummy" appendix (no cover or table of contents), just numbered pages in a temporary binding. This should take no more than 24 hours.
    2) When appendix is in final form (including cover and table of contents), contractor is given "OK" to print. Deliver 20 copies of up to 500 pages within 4 hours.

If receipt of material, from the Government, occurs such that contractor cannot perform above schedule during normal workday hours, contractor will perform such work during the following workday or on overtime if overtime is authorized by the Government.

**NOTE: Overtime shall apply to any work performed after 10:00pm or on weekends or Federal Holidays resulting from delays caused by the agency. No overtime payment will be paid because of contractor's failure to meet the schedule..**

**Overtime Schedule:  When the Government requires that work be performed Monday thru Friday after 10:00pm Saturdays, Sundays, and Federal holidays, in order to meet delivery requirements, overtime payments will be paid for at the hourly overtime rate in accordance with the contractor's offered hourly rate in the "Schedule of Prices". Contractor and agency must agree on the number of hours of overtime necessary to complete the job and this must be shown on the print order or attachment. No overtime will be paid if proof of agreement on the number of hours is not attached to the print order.**

**CONTRACTORS PLEASE NOTE: CONTRACTOR MAY NOT REFUSE TO WORK OVERTIME.**

SERVICE AND FILING OF BRIEFS AND APPENDICES BY CONTRACTOR: At Government's Option:

For each brief and/or appendix prepared by the Contractor with respect to which a request is made by the Government, the Contractor shall, in a manner consistent with the requirements of the United States Court of Appeals for the Second Circuit, serve two copies of the brief and/or 1 copy appendix on each party designated by the Government and timely file in the Court of Appeals the original and the appropriate number of copies of the brief and/or appendix. Service will generally be by mail, but personal service may be required. Absent a request by the Government that a particular brief and/or appendix be served and filed by the Contractor, the Contractor shall deliver to the Government the number of copies of the brief and/or appendix specified in the print order form.

If personal service is required, and the party is located more than 25 miles from the contractor's office, the Government will pay actual charges at cost without mark-up.

00000261

### SECTION 3.- DETERMINATION OF AWARD

The Government will determine the lowest bid by applying the prices offered in the "Schedule of Prices" to the following units of production which are the estimated requirements to produce 12 months orders under this contract. These units do not constitute, nor are they to be construed as, a guarantee of the volume of work which may be ordered for a like period of time.

OVERTIME PAYMENTS: Orders requiring production on Saturdays, Sundays, Federal holidays, or Monday thru Friday after 10:00pm in order to meet delivery requirements will be paid for at the overtime rate in accordance with the contractor's offered hourly rate in the "Schedule of Prices".

All other orders will be placed with the required schedule and paid for at the basic prices offered.

It is estimated that 15% of the orders placed on this contract will require an overtime schedule and,

The following item designations correspond to those listed in the "Schedule of Prices".

#### CATEGORY 1

| | |
|---|---|
| I. (a)(1) | 310 |
| (2) | 170 |
| (b) | 106 |
| (c) | 10106 |
| (d) | 318 |
| (e) | 15780 |
| (f) | 34234 |
| (g) | 2052 |
| (h) | 200 |
| (i) | 0 |
| (j) | 50 |
| | |
| II. (a) | 1,327 |
| (b) | 165,996 |
| (c)(1) | 10 |
| (2) | 0 |
| (d) | 14 |
| | |
| III. (a) | 255 |
| (b) | 348 |
| (c) | 255 |

IV  100

## SECTION 4.- SCHEDULE OF PRICES

**SUBMISSION OF OFFERS AND EVALUATION:** The offer shall be based upon supplying paper that meets or exceeds the minimum percentage of waste paper as required by this solicitation. By submission of an offer, offerors are certifying that the paper to be supplied contains at least the minimum percentage specified. This certification concerns a matter within the jurisdiction of an agency of the United States, and the making of a false, fictitious, or fraudulent certificate on may render the maker subject to prosecution under Title 18, United States Code, Section 1001. he Government reserves the right to require proof of such certification prior to first delivery and thereafter as may be otherwise provided for under the provisions of the contract.

Bids offered are f.o.b. destination.

Prices must include the cost of all required materials and operations for each item listed in accordance with these specifications.

Bidder must make an entry in each of the spaces provided. Contractor must submit a price for all items. A No Charge or a No Bid may be cause for your bid to be declared nonresponsive. Bids submitted with any obliteration, revision, or alteration of the order and manner of submitting bids, may be declared nonresponsive.

Bids submitted with NB (No Bid) or blank spaces for an item may be declared nonresponsive.

The Contracting Officer reserves the right to reject any offer that contains prices for individual items of production (whether or not such items are included in the Determination of Award) that are inconsistent or unrealistic in regard to other prices in the same offer or to GPO prices for the same operation if such action would be in the best interest of the Government.

All vouchers submitted to the GPO shall be based on the most economical method of production.

Fractional parts of 10 will be prorated at the per 10 rate.

<u>Prices must be submitted for the entire term of the contract and bids qualified for a lesser period will not be considered.</u>

(Initials)

USCA Case #14-7077    Document #1530697    Filed: 01/07/2015    Page 264 of 604

Appeals Briefs.                                                    Page 13 of 15
2231-S

I.    COMPOSITION AND PAGE MAKEUP:

(a) Cover pages:

   (1) Brief (6-1/8 x 9-1/4")...............per page............$ 10.00

   (2) Appendix (8-1/2 x 11")...............per page............$ 10.00

(b) Text page: Contractor set from manuscript copy.....per page.....$ 10.00

(c) Text page: Department supplied diskette(s)..per page............$ 5.50

(d) Remake of pages due to editorial changes....per page............$ 3.50

(e) Page proofs.................................per page............$ .25

(f) Authors alterations* (flat charge for access
   to file). Offer must include, and a charge
   will be allowed for, locating each deletion,
   change or addition in the file..............per alteration......$ .25

      *Alterations may consist of the addition or deletion of one or more words or phrases (groups of words within a
      single sentence), these will be considered as one alteration. <u>The maximum charge allowable for author's alterations
      on any one page shall be an amount equal to the cost of setting that page from manuscript copy.</u>

(g) Insertion of reference page numbers on
   Table of Contents or Index from edited
   page proofs.................................per line............$ .25

(h) Return to the Department the corrected version
   (i.e., the version as printed) of each brief
   on 3.5" diskette. This corrected version
   (hereinafter "corrected version file") shall
   be in WordPerfect 6.1.......................per diskette........$ 1.75

(i) .pdf file production using Acrobat 3.0 Reader
   for use in CD-ROM production, files must be
   identical to the printed version of text....per page............$ 5.50

(j) Diskette for .pdf file(s) above.............each...............$ 1.75

_____
(Initials)

II.   COMPLETE PRODUCT: Prices offered shall include the cost of all required materials and operations (EXCEPT Items I. and III.) necessary for the complete production and distribution of the product listed in accordance with these specifications.

### NOTE: RUNNING RATE IS PER 10 COPIES

|  | Running Per 10 Copies |
|---|---|
| Includes makeready if required: | |
| (a) Complete cover (wraparound)..............................$ | 6.00 |
| (b) Text per page........................................ ........$ | .35 |
| (c) Pressure sensitive cover stock (up to 8-1/2 x 11"): | |
| (1) White....................................per 100 leaves.....$ | 12.50 |
| (2) Colored...............................per 100 leaves.....$ | 12.50 |
| (d) Collating, trimming to size and binding    per 100 pages    $ | 12.25 |

III. SERVICE AND FILING OF BRIEFS AND APPENDICES BY CONTRACTOR: At Government's Option:

| | |
|---|---|
| (a) Filing brief and any appendices or attachments at court and on one party....................................$ | 50.00 |
| (b) Each additional service.....................................$ | 0.00 |
| ( c) Electronic filing of Briefs ...........................$ | 30.00 |

IV. OVERTIME PAYMENTS:

Hourly rate for work performed after 10:00pm on weekdays, Saturday, Sunday and Federal Holidays......per hour.............$ 95.00

It is estimated that 15% of the orders placed on this contract will require an overtime schedule .

SECTION 4.- TYPEFACES: If manufacturers generic equivalent typefaces are proposed, the bidder must list on the line of the same number as the preferred typeface, the name of the equivalent typeface and composing machine to be used.

Preferred Typefaces:

1. Century

2. Spartan Heavy

Manufacturers Generic
Equivalent Typefaces            Name of Composing Machine

1._____    _____

2._____    _____


BIDDERS NAME AND SIGNATURE: Fill out and return Two (2) copies of all pages in "Section 4.- Schedule of Prices", initial or sign each in the space provided and submit with GPO Form 910, "Bid". Do not enter bid prices on GPO Form 910. NOTE: The schedule of prices will prevail in instances where prices are inadvertently entered on GPO Form 910.

Bidder _Record Press, Inc.___

_229 West 36th 8th Fl. NY, NY. 10018_
                      (City - State)

By _Hugh A. Wilmot Jr. President_
     (Signature and title of person authorized to sign this bid)

_Hugh A. Wilmot    212-619-4949_
(Person to be contacted)    (Telephone Number)

The contractor is cautioned not to perform any operation(s) or produce any product(s) for which a price has not been offered under the contract. Further, the contractor is not to accept print orders which are outside the scope of the contract. If such orders are placed, contractor is to notify GPO New York immediately. Failure to do so may result in nonpayment.

RP000069

TITLE: APPEALS BRIEFS

| ITEM NO. | DESCRIPTION | | BASIS OF AWARD | Contr #1 - E&I COUNSEL PRESS NEW YORK UNIT RATE | COST | Contr #2 - G&I RECORD PRESS NEW YORK UNIT RATE | COST | Contr #3 - I4I WEST LEGAL NEW YORK UNIT RATE | COST | Contr #4 - K4I CURRENT CONTRACT UNIT RATE | COST | Contr #5 - M4I UNIT RATE | COST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | COMPOSITION AND PAGE MAKEUP | | | | | | | | | | | | |
| a | COVER PAGE | | 8 | | | | | | | | | | |
| 1 | BRIEF (8-1/8 X 9-1/4") | PER PAGE | 310 | 9.00 | 2,790.00 | 10.00 | 3,100.00 | 6.50 | 2,015.00 | 6.50 | 2,015.00 | | |
| 2 | APPENDIX (8-1/2 X 11") | PER PAGE | 170 | 9.00 | 1,530.00 | 10.00 | 1,700.00 | 6.50 | 1,105.00 | 6.50 | 1,105.00 | | |
| b | TEXT PAGE: MANUSCRIPT COPY | PER PAGE | 108 | 10.00 | 1,080.00 | 10.00 | 1,080.00 | 7.00 | 742.00 | 7.00 | 742.00 | | |
| c | TEXT PAGE: SUPPLIED DISK | PER PAGE | 10106 | 7.90 | 79,837.40 | 4.00 | 40,424.00 | 4.00 | 40,424.00 | 4.00 | 40,424.00 | | |
| d | REMAKE OF PAGES | PER PAGE | 318 N/C | | | 3.00 | 954.00 | N/C | | N/C | | | |
| e | PAGE PROOFS | PER PAGE | 15780 | 1.00 | 15,780.00 | 0.20 | 3,156.00 | 0.20 | 3,156.00 | 0.20 | 3,156.00 | | |
| f | AUTHOR'S ALTERATIONS | PER ALTERATION | 34234 N/C | | | 0.25 | 8,558.50 | N/C | | N/C | | | |
| g | INSERTION OF REFERENCE PAGE NUMBERS | PER LI | 2052 N/C | | | 0.20 | 410.40 | N/C | | N/C | | | |
| h | RETURN TO THE DEPT. CORRECTED | | | | | | | | | | | | |
| i | VERSION OF EACH BRIEF | PER DISKETTE | 200 N/C | | | 1.50 | 300.00 | N/C | | N/C | | | |
| | PDF FILE PRODUCTION USING ACROBAT 3.0 | | | | | | | | | | | | |
| j | READER FOR USE IN CD-ROM | PER PAGE | | 0.25 | | 5.00 | | 5.00 | | 5.00 | | | |
| | DISKETTE FOR PDF FILE ABOVE | EACH | 50 N/C | | | 1.50 | 75.00 | N/C | | N/C | | | |
| II | COMPLETE PRODUCT | | | | | | | | | | | | |
| a | COMPLETE COVER | PER 10 COPIES | 1327 | 3.00 | 3,981.00 | 5.50 | 7,298.50 | 5.50 | 7,298.50 | 5.50 | 7,298.50 | | |
| b | TEXT PER PAGE | PER 10 COPIES | 165966 | 0.50 | 82,988.00 | 0.30 | 49,788.80 | 0.20 | 33,199.20 | 0.20 | 33,199.20 | | |
| c | PRESSURE SENSITIVE COVER STOCK | | | | | | | | | | | | |
| 1 | WHITE | PER 100 LEAVES | 10 N/C | | | 12.00 | 120.00 | N/C | | N/C | | | |
| d | COLOR | PER 100 LEAVES | 10 N/C | | | 12.00 | 120.00 | N/C | | N/C | | | |
| e | COLLATING, TRIMMING TO SIZE AND BINDING | PER 100 PAGE | 14 | 6.50 | 91.00 | 12.00 | 168.00 | 5.00 | 70.00 | 5.00 | 70.00 | | |
| III | SERVICE AND FILING OF BRIEFS | | | | | | | | | | | | |
| a | FILING BRIEF AND ANY APPENDICES OR ATTACHMENTS A COURT AND ON ONE PARTY | | 255 | 20.00 | 5,100.00 | 50.00 | 12,750.00 | N/C | | N/C | | | |
| b | EACH ADDITIONAL SERVICE | | 348 N/C | | | N/C | | N/C | | N/C | | | |
| c | ELECTRONIC FILING OF BRIEFS EACH | | 255 | | | 30.00 | 7,650.00 | N/C | | N/C | | | |
| IV | OVERTIME PAYMENT | | | | | | | | | | | | |
| a | HOURLY RATE FOR WORK PERFORMED AFTER 10:00PM ON WEEKDAYS, SATURDAY, SUNDAY AND FEDERAL HOLIDAYS | PER HOUR | 100 | 150.00 | 15,000.00 | 95.00 | 9,500.00 | N/C | | N/C | | | |
| | CONTRACTOR TOTALS | | | | $208,167.40 | | $147,023.20 | | $88,009.70 | | $88,009.70 | | |
| | DISCOUNT | | | | | | | 2.00% | $1,780.19 | | | | |
| | DISCOUNTED TOTALS | | | | $208,167.40 | | $147,023.20 | | $86,249.51 | | $88,009.70 | | |

00000267

00000268

# EXHIBIT 3

00000269

CONFIDENTIAL

Burke, Brian                                                      May 25, 2010

Page 1

```
 1               UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLUMBIA


 3    - - - - - - - - - - - - - - - X

      UNITED STATES ex rel.          :

 4    BRIAN BURKE,                    :   Civil Action No.

              Plaintiff,             :   1:08-CV-00364(EGS)

 5        v.                         :

      RECORD PRESS, INC.,            :

 6           Defendant.              :   CONFIDENTIAL

      - - - - - - - - - - - - - - - X

 7

 8                            Washington, D.C.

 9                            Tuesday, May 25, 2010

10

11           Deposition of BRIAN BURKE, a witness

12    herein, called for examination by counsel for

13    Defendant in the above-entitled matter, pursuant

14    to notice, the witness being duly sworn by SUSAN

15    L. CIMINELLI, a Notary Public in and for the

16    District of Columbia, taken at the offices of

17    McKenna Long & Aldridge, LLP, 1900 K Street,

18    N.W., Washington, D.C., at 9:18 a.m., and the

19    proceedings being taken down by Stenotype by

20    SUSAN L. CIMINELLI, CRR, RPR.

21

22
```

00000270

CONFIDENTIAL

Burke, Brian                                                                              May 25, 2010

| | | Page 2 |
|---|---|---|
| 1 | APPEARANCES: | |
| 2 | | |
| 3 | On behalf of the Plaintiff: | |
| 4 | TYLER JAY KING, ESQ. | |
| 5 | 1420 N Street, N.W. | |
| 6 | Suite 706 | |
| 7 | Washington, D.C. 20005 | |
| 8 | 202-436-2641 | |
| 9 | tylerking@gmail.com | |
| 10 | | |
| 11 | On behalf of the Defendant: | |
| 12 | JOHN W. LOMAS, ESQ. | |
| 13 | WILLIAM T. O'BRIEN, ESQ. | |
| 14 | McKenna Long & Aldridge, LLP | |
| 15 | 1900 K Street, N.W. | |
| 16 | Washington, D.C. 20006 | |
| 17 | 202-496-7183 | |
| 18 | jlomas@mckennalong.com | |
| 19 | wobrien@mckennalong.com | |
| 20 | | |
| 21 | | |
| 22 | | |

| | | Page 3 |
|---|---|---|
| 1 | ALSO PRESENT: | |
| 2 | Sal Napolitano, Videographer | |
| 3 | Henry Kegan, Paralegal | |
| 4 | Hugh Wilmont, Jr. | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |

Page 4

1     C O N T E N T S
2  WITNESS: BRIAN BURKE                    PAGE
3      By Mr. Lomas                    7
4
5
6         E X H I B I T S
7  NUMBER      DESCRIPTION            PAGE
8  Exhibit 001  Notice of Video Deposition of
9            Relator Brian Burke        20
10 Exhibit 002  LexisNexis              28
11 Exhibit 003  Complaint 09CIV3291         32
12 Exhibit 004  Memorandum of Opinion and Order 09
13            Civ. 3291              38
14 Exhibit 005  Notice of Motion 09 CIV. 3291    46
15 Exhibit 006  08-4071-cv Appeal of SDNY Court
16            Dismissal              57
17 Exhibit 007  KenmoreAssCriminal Landlord blog  62
18 Exhibit 008  U.S. District Court 1:98-cv-00975
19            -SJ-CLP                75
20 Exhibit 009  Westlaw Pirro v. Brian T. Burke   78
21 Exhibit 010  Defendant's First Set of
22            Interrogatories to Relator B. Burke  89

Page 5

1     E X H I B I T S   (CONTINUED)
2  NUMBER      DESCRIPTION            PAGE
3  Exhibit 011  Plf's Objections and Answers to
4            1st Set              89
5  Exhibit 012  Verified Complaint Filed under Seal  109
6  Exhibit 013  5/8/09 Letter to Schumer from Burke  120
7  Exhibit 014  Declaration of Brian Burke in
8            Opposition to Defendant's Motion
9            for Summary Judgment        132
10 Exhibit 015  Invoice #A71701           134
11 Exhibit 016  Invoice #A71700           136
12
13
14
15
16
17
18
19
20
21
22

Henderson Legal Services, Inc.

202-220-4158                                          www.hendersonlegalservices.com

00000271

CONFIDENTIAL

Burke, Brian                                                                                                                    May 25, 2010

Page 6

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  This marks the
3    beginning of tape number 1 in the deposition of Brian
4    Burke in the matter of the United States ex rel.
5    Brian Burke, plaintiff, versus Record Press, Inc.,
6    defendant in Civil Action Number 1:08-CV-00364(EGS)
7    entitled -- filed in the United States District Court
8    for the District of Columbia, and held in the offices
9    of McKenna, Long & Aldridge, 1900 K Street,
10   Northwest, Washington, D.C. on Tuesday, May 25, 2010
11   at the time indicated on the video screen, currently
12   9:18.  The court reporter is Susan Ciminelli.  The
13   videographer is Sal Napolitano, both on behalf of
14   Henderson Legal Services.
15       Will the attorneys introduce themselves
16   and then the reporter will swear in the witness.
17       MR. LOMAS:  John Lomas, counsel for Record
18   Press.
19       MR. O'BRIEN:  William O'Brien, counsel for
20   Record Press.
21       MR. KING:  Tyler King, counsel for the
22   plaintiff, Brian Burke.

Page 7

1        MR. WILMONT:  Hugh Wilmont, president of
2    Record Press.
3        MR. KEGAN:  Henry Kegan, paralegal,
4    McKenna Long & Aldridge.
5    Whereupon,
6            BRIAN T. BURKE,
7    was called as a witness by counsel for Defendant, and
8    having been duly sworn by the Notary Public, was
9    examined and testified as follows:
10       EXAMINATION BY COUNSEL FOR DEFENDANT
11       BY MR. LOMAS:
12   Q.    I just want to make a couple brief
13   comments at the beginning.  Again, as we had
14   mentioned earlier, the parties have agreed to limit
15   both depositions, Mr. Burke's deposition and
16   Mr. Wilmont's deposition to a half day each.  Also
17   Record Press served Mr. Burke with interrogatories,
18   requests for admission, and document requests.  We
19   received Mr. Burke's response to the request for
20   admission at 7 p.m. last night.  Mr. Burke's
21   unverified response to the interrogatories a few
22   minutes after 9 p.m. and some document production at

Page 8

1    9:30 p.m.
2        We think that there is some deficiencies
3    with those responses, so we'll reserve our rights to
4    address those at a later time.  And we also
5    understand there is some additional documents,
6    financial documents we mentioned this morning, so as
7    we discussed, we'll reserve our right to keep the
8    deposition open in case there is anything that comes
9    up with those.  Good morning, Mr. Burke.
10   A.    Good morning.
11   Q.    Would you please state and spell your full
12   name for the record, please?
13   A.    Brian Thomas Burke, B-R-I-A-N,
14   T-H-O-M-A-S, B-U-R-K-E.
15   Q.    And where do you -- what's your current
16   address?
17   A.    145 East 23rd Street, Apartment 4-R.
18   Q.    And how long --
19   A.    New York, New York 10010.
20   Q.    And how long have you lived there?
21   A.    20 years.  Just over 20 years.
22   Q.    And what's your date of birth?

Page 9

1    A.    9-13-1961.
2    Q.    And Mr. Burke, have you ever been deposed
3    before?
4    A.    Yes.
5    Q.    How many times have you been deposed?
6    A.    I believe three times.
7    Q.    Okay.  So you're generally familiar with
8    the rules, but I'm going to go over just some, you
9    know, initial ground rules here to start with.  As
10   you know, I'll be asking you a series of questions
11   and remember that you're under oath and must answer
12   truthfully.  This is just like sworn testimony that
13   you would be giving in a courtroom.
14       The court reporter is going to be taking
15   down everything we say here, and so it's important to
16   say your answer out loud because the court reporter
17   won't be able to, you know, record nonverbal answers
18   such as a nod of the head and such.  And it's
19   important that you wait for the entire question
20   before answering, so the court reporter can get both
21   the question and the answer, and then potentially any
22   objection from your counsel.  And if you don't

3 (Pages 6 to 9)

00000272

CONFIDENTIAL

Burke, Brian                                                                                                    May 25, 2010

Page 10

1    understand my questions, any of the questions, could
2    you please just let me know?
3        A.    Yes.
4        Q.    And if you -- and if you don't let me
5    know, I'm just going to assume that you understand
6    the question. Is that okay?
7        A.    Yes.
8        Q.    And if at any time you need to take a
9    break, just let us know. I'll just ask that if there
10    is a question pending, we'll need to finish the
11    answer, and then we can see about taking a break.
12        A.    Yes.
13        Q.    And if we've moved away from one subject
14    and on to another, if you think of a clarification
15    for an answer you gave previously, just let us know
16    you'd like to clarify the earlier answer, and we can
17    do that while it's still in your mind.
18        A.    Yes.
19        Q.    And Mr. Burke, are you taking any
20    medications today that might make it difficult for
21    you to understand or answer my questions?
22        A.    No.

Page 11

1        Q.    Are you taking any medications at all
2    today?
3        A.    Just caffeine.
4        Q.    Have you had anything alcoholic to drink
5    in the last eight hours?
6        A.    No.
7        Q.    Okay. Are you sick at all today?
8        A.    No. To be honest, I have to be frank with
9    you that I'm a little tired. My schedule, I usually
10    work in the afternoons, and I did not get a full
11    night's sleep.
12        Q.    Okay. Are you -- are you currently under
13    doctor's care for any illnesses?
14        A.    What do you mean by illnesses?
15        Q.    Just any, you know, physical or mental
16    illness that you're under a doctor's care for?
17        MR. KING: Objection. Relevance.
18        THE WITNESS: I have allergies and I've
19    been treated for injuries on the job. You know,
20    normal flus.
21        BY MR. LOMAS:
22        Q.    Okay. Injuries on the job, does that

Page 12

1    include the back injury that I think you mentioned in
2    your interrogatories?
3        A.    Well, that -- oh, back -- well, that was
4    quite a while ago, yes. But that was, yes, that was
5    in the '90s.
6        Q.    Okay.
7        A.    But I had more recent injuries. I was
8    electrocuted on the job. I was out three months. It
9    was a serious injury. Some minor injures.
10        Q.    When was that?
11        A.    That was 2007, I believe.
12        Q.    Were you hospitalized for that?
13        A.    Just briefly. I went to St. Vincent
14    Hospital. I was electrocuted on a train trying to --
15    when I started -- I'm a train operator and when I
16    started the console, it was an electrical volt that
17    threw me up against the -- almost burnt off my thumb
18    and it was a severe injury.
19        Q.    And how long did you say you were out of
20    work for that?
21        A.    I was out approximately three months. And
22    that was Workers Comp. There was a settlement. So

Page 13

1    --
2        Q.    Any other illnesses in the past three
3    years?
4        A.    Illnesses? Again --
5        Q.    Or injuries?
6        A.    Injury. I did have an injury last year, a
7    sprain of my thumb from climbing up the side of what
8    they call the refuse train or the garbage train in a
9    very awkward position between a wall. And, you know,
10    I'm not as agile as I was in my youth, I guess.
11        Q.    Sure. Did you miss any time from work for
12    that?
13        A.    I missed two days.
14        Q.    Oh. Okay. Okay. Is there any reason
15    that you can think of that you would not be able to
16    answer the questions today fully and truthfully?
17        A.    Only if I don't have the answer.
18        Q.    Mr. Burke, can you tell me about your
19    education?
20        A.    Working backward or what?
21        Q.    Backwards, so starting from high school.
22    Or after?

4 (Pages 10 to 13)

Henderson Legal Services, Inc.

00000273

CONFIDENTIAL

Burke, Brian                                                                    May 25, 2010

Page 14

1    A.    Well, I graduated high school.  I went to
2  two different high schools.  Shamron High School in
3  Hollywood, Florida, my freshman and sophomore year.
4  Then my family moved to California.  I went to
5  Redwood High School for my junior and senior year.
6  Graduated from high school and then attended the
7  University of California Los Angeles for -- I
8  graduated from UCLA, a degree in economics.  And I
9  attended briefly the London School of Economics, but
10  didn't complete any course there.
11    Q.    And at UCLA, what year did you graduate?
12    A.    1984.
13    Q.    You said that was an economics degree?
14    A.    Yes.
15    Q.    And when did you go to the London School?
16    A.    Of Economics, in 1985.
17    Q.    Okay.
18    A.    I did re-enroll at UCLA after I graduated
19  in fact to earn another degree in psychology, and I
20  was accepted to do that, and -- but it turned out
21  I -- there was -- apparently I didn't apply to that
22  major early enough.  After a certain point of

Page 15

1  credits, there was some rules they said you couldn't
2  grant me an additional degree.  But I took the
3  classes any way.
4    Q.    So that was for another bachelor degree?
5    A.    That would have been another bachelor's
6  degree.  Yes.
7    Q.    And was that -- when you re-enrolled for
8  that, was that after you had already graduated or
9  1984 or --
10    A.    Yes, it would have been, yes, later part
11  of '84, '85.
12    Q.    Okay.
13    A.    And then later that year, in September, I
14  went to London School of Economics.
15    Q.    You said that you had moved in the middle
16  of high school from Florida to California.
17    A.    Yes.
18    Q.    How long had you lived in Florida?
19    A.    Seven, eight years.
20    Q.    Okay.  And then where did you live after
21  coming back from the London School of Economics?
22    A.    Came back to New York City.  My brother

Page 16

1  was living here at the time, and I stayed with him
2  for a while and moved into my present address.
3    Q.    Okay.  Do you have any military
4  experience?
5    A.    No.
6    MR. O'BRIEN:  Mr. Burke, if could you just
7  speak up a little bit.
8    THE WITNESS:  I'm sorry.
9    MR. O'BRIEN:  Thank you very much.
10    BY MR. LOMAS:
11    Q.    Okay.  And so when you moved to New York,
12  did you find employment?
13    A.    Yes.  I had different employment.  I did
14  some -- well, now we are talking, this is '86, '87.
15    Q.    Sure.
16    A.    You know, I was working, I was staying
17  with my brother.  I was working as a bookkeeper in
18  fact with his employer, John Hendricks, famous jazz
19  musician.
20    Q.    And then --
21    A.    And then later, I was working for the
22  parks department.  That was for a number of years.

Page 17

1  There was a large cut back in the early '90s, and I
2  had some sporadic -- basically sporadic employment
3  until my current employment, including three episodes
4  working with the Department of Commerce as a census
5  enumerator, and working for -- with the firm Peter
6  Vanilla & Associates as basically administrative
7  assistant, it was a management consulting firm for
8  large banks.
9    Q.    And that was Peter?
10    A.    Vanilla.
11    Q.    Okay.  And what was the position that you
12  had with the parks department?
13    A.    Basically just parks worker.  I was, I
14  guess, a per diem -- it was the civil service,
15  provisional.
16    Q.    And then have you ever been terminated
17  from any of your work?
18    A.    Terminated?  I guess laid off.
19    Q.    Laid off?
20    A.    Parks department, laid off.  Two-thirds of
21  the department in the early '90s.
22    Q.    Have you ever been fired for anything else

5 (Pages 14 to 17)

Henderson Legal Services, Inc.

00000274

CONFIDENTIAL

Burke, Brian                                                                                    May 25, 2010

Page 18

1    other than being laid off?
2         MR. KING:  Objection.  Relevance.
3         THE WITNESS:  Other than --
4    BY MR. LOMAS:
5    Q.    Yes, for a particular --
6    A.    Other than being laid off?
7    Q.    That's right.
8    A.    You mean terminated for cause?
9    Q.    Cause, exactly.
10   A.    No.
11   Q.    Have you ever been disciplined at work for
12   any reason?
13        MR. KING:  Objection.  Relevance.
14        MR. O'BRIEN:  Just, I'm sorry.  For the
15   record, Tyler, the relevance is not a proper
16   objection in a discovery deposition, so if you'd like
17   to object to form, or to anything that can be cured
18   now, that's fine, but relevance is just not a proper
19   objection, okay?
20        MR. KING:  Okay.
21        THE WITNESS:  Disciplined?  Let's see,
22   well, when I was working as a train operator, I got

Page 19

1    written up once for -- I believe I was written up.  I
2    couldn't find the record of it, but they did put a
3    document in front of me to sign saying I was rushing
4    in one injury I had on the garbage train.  Not the
5    one where I injured my thumb.  Dangerous train.
6         And I believe that's all.  I looked, in
7    fact, in the computer they are supposed to have what
8    they call -- I'm a shop steward, and so I'm very
9    familiar with their disciplinary procedure.  And in
10   the computer, they are supposed to have it on file.
11   It's called a disciplinary action notice, and in
12   fact, they have none for me, so I -- you know,
13   sometimes those records get lost.  I'm not
14   responsible for them.
15   Q.    Is that the only --
16   A.    Certainly that I'm aware of.  Sometimes
17   people get written up and they don't get noticed.
18   And somehow there is a disciplinary action on their
19   file that they are not aware of, maybe they didn't
20   do.  Of course, sometimes I help people, represent
21   people on those issues and sometimes those things
22   crop up, but I'm not aware of any other than that.

Page 20

1    Q.    Okay.  So -- and then you mentioned that
2    the train operator position and how long has that
3    been?
4    A.    Nine years, three months.
5    Q.    Okay.  And then were there any other --
6    any other places of employment other than the ones
7    that you've just mentioned?
8    A.    I can't really recall them.  You know, I
9    -- we're talking a while ago and I just --
10   Q.    You've never worked for the Government
11   Printing Office, is that right?
12   A.    No.  Never.
13   Q.    And you haven't worked for the defendant,
14   Record Press?
15   A.    Never.
16   Q.    I'm going to mark this Exhibit 1.
17        (Burke Exhibit No. 1 was
18        marked for identification.)
19   BY MR. LOMAS:
20   Q.    Mr. Burke, have you seen this document
21   before?
22   A.    I -- actually, no.

Page 21

1    Q.    This is the notice of video deposition for
2    you today, to be here today.  Just ask Mr. Burke to
3    stipulate -- or excuse me, Mr. King to stipulate that
4    the deposition notice, video deposition notice was
5    properly served?
6         MR. KING:  Counsel received it.
7         MR. LOMAS:  Thank you.
8    BY MR. LOMAS:
9    Q.    Mr. Burke, have you ever been married?
10   A.    No.
11   Q.    Do you have any children?
12   A.    Not give a smart answer, and I'll just say
13   no.
14   Q.    Okay.  So earlier you mentioned that
15   you've been deposed a few times before.  Could you
16   let me know about those depositions, please?
17   A.    Okay.
18   Q.    Just the first one.
19   A.    Let's see, well, that would be with the
20   government in the case, the underlying case, Brian
21   Burke versus Evans, Donald Evans, Secretary of
22   Commerce.  That would be the first one.  And then

Henderson Legal Services, Inc.

00000275

CONFIDENTIAL

Burke, Brian                                                                                    May 25, 2010

Page 22

1 twice by the MTA, I believe in -- what was it --
2 well, one in the case against Solomon Costa in the
3 MTA, New York City Transit. And then also -- there
4 was two. What was the other one? It was two with
5 the MTA. If I can remember, I'll --
6     Q.    So there were two depositions with the MTA
7 case?
8     A.    Actually, one I believe was New York City
9 Transit. And of course, that's an issue of whatever
10 degree they are separate. In my case, we are
11 strongly -- there's a dispute, but yeah, one was by
12 the MTA, Mr. Ching Wa Chin was the -- I guess
13 deposer, is it? And then the other one was done, New
14 York City Transit by -- I guess some guy who just
15 apparently does that for a living, and I don't
16 remember his name.
17    Q.    So were those depositions in the same
18 case?
19    A.    No.
20    Q.    So you've been involved in two different
21 cases with the MTA?
22    A.    Yes.

Page 23

1     Q.    Okay. And then what was the -- take the
2 first case with the MTA, what was --
3     A.    Oh, I guess the one involved the injury, I
4 guess. Was that -- yes. Okay. I'm trying to
5 remember. The first one, yeah, involved the -- they
6 blocked a -- me taking a loan from my 457 account
7 which, you know, that I was attempting to purchase a
8 property. And so I wasn't going to be able to
9 purchase it because of that, and I contended that
10 that was an unlawful act they did, and a seizure of
11 my account, my money.
12    Q.    When you refer to they, you mean --
13    A.    The MTA.
14    Q.    MTA, and that was your employer at the
15 time?
16    A.    Yes. And still is.
17    Q.    And when was that lawsuit filed?
18    A.    2007.
19    Q.    And do you know what court that was filed
20 in?
21    A.    Federal court. District court, Southern
22 District of New York.

Page 24

1     Q.    What was the result of that case?
2     A.    I guess recently it was dismissed in the
3 Second Circuit, which I guess I could do a motion for
4 reconsideration, petition the panel.
5     Q.    So it was -- so the Southern -- did the
6 Southern District initially dismiss it?
7     A.    Yes.
8     Q.    And then you appealed?
9     A.    For failure to plead. Although they
10 actually originally, they sent it to mediation. That
11 was an interesting case. They sent it to mediation
12 and for some reason, they changed their mind. They
13 actually assigned me an attorney and --
14    Q.    The court assigned you an attorney?
15    A.    Assigned me an attorney for mediation.
16 And it was -- a disagreement on the case and
17 apparently the court decided to dismiss it.
18    Q.    And then you appealed that court's
19 decision?
20    A.    Yes.
21    Q.    To the Second Circuit?
22    A.    Yes.

Page 25

1     Q.    And when was that appeal filed?
2     A.    Was it 2008?
3     Q.    And the Second Circuit affirmed the
4 court's decision, the Southern District's decision?
5     A.    Yes.
6           MR. O'BRIEN: Was that a yes, Mr. Burke?
7           THE WITNESS: Yes.
8           BY MR. LOMAS:
9     Q.    Okay. And then the second case with the
10 MTA. What was that about?
11    A.    That's currently in the Second Circuit.
12 That's about the Taylor Law, challenging the
13 constitutionality of it. That's actually -- it's
14 called the Taylor Law, but that's not the actual name
15 of the law. So I think they are calling it Mass
16 Public Employment Law, something. You can certainly
17 look that up.
18    Q.    Now, did you file that case as well?
19    A.    Yes.
20    Q.    So you're the plaintiff in that case?
21    A.    Yes. But I'm working with my union. And
22 some law professors on the case.

7 (Pages 22 to 25)

00000276

CONFIDENTIAL

Burke, Brian                                                                                          May 25, 2010

Page 26

1    Q.    Excuse me. I'm sorry. Is the union a
2  party?
3    A.    Not officially a party. They offered
4  moral support. There was the executive board passed
5  a unanimous motion supporting the case. I saw it. I
6  moved from calling it my case to our case, to the
7  sole plaintiff at this time. I don't know if we can
8  change that.
9    Q.    You're the sole plaintiff. And where was
10 that case originally filed?
11   A.    Same court. Southern District of New
12 York.
13   Q.    Okay. And then the other case you
14 mentioned you were deposed in, that was the Evans,
15 the case against Mr. Evans, the Commerce Secretary?
16   A.    Secretary of Commerce. Yes. I was
17 deposed. Yes.
18   Q.    And what kind of case was that?
19   A.    That was an employment discrimination,
20 Title VII.
21   Q.    And what court was that filed in?
22   A.    Same court. Southern District of New

Page 27

1  York.
2    Q.    And you were the plaintiff?
3    A.    Yes.
4    Q.    Were there any other plaintiffs in that
5  action?
6    A.    No.
7    Q.    Were you represented by counsel in that
8  case?
9    A.    No.
10   Q.    What was the nature of the discrimination
11 that you alleged?
12   A.    Well, they denied me -- it wasn't just me.
13 Myself and someone I was working with also, they
14 denied him as well -- he was a Vietnam veteran --
15 continued employment while the census was going on.
16 And as I mentioned, I was previously an enumerator.
17 I was a top scorer on the enumerator test, so I was
18 experienced and also I resigned from another job that
19 Peter Vanilla -- Peter Vanilla & Associates to take a
20 somewhat higher rate of pay job at the census.
21         And I did work with them for a while and
22 then right when the main enumeration, they just

Page 28

1  simply -- this one gentleman who was the crew leader
2  simply with some -- with some comments -- denied me
3  work. And so I believed -- I alleged it was for
4  reasons that -- as a cover person. And of course,
5  the court certainly disagreed with me, I guess.
6    Q.    The court dismissed the case, is that
7  right?
8    A.    The court dismissed the case. Yes.
9    Q.    I'd like to mark Exhibit 2, please.
10         (Burke Exhibit No. 2 was
11         marked for identification.)
12   BY MR. LOMAS:
13   Q.    Mr. Burke, do you recognize this document?
14   A.    I recognize the case.
15   Q.    And which case is this?
16   A.    This would be the one against the
17 Department of Commerce.
18   Q.    Your lawsuit against the Department of
19 Commerce?
20   A.    Yes.
21   Q.    The one that we just spoke about, is that
22 right?

Page 29

1    A.    Yes.
2    Q.    Okay. So you understand that you produced
3  this document to us last evening by your counsel?
4    A.    Oh, okay.
5    Q.    And is this the opinion from the court
6  dismissing your case?
7    A.    Well, this is a LexisNexis of the case.
8  It may be. It may be what you're contending.
9    Q.    Okay. But you recognize this is your
10 case?
11   A.    It seems very well to be my case, yes.
12 Nothing about it would tell me it's not my case.
13   Q.    Okay. If you turn to page 11. And you
14 see at that top there, where it says plaintiff, Brian
15 T. Burke, proceeding pro se brings this action, that
16 sentence there?
17   A.    Yes.
18   Q.    Okay. Does that indicate to you that this
19 is the case that you filed?
20   A.    Yes. I mean, again, I have no reason to
21 state this is not my case.
22   Q.    Okay. If you could turn to page 16,

8 (Pages 26 to 29)

00000277

CONFIDENTIAL

Burke, Brian                                                                                        May 25, 2010

Page 30

1  please?  And if you could look at the second
2  paragraph there, do you see where the court says,
3  plaintiff here has come forth with nothing beyond the
4  realm of conclusory assertions and speculation to
5  support his claims of discrimination.  Do you see
6  that?
7      A.   Yes, I do.
8      Q.   Do you see also where, in the next
9  paragraph, second sentence, his belief that the
10 failure to assign him work was motivated by
11 discriminatory intent on the part of his supervisors
12 is based largely on vague recollections of
13 conversations with third parties and unsupported
14 conclusions drawn from documents produced by
15 defendants.
16     A.   Yes.
17     Q.   Do you recall the court indicating that
18 you attempted to rely on an affirmation that was
19 inconsistent with your deposition testimony?
20     A.   I do not.
21     Q.   Mr. Burke, then you appealed this decision
22 to the Second Circuit, is that right?

Page 31

1      A.   Yes.
2      Q.   And what was the result there?
3      A.   They upheld the dismissal.  Summary order.
4      Q.   In a summary order?
5      A.   Yes.
6      Q.   All right.  And the court found no merit
7  to your claims, is that right?
8      A.   I don't know if there is an objection to
9  the -- can you repeat the question?
10     Q.   Did the court find any merit to your
11 claim?
12     A.   Is that -- would that be a legal
13 conclusion on my part or --
14     Q.   It's just asking what the court found.
15     A.   Well, that would be paraphrasing the
16 court.  I mean, you could just put the summary order
17 into --
18     Q.   The court dismissed your case, is that
19 right?
20     A.   The court dismissed the case.
21     Q.   And then the Second Circuit affirmed the
22 dismissal?

Page 32

1      A.   Yes.  Apparently the court made a judgment
2  on the facts.
3      Q.   Okay.  Mr. Burke, I'd like to mark another
4  document as Exhibit 3.
5              (Burke Exhibit No. 3 was
6              marked for identification.)
7          BY MR. LOMAS:
8      Q.   Mr. Burke, do you recognize this document?
9      A.   Yes.
10     Q.   And what is this?
11     A.   This is my complaint against the authority
12 challenging the Taylor Law.
13     Q.   And the authority, is that the
14 Metropolitan Transportation Authority?
15     A.   Yes.  And New York City Transit Authority,
16 Public Employment Relations Board and state attorney
17 general.
18     Q.   And this is the case we talked about a
19 little bit ago?
20     A.   Yes.
21     Q.   Okay.  Did you file this complaint pro se?
22     A.   Yes.

Page 33

1      Q.   So this document you submitted to the
2  Court, is that right?
3      A.   Yes.
4      Q.   Okay.  If you can turn to page 2.  And
5  under the second heading, Ku Klux Klan v. Notre Dame?
6      A.   Uh-huh.
7      Q.   Could you please -- well, it says there,
8  plaintiff has no evidence and will neither include or
9  request any evidence via discovery regarding past,
10 present or prospective active member status by
11 relevant state actors as a Kleagle, see Senator
12 Robert Byrd, Kloreroe, Klabee, Kludd, Kligrapp, et
13 cetera, of The Knights of the Invisible Empire.  Do
14 you see that?
15     A.   Yes.
16     Q.   And what relationship of that
17 allegation -- what was the relationship of that
18 allegation to your case?
19     A.   I felt when writing this pro se, I was
20 told the name of the act.  The original act, the
21 Civil Rights Act of 1871 was called the Ku Klux Klan
22 Act was passed by the federal government to outlaw

9 (Pages 30 to 33)

00000278

CONFIDENTIAL

Burke, Brian                                                              May 25, 2010

Page 34

1  the Ku Klux Klan and other civil rights violations by
2  organizations and individuals working with and for
3  the government. And of course, it was updated in the
4  '60s. I chose to include the original act and the
5  updated act, we have here Chapter 21, subchapter 1,
6  1983 civil action for deprivation of rights, as well
7  as Chapter 161 2403(b), intervention by United States
8  or a state, constitutional question as well.
9      Q.   Okay.
10     A.   So I wanted to point out that I was not
11  accusing anybody of being members of organizations
12  proscribed or otherwise. In fact, I contended that,
13  you know, that would be somewhat irrelevant unless
14  they were as part of their federal government or
15  state government responsibilities depriving me and my
16  co-workers, many of them who are in fact
17  African-American, Caribbean American, Jewish, like
18  myself, Catholic, et cetera, all those individuals
19  were -- were discriminated against by the Klan. And
20  the reason for that act was to proscribe that
21  behavior, more than simply belief, which may or may
22  not be covered under the First Amendment.

Page 35

1      Q.   If you could turn to the next page. And
2  the sentence beginning after the quote there with the
3  citations, it says, while not disputing defendant
4  state actor's right to be or not to be active members
5  of the Invisible Empire, it is defendant's passing,
6  upholding, enforcing the discriminatory and
7  unconstitutional Taylor Law, which has the same
8  outcome as the philosophy of the Klan, that is
9  unlawful. Do you see that sentence?
10     A.   Okay. Yes. Yes. I believe you read that
11  correctly.
12     Q.   So here are you accusing the defendant of
13  having the same philosophy of the Klan?
14     A.   I believe that their actions have that
15  same effect. Yes.
16     Q.   Okay. And then --
17     A.   An effect whether or not they intended to.
18  They certainly, where I work with in New York City
19  Transit, there is a demographic difference between
20  the -- the employees in New York City Transit who are
21  covered by the Taylor Law and individuals in Long
22  Island Railroad and Metro North, who also work for

Page 36

1  the MTA, who are not covered by the Taylor Law, have
2  the right to strike.
3      I believe there is a violation of equal
4  protection there under the 14th Amendment, possibly
5  the 13th Amendment as well. A law professor who is
6  going to perhaps be working along on the case, he
7  wrote in fact several papers how it violates the 13th
8  Amendment. But of course, I would challenge it under
9  10 different amendments. But yes, I absolutely
10  believe what I said. Yes.
11     Q.   And then at the end of that paragraph
12  there, the very last sentence, you state that you,
13  upon information and belief, have no standing to
14  question the constitutionality of the Taylor Law, is
15  that right?
16     A.   Vis-à-vis non-MTA departments, agencies or
17  authorities. I only -- I'm only challenging it for
18  New York City Transit, so not for the teachers, not
19  for the police, not for the fire department. There
20  is others who are covered by the Taylor Law in New
21  York State. I'm not challenging the
22  constitutionality of whether or not it should cover

Page 37

1  them. They have a different fact structure.
2  Certainly different organizations, different job
3  titles, everything is different.
4      Q.   Right.
5      A.   And certainly that's an issue in the case
6  because they are using case law stare decisis of
7  other teachers and so on, people who also challenged,
8  I believe hundreds of organizations that have
9  challenged the Taylor Law and also believe it's
10  unconstitutional, including the governor of New York
11  State which I include in my papers.
12     Q.   I'm sorry. Back before, earlier, we were
13  talking about the sentence toward the beginning
14  there, and it mentioned the Invisible Empire. What
15  was the Invisible Empire?
16     A.   That's one of the, I guess, colloquial
17  terms for these people. I guess you could call them
18  a terrorist organization, the Klan, or any current
19  organization that would be similarly modeled on that.
20     Q.   Is that -- is that your own term or is
21  that a term that you --
22     A.   I understand it's a term that's been used.

10 (Pages 34 to 37)

00000279

CONFIDENTIAL

Burke, Brian                                                                                            May 25, 2010

Page 38

1    I don't -- I'm certainly not claiming extra
2    knowledge.  Just my understanding.  And the Ku Klux
3    Klan versus Notre Dame is the name of a book.  I
4    don't know if you're aware of it.  They attempted to
5    march on Notre Dame University, it was the State of
6    Indiana was almost taken over by them in the '20s
7    when my grandfather lived there, an Irish Catholic in
8    that area.  They were terrorized, as well as, of
9    course, African Americans, Jewish Americans, et
10   cetera.
11       Q.    I'd like to mark Exhibit Number 4, please.
12             (Burke Exhibit No. 4 was
13             marked for identification.)
14       BY MR. LOMAS:
15       Q.    Mr. Burke, do you recognize this document?
16       A.    It may be -- well, it says, memorandum and
17   order by Judge Koeltl, district judge.
18       Q.    Is Mr. Koeltl the judge in this case
19   against MTA?
20       A.    He was the district judge.  There was also
21   magistrate judge assigned to it, but somehow the
22   magistrate judge got bypassed, I guess.

Page 39

1        Q.    Is this -- is this the order dismissing
2    your case?
3        A.    It looks like it.  I -- I have no reason
4    to believe this is not the order.
5        Q.    If you look at the very last page number
6    10, page 10.  Do you see the first full sentence
7    there, the third amended complaint is to dismiss with
8    prejudice?
9        A.    Yes.
10       Q.    Okay.  If you can flip back to page 5.
11   Are you on page 5, sir?  See the heading number 2?
12       A.    Yes.
13       Q.    In the middle of the page?  And then the
14   second paragraph there.  The last sentence in that
15   paragraph, it says that Mr. Burke sought to challenge
16   the fine before the New York PERB, but was
17   unsuccessful.
18       A.    Yes.
19       Q.    Now, what was the fine?
20       A.    There was a fine under the Taylor Law, I
21   and all my colleagues in the Transport Workers Union
22   local 100 went on strike in December of 2005.  We did

Page 40

1    in fact violate the Taylor Law.  We conceded that
2    point.  I conceded the point personally with PERB.  I
3    believe His Honor of course, though, is incorrect
4    in -- in the whole -- obviously I appealed it, so I
5    believe he was incorrect.  But that is apparently --
6    I don't know where they got that.  I didn't challenge
7    it under the PERB.
8        Q.    Okay.  So did you challenge the fine with
9    anyone before filing the lawsuit?
10       A.    No.  In fact, I conceded.  I sent in an
11   affirmation or affidavit, I believe it was an
12   affidavit saying I did violate it.  The strike was 2
13   1/2 days, but two of those days were on my days off,
14   regular days off.  So I actually only missed one day
15   of work, scheduled work.  And so it was two days of
16   fine for every one of those days.  So they fined me,
17   in fact, the correct amount, I believe.
18       Q.    Were you aware of the Taylor Law before
19   the strike?
20       A.    Absolutely.
21       Q.    Okay.  So you intentionally --
22       A.    Right.  Civil disobedience.  I believed

Page 41

1    and I believe it's the same with Dr. Martin Luther
2    King and other individuals, civil right leaders and
3    so on, activists, that if you believe a law is
4    unconstitutional, you should go -- Henry David
5    Thoreau, you should challenge it and accept the fine
6    and hopefully do what I did, and challenge it in
7    court through peaceful means.
8        Q.    Okay.  And how many -- how many amendments
9    to the Constitution did you challenge the act under?
10       A.    10.  I would point out there was, I
11   believe, no case law for several of those amendments,
12   so the judge throwing it out at the pleading stage
13   for I guess reasons of stare decisis would be
14   something I would hope that the Second Circuit would
15   consider.
16       Q.    So you -- and on page 7, if you turn to
17   page 7, the first full paragraph there says that all
18   of your claims were rooted in your argument that the
19   Taylor law is unconstitutional?
20       A.    Yes.
21       Q.    And you acknowledge the Taylor Law has
22   long been held constitutional?

11 (Pages 38 to 41)

Henderson Legal Services, Inc.

00000280

CONFIDENTIAL

Burke, Brian                                                                    May 25, 2010

---

Page 42

1    A.    You're asking if I acknowledge that?
2    Q.    That it has been previously.
3    A.    Well, I believe there may be individual
4 matters in individual cases with different facts.
5 Certainly it has been upheld before. I would agree
6 with that. Whether that means always prospectively
7 it means it's constitutional under any set --
8 different set of facts or different parties,
9 different organizations, different amendments, you
10 know, I'm not an attorney, but certainly just as a
11 citizen, someone with a little bit of understanding
12 of logic, maybe you have better ideas how stare
13 decisis works, but certainly it's not the same
14 parties and same facts should be something that I
15 believe the court should actually hear, which it
16 didn't do in this case.
17    Q.    Do you see on page 8 at the bottom of the
18 first big paragraph there. The court found that you
19 provided no plausible basis to find the Taylor Law
20 unconstitutional?
21    A.    Yes. That's what it says here. Yes.
22    Q.    Okay. Despite the history of precedent

---

Page 43

1 favoring the constitutionally of the Taylor Law, I
2 understand you also filed a motion for sanctions
3 against the opposing counsel, is that right, in that
4 case?
5    A.    Was it this case? I believe maybe if I
6 did -- if you have it, maybe I did.
7    Q.    If you're looking at -- I'm sorry, the
8 next section of this opinion right there?
9    A.    Rule 11. Okay. Yes.
10    Q.    Do you see there where --
11    A.    Yes I did. It was a rule evident in this
12 case as well.
13    Q.    And you see there where it says you filed
14 a motion for sanctions against MTA's counsel pursuant
15 to Rule 11 for their continual unremitting, satanic,
16 seditionist, actionable attack on the Constitution,
17 is that right?
18    A.    If that's what it says, then I would
19 certainly have to --
20    Q.    Do you acknowledge saying that in your
21 Rule 11 motion?
22    A.    I'm not going to dispute I did.

---

Page 44

1    Q.    Do you know what satanic conduct you were
2 referring to?
3    A.    Well, their attempt to block remedy,
4 basically, I believe they are attempting to overturn
5 Marbury versus Madison and deny court leave to
6 actually hear a case, any case apparently, any -- to
7 challenge any law as being unconstitutional. If
8 there was a decision, say -- I quoted, of course,
9 Dred Scott and Plessy vs. Ferguson, where it's not
10 allowed to be reheard again if -- you know, if
11 people, you know, if separate but equal is something
12 still -- the law of the land still, I believe that
13 would be unconstitutional, in that I think that's
14 something the court would be -- should be allowed to
15 hear it again and again and again, especially with
16 different facts, different parties, et cetera. But
17 the court disagreed with me.
18    Q.    And what did you mean by seditionist? The
19 same?
20    A.    Yes. I believe to attack the
21 Constitution, because basically they are ruling out
22 the Constitution as an effective body of law over the

---

Page 45

1 statute. So I believe that would be -- make it
2 seditionist. I was pledged to uphold and defend the
3 Constitution against all enemies foreign and domestic
4 without reservation. And that was part of my job as
5 a civil servant, and I believe I took it seriously.
6    Q.    Were you contending by using the phrase
7 satanic that the opposing counsel was acting like
8 Satan?
9    A.    My understanding, I'm certainly not any
10 expert on it, I don't practice -- I'm Catholic.
11 Satanism for people that do. But one of their
12 concepts is -- I can't remember -- I believe I quoted
13 it. I can't remember the -- the famous quote, to do
14 as thou wilt is the whole of the law, I believe.
15 Something along those lines.
16    Basically, that there is no law, or no
17 higher law, certainly no constitutional law. And so
18 -- that they would obey. And so I believe they were
19 acting along those lines. Yes. I believe the Taylor
20 Law in denying one group of people rights that other
21 people have, for instance the right to strike, is
22 prima facie unconstitutional.

12 (Pages 42 to 45)

Henderson Legal Services, Inc.

00000281

CONFIDENTIAL

Burke, Brian                                                                                    May 25, 2010

Page 46

1      Q.    I'm going to mark the next document as --
2    what are we up to, Exhibit 5?
3              (Burke Exhibit No. 5 was
4              marked for identification.)
5           BY MR. LOMAS:
6      Q.    Mr. Burke, do you recognize this document?
7      A.    Yes.
8      Q.    Is this the Rule 11 motion we were just
9    talking about?
10     A.    Rule 11 and 56 F.  And I guess there might
11   be some -- an opposition as well.  No.  Is this the
12   opposition to -- so I guess there might have been a
13   motion.  There was opposition and cross motion.
14     Q.    Okay.
15     A.    Yes.
16     Q.    So your opposition to the opposing
17   counsel's motion to dismiss?
18     A.    I believe that's what this was.  Yes.
19     Q.    And if you turn to page, the third page of
20   this document.  Under the heading 7th Amendment dead.
21     A.    Yes.
22     Q.    So you see there in the first sentence?

Page 47

1      A.    There it is.
2      Q.    That's where you refer to opposing counsel
3    as satanic and seditionist, is that right?  Is that
4    right, sir?
5      A.    Well, counsel, I don't want to, you know,
6    maybe get into, I guess, whether it was a noun or a
7    verb or what.  I believe these are almost -- wouldn't
8    this be adjectives.  I don't believe I'm referring to
9    them -- it's -- I believe I'm referring to their
10   actions.  But if you want to make that as a
11   description of them personally, you know, I guess you
12   have the right to do that.
13     Q.    I understand.
14     A.    I don't know that I was trying to do that.
15     Q.    I understand.  Under the next section, the
16   next section is titled Holocaust denial?
17     A.    Yes.
18     Q.    You refer to a strawman argument by the
19   authority's counsel that the Nuremberg laws are
20   current German law?
21     A.    Well, that if their argument was to be
22   upheld, if their argument was to be upheld, then yes,

Page 48

1    every law that has ever been held as constitutional
2    can never be reinterpreted, it can never be brought
3    back before the court again.  The -- I can't read
4    German, I have it there, but they were called the
5    Nuremberg laws that the German constitutional courts
6    upheld the laws that resulted in the Holocaust, the
7    murder of over six million innocent people for
8    reasons of their religion, et cetera.
9          That I guess under their theory, certainly
10   not my theory, and maybe I hope not your theory, but
11   I contended that under their -- under their logic,
12   that, yes, that as well as I pointed out, you know,
13   the Penal Laws of Ireland, the Chinese Exclusion Act,
14   of course, Dred Scott upholding -- well -- just you
15   know, I would imagine maybe some people would
16   disagree with that decision here.  I don't know.  I
17   did.
18     Q.    My question -- so did the authority's
19   counsel, though, ever refer to any of these German
20   laws in their motion to dismiss?
21     A.    No.  They didn't.
22     Q.    This is your interpretation of their

Page 49

1    argument?
2      A.    Yes.  My interpretation of if that
3    argument was allowed to prevail, that they would have
4    to prevail in upholding these other laws that were at
5    one time considered constitutional, and now hopefully
6    are not considered constitutional.  That there was a
7    change at some point where people would be allowed to
8    bring again perhaps repeatedly to a court and they
9    would actually hear it and not dismiss it in the
10   petition stage or the pleading stage.
11     Q.    Right.  And then, in fact, you go on to
12   say that if their argument was accepted, it would
13   stipulate their exultation of the satanic criminal
14   genocide of millions of innocent humans.  Later in
15   that paragraph?
16     A.    Yes.  That's what it says.
17     Q.    And the -- the death of remedy and
18   constitutional review serves their interests?
19     A.    That's exactly -- and I would point out
20   that it's in bold, capital letters.
21     Q.    And then earlier, again, I'm sorry in that
22   paragraph under 7th Amendment Dead.  You're saying

13 (Pages 46 to 49)

Henderson Legal Services, Inc.

202-220-4158                                                        www.hendersonlegalservices.com

CONFIDENTIAL

Burke, Brian                                                                          May 25, 2010

Page 50

1  there that the authority's counsel is issuing a death
2  of a thousand cuts to our Constitution.
3      A.   Yes.  In quotes.  And I guess as one more
4  nail in the coffin of the Constitution.  Yes.  It's a
5  shame that people with standing can't have a law
6  reviewed by the court, of being unconstitutional.
7  And I think it's unfortunate.
8      Q.   And is the Constitution the foundation
9  document in the previous sentence where you say
10 millions of citizens gave their lives, ten million
11 gave their blood, and hundreds of millions as well --
12     A.   Yes.  That's approximate.  Those numbers.
13     Q.   Okay.  If you could turn to the next page.
14 Actually, I guess on the bottom it starts with Penal
15 Laws of Ireland?
16     A.   Yes.
17     Q.   Bottom of the page you were on?
18     A.   Uh-huh.
19     Q.   Okay.  And then the next page.
20     A.   Which I point out would -- if this was in
21 the United States would be applying to myself --
22 would be applying to myself.

Page 51

1      Q.   I'm sorry, sir.  Is your argument that the
2  those laws of Ireland apply to you?
3      A.   No.  If these were in the United States,
4  they were of course not in the United States.  The
5  United States is a former British colony.  If we were
6  still a current British colony, perhaps it would be.
7  But of course, these laws are not in -- the law of
8  the land in either England or Ireland as I understand
9  it today.  They were considered constitutional at one
10 time, and then the courts revisited the issue
11 clearly.  And it was decided that it was an error and
12 that they would be allowed to -- basically, I guess
13 repleal whether these were unconstitutional, that
14 stare decisis was not absolute.  I quoted also Judge
15 Ginsburg about that.  She believes stare decisis is
16 not the sole principle for constitutional issues.
17     Q.   So --
18     A.   And I agree with her.
19     Q.   So I'm sorry.  It's not -- you weren't
20 contending these laws apply to you.  You were
21 contending -- is it that you're contending their
22 counsel, their argument --

Page 52

1      A.   I'm contending that they were laws that
2  were upheld by the House of Lords, and which was the
3  highest constitutional court in the land where many
4  of our laws came from.  Some, in fact, predate the
5  founding of this republic.  And of course, they were
6  later thrown out.  And these would be an example.
7          I suggest -- or I guess you -- more than
8  strongly suggest, state that for that same reason,
9  that I believe that the Taylor Law case -- and I
10 would point out, it was thrown out in the pleading
11 stage.  It was really facts apparently were not
12 allowed to come out.  It was just in the pleading
13 stage that -- now me or anybody else can now never,
14 ever challenge the Taylor Law in a hundred years from
15 now, wherever, any set of facts.
16         If there was a new constitutional
17 amendment apparently from my understanding that said
18 the Taylor Law is unconstitutional, well, that's too
19 bad, because you know, in 1960, they said it was
20 constitutional under one line of a state supreme
21 court somewhere.  So that's it.
22     Q.   Okay.  On the next page, and you mentioned

Page 53

1  this earlier, you refer to the Chinese Exclusion Act?
2      A.   Yes.  I was told -- sorry, I don't mean to
3  interrupt.
4      Q.   Sorry.  If you could just wait for the --
5      A.   I don't want to lose my train of thought.
6  I was told by a law professor that this law has still
7  not been overturned, and is arguably still a law in
8  the United States.
9      Q.   Okay.  And I'm sorry.  In the first
10 sentence there, who is the individual there?
11     A.   He was the counsel for the authority.
12     Q.   And why do you mention his name in that
13 paragraph?
14     A.   I believe he might be Chinese American.
15     Q.   Okay.
16     A.   And so if he believes that laws including
17 this law cannot ever be challenged again, and if it
18 was originally upheld, it has to be law forever, then
19 he probably wouldn't be allowed to practice law in
20 the United States, or even be a resident.  I would
21 hope that he would disagree and be allowed -- and
22 believe that people could challenge a law that

14 (Pages 50 to 53)

00000283

CONFIDENTIAL

Burke, Brian                                                                                          May 25, 2010

Page 54

1    violates civil rights and the Constitution.
2        Q.    Okay.  The next paragraph or section, I
3    guess, begins, slavery upheld?
4        A.    Yes.
5        Q.    And you refer to the Dred Scott decision,
6    and you say that it's defendant counsel's favorite
7    case due to the admitted upholding of the abomination
8    of human chattel?
9        A.    Well, that may be some speculation on my
10   part whether it is their favorite case.  They didn't
11   deny it.  They didn't point it out in their papers.
12   This is a very famous case, and I believe perhaps
13   everyone at the table here would perhaps be familiar
14   with it.  Should be familiar with it.  I believe the
15   court was wrong in their decision.  I really, to be
16   honest, truly hope everybody believes the court was
17   wrong in that.  And if I would be allowed to ask you
18   that question, I would.
19       Q.    Well, today I get to ask you the
20   questions, unfortunately for you.  Okay.  So you're
21   speculating that may be their favorite case.  Are you
22   speculating the fact that it would be their favorite

Page 55

1    case due to the admitted upholding of the abomination
2    of human chattel?  Is that the basis for upholding
3    the case?
4        A.    That is the -- I'm paraphrasing the case
5    itself that upheld the abomination of human chattel.
6        Q.    Right.
7        A.    If you believe that stare decisis is still
8    current law, slavery can never be challenged again,
9    then you are -- you are upholding the abomination of
10   human chattel, yes.  And I would hope
11   you people again would disagree with the court on
12   that, and ask that the court again review it.  It's
13   already been outlawed, of course, since.
14       Q.    Okay.  If you could turn a few pages --
15   I'm sorry, these pages aren't numbered -- but to the
16   page that begins with the heading, no premotion
17   conference.  A few more pages.  There you go.
18       A.    Yes.
19       Q.    And then down at the bottom there, under
20   the heading that says, stare decisis?
21       A.    Yes.
22       Q.    And here you admit that there is no case

Page 56

1    law throwing out the Taylor Law for constitutional
2    violations?
3        A.    Yes.  If I could read the sentence, and
4    then it says, as it then would already be unruled
5    unconstitutional and this case moot.
6        Q.    Right.
7        A.    So my position is that where you have one
8    side claiming stare decisis, where of course the
9    Taylor Law was upheld under various different set of
10   facts, different parties, different amendments, that
11   on my side or in any sides challenging a law
12   unless -- I wouldn't be able to claim stare decisis
13   because if I was, the case -- the law would already
14   be thrown out.  Only one court has to throw it out.
15   Of course, if I did win this case, it would have
16   obviously been appealed, perhaps stayed, and perhaps
17   I believe it would go to the Supreme Court.
18       Q.    And this motion for sanctions was denied,
19   is that right?
20       A.    Yes.  As was your ruling on the motion.
21       Q.    Did you move for reconsideration of the
22   court's decision in that case?

Page 57

1        A.    Did I?  I don't believe I did.  No.
2        Q.    But you appealed?
3        A.    I can't -- if I did -- it's a matter of
4    public record.
5        Q.    No.  That's fine.
6        A.    I don't --
7        Q.    But you appealed that case, is that right?
8        A.    Yes.
9        Q.    To the Second Circuit.  Are you
10   represented by counsel in that appeal?
11       A.    We are in discussion.  Discussion.
12       Q.    Have there been any briefs filed in that
13   case yet?
14       A.    No.  There is a brief -- the first brief
15   is due July 19th.  I plan to move it back at least a
16   month, or maybe only a month, so which would make it
17   August 19th, approximately, 18th.  I am hoping to be
18   represented in that case.
19       Q.    I want to mark another -- the next exhibit
20   here as Exhibit 6.
21             (Burke Exhibit No. 6 was
22             marked for identification.)

15 (Pages 54 to 57)

00000284

CONFIDENTIAL

Burke, Brian                                                                                    May 25, 2010

Page 58

1          BY MR. LOMAS:
2          Q.    Okay.  Mr. Burke, do you recognize this
3    document?
4          A.    It looks like my -- oh, my reply brief.
5          Q.    Your replay brief in what case?
6          A.    This is -- I point out I was the defendant
7    in this case.  I am not the plaintiff.  I did remove
8    this to district court, for -- I believe it was
9    reasons of a case that I won actually in -- as pro
10   se.  I won this in civil court.  But prior to winning
11   the case, I asked that it be removed to federal
12   court.  And it was dismissed.  And then the Second
13   Circuit, and in fact, technically, I won in the
14   Second Circuit -- actually, technically, I won it.
15   It was reversed and remanded.
16         Q.    Okay.  Could we go back to the beginning.
17   What -- how did this case start?
18         A.    Kenmore Associates is the -- well, it's a
19   very complicated case.  Frankly, I've been living in
20   this property for 20 years, and I guess I would have
21   to go on a little bit of a history of it.
22         Q.    Well, how about we say, did Kenmore

Page 59

1    Associates file a lawsuit against you?  Is that what
2    happened?
3          A.    They filed several lawsuits against me.
4          Q.    Several.
5          A.    And most of them have been dismissed.
6          Q.    And what's the relationship of Kenmore
7    Associates to you?
8          A.    Kenmore Associates is -- I consider -- I
9    guess they are a type of a shell corporation
10   apparently without any employees, or it's a very -- I
11   still haven't gotten to the bottom of it.  Apparently
12   it claims to own a property, a very valuable property
13   worth approximately $50 million that I contend is
14   owned by the people of the United States.
15         Q.    Is that the property you live in?
16         A.    Yes.  There was no moneys paid for the
17   property, and there was -- the title deed was not
18   notarized, and there was also some issues.
19         Q.    So setting aside your argument that the
20   people of the United States own that building, is
21   Kenmore Associates by law your landlord?
22         A.    I refer them as a putative landlord.  Yes.

Page 60

1          Q.    Okay.
2          A.    And Housing Services Incorporated is the
3    managing agent of the property.  Some connection to
4    it.
5          Q.    And then what did they file a lawsuit
6    against you for?
7          A.    Well, I guess they would consider it as
8    just a nonpayment.
9          Q.    Nonpayment of rent?
10         A.    Yes.  I have been withholding rent, doing
11   a rent strike for reasons of conditions in my
12   apartment, and also other reasons of harassment, not
13   allowed to have guests, harassment of my guests,
14   breaking and entering of my room, other issues, and
15   so on.
16         Q.    Are you still withholding rent?
17         A.    Yes.
18         Q.    How long has that been going on?
19         A.    Continuously.
20         Q.    Since when did it start?
21         A.    Well, probably -- I don't know, around
22   2001.

Page 61

1          Q.    2001.  And what's your rent per month?
2          A.    $660.
3          Q.    That's the current amount?
4          A.    Yes.
5          Q.    Has that been the same since 2001?
6          A.    Excuse me.  Let me correct that.  That is
7    what they claim it is.  I claim that it is $215
8    because that's, in fact, what it says on what they
9    claim is the lease.  I did sign some renewal lease
10   documents.  I originally moved into the property
11   without a lease, lived without a lease for seven,
12   eight years, whatever.
13              And under my understanding of New York
14   State law, when you're offered a renewal lease,
15   whatever is in it, you're supposed to sign it and
16   that only the -- only the aspects of -- that are the
17   same as or better than prior lease are in effect,
18   that basically any -- the landlord is not allowed to
19   add anything.
20              I'm not an attorney, but it is in the law
21   that basically on the same terms or better.  I think
22   that's the legal terms they use.  So I signed a

16 (Pages 58 to 61)

00000285

CONFIDENTIAL

Burke, Brian                                                                                      May 25, 2010

Page 62

1  renewal lease, and it said the rent was $215,
2  which it was at the time.  And I believe it still is.
3      Q.   Okay.  If you turn to -- again, these
4  pages aren't numbered, but I guess it's the second
5  page of the memorandum and reply, so after your table
6  of authorities.  Then memorandum and replay, and then
7  the next page.
8      A.   Okay, after it says, default.  Reply to
9  opposition, that page?
10     Q.   Right there.  The reply to opposition
11 heading.  Under there, it says, in plaintiff's
12 untimely defaulted brief, RICO employed classic
13 strawman arguendo.  So could you explain why you're
14 using the phrase, the term RICO?
15     A.   I believe they were violating the -- this
16 is referred to as the RICO Act, the Racketeer
17 Influenced and Corrupt Organization Act.
18     Q.   Did you file a counterclaim in that case
19 against them for RICO?
20     A.   I certainly did.
21     Q.   Okay.  I'm going to mark Exhibit Number 7.
22          (Burke Exhibit No. 7 was

Page 63

1          marked for identification.)
2          BY MR. LOMAS:
3      Q.   Mr. Burke, I'm going to represent that I
4  found this document on the blog posting on a website
5  with the title KenmoreAssCriminal Landlord.  Are you
6  familiar with that website at all?
7      A.   Yes.  I have someone that works in the --
8  lives in the building who apparently posted this
9  information, some of which I gave him.
10     Q.   And this is the building -- this is your
11 building again?
12     A.   Yes.  And this is mostly or all of my
13 documents.
14     Q.   Okay.  So is this the filing in court
15 where you alleged counts -- RICO violations against
16 Kenmore?
17     A.   I have seen this before.  I haven't looked
18 at it in a while.  I don't know what he has on the
19 site here, because this is actually kind of out of
20 date.  Obviously, it doesn't include apparently much
21 of my -- or maybe it does, I don't know, of my Second
22 Circuit case.  I don't know.  He hasn't updated it.

Page 64

1  He just puts it on the web for people to read.
2      Q.   He puts it on the web for you?
3      A.   Well, yes.  He uploads it himself and --
4  these are public documents.
5      Q.   Right.  Do you -- so it's not your
6  website?
7      A.   No.
8      Q.   Do you have any websites?
9      A.   No.
10     Q.   Do you -- do you -- excuse me, have you
11 had any information about this case, the Record Press
12 case, posted on any websites for you?
13     A.   No.
14     Q.   Okay.  If you could turn to page 2 of this
15 document, please?  And then if you look halfway down
16 the page, there is a heading, affirmative defenses
17 and counterclaims?
18     A.   Yes.
19     Q.   Okay.  Paragraph 11 there, it says, upon
20 information and belief, the organization also known
21 as Kenmore Associates, and then go on and on, and
22 then it says, is/are a racketeer influenced and

Page 65

1  corrupt organization.
2      A.   Yes.
3      Q.   Okay.  So is this your RICO claim against
4  them?
5      A.   That was -- it was an affirmative defense
6  and counterclaim to the nonpayment petition.
7      Q.   Right.  Okay.  And then a little bit
8  lower, you refer to innumerable predicate felonies?
9      A.   Yes.
10     Q.   As qualified under said RICO?
11     A.   Yes.
12     Q.   Now, if you turn to the next page, please.
13 At the top of that page, looks like you refer to one
14 of those felonies as the tenants being treated as
15 chattel slaves in violation of the 13th Amendment, is
16 that right?
17     A.   Yes.
18     Q.   Could you explain that, please?
19     A.   Well, as speaking for in my situation, I'm
20 not allowed to have guests in my apartment.  There is
21 curfews, terrorism.  I believe they are treating me
22 as a -- basically a convicted criminal.  And I

17 (Pages 62 to 65)

Henderson Legal Services, Inc.

00000286

CONFIDENTIAL

Burke, Brian                                                                 May 25, 2010

Page 66

1  understand that convicted criminals are not covered
2  under the 13th Amendment. I don't know if you're
3  aware of that. But not many -- not everybody is.
4       But so they are -- since I'm not a
5  convicted criminal, I've not ever been convicted of
6  any crime, I believe they are violating my rights
7  under the 13th Amendment. I believe I should be
8  allowed to live as a citizen of the United States, to
9  have guests in my home, but not have my home invaded.
10  Et cetera, et cetera.
11      Q.   Okay. If we go down a little bit further
12  down that page, halfway down, it refers to additional
13  predicate felonies. And it says, through blackmail,
14  intimidation and strong arm tactics forces
15  vulnerable, elderly, differently abled and/or health
16  compromised tenants into fraudulent medical
17  experiments, and then there is a parenthetical there
18  that refers to, I'm assuming some Nazi?
19      A.   Yes. Well, he was -- yes. Yes. He was a
20  Nazi, Josef Mengele. I believe from my
21  understanding, perhaps of my bringing this up, they
22  stopped doing some of these medical experiments.

Page 67

1  They used to do it in the lobby. The amount of
2  control they have over these individual people, I
3  mean, some of them are people they brought in from
4  prisons. I don't know where they got all the
5  different people, but this is a very respectable
6  neighborhood. I guess, you know, all neighborhoods
7  are respectable in their own way, but it's certainly
8  not an inexpensive neighborhood. Very expensive
9  property.
10      And they seem to be running amok with
11  this, you know, I don't know how to paraphrase it,
12  but they are -- I guess they are kind of some kind of
13  supported housing is how they refer to themselves,
14  but they are quite a racket, I believe, yes.
15      Q.   Well, so what -- could you give me
16  examples of what these medical experiments are?
17      A.   Apparently they are doing, you know, they
18  basically test drugs on people. They were giving
19  blood and taking blood in the lobby. They have a --
20  you know, people who -- with legitimate illnesses,
21  medical illnesses, there is a very high death rate in
22  the property.

Page 68

1       And they have -- they wander into people's
2  rooms. I don't know what they did. They attempted
3  to break into my apartment and have broken into my
4  apartment many times. They use what they call a
5  master key. They seem to not respect people's right
6  to privacy. There has been allegations to me of
7  people who had their life cut short.
8       Q.   And you're saying the Kenmore company,
9  they bring in prisoners to do these things, is that
10  right?
11      A.   No. Apparently people who were prisoners.
12      Q.   Were prisoners.
13      A.   They bring them in as residents, but some
14  of them work there as well, as convicted felons as I
15  believe I used the term in the amended -- in the
16  amended answer. And this was not -- nothing was ever
17  denied by the -- not one word of it was denied by the
18  counsel for the plaintiffs, which I believe
19  constitutes stipulation.
20      Q.   Further down in this section, you refer to
21  the alleged landlord/managing agent, Lawrence Oaks?
22      A.   Yes. He is gone. But yes.

Page 69

1       Q.   And then Amir Elhadide?
2       A.   Apparently he does still work there. Yes.
3       Q.   And so they were convicted?
4       A.   Of different crimes. I understand they
5  say information and belief, I have been told and this
6  wasn't denied, that he was convicted of attempted
7  murder. He is the superintendent. Has the key to
8  everyone's room. He has been in my room. I asked in
9  fact that as part of the stipulation, he not come
10  into my apartment. Yet they insist in bringing him
11  in there with some type of armed guard into my --
12  into my room.
13      And yes, he is a convicted felon. In New
14  York, if you're familiar, there is a -- there has
15  been stories about other superintendents who are
16  convicted of crimes, including rape, molestations,
17  and so on. And this is certainly a violent, high
18  violent felony. This is the type of person they have
19  who works there. Yes.
20      Q.   And you said on information and belief.
21  How did you learn that?
22      A.   I've been told by people who actually saw

18 (Pages 66 to 69)

Henderson Legal Services, Inc.

00000287

CONFIDENTIAL

Burke, Brian                                                          May 25, 2010

Page 70

1  the documents.  I don't know how to obtain them
2  myself, but --
3      Q.   Are these other people in your building?
4      A.   Yes.  There is a tenant's association.
5  There is some very active people who are researching
6  many of these issues.
7      Q.   Okay.
8      A.   Attempting to bring them to the
9  authorities.  It's been attempted to do that, and I
10  believe it is being investigated by some of the
11  people that I brought it to the attention to.
12      Q.   Okay.  Further down, you mentioned that
13  they, as predicate felonies, the RICO terrorizes and
14  commits acts of terrorism and war on the tenants in
15  violation of international law, et cetera, and this
16  includes human sacrifice, apparently?
17      A.   No.  I said human sacrifice, capital
18  murder, paraphrasing what their intent is.  But you
19  know, these mysterious deaths.  As I said, mysterious
20  deaths, a/k/a -- however you want to describe it.
21      Q.   Are these residents of the building that
22  are -- that have died?

Page 71

1      A.   Well, if they are dead, they are not
2  residents of the building.
3      Q.   Were they residents of the building, these
4  individuals?
5      A.   I mentioned some.  I mentioned a woman by
6  name there.  Others I don't have their names.  Again,
7  this is something I believe should be investigated by
8  an authority, but --
9      Q.   Okay.  So you described it as human
10  sacrifice in your complaint here?
11      A.   Potentially, possibly.  It would give a
12  motive.  I have to kind of speculate as to what their
13  motives might be.  If you just like to torture
14  people, I don't know.  Some kind of power trip,
15  absolute authority over people's lives.  You know, I
16  guess that's -- since I didn't get a degree in
17  psychology, I guess I can't suggest what their
18  psychological motives might be.
19      Q.   All right.  And you said that you don't
20  believe these deaths have been autopsied or
21  investigated, but are being covered up instead?
22      A.   Yes.  And I did myself attempt to bring it

Page 72

1  to authorities, a civil servant myself, if I hear of
2  a crime, I report it.  And I would point out it
3  mentions that there was ex-detectives, one who works
4  at the local precinct, I had reported that to
5  internal affairs, et cetera.  Well, he is going --
6  I'm just going further into it.  It was -- yes, I
7  guess I'm explaining how and why they would be able
8  to cover up crimes.
9      Q.   Okay.  And so this claim -- this RICO
10  claim, though, was this claim dismissed?
11      A.   It was -- in effect, all my affirmative
12  defenses and I guess apparently any right to any
13  affirmative defense was -- without explanation, it
14  wasn't -- it was struck by hearing officers in
15  housing court.
16          And nevertheless, I still prevailed in
17  front of a jury with apparently no defenses allowed.
18  I don't know how I can proceed in the case without --
19  without any defenses.  I guess they allow only
20  apparently implied warranty of habitability defense
21  in landlord court.
22      Q.   All right.  In your interrogatory

Page 73

1  responses, you mentioned a small claims case that you
2  filed.  Can you tell me about that case, please?
3      A.   Yes.  That was against PVA.  They didn't
4  pay all my -- all my earnings.
5      Q.   Who is PVA?
6      A.   PVA was the management consulting firm,
7  Peter Vanilla Associates, prior to my working with
8  the census in 2000.
9      Q.   And what was the outcome of that case?
10      A.   I prevailed in that case.  There is a
11  judgment -- a current -- still I haven't collected on
12  it.  I guess it was, I believe, approximately $800,
13  but I guess New York State law includes interest at 9
14  percent per annum from the date of judgment.  So it
15  would be approximately a thousand dollars.
16      Q.   Have you ever filed a lawsuit against the
17  Town of Babylon in New York?
18      A.   No.
19      Q.   Have you filed any other lawsuits other
20  than the ones we've spoken about today?
21      A.   No.  Not that I -- not that I -- unless I
22  forgot one, but I don't think I did.  There was -- I

19 (Pages 70 to 73)

CONFIDENTIAL

Burke, Brian                                                                          May 25, 2010

Page 74

1  think it was in high school, there was a -- but I
2  don't know if I was a plaintiff in that.  There was a
3  case.
4      Q.   What was that case about?
5      A.   A merchant didn't return our security
6  deposit, in fact, on a video camcorder in high
7  school.  We bought it for a school project.  I don't
8  believe I was the plaintiff.  I was one of the people
9  that deposited, so I might have been a plaintiff.
10     Q.   Have you been a defendant in any other
11 cases other than the ones we've spoken about?
12     A.   No.  The only time I've been defendant was
13 against Kenmore Associates from what I understand.
14     Q.   Have you ever been involved in a case with
15 Time Warner Cable?
16     A.   No.  Not that I'm aware of.  I was -- oh,
17 I was apparently a defendant, there was an injunction
18 involved in the Taylor Law case prior to our strike,
19 me and all my fellow TW Local 100 members were -- we
20 were served with an injunction, I guess I was a
21 plaintiff -- I mean, excuse me, a defendant in that
22 case, technically.  Me and 30,000 other people.

Page 75

1      Q.   To enjoin you from not striking?
2      A.   Yes.  Which we did anyway.
3      Q.   I'm going to mark the next exhibit,
4  Exhibit 8.
5           (Burke Exhibit No. 8 was
6           marked for identification.)
7           THE VIDEOGRAPHER:  Mr. Lomas, there is
8  five minutes on the tape.
9           BY MR. LOMAS:
10     Q.   Okay.  Mr. Burke, this is a docket for a
11 case in the Eastern District of New York.  You can
12 look down on the left side, the second defendant.  Do
13 you see that says Brian T. Burke?
14     A.   Yes.
15     Q.   Is this you?
16     A.   That looks like my name, I don't know.
17 Brian T. Burke.  I --
18     Q.   If you look --
19     A.   Demands -- I'm not -- I've never seen this
20 case before.
21     Q.   If you look -- look to the second to last
22 page of this document.

Page 76

1      A.   Time Warner.
2      Q.   And look for -- if you look for number 24,
3  docket number 24 on the second to last page, it will
4  give you some more description, see the injunction
5  number.  Do you see there where it has a partial
6  consent judgment order for Time Warner Cable against
7  Brian T. Burke in the amount of $1500?  Do you
8  remember that at all?
9      A.   No.  I was never served anything about
10 this.  I -- you know, I have Time Warner Cable now.
11 I have Road Runner.  I don't know what this -- I
12 mean, don't you have to serve people with a lawsuit?
13 What is this about?  I don't know.
14     Q.   Did you have Time Warner Cable in 1998?
15     A.   I don't remember.  I changed because I had
16 -- you know, I had Verizon -- what is it, DSL.  I had
17 Time Warner -- previously, I had -- you know, I
18 don't -- I don't remember what I had in 1998.
19     Q.   All right.  So you don't think this is --
20 do you think this is not you?
21     A.   I don't know.  You know, it's possible
22 they had some case and they never served me, so I

Page 77

1  guess they got a default judgment maybe.  I'm just
2  speculating.  It could be.
3      Q.   So you're not necessarily denying that
4  it's you?
5      A.   This is my first I've known about it, and
6  I really I guess I should thank you for -- can I keep
7  this or -- I have to look into this.
8      Q.   Well --
9      A.   This is return of service.  Wow.  Okay.
10 Well, I -- you know, I have some familiarity with
11 people saying they served me and didn't.
12     Q.   Mr. Burke, we are running out of the first
13 type, so --
14     A.   You want to take a break?
15     Q.   We are going to take a break now, if
16 that's okay?
17     A.   Absolutely.  This is a good time to take a
18 break.
19          MR. O'BRIEN:  And Mr. Burke, let us know
20 if you need a break.  Any time is okay.
21          THE WITNESS:  I might have to hit the
22 bathroom while you're doing that.

20 (Pages 74 to 77)

00000289

CONFIDENTIAL

Burke, Brian                                                                                  May 25, 2010

Page 78

1      THE VIDEOGRAPHER:  This marks the end of
2  tape number 1.  We are going off the record at 10:38.
3      (Recess.)
4          (Burke Exhibit No. 9 was
5          marked for identification.)
6      THE VIDEOGRAPHER:  This marks the
7  beginning of tape number 2 in the deposition of Brian
8  Burke.  We are on the record at 11:21.
9      BY MR. LOMAS:
10     Q.    Mr. Burke, I'm going to ask the court
11  reporter to hand you what's been marked as Burke
12  Exhibit 9?
13     A.    Oh, yes.  And I also wanted to mention on
14  the record.  I did mention it off the record.  Upon
15  reviewing Exhibit 8, I see that this case was
16  answered by somebody and -- amended answered by
17  somebody, so it was not a default judgment.  And I'm
18  stating in stronger terms that this is not me.
19     Q.    Okay.  Okay.  Mr. Burke, this is a
20  document with case information for a case titled
21  Jeanine Pirro v. Brian T. Burke.  Are you familiar
22  with that case?

Page 79

1      A.    No.  And I would just point out, my name
2  Brian Burke is a fairly common name.  I used to get
3  mail from a Brian Burke who was the chief operating
4  officer of the NHL, and he is, I believe, the general
5  manager of the Vancouver Canucks.  Brian T. Burke
6  would certainly be a little bit more rare.  There is
7  also a Brian Thomas Burke, a famous politician from
8  West Australia.
9          I don't believe this is me.  I believe in
10  New York State, there is a lot of -- Brian Burke is a
11  generally be an Irish name.  There is a lot of people
12  with that background in New York State.  And I
13  believe this is somebody who is maybe distantly
14  related to me, but I'm certainly not familiar with
15  it.  I wasn't served with anything with this case,
16  and unless it's another default judgment.  And it
17  couldn't be me.
18     Q.    I'm going to move to strike that response
19  as nonresponsive for the first portion.  And then
20  ask, just follow up, because I did have a pending
21  question at that time.
22     A.    Oh, I'm sorry.  I just jumped to what the

Page 80

1  next question is.
2      Q.    No.  That's fine.  If you could just wait
3  for the next questions.  So you understand this is
4  not -- you're not the Brian T. Burke in this case
5  with Ms. Pirro?
6      A.    I believe strongly I am not.  I have not
7  been noticed of anything regarding that.  And like
8  the previous document, I believe it would be somebody
9  else.
10     Q.    Mr. Burke, I'd like to ask you about your
11  preparation for today's deposition.  Did you speak
12  with anyone about today's deposition?
13     A.    I did speak with my attorney about time
14  and place, et cetera.
15     Q.    Did you speak with anyone else?
16     A.    No.
17     Q.    Did you review any documents for the
18  deposition?
19     A.    Review, what do you mean by review,
20  counsel?
21     Q.    Did you read or look at any documents to
22  prepare for the deposition today?

Page 81

1      A.    Specifically for deposition or --
2      Q.    To prepare, yes, to prepare for your
3  deposition today.
4      A.    I can't honestly answer that in the
5  affirmative.  I didn't do any special preparation for
6  today's deposition.
7      Q.    Okay.  Did you bring any documents with
8  you to this deposition?
9      A.    Yes, I did, actually.
10     Q.    And what are those documents?
11     A.    I gave them to Mr. King.  I have some
12  documents from the underlying case.  They are there
13  and in the bag from the Burke versus Evans case that
14  I discovered in the back of my closet.
15     Q.    And have those documents been produced to
16  us in this case?
17     A.    I just brought them from -- I brought them
18  from New York today.  I just discovered them actually
19  this morning, so --
20     Q.    So my understanding is that those
21  documents would be responsive to one of our requests.
22  So would you be prepared to produce those?

21 (Pages 78 to 81)

00000290

CONFIDENTIAL

Burke, Brian                                                                                    May 25, 2010

Page 82

1          MR. KING:  Absolutely.
2          BY MR. LOMAS:
3     Q.    How long did you meet with your counsel in
4     preparation for the deposition today?
5     A.    I did not meet with him at all.
6     Q.    How long did you speak with him?  You
7     mentioned earlier that you spoke with him.
8     A.    I spoke, yes, we communicated by phone and
9     I believe that there might be an area of privilege
10    here.
11    Q.    The contents certainly, but not the amount
12    of time.
13    A.    The amount of time?  Not a great length of
14    time.  We went over the interrogatories by phone.
15    That was -- that took a little bit of time.
16    Q.    An hour?
17    A.    Maybe an hour.
18    Q.    More?
19    A.    Approximately an hour.
20    Q.    Okay.  Mr. Burke, are you familiar with
21    the Manhattan Neighborhood Network?
22    A.    Yes.

Page 83

1     Q.    Do you -- do you produce a show on that
2     network?
3     A.    Yes, I do.
4     Q.    What kind of television show is that?
5     A.    It's a cable access show.
6     Q.    What's the content or subject matter of
7     the show?
8     A.    It's a variety show.  Recently, it's more
9     about my union.  I'm an active shop steward, and I
10    was selected as a delegate, I have the privilege of
11    being elected as a delegate, and representing my
12    members in Las Vegas in 2009.  I'm going to be
13    reaffirmed as a shop steward.  I'm a very active
14    member.  I was also asked to be prospectively and
15    released to do safety walk arounds for the union.
16         But basically, I've been putting material
17    protests and so on, which some including politicians
18    and so on as speakers regarding issues involving my
19    current employment with the MTA.
20    Q.    Okay.  Have you ever discussed or had
21    anyone discuss this case on your show?
22    A.    No.

Page 84

1     Q.    Have you ever mentioned Mr. Wilmont on the
2     show?
3     A.    No.
4     Q.    Has Record Press ever been mentioned on
5     your show?
6     A.    Never.
7     Q.    Is that the only show that you produce on
8     that channel?
9     A.    Yes.
10    Q.    Are you involved with any other shows?
11    A.    No.
12    Q.    That are on that channel?
13    A.    No.
14    Q.    Any other channel?
15    A.    No.  It's shown on -- it's one show, but
16    it's shown on different channels.  Time Warner Cable,
17    FiOS, RCN.  It's also broadcast over the web.
18    Q.    I see.
19    A.    Simulcast over the web.  But no, I
20    never -- any topic involving this case.
21    Q.    Has the Government Printing Office been
22    mentioned on your show ever?

Page 85

1     A.    Never.
2     Q.    Earlier we talked about some of your
3     depositions, and I noted in your interrogatory
4     response that there is a deposition that you did not
5     attend and were fined for?
6     A.    Yes.  I missed a deposition in the Burke
7     versus Evans case.  It was -- you know, I actually
8     don't even recall all the details of why.  I believe
9     it was I -- you know, I asked for -- I believe I
10    asked for a delay or something.  And I don't
11    remember.  Obviously I had a reason, but the court
12    did fine me for missing that deposition.  But it was
13    later taken, that deposition.  In fact, I took
14    depositions as well.
15    Q.    That was in the Evans case?
16    A.    Yes.
17    Q.    Okay.  And that case, the Evans case, as
18    we mentioned before, that was dismissed, correct?
19    A.    Yes.  It was.
20    Q.    And what did you feel -- or how did you
21    feel about that decision when it was dismissed?
22    A.    Well, the court made a determination based

Henderson Legal Services, Inc.

202-220-4158                                                    www.hendersonlegalservices.com

00000291

CONFIDENTIAL

Burke, Brian                                                    May 25, 2010

Page 86

1   on its readings of the fact. Certainly as a
2   plaintiff, I was, I guess by definition, a biased
3   participant in the proceedings. I would have
4   preferred to have it ruled by a jury.
5       Q.   Did you feel that you were wronged?
6       A.   By who?
7       Q.   By the court?
8       A.   Well, I'm not an attorney or a judge. I
9   was -- you know, I would say I was disappointed that
10  the facts weren't determined by the jury, but the
11  courts disagreed with me.
12      Q.   Okay. And then as we discussed, you
13  appealed that case to the Second Circuit, correct?
14      A.   Yes.
15      Q.   And then the Second Circuit affirmed the
16  dismissal?
17      A.   That's correct.
18      Q.   And were you upset with the Second
19  Circuit's decision?
20      A.   I was disappointed.
21      Q.   Were you angry?
22      A.   No. I was disappointed.

Page 87

1       Q.   And the United States asked the court to
2   award its cost for preparing its briefs against you,
3   is that right?
4       A.   That's correct.
5       Q.   Did that anger you?
6       A.   Anger me? No. That wouldn't -- I
7   wouldn't use that -- those terms. No. In fact, I
8   agree with the United States. I agreed with -- as a
9   citizen, I believe the government or -- should
10  attempt to retain the costs of briefs in a case that
11  they won.
12           You know, obviously, personally, I
13  wouldn't be happy to pay it. But if -- but you know,
14  I believe that they had every right to pursue those
15  costs, from what I understand. In the case that I
16  won against Kenmore Associates, they apparently
17  automatically send itemized and verified motion for
18  costs to the prevailing party. I don't see why they
19  wouldn't do that.
20      Q.   And the U.S. Attorney in the Evans case,
21  after your appeal, sent you a bill of costs as well,
22  is that right?

Page 88

1       A.   That's correct.
2       Q.   Did that bill cause a financial hardship?
3       A.   No.
4       Q.   Ultimately, the Second Circuit denied the
5   motion for cost, is that right?
6       A.   Well, they granted my motion against
7   costs. Yes.
8       Q.   So you never ended up having to pay any of
9   the costs for the briefs?
10      A.   That's correct.
11      Q.   Nor the appendix?
12      A.   Nor the appendix.
13      Q.   Right. Okay. All right. Could you tell
14  me what you did after you saw the -- or received the
15  bill of costs?
16      A.   Well, frankly, since we are under oath
17  here, I am a bit of a procrastinator. I think I read
18  it and I put it aside. And then perhaps the week
19  later, I got back to it. And you know, researched
20  the law and precedent involved with these -- these
21  itemized and verified bill of costs. And looked at
22  the bill closer.

Page 89

1           The amount in the bill, as someone who
2   purchased himself a printing products, a brief and
3   reply brief, et cetera, there was certain parts of
4   the bill that it seemed out of line with other parts
5   of the bill. And I attacked the motion on several
6   grounds. One of them was going to be whether that
7   was a competitive cost, which you are allowed to
8   attack in one of these types of motions. And several
9   other grounds that, of course, are a matter of
10  record.
11      Q.   In your response, you used the word we.
12  Was there anyone else that was involved with you?
13      A.   Did I say we?
14      Q.   I believe so.
15      A.   I'm not royal, so maybe -- can I withdraw
16  the we and put I then.
17      Q.   All right. I'm going to mark the next
18  exhibit, please. Actually, two exhibits. 10 and 11.
19           (Burke Exhibit Nos. 10-11 was
20           marked for identification.)
21      BY MR. LOMAS:
22      Q.   Okay. If you could look at the document

23 (Pages 86 to 89)

Henderson Legal Services, Inc.

00000292

CONFIDENTIAL

Burke, Brian                                                                May 25, 2010

Page 90

1   marked Exhibit 10, please.  Do you recognize that
2   document?
3       A.   Frankly, I think my attorney, Mr. King,
4   did receive these, and we went over it over the
5   phone.
6       Q.   These are the --
7       A.   I stated -- so actually, I guess that's a
8   longer way of saying I haven't actually seen these.
9   No.
10      Q.   You understand that these are the
11  interrogatories that Record Press served on you in
12  this case?
13      A.   You served me.  I'm represented, the
14  people represented ably by Mr. King.  He received
15  them, I believe.
16      Q.   And could you look at Exhibit Number 11,
17  please.
18      A.   Yes.
19      Q.   Do you recognize that document?
20      A.   Similar to the document I just -- I
21  believe the document I just reviewed and signed.
22      Q.   You just reviewed this document during the

Page 91

1   break, is that right?
2       A.   Yes.
3       Q.   And if you flip to the last page, and the
4   bottom of that page under verification, that's your
5   name, correct?
6       A.   Yes.
7       Q.   And that's your signature?
8       A.   Yes.
9       Q.   So you declare that these, under penalty
10  of perjury, the answers here are true and correct, is
11  that right?
12      A.   That's correct.  I would just point out,
13  though, there is qualifications within the context of
14  my answers.  Preliminary statements.
15      Q.   Okay.  If I can direct you to your
16  response to interrogatory number 1.
17      A.   Yes.
18      Q.   Okay.  And from Exhibit 10, interrogatory
19  number 1 referred to communications involving you or
20  folks on your behalf for the individuals listed in
21  your supplemental disclosures.  You have identified a
22  handful of individuals you have spoken with, is that

Page 92

1   right?
2       A.   Yes.
3       Q.   Okay.  If you could start with the first
4   response, subsection A.
5       A.   Uh-huh.
6       Q.   In that case, you spoke with Mr. Hugh
7   Wilmont, is that right?
8       A.   That's correct.
9       Q.   And you inquired about the bill that was
10  sent to you by the GPO -- or excuse me, by the U.S.
11  Attorney?
12      A.   Department of Justice.  Department of
13  Justice.  That's correct.
14      Q.   And when you spoke with Mr. Hugh, how did
15  you identify yourself -- Mr. Wilmont, excuse me.
16      A.   How did I identify myself?  If I would --
17  perhaps by my name, Brian Burke.
18      Q.   You don't recall?
19      A.   I believe -- I would believe that I told
20  him I was the plaintiff in a case.  And I received a
21  bill, and asking him about what -- you know, what
22  would some of the irregularities -- or one

Page 93

1   irregularity, I should say, in the bill, where did
2   that come from.
3       Q.   So you identified yourself as Brian Burke?
4       A.   I believe so.  Yes.  I don't recall that
5   specific detail.  Certainly if I was asked, I mean, I
6   don't -- I certainly didn't represent myself as
7   anybody else.  I don't know if that's what you're
8   implying.
9       Q.   I'm just asking the question.
10      A.   Well, I understand.
11      Q.   Is that the -- that was on July 5th, 2007,
12  is that right, on or about July 5th, 2007?
13      A.   I believe it was on July 5th, 2007.
14      Q.   Did you speak with Mr. Wilmont at any
15  other time?
16      A.   No.  Not that I -- no, I didn't.
17      Q.   You also spoke with individuals from the
18  Government Printing Office after you received the
19  bill from the U.S. Attorney's Office, is that right?
20      A.   That's correct.
21      Q.   Who is the first person you spoke with
22  from the GPO?

24 (Pages 90 to 93)

Henderson Legal Services, Inc.

00000293

CONFIDENTIAL

Burke, Brian                                                                    May 25, 2010

Page 94

1    A.   It might have been Akiko Ward, but that's
2  certainly a valid question.  I'm not exactly -- exact
3  on who I called first, but I believe -- I guess I
4  could say on information and belief, it was Akiko
5  Ward.
6    Q.   And what did you discuss with Akiko Ward?
7    A.   I asked her about the bill.  Her signature
8  was on it.  And I guess paraphrasing, she said that
9  she had really nothing to do with it.  Her signature
10  was apparently automatically added, and directed me
11  to the contracts department, I believe.  I don't know
12  if it was Mr. Adgerson by name personally at that
13  time.  I spoke to a number of people in that
14  department in the GPO that day, that afternoon, in
15  fact.
16    Q.   So she gave you -- she did not give you
17  any information about the bill?
18    A.   She gave me no information about the bill.
19  She had no information apparently.  She just directed
20  me to others that -- another department in GPO that
21  would have some information on that.
22    Q.   Mr. Burke, I'll just ask, I know it's

Page 95

1  conversational sometimes, but just make sure I finish
2  my answer -- or question, excuse me, before I
3  answer, just to help out the court reporter to get it
4  done.  And I'll try to do the same and not to speak
5  over you.
6    MR. O'BRIEN:  And also, Mr. Burke, if you
7  could speak clearly, I know it's difficult, as
8  clearly as possible, that would be great.  Thank you.
9    BY MR. LOMAS:
10    Q.   When you spoke with Miss Ward, did you
11  identify yourself as Brian Burke?
12    A.   If it came up, if she asked me who I
13  was -- you know, sometimes when you call government
14  offices, they don't always ask you their name.  And
15  it would be almost inappropriate to tell you, hi, my
16  name is Brian -- sometimes I do.  I can't remember
17  that specific detail.  I certainly would be free with
18  that information if they had any interest in it, I
19  would tell them who I was, why I was calling.
20  Sometimes they are not interested.
21    Q.   Now, do you recall the name of the
22  individual that Miss Ward told you to speak with, or

Page 96

1  suggested you speak with?
2    A.   No, I don't.  I'm trying to be as frank as
3  possible, and I don't want to misstate that she gave
4  me a person's name.  I don't seem to be recalling her
5  giving me a person's name.  She could have.  She
6  certainly referred me to -- that the information
7  existed, I believe in the contracts department.  And
8  that piece of data, I'm not 100 percent on.
9    Q.   So other than your response here in this
10  interrogatory subsection C, and what you've mentioned
11  so far in response to my questions, is there any
12  other information that you have about that discussion
13  with Miss Ward?
14    A.   No.
15    Q.   Okay.  Okay.  All right.  Let's just go
16  down to the next subsection, 1-D, it refers to
17  Mr. Jerry Nash?
18    A.   Uh-huh.
19    Q.   And it says that Mr. Nash referred you to
20  another GPO official, is that right?
21    A.   Yes.  I believe so.  I believe Mr. Nash
22  was also in the contracts department.  And he might

Page 97

1  have been the one that referred me to Mr. Adgerson,
2  or he might have referred me to Mr. Washington, who
3  referred me to Mr. Adgerson.
4    I wrote it down contemporaneously on the
5  motion I received from the government, the bill.  I
6  believe you have a copy of it.  And I wrote a number
7  of names down where they worked, and I don't know if
8  I gleaned any information from Mr. Nash, other than
9  --
10    Q.   So Mr. Nash didn't have any information
11  about the contract?
12    A.   No.  I don't believe he did.  He didn't
13  give me any.  So --
14    Q.   And then the next subsection E in your
15  response refers to a conversation with Charles
16  Washington?
17    A.   Yes.
18    Q.   And Mr. Washington didn't give you any
19  information about the contract either?
20    A.   About the contract itself, I don't believe
21  so.  No.  He may have also referred me to Mr.
22  Adgerson, or he, maybe -- I don't -- or he might have

Henderson Legal Services, Inc.

00000294

CONFIDENTIAL

Burke, Brian                                                    May 25, 2010

Page 98

1  referred me to Mr. Nash, and then he referred me to
2  Mr. Adgerson.  I -- I don't -- I can't recall the
3  exact -- it wasn't that, frankly, as important to me
4  at the time to --
5      Q.   Sure.  But other than Mr. Washington
6  referring you to someone else, there was no other
7  information about this?
8      A.   No other information.
9      Q.   And who did you identify yourself as when
10 you spoke with Mr. Washington?
11     A.   If I was asked, I gave my name.  Maybe
12 even if I wasn't asked.  And probably if I was even
13 asked, I mean, that's just being polite, you know, to
14 create a context.  Hi, my name is Brian Burke.  I'm a
15 plaintiff in a case that I received a bill from GPO
16 that I see may or may not be irregular.  And I have
17 some questions.
18          You know, I'm guessing, you know, what
19 the -- my opening remarks would be, but they would
20 probably be something along those lines, if I, you
21 know, trying to inform -- ask different information
22 from somebody, I would probably give them some idea

Page 99

1  of the context of why I'm asking the information.
2      Q.   And was this conversation that you refer
3  to here the only conversation you had with
4  Mr. Washington?
5      A.   I believe so.  Yes.
6      Q.   I'm sorry.  For the one discussion we've
7  talked about earlier with Mr. Jerry Nash, was that
8  the only conversation you had with Mr. Nash?
9      A.   Yes.  I believe so.
10     Q.   And subsection F, you refer to a
11 conversation with Lloyd Rawls?
12     A.   Yes.
13     Q.   Did Mr. Rawls give you any information
14 about the Record Press contract?
15     A.   No.  He didn't.  He was -- he worked with
16 the Inspector General's Office in the GPO, or he
17 certainly represented himself, and I certainly
18 believe and understand that he was of that capacity.
19 And I, in fact, gave him information.  So I wasn't
20 really getting any information from him.
21     Q.   So Mr. Rawls provided no information about
22 the contract either?

Page 100

1      A.   No.
2      Q.   Was this the only conversation you had
3  with Mr. Rawls?
4      A.   Yes.  I believe so.  Yes.
5      Q.   Other than what's stated here in your
6  response, in subsection F, and what we have just
7  spoken about, or you've just answered, is there
8  anything else you can recall about that conversation
9  with Mr. Rawls?
10     A.   Well, it was -- you know, it was more,
11 much more substantial than my calls with Ms. Ward or
12 Mr. Nash or Mr. Washington.  It was -- at that time,
13 I was -- well, I guess, again to be frank, a little
14 bit under stress.  I just discovered the government
15 was being defrauded.  I certainly believed and
16 believe that to be true.  And that's what I was
17 reporting to Mr. Rawls, illegal activity.
18          And I gave -- the conversation took as
19 long as it took.  It was certainly a great deal more
20 substantial.  And I believe Mr. Rawls was taking
21 notes.  He certainly seemed very conscientious, very
22 interested.  And he took the information I gave him

Page 101

1  and he -- I believe he said he would get back to me.
2  Certainly seemed appropriate for him to do so.  And
3  he hasn't to this day.
4      Q.   I'm going to move to object, that the
5  response is not responsive.  The only question I
6  asked was, was that the only conversation you had
7  with him.  But you did indicate that --
8      A.   I thought you had -- if you want to read
9  back the question, I thought you asked something more
10 specific about the conversation.
11     Q.   Well, actually, what I'm going to ask you
12 now is, did you -- you said Mr. Rawls never got back
13 to you again, is that right?
14     A.   He might have called me, and I wasn't --
15 you know, he didn't get me.  I don't have an
16 answering machine.  My number -- he certainly
17 didn't -- I didn't get anything by mail or anything
18 asking me to call him, or get in touch with him.  So
19 I would say I -- I'm not aware of any -- receiving
20 any communication or his office.
21     Q.   You never spoke with him again?
22     A.   I do not believe I ever spoke with him

26 (Pages 98 to 101)

Henderson Legal Services, Inc.

00000295

CONFIDENTIAL

Burke, Brian                                                                May 25, 2010

Page 102

1   again, no.
2       Q.   Okay.  Okay.  If you'd look at your
3   response to the question number 2.  Interrogatory
4   number 2.  You refer to Pamela Lewis.
5       A.   Yes.
6       Q.   Can you tell me about Pamela Lewis,
7   please?
8       A.   Yes.  Well, these -- I was referred to, by
9   Mr. Adgerson, I wanted to get a copy of the contract
10  that we were discussing that he had a copy of, and
11  where he informed me of the fraud, basically, or the
12  correct interpretation of the contract, I should say.
13          And I needed -- I asked to get a copy of
14  the contract for the motion opposition I was planning
15  to serve on that day.  And so he had me call the
16  Philadelphia office.  And to be honest with you, I
17  don't recall -- one of them was, I guess, the person
18  who -- I don't know what the term is -- controlled
19  the contract, or was the one who let the contract.
20  And that person wasn't there that day.  And then I
21  spoke to another person who I believe worked with
22  her, it's two women.

Page 103

1           And she sent me a copy of the PDF of the
2   RFP.  And that's what I used in my motion -- or a
3   part of that I used in my motion for that day.  For
4   the --
5       Q.   The RFP was blank, right?
6       A.   The RFP was blank.  Yes.  I mean, it
7   wasn't -- well, it wasn't blank.  It didn't have the
8   numbers of the, I guess the bids that Record Press
9   put in.  But I was told by Mr. Adgerson what they
10  were.  I guess I was a little bit off on one of them,
11  because I said that the relevant line was --
12      Q.   Okay.  I'm sorry.  Mr. Burke, I'm going to
13  again move to respond -- or move to strike that last
14  portion as nonresponsive.  I just asked if the RFP
15  was blank.  So if you could just answer the question.
16      A.   It wasn't blank.  I guess I'm interpreting
17  what you meant to said.  No, it certainly was not
18  blank.  I don't --
19      Q.   The price line items had nothing --
20      A.   The numbers in -- yeah.
21      Q.   It was not an RFP that Record Press had
22  responded to, correct?

Page 104

1       A.   It wasn't the -- yes.  I guess that would
2   be fair to say.  It wasn't -- obviously, Record Press
3   put numbers of, I guess, their bids in -- into the
4   RF -- RFP and that -- other than what I was -- I was
5   told or some of the relevant lines over the phone,
6   but I certainly did not have all -- you know, the
7   vast majority of the bids.
8       Q.   The RFP you were sent --
9       A.   The RFP.
10      Q.   Was not filled out by Record Press at that
11  time?  The copy of the RFP that you had in your hands
12  did not have --
13      A.   The RFP did not have the numbers that
14  Record Press put in their RFP to bid on the, I guess,
15  2231 S.
16      Q.   All right.  Thank you.  And that RFP is
17  the one that you attached to your complaint when you
18  filed this lawsuit, is that right?
19      A.   Is it?  I believe it is, then if that was
20  --
21      Q.   Is that the only document that you
22  received from the Philadelphia office of the GPO?

Page 105

1       A.   I believe, I -- I can't say for certain.
2   Certainly I believe it was the only one, you know,
3   the only relevant document.  You know, I mean, it
4   would be easy to say yes, but then if they sent me
5   two, I don't know whatever else they would have sent
6   me, I don't know.  I believe that document was the
7   only one I used, that I'm aware of.
8       Q.   Have you produced all the documents that
9   you received from the GPO to us in this case?
10      A.   From the GPO?
11      Q.   Yes.  That you received from the GPO?
12      A.   Yes.  I believe so.
13      Q.   Okay.  The other -- you mentioned that you
14  spoke with either Pamela Lewis or another woman.  Is
15  that Katherine Miller?
16      A.   Yes.  I spoke with one of them.  One of
17  them was out sick or went home early for whatever
18  reason.  And the other one was the one that sent me
19  the material.
20      Q.   Did you ever have any discussion with
21  Pamela Lewis after that point?
22      A.   Again, I guess, you know, to be more

27 (Pages 102 to 105)

Henderson Legal Services, Inc.

00000296

CONFIDENTIAL

Burke, Brian                                                                May 25, 2010

Page 106

1  accurate, I'm not sure which one it was.  I spoke
2  with one of them, so maybe if -- if it was Katherine
3  Miller I spoke to that day, then I never spoke with
4  her again, certainly that I'm aware of.  And if it
5  was Katherine Miller I spoke with, I never spoke with
6  Pamela Lewis on that day or ever.
7       Q.   I understand.  That was the only
8  conversation you had with either one?
9       A.   Yes.
10      Q.   Okay.  Fair.  Thanks.  Now, you also refer
11 to a conversation with Mr. Calvin Adgerson, is that
12 right?
13      A.   Yes.
14      Q.   Okay.  Now, did you speak with Mr.
15 Adgerson before or after you received the RFP
16 from Philadelphia?
17      A.   Before.
18      Q.   Before?
19      A.   Absolutely.
20      Q.   How many conversations did you have with
21 Mr. Adgerson?
22      A.   One.

Page 107

1       Q.   One.  Okay.  You -- in your complaint that
2  you filed in this case, you referred to Calvin
3  Anderson?
4       A.   Yes.  I'm still not a hundred percent on
5  the name.  I believe my former attorneys, Murphy
6  Anderson, they got his correct name.  I believe they
7  did tell me maybe it was Adgerson, and I maybe
8  thought people had mispronounced it as Anderson, or I
9  wrote it as Mr. Anderson.
10      Q.   Okay.  So it's the same person, we are
11 talking about the same conversation here?
12      A.   I believe it was one person.  Yes.
13 However he spells his name.
14      Q.   Okay.  And when you spoke with Mr.
15 Adgerson, who did you say you were?
16      A.   Again, you know, assuming I told him what
17 I was at all, I would have told him my name, and why
18 I was calling.  That I got a bill from GPO within the
19 context of a motion from the Department of Justice
20 that came out of GPO, and originated from Record
21 Press, and -- you know, I can't -- you know, I don't
22 -- I don't -- you know, I can't say for certain I

Page 108

1  identified myself at all.
2       I guess I'm assuming I did, if that -- if
3  that information was something that Mr. Adgerson, I
4  believe that's his name, that Mr. Adgerson would have
5  been interested in.  I would think he would have kind
6  of -- you know, I would just give intuitively a
7  context for why I was requesting this information.
8       Q.   You didn't identify yourself as Hugh
9  Wilmont when you spoke with Mr. Adgerson?
10      A.   Absolutely not.
11      Q.   And what did you discuss with Mr.
12 Adgerson?
13      A.   Well, like I said, I was referred to him.
14 And I discussed, as I said, I can't see how I
15 probably couldn't have identified myself, because I'm
16 giving -- you know, explaining why I'm calling him,
17 you know, why I'm taking his time away as a civil
18 servant.  That he works in the contracts department,
19 I understood.  And this -- I was asking him about
20 this contract that, you know, speaking with
21 Mr. Wilmont and wondering why this one line, why over
22 80 percent of the costs was for binding costs.

Page 109

1       You know, what -- and other lines of the
2  contract seemed quite competitive.  And he went and
3  got the contract.  And he pulled it out.  And that's
4  when he explained to me the per 10 running copies,
5  and how he was very adamant about the fact that --
6  that the costs they were charging for, the binding
7  costs, if -- he didn't have a copy of the bill and I
8  didn't have a copy of the contract.  He said, well,
9  if that's what they are charging, you know, they are
10 supposed to charge that amount for every 10 copies,
11 not for every copy, that's why they are charging too
12 much.
13      Q.   Okay.  And Mr. Burke, you recognize you're
14 under oath today, is that right?
15      A.   Absolutely.
16      Q.   I'm going to hand you what's going to be
17 marked as Exhibit 12.
18           (Burke Exhibit No. 12 was
19            marked for identification.)
20 BY MR. LOMAS:
21      Q.   Do you recognize this, Mr. Burke?
22      A.   This looks like -- is this the complaint

28 (Pages 106 to 109)

00000297

CONFIDENTIAL

Burke, Brian                                                                    May 25, 2010

Page 110

1  from -- filed by -- by I guess Murphy Anderson. They
2  were called somebody else.
3      Q.    This is the complaint that Murphy Anderson
4  filed on your behalf, is that right?
5      A.    They weren't called Murphy Anderson. They
6  changed names of the firm, I guess.
7      Q.    If you could flip to the last page,
8  please. And at the beginning, it says, the
9  undersigned being duly sworn deposes and says that I,
10 Brian Burke, and the plaintiff relator herein, is
11 that right?
12     A.    Yes. That's signed under oath.
13 Absolutely.
14     Q.    And I've read the foregoing pleading to be
15 filed on my behalf, that's right?
16     A.    Yes.
17     Q.    And the contents are true to your
18 knowledge?
19     A.    Uh-huh.
20          MR. O'BRIEN: I'm sorry, Mr. Burke, is
21 that a yes?
22          THE WITNESS: Yes.

Page 111

1          MR. O'BRIEN: You just have to answer
2  verbally. Thank you.
3          BY MR. LOMAS:
4      Q.    And is that your name on this page?
5      A.    Yes.
6      Q.    And that's your signature?
7      A.    Yes.
8      Q.    If you could flip, please, to paragraph
9  19. That paragraph refers to your discussion with
10 Calvin Anderson.
11     A.    Yes. Or Anderson, Agderson. Is his name
12 -- I'm still -- yeah.
13     Q.    Could you please read that second sentence
14 to yourself.
15     A.    You want me to read it out loud.
16     Q.    No. Just to yourself and let me know when
17 you're finished, please.
18     A.    Yes. This was written by counsel, so --
19     Q.    There is a pending question.
20     A.    I would have wrote it differently.
21     Q.    So, but you reviewed this document
22 pursuant to your verification on the last page, is

Page 112

1  that right?
2      A.    Yes.
3      Q.    Okay. And you're swearing that the
4  contents are true to your knowledge, is that right?
5      A.    Yes.
6      Q.    And you understand that a false statement
7  in a verified complaint constitutes perjury, is that
8  right?
9      A.    Absolutely.
10     Q.    And you have not amended this document at
11 any point?
12     A.    Not that I'm aware of. You know, I've
13 been represented throughout the case so -- I just
14 want to, you know, I'll just say this seems, you know
15 --
16          MR. O'BRIEN: Mr. Burke.
17          THE WITNESS: I'm sorry.
18          MR. O'BRIEN: We've made an agreement out
19 of a courtesy to Mr. King to allow your deposition to
20 be a half day, and it's going to go a little easier
21 if you just answer the questions that we ask.
22          THE WITNESS: Right. Right.

Page 113

1          MR. O'BRIEN: So there is no question
2  pending, so I'm going to ask you to stick to
3  answering Mr. Lomas's questions, okay? Do you
4  understand?
5          THE WITNESS: I understand.
6          MR. O'BRIEN: Thank you very much.
7          BY MR. LOMAS:
8      Q.    So again, just the -- okay, so you've read
9  this complaint as stated in your verification, and
10 you signed and swore that you read this complaint, is
11 that right?
12     A.    Yes.
13     Q.    Okay. And you swore that these are --
14 these facts that you've alleged in this complaint are
15 true, to your knowledge?
16     A.    Yes.
17     Q.    Now, is there anything in paragraph 19,
18 while under oath today, that you would like to
19 withdraw from this paragraph?
20     A.    No. Absolutely not. I would just like to
21 clarify even stronger. I probably would have worded
22 it a little bit clearer. I think if there is any

29 (Pages 110 to 113)

Henderson Legal Services, Inc.

00000298

CONFIDENTIAL

Burke, Brian                                                                                        May 25, 2010

Page 114

1  possibility of --
2          MR. O'BRIEN:  Mr. Burke, the question is,
3  is there anything you want to withdraw?
4          BY MR. LOMAS:
5      Q.   Withdraw?
6      A.   Withdraw.
7      Q.   Withdraw, like take out.
8      A.   Well, I don't know if clarifying it would
9  be withdrawing it.
10     Q.   No.  I'm just asking if you would like to
11 remove anything?
12     A.   No.  Absolutely not.  I would -- as I
13 said, if there is ambiguity, then I would ask that I
14 clarify -- be allowed to clarify.
15     Q.   Okay.  All right.  Mr. Burke, besides the
16 individuals that we've just spoken about today, did
17 you have any other conversations with any individual
18 from the Government Printing Office about this case?
19     A.   I spoke with somebody from the GPO's --
20 actually, someone in their counsel's office.  I did a
21 FOIA request, which they were -- explained to me that
22 because they are legislative agency, they are not

Page 115

1  required to follow FOIA, but yet they would do it
2  anyway.  But they didn't for some reason in this case
3  so --
4      Q.   Is that the only other person from the GPO
5  you spoke with?
6      A.   I believe so.  Yes.
7      Q.   You believe so?  You're not sure?
8      A.   I mean, I don't have any reason to believe
9  that I spoke with anybody else, other than people who
10 were mentioned on that page -- on the -- I believe
11 have you a copy of.
12     Q.   Right.
13     A.   You know the names of those people that I
14 wrote down, and then that one woman.
15     Q.   And do you have the name of that woman?
16     A.   No.  I don't.
17     Q.   Has she ever been identified in this case
18 before?
19     A.   I don't know.
20     Q.   Is there a reason?
21     A.   Because I don't know -- I don't remember
22 her name.  Because she -- she -- you know, I sent a

Page 116

1  FOIA request in.  I just never got anything.  She
2  said she was the FOIA person, even though she was in
3  the -- most places they have a separate FOIA office.
4  But apparently she was the FOIA person, so I spoke
5  with her.  She was in the general counsel's office, I
6  understood, an attorney for the GPO.  And she didn't
7  comply -- she did not comply when she said she would.
8      Q.   Mr. Burke, again, we're going to move to
9  strike that answer as nonresponsive.  I just asked if
10 her name had ever been disclosed in this case before?
11     A.   I don't recall her name.  I'm sorry.
12     Q.   Did you speak with anyone else, other than
13 individuals from GPO about this case?
14     A.   Yes.
15     Q.   And who was that?
16     A.   Well, I called -- I called Congress, and
17 the Senate.  They have joint responsibility over the
18 GPO, about fraud and any tendency to cover the same.
19 I believe that was something they had a right to be
20 noticed about, the Joint Committee on Printing.
21     Q.   And if you refer to paragraph 11 of your
22 interrogatory responses?

Page 117

1      A.   Yes.
2      Q.   You refer to Mike Harrison?
3      A.   I believe that's his name.  Yes.  Mike
4  Harrison.  He is an attorney.  I believe he works --
5  he apparently is the only -- on, I guess, the House
6  of Representatives side, the only person really
7  involved with the Joint Committee on Printing as any
8  kind of full time situation.
9      Q.   And did you tell -- did you accuse Record
10 Press of fraudulently billing the government to
11 Mr. Harrison?
12     A.   I informed him about information I had
13 that the -- there was some irregularities in their
14 billing.
15     Q.   And how many -- did you contact Mike
16 Harrison via phone?
17     A.   I believe so.  Yes.
18     Q.   So you accused Record Press of fraud when
19 you spoke with Mr. Harrison?
20     A.   I don't recall if I used the word fraud.
21 I might have, I might not have.  If Mr. Harrison says
22 I did, I would take his word for it.  I certainly

30 (Pages 114 to 117)

Henderson Legal Services, Inc.

00000299

CONFIDENTIAL

Burke, Brian                                                                                                    May 25, 2010

Page 118

1    informed him of the information I had.
2        Q.    Was that the only discussion you had with
3    Mr. Harrison?
4        A.    No.  I believe I called him more than
5    once.
6        Q.    How many conversations did you have with
7    him?
8        A.    At least maybe two, probably more like
9    three.
10       Q.    Is there a reason why you didn't identify
11   Mr. Harrison on your initial disclosures of witnesses
12   with relevant knowledge in this case?
13       A.    I don't know.  I would have to go over
14   what the request was.  I mean, why would that be
15   relevant?  I'm not saying -- I'm not stipulating to
16   that being relevant to this case.
17       Q.    Did Mr. Harrison ever send any
18   communication to you via letter or email, fax?
19       A.    No.
20       Q.    You spoke with Mr. Harrison because you
21   wanted Congress to investigate Record Press, is that
22   right?

Page 119

1        A.    I believe I asked for -- was it a GAO?  I
2    believe that there was an appropriate GAO audit of --
3    is it a GAO audit of GPO?
4        Q.    Audit of Record Press, billing to the
5    government?
6        A.    No.  Of GPO.
7        Q.    In relation to?
8        A.    His authority is over GPO not over -- I
9    mean, Record Press is a contractor of GPO.  I mean,
10   if they are letting one company defraud them, then
11   maybe their practices need to be audited.
12       Q.    But when you spoke with Mr. Harrison, you
13   spoke about the Record Press contract, right?
14       A.    I'm not -- honestly, counselor, I'm not
15   sure how specific I got on that.  I mean, he is the
16   main person for the Joint Committee on Printing, who
17   has the authority, sole authority, from my
18   understanding, over GPO, and I'm --
19       Q.    Mr. Burke, the question was whether you
20   spoke about --
21       A.    I don't know how specific I was.  I want
22   to be accurate and I understand I'm under oath, so I

Page 120

1    can't say I spoke specifically -- he may not have
2    been interested in one contract.
3        Q.    But did you mention Record Press when you
4    spoke with --
5        A.    I would say there was a good chance I did.
6        Q.    You referred earlier, you accused them of
7    irregularities, isn't that right?
8        A.    I mean, that would have been the reason I
9    was calling them, so I mean, there is a good chance
10   that it came up.  More likely than not, I would
11   think.
12       Q.    Mark that exhibit as Exhibit 13.
13           (Burke Exhibit No. 13 was
14           marked for identification.)
15       BY MR. LOMAS:
16       Q.    Mr. Burke, this is a letter that you sent
17   to Senator Schumer, is that right?
18       A.    Yes.  I believe so.
19       Q.    You produced this document in the case
20   last night, is that right, via counsel?
21       A.    Yes.  I informed counsel about this
22   communication.

Page 121

1        Q.    In the third sentence, you indicate to
2    Senator Schumer that you're suing a company called
3    Record Press to recover paid fraudulent claims, is
4    that right?
5        A.    Yes.
6        Q.    So you accused Record Press of fraud in
7    this letter to Senator Schumer?
8        A.    Well, that's -- that would be a reasonable
9    interpretation.
10       Q.    You indicate in this letter that the case
11   is also being investigated by New York State Attorney
12   General's Public Integrity Bureau, is that right?
13       A.    I informed them.
14       Q.    How did you inform them?
15       A.    By phone.
16       Q.    So you called and made a complaint?
17       A.    Yes.
18       Q.    And you accused Record Press of fraud?
19       A.    Well, I accused them of -- well, this --
20   in fact, to be more specific, in this instance, I had
21   reason to believe, and may or may not have been
22   correct about it, I still don't have the information

31 (Pages 118 to 121)

Henderson Legal Services, Inc.

00000300

CONFIDENTIAL

Burke, Brian                                                                                May 25, 2010

Page 122

1   on whether other people in my situation who have lost
2   cases were given bills that were apparently -- and
3   that's to be determined -- fraudulent.
4           But now, that wouldn't necessarily involve
5   the federal government.  New York State Attorney
6   General, from my understanding, doesn't have any
7   authority over the federal government.  But if
8   individuals, including myself, were defrauded when
9   they lost cases in the Second Circuit or wherever
10  else, there might have been a -- the same contract,
11  then I believe the attorney general's office would
12  have jurisdiction.  And that was why, as a civil
13  servant, and someone with specific knowledge, I felt
14  it was my duty as a citizen to report that.
15      Q.   Move to strike as nonresponsive.  You also
16  apparently, according to this letter, filed some sort
17  of complaint with the Staten Island District
18  Attorney's Office, is that right?
19      A.   I spoke to, I believe a number of
20  attorneys, district attorneys' offices.  They were
21  the ones -- they were very interested.
22      Q.   You accused Record Press of fraud when you

Page 123

1   spoke with these district attorneys?
2       A.   I informed them of the aspects of the case
3   which may affect citizens of their county.
4       Q.   And that involved Record Press, did it
5   not?
6       A.   That involved possible citizens of their
7   county being overbilled for -- if they lost cases.
8       Q.   Mr. Burke, again, you're not answering the
9   question.
10      A.   Again, you asked me to paraphrase if I
11  used the word fraud.  I can't guarantee that I did.
12      Q.   Mr. Burke, my question was very simple.
13  Did you refer to Record Press when you filed those
14  complaints?
15      A.   I believe that would have been the proper
16  context, yes.
17      Q.   And that's the case also with the New York
18  City Council?
19      A.   Yes.
20      Q.   Okay.  You refer to the New York Post
21  asking for or receiving exclusive rights to first
22  publish the story.  Did you approach the New York

Page 124

1   Post about this story?
2       A.   Yes.
3       Q.   You contacted Bruce Golding about this
4   story?
5       A.   Yes.
6       Q.   And you informed them that Record Press
7   was defrauding the government?
8       A.   I informed them about this case.
9       Q.   And that includes Record Press, is that
10  right?
11      A.   Record Press is a party in this case.
12      Q.   Are you refusing to acknowledge that you
13  informed them that Record Press was defrauding the
14  government?
15      A.   Is that your position, that they are
16  defrauding the government?  I informed them about the
17  case.
18      Q.   Mr. Burke, answer the question.
19      A.   The fraud is involved in the case.  You're
20  asking me to make a legal conclusion?
21      Q.   I'm asking you to tell me -- I'm telling
22  you -- I'm asking you what you told to Mr. Golding at

Page 125

1   the New York Post -- at the New York Post.
2       A.   That's not privileged, a reporter?
3       Q.   No.
4       A.   I explained to him about the case, and he
5   asked for exclusive rights to the case.  To report
6   and apparently he hasn't done a report yet.
7       Q.   Mr. Golding has never reported on this
8   case, has he?
9       A.   From my knowledge, not at this point.  So
10  I don't know if he still has exclusive rights.
11      Q.   When did you contact Mr. Golding?
12      A.   Obviously prior to this letter.  I don't
13  have the date.
14      Q.   Did you call Mr. Golding?
15      A.   I probably called the New York Post, and
16  they referred me to him.  He is their legal reporter.
17  And then I spoke to him.  They gave me this number
18  and I spoke to him.
19      Q.   Did you ever send any letters or emails or
20  faxes to Mr. Golding?
21      A.   I -- no faxes.  I don't know if I sent --
22  maybe I sent an email.  I could have.

32 (Pages 122 to 125)

CONFIDENTIAL

Burke, Brian                                                                                    May 25, 2010

Page 126

1    Q.    You've indicated his email address in this
2    letter.
3    A.    Yes, I do.  I may have sent him something,
4    but I can't recall at this time.
5    Q.    We would ask that if there was any email
6    sent to Mr. Golding that we receive copies, because
7    they would be responsive to the document requests on
8    communications about this case?
9    MR. O'BRIEN:  Tyler, can you tell us for
10   the record, did -- we, of course, requested emails.
11   Were those searched for and produced in response to
12   our document requests in this case?
13   MR. KING:  The documents that were
14   produced last night, and including the financial
15   documents that were just produced now, including the
16   documents that Mr. Burke brought with him today,
17   which he found this morning, were the documents that
18   he found in his search for documents in responding to
19   the document request.
20   And if there are other documents, such as,
21   you know, a document in this email, for example, then
22   it would have been one that simply did not come up in

Page 127

1    the search.  But Mr. Burke is -- you know, to the
2    extent that he becomes aware of a place where
3    documents exist, we will certainly be producing those
4    documents.
5    MR. O'BRIEN:  As part of this document
6    production, were emails searched?
7    MR. KING:  Were emails searched?
8    BY MR. LOMAS:
9    Q.    Mr. Burke, were emails searched in
10   response to our document request in this case?
11   A.    Searched.
12   Q.    Did you search your emails, your email,
13   Gmail account for emails responsive to this case?
14   A.    I don't really have -- I don't actually
15   know how to do that frankly.  I don't -- I mean, I
16   looked to see what was relevant documents.  I don't
17   know.
18   Q.    So the answer to that question is no, is
19   that right?
20   A.    Search?  I mean, I looked through it, but
21   I -- you know, maybe if there is some kind of
22   professional search method, I didn't -- I can't say I

Page 128

1    necessarily performed that.  And of course, maybe I
2    thought that that was something that was privileged
3    if I -- if that was the reason why I left it out.  I
4    don't even recall.  If I did send him something,
5    which I'm not saying I did, via email.
6    Q.    Mr. Burke, have you contacted any other
7    reporters about this case?
8    A.    No.  After he said we had an agreement to
9    be exclusive, so I had no reason to reach out to
10   other reporters.
11   Q.    Have you contacted any reporters about any
12   other lawsuits that you filed?
13   A.    I don't recall doing that, but you know,
14   that's possible.
15   Q.    And again, Mr. Golding never sent you any
16   letters, is that right?
17   A.    No.  It was just -- probably just one or
18   two conversations, and I don't think there was any
19   postal communication.
20   Q.    Did you ask Mr. Golding for any money for
21   this story?
22   A.    No.  Absolutely not.

Page 129

1    Q.    Mr. Golding never sent you any emails, is
2    that right?
3    A.    I don't believe he did.  I don't believe
4    he did.  I don't really know what I would have sent
5    him.  I guess maybe, you know, the number of the
6    case.
7    Q.    Mr. Burke, I asked if Mr. Golding sent you
8    any emails, but he did not?
9    A.    I don't believe he did.  No.
10   Q.    And there was no story ever published
11   about this case, is that right?
12   A.    Not that I'm aware of.  Not at that time.
13   Q.    Okay.  Thank you.  Okay, Mr. Burke, with
14   respect to the complaint that you filed in this case,
15   how did you become aware of the qui tam action?
16   A.    That's a good question.  How did I -- I
17   don't -- I probably just researched on the Internet,
18   I mean -- yeah.
19   Q.    Okay.  All right.  And as we discussed
20   earlier, you verified that the contents of your
21   complaint were true and accurate, is that right?
22   A.    Yes.

33 (Pages 126 to 129)

Henderson Legal Services, Inc.

00000302

CONFIDENTIAL

Burke, Brian                                                                                          May 25, 2010

Page 130

1    Q.   To your knowledge?
2         MR. O'BRIEN:  Was that a yes?
3         THE WITNESS:  To every extent possible,
4    yes.
5         BY MR. LOMAS:
6    Q.   You swore that -- on the last page, that
7    the contents were true, is that right?
8    A.   Well, is there any -- yes, I believe it's
9    true.  Is that -- what are we talking about now?  Did
10   I use those terms?  I mean, I know people like to
11   paraphrase, but is that what I said exactly?
12        BY MR. LOMAS:
13   Q.   You signed the last page of your verified
14   complaint?
15   A.   Okay.  Let me --
16   Q.   It's just a simple yes or no answer, Mr.
17   Burke.
18   A.   No, because there is a qualification.  It
19   says, the contents are true to my own knowledge,
20   except as to matters therein stated to be alleged
21   upon information and belief, and as to matters, I
22   believe them to be true facts as stated herein.  So I

Page 131

1    would prefer to use the full phrase than just whether
2    it's true or not.
3    Q.   Mr. Burke, my question was, you signed
4    this last page of this document, that's right?
5    A.   Yes.
6    Q.   Okay.  If we could look to page -- excuse
7    me, paragraph 15 of your complaint.  And in the
8    second sentence of that paragraph, you state that
9    Record Press billed the government $1483.77 for
10   collating and trimming 20 copies of a 566 page
11   appendix.  That's right?
12   A.   I was given the information later that
13   they -- apparently the government adds 7 percent to
14   the bill --
15   Q.   Mr. Burke, the question was --
16   A.   But that's what it says.  Counsel, you're
17   reading it very well.  Thank you.
18   Q.   And the next sentence, you alleged that
19   Record Press billed the government $398.47 for
20   collating and trimming 40 copies of a 76-page brief,
21   that's right?
22   A.   That's right, that's what it says.

Page 132

1    Q.   That's what you allege in your verified
2    complaint?
3    A.   That's an allegation, yes.  That's what it
4    -- but I didn't get the added 7 percent.  I didn't
5    have that knowledge.
6    Q.   Okay.  I'm going to ask the court reporter
7    to mark the next exhibit as Exhibit 14.
8         (Burke Exhibit No. 14 was
9         marked for identification.)
10        BY MR. LOMAS:
11   Q.   Mr. Burke, this is a declaration that you
12   submitted in opposition to defendant's motion for
13   summary judgment in this case, right?
14   A.   Yes.
15   Q.   And if you look to page 3, you declare
16   under penalty of perjury that the foregoing is true
17   and correct?
18   A.   Yes.
19   Q.   If you flip to Exhibit A of your
20   declaration, this is the itemized and verified bill
21   of costs that was sent to you from the Evans case?
22   A.   Yes.

Page 133

1    Q.   Is that right?
2    A.   Yes.
3    Q.   And this is a -- with attachments, this is
4    9, 10 pages?
5    A.   Yes.
6    Q.   And the -- Record Press, Inc. appears
7    nowhere on this document, is that right?
8    A.   I think you may be right about that.
9    Hopefully we are not missing a page, are we?
10   Q.   You attached this document to your
11   declaration, isn't that right?
12   A.   Oh, counsel put this together.
13   Q.   Mr. Burke, on page 3, you signed that you
14   declare under penalty of perjury that the foregoing
15   is true and correct, is that right?
16   A.   Oh, that's -- yes, that was asked and
17   answered.  Yes.
18   Q.   Okay.  If you could please turn to page --
19   the fourth page of the -- that Exhibit A.  The page
20   with your --
21   A.   The handwriting.
22   Q.   With the handwriting on it.  That's right.

34 (Pages 130 to 133)

CONFIDENTIAL

Burke, Brian                                                                                      May 25, 2010

Page 134

1  Okay.  And if you could look at the bottom of that
2  page, and the line, collating and trimming 1483.77.
3  This is the document from which you got the 1483.77
4  figure that you put in your complaint, is that right?
5      A.  I believe so.
6      Q.  Okay.  And if you could flip then a few
7  more pages to the next similar looking page with the
8  GPO heading.  And there at the bottom is $398.47 for
9  collating and trimming?
10     A.  Yes.
11     Q.  And that's the charge that you included in
12 paragraph 15 of your verified complaint, is that
13 right?
14     A.  I believe that's where I got it.  Yes.
15     Q.  Okay.  Thanks.  Okay.  Mark the next
16 exhibit as Exhibit 15.
17         (Burke Exhibit No. 15 was
18          marked for identification.)
19     BY MR. LOMAS:
20     Q.  Okay.  Mr. Burke, you see that this is --
21 has a Record Press, Inc. header on the top of the
22 page?

Page 135

1      A.  Yes.
2      Q.  And it says invoice number A 71701 at the
3  top right?
4      A.  Where?
5      Q.  At the upper right-hand corner?
6      A.  Invoice date.  Oh, A 71701.  Yes.
7      Q.  Right.  Okay.  And then if you look down
8  below, you see the notation Burke v. Evans?
9      A.  Yes.
10     Q.  Okay.  And then the description Burke T.
11 -- or excuse me, Brian T. Burke versus Donald Evans,
12 printing and binding 20 copies of the above appendix,
13 is that right?
14     A.  Yes.
15     Q.  And the charge for collating, trimming the
16 size and binding in this invoice is 1386.70?
17     A.  That's what it says.
18     Q.  Okay.  So this document shows that Record
19 Press billed 1386.70 for collating, trimming to size,
20 and binding -- Record Press billed the GPO $1,386.70
21 for collating, trimming to size, and binding the
22 appendix in your case?

Page 136

1      A.  Apparently.
2      Q.  Okay.  Mark the next exhibit, please.
3          (Burke Exhibit No. 16 was
4           marked for identification.)
5      BY MR. LOMAS:
6      Q.  Okay.  Mr. Burke, do you recognize this as
7  another Record Press invoice to the GPO?
8          MR. O'BRIEN:  What's the exhibit number?
9  I'm sorry.
10     BY MR. LOMAS:
11     Q.  I'm sorry.  This is Exhibit Number 16.
12     A.  Yes.  I see it seems very similar to the
13 previous exhibit.
14     Q.  Do you see that it refers to your case,
15 Brian T. Burke v. Donald Evans?
16     A.  Yes.
17     Q.  And this is for printing and binding 40
18 copies of the brief, the government's brief in that
19 case?
20     A.  Yes.
21     Q.  And the charge for collating, trimming to
22 size, and binding that Record Press charged the

Page 137

1  government for those briefs is $372.40?
2      A.  That's what it says.
3      Q.  Okay.  Okay.  Mr. Burke, who were your
4  attorneys when you filed this lawsuit?
5      A.  They were -- well, it's on the cover of
6  the complaint.  Now -- they are called Murphy
7  Anderson now, but I can't recall what the name of the
8  firm was at the time.
9      Q.  So originally they were called --
10     A.  Davis Cowell & Bowe, that's it.
11     Q.  And then they changed their name to Murphy
12 Anderson?
13     A.  Yes.
14     Q.  And your attorneys included Mark Hanna?
15     A.  Yes.  Ms. Jacobs and Keira McNett.
16     Q.  Okay.  Thank you.  Now, your counsel from
17 Murphy Anderson, they met with representatives from
18 the Government Printing Office in September 2009
19 about this case, isn't that right?
20     A.  Under my understanding.  Yes.
21     Q.  And they were --
22         MR. O'BRIEN:  I'm sorry, sir, what was

Henderson Legal Services, Inc.

202-220-4158                                                          www.hendersonlegalservices.com

CONFIDENTIAL

Page 138

1  your last --
2      THE WITNESS:  Under my understanding.  I
3  wasn't present, but I was told that that's what
4  occurred.  Yes.
5      BY MR. LOMAS:
6      Q.   And after meeting with the GPO
7  representatives about this case, your attorneys
8  withdrew as counsel, is that right?
9      A.   I changed -- counsel has been changed in
10 this case.
11     Q.   Your counsel withdrew?
12     A.   I'm not going to characterize it.  It was
13 a change of counsel.
14     Q.   And that occurred after the meeting with
15 the GPO?
16     A.   There was ongoing discussion prior about
17 changing counsel, and there was indeed a change in
18 counsel.
19     Q.   You changed counsel after the meeting with
20 the GPO, is that right?
21     A.   Yes.
22     Q.   Thank you.

Page 139

1      A.   They brought up a reason of conflict of
2  interest, et cetera.
3      Q.   Move to strike that portion of the
4  response as nonresponsive.  All right.  Can we go off
5  the record for a moment, please?
6      THE VIDEOGRAPHER:  Off the record at
7  12:28.
8      (Recess.)
9      THE VIDEOGRAPHER:  We are back on the
10 record at 12:58.
11     BY MR. LOMAS:
12     Q.   Mr. Burke, yes or no, did you review any
13 emails in response to the document request that
14 Record Press issued to you in this case?
15     A.   Review any emails?
16     Q.   In response to the document requests.
17     A.   I have emails between myself and my
18 attorney.
19     Q.   Those are the only emails you reviewed?
20     A.   That are related to this case?
21     Q.   In response -- are those the only emails
22 you reviewed in response to the document requests?

Page 140

1      A.   I believe -- I believe so.  Yes.
2      Q.   Were you asked to review any emails in
3  response to the document requests?
4      A.   I don't know.  Does it have -- mention
5  emails in the document request, or it just mentions
6  documents, or generic documents.
7      Q.   My question to you is, were you asked to
8  review emails in response to document requests?
9      A.   I don't recall that I was.
10     Q.   Thank you.  All right.  And earlier you
11 referred to a conversation with Hugh Wilmont, is that
12 right?
13     A.   Yes.
14     Q.   And you didn't identify yourself during
15 that conversation with Mr. Wilmont, did you?
16     A.   Can you -- can you repeat the question?
17     Q.   In your conversation that you referenced
18 earlier with Mr. Wilmont, you didn't identify
19 yourself when you spoke with Mr. Wilmont, did you?
20     A.   I'm going to object to you implying an
21 answer there, but again, I certainly would -- I
22 believe I would have had to identify myself in some

Page 141

1  context of why I was calling unless -- unless that
2  was just something that was indifferent to the
3  recipient, you know.  It's something that --
4      Q.   So you did identify yourself?
5      A.   I would think I did.  I mean, you know,
6  it's difficult to have a conversation with someone if
7  you don't identify yourself, but it's possible.
8      Q.   Other than that conversation with
9  Mr. Wilmont, have you had any other conversations
10 with him?
11     MR. KING:  Asked and answered.
12     THE WITNESS:  No.
13     BY MR. LOMAS:
14     Q.   So that was the only one, one conversation
15 with him?
16     MR. KING:  Asked and answered.
17     THE WITNESS:  Yes, I believe so.
18     BY MR. LOMAS:
19     Q.   Mr. Burke, I'd like to refer you back to
20 Exhibit 12 from -- if you could please turn to page
21 6.  Actually, before that, please turn to the end of
22 the document, the last page again.  And again, as we

36 (Pages 138 to 141)

00000305

CONFIDENTIAL

Burke, Brian                                                                      May 25, 2010

Page 142

1  spoke before, that's your signature on the last page?
2      A.   Yes.
3      Q.   With the verification.  Okay.  And then if
4  you'd flip back to page 6, if you could.  And look at
5  paragraph 26.  Here you allege in your verified
6  complaint that Record Press has knowingly presented
7  or caused to be presented to the U.S. Government
8  false or fraudulent claims for payment, is that
9  right?
10      A.   Yes.
11      Q.   So you're accusing Record Press of fraud?
12      A.   Accusing them of what is put on this
13  paper.  That's paraphrasing, fraudulent claims -- is
14  fraudulent claim fraud?  If that's the case, then
15  that's making -- I believe that would be a conclusion
16  of law perhaps, whether fraudulent claim -- was there
17  a scienter or whatever is required under the False
18  Claims Act.  You know, that's -- if you want to
19  paraphrase it as fraud, that's not what it says, but
20  similar.  Fraudulent claim.  That's what is says.
21      Q.   You're alleging that Record Press
22  knowingly presented false claims to the government?

Page 143

1      A.   Yes.
2      Q.   Yes or no?
3      A.   Yes.  I am affirmatively saying that what
4  it says here is correct.  Yes.
5      Q.   My question was, you are -- you are
6  stating that Record Press is knowingly presenting
7  false claims to the government?  Is that right?
8      A.   That would be correct.
9      Q.   And if you could look down at paragraph
10  28.  Again, you state here, Record Press knowingly
11  made, used, or caused to be made or used false or
12  fraudulent records or statements to get false or
13  fraudulent claims paid, is that right?
14      A.   Yes.  That's what it says.
15      Q.   And you stand by that allegation?
16      A.   I stand by that allegation.
17      Q.   And when you spoke with the New York Post
18  reporter, you spoke about this case, is that right?
19      A.   Yes.
20      Q.   And this case involves these allegations
21  against Record Press?
22      A.   Yes.

Page 144

1      Q.   And so you discussed those allegations
2  with the reporter?
3      A.   I don't want to misstate exactly what the
4  conversation was.  It was relating to this case.
5      Q.   You discussed your lawsuit against Record
6  Press, is that right?
7      A.   Yes.  In some manner.
8      Q.   Mr. Burke, have you ever been treated by a
9  psychologist?
10      A.   Treated?  I don't believe so, no.
11      Q.   What about by a psychiatrist?
12      A.   I don't believe so.  No.
13      Q.   Have you ever been diagnosed -- diagnosed
14  with any mental illness?
15      A.   Mental illness?  No.
16      Q.   Have you ever been treated by a social
17  worker for anything?
18      A.   No.
19      Q.   Have you ever met with a psychiatrist?
20      A.   In what context?  I studied psychology.  I
21  probably -- I've had conversations with
22  psychologists.  I mean, it's a very interesting

Page 145

1  field.
2      Q.   Have you ever had conversations with
3  psychiatrists about yourself?
4      A.   Perhaps.
5      Q.   And what would those discussions be about?
6          MR. KING:  Objection.  Overbroad.
7          THE WITNESS:  Wow.  About the field
8  itself.  Psychology is a fascinating field.  Perhaps
9  I was always interested in Alexander Solzhenitsyn's
10  view on psychology and his travails in the Soviet
11  Gulag, and how it's sometimes used against people by
12  the powerful.
13          BY MR. LOMAS:
14      Q.   So I asked earlier if you ever discussed,
15  talked with a psychiatrist about yourself.  And so
16  that's what I was referring to, anything -- any
17  discussions about you with the psychiatrist?
18      A.   I talked -- I've talked to, I don't know,
19  thousands of people in my life.  To be conservative,
20  and you know, I certainly can't -- you know, what
21  people's titles are, and what the exact
22  conversations -- I talk, you know, I talk to a

37 (Pages 142 to 145)

Henderson Legal Services, Inc.

00000306

CONFIDENTIAL

Burke, Brian                                                                                           May 25, 2010

Page 146

1  variety of people about basically whatever they want
2  to bring up themselves.
3      Q.    Any of those conversations been about any
4  symptoms of mental illness?
5          MR. KING:  Objection.  Overbroad.  And
6  expertise.
7          THE WITNESS:  Certainly not that I'm aware
8  of, or that I recall.
9      BY MR. LOMAS:
10     Q.    Okay.
11     A.    I would like to add that I was -- you
12 know, I don't know if it's somewhat relevant to this
13 case, and you guys are really polite about it, but I
14 do suffer from photophobia.  I have a disability,
15 partial disability, I guess, maybe you're aware of
16 it.  It was in the underlying case.  And my current
17 employer does reasonably accommodate me.  I certainly
18 believe and hope that you and the court would as
19 well, as has so far, but I don't know if that's
20 relevant to your question.
21     Q.    No.  We'll move to strike that because
22 there was no pending question.  It's nonresponsive to

Page 147

1  the earlier question.  But I think we are going to
2  have no further questions, subject to keeping the
3  deposition open because of the document request
4  that -- the responses and associated with some of the
5  pending issues with the discovery, okay?
6          MR. KING:  Okay.  And there is no redirect
7  at this time.
8          THE VIDEOGRAPHER:  This marks the end of
9  tape number 2.  We are off the record at 1:07.
10         (Whereupon, at 1:07 p.m., the taking of
11 the deposition ceased.)
12
13
14         _____
15             BRIAN BURKE
16
17 Subscribed and sworn to and before me
18 this _____ day of _____, 20_____.
19
20
21 _____
22     Notary Public

Page 148

1  UNITED STATES OF AMERICA)
2                          SS:
3  DISTRICT OF COLUMBIA    )
4
5      I, SUSAN L. CIMINELLI, the officer before whom
6  the foregoing deposition was taken, do hereby
7  certify that the witness whose testimony appears in
8  the foregoing deposition was duly sworn by me; that
9  the testimony of said witness was taken by me to the
10 best of my ability and thereafter reduced to
11 typewriting under my direction; that I am neither
12 counsel for, related to, nor employed by any of the
13 parties to the action in which this deposition was
14 taken, and further that I am not a relative or
15 employee of any attorney or counsel employed by the
16 parties thereto, nor financially or otherwise
17 interested in the outcome of the action.
18
19         _____
20             SUSAN L. CIMINELLI
21
22 My commission expires:  11/30/2011

38 (Pages 146 to 148)

00000307

# EXHIBIT 4

00000308





Positive
As of: Apr 20, 2009

**BRIAN T. BURKE, Plaintiff, -against- Secretary CARLOS GUTIERREZ and THE UNITED STATES DEPARTMENT OF COMMERCE, Defendants.**

**04 Civ. 7593 (PKC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 1111*

**January 12, 2006, Decided
January 12, 2006, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Burke v. Evans, 2007 U.S. App. LEXIS 13561 (2d Cir. N.Y., June 8, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Pro se plaintiff former employee filed suit pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, and the Rehabilitation Act of 1973, *29 U.S.C.S. § 701 et seq.*, against defendants, the United States Department of Commerce and the Secretary of Commerce. Defendants moved for summary judgment.

**OVERVIEW:** The employee alleged that he was discriminated against on the basis of his national origin, religion, sex, and disability, and he was retaliated against for filing a complaint with the Equal Employment Opportunity Office. As the Secretary was the only proper defendant in Title VII and the Rehabilitation Act actions, all claims against the Commerce Department were dismissed. Defendants asserted that the employee could not make out a prima facie case of discrimination and/or retaliation under either Title VII or the Rehabilitation Act and that, even if he could, defendants offered a legitimate, nondiscriminatory reason for the adverse employment action of which the employee complained, which he could not demonstrate to be a mere pretext--there was not enough work to go around. The court agreed. The employee's vague recollections of conversations in which third parties were alleged to have made admittedly unsubstantiated suggestions of discriminatory intent were insufficient to meet even the minimal burden imposed on a plaintiff in an employment discrimination case.



EXHIBIT
*Burke 2*

2006 U.S. Dist. LEXIS 1111, *

As the employee failed to allege retaliation in his administrative complaint, his retaliation claims were unexhausted.

**OUTCOME:** Defendants' motion for summary judgment was granted.

**CORE TERMS:** census, retaliation, summary judgment, prima facie case, national origin, enumerator, disability, religion, discriminatory, Rehabilitation Act, assigned, sex, pro se, citations omitted, affirmation, disabled, nondiscriminatory reason, photophobia, enumeration, terminated, deposition, genuine, hearsay, female, not-to-exceed, similarly situated, conversations, termination, impairment, quotation

### LexisNexis(R) Headnotes

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Covered Entities*
*Labor & Employment Law > Discrimination > Federal Employees*
[HN1] Federal employers are not amenable to suit under the Americans with Disabilities Act, *42 U.S.C.S. §§ 12112-12117. 42 U.S.C.S. § 12111(5)(B).*

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
*Governments > Courts > Authority to Adjudicate*
[HN2] A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*

[HN3] Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c).* In considering a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN4] It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in its favor, as a matter of law. When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must set forth specific facts showing that there is a genuine issue for trial as to a material fact. *Fed. R. Civ. P. 56(e).* A fact is material if it might affect the outcome of the suit under the governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Thus, in order to survive summary judgment, a nonmoving party must come forth with more than a mere scintilla of evidence in support of their position; he must come forward with evidence

00000310

USCA Case #14-7077    Document #1530697    Filed: 01/07/2015    Page 311 of 604

on which the jury could reasonably find for the non-moving party. The non-moving party may not rely on mere conclusory allegations nor speculation but instead must offer some hard evidence showing that its version of the events is not wholly fanciful. In the absence of any genuine dispute over a material fact, summary judgment is appropriate.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN5] Courts review pro se pleadings carefully and liberally and interpret such pleadings to raise the strongest arguments that they suggest. This is especially true in the summary judgment context, where a pro se plaintiff's claims are subject to a final dismissal. Special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment. A plaintiff's pro se status, while implicating a more liberal interpretation of his pleadings, does not excuse him from the burden of coming forward with concrete evidence from which a reasonable juror could return a verdict in his favor.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN6] In reviewing a motion for summary judgment, the court may conduct a search of the record and grant or deny summary judgment as the record indicates. *Fed. R. Civ. P. 56(c).*

*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Labor & Employment Law > Discrimination > Actionable Discrimination*
[HN7] Though discrimination cases generally involve issues of intent, which are often ill-suited to resolution at the summary judgment

stage, the United States Court of Appeals for the Second Circuit has gone out of its way to remind district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.

*Labor & Employment Law > Discrimination > Federal Employees*
*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview*
[HN8] Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, prohibits federal government agencies from discriminating on the basis of race, color, religion, sex, or national origin in making employment-related decisions. *42 U.S.C.S. § 2000e-16(a).* It is similarly prohibited for any employer, including the government, to discriminate against an employee because he has opposed any practice made an unlawful employment practice under Title VII, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. *42 U.S.C.S. § 2000e-3(a).*

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview*
*Labor & Employment Law > Discrimination > Disability Discrimination > Rehabilitation Act*
*Labor & Employment Law > Discrimination > Federal Employees*
[HN9] The Rehabilitation Act of 1973, *29 U.S.C.S. § 701 et seq.*, prohibits discrimination based on disability and applies to federal employers the same standards as are applicable to private employers under the Americans with Disabilities Act, *42 U.S.C.S. §§ 12112-12117. 29 U.S.C.S. §§ 791(g), 794a.*

00000311

2006 U.S. Dist. LEXIS 1111, *

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview*

[HN10] Since direct evidence of discrimination, such as a notation in an employee's personnel file, attesting to a discriminatory intent, is rarely available, claims of disparate treatment under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, are assessed by way of the three-part burden-shifting analysis described in McDonnell-Douglas. Initially, the plaintiff has the burden of establishing a prima facie case of discrimination, which requires a showing that 1) he is a member of a protected class; 2) he was qualified for the position at issue; 3) he suffered adverse employment action; and 4) the circumstances of the adverse employment action give rise to an inference of discrimination. The burden imposed on plaintiff to establish a prima facie case has been described by the United States Court of Appeals for the Second Circuit as minimal and de minimis.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*

[HN11] If a plaintiff is able to meet his burden of establishing a prima facie case of discrimination, a presumption of unlawful discrimination arises, and the burden is shifted to the defendant, who must then offer a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant is able to do so, the presumption of discrimination is erased, and the burden shifts back to the plaintiff to prove that the nondiscriminatory basis for the adverse action is mere pretext, and the defendant's true intent was discriminatory.

*Labor & Employment Law > Discrimination > Disability Discrimination > Rehabilitation Act*

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*

*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview*

[HN12] The McDonnell-Douglas burden-shifting mechanism is applied to claims of retaliation under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, and to claims of discrimination based on disability under the Rehabilitation Act.

*Labor & Employment Law > Discrimination > Actionable Discrimination*

[HN13] Though the United States Court of Appeals for the Second Circuit has noted that there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision, courts have identified certain circumstances which may suffice: Circumstances contributing to a permissible inference of discriminatory intent may include the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge; or the timing of the discharge.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*

*Labor & Employment Law > Discrimination > Actionable Discrimination*

00000312

2006 U.S. Dist. LEXIS 1111, *

[HN14] Though a plaintiff's burden in establishing a prima facie case on summary judgment is not a heavy one, he cannot meet it through reliance on unsupported assertions. That is, a plaintiff cannot defeat summary judgment by relying simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the adverse party's pleading. Rather, a plaintiff must proffer admissible evidence showing circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. Courts must carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.

***Labor & Employment Law > Discrimination > Actionable Discrimination***
[HN15] The stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview***
***Civil Procedure > Summary Judgment > Supporting Materials > Affidavits***
[HN16] A party may not rely on an affidavit which contradicts his prior deposition testimony to create an issue of fact precluding summary judgment.

***Evidence > Hearsay > General Overview***
***Labor & Employment Law > Discrimination > Actionable Discrimination***
[HN17] Inadmissible hearsay is insufficient to establish a prima facie case of discrimination.

***Labor & Employment Law > Discrimination > Actionable Discrimination***

[HN18] A plaintiff need not demonstrate that a coworker's employment circumstances were identical to his own, but only that her situation was sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.

***Labor & Employment Law > Discrimination > Disability Discrimination > Rehabilitation Act***
[HN19] To establish a prima facie case of discriminatory termination in violation of the Rehabilitation Act of 1973, *29 U.S.C.S. § 701 et seq.*, a plaintiff must show (1) that the plaintiff is disabled within the meaning of the Act; (2) that the plaintiff is otherwise qualified to perform the job; (3) that the plaintiff was discharged because of his disability; and (4) that the employer is a recipient of federal financial assistance. The Act defines a disabled individual as one who has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment. *29 U.S.C.S. § 705(20)(B)*. In order to meet the definition of disabled person, a plaintiff must show that he suffers from a physical or mental impairment, identify a major life activity of central importance to daily life, and show that his impairment substantially limits that major life activity.

***Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Impairments > General Overview***
***Labor & Employment Law > Discrimination > Disability Discrimination > Rehabilitation Act***
[HN20] The United States Supreme Court has held that, in considering the question of whether an individual is disabled under the Americans with Disabilities Act (ADA), *42 U.S.C.S. §§ 12112-12117*, courts should take

2006 U.S. Dist. LEXIS 1111, *

into account corrective measures, including wearing glasses or contact lenses. Since the Rehabilitation Act and the ADA use almost identical definitions of disabled person, courts look to cases interpreting the ADA for guidance in Rehabilitation Act cases.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > Filing of Charges*
[HN21] Before bringing a Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, action, a plaintiff must exhaust all administrative remedies available to him. In the case of federal employees, the administrative process entails consulting with an Equal Employment Office counselor and filing a formal written administrative complaint. Only if the matter is not resolved through the administrative process after receipt of a final agency decision may a plaintiff commence a district court suit.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > Filing of Charges*
[HN22] While plaintiffs are generally precluded from raising in a district court action claims not presented in the administrative complaint, there is an exception for claims which are "reasonably related" to those raised in an administrative complaint. The United States Court of Appeals for the Second Circuit recognizes three ways in which claims not raised in an administrative complaint may be deemed "reasonably related" to those charged administratively: 1) if the conduct complained of would fall within the scope of the Equal Employment Opportunity Commission (EEOC) investigation which can reasonably be expected to grow out of the charge that was made; 2) if the claim alleges retaliation by an employer against an employee for filing an EEOC charge; and 3) where the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge. The United States Court of Appeals for the Second Circuit has made clear that a plaintiff may only claim the benefit of the "retaliation exception" if the alleged retaliation postdates the filing of the administrative complaint.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > Filing of Charges*
[HN23] Where a plaintiff does not explicitly allege retaliation in an administrative complaint, the subsequent investigation of other forms of discrimination cannot reasonably be expected to extend to retaliation.

*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN24] In order to make out a prima facie case of retaliation under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, a plaintiff must show 1) participation in a protected activity known to the defendants; 2) adverse employment action; and 3) a causal connection between the two.

**COUNSEL:** For United States of Commerce, Donald L. Evans, Defendants: Kristen Lynn Vassallo, U.S. Attorney's Office, SDNY (Chambers Street), New York, NY.

**JUDGES:** [*1]  P. Kevin Castel, United States District Judge.

**OPINION BY:** P. Kevin Castel

**OPINION**

    MEMORANDUM AND ORDER

P. KEVIN CASTEL, U.S.D.J.

2006 U.S. Dist. LEXIS 1111, *

Plaintiff Brian T. Burke, proceeding pro se, brings this action pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. §§ 2000e et. seq.*, and the Rehabilitation Act, *29 U.S.C. §§ 701 et. seq.*, [1] against the United States Department of Commerce, and the Secretary of Commerce, Carlos Gutierrez. [2] Burke alleges that the Census Bureau, an arm of the Commerce Department by which he was employed in 2000, discriminated against him on the basis of his national origin, religion, sex, and disability, and also retaliated against him for filing a complaint with the Bureau's Equal Employment Opportunity Office.

1

Plaintiff purports to bring claims under the Americans with Disabilities Act ("ADA"), *42 U.S.C. §§ 12112-12117.* However, [HN1] federal employers are not amenable to suit under the ADA. See *42 U.S.C. § 12111(5)(B); Rivera v. Heyman, 157 F.3d 101, 103 (2d Cir. 1998).* As such, and in light of plaintiff's pro se status, I construe plaintiff's claims of discrimination based on disability as arising under the Rehabilitation Act, which is applicable to federal employees. See, e.g., *Alenski v. Potter, 2005 U.S. Dist. LEXIS 40971, 2005 WL 1309043 at *7 n.11 (E.D.N.Y. May 18, 2005).*

[*2]

2   The complaint in this action named the Department of Commerce and its then-Secretary Donald Evans as defendants. Pursuant to *Fed. R. Civ. P. 25(d),* Secretary Gutierrez has been substituted for Secretary Evans in the caption. As the Secretary is the only proper defendant in actions under Title VII and the Rehabilitation Act, all claims against the Commerce Department itself are dismissed. See *42 U.S.C. § 2000e-16(c); Torres v. United States Dept. of Veteran Affairs, 2004 U.S. Dist. LEXIS 5363, 2004 WL 691237 at *2 (S.D.N.Y. Mar. 31, 2004).*

Plaintiff was afforded an opportunity to conduct discovery, and the discovery period is now closed.

Defendants have moved for summary judgment, asserting that plaintiff cannot make out a prima facie case of discrimination and/or retaliation under either Title VII or the Rehabilitation Act, and that, even if he could, defendants have offered a legitimate, nondiscriminatory reason for the adverse employment action of which plaintiff complains, which reason plaintiff cannot demonstrate to [*3] be a mere pretext. In addressing defendants' motion, I have considered only plaintiff's version of the facts and such other facts as are not disputed by the plaintiff. [3] Where multiple inferences may be drawn from the facts, I have considered only the inference most favorable to plaintiff, the non-movant.

3

While plaintiff did not include with his opposition papers a statement of material facts in dispute as required under Local *Rule 56.1*, he did submit an affirmation in which he disputed certain of the facts offered in defendants' *Rule 56.1* statement. In light of plaintiff's pro se status, I will excuse his failure to comply with the rules, and treat his affirmation as though it were a counterstatement under *Rule 56.1.* See, e.g., *Holtz v. Rockefeller & Co., 258 F.3d 62, 72-73 (2d Cir. 2001)* [HN2] ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

For the reasons set forth below, defendants' motion is granted.

[*4] Factual Background

Plaintiff is a Caucasian man, of Irish national origin, who considers himself Roman Catholic. (Vassallo Decl. Ex. F) Plaintiff also

00000315

suffers from photophobia, a visual sensitivity to light, which requires him to wear tinted glasses. (Burke Dep. 212-13)

Plaintiff was hired by the Census Bureau on March 13, 2000 to work as an enumerator for the 2000 census. (Valle Decl. Ex. H) At the time of hire, plaintiff signed a "Temporary Excepted Service Employment Agreement for the 2000 Decennial Census Staff" (the "Agreement"). (Valle Decl. Ex. F; Burke Dep. 71-72) The Agreement provided that the position for which plaintiff was being hired was "strictly temporary" and that plaintiff might be "released from service" prior to his given "not-to-exceed" date, April 29, 2000, "if work or funds are no longer available." (Valle Decl. Ex. H, Ex. F at 1 (emphasis in original)) The Agreement further provided that the work schedule for plaintiff's position was classified as "intermittent," which was defined to mean that plaintiff would "be employed less than full time and [the position] required irregular work hours which cannot be prescheduled." (Valle Decl. Ex. F [*5] at 2 (emphasis in original))

Plaintiff knew that the job for which he had applied was temporary. (Burke Dep. 71) Plaintiff was given an employee handbook upon his hire, which handbook also stated that plaintiff was being hired for a temporary position and that he could be released prior to his "not-to-exceed" date for lack of funds or work. (Valle Decl. Ex. A p. 3-2; Burke Dep. 82) The handbook also stated that the expiration or "not-to-exceed" date of an appointment "does not guarantee the availability of work . . . ." (Valle Decl. Ex. A p. 3-2) Between March 13 and April 1, 2000, plaintiff worked for the Census Bureau -- either participating in paid training or engaging in non-training "regular work" -- on seven days, for a total of 52 hours. (Valle Decl. Ex. G; Burke Dep. 97-105) On April 18, plaintiff was terminated for lack of work. (Valle Decl. Ex. I)

On May 1, 2000, plaintiff was rehired by the Census Bureau and given a new "not-to-exceed" date of June 24, 2000. (Valle Decl. Ex. J) Between May 1 and May 6, 2000, plaintiff participated in paid training each day, for a total of 29 1/2 hours. (Valle Decl. Ex. G; Burke Dep. 113, 115-18) After May 6, plaintiff did not participate [*6] in any paid training or regular work for the Census Bureau. (Burke Dep. 119) On June 24, 2000, plaintiff was officially terminated by the Census Bureau. (Valle Decl. Ex. K) The June 24 "Notice of Personnel Action" form lists "lack of work" as the reason for the termination. (Id.)

On May 26, 2000, plaintiff first contacted the Census Bureau's Equal Employment Opportunity Office regarding his lack of assigned work. (Vassallo Decl. Ex. E at US 0000022; Burke Dep. 222) On July 4, 2000, plaintiff filed an administrative complaint against the Department of Commerce and the Census Bureau, claiming that he had been discriminated against based on his race, color, religion, sex, national origin, age, and disability. (Vassallo Decl. Ex. F; Burke Dep. 132-34) On his administrative complaint form, plaintiff did not mark the box for "retaliation" as a basis for the alleged discrimination. (Vassallo Decl. Ex. F) In his administrative complaint, plaintiff claimed that he was subjected to "purposeful and discriminatory denial of work beginning in mid May [sic], 2000 with the Group Living Enumeration and continuing through today (6/30/00) for Nonresponse Follow-up." (Id. at 2) He claimed [*7] that the officials involved in the discriminatory actions were David Brown and Jeff Lewis. (Id.) He claimed that one other Census employee had been subjected to the same discriminatory job actions, and that one other individual who was similarly situated -- a woman who he identified by first name only -- was treated more favorably by Messrs. Brown and Lewis. Plaintiff also noted in his complaint that he was unable to point to any statements made by Brown or Lewis that made him believe he was the subject of discrimination. (Id. at 3)

00000316

2006 U.S. Dist. LEXIS 1111, *

By decision dated January 23, 2004, plaintiff's administrative complaint was denied by an Administrative Judge of the Equal Employment Opportunity Commission ("EEOC"), who found that the Census Bureau did not discriminate against plaintiff on any of the bases alleged. [4] (Vassallo Decl. Ex. G) Plaintiff appealed the decision, and on June 25, 2004, the decision was affirmed by the EEOC, which concluded that "a preponderance of the record evidence does not establish that discrimination occurred." (Vassallo Decl. Ex. H) This action followed.

4   The Administrative Judge's decision notes that plaintiff had withdrawn his claims based on race and color discrimination, and sought to add claims that defendants retaliated against him for exercising his rights to be free of prohibited discrimination. (Vassallo Decl. Ex. G at 2 n.2) Plaintiff has not asserted claims of discrimination based on race, color, or age in this action.

[*8] Summary Judgment Standard

[HN3] Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995)* (citation and quotation marks omitted); accord *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

[HN4] It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in [*9] its favor, as a matter of law. *Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)*. When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" as to a material fact. *Fed. R. Civ. P. 56(e)*. A fact is material if it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. Thus, in order to survive summary judgment, plaintiffs must come forth with more than a mere scintilla of evidence in support of their position; they must come forward with evidence "on which the jury could reasonably find for the plaintiff." *Id. at 252*. "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.   [*10]   " *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.)*, cert. denied, *524 U.S. 911, 118 S. Ct. 2075, 141 L. Ed. 2d 151 (1998)*. In the absence of any genuine dispute over a material fact, summary judgment is appropriate.

[HN5] Courts review pro se pleadings carefully and liberally and interpret such pleadings "to raise the strongest arguments that they suggest." See e.g., *Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001)* (citations omitted). This is especially true in the summary judgment context, where a pro se plaintiff's claims are subject to a final dismissal. See *Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988)*

("Special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment.") (citation omitted). Plaintiff's pro se status, while implicating a more liberal interpretation of his pleadings, does not excuse him from the burden of coming forward with "concrete evidence from which a reasonable juror could return a verdict" in his favor. *LaGrande v. Key Bank Nat'l Ass'n, 393 F. Supp. 2d 213, 219 (S.D.N.Y. 2005)* (citation and internal quotation marks omitted); **[*11]** see also *Miller v. N.Y. City Health & Hosp. Corp., 2004 U.S. Dist. LEXIS 17050, 2004 WL 1907310 at *9 (S.D.N.Y. Aug. 25, 2004)*. [HN6] In reviewing a motion for summary judgment, the court may conduct a search of the record, and grant or deny summary judgment as the record indicates. See *Fed. R. Civ. P. 56(c)*; *New England Health Care Employees Union, District 1199, SEIU AFL-CIO v. Mount Sinai Hosp., 65 F.3d 1024, 1030 (2d Cir. 1995)*; *Korea Life Ins. Co. v. Morgan Guar. Trust Co. of New York, 269 F. Supp. 2d 424, 446 (S.D.N.Y. 2003)*.

[HN7] Though discrimination cases generally involve issues of intent, which are often ill-suited to resolution at the summary judgment stage, the Second Circuit has gone "out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'" *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)* (quoting *McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994)*), cert. denied, *540 U.S. 811, 124 S. Ct. 53, 157 L. Ed. 2d 24 (2003)*; see also *Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466* **[*12]** *(2d Cir.)* ("summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), cert. denied, *534 U.S. 993, 122 S. Ct. 460, 151 L. Ed. 2d 378 (2001)*; *Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994)* ("Though caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact.") (citations omitted); *Miller v. Taco Bell Corp., 204 F. Supp. 2d 456, 458 (E.D.N.Y. 2002)* ("where an employer provides convincing evidence explaining its conduct and the plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact and grant summary judgment to the employer") (citations and internal quotation marks omitted).

Discussion

[HN8] Title VII prohibits federal government agencies from discriminating on the basis of race, color, religion, sex, or national origin in making employment-related decisions. See *42 U.S.C. § 2000e-16(a)*; *Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000)*. **[*13]** It is similarly prohibited for any employer, including the government, to discriminate against an employee "because he has opposed any practice made an unlawful employment practice [under Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *42 U.S.C. § 2000e-3(a)*; *Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003)*. [HN9] The Rehabilitation Act prohibits discrimination based on disability and applies to federal employers the same standards as are applicable to private employers under the ADA. See *29 U.S.C. §§ 791(g), 794a*; *Rivera, 157 F.3d at 103*.

[HN10] Since direct evidence of discrimination, "such as a notation in an employee's personnel file, attesting to a discriminatory intent," *Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991)*, is rarely available, claims of disparate treatment under Title VII are assessed by way of the three-part burden-shifting analysis described in *McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. Initially, the plaintiff has the **[*14]** burden of establishing a prima facie case

of discrimination, which requires a showing that: 1) he is a member of a protected class; 2) he was qualified for the position at issue; 3) he suffered adverse employment action; and 4) the circumstances of the adverse employment action give rise to an inference of discrimination. *Mandell v. County of Suffolk, 316 F.3d 368, 377-78 (2d Cir. 2003)*. The burden imposed on plaintiff to establish a prima facie case has been described by the Second Circuit as "minimal" and "de minimis." *Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005)* (internal quotation marks and citation omitted).

[HN11] If a plaintiff is able to meet his burden of establishing a prima facie case of discrimination, a presumption of unlawful discrimination arises, and the burden is shifted to the defendant, who must then offer a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*; *Woodman, 411 F.3d at 76*. If the defendant is able to do so, the presumption of discrimination is erased, and the burden shifts back to [*15] the plaintiff to prove that the nondiscriminatory basis for the adverse action is mere pretext, and the defendant's true intent was discriminatory. *Reeves, 530 U.S. at 143*; *Woodman, 411 F.3d at 76*.

[HN12] The same burden-shifting mechanism is applied to claims of retaliation under Title VII, see *Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)*, and to claims of discrimination based on disability under the Rehabilitation Act. See *Teahan v. Metro-North Commuter R.R. Co., 951 F.2d 511, 514 (2d Cir. 1991)*, cert. denied, *506 U.S. 815, 113 S. Ct. 54, 121 L. Ed. 2d 24 (1992)*.

**Plaintiff Has Failed to Make Out a Prima Facie Case of Discrimination**

**Title VII Disparate Treatment Claims**

Defendants' motion for summary judgment challenging plaintiff's ability to state prima fa-cie claims of discrimination based on his national origin, religion, and sex, is addressed only to the fourth prong of the inquiry, namely, circumstances giving rise to an inference of discrimination. Though[HN13] the Second Circuit has noted that "there is no unbending or rigid rule about what circumstances allow an inference of discrimination when [*16] there is an adverse employment decision," see *Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996)*, courts have identified certain circumstances which may suffice:

> Circumstances contributing to a permissible inference of discriminatory intent may include the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge; or the timing of the discharge.

*Chambers, 43 F.3d at 37*; see also *Chertkova, 92 F.3d at 91*.

[HN14] Though, as noted above, plaintiff's burden in establishing a prima facie case on summary judgment is not a heavy one, he cannot meet it "through reliance on unsupported assertions." *Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)*. That is, a plaintiff cannot defeat [*17] summary judgment by relying "simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the adverse party's pleading." Id. (citations and in-

2006 U.S. Dist. LEXIS 1111, *

ternal quotation marks omitted). Rather, a plaintiff must "proffer[] admissible evidence showing circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Chambers, 43 F.3d at 38*. Courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999)*, cert. denied, *530 U.S. 1242, 120 S. Ct. 2688, 147 L. Ed. 2d 960 (2000)*.

Plaintiff here has come forth with nothing beyond the realm of conclusory assertions and speculation to support his claims of discrimination based on national origin, religion, or sex.

Plaintiff claims that he was "constructively terminated" as of May 6, 2000 because he was not assigned any work as a Census Bureau enumerator after that date. His belief that the failure to assign him work was motivated [*18] by discriminatory intent on the part of his supervisors is based largely on vague recollections of conversations with third parties and unsupported conclusions drawn from documents produced by defendants. Plaintiff claims that, in conversations with two other enumerators, William Sansom and Anthony Gardiner, and one crew leader, Kim Sweeney, he discussed the possibility that his supervisors, Brown and Lewis, might have denied him work because of his religion, national origin, gender or disability. (Burke Dep. 25-28; 197-98)

With regard to discrimination based on national origin, plaintiff testified that the only circumstances which led him to believe that failure to assign him work might have been motivated by his national origin were these discussions with "other people." (Burke Dep. 164) Plaintiff contends that one of two individuals, either Gardiner or Sweeney, told him that Brown "may have used an epithet for people of Irish background." (Id. 165) At his deposition, he admitted, however, that he never heard either Brown or Lewis make any disparaging comments about Irish people. (Id. 166) Assuming that Brown or Lewis used such an "epithet," it would be insufficient, standing [*19] alone, to support an inference of discrimination because [HN15] "the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination." *Abdu-Brisson, 239 F.3d at 468* (citing *Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir. 1994)*, abrogated on other grounds by *Schnabel v. Abramson, 232 F.3d 83 (2d Cir.2000)*).

Plaintiff claimed in his deposition that he had heard "one of the people in [his Census Bureau] group," refer to a drunk homeless man either by saying, "Oh, he must be Irish," or by commenting that perhaps the homeless man "needed some more" of the fortified wine product known as "Wild Irish Rose." (Burke Dep. 169-70) Plaintiff denied knowing who had made the remark, and explicitly stated that he did not consider the comment disparaging, nor did he consider it evidence of discrimination against him. In fact, as he testified, "We laughed, it wasn't even anything that I would be bothered by." (Id. 170) Despite this testimony, plaintiff attached to his affirmation an unsworn letter to defendant's counsel dated April 4, 2005, in which he states "upon . . . information and belief" [*20] that Mr. Brown is the individual who made the comment in question. (Burke Aff. Ex. 4) [HN16] Plaintiff may not rely on an affidavit (or, in this case, an affirmation) which contradicts his prior deposition testimony to create an issue of fact precluding summary judgment. See *Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996)*; *Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997)* (plaintiff's errata sheet, contradicting answers given at deposition, insufficient to create issue of fact). In any event, this stray comment, too, would be insufficient to support an inference of discrimination.

Plaintiff claims that Gardiner "said he had some information . . . about . . . why we were

00000320

being denied work, and that it was for very negative and illegal reasons including . . . that [Brown] basically wanted a certain type of person, he wanted people of certain backgrounds, and he was going to have less people of other backgrounds." (Id. 170-71) However, he was unable to state what "information" Gardiner claimed to have, or to relate Gardiner's statements in any more detailed fashion. (Id. 171-76) [*21] Plaintiff contends that his "speculation" as to discriminatory reasons for his not being assigned work was "encouraged" by additional conversations with Sweeney, and with Sansom and someone named Edward Thompson. (Id. 177-82) But plaintiff could not state the basis underlying any suggestion by these individuals that plaintiff's Irish heritage was a contributing factor in his not being assigned work after May 6. Plaintiff attributes his claims of discrimination based on religion to the same conversations. (Id. 198; 206)

Plaintiff's vague recollections of conversations in which third parties are alleged to have made admittedly unsubstantiated suggestions of discriminatory intent are insufficient to meet even the minimal burden imposed on a plaintiff in an employment discrimination case. [HN17] Inadmissible hearsay is insufficient to establish a prima facie case of discrimination. See e.g., *Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999); Phipps v. Comprehensive Cmty. Dev. Corp., 2005 U.S. Dist. LEXIS 1672, 2005 WL 287413 at \*12-\*13 (S.D.N.Y. Feb. 4, 2005); Rovtar v. Union Bank of Switzerland, 852 F. Supp. 180, 185 (S.D.N.Y. 1994);* [*22] cf. *Virgo v. Local Union 580, 629 F. Supp. 1204, 1207 (S.D.N.Y. 1986)* (Weinfeld, J.) (finding for Title VII defendant after bench trial; "The *only* evidence offered by plaintiff to sustain his allegation that his membership was not acted upon or delayed because of his race was his own testimony, which largely was based on double hearsay and unreliable recollections of past events and which frequently was inconsistent and contradictory with respect to material matters."). In his deposition, plaintiff himself repeatedly referred to the statements upon which he based his claims of discrimination as "hearsay" or even "triple hearsay." (e.g., Burke Dep. 31-32; 151; 164-65; 172; 175-76) His characterization was correct. Even accepting as true that the statements plaintiff attributes to other Census Bureau employees about potential discrimination were made, they would not constitute admissible evidence bearing on plaintiff's prima facie case.

In addition to the hearsay statements of coworkers, plaintiff attempts to show that similarly situated individuals, who were not members of the same protected groups as plaintiff, were treated differently. See, e.g.,      [*23] *Chambers, 43 F.3d at 37.* In support of this contention, plaintiff states that he was "told anecdotally that other people were working" after May 6, 2000, and that he saw people walking down the street in his neighborhood carrying bags that said "Census," which indicated that they were engaged in enumeration activities. (Burke Dep. 145-46) However, plaintiff was unable to provide any information as to the national origin or religion of any of the people he claims were given work after May 6. (Id. 146-53; 211-12)

Plaintiff attaches to his affirmation a list of approximately 1000 names which he contends are individuals who were employed as enumerators by the same Local Census Office that he was, Office 2233. (Burke Aff. Ex. 8) The document shows that, as to some substantial portion of the individuals listed, their "not-to-exceed" dates were extended beyond June 24, 2000, which was plaintiff's final "not-to-exceed" date and the day he was officially terminated by the Census Bureau. (Id.) In addition to failing to speak to which, if any, of these individuals actually performed any work after May 6, 2000, the document contains no information whatsoever about their [*24] religions or national origins. In the end, plaintiff relies solely upon his own "information and belief" and "life experience," and that of some of his

00000321

USCA Case #14-7077　　　Document #1530697　　　Filed: 01/07/2015　　　Page 322 of 604

Page 18
2006 U.S. Dist. LEXIS 1111, *

co-workers, for the proposition that others who received work were of different religions or national origins. (Id. 145-54) This is plainly insufficient, and, even crediting plaintiff's contention that some individuals were awarded work when he was not, a reasonable finder of fact could not draw an inference of discrimination.

Plaintiff's claim of sex/gender discrimination fails at the prima facie stage as well. Plaintiff bases his claim of sex discrimination on a Census Bureau "Notice of Visit" that was left at his apartment door. (Vassallo Decl. Ex. D) According to plaintiff, this notice was left by a female enumerator named "Gail" at some point after May 6, 2000. (Burke Dep. 153-54) He contends that the fact that at least one female enumerator was working after May 6 constitutes "anecdotal evidence" that he was discriminated against based on sex. (Id. 153-54) Plaintiff acknowledges that he has no other evidence upon which he bases his claim of sex discrimination. (Id. 201, 206) In order for Gail's post-May 6 enumeration [*25] work to support plaintiff's prima facie case of discrimination, plaintiff would have to demonstrate that, other than being female, she was "similarly situated in all material respects" to plaintiff. *McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001).* [HN18] Plaintiff need not demonstrate that Gail's employment circumstances were identical to his own, but only that her situation was "sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." Id; see also *Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64-65 (2d Cir. 1997).*

With regard to Gail, plaintiff cannot demonstrate that she was similarly situated: Plaintiff admittedly knows little more about Gail than her first name. He testified that he "may have" met someone named Gail at the Census Office, but could not be sure that he ever spoke to Gail. In fact, plaintiff could not even testify with certainty that Gail was female. He did claim to have called the telephone number listed on the "Notice of Visit" form and spoken with someone who he "assumed . . . was Gail." Because the person with whom he spoke [*26] "sounded like a female," and because plaintiff believed Gail to be a female name, he simply "assumed" Gail was a woman. (Burke Dep. 157-59) Plaintiff does not know who Gail's supervisor was, or to what "crew" she was assigned. (Id. 199-201) Plaintiff has also not submitted any evidence as to Gail's date of hire. As will be discussed in greater detail below, in the context of enumeration work for the Census Bureau, such information is of critical importance in determining whether any other enumerator can properly be considered "similarly situated" to plaintiff. Even crediting plaintiff's assumption that Gail was, in fact, a woman, the mere fact that she was apparently employed as an enumerator, and that she performed some work after May 6, 2000, without more, cannot suffice.

Plaintiff has failed to make out a prima facie case of discrimination based on national origin, religion, or sex.

Rehabilitation Act Claims

[HN19] "To establish a prima facie case of discriminatory termination in violation of the Rehabilitation Act of 1973, a plaintiff must show (1) that the plaintiff is [disabled] within the meaning of the Act; (2) that the plaintiff is otherwise qualified to perform [*27] the job; (3) that the plaintiff was discharged because of his [disability]; and (4) that the employer is a recipient of federal financial assistance." *Kinsella v. Rumsfeld, 320 F.3d 309, 314 (2d Cir. 2003)* (citation omitted). The Act defines a "disabled individual" as one who "has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." *29 U.S.C. § 705(20)(B).* In order to meet the definition of disabled person, a plain-

00000322

2006 U.S. Dist. LEXIS 1111, *

tiff must show that he suffers from a physical or mental impairment, identify a "major life activity . . . of central importance to daily life," and show that his impairment "substantially limits" that major life activity. *Weixel v. Board of Educ., 287 F.3d 138, 147 (2d Cir. 2002)*.

The disability from which plaintiff suffers that he claims forms the basis of defendants' discrimination against him is photophobia, a visual hypersensitivity to light. Defendants do not contest that plaintiff suffers from photophobia, but contend that his photophobia does not render him **[*28]** disabled within the meaning of the Rehabilitation Act, because it does not substantially limit any of his major life activities. They are correct.

[HN20] The Supreme Court has held that, in considering the question of whether an individual is disabled under the ADA, [5] courts should take into account corrective measures, including wearing glasses or contact lenses. *Sutton v. United Air Lines, 527 U.S. 471, 475, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)*; see also *Muller v. Costello, 187 F.3d 298, 312 (2d Cir. 1999)*. Plaintiff here has admitted that, when he wears tinted sunglasses as instructed by his doctor, none of his major life activities are impaired; he testified that, when he wears the glasses, "it's an absolute remedy, there's no problems at all on my part . . . ." (Burke Dep. 213-14) As such, no reasonable jury could find that he is disabled within the meaning of the Rehabilitation Act. Cf. *Habeebuddin v. City of Chic., 2003 U.S. Dist. LEXIS 5076, 2003 WL 1720003 at *13-*15 (N.D. Ill. Mar. 31, 2003)* (photophobia not a disability under ADA);*Ponce v. GMC, 2003 U.S. Dist. LEXIS 27051, 2002 WL 32783974 at *4-*5 (D. Or. Nov. 13, 2002)* (photophobia correctable with tinted glasses does not qualify **[*29]** as disability under Oregon law which defines disability in terms substantially identical to ADA), rep. & rec. adopted, 2003 WL 23976718 (D. Or. Jan. 8, 2003), aff'd, *143 Fed. Appx. 755 (9th Cir. 2005)*.

5

    Since the Rehabilitation Act and the ADA use almost identical definitions of "disabled person," courts look to cases interpreting the ADA for guidance in Rehabilitation Act cases. See *Garvin v. Potter, 367 F. Supp. 2d 548, 561 (S.D.N.Y. 2005)* (citation omitted).

Plaintiff has failed to make out a prima facie case of disability discrimination under the Rehabilitation Act.

Defendants Have Proffered a Legitimate Nondiscriminatory Reason for Plaintiff's Lack of Work

Even assuming plaintiff were able to make out a prima facie case of discrimination based on national origin, religion, gender or disability, defendants have met their burden of production in coming forward with a legitimate nondiscriminatory reason for plaintiff's failure to get any **[*30]** work after May 6, 2000. Defendants have asserted that the reason plaintiff was not awarded work after May 6 was simply because there was not enough work to go around. In her declaration, Patricia Valle, who has been employed by the Census Bureau for almost 30 years, and who served as the Area Manager for Manhattan during the time period at issue in this action, describes in great detail the methodology and practice of hiring enumerators and distributing work among them during the 2000 Census. Briefly, the Census Bureau engaged in what it calls "frontloading" -- hiring more workers in advance than it anticipated would be required to complete the necessary work for the Census. (Valle Decl. P13; Ex. C at US0000214; US 0000229) This policy, combined with the higher than usual survey response rate in Manhattan, resulted in approximately one-and-a-half to two times as many enumerators being hired as were necessary to complete the required enumeration activities. As such, many individuals who were

00000323

hired and trained became "spares," and were not needed except as replacements for other enumerators who, for one reason or another, could not complete their duties. (Id. PP14-16)

David Brown, [*31] to whose crew plaintiff claims to have been assigned, already had a crew of enumerators in place as of May 2000, when plaintiff completed training for the Non-Response Follow-Up operation. (Brown Decl. P6) Though Brown does not recall plaintiff at all, he explains that if, in fact, plaintiff was assigned to his crew, and if, in fact, he received no work after being so assigned, this was simply because Brown had enough enumerators already assigned to complete the necessary work, and no problems arose that would require any of them to be replaced. (Id. PP5-6) This was consistent with Brown's adherence to Census Bureau policy of assigning work to enumerators based on the "census block" in which they lived and their availability, and his procedure of assigning work only to as many enumerators as necessary. (Id. P4) Brown states that he did not assign work on the basis of race, color, religion, sex, disability or national origin. (Id. P8)

While plaintiff, in his affirmation, takes issue with some of the facts as outlined in the Valle and Brown declarations, his objections merely take the form of suggestions that the sworn statements constitute "purjury [sic]," and that there [*32] is "no actual evidence" supporting these statements. (Burke Aff. pp. 1-3) This is, of course, insufficient on a summary judgment motion. See Goenaga, 51 F.3d at 18. Defendants having proffered lack of available work as the legitimate nondiscriminatory reason for plaintiff's lack of assigned work after May 6, 2000, plaintiff would be required to demonstrate that the proffered reason is merely pretextual, and that the true reason for the denial of work was, in fact, discrimination. See, e.g., Reeves, 530 U.S. at 143; Woodman, 411 F.3d at 76. The hearsay statements of plaintiff's co-workers are plainly insufficient to meet this burden, as is the alleged comment made by Mr. Brown regarding the inebriated homeless man. See, e.g., Phipps, 2005 U.S. Dist. LEXIS 1672, 2005 WL 287413 at *19 (comments about Jamaican people generally were "too isolated, ambiguous and attenuated to the ultimate decision to terminate [plaintiff] so as to establish pretext for discrimination based on race or national origin").

In addition to the list of 1000 enumerators discussed above, which is also insufficient to rebut defendants' legitimate nondiscriminatory reason [*33] for the relevant adverse actions, plaintiff attaches to his affirmation a list of Local Census Offices with their closing dates. (Burke Aff. Ex. 11) The document shows that the office to which plaintiff was assigned, Office 2233, closed on September 30, 2000. (Id. at US0000640) He contends that this demonstrates that "there was plenty of work available up through September 30/2000." (Burke Aff. pp. 2-3) As defendants point out, however, the mere fact that the office was not officially closed until September 30 does not establish that there was, in fact, enumeration work available up through that date, and does not provide any evidence of discrimination.

Even if plaintiff could be said to have established a prima facie case of discrimination, he has failed to point to disputed issues of material fact as to the pretextual nature of defendants' contention that he was denied work simply because there was a surplus of enumerators and a dearth of assignments.

Plaintiff Failed to Exhaust Administratively his Claims of Retaliation

In addition to claiming discrimination on the basis of national origin, religion, gender and disability, plaintiff claims that the lack of work [*34] assigned to him after May 6, 2000 is attributable to defendants' having retaliated against him for making a complaint to the Census Bureau's Equal Employment Opportunity Office. Defendants contend, and the Court

agrees, that such a claim is barred by plaintiff's failure to exhaust it administratively.

[HN21] Before bringing a Title VII action, a plaintiff must exhaust all administrative remedies available to him. In the case of federal employees, the administrative process entails consulting with an Equal Employment Office counselor and filing a formal written administrative complaint. Only if the matter is not resolved through the administrative process after receipt of a final agency decision may a plaintiff commence a district court suit. See, e.g., *Belgrave v. Pena, 254 F.3d 384, 386 (2d Cir. 2001).*[HN22] While plaintiffs are generally precluded from raising in a district court action claims not presented in the administrative complaint, there is an exception for claims which are "reasonably related" to those raised in an administrative complaint. *Deravin v. Kerik, 335 F.3d 195, 200-01 (2d Cir. 2003).* The Second Circuit recognizes three ways in which claims [*35] not raised in an administrative complaint may be deemed "reasonably related" to those charged administratively: 1) "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made;" 2) if the claim alleges retaliation by an employer against an employee for filing an EEOC charge; and 3) where the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Id.* at 200-01 and n.3.

Though plaintiff's claims of retaliation might, on first glance, appear to fall under the second exception, the Second Circuit has made clear that a plaintiff may only claim the benefit of the "retaliation exception" if the alleged retaliation postdates the filing of the administrative complaint. See *Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 687 n.4 (2d Cir. 2001)* ("'we see no reason why a retaliation claim must arise before administrative proceedings terminate in order to be reasonably related. Instead, the rule is that a claim must

arise only after the EEOC complaint has been filed.'") (quoting *Malarkey v. Texaco, Inc., 983 F.2d 1204, 1209 (2d Cir. 1993)*). [*36]

> In the retaliation setting, the exhaustion requirement is relaxed because (1) there is a close connection between the retaliatory act and both the initial discriminatory conduct and the filing of the charge itself; and (2) the EEOC will already have had the opportunity to investigate and mediate the claims arising from the underlying discriminatory acts alleged . . . . These rationales however, are predicated upon the retaliation occurring *after* a charge is filed with the EEOC, and not before.

*Delly v. H.I.R.E. Inc., 2004 U.S. Dist. LEXIS 20446, 2004 WL 2297821 at *4 (E.D.N.Y. Oct. 13, 2004)* (emphasis in original); see also *Cordoba v. Beau Dietl & Assocs., 2003 U.S. Dist. LEXIS 22033, 2003 WL 22927874 at *10 (S.D.N.Y. Dec. 2, 2003); Gross v. NBC, 232 F. Supp. 2d 58, 73 (S.D.N.Y. 2002).*

Here, the retaliatory act of which plaintiff complains is the failure to award him work after May 6, 2000 (and, arguably, his termination on June 24, 2000). Plaintiff's administrative complaint was filed on July 4, 2000, and it is undisputed that plaintiff did not check the box listing retaliation as one of the grounds for his complaint. (Vassallo Decl. Ex. F) Nor is there [*37] any allegation of fact in the body of the complaint which would suggest that plaintiff was claiming that he had been retaliated against for any protected EEO activity. (Id.)

Plaintiff did, belatedly, raise the issue of retaliation to the EEOC Administrative Judge by way of an October 23, 2003 letter. (Vassallo Decl. Ex. L; Burke Dep. 255-57) The Administrative Judge noted in his decision that retalia-

tion had "not been investigated," but nevertheless went on to find that plaintiff had failed to establish a prima facie case of retaliation. (Vassallo Decl Ex. G at 5-6) While he chose to address plaintiff's belated allegations of retaliation, first asserted more than three years after the filing of the administrative complaint, additional grounds not asserted in the complaint do not necessarily relate back for exhaustion purposes. See, e.g., *Holtz v. Rockefeller & Co., 258 F.3d 62, 83 (2d Cir. 2001)*.

Nor is plaintiff's claim of retaliation "reasonably related" to the discrimination charges that were included in his administrative complaint under the first exception discussed above, that "the conduct complained of would fall within the scope of the EEOC investigation **[*38]** which can reasonably be expected to grow out of the charge that was made." *Deravin, 335 F.3d at 200-01*. Courts in this district have often found that, [HN23] where a plaintiff does not explicitly allege retaliation in an administrative complaint, the subsequent investigation of other forms of discrimination cannot reasonably be expected to extend to retaliation. See, e.g., *Gambrell v. AMTRAK, 2003 U.S. Dist. LEXIS 1515, 2003 WL 282182 at *8 (S.D.N.Y. Feb. 3, 2003)* ("Where the EEOC charge alleges discrimination but not retaliation, the reasonable scope of the agency's investigation cannot be expected to encompass allegations of retaliatory motive.") (citation omitted); *Cordoba, 2003 U.S. Dist. LEXIS 22033, 2003 WL 22927874 at *10; Moguel v. Covenant House/New York, 2004 U.S. Dist. LEXIS 19342, 2004 WL 2181084 at *8 (S.D.N.Y. Sept. 29, 2004); Bailey v. Colgate-Palmolive Co., 2003 U.S. Dist. LEXIS 8175, 2003 WL 21108325 at *13 (S.D.N.Y. May 14, 2003)*, aff'd., *93 Fed. Appx. 321 (2d Cir. 2004)*. As mentioned above, nothing in plaintiff's administrative complaint would have led an investigator to inquire as to any allegedly retaliatory actions taken against plaintiff -- plaintiff had **[*39]** been terminated by the time the complaint was filed. That no such component

of the investigation would have been likely to arise based on the administrative discrimination complaint was confirmed by the Administrative Judge's noting that retaliation was not, in fact, investigated. (Vassallo Decl. Ex. G at 5)

Finally, plaintiff's retaliation claims cannot be deemed "reasonably related" to the discrimination claims asserted in his administrative complaint under the third test -- "further incidents of discrimination carried out in precisely the same manner . . . ." *Deravin, 335 F.3d at 201*.

As plaintiff failed to allege retaliation in his administrative complaint, his retaliation claims are unexhausted, and defendants are entitled to summary judgment on those claims. See *Legnani, 274 F.3d at 687 n.4*.

For avoidance of doubt, were the Court to consider plaintiff's retaliation claims on the merits, summary judgment in favor of defendants would nevertheless be appropriate. [HN24] In order to make out a prima facie case of retaliation under Title VII, a plaintiff must show: 1) participation in a protected activity known to the defendants; 2) adverse employment **[*40]** action; and 3) a causal connection between the two. See, e.g., *Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003)*. Plaintiff has not shown any causal connection between either the failure to assign him work after May 6, 2000 (a date which preceded any alleged protected EEO activity) or his official termination on June 24, 2000 (which date had been set as his termination date on the day he was rehired, May 1) and his initial contact with the EEO office on May 26. No adverse employment action could have been taken against plaintiff after the filing of his formal administrative complaint, which did not take place until July 4, 2000, after he had been terminated. He has therefore failed to make out a prima facie case of retaliation and defendants are entitled to summary judgment.

00000326

Even were a prima facie case somehow to be divined from plaintiff's submissions to the court, the discussion of defendants' legitimate nondiscriminatory basis for their failure to assign plaintiff work after May 6, and plaintiff's failure to demonstrate that such basis was pretextual, see pgs. 17-20, supra, is equally applicable to his retaliation claims.

Conclusion

[*41]  For the reasons set forth above, defendants' motion for summary judgment is GRANTED. The Clerk is directed to enter a judgment in favor of defendants on all claims.

SO ORDERED.

P. Kevin Castel

United States District Judge

Dated: New York, New York

January 12, 2006

00000327

# EXHIBIT 5

00000328

'09 CIV 3291

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
BRIAN BURKE                          :        Docket #09 Civ.
          Plaintiff                  :

                 -v-                 :        **COMPLAINT**
                                     :        **Jury Trial**
                                     :        **Demanded**

Metropolitan Transportation Authority/   :
NYC Transit Authority & Public           :
Employment Relations Board &             :        Ann Cutter
NY Attorney General Andrew M. Cuomo       :
          Defendants,                :
-------------------------------------------------------X        4/8/09

### **Subject Matter Jurisdiction:**

(1) This Court has and would have subject matter jurisdiction over the

Constitutional violations alleged in this complaint. Complainant alleges violations

of **_Ku Klux Klan Act of 1871_** a.k.a. *The Civil Rights Act of 1871* and *Title 42*

*Chapter 21 Subchapter I § 1983. Civil action for Deprivation of Rights.* In addition

Fed. R. Civ. P. 5.1 *Constitutional Challenge to a Statute.* In addition *Title 28 Part VI*

*Chapter 161 § 2403 (b). Intervention by United States or a State; constitutional*

*question.* The **United States Constitutional Amendments** violated by the

Defendants (State Actors) include, but are not limited to, I, IV, V, VI, VII, VIII, IX, X,

XIII, XIV. Plaintiff contends The Public Employees Fair Employment Act, Article 14

of the New York State Civil Service Law, a.k.a. **The Taylor Law** was, is, and will be

facially and as applied unconstitutional under said Amendments.

### **STANDING**

(2) Plaintiff alleges standing for two specific State Actions; (a) Fine under Taylor

**EXHIBIT**
Burke 3
5/05/10   scc

00000329

Law for admitted December 2005 "strike" participation (b) Denial of Plaintiff's Taylor

Law Complaint # U-28203 by P.E.R.B. against the Authority, 2008. Plaintiff is, and

was for the preceding eight (8) years, a Train Operator and Transport Workers

Union Local 100 Union Member. For most of that time Plaintiff was and is a Shop

Steward (recognized by Authority by Stipulation) and/or Active Member of said

Union.

## VENUE

  (3) As to proper venue, plaintiff resides in New York County and Authority

Headquarters is/are in New York County.

## KLU KLUX KLAN V. NOTRE DAME

  (4) Plaintiff has no evidence and will neither include or request any evidence via

discovery regarding past, present or prospective active member status by relevant

State Actors as a Kleagle (see Senator Robert Byrd), Kloreroe, Klabee, Kludd,

Kligrapp, etc. of The Knights of The Invisible Empire (K.K.K.).  Petitioner holds no

interest in denying said State Actors their First Amendment rights and confirms

sworn pledge to uphold and defend the Constitution against all enemies, foreign

and domestic. *"Monsieur l'abbé, je déteste ce que vous écrivez, mais je donnerai*

*ma vie pour que vous puissiez continuer à écrire" Voltaire.*  Petitioners ethnicity is

Irish-American and a confirmed/practicing (Roman) Catholic, and additionally the

grandson of immigrants and the son of a former seminarian. The significant

majority of TWU members covered by the Taylor Law are, upon information and

belief, of African-American and/or Caribbean-American or immigrant and/or other

immigrant status or race and/or Jewish, Catholic (Irish etc,) ethnicity and/or religion

00000330

historically and legally discriminated against (see *Dred Scott v. Sandford, 60 U.S. (How. 19) 393 (1857)* & *Plessy v. Ferguson, 163 U.S. 537 (1896))*.  This fact is known to defendants.  While not disputing Defendant State Actor's right to be or not to be active members of The Invisible Empire, it is Defendants passing, upholding, enforcing the discriminatory and unconstitutional Taylor Law, which has the same outcome as the philosophy of the Klan, that is unlawful. The Klan is Anti-Union, Anti-Catholic, Anti-African-American, Anti-Immigrant, Anti-Semitic, etc.. Defendants ongoing unconstitutional banning of "strike"/speech, violations of Freedom of Assembly, Disparate Treatment/Impact, Excessive/Ruinous Fines, lack of Due Process, no Jury Trial, Unequal Protection, forced work without valid current contract, compared to identically/similarly situated fellow employees not covered by Taylor Law are unlawful. Plaintiff, upon information and belief, has no standing to question constitutionality of Taylor Law vis-à-vis non MTA Departments, agencies and or Authorities, but may solicit Amicus Curiae status by same by leave of Court.

### *Dred Scott v. Sandford, 60 U.S. (How. 19) 393 (1857)*

   (5) Plaintiff, never having been convicted of a crime, is covered by the Thirteenth Amendment to the United States Constitution, as well as, upon information and belief, virtually all or all colleagues under Taylor Law writ. Petitioner contends that the Taylor Law's requirement that Local 100 work without a contract and during a "strike" constitute "involuntary servitude" by definition. No contract no work.

   (6) Petitioner contends that the attempted and/or actual prior restraint of "strike", "work to rule" "work slowdown" and/or other job actions constitute prima facia violations of the First Amendment to the United States Constitution. In addition,

attempted and/or actual Injunctive Relief, apparently not in violation of the Taylor Law and applied only to the peasants/chattal, literally blocking using the word "strike" or discussing same, constitute the most egregious violation of the First Amendment since it's implementation. Banning of a "strike" or picketing violates Freedom of Assembly, by definition.

(7) The Taylor Law violates the Fourth and Fifth Amendment's Rights to Privacy, Due Process and self incrimination. There is no and/or inadequate Due Process under the Taylor Law. The tolling under said law rewards the employer for performing conspiracies/coverups/destruction of evidence/subornation regarding unlawful adverse job actions etc. by blocking all potential remedy for employee within Taylor Law process and access to all other Courts. Double Jeopardy occurred by prosecutions/contempt hearings/injunctive relief within and outside of the Taylor Law.

(8) The Taylor Law violates the Sixth and Seventh Amendments by denying the fundamental right to a Jury Trial. There is no Jury Trial right within the context of the Law.

(9) The Taylor Law violates the Eighth Amendment by instituting, and not blocking by "injunctive relief" by other Courts, excessive and ruinous fines. These fines and threats thereof were instituted against Plaintiff and colleagues as well as Local 100.

(10) The Taylor Law violate the Ninth and Tenth Amendments as the rights to Organize, "strike", perform job actions (including "Work to Rule"), and withdraw labor from the market in absence of current contract (no contract no work) would be

00000332

covered by said amendments and violated by Taylor Law. These rights are available to and undisputed for the vast majority of Americans, including identical/similar title holders within the MTA (see L.I.R.R. & Metro-North etc.).

### *Plessy v. Ferguson, 163 U.S. 537 (1896)*

(11) The Taylor Law violates the Thirteenth and Fourteenth Amendments by compelling Union Members/Employees to work without current contracts and during "strikes" (involuntary servitude) under threat of, no due process or jury trial, excessive/ruinous fines and/or prison, as occurred to Union Officers, the Union itself and members individually. The Taylor Law and the MTA violates Equal Protection and Due Process by granting the right to "strike" etc. to some similarly/identically situated MTA employees while denying the same to others. This results in unequal/disparate pay and benefits between the two groups of employees. The two groups differ in one respect. There is a substantially different demographic within the Transit Authority vis-à-vis Metro-North and Long Island Railroad. There is a substantially higher percentage of historically discriminated against groups within NYC Transit than Metro-North & L.I.R.R., resulting in the sole reason and outcome for the vast difference in pay and benefits between selfsame subsidiaries of the MTA.

**Remedy Sought**

For the Court to strike the Taylor Law as un-consitutional facially and as applied against MTA employees who are TWU Local 100 members. In addition, to to have the Court Order that the Payee(s) of all fines levied as a result of December 2005 "strike" be returned to Payer. All Rights Reserved Without Prejudice U.C.C. §1-308.

_____

Brian Burke pro-se
145 East 23rd Street
New York, NY 10010
(212) 614-8515
briantburke@gmail.com

Dated April 6, 2009

00000334

# EXHIBIT 6

00000335

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————

BRIAN BURKE,

                    Plaintiff,

          - against -

METROPOLITIAN TRANSPORTATION
AUTHORITY, ET AL.,

                    Defendants.

————————————————————

09 Civ. 3291 (JGK)

<u>MEMORANDUM OPINION
AND ORDER</u>

JOHN G. KOELTL, District Judge:

    The plaintiff, Brian Burke, brought this action pro se purportedly pursuant to 42 U.S.C. § 1983 against the New York City Transit Authority ("NYCTA"), the Metropolitan Transportation Authority ("MTA"), the New York Public Employment Relations Board ("PERB"), and the New York State Attorney General.  The plaintiff was fined for participating in a strike against his employer, the NYCTA, pursuant to New York's Public Employees' Fair Employment Act, N.Y. Civ. Serv. Law §§ 200-14 (1999) (commonly known as the "Taylor Law").  He seeks declaratory and injunctive relief, as well as money damages. Defendants NYCTA and the MTA each filed motions to dismiss the plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  The New York PERB and the New York State Attorney General filed a joint motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6).



EXHIBIT
_Burke 4_
5/25/10  s.w.

The plaintiff has made several motions, including a motion to admit a Third Amended Complaint, which names the City of New York as an additional defendant, as did a previous Amended Complaint.  Because the City of New York is a separate entity from the plaintiff's employer, the NYCTA, and because the Third Amended Complaint contains no allegations against the City of New York, the plaintiff's motion to join the City of New York is **denied**.  The plaintiff's motion to admit the remainder of his Third Amended Complaint is **granted**.  The defendants have requested that the Court apply their previous motions to dismiss against the plaintiff's Third Amended Complaint and the Court will do so.

I

In defending a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence.  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  In considering such a motion, the Court generally must accept the material factual allegations in the Complaint as true.  See J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004).  The Court does not, however, draw all reasonable inferences in the plaintiff's favor.  Id.; Graubart v. Jazz Images, Inc., No. 02 Civ. 4645, 2006 WL 1140724, at *2

2

00000337

(S.D.N.Y. Apr. 27, 2006).  Indeed, where jurisdictional facts
are disputed, the Court has the power and the obligation to
consider matters outside the pleadings, such as affidavits,
documents, and testimony, to determine whether jurisdiction
exists.  See APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003);
Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir.
1998); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d
Cir. 1986).  In doing so, the Court is guided by that body of
decisional law that has developed under Federal Rule of Civil
Procedure 56.  Kamen, 791 F.2d at 1011; see also Donelli v.
County of Sullivan, No. 07 Civ. 2157, 2009 WL 2365551, at *1
(S.D.N.Y. July 31, 2009); Tsering v. Wong, No. 08 Civ. 5633,
2008 WL 4525471, at *1 (S.D.N.Y. Oct. 3, 2008); Melnitzky v.
HSBC Bank USA, No. 06 Civ. 13526, 2007 WL 1159639, at *5
(S.D.N.Y. Apr. 18, 2007).

On a motion to dismiss pursuant to Rule 12(b)(6), the
allegations in the Complaint are accepted as true.  Grandon v.
Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).  In
deciding a motion to dismiss pursuant to Rule 12(b)(6), all
reasonable inferences must be drawn in the plaintiff's favor.
Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.
1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  The
Court's function on a motion to dismiss is "not to weigh the
evidence that might be presented at a trial but merely to

3

00000338

determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the Complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. at 1949; see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007); Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002); Powe v. Cambium Learning Co., No. 08 Civ. 1963, 2009 WL 2001440, at *1 (S.D.N.Y. July 9, 2009).

The pleadings and allegations of a pro se plaintiff must be construed liberally for the purposes of Rules 12(b)(1) and 12(b)(6). See McKithen v. Brown, 481 F.3d 89, 96 (2d. Cir. 2007) (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)); Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 145-46 (2d Cir. 2002). Additionally, the

4

00000339

submissions of a pro se litigant should be interpreted to "raise the strongest arguments that they suggest." Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)); see also Tsering, 2008 WL 4525471, at *1.

<div align="center">II</div>

The following facts are undisputed and are taken from the plaintiff's Third Amended Complaint.

Mr. Burke is, and was at time of the events in this case, a NYCTA train operator. (Third Am. Compl. ¶ 2.) He was fined under the Taylor Law for his participation in the December 2005 New York City transit strike. (Third Am. Compl. ¶ 2.) Mr. Burke sought to challenge the fine before the New York PERB, but he was unsuccessful. (Third Am. Compl. ¶ 2.)

The plaintiff now argues that the Taylor Law is unconstitutional under the First, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Thirteenth, and Fourteenth Amendments. He seeks declaratory judgment invalidating the law, an injunction blocking future enforcement of the law by the defendants, and he asks that all fines assessed as a result of the December 2005 strike be returned to those who paid them. All of the defendants move to dismiss the plaintiff's claims pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can

00000340

be granted.  The New York PERB and the New York State Attorney
General also move to dismiss pursuant Rule 12(b)(1).


                                III

     The New York PERB and New York State Attorney General argue
that this Court does not have subject matter jurisdiction over
the plaintiff's claims against them because they are entitled to
Eleventh Amendment immunity.  Under the Eleventh Amendment, a
state cannot be sued in federal court unless it consents or
"Congress, pursuant to a valid exercise of its power,
unequivocally states its intent to abrogate the state[']s[]
immunity."  New York City Health and Hosps. Corp. v. Perales, 50
F.3d 129, 134 (2d Cir. 1995).  State immunity to suit in federal
court extends to state agencies, such as the New York PERB,
which cannot be sued absent a waiver or clear congressional
abrogation.  See Pennhurst State Sch. & Hosp. v. Halderman, 465
U.S. 89, 100 (1984).  There is no evidence of such a waiver or
abrogation in this case.

     Eleventh Amendment immunity does not bar suits to enjoin
prospectively unconstitutional conduct by state officials acting
in their official capacities.  See Ex parte Young, 209 U.S. 123,
159-60 (1908).  To the extent the plaintiff is seeking such
injunctive relief against the New York State Attorney General in
this case, the Eleventh Amendment would not be a bar to his

                                 6

00000341

constitutional claims.  See Dube v. State Univ. of N.Y., 900

F.2d 587, 595 (2d Cir. 1990).  Any claims for retroactive money

damages would be barred.  See Edelman v. Jordan, 415 U.S. 651,

677 (1974).

    In any event, however, the plaintiff has failed to state a

claim against the New York State Attorney General, the New York

PERB, the NYCTA, or the MTA.  All of the plaintiff's claims are

rooted in his argument that the Taylor Law is unconstitutional.

However, the Taylor Law has long been held constitutional.  See,

e.g., Buffalo Teachers Fed'n, Inc. v. Helsby, 676 F.2d 28, 29-30

(2d Cir. 1982) (per curiam) (finding that fine assessed under

Taylor Law against worker who participated in strike did not

violate Equal Protection Clause); Cheeseman v. Carey, 623 F.2d

1387, 1389-93 (2d Cir. 1980) (Friendly, J.) (reviewing previous

unsuccessful constitutional challenges to Taylor Law and finding

that one Equal Protection claim "borders on the frivolous");

Margiotta v. Kaye, 283 F. Supp. 2d 857, 863-65 (E.D.N.Y. 2003)

(rejecting constitutional challenges to Taylor Law); N.Y. State

Inspection, Sec. & Law Enforcement Employees, Dist. Council 82

v. N.Y. State Pub. Employment Relations Bd., 629 F. Supp. 33, 54

(N.D.N.Y. 1984) (finding Taylor Law did not violate First or

Fourteenth Amendments); O'Brien v. Bd. of Educ., 498 F. Supp.

1033, 1037-38 (S.D.N.Y. 1980) (rejecting constitutional

challenges to the Taylor Law, including under Eighth Amendment);

00000342

New York City Transit Auth. v. Transp. Workers Union of America,
822 N.Y.S.2d 579, 591-92 (2d Dep't 2006) (rejecting challenges
to Taylor Law under Sixth and Fourteenth Amendments); Lawson v.
Bd. of Educ., 315 N.Y.S.2d 877, 878 (3d Dep't 1970) (noting that
court did not "perceive any merit as to the . . . contentions in
regard to the constitutionality" of Taylor Law), appeal denied,
269 N.E.2d 834 (1971), appeal dismissed, 404 U.S. 907 (1971).
The plaintiff appears to recognize this fact, noting that he
cannot "claim any case law throwing out the 'Taylor Law' for
[c]onstitutional violations." (Pl.'s Opp'n & Cross-Mot.
Affirmation 7.)  The plaintiff offers no convincing argument for
the Court to fail to follow the settled precedent holding the
Taylor Law constitutional.  The plaintiff has failed to provide
any plausible basis to find the Taylor Law unconstitutional.
Therefore, the plaintiff's claims against the defendants in this
case have no legal basis.


                              IV

    The plaintiff has also made a motion for sanctions against
defendant MTA's counsel pursuant to Rule 11 for their
"continual, unremitting, satanic, seditionist, actionable
attack" on the Constitution.  (Pl.'s Opp'n & Cross-Mot.
Affirmation 2.)  The plaintiff has alleged no conduct by the


                              8


00000343

MTA's counsel that would violate Rule 11.  Therefore, that motion is **denied**.

Finally, the plaintiff has made a motion for a continuance of a motion for summary judgment to allow discovery pursuant to Rule 56(f).  The plaintiff seeks "information, in the control of defendants, regarding MTA's actions as Plaintiff's employer and actions to institute egregious and ruinous fines."  (Pl.'s Opp'n & Cross-Mot. Affirmation 7.)  First, neither party made a motion for summary judgment in this case, and, for the reasons stated above, there is no need to convert the defendants' motions to dismiss into motions for summary judgment.  Second, the plaintiff has not presented an affidavit as required by the Rule, nor has he made any showing of how the facts he seeks would create a material issue of fact, what efforts he made to obtain those facts, and why they were unsuccessful.  See Paddington Partners v. Bouchard, 34 F.3d 1132, 1137-38 (2d Cir. 1994).  Therefore, the plaintiff's Rule 56(f) motion is **denied**.


                            CONCLUSION

The Court has carefully considered all of the parties' arguments.  To the extent not specifically addressed in this Opinion they are either moot or without merit.  For the reasons stated above, the defendants' motions to dismiss the plaintiff's

                                9

00000344

Third Amended Complaint are **granted**.  The Third Amended

Complaint is **dismissed with prejudice**.  The Clerk is directed to

**dismiss** any additional pending motions **without prejudice** as

moot.  The Clerk is also directed to enter Judgment and to close

this case.

SO ORDERED.

Dated:      New York, New York
            November 24, 2009

                                          John G. Koeltl
                                  United States District Judge

00000345

# EXHIBIT 7

00000346

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
BRIAN BURKE                                    :    Docket #09 Civ. 3291(JGK)(DF)
      Plaintiff                           :

         -v-                        :

                                 :    ## NOTICE OF
                                 :    ## MOTION

  Metropolitan Transportation Authority/    :
  NYC Transit Authority & Public             :
  Employment Relations Board &               :
  NY Attorney General Andrew M. Cuomo        :
             Defendants,              :
--------------------------------------------------------X

         **PLEASE TAKE NOTICE,** upon the annexed Affirmation/

Declaration of Plaintiff Brian Burke_____dated June 15, 2009

and the Exhibits and Memorandum of Law and all other pleadings and

proceedings herein,  Plaintiff Brian Burke will move on **August 27, 2009** before the

Honorable John G. Koetl, Judge of the Southern District of New York  at 500 Pearl

Street, New York NY , or as soon thereafter as counsel pro se may be heard, for an

order pursuant to Rules 11 and 56(f)  of the Federal Rules of Civil Procedure

                                 _____
                                 Brian Burke pro-se
                                 145 East 23rd Street
                                 New York, NY 10010
Dated June 15, 2009                      (212) 614-8515
                               briantburke@gmail.com



EXHIBIT
Burke 5
5/25/10 SCC

00000347

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

BRIAN BURKE                  :     Docket #09 Civ. 3291(JGK)(DF)
       Plaintiff           :

        -v-            :      # OPPOSITION &
                       :      # Cross-motion
                       :      # Affirmation

Metropolitan Transportation Authority/  :
NYC Transit Authority & Public        :
Employment Relations Board &       :
NY Attorney General Andrew M. Cuomo  :
         Defendants,        :
--------------------------------------------------------X

### Preliminary Statement

      **Plaintiff Brian Burke,_____,pro se, hereby affirms and states**

**under penalty of perjury:**Plaintiff requests the Court deem this Opposition for both

Authority 12(b)6 motions.

*"The general rule is that an unconstitutional statute, though having the form and the*
*name of law, is in reality no law, but is wholly void and ineffective for any purpose*
*since unconstitutionality dates from the time of its enactment and not merely from*
*the date of the decision so branding it; an unconstitutional law, in legal*
*contemplation, is as inoperative as if it had never been passed ... An*
*unconstitutional law is void." (16 Am. Jur. 2d, Sec. 178).*

*"Rosa Parks and Martin Luther King did not concede that it was illegal to violate*
*segregation laws, and workers need not concede that it is illegal to violate*
*unconstitutional strike bans like New York's Taylor law.*

*"When the transit workers struck, they were exercising their most basic labor right:*
*the right to quit work. Nobody denies that this right is guaranteed by the Thirteenth*
*Amendment to the U.S. Constitution, which prohibits slavery and involuntary*
*servitude. But employers argue that the amendment guarantees only the individual*
*right to quit in isolation from other workers. This argument misses the whole point of*
*the right to quit, which is—according to the Supreme Court—to give workers the*

00000348

*"power below" and employers the "incentive above to relieve a harsh overlordship or unwholesome conditions of work." Obviously, most workers cannot obtain any power just by quitting on their own. As CIO general counsel Lee Pressman explained more than a half-century ago: "The simple fact is that the right of individual workers to quit their jobs has meaning only when they may quit in concert, so that in their quitting or in their threat to quit they have a real bargaining strength." Ellen Dannin* **"Protecting labor law means protecting democracy"**

The head of the Executive Branch of New York State, an attorney and the boss of the Authority by Counsel, believes the "Taylor Law" to be unconstitutional. See attached article.

### SEVENTH AMENDMENT DEAD

The Authority, by counsel, in it's continual, unremitting, satanic, seditionist, actionable attack on the foundation document a million citizens gave their life, ten million their blood and hundreds of millions their toil must be sanctioned under Fed. R. Civ. P. 11. Counsel's "Death of a Thousand Cuts" for our revered Constitution, to which Plaintiff proudly pledged, under oath, to defend against all enemies, foreign and domestic, without reservation, deserves disbarment. Their open defiance of our mutual boss, David A. Paterson, would cause termination of Plaintiff and will go unremarked by Counsel.

### HOLOCAUST DENIAL

The Authority by Counsel contends, in its straw man argument, that *Gesetz zum Schutze des deutschen Blutes und der deutscher Ehre*, often called *Blutschutzgesetz,* and *Reichsbürgergesetz, a.k.a. Nuremberg Laws* are current German Law, as they were originally upheld by German Courts and must never be revisited, **AS A MATTER OF LAW.** Logic would stipulate their exultation of the satanic/criminal genocide of millions of innocent humans. This construction, **THE DEATH OF REMEDY AND CONSTITUTIONAL REVIEW,** also serves their interest.

### PENAL LAWS OF IRELAND

The Authority contends that the following laws, which apply to Plaintiff, are Constitutional and in effect and not subject to review, as they were upheld by the House of Lords: Exclusion of Catholics from most public offices (since 1607), Ban on intermarriage with Protestants;

Catholics barred from holding firearms or serving in the armed forces

Bar from membership in either the Parliament of Ireland or the Parliament of Great Britain from 1652; rescinded 1662-1691; renewed 1691-1829.

Disenfranchising Act 1728, exclusion from voting until 1793;

Exclusion from the legal professions and the judiciary;

Education Act 1695 - ban on foreign education;

Bar to Catholics entering Trinity College Dublin;

On a death by a Catholic, his legatee could benefit by conversion to the Church of Ireland;

Popery Act- Catholic inheritances of land were to be equally subdivided between all an owner's sons with the exception that if the eldest son and heir converted to Protestantism that he would become the one and only tenant of estate and portions for other children not to exceed one third of the estate. This "Gavelkind" system had previously been abolished by 1600.

Ban on converting from Protestantism to Roman Catholicism on pain of Praemunire: forfeiting all property estates and legacy to the monarch of the time and remaining in prison at monarchs pleasure. In addition, forfeiting monarchs protection. No injury however atrocious could have any action brought against it or any reparation for such.

Ban on Catholics buying land under a lease of more than 31 years; repealed 1778.

Ban on custody of orphans being granted to Catholics on pain of 500 pounds that was to be donated to the Blue Coat hospital in Dublin.

Ban on Catholics inheriting Protestant land

Prohibition on Catholics owning a horse valued at over £5 (in order to keep horses suitable for military activity out of the majority's hands)

Roman Catholic lay priests had to register to preach under the Registration Act 1704, but seminary priests and Bishops were not able to do so until the 1770s.

When allowed, new Catholic churches were to be built from wood, not stone, and away from main roads.

'No person of the popish religion shall publicly or in private houses teach school, or instruct youth in learning within this realm' upon pain of twenty pounds fine and three months in prison for every such offence. Repealed in 1782. [2]

Any and all rewards not paid by the crown for alerting authorities of offences to be levied upon the Catholic populace within parish and county.

The legislation devised for the Irish Catholics in that evil time was described by Edmond Burke as "*a machine as well fitted for the oppression, impoverishment, and degradation of a people, and the debasement in them of human nature itself, as ever proceeded from the perverted ingenuity of man*".

### CHINESE EXCLUSION ACT

Mr. Ching Wah Chin esq. has a First Amendment right to believe and fight for the idea that *U. S. Statutes at Large, Vol. XXII, p. 58 ff.* a.k.a. *Forty Seventh Congress Sess. I Chap 126* a.k.a. *The Chinese Exclusion Acts of 1882 and 1892* are in effect and Constitutional as, admittedly, they were upheld by the courts. Justice Harlan "*I think it follows that the children of Chinese born in this country do not, ipso facto, become citizens of the United States unless the Fourteenth Amendment overrides both treaty and statute. Does it bear that construction, or rather is it not the proper construction that all persons born in the United States of parents permanently residing here and susceptible of becoming citizens, and not prevented therefrom by treaty or statute, are citizens, and not otherwise*

*But the Chinese, under their form of government, the treaties and statutes, cannot become citizens, nor acquire a permanent home here, no matter what the length of their stay may be.* **Wharton Confl.Laws, § 1**."

Plaintiff requests of the Court that those with standing be allowed to seek review and not have case be dismissed **AS A MATTER OF LAW.**

### SLAVERY UPHELD

00000351

*Dred Scott v. Sandford, 60 U.S. (How. 19) 393 (1857)* is Defendant by Counsel's favorite case due to the admitted upholding of the abomination of Human Chattel.

According to the Court "*We think they [people of African ancestry] are not [citizens], and that they are not included, and were not intended to be included, under the word "citizens" in the Constitution, and can therefore claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States. . . . [T]he legislation and histories of the times, and the language used in the Declaration of Independence, show, that neither the class of persons who had been imported as slaves, nor their descendants, whether they had become free or not, were then acknowledged as a part of the people, nor intended to be included in the general words used in that memorable instrument"*

If Authority by Counsel's "Do as thou wilt is the whole of the law" (A. Crowley) philosophy and pathetic straw man attacks on the Constitution a.k.a. the United States were upheld **REMEDY AND THE CONSTITUTION WOULD BE AT END.**

## REINSTITUTION OF JIM CROW

The Authority's second favorite case is, of course, *Plessy v. Ferguson, 163 U.S. 537 (1896).* Homer Plessy and Dred Scott are possibly America's two greatest citizens. They failed in attempting to seek constitutional remedy for themselves and those similarly situated. William Rehnquist wrote a memo called "*A Random Thought on the Segregation Cases"*, when he was a law clerk in 1952, during early deliberations that led to the *Brown v. Board of Education* decision. In his memo, Rehnquist argued that "I realize that it is an unpopular and unhumanitarian position, for which I have been excoriated by 'liberal' colleagues but I think *Plessy v. Ferguson* was right and should be reaffirmed." He continued, "To the argument… that a majority may not deprive a minority of its constitutional right, the answer must be made that while this is sound in theory, in the long run it is the majority who will determine what the constitutional rights of the minority are." The Authority laughs at and mocks the attempt these two icon/heros made to free an honorable people.

00000352

The Authority demands, as of right (Divine Right of Kings?), to end Remedy, Access to Court and Jury, Constitutional Review, and by construction, the United States.

### Marbury v. Madison OVERTURNED

The Authority demands that *Marbury v. Madison, 5 U.S. (Cranch 1) 137 (1803)* be overturned, if it is not already, in order to serve alleged Authority interests. It demand that the Court  and Jury, **AS A MATTER OF LAW**, have no right to review constitutionality of "Taylor Law" and/or, by construction, any Law/Statute Vis-à-vis the Constitution of the United States, if that review does not serve 'Authority " interests. Their corrupt contention, that irrelevant common law trumps the Constitution.  *Englbom v. Carey, 677 F.2d 957*, the first case the MTA attempts to use under "POINT 1" involves the **THIRD AMENDMENT AND A DIFFERENT STATUTE WITH NO MENTION OF TAYLOR LAW**. Defendants demand that irrelevant case law, with **different parties, different facts, different Amendments and different laws** end remedy and Constitutional review. For most of the ten Amendments Plaintiff shows, or after discovery will show, are violated by the Taylor Law the Authority have supplied **NO CASE LAW.** The Authority's most corrupt/ illogical "argument" in history; wherein if **any Court, under any set of facts, with any party, under any Amendment uphold any law then Res Judicata/Collateral Estoppel block constitutional remedy as a matter of law without discovery, hearing or jury**. Plaintiff disputes this contention. Justice Ruth Bader Ginsberg, controlling Supreme Court Justice over the Second Circuit, on April 10, 2009 at Ohio State University Law Journal "Life on the Supreme Court' broadcast on CSPAN and available on line after the 50th minute stated the following; "With regard to Stare Decisis, we distinguish between statutory and Constitutional cases....if we really got it wrong it is our responsibility to correct it.....The tug of Stare Decisis is considerably weaker when we're dealing with a decision under the

00000353

Constitution." http://www.c-spanarchives.org/library/index.php?
main_page=product_video_info&products_id=285214-1

### NO PRE-MOTION CONFERENCE

Defendants have violated Judge Koeltl's Individual Practices in their panic to deny remedy.

### Fed. R. Civ. P. 56(f) Discovery Request

Plaintiff requests, in order to defend any motion for Summary judgment, to be allowed limited discovery. This would include limited interrogatories and/or depositions under Rule 30(b)6 and/or Subpoena. Plaintiff requires access to information, in the control of defendants, regarding MTA's actions as Plaintiff's employer and actions to institute egregious and ruinous fines etc.. Defendant MTA in case *Brian Burke v. Solomon Acosta & FasCore/Great West & MTA/NYC Transit Authority, et al., No. 07 Civ. 9933 (S.D.N.Y. August 25, 2008)* to have sole control over Plaintiff's "**Employee capital investments (401K, 457)" and to represent the "MTA NYC Transit Authority"** throughout case. In fact, the NYC Transit Authority was represented by Mr. Chin[*sic]* allegedly, after the fact, after Plaintiff accused the NYC Transit of default. Plaintiff's employer seems to be defined, like the Heisenberg uncertainty principle, only by the current legal interest of the Authority Defendants.  Plaintiff acknowledges this is not a tort case for reasons of legal liability.

### Stare Decisis

Plaintiff cannot, admittedly claim any case law throwing out the "Taylor Law" for Constitutional violations as it then **WOULD ALREADY BE RULED UNCONSTITUTIONAL AND THIS CASE MOOT.**

### CONCLUSION

Plaintiff requests the Court sanction the Defendants for their violation of Individual Practices and the attempt to deny remedy/jury. Plaintiff requests that the Court deny

00000354

12(b)6 Motion(s) or barring that, to allow discovery prior to decision and for all such and further relief that this Court may deem just and appropriate. All Rights Reserved Without Prejudice U.C.C. §1-308.

_____

Brian Burke pro-se
145 East 23rd Street
New York, NY 10010
(212) 614-8515
briantburke@gmail.com

Dated June 15, 2009




.COM    click for your candidate
VOTE KEYES  VOTE McCCAIN  VOTE BUSH  VOTE BAUER  VOTE FORBES  VOTE HATCH  VOTE GORE  VOTE BRADLEY


NEWS

## HOME
Business
Cartoons
Columnists
Editorial
Entertainment
Gossip
Horoscope
Features
Lottery
Market
Watch
News
Reviews
Savvy
Shopper
Sports
Weather

### PAST ISSUES
Archives
Last 7 Days

### INTERACTIVE FEATURES
Classified
Shopping
TV Listings
Word Games

**Send us Your Comments**

## TRANSIT UNION AND MTA 'STRIKE' A DEAL

By CARL CAMPANILE, DAVID SEIFMAN, ANDY GELLER, ROCCO PARASCANDOLA, LARRY CELONA, ROBERT HARDT Jr. and TRACY CONNOR



*TWO SIDES: Union Vice President Gil Rodriguez holds the court injunction forbidding a strike as he tells reporters the TWU will abide by it and stay on the job.*
*- NYP: W.A. Funches, Jr.*

Transit union leaders and the MTA reached a deal early today on a new contract to keep the subways and buses running -- after a knuckle-biting round of down-to-the wire talks.

"The riding public got what they deserved and the Transport Workers Union got what it deserved, a fair and just contract," said TWU President Willie James.

But earlier, Mayor Giuliani warned that wildcat job actions by angry workers could disrupt today's commute.

And other union officials said they


Buy Electronics at amazon.com



Want the


10 Millennium Countdown



crippling the transit system.

"There will be no strike," Mayor Giuliani said earlier as negotiators hammered out the details of the agreement. "The worst we will have to deal with are work stoppages here and there.

"Things should be fairly normal in the city [today]. I think it's going to be a normal day."

Giuliani said 3,000 extra cops will be on duty, watching for work stoppages or slowdowns or acts of sabotage.

He warned dissident workers they face possible $25,000 fines or even arrest if they stage any job actions.

The deal worked out between the Transport Workers Union and the Metropolitan Transportation Authority at the Grand Hyatt Hotel gave the 33,000 transit workers raises of 5, 3 and 4 percent over three years.

It also includes 2.3 percent in additional MTA contributions to pension and health plans -- money that would otherwise have come out of the workers' pockets.

After landing the deal, Local 100 negotiators headed to union headquarters to sell the contract to the 46-member executive board.

A majority has to approve it before the members vote on it, and James said he was "very confident" it would pass.



The drama started early in the day when lawyers for the MTA and the city launched a preemptive strike against a walkout -- going to the home of Brooklyn Supreme Court Chief Administrative Judge Michael Pesce to get orders barring a strike.

"It was a very unique scene in Judge Pesce's house," Corporation Counsel Michael Hess said. "We wanted the unions to be aware that they would be in contempt of court ... if they advocated a strike."

Invoking the state's Taylor Law, which bars strikes by public employees, the city's order calls for astronomical penalties of $25,000 per worker per day and $1 million against the union per day -- both doubling every day.

With the sledgehammer poised to strike, union officials swiftly announced they would respect the temporary restraining orders.

But thousands of defiant transit workers attending a 6 p.m. Manhattan Center meeting took an unofficial, show-of-hands vote in favor of a strike -- vowing they wouldn't be bullied by Giuliani's strong-arm tactics.

**E-Mail This Story to a Friend**

**Your Name**

00000358

## TWU lobbies for Taylor Law reform



THE WEEKLY NEWSPAPER OF THE NEW YORK STATE GOVERNMENT

# LEGISLATIVEGAZETTE
## .COM

Empire State Plaza, Concourse Level, Room 106
Albany, New York 12224
Phone (518) 473-9739 Fax (518) 486-8609

By WILLIAM ENG
Legislative Gazette Staff Writer
Mon, May 22, 2006

Members of Transit Worker Union Local 100 came to Albany last Tuesday and received bi-partisan support for their union and a number of bills they are lobbying for.

Senate Minority Leader David A. Paterson, D-Harlem, said, "In every movement there has to be changes" and pledged support to bills S.7880 and A.11227, which would amend the Taylor Law, which he called unconstitutional.

The TWU came under fire last December when its members decided to go on strike during contract negotiations, shutting down public transportation in New York City for 60 hours. Critics of the union say the strike was illegal because it violated the Taylor Law — a law that makes it illegal for public employees to strike in New York State.



The two bills, sponsored by Sen. Nicholas A. Spano, R,C,I-Yonkers and Assemblyman Adriano Espaillat, D,WF-Manhattan, would make two changes to the Taylor Law.

First, employees would be able to file for injunctive relief to the Public Employee Relations Board if a judge finds that an employer had been conducting improper practices.

Second, if the board finds that the employer had conducted an act of extreme provocation that employer would have to reimburse up to 50 percent of penalty fees incurred by the employee.

Assembly Speaker Sheldon Silver, D,WF-Manhattan, asked union members to unite behind state Comptroller Alan Hevesi, Attorney General Eliot Spitzer, the Assembly majority members and behind union President Roger Toussaint. Silver said it was "time to take back this state."

"We don't need a King George, we don't need a President George, and we don't need a Governor George," said Silver.

Toussaint, who served 4 1/2 days of his 11-day sentence for the illegal transit strike, told members that their lobby day was an opportunity to start the conversations they wanted.

"Together, united [we are] invincible," said Toussaint. "We took a stand and took it on the chin. We are the TWU. We don't care about jail time. We will never back down."

He said the union needed to heal after what it went through in December, but said, "If you think they give a damn about you, you have to be living in la-la land."

Toussaint said people would be telling the union's story for the next 30 years "because [we] are ground zero of this struggle."

Dennis Hughes, president of the New York State AFL-CIO, said labor relations would not be fair until the Taylor Law was amended, arguing that the law should "protect both sides."

"We want employers to feel regret for not reaching agreement deadlines," said Hughes. "Fair, adequate labor relations can be good for the state and citizens. I don't want to see this law continue without reform."

Assemblywoman Susan V. John, D-Rochester, chairwoman of the labor committee said, "New York works because TWU works."

00000359

"United we stand, divided we fall," John said. "Divided is when the bastards get you." John continued to pump up the crowd but did not go as far as the TWU union members did. After she said, "If we have to," the union members chanted in response, "Shut them down." John finished her sentence saying, "We will do what we have to do."

Assemblyman Joseph Saladino, R-Massapequa, said, "We in Albany are here for you. I stand for working people." He said Republicans and Democrats should stop fighting each other and start fighting for working people.

In addition to amending the Taylor Law, union members are pushing for other bills that would improve safety for transit workers and modify their retirement benefits.

Keywords: None Given

---

## Unique ■ Focused ■ Influential

© 2009 Legislative Gazette  -  Website Design by Achacan

00000360

# EXHIBIT 8

00000361

Share   Report Abuse   Next Blog»     Create Blog   Sign In

# KenmoreAssCriminal Landlord

Racketeer Influnced Corrupt Organization, Criminal "Landlord" Kenmore Associates a.k.a. Housing Services Incorporated.



**THURSDAY, AUGUST 23, 2007**

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATION



CIVIL COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : HOUSING PART H
----------------------------------------------------------X Index # 071507/07 &
KENMORE ASSOCIATES, L.P. & : Index # 52851/2006
HOUSING SERVICES INC. & Norris :
McLaughlin & Marcus Petitioner, :
v. : ANSWER &
: AFFIDAVIT
: JURY DEMAND
:
:
Respondent. :
----------------------------------------------------------X
In response to NOTICE of PETITION & PETITION respondent pro se
_____submits the following ANSWER & AFFIDAVIT:
GENERAL DENIAL
Defendant denies each and every allegation contained in the
PETITION on file herein. Upon information and belief:
1. Respondent denies paragraph #1 that Petitioner is "the landlord" or
"the owner" of 145 east 23rd street or 143-147 east 23rd street NY
NY but instead the Federal Government & People of the United
States.
2. Respondent denies paragraph #2 as Respondent had entered into
possession of said premises pursuant to the terms of Rent
Stabilized Law at a "rent" of $215 to the People of the United States
(owner).
3. Respondent is in Lawful possession of Apartment numbered 4R
at 145 east 23rd street New York, New York
4. Respondent denies paragraph #4 as the court of proper jurisdiction
is the United States District Court for the Southern District of New
York, Due to Federal ownership and Federal Questions of Law and

### About Me

Fin MacCool

View my complete profile

### Blog Archive

► 2009 (1)
► 2008 (2)
▼ 2007 (18)
   ► 11/25 - 12/02 (2)
   ► 10/14 - 10/21 (2)
   ► 09/09 - 09/16 (4)
   ► 09/02 - 09/09 (2)
   ► 08/26 - 09/02 (1)
   ▼ 08/19 - 08/26 (1)
      RACKETEER INFLUENCED AND CORRUPT ORGANIZATION
   ► 08/12 - 08/19 (3)
   ► 06/10 - 06/17 (2)
   ► 05/20 - 05/27 (1)
► 2006 (10)

### Racketeer Influenced Corrupt Organization

kenmorehallcourier

Land Patents

UNITED STATES of America v.ALL RIGHT, TITLE AND INTEREST IN REAL PROPERTY AND APPURTENANCES,

Racketeer Influenced Corrupt Organization

The People of the United States-actual owners

Expose Corrupt Courts

Constitutionality.

5. Respondent agrees to status as "Statutory Tenant" i.e. no lease and should be taken as a statement against interest by petitioner (RICO). "Rent" is $215.

6. Respondent acknowledges no payments to the Department of the Treasury or to any organization, entity, or individual payments for period mentioned. Section 8 payments were fraudulently paid for said apartment.

7. Respondent denies paragraph #6 as to proper service or form of Three (3) Day Demand.

8. Respondent denies paragraph #7 as so called "Kenmore Associates" or "Housing Services Incorporated" are not the lawful landlord of said premises.

9. Respondent lacks knowledge or information sufficient to form a belief of the truth of the allegations of paragraph #8.

10. Respondent agrees that premises is and/or would be subject to Rent Stabilization Law of 1969 but denies that petitioner is in compliance with said law or that premises was properly, correctly, or lawfully registered by landlord and requested rents are below legal maximum.

11. Respondent denies paragraph #11 in the entirety, other than being covered by Chapter 713 of the Laws of 1929, as amended (NYSMDL).

AFFIRMATIVE DEFENSES & COUNTERCLAIMS

11. Upon Information and Belief, The Organization also known as Kenmore

Associates a.k.a. Housing Services Incorporated aka Kenmore Housing Corp. aka

Kenmore Housing Development Corp. and Norris Mclaughlin & Marcus is/are a

Racketeer Influenced and Corrupt Organization (RICO) as defined by the Racketeer

Influenced and Corrupt Organizations Act, Title 18, Chapter 96, United States Code,

§1961-§1968. Petitioner (hereon in referred to as the Rico or petitioner) claims to

have stolen (without consideration (Nudum Pactum) to taxpayers) a $100,000,000

building by fraud, bribery, unlawful past, and future implied and actual considerations

to Politicians and Public Servants and/or Blackmail and Forgery in order to swindle

taxpayers of one of their most valuable properties. Innumerable Predicate Felonies

as qualified under said RICO act were, are and will be committed by the RICO in and

on an ongoing basis. These Predicate Felonies include, but are not limited to,

Medicaid (not even a licensed provider), Section 8 and virtually every other State,

Morganroth & Morganroth v. Norris, McLaughlin & Marcus Creditor Fraud

Kenmore Ass

KenmoreHall Criminal Landlord

KenmoreAss-Criminal-Landlord

KenmoreAss Criminal Landlord

Kenmore Hall Criminal Landlord

City-Wide Task Force on Housing Court

Metropolitan Council on Housing

NYC Rent Guidelines Board

Tenant.net

Show Us The Inherent Law

Dean Roberts-RICO's House Council

Housing & Services, Inc.

Case Manager/Mental Health Counselor

Social Services Program Manager, Kenmore Hall

Tran Dinh Truong-Former Owner

Reflexology in 4th fl Lounge

Congresswoman Maloney on Kenmore Hall

PR Newswire: 1999 Opening of Kenmore Hall

Google News

RICO is
violating the State and Federal Constitutional and Civil Rights of
Lawful Tenants in
the building referred to as Kenmore Hall. Tenants (including
respondent) are treated
as Chattel Slaves in violation of Amend. XIII to the Constitution of the
United States.
Section 1. Neither slavery nor involuntary servitude, except as a
punishment for crime whereof the party shall have been duly
convicted, shall exist within the United States, or any place subject
to their jurisdiction.
Section 2. Congress shall have power to enforce this article by
appropriate legislation.
Petitioners treating of Tenants as Chattel does not in any way extend
to any
responsibility for or interest in their Life, Liberty, Pursuit of
Happiness, Mental or
Physical Health, Quiet Use and Enjoyment, etc, but merely as Objects
necessary to
loot innumerable Government and other "programs" (or pograms). As
Predicate
Felonies, the RICO, through Blackmail, Intimidation, and Strong Arm
Tactics, forces
vulnerable, elderly, differently abled, and/or health compromised
Tenants into
Fraudulent Medical Experiments, (see Josef Mengele (Nazi SS-
Hauptsturmführer)),
to create unlawful revenues for petitioner, these "experiments"
conducted in full
view of other Tenants and the Public in the lobby of said building in
order to Harass
and successfully create fear in Tenants and to show that they can.
The RICO staffs
the building exclusively, except for two ex detectives, with Violent
and Drug Felons
and ex-cons, for obvious reasons. The alleged landlord/managing
agent, Lawrence
Oaks is a convicted Drug Trafficker and Amir Elhadide (Building
Superintendent)
was convicted of Attempted Murder on a woman. As Predicate
Felonies, the RICO
Terrorizes and commits Acts of Terrorism and War on Tenants in
violation of
International Law, and Federal, State and City Laws, Regulations, and
Rules via
"mysterious deaths" a.k.a. Human Sacrifice/Capitol Murder which are
never
autopsied or investigated, but instead covered up. The Attempted
Murder/Home
Invasion and Coverup of Chake Baghtedjian, a petit elderly immigrant,
in her

former apartment, 5F, on July 12, 2004, by staff Felons, occurred minutes after

Lilian Mateo/Linda McAndrews admitted to ordering Serial Home Invasions on

tape, in possession of respondent, and on their orders. Ms. Baghtedjian was taken

by ambulance by petitioner to one of their facilities in the Bronx, apparently in

coma, Illegally Evicted and kept incommunicado (Kidnaping (Federal Crime)) to

this day except for her Niece, unaware of the Proximate Cause of her Aunt's

Trauma. Admittedly Ms. Baghtedjian made a complaint to HPD resulting in still

open violation #4090511 and refused to participate in the RICO's Criminal

Pograms on Tenants. Nevertheless, to the respondent, this does not seem to reach

the legal threshold to commit said acts on a Lawful Tenant. A FOIL request for

information on this was denied by the NYPD on appeal (#06PL100336).

12. Perhaps, to the respondent, as the grandson of a former Police Captain and

currently employed as a Civil Servant, the most egregious and abominable act(s)

of (Predicate Felony) corruption involves the usurpation and "pimping out" of the

brave and hardworking employees of the New York City Police Department a.k.a.

New York's Finest a.k.a. NYPD. Through deliberate and malicious misinformation

and considerations, past, present, and ongoing, the RICO has thwarted

investigations of crimes committed against Tenants by the RICO and even their

reporting thereof. On June 6, 2005 at 11AM, after respondent arrived home at 7AM

after working at 14 hour day, a fact known to petitioner, Linda McAndrews and

others attempted a Home Invasion/Burglary/Constructive Eviction/Unlawful Entry

without notice, agreement, or legal cause, of respondent's residence. This was

prevented by respondent, though understandably sound asleep and sans apparel,

with the help of metal gates held against the door for that purpose and counterforce

Amendment IV: The right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon probable cause,

supported by Oath

or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized.

On July 11, 2005 respondent, in his Civil Service uniform and on his way to work,

went to the local precinct, Precinct 13, to report the instant crime and was thwarted

by Officer Catherine Weissheier, who apparently has a relationship with and/or

promises and/or conveyance of past, present, and/or future consideration(s) from

Linda McAndrews. This event was reported to the Internal Affairs Bureau of the

NYPD (case #05-16077) and the Civilian Complaint Review Board, who, because

of the egregious nature of the complaint, referred it to the Chief of Department of

the NYPD (case # OCD 200507136) and currently under investigation.

Amendment V: No person shall be held to answer for a capital, or otherwise infamous

crime, unless on a presentment or indictment of a grand jury, except in cases arising

in the land or naval forces, or in the militia, when in actual service in time of war or

public danger; nor shall any person be subject for the same offense to be twice put in

jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness

against himself, nor be deprived of life, liberty, or property, without due process of

law; nor shall private property be taken for public use, without just compensation.

13. False arrests of Tenants and Tenant Leaders occur on an ongoing basis and

are based on the Perjury, deliberate misinformation and Fraudulent Complaints

and for the purpose of denying the Constitutional, Common Law, and Civil Rights

of said Tenants and all Tenants via Unlawful Incarceration and meant to Harass

Oppress, Subjugate and create fear. These False Arrests include, but are in no way

limited to, Tenant Leader Sal Martinez (20i), and Tenants Larry King (17C), Andy

Hall (519), and Xaviere Sinclair (12P), but admittedly not the respondent, as yet,

who has never been arrested. The RICO uses the local Police Precinct (#13) as

their personal private security force, while denying law abiding Tenants any

remedy as to law, especially as to crimes committed by petitioner. The leverage

over the relevant Police Officers and/or Detectives include the promise of and/or

actual hiring of, the promise of and/or delivery of "medals" and/or "awards" by the

RICO and all other possible and actual considerations for these Civil Servants to

do other than their sworn duty. It is well know that the Politicians in the RICO's

pocket, including those, but not limited to, whose names are on the front of said

building, create fear in and performance from said NYPD employees to "do the

right thing" i.e. what the petitioner wants.

14. The subject building was seized lawfully (and is in fact still owned by the

Federal Government) on June 8th 1994 under 21 USC 881 (b) (Asset Forfeiture

Law) due to evidence that then owner Tran Dihn Truong allowed rampant illegal

drug and criminal activity to persist and exist throughout the building. The Main

Case Docket is 94 Civ 4148 of which a copy of the U.S. Marshal's 'Kenmore

directives' is annexed hereto as Exhibit 'A'

15. The Warrant issued for the Lawful Seizure gave all specific details of the

reasoning and causes necessary to support the Government's 'take over',

illustrating numerous actual drug cases and arrests indicative of rampant drug

activity thereat. At the date of the actual Seizure of the Kenmore, eleven (11)

persons were arrested for alleged illegal drug possession/sales, along with a small

cache of drugs and an inoperable gun. Previous to the Seizure there was the tragic

murder of an elderly infirm female Tenant in her apartment, just like with the RICO,

the difference being this case led to justifiable public outrage, the Seizure, and an

arrest. The case of Ms. Baghtedjian was reported to the Authorities (by Tenants)

and is being "investigated" by Detective Reuther of Manhattan South Homicide

Task Force and Lieutenant James Hanvey of Detective Borough Bronx with as yet

no arrest. Harold Williams is the head of "Kenmore Security" and an ex Homicide

Detective with many Detective and/or Homicide Detective Friends.

00000367

draw your own
conclusions. Former Homicide Detective Williams owns a security company called
Distinguished Gentleman's Investigations (DGI) who's license was revoked by New
York Secretary of State Randy Daniels for reasons including hiring at least six exconvicts
(for crimes including Rape and Assault), 22 who had their applications rejected by the State, and 47 who never submitted applications. Many of these
individuals worked at Kenmore Hall and it was reported to the New York Post that
DGI agents brazenly used illegal drugs on the job and threatened tenants if they
reported them (see exhibit c). The other ex-Detective working at Kenmore Hall, Dan
Danaher, formerly worked at the local Precinct (13) and continues to visit that
Precinct on an almost daily basis (see exhibit) while on the clock, presumably
performing some value or consideration for the petitioner. There are over one
hundred Precincts.
16. Claire Haaga Altman, Putative "owner" of the RICO, an Attorney, performs
separate Tax and Government subsidy scams involving the putative "enterprise"
also known as "Olive Leaf" and is considered by respondent as Part and Parcel of
the Instant RICO. Ms. Altman, whose current and/or former husband committed a
Homicide during an Assault, upon information and belief, is currently under
Investigation and/or Indictment. "Olive Leaf", whose status as a non-profit and/or forprofit
could not be determined (Both?), as well as "Kenmore Associates L.P. and/or
Housing Services Incorporated", upon information and belief, in fact are not duly and/
or properly registered with the appropriate authorities and/or the Internal Revenue
Service as required by Federal, State and City Laws, Rules and Regulations. As
Predicate Felonies, Ms. Altman's "Olive Leaf" occupies prime Commercial Street
Level and other space, including respondent's Lounge, while paying no and/or
radically reduced (subsidy) non-market rents as illegal and Fraudulent transfer of
considerations from non-profit "Kenmore Associates" to privately owned "Olive

Leaf" to the pure and illegal benefit of Ms. Haaga et. al.. This illegal transfer of
considerations, assets, value etc. are not reported to or taxed by the IRS and or
State and City Authorities, as well as innumerable other scams.
Amendment XIV. All persons born or naturalized in the United
States, and subject to the jurisdiction thereof, are citizens of the
United States and of the state wherein they reside. No state shall
make or enforce any law which shall abridge the privileges or
immunities of citizens of the United States; nor shall any state
deprive any person of life, liberty, or property, without due process
of law; nor deny to any person within its jurisdiction the equal
protection of the laws.
17. As additional Predicate Felonies, on an ongoing, continual and constant
basis, the RICO enforces a "Curfew" on Tenants (11PM-7AM) and reserves and
utilizes the absolute and unmitigated and unremediable right to bar any guest,
relative, friend, or Significant Other etc. at any time. This violates Tenants Federal,
State and City Right to Freedom of Association, By various United States Supreme
Court Precedent (available upon request), as well as Federal, State and City Rights
to Privacy and First Amendment Freedom of Assembly and Speech.
Amendment I:
Congress shall make no law respecting an establishment of religion, or
prohibiting the free exercise thereof; or abridging the freedom of speech,
or of the press; or the right of the people peaceably to assemble, and to
petition the Government for a redress of grievances.
This is the perfect method to Harass the Chattel in the most egregious possible
way. The humiliation of attempting to explain to Relatives, Friends etc. this bar on
visits to ones lawful Rent Stabilized Apartment in the "City that Never Sleeps" is the
RICO's vector into destroying Tenants interpersonal relationships to leave Tenants
more vulnerable and potentially in need of petitioners Fraudulent pograms and/or
to abandon apartment (Constructive eviction). These Jailhouse/ Halfway House/
Parolee rules should be applied to the Criminal RICO staff and the Criminals,
Felons, ex-cons and Addicts the petitioner willfully brings into building (an
additional Crime and Tort against Tenants), not law abiding Tenants, including

00000369

respondent, and by precedent and construction, all Tenants. Respondent works the
PM (Evening) shift of various hours, but approximately 3-11 or 4-12 and like most
people would tend to have guests, during the work week, after work and is
effectively barred from having visitors at least five days out of the week (respondent
works weekends). As to days off or mornings when respondent usually sleeps, the
RICO reserves the right to deny any guest at any time for any reason, and is
additionally used to Harass and Humiliate and embarrass "uncooperative"
Tenants. Additionally, if through begging, bribery or propitiousness, a particular
guest is potentially given favor for admission through the august RICO's area of
egress a Rube Goldberg gauntlet of requirements, lectures and orders and
violations of privacy ensue. The RICO, in violation of Federal, State and City
Constitution, Laws, Rules, Regulations and/or Charter, not limited to but including
the Interstate Commerce Clause and The Uniform Commercial Code, bars delivery
of packages etc. to Tenants, including but not limited to UPS, Fed Ex etc.. As
recently as June 31, 2006 RICO staff told a UPS deliveryman that respondent had
moved (see exhibit D). For a number of years respondent had to reroute deliveries
to MailBoxes etc. (see exhibit), causing additional delay and expense to
respondent by petitioner, as was their intent. For these and other enumerated and
unenumerated reasons, respondent has withheld "rent" and made various lawful
entreaties in order to seek remedy, and which respondent believes will only occur
with a duly appointed jury of peers.
Amendment VII In Suits at common law, where the value in controversy
shall exceed twenty dollars, the right of trial by jury shall be preserved,
and no fact tried by a jury, shall be otherwise re-examined in any Court
of the United States, than according to the rules of the common law.
18. As additional Predicate Felonies, upon Information and Belief, the RICO and/or
their staff engage in Massive Identity Theft for the primary purposes of profit.

Harassment, and Leverage. Illegal, Unwarranted, Unnecessary, and Dangerous

amounts of Personal, Private information regarding Tenants and their guests is

accumulated and amassed to be used and distributed and sold to the Tenants

detriment. These distribution points include, but are not limited to, the NYPD (for

additional Considerations) and other Government and/or private agencies, and

Criminal individuals and/or Organizations (other than the instant RICO). On two

occasions Housing Bureau Police (Public Housing), while doing a building wide

warrant sweep, at 6AM awoke respondent looking for a Criminal using respondents name, but of vastly different appearance and finger prints. The source

of the stolen identity was the RICO and/or staff. Petitioner requires, for those guests

it deigns to allow entrance, a specific type of Government Identification that is

demanded and if produced is held for the duration of the visit, during which the

Personal Information is photocopied and kept for various illegal purposes

(Predicate Felony). The Rico "lost" respondent's brother's Drivers License which

was returned over a month later. During previous visit of respondent by

respondents sister, brother-inlaw and 10 month old nephew, two of whom

respondent was meeting for the first time, the RICO barred the visitors from

accessing respondents apartment, for various purported "reasons" such as an

alleged one visiter at a time "rule" and lack of "correct" Government Identification for

nephew, which admittedly was not in their possession. The fourth floor lounge,

ostensibly provided for this very purpose in Certificate of Occupancy, was locked

and/or occupied by "olive leaf". This left the "Medical Experiment Center"/ Public

Lobby to conduct the Private Visit/Introductions. As the final brutal Harassment of

respondent and his relatives, when Finnian Aengus Church started to spit up, as 10

months old are wont to do, the only bathroom in the lobby and thus potentially

assessable to mother and child was affirmatively barred by the RICO, creating a

potential medical emergency and/or deliberate homicide of said child and

immediately ending visit. To this day, respondent's sister is too afraid of the RICO's

staff's barbarous Harassments/Criminal acts against herself and her son to again

visit respondent at his lawful address despite adjurations on respondents behalf.

19. As Predicate Felonies, the necessary means, and/or "business model", of and

for the RICO's ability to execute various 'scams', as a "Poverty Pimp", requires and

installs Criminals, Violent Felons, Crack and other addicted newcomers, exinmates

from Prison Early Release Programs etc., creating horrific conditions and

crime and maximum Fraudulent Gain to petitioner and maximum loss to Lawful and

Law Abiding Original Tenants and Taxpayers. This Gimmick/Tort/Scheme/

Harassment is likely well know to many or most New Yorkers over preceding

decades as an Unlawful Method for Criminal Landlords to empty a building of Rent

Stabilized or Controlled tenants without Due Process of Law (Innumerable Court

Precedents available upon request). The difference in the instant case is that

petitioner found a modus operandi wherein as their appanage they could and

would and have Fraudulently taxed various pograms for the dubious distinction of

bringing their anointed Criminal and/or Incompetent newcomers to New York's and

the Continent's most expensive neighborhood (Gramercy Park). The amount of

Crime and Crime Rate in the building is higher than when owned by Tran Dinh

Truong due to the hundreds of Criminal, Violent Drug Addicts, Felons, and other

Disorderly Individuals willfully and purposely brought into the building, whereas Tran

was merely indifferent. A FOIL request on this was blocked but recent crimes on

Tenants by other 'new' tenants (not the RICO but often with connivance,

foreknowledge, license,and in the interest of) in the building include, Murder (of

Henry Midgett by drug dealer Richard Williams, employed by petitioner), loan

sharking, Assault, Robbery, Prostitution, and Drug Dealing.

20. The conditions in Kenmore Hall are so horrendous and egregious as to

constitute additional Predicate Felonies, as well as other violations of Federal,

State, and City Laws, Rules and regulations by petitioner. Literally Hundreds of

open (unfixed) DHPD violations, including eight in respondents apartment

(Violations ID # 4957755, 57, 6205532, 33, 34, & 35, 6224703, 5688584) since May

2004 and remain willfully un-repaired as part of harassment and violation of implied

Warrant of Habitability. In the stipulation in a previous court appearance respondent

agreed to pay, and did in fact pay $3,250, if petitioner would repair violations and

other conditions by Licensed Plumbers & Electricians as required by law (see

exhibits F, G). This stipulation was unperformed by the RICO, who at every

opportunity attempted and did in fact use Unlicensed and Undocumented Staff who

willfully destroyed plaintiff's bathroom (Retaliatory Eviction). Staff, instead of making

repairs, created a large hole in respondents bathroom, which was covered with

plastic and became a vector for vermin, as was their desire. After numerous

importunings and many months, a deliberately inept restoration was undertaken (see

photos), which resulted in a grout or cement substance all over said bathroom and

when respondent at that time requested a repair of the leaking toilet it was instead

damaged to were it continuously flushes. Respondent, in order to stop tremendous

waste of water and noise, keeps toilet float ball raised and flushes toilet with the water

from the tub that will not drain. The same Unlicensed and Undocumented staff, while

snaking a pipe in a different apartment, damaged respondent's bathroom sink drain,

causing a significant leak when used. There is also considerable lead paint and

potentially fatal Toxic Black Mold (allergy) from upstairs leak. The apartment has not

been painted since the Major Capital Improvement of 10 years ago (the law is every 3

years). Upon information and belief, The RICO interferes with landline phone service

by means of Tap/Tampering/Taping. This was reported to respondent

00000373

by Verizon

Employee Philip Surachi (VID # 682) on December 23, 2003, who said that two jury

rigged illegal taps were on phone line in basement room assessable only to the

RICO staff, causing numerous instances of no dial tone, up to five days at a time.

Respondent neither owns nor possesses a cell phone. During the phone outages of

June 2006 (5 days) (as well as Aug. 07) on June 6 a Verizon Technician (VID # GIG),

visiting said basement room in order to check for tampering, was barred and told he

would need to give at least one days notice and make an appointment in order to

remove illegal devices a priori. No battery operated smoke detectors have ever been

installed in said apartment in violation of NYC Administrative Code §27-2045, 46,

instead a hard wired optical monitoring device running on alternating current was

furnished. During any blackout or electrical interruption to building or apartment has

and will fail and a fire is presumed more likely at at that time due to possible use of

candles matches etc., thus the reason for a battery requirement. Hot water is sporadic

(see exhibits).

21. Respondent moved into said building in 1989 and current apartment in 1992,

without a lease i. e. the Rent Stabilization Laws as a lease. In 1996 respondent

was forced to move to a temporary apartment (the current 4th floor lounge) while a

major capital improvement was performed on apartment and a "temporary

relocation agreement " was signed, with no copy given to respondent. On that

move property was stolen by staff. In 1997, at the MCI completion, respondent was

summoned to a building office wherein petitioner confiscated the temporary

apartment keys (constructive eviction). The RICO said that respondent's property

would be moved by staff only again (Threat) and that a multi page "Housing Rider"

by Housing and Urban Development had to be signed in only five minutes (Duress)

. Respondent was told it was a "Take it or leave it (meaning apartment)

proposition" and to sign or leave the building and become homeless

(Retaliatory
and Constructive Eviction) and have property converted and/or stolen
and sold
(duress)(see Kenmore V Rispler). Respondent knew that all renewal
leases (as
this was/is) must be made on the same terms or better, as well as
that the lease
contract was without consideration (Nudum Pactum) and thus null and
void, as
respondent was already a Lawful Tenant. In order to prevent
additional Looting of
respondent's property respondent signed that contract and was again
given no
copy. Respondent considers only the elements and clauses of said
contract that
are less restrictive than existing Rent Stabilization Law as being in
effect, as a
matter of Law and Precedent.
22. In order to conduct a proper defense, respondent will require the
appearance
of all named current and former employees of petitioner at trial, as
well as all
named and relevant documents and/or emails, and requests to be
informed in reply
as to whether their presence will require subpoena and if so the
named individuals
and documents present location.
First Affirmative Defense : Improper service (RPAPL § 735) and
defective
(unsigned) Petition and "Affirmation" 22 NYCRR § 130-1.1a, CPLR §
2101, RPAPL
§741.
Second Affirmative Defense : That petitioner has no standing in the
instant case to
bring suit as it is not the (proper) owner, but instead the People of
the United States
i. e. the Federal government as previously attested to in paragraphs
1, 11 etc.. Also
that petitioner (Kenmore Associates a.k.a.Housing & Services
Incorporated) is not
an actual legal entity properly registered with the Federal State and
Local
government, including the Tax authorities. Also that petitioner has
not paid
$102,000,000 court judgment against it and thus all assets would
revert to
Madigril Rispler. Respondent will require as part of defense all relevant
documents, originals notarized and/or certified, as well as chain of
custody of said
documents. Petitioner is in violation of any "agreement " with Federal
government

(VOID) as well as Nudum Pactum (Naked Contract, no Consideration). All surplus

Federal Property must be put up for lawful, proper advertised Auction. Upon

Information and Belief, Petitioner is a Racketeer Influenced and Corrupt

Organization as defined by Federal Law.

Third Affirmative Defense: That State Civil Court is not the court of Proper

Jurisdiction, due to Federal Ownership, Federal Questions, Federal Issues and

Federal Laws involved with and as defenses in the instant case. Respondent

moves and/or will move court for a MOTION TO DISMISS with prejudice (on

the state court level) and MOVE that the case be transferred to federal court at

petitioners expense or be resubmitted. Respondent asserts that United States

Constitutional Amendments I, IV, V, VI, VII, VIII, IX, X, XI, XIII, XIV will be used as

lawful defense. The Uniform Commercial Code, Housing and Urban Development

Rules and Regulations and all applicable governing Federal Laws, Rules and

Regulations will be used.

Fourth Affirmative Defense: Due to enumerated acts of Harassment of respondent

as well as other acts by petitioner and conditions of said apartment and building, a

violation of Warranty of Habitability, respondent owes and would owe no "rent"

under laws including Rent Stabilization Code 2525.5 and Real Property Law §

235-b and §235-d and §235-a and §235-c. Any use of restrictive clauses and/or

covenants in "Housing Rider" would violate RPL §235-c (Unconscionable Lease or

Clause) as well as the principle of Nadum Pactum (Naked Contract, No Consideration) which is basic contract law, as well as the settled law that a lease

must be renewed on the same terms or better than the original lease, in this case

no lease.

Fifth Affirmative Defense: Due to the petitioner waiting over two years to file case

against respondent, the Doctrine of Laches (estoppel) will be used. This is also

called "stale rent".

Sixth Affirmative Defense: For the reasons previously enumerated (1-22), the

00000376

defenses of Constructive Eviction and Retaliatory Eviction as well as Partial

Constructive Eviction as well as Obstruction of Justice will be used.

Seventh Affirmative Defense:That alleged rent amounts are incorrect. Respondents

lawful rent is $215.00 per Month and after building wide Major Capital Improvement rent was illegally tripled instead of by correct formula. That

$15,000.00 was paid into court for a pending appeal and sum was illegally and

without Due Process converted for petitioners use. That $3,250 paid to petitioner, in

part to effect repairs by Licensed Contractors was also converted for improper use

and should be applied to any amounts owed.

Eighth Affirmative Defense: The Federal Fair Housing Act and Fair Housing

amendments Act (42 U.S. Code § § 3601-3619, 3631) and Title VI of the Civil

Rights Act of 1964 and §504 of the Rehabilitation Act of 1973 and §109 of Title I of

the Housing and Community Development Act of 1974 will be used as defenses.

Respondent is (partially (Photophobia)) disabled and over 40.

Ninth Affirmative Defense: Res Judicata (index #52851/06) and Collateral Estoppel

re. any Motion to Strike Jury Demand.

Eleventh Affirmative Defense; Section 8 Fraud and payments (2921 Associates v.

Willis, Title 24 CFR: Ch VII HUD Part 792) and violation of Federal Consent

Judgment Williams v. New York City Hous. Auth., 975 F. Supp. 317, 319 (S.D.N.Y.

1997) (hereinafter the "Williams Consent Judgment').

Twelfth Affirmative Defense: Perjury, Malfeasance, lack of Due Diligence & Barratry

by RICO Counsel/Consiglieri/Party (ABA Model Rules of Professional Conduct).

Thirteenth Affirmative Defense: RICO(petitioner)'s violation of Federal Fair Debt

Collections Practices Act (15 U.S.C. § 1692) (Romea v. Heiberger & Assoc., 989

F.Supp. 712 (SDNY 1997). No Validation notice by their debt collector.

Fourteenth Affirmative Defense: Violations of Federal False Claims Act (31 U.S.C. §

3729) & NYSFCA, Article XIII §187-194, NYC Local Law #53/05.

Fifteenth Affirmative Defense: As PREDICATE FELONIES (RICO) petitioners

ongoing violations of § 411 & § 412 Illegal Immigration Reform and Control Act and §

274 Immigration and Nationality Act. Executive Order #12989, 61 Fed.

Reg. 6091

(Feb. 15, 1996), 8 U.S.C. § 1324, Federal Acquisition Regulation 9.406-2, 46 U.S.C. §

8704, etc.; and injunctive relief.

Sixteenth Affirmative Defense: violations of USA PATRIOT Act and 18 U.S.C. §

2331: domestic terrorism means activities that (A) involve acts dangerous to human

life that are a violation of the criminal laws of the U.S. or of any state, that (B) appear

to be intended (i) to intimidate or coerce a civilian population, (ii) to influence the

policy of a government by intimidation or coercion, or (iii) to affect the conduct of a

government by mass destruction, assassination, or kidnapping, and (C) occur

primarily within the territorial jurisdiction of the U.S. and New York State Anti-

Terrorism Laws.

Seventeenth Affirmative Defense: Violations of CPLR §2214(b), §2221 (c), 22

NYCRR §130-1, CPLR §3216, §3404, Uniform Rule 202.27 (22 NYCRR 202.27)

and NYCRR §208.14[c]) and Stipulation(s).

Eighteenth Affirmative Defense: Violations of Federal, State and City Building

Codes and licensing requirements, including, but not limited to, §27-3016-18, §

[B26-2.0] 26-141-§[B26-2.1] 26-142.

Nineteenth Affirmative Defense: Violation of 9 NYCRR § 2523.1-8.

Twentieth Affirmative Defense: Stare Decisis regarding inclusion on "Blacklist" (see Weisert v Subaqua, Supreme Court Justice Barbara Kapnick)

Twenty first Affirmative Defense: All other actual and appropriate affirmative

defenses, Federal, State and City, will be used, especially as may arise from Trial

and/or Reply or Motion.

First Counterclaim: That petitioner, reaching back six years before the filling of the

instant suit through present, engaged in such egregious criminal and civil

violations, (as enumerated in #1-#22) of Federal, State and City Laws, Regulations

and Rules including Predicate Felonies covered under RICO act and Harassment,

and Implied Warranty of Habitability and 22 NYCRR §130-1, a fine/penalty of

$100,000,000 be imposed on petitioner and awarded to respondent. Further that

Injunctive Relief be granted by court to stop Harassments, Torts,

Crimes and unlawful

restrictions and Chattel status.

Second Counterclaim: That for the reasons aforementioned, including but not

limited to ongoing Harassment and violation of Implied Warranty of Habitability and

§2525.5 of Rent Stabilization Code and Predicate Felony RICO (criminal and civil)

acts (pgs#1-22) punitive damages be awarded, to be set by court, as well as treble

damages qualified under said Federal RICO act.

Demand For an H.P. Inspection

Respondent demands an H.P. Inspection be made of subject building and unit

#4R prior to commencement of further appearances (or) any Trial Proceedings.

Jury Demand

Respondent hereby demands a Trial by Jury.

WHEREFORE, Respondent demands judgment against petitioner dismissing the

Petition with prejudice and awarding the respondent the damages asked for in the

First & Second Counterclaims, and for such and further relief that this court may deem

just and proper.

Dated: August 19, 2006, New York County, NY

..............................................

Respondent Pro Se,

145 east 23rd street

New York, NY 10010

To: Norris McLaughlin & Marcus P.A. briantburke@gmail.com

Counsel For Petitioner

875 Third Avenue, 18th Floor

New York, NY 10022

212-732-0606

CIVIL COURT OF THE CITY OF NEW YORK

COUNTY OF NEW YORK : HOUSING PART H

-----------------------------------------------------X Index # 071507/07 &

KENMORE ASSOCIATES, L.P. & : Index # 52851/2006

HOUSING SERVICES INC. & Norris :

McLaughlin & Marcus Petitioner, :

v. : Notice of Appeal

:

:

Respondent. :

-----------------------------------------------------X

PLEASE TAKE NOTICE that the appellant hereby

appeals to the Appellate Term of the Supreme Court, first Department, from the

Order by the Honorable Kevin McClanahan, Judge of Housing Court of the City

00000379

of New York, entered in the office of the Clerk of said Court on August 9, 2007,

and from each and every part thereof.

Dated August 20, 2007 _____

Appellant Pro-se

145 east 23rd street

To: Norris McLaughlin & Marcus P.A.

Counsel For Petitioner

875 Third Avenue, 18th Floor

New York, NY 10022

212-732-0606

CIVIL COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK : HOUSING PART H

-------------------------------------------------------X

KENMORE ASSOCIATES, L.P. & : Index #071507/07

HOUSING SERVICES INC. & Marcus : & Index # 52851/06

McLaughlin & Marcus, Petitioner, :

: AFFIDAVIT OF SERVICE

v. :

:

:

:

Respondent. :

-------------------------------------------------------X

I, , declare under penalty of perjury that I have served a copy of the attached Answer & Affidavit & Notice of Appeal & Order upon Dean Roberts, plaintiff's

counsel, by regular mail & Fax, whose address is: 875 Third Avenue, Floor 18, New

York, New York, postal code 10022 on August 19, 2007 CPLR § 2103(b) Upon an

attorney

By: --------------------------------------

respondent pro se

145 EAST 23RD STREET

New York, NY 10010

Norris McLaughlin & Marcus

petitioner's counsel Dated: August 19, 2007

875 Third Avenue Fl18

New York, NY 10022

Posted by Fin MacCool  at 1:31 PM    0 comments   Links to this post

Labels: corrupt, housing, landlord, onfluenced, organization, Racketeer

Newer Posts                      Home                      Older Posts

Subscribe to: Posts (Atom)

# EXHIBIT 9

00000381

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. BRIAN BURKE | : | |
| | : | Civil Action No. 1:08-cv-364 (EGS) |
| Relator/Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| RECORD PRESS, INC. | : | |
| | : | |
| Defendant. | : | |
| | : | |

## RELATOR'S INITIAL DISCLOSURES

Pursuant to Fed.R.Civ.Proc. 26(a)(1) and Local Rule 26.2(a), Relator Brian Burke, by and through counsel, makes the following initial disclosures. These initial disclosures are made without the benefit of discovery and thus Relator expects that additional sources of discoverable information will be disclosed as discovery progresses.

1.    **Persons Likely To Have Discoverable Information**. Besides Relator, who can be contacted through the undersigned counsel of record, Relator believes the following persons are likely to have discoverable information that he may use to support his claims or that Defendant may use to support its defenses:

Hugh Wilmot, President of Defendant Record Press, Inc. ("Record Press")

Calvin Anderson, Chief of the Commercial Examination Section, Office of the Controller's Procurement Accounting Division, GPO

Akiko Ward, GPO Customer Service Controller

1

Jerry Nash, GPO

Charles Washington, GPO

Ed Colbert, GPO

Lloyd Rawls, Special Agent, GPO Inspector General's Office

The addresses and telephone numbers of all of the above individuals are known to Defendant or obtainable through its records.

Additionally, other persons at the GPO and employees of Record Press may have discoverable information related to this case.

2.     **Documents**.  Copies of all documents in the possession, custody or control of Relator and which he may use to support his claims are provided herewith.  Relator has conducted a reasonable review of his records to produce these documents, but reserves the right to produce other documents he may locate as the case progresses.

3.     **Computation of Damages**.  Relator alleges that Defendant Record Press overcharged GPO ten times the contract rate for binding, trimming and collating briefs and appendices.  Based on the GPO's expected requirements, as stated in the RFP for its contract with Record Press, Relator estimates Record Press overcharged the Government approximately $280,000 for one contract year.  At this time, Relator does not have information regarding GPO's actual requirements and does not know how many years Record Press has had this contract, and is therefore unable to determine the full extent of damages.

2

00000383

4.    **Insurance Agreements**.  Relator has no insurance agreements relevant to

this dispute.

Dated: September 22, 2008                    Respectfully submitted,

                                             Mark Hanna (DC Bar 471960)
                                             Keira M. McNett (DC Bar 482199)
                                             MURPHY ANDERSON PLLC
                                             1701 K Street, NW, Suite 210
                                             Washington, DC 20006
                                             Phone: (202) 223-1057
                                             Fax: (202) 223-8651
                                             *mhanna@murphypllc.com*
                                             *kmcnett@murphypllc.com*

                                             Attorneys for Relator

3

00000384

## CERTIFICATE OF SERVICE

On this date, I served a copy of the Relator's Initial Disclosures, with attachments,

by delivering a copy via email to the following:

      William T. O'Brien, Esq.
      Attorney for Defendant
      wobrien@mckennalong.com

I declare under penalty of perjury under the laws of the District of Columbia that

the foregoing is true and correct.

Dated: September 22, 2008

                _Keira M. McNett_
                Keira M. McNett

4

00000385

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---------------------------------------------------

BRIAN BURKE,

        Plaintiff-Appellant,

      v.

DONALD L. EVANS, SECRETARY,
UNITED STATES DEPARTMENT OF
COMMERCE,

        Defendants-Appellees.

---------------------------------------------------x

06-1917-cv

ITEMIZED AND VERIFIED
BILL OF COSTS

      Counsel for defendants-appellees Donald L. Evans and the United

States Department of Commerce (collectively, "defendants-appellees"),

respectfully submit, pursuant to Rule 39 of the Federal Rules of Appellate

Procedure, the within bill of costs and request that the Clerk prepare an itemized

statement of costs taxed against plaintiff-appellant and in favor of defendants-

appellees for insertion in the mandate.

| | |
|---|---|
| Docketing Action | $    0.00 |
| Costs of printing appendix (necessary 20 copies) | $ 2136.36 |
| Costs of printing brief (necessary 30 copies) | $  419.95 |
| Costs of printing reply brief | $    0.00 |
| TOTAL | $ 2556.31 |

      Pursuant to 28 U.S.C. § 1924, the above costs are correct and were

necessarily incurred in the litigation of this action for printing work actually and

necessarily performed, as shown by Exhibits A and B attached hereto, which is a true copy of the print orders and invoices relating to the printing of defendants-appellees' appendix and brief, respectively. Annexed hereto as Exhibit C is an explanation of the difference between the amount of the Exhibit B and the amount for which defendant-appellee seeks costs.

   I verify under penalty of perjury that the foregoing is true and correct.

Executed on:    New York, New York
       June 21, 2007



         KRISTIN L. VASSALLO
         Assistant United States Attorney

– 2 –

00000387

## O 2511 Desktop Print Order

| Department | Req. No. | Date | Purchase Order No. | Print Order No. |
|---|---|---|---|---|
| Southern District | 7-00141 | 12-08-2006 | B-0601 | 65212 |

| Contractor | Jacket No. | Estimated Cost | Ship/Delivery Date |
|---|---|---|---|
| Appeals Brief/Appendices | 504-066 | | 12-18-2006 |

| Title Brian Burke V. Evans (06-1917) | Object Class | Sub Class | Contractor Code | Program No. |
|---|---|---|---|---|
| | 24.00 | 310 | 73951 | 2231-S |

**Proofs**

| Type of proof required | Sets | Days Gov't will hold | Furnish Electronic Media | SAC | Quantity |
|---|---|---|---|---|---|
| Gallery | X | | | 4410-KD | 20 |
| Page | 20 | | Qty: | Quality Level | Trim Size |
| | | | Qty: | IV | 8 1/2 x 11 |

| Materials Furnished to Contractor | | | | | |
|---|---|---|---|---|---|
| Manuscript X | Halftones | Line Rue. | Camera Copy | Negatives | Other |

| Text Stock | Cover Stock | No. of Text Pages | Fold-in Stock | Strip-ins |
|---|---|---|---|---|
| White Antique Paper | 45 lbs Vellum 65 lbs | | | |

| Four Color Process Printing | | Cover Ink | Text Ink | Cover Proos | | Fold-ins/Forms | | Negatives from | Negatives from |
|---|---|---|---|---|---|---|---|---|---|
| Face | Back | Black | Black | x | | Face only | Face & Back | Electronic media | camera copy |

**Binding**

| | Paste on Fold | Band Units of | Drill holes | In diameter on side | inches C. to C. |
|---|---|---|---|---|---|
| Saddle | Trim 4 Sides | Shrinkwrap Units of | Center holes | inches from | edge of sheet |
| 1 ULC | Perf on Fold | Perf off fold | Pads of | sheets/sets each. Pad on the side. Chipboard required | |
| Side | Tab seal | Fold to: | Pack | Per shipping container. Pallets required. | |
| Perfect | | | | | |
| Other | | | | | |

Instructions and Distribution:

Return all Government furnished materials and/or negs. to:

**Defendant Appellee's Appendix**
**(2004V03846)**

OF 4054    244
2537    12/06

12/06

5/7/0

Appeals Brief
86 Chambers Street (SDNY)

| Specifications written by: John Ellwood | Sold by: | Typed by: | Date sent to contractor 12/08/2006 |
|---|---|---|---|

Additional Shipping Instructions for Supt. of Docs. copies.

US Government Printing Office–M/F: "Depository"
Depository Receiving Section
44 H St., NW, Loading Dock        Item
Washington, DC 20401

Library of Congress
Anglo-American Acquisitions Division
Government Documents Section
101 Independence Ave., SE
Washington, DC 20540-4172
Marked: File Copies

US Government Printing Office–M/F: "Sales" Req.
Documents Warehouse
8610 Cherry Lane        M/F: "Subscription Stock" Req.
Laurel, MD 20707

Individual Printed Mailing Containers are Required

Stock No.
Sub. ID No.
ISBN No.
(Shipping labels for Supt. of Docs. "Sales" or "Subscription" copies must contain Stock No., Sub. ID No. and ISBN No. as indicated.)

00000388

**GPO** **U.S. GOVERNMENT PRINTING OFFICE**
KEEPING AMERICA INFORMED

May 31, 2007

United States Attorney
Civil Clerk's Office
Attn: John Ellwood
33 White Hall St., 7th Floor
New York, NY 10004

Dear Sir:

The following information is furnished in response to your
request for a cost to the Government for 20 copies of Print Order
65212 Jacket 604-066.

### COMPOSITION CHARGE

| Qty: | | Amount |
|---|---|---|
| 1 | Text Page(s) | 10.70 |
| | Combination Pages | |
| | (Text & Footnotes): | |
| 1 | Cover: | 10.70 |
| 53 | Index/Table of Contents: | 14.18 |
| 566 | Page Proofs: | 151.41 |
| | Pages Remake | |
| | Manuscript | |

### PRINTING AND ASSEMBLY APPENDIX/RECORD

| | | Unit Price | Amount |
|---|---|---|---|
| 20 | Cover Page Per Unit | .64 | 12.80 |
| 11320 | Text Page Per Unit | .04 | 452.80 |
| 1 | Collating & Trimming | 1483.77 | 1483.77 |
| | Total | | 2136.36 |

00000389

Page 2

I trust this information will serve your needs. If you require additional information, please contact me on (202) 512-1197.

Sincerely,

AKIKO Z. WARD
Customer Service Controller
(Office of the Customer Service Controller)

**PO 2511** *Desktop* **Print Order**

| Department | Req. No. | Date | Purchase Order No. | Print Order No. |
|---|---|---|---|---|
| Southern District | 7-00141 | | B-0601 | 65213 |

| Contractor | Jacket No. | Estimated Cost | Ship/Delivery Date |
|---|---|---|---|
| Appeals Brief/Appendices | 504-066 | | 12-18-2006 |

| Title | Class Code | State Code | Contractor Code | Program No. |
|---|---|---|---|---|
| Brian Burke V. Evans (06-1917) | 24:00 | 310 | 73951 | 2231-S |

| Proofs | Type of proof required | Sets | Days Gov't will hold | Furnished Electronic Media | | SAC | Quantity |
|---|---|---|---|---|---|---|---|
| | Gallery | X | | | Qty: | 4410-KD | 40 |
| | Page | 40 | | | Qty: | Quality Level IV | Trim Size 8 1/2 x 11 |

| Materials Furnished to Contractor Manuscript | Halftones | Line Illus. | Camera Copy | Negatives | Other |
|---|---|---|---|---|---|
| X | | | | | |

| Text Stock | Cover Stock | No. of Text Pages (including blanks) | Fold-in Stock | Strip-ins |
|---|---|---|---|---|
| White Antique Paper 45 lbs | Vellum 65 lbs | | | |

| Four Color Process Printing Face | Back | Cover Ink Black | Text Ink Black | Cover Print | | Fold-ins/Forms Face only | Face & Back | Negatives from Electronic media | Negatives from camera copy |
|---|---|---|---|---|---|---|---|---|---|
| | | | | X | | | | | |

| Binding | Saddle | Paste in Fold | Bend Units of | Drill ___ holes ___ in diameter on ___ side ___ inches C. to C. |
|---|---|---|---|---|
| | 1 ULC | Trim 4 Sides | Shrinkwrap Units of | Center of holes ___ inches from ___ edge of sheet |
| | Side | Perf on Fold | Perf off fold | Pads of ___ sheets/sets each. Pad on the ___ side. Chipboard required |
| | Perfect | Tab seal | Fold to | |
| | Other | | Pack | Per shipping container. Pallets required. |

Instructions and Distribution:

Reship all Government furnished materials and/or negs. to:

**Defendant Appellee's Red Brief**
**(2004V03846)**

I:    OE-9054    2-41
DCN: 2538 ___ Prnt ___ 12/06 ___ Prnt ___

I hereby certify ___

Date Received ___ 12/06

___ Date 2/7/07

Appeals Brief
86 Chambers Street (SDNY)

| Specifications written by: John Ellwood | Sold by: | Typed by: | Date sent to contractor 12/08/2006 |
|---|---|---|---|

*Additional Shipping Instructions for Supt. of Docs. copies.*

US Government Printing Office–M/F: "Depository" ___
Depository Receiving Section
44 N St., NW, Loading Dock          Item ___
Washington, DC 20401

Library of Congress
Anglo-American Acquisitions Division
Government Documents Section
101 Independence Ave., SE
Washington, DC 20540-4172
Marked: File Copies

US Government Printing Office–M/F: "Sales" Req. ___
Documents Warehouse
8610 Cherry Lane    M/F: "Subscription Stock" Req. ___
Laurel, MD 20707

Individual Printed Mailing Containers are Required

Stock No. ___
Sub. ID No. ___
ISBN No. ___

(Shipping labels for Supt. of Docs. "Sales" or "Subscription" copies must contain Stock No., Sub. ID No. and ISBN No. as indicated.)

00000391



**U.S. GOVERNMENT PRINTING OFFICE**
KEEPING AMERICA INFORMED

May 31, 2007

United States Attorney
Civil Clerk's Office
Attn: John Ellwood
33 White Hall St., 7th Floor
New York, NY 10004

Dear Sir:

The following information is furnished in response to your request for a cost to the Government for 40 copies of Print Order 65213 Jacket 604-066.

COMPOSITION CHARGE

| Qty: | | Amount |
|------|---|--------|
| | Text Pages: | |
| | (Text & Footnotes): | |
| 1 | Cover: | 10.70 |
| | Index/Table of Contents: | |
| | Page Proofs: | |
| | Pages Remake: | |
| | Manuscript: | |

PRINTING AND ASSEMBLY (BRIEFS)

| | | Unit Price | Amount |
|------|---|-----------|--------|
| 40 | Cover Pages Per Unit | .64 | 25.60 |
| 3040 | Text Page Per Unit | .04 | 121.60 |
| 1 | Collating & Trimming | 398.47 | 398.47 |
| | Total | | 556.37 |

00000392

Page 2

I trust this information will serve your needs. If you require additional information, please contact me on (202) 512-1197.

Sincerely,



AKIKO Z. WARD
Customer Service Controller
(Office of the Customer Service Controller)

00000393

Total Allowable Cost of Printing Brief

Composition

| | |
|---|---|
| Text pages | |
| Cover | $ 10.70 |
| Index/Table of Contents | |
| Page Proofs | |
| Subtotal for Composition: | $ 10.70 |

Printing and Assembly (based on 40 copies of cover page and text pages)

| | | |
|---|---|---|
| Cover page | ($25.60 x 3/4) | $ 19.20 |
| Text pages | ($121.60 x 3/4) | $ 91.20 |
| Collating & Trimming ($398.47 x 3/4) | | $ 298.85 |
| Subtotal for Printing and Assembly: | | $ 409.25 |

| | |
|---|---|
| Total Cost of Printing Brief | $ 419.95 |
| ($10.70 + 409.25) | |

Although the contract between this Office and its printer provides for a minimum run of forty copies, this Court's decision in Furman v. Cirrito, 782 F.2d 353, 356 (2d Cir. 1986), provides that printing costs for thirty copies of the brief are properly deemed taxable costs. Therefore, the "Cover Page Per Unit" and "Text Page Per Unit" charges under the heading "PRINTING AND ASSEMBLY (BRIEFS)" on the invoice contained in Exhibit B are discounted accordingly as set forth above.

The item listed on the invoice under the heading "COMPOSITION CHARGE," however, constitutes composition costs associated with setting the necessary type that remain the same regardless of how many copies are actually printed. It is therefore fully reimbursable under 28 U.S.C. § 1920(3).

00000394

## CERTIFICATE OF SERVICE

KRISTIN L. VASSALLO, an Assistant United States Attorney for the

Southern District of New York, hereby certifies that on June 21, 2007 I caused a

copy of the Itemized and Verified Bill of Costs to be served by Federal Express

upon the following:

Brian T. Burke
145 E. 23rd Street, Apt. 4R
New York, New York 10010


Dated: New York, New York
     June 21, 2007


KRISTIN L. VASSALLO
Assistant United States Attorney

Program 2231-S

Specifications by IFL                                                                      Page 1 of
15

Issue date

FORMERLY 1272-S

U.S. GOVERNMENT PRINTING OFFICE

PHILADELPHIA , PA.

GENERAL TERMS, CONDITIONS, AND SPECIFICATIONS

For the Procurement of

Appeals Briefs

as requisitioned from the U.S. Government Printing Office (GPO) by the

U.S. Department of Justice

Single Award

The term of this contract is for the period

beginning Date of Award (November 1,2006) and ending October 31, 2007

with an option for renewal from November 1, 2007 and ending October 31, 2008

with a second option for renewal from November 1, 2008 and ending October 31, 2009

with a third option for renewal from November 1, 2009 and ending October 31, 2010

and with a fourth option for renewal from November 1,2010 and ending October 31, 2011

OPTION TO EXTEND THE CONTRACT TERM: The Government may extend the term of this contract by written notice to the contractor not later than 30 days before the contract expires. If the Government exercises an option, the extended contract shall be considered to include this clause. The duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

Notwithstanding the above paragraph, at the request of the Government, the term of any contract resulting from this solicitation may be further extended for such period of time as may be mutually agreeable to the GPO and the contractor.

BID OPENING: Bids shall be publicly opened at **2:00 p.m.**, prevailing Philadelphia, PA time, on **October 18,2006**

RECOVERED MATERIALS PROGRAM: The Government Printing Office is promoting the use of recovered materials in its contracts to the maximum extent practicable, provided all specification requirements are met. Offerors are encouraged to supply paper and paper products that contain recovered materials even in the absence of a specific

00000396

solicitation provision or contract clause requiring such materials.

RESTRICTION ON LOCATION OF PRODUCTION FACILITIES: All production facilities used in the manufacture of the product(s) ordered under this contract, in Category 1, must be located within the borough of Manhattan south of 59th Street to the Battery and East and West to the rivers.

Any bidder intending to use production facilities outside this area should furnish information, with the bid, which will on its face demonstrate ability to meet the schedule requirements. The determination by the Government of the acceptability of this information in no way relieves the successful bidder of the responsibility for compliance with these schedule requirements.

BIDDERS, PLEASE NOTE: **These specifications have been extensively revised; therefore, all bidders are cautioned to familiarize themselves with all provisions of these specifications before bidding.**

SEE MANDATORY PROCUREMENT INTEGRITY REQUIREMENTS ATTACHED

For information of a technical nature call Pamela Lewis (215) 364-6465 (No collect calls).

## SECTION 1.- GENERAL TERMS AND CONDITIONS

GPO CONTRACT TERMS: Any contract which results from this Invitation for Bid will be subject to the applicable provisions, clauses, and supplemental specifications of GPO Contract Terms (GPO Pub. 310.2, effective December 1, 1987 (Rev. 9-88)) and GPO Contract Terms, Quality Assurance Through Attributes Program (GPO Pub. 310.1, effective May 1979 (revised December 1992)).

QUALITY ASSURANCE LEVELS AND STANDARDS: The following levels and standards shall apply to these specifications:

Product Quality Levels:

   (a) Printing Attributes -- Level IV.

   (b) Finishing Attributes -- Level IV.

Inspection Levels (from ANSI/ASQC Z1.4):

   (a) Non-destructive Tests - General Inspection Level I.

   (b) Destructive Tests    - Special Inspection Level S-2.

Specified Standards: The specified standards for the attributes requiring them shall be:

|   | Attribute | Specified Standard |
|---|---|---|
|   |   | Average type dimension |
| P-7. | Type Quality and Uniformity | in publication or |
|   |   | camera copy |

00000397

http://mail.google.com/mail/?attid=0.1&disp=vah&view=att&th=11397ed2db414286

07/05/2007 06:01 PM

SUBCONTRACTING: Subcontracting will not be permitted

EXTENSION OF CONTRACT TERM: At the request of the Government, the term of any contract resulting from this solicitation may be extended for such period of time as may be mutually agreeable to the GPO and the contractor.

DEFINITION OF RECOVERED MATERIALS IN PAPER PRODUCTS:

Waste Paper (when used in high grade bleached printing and writing papers) means any of the following "recovered materials":

(1) Postconsumer materials such as:

(a) Paper, paperboard, and fibrous wastes from retail stores, office buildings, homes, and so forth, after they have passed through their end usage as a consumer item, including: Used corrugated boxes, old newspapers; old magazines; mixed waste paper; tabulating cards, and used cordage; and

(b) All paper, paperboard, and fibrous waste that enter and are collected from municipal solid waste; and

(2) Manufacturing, forest residues, and other wastes such as:

(a) Dry paper and paperboard waste generated after completion of the papermaking process (that is, those manufacturing operations up to and including the cutting and trimming of the paper machine reel into smaller rolls or rough sheets) including envelope cuttings, bindery trimmings, and other paper and paperboard waste, resulting from printing, cutting, forming, and other converting operations; bag, box, and carton manufacturing wastes; and butt rolls, mill wrappers, and rejected unused stock; and

(b) Finished paper and paperboard from obsolete inventories of paper and paperboard manufacturers, merchants, wholesalers, dealers, printers, converters, or others.

(3) "Mill broke" is specifically excluded from the definition of waste paper. Mill broke means any paper waste generated in a paper mill prior to completion of the papermaking process.

MAINTENANCE OF RECORDS ON RECOVERED MATERIALS IN PAPER PRODUCTS: The contractor shall maintain manufacturer/mill accounting and record summaries on the fiber weight content used as feedstock, for purposes of Government audit, that will verify (i) the contractors certification of the minimum waste paper, post- consumer recovered materials, or recovered materials (cotton/linen) content, as applicable, used in performance of the contract, (ii) that the paper and paper products are in compliance with the specification requirements, and (iii) the paper is manufactured in accordance with the Environmental Protection Agency (EPA) Guideline for Federal Procurement of Paper and Paper Products Containing Recovered Materials, 40 CFR Part 250, whether the products are manufactured by the contractor or another paper mill. The contractor, if not the manufacturer, shall obtain this information from the paper manufacturer. The contractor shall maintain, and make available to the Government, these documents for one year after the expiration of the contract. Nothing in this clause shall excuse the contractor from furnishing the specified paper.

ECONOMIC PRICE ADJUSTMENT: The prices set forth in this contract shall be adjusted in accordance with the provisions of this clause, provided that, in no event will prices be revised to exceed the maximum permissible under any law existing as of the date of the contract or as may be hereafter promulgated.

Price adjustment period: For the purpose of this clause, the program years shall comply with the Contract Term clause. There shall be no price adjustment for orders placed during the first program year of this contract.

00000398

Price adjustment: The prices shall be adjusted on the basis of the "Consumer Price Index For All Urban Consumers - Commodities Less Food, Seasonally Adjusted," published monthly in the CPI Detailed Report by the Department of Labor, Bureau of Labor Statistics, in the following manner:

(1) The contract price of orders placed during the adjusted period (excluding reimbursable postage or transportation costs) shall be adjusted by the percentage increase or decrease in the average, seasonally adjusted Consumer Price Index For All Urban Consumers - Commodities Less Food (seasonally adjusted) as follows: An index shall be calculated by averaging the 12 seasonally adjusted months ending 3 months prior to the expiration of the first period of the contract. This average is then compared with the average index for the 12-month period ending 3 months prior to the beginning of the contract, called the base index. The percentage increase or decrease by comparing these two indexes shall be applied to the contractor's invoices for orders placed during the price adjustment period.

(2) The Government will notify the contractor in writing of the percentage increase or decrease to be applied to any invoices to be submitted for orders subject to price adjustment in accordance with this clause. Such percentage will be determined from the published index as set forth above. The contractor shall apply the percentage increase or decrease against the total price of the invoice less reimbursable postage or transportation costs. Any applicable discounts will be calculated on the basis of the invoice price as adjusted.

ASSIGNMENT OF JACKETS, PURCHASE AND PRINT ORDERS: A GPO jacket number will be assigned and a purchase order issued to the contractor to cover work performed. The purchase order will be supplemented by an individual "Print Order" for each job placed with the contractor. The print order, when issued, will indicate the quantity to be produced and any other information pertinent to the particular order.

PREAWARD SURVEY: In order to determine the responsibility of the prime con- tractor or any subcontractor, the Government reserves the right to conduct a preaward survey or to require other evidence of technical, production, mana- gerial, financial, and similar abilities to perform, prior to the award of a contract.

PRIOR TO AWARD: **A meeting will be held at the U.S. Attorney's Office, prior to actual award, to go over the provisions of the contract and establish initial contact with the Agency.**

**The Government may require, prior to award, the production of a brief as submitted by the Department to check contractor conformance with schedule and quality requirements.**

PAYMENT: The contractor shall submit a copy of their billing to.:

U.S. Department of Justice, Appeals Unit

For Criminal Briefs                                        For Civil Briefs

U.S. Department of Justice    U.S. Department of Justice

One St. Andrew's Plaza, Room 844   86 Chambers Street, 3rd Floor

New York, NY 10007   New York, NY 10007

After review and approval submit vouchers to: Comptroller, Stop FMCE, Office of Financial Management, U.S.

00000399

Government Printing Office, Washington, D.C. 20401.

NOTE: ON EACH ORDER: One copy of the print order with a copy of contractor's billing must be sent to the U.S. Government Printing Office, New York Regional Procurement Office, 928 Jaymore Road Suite A-190; Southampton, PA 18966 ATTN: Program Section.

PAYMENT BY ELECTRONIC FUNDS TRANSFER (EFT)

Public Law 104-134 requires that payments made under a contract or purchase order must be made electronically.

Companies (contractors) doing business with GPO should complete Standard Form 3881 (ACH Vendor/Miscellaneous Payment Enrollment Form) and submit it to the U.S. Government Printing Office, Examination and Billing Branch (FMCS), Washington, DC 20401.

SF-3881 is available from FMCS by calling (202) 512-0992or 0993 FAX (800) 245-5476 (no collect calls). Changes in company or financial institution information presently on file should be submitted to the same office.

Contractors that do not have an account at a financial institution or authorized payment agent must certify to such circumstances, in writing, to the Assistant Comptroller, Accounting Division, FMCS. The acceptance of these certificates by GPO will terminate on January 1, 1999, when all contractors will be paid through EFT.

LIMITATION OF PERFORMANCE AND CONTRACTOR OBLIGATIONS: Funds are available for performance of this contract for the first program period only.  The amount of funds at award is not considered sufficient for performance required for any program year other than the first program year. When additional funds are available for the full requirements for the next succeeding program year, the Contracting Officer shall, not later than 60 calendar days before the expiration of the program year for which performance has been funded (unless a later day is agreed to), so notify the contractor in writing. Notification that funds are not available shall effect cancellation of the contract.

The Government is not obligated to the contractor for any amount over requirements for which funds have been made available and as obligated by each print order.

The contractor is not obligated to incur costs for the performance required for any program year after the first unless and until written notification is received from the Contracting Officer of an increase in availability of funds. If so notified, the contractor's obligation shall increase only to the extent contract performance is required for the additional program year for which funds have been made available.

If this contract is terminated under the "Termination for Convenience of the Government" clause, "total contract price" in that clause means the amount available for performance of this contract, as provided for in this clause. The term "Work in Process" in that clause means the work under the program year requirements for which funds have been made available.  If the contract is terminated for default, the Government's rights under this contract shall apply to the entire multiyear requirements.

Notification to the contractor of an increase or decrease in the funds available for performance of the contract under another clause (e.g. the "Option" or "Changes" clause) shall not constitute the notification required by the first paragraph of this clause.

This procedure shall apply for each successive program year.

00000400

ORDERING: Items to be furnished under the contract shall be ordered by the issuance of print orders by the Government. Orders may be issued under the contract from Nov. 1, 2006 through Oct. 31,2007. All print orders issued hereunder are subject to the terms and conditions of the contract. The contract shall control in the event of conflict with any print order. A print order shall be "issued" for purposes of the contract, when it is either deposited in the U.S. Postal Service mail or otherwise furnished to the contractor in conformance with the schedule.

REQUIREMENTS: This is a requirements contract for the items and for the period specified herein. Shipment/delivery of items or performance of work shall be made only as authorized by orders issued in accordance with the clause entitled "Ordering". The quantities of items specified herein are estimates only, and are not purchased hereby. Except as may be otherwise provided in this contract, if the Government's requirements for the items set forth herein do not result in orders in the amounts or quantities described as "estimated", it shall not constitute the basis for an equitable price adjustment under this contract.

Except as otherwise provided in this contract, the Government shall order from the contractor all the items set forth which are required to be purchased by the Government activity identified on page 1.

The Government shall not be required to purchase from the contractor, requirements in excess of the limit on total orders under this contract, if any.

Orders issued during the effective period of this contract and not completed within that time shall be completed by the contractor within the time specified in the order, and the rights and obligations of the contractor and the Government respecting those orders shall be governed by the terms of this contract to the same extent as if completed during the effective period of this contract.

If shipment/delivery of any quantity of an item covered by the contract is required by reason of urgency prior to the earliest date that shipment/delivery may be specified under this contract, and if the contractor will not accept an order providing for the accelerated shipment/delivery, the Government may procure this requirement from another source.

The Government may issue orders which provide for shipment/delivery to or performance at multiple destinations.

Subject to any limitations elsewhere in this contract, the contractor shall furnish to the Government all items set forth herein which are called for by print orders issued in accordance with the "Ordering" clause of this contract.

SECTION 2.- SPECIFICATIONS

00000401

SCOPE: These specifications cover the production of appeals briefs and appendices requiring such operations as copy pickup, composition and makeup from department supplied diskette(s), preparation of indexes on some orders, printing, binding, packing, distribution and return of government furnished materials

TITLE: Appeals Briefs and Appendices

FREQUENCY OF ORDERS:  Approximately 300 Briefs and 150 Appendices

BRIEFS—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 200 copies per order with an average of 40 copies per order. Approximately 10 to 132 pages plus cover per order with an average of 40 pages per order Approximately 1 to 20 pages of index or table of contents per order.

APPENDICES—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 40 copies per order with a average of 20 copies per order. Approximately 8 to 1334 pages per order plus cover per order.

GOVERNMENT TO FURNISH: typewritten manuscript copy with computer diskettes or the Government will send copy by modem. Contractor must have the ability to receive by 56-k modem, E-mail or the Internet. Software program WordPerfect 8.0 or later will be used at the Government's discretion. Camera copy for text of Appendices and occasionally for Briefs.

Contractor must have the equipment compatible for use with the above software program and must have sufficient back-up equipment.

Occasionally the Government will supply pre-printed 8-1/2 x 11" pages which the contractor will be required to collate, typeset a cover, trim to finished size and bind.

Identification markings such as register marks, ring folios, rubber stamped jacket numbers, commercial identification marks of any kind, etc., except GPO imprint, form number, and revision date, carried on copy or film, must not print on finished product.

CONTRACTOR TO FURNISH: All materials and operations, other than those listed under "Government to Furnish," necessary to produce the product(s) in accordance with these specifications.

COMPOSITION: The entirety of each category of composition (text, tabular and display) must be identical throughout the products ordered under these specifications.

Composition must be computer output via laser printer, imagesetter or by photocomposition.

Output resolution for laser printers will be 300 to 625 dots per inch and imagesetters will be

will be 1,200 to 3,500 dots per inch.

Photocomposition includes all typesetting product by photographically creating the characters on sensitized film or paper.

Type Page Size: For Briefs, approximately 25 x 43 picas plus folio, facing pages can be one or two lines long or short to accommodate make up and page breaks.

Typefaces and Sizes: The contractor is required to furnish the following:

00000402

Cover: 12 to 72 point Century and Spartan Heavy.

Text, Index, Table of Contents, and Footnotes: 12 point Century with italic, bold, and small caps.

Display: 14 point Spartan Heavy.

Composition will be required on covers, table of contents, and text of Briefs and covers and table of contents of Appendices. Camera copy will be furnished for text of Appendices and occasionally for a percentage of text for Briefs.

No alternate typefaces will be allowed; however, manufacturers' generic equivalents will be accepted for the above typefaces. Each bidder shall list in the bid the name of the generic equivalent typeface(s) and composing machine to be used.

The GPO reserves the right to require samples of any generic equivalent typefaces offered if it is deemed necessary in order to determine the suitability of the offered typefaces.

The contractor must hold all repro for 60 days after delivery for possible use in reprints. After 60 days it may be disposed of.

FILMS/REPRODUCIBLES: The contractor must make all films/reproducibles required.

PROOFS: During the normal workday the contractor must deliver one set of page proofs and any revised page proofs. The contractor must also be able to transmit proofs and receive corrected proofs by facsimile.

On occasion, representatives of the government will read proofs at the contractor's plant. A suitable work place will be provided by the contractor.

The contractor will be responsible for performing all necessary proofreading to ensure that the proofs are in conformity with the copy submitted.

Page reader's proofs must be clean on white paper, free of ink smudges, with all images clearly legible. All proofs must be collated in sets, numbered sequentially, and have a one-inch clear margin on all sides. Proofs must be identified with the jacket number, program number, print order number, and proof date, at least 1/2" from the type area. The contractor's firm name must not appear on any proofs.

Page and Revised Page Proofs: Proofs must be uniform in size and contain a single page to a sheet. When pages contain space allowance for illustrations, an identifying illustration number must be marked in the space allowed. Tables on one set of proofs must be completely ruled.

If any contractor's errors are serious enough in the opinion of the GPO to require revised proofs, the revised proofs are to be provided at no expense to the Government. No extra time can be allowed for this reproofing; such operations must be accomplished within the original production schedule allotted in the specifications.

The contractor must not print prior to receipt of an "OK to print." Contractor will receive OK by phone or by facsimile.

STOCK/PAPER: The specifications of all paper furnished must be in accordance with those listed herein or listed for the corresponding JCP Code numbers in the "Government Paper Specification Standards No. 10" dated July 1994.

All text paper used in each copy must be of a uniform shade. All cover paper must have the grain parallel to the spine.

Text: White Antique Book, grammage 67 g/m$^2$ (basis weight: 45 lbs per 500 sheets, 25 x 38"), equal to JCP Code

00000403

A100.

Cover: White and Colored (usually, but not limited to, Red, Gray, Green, and Blue) Vellum-Finish Cover, grammage 175 g/m$^2$ (basis weight: 65 lbs per 500 sheets, 20 x 26"), equal to JCP Code L20.

Occasional orders may require the use of pressure sensitive cover stock (same as listed above) for the correction of minor errors, stock must have permanent adhesive. Stock to be equal to "Starliner" by Mactac with special permanent adhesive or Fasson "Crack 'n Peel" Plus with super permanent adhesive.

PRINTING: Print head to head in black ink. All orders may be printed by electro-static copying or by printing with direct image plates provided that the quality levels are maintained.

INK: If lithographic ink is used in the performance of this contract, the ink shall contain not less than the following percentages of vegetable oil: sheet- fed and forms ink, 20 percent.

For Appendices, the contractor will be required to mechanically number the pages. This shall be accomplished by a numbering machine consisting of 1 or 2 letters followed by up to 4 digits. All characters are to be 3/16" or 1/4" high. The numbered text is then used as camera copy.

MARGINS: Briefs: 1" on all sides.

BINDING: Perfect- or adhesive-bind products: Gather contractor printed and/or Department supplied printed material, perfect- or adhesive-bind with separate wraparound glued-on paper cover, and trim three sides. Covers trim flush.

PACKING: Pack in shipping containers. Each shipping container must not exceed 45 pounds when fully packed.

LABELING AND MARKING (Package and/or Container label): Reproduce shipping container label from furnished repro, fill in appropriate blanks and attach to shipping containers.

DISTRIBUTION: Deliver f.o.b. destination to the following addresses:

U.S. Department of Justice  U.S. Department of Justice

One St. Andrew's Plaza   86 Chambers Street , 3rd Floor

New York, NY 10007    New York, NY 10007

INSIDE PICKUP AND DELIVERY TO ROOM NUMBER SPECIFIED IS REQUIRED.

There will be one additional address in Manhattan.

Complete addresses and quantities will be furnished with the print orders.

All expenses incidental to returning materials, submitting proofs, and furnishing sample copies must be borne by the contractor.

RETURN OF GOVERNMENT FURNISHED MATERIAL, ETC: The contractor shall within 10 days of delivery of each brief, return to the Department the corrected version (i.e., the version as printed) of each brief on 3.5" diskette. This corrected version (hereinafter "corrected version file") shall be in WordPerfect 8.0 or higher as directed by the Government.

00000404

http://mail.google.com/mail/?attid=0.1&disp=vah&view=att&th=11397ed2db414286    07/05/2007 06:01 PM

Also .pdf file(s) in Acrobat 3.0 Reader for use in CD-ROM production, files must be identical to the printed version from contractor's application program files, e.g., using Macintosh platform, QuarkXPress, Adobe PageMaker, etc. or using Windows platform, QuarkXPress, Adobe PageMaker, Adobe FrameMaker, etc.

Required formatting of the corrected version file: Justification shall be Full or Left; Base Font shall be Courier; Line Spacing shall be one; paragraphs shall be separated by 2-points or more leading between lines and 6-points or more between paragraphs (tabular or spaced first-line indentations are permissible); lines within paragraphs shall end with Soft Returns, not Hard Returns; block quotations shall be left/right indented paragraphs; footnote markers in text and footnotes shall be in standard WordPerfect format.

Impermissible Formatting: Character font codes other than the Base Font shall be removed; center Justification codes shall be removed; other formatting codes added during the conversion process, if any, other than as required above, shall be removed.

SCHEDULE: Adherence to this schedule must be maintained. Contractor must not start production of any job prior to receipt of the individual print order (GPO Form 2511). No definite schedule for pickup of material can be predetermined. Furnished material and proofs must be picked up from and delivered to the addresses under DISTRIBUTION.

It should be noted that the performance period specified by the Government consists of contract  workdays Monday through Friday, from 9:00 a.m. to approximately 10:00 p.m..

The Contractor may be required to work on up to 4 briefs or appendices (up to 100 pages per order) in one day and maintain work schedules.

Contractor will be notified for pick up of initial copy and/or diskette(s) or Government will notify contractor that copy will be sent by modem as set forth below.

BRIEFS

Regular Schedule (non-Overtime): Contractor will be required to pickup copy and diskettes or be available to receive copy by electronic means between the hours of 9:00am to 12:00pm and to process copy and deliver typeset page proofs (up to 100 pages per brief) back to the agency within 4 hours.

Contractor will be required to pick up corrected page proofs or receive by facsimile during contract workday hours, make corrections and deliver (or facsimile) corrected set of page proofs back to the Department within one (1) hours of receipt.

Additional changes may be made by the agency up to 4 additional times per brief and the Contractor must turnaround each change within 30 minutes of receipt of change/

After receiving "OK to print," contractor will print, bind, and deliver 40 copies (up to 100 pages per brief) within 2 hours.

In the event that the contractor is responsible only for printing the cover and binding the brief, in one of two format, a copy of the text of the brief shall be provided by the Department to the contractor. After receiving the text of the

brief and an "OK to print," the contractor shall make the requisite copies of the text of the brief and bind and trim to size and deliver 40 copies within 2 hours. Trim sizes will either be 8-1/2 x 11" or 6-1/8 x 9-1/4

APPENDICES

Regular Schedule (Non-Overtime): The contractor will be required to pick up copy, typeset cover and table of contents,

00000405

number pages, print, and deliver 20 copies of up to 500 pages.

This should be a 2-step process:

1) Contractor prepares a "dummy" appendix (no cover or table of contents), just numbered pages in a temporary binding. This should take no more than 24 hours.

2) When appendix is in final form (including cover and table of contents), contractor is given "OK" to print. Deliver 20 copies of up to 500 pages within 4 hours.

If receipt of material, from the Government, occurs such that contractor cannot perform above schedule during normal workday hours, contractor will perform such work during the following workday or on overtime if overtime is authorized by the Government.

**NOTE: Overtime shall apply to any work performed after 10:00pm or on weekends or Federal Holidays resulting from delays caused by the agency. No overtime payment will be paid because of contractor's failure to meet the schedule..**

**Overtime Schedule:  When the Government requires that work be performed Monday thru Friday after 10:00pm Saturdays, Sundays, and Federal holidays, in order to meet delivery requirements, overtime payments will be paid for at the hourly overtime rate in accordance with the contractor's offered hourly rate in the "Schedule of Prices". Contractor and agency must agree on the number of hours of overtime necessary to complete the job and this must be shown on the print order or attachment. No overtime will be paid if proof of agreement on the number of hours is not attached to the print order.**

**CONTRACTORS PLEASE NOTE: CONTRACTOR MAY NOT REFUSE TO WORK OVERTIME.**


SERVICE AND FILING OF BRIEFS AND APPENDICES BY CONTRACTOR: At Government's Option:

For each brief and/or appendix prepared by the Contractor with respect to which a request is made by the Government, the Contractor shall, in a manner consistent with the requirements of the United States Court of Appeals for the Second Circuit, serve two copies of the brief and/or 1 copy appendix on each party designated by the Government and timely file in the Court of Appeals the original and the appropriate number of copies of the brief and/or appendix. Service will generally be by mail, but personal service may be required. Absent a request by the Government that a particular brief and/or appendix be served and filed by the Contractor, the Contractor shall deliver to the Government the number of copies of the brief and/or appendix specified in the print order form.

If personal service is required, and the party is located more than 25 miles from the contractor's office, the Government will pay actual charges at cost without mark-up.


SECTION 3.- DETERMINATION OF AWARD

The Government will determine the lowest bid by applying the prices offered in the "Schedule of Prices" to the following units of production which are the estimated requirements to produce 12 months orders under this contract. These units do not constitute, nor are they to be construed as, a guarantee of the volume of work which may be ordered for a like period of time.

OVERTIME PAYMENTS: Orders requiring production on Saturdays, Sundays, Federal holidays, or Monday thru Friday after 10:00pm in order to meet delivery requirements will be paid for at the overtime rate in accordance with the

00000406

contractor's offered hourly rate in the "Schedule of Prices".

All other orders will be placed with the required schedule and paid for at the basic prices offered.

It is estimated that 15% of the orders placed on this contract will require an overtime schedule and,

The following item designations correspond to those listed in the "Schedule of Prices".

CATEGORY 1

| | | |
|---|---|---|
| I. (a)(1) | 310 |
| (2) | 170 |
| (b) | 106 |
| (c) | 10106 |
| (d) | 318 |
| (e) | 15780 |
| (f) | 34234 |
| (g) | 2052 |
| h. | 200 |
| i. | 0 |
| (j) | 50 |
| II. (a) | 1,327 |
| (b) | 165,996 |
| (c)(1) | 10 |
| (2) | 0 |
| (d) | 14 |
| III. (a) | 255 |
| b. | 348 |
| c. | 255 |
| IV | 100 |

00000407

## SECTION 4.- SCHEDULE OF PRICES

SUBMISSION OF OFFERS AND EVALUATION: The offer shall be based upon supplying paper that meets or exceeds the minimum percentage of waste paper as required by this solicitation. By submission of an offer, offerors are certifying that the paper to be supplied contains at least the minimum percentage specified. This certification concerns a matter within the jurisdiction of an agency of the United States, and the making of a false, fictitious, or fraudulent certificate on may render the maker subject to prosecution under Title 18, United States Code, Section 1001. he Government reserves the right to require proof of such certification prior to first delivery and thereafter as may be otherwise provided for under the provisions of the contract.

Bids offered are f.o.b. destination.

Prices must include the cost of all required materials and operations for each item listed in accordance with these specifications.

Bidder must make an entry in each of the spaces provided. Contractor must submit a price for all items. A No Charge or a No Bid may be cause for your bid to be declared nonresponsive. Bids submitted with any obliteration, revision, or alteration of the order and manner of submitting bids, may be declared nonresponsive.

Bids submitted with NB (No Bid) or blank spaces for an item may be declared nonresponsive.

The Contracting Officer reserves the right to reject any offer that contains prices for individual items of production (whether or not such items are included in the Determination of Award) that are inconsistent or unrealistic in regard to other prices in the same offer or to GPO prices for the same operation if such action would be in the best interest of the Government.

All vouchers submitted to the GPO shall be based on the most economical method of production.

Fractional parts of 10 will be prorated at the per 10 rate.

<u>Prices must be submitted for the entire term of the contract and bids qualified for a lesser period will not be considered.</u>

———————————

(Initials)

I. COMPOSITION AND PAGE MAKEUP:

(a) Cover pages:

    (1) Brief (6-1/8 x 9-1/4")...................per page............$_____

    (2) Appendix (8-1/2 x 11")...................per page............$_____

(b) Text page: Contractor set from manuscript copy.....per page.....$_____

00000408

(c) Text page: Department supplied diskette(s)..per page...........$_____

(d) Remake of pages due to editorial changes....per page...........$_____

(e) Page proofs................................per page...........$_____

(f) Authors alterations* (flat charge for access

   to file). Offer must include, and a charge

   will be allowed for, locating each deletion,

   change or addition in the file..............per alteration......$_____

      *Alterations may consist of the addition or deletion of one or more words or phrases (groups of words within a single sentence), these will be considered as one alteration. <u>The maximum charge allowable for author's alterations on any one page shall be an amount equal to the cost of setting that page from manuscript copy.</u>

(g) Insertion of reference page numbers on

   Table of Contents or Index from edited

   page proofs................................per line...........$_____

(h) Return to the Department the corrected version

   (i.e., the version as printed) of each brief

   on 3.5" diskette. This corrected version

   (hereinafter "corrected version file") shall

   be in WordPerfect 6.1.......................per diskette........$_____

(i) .pdf file production using Acrobat 3.0 Reader

   for use in CD-ROM production, files must be

   identical to the printed version of text....per page...........$_____

(j) Diskette for .pdf file(s) above.............each................$_____

_____

(Initials)

00000409

II. COMPLETE PRODUCT: Prices offered shall include the cost of all required materials and operations (EXCEPT Items I. and III.) necessary for the complete production and distribution of the product listed in accordance with these specifications.

### NOTE: RUNNING RATE IS PER 10 COPIES

                                                            Running Per

                                                            10 Copies

   Includes makeready if required:                          -----------

(a) Complete cover (wraparound).............................$_____

(b) Text per page.......................................    .........$_____

(c) Pressure sensitive cover stock (up to 8-1/2 x 11"):

   (1) White..................................per 100 leaves......$_____

   (2) Colored................................per 100 leaves......$_____

(d) Collating, trimming to size and binding    per 100 pages    $_____

III. SERVICE AND FILING OF BRIEFS AND APPENDICES BY CONTRACTOR: At Government's

   Option:

(a) Filing brief and any appendices or attachments

    at court and on one party.......................................$_____

(b) Each additional service.........................................$_____

( c) Electronic filing of Briefs ...........................$_____

IV. OVERTIME PAYMENTS:

Hourly rate for work performed after 10:00pm on weekdays,

Saturday, Sunday and Federal Holidays......per hour..............$_____


   It is estimated that 15% of the orders placed on this contract will require an overtime schedule .


SECTION 4.- TYPEFACES: If manufacturers generic equivalent typefaces are proposed, the bidder must list on the line of the same number as the preferred typeface, the name of the equivalent typeface and composing machine to be used.

00000410

http://mail.google.com/mail/?attid=0.1&disp=vah&view=att&th=11397ed2db414286

07/05/2007 06:01 PM

Preferred Typefaces:

1. Century

2. Spartan Heavy

    Manufacturers Generic

    Equivalent Typefaces              Name of Composing Machine

1._____      _____

2._____      _____


BIDDERS NAME AND SIGNATURE: Fill out and return Two (2) copies of all pages in "Section 4.- Schedule of Prices", initial or sign each in the space provided and submit with GPO Form 910, "Bid". Do not enter bid prices on GPO Form 910. NOTE: The schedule of prices will prevail in instances where prices are inadvertently entered on GPO Form 910.


Bidder_____

_____

            (City - State)

By_____

        (Signature and title of person authorized to sign this bid)

_____

        (Person to be contacted)              (Telephone Number)


The contractor is cautioned not to perform any operation(s) or produce any product(s) for which a price has not been offered under the contract. Further, the contractor is not to accept print orders which are outside the scope of the contract. If such orders are placed, contractor is to notify GPO New York immediately. Failure to do so may result in nonpayment.

00000411

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
---------------------------------------------------------X
                BURKE             :     DOCKET # 06-1917-cv
             Appellant,    :
              v            :     **OPPOSITION TO ITEMIZED BILL**
            EVANS,       :     **OF COSTS & CROSS-MOTION**
             Appellee.   :
---------------------------------------------------------X

I, _____, Brian Burke, declare under penalty of perjury that the

following information is correct and true:

     Appellant, Brian Burke, vigorously disputes defendant's request for any "costs"

pursuant to Rule 39(b)? of FRAP: *Costs For and Against the United States. Costs for or against the United States, its agency, or officer will be assessed under Rule 39(a) only if authorized by law.*

 In Court of Appeals (4th Circuit) "D. If costs are sought by or against the United States or agency or officer, counsel must cite the statutory authority for an award of costs. [FRAP 39(b) and Local Rule 39(b)]."

 Eleventh Circuit "2. Costs for or Against the United States. When costs are sought for or against the United States, the statutory or other authority relied upon for such an award must be set forth as an attachment to the Bill of Costs."

 First Circuit: " IF SEEKING COSTS FOR OR AGAINST THE UNITED STATES, pursuant to Fed. R. App. P. 39(b), please specify statutory or other authority."  No statutory authority was cited.

 "Necessary copies" as per *Furman v. Cirrito,  782 F.2d 353, 355 (2d Cir.1986),* "Further in accordance with FRAP 39(c) appellant is only entitled to claim the "necessary copies" of briefs and appendices and at rates not higher than those generally charged for such work in the area where the Clerk's office is located. Ten (10) has been established as the number of necessary copies of the brief to be filed with the court, ..., and *two* additional copies for each party. See FRAP 31(b). For the appendix, the number of necessary copies is also ten (10) for the Court, ....., and *one* for each party."

    Pursuant to 28 U.S.C. § 1924  *Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed.*

 Defendant states "Although the contract between this Office and its printer provides

for a *minimum* run of forty copies, ..." but contract 2231-S actually states "BRIEFS— QUANTITY AND NUMBER OF PAGES: Approximately 10 to 200 copies per order with an average of 40 copies per order. Approximately 10 to 132 pages plus cover per order with an average of 40 pages per order Approximately 1 to 20 pages of index or table of contents per order.

APPENDICES—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 40 copies per order with a average of 20 copies per order. Approximately 8 to 1334 pages per order plus cover per order." The contract is actually between Record Press 229 west

36th st. NY NY and the Government Printing Office. Plaintiff reported to Lloyd Rawls of

GPO's Inspector General Office on July 5, 2007 that fraud was being committed by

Record Press against the GPO, U.S. Attorney's Office, U.S. Taxpayers and, potentially,

plaintiff. They are charging the government, et. al., exactly **TEN TIMES** the correct

amount for "collating & trimming" than allowed in said 2231-S contract. This was

ascertained in conversation with Calvin Aderson, Fiscal Manager at GPO. Relevant

contract part reads:

II. COMPLETE PRODUCT: Prices offered shall include the cost of all required materials and operations (EXCEPT Items I. and III.) necessary for the complete production and distribution of the product listed in accordance with these specifications.

<u>NOTE: RUNNING RATE IS PER 10 COPIES</u>

Running Per

10 Copies

Includes makeready if required:                -----------

(a) Complete cover (wraparound).............................$_____

(b) Text per page...........................................        ........$_____

(c) Pressure sensitive cover stock (up to 8-1/2 x 11"):

   (1) White...................................per 100 leaves......$_____

   (2) Colored................................per 100 leaves......$_____

(d) Collating, trimming to size and binding    per 100 pages        $ 12.50

I.e. $12.50 per **1000 PAGES AND NOT 100 PAGES.** This is pure **FRAUD** and actionable

under *Federal False Claims Act 31 USC § 3729-33.* The U.S.  Attorney's Office should

be prosecuting the Malefactor instead of rewarding/paying them and "taxing" untaxable

fraudulent "costs" against citizens attempting to enforce their Constitutional (Seventh

Amendment) Rights. Plaintiff has no information at this time that anyone at the U.S.

Attorney's Office are receiving kickbacks on this fraud. Nevertheless A.U.S.A. Kristin

Vassallo stated "I verify under penalty of perjury that the foregoing is true and correct."

which is again perjury and certainly by now grounds for disbarment. Plaintiff requests

this matter be brought before the Grievance Committee. Additional perjury was

committed on Certificate of Service as service to Fedex was not performed until 6:42 pm

on June 22, 2007. Other parts of "bill" are also likely ten times contract cost and no part of

bill should be paid or "taxed" until actually and correctly verified. All overpayments are

and should be recoverable and could be as much as **ONE MILLION DOLLARS.**  Bill

remains unpaid by U.S. Attorney's Office as verified by Jerry Nash of GPO contact

compliance.

WHEREFORE, petitioner prays for the granting of an Order from the Court granting

appellant's Motion in its entirety and dismissing appellee's Motion in its entirety and for

all such and further relief this Court may deem just and appropriate.

Dated: July 5, 2007

By: -------------------------------------
    **BRIAN T BURKE**
    pro se
     145 EAST 23RD STREET #4R
    New York, NY 10010

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT
#### Daniel Patrick Moynihan United States Courthouse
#### 500 Pearl Street
#### New York, NY 10007

**HON. DENNIS JACOBS**
**Chief Judge**

**CATHERINE O'HAGAN WOLFE**
**Clerk**



Before:
    Hon. Ralph K. Winter,
    Hon. Barrington D. Parker,
        *Circuit Judges,*
    Hon. Louis F. Oberdorfer,
        *District Judge.*

BURKE v. EVANS            Docket No. 06-1917-cv

### ORDER

    IT IS HEREBY ORDERED that the Appellees' itemized and verified bill of costs and the Appellant's opposition are construed as a motion to deny costs, and so construed, the motion to deny costs is GRANTED.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, Clerk
by

AUG - 2 2007
Date

Elizabeth Duwe
Motions Staff Attorney

---

The Honorable Louis F. Oberdorfer, Judge of the United States District Court for the District of Columbia, sitting by designation.

# EXHIBIT 10

00000416

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES ex rel. BRIAN BURKE,**<br><br>   **Plaintiff,**<br><br>   **v.**<br><br>**RECORD PRESS, INC.,**<br><br>   **Defendant.** | **Civil Action No. 1:08-CV-00364 (EGS)** |

**DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION TO
RELATOR BRIAN BURKE**

   Defendant Record Press, Inc. ("Record Press"), by and through counsel and pursuant to Federal Rule of Civil Procedure 36, hereby propounds this First Set of Requests for Admission to Relator Brian Burke ("Relator"), and requests that Relator admit the truth of the following statements within thirty (30) days after service of the same.

**DEFINITIONS**

   For purposes of these Requests for Admission, Relator should use the following definitions for the terms used herein.  All Requests for Admission and corresponding definitions of terms are for purposes of discovery only, and not to be construed as limiting or reflecting Record Press's position in this case regarding any other issue.  Record Press specifically reserves the right to use different terms, or to assert different meanings, for all purposes in this case.

   A.  "Plaintiff," "Relator," "you," and "your" means Relator Brian Burke.

   B.  "Defendant" and "Record Press" means Defendant Record Press, Inc.

   C.  "This Action" means Civil Action No. 1:08-CV-00364 (EGS) in the United States Court for the District of Columbia.

D.      "GPO" means the United States Government Printing Office.

E.      "RFP" means the GPO's request for proposal (Program 2231-S) attached as Exhibit 5 to the Declaration of Hugh Wilmot.

F.      "Communication" means, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer, or exchange of information between two or more persons of any nature whatsoever, by or to whomever, whether oral or written or whether face-to-face, by telephone, email, mail, personal delivery, or otherwise, including but not limited to, letters, correspondence, conversations, memoranda, dialogue, discussions, meetings, interviews, consultations, agreements, and other understandings.

G.      The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these document requests all information that might otherwise be construed to be outside of their scope.

H.      "Concern" and "concerning" are used in their broadest sense and embrace all matter relating to, referring to, referencing, describing, discussing, evidencing, or constituting the referenced subject.

I.      "Document" means all types of documents, electronically stored information, and things embraced within Federal Rules of Civil Procedure 34 and includes, without limitation, any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy, of the following items, however produced or reproduced, namely: books, accounting records of any nature whatsoever, agreements, communications, correspondence, facsimiles, telegrams, cable, telexes, memoranda, recordings, studies, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, diaries, letters, forecasts, statistical statements, graphs, laboratory or

-2-

00000418

engineering reports and records, notebooks, charts, plans, sketches, drawings, video tapes, films, slides, photographs, information bearing photographic products of any nature whatsoever, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, reports or summaries of interviews, reports or summaries of investigations, opinions or reports of consultants, patent studies, opinions of counsel, records, reports, summaries of negotiations, sales literature of any nature whatsoever, brochures, catalogues, catalogue sheets, pamphlets, periodicals, advertisements, circulars or trade letters, press releases, trade releases, publicity releases, new product releases, reprints, drafts of any documents, working papers, indices, original or preliminary notes, sound recordings, computer printouts, floppy disks, hard drives, CD-ROM's, magnetic tapes and any other data, database, server, or data compilations from which information can be obtained either directly, or, if necessary translated by you through detection devices into a reasonably usable form.  The term document also refers to any tangible object other than a document as described above, and includes objects of every kind and nature such as, but not limited to, products, prototypes, models, and specimens.

J.      "Person" means any natural person, firm, association, partnership, corporation, joint venture, or other form of legal entity.

K.      "Any" means each and every.

## INSTRUCTIONS

1.      These Requests for Admission are to be answered by you with reference to all information that is or may be available to you or any agencies, representatives, and/or any other persons or entities under your control and/or acting on your behalf.

2.      In responding to these Requests for Admission, you shall seek out all information that is available to you, fairly meet the substance of the requested admission, and admit any parts

-3-

00000419

of the matter as are true, and otherwise fully comply with Rule 36 of the Federal Rules of Civil Procedure.

3.    A denial or partial denial shall fairly meet the substance of the requested admission.  When good faith requires that you qualify your response or deny only part of the matter for which an admission is requested, you must specify the portions of the request to which you admit, and then deny or qualify your response as to the remainder.

4.    You may not give lack of information or knowledge as a reason for failure to admit or deny unless you have made reasonable inquiry, and unless the information known or obtainable by you is insufficient to enable you to admit or deny the statement for which an admission is requested.  In such case, you should set forth the nature and extent of the inquiry undertaken.

5.    If, after exercising due diligence, you cannot truthfully admit or deny any Request for Admission, explain in detail the reasons that you cannot truthfully admit or deny the request, and specify as much of the request as you can admit or deny.

6.    If your response to any Request for Admission is anything other than an unqualified admission, your response must specifically deny the statement or set forth in detail the reasons why you cannot truthfully admit or deny it.

7.    If you object to or otherwise decline to answer any portion of any Request for Admission, clearly identify the portion to which you object and the grounds for such objection, and provide all information called for by the portion of the Request for Admission to which you do not object or which you do not decline to answer.

00000420

8.      If you claim any form of privilege or work product as a ground for not responding to a Request for Admission or any part thereof, provide a privilege log detailing the nature of the document(s) for which you assert privilege or work product as a ground for not responding.

9.      If in answering any of these requests you encounter any ambiguity in construing any Request for Admission or any definition or instruction relevant to the Request for Admission, set forth the matter deemed ambiguous and the construction selected or used in answering the Request for Admission.

10.     In each Request for Admission, the terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all documents or information that might otherwise be construed to be outside the scope.

11.     Each Request for Admission shall be deemed a continuing request, and you are requested to supplement your response thereto promptly if and when you obtain any information that is inconsistent with your initial responses.

## REQUESTS FOR ADMISSION

Request for Admission 1

Admit that the GPO's request for proposal (Program 2231-S), attached as Exhibit 5 to the Declaration of Hugh Wilmot, ("RFP") is the contract between Record Press and the GPO.

Request for Admission 2

Admit that the RFP is for the printing of appeals briefs.

Request for Admission 3

Admit that the RFP contains the pricing terms for the printing of appeals briefs.

Request for Admission 4

Admit that the RFP has a line item for "Collating, trimming to size and binding per 100 pages."

00000421

Request for Admission 5

Admit that $12.25 is entered as the price for the "Collating, trimming to size and binding per 100 pages" line item in the RFP.

Request for Admission 6

Admit that Record Press's Invoice #A71700 is Record Press's invoice to the GPO for the printing and binding of 40 copies of the brief for Defendants-Appellees in Brian T. Burke v. Donald L. Evans.

Request for Admission 7

Admit that Record Press's Invoice #A71700 shows that Record Press charged $12.25 per 100 pages for Collating, Trimming to Size and Binding.

Request for Admission 8

Admit that Record Press's Invoice #A71700 shows that Record Press charged $372.40 for Collating, Trimming to Size and Binding 3,040 pages.

Request for Admission 9

Admit that Record Press's Invoice #A71701 is Record Press's invoice to the GPO for the printing and binding of 20 copies of the appendix for Defendants-Appellees in Brian T. Burke v. Donald L. Evans.

Request for Admission 10

Admit that Record Press's Invoice #A71701 shows that Record Press charged $12.25 per 100 pages for Collating, Trimming to Size and Binding.

Request for Admission 11

Admit that Record Press's Invoice #A71701 shows that Record Press charged $1,386.70 for Collating, Trimming to Size and Binding 11,320 pages.

00000422

Request for Admission 12

      Admit that you did not participate in the formation of Record Press's contract with the

GPO.

Request for Admission 13

      Admit that at the time you filed this action you had not seen a copy of the contract

between Record Press and GPO.

Request for Admission 14

      Admit that at the time you filed this action you had not seen a copy of Record Press

Invoice # A71700.

Request for Admission 15

      Admit that at the time you filed this action you had not seen a copy of Record Press

Invoice # A71701.

      Respectfully submitted,

/s/ John W. Lomas, Jr.
William T. O'Brien (DC Bar No. 450891)
John W. Lomas, Jr. (DC Bar No. 976555)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C.  20006
Phone: (202) 496-7500
Facsimile: (202) 496-7756

*Of Counsel:*

Malcolm I. Lewin, Esq.
MORRISON COHEN, LLP
909 Third Avenue
New York, NY  10022
Telephone:  (212) 735-8625
Facsimile:  (212) 735-8708

*Attorneys for Defendant Record Press, Inc.*

-7-

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of April 2010, the foregoing Defendant's First Set

of Requests for Admission To Relator Brian Burke was served via hand delivery on:

> Tyler Jay King, Esq.
> Tyler Jay King Law
> 1420 N Street, N.W., Suite 706
> Washington, D.C.  20005
> Phone: (202) 436-2641
> tyler@tylerkinglaw.com

and via e-mail delivery on:

> Darrell C. Valdez, Esq.
> U.S. Attorney's Office
> Judiciary Center Building
> 555 Fourth Street
> Washington, DC 20530
> (202) 307-2843
> darrell.valdez@usdoj.gov

  /s/ John W. Lomas, Jr.
John W. Lomas, Jr.

00000424

# EXHIBIT 11

00000425

<u>**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**</u>

| | |
|---|---|
| UNITED STATES, ex rel.<br>BRIAN BURKE,<br>         PLAINTIFF,<br><br>   V.<br><br>RECORD PRESS, INC.,<br>        DEFENDANT | Civil Action No: 1:08-CV-00364 (EGS) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S REQUESTS FOR ADMISSIONS**

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff, by and through his counsel, hereby submits the following responses to Defendant's Requests for Admissions:

PRELIMINARY STATEMENT

The word usage and sentence structure of the responses are those of Plaintiff's attorney who, in fact, prepared the responses in consultation with Plaintiff, and the language herein does not purport to be the exact language of the Plaintiff.

By providing these responses, Plaintiff does not waive any objections that it may have to Defendant's use or characterization of the responses provided and expressly reserves all objections as to vagueness and ambiguity.

SPECIFIC RESPONSES

1. Yes.

2. Yes, insofar as "printing" includes all work required to be performed under the contract.

3. Yes, insofar as "printing" includes all work required to be performed under the contract.

4. Yes.

1 of 3

00000426

5.  No, $12.25 is entered for the "Collating, trimming to size and binding per 100 pages" line item, but the price of that line item is subject to the 10-copy running rate, such that $12.25 is the price per 10-copies.

6.  Yes, insofar as "printing and binding" includes all work required to be performed under the contract pursuant to said invoice.

7.  Yes, insofar as the charge was per 1-copy.

8.  Yes, insofar as the charge was per 1-copy.

9.  Yes, insofar as "printing and binding" includes all work required to be performed under the contract pursuant to said invoice.

10. Yes, insofar as the charge was per 1-copy.

11. Yes, insofar as the charge was per 1-copy.

12. Yes.

13. No.

14. No.

15. No.


DATED:  May 24th, 2010


                              Respectfully Submitted,


                              /s/
                              _____
                              Tyler Jay King, Esq.
                              1420 N ST NW Ste. 706
                              Washington, DC  20005
                              (202) 436-2641


### CERTIFICATE OF SERVICE

     I hereby certify that, on this 24th day of May, 2010, I caused a true and accurate copy of foregoing to be served, via e-mail to:


2 of 3

00000427

William O'Brien
*Counsel for Defendant*

Respectfully Submitted,

/s/
_____
Tyler Jay King, Esq.

00000428

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES, ex rel.
BRIAN BURKE,

           PLAINTIFF,

    V.

RECORD PRESS, INC.,

         DEFENDANT

Civil Action No:  1:08-CV-00364 (EGS)

### PLAINTIFF, RELATOR'S, OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiff, Relator, Brian Burke, through the undersigned, submits this opposition to Defendant's Motion for Summary Judgment.  The grounds for this motion are set forth in the accompanying Memorandum of Points and Authorities in Support of Plaintiff, Relator's, Opposition to Defendant's Motion for Summary Judgment.

WHEREFORE, Plaintiff, Relator, respectfully requests that this Court deny Defendant's Motion for Summary Judgment; and order such further relief as this Court deems appropriate.

DATED, July 15th, 2010

Respectfully Submitted,

/s/
_____
Tyler Jay King, Esq.
1420 N St. NW, Ste. 706
Washington, DC  20005
(202) 436-2641

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above Request for Continuance has, this 14th day of January, 2010, been filed with this Court's Clerk, and has been sent by first-class mail to:

Darrell C. Valdez, Esq.

1 of 10

00000429

In addition, Record Press has already relied on a GPO in its Rule 11 Motion.  Record Press claims that the GPO spreadsheet demonstrates that Relator's claim is frivolous.  Strangely, however, the GPO spreadsheet offered in the Rule 11 Motion is actually different than the GPO spreadsheet offered in Record Press's Motion for Summary Judgment.  *RP Rule 11 Motion at pg. 92*.

Accordingly, the Sullivan Declaration and GPO spreadsheets do not demonstrate dispositively that, at the time Record Press executed the Contract, it had a reasonable belief that the Government read the Contract's outside its four corners.

### D.   GPO IS PAID A COMMISSION ON THE CONTRACT AMOUNT.

The GPO's commission creates an inference that the Government would not say anything to Record Press even if it discovered that the claims were incorrect.  To the extent that the Government's knowledge is even relevant to Record Press's knowledge, the question becomes whether or not the GPO's knowledge resulted in some conduct that gave rise to Record Press's alleged reasonable belief that it was not submitting false claims.

The facts on the record create an inference that the Government's knowledge might actually result in willful blindness, demonstrating that the Government would not have communicated at all with Record Press regarding the challenged charges.

Moreover, that the government acquiesced is, in and of itself, insufficient to sustain a government knowledge defense.  United States ex rel. Durcholz v. FKW, Inc., 189 F.3d 542, 546 (7th. Cir. 1999).  "[M]ere acquinesence would preclude FCA liability any time a government employee and a defendant were in cahoots."  United States *ex rel*. Tyson v. Amerigroup III., Inc., 488 F. Supp.2d 719, 730 (N.D. Ill. 2007)(citing United States *ex rel*. Asch v. Teller, Levit & Silvertrust, P.C., No. 00-C-3289, 2004  WL 1093784, at *3 (N.D. Ill. May 7, 2004).

8 of 10

**EXHIBIT A**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES, ex rel.
BRIAN BURKE,

                    PLAINTIFF,

       V.

RECORD PRESS, INC.,

                    DEFENDANT

C. A. No: 1:08-CV-00364 (EGS)(DAR)

**AFFIRMATION**

1. I, Plaintiff Brian Burke, am the Relator and originator/discover of the facts found in this case, which were found first on July 5th, 2007.

2. On July 5th, 2007, I reviewed a Motion for Itemized And Verified Bill Of Costs in an appeals case against the Department of Justice, which I lost ("DOJ's Motion for Costs").

3. I recognized that the prices for copy charges were out of line with competitive prices in the New York area such as FedEx/Kinko's Union Square location, as well as other printers such as Advanced Printing, 263 West 38th Street, NY, NY 10018.

4. I noted that the per page cost in the DOJ' Motion for Costs of 4 cents was competitive but the binding costs were approximately ten times competitive rates.  For example, at FedEx/Kinko's, perfect binding cost is $4.00 per copy, for any amount of pages up to 800 pages, and for any amount of copies, including a single copy.

5. On July 5, 2007, I called the Government Printing Office ("GPO") and ascertained that the relevant contractor was/is Record Press, Inc.  I spoke to their chief contract person Calvin Anderson ("Anderson"), (202-512-0987), and learned that

00000431

Record Press was overcharging by failing to apply the running rate to a particular line item (the "Per 10 Copies Running Rate").

6. Anderson explained to me that the Contract stated the Per 10 Copies Running Rate twice above the relevant line item, and that the Per 10 Copies Running Rate was in all caps and underlined. Anderson convinced me that the Per 10 Copies Running Rate applied to all line items from the relevant section.

7. I did not have a copy of the Contract at the time I spoke with Anderson.

8. Later that day, I received a copy of the Contract from the GPO, and on July 5, 2007, filed an opposition to the DOJ's Motion for Costs, setting forth what I had learned.

9. The DOJ's Motion for Costs was not granted, and notably, neither the DOJ nor GPO disputed my claim that the IVBC was based on false claims.


I the undersigned, Brian Burke, do hereby declare under penalty of perjury that the facts and representations made in the foregoing affirmation are true and correct to the best of my knowledge and understanding.

By: _____
Name: Brian Burke
Date: July 15, 2010

00000432

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES ex rel.      )
BRIAN BURKE,             )
                               )
      Plaintiff,          )
                               )     Civil Action No. 1:08-CV-00364 (EGS)
      v.                )
                               )
RECORD PRESS, INC.,      )
                               )
      Defendant.      )

**DECLARATION OF CALVIN ADGERSON, UNITED STATES GOVERNMENT
PRINTING OFFICE, IN SUPPORT OF RECORD PRESS, INC.'S
MOTION FOR SUMMARY JUDGMENT**

I, Calvin Adgerson declare:

1.    I am currently retired from the United States Government Printing Office ("GPO"). I submit this declaration in support of Record Press, Inc.'s Motion for Summary Judgment to dismiss the Complaint in this matter. I worked in the GPO for 34 years.

2.    From my work experience at GPO, I have knowledge of the GPO's contracting with outside vendors to provide printing services. I am familiar with the terms and conditions of GPO's contracts as to payment of contractors and the pricing requirements to be met by outside printing vendors.

3.    I have reviewed the Complaint in this matter filed by Brian Burke and I understand that Mr. Burke alleges that Record Press, Inc. submitted fraudulent claims for printing and binding services. I have also reviewed the bid submitted by Record Press, Inc. in this matter and am familiar with its terms and conditions and pricing.

4.  I further understand that at paragraph 19 of Mr. Burke's Complaint, he alleges that I confirmed to Mr. Burke via telephone "that the binding charge must be billed only for a 10-copy run of the document as Record Press charged." This is untrue.

5.  Mr. Burke did contact me by telephone, on or about July 2007. At that time he told me that he was Hugh Wilmot, the owner of Record Press, Inc. Only later in the conversation did it become apparent to me that I was not talking with Mr. Wilmot, but rather was speaking with Mr. Burke. I did not tell Mr. Burke that the binding charge must be billed only for a 10-copy run of the document. Nor do I believe that Record Press has improperly submitted invoices. I categorically reject the allegations Mr. Burke has made regarding our telephone conversation.

6.  The solicitation or invitation for bids states that the price for collating, trimming to size and binding briefs, per 100 pages, is $12.25. The "Running Per 10 Copies" caption applies only to the line items entitled "Complete Cover" and "Text per page," not to collating, trimming to size and binding. (Dkt. # 17, Exhibit 5 to the Declaration of Hugh Wilmot.)

7.  I have reviewed two invoices Record Press, Inc. submitted to GPO for services provided under this contract. (Dkt. # 17, Exhibit 6 to the Declaration of Hugh Wilmot.) I compared them to the bid and I believe Record Press, Inc. properly charged the GPO in accordance with the terms and conditions of the contract.

8.  Record Press, Inc.'s invoice shows that it charged GPO $1,386.70 for collating, trimming to size and binding at the contract rate of $12.25 per 100 pages. (Dkt. # 17, Exhibit 6 to the Declaration of Hugh Wilmot.) Likewise, Record Press, Inc.

2

charged $372.40 for collating, trimming to size and biding for 40 copies of its brief in accordance with the contract.  (Dkt. # 17, Exhibit 6 to the Declaration of Hugh Wilmot.)

9.    I have found no evidence of fraud or overcharging by Record Press, Inc. in connection with this matter.

I declare under penalty of perjury under the laws of the United States of America and the District of Columbia that the foregoing is true and correct.

Executed on this 30th day of June 2010 at 8:30 am.

Calvin Adgerson

3

00000435

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES, ex rel.
BRIAN BURKE,

         PLAINTIFF,

   V.

RECORD PRESS, INC.,

        DEFENDANT

Civil Action No: 1:08-CV-00364 (EGS)

### PLAINTIFF BRIAN BURKE'S PRE-TRIAL STATEMENT

Plaintiff, Relator, Brian Burke ("Mr. Burke"), by and through its undersigned counsel, respectfully submits this Pre-Trial Statement pursuant to Local Rule 16.5 and Federal Rule of Civ. Proc. 26(a)(3).

### I.    Statement of the Case

This case is about the overcharging of a line item in a contract (the "Contract") between the United States Government Printing Office ("GPO") and the Defendant, Record Press, Inc. ("Record Press"). The Contract unambiguously states that the price is $12.25 per 100 pages, per 10 copy running rate.

Record Press maintains that the Contract should be read contrary to its plain meaning and that the GPO agrees with this.

### II.  Statement of Claims Made by Relator.

Mr. Burke asserts a violation of the False Claims Act, specifically 31 USC §3729(a)(1) and (a)(2).

### III. Schedule of Witnesses to be Called by Relator

Mr. Burke plans to call the following witnesses at trial:

1.  Mr. Burke will testify that he received the invoices at issues in this matter as a result of his role in the *Brian T.*

00000436

*Burke v. Donald L. Evans* ("Evans") matter, that he noted what appeared to be an excessively large line item charge, that he undertook to contact the GPO and Record Press to determine why the charge was so high, that in the course of his contacts he spoke with Mr. Calvin Adgerson, that Mr. Adgerson's representations regarding the per 10 copy running rate indicated that Record Press had overcharged for the relevant line item, that he, Mr. Burke, disputed the overcharges in the underlying *Evans* matter, and that the Government conceded to Mr. Burke's opposition to the overcharges.


IV.   List of Exhibits to be Offered in Evidence by Relator

Mr. Burke does not expect to offer in evidence any exhibits Record Press does not already expect to offer at trial, except for:

- Record Press's bid in response to U.S. Government's Bid Invitation for Program 2214-S, dated February 8th, 2006.
- The GPO spreadsheet attached to Record Press's Rule 11 Motion.


V.    Deposition Designations to be Offered in Evidence by Relator

At this time, Mr. Burke intend to offer the following portions of the May 25th, 2010 deposition of Mr. Brian Burke into evidence: 27:1 – 81:18; 87:19-21; 94:8 – 95:16.


VI.   Itemization of Damages Relator Seeks to Recover.

Mr. Burke seeks damages for Record Press's overcharges under its contracts with the GPO.  The damages are equal to the amount charged in line item II(d) minus the amount which should have been charged by prorating the charge per 10 copies.


2 of 3

00000437

VII.  Request for other Relief Sought by Relator.

    Mr. Burke seeks judgment in its favor and any other and
further relief as the Court deems appropriate.


DATED:  November 2nd, 2010

                              Respectfully Submitted,

                              **/s/**
                              _____
                              Tyler Jay King, Esq.
                              Bar No. 979592
                              1420 N ST NW #706
                              Washington, DC  20005
                              (202) 436-2641



                    **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 2nd, 2010, a
copy of the foregoing was served by email to:

Darrell C. Valdez

John W. Lomas, Jr.

William T. O'Brien



                              Respectfully Submitted,

                              **/s/**
                              _____
                              Tyler Jay King, Esq.



                            3 of 3


00000438

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES ex rel.
  BRIAN BURKE,


    Plaintiff,                          Civil Action No.  08-0364
                                                DAR
      v.


RECORD PRESS, INC.,


    Defendant.


Appearances:          Tyler Jay King, Esquire
                      TYLER JAY KING LAW
                      1400 K Street, N.W.
                      Suite 706
                      Washington, DC 20005



                      Counsel for Plaintiff



                      John W. Lomas, Jr., Esquire
                      William T. O'Brien, Esquire
                      MCKENNA LONG & ALDRIDGE LLP
                      1900 K Street, N.W.
                      Washington, DC 20006



                      Counsel for Defendant

Burke v. Record Press, Inc.

## <u>INTERIM PRETRIAL ORDER</u>

Counsel for the parties appeared before the undersigned United States Magistrate Judge on November 3, 2010 for a final pretrial conference.  Discovery has been completed, and, with the consent of the parties, a bench trial of Plaintiff's claims against Defendant is scheduled to commence on December 20, 2010.[*]

In accordance with Rule 16(d) of the Federal Rules of Civil Procedure, it is ORDERED that:

(1) Plaintiff shall file any motion to bifurcate liability and damages by no later than November 8, 2010;

(2) no later than November 15, 2010, Plaintiff shall supplement his pretrial statement to fully comply with Local Civil Rule 16.5(1)(iv), (v) and (vii), and

(3) the deadline for the filing of objections to the opposing party's pretrial statement is extended to November 22, 2010.


                                        /s/
                                    _____
                                    DEBORAH A. ROBINSON
                                    United States Magistrate Judge


November 4, 2010
          DATE


November 3, 2010
NUNC PRO TUNC


_____

[*] The parties consent to the bifurcation of Defendant's counterclaim.

<u>**UNITED STATES DISTRICT COURT**</u>
<u>**FOR THE DISTRICT OF COLUMBIA**</u>

UNITED STATES, ex rel.
BRIAN BURKE,

              PLAINTIFF,

    V.

RECORD PRESS, INC.,

              DEFENDANT

Civil Action No:  1:08-CV-00364 (EGS)

**PLAINTIFF BRIAN BURKE'S PRE-TRIAL STATEMENT**

Plaintiff, Relator, Brian Burke ("Mr. Burke"), by and through its undersigned counsel, respectfully submits this Pre-Trial Statement pursuant to Local Rule 16.5 and Federal Rule of Civ. Proc. 26(a)(3).

<u>I.   Statement of the Case</u>

This case is about the overcharging of a line item in a contract (the "Contract") between the United States Government Printing Office ("GPO") and the Defendant, Record Press, Inc. ("Record Press").  The Contract unambiguously states that the price is $12.25 per 100 pages, per 10 copy running rate.

Record Press maintains that the Contract should be read contrary to its plain meaning and that the GPO agrees with this.

<u>II.  Statement of Claims Made by Relator.</u>

Mr. Burke asserts a violation of the False Claims Act, specifically 31 USC §3729(a)(1) and (a)(2).

<u>III. Schedule of Witnesses to be Called by Relator</u>

Mr. Burke plans to call the following witnesses at trial:

    *1.  Mr. Burke.*

<div align="center">1 of 1</div>

00000441

Mr. Burke will testify that he received the invoices at issues in this matter as a result of his role in the *Brian T. Burke v. Donald L. Evans* ("Evans") matter, that he noted what appeared to be an excessively large line item charge, that he undertook to contact the GPO and Record Press to determine why the charge was so high, that in the course of his contacts he spoke with Mr. Calvin Adgerson, that Mr. Adgerson's representations regarding the per 10 copy running rate indicated that Record Press had overcharged for the relevant line item, that he, Mr. Burke, disputed the overcharges in the underlying *Evans* matter, and that the Government conceded to Mr. Burke's opposition to the overcharges.  Mr. Burk is expected to testify for 30 minutes.

   *2.  Mr. Hugh Wilmot.*
   Mr. Wilmot is expected to testify regarding the determination of prices in the Contract, the relationship between the work performed and the prices charged, and the agreements entered into between Record Press and the GPO.  Mr. Wilmot is expected to testify for 45 minutes.

   *3.  Mr. Calvin Adgerson.*
   Mr. Adgerson is expected to testify regarding the fact that Record Press was overcharging under the Contract, by failing to apply the per 10 copy running rate.  Mr. Adgerson is expected to testify for 25 minutes.

IV.  List of Exhibits to be offered in Evidence by Relator

Mr. Burke expects to offer the following exhibits at trial:

- Record Press's bid in response to the U.S. Government's Bid invitation for Program 1272-S, dated July 18, 2001.
- Record Press's bid in response to the U.S. Government's Bid Invitation for Program 2214-S, dated February 8th, 2006.

2 of 2

00000442

- Record Press Invoices under Program 1272-S, dated 2001 through 2005.
- Contract Modification transferring Program 1272 to 2231-S, dated September 29, 2005.
- Contract Modification extending Record Press's contract for Program 2231-S through October 31, 2006, dated September 5, 2006.
- Record Press invoices under Program 2231-S, dated January 2006.
- Record Press's bid in response to the U.S. Government's Bid Invitation Program 2231-S (October 18, 2006), not dated.
- Purchase Order accepting Record Press's bid for Program 2231-S, dated November 1, 2006.
- Record Press Invoices under Program 2231-S, dated November 20, 2006.
- Record Press Invoice #A71700, dated December 22, 2006.
- Record Press Invoice #A71701, dated December 22, 2006.
- Record Press Invoices under Program 2231-S, dated 2010.
- GPO spreadsheet for the November 1, 2006 to October 31, 2007 Term of Program 2231-S, not dated.
- GPO spreadsheet attached to Record Press's Rule 11 Motion.
- Declaration of Thomas Sullivan, United States Government Printing Office, In Support of Record Press, Inc.'s Motion for Summary Judgment dated June 30, 2010.
- Declaration of Calvin Adgerson, United States Government Printing Office, In Support of Record Press, Inc.'s Motion for Summary Judgment dated June 30, 2010.
- Itemized and Verified Bill of Costs for Case No. 06-1917-cv in the United States Court of Appeals for the Second Circuit dated June 21, 2007.

V.    Deposition Designations to be offered in Evidence by Relator

00000443

At this time, Mr. Burke intends to offer the following portions of the May 25th, 2010 deposition of Mr. Wilmot into evidence:  27:1 – 81:18; 87:19-21; 94:8 – 95:16.

## VI.   Itemization of Damages Relator Seeks to Recover.

Mr. Burke seeks damages for Record Press's overcharges under its contracts with the GPO.  The damages are equal to the amount charged in line item II(d) minus the amount which should have been charged by prorating the charge per 10 copies.

Mr. Burke is arranging for the approximately 1,430 records to be factored into this formula.  This work is taking slightly longer than expected based on the non-sequential nature of the records.  The work is currently being performed at a rate of approximately 36-72 records per hour and will require an additional 20 to 30 hours to complete the calculations.  Mr. Burke will supplement this pretrial statement with the total calculation as soon as this is completed.

## VII. Request for other Relief Sought by Relator.

Mr. Burke seeks judgment in its favor and any other and further relief as the Court deems appropriate.

DATED:  November 15th, 2010

                                        Respectfully Submitted,

                                        **/s/**
                                        _____
                                        Tyler Jay King, Esq.
                                        Bar No. 979592
                                        1420 N ST NW #706
                                        Washington, DC  20005
                                        (202) 436-2641

**CERTIFICATE OF SERVICE**

4 of 4

00000444

The undersigned hereby certifies that on November 15th, 2010, a copy of the foregoing was served by email to:

Darrell C. Valdez

John W. Lomas, Jr.

William T. O'Brien

Respectfully Submitted,

**/s/**
_____
Tyler Jay King, Esq.

00000445

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES ex rel.** | ) | |
| **BRIAN BURKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:08-CV-00364 (EGS-DAR)** |
| **v.** | ) | |
| | ) | |
| **RECORD PRESS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT RECORD PRESS, INC.'S RULE 26(a)(3) OBJECTIONS**

Pursuant to Federal Rule of Civil Procedure 26(a)(3)(B), Local Rule 16.5, and the Court's

Interim Pretrial Order dated November 4, 2010 (Dkt. No. 52), Defendant Record Press, Inc.

("Defendant") files the following objections to Plaintiff's list of trial exhibits and Plaintiff's

designations of portions of deposition transcripts to be introduced at trial. Record Press also

objects to Plaintiff's continued failure to itemize alleged damages.

**I.    DEFENDANT'S OBJECTIONS TO PLAINTIFF'S TRIAL EXHIBITS**

| Title | Objection |
|---|---|
| Record Press's bid in response to the U.S. Government's Bid invitation for Program 2214-S, dated February 8th, 2006. | Relevance; Confusing under Rule 403 |
| The spreadsheet attached to Record Press's Rule 11 Motion. | Incomplete under Rule 106; Cumulative |

II.    **DEFENDANT'S OBJECTIONS AND COUNTER-DESIGNATIONS TO PLAINTIFF'S DEPOSITION DESIGNATIONS**

**Hugh Wilmot - May 25, 2010**

Defendant objects to Plaintiff's designation of an entire fifty-five page block of deposition testimony (27:1-81:18), which begins in the middle of a question, without removing unnecessary attorney discussion and questions that were not answered and/or rephrased. For purposes of these objections, Record Press will break up the designations into smaller segments.

| Page:Line | Objection | Counter-Designation |
|---|---|---|
| 27:1-2 | OBJECTION: Incomplete question. | |
| 27:5-10 | OBJECTION: Vague; Relevance. | |
| 33:1-5 | OBJECTION: Vague; Relevance. | |
| 33:10-19 | OBJECTION: Vague; Relevance. | |
| 35:7-36:6 | OBJECTION: Vague; Speculative; Foundation; Calls for legal conclusion; Relevance. | |
| 36:7-13 | OBJECTION: Leading; ; Relevance. | |
| 36:20-37:4 | OBJECTION: Foundation; Vague; Relevance. | |
| 37:11-14 | OBJECTION: Relevance | |
| 38:3-15 | OBJECTION: Foundation; Argumentative; Vague. | |
| 38:17-39:9 | OBJECTION: Foundation; Argumentative; Vague. | |
| 39:12-40:14 | OBJECTION: Foundation; Argumentative; Vague; Relevance. | |
| 40:16-41:14 | OBJECTION:  Relevance; Confusing under 403. | |

-2-

00000447

| Page:Line | Objection | Counter-Designation |
|---|---|---|
| 41:15-22 | OBJECTION: Foundation; Vague; Argumentative. | |
| 42:2-20 | OBJECTION: Foundation; Relevance; Argumentative; Confusing under 403. | |
| 42:21-43:4 | OBJECTION: Foundation; Argumentative; Mischaracterizes prior testimony. | |
| 43:6-8 | OBJECTION: Foundation; Argumentative; Confusing under 403. | |
| 43:9-14 | OBJECTION: Argumentative; Foundation; Confusing under 403. | |
| 43:10-21 | OBJECTION: Argumentative; Foundation; Confusing under 403; Vague. | |
| 44:1-4 | OBJECTION: Argumentative; Relevance. | |
| 44:6-11 | OBJECTION: Argumentative; Foundation; Vague. | |
| 44:13-17 | OBJECTION: Argumentative; Relevance. | |
| 44:19-45:3 | OBJECTION: Argumentative; Relevance; Confusing under 403; Vague; Foundation. | |
| 46:5-46:11 | OBJECTION: Foundation; Vague; Calls for legal conclusion. | |
| 46:13-22 | OBJECTION: Attorney discussion - no question and answer; Relevance. | |

-3-

00000448

| Page:Line | Objection | Counter-Designation |
|---|---|---|
| 47:1-7 | OBJECTION: Vague; Foundation. | |
| 47:21-48:4 | OBJECTION: Vague; Foundation. | |
| 48:6-10 | OBJECTION: Vague; Foundation. | |
| 48:11-13 | OBJECTION: Vague; Foundation. | |
| 48:17-19 | OBJECTION: Vague; Argumentative. | |
| 48:20-49:5 | OBJECTION: Vague; Compound question. | |
| 52:1-7 | OBJECTION: Attorney discussion - no question and answer. | |
| 52:19-53:6 | OBJECTION: Vague; Compound; Calls for speculation; Mischaracterizes prior testimony. | |
| 53:8-11 | OBJECTION: Vague; Foundation. | |
| 53:13-17 | OBJECTION: Vague; Foundation. | |
| 54:9-17 | OBJECTION: Vague; Foundation; Calls for legal conclusion. | |
| 54:18-55:5 | OBJECTION: Argumentative; Vague; Relevance. | |
| 55:6-8 | OBJECTION: Vague; Relevance. | |
| 55:9-56:7 | OBJECTION: Vague; Foundation; Calls for legal conclusion; Relevance. | |

00000449

| Page:Line | Objection | Counter-Designation |
|---|---|---|
| 56:9-57:7 | OBJECTION: Vague; Foundation; Misstates prior testimony; Asked and answered; Relevance. | |
| 57:9-13 | OBJECTION: Vague; Relevance. | |
| 57:15-58:13 | OBJECTION: Vague; Relevance. | |
| 58:14-20 | OBJECTION: Vague; Mischaracterizes prior testimony; Argumentative; Foundation; Relevance. | |
| 58:22-60:1 | OBJECTION: Vague; Mischaracterizes prior testimony; Argumentative; Foundation; Relevance. | |
| 60:2-12 | OBJECTION: Vague; Mischaracterizes prior testimony; Argumentative; Foundation; Asked and answered; Relevance. | |
| 60:14-61:1 | OBJECTION: Vague; Argumentative; Asked and answered; Relevance. | |
| 61:3-16 | OBJECTION: Asked and answered; Vague; Foundation; Relevance. | |
| 61:18-22 | OBJECTION: Vague; Asked and answered; Relevance. | |
| 62:2-9 | OBJECTION: Vague; Leading; Foundation; Relevance. | |
| 62:11-21 | OBJECTION: Vague; Relevance. | |
| 63:1-21 | OBJECTION: Argumentative; Foundation; | |

-5-

00000450

| Page:Line | Objection | Counter-Designation |
|---|---|---|
| | Vague; Relevance. | |
| 64:1-6 | OBJECTION: Argumentative; Foundation; Vague; Relevance. | |
| 64:8-9 | OBJECTION: Vague; Relevance. | |
| 64:10-22 | OBJECTION: Vague; Relevance. | |
| 67:10-16 | OBJECTION: Vague; Compound; Calls for speculation; Relevance. | |
| 67:18-68:7 | OBJECTION: Vague; Compound; Calls for speculation; Relevance. | |
| 68:9-19 | OBJECTION: Vague; Calls for speculation; Relevance. | |
| 68:21-69:9 | OBJECTION: Vague; Calls for speculation; Relevance. | |
| 69:10-69:21 | OBJECTION: Vague; Relevance. | |
| 69:22-70:3 | OBJECTION: Vague; Relevance. | |
| 70:5-12 | OBJECTION: Vague; Relevance; Foundation. | |
| 70:13-19 | OBJECTION: Vague; Relevance; Foundation. | |
| 70:21-71:6 | OBJECTION: Vague; Relevance; Foundation; Calls for legal conclusion. | |
| 71:8-15 | OBJECTION: Vague; Argumentative; Foundation. | |
| 71:17-72:2 | OBJECTION: Asked and answered; Calls for legal conclusion; Foundation; Vague. | |

00000451

| Page:Line | Objection | Counter-Designation |
|---|---|---|
| 72:4-72:11 | OBJECTION: Vague; Foundation; Calls for legal conclusion. | |
| 72:13-21 | OBJECTION: Vague; Foundation; Calls for speculation; Calls for legal conclusion. | |
| 73:1-13 | OBJECTION; Vague; Calls for legal conclusion; Foundation. | |
| 73:14-74:1 | OBJECTION: Vague; Foundation; Calls for legal conclusion. | |
| 74:3-8 | OBJECTION: Vague; Calls for legal conclusion. | |
| 74:9-14 | OBJECTION: Vague; Foundation. | |
| 74:16-75:1 | OBJECTION: Vague; Calls for legal conclusion; Asked and answered. | |
| 75:3-8 | OBJECTION: Vague; Compound; Calls for legal conclusion. | |
| 75:10-13 | OBJECTION: Vague. | |
| 75:14-19 | OBJECTION: Vague; Leading; Calls for speculation. | |
| 76:7-13 | OBJECTION: Argumentative; Asked and answered. | |
| 76:15-77:4 | OBJECTION: Vague. | |
| 77:6-11 | OBJECTION: Vague; Compound. | |
| 77:12-14 | OBJECTION: Vague. | |
| 78:1-8 | OBJECTION: Vague. | |

-7-

00000452

| Page:Line | Objection | Counter-Designation |
|---|---|---|
| 78:10-20 | OBJECTION: Vague; Calls for speculation; Asked and answered; Foundation. | |
| 78:21-79:10 | OBJECTION: Argumentative; Asked and answered; Vague; Foundation; Calls for speculation. | |
| 79:12-21 | OBJECTION: Misstates prior testimony; Argumentative; Vague; Calls for legal conclusion. | |
| 80:1-7 | OBJECTION: Argumentative | |
| 80:9-12 | OBJECTION: Mischaracterizes the exhibit; Vague. | |
| 80:14-17 | OBJECTION: Leading; mischaracterizes the exhibit. | |
| 80:22-81:7 | OBJECTION: Leading; Vague; Calls for legal conclusion; Foundation. | |
| 81:9-18 | OBJECTION: Argumentative; Misstates and mischaracterizes prior testimony; Vague; Leading. | |
| 87:19-21 | OBJECTION: Designation is only to a partial answer and no question; Foundation; Calls for legal conclusion; Vague; Relevance. | |
| 94:8-95:16 | OBJECTION: 94:8-95:9 Designation is only to an answer and no question; Calls for legal conclusion.<br><br>OBJECTION: 95:9-16. Vague; Foundation. | 94:2-7 |

-8-

00000453

### III.    OBJECTIONS TO PLAINTIFF'S "ITEMIZATION OF DAMAGES"

Record Press also objects to Plaintiff's ongoing failure to itemize the damages Plaintiff seeks in this case. Pursuant to Local Rule 16.5, Plaintiff's Pre-Trial Statement was due on October 20, 2010 - 14 days in advance of the November 3, 2010 Pre-Trial Conference. Plaintiff failed to timely file serve a Pre-Trial Statement. Instead, Plaintiff waited until the day before the Pre-Trial Conference to file and serve a Pre-Trial Statement. At the November 4, 2010 Pre-Trial Conference, the Court indicated that the substance of Plaintiff's Pre-Trial Statement failed to comply with Local Rule 16.5. Among the deficiencies the Court found in Plaintiff's Pre-Trial Statement was Plaintiff's failure to provide an itemization of damages, including the monetary value thereof, as required by Local Rule 16.5(b)(1)(vii). The Court ordered Plaintiff to supplement his Pre-Trial Statement to correct this and other deficiencies by November 15, 2010. (Dkt. No. 52.) Plaintiff filed a supplemental Pre-Trial Statement on November 15, but has still not "set forth separately each element of damages, and the monetary amount thereof, that the [Plaintiff] claims to be entitled to recover" as the Local Rule requires. See L.R. 16.5(b)(1)(vii); 16.5(b)(8).

Plaintiff tries to excuse his failure to comply with the Court's November 4, 2010 Order by claiming that the "work is taking slightly longer than expected based on the non-sequential nature of the records." Record Press, however, produced the "records" Plaintiff is reviewing to calculate alleged damages nearly six months ago on May 24, 2010. The trial is set for December 21, 2010. Given Plaintiff's failure to timely serve a Pre-Trial Statement with the required itemization of damages and subsequent failure to supplement his Pre-Trial Statement with the required itemization of damages by the Court's November 15, 2010 deadline, Record Press still does not know how much in damages Plaintiff is seeking in this case. Thus, Record Press respectfully requests that Plaintiff be precluded from seeking any damages at trial.

-9-

Date:   November 22, 2010                    Respectfully submitted,

 /s/ John W. Lomas, Jr.
John G. Horan (DC Bar No. 417729)
William T. O'Brien (DC Bar No. 450891)
John W. Lomas, Jr. (DC Bar No. 976555)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C.  20006
Phone: (202) 496-7500
Facsimile: (202) 496-7756

Malcolm I. Lewin
MORRISON COHEN LLP
909 Third Avenue
New York, New York 10022
Phone: (212) 735-8600
Facsimile: (212)

*Attorneys for Defendant Record Press, Inc*.

-10-

00000455

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of November, 2010, the foregoing Defendant Record Press, Inc.'s Rule 26(a)(3) Objections was served via the Court's Electronic Filing System ("ECF") on:

> Tyler Jay King, Esq.
> Tyler Jay King Law
> 1400 K Street, N.W., Suite 706
> Washington, D.C.  20005
> Phone: (202) 436-2641
> tyler@tylerkinglaw.com
>
> Darrell C. Valdez, Esq.
> U.S. Attorney's Office
> Judiciary Center Building
> 555 Fourth Street
> Washington, DC 20530
> (202) 307-2843
> darrell.valdez@usdoj.gov

/s/ John W. Lomas, Jr.
John W. Lomas, Jr.

00000456

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES, ex rel.
BRIAN BURKE,

          PLAINTIFF,

    V.

RECORD PRESS, INC.,

        DEFENDANT

Civil Action No: 1:08-CV-00364 (EGS)

**PLAINTIFF BRIAN BURKE'S SECOND SUPPLEMENTAL PRE-TRIAL STATEMENT**

Plaintiff, Relator, Brian Burke ("Mr. Burke"), by and through its undersigned counsel, respectfully submits this Pre-Trial Statement pursuant to Local Rule 16.5 and Federal Rule of Civ. Proc. 26(a)(3).

I.   Statement of the Case

This case is about the overcharging of a line item in a contract (the "Contract") between the United States Government Printing Office ("GPO") and the Defendant, Record Press, Inc. ("Record Press"). The Contract unambiguously states that the price is $12.25 per 100 pages, per 10 copy running rate.

Record Press maintains that the Contract should be read contrary to its plain meaning and that the GPO agrees with this.

II.  Statement of Claims Made by Relator.

Mr. Burke asserts a violation of the False Claims Act, specifically 31 USC §3729(a)(1) and (a)(2).

III. Schedule of Witnesses to be Called by Relator

Mr. Burke plans to call the following witnesses at trial:

*1. Mr. Burke.*

1 of 5

00000457

Mr. Burke will testify that he received the invoices at issues in this matter as a result of his role in the *Brian T. Burke v. Donald L. Evans* ("Evans") matter, that he noted what appeared to be an excessively large line item charge, that he undertook to contact the GPO and Record Press to determine why the charge was so high, that in the course of his contacts he spoke with Mr. Calvin Adgerson, that Mr. Adgerson's representations regarding the per 10 copy running rate indicated that Record Press had overcharged for the relevant line item, that he, Mr. Burke, disputed the overcharges in the underlying *Evans* matter, and that the Government conceded to Mr. Burke's opposition to the overcharges.  Mr. Burk is expected to testify for 30 minutes.

   *2.  Mr. Hugh Wilmot.*

   Mr. Wilmot is expected to testify regarding the determination of prices in the Contract, the relationship between the work performed and the prices charged, and the agreements entered into between Record Press and the GPO.  Mr. Wilmot is expected to testify for 45 minutes.

   *3.  Mr. Calvin Adgerson.*

   Mr. Adgerson is expected to testify regarding the fact that Record Press was overcharging under the Contract, by failing to apply the per 10 copy running rate.  Mr. Adgerson is expected to testify for 25 minutes.

IV.   List of Exhibits to be offered in Evidence by Relator

Mr. Burke expects to offer the following exhibits at trial:

- Record Press's bid in response to the U.S. Government's Bid invitation for Program 1272-S, dated July 18, 2001.
- Record Press's bid in response to the U.S. Government's Bid Invitation for Program 2214-S, dated February 8th, 2006.

2 of 5

00000458

- Record Press Invoices under Program 1272-S, dated 2001 through 2005.
- Contract Modification transferring Program 1272 to 2231-S, dated September 29, 2005.
- Contract Modification extending Record Press's contract for Program 2231-S through October 31, 2006, dated September 5, 2006.
- Record Press invoices under Program 2231-S, dated January 2006.
- Record Press's bid in response to the U.S. Government's Bid Invitation Program 2231-S (October 18, 2006), not dated.
- Purchase Order accepting Record Press's bid for Program 2231-S, dated November 1, 2006.
- Record Press Invoices under Program 2231-S, dated November 20, 2006.
- Record Press Invoice #A71700, dated December 22, 2006.
- Record Press Invoice #A71701, dated December 22, 2006.
- Record Press Invoices under Program 2231-S, dated 2010.
- GPO spreadsheet for the November 1, 2006 to October 31, 2007 Term of Program 2231-S, not dated.
- GPO spreadsheet attached to Record Press's Rule 11 Motion.
- Declaration of Thomas Sullivan, United States Government Printing Office, In Support of Record Press, Inc.'s Motion for Summary Judgment dated June 30, 2010.
- Declaration of Calvin Adgerson, United States Government Printing Office, In Support of Record Press, Inc.'s Motion for Summary Judgment dated June 30, 2010.
- Itemized and Verified Bill of Costs for Case No. 06-1917-cv in the United States Court of Appeals for the Second Circuit dated June 21, 2007.

V.    Deposition Designations to be offered in Evidence by Relator

00000459

At this time, Mr. Burke intends to offer the following portions of the May 25th, 2010 deposition of Mr. Wilmot into evidence:  27:1 – 81:18; 87:19-21; 94:8 – 95:16.

## VI.   Itemization of Damages Relator Seeks to Recover.

Mr. Burke seeks damages for Record Press's overcharges under its contracts with the GPO.  The damages are equal to the amount charged in line item II(d) minus the amount which should have been charged by prorating the charge per 10 copies.

An itemized list of the invoices Record Press provided pursuant to Relator's document request, comprising invoices for which the disputed line item was charged, is attached as Exhibit A and demonstrates total damages of $527,122.10.

## VII. Request for other Relief Sought by Relator.

Mr. Burke seeks judgment in its favor and any other and further relief as the Court deems appropriate.

DATED:  December 14th, 2010

Respectfully Submitted,

**/s/**
_____
Tyler Jay King, Esq.
Bar No. 979592
1420 N ST NW #706
Washington, DC  20005
(202) 436-2641

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 14th, 2010, a copy of the foregoing was served by email to:

Darrell C. Valdez

John W. Lomas, Jr.

4 of 5

00000460

William T. O'Brien

Respectfully Submitted,

**/s/**

_____
Tyler Jay King, Esq.

00000461

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A68969 | 13 | 0 | 0.00 | | 0 |
| A68974 | 14 | 0 | 0.00 | | 0 |
| A68976 | 14 | 0 | 0.00 | | 0 |
| A69086 | 18 | 0 | 0.00 | | 0 |
| A69090 | 13 | 0 | 0.00 | | 0 |
| A69148 | 13 | 0 | 0.00 | | 0 |
| A69952 | 20 | 0 | 0.00 | | 0 |
| A70198 | 40 | 0 | 0.00 | | 0 |
| A71070 | 40 | 0 | 0.00 | | 0 |
| A71620 | 20 | 0 | 0.00 | | 0 |
| A75557 | 20 | 2.45 | 0.12 | 0.01225 | 2.205 |
| A76127 80367 | 10 | 13.48 | 1.35 | 0.1348 | 12.132 |
| A70185 | 15 | 18.38 | 1.23 | 0.122533333 | 16.542 |
| A71538 | 20 | 19.2 | 0.96 | 0.096 | 17.28 |
| A71628 | 30 | 22.05 | 0.74 | 0.0735 | 19.845 |
| A68966 | 20 | 22.05 | 1.10 | 0.11025 | 19.845 |
| A68967 | 20 | 30 | 1.50 | 0.15 | 27 |
| A68968 | 20 | 30 | 1.50 | 0.15 | 27 |
| A68970 | 20 | 30 | 1.50 | 0.15 | 27 |
| A68971 | 20 | 30 | 1.50 | 0.15 | 27 |
| A68972 | 20 | 30 | 1.50 | 0.15 | 27 |
| A68973 | 20 | 30 | 1.50 | 0.15 | 27 |
| A68975 | 20 | 30 | 1.50 | 0.15 | 27 |
| A68977 | 20 | 30 | 1.50 | 0.15 | 27 |
| A68978 | 20 | 30 | 1.50 | 0.15 | 27 |
| A68979 | 20 | 30 | 1.50 | 0.15 | 27 |
| A68980 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69071 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69072 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69073 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69074 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69075 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69077 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69078 | 20 | 30 | 1.50 | 0.15 | 27 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A69084 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69085 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69087 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69088 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69089 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69146 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69147 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69186 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69242 | 20 | 30 | 1.50 | 0.15 | 27 |
| A69140 | 20 | 38.4 | 1.92 | 0.192 | 34.56 |
| A73716 | 20 | 39.2 | 1.96 | 0.196 | 35.28 |
| A79973 | 15 | 40.43 | 2.70 | 0.269533333 | 36.387 |
| A70095 | 20 | 40.8 | 2.04 | 0.204 | 36.72 |
| A69076 | 14 | 42 | 3.00 | 0.3 | 37.8 |
| A68956 | 20 | 43.2 | 2.16 | 0.216 | 38.88 |
| A72313 | 20 | 44.1 | 2.21 | 0.2205 | 39.69 |
| A77033 | 20 | 44.1 | 2.21 | 0.2205 | 39.69 |
| A78385 | 1 | 44.22 | 44.22 | 4.422 | 39.798 |
| A78557 | 20 | 44.8 | 2.24 | 0.224 | 40.32 |
| A73674 | 20 | 46.55 | 2.33 | 0.23275 | 41.895 |
| A62975 | 30 | 46.8 | 1.56 | 0.156 | 42.12 |
| A71852 | 40 | 47.5 | 1.19 | 0.11875 | 42.75 |
| A69950 | 20 | 48 | 2.40 | 0.24 | 43.2 |
| A74008 | 20 | 49 | 2.45 | 0.245 | 44.1 |
| A71213 | 20 | 50.4 | 2.52 | 0.252 | 45.36 |
| A77588 | 20 | 51.45 | 2.57 | 0.25725 | 46.305 |
| A78063 | 20 | 51.45 | 2.57 | 0.25725 | 46.305 |
| A71532 | 20 | 53.9 | 2.70 | 0.2695 | 48.51 |
| A73883 | 40 | 53.9 | 1.35 | 0.13475 | 48.51 |
| A77490 | 40 | 53.9 | 1.35 | 0.13475 | 48.51 |
| A73724 | 20 | 56.35 | 2.82 | 0.28175 | 50.715 |
| A75556 | 20 | 56.35 | 2.82 | 0.28175 | 50.715 |
| A74312 | 22 | 56.6 | 2.57 | 0.257272727 | 50.94 |
| A70593 | 20 | 57.6 | 2.88 | 0.288 | 51.84 |
| A74889 | 40 | 58.8 | 1.47 | 0.147 | 52.92 |

Case 1:08-cv-00364-DAR   Document 55-1   Filed 12/14/10   Page 3 of 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies Damages | Damages |
|---|---|---|---|---|---|
| A80188 | 40 | 58.8 | 1.47 | 0.147 | 52.92 |
| A75547 | 20 | 61.25 | 3.06 | 0.30625 | 55.125 |
| A79176 | 20 | 61.25 | 3.06 | 0.30625 | 55.125 |
| A70346 | 20 | 62 | 3.10 | 0.31 | 55.8 |
| A69819 | 40 | 62.4 | 1.56 | 0.156 | 56.16 |
| A71009 | 20 | 62.4 | 3.12 | 0.312 | 56.16 |
| A71409 | 20 | 63.7 | 3.19 | 0.3185 | 57.33 |
| A72307 | 20 | 63.7 | 3.19 | 0.3185 | 57.33 |
| A72308 | 40 | 63.7 | 1.59 | 0.15925 | 57.33 |
| A73133 | 40 | 63.7 | 1.59 | 0.15925 | 57.33 |
| A75777 | 20 | 63.7 | 3.19 | 0.3185 | 57.33 |
| A69864 | 20 | 64.8 | 3.24 | 0.324 | 58.32 |
| A78563 | 20 | 65.8 | 3.29 | 0.329 | 59.22 |
| A70209 | 40 | 66 | 1.65 | 0.165 | 59.4 |
| A71534 | 20 | 66.15 | 3.31 | 0.33075 | 59.535 |
| A71938 | 20 | 66.15 | 3.31 | 0.33075 | 59.535 |
| A72004 | 20 | 66.15 | 3.31 | 0.33075 | 59.535 |
| A75707 | 30 | 66.15 | 2.21 | 0.2205 | 59.535 |
| A76718 | 30 | 66.15 | 2.21 | 0.2205 | 59.535 |
| A77885 | 20 | 66.15 | 3.31 | 0.33075 | 59.535 |
| A78192 | 30 | 66.15 | 2.21 | 0.2205 | 59.535 |
| A70874 | 20 | 67.2 | 3.36 | 0.336 | 60.48 |
| A76588 | 35 | 68.6 | 1.96 | 0.196 | 61.74 |
| A69142 | 20 | 69.6 | 3.48 | 0.348 | 62.64 |
| A69265 | 40 | 72 | 1.80 | 0.18 | 64.8 |
| A69379 | 20 | 72 | 3.60 | 0.36 | 64.8 |
| A71010 | 40 | 72 | 1.80 | 0.18 | 64.8 |
| A71940 | 40 | 73.4 | 1.84 | 0.1835 | 66.06 |
| A78062 | 40 | 73.5 | 1.84 | 0.18375 | 66.15 |
| A71395 | 20 | 75.95 | 3.80 | 0.37975 | 68.355 |
| A71547 | 20 | 75.95 | 3.80 | 0.37975 | 68.355 |
| A71549 | 20 | 75.95 | 3.80 | 0.37975 | 68.355 |
| A79007 | 20 | 75.95 | 3.80 | 0.37975 | 68.355 |
| A69872 | 40 | 76.8 | 1.92 | 0.192 | 69.12 |
| A70303 | 20 | 76.8 | 3.84 | 0.384 | 69.12 |

Case 1:08-cv-00364-DAR   Document 55-1   Filed 12/14/10   Page 4 of 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A70378 | 20 | 76.8 | 3.84 | 0.384 | 69.12 |
| A71168 | 20 | 76.8 | 3.84 | 0.384 | 69.12 |
| A71710 | 20 | 78.4 | 3.92 | 0.392 | 70.56 |
| A71857 | 40 | 78.4 | 1.96 | 0.196 | 70.56 |
| A73141 | 20 | 78.4 | 3.92 | 0.392 | 70.56 |
| A78056 | 40 | 78.4 | 1.96 | 0.196 | 70.56 |
| A79189 | 40 | 78.4 | 1.96 | 0.196 | 70.56 |
| A71001 | 20 | 79.2 | 3.96 | 0.396 | 71.28 |
| A72318 | 20 | 80.85 | 4.04 | 0.40425 | 72.765 |
| A73885 | 20 | 80.85 | 4.04 | 0.40425 | 72.765 |
| A69871 | 40 | 81.6 | 2.04 | 0.204 | 73.44 |
| A74487 | 20 | 83.3 | 4.17 | 0.4165 | 74.97 |
| A77029 | 40 | 83.3 | 2.08 | 0.20825 | 74.97 |
| A71006 | 20 | 84 | 4.20 | 0.42 | 75.6 |
| A71069 | 20 | 84 | 4.20 | 0.42 | 75.6 |
| A76452 | 20 | 85.75 | 4.29 | 0.42875 | 77.175 |
| A77483 | 20 | 85.75 | 4.29 | 0.42875 | 77.175 |
| A70210 | 40 | 86.4 | 2.16 | 0.216 | 77.76 |
| A74248 | 40 | 88.2 | 2.21 | 0.2205 | 79.38 |
| A74273 | 40 | 88.2 | 2.21 | 0.2205 | 79.38 |
| A76284 | 40 | 88.2 | 2.21 | 0.2205 | 79.38 |
| A76703 | 40 | 88.2 | 2.21 | 0.2205 | 79.38 |
| A77574 | 20 | 88.2 | 4.41 | 0.441 | 79.38 |
| A78055 | 40 | 88.2 | 2.21 | 0.2205 | 79.38 |
| A78378 | 40 | 88.2 | 2.21 | 0.2205 | 79.38 |
| A79363 | 30 | 88.2 | 2.94 | 0.294 | 79.38 |
| A79617 | 30 | 88.2 | 2.94 | 0.294 | 79.38 |
| A79800 | 30 | 88.2 | 2.94 | 0.294 | 79.38 |
| A70536 | 20 | 88.8 | 4.44 | 0.444 | 79.92 |
| A77020 | 20 | 90.65 | 4.53 | 0.45325 | 81.585 |
| A68870 | 20 | 91.2 | 4.56 | 0.456 | 82.08 |
| A70997 | 40 | 91.2 | 2.28 | 0.228 | 82.08 |
| A71106 | 20 | 91.2 | 4.56 | 0.456 | 82.08 |
| A76014 | 40 | 93.1 | 2.33 | 0.23275 | 83.79 |

00000465

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A77177 | 20 | 93.1 | 4.66 | 0.4655 | 83.79 |
| A77239 | 40 | 93.1 | 2.33 | 0.23275 | 83.79 |
| A77503 | 40 | 93.1 | 2.33 | 0.23275 | 83.79 |
| A77877 | 40 | 93.1 | 2.33 | 0.23275 | 83.79 |
| A77890 | 40 | 93.1 | 2.33 | 0.23275 | 83.79 |
| A78258 | 20 | 93.1 | 4.66 | 0.4655 | 83.79 |
| A78366 | 20 | 93.1 | 4.66 | 0.4655 | 83.79 |
| A78813 | 40 | 93.1 | 2.33 | 0.23275 | 83.79 |
| A79368 | 40 | 93.1 | 2.33 | 0.23275 | 83.79 |
| A79379 | 40 | 93.1 | 2.33 | 0.23275 | 83.79 |
| A74561 | 17 | 93.71 | 5.51 | 0.551235294 | 84.339 |
| A73618 | 20 | 95.55 | 4.78 | 0.47775 | 85.995 |
| A74185 | 20 | 95.55 | 4.78 | 0.47775 | 85.995 |
| A78556 | 30 | 95.55 | 3.19 | 0.3185 | 85.995 |
| A79004 | 20 | 95.55 | 4.78 | 0.47775 | 85.995 |
| A70082 | 40 | 96 | 2.40 | 0.24 | 86.4 |
| A71066 | 40 | 96 | 2.40 | 0.24 | 86.4 |
| A69270 | 30 | 97.2 | 3.24 | 0.324 | 87.48 |
| A72315 | 40 | 98 | 2.45 | 0.245 | 88.2 |
| A72666 | 40 | 98 | 2.45 | 0.245 | 88.2 |
| A73382 | 20 | 98 | 4.90 | 0.49 | 88.2 |
| A76104 | 40 | 98 | 2.45 | 0.245 | 88.2 |
| A77238 | 40 | 98 | 2.45 | 0.245 | 88.2 |
| A79784 | 40 | 98 | 2.45 | 0.245 | 88.2 |
| A70044 | 20 | 98.4 | 4.92 | 0.492 | 88.56 |
| A70538 | 20 | 98.4 | 4.92 | 0.492 | 88.56 |
| A78802 | 30 | 99.23 | 3.31 | 0.330766667 | 89.307 |
| A74129 | 20 | 100.45 | 5.02 | 0.50225 | 90.405 |
| A77488 | 20 | 100.45 | 5.02 | 0.50225 | 90.405 |
| A69062 | 40 | 100.8 | 2.52 | 0.252 | 90.72 |
| A69855 | 20 | 100.8 | 5.04 | 0.504 | 90.72 |
| A69860 | 40 | 100.8 | 2.52 | 0.252 | 90.72 |
| A70093 | 40 | 100.8 | 2.52 | 0.252 | 90.72 |
| A70852 | 20 | 100.8 | 5.04 | 0.504 | 90.72 |
| A71550 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |

Case 1:08-cv-00364-DAR   Document 55-1   Filed 12/14/10   Page 6 of 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A72151 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |
| A72543 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |
| A72667 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |
| A72736 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |
| A72796 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |
| A73694 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |
| A73697 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |
| A76797 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |
| A77886 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |
| A78809 | 40 | 102.9 | 2.57 | 0.25725 | 92.61 |
| A70597 | 20 | 103.2 | 5.16 | 0.516 | 92.88 |
| A72301 | 20 | 105.35 | 5.27 | 0.52675 | 94.815 |
| A68999 | 40 | 105.6 | 2.64 | 0.264 | 95.04 |
| A69131 | 40 | 105.6 | 2.64 | 0.264 | 95.04 |
| A69326 | 40 | 105.6 | 2.64 | 0.264 | 95.04 |
| A69662 | 40 | 105.6 | 2.64 | 0.264 | 95.04 |
| A69945 | 40 | 105.6 | 2.64 | 0.264 | 95.04 |
| A70041 | 40 | 105.6 | 2.64 | 0.264 | 95.04 |
| A70527 | 40 | 105.6 | 2.64 | 0.264 | 95.04 |
| A74116 | 40 | 105.6 | 2.64 | 0.264 | 95.04 |
| A78144 | 30 | 106.58 | 3.55 | 0.355266667 | 95.922 |
| A72053 | 20 | 107.8 | 5.39 | 0.539 | 97.02 |
| A73157 | 40 | 107.8 | 2.70 | 0.2695 | 97.02 |
| A73877 | 40 | 107.8 | 2.70 | 0.2695 | 97.02 |
| A74130 | 40 | 107.8 | 2.70 | 0.2695 | 97.02 |
| A74745 | 16 | 107.8 | 6.74 | 0.67375 | 97.02 |
| A76991 | 40 | 107.8 | 2.70 | 0.2695 | 97.02 |
| A77501 | 20 | 107.8 | 5.39 | 0.539 | 97.02 |
| A77892 | 20 | 107.8 | 5.39 | 0.539 | 97.02 |
| A78819 | 40 | 107.8 | 2.70 | 0.2695 | 97.02 |
| A80187 | 40 | 107.8 | 2.70 | 0.2695 | 97.02 |
| A72816 | 20 | 108.8 | 5.44 | 0.544 | 97.92 |
| A77235 | 20 | 110.25 | 5.51 | 0.55125 | 99.225 |
| A80184 | 20 | 110.25 | 5.51 | 0.55125 | 99.225 |
| A65940 | 40 | 110.4 | 2.76 | 0.276 | 99.36 |

00000467

USCA Case #14-7077   Document #1530697   Filed: 01/07/2015   Page 468 of 604

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A69362 | 40 | 110.4 | 2.76 | 0.276 | 99.36 |
| A70302 | 40 | 110.4 | 2.76 | 0.276 | 99.36 |
| A70995 | 40 | 110.4 | 2.76 | 0.276 | 99.36 |
| A71110 | 40 | 110.4 | 2.76 | 0.276 | 99.36 |
| A71169 | 40 | 110.4 | 2.76 | 0.276 | 99.36 |
| A71535 | 40 | 112.7 | 2.82 | 0.28175 | 101.43 |
| A76983 | 40 | 112.7 | 2.82 | 0.28175 | 101.43 |
| A77494 | 40 | 112.7 | 2.82 | 0.28175 | 101.43 |
| A79608 | 40 | 112.7 | 2.82 | 0.28175 | 101.43 |
| A79788 | 40 | 112.7 | 2.82 | 0.28175 | 101.43 |
| A70453 | 20 | 112.8 | 5.64 | 0.564 | 101.52 |
| A77527 | 10 | 113.93 | 11.39 | 1.1393 | 102.537 |
| A68859 | 40 | 115.2 | 2.88 | 0.288 | 103.68 |
| A69865 | 40 | 115.2 | 2.88 | 0.288 | 103.68 |
| A70085 | 40 | 115.2 | 2.88 | 0.288 | 103.68 |
| A70195 | 40 | 115.2 | 2.88 | 0.288 | 103.68 |
| A71065 | 40 | 115.2 | 2.88 | 0.288 | 103.68 |
| A71216 | 40 | 115.2 | 2.88 | 0.288 | 103.68 |
| A69374 | 20 | 117.6 | 5.88 | 0.588 | 105.84 |
| A71858 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A72652 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A74022 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A74274 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A74892 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A75356 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A75776 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A76847 | 20 | 117.6 | 5.88 | 0.588 | 105.84 |
| A77481 | 20 | 117.6 | 5.88 | 0.588 | 105.84 |
| A77492 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A77493 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A78061 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A78367 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A79006 | 30 | 117.6 | 3.92 | 0.392 | 105.84 |
| A79188 | 40 | 117.6 | 2.94 | 0.294 | 105.84 |
| A79614 | 30 | 117.6 | 3.92 | 0.392 | 105.84 |

00000468

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A70076 | 40 | 117.82 | 2.95 | 0.29455 | 106.038 |
| A69364 | 40 | 120 | 3.00 | 0.3 | 108 |
| A70206 | 40 | 120 | 3.00 | 0.3 | 108 |
| A70517 | 40 | 120 | 3.00 | 0.3 | 108 |
| A70518 | 40 | 120 | 3.00 | 0.3 | 108 |
| A70528 | 40 | 120 | 3.00 | 0.3 | 108 |
| A70604 | 40 | 120 | 3.00 | 0.3 | 108 |
| A72304 | 20 | 120.05 | 6.00 | 0.60025 | 108.045 |
| A76705 | 20 | 120.05 | 6.00 | 0.60025 | 108.045 |
| A78474 | 20 | 120.05 | 6.00 | 0.60025 | 108.045 |
| A79596 | 20 | 120.05 | 6.00 | 0.60025 | 108.045 |
| A79616 | 40 | 120.05 | 3.00 | 0.300125 | 108.045 |
| A77163 | 30 | 121.28 | 4.04 | 0.404266667 | 109.152 |
| A71407 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A72316 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A72554 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A73056 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A73160 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A73374 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A73699 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A75659 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A75860 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A77060 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A77162 | 20 | 122.5 | 6.13 | 0.6125 | 110.25 |
| A77176 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A78054 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A79375 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A79598 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A79786 | 40 | 122.5 | 3.06 | 0.30625 | 110.25 |
| A75563 | 22 | 123.97 | 5.64 | 0.5635 | 111.573 |
| A69622 | 20 | 124.8 | 6.24 | 0.624 | 112.32 |
| A69649 | 40 | 124.8 | 3.12 | 0.312 | 112.32 |
| A69875 | 40 | 124.8 | 3.12 | 0.312 | 112.32 |
| A73334 | 20 | 124.95 | 6.25 | 0.62475 | 112.455 |
| A79008 | 30 | 124.95 | 4.17 | 0.4165 | 112.455 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A69873 | 20 | 127.2 | 6.36 | 0.636 | 114.48 |
| A70035 | 20 | 127.2 | 6.36 | 0.636 | 114.48 |
| A71399 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A71944 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A72738 | 30 | 127.4 | 4.25 | 0.424666667 | 114.66 |
| A73659 | 20 | 127.4 | 6.37 | 0.637 | 114.66 |
| A74272 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A74481 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A74485 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A74786 | 20 | 127.4 | 6.37 | 0.637 | 114.66 |
| A76846 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A77169 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A77231 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A77500 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A78259 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A78476 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A78808 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A78818 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A78994 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A78998 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A79183 | 20 | 127.4 | 6.37 | 0.637 | 114.66 |
| A79185 | 40 | 127.4 | 3.19 | 0.3185 | 114.66 |
| A73172 | 30 | 128.63 | 4.29 | 0.428766667 | 115.767 |
| A74643 | 30 | 128.63 | 4.29 | 0.428766667 | 115.767 |
| A78067 | 30 | 128.63 | 4.29 | 0.428766667 | 115.767 |
| A79972 | 30 | 128.63 | 4.29 | 0.428766667 | 115.767 |
| A68868 | 40 | 129.6 | 3.24 | 0.324 | 116.64 |
| A68935 | 40 | 129.6 | 3.24 | 0.324 | 116.64 |
| A69138 | 20 | 129.6 | 6.48 | 0.648 | 116.64 |
| A69667 | 40 | 129.6 | 3.24 | 0.324 | 116.64 |
| A70039 | 40 | 129.6 | 3.24 | 0.324 | 116.64 |
| A70079 | 30 | 129.6 | 4.32 | 0.432 | 116.64 |
| A70187 | 40 | 129.6 | 3.24 | 0.324 | 116.64 |
| A70512 | 40 | 129.6 | 3.24 | 0.324 | 116.64 |
| A70871 | 40 | 129.6 | 3.24 | 0.324 | 116.64 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A71145 | 40 | 129.6 | 3.24 | 0.324 | 116.64 |
| A71392 | 20 | 129.85 | 6.49 | 0.64925 | 116.865 |
| A74251 | 20 | 129.85 | 6.49 | 0.64925 | 116.865 |
| A74893 | 20 | 129.85 | 6.49 | 0.64925 | 116.865 |
| A77326 | 20 | 129.85 | 6.49 | 0.64925 | 116.865 |
| A75554 | 41 | 130.59 | 3.19 | 0.318512195 | 117.531 |
| A70999 | 20 | 132 | 6.60 | 0.66 | 118.8 |
| A71128 | 20 | 132 | 6.60 | 0.66 | 118.8 |
| A72058 | 40 | 132.3 | 3.31 | 0.33075 | 119.07 |
| A72673 | 40 | 132.3 | 3.31 | 0.33075 | 119.07 |
| A73701 | 40 | 132.3 | 3.31 | 0.33075 | 119.07 |
| A74611 | 20 | 132.3 | 6.62 | 0.6615 | 119.07 |
| A74739 | 40 | 132.3 | 3.31 | 0.33075 | 119.07 |
| A75326 | 40 | 132.3 | 3.31 | 0.33075 | 119.07 |
| A76124 | 40 | 132.3 | 3.31 | 0.33075 | 119.07 |
| A77888 | 40 | 132.3 | 3.31 | 0.33075 | 119.07 |
| A78260 | 40 | 132.3 | 3.31 | 0.33075 | 119.07 |
| A78993 | 40 | 132.3 | 3.31 | 0.33075 | 119.07 |
| A78995 | 40 | 132.3 | 3.31 | 0.33075 | 119.07 |
| A79797 | 20 | 132.3 | 6.62 | 0.6615 | 119.07 |
| A69122 | 40 | 134.4 | 3.36 | 0.336 | 120.96 |
| A69377 | 40 | 134.4 | 3.36 | 0.336 | 120.96 |
| A69863 | 40 | 134.4 | 3.36 | 0.336 | 120.96 |
| A70301 | 40 | 134.4 | 3.36 | 0.336 | 120.96 |
| A70474 | 40 | 134.4 | 3.36 | 0.336 | 120.96 |
| A70514 | 40 | 134.4 | 3.36 | 0.336 | 120.96 |
| A70535 | 40 | 134.4 | 3.36 | 0.336 | 120.96 |
| A72547 | 20 | 134.75 | 6.74 | 0.67375 | 121.275 |
| A76716 | 20 | 134.75 | 6.74 | 0.67375 | 121.275 |
| A79372 | 20 | 134.75 | 6.74 | 0.67375 | 121.275 |
| A75706 | 30 | 135.98 | 4.53 | 0.453266667 | 122.382 |
| A79175 | 30 | 135.98 | 4.53 | 0.453266667 | 122.382 |
| A70094 | 20 | 136.8 | 6.84 | 0.684 | 123.12 |
| A71629 | 40 | 137.2 | 3.43 | 0.343 | 123.48 |
| A71631 | 40 | 137.2 | 3.43 | 0.343 | 123.48 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A72050 | 40 | 137.2 | 3.43 | 0.343 | 123.48 |
| A73346 | 40 | 137.2 | 3.43 | 0.343 | 123.48 |
| A74376 | 40 | 137.2 | 3.43 | 0.343 | 123.48 |
| A74787 | 40 | 137.2 | 3.43 | 0.343 | 123.48 |
| A75961 | 20 | 137.2 | 6.86 | 0.686 | 123.48 |
| A76291 | 40 | 137.2 | 3.43 | 0.343 | 123.48 |
| A77030 | 40 | 137.2 | 3.43 | 0.343 | 123.48 |
| A79001 | 20 | 137.2 | 6.86 | 0.686 | 123.48 |
| A79789 | 40 | 137.2 | 3.43 | 0.343 | 123.48 |
| A79975 | 40 | 137.2 | 3.43 | 0.343 | 123.48 |
| A68991 | 40 | 139.2 | 3.48 | 0.348 | 125.28 |
| A69606 | 40 | 139.2 | 3.48 | 0.348 | 125.28 |
| A69611 | 40 | 139.2 | 3.48 | 0.348 | 125.28 |
| A69841 | 40 | 139.2 | 3.48 | 0.348 | 125.28 |
| A69854 | 40 | 139.2 | 3.48 | 0.348 | 125.28 |
| A69854 | 40 | 139.2 | 3.48 | 0.348 | 125.28 |
| A70073 | 40 | 139.2 | 3.48 | 0.348 | 125.28 |
| A70084 | 40 | 139.2 | 3.48 | 0.348 | 125.28 |
| A70382 | 20 | 139.2 | 6.96 | 0.696 | 125.28 |
| A70524 | 40 | 139.2 | 3.48 | 0.348 | 125.28 |
| A71217 | 40 | 139.2 | 3.48 | 0.348 | 125.28 |
| A71544 | 20 | 139.65 | 6.98 | 0.69825 | 125.685 |
| A74197 | 20 | 139.65 | 6.98 | 0.69825 | 125.685 |
| A77889 | 20 | 139.65 | 6.98 | 0.69825 | 125.685 |
| A79618 | 30 | 139.65 | 4.66 | 0.4655 | 125.685 |
| A79798 | 30 | 139.65 | 4.66 | 0.4655 | 125.685 |
| A71702 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A71861 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A72299 | 20 | 142.1 | 7.11 | 0.7105 | 127.89 |
| A72803 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A73354 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A74551 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A74614 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A75438 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A75558 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A75561 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A75774 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A75939 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A76585 | 20 | 142.1 | 7.11 | 0.7105 | 127.89 |
| A76796 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A77085 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A77085 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A79592 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| 80368 | 40 | 142.1 | 3.55 | 0.35525 | 127.89 |
| A72665 | 30 | 143.32 | 4.78 | 0.477733333 | 128.988 |
| A74497 | 30 | 143.33 | 4.78 | 0.477766667 | 128.997 |
| A79610 | 30 | 143.33 | 4.78 | 0.477766667 | 128.997 |
| A68863 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A68877 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A68955 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A69378 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A69648 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A69951 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A70083 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A70529 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A70598 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A70599 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A71014 | 40 | 144 | 3.60 | 0.36 | 129.6 |
| A72650 | 20 | 144.55 | 7.23 | 0.72275 | 130.095 |
| A76702 | 20 | 144.55 | 7.23 | 0.72275 | 130.095 |
| A77028 | 20 | 144.55 | 7.23 | 0.72275 | 130.095 |
| A78155 | 20 | 144.55 | 7.23 | 0.72275 | 130.095 |
| A71856 | 40 | 145 | 3.63 | 0.3625 | 130.5 |
| A71950 | 35 | 145.78 | 4.17 | 0.416514286 | 131.202 |
| A69176 | 20 | 146.4 | 7.32 | 0.732 | 131.76 |
| A70038 | 20 | 146.4 | 7.32 | 0.732 | 131.76 |
| A70092 | 20 | 146.4 | 7.32 | 0.732 | 131.76 |
| A71410 | 40 | 147 | 3.68 | 0.3675 | 132.3 |
| A72054 | 40 | 147 | 3.68 | 0.3675 | 132.3 |
| A73691 | 40 | 147 | 3.68 | 0.3675 | 132.3 |

00000473

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A73729 | 40 | 147 | 3.68 | 0.3675 | 132.3 |
| A76584 | 40 | 147 | 3.68 | 0.3675 | 132.3 |
| A77026 | 40 | 147 | 3.68 | 0.3675 | 132.3 |
| A77486 | 40 | 147 | 3.68 | 0.3675 | 132.3 |
| A78154 | 40 | 147 | 3.68 | 0.3675 | 132.3 |
| A78380 | 40 | 147 | 3.68 | 0.3675 | 132.3 |
| A79383 | 40 | 147 | 3.68 | 0.3675 | 132.3 |
| A80191 | 40 | 147 | 3.68 | 0.3675 | 132.3 |
| A69866 | 40 | 148.8 | 3.72 | 0.372 | 133.92 |
| A69949 | 40 | 148.8 | 3.72 | 0.372 | 133.92 |
| A70034 | 40 | 148.8 | 3.72 | 0.372 | 133.92 |
| A70046 | 40 | 148.8 | 3.72 | 0.372 | 133.92 |
| A70196 | 40 | 148.8 | 3.72 | 0.372 | 133.92 |
| A70853 | 40 | 148.8 | 3.72 | 0.372 | 133.92 |
| A71166 | 40 | 148.8 | 3.72 | 0.372 | 133.92 |
| A71215 | 40 | 148.8 | 3.72 | 0.372 | 133.92 |
| A73135 | 20 | 149.45 | 7.47 | 0.74725 | 134.505 |
| A75341 | 41 | 150.68 | 3.68 | 0.367512195 | 135.612 |
| A78798 | 30 | 150.68 | 5.02 | 0.502266667 | 135.612 |
| A71398 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A72003 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A72545 | 20 | 151.9 | 7.60 | 0.7595 | 136.71 |
| A72806 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A73700 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A73706 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A74488 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A74743 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A74748 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A74911 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A75027 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A75333 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A75660 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A76717 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A77524 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A79600 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |

00000474

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A79777 | 40 | 151.9 | 3.80 | 0.37975 | 136.71 |
| A68860 | 40 | 153.6 | 3.84 | 0.384 | 138.24 |
| A68992 | 40 | 153.6 | 3.84 | 0.384 | 138.24 |
| A69124 | 40 | 153.6 | 3.84 | 0.384 | 138.24 |
| A69497 | 40 | 153.6 | 3.84 | 0.384 | 138.24 |
| A69616 | 40 | 153.6 | 3.84 | 0.384 | 138.24 |
| A69663 | 40 | 153.6 | 3.84 | 0.384 | 138.24 |
| A69670 | 40 | 153.6 | 3.84 | 0.384 | 138.24 |
| A69844 | 20 | 153.6 | 7.68 | 0.768 | 138.24 |
| A69862 | 40 | 153.6 | 3.84 | 0.384 | 138.24 |
| A70996 | 40 | 153.6 | 3.84 | 0.384 | 138.24 |
| A71164 | 40 | 153.6 | 3.84 | 0.384 | 138.24 |
| A72550 | 20 | 154.35 | 7.72 | 0.77175 | 138.915 |
| A78368 | 20 | 154.35 | 7.72 | 0.77175 | 138.915 |
| A79599 | 20 | 154.35 | 7.72 | 0.77175 | 138.915 |
| A75440 | 41 | 155.7 | 3.80 | 0.379756098 | 140.13 |
| A69342 | 20 | 156 | 7.80 | 0.78 | 140.4 |
| A72059 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A72556 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A72647 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A73058 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A74195 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A74199 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A74891 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A74899 | 20 | 156.8 | 7.84 | 0.784 | 141.12 |
| A75031 | 20 | 156.8 | 7.84 | 0.784 | 141.12 |
| A77021 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A77353 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A77896 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A78150 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A78479 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A79369 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A80182 | 40 | 156.8 | 3.92 | 0.392 | 141.12 |
| A78146 | 30 | 158.03 | 5.27 | 0.526766667 | 142.227 |
| A78603 | 30 | 158.03 | 5.27 | 0.526766667 | 142.227 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A68998 | 40 | 158.4 | 3.96 | 0.396 | 142.56 |
| A69612 | 40 | 158.4 | 3.96 | 0.396 | 142.56 |
| A69837 | 40 | 158.4 | 3.96 | 0.396 | 142.56 |
| A69867 | 40 | 158.4 | 3.96 | 0.396 | 142.56 |
| A69869 | 40 | 158.4 | 3.96 | 0.396 | 142.56 |
| A70037 | 40 | 158.4 | 3.96 | 0.396 | 142.56 |
| A70075 | 40 | 158.4 | 3.96 | 0.396 | 142.56 |
| A70081 | 40 | 158.4 | 3.96 | 0.396 | 142.56 |
| A70202 | 40 | 158.4 | 3.96 | 0.396 | 142.56 |
| A70386 | 40 | 158.4 | 3.96 | 0.396 | 142.56 |
| A74126 | 25 | 159.25 | 6.37 | 0.637 | 143.325 |
| A74529 | 20 | 159.25 | 7.96 | 0.79625 | 143.325 |
| A74895 | 20 | 159.25 | 7.96 | 0.79625 | 143.325 |
| A75769 | 20 | 159.25 | 7.96 | 0.79625 | 143.325 |
| A75353 | 41 | 160.72 | 3.92 | 0.392 | 144.648 |
| A75712 | 41 | 160.72 | 3.92 | 0.392 | 144.648 |
| A75934 | 41 | 160.72 | 3.92 | 0.392 | 144.648 |
| A71402 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A71863 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A72804 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A73330 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A73335 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A73599 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A74194 | 20 | 161.7 | 8.09 | 0.8085 | 145.53 |
| A74310 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A75038 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A75710 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A76272 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A76371 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A77171 | 20 | 161.7 | 8.09 | 0.8085 | 145.53 |
| A77572 | 30 | 161.7 | 5.39 | 0.539 | 145.53 |
| A77576 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A78265 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |
| A79803 | 30 | 161.7 | 5.39 | 0.539 | 145.53 |
| A80178 | 40 | 161.7 | 4.04 | 0.40425 | 145.53 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A68938 | 40 | 163.2 | 4.08 | 0.408 | 146.88 |
| A69499 | 40 | 163.2 | 4.08 | 0.408 | 146.88 |
| A69608 | 40 | 163.2 | 4.08 | 0.408 | 146.88 |
| A69946 | 20 | 163.2 | 8.16 | 0.816 | 146.88 |
| A70854 | 40 | 163.2 | 4.08 | 0.408 | 146.88 |
| A71107 | 40 | 163.2 | 4.08 | 0.408 | 146.88 |
| A74489 | 20 | 164.15 | 8.21 | 0.82075 | 147.735 |
| A75434 | 20 | 164.15 | 8.21 | 0.82075 | 147.735 |
| A75704 | 30 | 165.38 | 5.51 | 0.551266667 | 148.842 |
| A76057 | 30 | 165.38 | 5.51 | 0.551266667 | 148.842 |
| A76293 | 30 | 165.38 | 5.51 | 0.551266667 | 148.842 |
| 80365 | 30 | 165.38 | 5.51 | 0.551266667 | 148.842 |
| A71551 | 20 | 166.6 | 8.33 | 0.833 | 149.94 |
| A72674 | 40 | 166.6 | 4.17 | 0.4165 | 149.94 |
| A72810 | 40 | 166.6 | 4.17 | 0.4165 | 149.94 |
| A74200 | 40 | 166.6 | 4.17 | 0.4165 | 149.94 |
| A77894 | 40 | 166.6 | 4.17 | 0.4165 | 149.94 |
| A78210 | 40 | 166.6 | 4.17 | 0.4165 | 149.94 |
| A78369 | 40 | 166.6 | 4.17 | 0.4165 | 149.94 |
| A78560 | 20 | 166.6 | 8.33 | 0.833 | 149.94 |
| A79378 | 20 | 166.6 | 8.33 | 0.833 | 149.94 |
| A79981 | 40 | 166.6 | 4.17 | 0.4165 | 149.94 |
| A80177 | 40 | 166.6 | 4.17 | 0.4165 | 149.94 |
| A69359 | 40 | 168 | 4.20 | 0.42 | 151.2 |
| A69361 | 40 | 168 | 4.20 | 0.42 | 151.2 |
| A70184 | 40 | 168 | 4.20 | 0.42 | 151.2 |
| A70205 | 20 | 168 | 8.40 | 0.84 | 151.2 |
| A70450 | 40 | 168 | 4.20 | 0.42 | 151.2 |
| A70858 | 40 | 168 | 4.20 | 0.42 | 151.2 |
| A71219 | 40 | 168 | 4.20 | 0.42 | 151.2 |
| A68952 | 18 | 168.48 | 9.36 | 0.936 | 151.632 |
| A71543 | 20 | 169.05 | 8.45 | 0.84525 | 152.145 |
| A79790 | 20 | 169.05 | 8.45 | 0.84525 | 152.145 |
| A71853 | 40 | 170 | 4.25 | 0.425 | 153 |
| A70993 | 20 | 170.4 | 8.52 | 0.852 | 153.36 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A71859 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A71860 | 20 | 171.5 | 8.58 | 0.8575 | 154.35 |
| A72548 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A72555 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A73377 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A74007 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A74379 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A75768 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A76289 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A77487 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A79591 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A79601 | 40 | 171.5 | 4.29 | 0.42875 | 154.35 |
| A76294 | 30 | 172.73 | 5.76 | 0.575766667 | 155.457 |
| A69000 | 40 | 172.8 | 4.32 | 0.432 | 155.52 |
| A69275 | 20 | 172.8 | 8.64 | 0.864 | 155.52 |
| A69842 | 20 | 172.8 | 8.64 | 0.864 | 155.52 |
| A69953 | 40 | 172.8 | 4.32 | 0.432 | 155.52 |
| A70305 | 40 | 172.8 | 4.32 | 0.432 | 155.52 |
| A71003 | 40 | 172.8 | 4.32 | 0.432 | 155.52 |
| A71013 | 40 | 172.8 | 4.32 | 0.432 | 155.52 |
| A71072 | 40 | 172.8 | 4.32 | 0.432 | 155.52 |
| A69654 | 20 | 175.2 | 8.76 | 0.876 | 157.68 |
| A75543 | 41 | 175.79 | 4.29 | 0.428756098 | 158.211 |
| A75657 | 41 | 175.79 | 4.29 | 0.428756098 | 158.211 |
| A71408 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A71541 | 20 | 176.4 | 8.82 | 0.882 | 158.76 |
| A72056 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A72671 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A73059 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A74486 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A75355 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A75439 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A75764 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A75864 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A76112 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |

Case 1:08-cv-00364-DAR    Document 55-1    Filed 12/14/10    Page 18 of 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A77174 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A78149 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A79365 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A79373 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A80189 | 40 | 176.4 | 4.41 | 0.441 | 158.76 |
| A62976 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A68996 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A68997 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A69141 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A69177 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A69324 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A70074 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A70353 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A70873 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A70877 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A71073 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A71167 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A71221 | 40 | 177.6 | 4.44 | 0.444 | 159.84 |
| A73956 | 20 | 178.85 | 8.94 | 0.89425 | 160.965 |
| A75351 | 20 | 178.85 | 8.94 | 0.89425 | 160.965 |
| A70860 | 20 | 180 | 9.00 | 0.9 | 162 |
| A76986 | 17 | 181.18 | 10.66 | 1.065764706 | 163.062 |
| A71864 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A71939 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A72305 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A73345 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A73348 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A73702 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A74482 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A75785 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A75933 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A76055 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A76714 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A77173 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A78477 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A78803 | 20 | 181.3 | 9.07 | 0.9065 | 163.17 |
| A78806 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A78997 | 20 | 181.3 | 9.07 | 0.9065 | 163.17 |
| A79359 | 20 | 181.3 | 9.07 | 0.9065 | 163.17 |
| A79371 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A79775 | 40 | 181.3 | 4.53 | 0.45325 | 163.17 |
| A70033 | 40 | 182.4 | 4.56 | 0.456 | 164.16 |
| A70869 | 40 | 182.4 | 4.56 | 0.456 | 164.16 |
| A73158 | 20 | 183.75 | 9.19 | 0.91875 | 165.375 |
| A75779 | 20 | 183.75 | 9.19 | 0.91875 | 165.375 |
| A73049 | 40 | 186.2 | 4.66 | 0.4655 | 167.58 |
| A73705 | 40 | 186.2 | 4.66 | 0.4655 | 167.58 |
| A75325 | 40 | 186.2 | 4.66 | 0.4655 | 167.58 |
| A76706 | 40 | 186.2 | 4.66 | 0.4655 | 167.58 |
| A77164 | 20 | 186.2 | 9.31 | 0.931 | 167.58 |
| A77183 | 20 | 186.2 | 9.31 | 0.931 | 167.58 |
| A78814 | 40 | 186.2 | 4.66 | 0.4655 | 167.58 |
| A68856 | 40 | 187.2 | 4.68 | 0.468 | 168.48 |
| A68871 | 40 | 187.2 | 4.68 | 0.468 | 168.48 |
| A69125 | 40 | 187.2 | 4.68 | 0.468 | 168.48 |
| A69328 | 40 | 187.2 | 4.68 | 0.468 | 168.48 |
| A69358 | 40 | 187.2 | 4.68 | 0.468 | 168.48 |
| A69845 | 40 | 187.2 | 4.68 | 0.468 | 168.48 |
| A70086 | 40 | 187.2 | 4.68 | 0.468 | 168.48 |
| A70521 | 40 | 187.2 | 4.68 | 0.468 | 168.48 |
| A79384 | 30 | 187.43 | 6.25 | 0.6247666667 | 168.687 |
| 80369 | 20 | 188.65 | 9.43 | 0.94325 | 169.785 |
| A71851 | 40 | 190 | 4.75 | 0.475 | 171 |
| A75338 | 41 | 190.86 | 4.66 | 0.465512195 | 171.774 |
| A71400 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A71709 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A73052 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A73139 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A74311 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A74804 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |

00000480

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A75030 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A75559 | 20 | 191.1 | 9.56 | 0.9555 | 171.99 |
| A75708 | 30 | 191.1 | 6.37 | 0.637 | 171.99 |
| A76109 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A76696 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A77102 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A77324 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A77526 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A78561 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A78807 | 20 | 191.1 | 9.56 | 0.9555 | 171.99 |
| A79003 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A79005 | 40 | 191.1 | 4.78 | 0.47775 | 171.99 |
| A79603 | 30 | 191.1 | 6.37 | 0.637 | 171.99 |
| 80364 | | | | | |
| A68866 | 40 | 192 | 4.80 | 0.48 | 172.8 |
| A69262 | 50 | 192 | 3.84 | 0.384 | 172.8 |
| A69613 | 40 | 192 | 4.80 | 0.48 | 172.8 |
| A69833 | 40 | 192 | 4.80 | 0.48 | 172.8 |
| A70045 | 40 | 192 | 4.80 | 0.48 | 172.8 |
| A70208 | 40 | 192 | 4.80 | 0.48 | 172.8 |
| A70513 | 40 | 192 | 4.80 | 0.48 | 172.8 |
| A71104 | 20 | 192 | 9.60 | 0.96 | 172.8 |
| A72648 | 20 | 193.55 | 9.68 | 0.96775 | 174.195 |
| A75772 | 21 | 195.51 | 9.31 | 0.931 | 175.959 |
| A75327 | 41 | 195.88 | 4.78 | 0.477756098 | 176.292 |
| A75983 | 41 | 195.88 | 4.78 | 0.477756098 | 176.292 |
| A76286 | 41 | 195.88 | 4.78 | 0.477756098 | 176.292 |
| A76287 | 41 | 195.88 | 4.78 | 0.477756098 | 176.292 |
| A71540 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A71942 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A72005 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A72799 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A73728 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A74247 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A74740 | 20 | 196 | 9.80 | 0.98 | 176.4 |

00000481

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A75022 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A75323 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A75545 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A76701 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A77031 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A77182 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A78057 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A78396 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A78810 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A79377 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A79607 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A79979 | 40 | 196 | 4.90 | 0.49 | 176.4 |
| A68901 | 40 | 196.8 | 4.92 | 0.492 | 177.12 |
| A69137 | 40 | 196.8 | 4.92 | 0.492 | 177.12 |
| A69858 | 40 | 196.8 | 4.92 | 0.492 | 177.12 |
| A70855 | 40 | 196.8 | 4.92 | 0.492 | 177.12 |
| A70878 | 40 | 196.8 | 4.92 | 0.492 | 177.12 |
| A75658 | 21 | 198.08 | 9.43 | 0.943238095 | 178.272 |
| A75784 | 20 | 198.45 | 9.92 | 0.99225 | 178.605 |
| A78397 | 20 | 198.45 | 9.92 | 0.99225 | 178.605 |
| A78471 | 30 | 198.45 | 6.62 | 0.6615 | 178.605 |
| A71626 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A71705 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A73053 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A73061 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A73063 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A73137 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A73987 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A74609 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A75036 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A76274 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A76451 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A77184 | 1640 | 200.9 | 0.12 | 0.01225 | 180.81 |
| A77323 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A78559 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |

00000482

Case 1:08-cv-00364-DAR Document 55-1 Filed 12/14/10 Page 22 of 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A79978 | 20 | 200.9 | 10.05 | 1.0045 | 180.81 |
| A79983 | 40 | 200.9 | 5.02 | 0.50225 | 180.81 |
| A69847 | 40 | 201.06 | 5.03 | 0.50265 | 180.954 |
| A69856 | 40 | 201.6 | 5.04 | 0.504 | 181.44 |
| A70090 | 40 | 201.6 | 5.04 | 0.504 | 181.44 |
| A71012 | 40 | 201.6 | 5.04 | 0.504 | 181.44 |
| A71126 | 20 | 201.6 | 10.08 | 1.008 | 181.44 |
| A73357 | 20 | 203.35 | 10.17 | 1.01675 | 183.015 |
| A71536 | 40 | 205.8 | 5.15 | 0.5145 | 185.22 |
| A72155 | 40 | 205.8 | 5.15 | 0.5145 | 185.22 |
| A73717 | 20 | 205.8 | 10.29 | 1.029 | 185.22 |
| A74196 | 40 | 205.8 | 5.15 | 0.5145 | 185.22 |
| A74309 | 40 | 205.8 | 5.15 | 0.5145 | 185.22 |
| A74735 | 40 | 205.8 | 5.15 | 0.5145 | 185.22 |
| A74741 | 40 | 205.8 | 5.15 | 0.5145 | 185.22 |
| A76372 | 40 | 205.8 | 5.15 | 0.5145 | 185.22 |
| A78570 | 40 | 205.8 | 5.15 | 0.5145 | 185.22 |
| A79376 | 40 | 205.8 | 5.15 | 0.5145 | 185.22 |
| A79611 | 30 | 205.8 | 6.86 | 0.686 | 185.22 |
| A79977 | 40 | 205.8 | 5.15 | 0.5145 | 185.22 |
| A75336 | 41 | 205.92 | 5.02 | 0.502243902 | 185.328 |
| A68954 | 40 | 206.4 | 5.16 | 0.516 | 185.76 |
| A69130 | 40 | 206.4 | 5.16 | 0.516 | 185.76 |
| A69331 | 40 | 206.4 | 5.16 | 0.516 | 185.76 |
| A69650 | 40 | 206.4 | 5.16 | 0.516 | 185.76 |
| A69870 | 20 | 206.4 | 10.32 | 1.032 | 185.76 |
| A71002 | 40 | 206.4 | 5.16 | 0.516 | 185.76 |
| A71212 | 40 | 208 | 5.20 | 0.52 | 187.2 |
| A74275 | 20 | 208.25 | 10.41 | 1.04125 | 187.425 |
| A71004 | 20 | 208.8 | 10.44 | 1.044 | 187.92 |
| A75766 | 40 | 208.8 | 5.22 | 0.522 | 187.92 |
| A78384 | 30 | 209.48 | 6.98 | 0.698266667 | 188.532 |
| A69263 | 50 | 210 | 4.20 | 0.42 | 189 |
| A72809 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A73878 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |

00000483

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A74132 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A74134 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A75984 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A76699 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A76711 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A77168 | 20 | 210.7 | 10.54 | 1.0535 | 189.63 |
| A77499 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A77882 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A78365 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A78996 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A79364 | 40 | 210.7 | 5.27 | 0.52675 | 189.63 |
| A75551 | 41 | 210.95 | 5.15 | 0.514512195 | 189.855 |
| A75555 | 41 | 210.95 | 5.15 | 0.514512195 | 189.855 |
| A68861 | 40 | 211.2 | 5.28 | 0.528 | 190.08 |
| A69133 | 40 | 211.2 | 5.28 | 0.528 | 190.08 |
| A69580 | 40 | 211.2 | 5.28 | 0.528 | 190.08 |
| A70091 | 40 | 211.2 | 5.28 | 0.528 | 190.08 |
| A70096 | 40 | 211.2 | 5.28 | 0.528 | 190.08 |
| A70188 | 40 | 211.2 | 5.28 | 0.528 | 190.08 |
| A70201 | 40 | 211.2 | 5.28 | 0.528 | 190.08 |
| A70994 | 40 | 211.2 | 5.28 | 0.528 | 190.08 |
| A75705 | 30 | 213.15 | 7.11 | 0.7105 | 191.835 |
| A76987 | 20 | 213.15 | 10.66 | 1.06575 | 191.835 |
| A77478 | 30 | 213.15 | 7.11 | 0.7105 | 191.835 |
| A70613 | 30 | 215 | 7.17 | 0.716666667 | 193.5 |
| A78815 | 20 | 215.05 | 10.75 | 1.07525 | 193.545 |
| A74480 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |
| A75340 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |
| A76698 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |
| A77234 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |
| A77322 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |
| A77881 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |
| A78152 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |
| A78472 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |
| A78562 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |

00000484

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A78566 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |
| A79594 | 40 | 215.6 | 5.39 | 0.539 | 194.04 |
| A75781 | 41 | 215.97 | 5.27 | 0.526756098 | 194.373 |
| A69861 | 40 | 216 | 5.40 | 0.54 | 194.4 |
| A71074 | 20 | 216 | 10.80 | 1.08 | 194.4 |
| A71113 | 40 | 216 | 5.40 | 0.54 | 194.4 |
| A72055 | 40 | 220 | 5.50 | 0.55 | 198 |
| A72670 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A73339 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A73342 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A73367 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A73882 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A74131 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A75318 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A77027 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A77032 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A77489 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A77495 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A77525 | 20 | 220.5 | 11.03 | 1.1025 | 198.45 |
| A78564 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A79791 | 40 | 220.5 | 5.51 | 0.55125 | 198.45 |
| A62973 | 40 | 220.8 | 5.52 | 0.552 | 198.72 |
| A69129 | 40 | 220.8 | 5.52 | 0.552 | 198.72 |
| A69610 | 40 | 220.8 | 5.52 | 0.552 | 198.72 |
| A69614 | 40 | 220.8 | 5.52 | 0.552 | 198.72 |
| A69852 | 40 | 220.8 | 5.52 | 0.552 | 198.72 |
| A70522 | 20 | 220.8 | 11.04 | 1.104 | 198.72 |
| A71112 | 40 | 220.8 | 5.52 | 0.552 | 198.72 |
| A72060 | 20 | 222.95 | 11.15 | 1.11475 | 200.655 |
| A78558 | 30 | 224.18 | 7.47 | 0.747266667 | 201.762 |
| A72153 | 40 | 225.4 | 5.64 | 0.5635 | 202.86 |
| A73138 | 40 | 225.4 | 5.64 | 0.5635 | 202.86 |
| A73704 | 40 | 225.4 | 5.64 | 0.5635 | 202.86 |
| A74418 | 40 | 225.4 | 5.64 | 0.5635 | 202.86 |
| A76704 | 40 | 225.4 | 5.64 | 0.5635 | 202.86 |

00000485

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A76710 | 40 | 225.4 | 5.64 | 0.5635 | 202.86 |
| A77237 | 40 | 225.4 | 5.64 | 0.5635 | 202.86 |
| A77484 | 40 | 225.4 | 5.64 | 0.5635 | 202.86 |
| A79370 | 40 | 225.4 | 5.64 | 0.5635 | 202.86 |
| A69339 | 40 | 225.6 | 5.64 | 0.564 | 203.04 |
| A70080 | 40 | 225.6 | 5.64 | 0.564 | 203.04 |
| A70299 | 40 | 225.6 | 5.64 | 0.564 | 203.04 |
| A70998 | 40 | 225.6 | 5.64 | 0.564 | 203.04 |
| A71068 | 40 | 225.6 | 5.64 | 0.564 | 203.04 |
| A71114 | 40 | 225.6 | 5.64 | 0.564 | 203.04 |
| A75352 | 41 | 226.01 | 5.51 | 0.551243902 | 203.409 |
| A75548 | 45 | 226.01 | 5.02 | 0.502244444 | 203.409 |
| A77876 | 30 | 227.85 | 7.60 | 0.7595 | 205.065 |
| A78395 | 30 | 227.85 | 7.60 | 0.7595 | 205.065 |
| A79615 | 30 | 227.85 | 7.60 | 0.7595 | 205.065 |
| A69859 | 20 | 228 | 11.40 | 1.14 | 205.2 |
| A73657 | 40 | 230.3 | 5.76 | 0.57575 | 207.27 |
| A74640 | 40 | 230.3 | 5.76 | 0.57575 | 207.27 |
| A74737 | 40 | 230.3 | 5.76 | 0.57575 | 207.27 |
| A74747 | 40 | 230.3 | 5.76 | 0.57575 | 207.27 |
| A75322 | 40 | 230.3 | 5.76 | 0.57575 | 207.27 |
| A75331 | 40 | 230.3 | 5.76 | 0.57575 | 207.27 |
| A76832 | 40 | 230.3 | 5.76 | 0.57575 | 207.27 |
| A77573 | 40 | 230.3 | 5.76 | 0.57575 | 207.27 |
| A79974 | 20 | 230.3 | 11.52 | 1.1515 | 207.27 |
| A69175 | 40 | 230.4 | 5.76 | 0.576 | 207.36 |
| A69512 | 40 | 230.4 | 5.76 | 0.576 | 207.36 |
| A69647 | 40 | 230.4 | 5.76 | 0.576 | 207.36 |
| A70042 | 40 | 230.4 | 5.76 | 0.576 | 207.36 |
| A70207 | 40 | 230.4 | 5.76 | 0.576 | 207.36 |
| A70304 | 40 | 230.4 | 5.76 | 0.576 | 207.36 |
| A70530 | 20 | 230.4 | 11.52 | 1.152 | 207.36 |
| A71008 | 40 | 230.4 | 5.76 | 0.576 | 207.36 |
| A80859 | 40 | 232.5 | 5.81 | 0.58125 | 209.25 |
| A79597 | 20 | 234.65 | 11.73 | 1.17325 | 211.185 |

00000486

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A71855 | 40 | 235 | 5.88 | 0.5875 | 211.5 |
| A68858 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A69174 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A70458 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A70876 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A71619 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A73358 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A73359 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A73695 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A74006 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A74021 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A74344 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A74565 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A77325 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A77575 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A79182 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A79184 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A79403 | 20 | 235.2 | 11.76 | 1.176 | 211.68 |
| A79605 | 40 | 235.2 | 5.88 | 0.588 | 211.68 |
| A75863 | 41 | 236.06 | 5.76 | 0.575756098 | 212.454 |
| A76123 | 41 | 236.06 | 5.76 | 0.575756098 | 212.454 |
| A77586 | 30 | 238.88 | 7.96 | 0.796266667 | 214.992 |
| A79401 | 30 | 238.88 | 7.96 | 0.796266667 | 214.992 |
| A68931 | 40 | 240 | 6.00 | 0.6 | 216 |
| A68994 | 40 | 240 | 6.00 | 0.6 | 216 |
| A69134 | 40 | 240 | 6.00 | 0.6 | 216 |
| A69139 | 40 | 240 | 6.00 | 0.6 | 216 |
| A70043 | 40 | 240 | 6.00 | 0.6 | 216 |
| A71554 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A71704 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A72549 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A74036 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A74057 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A74170 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A74639 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |

00000487

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A75320 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A78064 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A78565 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A78568 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A80174 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A80175 | 20 | 240.1 | 12.01 | 1.2005 | 216.09 |
| A80183 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| 80370 | 40 | 240.1 | 6.00 | 0.60025 | 216.09 |
| A75441 | 41 | 241.08 | 5.88 | 0.588 | 216.972 |
| A75963 | 20 | 242.55 | 12.13 | 1.21275 | 218.295 |
| A68855 | 40 | 244.8 | 6.12 | 0.612 | 220.32 |
| A69264 | 40 | 244.8 | 6.12 | 0.612 | 220.32 |
| A69375 | 40 | 244.8 | 6.12 | 0.612 | 220.32 |
| A70384 | 40 | 244.8 | 6.12 | 0.612 | 220.32 |
| A70456 | 40 | 244.8 | 6.12 | 0.612 | 220.32 |
| A70857 | 40 | 244.8 | 6.12 | 0.612 | 220.32 |
| A72675 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A73380 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A73656 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A74378 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A75032 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A75035 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A77167 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A77363 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A79000 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A79380 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A79414 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A80176 | 40 | 245 | 6.13 | 0.6125 | 220.5 |
| A75780 | 41 | 246.1 | 6.00 | 0.600243902 | 221.49 |
| A76276 | 41 | 246.1 | 6.00 | 0.600243902 | 221.49 |
| A76285 | 41 | 246.1 | 6.00 | 0.600243902 | 221.49 |
| A79799 | 30 | 246.23 | 8.21 | 0.820766667 | 221.607 |
| A74613 | 20 | 247.45 | 12.37 | 1.23725 | 222.705 |
| A75324 | 20 | 247.45 | 12.37 | 1.23725 | 222.705 |
| A77883 | 20 | 247.45 | 12.37 | 1.23725 | 222.705 |

Case 1:08-cv-00364-DAR   Document 55-1   Filed 12/14/10   Page 28 of 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A78805 | 20 | 247.45 | 12.37 | 1.23725 | 222.705 |
| A68869 | 40 | 249.6 | 6.24 | 0.624 | 224.64 |
| A68934 | 40 | 249.6 | 6.24 | 0.624 | 224.64 |
| A69653 | 40 | 249.6 | 6.24 | 0.624 | 224.64 |
| A70036 | 40 | 249.6 | 6.24 | 0.624 | 224.64 |
| A70258 | 40 | 249.6 | 6.24 | 0.624 | 224.64 |
| A70843 | 40 | 249.6 | 6.24 | 0.624 | 224.64 |
| A72045 | 40 | 249.9 | 6.25 | 0.62475 | 224.91 |
| A72152 | 40 | 249.9 | 6.25 | 0.62475 | 224.91 |
| A73416 | 20 | 249.9 | 12.50 | 1.2495 | 224.91 |
| A73600 | 40 | 249.9 | 6.25 | 0.62475 | 224.91 |
| A74037 | 40 | 249.9 | 6.25 | 0.62475 | 224.91 |
| A74553 | 40 | 249.9 | 6.25 | 0.62475 | 224.91 |
| A75321 | 40 | 249.9 | 6.25 | 0.62475 | 224.91 |
| A75938 | 40 | 249.9 | 6.25 | 0.62475 | 224.91 |
| A76105 | 40 | 249.9 | 6.25 | 0.62475 | 224.91 |
| A77199 | 40 | 249.9 | 6.25 | 0.62475 | 224.91 |
| A77327 | 40 | 249.9 | 6.25 | 0.62475 | 224.91 |
| A75347 | 41 | 251.13 | 6.13 | 0.612512195 | 226.017 |
| A70614 | 30 | 252 | 8.40 | 0.84 | 226.8 |
| A79360 | 30 | 253.58 | 8.45 | 0.845266667 | 228.222 |
| A69267 | 40 | 254.4 | 6.36 | 0.636 | 228.96 |
| A69325 | 40 | 254.4 | 6.36 | 0.636 | 228.96 |
| A70534 | 40 | 254.4 | 6.36 | 0.636 | 228.96 |
| A72311 | 40 | 254.8 | 6.37 | 0.637 | 229.32 |
| A72677 | 30 | 254.8 | 8.49 | 0.849333333 | 229.32 |
| A72680 | 30 | 254.8 | 8.49 | 0.849333333 | 229.32 |
| A72735 | 40 | 254.8 | 6.37 | 0.637 | 229.32 |
| A72956 | 40 | 254.8 | 6.37 | 0.637 | 229.32 |
| A73690 | 40 | 254.8 | 6.37 | 0.637 | 229.32 |
| A73873 | 40 | 254.8 | 6.37 | 0.637 | 229.32 |
| A74198 | 40 | 254.8 | 6.37 | 0.637 | 229.32 |
| A76269 | 40 | 254.8 | 6.37 | 0.637 | 229.32 |
| A78211 | 20 | 254.8 | 12.74 | 1.274 | 229.32 |
| A75703 | 30 | 257.25 | 8.58 | 0.8575 | 231.525 |

00000489

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A76270 | 21 | 257.25 | 12.25 | 1.225 | 231.525 |
| A73417 | 40 | 257.7 | 6.44 | 0.64425 | 231.93 |
| A70381 | 40 | 259.2 | 6.48 | 0.648 | 233.28 |
| A70537 | 40 | 259.2 | 6.48 | 0.648 | 233.28 |
| A70539 | 40 | 259.2 | 6.48 | 0.648 | 233.28 |
| A72052 | 40 | 259.7 | 6.49 | 0.64925 | 233.73 |
| A73344 | 40 | 259.7 | 6.49 | 0.64925 | 233.73 |
| A74912 | 40 | 259.7 | 6.49 | 0.64925 | 233.73 |
| A75354 | 40 | 259.7 | 6.49 | 0.64925 | 233.73 |
| A77170 | 40 | 259.7 | 6.49 | 0.64925 | 233.73 |
| A79179 | 40 | 259.7 | 6.49 | 0.64925 | 233.73 |
| A79180 | 40 | 259.7 | 6.49 | 0.64925 | 233.73 |
| A79782 | 40 | 259.7 | 6.49 | 0.64925 | 233.73 |
| A76125 | 30 | 260.93 | 8.70 | 0.869766667 | 234.837 |
| A76456 | 30 | 260.93 | 8.70 | 0.869766667 | 234.837 |
| A78145 | 30 | 260.93 | 8.70 | 0.869766667 | 234.837 |
| A68932 | 20 | 261.6 | 13.08 | 1.308 | 235.44 |
| A70601 | 20 | 261.6 | 13.08 | 1.308 | 235.44 |
| A70872 | 20 | 261.6 | 13.08 | 1.308 | 235.44 |
| A75346 | 20 | 262.15 | 13.11 | 1.31075 | 235.935 |
| A70204 | 40 | 264 | 6.60 | 0.66 | 237.6 |
| A70380 | 40 | 264 | 6.60 | 0.66 | 237.6 |
| A80185 | 40 | 264 | 6.60 | 0.66 | 237.6 |
| A71621 | 40 | 264.6 | 6.62 | 0.6615 | 238.14 |
| A71706 | 40 | 264.6 | 6.62 | 0.6615 | 238.14 |
| A71943 | 40 | 264.6 | 6.62 | 0.6615 | 238.14 |
| A73678 | 40 | 264.6 | 6.62 | 0.6615 | 238.14 |
| A74271 | 40 | 264.6 | 6.62 | 0.6615 | 238.14 |
| A74550 | 40 | 264.6 | 6.62 | 0.6615 | 238.14 |
| A77159 | 40 | 264.6 | 6.62 | 0.6615 | 238.14 |
| A77196 | 20 | 264.6 | 13.23 | 1.323 | 238.14 |
| A79982 | 40 | 264.6 | 6.62 | 0.6615 | 238.14 |
| A75560 | 41 | 266.19 | 6.49 | 0.649243902 | 239.571 |
| A70519 | 40 | 268 | 6.70 | 0.67 | 241.2 |
| A77878 | 30 | 268.28 | 8.94 | 0.894266667 | 241.452 |

00000490

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A79971 | 30 | 268.28 | 8.94 | 0.894266667 | 241.452 |
| A69179 | 40 | 268.8 | 6.72 | 0.672 | 241.92 |
| A69835 | 40 | 268.8 | 6.72 | 0.672 | 241.92 |
| A69669 | 40 | 268.8 | 6.72 | 0.672 | 241.92 |
| A70352 | 40 | 268.8 | 6.72 | 0.672 | 241.92 |
| A70377 | 40 | 268.8 | 6.72 | 0.672 | 241.92 |
| A71062 | 40 | 268.8 | 6.72 | 0.672 | 241.92 |
| A71529 | 40 | 269.5 | 6.74 | 0.67375 | 242.55 |
| A71548 | 40 | 269.5 | 6.74 | 0.67375 | 242.55 |
| A72150 | 40 | 269.5 | 6.74 | 0.67375 | 242.55 |
| A72546 | 40 | 269.5 | 6.74 | 0.67375 | 242.55 |
| A73378 | 20 | 269.5 | 13.48 | 1.3475 | 242.55 |
| A75900 | 40 | 269.5 | 6.74 | 0.67375 | 242.55 |
| A76111 | 40 | 269.5 | 6.74 | 0.67375 | 242.55 |
| A76120 | 40 | 269.5 | 6.74 | 0.67375 | 242.55 |
| A76453 | 40 | 269.5 | 6.74 | 0.67375 | 242.55 |
| A76708 | 40 | 269.5 | 6.74 | 0.67375 | 242.55 |
| A76842 | 20 | 269.5 | 13.48 | 1.3475 | 242.55 |
| A79781 | 20 | 269.5 | 13.48 | 1.3475 | 242.55 |
| A71936 | 40 | 270.3 | 6.76 | 0.67575 | 243.27 |
| A74610 | 20 | 271.95 | 13.60 | 1.35975 | 244.755 |
| A77304 | 20 | 271.95 | 13.60 | 1.35975 | 244.755 |
| A77578 | 20 | 271.95 | 13.60 | 1.35975 | 244.755 |
| A79177 | 30 | 271.95 | 9.07 | 0.9065 | 244.755 |
| A69816 | 40 | 273.6 | 6.84 | 0.684 | 246.24 |
| A69954 | 40 | 273.6 | 6.84 | 0.684 | 246.24 |
| A70383 | 40 | 273.6 | 6.84 | 0.684 | 246.24 |
| A70596 | 40 | 273.6 | 6.84 | 0.684 | 246.24 |
| A71016 | 20 | 273.6 | 13.68 | 1.368 | 246.24 |
| A72306 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A72310 | 20 | 274.4 | 13.72 | 1.372 | 246.96 |
| A72319 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A72807 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A72915 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A72954 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A73337 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A74612 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A74738 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A74894 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A75655 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A79187 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A79381 | 40 | 274.4 | 6.86 | 0.686 | 246.96 |
| A72957 | 20 | 275.25 | 13.76 | 1.37625 | 247.725 |
| A75654 | 41 | 276.24 | 6.74 | 0.673756098 | 248.616 |
| A76697 | 20 | 276.85 | 13.84 | 1.38425 | 249.165 |
| A69266 | 40 | 278.4 | 6.96 | 0.696 | 250.56 |
| A71537 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A71948 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A72154 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A72541 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A72544 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A72800 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A72811 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A73414 | 20 | 279.3 | 13.97 | 1.3965 | 251.37 |
| A74250 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A74731 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A75711 | 20 | 279.3 | 13.97 | 1.3965 | 251.37 |
| A76455 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A76715 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A77061 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A77175 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A78554 | 30 | 279.3 | 9.31 | 0.931 | 251.37 |
| A78581 | 30 | 279.3 | 9.31 | 0.931 | 251.37 |
| A79980 | 40 | 279.3 | 6.98 | 0.69825 | 251.37 |
| A75433 | 41 | 281.26 | 6.86 | 0.686 | 253.134 |
| A75861 | 41 | 281.26 | 6.86 | 0.686 | 253.134 |
| A76278 | 41 | 281.26 | 6.86 | 0.686 | 253.134 |
| A78555 | 30 | 282.98 | 9.43 | 0.943266667 | 254.682 |
| A69340 | 40 | 283.2 | 7.08 | 0.708 | 254.88 |
| A69849 | 40 | 283.2 | 7.08 | 0.708 | 254.88 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A70449 | 40 | 283.2 | 7.08 | 0.708 | 254.88 |
| A71067 | 40 | 283.2 | 7.08 | 0.708 | 254.88 |
| A71391 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A71539 | 30 | 284.2 | 9.47 | 0.947333333 | 255.78 |
| A72300 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A72813 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A73153 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A73338 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A74549 | 20 | 284.2 | 14.21 | 1.421 | 255.78 |
| A75339 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A76586 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A77303 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A77879 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A79367 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A79604 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A80172 | 40 | 284.2 | 7.11 | 0.7105 | 255.78 |
| A71220 | 20 | 285.6 | 14.28 | 1.428 | 257.04 |
| A76277 | 41 | 286.28 | 6.98 | 0.698243902 | 257.652 |
| A78381 | 30 | 286.65 | 9.56 | 0.9555 | 257.985 |
| A79613 | 20 | 286.65 | 14.33 | 1.43325 | 257.985 |
| A70875 | 40 | 287.59 | 7.19 | 0.718975 | 258.831 |
| A69063 | 30 | 288 | 9.60 | 0.96 | 259.2 |
| A69621 | 40 | 288 | 7.20 | 0.72 | 259.2 |
| A69820 | 40 | 288 | 7.20 | 0.72 | 259.2 |
| A70605 | 40 | 288 | 7.20 | 0.72 | 259.2 |
| A70850 | 20 | 288 | 14.40 | 1.44 | 259.2 |
| A73050 | 40 | 289.1 | 7.23 | 0.72275 | 260.19 |
| A74416 | 20 | 289.1 | 14.46 | 1.4455 | 260.19 |
| A75773 | 40 | 289.1 | 7.23 | 0.72275 | 260.19 |
| A76587 | 40 | 289.1 | 7.23 | 0.72275 | 260.19 |
| A78475 | 40 | 289.1 | 7.23 | 0.72275 | 260.19 |
| A79178 | 40 | 289.1 | 7.23 | 0.72275 | 260.19 |
| A79787 | 20 | 289.1 | 14.46 | 1.4455 | 260.19 |
| A79976 | 40 | 289.1 | 7.23 | 0.72275 | 260.19 |
| A77496 | 30 | 290.33 | 9.68 | 0.967766667 | 261.297 |

00000493

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A75024 | 41 | 291.31 | 7.11 | 0.710512195 | 262.179 |
| A69502 | 40 | 292.8 | 7.32 | 0.732 | 263.52 |
| A70525 | 40 | 292.8 | 7.32 | 0.732 | 263.52 |
| A71393 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A71533 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A71625 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A72317 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A73136 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A73360 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A73955 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A74401 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A74615 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A75549 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A79590 | 40 | 294 | 7.35 | 0.735 | 264.6 |
| A71633 | 20 | 296.45 | 14.82 | 1.48225 | 266.805 |
| A68936 | 40 | 297.6 | 7.44 | 0.744 | 267.84 |
| A69329 | 40 | 297.6 | 7.44 | 0.744 | 267.84 |
| A71030 | 40 | 297.6 | 7.44 | 0.744 | 267.84 |
| A71941 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A73881 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A74888 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A74897 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A75962 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A76107 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A76449 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A77084 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A78569 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A78816 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A79785 | 40 | 298.9 | 7.47 | 0.74725 | 269.01 |
| A79801 | 20 | 298.9 | 14.95 | 1.4945 | 269.01 |
| A74127 | 25 | 300.13 | 12.01 | 1.20052 | 270.117 |
| A75337 | 41 | 301.35 | 7.35 | 0.735 | 271.215 |
| A75437 | 41 | 301.35 | 7.35 | 0.735 | 271.215 |
| A78052 | 30 | 301.35 | 10.05 | 1.0045 | 271.215 |
| A78799 | 30 | 301.35 | 10.05 | 1.0045 | 271.215 |

00000494

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| 80366 | 20 | 301.35 | 15.07 | 1.50675 | 271.215 |
| A65941 | 40 | 302.4 | 7.56 | 0.756 | 272.16 |
| A68953 | 40 | 302.4 | 7.56 | 0.756 | 272.16 |
| A69609 | 40 | 302.4 | 7.56 | 0.756 | 272.16 |
| A70480 | 40 | 302.4 | 7.56 | 0.756 | 272.16 |
| A71111 | 40 | 302.4 | 7.56 | 0.756 | 272.16 |
| A75335 | 40 | 303.8 | 7.60 | 0.7595 | 273.42 |
| A77197 | 40 | 303.8 | 7.60 | 0.7595 | 273.42 |
| A65942 | 40 | 307.2 | 7.68 | 0.768 | 276.48 |
| A68867 | 40 | 307.2 | 7.68 | 0.768 | 276.48 |
| A69123 | 40 | 307.2 | 7.68 | 0.768 | 276.48 |
| A70077 | 40 | 307.2 | 7.68 | 0.768 | 276.48 |
| A71125 | 40 | 307.2 | 7.68 | 0.768 | 276.48 |
| A71623 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| A72676 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| A73156 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| A74009 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| A74528 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| A75562 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| A76707 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| A77365 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| A77891 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| A78364 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| A78804 | 40 | 308.7 | 7.72 | 0.77175 | 277.83 |
| 80371 | 20 | 308.7 | 15.44 | 1.5435 | 277.83 |
| A70856 | 40 | 312 | 7.80 | 0.78 | 280.8 |
| A71000 | 40 | 312 | 7.80 | 0.78 | 280.8 |
| A74402 | 30 | 313.6 | 10.45 | 1.045333333 | 282.24 |
| A76103 | 40 | 313.6 | 7.84 | 0.784 | 282.24 |
| A76106 | 20 | 313.6 | 15.68 | 1.568 | 282.24 |
| A78473 | 40 | 313.6 | 7.84 | 0.784 | 282.24 |
| A79609 | 40 | 313.6 | 7.84 | 0.784 | 282.24 |
| A76121 | 21 | 313.85 | 14.95 | 1.49452381 | 282.465 |
| A75901 | 20 | 316.05 | 15.80 | 1.58025 | 284.445 |
| A76108 | 20 | 316.05 | 15.80 | 1.58025 | 284.445 |

USCA Case #14-7077    Document #1530697    Filed: 01/07/2015    Page 496 of 604

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A75019 | 41 | 316.42 | 7.72 | 0.771756098 | 284.778 |
| A68930 | 40 | 316.8 | 7.92 | 0.792 | 285.12 |
| A69128 | 40 | 316.8 | 7.92 | 0.792 | 285.12 |
| A70040 | 40 | 316.8 | 7.92 | 0.792 | 285.12 |
| A70181 | 40 | 316.8 | 7.92 | 0.792 | 285.12 |
| A70379 | 40 | 316.8 | 7.92 | 0.792 | 285.12 |
| A70600 | 40 | 316.8 | 7.92 | 0.792 | 285.12 |
| A71405 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| A71530 | 20 | 318.5 | 15.93 | 1.5925 | 286.65 |
| A71947 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| A72309 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| A73140 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| A73333 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| A75023 | 20 | 318.5 | 15.93 | 1.5925 | 286.65 |
| A76101 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| A76369 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| A77023 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| A77229 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| A77482 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| 80372 | 40 | 318.5 | 7.96 | 0.79625 | 286.65 |
| A73336 | 20 | 320.95 | 16.05 | 1.60475 | 288.855 |
| A75021 | 41 | 321.44 | 7.84 | 0.784 | 289.296 |
| A62974 | 40 | 321.6 | 8.04 | 0.804 | 289.44 |
| A69832 | 40 | 321.6 | 8.04 | 0.804 | 289.44 |
| A69868 | 40 | 321.6 | 8.04 | 0.804 | 289.44 |
| A70376 | 40 | 321.6 | 8.04 | 0.804 | 289.44 |
| A70455 | 40 | 321.6 | 8.04 | 0.804 | 289.44 |
| A73055 | 40 | 323.4 | 8.09 | 0.8085 | 291.06 |
| A75034 | 40 | 323.4 | 8.09 | 0.8085 | 291.06 |
| A75553 | 40 | 323.4 | 8.09 | 0.8085 | 291.06 |
| A75770 | 40 | 323.4 | 8.09 | 0.8085 | 291.06 |
| A77230 | 40 | 323.4 | 8.09 | 0.8085 | 291.06 |
| A77887 | 40 | 323.4 | 8.09 | 0.8085 | 291.06 |
| A78193 | 20 | 323.4 | 16.17 | 1.617 | 291.06 |
| A78801 | 30 | 323.4 | 10.78 | 1.078 | 291.06 |

00000496

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A80173 | 40 | 323.4 | 8.09 | 0.8085 | 291.06 |
| A79361 | 20 | 325.85 | 16.29 | 1.62925 | 293.265 |
| A68865 | 40 | 326.4 | 8.16 | 0.816 | 293.76 |
| A68910 | 40 | 326.4 | 8.16 | 0.816 | 293.76 |
| A69848 | 40 | 326.4 | 8.16 | 0.816 | 293.76 |
| A70992 | 40 | 326.4 | 8.16 | 0.816 | 293.76 |
| A72047 | 40 | 328.3 | 8.21 | 0.82075 | 295.47 |
| A73897 | 40 | 328.3 | 8.21 | 0.82075 | 295.47 |
| A74415 | 40 | 328.3 | 8.21 | 0.82075 | 295.47 |
| A74555 | 40 | 328.3 | 8.21 | 0.82075 | 295.47 |
| A75350 | 40 | 328.3 | 8.21 | 0.82075 | 295.47 |
| A75899 | 40 | 328.3 | 8.21 | 0.82075 | 295.47 |
| A76370 | 40 | 328.3 | 8.21 | 0.82075 | 295.47 |
| A77161 | 40 | 328.3 | 8.21 | 0.82075 | 295.47 |
| A70072 | 20 | 328.8 | 16.44 | 1.644 | 295.92 |
| A77364 | 20 | 330.75 | 16.54 | 1.65375 | 297.675 |
| A69579 | 40 | 331.2 | 8.28 | 0.828 | 298.08 |
| A69839 | 40 | 331.2 | 8.28 | 0.828 | 298.08 |
| A70452 | 40 | 331.2 | 8.28 | 0.828 | 298.08 |
| A71005 | 40 | 331.2 | 8.28 | 0.828 | 298.08 |
| A71542 | 40 | 333.2 | 8.33 | 0.833 | 299.88 |
| A71945 | 40 | 333.2 | 8.33 | 0.833 | 299.88 |
| A72321 | 40 | 333.2 | 8.33 | 0.833 | 299.88 |
| A73698 | 40 | 333.2 | 8.33 | 0.833 | 299.88 |
| A77195 | 40 | 333.2 | 8.33 | 0.833 | 299.88 |
| A77479 | 40 | 333.2 | 8.33 | 0.833 | 299.88 |
| A80180 | 40 | 333.2 | 8.33 | 0.833 | 299.88 |
| A69127 | 40 | 336 | 8.40 | 0.84 | 302.4 |
| A70473 | 40 | 336 | 8.40 | 0.84 | 302.4 |
| A71639 | 40 | 338.1 | 8.45 | 0.84525 | 304.29 |
| A72955 | 40 | 338.1 | 8.45 | 0.84525 | 304.29 |
| A73075 | 20 | 338.1 | 16.91 | 1.6905 | 304.29 |
| A73077 | 40 | 338.1 | 8.45 | 0.84525 | 304.29 |
| A74484 | 40 | 338.1 | 8.45 | 0.84525 | 304.29 |
| A75334 | 40 | 338.1 | 8.45 | 0.84525 | 304.29 |

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A78613 | 40 | 338.1 | 8.45 | 0.84525 | 304.29 |
| A79002 | 40 | 338.1 | 8.45 | 0.84525 | 304.29 |
| A79186 | 40 | 338.1 | 8.45 | 0.84525 | 304.29 |
| A79776 | 40 | 338.1 | 8.45 | 0.84525 | 304.29 |
| A79793 | 12 | 338.1 | 28.18 | 2.8175 | 304.29 |
| A71854 | 40 | 340 | 8.50 | 0.85 | 306 |
| A70189 | 40 | 340.8 | 8.52 | 0.852 | 306.72 |
| A70454 | 40 | 340.8 | 8.52 | 0.852 | 306.72 |
| A70594 | 40 | 340.8 | 8.52 | 0.852 | 306.72 |
| A71063 | 40 | 340.8 | 8.52 | 0.852 | 306.72 |
| A75544 | 41 | 341.53 | 8.33 | 0.833 | 307.377 |
| A72815 | 40 | 343 | 8.58 | 0.8575 | 308.7 |
| A76056 | 40 | 343 | 8.58 | 0.8575 | 308.7 |
| A76709 | 40 | 343 | 8.58 | 0.8575 | 308.7 |
| A77360 | 40 | 343 | 8.58 | 0.8575 | 308.7 |
| A77577 | 40 | 343 | 8.58 | 0.8575 | 308.7 |
| A79792 | 40 | 343 | 8.58 | 0.8575 | 308.7 |
| A80192 | 30 | 343 | 11.43 | 1.143333333 | 308.7 |
| A69132 | 40 | 345.6 | 8.64 | 0.864 | 311.04 |
| A71115 | 40 | 345.6 | 8.64 | 0.864 | 311.04 |
| A71117 | 20 | 345.6 | 17.28 | 1.728 | 311.04 |
| A71397 | 40 | 347.9 | 8.70 | 0.86975 | 313.11 |
| A73598 | 40 | 347.9 | 8.70 | 0.86975 | 313.11 |
| A74133 | 40 | 347.9 | 8.70 | 0.86975 | 313.11 |
| A74641 | 8 | 347.9 | 43.49 | 4.34875 | 313.11 |
| A76448 | 40 | 347.9 | 8.70 | 0.86975 | 313.11 |
| A74377 | 20 | 350.35 | 17.52 | 1.75175 | 315.315 |
| A69178 | 40 | 350.4 | 8.76 | 0.876 | 315.36 |
| A76268 | 41 | 351.58 | 8.58 | 0.857512195 | 316.422 |
| A72049 | 40 | 352.8 | 8.82 | 0.882 | 317.52 |
| A72057 | 20 | 352.8 | 17.64 | 1.764 | 317.52 |
| A72681 | 40 | 352.8 | 8.82 | 0.882 | 317.52 |
| A72802 | 40 | 352.8 | 8.82 | 0.882 | 317.52 |
| A72817 | 30 | 352.8 | 11.76 | 1.176 | 317.52 |
| A73379 | 40 | 352.8 | 8.82 | 0.882 | 317.52 |

00000498

Case 1:08-cv-00364-DAR   Document 55-1   Filed 12/14/10   Page 38 of 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A73655 | 40 | 352.8 | 8.82 | 0.882 | 317.52 |
| A73703 | 40 | 352.8 | 8.82 | 0.882 | 317.52 |
| A73876 | 40 | 352.8 | 8.82 | 0.882 | 317.52 |
| A74805 | 40 | 352.8 | 8.82 | 0.882 | 317.52 |
| A78363 | 40 | 352.8 | 8.82 | 0.882 | 317.52 |
| A69674 | 40 | 355.2 | 8.88 | 0.888 | 319.68 |
| A70595 | 40 | 355.2 | 8.88 | 0.888 | 319.68 |
| A73054 | 20 | 355.25 | 17.76 | 1.77625 | 319.725 |
| A76273 | 41 | 356.6 | 8.70 | 0.869756098 | 320.94 |
| A69664 | 20 | 357.6 | 17.88 | 1.788 | 321.84 |
| A71627 | 40 | 357.7 | 8.94 | 0.89425 | 321.93 |
| A74896 | 40 | 357.7 | 8.94 | 0.89425 | 321.93 |
| A75435 | 40 | 357.7 | 8.94 | 0.89425 | 321.93 |
| A77086 | 40 | 357.7 | 8.94 | 0.89425 | 321.93 |
| A69064 | 40 | 360 | 9.00 | 0.9 | 324 |
| A70088 | 40 | 360 | 9.00 | 0.9 | 324 |
| A72320 | 20 | 362.5 | 18.13 | 1.8125 | 326.25 |
| A72798 | 40 | 362.6 | 9.07 | 0.9065 | 326.34 |
| A73048 | 40 | 362.6 | 9.07 | 0.9065 | 326.34 |
| A73060 | 40 | 362.6 | 9.07 | 0.9065 | 326.34 |
| A73134 | 40 | 362.6 | 9.07 | 0.9065 | 326.34 |
| A73731 | 40 | 362.6 | 9.07 | 0.9065 | 326.34 |
| A73898 | 40 | 362.6 | 9.07 | 0.9065 | 326.34 |
| A75778 | 40 | 362.6 | 9.07 | 0.9065 | 326.34 |
| A79602 | 40 | 362.6 | 9.07 | 0.9065 | 326.34 |
| A70320 | 40 | 364.8 | 9.12 | 0.912 | 328.32 |
| A70851 | 40 | 364.8 | 9.12 | 0.912 | 328.32 |
| A70985 | 40 | 364.8 | 9.12 | 0.912 | 328.32 |
| A71214 | 40 | 364.8 | 9.12 | 0.912 | 328.32 |
| A74380 | 20 | 367.5 | 18.38 | 1.8375 | 330.75 |
| A74483 | 40 | 367.5 | 9.19 | 0.91875 | 330.75 |
| A69126 | 40 | 369.6 | 9.24 | 0.924 | 332.64 |
| A69850 | 40 | 369.6 | 9.24 | 0.924 | 332.64 |
| A70837 | 40 | 369.6 | 9.24 | 0.924 | 332.64 |
| A71390 | 20 | 369.95 | 18.50 | 1.84975 | 332.955 |

00000499

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A71531 | 40 | 372.4 | 9.31 | 0.931 | 335.16 |
| A71700 | 40 | 372.4 | 9.31 | 0.931 | 335.16 |
| A72814 | 20 | 372.4 | 18.62 | 1.862 | 335.16 |
| A76712 | 20 | 372.4 | 18.62 | 1.862 | 335.16 |
| A76990 | 40 | 372.4 | 9.31 | 0.931 | 335.16 |
| A78379 | 40 | 372.4 | 9.31 | 0.931 | 335.16 |
| A78572 | 40 | 372.4 | 9.31 | 0.931 | 335.16 |
| A78811 | 40 | 372.4 | 9.31 | 0.931 | 335.16 |
| A69853 | 40 | 374.4 | 9.36 | 0.936 | 336.96 |
| A71061 | 40 | 374.4 | 9.36 | 0.936 | 336.96 |
| A76102 | 21 | 375.59 | 17.89 | 1.78852381 | 338.031 |
| A76283 | 21 | 375.59 | 17.89 | 1.78852381 | 338.031 |
| A75026 | 41 | 376.69 | 9.19 | 0.918756098 | 339.021 |
| A72668 | 40 | 377.3 | 9.43 | 0.94325 | 339.57 |
| A72805 | 40 | 377.3 | 9.43 | 0.94325 | 339.57 |
| A73673 | 40 | 377.3 | 9.43 | 0.94325 | 339.57 |
| A73734 | 40 | 377.3 | 9.43 | 0.94325 | 339.57 |
| A74169 | 40 | 377.3 | 9.43 | 0.94325 | 339.57 |
| A75020 | 40 | 377.3 | 9.43 | 0.94325 | 339.57 |
| A77059 | 40 | 377.3 | 9.43 | 0.94325 | 339.57 |
| A78257 | 40 | 377.3 | 9.43 | 0.94325 | 339.57 |
| A69846 | 20 | 379.2 | 18.96 | 1.896 | 341.28 |
| A69846 | 20 | 379.2 | 18.96 | 1.896 | 341.28 |
| A71624 | 20 | 379.75 | 18.99 | 1.89875 | 341.775 |
| A76450 | 41 | 381.71 | 9.31 | 0.931 | 343.539 |
| A72156 | 20 | 382.2 | 19.11 | 1.911 | 343.98 |
| A76713 | 40 | 382.2 | 9.56 | 0.9555 | 343.98 |
| A76989 | 20 | 382.2 | 19.11 | 1.911 | 343.98 |
| A68876 | 40 | 384 | 9.60 | 0.96 | 345.6 |
| A71946 | 20 | 384.65 | 19.23 | 1.92325 | 346.185 |
| A70190 | 20 | 386.4 | 19.32 | 1.932 | 347.76 |
| A75028 | 41 | 386.73 | 9.43 | 0.943243902 | 348.057 |
| A75775 | 41 | 386.73 | 9.43 | 0.943243902 | 348.057 |
| A73062 | 40 | 387.1 | 9.68 | 0.96775 | 348.39 |
| A73076 | 40 | 387.1 | 9.68 | 0.96775 | 348.39 |

00000500

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A74135 | 40 | 387.1 | 9.68 | 0.96775 | 348.39 |
| A74554 | 40 | 387.1 | 9.68 | 0.96775 | 348.39 |
| A77172 | 40 | 387.1 | 9.68 | 0.96775 | 348.39 |
| A79593 | 20 | 387.1 | 19.36 | 1.9355 | 348.39 |
| A76275 | 21 | 388.45 | 18.50 | 1.849761905 | 349.605 |
| A71011 | 40 | 388.8 | 9.72 | 0.972 | 349.92 |
| A77088 | 20 | 389.55 | 19.48 | 1.94775 | 350.595 |
| A70300 | 20 | 391.2 | 19.56 | 1.956 | 352.08 |
| A72006 | 40 | 392 | 9.80 | 0.98 | 352.8 |
| A72801 | 40 | 392 | 9.80 | 0.98 | 352.8 |
| A77018 | 40 | 392 | 9.80 | 0.98 | 352.8 |
| A79589 | 40 | 392 | 9.80 | 0.98 | 352.8 |
| A69874 | 40 | 393.6 | 9.84 | 0.984 | 354.24 |
| A71703 | 40 | 396.9 | 9.92 | 0.99225 | 357.21 |
| A72797 | 40 | 396.9 | 9.92 | 0.99225 | 357.21 |
| A73051 | 20 | 396.9 | 19.85 | 1.9845 | 357.21 |
| A73415 | 40 | 396.9 | 9.92 | 0.99225 | 357.21 |
| A73619 | 40 | 396.9 | 9.92 | 0.99225 | 357.21 |
| A73653 | 40 | 396.9 | 9.92 | 0.99225 | 357.21 |
| A73413 | 40 | 401.8 | 10.05 | 1.0045 | 361.62 |
| A76282 | 40 | 401.8 | 10.05 | 1.0045 | 361.62 |
| A78058 | 20 | 401.8 | 20.09 | 2.009 | 361.62 |
| A80171 | 40 | 401.8 | 10.05 | 1.0045 | 361.62 |
| A80179 | 20 | 401.8 | 20.09 | 2.009 | 361.62 |
| A69268 | 40 | 403.2 | 10.08 | 1.008 | 362.88 |
| A69372 | 40 | 403.2 | 10.08 | 1.008 | 362.88 |
| A71545 | 20 | 404.25 | 20.21 | 2.02125 | 363.825 |
| A76985 | 20 | 404.25 | 20.21 | 2.02125 | 363.825 |
| A73363 | 40 | 406.7 | 10.17 | 1.01675 | 366.03 |
| A74020 | 40 | 406.7 | 10.17 | 1.01675 | 366.03 |
| A75546 | 40 | 406.7 | 10.17 | 1.01675 | 366.03 |
| A70385 | 40 | 408 | 10.20 | 1.02 | 367.2 |
| A78060 | 20 | 409.15 | 20.46 | 2.04575 | 368.235 |
| A73386 | 40 | 411.6 | 10.29 | 1.029 | 370.44 |
| A74193 | 40 | 411.6 | 10.29 | 1.029 | 370.44 |

00000501

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A75037 | 40 | 411.6 | 10.29 | 1.029 | 370.44 |
| A77893 | 40 | 411.6 | 10.29 | 1.029 | 370.44 |
| A69651 | 20 | 412.8 | 20.64 | 2.064 | 371.52 |
| A70523 | 40 | 412.8 | 10.32 | 1.032 | 371.52 |
| A74249 | 20 | 414.05 | 20.70 | 2.07025 | 372.645 |
| A76054 | 40 | 416.5 | 10.41 | 1.04125 | 374.85 |
| A75767 | 21 | 416.75 | 19.85 | 1.98452381 | 375.075 |
| A70515 | 40 | 417.6 | 10.44 | 1.044 | 375.84 |
| A71071 | 20 | 417.6 | 20.88 | 2.088 | 375.84 |
| A78614 | 20 | 418.95 | 20.95 | 2.09475 | 377.055 |
| A73908 | 40 | 421.4 | 10.54 | 1.0535 | 379.26 |
| A74736 | 40 | 421.4 | 10.54 | 1.0535 | 379.26 |
| A75661 | 40 | 421.4 | 10.54 | 1.0535 | 379.26 |
| A73692 | 41 | 421.89 | 10.29 | 1.029 | 379.701 |
| A68939 | 40 | 422.4 | 10.56 | 1.056 | 380.16 |
| A71630 | 40 | 426.3 | 10.66 | 1.06575 | 383.67 |
| A74220 | 40 | 426.3 | 10.66 | 1.06575 | 383.67 |
| A74726 | 40 | 426.3 | 10.66 | 1.06575 | 383.67 |
| A77875 | 30 | 426.3 | 14.21 | 1.421 | 383.67 |
| A69498 | 20 | 427.2 | 21.36 | 2.136 | 384.48 |
| A69615 | 40 | 427.2 | 10.68 | 1.068 | 384.48 |
| A70089 | 40 | 427.2 | 10.68 | 1.068 | 384.48 |
| A74783 | 40 | 431.2 | 10.78 | 1.078 | 388.08 |
| A77884 | 40 | 431.2 | 10.78 | 1.078 | 388.08 |
| A78567 | 40 | 431.2 | 10.78 | 1.078 | 388.08 |
| A70078 | 40 | 432 | 10.80 | 1.08 | 388.8 |
| A71108 | 80 | 432 | 5.40 | 0.54 | 388.8 |
| A71127 | 40 | 432 | 10.80 | 1.08 | 388.8 |
| A76288 | 21 | 432.18 | 20.58 | 2.058 | 388.962 |
| A73654 | 20 | 433.65 | 21.68 | 2.16825 | 390.285 |
| A73654 | 20 | 433.65 | 21.68 | 2.16825 | 390.285 |
| A77017 | 50 | 434.88 | 8.70 | 0.86976 | 391.392 |
| A72314 | 40 | 436.1 | 10.90 | 1.09025 | 392.49 |
| A74890 | 40 | 436.1 | 10.90 | 1.09025 | 392.49 |
| A73057 | 40 | 441 | 11.03 | 1.1025 | 396.9 |

00000502

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A79796 | 40 | 441 | 11.03 | 1.1025 | 396.9 |
| A68857 | 40 | 441.6 | 11.04 | 1.104 | 397.44 |
| A69271 | 40 | 441.6 | 11.04 | 1.104 | 397.44 |
| A70602 | 40 | 441.6 | 11.04 | 1.104 | 397.44 |
| A76271 | 41 | 441.98 | 10.78 | 1.078 | 397.782 |
| A73341 | 20 | 443.45 | 22.17 | 2.21725 | 399.105 |
| A75782 | 20 | 443.45 | 22.17 | 2.21725 | 399.105 |
| A77895 | 20 | 443.45 | 22.17 | 2.21725 | 399.105 |
| A77362 | 20 | 445.9 | 22.30 | 2.2295 | 401.31 |
| A77587 | 40 | 445.9 | 11.15 | 1.11475 | 401.31 |
| A78065 | 40 | 445.9 | 11.15 | 1.11475 | 401.31 |
| A79780 | 40 | 445.9 | 11.15 | 1.11475 | 401.31 |
| A71394 | 40 | 448.35 | 11.21 | 1.120875 | 403.515 |
| A72157 | 30 | 450.8 | 15.03 | 1.502666667 | 405.72 |
| A73362 | 40 | 450.8 | 11.27 | 1.127 | 405.72 |
| A74381 | 40 | 450.8 | 11.27 | 1.127 | 405.72 |
| A70592 | 40 | 451.2 | 11.28 | 1.128 | 406.08 |
| A75862 | 41 | 452.03 | 11.03 | 1.102512195 | 406.827 |
| A71632 | 40 | 455.7 | 11.39 | 1.13925 | 410.13 |
| A74128 | 40 | 455.7 | 11.39 | 1.13925 | 410.13 |
| A77485 | 40 | 455.7 | 11.39 | 1.13925 | 410.13 |
| A77480 | 40 | 460.6 | 11.52 | 1.1515 | 414.54 |
| A69274 | 40 | 464.4 | 11.61 | 1.161 | 417.96 |
| A71105 | 40 | 464.64 | 11.62 | 1.1616 | 418.176 |
| A74552 | 100 | 465.5 | 4.66 | 0.4655 | 418.95 |
| A74749 | 40 | 465.5 | 11.64 | 1.16375 | 418.95 |
| A69851 | 20 | 468 | 23.40 | 2.34 | 421.2 |
| A69947 | 40 | 470.4 | 11.76 | 1.176 | 423.36 |
| A71162 | 40 | 470.4 | 11.76 | 1.176 | 423.36 |
| A73879 | 40 | 470.4 | 11.76 | 1.176 | 423.36 |
| A77502 | 40 | 470.4 | 11.76 | 1.176 | 423.36 |
| A73361 | 20 | 472.85 | 23.64 | 2.36425 | 425.565 |
| A69843 | 40 | 475.2 | 11.88 | 1.188 | 427.68 |
| A71389 | 40 | 475.3 | 11.88 | 1.18825 | 427.77 |
| A72649 | 40 | 475.3 | 11.88 | 1.18825 | 427.77 |

00000503

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A75332 | 20 | 475.3 | 23.77 | 2.3765 | 427.77 |
| A79984 | 40 | 475.3 | 11.88 | 1.18825 | 427.77 |
| A76290 | 21 | 481.06 | 22.91 | 2.290761905 | 432.954 |
| A68862 | 40 | 484.8 | 12.12 | 1.212 | 436.32 |
| A72808 | 40 | 490 | 12.25 | 1.225 | 441 |
| A73620 | 25 | 490 | 19.60 | 1.96 | 441 |
| A75029 | 20 | 490 | 24.50 | 2.45 | 441 |
| A72651 | 40 | 494.9 | 12.37 | 1.23725 | 445.41 |
| A75319 | 40 | 494.9 | 12.37 | 1.23725 | 445.41 |
| A75985 | 20 | 497.35 | 24.87 | 2.48675 | 447.615 |
| A73693 | 40 | 498.3 | 12.46 | 1.24575 | 448.47 |
| A65938 | 40 | 499.2 | 12.48 | 1.248 | 449.28 |
| A72048 | 40 | 504.7 | 12.62 | 1.26175 | 454.23 |
| A72552 | 20 | 504.7 | 25.24 | 2.5235 | 454.23 |
| A74548 | 40 | 504.7 | 12.62 | 1.26175 | 454.23 |
| A74742 | 40 | 504.7 | 12.62 | 1.26175 | 454.23 |
| A79595 | 40 | 504.7 | 12.62 | 1.26175 | 454.23 |
| A79802 | 20 | 516.95 | 25.85 | 2.58475 | 465.255 |
| A76292 | 30 | 518.18 | 17.27 | 1.727266667 | 466.362 |
| A70849 | 40 | 518.4 | 12.96 | 1.296 | 466.56 |
| A74642 | 8 | 520.38 | 65.05 | 6.50475 | 468.342 |
| A69834 | 20 | 520.8 | 26.04 | 2.604 | 468.72 |
| A71949 | 60 | 521.85 | 8.70 | 0.86975 | 469.665 |
| A74784 | 20 | 521.85 | 26.09 | 2.60925 | 469.665 |
| A75898 | 20 | 521.85 | 26.09 | 2.60925 | 469.665 |
| A69272 | 40 | 523.2 | 13.08 | 1.308 | 470.88 |
| A76984 | 40 | 524.3 | 13.11 | 1.31075 | 471.87 |
| A73676 | 40 | 529.2 | 13.23 | 1.323 | 476.28 |
| A74527 | 40 | 529.2 | 13.23 | 1.323 | 476.28 |
| A75897 | 40 | 529.2 | 13.23 | 1.323 | 476.28 |
| A71401 | 40 | 534.1 | 13.35 | 1.33525 | 480.69 |
| A73074 | 40 | 534.1 | 13.35 | 1.33525 | 480.69 |
| A73884 | 40 | 534.1 | 13.35 | 1.33525 | 480.69 |
| A74562 | 40 | 539 | 13.48 | 1.3475 | 485.1 |
| A80181 | 20 | 539 | 26.95 | 2.695 | 485.1 |

00000504

Case 1:08-cv-00364-DAR    Document 55-1    Filed 12/14/10    Page 44 of 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies Damages | Damages |
|---|---|---|---|---|---|
| A80186 | 20 | 543.9 | 27.20 | 2.7195 | 489.51 |
| A69330 | 20 | 552 | 27.60 | 2.76 | 496.8 |
| A75937 | 41 | 552.48 | 13.48 | 1.347512195 | 497.232 |
| A72046 | 20 | 556.15 | 27.81 | 2.78075 | 500.535 |
| A7022 | 20 | 556.15 | 27.81 | 2.78075 | 500.535 |
| A73349 | 40 | 558.6 | 13.97 | 1.3965 | 502.74 |
| A74746 | 12 | 558.6 | 46.55 | 4.655 | 502.74 |
| A74498 | 30 | 558.6 | 18.62 | 1.862 | 502.74 |
| A78153 | 20 | 558.6 | 27.93 | 2.793 | 502.74 |
| A69500 | 20 | 559.2 | 27.96 | 2.796 | 503.28 |
| A79374 | 20 | 563.5 | 28.18 | 2.8175 | 507.15 |
| A69273 | 20 | 564 | 28.20 | 2.82 | 507.6 |
| A71064 | 20 | 571.2 | 28.56 | 2.856 | 514.08 |
| A78480 | 20 | 583.1 | 29.16 | 2.9155 | 524.79 |
| A68911 | 20 | 588 | 29.40 | 2.94 | 529.2 |
| A70259 | 40 | 588 | 14.70 | 1.47 | 529.2 |
| A69144 | 40 | 590.4 | 14.76 | 1.476 | 531.36 |
| A72553 | 40 | 592.9 | 14.82 | 1.48225 | 533.61 |
| A70516 | 20 | 600 | 30.00 | 3 | 540 |
| A71622 | 20 | 600.25 | 30.01 | 3.00125 | 540.225 |
| A73601 | 20 | 600.25 | 30.01 | 3.00125 | 540.225 |
| A72298 | 40 | 602.7 | 15.07 | 1.50675 | 542.43 |
| A74343 | 40 | 602.7 | 15.07 | 1.50675 | 542.43 |
| A78386 | 1 | 603.31 | 603.31 | 60.331 | 542.979 |
| A70343 | 40 | 604.8 | 15.12 | 1.512 | 544.32 |
| A71165 | 40 | 604.8 | 15.12 | 1.512 | 544.32 |
| A75765 | 21 | 607.11 | 28.91 | 2.891 | 546.399 |
| A74725 | 20 | 610.05 | 30.50 | 3.05025 | 549.045 |
| A69840 | 20 | 612 | 30.60 | 3.06 | 550.8 |
| A79366 | 40 | 612.5 | 15.31 | 1.53125 | 551.25 |
| A75865 | 41 | 612.75 | 14.95 | 1.494512195 | 551.475 |
| A76126 | 40 | 617.3 | 15.43 | 1.54325 | 555.57 |
| A71862 | 40 | 617.4 | 15.44 | 1.5435 | 555.66 |
| A75709 | 30 | 621.08 | 20.70 | 2.070266667 | 558.972 |
| A78571 | 20 | 622.3 | 31.12 | 3.1115 | 560.07 |

00000505

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A69836 | 20 | 626.4 | 31.32 | 3.132 | 563.76 |
| A75656 | 10 | 627.2 | 62.72 | 6.272 | 564.48 |
| A72672 | 20 | 629.65 | 31.48 | 3.14825 | 566.685 |
| A72303 | 40 | 632.1 | 15.80 | 1.58025 | 568.89 |
| A74913 | 75 | 633.94 | 8.45 | 0.845253333 | 570.546 |
| A76110 | 20 | 646.8 | 32.34 | 3.234 | 582.12 |
| A79385 | 20 | 646.8 | 32.34 | 3.234 | 582.12 |
| A74744 | 11 | 650.84 | 59.17 | 5.916727273 | 585.756 |
| A77232 | 20 | 651.7 | 32.59 | 3.2585 | 586.53 |
| A72551 | 40 | 661.5 | 16.54 | 1.65375 | 595.35 |
| A73418 | 20 | 661.5 | 33.08 | 3.3075 | 595.35 |
| A75936 | 20 | 663.95 | 33.20 | 3.31975 | 597.555 |
| A74898 | 20 | 668.85 | 33.44 | 3.34425 | 601.965 |
| A75033 | 20 | 673.75 | 33.69 | 3.36875 | 606.375 |
| A71396 | 40 | 676.2 | 16.91 | 1.6905 | 608.58 |
| A68875 | 40 | 676.8 | 16.92 | 1.692 | 609.12 |
| A69503 | 40 | 681.6 | 17.04 | 1.704 | 613.44 |
| A72737 | 20 | 683.55 | 34.18 | 3.41775 | 615.195 |
| A78059 | 40 | 686 | 17.15 | 1.715 | 617.4 |
| A78817 | 20 | 688.45 | 34.42 | 3.44225 | 619.605 |
| A76700 | 40 | 695.8 | 17.40 | 1.7395 | 626.22 |
| A70186 | 40 | 696 | 17.40 | 1.74 | 626.4 |
| A71634 | 40 | 700.7 | 17.52 | 1.75175 | 630.63 |
| A73369 | 40 | 700.7 | 17.52 | 1.75175 | 630.63 |
| A74023 | 40 | 700.7 | 17.52 | 1.75175 | 630.63 |
| A74125 | 40 | 700.7 | 17.52 | 1.75175 | 630.63 |
| A72542 | 20 | 703.15 | 35.16 | 3.51575 | 632.835 |
| A70182 | 20 | 708 | 35.40 | 3.54 | 637.2 |
| A73727 | 20 | 708.05 | 35.40 | 3.54025 | 637.245 |
| A73351 | 40 | 710.5 | 17.76 | 1.77625 | 639.45 |
| A79382 | 20 | 712.95 | 35.65 | 3.56475 | 641.655 |
| A69269 | 20 | 715.2 | 35.76 | 3.576 | 643.68 |
| A69821 | 20 | 717.6 | 35.88 | 3.588 | 645.84 |
| A70520 | 20 | 720 | 36.00 | 3.6 | 648 |
| A73352 | 40 | 720.3 | 18.01 | 1.80075 | 648.27 |

00000506

Case 1:08-cv-00364-DAR   Document 55-1   Filed 12/14/10   Page 46 of 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A73909 | 20 | 722.75 | 36.14 | 3.61375 | 650.475 |
| A69948 | 20 | 727.2 | 36.36 | 3.636 | 654.48 |
| A77024 | 40 | 735 | 18.38 | 1.8375 | 661.5 |
| A69671 | 20 | 736.8 | 36.84 | 3.684 | 663.12 |
| A69672 | 20 | 736.8 | 36.84 | 3.684 | 663.12 |
| A74303 | 20 | 742.35 | 37.12 | 3.71175 | 668.115 |
| A68937 | 20 | 756 | 37.80 | 3.78 | 680.4 |
| A70344 | 20 | 756 | 37.80 | 3.78 | 680.4 |
| A68993 | 20 | 758.4 | 37.92 | 3.792 | 682.56 |
| A73340 | 40 | 759.5 | 18.99 | 1.89875 | 683.55 |
| A75859 | 20 | 761.95 | 38.10 | 3.80975 | 685.755 |
| A71222 | 20 | 772.8 | 38.64 | 3.864 | 695.52 |
| A73658 | 20 | 774.2 | 38.71 | 3.871 | 696.78 |
| A78066 | 40 | 774.2 | 19.36 | 1.9355 | 696.78 |
| A78999 | 20 | 779.1 | 38.96 | 3.8955 | 701.19 |
| A69338 | 20 | 780 | 39.00 | 3.9 | 702 |
| A73347 | 40 | 784 | 19.60 | 1.96 | 705.6 |
| A78148 | 20 | 784 | 39.20 | 3.92 | 705.6 |
| A70200 | 20 | 784.4 | 39.22 | 3.922 | 705.96 |
| A74417 | 20 | 786.45 | 39.32 | 3.93225 | 707.805 |
| A75858 | 40 | 788.9 | 19.72 | 1.97225 | 710.01 |
| A73170 | 30 | 790.13 | 26.34 | 2.633766667 | 711.117 |
| A70199 | 40 | 792 | 19.80 | 1.98 | 712.8 |
| A76988 | 40 | 803.6 | 20.09 | 2.009 | 723.24 |
| A69360 | 20 | 816 | 40.80 | 4.08 | 734.4 |
| A75025 | 41 | 818.67 | 19.97 | 1.996756098 | 736.803 |
| A71163 | 20 | 825.6 | 41.28 | 4.128 | 743.04 |
| A71015 | 40 | 830.4 | 20.76 | 2.076 | 747.36 |
| A79794 | 40 | 837.9 | 20.95 | 2.09475 | 754.11 |
| A71218 | 20 | 840 | 42.00 | 4.2 | 756 |
| A69341 | 40 | 844.8 | 21.12 | 2.112 | 760.32 |
| A74136 | 20 | 857.5 | 42.88 | 4.2875 | 771.75 |
| A79606 | 20 | 862.4 | 43.12 | 4.312 | 776.16 |
| A72051 | 20 | 869.75 | 43.49 | 4.34875 | 782.775 |
| A69136 | 20 | 878.4 | 43.92 | 4.392 | 790.56 |

00000507

Case 1:08-cv-00364-DAR   Document 55-1   Filed 12/14/10   Page 47 of 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A77236 | 20 | 882 | 44.10 | 4.41 | 793.8 |
| A79362 | 20 | 886.9 | 44.35 | 4.4345 | 798.21 |
| A65939 | 40 | 892.8 | 22.32 | 2.232 | 803.52 |
| A78151 | 20 | 894.25 | 44.71 | 4.47125 | 804.825 |
| A75550 | 20 | 906.5 | 45.33 | 4.5325 | 815.85 |
| A75935 | 20 | 911.4 | 45.57 | 4.557 | 820.26 |
| A72061 | 40 | 916.3 | 22.91 | 2.29075 | 824.67 |
| A70496 | 20 | 916.8 | 45.84 | 4.584 | 825.12 |
| A68864 | 20 | 919.2 | 45.96 | 4.596 | 827.28 |
| A71707 | 20 | 926.1 | 46.31 | 4.6305 | 833.49 |
| A75866 | 40 | 926.1 | 23.15 | 2.31525 | 833.49 |
| A75783 | 40 | 931 | 23.28 | 2.3275 | 837.9 |
| A73054 | 40 | 945.7 | 23.64 | 2.36425 | 851.13 |
| A73132 | 40 | 945.7 | 23.64 | 2.36425 | 851.13 |
| A69327 | 20 | 952.8 | 47.64 | 4.764 | 857.52 |
| A73355 | 20 | 955.5 | 47.78 | 4.7775 | 859.95 |
| A77025 | 20 | 965.3 | 48.27 | 4.8265 | 868.77 |
| A76454 | 20 | 980 | 49.00 | 4.9 | 882 |
| A78383 | 100 | 980 | 9.80 | 0.98 | 882 |
| A73350 | 20 | 999.6 | 49.98 | 4.998 | 899.64 |
| A75349 | 20 | 1002.05 | 50.10 | 5.01025 | 901.845 |
| A78382 | 20 | 1004.5 | 50.23 | 5.0225 | 904.05 |
| A77361 | 42 | 1006.95 | 23.98 | 2.3975 | 906.255 |
| A79783 | 20 | 1009.4 | 50.47 | 5.047 | 908.46 |
| A74019 | 70 | 1020.43 | 14.58 | 1.457757143 | 918.387 |
| A22669 | 20 | 1024.1 | 51.21 | 5.1205 | 921.69 |
| A73677 | 20 | 1029 | 51.45 | 5.145 | 926.1 |
| A68995 | 20 | 1036.8 | 51.84 | 5.184 | 933.12 |
| A70451 | 20 | 1044 | 52.20 | 5.22 | 939.6 |
| A74302 | 40 | 1058.4 | 26.46 | 2.646 | 952.56 |
| A77019 | 20 | 1058.4 | 52.92 | 5.292 | 952.56 |
| A70345 | 40 | 1060.8 | 26.52 | 2.652 | 954.72 |
| A69655 | 30 | 1083.6 | 36.12 | 3.612 | 975.24 |
| A69656 | 30 | 1083.6 | 36.12 | 3.612 | 975.24 |
| A80193 | 20 | 1087.8 | 54.39 | 5.439 | 979.02 |

00000508

Case 1:08-cv-00364-DAR Document 55-1 Filed 12/14/10 Page 48 or 49

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A77491 | 20 | 1092.7 | 54.64 | 5.4635 | 983.43 |
| A73725 | 40 | 1097.6 | 27.44 | 2.744 | 987.84 |
| A70457 | 20 | 1099.2 | 54.96 | 5.496 | 989.28 |
| A69337 | 20 | 1111.2 | 55.56 | 5.556 | 1000.08 |
| A79804 | 20 | 1112.3 | 55.62 | 5.5615 | 1001.07 |
| A79778 | 40 | 1127 | 28.18 | 2.8175 | 1014.3 |
| A72302 | 20 | 1134.35 | 56.72 | 5.67175 | 1020.915 |
| A70526 | 20 | 1166.4 | 58.32 | 5.832 | 1049.76 |
| A79779 | 20 | 1178.45 | 58.92 | 5.89225 | 1060.605 |
| A79795 | 20 | 1190.7 | 59.54 | 5.9535 | 1071.63 |
| A75771 | 21 | 1191.07 | 56.72 | 5.671761905 | 1071.963 |
| A78194 | 40 | 1220.1 | 30.50 | 3.05025 | 1098.09 |
| A75552 | 21 | 1227.08 | 58.43 | 5.843238095 | 1104.372 |
| A71017 | 20 | 1248 | 62.40 | 6.24 | 1123.2 |
| A73171 | 20 | 1254.4 | 62.72 | 6.272 | 1128.96 |
| A72812 | 20 | 1256.85 | 62.84 | 6.28425 | 1131.165 |
| A77198 | 20 | 1291.15 | 64.56 | 6.45575 | 1162.035 |
| A74400 | 20 | 1300.95 | 65.05 | 6.50475 | 1170.855 |
| A73376 | 20 | 1305.85 | 65.29 | 6.52925 | 1175.265 |
| A71937 | 20 | 1323 | 66.15 | 6.615 | 1190.7 |
| A78582 | 30 | 1356.08 | 45.20 | 4.520266667 | 1220.472 |
| A73375 | 40 | 1362.2 | 34.06 | 3.4055 | 1225.98 |
| A73343 | 20 | 1376.9 | 68.85 | 6.8845 | 1239.21 |
| A71701 | 20 | 1386.7 | 69.34 | 6.9335 | 1248.03 |
| A79612 | 20 | 1391.6 | 69.58 | 6.958 | 1252.44 |
| A73366 | 20 | 1396.5 | 69.83 | 6.9825 | 1256.85 |
| A73744 | 20 | 1492.05 | 74.60 | 7.46025 | 1342.845 |
| A74024 | 20 | 1512.88 | 75.64 | 7.5644 | 1361.592 |
| A77160 | 20 | 1519 | 75.95 | 7.595 | 1367.1 |
| A76122 | 21 | 1538.36 | 73.26 | 7.32552381 | 1384.524 |
| A71403 | 20 | 1545.95 | 77.30 | 7.72975 | 1391.355 |
| A80190 | 20 | 1548.4 | 77.42 | 7.742 | 1393.56 |
| A71406 | 20 | 1568 | 78.40 | 7.84 | 1411.2 |
| A77160 | 20 | 1568 | 78.40 | 7.84 | 1411.2 |
| A77361 | 20 | 1587.6 | 79.38 | 7.938 | 1428.84 |

00000509

Damage Analysis

| Invoice No. | Copies | Total Charge | /Copy | /10 Copies | Damages |
|---|---|---|---|---|---|
| A78800 | 20 | 1607.2 | 80.36 | 8.036 | 1446.48 |
| A74750 | 20 | 1629.25 | 81.46 | 8.14625 | 1466.325 |
| A69623 | 20 | 1723.2 | 86.16 | 8.616 | 1550.88 |
| A74372 | 40 | 1739.5 | 43.49 | 4.34875 | 1565.55 |
| A79181 | 20 | 1741.95 | 87.10 | 8.70975 | 1567.755 |
| A73931 | 20 | 1776.25 | 88.81 | 8.88125 | 1598.625 |
| A78478 | 20 | 1783.6 | 89.18 | 8.918 | 1605.24 |
| A78053 | 20 | 1822.8 | 91.14 | 9.114 | 1640.52 |
| A70603 | 20 | 1824 | 91.20 | 9.12 | 1641.6 |
| A77087 | 40 | 1960 | 49.00 | 4.9 | 1764 |
| A75662 | 21 | 2027.13 | 96.53 | 9.653 | 1824.417 |
| A78812 | 20 | 2031.05 | 101.55 | 10.15525 | 1827.945 |
| A75868 | 21 | 2034.85 | 96.90 | 9.689761905 | 1831.365 |
| A68940 | 20 | 2136 | 106.80 | 10.68 | 1922.4 |
| A73672 | 20 | 2165.8 | 108.29 | 10.829 | 1949.22 |
| A75436 | 20 | 2197.65 | 109.88 | 10.98825 | 1977.885 |
| A73385 | 20 | 2415.7 | 120.79 | 12.0785 | 2174.13 |
| A73675 | 20 | 2462.25 | 123.11 | 12.31125 | 2216.025 |
| A74145 | 13 | 2618.07 | 201.39 | 20.139 | 2356.263 |
| A71109 | 40 | 2784 | 69.60 | 6.96 | 2505.6 |
| A75867 | 21 | 3416.28 | 162.68 | 16.268 | 3074.652 |
| A72062 | 20 | 3493.7 | 174.69 | 17.4685 | 3144.33 |
| A73932 | 50 | 3503.5 | 70.07 | 7.007 | 3153.15 |
| A74806 | 20 | 3721.55 | 186.08 | 18.60775 | 3349.395 |
| A79402 | 20 | 3736.25 | 186.81 | 18.68125 | 3362.625 |
| A73365 | 20 | 4118.45 | 205.92 | 20.59225 | 3706.605 |
| A73142 | 60 | 4961.25 | 82.69 | 8.26875 | 4465.125 |
| A71007 | 20 | 5018.4 | 250.92 | 25.092 | 4516.56 |
| A74025 | 30 | 6129.9 | 204.33 | 20.433 | 5516.91 |
| A73143 | 20 | 6396.95 | 319.85 | 31.98475 | 5757.255 |
| A72312 | 40 | 12740 | 318.50 | 31.85 | 11466 |
| | | | | | 527122.1 |

00000510

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, ex rel., BRIAN BURKE<br><br>             Plaintiffs,<br><br>         v.<br><br>RECORD PRESS, INC.,<br><br>             Defendant. | **Case No.**     1:08-cv-00364<br><br>**Judge:**     Deborah A.<br>         Robinson |

**RELATOR'S EMERGENCY MOTION FOR EXPEDITED RULING ON LEAVE TO ADMIT EXPERT TESTIMONY AND TO CONTINUE TRIAL DATE**

Pursuant to Local Rules LCvR 7(f) and 16.1(b) and Federal Rules of Civil Procedure Rule 6(b), Relator, by and through the undersigned, respectfully and humbly submits this Emergency Motion for Expedited Ruling on Leave to Admit Expert Testimony and to Continue Trial Date ("Emergency Motion for Leave to Admit Expert"). The grounds for this motion are set forth in the accompanying Memorandum of Points and Authorities.

WHEREFORE, Relator respectfully requests that this Court grant this motion; and grant such other and further relief as this court deems appropriate.

DATED:  December 15th, 2010

Respectfully Submitted,

/s/

_____
Tyler Jay King, Esq.
Bar No. 979592
1420 N Street NW Ste. 706
Washington, DC  20005
(202) 436-2641

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 15th, 2010, a copy of the foregoing was sent by email to the pertinent parties of record in this matter.

1 of 1

00000511

Respectfully Submitted,

/s/

_____
Tyler Jay King, Esq.

**MEMORANDUM OF POINTS AND AUTHORITES IN SUPPORT OF RELATOR'S EMERGENCY MOTION FOR EXPEDITED RULING ON LEAVE TO ADMIT EXPERT TESTIMONY AND TO CONTINUE TRIAL DATE**

Relator, by and through the undersigned counsel, submits this Memorandum of Points and Authorities, stating as follows:

PERTINENT FACTS

1.  Relator identified an expert and noticed Defendant, Record Press, ("RP") on April 1st, 2010.
2.  The parties agreed to a scheduling order providing Relator with a deadline of September 21st, 2010, by which to submit an expert report.
3.  Unfortunately, prior to the time by which the expert report was due, on July 13th, 2010, Relator's expert informed Relator's Counsel that he, the expert, would be backing out, because, in addition to health reasons, he planned to close down his practice and wanted his final matters to involve a specific subject matter area.
4.  Relator diligently pursued efforts to identify another expert. Despite Relator's diligent efforts[1], Relator was unable to immediately identify an expert when the original expert backed out.

_____

[1] Relator's Counsel is available to provide, at the Court's request, documentary evidence regarding the details of the many efforts undertaken to obtain an expert.

2 of 2

00000512

5.  Even though Relator's efforts were not bearing fruit, Relator continued to search for potential experts, and has just now identified one Morris Gocial who is available and has agreed to provide expert testimony in this matter.

6.  Relator's Counsel just received preliminary confirmation regarding Mr. Gocial's potential testimony on Monday, December 13th, 2010.

7.  A letter from Mr. Gocial, dated Tuesday, December 15th, 2010, is attached as Exhibit A, and indicates the general subject and basis of Mr. Gocial's proposed testimony.

8.  The parties have agreed to a one-day trial date of December 21st, 2010.

I.  MR. GOCIAL'S PROPOSED TESTIMONY IS RELEVANT BECAUSE IT CAN INFORM THE COURT'S UNDERSTANDING OF THE MERITS OF THE PARTIES' DISPUTE REGARDING THE RELEVANT CONTRACT AND DISPUTED LINE ITEM IN THIS MATTER.

The essence of this matter involves the disputed application of a contract term to a line item in the relevant contract.  Mr. Gocial will provide testimony pertaining to Relator's assertions regarding the issue of the application of the relevant contract term to the relevant line item.

Because the issues in the matter fall squarely on the parties' dispute regarding whether or not to apply the relevant contract term to a particular line item of the contract, Mr. Gocial's proposed testimony serves the interests of justice by permitting the issue to tried on its full merits.

00000513

II.    DENYING RELATOR'S REQUEST TO CONTINUE THE TRIAL DATE AND ADMIT AN EXPERT TO SUBMIT AN EXPERT REPORT WILL WORK AN EXTREME PREJUDICE ON RELATOR.

Relator's request to admit expert testimony comes at a time when RP may seek to limit Relator's testimony regarding his opinions on the meaning and interpretation of the relevant contract and disputed line item.  This makes it all the more apparent, and important, that Relator will be prejudiced by not being able to admit expert testimony on the meaning and interpretation of the relevant contract and disputed line item.

Because the essence of this matter involves the disputed application of a contract term to a line item in the contract, and because Relator may himself be unable to provide testimony regarding contract meaning and interpretation, denying Relator's request to admit expert testimony will be extremely prejudicial.


II.    GRANTING RELATOR'S REQUEST TO CONTINUE THE TRIAL DATE AND EXTEND THE TIME PERIOD TO ADMIT AN EXPERT AND SUBMIT AN EXPERT REPORT WILL NOT UNDULY DELAY THESE PROCEEDINGS OR PREJUDICE RP.

Relator's request is limited in scope and time and will not unduly delay these proceedings.  Moreover, Relator's request to reschedule the trial date, will mitigate any prejudice to RP, by allowing RP time to respond to Relator's expert witness report.

The trial in this matter is scheduled for only one-day and therefore a rescheduling of the trial date will not present a substantial undertaking.

Moreover, Relator's specific request will not complicate or compound the issues in this matter, but instead will help inform and focus the parties' and Court's analysis of the issues in this matter.

00000514

II.   RELATOR'S REQUEST TO CONTINUE THE TRIAL DATE AND EXTEND THE
      TIME PERIOD TO INDENTIFY AN EXPERT AND SUBMIT AN EXPERT REPORT
      IS MADE IN GOOD-FAITH.

      At all times, Relator was ready, willing, and able to retain an
expert.  Relator's inability to timely identify an expert and submit
and expert report comes not because of lack of diligence or effort,
but because Relator's diligent and continuous efforts to identify an
expert resulted in so many dead ends.

      In addition, Relator had early on obtained an expert, and
operated under the understanding that the issue of finding an expert
has been resolved, only to find out later that the expert would back
out, through no fault of Relator.

                              CONCLUSION

      For the foregoing reasons, it is fair and just to provide
Relator an opportunity to submit relevant expert testimony in this
matter and there is good cause to reschedule the trial date in this
matter in order to provide RP an opportunity to respond to the
proposed expert report.

DATED:  December 15th, 2010

                              Respectfully Submitted,


                              _____
                              Tyler Jay King, Esq.
                              Bar No. 979592
                              1420 N Street NW Ste. 706
                              Washington, DC  20005
                              (202) 436-2641


                         **CERTIFICATE OF SERVICE**


                            5 of 5

The undersigned hereby certifies that on December 15th, 2010, a copy of the foregoing was sent by email to the pertinent parties of record in this matter.

Respectfully Submitted,

_____
Tyler Jay King, Esq.

00000516

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, ex rel., BRIAN BURKE | **Case No.**   1:08-cv-00364 |
| Plaintiffs, | **Judge:**   Deborah A. |
| v. | Robinson |
| RECORD PRESS, INC., | |
| Defendant. | |

**PROPOSED ORDER**

Upon consideration of Relator's Emergency Motion for Leave to Admit Expert, and in consideration of arguments on behalf thereof, it is, by the Court, this ___ day of _____, 2010:


ORDERED:  That the motion is hereby GRANTED;

And it is further ORDERED that:


_____


Copies to:

_____
JUDGE

7 of 7

00000517

# GOLD GOCIAL GERSTEIN LLC

Certified Public Accountants and Consultants

*Formerly: Gold Meltzer Plasky & Wise, PA and Gocial Gerstein, LLC*

The Pavilion, Suite 900
261 Old York Road
Jenkintown, PA 19046

215.572.7790
215.572.8945 fax
www.g3cpa.com

December 15, 2010

Tyler Jay King, Esq.
1420 N Street NW
Suite 706
Washington, DC  20005

RE:    Burke v. Record Press

Dear Mr. King:

Please be advised that I have reviewed the bid contract between the Government Printing Office and Record Press dated October 18, 2006, as well as various invoices generated by Record Press based on that contract.

It is my opinion that, in no uncertain terms, the invoices I reviewed were overbilled according to the terms of the contract.   My opinion is based on my many years of experience of reviewing contracts in my capacity as a certified public accountant as well as my experience as a forensic accountant.   Upon further research and review of additional documents, I will issue a final report regarding this matter.

Very truly yours,

Morris Gocial, CPA/CFF, CVA, CrFA

00000518

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, ex rel., BRIAN BURKE | **Case No.**    1:08-cv-00364 |
| Plaintiffs, | **Judge:**      Deborah A. |
| v. | Robinson |
| RECORD PRESS, INC., | |
| Defendant. | |

**RELATOR'S MEMORANDUM IN OPPOSITION TO RECORD PRESS, INC.'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY FROM BRIAN BURKE REGARDING ANY RECORD PRESS CONTRACTS WITH THE UNITED STATES GOVERNMENT PRINTING OFFICE**

Relator, by and through the undersigned, respectfully requests that the Court deny Record Press, Inc.'s Motion to *In Limine* to Exclude Testimony from Brian Burke Regarding Any Record Press Contracts with the United States Government Printing Office ("RP's Motion to Exclude Relator's Testimony").

Record Press, Inc., ("RP") argues that because Relator is not a party to the subject contract in this matter, he should not be permitted to offer any testimony regarding the subject contract.

I.    THE SCOPE OF TESTIMONY RP INTENDS TO EXLCUDE IS OVERYL BROAD.

Upon further discussions with RP's Counsel, Relator is confident that he will be willing to stipulate to not offering any testimony regarding his opinions on the meaning and interpretation of the subject contract. However, Relator has personal knowledge of facts pertaining to the subject contract by virtue of the fact that he was personally billed pursuant to said contract. Therefore, although it may be argued, and the parties can agree, that Relator's opinions regarding contract interpretation and meaning are inadmissible, the broad scope of testimony that RP describes in the instant motion will also capture admissible testimony.

1 of 4

00000519

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES, ex rel., BRIAN BURKE | **Case No.**   1:08-cv-00364 |
| Plaintiffs, | **Judge:**   Deborah A. |
| v. | Robinson |
| RECORD PRESS, INC., | |
| Defendant. | |

### RELATOR'S UNCONSENTED MOTION TO RESCHEDULE STATUS HEARING

Relator, by and through the undersigned, respectfully submits this Unconsented Motion to Reschedule Status Hearing.  The grounds for this motion are set forth in the accompanying Memorandum of Points and Authorities.

Relator requested but did not obtain consent to this motion from the opposing party.

WHEREFORE, Relator respectfully requests that this Court grant this motion; and grant such other and further relief as this court deems appropriate.

DATED:  January 5th, 2011

Respectfully Submitted,

/s/

_____
Tyler Jay King, Esq.
Bar No. 979592
1420 N Street NW Ste. 706
Washington, DC  20005
(202) 436-2641

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 5th, 2011, a copy of the foregoing was sent by email to the pertinent parties of record in this matter.

1 of 1

00000520

Respectfully Submitted,

/s/
_____
Tyler Jay King, Esq.

### MEMORANDUM OF POINTS AND AUTHORITES IN SUPPORT OF RELATOR'S UNCONSENTED MOTION TO RESECHEDULE STATUS HEARING

Relator, by and through the undersigned counsel, submits this Memorandum of Points and Authorities, stating as follows:

PERTINENT FACTS

1.  The Court scheduled a status hearing for January 6th, 2011, in relation to motions pertaining to evidentiary issues regarding the trial in this matter scheduled for February 14th, 2011.

2.  The pending issues can be broken down into basically three categories, (1) whether or not statements by the GPO to Relator are inadmissible hearsay, (2) whether or not Relator's pretrial statement of damages should be striken, and (3) Defendant's response to Relator's expert testimony.

3.  Relator's Counsel is currently in a West African country, for which non-refundable tickets were purchased approximately 8 months ago, and which is a necessary trip for personal family reasons related to his wife's family.

4.  Although Relator's Counsel can arrange to attend the status conference by phone, conference by phone may hinder clarity of communication, and may prolong the duration of the hearing itself.

5.  In addition, shortly before leaving the United States, Relator's Counsel received Defendant's Replies to Relator's Opposition to Defendant's Motions regarding the three aforementioned issues, and there has been only a limited amount

2 of 2

of time to research and prepare for the January 6th, 2011 hearing.

6.    Moreover, the Relator's expert report is due today, and both parties will benefit by rescheduling the status hearing, so that issues pertaining to Relator's expert report can be addressed at one time in conjunction with the other two issues.

7.    Relator's Counsel is available the entire week of January 31st, to February 4th, 2011, and Defendant's Counsel has indicated that they will also be available that week.

DISCUSSION

I.    RESCHEDULING THE STATUS HEARING PROMOTES JUDICIAL ECONOMY.

As both parties agree, this matter is a relatively simple one. Because the evidentiary issues for which the status hearing have been scheduled are three in number, and one of which may not be fully ripe for hearing until after the January 6th, 2011 hearing, it will be a more efficient use of the Court and parties' time to set a hearing during which all three issues can be heard at once.

II.    RESCHEDULING THE STATUS HEARING WILL NOT UNDULY PREJUDICE THE DEFENDANT.

Rescheduling the January 6th, 2011 hearing to the week of January 31st to February 4th, 2011, does not unduly prejudice the Defendant because it will allow the Defendant an adequate opportunity to review and respond to Relator's expert report prior to the status hearing.

Rescheduling the January 6th, 2011 hearing will not unduly prejudice the Defendant because it will provide for a more efficient use Defendant's time, as indicated in the above section I.

3 of 3

Rescheduling the hearing will not unduly prejudice the Defendant because it will not threaten to delay any other aspect of these proceedings.

III.  RELATOR'S REQUEST TO RESCHEDULE THE STATUS HEARING IS MADE IN GOOD-FAITH AND NOT FOR DILATORY PURPOSE.

In advance of leaving the United States, Relator's Counsel, made many attempts to contact the Court in order to inquire about the possibility for a status hearing by teleconference, because Relator's Counsel desired to make attempts to avoid rescheduling. Unfortunately, because of the holidays, Relator's Counsel was unable to determine the Court's practice in this respect until yesterday.

Relator's Counsel had only a few days time between which the January 6th, 2011 was originally scheduled, and when he departed the United States.  It would have been extremely difficult, if not impossible, to arrange to schedule the January 6th, 2011 hearing for that time window, as many days are consumed in preparing for oversees travel.

Relator's request to reschedule is not intended to delay these proceedings, and in fact, it does not in and of itself serve to delay the main proceeding at all.

IV.  RESCHEDULING THE STATUS HEARING WILL ALLOW PENDING MATTERS TO BE ADDRESSED FULLY ON THEIR MERITS.

Rescheduling the status hearing serves the interests of justice by permitting the pending issues to be addressed fully on their merits.  Defendant will be provided an opportunity to review and respond to Relator's expert report, and Relator will be provided an opportunity to review and reply to Defendant's Replies to Relator's Oppositions to Defendant's Motions regarding evidentiary issues.

00000523

<u>CONCLUSION</u>

For the foregoing reasons, the interests of justice and judicial economy will be served by rescheduling the January 6th, 2011 status hearing to the week of January 31st, to February 4th, 2011. There is good cause to do so, and the result does not unduly prejudice Defendant, if at all.

DATED:  January 5th, 2011

Respectfully Submitted,

/s/
_____
Tyler Jay King, Esq.
Bar No. 979592
1420 N Street NW Ste. 706
Washington, DC  20005
(202) 436-2641

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 5th, 2011, a copy of the foregoing was sent by email to the pertinent parties of record in this matter.

Respectfully Submitted,

/s/
_____
Tyler Jay King, Esq.

5 of 5

00000524

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, ex rel., BRIAN BURKE | **Case No.**    1:08-cv-00364 |
|            Plaintiffs, | **Judge:**    Deborah A. Robinson |
|        v. | |
| RECORD PRESS, INC., | |
|            Defendant. | |

**PROPOSED ORDER**

Upon consideration of Relator's Unconsented Motion to Reschedule Status Hearing, and in consideration of arguments on behalf thereof, it is, by the Court, this ___ day of _____, 2011:

ORDERED:  That the motion is hereby GRANTED;

And it is further ORDERED that:

_____

Copies to:

                    _____
                    JUDGE ROBINSON

6 of 6

00000525

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

---------------------------------------------------------X

UNITED STATES OF AMERICA    :    Case No. 1:08-CV-00364(EGS)(DAR)

Ex rel.BRIAN BURKE             :      **AFFIDAVIT &**

    145 East 23rd St. #4R        :     <u>**MEMORANDUM of LAW**</u>

    New York, NY 10010       :    <u>**OMNIBUS MOTION to**</u>

    212-614-8515             :    <u>**DISMISS COUNTERCLAIM**</u>

         Plaintiff, pro se      : 

                        : 

           against,       : 

RECORD PRESS           :     <u>**Jury demand**</u>

       Defendant,       : 

---------------------------------------------------------X

    SS: I declare under penalty of perjury that the forgoing is true and correct. Executed on February 17, 2011 ,_____/S/_____, (Brian Burke), Relator in this Action,

<div align="center"><b>PRELIMINARY STATEMENT</b></div>

    Plaintiff/Counterclaim Defendant Notices the Court & Opposing Party that same is proceeding Pro Se, a.k.a Propria Persona for all purposes related to said Counterclaim. "In the federal courts, the right of self-representation has been protected by statute since the beginnings of our Nation. *Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92,* enacted by the First Congress and signed by President Washington one day before the *Sixth Amendment [422 U.S. 806, 813]* was proposed, provided that "in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of . . . counsel . . . ."The right is currently codified in *28 U.S.C. 1654.* " *Faretta v. California 422 US 806 (1975),*

<div align="center"><u><b>MOTION FOR JOINDER & STAY</b></u></div>

    Movant respectfully requests Joinder of Claim & CounterClaim (Fed. R. Civ. P. 18(a)) for purposes of single Order/Decision by Court only, for reasons of Judicial Economy and in the

interest of Justice and all Parties. This is due to now two related pending Motion(s) to Dismiss.

This would necessitate a Stay until instant Motion is fully briefed.

### Motion for CM/ECF Password

Petitioner/Counterclaim Defendant request leave to file future documents, reply etc.,

electronically, under LCvR 5.4(b)(2). "A pro se party may obtain a CM/ECF password from the

Clerk with leave of Court.  Whether leave of Court should be granted is within the discretion of the

judge to whom the case is assigned.  To obtain leave of Court, the pro se party must file a written

motion entitled "Motion for CM/ECF Password," describing the party's access to the internet and

confirming the capacity to file documents and receive the filings of other parties electronically on

a regular basis.  If leave of Court is granted, the pro se party must complete the CM/ECF training

provided by the Clerk to all electronic filers before the Clerk issues a CM/ECF password. "

Movant has all proper equipment necessary , including Adobe Acrobat, and has filed

electronically in the Second Circuit and uses PACER. This Relief would be in the best interest of

all Parties and Court. Petitioner Requests admission of of Instant Pleading by ECF, which can be

performed by Mr. King, who will get this copy by PDF attached to email, from account

briantburke@gmail.com.

### Movant requests Court construe Pleadings liberally.

"The court must construe the pleadings liberally, Pro se litigants' court submissions are to be

construed liberally and held to less stringent standards than submissions of lawyers.  If the court

can reasonably read the submissions, it should do so despite failure to cite proper legal authority,

confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with

rule requirements. *Boag v. MacDougall, 454 U.S. 364, 102 S.Ct. 700, 70 L.Ed.2d 551 (1982);*

*Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)*(quoting *Conley v.*

*Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); Haines v. Kerner, 404 U.S. 519, 92*

*S.Ct. 594, 30 L.Ed.2d 652 (1972);  McDowell v. Delaware State Police, 88 F.3d 188, 189 (3rd Cir.*

*1996); United States v. Day, 969 F.2d 39, 42 (3rd Cir. 1992)*(holding pro se petition cannot be

held to same standard as pleadings drafted by attorneys); *Then v. I.N.S., 58 F.Supp.2d 422, 429 (D.N.J. 1999).*

The courts provide pro se parties wide latitude when construing their pleadings and papers. When interpreting pro se papers, the Court should use common sense to determine what relief the party desires. *S.E.C. v. Elliott, 953 F.2d 1560, 1582 (11th Cir. 1992).* See also, *United States v. Miller, 197 F.3d 644, 648 (3rd Cir. 1999)* (Court has special obligation to construe pro se litigants' pleadings liberally); *Poling v. K.Hovnanian Enterprises, 99 F.Supp.2d 502, 506-07 (D.N.J. 2000).*

Defendant has the right to submit pro se briefs on appeal, even though they may be in artfully drawn but the court can reasonably read and understand them. See, *Vega v. Johnson, 149 F.3d 354 (5th Cir. 1998).* Courts will go to particular pains to protect pro se litigants against consequences of technical errors if injustice would otherwise result. *U.S. v. Sanchez, 88 F.3d 1243 (D.C.Cir. 1996).*

Moreover, "the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory." *Bonner v. Circuit Court of St. Louis, 526 F.2d 1331, 1334 (8th Cir. 1975) (quoting Bramlet v. Wilson, 495 F.2d 714, 716 (8th Cir. 1974)).* Thus, if this court were to entertain any motion to dismiss this court would have to apply the standards of *White v. Bloom.* Furthermore, if there is any possible theory that would entitle the Plaintiff to relief, even one that the Plaintiff hasn't thought of, the court cannot dismiss this case."

### Motion For Jury Trial

Counterclaim Defendant requests Jury Trial for all aspects of Counterclaim. Plaintiff requested Jury Trial in Complaint and waived same only for Bifurcated Proceedings (Claim, not Counterclaim) that took place on February 14, 2011, in front of Magistrate Judge Deborah A. Robinson. It is agreed between Relator & Mr. King esq. that he will not be representing Relator with regard to Counterclaim. Case law requires representation in Qui Tam cases, as we are suing in the name of the United States. Plaintiff understands that Record press is not

Counterclaiming against the United States (other than for the False Claim at question) but Petitioner individually, thus the right to self representation and Jury Trial.  Petitioner requests Counterclaim be regulated by LCvR 72.2 & 72.3 but not, at this time, LCvR 73.3.

### Motion *In Limine I*

Movant, as an admitted whistle-blower, is quite saddened to have to inform the Court of Perjury (*TITLE 18 PART I  CHAPTER 79  § 1621*) as well as likely Subornation of same (*18 U.S.C.A. § 1622*).  Mr. Adgerson, to whom Relator would like to apologize for any misspelling of name in Complaint etc., has, unfortunately, availed himself of this unlawful practice. Mr King has informed me this is his first case wherein a witness has performed this on a material issue.  On July 5, 2007, date of stipulated to conversation with witness, the other Party to the conversation declared under Oath in Second Circuit Pleading "Plaintiff reported to Lloyd Rawls of GPO's Inspector General Office on July 5, 2007 that fraud was being committed by Record Press against the GPO, U.S. Attorney's Office, U.S. Taxpayers and, potentially, plaintiff. They are charging the government, et. al., exactly TEN TIMES the correct amount for "collating & trimming" than allowed in said 2231-S contract. This was ascertained in conversation with Calvin Aderson, Fiscal Manager at GPO." *att.*.

The U.S. Attorney's Office, whether it investigated or not, chose not to dispute this Opposition, despite every reason to do so, thus stipulating to same. The Second Circuit granted Relator's Relief based on this Contemporaneous Account. Now years later, via recovered memory?, Witness Adgerson  places before the Court an entirely different account of our conversation. This is the Perjury, intended to Obstruct Justice (*TITLE 18 PART I  CHAPTER 73*) for the People.  This Perjury consisted mainly of two parts; First the Canard (lie) about Relator's misrepresentation, which is intended to defame and attack personal credibility and/or the People's case, Second the more harmful, and even more nonsensical, Lie/Perjury about what was said to Petitioner about the Running Rate (Per 10 Copies) application to the issue at hand, Line D. First the misrepresentation never happened, other than in the testilying of witness.

Petitioner spoke to at least a dozen employees of GPO that day and there was no allegation of misrepresentation. Why Adgerson? Because he would not have given the information otherwise? Is it the GPO's position they only work for and serve 'Their' Contractors(Sullivan's Testimony), or who pays them, the People and Congress? No, because it did not happen. Counterclaim Defendant understands the Court would prefer not to rule on a "He said he said" that was not recorded. Petitioner's statement(s) on the Record since the day of the conversation have been consistent. More importantly, for triers of fact, Mr. Adgerson's version **COULD NOT HAVE HAPPENED**. There was absolutely NO WAY Movant could have gleaned information about the Running Rates application to Line D otherwise.  Mr Adgerson was represented, by his boss, as the Chief Contract Person on this matter and was quite helpful. He had the Contract/RFP and Relator had the Invoices (albeit including GPO's 7% "Profit" on the False Claim, which presumably informs their credibility on deciding whether same occurred).  As Plaintiff stated, repeatedly, under oath, and without ever seeing 2231-S, Mr Adgerson was asked why the "binding costs" were so high, when other costs were quite competitive. He stated emphatically that it was because the $12.25 (he actually said $12.50, an amount including GPO's 'tip', leading to this whistle-blower using that figure in that days Opposition and FCA Complaint) "per 100 pages" applied to the Running Rate (10), i.e. per 1,000 pages. He was quite adamant & vociferous and stated how clear it is. He said that the words "Note: RUNNING RATE IS PER 10 COPIES" was in bold, capitalized, underlined and repeated. He stated clearly that Running Rate applied to all lines in paragraph II.  Clearly, years later, in planning defense of instant FCA Case it was seen that this position by the senior Contract Supervisor/Manager would be fatal. Thus the obvious Subornation. Who Suborned Mr. Adgerson, admittedly, Relator can only guess at this time, but it it clearly a circumscribed group with incentive to do same. How was it done, we have either Gold or Lead, i.e. Consideration or Extortion/Threat. Was he forced to retire, was his pension threatened, or charges/discipline dangled? Speculation ripe for Investigation by appropriate Authorities without a Conflict of Interest. Movant requests Striking, prospectively &

retrospectively, of said Perjury and for a Referral by Court for appropriate entity to investigate Perjury, Subornation & Conspiracy to Perform same, Obstruction of Justice & Conspiracy to Perform same and Conspiracy to Defraud the United States. Petitioner believe qualified Hearsay Exceptions would be controlling here under Fed.R. Ev. 801(d)(1) & (2)(B),(C)(E).

### Motion *In Limine II*

Movant Requests the Court Strike, Prospectively & Retrospectively, all Testimony/Evidence by Mr. Sullivan related to any unsupported testimony regarding "industry practice", Record Press's need for "profit", whether any specific price points result in same or, in fact any testimony/ evidence which would or could be admitted by an Expert Witness, such as Mr. Gocial. Mr. Sullivan, however much time he worked at GPO (which Counterclaim Defendant Stipulates to) he was not certified, or asked to be considered as an expert witness. Even as a fact witness, his testimony/evidence is Prejudicial and potentially incorrect (see above regarding Mr. Adgerson's Subornation). This witness acknowledged no prior discussion or "meeting of minds" or in fact any Ex Post Facto (to 2231-s signing/bids) conversation regarding 2231-s and proper invoicing Vis-à-vis Record Press. Movant Stipulates it is "GPO"s, or at least Mr. Sullivan's, Testimony that Record Press invoiced the correct amount, or at least that 'his contractor' could use the money to go toward their profit, which he apparently prefers the government/Taxpayer guarantee.

### Motion *In Limine III*

Petitioner acknowledges a conflict regarding instant Motion to Strike various "Spreadsheets" in Case. While clearly a 'statement against interest' by Record Press, it was not explicitly made a part of the 2231-s Contract, whether attached or not, or produced later.  Non-movant clearly profers these documents as Dispositive, and they may very well be correct. Defendant, like the Wizard behind the curtain, or the naked Emperor, would prefer the Court view the section of the document(s) they deem important. The Court must instead, in order to obtain the Truth(Veritas) Justice and Remedy for the abused Taxpayer, rely and deconstruct the relevant part of the 'spreadsheets'. It is not disputed that Respondent has attempted to parse the most irrelevant part

(s) of these documents and has run panicking from the actual numbers in said exhibits.

Defendant clearly state that because the relevant lines, undisputed, say, respectively, IIa

COMPLETE COVER    PER 10 COPIES ; IIb TEXT PER PAGE     PER 10 COPIES and skipping,

for now IIc,; IId COLLATING, TRIMMING TO SIZE AND BINDING     PER 100 PAGE,  the case is

over. Slamdunk. Problem. The actual numbers do not agree with Defendant's theory. As Mr.

Wilmont basically eschewed and distanced himself and his firm from this 'dispositive' document,

and Relator doesn't blame him, and only acknowledged "reviewing" same on the stand,

presumably ex post facto and on advise of Counsel, Relator would request using otherwise

irrelevant testimony by Mr. Sullivan, the only individual with apparent knowledge about same.

Mr. Sullivan was asked about the highly relevant "BASIS OF AWARD". These numbers came

right out of the 2231-S contract.  Witness claimed these numbers derived from a former contract

and are used, very importantly, to compare various bids and find lowest competent bider, in the

interest of the Taxpayer/People, as required. Excellent, and fully within their Fiduciary duty to us

Taxpayers. But there's that little problem within this 'dispositive' document. The numbers do not

come within magnitudes of agreeing with Defendant's, or for that matter, Mr. Sullivan's, spin on

what the Contract 'actually' says. It may disappoint the Court to have to state that this 'best'

document which is allegedly exculpatory for Defendant also bars Relator's version. An

assumption was made by Relator & Mr. Adgerson(pre Perjury) and Murphy Anderson LLP and

Mr. King and Mr Gocial that Record Press is at least allowed to charge something for line IId in

cases such as the admitted invoices. According to the 'dispositive' 'spreadsheet' Mr. Sullivan, and

presumably Defendant's Counsel, support, this is incorrect. The argument as to whether 'PER10

COPIES' RUNNING RATE apply to line IId maybe all but moot and the Court maybe ruling on the

incorrect issue. Instead, according to the 'spreadsheet'/'dispositive' Exhibit and the Contract the

issue is should Record Press be invoicing at all under IId in circumstances such as *Burke v.*

*Evans.* Relator contends that Defendant acted with intent, but nevertheless, this hurdle is not

required for FCA. Relator requests only this 'dispositive' document make sense, and it does.

Honing in on the three most relevant lines, we start with IIa. COMPLETE COVER PER 10

COPIES. and the "BASIS OF AWARD" 1327, from the Contract. Mr. Sullivan suggested we

multiply 1327 times "PER 10 COPIES", i.e 13,270 books. Then we have Record Press's Bid/Offer

of $6.00 per ten rap-around covers and the entirely correct amount, under both parties Theories,

of $7,962.00. Excellent. Next IIb we have and TEXT PER PAGE PER 10 COPIES with a "BASIS

OF AWARD" of 165,996, i.e. 1,659,960 pages. and the Bid/Offer of $.35. PER 10 COPIES to get

$58,098.60. Entirely correct and consistent with all parties Theories. As IIc was not part of the

admitted invoices, we will skip for now. Saving the best for last we have the penultimate line, IId

COLLATING, TRIMMING TO SIZE AND BINDING        PER 100 PAGES. "BASIS OF AWARD" is

14? and from the 2231-S Contract. Mr. Sullivan stated, under oath, that these are actual numbers

from a previous contract, that they are used to find the lowest cost competent bidder, and further

that they should be and were? used to direct successful bidders as to correct billing & invoice

practice, in order to presumably conform with the False Claims Act and not 'Overbill'. Upon

questioning by Mr. King, Mr. Sullivan stated this "BASIS OF AWARD" of 14*[SIC]* should be

multiplied by the stated "PER 100 PAGES" in order to arrive at 1400 pages?*[SIC]*. This number

would be consistent with their theory. Ours would be 14,000 pages*[SIC]*. Regardless, let's move

on. Multiplying 1400 (their theory) by $12.25 and dividing(again) by PER 100 PAGES and

multiplying by $12.25 equals the correct $171.50. With Plaintiff's theory, you would multiply 14 by

1,000 (i.e. PER 10 COPIES, PER 100 PAGES=1,000) and by the admitted accepted bid/offer of

$12.25 per? divided again by 1,000 to equal 171.50. In other words, both theories result in an

equality, i.e. correct answer. If Relator were to be so bold as to supply implied algebraic

definition, we have for IId 14x pages  X $12.25 divided by x = $171.50. The problem is that x can

be either 100(defendant's position) or 1,000(Relators/Taxpayers) and we have gotten no closer

to the Truth(Veritas), or assisting the Court in deciding Case. So what is x, 100 or 1,000? Well,

let's compare to the above lines for some Truth, as presumably the number of bindings should

conform to the number of books. We have, as stipulated to, 13,270 books. 14,000 comes a lot

closer to 13,270 than 1,400, but admittedly not identical. A rounding error perhaps, or were there some additional bindings in another category? Problem, Mr. Sullivan stated , under oath that the 1,400 was pages? and not books, which according to lines IIa & IIb average 125 pages for both Appendices and Briefs. Instead, according to agreement, we have 1,659,960 pages, an entirely reasonable number.  How do we fit 1400 bound pages into 1,659,960 pages and 13,270 books, or for that matter 14,000 pages. We cannot.  Occam's Razor (i.e. the simplest explanation that explains all the facts) suggests our answer. IId has nothing to do with IIa or IIb. Record Press is allowed to bill for/through line IIa and IIb **OR** IId but not both. Let us go back to the 2231-S contract and page 6 paragraph 8 which states 'Occasionally the Government will supply pre-printed 8-1/2 x 11" pages which the contractor will be required to collate, typeset a cover trim to finished size and bind. "  This is what IId is for, and not the usual order created from PDF or CD, if the 'spreadsheets' are correct. They were proffered by defense and are a statement against interest. Of course, under the only rational interpretation of the 'spreadsheet' Record Press was not allowed to charge the Government at all in the vast majority of invoices. In our original theory in Complaint, Defendant charged 10 times too much for line IId but were certainly allowed to bill something. Either way, they charged the People/Taxpayer at least $500,000 too much over the non-statutorily limited time span for IId. The 'overbilling' is just slightly larger under this axiom conforming with both the 'spreadsheet'(s), i.e. previous billing practice, and 2231-S.

  Being so bold as to anticipate Defendant's likely and most logical defense, and hoping the court does not view this as a Straw Man, let us throw out all the numbers on line 11d, and assume Contractor is allowed to charge on line IId for all "TEXT PER PAGE", as is now Record Press practice. If we plug in the numbers on lines IIa &IIb, which appear entirely correct and logical, into the now blank IId, we get a magnitude of difference in this "Old Bid/bill/contract/spreadsheet".  Back to the "new" line IId we have a "BASIS OF AWARD" of either 1,659x(Relator version) or 16,599x(Defendant's)pages. First, with 16599.6x wherein x is 1,000(PER 10 COPIES X PER 100 PAGES) times 12.25 and divided again by 1,000= $20,334.5. With Defendant's Straw

Man? we have $203,349.51. This "correct" and consistent number, if we accept record press's position that they are allowed to charge under IIa, IIb & IId simultaneously would more than double Record Press's Bid/Invoice/Payment, if the winning bider/Contractor. But they would lose as their bid would be substantially higher.  Other potential contractors bid less than half Record Press's $12.25 per 1,000 or per 100 pages. Two bid $5.00 and one bid $6.50. Another contractor would have won the bid. Thus, under any possible theory they are either violating the FCA or not the Contractor.

### MOTION TO DISMISS COUNTERCLAIM

Petitioner Requests of Court Dismissal of Counterclaim with Prejudice, under Fed. R. Civ. P. 12(b)(6) & (c) and/or Fed R. Civ. P. 56 and/or Fed. R. Civ. P. 9 and/or Fed. R. Civ. P. 11as appropriate. In addition, Collateral Estoppel, i.e.  Issue Preclusion, and/or Res Judicata and/or Double Jeopardy as previously decided within Defendant's Rule 11 Motion. Counterclaim Defendant request Court construe instant Request for Relief as an Anti-SLAPP (Strategic Lawsuit Against Public Participation) Motion, see *Godin v. Schenks, et. al. 134 (First Circuit)*.  In addition, Petitioner would point out both Parties are residents of New York State and covered by anti-SLAPP laws  *N.Y. Civ. Rights Law §§ 70-a, 76-a  & N.Y. C.P.L.R. §§ 3211(g), 3212(h)*. Petitioner, pro se contends that in order to defend against Counter-Claim, an emphasis on the underlying case merits is in order. As can be seen by Defendant's filings and testimony, a classic Government Knowledge Defense is being attempted. See THE GOVERNMENT KNOWLEDGE DEFENSE TO THE CIVIL FALSE CLAIMS ACT: A MISNOMER BY ANY OTHER NAME DOES NOT SOUND AS SWEET Author MICHAEL J. DAVIDSON *45 Idaho L. Rev. 41. Att.* "The Development of the Government Knowledge Defense In 1986, in addition to eliminating the government knowledge-based jurisdictional bar, Congress clarified the FCA's scienter element, making it clear that the United States need not prove specific intent in order to establish that the defendant acted knowingly when it submitted a false claim or statement to the United States. ... Hagood In Hagood, a qui tam relator brought suit alleging that the water agency had presented

false cost allocation information to the United States to obtain an Army Corps of Engineers

contract. ... The contractor in this scenario is still attempting to defraud the United States, and that

fact remains unchanged even when the contracting officer or some other relevant

acquisition official discovers the misconduct. ... The Tenth Circuit noted that the court in Butler

had rejected the position that only a contracting officer's knowledge was relevant for purposes of

determining whether a defendant had acted knowingly. ... For purposes of this defense, the

legally relevant authority extends beyond that possessed by contracting officers to other

procurement officials "with authority to act under the contract." ... **Significantly, government**

**employees, including procurement officials, lack the authority to waive fraudulent conduct. ...**

Further, contractors will be held responsible for knowing the limitations on the authority of

government contracting officials when such limitations were contained in published laws or

regulations. .." "By the plain terms of the FCA's statutory language, the scienter requirement is

that the defendant acted knowingly for all FCA claims except those enumerated in sections 3729

(a)(3), (a)(4) and (a)(5). Currently, the FCA defines "knowing" and "knowingly" to "mean that a

person, with respect to information--(1) has actual knowledge of the information; (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of

the truth or falsity of the information . . . ."  In other words, the "defendant must 'know' that a claim

or statement is false or fraudulent, that is, he must (1) have actual knowledge that it is false, (2)

act in deliberate ignorance of its truth or falsity or (3) act in reckless disregard of its truth or falsity."

The United States, or a relator acting on its behalf, is not required to prove that the defendant

acted with the specific intent to defraud. See *United States ex rel. Hagood v. Sonoma County

Water Agency. ""[t]*hat the relevant government officials know of the falsity is not in itself a

defense."  In short, the court found evidence of government knowledge potentially relevant to the

FCA's scienter element, but not to the issue of falsity". """Protection of the public fisc requires that

those who seek public funds act with scrupulous regard for the requirements of the law . . . . [T]

hose who deal with the Government are expected to know the law and may not rely on the

00000536

conduct of Government agents contrary to law."

"The unsuitability of government knowledge as an absolute defense is highlighted further when the knowledgeable federal employee is not merely a passive recipient of information, but instead is a participant in a scheme to defraud the United States. Clearly, the defendant should not escape liability merely because it found a willing participant--a coconspirator--within the government." MICHAEL J. DAVIDSON 45 IDAHO L. REV. 41*att*.

"Additionally, an FCA defendant should not benefit if someone from the government learns of the falsity and simply does nothing about it. The Seventh Circuit has held that mere governmental acquiescence is insufficient to sustain a government knowledge defense.  The government must both know of, and approve, the particular claim before it is submitted. The opinions of other circuit courts appear to have adopted a similar standard.  Unless that person is someone with the requisite level of authority and approves or otherwise indicates to the defendant that its conduct is permissible, then the defendant's scienter remains unaffected. Additionally, "mere acquiescence would preclude FCA liability any time a government employee and a defendant were in cahoots."

"Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct.  See *United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956)* ("[W]e do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute."); see also *United States v. Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 771 (N.D. Tex. 2002)* ("A violation of the rights of the United States may not be waived or ratified by the unauthorized acts of its agents."); *United States ex rel. Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995)* ("[A] government officer cannot authorize a contractor to violate federal regulations."); *United States v. Cripps, 460 F. Supp. 969, 973-74 (E.D. Mich. 1978)* (stating that a federal employee who urges someone to defraud the government acts ultra vires). Because they lack the authority to waive fraud, acquisition officials cannot "ratify" such conduct. See *CIBINIC, NASH & NAGLE, supra note 150, at 48* ("[I]llegal

actions cannot be ratified because officials lack the authority to enter into illegal agreements."); cf.

*Winter v. Cath-DR/Balti Joint Venture, 497 F.3d 1339, 1347 (Fed. Cir. 2007)* (noting that authority

is a prerequisite to ratification). Accordingly, the FCA is violated when a contractor submits a false

claim even when the contractor informs the government of the claim's falsity before submission.

*United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995)* ("Defendants

knowingly caused false claims to be presented and that, after the government became aware of

the underlying scheme, it continued to pay claims only because it had already become

contractually bound to make those payments as a result of the defendant's fraudulent course

of conduct.").

    Further, once false claims are received, a contracting officer may not modify the contract, or

take other action, to waive past false claims. The Federal Acquisition Regulation (FAR) also

contains express limitations on contracting officer authority when a claim is suspected to be false

or tainted by fraud. Pursuant to FAR 33.210(b), the contracting officer has no authority to settle,

compromise, pay or adjust "any claim involving fraud.*" Nat'l Wholesalers, 236 F.2d at 950*; see

also *United States ex rel. McCray Sanitation Serv. v. Midwest Container Co., 7 F.3d 1046, at \*2

(10th Cir. 1993)* (unpublished table decision) ("[Contracting agency cannot] 'ratify' any previous

fraud by [contractor]."). Similarly, section 605(a) of the Contract Disputes Act removes any

authority from the head of an agency "to settle, compromise, pay, or otherwise adjust any claim

involving fraud." This statutory restriction on agency heads extends downward to subordinate

agency procurement officials.

    The falsity of the claim is measured at the time it is submitted to the United States.

Accordingly, a necessary prerequisite to any defense based on government knowledge of the

falsity is that the relevant government officials knew of the challenged conduct before the false

statement or claim was presented to the United States. Several courts have recognized this

limitation on a government knowledge defense. *United States v. Southland Mgmt. Corp., 326 F.

3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring)* ("In principle, it would seem that

00000538

the government's knowledge of a false claim would not be an effective defense . . . if the government's knowledge came 'too late in the process'" (quoting *Durcholz, 189 F.3d at 544-45)); United States v. Shasta Servs., Inc., 440 F. Supp. 2d 1108, 1113-14 (E.D. Cal. 2006)* (applying the defense to California's FCA). Although not directly addressing the issue, other cases applying the government knowledge defense contain fact patterns in which the government was aware of the challenged conduct before a claim was presented. Such a temporal requirement is consistent with the basic premise underlying the defense--that the contractor did not knowingly engage in misconduct because it believed the government knew of its conduct and approved, either explicitly or tacitly. Also, this prerequisite to the government knowledge defense is consistent with the authority limitations placed on the contracting officer, as well as any other potentially relevant government official that a contractor may reasonably expect to deal with during a federal procurement. As noted earlier, government procurement officials cannot waive or ratify false or fraudulent claims. The following FCA case illustrates this point. In *United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956).,* the defendant was awarded a contract to provide 6000 proprietary Delco-Remy vehicle regulators to the Army. The bid proposal permitted either Delco-Remy regulators or "equals," but National Wholesalers offered to provide the actual Delco-Remy regulators, and the contract was awarded on that basis. Unable to provide conforming Delco-Remy regulators, the defendant manufactured its own regulators--which the district found to be equal to the brand regulators--but then printed and affixed false Delco-Remy labels to the regulators. Unaware of the mislabeling, the Army accepted seventeen shipments of the mislabeled parts, for a total of 4086 regulators. Additionally, the contractor submitted seventeen invoices for payment. Upon discovering the contractor's misconduct, the Army issued a "stop order" on future deliveries and tested the manufactured regulators.

Finding the regulators satisfactory, the Army's Contracting Officer accepted them as "equal" to the Delco-Remy regulators, and the contractor furnished the remaining regulators. Subsequently,

the United States Attorneys Office filed suit under the False Claims Act, based on the seventeen

invoices submitted prior to the contracting officer having learned of the mislabeling. The

district court found for the defendants, determining in part that the regulators were "equals" and

that the contracting officer had the authority to resolve contract disputes, which he had done here.

On appeal, the United States Court of Appeals for the Ninth Circuit reversed. The court

determined that the time to test the falsity of a claim is the date when it is submitted.  Accordingly,

"every one of the invoices prior to [when the contracting officer learned of the mislabeling] was

false when made."  Further, although the contracting officer has the authority to modify a contract,

a retroactive modification under such circumstances was "void as against public policy." The

court continued: "In such palming off as we have here we do not believe that the Congress ever

intended that contracting officers should have the power to vitiate the False Claims statute."

   Given the strong merits of the instant underlying case Defendant has no lawful grounds to

prosecute its SLAPP Counterclaim, as this Court has previously ruled.  This attempt additionally

violates Petitioners First Amendment (Petition the Government for redress of grievances,

Freedom of Speech, Due Process, ruinous fines, double jeopardy etc. ) and in this capacity

petitioner contends Record Press is performing as a State Actor. See *Shelley v. Kraemer, 334*

*U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948)*, ruling that racially discriminatory restrictive

covenants affecting real estate were unenforceable in state courts, because any such

enforcement would amount to state action in contravention of the Fourteenth Amendment.

Groups of homeowners used restrictive covenants to prevent the sale or rental of their homes to

African Americans, Jews, and other minorities. A restriction was included in their real estate

deeds forbidding such sale or rental. Until 1948 this form of private discrimination was thought to

be legal because the state was not involved.  In *Burton v. Wilmington Parking Authority, 365 U.S.*

*715, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961)*, the Court found state action when a state agency

leased property to a restaurant that refused to serve African Americans. It stated that state action

in support of discrimination exists when there is a "close nexus" between the functions of the

state and the private discrimination. "

<div align="center">

**STATEMENT OF MATERIAL FACTS**

</div>

It is acknowledged that Defendant Record Press holds, and has held Contractor status as winning bidder on contract 2231-S with the Government Printing Office to print Briefs & Appendix for SDNY US Attorney's Office. It is agreed that Record Press is charging the correct amount on the line II(b) "Text Per Page" "Per 10 Copies" $.35 and II(a) "Complete Cover" "Per 10 Copies" $6.00. We have at issue, whether, within four corners of the contract, the line(s) RUNNING RATE PER 10 COPIES apply to line II(d) Collating, trimming to size and binding per 100 pages $ 12.25. We now, in addition, have documents, the spreadsheets, which indicate Record Press, or any other winning contractor, should not be charging on line II(d) at all, other than in rare circumstances, such as preprinted documents or writs of certiorari, which require 'Pressure Sensitive Cover Stock' and substantial trimming.

Mr. Gocial's attached Expert Report is included as a Material Statement of Facts and is Subsumed within instant Motion to Dismiss by designation.

A plain reading of the four corners of contact 2231-S leads one to conclude that winning contractor must charge the People no more than $12.25 per 10 Running Rate Copies Per 100 Pages, i.e. per 1000 pages for relevant line II(d). Record Press chose to ignore clear **NOTE: RUNNING RATE IS PER 10 COPIES**  and again above all bid lines in section II "Running Per 10 Copies"

<div align="center">

**MOTION TO ADD AFFIRMATIVE DEFENSE**

</div>

Counterclaim Defendant requests leave of the Court to add Affirmative Defense and/or Claim. Upon Information & Belief, Petitioner is informed that Record Press has been involved in Bid-Rigging. This is a violation of the  Sherman Antitrust Act, 2/30/1890, ch. 647, 26 Stat. 209, 15 U.S.C. § 1–7 See *att.*. The Conspiratorial parties, atypically, were not otherwise lawfully competing printers, but Record Press and one or more employees, or former employees, of G.P.O..  Acknowledging the Plausibility standard under *Bell Atlantic Corp. v. Twombly, 550 U.S.*

*544 (2007),* Petitioner offers the following evidence. First, for economy see above Motion(s) *In Limine.*

Second, Start with 2231-S. As Stipulated, one party contends the relevant line IId should be read as "Per 10 Copies, Per 100 Pages", and the other "Per Copy, Per 100 Pages". Why not Write that? Is it to create Plausible Deniability? We shall see. Record Press contends it has been contracting with GPO for 30 years and in existence for 65, to which Petitioner Stipulates. In this time a Company and/or its Officers would presumably make many friends. Not a crime. Defendant acknowledges bidding on 2231-S and for years at questions, winning same. There could be no OverCharge/False Claim/Fraud without winning same. How to do so? Craft, or have crafted, a contract to "fit your needs" as potential Contractor. You want to make an unnatural rate of return, a.k.a. 'profit', but still win bid. How? Create, or have drafter create, a 'special gimmick' that only you and GPO insider(s) know(s). Virtually an act of genius, this 2231-s attempts the all but impossible. To dissuade legitimate bidders from correctly bidding their interest, due to this secret or trick, and losing the bid. Of course us taxpayers also lose out. Record Press won its bid by unlawful insider knowledge and/or conspiracy. We have on the II(d) line the now famous "Basis of Award" of 14*[sic].* Defendant, with its insider knowledge, bids more than double the other bidders on this, to other bidders, trivial line. On the 'major' lines II(a) & II(b) it bids competitively. As Record Press acknowledged under Oath, their "Profit" existed on that line only with their bid. If the other bidders had the "secret" of the bid, that the vast majority of the revenue would ensue on that line (if II(d) is per 100 pages but not per 10 copies per 100 pages **AND** they are allowed by their insider friends to charge II(d) for magnitudes greater pages & books than stated in RFP) they would bid appropriately, i.e. like Record Press. Another bidder who divined the scam would bid even higher on line II(d), why not $15 or $20, and only slightly lower on lines II(a) & II(b) such as $.32 per ten pages text per page. They would beat Defendant and Conspirator(s) at their own game. That winning bidder would have even more "Profit" and win the rigged bid. Didn't happen because the other bidders are not in on the scam. Why share when you

00000542

can keep all the ill gotten gains for yourself?

It's nice to have friends. Record Press charged GPO, who charged DOJ, i.e current and future

Taxpayers, $70 per binding for a book of 283 'leaves' (566 double sided pages). Binding and

pages had the appearance of a smallish phone book. If The Yellow Pages were charged $70 for

a binding that cost $.01 of glue, or less, they would go broke. If the People were charged $12.25

per book per 100 pages for binding alone for printing the Federal Budget the United States would

go (more) broke. Of course, there was not one scintilla even one other GPO printer, or the GPO

itself, ever charged this 'Kings Ransom' for binding glue, which should be deemed inculpatory.

On July 5, 2007, Petitioner contacted FedEx Kinko's, whom the SDNY US Attorney's Office has a

contract with, and asked what they charge for 'perfect' binding. They quoted a price of $4 per

book for small orders and up to 50% off ($2) for larger orders, for any number of pages. They

charge $.07 'text per page' for small orders with up to 50% off for large ($.035 same as Record

Press).

## CONCLUSION

For the aforesaid reasons, Relator/Counterclaim Defendant Pray Motions be granted by Court,

in the interest of justice, and for all other Relief the Court may deem Just and Appropriate.

DATED: February 17, 2011


                                          /S/
                        -----------------------------------------------------------
                          BRIAN T. BURKE, Relator/Counterclaim
                          Defendant
                         145 east 23rd street #4R
                         New York, NY 10010
                         (212) 614-8515
                          briantburke@gmail.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

---------------------------------------------------------X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.  1:08-CV-00364(EGS)(DAR) |
| Ex rel.BRIAN BURKE | : | |
| 145 East 23rd St. #4R | : | |
| New York, NY 10010 | : | |

212-614-8515                     :    **ORDER & DECISION**

        Plaintiff, pro se    :

                      :

        against,    :

RECORD PRESS                     :

        Defendant,    :

---------------------------------------------------------X

It is the Opinion of the Court that Relator/Counterclaim Defendant's Omnibus Motion to

Dismiss Counterclaim with Prejudice be granted in all parts. In addition, this Court Denies

Defendant's Oral post Trial Motion to Dismiss in all parts.

SO ORDERED

_____

Dated:

00000544

| ITEM NO. | DESCRIPTION | BASIS OF AWARD | NEW YORK UNIT RATE | NEW YORK COST | NEW YORK UNIT RATE | NEW YORK COST | NEW YORK COST | NEW YORK UNIT RATE | CONTRACT COST | CONTRACT UNIT RATE | COST |
|---|---|---|---|---|---|---|---|---|---|---|---|
| a | **COMPOSITION AND PAGE MAKEUP** | | | | | | | | | | |
| | COVER PAGE | | | | | | | | | | |
| 1 | BRIEF (8-1/8 X 9-1/4") PER PAGE | 310 | 9.00 | 2,790.00 | 10.00 | 3,100.00 | 2,015.00 | 8.50 | 2,015.00 | 6.50 | |
| 2 | APPENDIX (8-1/2 X 11") PER PAGE | 170 | 9.00 | 1,530.00 | 10.00 | 1,700.00 | 1,105.00 | 6.50 | 1,105.00 | 6.50 | |
| b | TEXT PAGE: MANUSCRIPT COPY PER PAGE | 106 | 10.00 | 1,060.00 | 10.00 | 1,060.00 | 742.00 | 7.00 | 742.00 | 7.00 | |
| c | TEXT PAGE: SUPPLIED DISK PER PAGE | 10106 | 7.80 | 78,827.40 | 4.00 | 40,424.00 | 40,424.00 | 4.00 | 40,424.00 | 4.00 | |
| d | REMAKE OF PAGES PER PAGE | 318 | NIC | | 3.00 | 954.00 | | NIC | | NIC | |
| e | PAGE PROOFS PER PAGE | 15780 | 1.00 | 15,780.00 | 0.20 | 3,156.00 | 3,156.00 | 0.20 | 3,156.00 | 0.20 | |
| f | AUTHOR'S ALTERATIONS PER ALTERATION | 34234 | NIC | | 0.25 | 8,558.50 | | NIC | | NIC | |
| g | INSERTION OF REFERENCE PAGE NUMBERS PER LI | 2052 | NIC | | | 410.40 | | NIC | | NIC | |
| h | RETURN TO THE DEPT. CORRECTED VERSION OF EACH BRIEF PER DISKETTE | 200 | NIC | | 1.50 | 300.00 | | NIC | | NIC | |
| i | PDF FILE PRODUCTION USING ACROBAT 3.0 READER FOR USE IN CD-ROM PER PAGE | | 0.25 | | 5.00 | | | 5.00 | | 5.00 | |
| j | DISKETTE FOR PDF FILE ABOVE EACH | 50 | NIC | | 1.50 | 75.00 | | NIC | | NIC | |
| II | **COMPLETE PRODUCT** | | | | | | | | | | |
| a | COMPLETE COVER PER 10 COPIES | 1327 | 3.00 | 3,981.00 | 6.50 | 7,289.50 | 7,289.50 | 6.50 | 7,289.50 | 5.50 | |
| b | TEXT PER PAGE PER 10 COPIES | 165938 | 0.50 | 82,968.00 | 0.30 | 49,768.80 | 33,199.20 | 0.30 | 33,199.20 | 0.20 | |
| c | PRESSURE SENSITIVE COVER STOCK | | | | | | | | | | |
| 1 | WHITE PER 100 LEAVES | 16 | NIC | | 12.00 | 120.00 | | NIC | | NIC | |
| 2 | COLOR PER 100 LEAVES | | NIC | | 12.00 | | | NIC | | NIC | |
| d | COLLATING, TRIMMING TO SIZE AND BINDING PER 100 PAGE | 14 | 6.50 | 91.00 | 12.00 | 168.00 | 70.00 | 5.00 | 70.00 | 5.00 | |
| III | **SERVICE AND FILING OF BRIEFS** | | | | | | | | | | |
| a | FILING BRIEF AND ANY APPENDICES OR ATTACHMENTS AT COURT AND ON ONE PARTY | 255 | 20.00 | 5,100.00 | 50.00 | 12,750.00 | | NIC | | NIC | |
| b | EACH ADDITIONAL SERVICE | 346 | NIC | | NIC | | | NIC | | NIC | |
| c | ELECTRONIC FILING OF BRIEFS EACH | 255 | | | 30.00 | 7,650.00 | | NIC | | NIC | |
| IV | **OVERTIME PAYMENT** | | | | | | | | | | |
| a | HOURLY RATE FOR WORK PERFORMED AFTER 10:00PM OR WEEKDAYS, SATURDAY, SUNDAY AND FEDERAL HOLIDAYS PER HOUR | 100 | 150.00 | 15,000.00 | 95.00 | 9,500.00 | | NIC | | NIC | |
| | **CONTRACTOR TOTALS** | | | $205,187.40 | | $147,003.20 | | | $88,009.70 | | $88,009.70 |
| | DISCOUNT | | | | | 2.00% | | | $1,760.19 | | |
| | **DISCOUNTED TOTALS** | | | $205,187.40 | | $147,023.20 | | | $86,249.51 | | $88,009.70 |

00000545

Program No 22314 Term 11/01/06 To 10/31/07
TITLE: APPEALS BRIEFS

| ITEM NO | DESCRIPTION | BASIS OF AWARD | (Contr #1 - E4) RECORD PRESS NEW YORK — UNIT RATE | COST | (Contr #2 - G4) CURRENT CONTRACTOR — UNIT RATE | COST | (Contr #3 - I4) UNIT RATE | COST | (Contr #4 - K4) UNIT RATE | COST | (Contr #5 - M4) UNIT RATE | COST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | COMPOSITION AND PAGE MAKEUP | | | | | | | | | | | |
| | COVER PAGE | | | | | | | | | | | |
| a | BRIEF (8-1/8 X 8-1/4") PER PAGE | 310 | 10.00 | 3,100.00 | 10.00 | 3,100.00 | | | | | | |
| 2 | APPENDIX (8-1/2 X 11") PER PAGE | 170 | 10.00 | 1,700.00 | 10.00 | 1,700.00 | | | | | | |
| b | TEXT PAGE MANUSCRIPT COPY PER PAGE | 108 | 10.00 | 1,080.00 | 10.00 | 1,080.00 | | | | | | |
| c | TEXT PAGE SUPPLIED DISK PER PAGE | 10106 | 5.50 | 55,583.00 | 4.00 | 40,424.00 | | | | | | |
| d | REMAKE OF PAGES PER PAGE | 318 | 3.50 | 1,113.00 | 3.00 | 954.00 | | | | | | |
| e | PAGE PROOFS PER PAGE | 15780 | 0.25 | 3,945.00 | 0.20 | 3,156.00 | | | | | | |
| f | AUTHOR'S ALTERATIONS PER ALTERATION | 34234 | 0.25 | 8,558.50 | 0.25 | 8,558.50 | | | | | | |
| g | INSERTION OF REFERENCE PAGE NUMBERS PER LI | 2052 | 0.25 | 513.00 | 0.20 | 410.40 | | | | | | |
| h | RETURN TO THE DEPT. CORRECTED VERSION OF EACH BRIEF PER DISKETTE | 200 | 1.75 | 350.00 | 1.50 | 300.00 | | | | | | |
| I | PDF FILE PRODUCTION USING ACROBAT 3.0 READER FOR USE IN CD-ROM PER PAGE | | 5.50 | | 5.00 | | | | | | | |
| J | DISKETTE FOR PDF FILE ABOVE. EACH | 50 | 1.75 | 87.50 | 1.50 | 75.00 | | | | | | |
| II | COMPLETE PRODUCT | | | | | | | | | | | |
| a | COMPLETE COVER PER 10 COPIES | 1327 | 6.00 | 7,962.00 | 6.50 | 7,288.50 | | | | | | |
| b | TEXT PER PAGE PER 10 COPIES | 163996 | 0.35 | 58,098.60 | 0.30 | 49,798.80 | | | | | | |
| c | PRESSURE SENSITIVE COVER STOCK PER 100 LEAVES | 10 | 12.50 | 125.00 | 12.00 | 120.00 | | | | | | |
| 1 | WHITE PER 100 LEAVES | | 12.50 | | 12.00 | | | | | | | |
| 2 | COLOR PER 100 LEAVES | | 13.50 | | 13.00 | | | | | | | |
| d | COLLATING, TRIMMING TO SIZE AND BINDING PER 100 PAGE | 14 | 12.25 | 171.50 | 12.00 | 168.00 | | | | | | |
| III | SERVICE AND FILING OF BRIEFS FILING BRIEF AND ANY APENDICES OR ATTACHMENTS AT COURT AND ON ONE PARTY | 255 | 50.00 | 12,750.00 | 50.00 | 12,750.00 | | | | | | |
| b | EACH ADDITIONAL SERVICE | 348 N/C | | | N/C | | | | | | | |
| c | ELECTRONIC FILING OF BRIEFS EACH | 255 | 30.00 | 7,650.00 | 30.00 | 7,650.00 | | | | | | |
| IV | OVERTIME PAYMENT | | | | | | | | | | | |
| a | HOURLY RATE FOR WORK PERFORMED AFTER 10:00PM ON WEEKDAYS, SATURDAY, SUNDAY AND FEDERAL HOLIDAYS PER HOUR | 100 | 95.00 | 9,500.00 | 95.00 | 9,500.00 | | | | | | |
| | CONTRACTOR TOTALS | | | $172,387.10 | | $147,023.20 | | | | | | |
| | DISCOUNT | | | | | | | | | | | |
| | DISCOUNTED TOTALS | | | $172,387.10 | | $147,023.20 | | | | | | |

Page 1 of 1

00000546

This document is available in two formats: this web page (for browsing content) and PDF (comparable to original document formatting). To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.

## Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For

### *An Antitrust Primer*

This primer briefly describes the most common antitrust violations and outlines those conditions and events that indicate anticompetitive collusion.

### Introduction [1]

American consumers have the right to expect the benefits of free and open competition — the best goods and services at the lowest prices. Public and private organizations often rely on a competitive bidding process to achieve that end. The competitive process only works, however, when competitors set prices honestly and independently. When competitors collude, prices are inflated and the customer is cheated. Price fixing, bid rigging, and other forms of collusion are illegal and are subject to criminal prosecution by the Antitrust Division of the United States Department of Justice.

In recent years, the Antitrust Division has successfully prosecuted regional, national, and international conspiracies affecting construction, agricultural products, manufacturing, service industries, consumer products, and many other sectors of our economy. Many of these prosecutions resulted from information uncovered by members of the general public who reported the information to the Antitrust Division. Working together, we can continue the effort to protect and promote free and open competition in the marketplaces of America.

This primer contains an overview of the federal antitrust laws and the penalties that may be imposed for their violation. It briefly describes the most common antitrust violations and outlines those conditions and events that indicate anticompetitive collusion so that you might better identify and report suspicious activity.

### Federal Antitrust Enforcement

Enacted in 1890, the Sherman Act is among our country's most important and enduring pieces of economic legislation. The Sherman Act prohibits any agreement among competitors to fix prices, rig bids, or engage in other anticompetitive activity. Criminal prosecution of Sherman Act violations is the responsibility of the Antitrust Division of the United States Department of Justice.

Violation of the Sherman Act is a felony punishable by a fine of up to $10 million for corporations, and a fine of up to $350,000 or 3 years imprisonment (or both) for individuals, if the offense was committed before June 22, 2004. If the offense was

00000547

committed on or after June 22, 2004, the maximum Sherman Act fine is $100 million for corporations and $1 million for individuals, and the maximum Sherman Act jail sentence is 10 years. Under some circumstances, the maximum potential fine may be increased above the Sherman Act maximums to twice the gain or loss involved. In addition, collusion among competitors may constitute violations of the mail or wire fraud statute, the false statements statute, or other federal felony statutes, all of which the Antitrust Division prosecutes.

In addition to receiving a criminal sentence, a corporation or individual convicted of a Sherman Act violation may be ordered to make restitution to the victims for all overcharges. Victims of bid-rigging and price-fixing conspiracies also may seek civil recovery of up to three times the amount of damages suffered.

**Forms of Collusion**

Most criminal antitrust prosecutions involve price fixing, bid rigging, or market division or allocation schemes. Each of these forms of collusion may be prosecuted criminally if they occurred, at least in part, within the past five years. Proving such a crime does not require us to show that the conspirators entered into a formal written or express agreement. Price fixing, bid rigging, and other collusive agreements can be established either by direct evidence, such as the testimony of a participant, or by circumstantial evidence, such as suspicious bid patterns, travel and expense reports, telephone records, and business diary entries.

Under the law, price-fixing and bid-rigging schemes are per se violations of the Sherman Act. This means that where such a collusive scheme has been established, it cannot be justified under the law by arguments or evidence that, for example, the agreed-upon prices were reasonable, the agreement was necessary to prevent or eliminate price cutting or ruinous competition, or the conspirators were merely trying to make sure that each got a fair share of the market.

*Price Fixing*

Price fixing is an agreement among competitors to raise, fix, or otherwise maintain the price at which their goods or services are sold. It is not necessary that the competitors agree to charge exactly the same price, or that every competitor in a given industry join the conspiracy. Price fixing can take many forms, and any agreement that restricts price competition violates the law. Other examples of price-fixing agreements include those to:

- Establish or adhere to price discounts.

- Hold prices firm.

- Eliminate or reduce discounts.

- Adopt a standard formula for computing prices.

- Maintain certain price differentials between different types, sizes, or quantities of

00000548

products.

- Adhere to a minimum fee or price schedule.

- Fix credit terms.

- Not advertise prices.

In many cases, participants in a price-fixing conspiracy also establish some type of policing mechanism to make sure that everyone adheres to the agreement.

### *Bid Rigging*

Bid rigging is the way that conspiring competitors effectively raise prices where purchasers — often federal, state, or local governments — acquire goods or services by soliciting competing bids.

Essentially, competitors agree in advance who will submit the winning bid on a contract being let through the competitive bidding process. As with price fixing, it is not necessary that all bidders participate in the conspiracy.

Bid rigging also takes many forms, but bid-rigging conspiracies usually fall into one or more of the following categories:

**Bid Suppression**: In bid suppression schemes, one or more competitors who otherwise would be expected to bid, or who have previously bid, agree to refrain from bidding or withdraw a previously submitted bid so that the designated winning competitor's bid will be accepted.

**Complementary Bidding:** Complementary bidding (also known as "cover" or "courtesy" bidding) occurs when some competitors agree to submit bids that either are too high to be accepted or contain special terms that will not be acceptable to the buyer. Such bids are not intended to secure the buyer's acceptance, but are merely designed to give the appearance of genuine competitive bidding. Complementary bidding schemes are the most frequently occurring forms of bid rigging, and they defraud purchasers by creating the appearance of competition to conceal secretly inflated prices.

**Bid Rotation:** In bid rotation schemes, all conspirators submit bids but take turns being the low bidder. The terms of the rotation may vary; for example, competitors may take turns on contracts according to the size of the contract, allocating equal amounts to each conspirator or allocating volumes that correspond to the size of each conspirator company. A strict bid rotation pattern defies the law of chance and suggests collusion is taking place.

**Subcontracting:** Subcontracting arrangements are often part of a bid-rigging scheme. Competitors who agree not to bid or to submit a losing bid frequently receive subcontracts or supply contracts in exchange from the successful low bidder. In some schemes, a low bidder will agree to withdraw its bid in favor of the next low bidder in exchange for a lucrative subcontract that divides the illegally obtained higher price

00000549

between them.

Almost all forms of bid-rigging schemes have one thing in common: an agreement among some or all of the bidders which predetermines the winning bidder and limits or eliminates competition among the conspiring vendors.

### *Market Division*

Market division or allocation schemes are agreements in which competitors divide markets among themselves. In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves. For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers. In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors. In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies.

### Detecting Bid Rigging, Price Fixing, And Other Types Of Collusion

Bid rigging, price fixing, and other collusion can be very difficult to detect. Collusive agreements are usually reached in secret, with only the participants having knowledge of the scheme. However, suspicions may be aroused by unusual bidding or pricing patterns or something a vendor says or does.

### *Bid or Price Patterns*

Certain patterns of bidding or pricing conduct seem at odds with a competitive market and suggest the possibility of collusion:

### Bids

- The same company always wins a particular procurement. This may be more suspicious if one or more companies continually submit unsuccessful bids.

- The same suppliers submit bids and each company seems to take a turn being the successful bidder.

- Some bids are much higher than published price lists, previous bids by the same firms, or engineering cost estimates.

- Fewer than the normal number of competitors submit bids.

- A company appears to be bidding substantially higher on some bids than on other bids, with no apparent cost differences to account for the disparity.

- Bid prices drop whenever a new or infrequent bidder submits a bid.

- A successful bidder subcontracts work to competitors that submitted unsuccessful

00000550

bids on the same project.

- A company withdraws its successful bid and subsequently is subcontracted work by the new winning contractor.

**Prices**

- Identical prices may indicate a price-fixing conspiracy, especially when:

- Prices stay identical for long periods of time.

- Prices previously were different.

- Price increases do not appear to be supported by increased costs.

- Discounts are eliminated, especially in a market where discounts historically were given.

- Vendors are charging higher prices to local customers than to distant customers. This may indicate local prices are fixed.

### *Suspicious Statements or Behavior*

While vendors who collude try to keep their arrangements secret, occasional slips or carelessness may be a tip-off to collusion. In addition, certain patterns of conduct or statements by bidders or their employees suggest the possibility of collusion. Be alert for the following situations, each of which has triggered a successful criminal antitrust prosecution:

- The proposals or bid forms submitted by different vendors contain irregularities (such as identical calculations or spelling errors) or similar handwriting, typeface, or stationery. This may indicate that the designated low bidder may have prepared some or all of the losing vendor's bid.

- Bid or price documents contain white-outs or other physical alterations indicating last-minute price changes.

- A company requests a bid package for itself and a competitor or submits both its and another's bids.

- A company submits a bid when it is incapable of successfully performing the contract (likely a complementary bid).

- A company brings multiple bids to a bid opening and submits its bid only after determining (or trying to determine) who else is bidding.

- A bidder or salesperson makes:

- Any reference to industry-wide or association price schedules.

00000551

- Any statement indicating advance (non-public) knowledge of competitors' pricing.

- Statements to the effect that a particular customer or contract "belongs" to a certain vendor.

- Statements that a bid was a "courtesy," "complementary," "token," or "cover" bid.

- Any statement indicating that vendors have discussed prices among themselves or have reached an understanding about prices.

### *A Caution About Indicators of Collusion*

While these indicators may arouse suspicion of collusion, they are not proof of collusion. For example, bids that come in well above the estimate may indicate collusion or simply an incorrect estimate. Also, a bidder can lawfully submit an intentionally high bid that it does not think will be successful for its own independent business reasons, such as being too busy to handle the work but wanting to stay on the bidders' list. Only when a company submits an intentionally high bid because of an agreement with a competitor does an antitrust violation exist. Thus, indicators of collusion merely call for further investigation to determine whether collusion exists or whether there is an innocent explanation for the events in question.

### Conditions Favorable To Collusion

While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

- Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are "fringe" sellers who control only a small fraction of the market.

- The probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured.

- The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.

- Repetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts provide the opportunity for competitors to share the work.

- Collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting

00000552

employment from one company to another.

- Bidders who congregate in the same building or town to submit their bids have an easy opportunity for last-minute communications.

**What You Can Do**

Antitrust violations are serious crimes that can cost a company hundreds of millions of dollars in fines and can send an executive to jail for up to ten years. These conspiracies are by their nature secret and difficult to detect. The Antitrust Division needs your help in uncovering them and bringing them to our attention.

If you think you have a possible violation or just want more information about what we do, contact the Citizen Complaint Center of the Antitrust Division:

**E-mail:** *antitrust.complaints@usdoj.gov*

**Phone:** 1-888-647-3258 (toll-free in the U.S. and Canada) or 1-202-307-2040

**Address:**

Citizen Complaint Center
Antitrust Division, U.S. Dept. of Justice
950 Pennsylvania Ave. NW, Suite 3322
Washington, DC 20530

---

**FOOTNOTES**

1. This Primer provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. No limitations are hereby placed on otherwise lawful investigative and litigation prerogatives of the Department of Justice.

00000553



LEXSEE 45 IDAHO L. REV. 41

Copyright (c) 2008 Idaho Law Review
Idaho Law Review

2008

45 Idaho L. Rev. 41

**LENGTH:** 14916 words

ARTICLE: THE GOVERNMENT KNOWLEDGE DEFENSE TO THE CIVIL FALSE CLAIMS ACT: A MISNOMER BY ANY OTHER NAME DOES NOT SOUND AS SWEET

**NAME:** MICHAEL J. DAVIDSON*

**BIO:**

> * B.S., U.S. Military Academy, 1982; J.D., College of William & Mary, 1988; LL.M. (Military Law), The Army's Judge Advocate General's School, 1994; LL.M. (Government Procurement Law), George Washington University (GWU) School of Law, 1998; S.J.D., GWU, 2007. The author is a federal attorney. The opinions contained in this article are those of the author and do not reflect the position of any federal agency or the United States Government.

**SUMMARY:**
 ... A Phoenix Rises from the Ashes: The Development of the Government Knowledge Defense In 1986, in addition to eliminating the government knowledge-based jurisdictional bar, Congress clarified the FCA's scienter element, making it clear that the United States need not prove specific intent in order to establish that the defendant acted knowingly when it submitted a false claim or statement to the United States. ... Citing several dated cases, the court pointed out that " b ecause FCA liability requires an element of fraud or falsity, courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false." ... Hagood In Hagood, a qui tam relator brought suit alleging that the water agency had presented false cost allocation information to the United States to obtain an Army Corps of Engineers contract. ... The contractor in this scenario is still attempting to defraud the United States, and that fact remains unchanged even when the contracting officer or some other relevant acquisition official discovers the misconduct. ... The Tenth Circuit noted that the court in Butler had rejected the position that only a contracting officer's knowledge was relevant for purposes of determining whether a defendant had acted knowingly. ... For purposes of this defense, the legally relevant authority extends beyond that possessed by contracting officers to other procurement officials "with authority to act under the contract." ... Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct. ... Further, contractors will be held responsible for knowing the limitations on the authority of government contracting officials when such limitations were contained in published laws or regulations. ... Finding the regulators satisfactory, the Army's Contracting Officer accepted them as "equal" to the Delco-Remy regulators, and the contractor furnished the remaining regulators.

00000554

**TEXT:**

I. INTRODUCTION

The Civil False Claims Act  n1 (FCA) serves as the United States Government's preeminent tool for addressing fraud.  n2 The FCA's application  has expanded beyond its initial focus on defense procurement fraud to embrace most federally funded government programs.  n3 The largest recoveries under the FCA are currently obtained in health care fraud cases.  n4 As a fraud fighting tool, the FCA has proven extremely successful, at least in terms of the fraud-related monetary recoveries. Since 1986, the United States has recovered more than $ 20 billion under the FCA.  n5

In response to the government's aggressive use of the FCA, the defense bar has developed several defenses to FCA claims.  n6 One such defense that has enjoyed a measure of success is the inappropriately named "government knowledge defense." The government knowledge defense is a misnomer to the extent the term implies that government knowledge of alleged wrongdoing, by itself, affords a complete defense to an FCA lawsuit. Indeed, the scope of the defense is much narrower. To the extent knowledge of wrongdoing by government officials constitutes a defense at all, such knowledge serves as a defense to the FCA's scienter element; that is, the alleged misconduct was not committed knowingly. In other words, the defendant could not have knowingly violated the FCA because the government knew about the conduct and authorized it, either explicitly or tacitly; or, at the very minimum, the defendant reasonably believed that the government was aware of, and in agreement with, the challenged conduct.

This article will examine the government knowledge defense, reviewing its development and examining its present state. Part II first provides an overview of the FCA. Part III then examines the development of the defense, distinguishing between the pre-1986 jurisdictional bar generated by government knowledge of misconduct and the post-1986 development of what has become known as the government knowledge defense. The article posits that the modern government knowledge defense traces its lineage to the Ninth Circuit's seminal decision in *United States ex rel. Hagood v. Sonoma County Water Agency.*  n7 Reviewing reported decisions, Part IV discusses the defense as it has developed into its modern form and attempts to articulate the defense's basic elements. Although the FCA has been applied to address fraud in the vast  majority of federally funded programs, this article will focus primarily on its application to government contracts.

II. HISTORICAL BACKGROUND OF THE FALSE CLAIMS ACT

The False Claims Act was enacted during the Civil War as a statutory tool to combat widespread fraud found among defense contractors.  n8 The Union Army reported instances of being charged multiple times for the same horse, finding "boots made of cardboard rather than leather,"  n9 and discovering sawdust substituted for gunpowder in ammunition crates and muskets in rifle crates.  n10 Civil War contractors had billed the United States "for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war."  n11 In its original form, the FCA allowed private persons to initiate lawsuits  n12 and provided for both criminal and civil penalties, but Congress eventually removed the FCA's criminal component and placed it elsewhere.  n13

Except for brief flurries of activity associated with America's entry into war, with concomitant increases in defense spending and defense contractor fraud, the FCA was infrequently used.  n14 However, during the early 1980s, federal agencies reported a steady increase in fraud investigations. The Department of Defense (DoD) reported that it conducted 2311 such investigations in 1984.  n15 The following year, the DoD Inspector  General "testified that 45 of the 100 largest defense contractors, including 9 of the top 10, were under investigation for multiple fraud offenses."  n16 Further, the Department of Justice reported to Congress that, within the proceeding year, it had achieved convictions of four major defense companies and had indicted another.  n17

The procurement fraud scandals of the early 1980s gave rise to various legislative initiatives designed to strengthen the government's ability to deal with rampant fraud within the defense industry,  n18 including significant revisions to the FCA.  n19 The 1986 amendments increased the maximum penalty from $ 2000 to $ 10,000 and provided for treble damages,  n20 added "reverse false claims"  n21 and anti-retaliation provisions,  n22 eliminated the exclusion for

45 Idaho L. Rev. 41

members of the armed forces, n23 clarified the scienter element n24 and the standard of proof, n25 and lengthened the statute of limitations. n26

In its current form, the FCA provides for civil liability against any person who engages in one of seven forms of misconduct. n27 The most common FCA causes of action are submitting a false claim and making or using false records to support a false claim. n28

An FCA action may be brought initially by either the United States or by an individual on behalf of the United States. n29 When suit is brought by an individual (a relator), the case is known as a qui tam. n30 "The basic idea [behind a qui tam suit] is that a private citizen with personal knowledge of such fraud may bring suit on the government's behalf in return for a cut of the proceeds should the suit prevail." n31 The United States may assume control over a qui tam lawsuit or it may decline to intervene and permit the relator to pursue the case. n32

A defendant found to have violated the FCA may be held liable for treble damages and a civil penalty of $ 5500 to $ 11,000 per false claim. n33 FCA damages "typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'" n34 Additionally, recovery of penalties is not dependent upon the United States proving actual damages. n35 In successful qui tam cases, the relator is entitled to a share of the government's recovery. This share may range up to thirty percent of the amount the United States recovers, depending upon the relator's contribution to the successful resolution of the case. n36

   III. THE DEVELOPMENT OF THE GOVERNMENT KNOWLEDGE DEFENSE

   A. Demise of the Government Knowledge Jurisdictional Bar

Prior to 1986, government knowledge of the factual basis for a qui tam suit served as a jurisdictional bar to potential relators. n37 This bar reflected Congress's efforts during World War II to eliminate parasitic lawsuits. n38 Such lawsuits were being brought "'by parties having no information of their own to contribute, but who merely plagiarized information in indictments returned to the courts, newspaper stories or congressional investigations.'" n39 The FCA's prior government knowledge provision had been strictly interpreted so as to "preclud[e] any qui tam suit based on information in the Government's possession, despite the source." n40 Some courts have precluded qui tam lawsuits based on information in the government's possession even when the relator was the source of that information. n41 Corrupt contractors found an unintended safe harbor. As one legal treatise noted: "Defense contractors seeking to avoid liability or governmental officials who resented qui tam actions were almost always able to find some Government official somewhere who had some knowledge of the fraudulent activities involved." n42

Believing that such a draconian jurisdictional bar could lead to inequitable results n43 and seeking to encourage potential relators to bring suit, n44 Congress eliminated the jurisdictional bar and instead substituted a public disclosure standard: "[A] qui tam suit will be barred only if it is based on information that was 'publicly disclosed' at various hearings, in certain types of reports, or by the media." n45 Under this standard, "[i]nformation that the government 'has,' but that was never publicly disclosed, does not bar a qui tam suit." n46

In the event of a public disclosure, the qui tam relator's action is not barred so long as the relator was the original source of the information giving rise to the lawsuit. n47 The "original source" requirement is jurisdictional. n48 The FCA defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under [the FCA] which is based on the information." n49

The prior government knowledge-based jurisdictional bar and the current government knowledge defenses are analytically distinct concepts. The former focused on the government's knowledge of the fraud to preclude the relator from bringing suit; n50 the latter focuses on the effect the government's knowledge has on the defendant's mental state in order to determine if the defendant acted knowingly. n51 Further, the earlier jurisdictional language was removed from the FCA in 1986 n52 and replaced with the public disclosure/original source language found in § 3730(e)(4). n53

Accordingly, to the extent that the possession of information forming the basis of a relator's FCA lawsuit served as a jurisdictional bar, that form of government knowledge defense no longer exists. However, "[o]nce public disclosure became the linchpin of the jurisdictional scheme, the effect of government knowledge on the viability of an FCA claim was thrown to the courts to decide." n54

B. A Phoenix Rises from the Ashes: The Development of the Government Knowledge Defense

In 1986, in addition to eliminating the government knowledge-based jurisdictional bar, Congress clarified the FCA's scienter element, making it clear that the United States need not prove specific intent in order to establish that the defendant acted knowingly when it submitted a false claim or statement to the United States. n55 In doing so, Congress intended to reach "the increasingly familiar 'ostrich-like' conduct of corporate officers, who had been able to insulate themselves from FCA liability for false claims submitted by unwitting subordinates." n56

By the plain terms of the FCA's statutory language, the scienter requirement is that the defendant acted knowingly for all FCA claims except those enumerated in sections 3729(a)(3), (a)(4) and (a)(5). n57 Currently, the FCA defines "knowing" and "knowingly" to "mean that a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information . . . ." n58

In other words, the "defendant must 'know' that a claim or statement is false or fraudulent, that is, he must (1) have actual knowledge that it is false, (2) act in deliberate ignorance of its truth or falsity or (3) act in reckless disregard of its truth or falsity." n59 The United States, or a relator acting on its behalf, is not required to prove that the defendant acted with the specific intent to defraud. n60

1. *Boisjoly:* A Failed First Attempt

The first reported post-1986 amendment case to address the government knowledge defense was *Boisjoly v. Morton Thiokol, Inc.* n61 In *Boisjoly,* an engineer working for the defendant filed a qui tam following the Challenger disaster, alleging that Morton Thiokol provided NASA with defective solid rocket motors (SRM), n62 that the defendant's role in the launch decision constituted a false claim, and that the company requested and received a bonus from NASA despite the shuttle disaster and the company's failure to meet contract specifications. n63

The court granted the defendant's motion to dismiss the first cause of action, noting that the complaint itself indicated that NASA knew of the alleged SRM defects. n64 Citing several dated cases, n65 the court pointed out that "[b]ecause FCA liability requires an element of fraud or falsity, courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false." n66 The court then posited, "only if the government gets something less than or different from that which it expected can it be  said to have suffered the kind of injury necessary to invoke FCA liability." n67 The court held "that if the complaint itself alleges that the government knew of those very facts or characteristics which allegedly make the claim false, no claim has been stated." n68

Further, the court determined that the remaining causes of action did not state an FCA claim. n69 The court found that the defendant had certified the safety of the SRMs only after disclosing its concerns to NASA and after being pressured by the government to submit the certification. n70 The court held that such "circumstances are simply not the kind against which the FCA is meant to protect" and "negate[] any element of falsity or fraud that might otherwise exist." n71

With respect to that portion of the opinion addressing the government knowledge defense, the court's decision has been criticized  n72 and effectively overruled to the extent *Boisjoly* suggests that government knowledge constitutes an absolute defense. n73 In *Shaw v. AAA Engineering & Drafting, Inc.,* the United States Court of Appeals for the Tenth Circuit specifically rejected the notion that government knowledge constituted an absolute defense to an FCA case. n74 Instead, the court noted that "there may still be occasions when the government's knowledge of or cooperation with a

00000557

contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA." n75 Further, as subsequent case law has shown, government knowledge may serve as a defense to the FCA's scienter element, rather than to the falsity of the claim. n76

2. *Hagood:* The Ninth Circuit Sets the Standard

The seminal and most often cited case to address the government knowledge defense since the 1986 amendments to the FCA is *United States ex rel. Hagood v. Sonoma County Water Agency.* n77 Indeed, the *Hagood* decision has been cited with approval by several circuit courts, including the Second, n78 Sixth, n79 Seventh, n80 and Tenth, n81 by the U.S. Court of Federal Claims, n82 and by district court decisions in other circuits. n83

a. *Hagood*

In *Hagood,* a *qui tam* relator n84 brought suit alleging that the water agency had presented false cost allocation information to the United States to obtain an Army Corps of Engineers contract. n85 The district court dismissed the suit "for failure to state a claim for which relief could be granted." n86

The district court believed that Hagood's complaint was "essentially self-contradictory" because it both alleged that the water agency had committed fraud and that "'the high government officials responsible for taking the action' knew of the facts that made the complaint false." n87 Further, the district court found that Hagood failed to sufficiently plead fraudulent intent for purposes of Fed. R. Civ. P. 9(b) and that the government's knowledge of the alleged falsity made it "impossible to say that the government had suffered the kind of injury necessary to impose liability under the False Claims Act." n88 Elaborating, the district court mused, "it is difficult to see how any damages to the United States are caused by false statements when officials, with full knowledge of the falsity of the statements, proceed to take an action depriving the government of funds notwithstanding the false statements." n89

On appeal, the United States Court of Appeals for the Ninth Circuit reversed and remanded. n90 The appellate court found that Hagood's complaint was not self-contradicting. n91 Reviewing the FCA's requirement that the alleged misconduct be knowing, the court noted that the scienter element required more than mere negligence or innocent mistake but did not require the government to prove specific intent to deceive. n92 In terms of intent, the United States had to establish "the knowing presentation of what is known to be false." n93

With respect to government knowledge of the falsity, the court acknowledged that such knowledge could be "highly relevant"; it could "show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." n94 However, the court also posited that government knowledge did not alone provide an absolute defense--"[t]hat the relevant government officials know of the falsity is not in itself a defense." n95 In short, the court found evidence of government knowledge potentially relevant to the FCA's scienter element, but not to the issue of falsity. n96

The court left the question of whether government knowledge may preclude an award of damages unanswered. n97 However, the court pointed out that the United States need not prove damages in order to recover penalties and costs, suggesting that even if government knowledge provided a causal defense against an award of damages, such knowledge did not insulate the defendant from the imposition of penalties. n98

Finally, the court rejected an estoppel defense. Reiterating the well-established law that "estoppel will not lie against the United States 'on the same terms as any other litigant,'" under the facts alleged in this case, the court posited that "[t]he defendant's 'inability to retain money that it should never have received in the first place' is not the kind of detrimental reliance that justifies estoppel against the government." n99 Finding that Hagood's allegations constituted a valid cause of action, the court further admonished: "'Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of the law . . . . [T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.'" n100

00000558

b. *Hagood's* Progenies: *Wang & Butler*

The Ninth Circuit's decisions in *Wang* and *Butler* amplified its original decision in *Hagood*. In *Wang ex rel. United States v. FMC Corp.*, n101 a qui tam relator, who had alleged that FMC defrauded the United States on four defense contracts including a contract involving a lightweight howitzer, unsuccessfully appealed the district court's grant of summary judgment to FMC. n102 In support of his claim, Wang alleged "that FMC's engineering work was of 'low quality,' and that the design for the lightweight howitzer was 'faulty.'" n103 Wang's sole piece of evidence to support his allegations concerning the howitzer contract was an FMC "lessons learned" memorandum written after the contract had been cancelled. n104 Significantly, "all of the issues discussed in the memorandum were first raised and considered in meetings with the Army." n105

Analyzing the FCA's scienter requirement, the court noted that the Army knew about "FMC's mistakes and limitations, and that FMC was open with the government about them . . . ." n106 Accordingly, the court opined that Wang's evidence was insufficient to survive summary judgment, the memorandum suggesting only "that while FMC might have been groping for solutions, it was not cheating the government in the effort." n107 To be knowingly false, there must be something more than a mere scientific untruth, there must be "a lie." n108

Following *Wang*, the Ninth Circuit again addressed the issue of government knowledge in an FCA case. In *United States ex rel. Butler v. Hughes Helicopter, Inc.*, n109 a qui tam relator, who alleged that the defendant had made false statements and submitted false claims "related to several aspects of the testing of the avionics and navigation subsystems" of the Apache attack helicopter, appealed an adverse directed verdict. n110 At trial, the defendant argued, in relevant part, that Army technical representatives approved deviations from the required specifications and that Army technical representatives were also present during relevant equipment tests. n111 As part of its findings of fact, the district court noted "the Army's knowledge of and access to the modifications in the testing of the subsystems . . . ." n112 Further, the district court's decision relied on its conclusion that the Army and defendant enjoyed a "pattern of cooperation" in which "information flowed freely," and "all information upon which [Butler] bases his case was not only available to the Army, but in the Army's possession." n113

On appeal, Butler did not challenge the district court's findings of fact, but instead argued "that the *wrong* Army personnel knew, that is, that only a contracting officer had the power to modify a government contract to allow the deviations the Army allowed in the testing." n114 The court first noted that government knowledge is not an automatic defense to an FCA action and that courts must evaluate the significance of such knowledge on a case-by-case basis. n115 Relying on *Hagood* and *Wang*, the court then determined that the scope of its review focused on the evidence "that [the defendant] and the Army had so completely cooperated and shared all information during the testing that [the defendant] did not 'knowingly' submit false claims," in which case the court would affirm the directed verdict. n116 With respect to the government knowledge defense, the court did not directly confront Butler's argument, but instead found that test changes were discussed between the defendant and Army representatives, that Army technical representatives knew of and approved these changes, and, accordingly, that the allegedly noncompliant test could not have been a "knowingly false statement[]." n117

IV. THE CURRENT STATE OF THE DEFENSE

The vast majority of cases have determined that government knowledge is not an absolute defense to an FCA action. n118 In other words, the mere fact that government officials know of the falsity does not, standing alone, constitute a defense. n119 While relevant, "the Government's knowledge is . . . not necessarily dispositive . . . ." n120 The significance of the government's knowledge is determined on a case by case basis. n121

Since the 1986 FCA amendments, several courts have addressed the government knowledge defense, providing an emerging, but sufficiently well defined, body of law to map out the parameters of this defense. In order for government knowledge of defendant's alleged wrongdoing to serve as a defense to an FCA action, the defendant must satisfy several elements. First, the defendant can use the government's knowledge of his conduct to defend against the FCA's scienter

45 Idaho L. Rev. 41

element to establish that he did not knowingly commit a violation of the FCA. Second, the defendant must establish that the government had knowledge of the specific conduct that forms the basis of the FCA claim. Third, the defendant cannot merely show that someone in the government had knowledge of the challenged conduct; rather, the defendant must prove that a relevant government official was aware of the challenged conduct and approved it, either explicitly or tacitly. Finally, the defendant must also prove that the relevant government official had knowledge of the specific conduct at issue *before* the defendant presented a claim.

   A. Defendant's Scienter Was Affected

   The courts have applied the government knowledge defense to the scienter element of the FCA.  n122 As originally explained by the United States Court of Appeals for the Ninth Circuit in *Hagood,* the requisite intent in an FCA case is "the knowing presentation of what is known to be false." n123 Accordingly, "[t]hat the relevant government officials know of the falsity is not in itself a defense." n124 "[T]he knowledge possessed by officials of the United States may be . . . relevant. . . . [to] show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." n125 The focus of the defense is not on what the government knew; rather, the defense focuses on whether the defendant acted knowingly, examining the effect of the government's knowledge on the defendant.

   Interpreting the FCA to provide an absolute defense based on government knowledge of the specific falsity at issue, without a concomitant effect on the defendant's mental state, would lead to absurd results. To illustrate, assume that a contractor knowingly submits a false claim--indeed does so with the specific intent to defraud the United States--but a federal employee learns of the falsity unbeknownst to the corrupt contractor, either before or after the claim is submitted. Is the claim any less false, or was it submitted any less knowingly, merely because someone in the government became aware of it? The answer, of course, is no. n126 Nor does the answer change if the federal employee who  discovers the falsity is the cognizant contracting officer.  n127 The contractor in this scenario is still attempting to defraud the United States, and that fact remains unchanged even when the contracting officer or some other relevant acquisition official discovers the misconduct.

   In *Shaw v. AAA Engineering & Drafting Inc.,*  n128 the United States Court of Appeals for the Tenth Circuit rejected a government knowledge defense based on knowledge of misconduct provided to the government by the qui tam relator, who had formerly been employed by the defendant. While still an employee of the defendant, Shaw reported certain environmental misconduct to the government's Quality Assurance Evaluator, who in turn relayed the information to the contracting officer.  n129 In rejecting the defense the court posited:

      Assuming some level of government knowledge would negate the intent requirement under the FCA
      as a matter of law, the level of government knowledge in the present case does not do so. It was the
      plaintiff, Shaw, and not the individual defendants or other AAA employees, who told the government
      about the failure to practice silver recovery.  n130

   The unsuitability of government knowledge as an absolute defense is highlighted further when the knowledgeable federal employee is not merely a passive recipient of information, but instead is a participant in a scheme to defraud the United States.  n131 Clearly, the defendant should not escape liability merely because it found a willing participant--a coconspirator--within the government.

   Additionally, an FCA defendant should not benefit if someone from the government learns of the falsity and simply does nothing about it. The Seventh Circuit has held that mere governmental acquiescence is insufficient to sustain a government knowledge defense.  n132 The government  must both know of, and approve, the particular claim before it is submitted.  n133 The opinions of other circuit courts appear to have adopted a similar standard.  n134 Unless that person is someone with the requisite level of authority and approves or otherwise indicates to the defendant that its conduct is permissible, then the defendant's scienter remains unaffected. Additionally, "mere acquiescence would preclude FCA liability any time a government employee and a defendant were in cahoots." n135

45 Idaho L. Rev. 41

Even though the government has not affirmatively approved a particular claim or its underlying factual basis when such is in contention, apparently some courts have imposed a less demanding standard that permits the defense when government knowledge is coupled with acquiescence. n136 Such a standard would seem defensible so long as the defendant could establish that the particular facts and circumstances surrounding the government's receipt of relevant information, and subsequent acquiescence, reasonably affected the defendant's mental state. In those jurisdictions adopting such a standard, the critical focus would remain on the defendant's scienter, that is, did the defendant knowingly submit a false claim.

B. Specific Falsity at Issue

In order for government knowledge to serve as a defense, the United States must also have known of the specific falsity at issue. Both the Fifth and Seventh Circuits have posited: "'[I]f the government knows and approves of *the particulars* of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.'" n137 Other courts applying the defense have articulated a similar standard n138 or have noted that the specific falsity at issue was known to the government. n139 Logically, this element should be met if the defendant has fully disclosed all relevant facts leading up to the presentment of a claim, or followed the government's specific instructions when presenting the claim, such that it is apparent that the government knew and approved of the defendant's course of action. n140 Under this standard, it is insufficient that the Government becomes aware of contractual or programmatic irregularities not amounting to fraud or becomes aware of other, unrelated fraud.

C. Relevant Government Officials

Merely establishing that someone within the government possessed knowledge of the defendant's wrongdoing does not, by itself, satisfy this element of the government knowledge defense. Albeit few cases have squarely addressed the issue, several opinions have suggested a limitation on the defense, requiring that the knowledge be possessed by relevant government employees. n141 Other court opinions applying the defense, but not addressing the relevant pool of government officials, have noted complete or extensive knowledge by the government of the alleged misconduct, n142 suggesting that this limited body of relevant or responsible officials also had the requisite knowledge. If such a limitation did not exist, then a defendant could escape liability simply by finding someone within the government who possessed some knowledge of the challenged conduct, regardless of that person's authority or relationship with the underlying program or activity.

The United States Court of Appeals for the Tenth Circuit was one of the few courts to directly address this issue in the federal procurement context. In *United States ex rel. Stone v. Rockwell International Corp.,* n143 the Tenth Circuit reviewed a challenge to the district court's jury instruction, "charging the jury that they could consider the knowledge of all 'government employees with authority to act under the contract.'" n144 Noting that the instruction had not limited the jury's consideration of knowledge possessed only by the government's contracting officers, but rather that such authority extended to "a broader range of individuals," the appellate court held that the district court's instruction was not in error. n145

Further, the court rejected the appellant's argument that upholding the lower court's jury instruction would conflict with *United States ex rel. Butler v. Hughes Helicopters, Inc.* n146 The Tenth Circuit noted that the court in *Butler* had rejected the position that only a contracting officer's knowledge was relevant for purposes of determining whether a defendant had acted knowingly. n147 Instead, the Ninth Circuit had included "technical representatives" within the pool of relevant government officials. n148

As the *Stone* decision correctly indicates, for purposes of this defense, the legal significance of the government's knowledge in the federal procurement context is linked to the authority of the employee in possession of the information. That authority does not reside with all employees merely because they are somehow associated with the procurement; nor, on the other hand, is such authority embodied solely in the contracting officer. For purposes of this defense, the legally relevant authority extends beyond that possessed by contracting officers to other procurement

00000561

officials "with authority to act under the contract." n149

Unfortunately the courts have failed to provide a clear standard for determining relevant officials--those with the requisite level of authority--specifically for purposes of the government knowledge defense. However, although the two bodies of law are not synonymous, established principles of general federal procurement law addressing the authority of federal acquisition officials to bind the government offer guidance for FCA cases. Under these legal principles, application of the government knowledge defense should be limited to knowledge possessed by government employees acting with actual contractual authority, depending upon the facts of the case. n150

1. Actual Authority, Express or Implied, Is Required

As a general rule, the United States is bound only by the conduct of its employees acting with actual authority. n151 Similarly, as a general rule in the procurement context, "[o]nly persons with contracting authority can bind the Government." n152 In the procurement context, cognizant contracting officers have actual authority to bind the government. n153 Once they receive the requisite grant of authority, contracting officers may "enter into, administer, or terminate contracts and make related determinations and findings." n154 Further, contracting officers possess authority "to execute contract modifications on behalf of the Government." n155

Limits on the contracting officer's authority are provided to that official in writing and such limitations are known, or readily subject to determination, by contractors and other federal officials. Contracting officers are appointed in writing with a Certificate of Appointment (called a "warrant") containing any limitations on their authority. n156 Information concerning the limitations on the contracting officer's authority is readily available to the public. n157 Indeed, some contracting officers even post their warrants on their office wall for contractor review. n158

Contracting officers may delegate portions of their authority to other government employees. n159 Accordingly, with respect to federal procurements, the "relevant" pool of actors for the government knowledge defense should normally include the contracting officer overseeing the particular contract, who usually possesses the "authority to enter into, administer, or terminate contracts and make related determinations and findings." n160 Also, the relevant pool could include those subordinate contracting officials whom the contracting officer expressly delegates actual authority to perform various contracting functions. n161 Typical government officials falling into this category may include the Administrative Contracting Officer (ACO), n162 Terminating Contracting Officer (TCO), n163 and certain "formally designated representatives who act on behalf of the Government during contract administration." n164 Such representatives could include the "contracting officer representative (COR), contracting officer technical representative (COTR), Government Technical Representative (GTR), or Government Technical Evaluator (GTE)." n165

For contractors, authority issues may become confusing in federal procurements because they frequently deal with government employees with varying levels of authority, who may possess titles or exercise related duties that suggest a greater level of authority. n166 As one treatise notes:

> Within contracting offices, personnel with official-sounding titles such as contract specialist, negotiators, and administrators work for contracting officers and handle the day-to-day contracting activity of the government, but such personnel generally do not have authority to order additional work or to commit the government by virtue of their position. Contractors are expected to recognize this lack of authority. n167

In order to provide relief to contractors, various courts and boards have relied on the court-created theory of "implied" actual authority to bind the United States. n168 Accordingly, in some limited circumstances, "[t]he authority of a Government official . . . may . . . arise from 'implied actual authority.'" n169 A government employee may be found to possess the "implied authority to bind the Government in contract 'when such authority is considered to be an integral part of the duties assigned to [the] government employee." n170 In this context "integral" means "'essential or necessary to form a whole.'" n171 However, implied authority only exists when *some* authority has been properly

45 Idaho L. Rev. 41

delegated to a government employee. n172 A government procurement official lacking any actual authority, cannot be deemed to possess implied actual authority. n173

Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct. n174 Accordingly, the FCA is violated when a contractor submits a false claim even when the contractor informs the government of the claim's falsity before submission. n175 Further, once false claims are received, a contracting officer may not modify the contract, or take other action, to waive past false claims. n176

The Federal Acquisition Regulation (FAR) also contains express limitations on contracting officer authority when a claim is suspected to be false or tainted by fraud. Pursuant to FAR 33.210(b), the contracting officer has no authority to settle, compromise, pay or adjust "any claim involving fraud." n177 Similarly, section 605(a) of the Contract Disputes Act removes any authority from the head of an agency "to settle, compromise, pay, or otherwise adjust any claim involving fraud." n178 This statutory restriction on agency heads extends downward to subordinate agency procurement officials. n179

However, the fact that a contracting officer, or other authorized procurement official, resolved a bona fide pre-claim dispute that later forms the basis of an FCA lawsuit may give rise to a triable issue. n180 Although they may not waive false or fraudulent claims, contracting officers may resolve legitimate contract disputes. n181 Indeed, as a matter of policy, the federal government encourages resolution of contractual disputes at the contracting officer level. n182 As one court explained this distinction: "[T]he fact of a settlement, while not dispositive, is relevant insofar as it supports an inference that the defendant was involved in a contract dispute with the government, not that a government officer knew of a fraud and nonetheless decided to settle." n183

2. Knowledge and the Duty to Inquire

A second, significant body of law exists placing a duty of inquiry on a contractor when dealing with the United States. This duty is rooted in the unique status of the United States as a sovereign and draws upon the legal principle that persons are charged with constructive knowledge of published laws and regulations. n184 As the United States Supreme Court has admonished: "'Men must turn square corners when they deal with the Government . . . .'" n185

Within the realm of federal procurement law, courts have placed the burden on contractors to ensure that they are "dealing with a Government employee with contracting authority." n186 Further, contractors will be held responsible for knowing the limitations on the authority of government contracting officials when such limitations were contained in published laws or regulations. n187 Additionally, when the limitations on delegations of authority are expressly made known to contractors by including authority limitations as contract clauses, contractors will be held to those limitations. n188

Various courts have applied the "square corners" rule to the FCA. n189 Further, the legislative history from the 1986 amendments to the FCA reflects a congressional desire that a duty of inquiry be placed on contractors who deal with the government. n190 Furthermore, the FCA's legislative history indicates that the Act's "knowing" definition reflects, at least in part, the constructive knowledge standard. n191 The incorporation of a constructive knowledge standard into the FCA was designed to place at least a limited duty of inquiry upon the defendant in order "to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries that would alert him that false claims are being submitted." n192

Given the existence of this body of law, with its application to both federal procurement law concerning the authority of federal acquisition officials and to the FCA, any government knowledge defense must also be scrutinized to determine if the defendant contractor knew, or should have known, of the authority limitations on the government official alleged to possess knowledge of contractor wrongdoing. Clearly, if the FCA defendant has actual knowledge of such limitations because of contractual clauses articulating the authority of the government's officials, then federal employees falling outside the scope of those clauses should not constitute relevant officials for purposes of this defense.

00000563

45 Idaho L. Rev. 41

Similarly, if contractual authority limitations are contained in publicly available statutes or regulations (for example, FAR), then the contractor should be charged with the constructive knowledge of those limitations and the defense should fail. Finally, some form of limited duty of inquiry should be placed on the contractor to determine the authority of the government official with whom the contractor is providing information.

3. Timing Does Matter

The falsity of the claim is measured at the time it is submitted to the United States. n193 Accordingly, a necessary prerequisite to any defense based on government knowledge of the falsity is that the relevant government officials knew of the challenged conduct *before* the false statement or claim was presented to the United States. Several courts have recognized this limitation on a government knowledge defense. n194 Although not directly addressing the issue, other cases applying the government knowledge defense contain fact patterns in which the government was aware of the challenged conduct before a claim was presented. n195

Such a temporal requirement is consistent with the basic premise underlying the defense--that the contractor did not knowingly engage in misconduct because it believed the government knew of its conduct and approved, either explicitly or tacitly. Also, this prerequisite to the government knowledge defense is consistent with the authority limitations placed on the contracting officer, as well as any other potentially relevant government official that a contractor may reasonably expect to deal with during a federal procurement. As noted earlier, government procurement officials cannot waive or ratify false or fraudulent claims. n196

The following FCA case illustrates this point. In *United States v. National Wholesalers,* n197 the defendant was awarded a contract to provide 6000 proprietary Delco-Remy vehicle regulators to the Army. n198 The bid proposal permitted either Delco-Remy regulators or "equals," but National Wholesalers offered to provide the actual Delco-Remy regulators, and the contract was awarded on that basis. n199 Unable to provide conforming Delco-Remy regulators, the defendant manufactured its own regulators--which the district found to be equal to the brand regulators--but then printed and affixed false Delco-Remy labels to the regulators. n200

Unaware of the mislabeling, the Army accepted seventeen shipments of the mislabeled parts, for a total of 4086 regulators. n201 Additionally, the contractor submitted seventeen invoices for payment. n202 Upon discovering the contractor's misconduct, the Army issued a "stop order" on future deliveries and tested the manufactured regulators. n203 Finding the regulators satisfactory, the Army's Contracting Officer accepted them as "equal" to the Delco-Remy regulators, and the contractor furnished the remaining regulators. n204

Subsequently, the United States Attorneys Office filed suit under the False Claims Act, based on the seventeen invoices submitted prior to the contracting officer having learned of the mislabeling. n205 The district court found for the defendants, determining in part that the regulators were "equals" and that the contracting officer had the authority to resolve contract disputes, which he had done here. n206

On appeal, the United States Court of Appeals for the Ninth Circuit reversed. The court determined that the time to test the falsity of a claim is the date when it is submitted. n207 Accordingly, "every one of the invoices prior to [when the contracting officer learned of the mislabeling] was false when made." n208 Further, although the contracting officer has the authority to modify a contract, a retroactive modification under such circumstances was "void as against public policy." n209 The court continued: "In such palming off as we have here we do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute." n210

V. CONCLUSION

As one federal court has correctly noted, the government knowledge defense is "inaptly-named." n211 The fact that someone in the government possessed knowledge of the misconduct that forms the basis of a False Claims Act lawsuit, by itself, does not constitute a legal defense. Depending upon the circumstances, government knowledge may be highly relevant evidence to negate the FCA defendant's scienter. In other words, government knowledge may

45 Idaho L. Rev. 41

establish that the defendant did not act knowingly, that it did not act with actual knowledge, in deliberate ignorance, or with reckless disregard.

The modern-day government knowledge defense developed slowly in the wake of the 1986 amendments to the False Claims Act. Beginning with the seminal case of *United States ex rel. Hagood v. Sonoma County Water Agency,* n212 the courts have gradually defined the defense's contours and criteria. The vast majority of cases have held that government knowledge may serve as a defense to the FCA's knowing scienter element. Further, the courts require that a relevant government official possess knowledge of the specific falsity at issue before the defendant presents a claim and approve of that conduct. Although not fully mature, the government knowledge defense is sufficiently well developed to provide courts and practitioners with solid guideposts for applying it in FCA litigation.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
GovernmentsState & Territorial GovernmentsClaims By & AgainstLabor & Employment LawEmployer LiabilityFalse Claims ActCoverage & DefinitionsJurisdictional BarLabor & Employment LawEmployer LiabilityFalse Claims ActCoverage & DefinitionsQui Tam Actions

**FOOTNOTES:**

n1 31 U.S.C. §§ 3729-3733 (2000).

n2 United States *ex rel.* Roby v. Boeing Co., 302 F.3d 637, 641 (6th Cir. 2002) ("The FCA has since become the primary means by which the Government combats and deters fraud."); Ron R. Hutchinson, *The Government's Audit and Investigative Powers over Commercial Item Contracts and Subcontracts,* 27 PUB. CONT. L.J. 263, 286 (1998) ("The Civil False Claims Act is the Government's primary vehicle for pursuing civil fraud . . . .").

n3 JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS 1-3 (Supp. 1999) ("combating fraud in virtually every program involving federal funds").

n4 Press Release, U.S. Dep't of Justice, Justice Department Recovers $ 2 Billion for Fraud Against the Government in FY 2007; More Than $ 20 Billion Since 1986 (Nov. 1, 2007), http://www.usdoj.gov/opa/pr/2007/November/07_civ_873.html.

n5 *Id.*

n6 *See, e.g.,* United States v. Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 768-74 (N.D. Tex. 2002) (addressing several defenses).

45 Idaho L. Rev. 41

n7 929 F.2d 1416 (9th Cir. 1991).

n8 SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5273 ("The False Claims Act was adopted in 1863 and signed into law by President Abraham Lincoln in order to combat rampant fraud in Civil War defense contracts."); *see also* United States *ex rel.* Wilkins v. N. Am. Constr. Corp., 173 F. Supp. 2d 601, 619 (S.D. Tex. 2001) ("The False Claims Act is a statutory cause of action intended from its inception to combat fraud against the government.").

n9 JAMES B. HELMER, JR., ANN LUGBILL, & ROBERT C. NEFF, JR., FALSE CLAIMS ACT: WHISTLEBLOWER LITIGATION §2-4, at Inside America's Biggest Defense Scandal 28 (2d ed. 1999).

n10 *Id.;* ANDY PASZTOR, WHEN THE PENTAGON WAS FOR SALE 11 (1995).

n11 United States v. McNinch, 356 U.S. 595, 599 (1958).

n12 S. REP. NO. 99-345, at 10 ("The original False Claims Act also contained a provision allowing private persons, or 'relators,' to bring suit under the act.").

n13 BOESE, *supra* note 3, at 1-10 n.27. False claims are now prosecuted criminally pursuant to 18 U.S.C. § 287. *Id.*

n14 *See* John P. Robertson, *The False Claims Act,* 26 ARIZ. ST. L.J. 899, 901 (1994) ("[T]he Act lay essentially dormant until World War II broke out and fraud on the government by defense contractors increased."); *see* BOESE, *supra* note 3, at 1-11 ("There are few reported [FCA] decisions prior to 1930."); *Id.* at 1-14 ("The dramatic increases in government spending during and after World War II triggered an upsurge in the number of FCA cases brought by the Government; the number of such cases rose again during the military buildup of the Vietnam War . . . .").

n15 S. REP. NO. 99-345, at 2 ("up 30 percent from 1982"). The Department of Health and Human Services also reported a significant increase in entitlement program fraud. *Id.*

n16 *Id.*

00000566

n17 *Id.* at 2-3.


n18 In 1986, Congress also passed the Anti-Kickback Act, 41 U.S.C. §§ 51-58 (2000), a prohibited employment statute, 10 U.S.C. § 2408 (2006), and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812 (2000). *See* Vt. Agency of Natural Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 786 n.17 (2000) ("PFCRA was designed to operate in tandem with the FCA. . . . [and was] enacted at virtually the same time as the FCA was amended in 1986 . . . its scope is virtually identical to that of the FCA."). For a discussion of the prohibited employment statute, see generally Michael J. Davidson, *10 U.S.C. § 2408: An Unused Weapon in the Procurement Fraud Wars,* 26 PUB. CONT. L.J. 181 (1997).

    Additionally, in 1986 the FBI initiated a major investigation into defense procurement fraud, known as Operation Ill Wind. Dick Thornburgh, *Foreword, Sixth Survey of White Collar Crime,* 28 AM. CRIM. L. REV. 383, 385-86 (1991). By April 1991, the government had achieved convictions of twenty-seven of the largest defense contractors for defrauding the United States. *Id.* at 386. Similar investigative efforts by the Defense Criminal Investigative Service generated an increase in procurement fraud-related convictions, "with 283 convictions in 1990 alone." *Id.*


n19 *See* S. REP. NO. 99-345, at 2.


n20 *Id.* at 17. The earlier version of the FCA provided for double damages. *Id.*


n21 *Id.* at 18; *see* 31 U.S.C. § 3729(a)(7). A reverse false claim is a claim "to avoid a payment to the government." S. REP. NO. 99-345, at 18.


n22 *Id.* at 13 ("afforded protection from retaliation for his actions"); *see also* 31 U.S.C. § 3730(h).


n23 S. REP. NO. 99-345, at 18. The military exclusion, which had existed since 1863, was removed because Congress believed "that military code remedies [were] inadequate to ensure full recoveries for fraudulent acts by servicepersons and such persons should therefore not be exempt from False Claims Act coverage." *Id.* at 15.


n24 *Id.* at 20-21; *see also* BOESE, *supra* note 3, at 1-16 ("[T]he 1986 Amendments resolved this dispute [concerning the meaning of the statutory requirement that the person act knowingly] by explicitly eliminating the need to prove specific intent to defraud.").


n25 S. REP. NO. 99-345, at 7. Previously, some courts "required that the United States prove a violation [of the FCA] by clear and convincing, or even clear, unequivocal and convincing evidence . . . ." *Id.* In 1986, Congress clarified the standard of proof as being a preponderance of the evidence. *Id.* at 13, 30-31. *See also* 31 U.S.C. §

45 Idaho L. Rev. 41

3731(c) ("In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.").

n26 S. REP. NO. 99-345, at 8 ("[T]he subcommittee added a modification of the statute of limitations to permit the Government to bring an action within 6 years of when the false claim is submitted (current standard) or within 3 years of when the Government learned of a violation, whichever is later."); *see also* 31 U.S.C. § 3731(b).

n27 31 U.S.C. § 3729(a)(1-7).

n28 *See generally id.* § 3729(a)(1), (2).

n29 31 U.S.C. § 3730(a), (b).

n30 Vt. Agency of Natural Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 768 (2000). *"Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Id.* n.1. However, "[i]n practice, the phrase means 'an action under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive.'" United States v. Kitsap Physicians Servs., 314 F.3d 995, 997 n.1 (9th Cir. 2002) (quoting Bryan Garner, A DICTIONARY OF MODERN LEGAL USAGE 728 (2d Ed. 1995)).

n31 United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1016 (7th Cir. 1999).

n32 *Vt. Agency of Natural Res.,* 529 U.S. at 769. Under either scenario, the relator normally receives a share of the government's recovery. *Id.* at 769-70; 31 U.S.C. § 3730(d) (2000).

n33 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(9) (2008).

n34 United States *ex rel.* Compton v. Midwest Specialties, Inc., 142 F.3d 296, 304 (6th Cir. 1998) (quoting United States *ex rel.* Marcus v. Hess, 317 U.S. 537, 549 (1943)).

n35 *See Kitsap Physicians Servs.,* 314 F.3d at 1002; Varljen v. Cleveland Gear Co., 250 F.3d 426, 429 (6th Cir. 2001) ("[R]ecovery under the FCA is not dependent upon the government's sustaining monetary damages."); United States *ex rel.* Bettis v. Odebrecht Contractor of Cal., Inc., 297 F. Supp. 2d 272, 278 (D.D.C. 2004) ("even

45 Idaho L. Rev. 41

if the government has suffered no loss").

n36 31 U.S.C. § 3730(d). Further, the court may award reasonable expenses, attorney's fees and costs to the relator to be paid by the defendant. *Id.*

n37 *See* United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 n.5 (4th Cir. 2002); United States *ex rel.* Grynberg v. Praxair, Inc., 207 F. Supp. 2d 1163, 1181 (D. Colo. 2001) (citing 31 U.S.C. § 3730(b)(4) (1982) (current version at 31 U.S.C. § 3730(b)(4) (2000)). In contrast, "[t]he government itself, of course, could still bring suit for such a violation; only private parties were barred from seeking recovery." United States *ex rel.* Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 408 (3d Cir. 1999).

n38 HELMER, LUGBILL & NEFF, *supra* note 9, § 2-5, at 36, 39, § 2-6(b)(2), at 46; *see also* SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5273.

n39 CLAIRE M. SYLVIA, THE FALSE CLAIMS ACT: FRAUD AGAINST THE GOVERNMENT § 27, at 47 (Andrea G. Nadel et al. eds.) (2004) (quoting United States v. Burmah Oil Co., 558 F.2d 43, 46 n.1 (2d Cir. 1977).

n40 S. REP. NO. 99-345, at 12; *see also* Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1419 (9th Cir. 1992) ("Courts read the amended Act as prohibiting all *qui tam* suits where the government already possessed the information, even where the relator had independently uncovered fraud against the government and the government knew of that fraud only because the relator had been decent enough to tell the government about it.").

n41 SYLVIA, *supra* note 39, §29, at 53.

n42 HELMER, LUGBILL & NEFF, *supra* note 9, §2-5, at 40.

n43 S. REP. NO. 99-345, at 12-13.

n44 *Id.* at 8 ("encourage assistance from the private citizenry").

n45 United States *ex rel.* Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 408 (3d Cir. 1999) (citing 31 U.S.C. §

45 Idaho L. Rev. 41

3730(e)(4)(A) (1994)). The public disclosure must have occurred "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media . . . ." 31 U.S.C. § 3730(e)(4)(A).

n46 *Cantekin,* 192 F.3d at 408.

n47 *Id.* at 408-09; *see also* 31 U.S.C. § 3730(e)(4)(A) ("unless . . . the person bringing the action is an original source of the information").

n48 Rockwell Int'l Corp. v. United States, 549 U.S. 457,    , 127 S. Ct. 1397, 1406 (2007).

n49 31 U.S.C. § 3730(e)(4)(B).

n50 *See* Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1419 (9th Cir. 1992); SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 12 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5277 ("That jurisdictional bar . . . has been applied only to private *qui tam* suits, and not those suits taken over by the Government.").

n51 United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991); *see also* United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false . . . ."); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519 (10th Cir. 2000).

n52 *Shaw,* 213 F.3d at 534 ("language was removed in 1986"); *Hagood,* 929 F.2d at 1420 ("language disappeared from the statute with the 1986 amendments").

n53 31 U.S.C. § 3730(e)(4).

n54 United States *ex rel.* Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) (citing United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326 (9th Cir. 1995), *aff'd* 168 F.3d 1013 (7th Cir. 1999)); *see also Butler,* 71 F.3d at 326 ("The 1986 amendments eliminated this language, however, leaving open what would be the effect of government knowledge of the facts underlying a suit.").

45 Idaho L. Rev. 41

n55 *See* S. REP. NO. 99-345, at 7.

n56 *Lamers,* 998 F. Supp. at 987 (citing S. REP. NO. 99-345, at 7); *see also* S. REP. NO. 99-345, at 7 ("Currently, in judicial districts observing an 'actual knowledge' standard, the Government is unable to hold responsible those corporate officers who insulate themselves from knowledge of false claims submitted by lower-level subordinates."); *id.* at 21 ("[T]he constructive knowledge definition attempts to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted."); United States v. NHC Healthcare Corp., 115 F. Supp. 2d 1149, 1153 (W.D. Mo. 2000) ("The purpose of this particular definition of 'knowing' was to avoid the claimants who bury their heads in the sand and purposefully submit in ignorance a false claim.").

n57 31 U.S.C. § 3729(a)(3) (conspiring to defraud); *id.* § 3729(a)(4) (intending to defraud by delivering less property than in the defendant's possession); *id.* § 3729(a)(5) (intending to defraud by making or delivering a receipt certifying receipt of property "without completely knowing that the information on the receipt is true"); *see also* HELMER, LUGBILL & NEFF., *supra* note 9, § 3-15, at 110 ("With the exception of claims brought under 31 U.S.C. § 3729(a)(3), (a)(4), and (a)(5), the [FCA's] only 'scienter' requirement is a 'knowing violation.'").

n58 31 U.S.C. § 3729(b).

n59 United States *ex rel.* Humphrey v. Franklin-Williamson Human Servs., Inc., 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002); *see also* United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 439 (E.D.N.Y. 1995) ("[T]he government need not prove an intent to defraud, but only that the violations were committed knowingly, that is with willful blindness to the existence of a fact or reckless disregard for the truth." (citing United States v. Foster Wheeler Corp., 316 F. Supp. 963, 967 (S.D.N.Y. 1970))).

n60 31 U.S.C. § 3729(b); *see also* United States *ex rel.* Quirk v. Madonna Towers, Inc., 278 F.3d 765, 767 (8th Cir. 2002) ("No proof of specific intent to defraud the government is required." (citing 31 U.S.C. § 3729(b))).

n61 706 F. Supp. 795 (D. Utah 1988).

n62 *Id.* at 799. A government commission that investigated the Challenger disaster attributed the cause of the explosion to a gas leak in a joint's seal, which was located between two portions of one of the solid rocket motors. *Id.* at 798. The plaintiff's employment for Morton Thiokol involved work with the solid rocket motors. *Id.* at 799.

n63 *Id.* at 803. In addition to his *qui tam,* Boisjoly pursued unsuccessfully several statutory and common law claims. *Id.* at 799-807.

n64 *Id.* at 809-10.

n65 *Id.* at 809 (citing United States v. Fox Lake State Bank, 366 F.2d 962, 965 (7th Cir. 1966); Woodbury v. United States, 232 F. Supp. 49, 54-55 (D. Or. 1964), *modified,* 359 F.2d 370 (9th Cir. 1966); and United States v. Schmidt, 204 F. Supp. 540 (E.D. Wis. 1962)). Although proceeding under different legal theories, the courts relied on the government's knowledge to rule in favor of the FCA defendants. *Fox Lake State Bank,* 366 F.3d at 965-66 (applying an estoppel theory); *Woodbury,* 232 F. Supp. at 54-55 (finding no intent to defraud); *Schmidt,* 204 F. Supp. at 544 (finding no intent to commit fraud or violate the FCA). Although these pre-1986 cases are of limited applicability because of the changes in the law, they and others like them provided an equitable rationale similar to that reflected in the modern government knowledge defense. *See* United States *ex rel.* Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("[T]he equitable rationale behind the defense has an impressive pedigree in this circuit." (discussing *Schmidt,* 204 F. Supp. at 540; *Fox Lake State Bank,* 366 F.2d at 962)).

n66 *Boisjoly,* 706 F. Supp. at 809.

n67 *Id.*

n68 *Id.* at 810.

n69 *Id.*

n70 *Id.* at 810-11.

n71 *Id.* at 811.

n72 *See* United States *ex rel.* Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) ("We agree that *[Boisjoly]* is an unreliable guide." (agreeing with United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991))); *Hagood,* 929 F.2d at 1421 (9th Cir. 1991) *("Boisjoly* may be defensible on its facts; its dicta are an unreliable guide."); *cf.* Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 59 (1993) ("This court discerns several problems with *Boisjoly."*).

n73 *See* Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534-35 (10th Cir. 2000).

n74 *Id.* at 534 ("[G]overnment knowledge of a contractor's wrongdoing is no longer an automatic defense . . . .").

n75 *Id.*

n76 *See infra* note 119 and accompanying text.

n77 929 F.2d 1416 (9th Cir. 1991).

n78 United States *ex rel.* Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) ("[W]e agree with *Hagood.")*.

n79 Varljen v. Cleveland Gear Co., 250 F.3d 426, 430 (6th Cir. 2001).

n80 United States *ex rel.* Durcholz v. FKW, Inc., 189 F.3d 542, 544-45 (7th Cir. 1999).

n81 Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000).

n82 *See* Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 59 (1993).

n83 *See* United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); United States *ex rel.* Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995); United States *ex rel.* Milam v. Regents of Univ. of Cal., 912 F. Supp. 868, 888-89 (D. Md. 1995); X Corp. v. Doe, 816 F. Supp. 1086, 1094 (E.D. Va. 1993).

n84 The United States declined to intervene in the case beyond moving to dismiss certain individual defendants. United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1418 (9th Cir. 1991) ("Hagood proceeded as the sole plaintiff . . . .").

n85 *Id.*

00000573

45 Idaho L. Rev. 41

n86 *Id.*

n87 *Id.*

n88 *Id.* The district court relied on reasoning under similar facts in *Boisjoly v. Morton Thiokol, Inc.,* 706 F. Supp. 795, 808-10 (D. Utah 1988).

n89 *Hagood,* 929 F.2d at 1419 (internal quotation marks omitted).

n90 *Id.* at 1422.

n91 *Id.* at 1420.

n92 *Id.* at 1422. Further, the court noted that in order for the defendant "[t]o take advantage of a disputed legal question . . . [it could] be neither deliberately ignorant nor recklessly disregardful." *Id.* at 1421.

n93 *Id.* (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981).

n94 *Id.*

n95 *Id.*

n96 *See* BOESE, *supra* note 3, at 2-78 ("The 'government knowledge' defense to 'falsity' was dealt a further blow by the Ninth Circuit's first decision in *[Hagood]."). Id.*

n97 *Hagood,* 929 F.2d at 1421 ("It may be, as the district court observed, that no damages were suffered when officers of the United States knowledgeably decided to proceed with the contract.").

n98 *Id.* ("No damages need be shown in order to recover the penalty." (citing Rex Trailer Co. v. United States,

45 Idaho L. Rev. 41

350 U.S. 148, 153 n.5 (1956))).

n99 *Id.* at 1421-22 (quoting Heckler v. Cmty. Health Servs., 467 U.S. 51, 60, 61 (1984)).

n100 *Id.* at 1422 (quoting *Heckler,* 467 U.S. at 63).

n101 975 F.2d 1412 (9th Cir. 1992).

n102 *Id.* at 1414.

n103 *Id.* at 1421.

n104 *Id.* at 1416.

n105 *Id.* The memorandum "was part of a dialogue with the Army." *Id.* at 1421.

n106 *Id.*

n107 *Id.*

n108 *Id.* Hardly the model of clarity, the court's use of the concept of a scientifically untrue statement was equated with "scientific error[]" or a scientific theory not fully embraced within the scientific community, as opposed to an outright falsehood, one that was morally wrong. *Id.; see* United States *ex rel.* Harris v. Bernad, 275 F. Supp. 2d 1, 6 (D.D.C. 2003) ("[M]ere disagreements over scientific opinion, methodology, and judgments do not amount to claims under the FCA." (citing *Wang Chen-Cheng,* 975 F.2d at 1420-21)).

n109 71 F.3d 321 (9th Cir. 1995).

n110 *Id.* at 324, 325.

n111 *Id.* at 325.

n112 *Id.*

n113 *Id.* at 326 (alteration in original).

n114 *Id.*

n115 *Id.*

n116 *Id.* at 328.

n117 *Id.* at 329.

n118 Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000) ("[G]overnment knowledge of a contractor's wrongdoing is no longer an automatic defense." (citing United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1420 (9th Cir. 1991); 31 U.S.C. §§ 3729-3733 (2000))); *see also* Varljen v. Cleveland Gear Co., 250 F.3d 426, 430 (6th Cir. 2001) ("[E]ven the government's knowledge of a fraud does not necessarily absolve a contractor from liability under the FCA." (citing *Hagood,* 929 F.2d at 1421)); United States *ex rel.* Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) (concurring with *Hagood,* which "expressly rejected the contention that government knowledge of the falsity of a claim automatically bars an FCA action") citing *Hagood,* 929 F.2d at 1416)); United States *ex rel.* Longhi v. Lithium Power Techs., Inc., 513 F. Supp. 2d 866, 883-84 (S.D. Tex. 2007); United States *ex rel.* Bettis v. Odebrecht Contractors of Cal., 297 F. Supp. 2d 272, 294 (D.D.C. 2004) ("[T]he government's knowledge, while perhaps not a complete defense, is not 'irrelevant.'"); United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); United States *ex rel.* Milam v. Regents of Univ. of Cal., 912 F. Supp. 868, 888 (D. Md. 1995) ("not an absolute defense" (citing Kriendler, 985 F.2d at 1156-57)).

n119 *Hagood,* 929 F.2d at 1421 ("That the relevant government officials know of the falsity is not in itself a defense." (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981))); *see also* United States *ex rel.* Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995) ("[I]f the defendants knowingly presented or caused to be presented false or fraudulent claims, then it is not a defense that the government officials also knew the claims were false but continued to pay the claims." (citing *Kriendler,* 985 F.2d at 1156)); JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 168-69 (3d ed. 1998) ("[T]he fact that the germane Government officials knew of a claim's falsity is not a defense." (citing *Hagood,* 929 F.2d 1416)).

45 Idaho L. Rev. 41

n120 United States *ex rel.* A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 455 n.21 (6th Cir. 2005) (citing *Kriendler,* 985 F.2d at 1156; *Hagood,* 929 F.2d at 1421).

n121 *See* United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326 (9th Cir. 1995) ("[C]ourts have had to decide case by case whether a FCA claim based on information in the government's possession can succeed.").

n122 *See generally* United States *ex rel.* Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 491 F.3d 254, 262-63 (5th Cir. 2007) (finding Lockheed did not act knowingly); United States *ex rel.* Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003) ("[The government's] knowledge . . . bears on whether the defendants had the requisite intent under the Act." (citing United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002))); *Becker,* 305 F.3d at 289 ("can negate the scienter required for an FCA violation" (citing United States v. Southland Mgmt. Corp., 288 F.3d 665, 686 (5th Cir. 2002))); *Shaw,* 213 F.3d at 534; *Kriendler,* 985 F.2d at 1157; *Hagood,* 929 F.2d at 1421)); United States *ex rel.* Stone v. Rockwell Int'l Corp., 282 F.3d 787, 811 (10th Cir. 2002) ("cast doubt on whether he 'knowingly' submitted a false claim" (citing *Butler,* 71 F.3d at 326-27)), *rev'd in part on other grounds,* 549 U.S. 457 (2007); *Shaw,* 213 F.3d at 534 ("[Contractor may not] possess the requisite state of mind" (citing *Butler,* 71 F.3d at 327; Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992))); United States *ex rel.* Durcholz v. FKW, Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("cannot be said to have knowingly presented a fraudulent or false claim" (citing United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999); Hindo v. Univ. of Health Scis./Chicago Med. Sch., 65 F.3d 608, 613-14 (7th Cir. 1995))); *Kriendler,* 985 F.2d at 1156, 1157 ("may show that the contractor has not 'knowingly' submitted a false claim" (citing *Hagood,* 929 F.2d at 1421)); *Hagood,* 929 F.2d at 1421 ("Such knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth."); *Longhi,* 513 F. Supp. 2d at 883 ("can rebut scienter"); *Bettis,* 297 F. Supp. 2d at 294 ("serves to negate a finding of scienter"). *But cf. Costner,* 317 F.3d at 887 (noting that government knowledge may also serve as a defense to the FCA's materiality element).

n123 929 F.2d at 1421.

n124 *Id.* (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981)).

n125 *Id.*

n126 *See* United States v. Southland Mgmt. Corp., 326 F.3d 669, 682-83 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false . . . ." (citing *Durcholz,* 189 F.3d at 544-45)).

45 Idaho L. Rev. 41

n127 *Id.* at 682.

n128 213 F.3d 519 (10th Cir. 2000).

n129 *Id.* at 527. The contract required AAA to provide equipment to remove trace silver from the photography development process and to properly dispose of various chemicals in compliance with federal standards. *Id.* Instead, AAA managers directed that the chemicals be deposited in the drain, and various employees complied with that directive. *Id.* When questioned by government contracting officials, AAA management was evasive about meeting their environmental contractual obligations until the Air Force Office of Special Investigations closed AAA's main photography laboratory. *Id.* at 527-28.

n130 *Id.* at 534.

n131 *See Southland Mgmt. Corp.,* 326 F.3d at 682 n.9 (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the claimant was colluding with the government employee to submit a false claim . . . ." (citing *Durcholz,* 189 F.3d at 544-45)).

n132 *Durcholz,* 189 F.3d at 546.

n133 *Id.* at 545; *see also* United States *ex rel.* Tyson v. Amerigroup Ill., Inc., No. 02 C-6074, 2005 WL 3111972, at *6 (N.D. Ill. Oct. 21, 2005) ("The Court of Appeals' conjunctive phrasing--'if the government knows *and* approves'--would appear to have been purposeful and intended to signal that mere knowledge alone of illegality would not enable those who defraud the government from being able to draw a conjurer's circle around their illegality and insulate themselves from condign punishment.").

n134 *See* United States *ex rel.* Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003); United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002); *see also* Am. Contract Servs. v. Allied Mold & Die, Inc., 114 Cal. Rptr. 2d 773, 779-80 (Cal. Ct. App. 2001).

n135 United States *ex rel.* Tyson v. Amerigroup Ill., Inc., 488 F. Supp. 2d 719, 730 (N.D. Ill. 2007) (citing United States *ex rel.* Asch v. Teller, Levit & Silvertrust, P.C., No. 00-C-3289, 2004 WL 1093784, at *3 (N.D. Ill. May 7, 2004)).

n136 *See Southland Mgmt. Corp.,* 326 F.3d at 682 (noting that in many cases government knowledge and acquiescence "was 'highly relevant' to show that the contractor did not submit payment claims in deliberate

ignorance or reckless disregard of their truth or falsity" (citation omitted)). However, for this position the court in *Southland* cited *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir. 1991). *Id.* A fair reading of that opinion fails to reveal the articulation of any such definitive standard. *See Hagood,* 929 F.2d at 1421.


n137 United States *ex rel.* Laird v. Lockheed Martin Eng'g & Sci. Servs., Co., 491 F.3d 254, 263 (5th Cir. 2007) (emphasis added) (quoting *Durcholz,* 189 F.3d at 545); *accord Tyson,* 488 F. Supp. 2d at 729-30.


n138 *See* United States *ex rel.* Englund v. Los Angeles County, No. Civ. S-04-282-LKK/JFM, 2006 WL 3097941, at *8 (E.D. Cal. Oct. 31, 2006) ("when responsible government officials have been fully apprised of all relevant information" (citing United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999))).


n139 *See, e.g.,* United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326, 328 (9th Cir. 1995) (noting that the government knew and approved the specific testing method at issue); X Corp. v. Doe, 816 F. Supp. 1086, 1093 (E.D. Va. 1993) ("X Corp. *disclosed* to the government that computer equipment supplied under the MASC contract might contain remanufactured components."); Boisjoly v. Morton Thiokol, Inc., 706 F. Supp. 795, 810 (D. Utah 1988) ("informed NASA . . . of these concerns and their basis").


n140 *See infra* note 142 and accompanying text.


n141 *Hagood,* 929 F.2d at 1421 ("relevant government officials"); United States *ex rel.* Gudur v. Deloitte Consulting LLP, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007) ("[N]o violation exists where relevant government officials are informed of the alleged falsity . . . ."); United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); *see also* United States *ex rel.* Werner v. Fuentez Sys. Concepts, Inc., 115 Fed. App'x 127, 128 (4th Cir. 2004) ("the OSC officials responsible for managing their contracts"); United States *ex rel.* Grynberg v. Praxair, Inc., 207 F. Supp. 2d 1163, 1178 (D. Colo. 2001) ("known to and approved by the responsible government authorities"); United States *ex rel.* Durcholz v. FKW, Inc., 997 F. Supp. 1143, 1156 (S.D. Ind. 1998) ("many, if not all, of the relevant Navy officials did know"), *aff'd,* 189 F.3d 542 (7th Cir. 1999); United States *ex rel.* Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("responsible government officials"), *aff'd,* 168 F.3d 1013 (7th Cir. 1999); CIBINIC & NASH, *supra* note 119, at 168 ("germane Government officials knew"); *cf.* United States *ex rel.* Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) (concurring with *Hagood).*


n142 United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002) ("DOE's *full knowledge* of the material facts underlying any representations implicit in Westinghouse's conduct negates any knowledge that Westinghouse had regarding the truth or falsity of those representations." (emphasis added)); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000) ("Nevertheless, there may still be occasions when the government's knowledge of or cooperation with a contractor's actions is *so extensive* that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA."

45 Idaho L. Rev. 41

(citing *Butler,* 71 F.3d at 327; Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992)) (emphasis added)); *Wang Chen-Cheng,* 975 F.2d at 1421 ("FMC was open with the government . . . ."); United States v. Prabhu, 442 F. Supp. 2d 1008, 1030 (D. Nev. 2006) ("complied with Government instructions regarding the claims" (citing 31 U.S.C. § 3729(b) (2000))); United States *ex rel.* Werner v. Fuentez Sys. Concepts, Inc., 319 F. Supp. 2d 682, 685 (N.D.W. Va. 2004) ("full knowledge of the defendants' billing practices" by the "Coast Guard officials responsible for handling the contracts"), *aff'd,* 115 F. App'x 127 (4th Cir. 2004); United States *ex rel.* Bettis v. Odebrecht Contractors of Cal., 297 F. Supp. 2d 272, 297 (D.D.C. 2004) *("fully aware* of and approved of the way that defendant calculated its claims for progress payments" (emphasis added)).

n143 282 F.3d 787, 812 (10th Cir. 2002), *rev'd in part on other grounds,* 549 U.S. 457 (2007).

n144 *Id.*

n145 *Id.* & n.11. The court appeared to suggest that this broader range of individuals included "certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer." *Id.* n.11.

n146 71 F.3d 321 (9th Cir. 1995); *Stone,* 282 F.3d at 812 n.12.

n147 *See Stone,* 282 F.3d at 812 n.12 *("Butler* rejected the argument that for purposes of determining whether the defendant 'knowingly' submitted a false claim to the Government, only contracting officers' knowledge is relevant.").

n148 *Id.*

n149 *Id.* at 812 n.11.

n150 Under agency law, there exists the concept of "apparent" authority. "An agent has 'apparent' authority . . . where the principal has held out the agent as having such authority or has permitted the agent to represent that he has such authority." United States v. Schaltenbrand, 930 F.2d 1554, 1560 (11th Cir. 1991). However, in government procurement law, the United States cannot be bound under the theory of apparent authority. JOHN CIBINIC, JR., RALPH C. NASH, JR. & JAMES F. NAGLE, ADMINISTRATION OF GOVERNMENT CONTRACTS 31 (4th ed. 2006) ("Recognizing the importance of effective government control over the conduct of its agents, the courts and boards have rejected the apparent authority rule, holding that *actual authority* is required to bind the government."); *see also* Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006) (noting that apparent authority is insufficient to bind the government); Am. Anchor & Chain Corp. v.

45 Idaho L. Rev. 41

United States, 331 F.2d 860, 861-62 (Ct. Cl. 1964) (noting that conduct of employee with apparent authority binds a contractor, but only actual authority of a government employee will bind the United States).

n151 Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947); Starflight Boats v. United States, 48 Fed. Cl. 592, 597-98 (2001); *see also* Ralph C. Nash & John Cibinic, *Contracting Authority of Government Employees: Handle with Care!,* in 12 NASH AND CIBINIC REPORT 9, P50, at 138 (1998) ("The rule is clear that the Government is only bound by the acts of its employees that are within the scope of their *actual authority.")* [hereinafter NASH & CIBINIC REPORT].

n152 Real Estate Technical Advisors, Inc., 03-1 B.C.A. (CCH) P32,074 at 158,507 (A.S.B.C.A. Nov. 18, 2002).

n153 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007); *see* CIBINIC, NASH & NAGLE, *supra* note 150, at 31 ("Contracting officers have the sole authority to legally bind the government to contracts and contract modifications."); *see also* 48 C.F.R. § 1.601(a) (2007) ("Contracts may be entered into and signed on behalf of the Government only by contracting officers."). The Federal Acquisition Regulation is contained in 48 C.F.R. Chapter 1. Contracting officers' authority "flows from the head of the agency." CIBINIC, NASH & NAGLE, *supra* note 150, at 33.

n154 48 C.F.R. § 1.602-1(a).

n155 *Id.* § 43.102(a).

n156 *Id.* § 1.603-3(a); *see also id.* § 1.602-1(a) (requiring clear written instructions concerning the limits of their authority); NASH & CIBINIC REPORT, *supra* note 151, P50, at 138 ("The scope of a CO's authority can generally be found by looking at the internal document granting the authority.").

n157 48 C.F.R. § 1.602-1(a) ("Information on the limits of the contracting officers' authority shall be readily available to the public and agency personnel.").

n158 NASH & CIBINIC REPORT, *supra* note 151, P50, at 141.

n159 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007) ("When authorized, the contracting officer may delegate some of its authority to certain designated representatives, who act on behalf of the government during contract administration." (citing CIBINIC, NASH & NAGLE, *supra* note 150, at 39)).

45 Idaho L. Rev. 41

n160 48 C.F.R. § 1.602-1(a); *see also id.* § 2.101(b). However, contracting officers may bind the government only to the extent that authority has been delegated to them to do so. *Id.* § 1.602-1(a).

n161 The contracting officer may delegate authority to his/her authorized representatives. *Id.* § 2.101(b); *see also* CIBINIC, NASH & NAGLE, *supra* note 150, at 37 (contracting officers may be granted authority to appoint subsidiary contracting officers or other representatives).

n162 The ACO is a type of contracting officer that administers a contract after it has been awarded. 48 C.F.R. § 2.101(b). Contracting officers who award the contract are known as procuring contracting officers (PCO) who may also retain some or all authority for administering the contract. CIBINIC, NASH & NAGLE, *supra* note 150, at 37. Indeed, "[a] single contracting officer may be responsible for duties in any or all of these areas." 48 C.F.R. § 2.101(b) (referring to the procuring, administration, and termination of a contract).

n163 The TCO is a type of contracting officer who settles terminated contracts. 48 C.F.R. § 2.101(b).

n164 CIBINIC, NASH & NAGLE, *supra* note 150, at 39.

n165 *Id.*

n166 *Id.* at 30-31. Government employees other than contracting officers may be delegated authority to perform various contract-related functions. *Id.* at 31.

n167 *Id.* at 33.

n168 *Id.* at 43.

n169 Real Estate Technical Advisors, Inc., 03-1 B.C.A. (CCH) P32,074 at 158,507 (A.S.B.C.A. Nov. 18, 2002).

n170 Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 120 (2006) (alteration in original) (quoting H. Landau & Co. v United States, 886 F.2d 322, 324 (Fed. Cir. 1989)); *see also* Brunner v. United States, 70 Fed. Cl. 623, 640-41 (2006); Real Estate Technical Advisors, Inc., 03-1 B.C.A. P32,074, at 158,507; CIBINIC, NASH & NAGLE, *supra* note 150, at 44.

00000582

45 Idaho L. Rev. 41

n171 Confidential Informant v. United States, 46 Fed. Cl. 1, 7 (2000) (quoting Roy v. United States, 38 Fed. Cl. 184, 189 (1997)).

n172 CIBINIC, NASH & NAGLE, *supra* note 150, at 43; *see also Brunner,* 70 Fed. Cl. at 641 ("This implied authority to contract must be based upon 'at the least, some limited, related authority.'" (citing Cal. Sand & Gravel, Inc., v. United States, 22 Cl. Ct. 19, 27 (1990))).

n173 *See* Starflight Boats v. United States, 48 Fed. Cl. 592, 599 (2001) ("Although Brian was involved in the administration of this contract, a person with no actual authority can not acquire actual authority 'through the court-made rule of implied actual authority.'" (quoting Cal. Sand & Gravel, Inc., 22 Cl. Ct. at 27)).

n174 *See* United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956) ("[W]e do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute."); *see also* United States v. Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 771 (N.D. Tex. 2002) ("A violation of the rights of the United States may not be waived or ratified by the unauthorized acts of its agents."); United States *ex rel.* Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995) ("[A] government officer cannot authorize a contractor to violate federal regulations."); United States v. Cripps, 460 F. Supp. 969, 973-74 (E.D. Mich. 1978) (stating that a federal employee who urges someone to defraud the government acts ultra vires). Because they lack the authority to waive fraud, acquisition officials cannot "ratify" such conduct. *See* CIBINIC, NASH & NAGLE, *supra* note 150, at 48 ("[I]llegal actions cannot be ratified because officials lack the authority to enter into illegal agreements."); *cf.* Winter v. Cath-DR/Balti Joint Venture, 497 F.3d 1339, 1347 (Fed. Cir. 2007) (noting that authority is a prerequisite to ratification).

n175 *Mayman,* 894 F. Supp at 223 ("A contractor who tells a government contracting officer that a claim is false still violates the statute when the false claim is submitted." (citing United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 2001))); *Cripps,* 460 F. Supp. at 973 ("To the extent that defendant is urging that someone at HUD authorized him to engage in this conduct to defraud HUD and submit false claims and derive a benefit therefrom, such assertion even if true is no defense to plaintiff's [FCA] claim."); *cf. Hagood,* 929 F.2d at 1421 ("That the relevant government officials know of the falsity is not in itself a defense." (citing United States v. Ehrlich, 643 F.2d, 638-39 (9th Cir. 1981))); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995) ("Defendants knowingly caused false claims to be presented and that, after the government became aware of the underlying scheme, it continued to pay claims only because it had already become contractually bound to make those payments as a result of the defendant's fraudulent course of conduct.").

n176 *Nat'l Wholesalers,* 236 F.2d at 950; *see also* United States *ex rel.* McCray Sanitation Serv. v. Midwest Container Co., 7 F.3d 1046, at *2 (10th Cir. 1993) (unpublished table decision) ("[Contracting agency cannot] 'ratify' any previous fraud by [contractor].").

n177 48 C.F.R. § 33.210(b) (2007).

00000583

45 Idaho L. Rev. 41

n178 41 U.S.C. § 605(a) (2000).

n179 *See* United States v. United Techs. Corp., No. 5:92-CV-375 (EBB), 1996 WL 653620, at *2 (D. Conn. Oct. 11, 1996) ("The statute's restriction on the authority of agency heads should be read as encompassing their subordinates."); *cf. Contract Disputes Act of 1978,* S. REP. NO. 95-1118, at 19 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5235, 5253 ("[I]t is not the intent of this section to authorize Agency heads, contracting officers, or agency boards to settle or compromise claims independent of their legal or contractual merits . . . .").

n180 *See* United States *ex rel.* A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 455 n.21 (6th Cir. 2005) ("[Government knowledge may be] used to demonstrate that what the defendant submitted was not actually false but rather conformed to a modified agreement . . . ."); United States *ex rel.* Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993) ("In some cases, the fact that government officials knew of the contractor's actions may show that the contract has been modified or that its intent has been clarified, and therefore that the claim submitted by the contractor was not 'false.'").

n181 48 C.F.R. § 33.210 (noting that contracting officers are authorized to resolve and decide contractual claims).

n182 48 C.F.R. § 33.204 ("The Government's policy is to try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level.").

n183 United States *ex rel.* Bettis v. Odebrecht Contractors of Cal., Inc., 297 F. Supp. 2d 272, 294 (D.D.C. 2004); *cf.* United States *ex rel.* Stebner v. Stewart & Stephenson Servs., Inc., 144 F. App'x 389, 394 (5th Cir. 2005) (applying government knowledge defense when "the Government negotiated contract modifications in response to the well-documented corrosion problem.").

n184 *See* Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." (citing Federal Register Act, ch. 417, sec. 7, 49 stat. 500, 502 (1935))); Nobles v. Rural Cmty. Ins. Servs., 303 F. Supp. 2d 1292, 1303 (M.D. Ala. 2004) ("[charged] with notice of the provisions in the Code of Federal Regulations" (citing *Merrill,* 332 U.S. at 384-85)); *In re* Doe I, 969 F. Supp. 561, 563 (D. Ariz. 1996).

n185 *Merrill,* 332 U.S. at 385 (quoting Rock Island, Ark. & La. R.R. Co. v. United States, 254 U.S. 141, 143 (1920)).

45 Idaho L. Rev. 41

n186 NASH & CIBINIC REPORT, *supra* note 151, P50, at 139 (citation omitted).


n187 Brunner v. United States, 70 Fed. Cl. 623, 644 (2006) ("[P]ublicly-accessible laws or regulations can limit the contracting authority that would otherwise be implied by a government agent's related powers, for potential contractors are on notice of such restrictions."); NASH & CIBINIC REPORT, *supra* note 151, P50, at 139 ("Agency regulations may also contain limitations on authority and such regulations will be binding on contractors if they are published.").


n188 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1346 (Fed. Cir. 2007) ("[C]ould not have had the implicit authority to authorize contract modifications because the contract language and the government regulation it incorporates by reference explicitly state that only the contracting officer had the authority to modify the contract.") (emphasis omitted).


n189 United States *ex rel.* Compton v. Midwest Specialties, Inc., 142 F.3d 296, 302 n.4 (6th Cir. 1998) ("[T]he 'square-corners' rule applies fully in the False Claims Act context." (citing United States v. Aerodex, Inc., 469 F.2d 1003, 1007 (5th Cir. 1972))); *but cf.* United States *ex rel.* A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 446 (6th Cir. 2005) (holding that the "natural tendency" standard was proper for determining whether a false statement was material under the FCA).


n190 SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272 ("But the Committee does believe the civil False Claims Act should recognize that those doing business with the Government have an obligation to make a limited inquiry to ensure the claims they submit are accurate.").


n191 *Id.* at 14-15, 17, 21.


n192 *Id.* at 21; *see also* Crane Helicopter Servs., Inc. v. United States, 45 Fed. Cl. 410, 433 (1999) ("[The FCA's knowing standard was designed to address] 'the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know'" and to reach "those who ignore obvious warning signs.") (citation omitted).


n193 United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956).


n194 *See* United States *ex rel.* Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003) ("'If the government knows and approves of the particulars of a claim for payment *before* that claim is presented . . . .'" (emphasis added) (altercation omitted) (quoting United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 542, 543 (7th Cir. 1999))); United States *ex rel.* Stone v. Rockwell Int'l Corp., 282 F.3d 787, 811 (10th Cir.

45 Idaho L. Rev. 41

2002) ("The defendant . . . may be able to cast doubt on whether he 'knowingly' submitted a false claim by showing that the Government itself was already aware of the facts underlying the FCA claim when the allegedly fraudulent claim was submitted." (citing United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326-27 (9th Cir. 1995))); United States *ex rel.* Durcholz v. FKW, Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("before [the] claim is presented"); *see also* United States *ex rel.* Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 491 F.3d 254, 263 (5th Cir. 2007) ("before that claim is presented" (citing *Durcholz,* 189 F.3d at 545)); United States *ex rel.* Humphrey v. Franklin-Williamson Human Servs., Inc., 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002) ("before [the] claim is presented") citing *Durcholz,* 189 F.3d. at 545)); United States *ex rel.* Maxwell v. Kerr-McGee Chem. Worldwide, LLC, No. 04-CV-01224-PSF-CBS, 2006 WL 2869515, at *16 (D. Colo. Oct. 6, 2006); *cf.* United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the government's knowledge came 'too late in the process'" (quoting *Durcholz,* 189 F.3d at 544-45)); United States v. Shasta Servs., Inc., 440 F. Supp. 2d 1108, 1113-14 (E.D. Cal. 2006) (applying the defense to California's FCA).


n195 *See, e.g., Becker,* 305 F.3d at 287-89; X Corp. v. Doe, 816 F. Supp. 1086, 1093 (E.D. Va. 1993) (finding government notification in defendant's proposal).


n196 *See supra* notes 173, 175, and accompanying text.


n197 236 F.2d 944 (9th Cir. 1956).


n198 *Id.* at 945.


n199 *Id.* at 945-96.


n200 *Id.* at 946.


n201 *Id.* at 946 & n.3.


n202 *Id.* at 948.


n203 *Id.* at 946.

45 Idaho L. Rev. 41

n204 *Id.* at 946, 948.

n205 *Id.* at 948.

n206 *Id.* at 949-50. The district court also erroneously determined that the contract permitted "equals." *Id.* at 949.

n207 *Id.* at 950.

n208 *Id.*

n209 *Id.*

n210 *Id.*

n211 United States *ex rel.* Gudur v. Deloitte Consulting LLP, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007).

n212 929 F.2d 1416 (9th Cir. 1991).

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

---------------------------------------------------------X

UNITED STATES OF AMERICA         :       Case No.  1:08-CV-00364(EGS)(DAR)
Ex rel.BRIAN BURKE                       :
    145 East 23rd St. #4R                 :
    New York, NY 10010                   :

    212-614-8515                             :       **CERTIFICATE OF SERVICE**

        Plaintiff, pro se                  :
                         :
        against,                         :

    RECORD PRESS                         :
           Defendant,                     :

---------------------------------------------------------X


    I_____/S/_____ declare under penalty of perjury that the forgoing is

true and correct. , I served a copy of AFFIDAVIT & MEMORANDUM OF LAW OMNIBUS MOTION

TO DISMISS COUNTERCLAIM & attached Exhibits by Overnight Mail or email on the following

parties:  (1) William T. O'Brien esq. McKenna Long & Aldridge llp 1900 K street, N.W.
Washington D.C. 20006 , by Overnight Mail
(2)Darrell C. Valdez esq. U.S. Attorney's Office Judiciary Center Building 555 Fourth Street
Washington D.C. 20530 by Overnight Mail
(3)Tyler Jay King, by Email to tyler@tylerjayking.com

Dated February 20, 2011                              _____/S/_____

00000588

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**RECEIVED**

MAR 1 8 2011

Clerk, U.S. District and
Bankruptcy Courts

BRIAN BURKE,                                    :
                                                :
Plaintiff/Counterclaim Defendant : C. A. # 1:08-CV-00364-(DAR)(EGS)
          vs.                                   :
RECORD PRESS, INC.                              :
                                                :
Defendant.                                      :
_____ :

## COUNTERCLAIM DEFENDANT'S MOTION IN LIMINE

"I _____/S/_Brian Burke declare, certify, verify, & state, under penalty of perjury that

the foregoing is true and correct. Executed on March 16, 2011.":  Plaintiff/Counterclaim

Defendant pro se Brian Burke respectfully request that the Court Strike Documents 72 & 73

filed by Defendant for the following reasons.

### IMPROPER SERVICE

Defendant has violated *LCvR 5.4(e)(3)* *"A party appearing pro se shall file documents in*

*paper form with the Clerk **and must be served with documents in paper form**, unless the pro*

*se party has obtained a CM/ECF password."* for both Documents 72 & 73. In addition *Fed. R.*

*Civ. P. 5(a)(1)(D) Service: When Required, a written motion, except one that may be heard ex*

*parte; Fed. R. Civ. P. 5(b)(2)(E) sending it by electronic means if the person consented in*

*writing.* Non-movant has not consented or been contacted in this regard or been properly

served Documents at issue, see Certificate(s) of Service attached to Documents 72, 73. See

Plaintiff's Reply to Op..

### NO PROPOSED ORDER

Defendant has violated *LCvR 7 (c) PROPOSED ORDER. Each motion and opposition shall*

*be accompanied by a proposed order.* Another ground to Strike in prospective Motion In

00000589

Limine.

## NO STAY

For November 3 Order we have " *INTERIM PRETRIAL ORDER*

*Counsel for the parties appeared before the undersigned United States Magistrate*

*Judge on November 3, 2010 for a final pretrial conference. Discovery has been completed,*

*and,with the consent of the parties, a bench trial of Plaintiff's claims against Defendant is*

*scheduled to commence on December 20, 2010.\*In accordance with Rule 16(d) of the Federal*

*Rules of Civil Procedure, it is ORDERED that: (1) Plaintiff shall file any motion to bifurcate*

*liability and damages by no later than November 8, 2010; (2) no later than November 15, 2010,*

*Plaintiff shall supplement his pretrial statement to fully comply with Local Civil Rule 16.5(1)(iv),*

*(v) and (vii), and (3) the deadline for the filing of objections to the opposing party's pretrial*

*statement is extended to November 22, 2010."*

/s/

DEBORAH A. ROBINSON United States Magistrate Judge November 4, 2010

DATE November 3, 2010 NUNC PRO TUNC att. to Reply to Opposition.

No mention of a Stay. On Information and Belief, Plaintiff is informed and believes

that Defendant by Counsel intends to insert deliberately incorrect 'facts' into the record. An

Action as important as a Stay, whether by Agreement, *Sua Sponte*, etc., would be made part of

the record. There is no evidence of this 'Stay' mentioned prominently in each Document, and

Defendant will presumably proffer none. Perhaps the most serious reason to Strike.

## MR. BURKE'S MOTION IS NOT MOOT

For brevity & economy please see Counterclaim Defendant's Reply to Opposition,

Document #74, and Opposition to Fed. R. Civ. P. 41(a)(2) Motion. Additional grounds to Strike

## NO Statement Of Undisputed Material Facts

Record Press has chosen to Redact their "Statement Of Undisputed Material Facts"

required in their Opposition (Doc. 73), under Local Rule 7(h)(1).

00000590

### MOTION FOR ORAL HEARING

Plaintiff Requests Oral Hearing for all outstanding Motions under *LCvR 7 (f) A party may in a motion or opposition request an oral hearing, but its allowance shall be within the discretion of the court. If at the time of the hearing the moving party fails to appear, the court may treat the motion as withdrawn; if the opposing party fails to appear, the court may treat the motion as conceded.* For Petitioner, pro se, any Thursday would be best. If not, then any Friday would be second best day.

### LCvR 7 (f)

Counterclaim Defendant phoned McKenna Long & Aldridge twice and left voice mail with Mr. O'Brien esq. and Mr. Lomas esq.. Those calls were not returned. Plaintiff's Reply to Opposition included a desire to file instant Motion In Limine

### CONCLUSION

For these reasons Counterclaim Defendant requests that the Court grant motion in all parts, and for further and such relief the Court deems just.

Date: March 16, 2011

Respectfully submitted,

/S/ Brian T. Burke, pro se
145 East 23rd Street #4R
New York, NY 10010
briantburke@gmail.com
212-614-8515

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

———————————————X
                         :     Case No. 1:08-CV-00364(EGS)(DAR)

**BRIAN BURKE**         :

                          :

Plaintiff, pro se         :

                          :

against,             :

RECORD PRESS       :

Defendant/Counterclaimant  :

———————————————X

# ORDER & DECISION

This matter is before the Court on Counterclaim Defendant's Motion In Limine, to Strike documents 72 & 73 and for Oral Hearing. Upon careful consideration of the Motion and Opposition to the Motion, and for good cause shown, it is hereby ORDERED that Motion is GRANTED in all parts.

.

                                      SO ORDERED

                                    _____

Dated:                            Magistrate Judge Deborah A. Robinson

00000592

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____

BRIAN BURKE,                          :
                                      :
    Plaintiff/Counterclaim Defendant : C. A. # 1:08-CV-00364-(DAR)(EGS)
                    vs.               :
RECORD PRESS, INC.                    :
                                      :
    Defendant.                        :
_____:

## COUNTERCLAIM DEFENDANT'S OMNIBUS MOTION II

"_____/S/_ Brian Burke declare, certify, verify, & state, under penalty of perjury that the foregoing is true and correct. Executed on April 2, 2011.":  Plaintiff/Counterclaim Defendant *pro se* Brian Burke respectfully request that the Court grant prospective Relief Requests for the following reasons.

### MOTION TO STIPULATE TO REQUEST TO CONSOLIDATE

Record Press, by Counsel, has altered their original Request to Dismiss Counterclaim Without Prejudice to a Fed. R. Civ P. 42(a)(2) request (Defendant's reply Memorandum 1:3) to Consolidate the Actions (Liability, Damages, Counterclaim(s)), to which Plaintiff now Stipulates to. Claimant has pending Request to Join Liability Claim & Counterclaim(s) for Purposes of single Order/Decision only for Pending Motion(s) to Dismiss/Summary Judgment *etc.*. Nevertheless, Petitioner again Stipulates (agrees to) Defendant's eminently reasonable, in the interest of Judicial Economy, Consolidation for all purposes for upcoming Counterclaim Jury Trial.

### MOTION *IN LIMINE*/TO STRIKE

As predicted, Defendant, by Counsel, continues to spin their deliberate falsehood of a "Stay" for Counterclaim in Defendant's Reply to Opposition (doc. 78).  Within same on page 3 line 2 Record Press States "......... and stayed until **after trial**\*...."(emphasis added). The

Received
Mail Room

APR – 5 2011

00000593

Deliberate Falsehood ("Myth"), meant to Obstruct Justice, Delay Proceedings and Violate Plaintiff's Due Process Rights (see Model Rules of Professional Conduct, *Fed. R. Civ. P. 11 etc.*) has wandered over the map more than the Prophet Moses. In Document 72 we have "proceedings on Record Press's counterclaim are presently stayed until after proceedings on Mr. Burke's claims.". Was Record Press contending that fallacious 'stay' lasted until after Decision and is now stating "after trial"*? If Deliberately False "stay" Fable now exists only until trial*, the issue is moot, as Counterclaim Defendant *pro se* submitted Omnibus Motion **AFTER TRIAL**\*.

Petitioner understands that two stays were granted by Court, long since lapsed. Due to the Counterclaim(s), as previously stated, Claimant was required to seek new Counsel and requested by motion, and requiring a LCvR 7(f) hearing. These requests were Opposed by Defendant, citing prejudicial "delay". Plaintiff again understands that Represented (not *ex-parte*) Parties can consent to a Stay and place before the Court same Consent Motion which may very well be granted. This would be done on the Record and by Order. Never happened.

Claimant requests striking of sentence (doc. 72  3:7-10) "Mr. Tyler King, Mr. Burke's counsel for his False Claims Act claims, represented to counsel for Record Press and the Court at the Pre-Trial Hearing, however, that he had conferred with Mr.Burke via telephone during the break and that  Mr. Burke had agreed to bifurcate and stay the counterclaim." and all other representations of a "stay" for reasons of Deliberate Falsehood, Hearsay (Fed. R. Ev. 804), Double Hearsay (Fed. R. Ev. 804), and violations of Attorney-Client Privilege (Fed. R. Ev. 502).

_____

\*(Petitioner understands this to mean either original 12/22/2010 trial date or actual 02/14/2011 trial date for Liability Claim and not upcoming Counterclaim trial, as that would be nonsensical or impossible and violate Due Process)

00000594

## MOTION *IN LIMINE*/TO STRIKE II

Petitioner Respectfully request the Court strike the word "false" in Document 72 page 2 line 2. This deliberately mendacious adjective is meant to mislead Court that Defendant believes the Claim to be spurious while never stating why, despite every opportunity to do so.  Relator requests leave to submit Wilmont Deposition, pages 71-91, which show unequivocally that Record Press relied solely on RFP 2231-S/1272-S without any reference to 'spreadsheet(s)' or any meeting of minds with G.P.O.. There was no evidence submitted that the phrase "PER 10 COPIES" allegedly redacted from unreferenced 'spreadsheet(s)(lines II(c) & (d))'  was not simply whited out, as no chain of custody was established for non-original document(s), but nevertheless show undisputed Bid-Rigging & Conspiracy, the reason Defendant insists no reliance on 'dispositive' document(s) . See Omnibus Motion *in limine* III & Affirmative Defense (Perjury, Subornation & Bid-Rigging, *etc*.). Wilmont Deposition has been labeled 'Confidential' but Counterclaim Defendant understands relevant pages are not under any proposed protective order.

## MOTION FOR FED. R. CIV. P. 56(F) INTERROGATORIES

In the interest of Judicial Economy, Efficiency & to avoid redundant Evidence, Petitioner Requests to be allowed to serve 25 written Interrogatories on three individuals under Fed. R. Civ. P. 56(f) and/or 33 & 26.  Plaintiff will also request, as yet unspecified, 'Request for Admission(s)' of same individuals.  These Requests will be strictly limited to Counterclaim Defendant's 'Affirmative Defense/Claim' regarding Bid-Rigging Allegation*.

_____

* (see Bid-Rigging Element in Omnibus Motion (no facts Controverted by Defendant (see "Any material fact set forth by the moving papers and not controverted by the opposing papers is deemed admitted"  *Cabrera v. Peters et. al. 23 F. 3d 410 C. A. Seventh Circuit* )))

The three individuals Petitioner is Requesting Additional Evidence from are, respectively, Ira Fishkin, sole G.P.O. Manager of Boston, New York & Philadelphia Offices[*sic*](see http://www.gpo.gov/customers/letters/669.htm) whom Mr. Wilmont acknowledges regular discussions with in Deposition ( 75:21-77:10 att.). Second, Mr. Raymond Thomas Sullivan, who testified at Bifurcated 02/14/2011 Hearing and revealed the Rosetta Stone regarding 'Dispositive' 'Spreadsheet(s)' leading to Bid-Rigging Claim/Affirmative Defense to Counterclaim.  Finally Mr. John Farrell, who was President of Record Press from 1990-2002 (see http://www.linkedin.com/pub/john-farrell/14/198/24b & Wilmont Depo. 8:1, 10) and like the two other named men, upon Information and Belief, have and/or should have specific information regarding Record Press/GPO Bid-Rigging regarding 2231-S/1272-S Contract(s). Petitioner requests all references to 2231-S be construed as 2231-S/1272-S, for reasons of economy and abbreviation as they are identical with identical 'False Claim(s)'. Mr. Farrell, has been/is, in addition, President of 'competing' PrintingHouse[*sic*] Press Ltd. of Manhattan since July 2002 and Petitioner may have to amend/withdraw suggestion that 2231-S/1272-S Bid-Rigging did not involve other potential contractors/bidders.

## MOTION FOR ORAL HEARING

Plaintiff again Requests Oral Hearing for all outstanding Motions under *LCvR 7 (f) A party may in a motion or opposition request an oral hearing, but its allowance shall be within the discretion of the court. If at the time of the hearing the moving party fails to appear, the court may treat the motion as withdrawn; if the opposing party fails to appear, the court may treat the motion as conceded.* For Petitioner, *pro se*, any Thursday would be best. If not, then any Friday would be second best day, Wednesday third best.

**LCvR 7 (m)**

Counterclaim Defendant *pro se* phoned Counterclaimant by Counsel on Thursday March 31, 2011 at 1 PM.  Mr. O'Brien returned call next day.  It was agreed that Defendant would oppose motions for Stay, to Strike, for Discovery & Oral Hearing.

**CONCLUSION**

For these reasons Counterclaim Defendant requests that the Court grant Counterclaim Defendant's Motion(s) in all parts, and for further and such relief the Court deems just.

Date: April 2, 2011                                Respectfully submitted,

/S/ Brian T. Burke, pro se
145 East 23rd Street #4R
New York, NY 10010
briantburke@gmail.com
212-614-8515

00000597

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
——————————————————X
                                          :
**BRIAN BURKE**                           :      Case No. 1:08-CV-00364(EGS)(DAR)
                                          :
                                          :
                                          :
                                          :      **CERTIFICATE OF SERVICE**
Counterclaim Defendant, pro se            :
                                          :
against,                                  :
**RECORD PRESS**                          :
**Defendant,  Counterclaimant**           :
——————————————————X

I_____/S/__Brian Burke_____ declare under penalty of perjury that the forgoing is

true and correct. , I served a copy of Counterclaim Defendant's Omnibus Motion II by U.S.
Mail & email on

the following parties:

1) William T. O'Brien esq. McKenna Long & Aldridge llp 1900 K street, N.W.

Washington D.C. 20006 , by Mail & email wobrien@mckennalong.com

(2)Darrell C. Valdez esq. U.S. Attorney's Office Judiciary Center Building 555 Fourth Street

Washington D.C. 20530 by Mail & email darrell.valdez@usdoj.gov

(3)Tyler Jay King, by Mail 1420 N. St. N.W. #706 Wash. D.C. 20005 & Email to

tyler@tylerjayking.com

Dated April 2, 2011                          _____
                                                    /S/  Brian Burke____
                                             145 East 23rd Street #4R
                                             New York, NY 10010
                                             briantburke@gmail.com
                                             212-614-8515

00000598

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

————————————X

**BRIAN BURKE**                  :    Case No. 1:08-CV-00364(EGS)(DAR)

                                 :    # ORDER & DECISION

Plaintiff, pro se               :

                                 :

against,                         :

**RECORD PRESS**                 :

Defendant/Counterclaimant        :

————————————X

This matter is before the Court on Counterclaim Defendant's Omnibus Motion II. Upon

careful consideration of the Motion, Opposition to the Motion, and  Reply and for good

cause shown, it is hereby ORDERED that Motion is GRANTED in all parts.

.

SO ORDERED

_____

Dated:                          Magistrate Judge Deborah A. Robinson

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


BRIAN BURKE,                    :   Civil Action No. 08-364
            Plaintiff          :
                               :
v.                             :   February 14, 2011
                               :   MORNING SESSION
RECORD PRESS, INC.,            :
                               :
            Defendant          :   10:04 a.m.
. . . . . . . . . . . . . . . . :  . . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
MORNING SESSION
BEFORE THE HONORABLE MAGISTRATE JUDGE DEBORAH A. ROBINSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

  For the Plaintiff:            TYLER J. KING
                                1420 N Street, NW
                                Suite 706
                                Washington, DC 20005
                                (202) 436-2641


  For the Defendant:            JOHN WILLIAM LOMAS
                                WILLIAM T. O'BRIEN
                                MCKENNA LONG & ALDRIDGE LLP
                                1900 K Street, NW
                                Washington, DC 20006
                                (202) 496-7183


  For Interested Party          DARRELL C. VALDEZ
  The United States:            U.S. ATTORNEY'S OFFICE
                                Judiciary Center Building
                                555 Fourth Street, NW
                                Washington, DC 20530
                                (202) 307-2843


  Court Reporter:               REBECCA STONESTREET, RPR, CRR
                                Official Court Reporter
                                Room 6511, U.S. Courthouse
                                Washington, D.C.  20001
                                (202) 354-3249


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

00000600

2

## C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| HUGH WILMOT | | | | |
| By Mr. King | 17 | -- | -- | -- |
| By Mr. Lomas | -- | 48 | -- | -- |
| CALVIN ADGERSON | | | | |
| By Mr. King | 60 | -- | -- | -- |
| By Mr. Lomas | -- | 74 | -- | -- |

## E X H I B I T S

| NUMBER | ADMITTED |
|---|---|
| PLAINTIFF | |
| A | 19 |
| C | 27 |
| D | 37 |

00000601

3

**P R O C E E D I N G S**

1

2          COURTROOM CLERK:  Civil case number 08-364, United

3    States ex rel Brian Burke versus Record Press, Inc.  Counsel for

4    Mr. Burke and relator, Tyler J. King; for Record Press,

5    William T. O'Brien, John William Lomas; we have the paralegal,

6    Valerie Lam, and we have Mr. Wilmot.  He's also a witness.  This

7    is here for a bench trial.

8          THE COURT:  Good morning to all of you.  Is everyone

9    ready to proceed?

10          MR. KING:  Yes, Your Honor.

11          THE COURT:  Now, just so the record is clear, although

12   when the case was called there was a reference to Mr. Burke on

13   behalf of the United States, the record reflects that the

14   United States has not -- or determined not to proceed with

15   respect to this matter.  So Mr. Burke is proceeding on his own

16   behalf against the defendant Record Press.

17          Now, Mr. O'Brien or Mr. Lomas, let me ask you to please

18   identify the individuals seated at the table by name, please.  I

19   think only the last name have been mentioned.  You referred to

20   someone assisting in a paralegal capacity?

21          MR. LOMAS:  Yeah, that's Ms. Valerie Lam, who's here

22   with us, assisting in a paralegal capacity.  And then

23   Mr. Hugh --

24          THE COURT:  L-A-M-B?

25          MR. LOMAS:  L-A-M.

```
 1              THE COURT:  L-A-M, very well.  Thank you very much.

 2              MR. LOMAS:  And then Mr. Hugh Wilmot, W-I-L-M-O-T, is

 3    here on behalf of the defendant Record Press.

 4              THE COURT:  Is Mr. Wilmot an officer of Record Press?

 5              MR. LOMAS:  Yes, Your Honor.  He's the president of

 6    Record Press.

 7              THE COURT:  Very well.  Thank you very much.  I assume

 8    it is the case that you still intend to elicit testimony from

 9    Mr. Wilmot.  Is that correct?

10              MR. LOMAS:  Yes, Your Honor, that's correct.

11              THE COURT:  Very well.  Is there any objection,

12    Mr. King, to Mr. Wilmot's presence at the table in his capacity

13    as an officer of the corporation?

14              MR. KING:  No, Your Honor.  And Mr. Burke also intends

15    to elicit testimony from Mr. Wilmot.

16              THE COURT:  Very well.  Thank you very much.

17              We will proceed then with the bench trial.  The Court

18    notes that both parties, Mr. Burke and Record Press, have

19    consented to proceed before this court.  I do thank you very

20    much for the inconvenience associated with moving from courtroom

21    four.  I believe you were told that the technical equipment that

22    you requested was not available at this time in courtroom four.

23              So I believe we are ready to proceed.  And I am

24    prepared, as I indicated, to allow each side to make a statement

25    in the nature of an opening statement, as you would if a jury
```

5

1    were present.

2         Mr. King, we will of course hear from you first.  And

3    before you proceed, may I ask whether the gentleman seated on

4    the front row on your side of the courtroom is a witness.

5         MR. KING:  That's Mr. Gocial, the expert.

6         THE COURT:  Well, I believe it is appropriate for

7    Mr. Gocial to wait outside in one of the witness rooms, then --

8         MR. KING:  With all due respect, Your Honor --

9         THE COURT:  -- since Mr. Gocial is not a party.

10   Mr. Wilmot is in a slightly -- I said slightly.  I should have

11   said a dramatically different posture, inasmuch as he is an

12   officer of the corporate defendant.

13        MR. KING:  That's true, Your Honor.  At the same time,

14   Mr. Gocial is Mr. Burke's expert, and it's important for

15   Mr. Gocial as the expert to be able to hear the testimony that's

16   given here today, so that in the event that the testimony is

17   relevant to his opinions, he's able to also observe and see what

18   kind of testimony is given.

19        He's reviewed all of the record of this case.  And if

20   he were another fact witness, I could understand that he may be

21   required to leave the courtroom, but he's an opinion -- his

22   testimony is on opinion, he's an expert witness, and his

23   observing of other people's testimony is important to whether or

24   not he can still testify as to what his opinion would be.

25        So, for example, it may be that certain testimony is

00000604