6

1     given that I might want to question Mr. Gocial on.  And if he's

2     not present in order to hear that testimony, I would have no

3     opportunity to ask him about whether or not that testimony

4     affects his opinions.

5              THE COURT:  The Court's intention is to enforce the

6     rule on witnesses.  If you wish to be heard, Mr. O'Brien or

7     Mr. Lomas, I will certainly hear from you.  The Court was not

8     aware that this was an issue that would arise.  Do you wish to

9     be heard?

10              MR. LOMAS:  Thank you, Your Honor.  As we discussed at

11     the January 31, 2011 status conference, Mr. Gocial, the expert

12     witness here, is testifying purely on the amount of damages

13     assuming liability.  It's a very narrow scope of testimony, and

14     Your Honor limited that testimony to just two invoices.  So it's

15     the amount of damages with respect to two invoices.

16              And the claim in this case is also a very narrow one.

17     It is whether or not this per-10-copy running rate should apply

18     to a line item in the contract between Record Press and the

19     Government Printing Office.

20              So the amount of damages, the calculation is a very

21     simple one.  There's no need, Your Honor, for Mr. Gocial to hear

22     testimony of witnesses concerning liability or so forth, since

23     the opinion is purely based on an assumption of liability, and

24     just simply applying the contract in the way that Mr. Burke

25     alleges it should have been applied.

00000605

7

```
 1              THE COURT:  Very well.  Thank you, Mr. Lomas.  The
 2    Court intends to enforce the rule on witnesses.  Mr. Gocial is a
 3    witness, and the Court will require Mr. Gocial to wait in a
 4    witness room or elsewhere in the courthouse until it is time for
 5    his testimony to be elicited.
 6              Mr. Gocial, the deputy clerk of court will escort you
 7    to a comfortable place.  You are not confined there, of course.
 8    We will just ask you to perhaps regard that as your home base
 9    until it is time for your testimony to be taken.  She will also
10    tell you where the cafeteria is, where I believe there might
11    still be at least beverage service until lunchtime.  Thank you
12    very much.
13              (OFF THE RECORD.)
14              THE COURT:  We will certainly indicate that I have no
15    objection whatsoever to your having your phone, in hopes that
16    that will be sufficient for you to retrieve it.
17              MR. LOMAS:  Your Honor, if I may.
18              THE COURT:  Yes.
19              MR. LOMAS:  I would like to point out, we do have two
20    additional witnesses that are in the courtroom from the
21    Government Printing Office.
22              THE COURT:  I did not realize that the others were
23    witnesses.  I recognize Mr. Valdez on the front row as an
24    Assistant U.S. Attorney.  He is not a witness --
25              MR. LOMAS:  Correct.
```

00000606

8

1          THE COURT:  -- and has no role other than that of a

2     spectator, so he may stay.  But the two individuals to whom you

3     referred should accompany Ms. Miller, who just left.

4          MR. LOMAS:  And actually, with respect to Mr. Valdez,

5     Your Honor, Mr. Valdez has requested that when the Government

6     Printing Office witnesses take the stand, that he be permitted

7     to sit in the well to -- if necessary, to protect the witnesses

8     during their examinations.  I wanted to pass that request on to

9     you, Your Honor.

10          THE COURT:  The Court will hear that at the time we

11     reach that point.

12          MR. LOMAS:  Thank you, Your Honor.

13          THE COURT:  When I say, "hear that," I mean hear that

14     request.

15          MR. LOMAS:  Thank you.

16          THE COURT:  I mistakenly indicated that two individuals

17     were leaving.  Actually, there are three.  You're coming back,

18     I'm sorry -- you're leaving?

19          MR. LOMAS:  Your Honor, the third individual is

20     Mr. Potter, the counsel for the Government Printing Office.  He

21     will not be a witness, but is here on behalf of them.

22          THE COURT:  Very well.  Thank you.

23          Now, are there any other preliminary matters before we

24     turn our attention to opening statements?  Any other preliminary

25     matters on behalf of the plaintiff, Mr. King?

00000607

9

```
1              MR. KING:  No, Your Honor.

2              THE COURT:  Very well.  Mr. King, we'll hear your

3    opening statement.

4              MR. KING:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. KING:  Thank you for your time today.  Mr. Burke is

7    a relator in a False Claims Act case.  This case is brought

8    under 31 USC 3729(A), relating to claims that are knowingly --

9    false claims that are knowingly presented.

10             The evidence is going to show clearly that the invoices

11   submitted by Record Press to the GPO constitute false claims

12   under the False Claims Act because Record Press knowingly

13   submitted them, and those invoices contained charges which were

14   not allowed for in the contract.

15             The defense may try to confuse or complicate this case

16   by what the GPO thinks or says, but the fact is that the

17   evidence will show that Record Press had no knowledge of the

18   GPO's understanding, and that the government knowledge defense,

19   to the extent that they may try to implicate it, is not at issue

20   here.  Because the simple fact is that Record Press had no

21   reason to believe that the contract should mean anything other

22   than what it says.  And the evidence will clearly show what the

23   contract says.  Thank you, Your Honor.

24             THE COURT:  Thank you very much, Mr. King.

25             Mr. Lomas or Mr. O'Brien?  Mr. Lomas.
```

00000608

1          MR. LOMAS:  Thank you, Your Honor.  This is a simple

2    case concerning a single line item price term:  Collating,

3    trimming to size, and binding, from a single contract between

4    Record Press and the United States Government Printing Office.

5          Record Press and the United States Government Printing

6    Office are in full agreement that the price for collating,

7    trimming to size, and binding is $12.25; that no per-10-copy

8    running rate applies to that price, that there has been no

9    overcharging, and there is no fraud.

10          Your Honor, you're going to see a copy of the contract

11   today, and you may see it up here on the screen in a moment.

12   And you're going to hear testimony about this contract and the

13   particular line item -- the single line item that is at issue:

14   The collating, trimming to size, and binding line item.

15          If you see on your screen, you're to going to see,

16   there is that line item, II(D), "collating, trimming to size,

17   and binding," and it clearly indicates on this contract $12.25

18   per 100 pages.  Again, that is the only line item that is at

19   issue.

20          Now, there are two invoices from Record Press that are

21   in this case.  They're related to a case that Mr. Burke had

22   filed against the Secretary of Commerce.  His case was dismissed

23   and brought up on appeal, and the -- and he lost his appeal.

24   And the government had appellate briefs and appendices printed

25   for that appeal, and Record Press printed those briefs, and

00000609

11

1    Record Press invoiced the GPO for those briefs.

2            We're going to pull up a copy of the first invoice in

3    this case.  And again, there's a line item here for collating,

4    trimming to size, and binding, and you'll see that here on the

5    screen.  And the word outlines here the price:  $12.25 per

6    100 pages, the contract price.

7            Then we'll show the second invoice from Mr. Burke's

8    case.  And here it is again:  The collating, trimming to size,

9    and binding charge, explicitly stated on the contract, $12.25

10   per 100 pages.

11           Now, Your Honor, the price in the contract and the

12   amounts that Record Press charged on these invoices don't appear

13   in the complaint because Mr. Burke filed his fraud claim without

14   seeing the Record Press contract and the Record Press invoices.

15   Nevertheless, Mr. Burke disagrees with the Government Printing

16   Office and Record Press that the contract price is $12.25 per

17   100 pages.

18           Now, you're also going to see, Your Honor, a

19   spreadsheet in this case, and the spreadsheet is on this screen.

20   This spreadsheet was sent by the Government Printing Office to

21   prospective vendors such as Record Press, along with the

22   invitation for bids on this contract, meaning that the vendors

23   would have had this spreadsheet in their hand when they received

24   the Government Printing Office's request for their submission of

25   a bid.

00000610

1          Now, you're going to hear testimony today about this

2     spreadsheet, and you're going to hear that on the left side of

3     this sheet are the line items that are in the request for bid.

4     And the focus here is going to be on this set of line items

5     right here (indicating), that you can see on your screen.  And

6     this, again, here is where you see the collating, trimming to

7     size, and binding line item, which again is the only line item

8     that is involved in this case.  And right under there it says,

9     "per 100 pages," indicating to prospective vendors that the

10    price should be per 100 pages.

11         Now, Mr. Burke alleges that a per-10-copy running rate

12    should apply.  You can see in line items A and B that a

13    per-10-copy running rate applies only to complete cover and text

14    per page.

15         So again, this is the spreadsheet that comes to a

16    vendor such as Record Press before they even make their bid on

17    this contract.

18         Now again, Your Honor, we're here today because a

19    stranger to the contract, Mr. Burke, the relator, filed this

20    qui tam lawsuit, again without seeing the Record Press contract,

21    without seeing the Record Press invoices.  And the typical

22    relator in a qui tam false claim suit contemplated by that

23    statute is a whistleblower with some sort of insider knowledge:

24    A government employee, or a former government employee, or a

25    current or former employee of a government contractor who is

00000611

13

1    aware of some sort of wrongdoing.  Mr. Burke will admit today

2    that he has never been an employee of the Government Printing

3    Office, nor Record Press, certainly not a party to the contract,

4    and had no involvement in the formation of the contract.

5            Now, the Court is going to hear from the alleged victim

6    in this case, the Government Printing Office.  And the Court is

7    going to hear that the Government Printing Office reviewed

8    Burke's allegations, and reviewed those documents that Burke

9    didn't review before filing this case:  The Record Press

10   contract and the Record Press invoices.  And the Government

11   Printing Office confirmed, again, that Record Press was charging

12   the correct contract price of $12.25 per 100 pages, and that

13   there was no overcharging and no fraud.

14           The Court is going to hear that today from a senior

15   level manager at the GPO who has been at the GPO for more than

16   30 years and has 30 years of experience in the printing

17   industry, and another 34-plus-year veteran of the GPO, who had

18   responsibility for reviewing printing bidder contracts and

19   invoices to make sure that they were properly paid.

20           And again, this is a fraud case, so there's an

21   allegation that Record Press is lying to the Government Printing

22   Office.  So Mr. Burke has to show that the invoices are false,

23   that Record Press overcharged for collating, trimming to size,

24   and binding, because the contract price is not the $12.25 per

25   100 pages that is the GPO and Record Press say it is.

00000612

1          Then the second element he has to show is the knowing

2     element, the knowledge of falsity.  It's not that they knew that

3     they were charging $12.25 per 100 pages, it's that they knew

4     that that was the wrong amount.  Mr. King has to show that

5     Record Press knew it was the wrong amount to charge because they

6     knew that a per-10-copy running rate should have applied.

7          Then the third thing that Mr. King has to show is

8     materiality.  The False Claims Act law requires -- as all fraud

9     cases, requires that it would have made a difference.  It needed

10    to make a difference here.  The behavior would have changed.

11          Now, with respect to the first element, falsity,

12    fundamental contract law says a contract means what the parties

13    to the contract say it means.  And again, you're going to hear

14    today, from both the Government Printing Office and Record

15    Press, that they agree on the contract price of $12.25 per

16    100 pages.

17          And there's a quote that we may pull up on the screen

18    here from a case that I think captures this in the False Claims

19    Act context.  It says, "If both the contractor and the

20    government interpret the contract one way throughout the

21    contract's history, it's unthinkable that the contractor's

22    billings which follow this common interpretation could

23    constitute a false claim."

24          Now, the Court is going to hear today from three

25    witnesses who will confirm that Government Printing Office and

00000613

1     Record Press have always understood that the contract price is

2     $12.25 per 100 pages.  You hear Mr. Wilmot's name earlier.

3     Mr. Wilmot is going to testify on behalf of Record Press.  He's

4     going to talk about how his 65-year-old company that he is with,

5     Record Press, that has been contracting with the government for

6     more than 30 years, has supplied a bid to the Government

7     Printing Office in response to this request for bid.  And that

8     bid for that line item was $12.25 per 100 pages.  And there was

9     no 10-copy running rate applied to that price when Record Press

10    submitted its bid.

11           Mr. Wilmot will testify that if it did apply, that

12    Record Press would actually be losing money on this contract.

13    So -- to show it's unreasonable.  And Mr. Record Press (sic)

14    will testify that Record Press continues to this day to be the

15    vendor for the GPO for appellate briefs under this contract;

16    that the contract was renewed; that the price term is exactly

17    the same, $12.25 per 100 pages; and that the government

18    continues to accept, approve, and pay those invoices.

19           I mentioned earlier that you were going to hear from a

20    34-year veteran of the GPO with experience in reviewing

21    contracts and invoices.  That's Mr. Calvin Adgerson, who will

22    testify today.  And Mr. Adgerson will confirm, again, that the

23    GPO reviewed Burke's claims and found they had no merit, because

24    the contract price is the $12.25 per 100 pages.

25           And then the Court will also hear from

00000614

1    Mr. Tom Sullivan, who is a senior level manager at the GPO, who

2    is responsible for all of the GPO's procurement of printing

3    contracts from vendors such as Record Press.  And he will

4    confirm that he personally reviewed Burke's claims, reviewed the

5    Record Press contract, reviewed the Record Press invoices, and

6    confirmed that there was no fraud, no overcharging.  Because

7    Record Press charged the amount that both GPO and Record Press

8    understood the contract price.  Mr. Sullivan will be testifying

9    about that spreadsheet that I told you earlier about that shows

10   to prospective vendors how the line items should be priced.

11        Now, that's the falsity issue.  Then Mr. Burke also has

12   to get over the knowledge element, which means he has to show

13   that Record Press knew that the contract price was wrong that

14   they were charging, knew that the price was actually not $12.25

15   per 100 pages.  He has to show that the government and

16   Record Press' understanding of that price term was unreasonable,

17   their own price term was unreasonable.  And again, the same

18   evidence that we've just discussed will preclude any finding of

19   knowledge.

20        And then finally, with respect to the materiality

21   element, that Mr. King will have to show that it would make a

22   difference.  But the government -- as I said, Your Honor, you're

23   going to hear testimony today that the government and

24   Record Press have continued on to this day, even after reviewing

25   and seeing and knowing about Mr. Burke's claims, that they

00000615

17

1    continue to operate as normal because the contract price is

2    $12.25 per 100 pages.

3          So the GPO renewed the contract, and Record Press

4    continues to operate under that contract, continues to submit

5    invoices with that price, and the GPO continues to accept and

6    approve those payments because that's what they agreed.

7          Thank you, Your Honor.

8          THE COURT:  Very well.  Thank you very much, Mr. Lomas.

9          Mr. King, you may call your first witness.

10         MR. KING:  Plaintiff calls Mr. Wilmot.

11         THE COURT:  Mr. Wilmot, good morning.

12         THE WITNESS:  Good morning, Your Honor.

13         THE COURT:  Let me ask you to please face the deputy

14   clerk to be sworn, and then have a seat on the witness stand.

15         (Oath administered by Courtroom Deputy.)

16         THE COURT:  Please have a seat.

17         THE WITNESS:  Thank you.

18         THE COURT:  Mr. King, you may proceed.

19         MR. KING:  Thank you, Your Honor.

20      **(HUGH WILMOT, PLAINTIFF witness, having been duly sworn,**

21                    **testified as follows:)**

22                    **DIRECT EXAMINATION**

23   BY MR. KING:

24   Q.  Mr. Wilmot, can you please state your name and your address

25   for the record?

1   A.  Hugh Wilmot, Junior.  48 Prince Street, Hastings on Hudson,

2   New York, 10706.

3   Q.  And Mr. Wilmot, what is your position with Record Press?

4   A.  I am the president of Record Press.

5   Q.  And how long have you been the president of Record Press?

6   A.  Since 2003.

7   Q.  And before that, were you also an employee of Record Press?

8   A.  No, I was not.

9   Q.  Okay.  Did you work for Record Press in a different capacity

10  before being president?

11  A.  Record Press was a client of my firm.

12  Q.  Okay.  Mr. Wilmot, I'm marking a document as Plaintiff's

13  Exhibit A.

14        MR. KING:  Your Honor, may I approach the witness?

15        THE COURT:  Yes, you may.

16  BY MR. KING:

17  Q.  Mr. Wilmot, I'm handing you a document, Plaintiff's

18  Exhibit A.

19        Mr. Wilmot, do you recognize this document?

20  A.  Yes, I do.

21  Q.  And what is the document?

22  A.  This is the bid from the U.S. Government Printing Office.

23  Q.  And is that your signature on the document, if you would

24  look to the signature page?

25  A.  Yes, it is.

00000617

19

1    Q.  Was that document made at or near the time of the contract

2    with the GPO?

3    A.  Yes, it was.

4    Q.  And was it made by a person with knowledge of the contract?

5    A.  Could you please rephrase your question?

6    Q.  Was the contract made by a person with knowledge of the

7    contract?

8            MR. LOMAS:  Your Honor, we'll stipulate to this being

9    admissible, if that's one of the questions.

10           THE COURT:  Mr. King, given the stipulation that

11   Plaintiff's Exhibit A is admissible, and further, given my

12   understanding that the questions you're asking now have to do

13   with trying to demonstrate that it's admissible, I'm prepared to

14   admit Plaintiff's Exhibit A without objection.  So you may

15   proceed to the questions you have regarding the substance of the

16   contract.

17           And the record will reflect that Plaintiff's Exhibit A

18   is admitted without objection.

19           (PLAINTIFF EXHIBIT A was moved into evidence.)

20   BY MR. KING:

21   Q.  Mr. Wilmot, if you look to the last page of that document,

22   it's Bates number RP 69.

23   A.  (Witness complies.)

24   Q.  Do you see --

25           THE COURT:  Mr. King, my copy does not have RP 69.  The

00000618

20

```
1    last page that I have has RP 68.  Is there a page that's become

2    misplaced?

3              MR. KING:  Yes, there is, Your Honor.

4              THE COURT:  Thank you.  I'll ask you, Mr. Wilmot, do

5    you have the page that is designated RP 000069?

6              THE WITNESS:  I do, Your Honor.

7              THE COURT:  Very well.  Thank you, Mr. King.  You may

8    proceed.

9    BY MR. KING:

10   Q.  Do you recognize that spreadsheet?

11   A.  Yes, I do.

12   Q.  Do you recall in your deposition that you stated that you

13   had never seen that spreadsheet prior to entering into the

14   contract?

15             MR. LOMAS:  Objection, Your Honor.  I don't believe

16   he's established any inconsistency to bring up the prior

17   statement.

18             MR. KING:  I'm sorry, what was the objection?

19             THE COURT:  Let me ask you to come back to the podium,

20   please.  I believe I heard you, Mr. Lomas, but I want to be

21   certain that Mr. King heard you and that the court reporter is

22   able to hear.

23             MR. LOMAS:  Thank you.  It sounded like Mr. King was

24   referring to prior deposition testimony, but he hasn't shown any

25   inconsistent statement or anything, any basis.  So it's hearsay.
```

00000619

1          So I just wanted to object to the question about the

2    prior testimony.  Thank you.

3          THE COURT:  Mr. King?

4          MR. KING:  Well, the first question was whether or not

5    Mr. Wilmot recognizes this spreadsheet.  He answered that he did

6    recognize this spreadsheet; however, in his deposition he

7    testified that -- he testified differently regarding his

8    knowledge of this spreadsheet.

9          THE COURT:  Well, the Court will sustain the objection

10   for the reasons which the objection embodied.  In other words,

11   at this time there has been no basis for the attempt to impeach

12   the witness with any prior statement.

13         And before we proceed, let me apologize to all of you

14   for the noise.  I assure you that I am able to hear, but I

15   believe on one side of us there is construction under way.  I

16   apologize for the disruption.  I think if we all keep our voices

17   up, we'll have an accurate record of our proceedings.

18   Unfortunately, there is virtually nothing that I can do about

19   the noise.

20   BY MR. KING:

21   Q.  Mr. Wilmot, did you review the spreadsheet before making

22   this contract?

23   A.  Yes, I did.

24   Q.  Okay.  Do you recall that in your deposition you provided

25   testimony that's the opposite of what you're testifying to

22

1    today?

2    A.  I do not recall that.

3    Q.  Mr. Wilmot, I'm marking Plaintiff's Exhibit B.

4         Actually, I'm going to hold off on Plaintiff's

5    Exhibit B for the time being.

6         THE COURT:  Very well.

7    BY MR. KING:

8    Q.  Mr. Wilmot, if I could draw your attention to the page in

9    Exhibit Number A that is marked RP 66.  Actually, Mr. Wilmot, if

10   you could look through the contract and indicate to me on which

11   page Roman numeral II appears.  Mine appears to be an incomplete

12   copy.  Do you have RP 67 in your copy?

13   A.  I do.

14   Q.  You do.  Okay.

15        MR. KING:  Your Honor, do you have RP 67 in your copy?

16        THE COURT:  I do.

17   BY MR. KING:

18   Q.  Okay.  If you look at Roman numeral II, do you see there the

19   reference to the running rate?

20   A.  I do.

21   Q.  Okay.  And are you familiar with what a running rate is?

22   A.  Yes, I am.

23   Q.  Okay.  And what is a running rate?

24   A.  A running rate is essentially, in a bidding process or to a

25   particular printer, is the amount of copies that a particular

1    pricing is going to be based on.

2    Q.  Okay.  And in this case, what amount of copies does the

3    running rate refer to?

4    A.  For line items "Complete cover, wraparound," the price is

5    six dollars for a running rate of 10 copies, along with the text

6    per page of $0.35.

7    Q.  And I'm sorry, could you repeat?  What amount of copies does

8    the running rate refer to?

9    A.  10 copies.

10   Q.  Okay.  Did Record Press ever issue invoices pursuant to this

11   contract that called for a number of copies less than 10?

12   A.  I believe we have, yes.

13   Q.  All right.  Do you recall whether or not any of your --

14   okay.

15            MR. KING:  Your Honor, I have RP 70 through RP 2351.

16   I'm handing these to Mr. Wilmot.

17            MR. LOMAS:  Your Honor, we object.

18            MR. KING:  May I approach the witness, Your Honor?

19            THE COURT:  Before you do, I will hear the objection.

20   Mr. Lomas?

21            MR. LOMAS:  Thank you, Your Honor.  At the status

22   conference on January 31st, we narrowed this, for purposes of

23   today, to two invoices.  And what Mr. King is about to hand the

24   witness is hundreds of invoices.

25            THE COURT:  Thank you, Mr. Lomas.  I believe your

00000622

24

1    statement, just so we have a clear record -- Mr. King, you

2    indicated that the stack begins with RP 00 -- what is the first

3    number?

4            MR. KING:  70, Your Honor.

5            THE COURT:  -- 70 through RP 02, and then a three-digit

6    number.  In other words --

7            MR. KING:  That's right, 2351.

8            THE COURT:  And are those consecutive pages in between

9    70 and 2361?

10           MR. KING:  More or less, Your Honor.

11           THE COURT:  And can we describe the stack as a stack

12   that is perhaps a little less than a foot tall?

13           MR. KING:  Yes, Your Honor.

14           THE COURT:  Now, what is your response to Mr. Lomas'

15   contention that when we were last in court the Court ordered

16   that at issue here -- the invoice at issue would be confined

17   to -- invoices at issue are confined to two?

18           MR. KING:  Well, Your Honor, I understood that the

19   issue was whether or not these other invoices are going to be

20   admitted into evidence.  And we agreed that the two invoices to

21   be admitted into evidence were the two that were specific to

22   Mr. Burke's work.

23           These invoices are not intended to be entered into

24   evidence; the invoices are simply going to be offered to

25   Mr. Wilmot while he's testifying, to help him refresh his memory

25

```
1    as to whether or not any of the charges -- any of the invoices

2    that Record Press submitted pursuant to this contract were for

3    an amount of copies less than 10.

4            THE COURT:  Well, because Mr. Wilmot has not indicated

5    that his recollection is exhausted, the Court will not permit

6    you to show him the stack of invoices for the purpose of

7    refreshing his recollection.

8            MR. KING:  Well then, Your Honor, I would suggest that

9    the invoices be presented to impeach the witness because they

10   contradict his testimony.  It's a very essential fact to this

11   case of whether or not there's ever an invoice for less than

12   10 copies.

13           THE COURT:  Well, the witness has not indicated that

14   his recollection is exhausted, so you may proceed with the

15   question.  And indeed, there was no objection to the question,

16   as I recall.

17   BY MR. KING:

18   Q.  Mr. Wilmot, would you be surprised if the thousands of

19   invoices that are sitting on the table here all are for an

20   amount of copies greater than 10?

21           MR. LOMAS:  Objection, Your Honor, to the relevance of

22   the question.

23           MR. KING:  May I respond, Your Honor?

24           THE COURT:  What is your response to the relevance

25   objection, Mr. King?
```

00000624

1          MR. KING:  This fact of whether or not any of the

2     invoices have a request for an amount of copies less than 10 is

3     an essential fact related to whether or not the contract that

4     calls for the running rate of 10 would imply that the running

5     rate applies to these invoices.  And now the idea is that

6     somehow the running rate does not apply to one of these line

7     items.

8          But the fact is that if the running rate, as Mr. Wilmot

9     testified to, is used for a particular quantity of copies, and

10    if every single invoice is for a number of copies greater than

11    10, then it's very important for the evidence and for the

12    testimony to reflect that fact.

13         THE COURT:  The Court will sustain the objection.  It

14    may be that at some later point there will be some relevance to

15    the question.  At this time it is not relevant, given the most

16    recent orders that the Court entered with respect to the issues

17    in the case and the evidence which would be admitted.

18         So I will suggest that you turn your attention to the

19    questions regarding the two invoices which are plainly

20    admissible.

21         MR. KING:  Okay.

22    BY MR. KING:

23    Q.  Let's move to the invoices.  Mr. Wilmot, I'm marking

24    Plaintiff's Exhibit C.

25         MR. KING:  Your Honor, may I approach the witness?

00000625

27

```
 1              THE COURT:  Yes.

 2   BY MR. KING:

 3   Q.  Mr. Wilmot, I'm handing you Exhibit C.  Thank you.

 4              MR. KING:  Would the parties stipulate to the

 5   admissibility of Plaintiff's Exhibit C?

 6              MR. LOMAS:  Yes, Your Honor.

 7              THE COURT:  Thank you, Mr. Lomas.  Plaintiff's

 8   Exhibit C will be admitted without objection.

 9              (PLAINTIFF EXHIBIT Number C was moved into evidence.)

10   BY MR. KING:

11   Q.  Mr. Wilmot, if you look at the first line item of this

12   invoice -- could you just state for the record the invoice

13   number on this document?

14   A.  Record Press invoice number A 71700.

15   Q.  And under the description of this invoice, how would -- do

16   you recognize what this invoice was for?

17   A.  Yes, I do.

18   Q.  And what was it for?

19   A.  This invoice was for the production of 40 copies of a

20   defendant appellee's brief in the Burke v. Evans matter.

21   Q.  Just to be clear, does the invoice not say that it's for

22   20 copies?

23   A.  No, it does not.

24              MR. KING:  Your Honor, do you have 71700 or 71701?

25              THE COURT:  What I have is A 71701.  That is what you
```

00000626

28

1    handed to Ms. Miller.

2          MR. LOMAS:  Excuse me, Your Honor.  I believe the

3    witness has a different one.  The stipulation was on the

4    assumption that we have a copy of what the witness was handed,

5    but I don't believe that's been the case.  I believe we need to

6    fix that.

7          MR. KING:  Yes, Your Honor, I believe I handed the

8    witness the next invoice.  So if I could just take a look at

9    what I handed the witness?

10          THE COURT:  Of course.

11          MR. KING:  Thank you.

12          All right.  I'm removing the label for Plaintiff's

13    Exhibit C -- or actually, I'm marking it out with my pen here,

14    and then I'm handing Mr. Wilmot another document marked

15    Plaintiff's Exhibit C, which is 71701, which is the document

16    that Your Honor is holding, also marked as Plaintiff's

17    Exhibit C.

18          THE COURT:  Very well, thank you.  Is that what you

19    have, Mr. Lomas, 71701?

20          MR. LOMAS:  That's right, yes, Your Honor.  Thank you.

21          THE COURT:  Very well.  Thank you.  With the

22    substitution, Mr. Lomas and Mr. O'Brien, may the exhibit still

23    be admitted without objection?

24          MR. LOMAS:  Yes, Your Honor.

25          THE COURT:  Very well.

00000627

1    BY MR. KING:

2    Q.  Following along on your description of the 40 copies, do you

3    see there the first line item, can you describe what this line

4    item refers to?

5    A.  The first line item is the typeset cover charge at $10 per

6    page.

7    Q.  And does that correspond to a line item in the contract?

8          THE COURT:  Before that question is answered, I will

9    note that the copy that I have refers to printing and binding of

10   20 copies.  Did you indicate in your question, Mr. King, that

11   the invoice was for 40 copies?

12          MR. KING:  I'm sorry, Your Honor.  Do you have 71701?

13          THE COURT:  I do.  But I note that under description,

14   the third -- I'm reluctant to say line, because I realize that

15   has some significance for the evidence in the case.  But I'm

16   using the word "line" loosely.  Mine reads, quote, "For printing

17   and binding 20 copies of the above appendix," closed quote.

18   BY MR. KING:

19   Q.  And Mr. Wilmot, your copy also says that?

20   A.  My copy reads, "For printing and binding 20 copies of the

21   above appendix for defendant appellees."

22   Q.  And you're looking at invoice A 71701?

23   A.  That is correct.

24   Q.  I am now looking at 71701 as well, and I do show 20 copies.

25          THE COURT:  Very well.  I believe in your question you

00000628

30

1    said 40.

2          MR. KING:  I did.  And I misspoke, Your Honor.

3          THE COURT:  Very well.  Thank you.

4          MR. KING:  Thank you, Your Honor.

5    BY MR. KING:

6    Q.  Does that line item number one correspond to a line item in

7    the contract, Mr. Wilmot?

8          MR. LOMAS:  Objection.  Vague with respect to the line

9    item one.

10         THE COURT:  Just so the record is clear, would you mind

11   reading, Mr. King, the item to which you refer?

12         MR. KING:  When I refer to line item one in the

13   invoice, I'm referring to the typeset cover at $10 per page.

14   BY MR. KING:

15   Q.  Does that correspond to a line item in the contract?

16   A.  Yes, it does.

17   Q.  And which line item in the contract does it refer to?

18   A.  On RP 66, Roman numeral I, item A 2.

19   Q.  And did you apply the running rate to -- on the invoice, did

20   you apply the running rate to this line item for typeset cover

21   at $10 per page?

22         MR. LOMAS:  Objection.  Vague with respect to "running

23   rate."

24         THE COURT:  May I ask you to rephrase your question,

25   please, Mr. King?

31

```
1    BY MR. KING:

2    Q.  Mr. Wilmot, did you apply the running rate that's indicated

3    in the Plaintiff's Exhibit A to the line item typeset cover at

4    $10 per page in the invoice?

5    A.  That's not applied.

6    Q.  I'm sorry?

7    A.  No, that's not applied.

8    Q.  It's not applied.

9         Going on to the next line item, "pages text times

10   one proof copy at $0.25 per page," what does this charge refer

11   to?

12   A.  This charge is indicated on RP 66 as page proofs per page at

13   $0.25.

14   Q.  Mr. Wilmot, does this -- then your testimony is that this

15   line item, "Pages text times one proof copy at $0.25 per page,"

16   corresponds to a line item in Plaintiff's Exhibit A, and that

17   line item is Roman numeral IIA?

18        MR. LOMAS:  Objection, Your Honor.  I believe that

19   mischaracterizes the testimony.

20        THE COURT:  Sustained.

21   BY MR. KING:

22   Q.  Mr. Wilmot, does this line item, "Pages text times one proof

23   copy at $0.25 per page," correspond to a line item in

24   Plaintiff's Exhibit A, the contract?

25   A.  Yes, it does.
```

32

1   Q.  And which line item does it correspond to?

2   A.  On RP 66, Roman numeral I, item E.

3   Q.  Going down to the next line item, "Covers printed at $0.60

4   per cover," what is involved in this particular line item?

5          MR. LOMAS:  Objection.  Vague.

6          THE COURT:  Is your question, Mr. King, to which entry

7   in the contract it corresponds?  That appeared to be the form of

8   the question regarding the first two items.  Or was your

9   question different?

10         MR. KING:  No, Your Honor, the question is the same.

11  BY MR. KING:

12  Q.  Does this line item correspond to a line item in Plaintiff's

13  Exhibit A?

14  A.  Yes, it does.

15  Q.  And what line item does it refer to?

16  A.  RP 67, Roman numeral II, line item A, II(A).

17  Q.  Does the invoice apply the running rate to this particular

18  line item, "Covers printed at $0.60 per cover"?

19  A.  Your question again?

20  Q.  Does the invoice apply the running rate?

21  A.  The invoice applies the running rate to this particular line

22  item, yes.

23  Q.  Going to the next line, "Page numbers inserted in table of

24  contents" at $0.25, what line item in the contract does this

25  line item in the invoice refer to?

00000631

33

```
1    A.  This line item is referenced on RP 66, Roman numeral I,

2    item G.

3    Q.  G.  And is the running rate applied to this line item?

4    A.  It does not.

5    Q.  Moving on to the next line item in the invoice, "566 pages

6    text printed times 20 copies at .035 per page."

7            What line item in the contract does this line item in

8    the invoice refer to?

9    A.  This item is referenced on RP 67, Roman numeral II, item B.

10   Q.  Is the running rate applied to this line item in the

11   invoice?

12   A.  Yes, the running rate is applied to this line item.

13   Q.  Going on to the next line, "Collating, trimming to size, and

14   binding charge, 11,320 pages at $12.25 per 100 pages," what line

15   item in the contract does this line item in the invoice refer

16   to?

17   A.  This line item is referenced on RP 67, item II(D).

18   Q.  Does the invoice apply the running rate to this line item?

19   A.  No, it does not.

20   Q.  The next line, "Text page at $10 per page," what line item

21   in the contract does this line item in the invoice refer to?

22   A.  This is referenced on RP 66, Roman numeral I, item B.

23   Q.  And is the running rate applied to this line item in the

24   invoice?

25   A.  No, it does not.
```

00000632

1    Q.  Mr. Wilmot, am I characterizing your testimony correct, that

2    of all of the line items in this invoice that correspond to a

3    line item under Roman numeral I of the contract, that

4    Record Press does not apply the running rate?

5    A.  That's correct.

6    Q.  Is it also correct that, under Roman numeral II of the

7    contract, Record Press charges the running rate for some line

8    items, but doesn't charge it for line item D as reflected in the

9    invoice?

10   A.  I'm sorry, could you rephrase your question?

11   Q.  Based on the testimony that you gave, doesn't your testimony

12   reflect the fact that with respect to the charges arising from

13   Roman numeral II in the contract, Record Press charges the

14   running rate for all line items, but then does not charge the

15   running rate for D?

16           MR. LOMAS:  Objection.  I think that mischaracterizes

17   the testimony with respect to "all."  It was unclear -- and it's

18   also vague with respect to "all."

19   BY MR. KING:

20   Q.  All right.  Let me try one more time.  Mr. Wilmot, your

21   testimony that you just gave regarding the charges in the

22   invoice, does your testimony reflect the fact that, with respect

23   to the charges arising from Roman numeral number II in the

24   contract, Record Press' invoices charge the running rate for

25   some line items, but then do not charge the running rate for

00000633

1    line item D?

2    A.  Consistent with Record Press' invoice, Record Press charges

3    the running rate for line items "Complete cover" and "Text per

4    page," which is on RP 67, Roman numeral II, A and B, items A and

5    B.

6    Q.  Mr. Wilmot, does Record Press charge the running rate for

7    all of the line items in Roman numeral number II?

8    A.  No, it does not.

9    Q.  Does Record Press follow that pattern of not charging the

10   running rate to Roman numeral II(D) for all of its invoices?

11   A.  That's correct.

12   Q.  Mr. Wilmot, you testified earlier that Record Press will

13   perform work for invoices on jobs that are less than 10 copies.

14   Is this one of those jobs?  How many copies are invoiced on this

15   job?

16          MR. LOMAS:  Object to the preface of the things that

17   mischaracterize his prior testimony.

18          THE COURT:  Well, as phrased, the question is compound

19   because there was a question, which was not answered, and a

20   second one was asked.  So let me ask you to ask a single

21   question, Mr. King.

22          MR. KING:  Okay.

23   BY MR. KING:

24   Q.  How many copies does the invoice charge for?

25   A.  Referencing Record Press' invoice A 71701, the description

00000634

1    in this invoice charges for 20 copies of an appendix for

2    defendant appellees in the Burke v. Evans matter.

3    Q.  So how would you apply the running rate of per-10 copies to

4    this invoice?

5            MR. LOMAS:  Objection.  Vague.

6            THE COURT:  Are you able to answer the question,

7    Mr. Wilmot?

8            THE WITNESS:  If asked again.

9            THE COURT:  Could you repeat your question, please,

10   Mr. King.

11   BY MR. KING:

12   Q.  Given an invoice that charges for 20 copies, and a running

13   rate that provides for per-10 copies, how would you apply the

14   running rate to this particular invoice?

15           MR. LOMAS:  Objection.  Vague, with respect to...

16           THE COURT:  Are you able to answer the question,

17   Mr. Wilmot?

18           THE WITNESS:  Yes, I am.

19           THE COURT:  Very well.  The objection is overruled.

20   A.  This invoice is billed consistently with the contract.

21   BY MR. KING:

22   Q.  Well, Mr. Wilmot, my question was how you apply the running

23   rate of per-10 copies to a job that requires 20 copies to be

24   made.

25   A.  For the line items requiring 10 copies, in this particular

37

1    case covers and text per page, the price is adjusted accordingly

2    for a running rate of 10 copies.

3            In this instance, the cover is adjusted to be for $0.60

4    as an item price; for text per page, with a quantity of 11,320

5    in total of a 560-page document, the price is adjusted to be

6    .035, which represents an adjustment for the running rate of

7    10 copies.

8    Q.  Let's go to the next invoice.  Mr. Wilmot, I'm marking a

9    document Plaintiff's Exhibit D.

10           MR. KING:  May I approach the witness, Your Honor?

11           THE COURT:  You may.

12   BY MR. KING:

13   Q.  Mr. Wilmot, do you recognize this document?

14   A.  Yes, I do.

15   Q.  And what invoice does this refer to?

16   A.  This document is Record Press' invoice A 71700.

17           MR. KING:  Do you stipulate to its admission?

18           MR. LOMAS:  Yes.  Your Honor, we stipulate to the

19   admission of this exhibit.

20           THE COURT:  Thank you, Mr. Lomas.  Plaintiff's

21   Exhibit D, the invoice A 71700, will be admitted without

22   objection.

23           (PLAINTIFF EXHIBIT D was moved into evidence.)

24   BY MR. KING:

25   Q.  Generally speaking, Mr. Wilmot, how do you describe the work

38

1    that this invoice refers to, the particular job, if you will?

2    A.  This invoice is for printing and binding 40 copies of the

3    above brief for the defendant appellees in the Burke v. Evans

4    matter, as noted.

5    Q.  If you go to the first line item of this invoice, which is

6    "Typeset cover at $10 per page," does that correspond, like the

7    other invoice, to line item, in the contract, Roman numeral I,

8    A2?

9    A.  No, it does not.

10   Q.  It does not.  What line item in the contract does this line

11   item in the invoice, "Typeset cover at $10 per page," refer to?

12   A.  Referencing RP 66, Roman numeral I, line item A1.

13   Q.  A1.  Thank you.

14          And does the invoice apply the running rate to this

15   line item?

16   A.  No, it does not.

17   Q.  Moving on to the next line item, "Covers printed at $0.60

18   per cover," what line item in the contract does this line item

19   in the invoice refer to?

20   A.  Referencing RP 67, Roman numeral II, item A.

21   Q.  And does the invoice charge the running rate for this line

22   item?

23   A.  Consistent with the contract, it does.

24   Q.  The next line item, "76 pages text printed at 40 copies"

25   at .035 per page on the invoice, what line item from the

00000637

39

1    contract does that refer to?

2    A.  Referencing RP 67, Roman numeral II, item B.

3    Q.  Does the invoice apply the running rate to this line item?

4    A.  Yes, it does.

5    Q.  The next line item, "Collating, trimming to size, and

6    binding," charge 3,040 pages at $12.25 per 100 pages.

7            What line item in the contract does this line item

8    refer to?

9    A.  Referencing RP 67, Roman numeral II, line item D, as in

10   David.

11   Q.  Does the invoice charge the running rate for this line item?

12   A.  No, it does not.

13   Q.  Then again, your testimony is that the invoice does not

14   charge the running rate for line items in the contract that fall

15   under Roman numeral I?

16   A.  That is correct.

17   Q.  And now with respect to Roman numeral II of the contract,

18   Record Press charges the running rate for II(A) and B, but does

19   not charge the running rate for II(D)?

20   A.  That is correct.

21   Q.  Mr. Wilmot, why doesn't Record Press charge the running rate

22   for D, but does charge it for all the other line items under II?

23            MR. LOMAS:  Objection.  There's an assumption there

24   that no foundation has been laid for.

25            THE COURT:  The objection is overruled.

00000638

40

1    A.  Can you please re-ask the question?

2    BY MR. KING:

3    Q.  Yes.  Why does Record Press not charge the running rate for

4    D, but does charge it for all the other line items under II?

5    A.  With respect to the contract, referencing page RP 67, it's

6    clearly written there, "Per 100 pages."  In addition to that,

7    RP 69 lists clearly what is required in the bidding process as

8    to what rate is to be applied for the line items.

9    Q.  You're referring to the GPO spreadsheet?

10   A.  RP 69, that's correct, yes.

11   Q.  Well, if we're going to be looking at Record Press 69, the

12   GPO spreadsheet, can I draw your attention to the column for

13   "Basis of award"?  What does "basis of award" refer to?

14   A.  The basis of award is a quantity issued by the GPO as an

15   indication of what they will use in their internal accounting to

16   determine who the winner of the contract is.

17   Q.  Okay.  And if you look under the column for "Record Press,"

18   you see that the corresponding number for Record Press for that

19   particular line item, II(D), is what?

20   A.  Referencing that column on the unit rate for II(D), I read

21   $12.

22   Q.  All right.  Now if you go to the column for the cost under

23   "Record Press," and you follow it down to that line item for

24   II(D), what is your cost?

25   A.  The cost is $168.

Rebecca Stonestreet          (202) 354-3249     kingreporter2@verizon.net

00000639

41

1    Q.  All right.  Now if you go back to -- stay in the same column

2    under "Record Press," and go to the line item for II(B).  What

3    is the cost there?

4    A.  Reading text per page per 10 copies, the cost here is

5    $49,798.80.

6    Q.  Okay.  Mr. Wilmot, would you agree that $168 is a much

7    smaller number than $49,798.80?

8    A.  Yes.

9    Q.  Yes.  If you go back to Plaintiff's Exhibit D, which is your

10   invoice, and you look at the corresponding charges, would you

11   agree that the line item II(D) is now a much greater number than

12   line item II(B)?  In the invoice, the number corresponding to

13   line item II(D) is what for the amount?

14   A.  II(D), okay, on this invoice is $372.40.

15   Q.  And the line item referring to II(B), that amount is what?

16   A.  Referencing RP 69 on the spreadsheet?

17   Q.  No, the invoice.  Stay on the invoice, please.

18   A.  Okay.  $106.40.

19   Q.  Now, isn't it fair to say that the line item II(D) in the

20   invoice is much greater than line item II(B) in the invoice?

21          MR. LOMAS:  Objection.  Vague and argumentative.

22          THE COURT:  Sustained.

23   BY MR. KING:

24   Q.  Mr. Wilmot, can you compare the -- okay.  Under

25   Record Press 69, the amount for Record Press that corresponds to

42

1    line item II(D) is greater than or less than the amount for

2    II(B)?

3    A.  The invoice is less than what's listed in RP 69.

4    Q.  No, Mr. Wilmot.  My question is -- just look at RP 69.

5    A.  Okay.

6    Q.  The line item for II(D) corresponding to Record Press is

7    less than or greater than II(B)?

8    A.  II(D) is less than II(B).

9    Q.  Okay.  Now if you look in the invoice, line item II(D).  Is

10   it also less than II(B), or is it greater than II(B)?

11   A.  Okay.  Text per page here is -- $106.40 is less than

12   $372.40, collating.

13   Q.  So Mr. Wilmot, your testimony, then, is that -- well, first

14   of all, you said that you looked at this spreadsheet before you

15   made this contract with GPO?

16   A.  That's correct.

17            MR. KING:  One moment, Your Honor.

18            THE COURT:  Certainly.

19            MR. KING:  Your Honor, may I approach the witness?

20            THE COURT:  Yes.

21   BY MR. KING:

22   Q.  Mr. Wilmot, I'm handing you Plaintiff's Exhibit B.

23   Mr. Wilmot, do you recognize this document?

24            MR. LOMAS:  We object to the relevance of this

25   document.  This appears to be a contract for 1272 S, and the

00000641

43

1    claim in the complaint is based solely on the contract that

2    we've been speaking about earlier, program 2231 S.

3            THE COURT:  In other words, this is for a different

4    contract other than the contract which governs the two invoices?

5    Is that your objection?

6            MR. LOMAS:  Yes, Your Honor.  That's right.

7            THE COURT:  Mr. King?

8            MR. KING:  Your Honor, as I argued before, the action

9    at issue in this case is not one particular contract.  The

10   action has to do with an unlawful billing practice, which is the

11   failure to apply the running rate to this particular line item

12   in the contract.  And the contract that's marked as Plaintiff's

13   Exhibit B is the predecessor contract to Plaintiff's Exhibit A.

14   It is in fact identical, and Mr. Wilmot can certainly testify to

15   its authenticity.

16           THE COURT:  The Court will not permit the use of

17   Exhibit B, since it is the case that Exhibit A, which has

18   already been admitted into evidence, is the contract which

19   governs the two invoices which are at issue.  So I will ask you

20   to retrieve Exhibit B, please.

21           If this is a convenient time for the parties to take a

22   brief recess, perhaps we can take a 10-minute recess now, and

23   then continue until we break for lunch.

24           MR. KING:  Thank you, Your Honor.

25           THE COURT:  Very well.  I will ask you to step down,

00000642

44

1    Mr. Wilmot.  You have not completed your testimony, you remain

2    under oath, and you may not discuss either the testimony you've

3    already given or any anticipated testimony with anyone:

4    Counsel, the parties, anyone else.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  Very well.  Thank you, and we'll resume in

7    about 10 minutes.

8              (Recess taken at 11:26 a.m.).

9              THE COURT:  Now, Mr. Wilmot, I'll ask you to please

10   return to your seat on the witness stand.

11             Thank you.  Mr. King, you may continue.

12             MR. KING:  Thank you, Your Honor.

13             Your Honor, if I could just address the decision to

14   withdraw Plaintiff's Exhibit B, which was the contract for

15   1272 S.  If you would note on the spreadsheet, the GPO

16   spreadsheet that Mr. Wilmot testified to that he reviewed in

17   entering into the contract, 2231 S, that's RP 69.

18             If you go to the top of RP 69, you'll see that the

19   spreadsheet refers to program number 1272 S.  So the testimony

20   of Mr. Wilmot, you know, the contract of 2231, you know, it

21   pulls this program, 1272 S, directly into this case.

22             THE COURT:  The Court has already ruled that Exhibit B

23   is not relevant.  The matter is confined to the two invoices

24   which are governed by A, which has already been admitted without

25   objection, and the Court has so ruled.

45

1              So I will ask you to continue your inquiry, please.

2       BY MR. KING:

3       Q.  Thank you again for your testimony, Mr. Wilmot.

4              So to continue on, let's just wrap up here.  To

5       reiterate your testimony, you testified earlier that you believe

6       that Record Press did run -- did perform runs of copies of less

7       than 10 copies.  You testified to that.  Correct?

8              MR. LOMAS:  Objection.

9              THE COURT:  On what ground?

10             MR. LOMAS:  Argumentative and relevance.

11             THE COURT:  Sustained.

12             MR. KING:  I'm sorry, the number of copies in the

13      invoices are not relevant?  Is that what the basis of the

14      argument is?

15             THE COURT:  The Court understands the relevance

16      objection to be that the invoices here are for either

17      20 copies - that is, invoice A 71701 - or 40 copies in A 71700.

18             MR. KING:  Okay.

19             THE COURT:  Therefore, whether other invoices were for

20      other amounts is simply not relevant.

21             MR. KING:  Okay.

22      BY MR. KING:

23      Q.  And Mr. Wilmot, you testified that the invoice charges the

24      running rate for line items II(A) and II(B) from the contracts.

25      Correct?

00000644

46

```
1              THE COURT:  Are you referring to both invoices?
2              MR. KING:  Both invoices, yes.
3    A.  Yes, the invoices are consistent with the billing of II(A)
4    and II(B).
5    BY MR. KING:
6    Q.  And the invoices, both invoices, they do not charge the
7    running rate for line item II(D)?
8    A.  Correct.  Consistent with the contract, it does not.
9    Q.  And that line item II(D), what are the words that describe
10   that line item again?
11   A.  Reading from RP 67, item II(D) reads, "Collating, trimming
12   to size, and binding per 100 pages, $12.25."
13   Q.  Okay.  And Mr. Wilmot, again, could you repeat your
14   testimony as to why Record Press does not charge the running
15   rate for collating, trimming to size, and binding, but does so
16   for A and B?
17   A.  Sure.  As listed in item II(D) on RP 67, it reads,
18   "Collating, trimming to size, and binding per 100 pages."  In
19   addition to that, RP 69 clearly indicates "Collating, trimming
20   to size, and binding per 100 page."
21   Q.  Mr. Wilmot, drawing your attention to RP 69, the numbers
22   that appear in those various cells, do they have any meaning to
23   you?
24   A.  As I testified before, the numbers reflect an internal
25   quantity listed by the GPO to determine -- to level the playing
```

```
 1    field among bidders, if you will, okay, comparing apples to

 2    apples, oranges to oranges.  And we determine pricing based on

 3    what we produce, and the costs associated with producing that

 4    product.

 5    Q.  So if they do have meaning to you, how would you describe

 6    that meaning?

 7    A.  Consistent with my testimony before, the numbers reflected

 8    there are GPO numbers reflecting the basis of award, the

 9    multiples that they will use to determine what the contract

10    amount is going to total.

11    Q.  But you're testifying about what they mean to the GPO.  What

12    does their meaning to the GPO mean to you and Record Press?

13              MR. LOMAS:  Objection.  Asked and answered.

14              THE COURT:  Overruled.

15    A.  With respect to these numbers, essentially we would know

16    where our contract total is going to be.  So in this particular

17    instance, we are a bidder of $147,000.23, as compared to the

18    other bidders.  So we don't really know what the other bidders

19    are going to bid, so this will help us to see what the overall

20    number is going to be.  Okay?

21              So other than that, it does not influence what our line

22    item charge is going to be.  It is based on what we feel we can

23    produce, the rate at which we can produce and make a profit to

24    cover our expenses.

25              MR. KING:  Thank you, Mr. Wilmot.
```

00000646

48

1              Thank you, Your Honor.  No more questions.

2              THE COURT:  Very well.  Thank you very much, Mr. King.

3              Mr. Lomas or Mr. O'Brien?  Mr. Lomas, you may

4      cross-examine.

5              MR. LOMAS:  Thank you, Your Honor.

6                        **CROSS EXAMINATION**

7      BY MR. LOMAS:

8      Q.  Good morning, Mr. Wilmot.

9      A.  Good morning.

10     Q.  You said earlier you were the president of Record Press?

11     A.  That's correct.

12     Q.  How long has Record Press been in business?

13     A.  Record Press has been in business since 1945.

14     Q.  And generally what type of business is Record Press in?

15     A.  Record Press is an appellate printer; a financial and

16     commercial printer as well.

17     Q.  So what does the appellate printing entail?

18     A.  The appellate printing entails -- we're often engaged by law

19     firms, solo practitioners, or interested parties with items that

20     are on appeal.  We have a staff of six paralegals and attorneys,

21     and it's their job to interpret the guidelines of a particular

22     appellate court, and as such perfect the record and file --

23     serve and file a particular case.

24     Q.  And who does Record Press do that work for?

25     A.  It could be law firms, it could be the government, solo

00000647

1    practitioners, just any appellate...

2    Q.  And the work that is done with the government, who is that

3    contracted through?

4    A.  The Government Printing Office, GPO.

5    Q.  And how long has Record Press been contracting with the

6    Government Printing Office?

7    A.  Over 30 years.

8    Q.  Is Record Press still contracting with the Government

9    Printing Office?

10   A.  Yes, we do.

11   Q.  Mr. Wilmot, I would like to refer you back to what was

12   marked as Plaintiff's Exhibit A.  And this was the contract,

13   Record Press' contract with the GPO for program 2231 S.  Is that

14   right?

15   A.  That's correct.

16   Q.  Now, how was this contract formed?

17   A.  A request for bid is sent out by the GPO.  It arrives via

18   U.S. mail, and it is then reviewed and prepared for submission.

19   Q.  So was this the request for bid, and then Record Press

20   filled it out?

21   A.  That's correct.

22   Q.  And was there anything sent with the request for bid?

23   A.  Not in this case, other than what was required to be filled

24   out.

25   Q.  And did Record Press fill out price terms in the request for

00000648

50

1    bid?

2    A.  That's correct.

3    Q.  And if you flip to the last page that's marked with

4    production number RP 69, so RP 69 of Plaintiff's Exhibit A.

5    A.  That's correct.

6    Q.  You spoke about this spreadsheet earlier with Mr. King?

7    A.  Yes.

8    Q.  Was this part of the request for bid?

9    A.  This constitutes the entire package, yes.

10   Q.  When you say "this constitutes," you're talking about

11   Plaintiff's Exhibit A?

12   A.  Correct.

13   Q.  So this spreadsheet here was part of that package?

14   A.  Stapled as a part of the package.

15   Q.  So did Record Press have this spreadsheet then, before it

16   filled out the price terms?

17   A.  That's correct.

18   Q.  Now, on the left column here there looks to be line items.

19   On the left column of RP 69 of Plaintiff's Exhibit A, there's a

20   list of line items.  Is that what those are?

21   A.  Yes.

22   Q.  And are those line items in the request for bid itself?

23   A.  Yes.

24   Q.  Now, if we can focus maybe attention on the part that's just

25   under column II, or Roman numeral II, some of these line items

00000649

1    that you were discussing with Mr. King.

2            Now, could you explain what this shows with respect to

3    these line items?

4    A.  Okay.

5    Q.  Well, actually, let me refer you to II(A) for a moment, the

6    line item that says, "Complete cover."  What does the "per

7    10 copies" mean with respect to "complete cover"?

8    A.  Okay.  Essentially, we will be charging a per-10-copy rate

9    to that line item.

10   Q.  And then what does the per 10 copies mean for what's marked

11   as Roman numeral II(B), the text per page line item?

12   A.  We would be charging a per-10-copy rate for that particular

13   line item.

14   Q.  And then for the pressure-sensitive stock, II(C), and then

15   there's a Roman numeral I for white pressure-sensitive stock.

16   Is that right?

17   A.  That's correct.

18   Q.  What does the "per 100 leaves" mean for that line item?

19   A.  Our billing charge should reflect a charge of per

20   100 leaves.

21   Q.  And is that the same for the "Color" line item, which also

22   says, "per 100 leaves"?

23   A.  That is correct.

24   Q.  Then what about with respect to line item II(D), which says,

25   "Collating, trimming to size, and binding per 100 page"?

```
1    A.  We would be charging a rate consistent with per 100 page.

2    Q.  So did Record Press review this portion of the spreadsheet

3    before it filled out its bid for this program?

4    A.  Absolutely and always.

5    Q.  Okay.  And let me refer -- actually, if we go back to the

6    spreadsheet itself, the whole spreadsheet.  The numbers that are

7    in the spreadsheet, those aren't the numbers that Record Press

8    bid this time for this contract.  Is that right?  These are

9    older price numbers.  Is that right?

10   A.  That's correct.

11   Q.  Now, if we can go back to what's marked as RP -- production

12   number RP 67 of Plaintiff's Exhibit A.  Now, on the screen it

13   may help you, but we can blow up the line item.  Oh, it's not

14   working.  Okay.

15           If you could look under Roman numeral II, "Complete

16   product," and line D, "Collating, trimming to size, and

17   binding," do you see that line item?

18   A.  Yes, I do.

19   Q.  And what price did Record Press bid when it submitted its

20   bid to the GPO for this line item?

21   A.  $12.25.

22   Q.  What rate is that based on?

23   A.  Per 100 pages.

24   Q.  When Record Press submitted its bid for this line item, was

25   there a 10-copy running rate included in that price bid?
```

00000651

53

```
1    A.  No.

2    Q.  The 10-copy running rate doesn't apply to Record Press' bid?

3    A.  That's correct.

4    Q.  Now, could you please describe what type of work the

5    collating, trimming to size, and binding line item refers to?

6    A.  Collating, trimming to size, and binding involves

7    programming from the Xerox operator, to program the number of

8    copies and print them in a fashion that a voluminous record, for

9    instance, or appendix is collated and ready to be passed on to

10   the next department.

11        That next department could be the bindery, and so the

12   trimming that's involved there is cutting to size based on the

13   guidelines of that particular appellate court.

14        In addition to that, it is then moved on to the perfect

15   bindery department, and their job is to wrap a cover around the

16   printed matter and perfect bind it.  It then goes back to the

17   trimming department for actual shaving, and it is then passed on

18   to packing.

19   Q.  Now, did Record Press -- or excuse me, did the Government

20   Printing Office award this contract to Record Press?

21   A.  Yes, it did.

22   Q.  So in that process, did the GPO accept this bid that we see

23   here in this Plaintiff's Exhibit A?

24   A.  That's correct.

25   Q.  And did the GPO accept Record Press' bid for collating,
```

00000652

1    trimming to size, and binding, with a price of $12.25 per

2    100 pages?

3    A.  Yes, they did.

4    Q.  Did Record Press provide appellate brief printing services

5    for the GPO under this contract?

6    A.  Yes, it did.

7    Q.  How does Record Press get paid for the services that it

8    provides under this contract?

9    A.  We submit two invoices, one to Washington and one to the

10   Philadelphia GPO offices, and it is paid out of Washington.

11   Q.  So why does Record Press submit invoices to two different

12   GPO offices?

13   A.  Checks and balances by the GPO.

14   Q.  I want to refer you back to Plaintiff's Exhibit D.  Do you

15   have that in front of you?  That was the invoice that's marked

16   A 71700.  Do you see that?

17   A.  Yes.

18   Q.  Is this a Record Press invoice to the GPO?

19   A.  Yes, it is.

20   Q.  And was this invoice issued to the GPO under the contract

21   that we've talked about, Plaintiff's Exhibit A?

22   A.  That's correct.

23   Q.  Did Record Press charge for collating, trimming to size, and

24   binding in this invoice?

25   A.  Yes, it did.

1    Q.  And what was the amount -- what was the total amount that

2    Record Press charged for collating, trimming to size, and

3    binding?

4    A.  $372.40.

5    Q.  And how did Record Press determine that $372.40 was the

6    amount to charge?

7    A.  Essentially, based on 3,040 pages, times a rate of $12.25

8    per 100 pages.

9    Q.  And is that rate the contract price?

10   A.  Yes, it is.

11   Q.  Did the GPO accept this invoice and pay it?

12   A.  Yes.  It is indicated as such, paid.

13   Q.  So I want to refer you then back to Plaintiff's Exhibit C.

14   Does the invoice that I think is identified A 71701, do you see

15   that one?

16   A.  Yes, I do.

17   Q.  Is this a Record Press invoice to the GPO?

18   A.  This is a Record Press invoice.

19   Q.  Was this invoice -- excuse me, did Record Press invoice

20   this -- sorry.  Issue this invoice to the GPO pursuant to the

21   contract that's Plaintiff's Exhibit A?

22   A.  Yes, it did.

23   Q.  Did Record Press charge for collating, trimming to size, and

24   binding in this invoice?

25   A.  Yes, it did.

00000654

56

1    Q.  And what was the amount that Record Press charged?

2    A.  $1,386.70.

3    Q.  And how did Record Press determine that amount?

4    A.  Based on 11,320 pages, at a rate of $12.25 per 100 pages,

5    that price was determined.

6    Q.  Was that price of $12.25 per 100 pages the contract price?

7    A.  Yes, that's consistent with the contract.

8    Q.  Did the GPO accept this invoice and pay it?

9    A.  Yes, and indicated as such.

10   Q.  On this particular invoice, if a per-10-copy running rate

11   would have applied to this line item, would that have changed

12   the amount that Record Press would have charged?

13   A.  Yes.

14   Q.  By how much?

15   A.  The amount would have been reduced by 90 percent.

16   Q.  90 percent.  So if the amount for this line item had been

17   reduced by 90 percent, would Record Press be able to make money

18   on this invoice?

19   A.  Unfortunately not.

20   Q.  I want to refer you back to Plaintiff's Exhibit A if you

21   could for a moment, Mr. Wilmot, and the production page number

22   RP 54.  It's back toward the front.

23   A.  (Witness complies.)

24   Q.  Are you there?

25   A.  Yes, I am.

```
1    Q.  Does this page of the contract state what the term of this

2    contract is?

3    A.  Yes, it does.

4    Q.  And what was the term of this contract?

5    A.  A base year and four option years.

6    Q.  And so what was the base year?  Is that the first date here,

7    November 1st, 2006 through October 31, 2007?

8    A.  That's correct.

9    Q.  And then the four additional years, what did you refer to

10   those as?

11   A.  Option years.

12   Q.  And so who has the option to renew those years?

13   A.  The GPO.

14   Q.  Did the GPO renew Record Press' contract?

15   A.  Yes.  Twice.

16   Q.  You're aware that Mr. Burke filed this case in 2008.  Is

17   that right?

18   A.  That's correct.

19   Q.  And so did the GPO renew this contract since Mr. Burke filed

20   this case?

21   A.  Yes.  Twice.

22   Q.  Is this contract still in force today?

23   A.  Yes, it is.

24   Q.  The GPO hasn't terminated it?

25   A.  No, it has not.
```

```
1    Q.  Has the GPO ever suspended any payments on Record Press'

2    invoices under this contract?

3    A.  No, it has not.  Never.

4    Q.  Is $12.25 per 100 pages still the contract price for

5    trimming to size, collating, and binding?

6    A.  That's correct.

7    Q.  Has the GPO ever instructed Record Press to apply a

8    per-10-copy running rate to that line item?

9    A.  Never.

10   Q.  Does Record Press still provide printing services under this

11   contract to the GPO?

12   A.  Yes, it does.

13   Q.  Does Record Press still charge $12.25 per 100 pages?

14   A.  Yes, it does.

15   Q.  Does Record Press still issue those invoices reflecting that

16   to the GPO?

17   A.  Yes, it does.

18   Q.  And is that charge identified on the actual invoice for the

19   invoices?

20   A.  Yes, it does.

21   Q.  And does the GPO still pay those invoices?

22   A.  Yes, they do.

23   Q.  Has the GPO ever raised any issues with Record Press with

24   respect to this line item?

25   A.  Never.
```

1  Q.  Has any other government agency ever raised any issues with

2  Record Press with respect to this line item?

3  A.  Never.

4          MR. LOMAS:  Thank you.  I have no further questions.

5          THE COURT:  Thank you, Mr. Lomas.  Mr. King, do you

6  have redirect?

7          MR. KING:  No, Your Honor.

8          THE COURT:  Very well.  Thank you very much.

9          Mr. Wilmot, thank you.  You may step down.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  Now counsel, I will be guided by your

12  preferences.  It is now 12:00 noon.  We can recess now for lunch

13  and reconvene at 1:15; alternatively, if you would like to take

14  20 minutes or so to begin the testimony of the next witness, you

15  may do that and then we will recess at that point.

16          What is your preference, Mr. King?

17          MR. KING:  We're going to ask to call Mr. Adgerson for

18  a short time.

19          THE COURT:  Very well.  Is he in the witness room?

20  Would one of you please be so kind as to ask him to come in?

21  Thank you.

22          MR. LOMAS:  Your Honor, while we're waiting for

23  Mr. Adgerson, I just wanted to mention that AUSA Valdez is on

24  behalf of government witnesses, and he would like to step in the

25  well when Mr. Adgerson is on the stand.

00000658

60

```
1                THE COURT:  You mean, at the table with counsel?  Is
2     that without objection, Mr. King?
3                MR. KING:  That's without objection.
4                THE COURT:  Very well.
5                Good afternoon, Mr. Adgerson.  I'll ask you to please
6     face the deputy clerk to be sworn, and then have a seat on the
7     witness stand.
8                     (Oath administered by Courtroom Deputy.)
9                THE COURT:  Good afternoon.
10               THE WITNESS:  Good afternoon.
11               THE COURT:  Mr. King, you may proceed.
12        (CALVIN ADGERSON, PLAINTIFF witness, having been duly sworn,
13                          testified as follows:)
14                          DIRECT EXAMINATION
15    BY MR. KING:
16    Q.  Good afternoon, Mr. Adgerson.
17    A.  Good afternoon, Mr. King.
18    Q.  Thank you for your time today.
19               Mr. Adgerson, were you employed with -- first of all,
20    do you recall ever receiving a call from Mr. Burke, the
21    plaintiff in this case?
22    A.  I do.
23    Q.  Okay.  And were you employed with the GPO at that time?
24    A.  Yes, I was.
25    Q.  And what was your position at the GPO at that time?
```

00000659

61

1    A.   I was the branch chief of the commercial billing section.

2    Q.   Okay.  I'm sorry, could you repeat that?

3    A.   I was the branch chief of the commercial billing and

4    examination section.

5    Q.   Commercial billing and examination section?

6    A.   Yes.

7    Q.   And what was the role of that particular department?

8    A.   We were responsible for paying commercial printing invoices,

9    and also processing non-printing invoices.

10   Q.   And so what was your role at that department with respect to

11   that department's role?

12   A.   I'm sorry, I didn't...

13   Q.   You stated your position.  My question is:  What were you

14   required to do in that position at that department?

15   A.   I was more of a managerial aspect.  I was responsible for

16   making sure that the sections functioned properly.  I had three

17   supervisors that were section chiefs that reported to me, but it

18   was more from a management perspective as far as meetings,

19   making sure that operations were functioning properly.

20   Q.   Going back to the call from Mr. Burke.  When you received

21   the call from Mr. Burke, what was the nature of Mr. Burke's

22   inquiry?

23   A.   Mr. Burke had inquired about how we were processing our

24   invoices on the 2231 contract, whether we were processing them

25   correctly; specifically in regards to the trimming, binding, and

00000660

1     collating charge.

2     Q.  And during the course of that conversation, did you

3     undertake to investigate Mr. Burke's inquiry?

4     A.  No, the only thing that I had at that time when I spoke to

5     Mr. Burke was a copy of the contract.

6     Q.  Okay.  And did you then review the contract in your

7     discussion with Mr. Burke?

8     A.  When you say review the contract, you mean to look at the

9     contract?

10    Q.  Yeah.  I mean basically, when you're on the phone with

11    Mr. Burke, do you have the contract in your hands and are you

12    looking at it as you're --

13    A.  Yes.

14    Q.  Okay.  Now, how did you respond to Mr. Burke when he called

15    you and you were reviewing the contract?

16    A.  I don't quite understand your question.  To a specific

17    question that he asked?

18    Q.  Yeah.  How did you respond to his inquiry?

19          MR. LOMAS:  Objection.  Vague.  It doesn't identify a

20    specific question.

21    BY MR. KING:

22    Q.  What did you tell Mr. Burke?

23    A.  In response to something that Mr. Burke asked me?

24    Q.  Yes.

25    A.  Specifically?

00000661

63

1    Q.  You said that -- you testified earlier that he -- the nature

2    of his call was in relation to billing under this particular

3    contract, and specifically this collating, trimming to size, and

4    binding, and that he was questioning this.  What did you tell

5    him?

6    A.  That I could not determine how we were billing the contract

7    at that point because I didn't have any invoices in front of me.

8    Q.  Uh-huh.  Did Mr. Burke provide you with any information

9    regarding how the contract was being charged?

10   A.  Are you referring to his interpretation of how the contract

11   was being charged, or my...

12   Q.  No, I'm referring to whether or not Mr. Burke provided you

13   any information upon which you were able to respond to him.

14   A.  Respond?  I still don't understand.  When you say "respond

15   to him," I'm trying to understand exactly:  Respond to what?

16   Q.  Mr. Burke's questioning whether or not the charges were

17   correct.

18   A.  Right.  And at that point I mentioned earlier that I did not

19   have any invoices in front of me, so that I could not tell

20   Mr. Burke how we were processing the invoices.

21   Q.  Okay.  So is it true your testimony today is that you did

22   not tell Mr. Burke whether or not Record Press was charging the

23   invoices correctly?  Should I repeat --

24   A.  Yeah, right.  My response to Mr. Burke was that we -- I

25   could not tell him how we were processing the invoices because I

00000662

64

1    didn't have any invoices in front of me.  I did not tell

2    Mr. Burke that we were processing the invoices incorrectly, if

3    that answers your question.

4    Q.  Uh-huh.  Did you tell Mr. Burke anything about how

5    Record Press was processing its invoices?

6    A.  Well, if I did not have any invoices, I would not know how

7    Record Press was processing their invoices.  So I couldn't tell

8    Mr. Burke how Record Press was being paid.

9    Q.  Did Mr. Burke provide you any information regarding how

10   Record Press was charging on its invoices?

11   A.  Not to my knowledge.  That I can remember that he provided

12   me physically, or just by telling me?

13   Q.  Telling you.

14   A.  Telling me?  He may have, but I don't remember him telling

15   me anything specifically about how Record Press was being paid.

16   Q.  No, but my question is not how they're being paid.  My

17   question is how they're charging.  Did he give you any

18   information upon which you were able to base an understanding of

19   what -- I'm sorry, you said that you didn't have any invoices so

20   you didn't know -- you wouldn't be able to provide some response

21   about whether or not GPO -- what GPO was doing.

22        And my question is:  Since you didn't have any invoices

23   in front of you, did Mr. Burke provide you with any information

24   from something he had that reflected what would have been on an

25   invoice?

00000663

```
1              MR. LOMAS:  Objection.  Leading.

2              THE COURT:  The objection is overruled.

3    A.  Not anything that I could recall that he specifically said

4    about what Record Press was being paid or how the invoices were

5    being processed.

6    BY MR. KING:

7    Q.  How did the conversation end?  You know, what was the idea

8    that was conveyed to Mr. Burke?

9              MR. LOMAS:  Objection.  Compound and...

10             THE COURT:  Sustained.  Let me ask you to rephrase your

11   question.

12             MR. KING:  Thank you, Your Honor.

13   BY MR. KING:

14   Q.  What was the result, in your estimation, of the

15   conversation?

16   A.  The result of the conversation, in my estimation, is that

17   Mr. Burke had some question as to how these invoices were being

18   processed on this contract.  And...

19   Q.  Okay.  So that's the end of that.

20             So having received this call from Mr. Burke, him

21   expressing his question about it, is your testimony today simply

22   that you did not provide him with any information?

23   A.  Provide him with information?  Yes, I provided Mr. Burke

24   with some information.

25   Q.  Okay.  What information did you provide Mr. Burke?
```

```
1    A.   I provided Mr. Burke information to contact the contracting

2    officer if he had questions about contract interpretation.   If

3    he was questioning about how we were billing, I could not

4    provide him with any information at that time because I did not

5    have copies of invoices in front of me.

6    Q.   Did you provide Mr. Burke with any information about what

7    the contract said?

8    A.   About what the contract said as far as?

9    Q.   Its terms.

10   A.   Its terms?  We may have discussed, you know, the contract

11   terms.  You know, at no point did I tell Mr. Burke that we were

12   processing these invoices incorrectly.

13   Q.   Uh-huh.  So what kinds of contract terms -- if you can

14   recall, what kind of contract terms did you provide information

15   to Mr. Burke about?

16   A.   Well, as I said, Mr. Burke had inquired about this one

17   specific line item, the collating, binding, and I think there's

18   one other process that's involved there.  But that specific line

19   item.

20   Q.   What information did you provide to Mr. Burke about that

21   line item?

22   A.   That I didn't know if we were processing -- or how our

23   office was processing that particular line item because I did

24   not have any invoices in front of me.

25   Q.   Okay.  Thank you.  But I'm just trying to narrow in on:  Did
```

67

1    you provide Mr. Burke any information about what the contract

2    said with respect to that line item?

3    A.  With regards to what it said?

4    Q.  That's right.  The term of the contract.

5    A.  The term?  I'm not understanding when you say "the term."

6    Q.  The collating, trimming to size, and binding, which is that

7    work that you're referring to, which is the subject matter of

8    your conversation, that refers to a particular line item in the

9    contract.  Correct?

10   A.  That's correct.

11   Q.  Did you provide Mr. Burke with any information regarding

12   what that contract said regarding that line item?

13   A.  None other than what was on that specific line item, that

14   that charge would be 12 -- I think $12.25 per hundred.

15   Q.  Okay.  Did you provide any information to Mr. Burke

16   regarding the running rates in the contract?

17   A.  None other than what the line item that I just referred to,

18   what I just said.

19   Q.  So is it possible to answer that in a yes or no?  Did you

20   give him information -- did you provide Mr. Burke with

21   information from the contract about the running rate, yes or no?

22   A.  For that specific line item?

23   Q.  Well, let's do it one step at a time.  At all?

24   A.  At all, yes.  For that specific item, yes.

25   Q.  Well, okay.  Let me just back up because it is a bit of a

68

```
1    compound question.  And we're stepping in front of and in back
2    of each other.
3            Did you provide Mr. Burke any information at all about
4    the running rate in the contract, yes or no?
5    A.   Yes.
6    Q.   What did you tell him about the running rate in the
7    contract?
8    A.   When Mr. Burke inquired about that particular rate, or about
9    the contract, he inquired as to if we were processing these
10   invoices correctly.  He had a concern about how we were
11   processing these invoices.
12           My response to Mr. Burke was that I did not know how we
13   were processing these invoices because I did not have copies of
14   invoices this front of me.
15   Q.   What did you tell Mr. Burke about the running rate?
16   A.   Which running rate?
17   Q.   Is there more than one running rate?
18   A.   Yes, there are multiple line items on the contract.
19   Q.   Okay.  You said that you did provide Mr. Burke with
20   information about a running rate.  What information about the
21   running rate did you provide him?
22   A.   That at that -- that particular running rate, if we're
23   talking about the collating, trimming, and binding, that that
24   rate, as it was listed on the contract, is per hundred at the
25   rate that was listed.
```

00000667

1    Q.  Are you saying that you told Mr. Burke that the running rate

2    applied to collating, trimming to size, and binding at the

3    per-100 rate?

4    A.  Yes.

5              MR. LOMAS:  Objection.  Vague.  I'm sorry, I just want

6    to object to that as vague.  I'm not sure the witness

7    understands what running rate he's referring to, because he's

8    not clarifying which running rate.

9              THE COURT:  Let me ask you to rephrase your question

10   then, Mr. King, since Mr. Adgerson said there is more than one

11   running rate.

12   BY MR. KING:

13   Q.  Did you tell Mr. Burke that the running rate applied to the

14   line item for the collating, trimming to size, and binding at

15   the per-100-page rate?

16             MR. LOMAS:  Same objection.

17             THE COURT:  The objection is overruled.

18   A.  Are you referring to the rate that's listed on that line

19   item?

20   BY MR. KING:

21   Q.  I mean, I'm just asking the question.  The question is:  Did

22   you tell Mr. Burke that the running rate --

23   A.  For that line item, for trimming, collating, and binding --

24   there's multiple rates in the contract.  Are you referring to

25   the rate for trimming, collating, and binding?  If you're

00000668

1    referring to that rate, yes, I told Mr. Burke that that was per

2    hundred at the rate that was listed next to that line item.

3    Q.  Okay.  Now, there is a running rate.  The words "running

4    rate" are used in the contract.  Right?

5    A.  Yes.

6    Q.  Okay.  And when I asked you if you referred to the running

7    rate in your talk with Mr. Burke, I'm referring to the running

8    rate that's indicated by the words "running rate" in the

9    contract.

10          So is your testimony still that when you told Mr. Burke

11    about the running rate, you were referring to the term in the

12    contract that actually uses the words "running rate"?

13    A.  The word -- are you specifically talking about the word

14    "running"?

15    Q.  The words, the actual words "running rate."

16    A.  Right.  And as I said before, you have different line items

17    that have rates.  You have multiple line items that have rates.

18    Q.  Okay.  But those rates, it seems like now you're calling

19    those running rates.

20    A.  Those processes require an operation.  So when you look at a

21    contract and you have specific processes, then we refer to those

22    as actual running rates if it involves a process that...

23    Q.  Okay.  So your testimony is that, when you told Mr. Burke

24    about the running rates, that you weren't necessarily referring

25    to the running rate that's indicated by the words "running

1    rate"; that you're also referring to other rates that don't

2    necessarily correspond to the words "running rate"?  Is that

3    your testimony?

4              MR. LOMAS:  Objection.  Vague.

5              THE COURT:  Sustained.

6    BY MR. KING:

7    Q.  I'm just going to have to back it up a little bit again.

8    I'm sorry this is taking too long.

9              You testified that you told Mr. Burke about a contract

10   term that related to a running rate.  Correct?

11   A.  I testified that I told Mr. Burke about a line item for a

12   rate for trimming, collating, and binding at the per-100 cost.

13   Q.  Okay.  When you spoke to Mr. Burke, did you use the words

14   "running rate"?

15   A.  That was almost four years ago.  I don't remember

16   specifically using the word "running rate."  I can't tell you

17   that.

18   Q.  So as far as you're aware right now, you're not sure whether

19   or not you discussed a quote/unquote "running rate" with

20   Mr. Burke?

21             MR. LOMAS:  Objection.  Mischaracterizes testimony.

22             THE COURT:  Sustained.

23   BY MR. KING:

24   Q.  Is your testimony today that you might not have used the

25   words "running rate" when you spoke to Mr. Burke?

72

```
1    A.  You say might not have used?  Again, we're talking

2    approximately four years ago, so I could not specifically tell

3    you whether I used the word "running" or did not use the word

4    "running."  I just don't remember that.

5    Q.  So it's true that you might not have said that?

6          THE COURT:  Might not have said?  Let me ask you to ask

7    a complete question, please, since it is not clear what the

8    term, quote, "that," closed quote, refers to.

9    BY MR. KING:

10   Q.  It's true that you might not have used the words "running

11   rate" when you spoke to Mr. Burke?

12   A.  In regards to a specific, or just the word, period?  Again,

13   it's been four years, and I don't remember, or I can't

14   specifically say that, when I discussed that particular line

15   item that was in question, that I used the word "running."  I

16   don't remember.

17   Q.  In your investigation and analyzing the contract to respond

18   to Mr. Burke's questions, did you look at the GPO spreadsheet

19   for this particular job?

20         MR. LOMAS:  Objection.  Foundation.  Mischaracterizes

21   testimony.  Foundation with respect to the investigation

22   analysis.

23         THE COURT:  Will you rephrase your question, please,

24   Mr. King?

25   BY MR. KING:
```

00000671

73

1    Q.  When you were on the phone with Mr. Burke and you were

2    addressing his question, you said that you did have the contract

3    with you.  Correct?

4    A.  That's correct.

5    Q.  And did you just happen to have that contract in front of

6    you when he called?  Or did you, you know, take an effort to

7    pull up the contract when he called?

8    A.  No, the contract was actually physically brought to me.

9    Mr. Burke had spoken to one of my supervisors, and she

10   transferred the call to me and she brought the contract up.

11   Q.  Okay.  And did you also have a GPO spreadsheet that

12   corresponded to this contract?

13   A.  I had the prices.  I don't recollect whether it was the

14   spreadsheet or whether it was the bid papers, but I did have the

15   prices.

16   Q.  And if you were going to -- when you said you didn't know

17   how GPO was processing it, or you didn't know if GPO was

18   processing it correctly, why weren't you able to determine

19   whether or not GPO was processing it correctly at that time?

20   A.  Because -- at the time that I spoke to Mr. Burke?

21   Q.  Uh-huh.

22   A.  Because I did not have a copy of an invoice in front of me.

23   So in order for me to verify whether or not we were processing

24   them correctly or incorrectly, I would have to have an invoice

25   to review.

00000672

74

```
1    Q.  Okay.

2              MR. KING:  No more questions, Your Honor.  Thank you.

3              THE COURT:  Very well.  Thank you, Mr. King.

4              Mr. Lomas, do you wish to cross-examine now or after

5    lunch?

6              MR. LOMAS:  Your Honor, if we could do it now, that

7    would be preferred, so Mr. Adgerson can be on his way.

8              THE COURT:  Very well.

9              MR. LOMAS:  Thank you.

10                         CROSS EXAMINATION

11   BY MR. LOMAS:

12   Q.  Good morning, Mr. Adgerson.

13   A.  Good morning.

14   Q.  Could you just -- I don't know if we got it for the record.

15   Your full name, please?

16   A.  My name is Calvin Adgerson.

17   Q.  Can you spell your last name?

18   A.  A-D-G, as in George, E-R-S-O-N.

19   Q.  Thank you.  And you said you are retired from the GPO?

20   A.  That's correct.

21   Q.  And how long did you work for the GPO before you retired?

22   A.  I was an employee of the GPO for over 34 years.

23   Q.  And what was the general nature of your responsibilities at

24   the GPO?

25   A.  The first approximately six years I was in the production
```

00000673

75

```
 1    area.  I was a typesetter.  And in 1980 I transferred over to

 2    the finance area.

 3    Q.  And what were your responsibilities in the finance area?

 4    A.  In the finance area, originally I was a printing specialist,

 5    and we reviewed agency billings.  We billed customer agencies

 6    and reviewed the invoices that were received from the printing

 7    contractors for correctness, to make sure that we were billed

 8    the customer agencies correctly.

 9    Q.  And did your responsibilities in finance change after that

10    point at all?

11    A.  About 10 years afterwards, I became a supervisor in the

12    payables area, and that area was directly responsible for paying

13    the commercial printing vendors.  That was in 1990.

14    Q.  And so were you reviewing to make sure vendors were being

15    paid properly?

16    A.  Yes, that's correct.

17    Q.  And if you spotted an issue -- if you identified an issue

18    with that, would you raise it?

19    A.  Yes.  We would raise the issue and take the necessary steps

20    to correct what was wrong if we found something that was billed

21    incorrectly, yes.

22    Q.  Now, if there was a question about a vendor contract, who

23    would you go to, or would there be somebody you would go to, to

24    discuss that?

25    A.  Yes.  If there was ever any discrepancy that we would find,
```

00000674

1    we would contact the contracting officer for clarification.

2    Q.  And so why would you need the contracting officer's

3    clarification?  Why wouldn't you, for example, be able to

4    provide that?

5    A.  Well, our area specifically is responsible for processing

6    the invoices.  And there may be occasion where we interpret

7    something incorrectly, and we would seek the contracting

8    officer's guidance because the contracting officer has final

9    authority.  They administer the contracts.  So that's where we

10   would go for clarification.

11   Q.  Now, when Mr. Burke first called you, were you aware of any

12   concern or issue about Record Press' contract or invoices?

13   A.  No, there was no issue, to my knowledge, about how the

14   invoices on this contract for Record Press were being processed.

15   Q.  And when Mr. Burke called you, did he tell you who he was?

16   A.  No.  Well, when he called me, he identified himself as a

17   representative of Mr. Wilmot from Record Press, and proceeded to

18   inquire about how we were processing the invoices on this

19   contract for payment.

20   Q.  Did you come to realize during the conversation that it was

21   not Mr. Wilmot or anybody from Record Press?

22   A.  Well, during the course of the conversation, yes.  During

23   the course of the conversation, I recollect that Mr. Burke had

24   asked me to fax a copy of the contract to him.  And my thinking

25   was, and this is what I related:  If you're who you say you are,

77

1    you should already have a copy of the contract.  And that's when

2    he identified himself.

3    Q.  And did you fax him a copy, Mr. Burke a copy of the

4    contract?

5    A.  No, I did not.

6    Q.  At any time did you tell Mr. Burke that a per-10-copy

7    running rate applied to the trimming, collating to size (sic),

8    and binding line item?

9    A.  No, I did not.

10   Q.  Did you tell Mr. Burke you would look into the matter?

11   A.  I referred Mr. Burke to the contracting officer once it was

12   determined to me who he was.

13   Q.  Now, after your phone call, did you do anything to follow up

14   on this call?

15   A.  Yes.  For my own satisfaction, I spoke to my section chief

16   and had her contact her contracting officer to verify that, one,

17   we had interpreted the contract correctly; and two - and she

18   could do this - that we were paying the invoices correctly.

19   Q.  And what was the name of your section chief?

20   A.  Rosa Smith.

21   Q.  Did she report to you?

22   A.  Yes.

23   Q.  And what did you learn through this follow-up?

24   A.  It was determined that we had been processing the invoices

25   correctly, and there were no issues in the way we were

00000676

```
 1    processing them.

 2    Q.  And so the price for collating, trimming to size, and

 3    binding, is that $12.25 per 100 pages?

 4    A.  Yes, that's correct.

 5    Q.  And does a per-10-copy running rate apply?

 6    A.  No, it does not.

 7    Q.  Mr. Adgerson, are you familiar with an allegation that Burke

 8    made in his complaint that mentioned your name?

 9    A.  Yes.  Again, after our conversation, other than just to

10    verify that we were billing the contractors -- or we were paying

11    the contractors' invoices correctly, that was the end of it for

12    me as far as I was concerned, until my name happened to appear

13    in this case here, which was a shock to me, to be honest.

14            MR. LOMAS:  Your Honor, may I approach?

15            THE COURT:  Yes, you may.

16    BY MR. LOMAS:

17    Q.  Mr. Adgerson, could you flip to the paragraph that's marked

18    19 in this document?  And this document is the verified -- do

19    you see that this is the verified complaint in this matter,

20    United States of America ex rel Brian Burke v. Record Press?

21    A.  Yes.

22    Q.  Can you flip to Paragraph Number 19?

23    A.  (Witness complies.)

24    Q.  Do you see the sentence that begins, for example, "Calvin

25    Anderson"?
```

00000677

79

```
 1    A.  Yes.

 2    Q.  First, is that your name?

 3    A.  No, it's not.

 4    Q.  And second, the remainder of that sentence, is that true?

 5    A.  No, that is not true.

 6    Q.  Thank you, Mr. Adgerson.

 7          MR. LOMAS:  No further questions.

 8          THE COURT:  Now, Mr. King, do you have redirect

 9    examination of Mr. Adgerson?

10          MR. KING:  No, I do not, Your Honor.

11          THE COURT:  You do not?  Very well.  Thank you,

12    Mr. Adgerson.  You may step down.

13          MR. VALDEZ:  May I be excused from the well,

14    Your Honor?

15          THE COURT:  May Mr. Adgerson be excused, Mr. Lomas?

16          Excuse me.  Mr. King, may Mr. Adgerson be excused?

17          MR. KING:  Absolutely, Your Honor.

18          THE COURT:  Very well.  You may be excused.  And

19    Mr. Valdez, you may be excused from the well of the court.

20    Thank you.

21          It is now approximately 12:35.  We will recess at this

22    time for lunch, and reconvene at 10 minutes before 2:00.

23          Mr. King, who will be your next witness?

24          MR. KING:  Mr. Burke will be the next witness.

25          THE COURT:  Very well.  Thank you very much.
```

00000678

80

1              (Lunch recess taken at 12:44 p.m.).

2

3

4              **CERTIFICATE OF OFFICIAL COURT REPORTER**

5

6         **I, Rebecca Stonestreet, certify that the foregoing is a**

7    **correct transcript from the record of proceedings in the**

8    **above-entitled matter.**

9

10

11

12    _____            _____

13    **SIGNATURE OF COURT REPORTER**                  **DATE**

14

15

16

17

18

19

20

21

22

23

24

25

Rebecca Stonestreet          (202) 354-3249      kingreporter2@verizon.net

00000679

**$**

**$0.25** [5] - 31:10, 31:13, 31:15, 31:23, 32:24
**$0.35** [2] - 23:6
**$0.60** [4] - 32:3, 32:18, 37:3, 38:17
**$1,386.70** [1] - 56:2
**$10** [7] - 29:5, 30:13, 30:21, 31:4, 33:20, 38:6, 38:11
**$106.40** [2] - 41:18, 42:11
**$12** [1] - 40:21
**$12.25** [27] - 10:7, 10:17, 11:5, 11:9, 11:16, 13:12, 13:24, 14:3, 14:15, 15:2, 15:8, 15:17, 15:24, 16:14, 17:2, 33:14, 39:6, 46:12, 52:21, 54:1, 55:7, 56:4, 56:6, 58:4, 58:13, 67:14, 78:3
**$147,000.23** [1] - 47:17
**$168** [2] - 40:25, 41:6
**$372.40** [4] - 41:14, 42:12, 55:4, 55:5
**$49,798.80** [2] - 41:5, 41:7

**0**

**00** [1] - 24:2
**000069** [1] - 20:5
**02** [1] - 24:5
**035** [3] - 33:6, 37:6, 38:25
**08-364** [2] - 1:3, 3:2

**1**

**10** [20] - 23:5, 23:9, 23:11, 25:3, 25:12, 25:20, 26:2, 26:4, 26:11, 35:13, 36:25, 37:2, 37:7, 41:4, 44:7, 45:7, 51:7, 51:10, 75:11, 79:22
**10-copy** [3] - 15:9, 52:25, 53:2
**10-minute** [1] - 43:22
**100** [35] - 10:18, 11:6, 11:10, 11:17, 12:9, 12:10, 13:12, 13:25, 14:3, 14:16, 15:2, 15:8, 15:17, 15:24, 16:15, 17:2, 33:14, 39:6, 40:6, 46:12, 46:18, 46:20, 51:18, 51:20, 51:22, 51:25, 52:1, 52:23, 54:2, 55:8, 56:4, 56:6, 58:4, 58:13, 78:3
**10706** [1] - 18:2
**10:04** [1] - 1:7
**11,320** [2] - 33:14, 37:4, 56:4
**11:26** [1] - 44:8
**12** [1] - 67:14

**1272** [4] - 42:25, 44:15, 44:19, 44:21
**12:00** [1] - 59:12
**12:35** [1] - 79:21
**12:44** [1] - 80:1
**14** [1] - 1:5
**1420** [1] - 1:12
**17** [1] - 2:3
**19** [3] - 2:11, 78:18, 78:22
**1900** [1] - 1:16
**1945** [1] - 48:13
**1980** [1] - 75:1
**1990** [1] - 75:13
**1:15** [1] - 59:13
**1st** [1] - 57:7

**2**

**2** [1] - 30:18
**20** [1] - 27:22, 29:10, 29:17, 29:20, 29:24, 33:6, 36:1, 36:12, 36:23, 45:17, 59:14
**20001** [1] - 1:23
**20005** [1] - 1:13
**20006** [1] - 1:17
**2003** [1] - 18:6
**2006** [1] - 57:7
**2007** [1] - 57:7
**2008** [1] - 57:16
**2011** [2] - 1:5, 6:11
**202** [4] - 1:14, 1:17, 1:21, 1:24
**20530** [1] - 1:20
**2231** [5] - 43:2, 44:17, 44:20, 49:13, 61:24
**2351** [2] - 23:15, 24:7
**2361** [1] - 24:9
**27** [1] - 2:12
**2:00** [1] - 79:22

**3**

**3,040** [2] - 39:6, 55:7
**30** [4] - 13:16, 15:6, 49:7
**307-2843** [1] - 1:21
**31** [3] - 6:11, 9:8, 57:7
**31st** [1] - 23:22
**34** [1] - 74:22
**34-plus-year** [1] - 13:17
**34-year** [1] - 15:20
**354-3249** [1] - 1:24
**37** [1] - 2:12
**3729(A** [1] - 9:8

**4**

**40** [7] - 27:19, 29:2, 29:11, 30:1, 38:2, 38:24, 45:17
**436-2641** [1] - 1:14
**48** [2] - 2:4, 18:1
**496-7183** [1] - 1:17

**5**

**54** [1] - 56:22
**555** [1] - 1:20
**560-page** [1] - 37:5
**566** [1] - 33:5

**6**

**60** [1] - 2:5
**65-year-old** [1] - 15:4
**6511** [1] - 1:23
**66** [7] - 22:9, 30:18, 31:12, 32:2, 33:1, 33:22, 38:12
**67** [13] - 22:12, 22:15, 32:16, 33:9, 33:17, 35:4, 38:20, 39:2, 39:9, 40:5, 46:11, 46:17, 52:12
**68** [1] - 20:1
**69** [16] - 19:22, 19:25, 40:7, 40:10, 40:11, 41:16, 41:25, 42:3, 42:4, 44:17, 44:18, 46:19, 46:21, 50:4, 50:19

**7**

**70** [4] - 23:15, 24:4, 24:5, 24:9
**706** [1] - 1:13
**71700** [6] - 27:14, 27:24, 37:16, 37:21, 45:17, 54:16
**71701** [10] - 27:24, 27:25, 28:15, 28:19, 29:12, 29:22, 29:24, 35:25, 45:17, 55:14
**74** [1] - 2:6
**76** [1] - 38:24

**9**

**90** [3] - 56:15, 56:16, 56:17

**A**

**a.m** [1] - 1:7
**a.m.)** [1] - 44:8
**A1** [2] - 38:12, 38:13
**A2** [1] - 38:8
**able** [12] - 5:15, 5:17, 20:22,

21:14, 36:6, 36:16, 56:17, 63:13, 64:18, 64:20, 73:18, 76:3
**above-entitled** [1] - 80:8
**absolutely** [2] - 52:4, 79:17
**accept** [6] - 15:18, 17:5, 53:22, 53:25, 55:11, 56:8
**accompany** [1] - 8:3
**accordingly** [1] - 37:1
**accounting** [1] - 40:15
**accurate** [1] - 21:17
**Act** [4] - 9:7, 9:12, 14:8, 14:19
**Action** [1] - 1:3
**action** [2] - 43:8, 43:10
**actual** [4] - 53:17, 58:18, 70:15, 70:22
**addition** [2] - 40:6, 46:19, 53:14
**additional** [2] - 7:20, 57:9
**address** [2] - 17:24, 44:13
**addressing** [1] - 73:2
**ADG** [1] - 74:18
**Adgerson** [19] - 15:21, 15:22, 59:17, 59:23, 59:25, 60:5, 60:16, 60:19, 69:10, 74:7, 74:12, 74:16, 78:7, 78:17, 79:6, 79:9, 79:12, 79:15, 79:16
**ADGERSON** [2] - 2:5, 60:12
**adjusted** [3] - 37:1, 37:3, 37:5
**adjustment** [1] - 37:6
**administer** [1] - 76:9
**administered** [2] - 17:15, 60:8
**admissibility** [1] - 27:5
**admissible** [4] - 19:9, 19:11, 19:13, 26:20
**admission** [2] - 37:17, 37:19
**admit** [2] - 13:1, 19:14
**ADMITTED** [1] - 2:9
**admitted** [9] - 19:18, 24:20, 24:21, 26:17, 27:8, 28:23, 37:21, 43:18, 44:24
**affects** [1] - 6:4
**afternoon** [5] - 60:5, 60:9, 60:10, 60:16, 60:17
**afterwards** [1] - 75:11
**agencies** [2] - 75:5, 75:8
**agency** [2] - 59:1, 75:5
**ago** [2] - 71:15, 72:2
**agree** [3] - 14:15, 41:6, 41:11
**agreed** [2] - 17:6, 24:20
**agreement** [1] - 10:6
**aided** [1] - 1:25
**ALDRIDGE** [1] - 1:16
**allegation** [2] - 13:21, 78:7

00000680

**allegations** [1] - 13:8
**alleged** [1] - 13:5
**alleges** [2] - 6:25, 12:11
**allow** [1] - 4:24
**allowed** [1] - 9:14
**almost** [1] - 71:15
**alternatively** [1] - 59:13
**America** [1] - 78:20
**amount** [25] - 6:12, 6:15,
6:20, 14:4, 14:5, 16:7, 22:25,
23:2, 23:7, 25:3, 25:20, 26:2,
41:13, 41:15, 41:25, 42:1,
47:10, 55:1, 55:6, 56:1, 56:3,
56:12, 56:15, 56:16
**amounts** [2] - 11:12, 45:20
**analysis** [1] - 72:22
**analyzing** [1] - 72:17
**and..** [2] - 65:9, 65:18
**Anderson** [1] - 78:25
**answer** [3] - 36:6, 36:16,
67:19
**answered** [4] - 21:5, 29:8,
35:19, 47:13
**answers** [1] - 64:3
**anticipated** [1] - 44:3
**apologize** [2] - 21:13, 21:16
**appeal** [4] - 10:23, 10:25,
48:20
**appear** [3] - 11:12, 46:22,
78:12
**APPEARANCES** [1] - 1:11
**appeared** [1] - 32:7
**appellate** [8] - 10:24, 15:15,
48:15, 48:17, 48:18, 48:22,
53:13, 54:4
**appellate..** [1] - 49:1
**appellee's** [1] - 27:20
**appellees** [3] - 29:21, 36:2,
38:3
**appendices** [1] - 10:24
**appendix** [4] - 29:17, 29:21,
36:1, 53:9
**apples** [2] - 47:1, 47:2
**applied** [15] - 6:25, 14:6,
15:9, 31:5, 31:7, 31:8, 33:3,
33:10, 33:12, 33:23, 40:8,
56:11, 69:2, 69:13, 77:7
**applies** [4] - 10:8, 12:13,
26:5, 32:21
**apply** [20] - 6:17, 12:12,
15:11, 26:6, 30:19, 30:20,
31:2, 32:17, 32:20, 33:18,
34:4, 36:3, 36:13, 36:22,
38:14, 39:3, 43:11, 53:2,
58:7, 78:5
**applying** [1] - 6:24
**approach** [6] - 18:14,
23:18, 26:25, 37:10, 42:19,
78:14
**appropriate** [1] - 5:6

**approve** [2] - 15:18, 17:6
**area** [7] - 75:1, 75:2, 75:3,
75:4, 75:12, 76:5
**argued** [1] - 43:8
**argument** [1] - 45:14
**argumentative** [2] - 41:21,
45:10
**arise** [1] - 6:8
**arising** [2] - 34:12, 34:23
**arrives** [1] - 49:17
**aspect** [1] - 61:15
**Assistant** [1] - 7:24
**assisting** [2] - 3:20, 3:22
**associated** [2] - 4:20, 47:3
**assume** [1] - 4:7
**assuming** [1] - 6:13
**assumption** [3] - 6:23,
28:4, 39:23
**assure** [1] - 21:14
**attempt** [1] - 21:11
**attention** [6] - 8:24, 22:8,
26:18, 40:12, 46:21, 50:24
**Attorney** [1] - 7:24
**ATTORNEY'S** [1] - 1:19
**attorney** [1] - 48:20
**attorneys** [1] - 3:20
**AUSA** [1] - 59:23
**authenticity** [1] - 43:15
**authority** [1] - 76:9
**available** [1] - 4:22
**award** [5] - 40:13, 40:14,
47:8, 53:20
**aware** [5] - 6:8, 13:1, 57:16,
71:18, 76:11

## B

**balances** [1] - 54:13
**base** [4] - 7:8, 57:5, 57:6,
64:18
**based** [10] - 6:23, 23:1,
34:11, 43:1, 47:2, 47:22,
52:22, 53:12, 55:7, 56:4
**Basis** [1] - 40:13
**basis** [6] - 20:25, 21:11,
40:13, 40:14, 45:13, 47:8
**Bates** [1] - 19:22
**became** [1] - 75:11
**become** [1] - 20:1
**BEFORE** [1] - 1:9
**begin** [1] - 59:14
**begins** [2] - 24:2, 78:24
**behalf** [7] - 3:13, 3:16, 4:3,
8:21, 8:25, 15:3, 59:24
**behavior** [1] - 14:10
**bench** [2] - 3:7, 4:17
**BENCH** [1] - 1:8
**between** [3] - 6:18, 10:3,
24:8
**beverage** [1] - 7:11

**bid** [25] - 11:25, 12:3,
12:16, 15:6, 15:7, 15:8,
15:10, 18:22, 47:19, 49:17,
49:19, 49:22, 50:1, 50:8,
50:22, 52:3, 52:8, 52:19,
52:20, 52:24, 52:25, 53:2,
53:22, 53:25, 73:14
**bidder** [2] - 13:18, 47:17
**bidders** [3] - 47:1, 47:18
**bidding** [2] - 22:24, 40:7
**bids** [1] - 11:22
**billed** [4] - 36:20, 75:5,
75:7, 75:20
**billing** [10] - 43:10, 46:3,
51:19, 61:1, 61:3, 61:5, 63:2,
63:6, 66:3, 78:10
**billings** [1] - 14:22, 75:5
**bind** [1] - 53:16
**bindery** [2] - 53:11, 53:15
**binding** [39] - 10:3, 10:7,
10:14, 10:17, 11:4, 11:9,
12:7, 13:24, 29:9, 29:17,
29:20, 33:14, 38:2, 39:6,
46:12, 46:15, 46:18, 46:20,
51:25, 52:17, 53:5, 53:6,
54:1, 54:24, 55:3, 55:24,
58:5, 61:25, 63:4, 66:17,
67:6, 68:23, 69:2, 69:14,
69:23, 69:25, 71:12, 77:8,
78:3
**bit** [2] - 67:25, 71:7
**blow** [1] - 52:13
**branch** [2] - 61:1, 61:3
**break** [1] - 43:23
**Brian** [2] - 3:3, 78:20
**BRIAN** [1] - 1:3
**brief** [4] - 27:20, 38:3,
43:22, 54:4
**briefs** [1] - 10:24, 10:25,
11:1, 15:15
**bring** [1] - 20:16
**brought** [4] - 9:7, 10:23,
73:8, 73:10
**Building** [1] - 1:19
**BURKE** [1] - 1:3
**Burke** [88] - 3:3, 3:4, 3:12,
3:15, 4:14, 4:18, 6:24, 9:6,
10:21, 11:13, 11:15, 12:11,
12:19, 13:1, 13:8, 13:22,
16:11, 27:20, 36:2, 38:3,
57:16, 57:19, 60:20, 61:20,
61:21, 61:23, 62:5, 62:7,
62:11, 62:14, 62:22, 62:23,
63:8, 63:12, 63:20, 63:22,
63:24, 64:2, 64:4, 64:8, 64:9,
64:23, 65:8, 65:17, 65:20,
65:23, 65:25, 66:1, 66:6,
66:11, 66:15, 66:16, 66:20,
67:1, 67:11, 67:15, 67:20,
68:3, 68:8, 68:12, 68:15,

68:19, 69:1, 69:13, 69:22,
70:1, 70:7, 70:10, 70:23,
71:9, 71:11, 71:13, 71:20,
71:25, 72:11, 73:1, 73:9,
73:20, 76:11, 76:15, 76:23,
77:3, 77:6, 77:10, 77:11,
78:7, 78:20, 79:24
**Burke's** [11] - 5:14, 11:7,
13:8, 15:23, 16:4, 16:25,
24:22, 61:21, 62:3, 63:16,
72:18
**business** [3] - 48:12, 48:13,
48:14
**BY** [43] - 17:23, 18:16,
19:20, 20:9, 21:20, 22:7,
22:17, 25:17, 26:22, 27:2,
27:10, 29:1, 29:18, 30:5,
30:14, 31:1, 31:21, 32:11,
34:19, 35:23, 36:11, 36:21,
37:12, 37:24, 40:2, 41:23,
42:21, 45:2, 45:22, 46:5,
48:7, 60:15, 62:21, 65:6,
65:13, 69:12, 69:20, 71:6,
71:23, 72:9, 72:25, 74:11,
78:16

## C

**cafeteria** [1] - 7:10
**calculation** [1] - 6:20
**CALVIN** [2] - 2:5, 60:12
**Calvin** [3] - 15:21, 74:16,
78:24
**capacity** [4] - 3:20, 3:22,
4:12, 18:9
**captures** [1] - 14:18
**case** [35] - 3:2, 3:12, 4:8,
5:19, 6:16, 9:7, 9:15, 10:2,
10:21, 10:22, 11:3, 11:8,
11:19, 12:8, 13:6, 13:9,
13:20, 14:18, 23:2, 25:11,
26:17, 28:5, 29:15, 37:1,
43:9, 43:17, 44:21, 48:23,
49:23, 57:16, 57:20, 60:21,
78:13
**cases** [1] - 14:9
**cells** [1] - 46:22
**Center** [1] - 1:19
**certain** [2] - 5:25, 20:21
**certainly** [5] - 6:7, 7:14,
13:3, 42:18, 43:14
**CERTIFICATE** [1] - 80:4
**certify** [1] - 80:6
**change** [1] - 75:9
**changed** [2] - 14:10, 56:11
**characterizing** [1] - 34:1
**charge** [33] - 11:9, 14:5,
29:5, 31:10, 31:12, 33:14,
34:8, 34:14, 34:24, 34:25,

**35**:6, 35:24, 38:21, 39:6, 39:11, 39:14, 39:19, 39:21, 39:22, 40:3, 40:4, 46:6, 46:14, 47:22, 51:19, 54:23, 55:6, 55:23, 58:13, 58:18, 62:1, 67:14

**charged** [7] - 11:12, 16:7, 55:2, 56:1, 56:12, 63:9, 63:11

**charges** [14] - 9:13, 25:1, 34:7, 34:12, 34:13, 34:21, 34:23, 35:2, 36:1, 36:12, 39:18, 41:10, 45:23, 63:16

**charging** [10] - 13:11, 14:3, 16:14, 35:9, 51:8, 51:12, 52:1, 63:22, 64:10, 64:17

**checks** [1] - 54:13

**chief** [4] - 61:1, 61:3, 77:15, 77:19

**chiefs** [1] - 61:17

**Civil** [1] - 1:3

**civil** [1] - 3:2

**claim** [5] - 6:16, 11:13, 12:22, 14:23, 43:1

**Claims** [4] - 9:7, 9:12, 14:8, 14:18

**claims** [6] - 9:8, 9:9, 9:11, 15:23, 16:4, 16:25

**clarification** [3] - 76:1, 76:3, 76:10

**clarifying** [1] - 69:8

**clear** [5] - 3:11, 24:1, 27:21, 30:10, 72:7

**clearly** [6] - 9:10, 9:22, 10:17, 40:6, 40:7, 46:19

**CLERK** [1] - 3:2

**clerk** [3] - 7:6, 17:14, 60:6

**client** [1] - 18:11

**closed** [2] - 29:17, 72:8

**collated** [1] - 53:9

**collating** [29] - 10:2, 10:6, 10:14, 10:16, 11:3, 11:8, 12:6, 13:23, 42:12, 46:15, 53:5, 53:6, 53:25, 54:23, 55:2, 55:23, 58:5, 62:1, 63:3, 66:17, 67:6, 68:23, 69:2, 69:14, 69:23, 69:25, 71:12, 77:7, 78:2

**Collating** [7] - 33:13, 39:5, 46:11, 46:18, 46:19, 51:25, 52:16

**Color** [1] - 51:21

**COLUMBIA** [1] - 1:2

**column** [8] - 40:12, 40:17, 40:20, 40:22, 41:1, 50:18, 50:19, 50:25

**comfortable** [1] - 7:7

**coming** [1] - 8:17

**Commerce** [1] - 10:22

**commercial** [6] - 48:16,

61:1, 61:3, 61:5, 61:8, 75:13

**common** [1] - 14:22

**company** [1] - 15:4

**compare** [1] - 41:24

**compared** [1] - 47:17

**comparing** [1] - 47:1

**complaint** [4] - 11:13, 43:1, 78:8, 78:19

**Complete** [2] - 23:4, 35:3, 51:6, 52:15

**complete** [3] - 12:13, 51:7, 72:7

**completed** [1] - 44:1

**complicate** [1] - 9:15

**complies** [3] - 19:23, 56:23, 78:23

**compound** [1] - 35:18, 65:9, 68:1

**computer** [1] - 1:25

**computer-aided** [1] - 1:25

**concern** [2] - 68:10, 76:12

**concerned** [1] - 78:12

**concerning** [2] - 6:22, 10:2

**conference** [2] - 6:11, 23:22

**confined** [4] - 7:7, 24:16, 24:17, 44:23

**confirm** [1] - 14:25, 15:22, 16:4

**confirmed** [2] - 13:11, 16:6

**confuse** [1] - 9:15

**consecutive** [1] - 24:8

**consented** [1] - 4:19

**consistent** [7] - 35:2, 38:23, 46:3, 46:8, 47:7, 52:1, 56:7

**consistently** [1] - 36:20

**constitute** [2] - 9:11, 14:23

**constitutes** [2] - 50:9, 50:10

**construction** [1] - 21:15

**contact** [3] - 66:1, 76:1, 77:16

**contained** [1] - 9:13

**contemplated** [1] - 12:22

**contention** [1] - 24:15

**contents** [1] - 32:24

**context** [1] - 14:19

**continue** [5] - 17:1, 43:23, 44:11, 45:1, 45:4

**continued** [1] - 16:24

**continues** [5] - 15:14, 15:18, 17:4, 17:5

**contract** [162] - 6:18, 6:24, 9:14, 9:21, 9:23, 10:3, 10:10, 10:12, 10:17, 11:6, 11:9, 11:11, 11:14, 11:16, 11:22, 12:17, 12:19, 12:20, 13:3, 13:4, 13:10, 13:12, 13:24, 14:12, 14:13, 14:15, 14:20,

15:1, 15:12, 15:15, 15:16, 15:24, 16:5, 16:8, 16:13, 17:1, 17:3, 17:4, 19:1, 19:4, 19:6, 19:7, 19:16, 20:14, 21:22, 22:10, 23:11, 25:2, 26:3, 29:7, 30:7, 30:15, 30:17, 31:24, 32:7, 32:24, 33:7, 33:15, 33:21, 34:3, 34:7, 34:13, 34:24, 36:20, 38:7, 38:10, 38:18, 38:23, 39:1, 39:7, 39:14, 39:17, 40:5, 40:16, 42:15, 42:25, 43:1, 43:4, 43:9, 43:12, 43:13, 43:18, 44:14, 44:17, 44:20, 46:8, 47:9, 47:16, 49:12, 49:13, 49:16, 52:8, 53:20, 54:5, 54:8, 54:20, 55:9, 55:21, 56:6, 56:7, 57:1, 57:2, 57:4, 57:14, 57:19, 57:22, 58:2, 58:4, 58:11, 61:24, 62:5, 62:6, 62:8, 62:9, 62:11, 62:15, 63:3, 63:6, 63:9, 63:10, 65:18, 66:2, 66:7, 66:8, 66:10, 66:13, 66:14, 67:1, 67:4, 67:9, 67:12, 67:16, 67:21, 68:4, 68:7, 68:9, 68:18, 68:24, 69:24, 70:4, 70:9, 70:12, 70:21, 71:9, 72:17, 73:2, 73:5, 73:7, 73:8, 73:10, 73:12, 75:22, 76:12, 76:14, 76:19, 76:24, 77:1, 77:4, 77:17

**contract's** [1] - 14:21

**contracted** [1] - 49:3

**contracting** [10] - 15:5, 49:5, 49:8, 66:1, 76:1, 76:2, 76:7, 76:8, 77:11, 77:16

**contractor** [2] - 12:25, 14:19

**contractor's** [1] - 14:21

**contractors** [2] - 75:7, 78:10

**contractors'** [1] - 78:11

**contracts** [5] - 13:18, 15:21, 16:3, 45:24, 76:9

**contradict** [1] - 25:10

**convenient** [1] - 43:21

**conversation** [9] - 62:2, 65:7, 65:15, 65:16, 67:8, 76:20, 76:22, 76:23, 78:9

**conveyed** [1] - 65:8

**copies** [46] - 22:25, 23:2, 23:5, 23:7, 23:9, 23:11, 25:3, 25:12, 25:20, 26:2, 26:9, 26:10, 27:19, 27:22, 29:2, 29:10, 29:11, 29:17, 29:20, 29:24, 33:6, 35:13, 35:14, 35:24, 36:1, 36:3, 36:12, 36:13, 36:23, 36:25, 37:2,

37:7, 38:2, 38:24, 41:4, 45:6, 45:7, 45:12, 45:17, 51:7, 51:10, 53:8, 66:5, 68:13

**copy** [19] - 10:10, 11:2, 19:25, 22:12, 22:15, 28:4, 29:9, 29:19, 29:20, 31:10, 31:15, 31:23, 62:5, 73:22, 76:24, 77:1, 77:3

**corporate** [1] - 5:12

**corporation** [1] - 4:13

**correct** [43] - 4:9, 4:10, 7:25, 13:12, 29:23, 34:1, 34:5, 34:6, 35:11, 39:16, 39:20, 40:10, 42:16, 45:7, 45:25, 46:8, 48:11, 49:15, 49:21, 50:2, 50:5, 50:12, 50:17, 51:17, 51:23, 52:10, 53:3, 53:24, 54:22, 57:8, 57:18, 58:6, 63:17, 67:9, 67:10, 71:10, 73:3, 73:4, 74:20, 75:16, 75:20, 78:4, 80:7

**correctly** [11] - 61:25, 63:23, 68:10, 73:18, 73:19, 73:24, 75:8, 77:17, 77:18, 77:25, 78:11

**correctness** [1] - 75:7

**correspond** [9] - 29:7, 30:6, 30:15, 31:23, 32:1, 32:12, 34:2, 38:6, 71:2

**corresponded** [1] - 73:12

**corresponding** [4] - 40:18, 41:10, 41:12, 42:6

**corresponds** [3] - 31:16, 32:7, 41:25

**cost** [6] - 40:22, 40:24, 40:25, 41:3, 41:4, 71:12

**costs** [1] - 47:3

**counsel** [5] - 3:3, 8:20, 44:4, 59:11, 60:1

**course** [6] - 5:2, 7:7, 28:10, 62:2, 76:22, 76:23

**COURT** [115] - 1:1, 3:8, 3:11, 3:24, 4:1, 4:4, 4:7, 4:11, 4:16, 5:6, 5:9, 6:5, 7:1, 7:14, 7:18, 7:22, 8:1, 8:10, 8:13, 8:16, 8:22, 9:2, 9:5, 9:24, 17:8, 17:11, 17:13, 17:16, 17:18, 18:15, 19:10, 19:25, 20:4, 20:7, 20:19, 21:3, 21:9, 22:6, 22:16, 23:19, 23:25, 24:5, 24:8, 24:11, 24:14, 25:4, 25:13, 25:24, 26:13, 27:1, 27:7, 27:25, 28:10, 28:18, 28:21, 28:25, 29:8, 29:13, 29:25, 30:3, 30:10, 30:24, 31:20, 32:6, 35:18, 36:6, 36:9, 36:16, 36:19, 37:11, 37:20, 39:25, 41:22, 42:18, 42:20,

43:3, 43:7, 43:16, 43:25,
44:6, 44:9, 44:22, 45:9,
45:11, 45:15, 45:19, 46:1,
47:14, 48:2, 59:5, 59:8,
59:11, 59:19, 60:1, 60:4,
60:9, 60:11, 65:2, 65:10,
69:9, 69:17, 71:5, 71:22,
72:6, 72:23, 74:3, 74:8,
78:15, 79:8, 79:11, 79:15,
79:18, 79:25, 80:4, 80:13
**Court** [21] - 1:22, 1:22,
4:17, 6:7, 7:2, 7:3, 8:10,
13:5, 13:6, 13:14, 14:24,
15:25, 21:9, 24:15, 25:5,
26:13, 26:16, 43:16, 44:22,
44:25, 45:15
**court** [7] - 4:19, 7:6, 20:21,
24:15, 48:22, 53:13, 79:19
**Court's** [1] - 6:5
**Courthouse** [1] - 1:23
**courthouse** [1] - 7:4
**Courtroom** [2] - 17:15, 60:8
**courtroom** [5] - 4:20, 4:22,
5:4, 5:21, 7:20
**COURTROOM** [1] - 3:2
**cover** [17] - 12:13, 23:4,
29:5, 30:13, 30:20, 31:3,
32:4, 32:18, 35:3, 37:3, 38:6,
38:11, 38:18, 47:24, 51:6,
51:7, 53:15
**Covers** [3] - 32:3, 32:18,
38:17
**covers** [1] - 37:1
**cross** [2] - 48:4, 74:4
**CROSS** [3] - 2:2, 48:6,
74:10
**cross-examine** [2] - 48:4,
74:4
**CRR** [1] - 1:22
**current** [1] - 12:25
**customer** [2] - 75:5, 75:8
**cutting** [1] - 53:12

## D

**D.C** [1] - 1:23
**damages** [3] - 6:12, 6:15,
6:20
**DARRELL** [1] - 1:18
**DATE** [1] - 80:13
**date** [1] - 57:6
**David** [1] - 39:10
**DC** [3] - 1:13, 1:17, 1:20
**DEBORAH** [1] - 1:9
**decision** [1] - 44:13
**defendant** [7] - 3:16, 4:3,
5:12, 27:20, 29:21, 36:2,
38:3
**Defendant** [2] - 1:7, 1:15

**defense** [2] - 9:15, 9:18
**demonstrate** [1] - 19:13
**department** [7] - 53:10,
53:11, 53:15, 53:17, 61:7,
61:10, 61:14
**department's** [1] - 61:11
**deposition** [4] - 20:12,
20:24, 21:6, 21:24
**Deputy** [2] - 17:15, 60:8
**deputy** [3] - 7:6, 17:13, 60:6
**describe** [6] - 24:11, 29:3,
37:25, 46:9, 47:5, 53:4
**description** [4] - 27:15,
29:2, 29:13, 35:25
**designated** [1] - 20:5
**determine** [8] - 40:16,
46:25, 47:2, 47:9, 55:5, 56:3,
63:6, 73:18
**determined** [4] - 3:14, 56:5,
77:12, 77:24
**didn't..** [1] - 61:12
**difference** [3] - 14:9, 14:10,
16:22
**different** [7] - 5:11, 18:9,
28:3, 32:9, 43:3, 54:11,
70:16
**differently** [1] - 21:7
**digit** [1] - 24:5
**DIRECT** [3] - 2:2, 17:22,
60:14
**directly** [2] - 44:21, 75:12
**disagrees** [1] - 11:15
**discrepancy** [1] - 75:25
**discuss** [2] - 44:2, 75:24
**discussed** [5] - 6:10, 16:18,
66:10, 71:19, 72:14
**discussing** [1] - 51:1
**discussion** [1] - 62:7
**dismissed** [1] - 10:22
**disruption** [1] - 21:16
**DISTRICT** [3] - 1:1, 1:2,
1:10
**document** [18] - 18:12,
18:17, 18:19, 18:21, 18:23,
19:1, 19:21, 27:13, 28:14,
28:15, 37:5, 37:9, 37:13,
37:16, 42:23, 42:25, 78:18
**documents** [1] - 13:8
**dollars** [1] - 23:5
**done** [1] - 49:2
**down** [5] - 32:3, 40:23,
43:25, 59:9, 79:12
**dramatically** [1] - 5:11
**draw** [2] - 22:8, 40:12
**drawing** [1] - 46:21
**due** [1] - 5:8
**duly** [2] - 17:20, 60:12
**during** [8] - 8:8, 62:2,
76:20, 76:22

## E

**E-R-S-O-N** [1] - 74:18
**effort** [1] - 73:6
**either** [2] - 44:2, 45:16
**element** [5] - 14:1, 14:2,
14:11, 16:12, 16:21
**elicit** [2] - 4:8, 4:15
**elicited** [1] - 7:5
**elsewhere** [1] - 7:4
**embodied** [1] - 21:10
**employed** [2] - 60:19, 60:23
**employee** [6] - 12:24,
12:25, 13:2, 18:7, 74:22
**end** [3] - 65:7, 65:19, 78:11
**enforce** [2] - 6:5, 7:2
**engaged** [1] - 48:18
**entail** [1] - 48:17
**entails** [1] - 48:18
**entered** [2] - 24:23, 26:16
**entering** [2] - 20:13, 44:17
**entire** [1] - 50:9
**entitled** [1] - 80:8
**entry** [1] - 32:6
**equipment** [1] - 4:21
**escort** [1] - 7:6
**essential** [2] - 25:10, 26:3
**essentially** [4] - 22:24,
47:15, 51:8, 55:7
**established** [1] - 20:16
**estimation** [2] - 65:14,
65:16
**Evans** [3] - 27:20, 36:2,
38:3
**event** [1] - 5:16
**evidence** [14] - 9:10, 9:17,
9:22, 16:18, 19:19, 24:20,
24:21, 24:24, 26:11, 26:17,
27:9, 29:15, 37:23, 43:18
**ex** [2] - 3:3, 78:20
**exactly** [2] - 15:16, 63:15
**examination** [2] - 61:4,
61:5, 79:9
**EXAMINATION** [4] - 17:22,
48:6, 60:14, 74:10
**examinations** [1] - 8:8
**examine** [2] - 48:4, 74:4
**example** [3] - 5:25, 76:3,
78:24
**Excuse** [1] - 79:16
**excuse** [3] - 28:2, 53:19,
55:19
**excused** [5] - 79:13, 79:15,
79:16, 79:18, 79:19
**exhausted** [2] - 25:5, 25:14
**exhibit** [2] - 28:22, 37:19
**Exhibit** [41] - 18:13, 18:18,
19:11, 19:14, 19:17, 22:3,
22:5, 22:9, 26:24, 27:3, 27:5,

27:8, 28:13, 28:15, 28:17,
31:3, 31:16, 31:24, 32:13,
37:9, 37:21, 41:9, 42:22,
43:13, 43:17, 43:20, 44:14,
44:22, 49:12, 50:4, 50:11,
50:19, 52:12, 53:23, 54:14,
54:21, 55:13, 55:21, 56:20
**EXHIBIT** [3] - 19:19, 27:9,
37:23
**expenses** [1] - 47:24
**experience** [2] - 13:16,
15:20
**expert** [5] - 5:5, 5:14, 5:15,
5:22, 6:11
**explain** [1] - 51:2
**explicitly** [1] - 11:9
**expressing** [1] - 65:21
**extent** [1] - 9:19

## F

**face** [2] - 17:13, 60:6
**fact** [11] - 5:20, 9:16, 9:20,
25:10, 26:1, 26:3, 26:8,
26:12, 34:12, 34:22, 43:14
**failure** [1] - 43:11
**fair** [1] - 41:19
**fall** [1] - 39:14
**False** [4] - 9:7, 9:12, 14:8,
14:18
**false** [5] - 9:9, 9:11, 12:22,
13:22, 14:23
**falsity** [3] - 14:2, 14:11,
16:11
**familiar** [2] - 22:21, 78:7
**far** [4] - 61:18, 66:8, 71:18,
78:12
**fashion** [1] - 53:8
**fax** [2] - 76:24, 77:3
**February** [1] - 1:5
**field** [1] - 47:1
**file** [2] - 48:22, 48:23
**filed** [5] - 10:22, 11:13,
12:19, 57:16, 57:19
**filing** [1] - 13:9
**fill** [1] - 49:25
**filled** [4] - 49:20, 49:23,
50:16, 52:3
**final** [1] - 76:8
**finally** [1] - 16:20
**finance** [4] - 75:2, 75:3,
75:4, 75:9
**financial** [1] - 48:15
**firm** [1] - 18:11
**firms** [2] - 48:19, 48:25
**first** [17] - 5:2, 11:2, 14:11,
17:9, 21:4, 24:2, 27:11, 29:3,
29:5, 32:8, 38:5, 42:13, 57:6,
60:19, 74:25, 76:11, 79:2

**fix** [1] - 28:6
**flip** [3] - 50:3, 78:17, 78:22
**focus** [2] - 12:4, 50:24
**follow** [5] - 14:22, 35:9, 40:23, 77:13, 77:23
**follow-up** [1] - 77:23
**following** [1] - 29:2
**follows** [2] - 17:21, 60:13
**foot** [1] - 24:12
**FOR** [1] - 1:2
**force** [1] - 57:22
**foregoing** [1] - 80:6
**form** [1] - 32:7
**formation** [1] - 13:4
**formed** [1] - 49:16
**former** [2] - 12:24, 12:25
**forth** [1] - 6:22
**foundation** [3] - 39:24, 72:20, 72:21
**four** [7] - 4:21, 4:22, 57:5, 57:9, 71:15, 72:2, 72:13
**Fourth** [1] - 1:20
**fraud** [6] - 10:9, 11:13, 13:13, 13:20, 14:8, 16:6
**front** [14] - 5:4, 7:23, 54:15, 56:22, 63:7, 63:19, 64:1, 64:23, 66:5, 66:24, 68:1, 68:14, 73:5, 73:22
**full** [2] - 10:6, 74:15
**functioned** [1] - 61:16
**functioning** [1] - 61:19
**fundamental** [1] - 14:12

## G

**general** [1] - 74:23
**generally** [2] - 37:25, 48:14
**gentleman** [1] - 5:3
**George** [1] - 74:18
**given** [8] - 5:16, 5:18, 6:1, 19:10, 19:11, 26:15, 36:12, 44:3
**Gocial** [11] - 5:5, 5:7, 5:9, 5:14, 5:15, 6:1, 6:11, 6:21, 7:2, 7:3, 7:6
**governed** [1] - 44:24
**Government** [22] - 6:19, 7:21, 8:5, 8:20, 10:4, 10:5, 11:15, 11:20, 11:24, 13:2, 13:6, 13:7, 13:10, 13:21, 14:14, 14:25, 15:6, 18:22, 49:4, 49:6, 49:8, 53:19
**government** [15] - 9:18, 10:24, 12:24, 12:25, 14:20, 15:5, 15:17, 16:15, 16:22, 16:23, 48:25, 49:2, 59:1, 59:24
**governs** [2] - 43:4, 43:19
**GPO** [63] - 9:11, 9:16, 11:1,
13:15, 13:17, 13:25, 15:15, 15:20, 15:23, 16:1, 16:7, 17:3, 17:5, 19:2, 40:9, 40:12, 40:14, 42:15, 44:15, 46:25, 47:8, 47:11, 47:12, 49:4, 49:13, 49:17, 52:20, 53:22, 53:25, 54:5, 54:10, 54:12, 54:13, 54:18, 54:20, 55:11, 55:17, 55:20, 56:8, 57:13, 57:14, 57:19, 57:24, 58:1, 58:7, 58:11, 58:16, 58:21, 58:23, 60:23, 60:25, 64:21, 72:18, 73:11, 73:17, 73:19, 74:19, 74:21, 74:22, 74:24
**GPO's** [2] - 9:18, 16:2
**greater** [7] - 25:20, 26:10, 41:11, 41:20, 42:1, 42:7, 42:10
**ground** [1] - 45:9
**guidance** [1] - 76:8
**guided** [1] - 59:11
**guidelines** [2] - 48:21, 53:13

## H

**hand** [2] - 11:23, 23:23
**handed** [4] - 28:1, 28:4, 28:7, 28:9
**handing** [5] - 18:17, 23:16, 27:3, 28:14, 42:22
**hands** [1] - 62:11
**Hastings** [1] - 18:1
**hear** [24] - 5:2, 5:15, 6:2, 6:7, 6:21, 8:10, 8:13, 9:2, 10:12, 12:1, 12:2, 13:5, 13:7, 13:14, 14:13, 14:24, 15:2, 15:19, 15:25, 16:23, 20:22, 21:14, 23:19
**heard** [4] - 6:6, 6:9, 20:20, 20:21
**hearsay** [1] - 20:25
**help** [3] - 24:25, 47:19, 52:13
**himself** [2] - 76:16, 77:2
**history** [1] - 14:21
**hold** [1] - 22:4
**holding** [1] - 28:16
**home** [1] - 7:8
**honest** [1] - 78:13
**Honor** [78] - 3:10, 4:5, 4:10, 4:14, 5:8, 5:13, 6:10, 6:14, 6:21, 7:17, 8:5, 8:9, 8:12, 8:19, 9:1, 9:4, 9:23, 10:1, 10:10, 11:11, 11:18, 12:18, 16:22, 17:7, 17:12, 17:19, 18:14, 19:8, 20:3, 20:6, 20:15, 22:15, 23:15, 23:17, 23:18, 23:21, 24:4, 24:10,
24:13, 24:18, 25:8, 25:21, 25:23, 26:25, 27:6, 27:24, 28:2, 28:7, 28:16, 28:20, 28:24, 29:12, 30:2, 30:4, 31:18, 32:10, 37:10, 37:18, 42:17, 42:19, 43:6, 43:8, 43:24, 44:5, 44:12, 44:13, 48:1, 48:5, 59:7, 59:10, 59:22, 65:12, 74:2, 74:6, 78:14, 79:10, 79:14, 79:17
**HONORABLE** [1] - 1:9
**hopes** [1] - 7:15
**Hudson** [1] - 18:1
**HUGH** [2] - 2:3, 17:20
**Hugh** [3] - 3:23, 4:2, 18:1
**hundred** [3] - 67:14, 68:24, 70:2
**hundreds** [1] - 23:24

## I

**idea** [2] - 26:5, 65:7
**identical** [1] - 43:14
**identified** [5] - 55:14, 58:18, 75:17, 76:16, 77:2
**identify** [2] - 3:18, 62:19
**II** [18] - 22:11, 22:18, 32:16, 33:9, 34:6, 34:13, 34:23, 35:4, 35:7, 38:20, 39:2, 39:9, 39:17, 39:22, 40:4, 50:25, 52:15
**II(A** [4] - 39:18, 45:24, 46:3, 51:5
**II(A)** [1] - 32:16
**II(B** [9] - 41:12, 41:15, 41:20, 42:2, 42:7, 42:10, 45:24, 51:11
**II(B)** [3] - 41:2, 42:8, 46:4
**II(C** [1] - 51:14
**II(D** [18] - 10:16, 35:10, 39:19, 40:19, 40:20, 40:24, 41:11, 41:13, 41:14, 41:19, 42:1, 42:6, 42:8, 46:7, 46:9, 46:11, 46:17, 51:24
**II(D)** [2] - 33:17, 42:9
**IIA** [1] - 31:17
**impeach** [2] - 21:11, 25:9
**implicate** [1] - 9:19
**imply** [1] - 26:4
**important** [3] - 5:14, 5:23, 26:11
**inasmuch** [1] - 5:11
**INC** [1] - 1:6
**Inc** [1] - 3:3
**included** [1] - 52:25
**incomplete** [1] - 22:11
**inconsistency** [1] - 20:16
**inconsistent** [1] - 20:25
**inconvenience** [1] - 4:20
**incorrectly** [5] - 64:2, 66:12, 73:24, 75:21, 76:7
**indeed** [1] - 25:15
**indicate** [3] - 7:14, 22:10, 29:10
**indicated** [11] - 4:24, 8:16, 24:2, 25:4, 25:13, 31:2, 31:12, 55:12, 56:9, 70:8, 70:25
**indicates** [2] - 10:17, 46:19
**indicating** [2] - 12:5, 12:9
**indication** [1] - 40:15
**individual** [1] - 8:19
**individuals** [3] - 3:18, 8:2, 8:16
**industry** [1] - 13:17
**influence** [1] - 47:21
**information** [22] - 63:8, 63:13, 64:9, 64:18, 64:23, 65:22, 65:23, 65:24, 65:25, 66:1, 66:4, 66:6, 66:14, 66:20, 67:1, 67:11, 67:15, 67:20, 67:21, 68:3, 68:20
**inquire** [1] - 76:18
**inquired** [4] - 61:23, 66:16, 68:8, 68:9
**inquiry** [4] - 45:1, 61:22, 62:3, 62:18
**inserted** [1] - 32:23
**insider** [1] - 12:23
**instance** [3] - 37:3, 47:17, 53:9
**instructed** [1] - 58:7
**intend** [1] - 4:8
**intended** [1] - 24:23
**intends** [2] - 4:14, 7:2
**intention** [1] - 6:5
**interested** [1] - 48:19
**Interested** [1] - 1:18
**internal** [2] - 40:15, 46:24
**interpret** [3] - 14:20, 48:21, 76:6
**interpretation** [3] - 14:22, 63:10, 66:2
**interpreted** [1] - 77:17
**investigate** [1] - 62:3
**investigation** [2] - 72:17, 72:21
**invitation** [1] - 11:22
**invoice** [86] - 11:2, 11:7, 24:16, 25:11, 26:10, 27:12, 27:14, 27:15, 27:16, 27:19, 27:21, 28:8, 29:11, 29:22, 30:13, 30:19, 31:4, 32:17, 32:20, 32:21, 32:25, 33:5, 33:8, 33:11, 33:15, 33:18, 33:21, 33:24, 34:2, 34:9, 34:22, 35:2, 35:24, 35:25, 36:1, 36:4, 36:12, 36:14, 36:20, 37:8, 37:15, 37:16,

37:21, 38:1, 38:2, 38:5, 38:7, 38:11, 38:14, 38:19, 38:21, 38:25, 39:3, 39:11, 39:13, 41:10, 41:12, 41:14, 41:17, 41:20, 42:3, 42:9, 45:17, 45:23, 54:15, 54:18, 54:20, 54:24, 55:11, 55:14, 55:17, 55:18, 55:19, 55:20, 55:24, 56:8, 56:10, 56:18, 58:18, 64:25, 73:22, 73:24

**invoiced** [2] - 11:1, 35:14

**invoices** [84] - 6:14, 6:15, 9:10, 9:13, 10:20, 11:12, 11:14, 12:21, 13:10, 13:19, 13:22, 15:18, 15:21, 16:5, 17:5, 23:10, 23:23, 23:24, 24:17, 24:19, 24:20, 24:23, 24:24, 25:1, 25:6, 25:9, 25:19, 26:2, 26:5, 26:19, 26:23, 34:24, 35:10, 35:13, 43:4, 43:19, 44:23, 45:13, 45:16, 45:19, 46:1, 46:2, 46:3, 46:6, 54:9, 54:11, 58:2, 58:15, 58:19, 58:21, 61:8, 61:9, 61:24, 63:7, 63:19, 63:20, 63:23, 63:25, 64:1, 64:2, 64:5, 64:6, 64:7, 64:10, 64:19, 64:22, 65:4, 65:17, 66:5, 66:12, 66:24, 68:10, 68:11, 68:13, 68:14, 75:6, 76:6, 76:12, 76:14, 76:18, 77:18, 77:24, 78:11

**involved** [4] - 12:8, 32:4, 53:12, 66:18

**involvement** [1] - 13:4

**involves** [2] - 53:6, 70:22

**issue** [19] - 6:8, 9:19, 10:13, 10:19, 16:11, 23:10, 24:16, 24:17, 24:19, 43:9, 43:19, 55:20, 58:15, 75:17, 75:19, 76:12, 76:13

**issued** [2] - 40:14, 54:20

**issues** [6] - 26:16, 58:23, 59:1, 77:25

**item** [141] - 6:18, 10:2, 10:13, 10:14, 10:16, 10:18, 11:3, 12:7, 15:8, 27:11, 29:3, 29:4, 29:5, 29:7, 30:6, 30:9, 30:11, 30:12, 30:15, 30:17, 30:18, 30:20, 31:3, 31:9, 31:15, 31:16, 31:17, 31:22, 31:23, 32:1, 32:3, 32:4, 32:12, 32:15, 32:16, 32:18, 32:21, 32:23, 32:24, 32:25, 33:1, 33:3, 33:5, 33:7, 33:10, 33:12, 33:13, 33:14, 33:15, 33:17, 33:18, 33:20, 33:21, 33:23, 34:2, 34:3, 34:7, 34:8, 34:14, 34:25, 35:1, 35:3, 35:7, 36:25, 38:5, 38:7, 38:10, 38:12, 38:15, 38:17, 38:18, 38:21, 38:24, 38:25, 39:3, 39:5, 39:7, 39:9, 39:11, 39:14, 39:22, 40:4, 40:8, 40:19, 40:23, 41:2, 41:11, 41:12, 41:13, 41:15, 41:19, 41:20, 42:1, 42:6, 42:9, 43:11, 45:24, 46:7, 46:9, 46:10, 47:21, 50:18, 50:20, 50:22, 50:25, 51:3, 51:6, 51:9, 51:11, 51:13, 51:18, 51:21, 51:24, 52:13, 52:16, 52:17, 52:20, 52:24, 53:5, 56:11, 56:16, 58:8, 58:24, 59:2, 66:17, 66:18, 66:21, 66:23, 67:2, 67:8, 67:12, 67:13, 67:17, 67:22, 68:18, 69:14, 69:18, 69:23, 70:2, 70:16, 70:17, 71:11, 72:14, 77:8

38:20, 38:22, 38:24, 38:25, 39:2, 39:3, 39:5, 39:7, 39:9, 39:11, 40:19, 40:23, 41:2, 41:11, 41:12, 41:13, 41:15, 41:19, 41:20, 42:1, 42:6, 42:9, 43:11, 46:7, 46:9, 46:10, 46:11, 46:17, 47:22, 51:6, 51:9, 51:11, 51:13, 51:18, 51:21, 51:24, 52:13, 52:17, 52:20, 52:24, 53:5, 56:11, 56:16, 58:8, 58:24, 59:2, 66:17, 66:19, 66:21, 66:23, 67:2, 67:8, 67:12, 67:13, 67:17, 67:22, 67:24, 69:14, 69:19, 69:23, 70:2, 71:11, 72:15, 77:8

**items** [29] - 12:3, 12:4, 12:12, 16:10, 23:4, 26:7, 32:8, 34:2, 34:8, 34:14, 34:25, 35:3, 35:4, 35:7, 36:25, 39:14, 39:22, 40:4, 40:8, 45:24, 48:19, 50:18, 50:20, 50:22, 50:25, 51:3, 68:18, 70:16, 70:17

**itself** [2] - 50:22, 52:6

## J

**January** [2] - 6:11, 23:22

**job** [6] - 35:15, 36:23, 38:1, 48:21, 53:15, 72:19

**jobs** [2] - 35:13, 35:14

**JOHN** [1] - 1:15

**John** [1] - 3:5

**JUDGE** [2] - 1:9, 1:10

**Judiciary** [1] - 1:19

**Junior** [1] - 18:1

**jury** [1] - 4:25

## K

**keep** [1] - 21:16

**kind** [3] - 5:18, 59:20, 66:14

**kinds** [1] - 66:13

**King** [5] - 2:3, 2:5, 8:25, 43:7, 60:2

**king** [39] - 3:4, 4:12, 5:2, 9:2, 9:24, 14:4, 14:7, 16:21, 17:9, 17:18, 19:10, 19:25, 20:7, 20:21, 20:23, 21:3, 23:23, 24:1, 25:25, 29:10, 30:11, 30:25, 32:6, 35:21, 36:10, 44:11, 48:2, 50:6, 51:1, 59:5, 59:16, 60:11, 60:17, 69:10, 72:24, 74:3, 79:8, 79:16, 79:23

**KING** [98] - 1:12, 3:10, 4:14, 5:5, 5:8, 5:13, 9:1, 9:4, 9:6, 17:10, 17:19, 17:23, 18:14,

18:16, 19:20, 20:3, 20:9, 20:18, 21:4, 21:20, 22:7, 22:15, 22:17, 23:15, 23:18, 24:4, 24:7, 24:10, 24:13, 24:18, 25:8, 25:17, 25:23, 26:1, 26:21, 26:22, 26:25, 27:2, 27:4, 27:10, 27:24, 28:7, 28:11, 29:1, 29:12, 29:18, 30:2, 30:4, 30:5, 30:12, 30:14, 31:1, 31:21, 32:10, 32:11, 34:19, 35:22, 35:23, 36:11, 36:21, 37:10, 37:12, 37:17, 37:24, 40:2, 41:23, 42:17, 42:19, 42:21, 43:8, 43:24, 44:12, 45:2, 45:12, 45:18, 45:21, 45:22, 46:2, 46:5, 47:25, 59:7, 59:17, 60:3, 60:15, 62:21, 65:6, 65:12, 65:13, 69:12, 69:20, 71:6, 71:23, 72:9, 72:25, 74:2, 79:10, 79:17, 79:24

**knowing** [2] - 14:1, 16:25

**knowingly** [3] - 9:8, 9:9, 9:12

**knowledge** [11] - 9:17, 9:18, 12:23, 14:2, 16:12, 16:19, 19:4, 19:6, 21:8, 64:11, 76:13

## L

**L-A-M** [1] - 3:25

**label** [1] - 28:12

**laid** [1] - 39:24

**Lam** [2] - 3:6, 3:21

**LAM** [1] - 4:1

**LAMB** [1] - 3:24

**last** [6] - 3:19, 19:21, 20:1, 24:15, 50:3, 74:17

**law** [4] - 14:8, 14:12, 48:18, 48:25

**lawsuit** [1] - 12:20

**leading** [1] - 65:1

**learn** [1] - 77:23

**least** [1] - 7:11

**leave** [1] - 5:21

**leaves** [3] - 51:18, 51:20, 51:22

**leaving** [2] - 8:17, 8:18

**left** [4] - 8:3, 12:2, 50:18, 50:19

**less** [14] - 23:11, 24:10, 24:12, 25:3, 25:11, 26:2, 35:13, 42:1, 42:3, 42:7, 42:8, 42:10, 42:11, 45:6

**level** [3] - 13:15, 16:1, 46:25

**liability** [3] - 6:13, 6:22,

6:23

**limited** [1] - 6:14

**line** [159] - 6:18, 10:2, 10:13, 10:14, 10:16, 10:18, 11:3, 12:3, 12:4, 12:7, 12:12, 15:8, 16:10, 23:4, 26:6, 27:11, 29:3, 29:5, 29:7, 29:14, 29:16, 30:6, 30:8, 30:12, 30:15, 30:17, 30:20, 31:3, 31:9, 31:15, 31:16, 31:17, 31:22, 31:23, 32:1, 32:3, 32:4, 32:12, 32:15, 32:16, 32:18, 32:21, 32:23, 32:24, 32:25, 33:1, 33:3, 33:5, 33:7, 33:10, 33:12, 33:13, 33:14, 33:15, 33:17, 33:18, 33:20, 33:21, 33:23, 34:2, 34:3, 34:7, 34:8, 34:14, 34:25, 35:1, 35:3, 35:7, 36:25, 38:5, 38:7, 38:10, 38:12, 38:15, 38:17, 38:18, 38:21, 38:24, 38:25, 39:3, 39:5, 39:7, 39:9, 39:11, 39:14, 39:22, 40:4, 40:8, 40:19, 40:23, 41:2, 41:11, 41:12, 41:13, 41:15, 41:19, 41:20, 42:1, 42:6, 42:9, 43:11, 45:24, 46:7, 46:9, 46:10, 47:21, 50:18, 50:20, 50:22, 50:25, 51:3, 51:6, 51:9, 51:11, 51:13, 51:18, 51:21, 51:24, 52:13, 52:16, 52:17, 52:20, 52:24, 53:5, 56:11, 56:16, 58:8, 58:24, 59:2, 66:17, 66:18, 66:21, 66:23, 67:2, 67:8, 67:12, 67:13, 67:17, 67:22, 68:18, 69:14, 69:18, 69:23, 70:2, 70:16, 70:17, 71:11, 72:14, 77:8

**list** [1] - 50:20

**listed** [7] - 42:3, 46:17, 46:25, 68:24, 68:25, 69:18, 70:2

**lists** [1] - 40:7

**LLP** [1] - 1:16

**Lomas** [21] - 2:4, 2:6, 3:5, 3:17, 6:7, 7:1, 9:25, 17:8, 20:20, 23:20, 23:25, 27:7, 28:19, 28:22, 37:20, 48:3, 59:5, 74:4, 79:15

**LOMAS** [59] - 1:15, 3:21, 3:25, 4:2, 4:5, 4:10, 6:10, 7:17, 7:19, 7:25, 8:4, 8:12, 8:15, 8:19, 10:1, 19:8, 20:15, 20:23, 23:17, 23:21, 25:21, 27:6, 28:2, 28:20, 28:24, 30:8, 30:22, 31:18, 32:5, 34:16, 35:16, 36:5, 36:15, 37:18, 39:23, 41:21, 42:24,

00000685

43:6, 45:8, 45:10, 47:13, 48:5, 48:7, 59:4, 59:22, 62:19, 65:1, 65:9, 69:5, 69:16, 71:4, 71:21, 72:20, 74:6, 74:9, 74:11, 78:14, 78:16, 79:7

**Lomas'** [1] - 24:14
**LONG** [1] - 1:16
**look** [15] - 18:24, 19:21, 22:10, 22:18, 27:11, 28:8, 40:17, 41:10, 42:4, 42:9, 52:15, 62:8, 70:20, 72:18, 77:10
   **looked** [1] - 42:14
   **looking** [4] - 29:22, 29:24, 40:11, 62:12
   **looks** [1] - 50:18
   **loosely** [1] - 29:16
   **losing** [1] - 15:12
   **lost** [1] - 10:23
   **lunch** [4] - 43:23, 59:12, 74:5, 79:22
   **Lunch** [1] - 80:1
   **lunchtime** [1] - 7:11
   **lying** [1] - 13:21

**M**

**machine** [1] - 1:25
**MAGISTRATE** [1] - 1:9
**mail** [1] - 49:18
**management** [1] - 61:18
**manager** [2] - 13:15, 16:1
**managerial** [1] - 61:15
**marked** [10] - 22:9, 28:14, 28:16, 43:12, 49:12, 50:3, 51:10, 52:11, 54:15, 78:17
   **marking** [5] - 18:12, 22:3, 26:23, 28:13, 37:8
   **materiality** [2] - 14:8, 16:20
   **matter** [10] - 3:15, 27:20, 36:2, 38:4, 44:23, 53:16, 67:7, 77:10, 78:19, 80:8
   **matters** [2] - 8:23, 8:25
**MCKENNA** [1] - 1:16
**mean** [11] - 8:13, 9:21, 47:11, 47:12, 51:7, 51:10, 51:18, 60:1, 62:8, 62:10, 69:21
   **meaning** [5] - 11:22, 46:22, 47:5, 47:6, 47:12
   **means** [3] - 14:12, 14:13, 16:12
   **meetings** [1] - 61:18
   **memory** [1] - 24:25
   **mention** [1] - 59:23
   **mentioned** [4] - 3:19, 15:19, 63:18, 78:8
   **merit** [1] - 15:23

**might** [7] - 6:1, 7:10, 71:24, 72:1, 72:5, 72:6, 72:10
**Miller** [2] - 8:3, 28:1
**mind** [1] - 30:10
**mine** [2] - 22:11, 29:16
**minutes** [3] - 44:7, 59:14, 79:22
**mischaracterize** [1] - 35:17
**mischaracterizes** [4] - 31:19, 34:16, 71:21, 72:20
**misplaced** [1] - 20:2
**misspoke** [1] - 30:2
**mistakenly** [1] - 8:16
**moment** [4] - 10:11, 42:17, 51:5, 56:21
**money** [2] - 15:12, 56:17
**morning** [9] - 3:8, 9:4, 9:5, 17:11, 17:12, 48:8, 48:9, 74:12, 74:13
**MORNING** [2] - 1:5, 1:9
**most** [1] - 26:15
**move** [1] - 26:23
**moved** [4] - 19:19, 27:9, 37:23, 53:14
**moving** [3] - 4:20, 33:5, 38:17
**MR** [156] - 3:10, 3:21, 3:25, 4:2, 4:5, 4:10, 4:14, 5:5, 5:8, 5:13, 6:10, 7:17, 7:19, 7:25, 8:4, 8:12, 8:15, 8:19, 9:1, 9:4, 9:6, 10:1, 17:10, 17:19, 17:23, 18:14, 18:16, 19:8, 19:20, 20:3, 20:9, 20:15, 20:18, 20:23, 21:4, 21:20, 22:7, 22:15, 22:17, 23:15, 23:17, 23:18, 23:21, 24:4, 24:7, 24:10, 24:13, 24:18, 25:8, 25:17, 25:21, 25:23, 26:1, 26:21, 26:22, 26:25, 27:2, 27:4, 27:6, 27:10, 27:24, 28:2, 28:7, 28:11, 28:20, 28:24, 29:1, 29:12, 29:18, 30:2, 30:4, 30:5, 30:8, 30:12, 30:14, 30:22, 31:1, 31:18, 31:21, 32:5, 32:10, 32:11, 34:16, 34:19, 35:16, 35:22, 35:23, 36:5, 36:11, 36:15, 36:21, 37:10, 37:12, 37:17, 37:18, 37:24, 39:23, 40:2, 41:21, 41:23, 42:17, 42:19, 42:21, 42:24, 43:6, 43:8, 43:24, 44:12, 45:2, 45:8, 45:10, 45:12, 45:18, 45:21, 45:22, 46:2, 46:5, 47:13, 47:25, 48:5, 48:7, 59:4, 59:7, 59:17, 59:22, 60:3, 60:15, 62:19, 62:21, 65:1, 65:6, 65:9, 65:12, 65:13, 69:5, 69:12, 69:16, 69:20, 71:4, 71:6, 71:21,

71:23, 72:9, 72:20, 72:25, 74:2, 74:6, 74:9, 74:11, 78:14, 78:16, 79:7, 79:10, 79:13, 79:17, 79:24
   **multiple** [3] - 68:18, 69:24, 70:17
   **multiples** [1] - 47:9
   **my..** [1] - 63:11

**N**

**name** [11] - 3:18, 3:19, 15:2, 17:24, 74:15, 74:16, 74:17, 77:19, 78:8, 78:12, 79:2
**narrow** [3] - 6:13, 6:16, 66:25
**narrowed** [1] - 23:22
**nature** [4] - 4:25, 61:21, 63:1, 74:23
**near** [1] - 19:1
**necessarily** [2] - 70:24, 71:2
**necessary** [2] - 8:7, 75:19
**need** [3] - 6:21, 28:5, 76:2
**needed** [1] - 14:9
**never** [6] - 13:2, 20:13, 58:3, 58:9, 58:25, 59:3
**nevertheless** [1] - 11:15
**New** [1] - 18:2
**next** [17] - 28:8, 31:9, 32:3, 32:23, 33:5, 33:13, 33:20, 37:8, 38:17, 38:24, 39:5, 53:10, 53:11, 59:14, 70:2, 79:23, 79:24
**noise** [2] - 21:14, 21:19
**non** [1] - 61:9
**non-printing** [1] - 61:9
**none** [2] - 67:13, 67:17
**noon** [1] - 59:12
**normal** [1] - 17:1
**note** [3] - 29:9, 29:13, 44:15
**noted** [1] - 38:4
**notes** [1] - 4:18
**nothing** [1] - 21:18
**November** [1] - 57:7
**Number** [3] - 22:9, 27:9, 78:22
   **NUMBER** [1] - 2:9
   **number** [22] - 3:2, 19:22, 23:11, 24:3, 24:6, 26:10, 27:13, 27:14, 30:6, 34:23, 35:7, 40:18, 41:7, 41:11, 41:12, 44:19, 45:12, 47:20, 50:4, 52:12, 53:7, 56:21
   **numbers** [9] - 32:23, 46:21, 46:24, 47:7, 47:8, 47:15, 52:6, 52:7, 52:9
   **numeral** [27] - 22:11, 22:18,

30:18, 31:17, 32:2, 32:16, 33:1, 33:9, 33:22, 34:3, 34:6, 34:13, 34:23, 35:4, 35:7, 35:10, 38:7, 38:12, 38:20, 39:2, 39:9, 39:15, 39:17, 50:25, 51:11, 51:15, 52:15
**NW** [3] - 1:12, 1:16, 1:20

**O**

**O'Brien** [6] - 3:5, 3:17, 6:6, 9:25, 28:22, 48:3
**O'BRIEN** [1] - 1:15
**Oath** [2] - 17:15, 60:8
**oath** [1] - 44:2
**object** [5] - 21:1, 23:17, 35:16, 42:24, 69:6
**objection** [44] - 4:11, 7:15, 19:14, 19:18, 20:15, 20:18, 21:9, 21:10, 23:19, 25:15, 25:21, 25:25, 26:13, 27:8, 28:23, 30:8, 30:22, 31:18, 32:5, 34:16, 36:5, 36:15, 36:19, 37:22, 39:23, 39:25, 41:21, 43:5, 44:25, 45:8, 45:16, 47:13, 60:2, 60:3, 62:19, 65:1, 65:2, 65:9, 69:5, 69:16, 69:17, 71:4, 71:21, 72:20
**observe** [1] - 5:17
**observing** [1] - 5:23
**occasion** [1] - 76:6
**October** [1] - 57:7
**OF** [4] - 1:2, 1:8, 80:4, 80:13
**OFF** [1] - 7:13
**offered** [1] - 24:24
**Office** [21] - 6:19, 7:21, 8:6, 8:20, 10:4, 10:6, 11:16, 11:20, 13:3, 13:6, 13:7, 13:11, 13:22, 14:14, 14:25, 15:7, 18:22, 49:4, 49:6, 49:9, 53:20
   **office** [1] - 66:23
   **OFFICE** [1] - 1:19
   **Office's** [1] - 11:24
   **officer** [8] - 4:4, 4:13, 5:12, 66:2, 76:1, 76:8, 77:11, 77:16
   **officer's** [2] - 76:2, 76:8
   **offices** [2] - 54:10, 54:12
   **OFFICIAL** [1] - 80:4
   **Official** [1] - 1:22
**often** [1] - 48:18
**older** [1] - 52:9
**once** [1] - 77:11
**one** [30] - 5:7, 6:16, 6:21, 14:20, 19:9, 21:15, 26:6, 28:3, 30:6, 30:9, 30:12,

00000686

31:10, 31:15, 31:22, 34:20, 35:14, 35:20, 42:17, 43:9, 54:9, 55:15, 59:20, 66:16, 66:18, 67:23, 68:17, 69:10, 73:9, 77:16

**opening** [3] - 4:25, 8:24, 9:3

**operate** [2] - 17:1, 17:4

**operation** [1] - 70:20

**operations** [1] - 61:19

**operator** [1] - 53:7

**opinion** [4] - 5:21, 5:22, 5:24, 6:23

**opinions** [2] - 5:17, 6:4

**opportunity** [1] - 6:3

**opposite** [1] - 21:25

**option** [3] - 57:5, 57:11, 57:12

**oranges** [2] - 47:2

**order** [2] - 6:2, 73:23

**ordered** [1] - 24:15

**orders** [1] - 26:16

**originally** [1] - 75:4

**outlines** [1] - 11:5

**outside** [1] - 5:7

**overall** [1] - 47:19

**overcharged** [1] - 13:23

**overcharging** [3] - 10:9, 13:13, 16:6

**overruled** [3] - 36:19, 39:25, 47:14, 65:2, 69:17

**own** [3] - 3:15, 16:17, 77:15

**P**

**p.m.)** [1] - 80:1

**package** [3] - 50:9, 50:13, 50:14

**packing** [1] - 53:18

**page** [37] - 12:14, 18:24, 19:21, 20:1, 20:5, 22:8, 22:11, 23:6, 29:6, 30:13, 30:21, 31:4, 31:10, 31:12, 31:15, 31:23, 33:6, 33:20, 35:4, 37:1, 37:4, 38:6, 38:11, 38:25, 40:5, 41:4, 42:11, 46:20, 50:3, 51:11, 51:25, 52:1, 56:21, 57:1

**Page** [1] - 32:23

**pages** [37] - 10:18, 11:6, 11:10, 11:17, 12:9, 12:10, 13:12, 13:25, 14:3, 14:16, 15:2, 15:8, 15:17, 15:24, 16:15, 17:2, 24:8, 31:9, 33:5, 33:14, 38:24, 39:6, 40:6, 46:12, 46:18, 52:23, 54:2, 55:7, 55:8, 56:4, 56:6, 58:4, 58:13, 78:3

**Pages** [2] - 31:15, 31:22

**paid** [9] - 13:19, 54:7, 54:10, 55:12, 64:8, 64:15, 64:16, 65:4, 75:15

**papers** [1] - 73:14

**paragraph** [1] - 78:17

**Paragraph** [1] - 78:22

**paralegal** [3] - 3:5, 3:20, 3:22

**paralegals** [1] - 48:20

**part** [4] - 50:8, 50:13, 50:14, 50:24

**particular** [27] - 10:13, 22:25, 26:9, 32:4, 32:17, 32:21, 36:14, 36:25, 38:1, 40:19, 43:9, 43:11, 47:16, 48:21, 48:23, 51:12, 53:13, 56:10, 61:7, 63:2, 66:23, 67:8, 68:8, 68:22, 72:14, 72:19

**parties** [6] - 4:18, 14:12, 27:4, 43:21, 44:4, 48:19

**party** [2] - 5:9, 13:3

**Party** [1] - 1:18

**pass** [1] - 8:8

**passed** [2] - 53:9, 53:17

**pattern** [1] - 35:9

**pay** [4] - 15:18, 55:11, 56:8, 58:21

**payables** [1] - 75:12

**paying** [4] - 61:8, 75:12, 77:18, 78:10

**payment** [1] - 76:19

**payments** [2] - 17:6, 58:1

**pen** [1] - 28:13

**people's** [1] - 5:23

**per** [64] - 10:18, 11:5, 11:10, 11:16, 12:9, 12:10, 12:14, 13:12, 13:24, 14:3, 14:15, 15:2, 15:8, 15:17, 15:24, 16:15, 17:2, 23:6, 29:5, 30:13, 30:21, 31:4, 31:10, 31:12, 31:15, 31:23, 32:4, 32:18, 33:6, 33:14, 33:20, 35:3, 37:1, 37:4, 38:6, 38:11, 38:18, 38:25, 39:6, 41:4, 42:11, 46:12, 46:18, 46:20, 51:6, 51:10, 51:11, 51:18, 51:19, 51:22, 51:25, 52:1, 52:23, 54:1, 55:8, 56:4, 56:6, 58:4, 58:13, 67:14, 68:24, 70:1, 78:3

**Per** [1] - 40:6

**per-10** [3] - 36:3, 36:13, 36:23

**per-10-copy** [11] - 6:17, 10:7, 12:11, 12:13, 14:6, 51:8, 51:12, 56:10, 58:8, 77:6, 78:5

**per-100** [2] - 69:3, 71:12

**per-100-page** [1] - 69:15

**percent** [3] - 56:15, 56:16, 56:17

**perfect** [3] - 48:22, 53:14, 53:16

**perform** [2] - 35:13, 45:6

**perhaps** [3] - 7:8, 24:12, 43:22

**period** [1] - 72:12

**permit** [2] - 25:5, 43:16

**permitted** [1] - 8:6

**person** [2] - 19:4, 19:6

**personally** [1] - 16:4

**perspective** [1] - 61:18

**Philadelphia** [1] - 54:10

**phone** [4] - 7:15, 62:10, 73:1, 77:13

**phrased** [1] - 35:18

**physically** [2] - 64:12, 73:8

**place** [1] - 7:7

**plainly** [1] - 26:19

**Plaintiff** [2] - 1:4, 1:12

**PLAINTIFF** [5] - 17:20, 19:19, 27:9, 37:23, 60:12

**plaintiff** [4] - 2:10, 8:25, 17:10, 60:21

**Plaintiff's** [35] - 18:12, 18:17, 19:11, 19:14, 19:17, 22:3, 22:4, 26:24, 27:5, 27:7, 28:12, 28:15, 28:16, 31:3, 31:16, 31:24, 32:12, 37:9, 37:20, 41:9, 42:22, 43:12, 43:13, 44:14, 49:12, 50:4, 50:11, 50:19, 52:12, 53:23, 54:14, 54:21, 55:13, 55:21, 56:20

**playing** [1] - 46:25

**podium** [1] - 20:19

**point** [8] - 7:19, 8:11, 26:14, 59:15, 63:7, 63:18, 66:11, 75:10

**portion** [1] - 52:2

**position** [4] - 18:3, 60:25, 61:13, 61:14

**possible** [1] - 67:19

**posture** [1] - 5:11

**potter** [1] - 8:20

**practice** [1] - 43:10

**practitioners** [2] - 48:19, 49:1

**preclude** [1] - 16:18

**predecessor** [1] - 43:13

**preface** [1] - 35:16

**preference** [1] - 59:16

**preferences** [1] - 59:12

**preferred** [1] - 74:7

**preliminary** [2] - 8:23, 8:24

**prepared** [3] - 4:24, 19:13, 49:18

**presence** [1] - 4:12

**present** [2] - 5:1, 6:2

**presented** [2] - 9:9, 25:9

**president** [5] - 4:5, 18:4, 18:5, 18:10, 48:10

**PRESS** [1] - 1:6

**Press** [128] - 3:3, 3:4, 3:16, 4:3, 4:4, 4:6, 4:18, 6:18, 9:11, 9:12, 9:17, 9:20, 10:4, 10:5, 10:20, 10:25, 11:1, 11:12, 11:14, 11:16, 11:21, 12:16, 12:20, 12:21, 13:3, 13:9, 13:10, 13:11, 13:21, 13:23, 13:25, 14:5, 14:15, 15:1, 15:3, 15:5, 15:9, 15:12, 15:13, 15:14, 16:3, 16:5, 16:7, 16:13, 16:24, 17:3, 18:3, 18:4, 18:5, 18:7, 18:9, 18:11, 23:10, 25:2, 27:14, 34:4, 34:7, 34:13, 35:2, 35:6, 35:9, 35:12, 39:18, 39:21, 40:3, 40:11, 40:17, 40:18, 40:23, 41:2, 41:25, 42:6, 45:6, 46:14, 47:12, 48:10, 48:12, 48:13, 48:14, 48:15, 48:24, 49:5, 49:8, 49:19, 49:25, 50:15, 52:2, 52:7, 52:19, 52:24, 53:19, 53:20, 54:4, 54:7, 54:11, 54:18, 54:23, 55:2, 55:5, 55:17, 55:18, 55:19, 55:23, 56:1, 56:3, 56:12, 56:17, 58:7, 58:10, 58:13, 58:15, 58:23, 59:2, 63:22, 64:5, 64:7, 64:8, 64:10, 64:15, 65:4, 76:14, 76:17, 76:21, 78:20

**Press'** [16] - 16:16, 34:24, 35:2, 35:25, 37:16, 49:13, 53:2, 53:25, 57:14, 58:1, 76:12

**pressure** [2] - 51:14, 51:15

**pressure-sensitive** [2] - 51:14, 51:15

**price** [38] - 10:2, 10:6, 10:8, 11:5, 11:6, 11:11, 11:16, 12:10, 13:12, 13:24, 14:15, 15:1, 15:9, 15:16, 15:24, 16:8, 16:13, 16:14, 16:16, 16:17, 17:1, 17:5, 23:4, 37:1, 37:4, 37:5, 49:25, 50:16, 52:9, 52:19, 52:25, 54:1, 55:9, 56:5, 56:6, 58:4, 78:2

**priced** [1] - 16:10

**prices** [2] - 73:13, 73:15

**pricing** [2] - 23:1, 47:2

**Prince** [1] - 18:1

**print** [1] - 53:8

**printed** [8] - 10:24, 10:25, 32:3, 32:18, 33:6, 38:17, 38:24, 53:16

**printer** [3] - 22:25, 48:15, 48:16

**Printing** [22] - 6:19, 7:21, 8:6, 8:20, 10:4, 10:5, 11:15, 11:20, 11:24, 13:2, 13:6, 13:7, 13:11, 13:21, 14:14, 14:25, 15:7, 18:22, 49:4, 49:6, 49:9, 53:20

**printing** [16] - 13:16, 13:18, 16:2, 29:9, 29:16, 29:20, 38:2, 48:17, 48:18, 54:4, 58:10, 61:8, 61:9, 75:4, 75:6, 75:13

**proceed** [12] - 3:9, 3:14, 4:17, 4:19, 4:23, 5:3, 17:18, 19:15, 20:8, 21:13, 25:14, 60:11

**proceeded** [1] - 76:17

**proceeding** [1] - 3:15

**proceedings** [2] - 21:17, 80:7

**Proceedings** [1] - 1:25

**process** [5] - 22:24, 40:7, 53:22, 66:18, 70:22

**processed** [2] - 65:5, 65:18, 76:14

**processes** [2] - 70:20, 70:21

**processing** [22] - 61:9, 61:23, 61:24, 63:20, 63:25, 64:2, 64:5, 64:7, 66:12, 66:22, 66:23, 68:9, 68:11, 68:13, 73:17, 73:18, 73:19, 73:23, 76:5, 76:18, 77:24, 78:1

**procurement** [1] - 16:2

**produce** [3] - 47:3, 47:23

**produced** [1] - 1:25

**producing** [1] - 47:3

**product** [2] - 47:4, 52:16

**production** [5] - 27:19, 50:4, 52:11, 56:21, 74:25

**profit** [1] - 47:23

**program** [6] - 43:2, 44:19, 44:21, 49:13, 52:3, 53:7

**programming** [1] - 53:7

**proof** [3] - 31:10, 31:15, 31:22

**proofs** [1] - 31:12

**properly** [4] - 13:19, 61:16, 61:19, 75:15

**prospective** [3] - 11:21, 12:9, 16:10

**protect** [1] - 8:7

**provide** [21] - 54:4, 58:10, 63:8, 64:9, 64:20, 64:23, 65:22, 65:23, 65:25, 66:4, 66:6, 66:14, 66:20, 67:1, 67:11, 67:15, 67:20, 68:3, 68:19, 68:21, 76:4

**provided** [5] - 21:24, 63:12, 64:11, 65:23, 66:1

**provides** [2] - 36:13, 54:8

**pull** [3] - 11:2, 14:17, 73:7

**pulls** [1] - 44:21

**purely** [2] - 6:12, 6:23

**purpose** [1] - 25:6

**purposes** [1] - 23:22

**pursuant** [3] - 23:10, 25:2, 55:20

## Q

**quantity** [4] - 26:9, 37:4, 40:14, 46:25

**questioning** [3] - 63:4, 63:16, 66:3

**questions** [10] - 19:9, 19:12, 19:15, 26:19, 48:1, 59:4, 66:2, 72:18, 74:2, 79:7

**qui** [2] - 12:20, 12:22

**quite** [1] - 62:16

**quote** [5] - 14:17, 29:16, 29:17, 72:8

**quote/unquote** [1] - 71:19

## R

**raise** [2] - 75:18, 75:19

**raised** [2] - 58:23, 59:1

**rate** [115] - 6:17, 10:8, 12:11, 12:13, 14:6, 15:9, 22:19, 22:21, 22:23, 22:24, 23:3, 23:5, 23:8, 26:4, 26:5, 26:6, 26:8, 30:19, 30:20, 30:23, 31:2, 32:17, 32:20, 32:21, 33:3, 33:10, 33:12, 33:18, 33:23, 34:4, 34:7, 34:14, 34:15, 34:24, 34:25, 35:3, 35:6, 35:10, 36:3, 36:13, 36:14, 36:23, 37:2, 37:6, 38:14, 38:21, 39:3, 39:11, 39:14, 39:18, 39:19, 39:21, 40:3, 40:8, 40:20, 43:11, 45:24, 46:7, 46:15, 47:23, 51:8, 51:12, 52:1, 52:22, 52:25, 53:2, 55:7, 55:9, 56:4, 56:10, 58:8, 67:21, 68:4, 68:6, 68:8, 68:15, 68:16, 68:17, 68:20, 68:21, 68:22, 68:24, 68:25, 69:1, 69:3, 69:7, 69:8, 69:11, 69:13, 69:15, 69:18, 69:22, 69:25, 70:1, 70:2, 70:3, 70:4, 70:7, 70:8, 70:11, 70:12, 70:15, 70:25, 71:1, 71:2, 71:10, 71:12, 71:14, 71:16, 71:19, 71:25, 72:11, 77:7, 78:5

**rates** [9] - 67:16, 69:24, 70:17, 70:18, 70:19, 70:22,

70:24, 71:1

**re** [1] - 40:1

**re-ask** [1] - 40:1

**reach** [1] - 8:11

**read** [1] - 40:20

**reading** [3] - 30:11, 41:4, 46:11

**reads** [4] - 29:16, 29:20, 46:11, 46:17

**ready** [3] - 3:9, 4:23, 53:9

**realize** [3] - 7:22, 29:14, 76:20

**really** [1] - 47:18

**reason** [1] - 9:21

**reasons** [1] - 21:10

**Rebecca** [1] - 80:6

**REBECCA** [1] - 1:22

**received** [4] - 11:23, 61:20, 65:20, 75:6

**receiving** [1] - 60:20

**recent** [1] - 26:16

**recess** [6] - 43:22, 59:12, 59:15, 79:21, 80:1

**Recess** [1] - 44:8

**recognize** [7] - 7:23, 18:19, 20:10, 21:6, 27:16, 37:13, 42:23

**recognizes** [1] - 21:5

**recollect** [2] - 73:13, 76:23

**recollection** [3] - 25:5, 25:7, 25:14

**reconvene** [2] - 59:13, 79:22

**record** [14] - 1:6, 3:11, 3:13, 5:19, 17:25, 19:17, 21:17, 24:1, 27:12, 30:10, 48:22, 53:8, 74:14, 80:7

**RECORD** [1] - 7:13

**Record** [139] - 3:3, 3:4, 3:16, 4:3, 4:4, 4:6, 4:18, 6:18, 9:11, 9:12, 9:17, 9:20, 10:4, 10:5, 10:20, 10:25, 11:1, 11:12, 11:14, 11:16, 11:21, 12:16, 12:20, 12:21, 13:3, 13:9, 13:10, 13:11, 13:21, 13:23, 13:25, 14:5, 14:14, 15:1, 15:3, 15:5, 15:9, 15:12, 15:13, 15:14, 16:3, 16:5, 16:7, 16:13, 16:16, 16:24, 17:3, 18:3, 18:4, 18:5, 18:7, 18:9, 18:11, 23:10, 25:2, 27:14, 34:4, 34:7, 34:13, 34:24, 35:2, 35:6, 35:9, 35:12, 35:25, 37:16, 39:18, 39:21, 40:3, 40:11, 40:17, 40:18, 40:23, 41:2, 41:25, 42:6, 45:6, 46:14, 47:12, 48:10, 48:12, 48:13, 48:14, 48:15, 48:24, 49:5, 49:8, 49:13, 49:19, 49:25,

50:15, 52:2, 52:7, 52:19, 52:24, 53:2, 53:19, 53:20, 53:25, 54:4, 54:7, 54:11, 54:18, 54:23, 55:2, 55:5, 55:17, 55:18, 55:19, 55:23, 56:1, 56:3, 56:12, 56:17, 57:14, 58:1, 58:7, 58:10, 58:13, 58:15, 58:23, 59:2, 63:22, 64:5, 64:7, 64:8, 64:10, 64:15, 65:4, 76:12, 76:14, 76:17, 76:21, 78:20

**RECROSS** [1] - 2:2

**redirect** [2] - 59:6, 79:8

**REDIRECT** [1] - 2:2

**reduced** [2] - 56:15, 56:17

**refer** [25] - 23:3, 23:8, 30:11, 30:12, 30:17, 31:10, 32:15, 32:25, 33:8, 33:15, 33:21, 37:15, 38:11, 38:19, 39:1, 39:8, 40:13, 49:11, 51:5, 52:5, 54:14, 55:13, 56:20, 57:9, 70:21

**reference** [2] - 3:12, 22:19

**referenced** [4] - 33:1, 33:9, 33:17, 33:22

**referencing** [8] - 35:25, 38:12, 38:20, 39:2, 39:9, 40:5, 40:20, 41:16

**referred** [5] - 3:19, 8:3, 67:17, 70:6, 77:11

**referring** [16] - 20:24, 30:13, 40:9, 41:15, 46:1, 63:10, 63:12, 67:7, 69:7, 69:18, 69:24, 70:1, 70:7, 70:11, 70:24, 71:1

**refers** [7] - 29:4, 29:9, 38:1, 44:19, 53:5, 67:8, 72:8

**reflect** [6] - 19:17, 26:12, 34:12, 34:22, 46:24, 51:19

**reflected** [3] - 34:8, 47:7, 64:24

**reflecting** [2] - 47:8, 58:15

**reflects** [1] - 3:13

**refresh** [1] - 24:25

**refreshing** [1] - 25:7

**regard** [1] - 7:8

**regarding** [10] - 19:15, 21:7, 26:19, 32:8, 34:21, 63:9, 64:9, 67:11, 67:12, 67:16

**regards** [3] - 61:25, 67:3, 72:12

**reiterate** [1] - 45:5

**rel** [2] - 3:3, 78:20

**related** [4] - 10:21, 26:3, 71:10, 76:25

**relating** [1] - 9:8

**relation** [1] - 63:2

**relator** [4] - 3:4, 9:7, 12:19, 12:22

00000688

relevance [6] - 25:21,
25:24, 26:14, 42:24, 45:10,
45:15
  relevant [5] - 5:17, 26:15,
44:23, 45:13, 45:20
  reluctant [1] - 29:14
  remain [1] - 44:1
  remainder [1] - 79:4
  remember [6] - 64:11,
64:14, 71:15, 72:4, 72:13,
72:16
  removing [1] - 28:12
  renew [3] - 57:12, 57:14,
57:19
  renewed [2] - 15:16, 17:3
  repeat [5] - 23:7, 36:9,
46:13, 61:2, 63:23
  rephrase [6] - 19:5, 30:24,
34:10, 65:10, 69:9, 72:23
  report [1] - 77:21
  reported [2] - 1:25, 61:17
  reporter [1] - 20:21
  REPORTER [2] - 80:4,
80:13
  Reporter [1] - 1:22, 1:22
  representative [1] - 76:17
  represents [1] - 37:6
  request [12] - 8:8, 8:14,
11:24, 12:3, 15:7, 26:2,
49:17, 49:19, 49:22, 49:25,
50:8, 50:22
  requested [2] - 4:22, 8:5
  require [2] - 7:3, 70:20
  required [4] - 5:21, 40:7,
49:23, 61:14
  requires [3] - 14:8, 14:9,
36:23
  requiring [1] - 36:25
  respect [25] - 3:15, 5:8,
6:15, 8:4, 14:11, 16:20,
26:16, 30:8, 30:22, 34:12,
34:17, 34:18, 34:22, 36:15,
39:17, 40:5, 47:15, 51:2,
51:7, 51:24, 58:24, 59:2,
61:10, 67:2, 72:21
  respond [8] - 25:23, 62:14,
62:18, 63:13, 63:14, 63:15,
72:17
  response [7] - 15:7, 24:14,
25:24, 62:23, 63:24, 64:20,
68:12
  responsibilities [3] - 74:23,
75:3, 75:9
  responsibility [1] - 13:18
  responsible [5] - 16:2,
61:8, 61:15, 75:12, 76:5
  result [2] - 65:14, 65:16
  resume [1] - 44:6
  retired [2] - 74:19, 74:21
  retrieve [2] - 7:16, 43:20

return [1] - 44:10
  review [6] - 13:9, 21:21,
52:2, 62:6, 62:8, 73:25
  reviewed [11] - 5:19, 13:7,
13:8, 15:23, 16:4, 16:5,
44:16, 49:18, 75:5, 75:6
  reviewing [5] - 13:18,
15:20, 16:24, 62:15, 75:14
  ROBINSON [1] - 1:9
  role [4] - 8:1, 61:7, 61:10,
61:11
  Roman [27] - 22:11, 22:18,
30:18, 31:17, 32:2, 32:16,
33:1, 33:9, 33:22, 34:3, 34:6,
34:13, 34:23, 35:4, 35:7,
35:10, 38:7, 38:12, 38:20,
39:2, 39:9, 39:15, 39:17,
50:25, 51:11, 51:15, 52:15
  Room [1] - 1:23
  room [2] - 7:4, 59:19
  rooms [1] - 5:7
  Rosa [1] - 77:20
  row [2] - 5:4, 7:23
  RP [42] - 19:22, 19:25, 20:1,
20:5, 22:9, 22:12, 22:15,
23:15, 24:2, 24:5, 30:18,
31:12, 32:2, 32:16, 33:1,
33:9, 33:17, 33:22, 35:4,
38:12, 38:20, 39:2, 39:9,
40:5, 40:7, 40:10, 41:16,
42:3, 42:4, 44:17, 44:18,
46:11, 46:17, 46:19, 46:21,
50:4, 50:19, 52:11, 52:12,
56:22
  RPR [1] - 1:22
  rule [2] - 6:6, 7:2
  ruled [1] - 44:22, 44:25
  run [1] - 45:6
  running [103] - 6:17, 10:8,
12:11, 12:13, 14:6, 15:9,
22:19, 22:21, 22:23, 22:24,
23:3, 23:5, 23:8, 26:4, 26:6,
26:8, 30:19, 30:20, 30:22,
31:2, 32:17, 32:20, 32:21,
33:3, 33:10, 33:12, 33:18,
33:23, 34:4, 34:7, 34:14,
34:15, 34:24, 34:25, 35:3,
35:6, 35:10, 36:3, 36:12,
36:14, 36:22, 37:2, 37:6,
38:14, 38:21, 39:3, 39:11,
39:14, 39:18, 39:19, 39:21,
40:3, 43:11, 45:24, 46:7,
46:14, 52:25, 53:2, 56:10,
58:8, 67:16, 67:21, 68:4,
68:6, 68:15, 68:16, 68:17,
68:20, 68:21, 68:22, 69:1,
69:7, 69:8, 69:11, 69:13,
69:22, 70:3, 70:6, 70:7, 70:8,
70:11, 70:12, 70:14, 70:15,
70:19, 70:22, 70:24, 70:25,

71:2, 71:10, 71:14, 71:16,
71:19, 71:25, 72:3, 72:4,
72:10, 72:15, 77:7, 78:5
  runs [1] - 45:6

# S

satisfaction [1] - 77:15
  scope [1] - 6:13
  screen [7] - 10:11, 10:15,
11:5, 11:19, 12:5, 14:17,
52:12
  seat [4] - 17:14, 17:16,
44:10, 60:6
  seated [2] - 3:18, 5:3
  second [4] - 11:7, 14:1,
35:20, 79:4
  Secretary [1] - 10:22
  section [6] - 61:1, 61:4,
61:5, 61:17, 77:15, 77:19
  sections [1] - 61:16
  see [22] - 5:17, 10:10,
10:11, 10:15, 11:4, 11:18,
12:5, 12:6, 12:12, 19:24,
22:18, 29:3, 40:18, 44:18,
47:19, 52:17, 53:22, 54:16,
55:14, 78:19, 78:24
  seeing [4] - 11:14, 12:20,
12:21, 16:25
  seek [1] - 76:7
  senior [2] - 13:14, 16:1
  sensitive [2] - 51:14, 51:15
  sent [3] - 11:20, 49:17,
49:22
  sentence [2] - 78:24, 79:4
  serve [1] - 48:23
  service [1] - 7:11
  services [3] - 54:4, 54:7,
58:10
  SESSION [2] - 1:5, 1:9
  set [1] - 12:4
  shaving [1] - 53:17
  sheet [1] - 12:3
  shock [1] - 78:13
  short [1] - 59:18
  shorthand [1] - 1:25
  show [14] - 9:10, 9:17, 9:22,
11:7, 13:22, 14:1, 14:4, 14:7,
15:13, 16:12, 16:15, 16:21,
25:6, 29:24
  shown [1] - 20:24
  shows [2] - 16:9, 51:2
  sic [2] - 15:13, 77:7
  side [4] - 4:24, 5:4, 12:2,
21:15
  signature [3] - 18:23,
18:24, 80:13
  significance [1] - 29:15
  simple [3] - 6:21, 9:20, 10:1

simply [4] - 6:24, 24:24,
45:20, 65:21
  single [5] - 10:2, 10:3,
10:13, 26:10, 35:20
  sit [1] - 8:7
  sitting [1] - 25:19
  six [3] - 23:5, 48:20, 74:25
  size [30] - 10:3, 10:7, 10:14,
10:16, 11:4, 11:8, 12:7,
13:23, 33:13, 39:5, 46:12,
46:15, 46:18, 46:20, 51:25,
52:16, 53:5, 53:6, 53:12,
54:1, 54:23, 55:2, 55:23,
58:5, 63:3, 67:6, 69:2, 69:14,
77:7, 78:2
  slightly [2] - 5:10
  smaller [1] - 41:7
  Smith [1] - 77:20
  solely [1] - 43:1
  solo [2] - 48:19, 48:25
  someone [1] - 3:20
  sorry [13] - 8:18, 20:18,
23:7, 29:12, 31:6, 34:10,
45:12, 55:20, 61:2, 61:12,
64:19, 69:5, 71:8
  sort [2] - 12:23, 13:1
  sounded [1] - 20:23
  speaking [2] - 37:25, 43:2
  specialist [1] - 75:4
  specific [10] - 24:21, 62:16,
62:20, 66:17, 66:18, 67:13,
67:22, 67:24, 70:21, 72:12
  specifically [10] - 61:25,
62:25, 63:3, 64:15, 65:3,
70:13, 71:16, 72:2, 72:14,
76:5
  spectator [1] - 8:2
  spell [1] - 74:17
  spoken [1] - 73:9
  spotted [1] - 75:17
  spreadsheet [30] - 11:19,
11:20, 11:23, 12:2, 12:15,
16:9, 20:10, 20:13, 21:5,
21:6, 21:8, 21:21, 40:9,
40:12, 41:16, 42:14, 44:15,
44:16, 44:19, 50:6, 50:13,
50:15, 52:2, 52:6, 52:7,
72:18, 73:11, 73:14
  stack [4] - 24:2, 24:11, 25:6
  staff [1] - 48:20
  stand [5] - 8:6, 17:14,
44:10, 59:25, 60:7
  stapled [1] - 50:14
  state [1] - 17:24, 27:12,
57:1
  statement [4] - 4:24, 4:25,
9:3, 20:17, 20:25, 21:12,
24:1
  statements [1] - 8:24
  STATES [2] - 1:1, 1:10

00000689

**States** [7] - 1:19, 3:3, 3:13, 3:14, 10:4, 10:5, 78:20
**status** [2] - 6:11, 23:21
**statute** [1] - 12:23
**stay** [3] - 8:2, 41:1, 41:17
**step** [5] - 43:25, 59:9, 59:24, 67:23, 79:12
**stepping** [1] - 68:1
**steps** [1] - 75:19
**still** [13] - 4:8, 5:24, 7:11, 28:22, 49:8, 57:22, 58:4, 58:10, 58:13, 58:15, 58:21, 63:14, 70:10
**stipulate** [4] - 19:8, 27:4, 37:17, 37:18
**stipulation** [2] - 19:10, 28:3
**stock** [2] - 51:14, 51:15
**Stonestreet** [1] - 80:6
**STONESTREET** [1] - 1:22
**stranger** [1] - 12:19
**Street** [4] - 1:12, 1:16, 1:20, 18:1
**subject** [1] - 67:7
**submission** [2] - 11:24, 49:18
**submit** [3] - 17:4, 54:9, 54:11
**submitted** [6] - 9:11, 9:13, 15:10, 25:2, 52:19, 52:24
**substance** [1] - 19:15
**substitution** [1] - 28:22
**sufficient** [1] - 7:16
**suggest** [2] - 25:8, 26:18
**suit** [1] - 12:22
**Suite** [1] - 1:13
**Sullivan** [2] - 16:1, 16:8
**supervisor** [1] - 75:11
**supervisors** [2] - 61:17, 73:9
**supplied** [1] - 15:6
**surprised** [1] - 25:18
**suspended** [1] - 58:1
**sustain** [2] - 21:9, 26:13
**sustained** [6] - 31:20, 41:22, 45:11, 65:10, 71:5, 71:22
**sworn** [4] - 17:14, 17:20, 60:6, 60:12

**T**

**table** [5] - 3:18, 4:12, 25:19, 32:23, 60:1
**tall** [1] - 24:12
**tam** [2] - 12:20, 12:22
**technical** [1] - 4:21
**term** [12] - 10:2, 15:16, 16:16, 16:17, 57:1, 57:4, 67:4, 67:5, 70:11, 71:10,
72:8
**terminated** [1] - 57:24
**terms** [7] - 49:25, 50:16, 66:9, 66:10, 66:11, 66:13, 66:14
**testified** [14] - 17:21, 21:7, 26:9, 35:12, 44:16, 45:5, 45:7, 45:23, 46:24, 60:13, 63:1, 71:9, 71:11
**testify** [6] - 5:24, 15:3, 15:11, 15:14, 15:22, 43:14
**testifying** [5] - 6:12, 16:8, 21:25, 24:25, 47:11
**testimony** [51] - 4:8, 4:15, 5:15, 5:16, 5:18, 5:22, 5:23, 5:25, 6:2, 6:3, 6:13, 6:14, 6:22, 7:5, 7:9, 10:12, 12:1, 16:23, 20:24, 21:2, 21:25, 25:10, 26:12, 31:14, 31:19, 34:1, 34:11, 34:17, 34:21, 34:22, 35:17, 39:13, 42:13, 44:1, 44:2, 44:3, 44:19, 45:3, 45:5, 46:14, 47:7, 59:14, 63:21, 65:21, 70:10, 70:23, 71:3, 71:21, 71:24, 72:21
**text** [12] - 12:13, 23:5, 31:9, 31:15, 31:22, 33:6, 37:1, 37:4, 38:24, 41:4, 42:11, 51:11
**Text** [2] - 33:20, 35:3
**that..** [1] - 70:22
**THE** [123] - 1:2, 1:9, 3:8, 3:11, 3:24, 4:1, 4:4, 4:7, 4:11, 4:16, 5:6, 5:9, 6:5, 7:1, 7:13, 7:14, 7:18, 7:22, 8:1, 8:10, 8:13, 8:16, 8:22, 9:2, 9:5, 9:24, 17:8, 17:11, 17:12, 17:13, 17:16, 17:17, 17:18, 18:15, 19:10, 19:25, 20:4, 20:6, 20:7, 20:19, 21:3, 21:9, 22:6, 22:16, 23:19, 23:25, 24:5, 24:8, 24:11, 24:14, 25:4, 25:13, 25:24, 26:13, 27:1, 27:7, 27:25, 28:10, 28:18, 28:21, 28:25, 29:8, 29:13, 29:25, 30:3, 30:10, 30:24, 31:20, 32:6, 35:18, 36:6, 36:8, 36:9, 36:16, 36:18, 36:19, 37:11, 37:20, 39:25, 41:22, 42:18, 42:20, 43:3, 43:7, 43:16, 43:25, 44:5, 44:6, 44:9, 44:22, 45:9, 45:11, 45:15, 45:19, 46:1, 47:14, 48:2, 59:5, 59:8, 59:10, 59:11, 59:19, 60:1, 60:4, 60:9, 60:10, 60:11, 65:2, 65:10, 69:9, 69:17, 71:5, 71:22, 72:6, 72:23, 74:3, 74:8, 78:15, 79:8, 79:11, 79:15, 79:18, 79:25
**therefore** [1] - 45:19
**thinking** [1] - 76:24
**thinks** [1] - 9:16
**third** [3] - 8:19, 14:7, 29:14
**thousands** [1] - 25:18
**three** [4] - 8:17, 14:24, 24:5, 61:16
**three-digit** [1] - 24:5
**throughout** [1] - 14:20
**to..** [1] - 36:15
**today** [18] - 5:16, 9:6, 10:11, 12:1, 12:18, 13:1, 13:14, 14:14, 14:24, 15:22, 16:23, 22:1, 23:23, 57:22, 60:18, 63:21, 65:21, 71:24
**Tom** [1] - 16:1
**top** [1] - 44:18
**total** [4] - 37:5, 47:10, 47:16, 55:1
**toward** [1] - 56:22
**transcript** [2] - 1:25, 80:7
**TRANSCRIPT** [1] - 1:8
**transcription** [1] - 1:25
**transferred** [2] - 73:10, 75:1
**trial** [2] - 3:7, 4:17
**TRIAL** [1] - 1:8
**trimming** [36] - 10:3, 10:7, 10:14, 10:16, 11:4, 11:8, 12:6, 13:23, 33:13, 39:5, 46:11, 46:15, 46:18, 46:19, 51:25, 52:16, 53:5, 53:6, 53:12, 53:17, 54:1, 54:23, 55:2, 55:23, 58:5, 61:25, 63:3, 67:6, 68:23, 69:2, 69:14, 69:23, 69:25, 71:12, 77:7, 78:2
**true** [6] - 5:13, 63:21, 72:5, 72:10, 79:4, 79:5
**try** [3] - 9:15, 9:19, 34:20
**trying** [3] - 19:13, 63:15, 66:25
**turn** [2] - 8:24, 26:18
**twice** [2] - 57:15, 57:21
**two** [14] - 6:14, 6:15, 7:19, 8:2, 8:16, 10:20, 23:23, 24:17, 24:20, 24:21, 26:19, 32:8, 43:4, 43:19, 44:23, 54:9, 54:11, 77:17
**TYLER** [1] - 1:12
**Tyler** [1] - 3:4
**type** [2] - 48:14, 53:4
**typeset** [4] - 29:5, 30:13, 30:20, 31:3
**Typeset** [2] - 38:6, 38:11
**typesetter** [1] - 75:1
**typical** [1] - 12:21

**U**

**U.S** [5] - 1:19, 1:23, 7:24, 18:22, 49:18
**unclear** [1] - 34:17
**under** [26] - 9:8, 9:12, 12:8, 15:15, 17:4, 21:15, 27:15, 29:13, 34:3, 34:6, 39:15, 39:22, 40:4, 40:17, 40:22, 41:2, 41:24, 44:2, 50:25, 52:15, 54:5, 54:8, 54:20, 58:2, 58:10, 63:2
**understood** [3] - 15:1, 16:8, 24:18
**undertake** [1] - 62:3
**unfortunately** [2] - 21:18, 56:19
**unit** [1] - 40:20
**UNITED** [2] - 1:1, 1:10
**United** [7] - 1:19, 3:2, 3:13, 3:14, 10:4, 10:5, 78:20
**unlawful** [1] - 43:10
**unreasonable** [3] - 15:13, 16:16, 16:17
**unthinkable** [1] - 14:21
**up** [14] - 10:11, 10:23, 11:2, 14:17, 20:16, 21:17, 45:4, 52:13, 67:25, 71:7, 73:7, 73:10, 77:13, 77:23
**USC** [1] - 9:8
**uses** [1] - 70:12

**V**

**vague** [1] - 30:8, 30:22, 32:5, 34:18, 36:5, 36:15, 41:21, 62:19, 69:5, 69:6, 71:4
**VALDEZ** [2] - 1:18, 79:13
**Valdez** [5] - 7:23, 8:4, 8:5, 59:23, 79:19
**Valerie** [2] - 3:6, 3:21
**various** [1] - 46:22
**vendor** [3] - 12:16, 15:15, 75:22
**vendors** [7] - 11:21, 11:22, 12:9, 16:3, 16:10, 75:13, 75:14
**verified** [2] - 78:18, 78:19
**verify** [3] - 73:23, 77:16, 78:10
**versus** [1] - 3:3
**veteran** [2] - 13:17, 15:20
**via** [1] - 49:17
**victim** [1] - 13:5
**virtually** [1] - 21:18
**voices** [1] - 21:16
**voluminous** [1] - 53:8

## W

**wait** [2] - 5:7, 7:3
**waiting** [1] - 59:22
**Washington** [6] - 1:13, 1:17, 1:20, 1:23, 54:9, 54:10
**whatsoever** [1] - 7:15
**whistleblower** [1] - 12:23
**white** [1] - 51:15
**whole** [1] - 52:6
**William** [2] - 3:5
**WILLIAM** [2] - 1:15, 1:15
**WILMOT** [3] - 2:3, 4:2, 17:20
**Wilmot** [70] - 3:6, 4:2, 4:4, 4:9, 4:15, 5:10, 15:3, 15:11, 17:10, 17:11, 17:24, 18:1, 18:3, 18:12, 18:17, 18:19, 19:21, 20:4, 21:5, 21:21, 22:3, 22:8, 22:9, 23:16, 24:25, 25:4, 25:18, 26:8, 26:23, 27:3, 27:11, 28:14, 29:19, 30:7, 31:2, 31:14, 31:22, 34:1, 34:20, 35:6, 35:12, 36:7, 36:17, 36:22, 37:8, 37:13, 37:25, 39:21, 41:6, 41:24, 42:4, 42:13, 42:22, 42:23, 43:14, 44:1, 44:9, 44:16, 44:20, 45:3, 45:23, 46:13, 46:21, 47:25, 48:8, 49:11, 56:21, 59:9, 76:17, 76:21
**Wilmot's** [2] - 4:12, 15:2
**winner** [1] - 40:16
**wish** [3] - 6:6, 6:8, 74:4
**withdraw** [1] - 44:14
**WITNESS** [9] - 2:2, 17:12, 17:17, 20:6, 36:8, 36:18, 44:5, 59:10, 60:10
**Witness** [3] - 19:23, 56:23, 78:23
**witness** [34] - 3:6, 5:4, 5:7, 5:20, 5:22, 6:12, 7:3, 7:4, 7:24, 8:21, 17:9, 17:14, 17:20, 18:14, 21:12, 23:18, 23:24, 25:9, 25:13, 26:25, 28:3, 28:4, 28:8, 28:9, 37:10, 42:19, 44:10, 59:14, 59:19, 60:7, 60:12, 69:6, 79:23, 79:24
**witnesses** [9] - 6:6, 6:22, 7:2, 7:20, 7:23, 8:6, 8:7, 14:25, 59:24
**word** [9] - 11:5, 29:16, 70:13, 71:16, 72:3, 72:12, 72:15
**words** [14] - 21:10, 24:6, 43:3, 46:9, 70:3, 70:8, 70:12, 70:15, 70:25, 71:2, 71:13,

71:25, 72:10
**wrap** [2] - 45:4, 53:15
**wraparound** [1] - 23:4
**written** [1] - 40:6
**wrongdoing** [1] - 13:1

## X

**Xerox** [1] - 53:7 

## Y

**year** [2] - 57:5, 57:6
**years** [14] - 13:16, 15:6, 49:7, 57:5, 57:9, 57:11, 57:12, 71:15, 72:2, 72:13, 74:22, 74:25, 75:11
**York** [1] - 18:2

1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF COLUMBIA

3    BRIAN BURKE                      CIVIL ACTION NO. 08-364

4    VERSUS                           WASHINGTON,D.C.

5    RECORD PRESS, INC.               FEBRUARY 14, 2011

6                                     1:45 P.M.

7              **TRANSCRIPT OF BENCH TRIAL (PM SESSION)**

8              **BEFORE THE HONORABLE DEBORAH H. ROBINSON**

9            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

10   <u>A P P E A R A N C E S</u>:

11   FOR THE PLAINTIFF,              Tyler J. King, Esq.
                                     1420 N Street, NW
12                                   Suite 706
                                     Washington, DC 20005
13                                   (202) 436-2641

14   FOR THE DEFENDANT,             John William Lomas, Esq.
                                    MCKENNA LONG & ALDRIDGE LLP
15                                  1900 K Street, NW
                                    Washington, DC 20006
16                                  (202) 496-7183
                                    William T. O'Brien, Esq.
17                                  MCKENNA LONG & ALDRIDGE LLP
                                    1900 K Street, NW  Suite 100
18                                  Washington, DC 20006
                                    (202) 496-7107
19
     REPORTED BY:                   WENDY C. RICARD, RPR, CCR
20                                  OFFICIAL COURT REPORTER
                                    333 Constitution Avenue,NW
21                                  Room #6718
                                    Washington, DC  20001
22                                  202-354-3111

23   Proceedings recorded by mechanical stenography.

24   Transcript produced by computer-aided transcription.

25

00000692

**I N D E X**

**WITNESSES:**                                    **PAGE:**

Morris Gocial..............
      By Mr. King                                 5

Brian Thomas Burke.........
      By Mr. King                                 17
      By Mr. O'Brien........                       30

Raymond Sullivan...........
      By Mr. Lomas..........                       60
      By Mr. King...........                       78

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000693

1                    P–R–O–C–E–E–D–I–N–G–S

2          THE COURT: Now, good afternoon.  Mr.  King.

3          MR. KING:  Yes, Your Honor.  The parties have

4   discussed the possibility of stipulating to damages with the

5   idea being that Mr.  Gocial, the expert for Mr.  Burke, would

6   not be needed to testify.

7              Now, the -- Mr.  Gocial is prepared to testify, and

8   Mr.  Burke, you know, wants him to testify.  Mr.  Burke needs

9   to prove damages.  One of the --

10         THE COURT: Is there any reason that Mr. Gocial cannot

11  testify now?

12         MR. KING:  No.

13         THE COURT: Can we do that, then?

14         MR. KING:  Certainly.

15         THE COURT: Is that without objection, Mr.  Lomas?

16         MR. LOMAS:  Yes, Your Honor.  Thank you.  I think the

17  question is that what we had offered to do is stipulate to the

18  amount of the difference between the charges on the two

19  invoices that Record Press charged and the amount of the

20  charges that would be charged assuming the theory of the case

21  of Mr.  Burke, that the --

22             THE COURT: Well, that stipulation has been rejected.

23  Since Mr.  Gocial is here, he can testify subject, of course,

24  to whatever objections might be made with respect to any

25  individual questions.

00000694

1              MR. LOMAS:  Sure.

2              THE COURT: If the parties wish for Mr.  Gocial to --

3     of if they agree --

4              MR. LOMAS:  No, Your Honor.  I think the issue was --

5              THE COURT: -- that Mr.  Gocial should testify now or

6     if Mr.  King wants him to testify now, then I see no reason why

7     he cannot, and he could then be excused.

8              MR. LOMAS:  Yes, Your Honor.  I think the basis of

9     declining the stipulation seemed to be wanting Mr.  Gocial to

10    testify outside the bounds of what was agreed to at the January

11    31st status conference because he only submitted a report on

12    damages and the amount of damages, and since we'd be offering

13    to stipulate to the amount of damages, it sounds like Mr. King

14    wants to take him outside that scope and discuss matters that

15    are related to liability.

16             THE COURT: Again, I will certainly hear objections to

17    any questions as they are asked, but the stipulation has been

18    rejected, and I gather that it has, then Mr.  Gocial will be

19    sworn, and the inquiry will proceed subject to whatever

20    objections and ruling on objections may arise during his

21    testimony.

22             MR. LOMAS:  Okay.  Thank you, Your Honor.

23             THE COURT: Is that satisfactory?

24             MR. LOMAS:  Yes.

25             MR. KING:  Yes, Your Honor.

00000695

```
1              THE COURT: Mr. King, is it your request to call Mr.
2    Gocial next?
3              MR. KING: Yes, Your Honor.
4              THE COURT: Very well. Good afternoon, sir. Now,
5    let me ask you to please step forward to face the deputy clerk
6    to be sworn.
7    *            *            *            *
8              MORRIS GOCIAL, called as a witness in this case,
9    after having been duly sworn, testified as follows:
10   *            *            *            *
11             THE COURT: Now, good afternoon. Now, I note, sir,
12   that you have a -- you may have a seat. I note that there is a
13   binder in your hand. I will permit you to leave the binder
14   there on the table, but you must keep it closed until such time
15   as the Court has indicated that you are free to review it or to
16   read from portions of it or look at portions of it to refresh
17   your memory during the course of your testimony. We haven't
18   reached that point yet, so I'll direct you to please keep it
19   closed in the meantime.
20             THE WITNESS: I understand.
21             THE COURT: Thank you. Now, Mr. King, please
22   proceed.
23             MR. KING: Thank you, Your Honor.
24   DIRECT EXAMINATION BY MR. KING:
25   Q.  Mr. Gocial, could you please state and spell your name for
```

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000696

1    the record?

2    A.    Morris Gocial; G-O-C-I-A-L.

3          (Whereupon, there was a brief pause to deal with

4    microphone/headset issue.)

5          THE COURT REPORTER:  Could you spell your name again?

6          THE WITNESS:  G-O-C-I-A-L.

7          THE COURT: I believe you may continue, Mr.  King.  Is

8    everyone able to hear?  Very well.  I think we've made an

9    adjustment for one of the mics.  Very well.  Please proceed.

10   BY MR. KING:

11   Q.    Mr.  Gocial, where do you reside?

12   A.    I reside in Philadelphia at 440 Avenue of the Arts,

13   Philadelphia, Pennsylvania.

14   Q.    Could you explain for the Court your educational

15   experience?

16   A.    Yes.  I graduated from Temple University in Philadelphia

17   with a Bachelor in Business Administration.

18   Q.    And describe your work experience, please?

19   A.    Okay.  When I -- after I graduated from college, I worked

20   at Pricewaterhouse; then I went to a smaller firm, Fischbein

21   and Company, and then I went out on my own.  I've been out on

22   my own since 1974, and I've grown my company to about

23   70-something people right now with approximately 20 partners.

24   Q.    And what is the nature of the business?

25   A.    We are a CPA firm, management consulting firm, with

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

```
 1    specialties in the areas of litigation support and business
 2    evaluations.
 3    Q.    And your professional designations, if you will?
 4    A.    I'm a Certified Public Accountant.  I'm a Certified
 5    Forensic Accountant.  I'm a Certified Valuation Analyst. I'm
 6    certified in financial forensics.
 7    Q.    And memberships in professional organizations?
 8    A.    I belong to the American Institute of CPA's; the
 9    Pennsylvania Institute of CPA's; the New Jersey Society of
10    CPA's because I'm registered in both of those states as a CPA.
11    I belong to the National Association of Certified Valuation --
12    Association -- the National Evaluation Association.
13    Q.    Uh-huh.
14    A.    And I'm also on the Pennsylvania Institute of CPA's
15    Business Evaluation Committee and the Pennsylvania Institute of
16    CPA's Forensic and Litigation Committee.
17    Q.    Have you had an opportunity to lecture?
18    A.    I have lectured on occasion, yes.
19    Q.    Okay.  And what generally is the nature of those lectures?
20    A.    I testified -- I lectured at a lawyers' seminar in
21    reference as to how to select an expert witness.
22    Q.    Uh-huh.
23    A.    I testified at a divorce conference as to what the role of
24    a forensic accountant would be.  I testified in front of the
25    legal administrators to teach them how to read financial
```

00000698

```
1    statements.

2    Q.   Have you had experience in providing expert testimony in

3    cases before?

4    A.   I have.

5    Q.   Okay.  All right, we're prepared to move now to the issues

6    at stake here.  And let's just get right to the invoices.  Mr.

7    Gocial, I'm handing you a document.

8              Your Honor, may I approach?

9              THE COURT: Mr.  King,  is it your intention to ask

10   the Court to permit Mr.  Gocial to render an opinion and

11   testify as an expert?

12             MR. KING:  Yes.  Would the Court admit Mr.  Gocial at

13   this time?

14             THE COURT: Mr.  Lomas and Mr. O'Brien, do you wish to

15   inquire in the nature of voir dire before you respond?

16             MR. O'BRIEN:  Your Honor, the only thing I'd be

17   interested in --

18             THE COURT:  I can hear you, Mr.  O'Brien, but let me

19   ask you to come to the microphone, please, so we'll be certain

20   that the backup recording equipment is operating.

21             MR. O'BRIEN:  Thank you, Your Honor.  We just want to

22   be crystal clear about what opinion Mr.  Gocial is being

23   offered for.  Again, if we go back to that lengthy January 31

24   hearing that we had, it was as to two invoices, the amount of

25   damages per two invoices, and if that is what he's being
```

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1      offered as an expert on, then we would stipulate to his
2      qualifications for that.
3                  THE COURT: Mr. King?
4                  MR. KING: Yes, Your Honor. Mr. Gocial's testimony
5      at this time pertains to damages as they're reflected in the
6      invoices.
7                  THE COURT: And when you say "the invoices", you mean
8      the two invoices which are at issue?
9                  MR. KING: That's correct, Your Honor.
10                 THE COURT: In other words, the opinions you intend to
11     elicit concern the two invoices?
12                 MR. KING: That's correct, Your Honor.
13                 THE COURT: Very well. Thank you, Mr. King. And
14     with that, is it correct, Mr. O'Brien, you have no objection
15     to permitting Mr. -- or to the Court receiving Mr. Gocial as
16     an expert for the purpose of rendering an opinion regarding
17     damages arising from those two invoices?
18                 MR. O'BRIEN: That's correct, Your Honor. And no
19     opinion as to liability as we carefully went over in the
20     January 31 hearing, nothing with contract interpretation.
21                 THE COURT: Very well. Mr. Gocial has not been
22     offered as an expert with respect to that matter, so I assume
23     you will ask him no questions about that, Mr. King; am I
24     correct?
25                 MR. KING: That's correct, Your Honor.

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1              THE COURT: Very well.  You may proceed.  The Court

2    will receive Mr.  Gocial as an expert with respect to offering

3    -- for the purpose of receiving an opinion with respect to

4    damages arising from the two invoices.

5              Now, you may --

6              MR. KING:  May I approach the witness, Your Honor?

7              THE COURT: Yes, you may.

8              MR. KING:  Thank you.

9    BY MR. KING:

10   Q.   Mr.  Gocial, I'm handing you Record Press invoice 87-1700.

11   And that is Plaintiff's Exhibit D.  Mr.  Gocial, you had an

12   opportunity to review this invoice as part of your report; is

13   that correct?

14   A.   Yes, I did.

15   Q.   And if we could just quickly go through these line items

16   and indicate where you found any overcharging, if at all.

17             MR. O'BRIEN:  Objection, your Honor.  There's one

18   line out of an issue.  It's collating, trimming to size and

19   binding --

20             MR. KING:  Okay.  If we want to zero in on the

21   disputed line item.

22             THE COURT: Very well.  Let me ask you then, Mr.

23   King, please rephrase your question.

24             MR. KING:  Okay.

25             THE COURT: Thank you.

00000701

1    BY MR. KING:

2    Q.   Mr. Gocial, could you indicate for the Court which line

3    item on Plaintiff's Exhibit D and refer to it by the name and

4    not really the number of it.

5    A.   Okay.

6    Q.   Refer to the line item wherein the damages that you've

7    identified occurred.

8            THE WITNESS:  Your Honor, may I pull out my own copy

9    of this so I don't have to recalculate some of the numbers?

10            THE COURT:  When you say "your copy of this", do you

11    mean --

12            THE WITNESS:  The exact copy of this invoice that I

13    did some mathematical calculations on.

14            THE COURT:  Is that without objection?

15            MR. O'BRIEN:  Your Honor, the objection would be

16    there's one line at issue; it's point 1225, $372.40.  So it's a

17    matter of moving the decimal place.

18            THE COURT: Well, let me ask you, Mr. King, will you

19    inquire please of Mr. Gocial whether he is able to testify

20    without resort to the materials in his binder?

21    BY MR. KING:

22    Q.   Are you -- in order to answer this question, are you able

23    to answer it just based on the face of this invoice?

24    A.   Yes, I can.

25    Q.   You can?  Okay.  Then for the purposes of this particular

```
 1   question, can you identify the line item on this invoice by the
 2   name of it, which refers to -- which has a -- which is included
 3   in the damages in your report in this matter?
 4   A.   Okay.  The fourth amount from the top which is totalling
 5   of $372.40, it reads from left to right, 3,040 in quantity
 6   column; the description is collating, trimming to size, and
 7   binding charge; 3,040 pages at 12.25 per 100 pages.
 8            And the price, it is point, 1225 cents -- doesn't
 9   have a dollar mark, but that's what I believe that it refers
10   to; and the total amount is $372.40.
11   Q.   And based on your analysis of the invoice and the amount
12   of damages, what did you determine the precise amount of
13   damages in this particular invoice to be?
14   A.   My calculations suggest that this line should be $37.24;
15   therefore, is overstated by about 37, -- three -- well, the
16   difference between $37.24 and $372.40.
17   Q.   Okay.  Thank you, Mr. Gocial.
18            MR. KING:  Your Honor, may I approach the witness
19   again?
20            THE COURT: Yes.
21   BY MR. KING:
22   Q.   Mr. Gocial, I'm handing you a document, it's labeled with
23   Bates number RP-69.  This is an attachment to Plaintiff's
24   Exhibit A.  In rendering --
25            MR. O'BRIEN:  Your Honor, I'm going to object to the
```

```
 1   introduction of this spreadsheet.  This goes not to damages,
 2   but to contract -- this is a contract that's being put in front
 3   of the witness.
 4             MR. KING:  Your Honor, if I may respond?
 5             THE COURT: Mr.  King.
 6             MR. KING:  It's not true that this is a contract.
 7   The contract is a very specific document.  This is a -- this is
 8   another document that other people have testified to today with
 9   respect to this matter.  My line of questioning for Mr. Gocial
10   here is simply whether or not he reviewed this in his -- in
11   preparing his report, and if he reviewed it whether or not it
12   affected his calculation of the amount of damages.
13             MR. O'BRIEN:  Your Honor, if I may?
14             THE COURT: You may inquire of Mr. Gocial what he
15   considered in forming his opinion.
16             MR. KING:  Uh-huh.
17   BY MR. KING:
18   Q.  Mr. Gocial, did you have an opportunity to review this
19   spreadsheet?
20             THE COURT: The question would be in a non-leading
21   form; what was it that Mr. Gocial reviewed?
22   BY MR. KING:
23   Q.  Mr. Gocial, what did you review in forming your opinion?
24   A.  I reviewed the invitation for bid, Contract No. 2231-S,
25   which is the contract that I believe covers this particular
```

1    invoice, and part of that contract included this spreadsheet.

2    So, therefore, I read the entire contract, including this

3    spreadsheet, and that is the information that I utilized to

4    formulate my opinion.

5    Q.    Okay.  Did the -- having an opportunity now to look at the

6    spreadsheet again, does the spreadsheet change your opinion or

7    the report in my manner?

8    A.    I found this spreadsheet not to be of any value in terms

9    of my being able to formulate an opinion.  There are too many

10   questions and unanswered questions as to what this really means

11   relative to the actual contract --

12           MR. O'BRIEN:  Objection, Your Honor.  When he says

13   "what this really means", it's going to contract

14   interpretation, and, again, he's only here for damages, not to

15   say what the contract means or the interpretation of the

16   contract.

17           THE COURT: The objection is overruled with the

18   understanding that the witness may complete his answer, which

19   is a part of the inquiry of what he reviewed in order to

20   formulate the opinion.

21           THE WITNESS:  To support my opinion, I looked at this

22   contract and the numbers as presented here didn't make any

23   sense when you compare --

24           THE COURT: The question is only at this point what

25   you reviewed in formulating your opinion.

00000705

1          THE WITNESS:  I thought I answered that already, Your

2     Honor.

3     BY MR. KING:

4     Q.    And then it was just whether or not having the opportunity

5     to see this again today has changed in any way your

6     understanding of the amount of damages at issue here?

7     A.    It has not changed my mind.

8          MR. KING:  Okay.  Thank you, Your Honor.

9          THE COURT: You may continue.

10          MR. KING:  Yes.  The -- may I approach, again, Your

11     Honor?

12          THE COURT: Yes.

13     BY MR. KING:

14     Q.    I'm now handing you what's been marked as Plaintiff's

15     Exhibit C.  This is the invoice, 87-1701.  Did you have an

16     opportunity to review this invoice in rendering your report?

17     A.    I did.

18     Q.    Could you identify for the Court by using the words in the

19     line item, which line item in this -- in this invoice

20     represents a damage in your expert report?

21     A.    It is the 6th line item down that starts under the

22     quantity, 11,320, with the description:  Collating, trimming to

23     size, and binding charge; 11,320 pages at $12.25 per hundred

24     pages.

25          The price is point 1225 cents.  I'm sorry it should read

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    12 point 25 cents or point 1225 dollars, which totals up to

2    $1,386.70.

3    Q.   How did you calculate the amount of damages with respect

4    to this particular line item?

5    A.   Because this line item didn't take into consideration the

6    running rate of 10 copies, I recalculated it and came up with a

7    dollar amount; that line should have been of $138.67.  And the

8    damage, therefore, would be the difference between $138.67 and

9    the $1,386.70.

10   Q.   And having the spreadsheet that I also handed you before,

11   RP-69, having the opportunity to see that again today, does

12   having that opportunity to see it change or affect your

13   analysis of the damages at issue in this invoice?

14   A.   It does not.

15           MR. KING:  No further questions, Your Honor.

16           THE COURT: Very well.  Thank you very much, Mr.

17   King.

18           Mr.  Lomas or Mr. O'Brien, you may cross-examine.

19   Mr.  Lomas?

20           MR. LOMAS:  No, Your Honor.  No questions.  Thank

21   you.

22           THE COURT: Very well, thank you.  Mr.  Gocial, thank

23   you very much, sir.  You may step down.

24           THE WITNESS:  Thank you, Your Honor.

25           MR. KING:  Your Honor, is Mr.  Gocial required to

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000707

1    leave the courtroom at this point or can he stay now that he's

2    done testifying?

3            THE COURT:  Am I correct that you do not intend to

4    call Mr.  Gocial -- in other words, that you have completed

5    your inquiry of Mr. Gocial; is that correct?

6            MR. KING:  Yes, Your Honor.

7            THE COURT: Very well, I assume in that event the

8    defendant has no objection?

9            MR. LOMAS:  No, Your Honor.  We will not be calling

10   Mr.  Gocial.

11           THE COURT:  Very well, thank you.  Then, yes, sir,

12   you are free to stay.  Now, Mr.  King, is Mr.  Burke your next

13   witness?

14           MR. KING:  Yes.

15           THE COURT: Very well.  Mr.  Burke, good afternoon.  I

16   will ask you to please step around toward the witness chair and

17   face the deputy clerk to be sworn.

18   *        *        *              *        *

19           **BRIAN THOMAS BURKE**, called as a witness in this case,

20   after having been duly sworn, testified as follows:

21   *        *        *              *        *

22           THE COURT:  Mr. King.

23   **DIRECT EXAMINATION BY MR. KING:**

24   Q.   Mr. Burke, please state and spell your name for the

25   record.

1    A.    My name is Brian Thomas Burke; B-R-I-A-N; T-H-O-M-A-S;

2    B-U-R-K-E.

3    Q.    And where do you live?

4    A.    I live at 145 East 23rd Street, Apartment 4-R, New York,

5    New York, 10010.

6    Q.    Mr. Burke, please explain the events that arose wherein

7    you received a bill from Record Press for -- or not from Record

8    Press, I'm sorry, but please describe the events that led to

9    your receiving a bill for the copy charges that are disputed in

10   this matter.

11   A.    I was a plaintiff in a case against the Department of

12   Commerce, Bureau of Census.  They were represented by the U.S.

13   Attorney's office.  It was an EEO case.  And I guess, perhaps,

14   I should ask the Court at this time for a reasonable

15   accommodation.  I do have a disability, photophobia.  It's

16   myopia.  And that's one of the issues at hand in that case, but

17   discrimination for lack of work assigned to me.

18        THE COURT: Let me interrupt you for just one moment.

19   Mr. King, what is the accommodation that Mr. Burke requires?

20        MR. KING:  Mr. Burke, I think, is best to explain,

21   Your Honor.

22        THE WITNESS:  Your Honor, as I guess as a

23   non-attorney I just want, you know, I have to wear prescription

24   lenses.  I have to apologize.

25        THE COURT: Oh, no apology is necessary.  Is there

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000709

```
1    anything else that you require of the Court?  I thought I heard
2    you say that there's an accommodation you need?
3              THE WITNESS:  No, Your Honor.  That's the only
4    accommodation.
5              THE COURT:  That's the only one?
6              THE WITNESS:  Yes.
7              THE COURT: Very well.  I certainly have no objection
8    whatsoever to your continuing to wear your glasses, your
9    sunglasses.
10              MR. KING:  Thank you, Your Honor.
11              THE WITNESS:  Thank you, Your Honor.  Yes.  And,
12    well, anyway, the courts -- the district court judge threw out
13    the case, and I appealed it to the Second Circuit.  In the
14    Second Circuit, the United States prevailed, and that case was
15    dismissed in the Second Circuit.
16              After that case, under case law there is -- the U.S.
17    Attorney's Office was allowed to do a motion for cause I
18    understand.  They did do that for the cost of the briefs and
19    the printing costs.  I opposed that motion and --
20    BY MR. KING:
21    Q.  Mr. Burke, if you don't mind, I'm just going to interrupt
22    you on that point and then let me introduce an exhibit to you.
23              If I may approach, Your Honor?
24              THE COURT:  Yes.
25    BY MR. KING:
```

1    Q.   I'm handing Mr. Burke Plaintiff's Exhibits C and D.   Mr.

2    Burke, these are the invoices -- can you -- if you have a

3    moment to look at the invoices.  Those are the invoices from

4    Record Press that correspond to the brief and the appendix in

5    that matter; is that correct?

6    A.   Yes.

7    Q.   Let me just go ahead and I'll ask you the question:  If --

8    it's the case, though, correct, that the bill that you just

9    testified about was a different bill than these invoices,

10    correct?

11    A.   I believe there was an added seven percent to those bills.

12    Q.   So the bills that you received from the -- as part of the

13    bill of costs included these charges, but also included an

14    additional charge of seven percent, correct?

15    A.   That is my understanding at this time, yes.

16    Q.   Okay.  After you received the bill, what did you do?

17    A.   Well, I had a certain time to respond to a motion.  I

18    believe it was 14 days, and I did procrastinate a bit.  I'm a

19    working man, and that last day was to respond to -- I reviewed

20    the bill and, of course, I had printed my own briefs, and I saw

21    that the costs were -- some of them seemed competitive, and one

22    line was an outrageous cost for binding costs, which was

23    approximately 85 percent of the costs.

24        And I immediately was struck by this irregularity, it

25    seemed, someone who pays for binding themselves, and --

00000711

1    Q.   What did you decide to do after that happened?

2    A.   I made some phone calls.  I made a number of phone calls.

3    I wish could remember the exact order.  I don't know if I

4    called GPO first, or I did call Record Press, and I did speak

5    to Mr.  Wilmot and Mr. -- and he said that --

6              MR. O'BRIEN:  Objection, Your Honor; as to hearsay.

7              THE COURT: Sustained.

8    BY MR. KING:

9    Q.   Mr.  Wilmot -- I'm sorry -- Mr.  Burke, you said that you

10   called the GPO.  Did you speak with Mr.  Adgerson when you

11   called the GPO?

12   A.   I spoke with Mr.  Adgerson and a number of people.

13   Q.   How did you introduce yourself to Mr.  Adgerson?

14   A.   Well, I -- as I said, I made a number of calls.  Probably

15   10 to 15 calls trying to speaking to Mr.  Adgerson, and I was

16   as he's testified basically referred to him, and I, as myself,

17   Brian Burke, and I explained --

18             MR. O'BRIEN:  Objection, Your Honor.

19             THE COURT: Let me ask you to come to the podium, Mr.

20   O'Brien.

21             MR. O'BRIEN:  Yes, Your Honor.

22             THE COURT:  What is your objection?

23             MR. O'BRIEN:  Mr.  Burke's statements that he is

24   testifying to now are hearsay.  So there's been no

25   demonstration for why that should be an exception to hearsay.

1           THE COURT: Mr. King.

2           MR. KING:  Well, Your Honor, to be questioned of

3     whether or not Mr. Burke said that he was himself or someone

4     else is at issue right now, and the point of Mr. Burke's

5     testifying about what he said is to determine not whether or

6     not it's true that he is Mr. Burke, but that he actually made

7     these statements.

8           And that the reason for his testimony is to deal with

9     the fact that there's conflicting testimony that he did not in

10    fact say these words, and now he's able to testify, and he can

11    be cross-examined.  The rules regarding hearsay and the

12    unavailability of a person and the inability to cross-examine

13    them are not at issue.

14          Mr. Burke is the declarant.  He's here in court

15    making this statement.  He's not talking about what someone

16    else said outside the court, and for all these reasons, he can

17    testify about what he said to Mr. Adgerson.

18          THE COURT: The Court will overrule the objection

19    based upon your representation that you are not offering the

20    statement for the truth of the matter asserted in it.  It's

21    simply to explain subsequent conduct.

22          MR. KING:  Thank you, Your Honor.

23    BY MR. KING:

24    Q.   Mr. Burke, you -- again, how did you introduce yourself

25    -- how did you represent yourself to Mr. Adgerson when you

1    called?

2    A.   It was not a long conversation.  I identified myself as I

3    did with all the other 10 to 15 people I called that day.  I

4    gave them my name and why I was calling, that I was a plaintiff

5    in a case, and I lost this case, and I was served this motion

6    for costs and within it was a bill from GPO, and I was

7    inquiring about that one line on this bill that I believe as I

8    do today is an outrageous charge.

9    Q.   Did Mr. Adgerson provide you information about the --

10    about the contract?

11        MR. O'BRIEN:  Objection.  Any statement by Mr.

12    Adgerson will be hearsay.

13        THE COURT: Mr. King.

14        MR. KING:  First of all, Your Honor, I'm not asking

15    him to repeat a statement of Mr. Adgerson.  I'm asking him

16    whether or not Mr. Adgerson provided him with information.  I

17    will ask him whether or not Mr. Adgerson made certain

18    statements, but, again, the question is not whether or not the

19    statements are true; the question is whether or not the

20    statements were made.

21        And at issue here is, you know, already today we've

22    had a defense put up a copy of the verified complaint in the

23    case, pointing out that Mr. Burke made a claim in his verified

24    complaint that contradicts the testimony of a witness.  Mr.

25    Burke's good faith in filing the complaint is called into

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000714

1    question.

2         Mr. Burke's knowledge of statements made by GPO

3    officials to him as it pertains to his state of mind reflects

4    his good faith, and the -- Mr. Burke's testimony on what was

5    said to him implicates the question of whether or not the

6    statement was made and not so much whether or not -- you know,

7    what the statement is true.

8         And, to be perfectly honest with you, we're not going

9    to even be able to get close today to whether or not Mr. Burke

10   is going to be able to provide hearsay testimony on whether or

11   not Mr. Adgerson's statements are true and how that relates to

12   liability in the case.

13        This line of questioning is simply what did -- is

14   what Mr. Adgerson says he told you true or did he tell you

15   something else?  Is it true that --

16        THE COURT:  First of all, the question which was

17   asked -- the Court finds that the question which was asked was

18   compound.  The Court is prepared to overrule the objection to

19   the question of whether Mr. Burke spoke with Mr. Adgerson,

20   however, the Court will sustain the objection to what may well

21   be your follow-up question, which is what did Mr. Adgerson

22   say.  The Court would find that is hearsay, and it is

23   inadmissible.

24        I would also note for the record that this is a

25   matter that should come as no surprise to any of the parties

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    because, although, the pretrial conference was conducted off

2    the record, this is an issue which arose at least to some

3    extent at that time and may have indeed been addressed at an

4    earlier point.

5         If you wish to ask the first part of the compound

6    question, the Court is prepared to overrule the objection to

7    that, but I will not permit the further question regarding what

8    Mr. Adgerson said in response, if anything -- we recognize -- I

9    apologize.  I will not permit the question regarding what Mr.

10   Adgerson said, finding that it is inadmissible hearsay.

11        MR. KING:  Okay.

12   BY MR. KING:

13   Q.   Mr. Burke, what was the nature of your inquiry with Mr.

14   Adgerson?

15   A.   Well, basically, it was a question that was fairly

16   specific.  I was looking at this bill, and I saw some of the

17   costs seemed quite competitive, per page costs, and the

18   collating, trimming, and binding costs were this outrageous

19   charge, and it certainly just didn't -- it defied logic to me,

20   just as any type of contract, whether it was --

21   Q.   And Mr. Burke, did the -- did Mr. Adgerson confirm or

22   deny your suspicion?

23        MR. O'BRIEN:  Objection, Your Honor.

24        THE COURT: The objection is sustained on the ground

25   previously stated; that is, the answer would be hearsay.

1          MR. KING:  Okay.  And so, Your Honor, any question
2     about anything that Mr.  Adgerson said is hearsay; is there no
3     room for any statement that Mr.  Adgerson said to fall under an
4     exception to this rule?
5          THE COURT: I am reluctant to rule in advance because
6     I have not heard the question.  It may be that there is some
7     question as to which the Court would find the answer does not
8     call for inadmissable hearsay, but, certainly, questions
9     regarding what Mr.  Adgerson said about his understanding of
10    the invoice or the billing practice would be inadmissible
11    hearsay.
12    BY MR. KING:
13    Q.   Mr.  Burke, it's true that you did not have a copy of the
14    contract at this time?
15    A.   That is absolutely correct.
16    Q.   But you did have a copy of the invoices?
17    A.   I -- well, it was invoices plus seven percent.
18    Q.   Right.  You had a copy of the Department of Justice's
19    invoices to you, correct?
20    A.   Correct.
21    Q.   And so the nature of the conversation was that you were
22    providing -- is it true that the nature of the conversation
23    involved you --
24          THE COURT: Well, let's also not -- I will remind you
25    that since this is direct examination, your inquiry must

00000717

```
 1      proceed by non-leading questions.
 2              MR. KING:  Thank you, Your Honor.
 3      BY MR. KING:
 4      Q.  Mr. Burke, did -- could you please explain to the Court
 5      whether or not Mr. Adgerson cited any words from the contract
 6      that he was reviewing?
 7              MR. O'BRIEN:  Objection, Your Honor.
 8              THE WITNESS:  Yes.
 9              THE COURT: Sustained.
10              MR. KING:  Okay, Your Honor.  And then I would just
11      respond that again if the question is whether or not Mr.
12      Adgerson used specific words, it goes to whether or not the
13      statement was made and not whether or not those words are true
14      or whether or not they have some relationship to something
15      else.
16              THE COURT: You are certainly free to ask what Mr. --
17      you're certainly free to ask Mr. Burke what he did in response
18      to whatever it was that he was told.
19              MR. KING:  Okay.
20      BY MR. KING:
21      Q.  Mr. Burke, based on the words that Mr. Adgerson used in
22      responding to your inquiry, what did that lead you to do?
23      A.  Well -- well, I was told not to use this word in court,
24      but basically I answered, "Oh, so it's fraud," and that was
25      basically the end of the conversation.  Then I immediately
```

00000718

1   called the Inspector General for the Government Printing Office

2   prior to getting the contract, and then I spoke to I guess it

3   was a Mr. Lloyd Rawls(Phonetic) from the Government Printing

4   Office and gave him the full information, that based --

5           MR. O'BRIEN:  Your Honor, his statements, Mr.

6   Burke's statements, again, he's talking about hearsay, his

7   conversations with Mr. Rawls.  There's no exception for that

8   that's been cited for hearsay.

9           THE COURT: The Court is prepared for Mr. Burke to

10  finish his answer to the question without regard and no further

11  question has been asked, but I assume that consistent with the

12  Court's earlier rulings, he will not ask what the inspector

13  general said.

14  BY MR. KING:

15  Q.   And let's narrow in on just a couple of categories of what

16  you did because obviously you did a lot, but let's narrow in

17  the focus.  What did you do in response to your conversation

18  with Mr. Adgerson in relation to the case, Burke v. Evans, in

19  which those charges were assessed?

20  A.   Well, after I dealt with the inspectors general's office,

21  I -- actually, Mr. Rawls -- excuse me, Mr. Adgerson did tell

22  me that I could get a copy of the contract from the

23  Philadelphia office, the contracting officer, and I did get a

24  hold of not the contract officer apparently for this, but a

25  co-worker.  And she sent me a copy by e-mail of the 2231-S, and

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000719

1    given what the information I gleaned from Mr.  Adgerson and the

2    contract itself, I filed a reply to the U.S. -- United States

3    as motion for costs.

4    Q.   And, Mr. Burke, was your opposition to those costs, was

5    your contesting of those costs, ever opposed?

6    A.   It was not opposed, and I'd like to point out within that

7    motion in my reply, I did make a contemporaneous account

8    paraphrasing what Mr.  Adgerson said under oath, and it was

9    upheld by the Second Circuit.

10   Q.   What did you end up paying for those costs?

11   A.   The Court quashed the motion and, certainly, wouldn't want

12   to presume why, but they apparently took my word on this.

13   Q.   Mr.  Burke, please explain what you did in response to the

14   conversation with Mr.  Adgerson and having received the

15   contract in relation to this case?

16   A.   Yeah, well, of course, when I discovered what I guess is

17   now controversial, what my opinion is in this case, and what I

18   believe the correct amount should be, I filed the pages for the

19   motion, and I did also I believe called the Department of

20   Justice about it, this information.

21   Q.   I'm sorry, Mr.  Burke.  My question, though, has to do

22   with this particular case.

23   A.   All right.

24   Q.   And the question is just was -- how did this prompt you --

25   how did your conversation with Mr.  Adgerson and your having

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

```
 1   the contract prompt you to get involved in this particular
 2   matter?
 3   A.   Well, after a little research, I realized that I believed
 4   they were in violation of the Federal False Claims Act, and I
 5   called some law firms and I obtained retained counsel, and, of
 6   course, it was a complaint filed under seal with the Department
 7   of Justice.
 8            MR. KING:  Thank you, Mr. Burke.  No further
 9   questions.
10            THE COURT: Thank you very much, Mr. King.  Mr.
11   O'Brien?
12            MR. O'BRIEN:  Yes, Your Honor.
13            THE COURT: You may cross-examine.
14   CROSS-EXAMINATION BY MR. O'BRIEN:
15   Q.   Mr. Burke, I believe you've just indicated that at the
16   time that you filed this complaint, you did not have the actual
17   invoices from Record Press, correct?
18   A.   Did counsel mean by actual invoices if I had invoices plus
19   seven percent more, it would certainly mimic or mirror the
20   invoices, so I wouldn't necessarily agree with your statement.
21   Q.   Sure.  And what I mean by the specific invoices, Mr.
22   Burke, is the Plaintiff's Exhibit D and C.  If we could pull
23   those up?
24   A.   I don't believe I had this identical document.  I had a
25   similar document.
```

1    Q.   And you've never worked for Record Press; is that correct,

2    Mr. Burke?

3    A.   That's correct.

4    Q.   And you've never worked for the Government Printing

5    Office; am I right?

6    A.   That's correct.

7    Q.   And you did not participate in the drafting of the

8    contract between Record Press and the Government Printing

9    Office, correct?

10   A.   That's correct.

11   Q.   And when you filed your complaint, you did not have these

12   two invoices, this is Plaintiff's C and D, correct?

13   A.   I wouldn't agree with that.  I believe what I had was a

14   similar document with seven percent --

15   Q.   Okay.  Well, I'm asking you about these two exact

16   invoices, sir.  You didn't have these two exact invoices,

17   right?

18   A.   Well, this is -- my copy is of some invoices.  No.  I

19   didn't have this exact document.

20   Q.   As a matter of fact, you stated in your verified complaint

21   that relator does not have access to Record Press' invoices,

22   correct?

23   A.   Well, again, you're characterizing what is a Record Press

24   invoice.  I believe I did have a Record Press invoice, but not

25   this exact document.  It was simply seven percent added to it.

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000722

1    Q.    And the seven percent, you're talking about the bill of

2    costs that you received from the GPO; is that correct?

3    A.    I'm talking about the seven percent that the Government

4    Printing Office adds to their invoices when they send it to the

5    Department of Justice.

6    Q.    Right.  And it's the bill of costs that you received from

7    the government, right?

8    A.    It was a bill of costs with documents attached.

9    Q.    Right.  And that is the bill of cost that prompted you to

10   make these phone calls that you've been talking about to the

11   government, right?

12   A.    To the government and others, yes.

13   Q.    But the amounts that you included in your verified

14   complaint are not the amounts from the Record Press invoices,

15   Exhibit C and D, correct?

16   A.    There is a seven percent added due to the GPO's overhead

17   added to the cost.

18   Q.    Right.  So when you stated in your verified complaint for

19   instance that Record Press charged $1,483.77, that was false,

20   correct?

21   A.    This was on information I believe that was represented by

22   the government as being their costs.  I wasn't aware at the

23   time of the seven percent added, and I was not informed of it,

24   so it was off by seven percent.

25   Q.    So your complaint stating that Record Press charged the

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000723

1    government $1,483.77, your verified complaint, was wrong?

2    A.   It was to the extent that I was being charged the amount

3    that I put in the complaint what Record Press was paid or what

4    they requested under their -- what I contend is a false claim

5    was seven percent less.

6    Q.   And it was also seven percent less than $398.47, right?

7    A.   That's correct.  And I would certainly point out that

8    might be an incentive for GPO to not want to discover this

9    information.

10   Q.   And so when you put that in your complaint at Paragraph 15

11   that Record Press charged the government or charged $398.47,

12   that was false, right?

13   A.   Well, the amount that Record Press charged the government

14   was seven percent less than I was being charged by the

15   government.  So the government was, in fact, I guess profiting

16   from the overcharge.

17   Q.   And, sir, if you look at Record Press exhibit or rather

18   the Record Press invoice that is listed at Plaintiff's Exhibit

19   C, the amount that was charged to the government was -- if you

20   look at the line item, $12.25 per 100 pages, correct?

21   A.   Well, if these documents are correct.

22   Q.   Right.  And then if you look at Plaintiff's Exhibit D, and

23   you'll see the line item for the amount for collating, trimming

24   to size and binding charge, that's $12.25 per 100 pages,

25   correct?

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000724

1      A.    If these documents are correct.

2      Q.    In your verified complaint at Paragraph 12, you stated

3      that Record Press charged $12.50 per page, correct?

4      A.    I don't have a copy of the complaint in front of me.

5      Q.    Sure.  Let us get that for you.  If we could show you a

6      copy of your verified complaint at Paragraph 12, sir, and for

7      the convenience of the Court, we'll pull it up on the screen

8      and for you, Mr. Burke, as well.  And --

9              THE COURT: Is it on your screen, Mr. Burke?  I have

10      it here.

11             THE WITNESS:  I have one page there, a cover page.

12      BY MR. O'BRIEN:

13      Q.    Sure.  And I'm going to ask you to look at Paragraph 12,

14      Mr. Burke.

15      A.    (Witness complies.)

16      Q.    Do you see that, Mr. Burke?

17      A.    Yes.

18      Q.    And you see where you say that Record Press' contract with

19      GPO incorporated the terms, conditions, and specifications set

20      forth in the request for proposal and sets the cost for binding

21      a 10-copy run of a brief or appendix at $12.50 per 100 pages;

22      do you see that, sir?

23      A.    Yes, I do.

24      Q.    This is what you alleged in your verified complaint,

25      right?

```
1    A.    If this is a correct copy of the complaint, yes.
2    Q.    And, in fact, Record Press charged $12.25 per 100 pages,
3    right, sir?
4    A.    That isn't my information.
5    Q.    Well, if we just looked at the invoices that your counsel
6    put into record showing that they charged $12.25 per 100 pages,
7    right, sir?
8    A.    In the invoice I got from the government, it wasn't broken
9    down with the seven percent, so we didn't make an assumption,
10   and we made the assumption that they were charging $12.50
11   instead of $12.25.
12   Q.    In fact, when you filed the case, you just had the GPO
13   request for proposal, but the line item for the collating,
14   trimming and binding, that was blank, right?
15   A.    Mr. Adgerson gave me some numbers, and I believe --
16   Q.    That's not my question, sir.  The document that you had,
17   the line item for collating, trimming and sizing, that was
18   blank, right?
19   A.    The -- was blank, but as you can see in the
20   contemporaneous document I filed with Court the day I
21   discovered the overcharge or fraud --
22   Q.    Sir, my question is just --
23   A.    -- I got those numbers, 12.50.
24   Q.    Yeah, 12.50; which is not the amount that was charged,
25   right, sir?
```

```
1    A.   It was information that was given to me by GPO.  I didn't
2    make it out of air.
3    Q.   But you didn't have the Record Press invoices when you
4    filed, you told us, right, sir?
5    A.   I had a conversation with Mr. Adgerson who gave me this
6    number, 12.50.
7    Q.   And, sir, when you filed your complaint, you had the RFP
8    from the government, but not the line items that were filled in
9    by Record Press, right?
10   A.   I had line items given to me by Mr.  Adgerson.
11   Q.   You have to listen to my question, okay?
12          THE COURT: The Court is going to interject at this
13   point.  Mr.  O'Brien has asked a question I believe three
14   times, perhaps, phrasing it slightly differently each time, and
15   that is the question that you must answer.
16          THE WITNESS:  I apologize to the Court, Your Honor.
17          THE COURT:  Do you want Mr. O'Brien to repeat it?
18          THE WITNESS:  Yes.  I have to apologize.  Sorry.
19   BY MR. O'BRIEN:
20   Q.   Sure.  Mr.  Burke, when you filed your complaint, you had
21   from the GPO a blank request for proposal; it did not have the
22   line items filled in for collating, trimming, and sizing and
23   binding, right?
24   A.   The document that I was e-mailed by GPO on the day of the
25   discovery was blank, yes, as far as those line items.
```

1    Q.    And there were no price terms filled in, right?

2    A.    On that particular document, there were no price terms.

3    Q.    Now, Mr. Burke, you mentioned in response to questions

4    from Mr. King that you filed this case after you received the

5    bill of costs from the Burke v. Evans case; is that right?

6    A.    From information I gleaned from that, yes.

7    Q.    And Mr. Evans, this was your lawsuit against Mr. Evans

8    who was the Secretary of Commerce; am I right?

9    A.    Yes.  Mr. Evans, and then they wanted to change it to I

10   guess Mr. Gonzales who became the new Secretary of Commerce.

11   Q.    Now, in that case, you're alleging that you were the

12   victim of employment discrimination, Title VII; is that right?

13   A.    I believe Title VII, the Rehabilitation Act, yes.

14   Q.    And the Court dismissed your case; is that right, sir?

15   A.    That's correct.

16   Q.    Now, in the dismissal, the Court found that you had come

17   forward with, quote:  Nothing beyond the realm of conclusory

18   assertions and speculation to support your claims; am I right?

19   A.    Well, I don't have that information in front of me.  I

20   can't recall exactly what the Court said, but --

21   Q.    Well, let's go ahead and mark an exhibit that I'd like to

22   put in front of you.

23              MR. KING:  Your Honor, I'm going to object on the

24   grounds of relevance.

25              THE COURT: Mr. O'Brien?

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000728

1          MR. O'BRIEN:  It goes to his motivation.  First of

2    all, Your Honor, he testified as to it on direct, but it also

3    goes to his motivation, the basis of his investigation, the

4    reason he filed this lawsuit; he's saying it was in response to

5    this bill of costs.

6          Also, specifically, in this case, it goes to his

7    honesty, his credibility, because there's statements in the

8    decision that go to his credibility.  As a witness, there's

9    traditional impeachment.

10          THE COURT:  The objection is overruled.

11          MR. O'BRIEN:  May I approach, Your Honor?

12          THE COURT: Yes.

13    BY MR. O'BRIEN:

14    Q.   Mr. Burke, we have put in front of you a copy of the

15    decision from the Burke v. Evans case, and if I could ask you

16    to turn to Page 16, please.  And for the convenience of the

17    Court, we'll also put it up on the screen, and, also, Mr.

18    Burke, for you on the screen.

19          THE COURT: I see that there is an opinion now on my

20    screen.  Do you have the opinion on your screen, Mr. Burke?

21          THE WITNESS:  I have Page 5 on the screen.  You asked

22    for Page 16?

23          MR. O'BRIEN:  Yes.  We'll turn to Page 16 for you,

24    Mr. Burke, on the screen as well, okay?

25          THE WITNESS:  All right.  Yes.

1     BY MR. O'BRIEN:

2     Q.    Okay.  Mr.  Burke, the question I had asked you is that

3     the Court found in this case that you had come forward with

4     nothing beyond the realm of conclusory assertions and

5     speculation to support your claims?

6          If you look at the first full paragraph on the left column

7     there, sir, at Page 16?

8     A.    Yes, I see that.

9     Q.    So does this refresh your recollection that the Court had

10    found that you had nothing but conclusory assertions and

11    speculation to support your claims?

12    A.    Well, they dismissed the case, so that -- yes, that was

13    their legal opinion.  Yes.

14    Q.    The Court also found that your allegations were based on

15    vague recollections of conversations with third parties; do you

16    see that, sir?

17    A.    In the middle of the next paragraph.

18    Q.    And, likewise, it said that you had unsupported

19    conclusions drawn from documents produced by the defendants in

20    that case; do you see that?

21    A.    Yes.  That's exactly what it says, yes.

22    Q.    Further, in that case, sir, the Court found that you had

23    attempted to rely on an affirmation that contradicted your

24    prior deposition testimony; do you recall that?

25    A.    Where is that?

```
 1    Q.   We'll pull the page out for you, sir.  Do you see where it
 2    says, plaintiff may not rely on an affidavit, or, in this case,
 3    an affirmation, which contradicts his prior deposition
 4    testimony to create an issue of fact precluding summary
 5    judgment; do you see that, sir?
 6    A.   Yeah.   They quoted another case.  I don't understand what
 7    you're --
 8    Q.   I just wanted to refresh your recollection that the Court
 9    had found this; do you recall that?
10    A.   Well, can I get what line -- you're kind of taking --
11    Q.   Well, you have a hard copy in front of you as well, sir,
12    on Page 16, and if we could also zoom back.
13    A.   Yes.  I believe that was an issue regarding my recognizing
14    Mr.  Brown(Phonetic) who -- that was the first time I had met
15    him, and I, certainly, at the deposition, I was made aware that
16    based on his voice and appearance that he was the one that made
17    the remarks.  So, certainly, there was perhaps that slight
18    contradiction.
19    Q.   Sure.  So it is your memory --
20         THE COURT:  Just the following:  If it is your
21    contention, Mr.  O'Brien, that in the opinion there are
22    references to a finding by a court regarding Mr.  Burke's
23    credibility, I believe that those would be relevant to this
24    proceeding.  If -- the Court cannot conclude that the same
25    would be true with regard to findings of the Court regarding
```

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

```
 1    matters such as, for example, the sufficiency of the evidence.
 2            The Court cannot conclude without anything more that
 3    a court's finding that the evidence was insufficient --
 4            MR. O'BRIEN:  I understand, your Honor.
 5            THE COURT:  -- had a bearing on Mr. Burke's
 6    credibility.  So I will ask that if there are findings
 7    regarding, for example, credibility issues, that you may
 8    certainly highlight those, but that the Court would find no
 9    relevance or probative value, with all due respect to other
10    judges, in a mere determination that there was insufficient
11    evidence --
12            MR. O'BRIEN:  Understood, Your Honor.
13            THE COURT:  -- that do not have any bearing upon Mr.
14    Burke's credibility.
15            MR. O'BRIEN:  No, I understand, Your Honor.  And just
16    another -- I really just have another question on this opinion
17    and would move on.  But the Court that we're talking about in
18    this decision here, Your Honor, is contradiction of prior
19    deposition testimony against an affirmation.
20            So this is the language that is highlighted near
21    Burke Affidavit Exhibit 4 in which the Court says the plaintiff
22    may not rely on an affidavit, in this case, an affirmation,
23    which contradicts his prior deposition testimony.  So it goes
24    to inconsistencies between sworn testimony and affirmation.
25    That was the only --
```

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

```
1                THE WITNESS:  That's your words.  It should simply
2      say it contradicts, and I agree that the Court, it did
3      contradict it because the information I gleaned at a later time
4      upon my deposition of Mr.  Brown.
5      BY MR. O'BRIEN:
6      Q.   Okay.  And you --
7      A.   Drawing a conclusion.
8      Q.   The Second Circuit affirmed the dismissal of your case in
9      Burke v. Evans; is that right?
10     A.   I'd point out, Mr. O'Brien, if I didn't lose this case, I
11     would not have got a bill of costs, and I wouldn't have found
12     the overcharge.
13     Q.   Well, sir, that's not exactly my question; my question was
14     that the Second Circuit affirmed the dismissal of the lower
15     court here, right?
16     A.   That's correct.
17     Q.   And also they did that in a summary order, right?
18     A.   Yes.
19     Q.   Okay.  And then that's when you subsequently got the bill
20     of costs, right?
21     A.   I believe that I may have done a motion for hearing, but
22     at some point, I did get a motion for costs, yes.
23     Q.   At some point, did you also send a letter to Senator
24     Charles Schumer about this case?
25     A.   I approached a number of politicians and media individuals
```

1    who I thought would be interested in this activity, yes.

2    Q.    And did those individuals include Senator Schumer?

3    A.    If you -- if I gave that information to you, then I'm sure

4    that's what I did, yes.

5    Q.    And you also said media --

6              MR. KING:  Object on the grounds of relevance to this

7    line of questioning about whether or not Mr. Burke talked to

8    other people.

9              THE COURT: Sustained.

10             MR. O'BRIEN:  Well, Your Honor, I would like to ask

11   Mr. Burke about his motivation for filing this lawsuit, and it

12   is related to that, if I may.  It also goes to his impeachment

13   bias and his state of mind, and, likewise, counsel did not

14   object to the exhibit we identified for Mr. -- letter to Mr.

15   Schumer when -- in his pretrial statement, there was no

16   objection to the identification of this trial exhibit, so I'd

17   ask a little bit of leeway to ask him about this letter.

18             THE COURT: What is the relevance of the letter to the

19   issues now before the Court?

20             MR. O'BRIEN:  Your Honor, this goes to --

21             THE WITNESS:  Your Honor, could I just -- I think

22   there is -- if I could answer the question, I might -- I think

23   it would be informative of the Court and Mr. O'Brien.

24             THE COURT: Just one moment, Mr. Burke.  Right now

25   I'm speaking with the lawyers.

```
 1                    THE WITNESS:  Sure.
 2                    THE COURT: Your lawyer has objected to the question.
 3                    MR. O'BRIEN:  Mr.  Burke has indicated he's willing
 4       to answer it, but, in any event, it does, I believe, Your
 5       Honor, go to bias.
 6                    THE COURT:  There is an objection pending.
 7                    MR. O'BRIEN:  Yeah.
 8                    THE COURT: The Court is prepared to sustain the
 9       objection.  I have not heard any proffer from you, Mr.
10       O'Brien, regarding why the letter would be relevant to any
11       issue having to do with liability.
12                    MR. O'BRIEN:  Sure.
13                    THE COURT:  Should there be some other issue that
14       emerges at some later point, the Court can address it then.
15                    MR. O'BRIEN:  Well, there are two other issues if I
16       may, Your Honor; one would be for vexatiousness.  I mean under
17       the False Claims Act statute, if there is evidence of
18       vexatiousness, it's the defendant's right to ask about that.
19       So not as to liability, but vexatiousness would be one ground.
20                    THE COURT: Is that the issue to which you believe
21       it's relevant?
22                    MR. O'BRIEN:  I do, Your Honor.
23                    THE COURT: Mr.  King?
24                    MR. KING:  If I could just ask Mr.  O'Brien to
25       clarify.
```

1              MR. O'BRIEN:  Sure.

2              MR. KING:  The point is that evidence of

3      vexatiousness, that's a liability under the Act?

4              MR. O'BRIEN:  No.  Under 31 U.S.C. 3730(d)4, Your

5      Honor, the -- we're entitled to ask questions or lay a

6      foundation for vexatiousness to recover attorney's fees and

7      costs as the defendant in a case like this, so I think that

8      under that section of the False Claims Act alone, we would be

9      entitled to ask questions on that.

10             THE COURT: So you do not contend that the answer is

11     relevant at all to liability?

12             MR. O'BRIEN:  That's right, Your Honor.  We're not

13     asking it with respect to liability, it goes to the

14     vexatiousness issue.

15             MR. KING:  Your Honor --

16             THE COURT: Mr.  King, with the understanding that the

17     question is coming in for that limited purpose, although, we --

18     the Court has made no finding regarding liability at this

19     point, in order to streamline the proceeding, is there any

20     objection to the question being asked now while Mr.  Burke is

21     on the stand?

22             MR. KING:  That's fine.

23             THE COURT: And you will, of course, have the

24     opportunity to redirect.

25             MR. KING:  I would point out that the Rule 11 motion

1    has been filed accusing Mr. Burke of filing frivolously; that

2    that motion had already been decided and overruled.  It seems

3    like this is another opportunity to try to bring up whether or

4    not that motion should be granted, when it's already been

5    denied.

6            But in the interest of streamlining, for the limited

7    purpose of whether or not this is vexatiousness, it is -- I

8    will not object on that.

9            THE COURT: Very well.  Thank you very much, Mr. King.

10    The objection has been withdrawn, so, Mr.  Burke, let's ask Mr.

11    O'Brien to repeat the question.  We've had so much dialog --

12            THE WITNESS:  Yes.  Could you please repeat the

13    question?

14            THE COURT: Please state your question, and, then, Mr.

15    Burke, you will answer the question.

16    BY MR. O'BRIEN:

17    Q.   Sure.  Mr.  Burke, you contacted Senator Schumer at some

18    point in connection with this case; is that right?

19    A.   Mr.  O'Brien, I'd like to point out that my understanding

20    is --

21    Q.   I'm sorry, sir.  That's a very simple question.  Just, you

22    did write a letter to Senator Charles Schumer about this case,

23    right?

24    A.   I wrote a letter to the head of the joint committee on

25    printing, who has jurisdiction over the Government Printing

00000737

1    Office.

2    Q.    Okay.  But you also wrote a letter to Senator Charles

3    Schumer, right?

4    A.    Well, that is Senator Charles Schumer.  He's the head of

5    the joint committee on print --

6    Q.    Thank you.  Let's go ahead and mark -- I'm sorry.  We

7    don't have to mark it.  If I may approach the witness?

8              THE COURT: You may.

9              MR. O'BRIEN:  Thank you, Your Honor.

10   BY MR. O'BRIEN:

11   Q.    And for -- Mr. Burke, for your convenience, we've also

12   put it up on the screen in front of you, and it's also on Judge

13   Robinson's screen.  So Mr. Burke, this is the letter from you

14   to Senator Schumer, and it's dated May 8th, 2009, right?

15   A.    Correct.

16   Q.    It's also -- you've also sent it to "TWIMC", I take it

17   that's "To Whom It May Concern"?

18   A.    Correct.

19   Q.    Now, you wrote to Senator Schumer that you were suing

20   Record Press in the name of the people to recover paid

21   fraudulent claims; am I right?

22   A.    That's what it says, yes.

23   Q.    And you also gave Senator Schumer this Court's case

24   number, right; 08-CV-364?

25             MR. KING:  Your Honor, objection.  The document

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

```
1    speaks for itself.  If Mr. O'Brien wants to ask some other
2    question other than what the document says, I can understand,
3    but we can all read the document.
4              THE COURT: The objection is sustained.
5    BY MR. O'BRIEN:
6    Q.   Well, did you invite Mr.  -- rather Senator Schumer's
7    office to submit an amicus curiae in the case before this Court
8    right now?
9    A.   Well, it says you are welcome to supply an amicus curiae,
10   but that's not -- wasn't my request.  So you may request for
11   something else other than that.
12   Q.   Were you welcome to the Senator to submit an amicus curie
13   in this case?
14   A.   Well, I said his offices, it may not be him personally.
15   Perhaps, his counsel or the government joint committee on
16   printing's counsel.
17   Q.   Did you ask Senator Schumer to send a FOIA to the
18   Inspector General at the Department of Justice?
19   A.   Yes.  That was my request or request for information.
20   Q.   Did you tell Senator Schumer that, quote:  Thousands of
21   New York citizens individually defrauded, as well as
22   taxpayers?
23   A.   I made an assumption that there was a number other people
24   who were served with these bills of costs.  It turns out that
25   was incorrect information, but, of course, if they were
```

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000739

1    overcharging the government, then all citizens would be

2    defrauded.

3    Q.    Did you approach the New York Post about the case before

4    this Court?

5    A.    Yes.

6    Q.    Did you contact a reporter named Mr. Golding(Phonetic)

7    about this story?

8    A.    Yes.

9    Q.    Did you try to get the New York Post to do a story on

10   Record Press' alleged fraud?

11   A.    Well, I wouldn't characterize what the New York Post would

12   or would not do.  I gave them information.

13   Q.    Well, was it your hope that the New York Post would do a

14   story on Record Press' alleged fraud?

15   A.    I would hope that the public would be informed about

16   situations such as that.

17   Q.    In your letter to Senator Schumer and to whom it may

18   concern, nowhere in this letter do you name Calvin Adgerson,

19   correct?

20   A.    That's correct.

21   Q.    But this is in May 2009 that you wrote this letter, right?

22   A.    I guess I don't understand the question, counsel.  Why

23   would that be -- why would I put his name in there?  I don't

24   understand.

25   Q.    It's a simple question, sir.  I'm just asking you as of

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000740

1    May 8th, 2009, when you're writing to Senator Schumer, you

2    don't name Calvin Adgerson, right?

3    A.    What would I name him as?

4    Q.    Sir, is it "yes" or "no"?

5    A.    I didn't use Mr. Adgerson's name in this letter. I don't

6    understand the question, though.

7    Q.    Sure. But -- thank you for answering. The question has

8    been answered, but this is a year-and-a-half after you filed

9    your verified complaint, right?

10   A.    Again, I don't understand what -- why would I put his name

11   in the paper that was filed -- I filed in the Burke versus

12   Evans case on the day that I spoke to him.

13          THE COURT: I'm sorry. Mr. King, was there an

14   objection to the question that was asked?

15          MR. KING: Objection. Again, on the grounds of the

16   fact that this line of questioning is just asking Mr. Burke to

17   confirm dates in the letter, et cetera. If the question has to

18   do with why Mr. Burke didn't do something or did do something,

19   I can understand, but just reiterating again what's in the

20   letter, again, I would object on the same basis that the

21   document speaks for itself.

22          THE COURT: The objection is sustained.

23   BY MR. O'BRIEN:

24   Q.    Did you believe, sir, after you got the bill of costs that

25   individuals including yourself were defrauded when they lost

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    cases in the Second Circuit?

2    A.    I have to acknowledge that I made an assumption that the

3    U.S. Attorney's Office would -- identical to my case for people

4    who lost cases filed bills of costs, and I certainly didn't

5    think of any reason why they wouldn't.  Upon further

6    investigation, I couldn't find any other bills of costs on

7    people who lost cases, which is, perhaps, another issue for

8    some other forum, but I did have some incorrect information.

9    Q.    But my question is:  At the time that you were putting

10   together your complaint, did you believe that individuals,

11   including yourself, were defrauded when they lost cases in the

12   Second Circuit?

13   A.    I believed that it -- I did draw a conclusion that other

14   people were treated similarly to myself and given bills of

15   costs or perhaps law firms were given bills of cost and paid

16   them, and they would have been defrauded.  If no other

17   individuals or law firms were given bills of costs by the U.S.

18   Attorney's Office in the Southern District of New York, then

19   that information would not be accurate other than as

20   taxpayers.

21   Q.    But it was your belief that people who lost cases in the

22   Second Circuit were being defrauded because they got

23   overbilled; is that correct?

24   A.    That's correct.  I, again, as Record Press is the

25   contractor for the U.S. Attorney's Office, Southern District of

00000742

1    New York or through the Government Printing Office, if they

2    were also submit bill of costs by the Department of Justice and

3    in that Second Circuit, then that presumption is they would

4    have been identically defrauded as the attempt was against

5    myself.

6    Q.    And you told us earlier that in response to getting that

7    bill of costs, you notified the so-called joint committee on

8    printing; is that right?

9    A.    I understand under the Federal False Claims Act, I'm

10    required to notify the appropriate author.

11    Q.    So you notified the joint committee on printing?

12    A.    I notified employees of the joint committee on printing,

13    yes.

14    Q.    And you also contacted Congress; is that right?

15    A.    The joint committee on printing is a congressional

16    organization, and I understand the Government Printing Office

17    is a Congressional agency.  They have complete authority over

18    the Government Printing Office.  So the joint committee, the

19    Senate and the House of Representatives, so, of course, by

20    contacting the joint committee on printing, I would be

21    contacting Congress, yes, that's correct.

22    Q.    And you also contacted the Senate; is that right?

23    A.    Yes.  They are part of the joint committee on printing.

24    Q.    Sir, the New York Post never did a story on this; is that

25    right?

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000743

1  A.   To my knowledge, they have not yet done a story on this,
2  no.
3  Q.   Are you aware that the GPO investigated your complaint
4  against Record Press?
5  A.   I hope so.  I was supposed to get a closing report, but I
6  have not gotten any information on that filing.
7  Q.   Well, you were aware that the GPO found no fraud, right,
8  sir?
9  A.   Excuse me?  Could you repeat that question?
10  Q.   Yes.  You're aware that the GPO found no fraud with
11  respect to your complaint; is that correct?
12         MR. KING:  Objection.  Speculation.
13         THE COURT: Can you rephrase your question please, Mr.
14  O'Brien?
15         MR. O'BRIEN:  Yes, Your Honor.
16  BY MR. O'BRIEN:
17  Q.   Let me ask a different question if I may then.  It might
18  help clarify; you're aware that the GPO presented information
19  to your counsel that there was no fraud found with respect to
20  your complaint about Mr. Wilmot and Record Press, right?
21  A.   Are you talking about the Inspector General of the GPO or
22  the GPO itself that got the seven percent?
23  Q.   Sir, I'm talking about whether you're aware in September
24  of 2009 if that senior GPO representatives presented
25  information to your counsel showing that there was no fraud

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    committed by Record Press?

2    A.    I'm aware that Mr. Sullivan did meet with my counsel,

3    and, no, I would disagree with your statement.  They gave no

4    evidence.  They gave that spreadsheet which is the most

5    illogical piece of mathematics I've ever seen in my life, and

6    -- implies more fraud.  So I would have to answer the negative.

7    Q.    But you're aware that the -- that Mr. Sullivan of the GPO

8    met with your prior counsel; is that correct, sir?

9    A.    I am aware of that, yes.

10   Q.    And that he provided information with respect to your

11   complaints against Record Press?

12   A.    They supplied a similar spreadsheet, which they did not

13   have Record Press named in it, and I pointed it out to my

14   counsel at the time these nonsensical numbers that make the

15   spreadsheet less than worthless, perhaps, fraudulent in and of

16   itself.

17   Q.    So that's a "yes" that you're aware that Mr. Sullivan of

18   the GPO met with your prior counsel?

19   A.    I'm aware he met with them, yes.

20             MR. O'BRIEN:  Court's indulgence.  No further

21   questions at this time, Your Honor.

22             THE COURT: Thank you, Mr. O'Brien.  Will you have

23   redirect examination, Mr. King?

24             MR. KING:  No, your Honor.

25             THE COURT: Very well.  In that event, Mr. Burke, you

```
 1   may step down or return to your seat at the table next to your
 2   lawyer.
 3               THE WITNESS:  Thank you, Your Honor.
 4               THE COURT:  Thank you.  Mr.  King?
 5               MR. KING:  The plaintiff has no other witness to
 6   call, Your Honor.
 7               THE COURT: Are there other exhibits that you intend
 8   to move into evidence?
 9               If you wish to -- perhaps, this is the time that the
10   parties would appreciate a brief recess just so that you can
11   determine that you have moved in everything you believe you
12   have moved in.  You're welcome to speak with the deputy clerk
13   when she's free just to confirm that your list corresponds with
14   her list.
15               MR. KING:  Thank you, Your Honor.
16               THE COURT:  So once that has been accomplished, is it
17   correct that you will rest?
18               MR. KING:  That's correct, Your Honor.
19               THE COURT:  And your intention, Mr.  O'Brien, Mr.
20   Lomas, at that point?
21               MR. LOMAS:  Yes, Your Honor.  We'll make a motion for
22   under Rule 52(c) to enter judgment based on the evidence that
23   was presented in Mr.  Burke's case.
24               THE COURT:  Will you be prepared to proceed with the
25   motion after the brief recess?
```

```
 1              MR. LOMAS:  Yes, Your Honor.
 2              THE COURT:  Will you be prepared at that time to
 3     respond to the motion, Mr. King?
 4              I ask the question that way because we do have some
 5     degree of flexibility.  This is a bench trial.  I can take a
 6     brief recess; you can proceed with your motion, and I can hear
 7     your response tomorrow.  I can hear the motion and the response
 8     tomorrow.
 9              Perhaps, the thing to do is to take a recess of,
10     let's say, 20 minutes.  I will hear the motion, and then if you
11     wish me to wait until tomorrow for you to have an opportunity
12     to reply, we can do that.
13              MR. KING:  Okay.  Thank you, Your Honor.
14              THE COURT: Very well.  For now, we'll take a 20-
15     minute recess.  Thank you.
16              (Whereupon, there was a brief recess; thereafter,
17     court resumed as follows:)
18              THE COURT: We're back on the record now.  Mr. King,
19     did you have an opportunity to review your exhibit list and
20     compare it to the list maintained by the clerk?
21              MR. KING:  Yes, Your Honor.  And the only document I
22     had that has not --
23              THE COURT: Let me ask you to come back to the podium,
24     please.
25              MR. KING:  I'm sorry.  The only document that I have
```

1    that has not been offered yet is the expert report.

2            MR. O'BRIEN:  Your Honor, we would object to the

3    entry of the expert report.  No witness testified about --

4            THE COURT: Well, I was prepared to ask a question or

5    two.  What is the basis of your request to admit the report?

6    The expert has testified, of course, and has been excused.  And

7    no questions were asked by you regarding the report while the

8    expert was present.  So what is the basis now for moving to

9    admit the report?

10           MR. KING:  Well, the report provides the information,

11   you know, the supplementary information upon which the expert

12   formed his opinions, and I understood that the expert filed his

13   report with the Court.  It was very clear that he was

14   submitting this report pursuant to the testimony that he was

15   going to offer, and this is the documentation that supports his

16   testimony.

17           I wouldn't need him to authenticate it because it's

18   already very clearly his expert report.  It's just a request

19   that the -- having the testimony before the Court, having heard

20   his testimony, that his report now be admitted in support of

21   his testimony.

22           THE COURT: Mr.  Lomas or Mr.  O'Brien -- thank you,

23   Mr.  King.  You may have a seat for the moment.  Mr.  Lomas?

24           MR. LOMAS:  Thank you, Your Honor.  The expert report

25   is hearsay.  If Mr.  King wanted to elicit background and

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    support of Mr. Gocial's opinion, he could have done so on the

2    stand.  We have had no opportunity to cross-examine Mr. Gocial

3    on anything that is in that expert report.

4         And just with respect to being that it was filed with

5    the Court, of course, the Court struck the filing as improper

6    because it's an expert report, it was just the discovery matter

7    to be served on the parties; but, again, in the end, I mean,

8    it's a hearsay statement, and we have had no opportunity to

9    cross-examine Mr. Gocial so it's improper to be admitted at

10   this time.  Thank you.

11        THE COURT: Thank you, Mr. Lomas.  To the extent that

12   there is a request pending to admit the report as an exhibit,

13   the Court will deny the request.  The Court finds that the

14   exhibit is not admissible largely for the reasons offered by

15   counsel for the defendant.

16        The Court did not read the exhibit, and I recall that

17   when we were last in court, the Court noted on the record that

18   the Court took great pains to avoid reading the report and

19   addressed without regard to the contents of the report, the

20   motions that were pending at that time concerning the testimony

21   or anticipated testimony of Mr. Gocial, so the Court has not

22   seen the report.

23        In any event, Mr. Gocial was present and testified

24   in response to the questions that were asked of him regarding

25   what he considered in formulating his opinion.  So there is no

1  prejudice to the plaintiff, and, indeed, the report would

2  likely not have been received into evidence in any circumstance

3  since the report is hearsay.

4          The report is a -- typically, as in this case, the

5  report was provided in accordance with the rules governing

6  discovery and would not be -- would not be regarded as evidence

7  in the ordinary circumstance, particularly, whereas here the

8  witness was present and testified regarding the basis of his

9  opinion and indeed stated his opinion.

10         For those reasons, the Court will deny the request to

11  admit the report into evidence.

12         Now, Mr. King, with regard to your other exhibits?

13         MR. KING:  No other exhibit, Your Honor.

14         THE COURT: So let me remind you to come back to

15  podium, please.  So do you rest at this time?

16         MR. KING:  Yes, Your Honor.  The plaintiff has no

17  other exhibits or witnesses to call.

18         THE COURT:  Very well.  Thank you, Mr. King.

19         MR. KING:  Thank you, Your Honor.

20         THE COURT: Now, Mr. Lomas.

21         MR. LOMAS:  Yes, Your Honor.  As I mentioned before

22  we broke, we would like to move for judgment under 52(c), but

23  for the convenience of one of the witnesses, Mr. Sullivan, who

24  is here and has been patiently waiting, we would be willing to

25  go forward with Mr. Sullivan's testimony, who we would be

1    calling on our case, and we discussed that with Mr. King and

2    he was fine with that, as well, and then discuss the Rule 52

3    motion after Mr. Sullivan has completed his testimony if

4    that's all right with Your Honor.

5            THE COURT: That is perfectly fine. Very well. You

6    may call Mr. Sullivan.

7            MR. LOMAS: Thank you. Yes. And, also, Mr. Valdez,

8    again, is here, and he would like to be at counsel's table

9    while Mr. Sullivan is present if that's okay with Your Honor.

10           THE COURT: Is that again without objection, Mr.

11   King?

12           MR. KING: Yes, Your Honor.

13           THE COURT: Very well, thank you. Mr. Valdez, you

14   may return to the well of the court, and, Mr. Lomas, you may

15   call Mr. Sullivan.

16           MR. LOMAS: Thank you. Record Press calls Mr.

17   Sullivan to the stand.

18           THE COURT: Now, good afternoon. Let me ask you, sir,

19   to please face the deputy clerk to be sworn.

20   *            *            *            *            *

21           **RAYMOND SULLIVAN**, called as a witness in this case,

22   after having been duly sworn, testified as follows:

23   *            *            *            *            *

24           THE COURT: Now, good afternoon. Mr. Lomas.

25   **DIRECT EXAMINATION BY MR. LOMAS:**

1   Q.   Good afternoon, Mr. Sullivan.  Could you please state
2   your name?
3   A.   Raymond Sullivan.
4   Q.   And do you work for the Government Printing Office?
5   A.   Yes.
6   Q.   And how long have you worked for the Government Printing
7   Office?
8   A.   Approximately 35 years.
9   Q.   And could you tell us about your history with the
10  Government Printing Office?  Did you -- when did you start with
11  them?
12  A.   I started with the Government Printing Office straight out
13  of college, was hired into a management trainee program; a
14  three-year program.  After that, I became a printing
15  specialist, was involved in writing, certifying, and awarding
16  contracts.
17       From there I became involved in automation efforts; did a
18  lot of work on printing cost estimating systems and electronic
19  procurement systems within GPO.  I moved from there to a staff
20  director position where I wrote policy and regulation and
21  contract terms.  After that, I moved to a position of over a
22  division called the "Term Contracts Division", which is the
23  type of contract that is in question.  I supervised that
24  division that specifically related -- worked on these types of
25  contracts.

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

```
1        After that I moved to a position of -- my title was
2    "Director of Major Acquisitions".  I handled large scale
3    acquisitions such as a worldwide A-76 contract for all of the
4    State Department printing areas and the 2010 census.  My
5    current title is I am "Acting Managing Director of Customer
6    Services", which oversees all of the print procurement
7    functions at the GPO.
8    Q.   The printing procurement functions, is that referring to
9    printing that's procured from outside vendors?
10   A.   Correct.
11   Q.   Would -- such as one of those outside vendors be Record
12   Press, for example?
13   A.   Yes.
14   Q.   So throughout your time at the GPO, have you had the
15   opportunity to review contracts with vendors, outside vendors,
16   for printing services?
17   A.   Yes.  I have done that pretty much my whole career.
18   Q.   And what is your position now -- how is that in relation
19   on an organization chart, for example, with respect to the head
20   of GPO?
21   A.   The head of the agency is the public printer.  There is an
22   assistant public printer beneath him, and I report directly to
23   that person.
24   Q.   Okay.  Now, are you familiar with the Record Press
25   contract that is -- that this case is about?
```

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000753

1    A.   I have reviewed that contract, yes.

2    Q.   And when did you first review that contract?

3    A.   I want to say at August of 2009, I was asked to fill in

4    for a director who was over the east coast regional offices who

5    had been reviewing this case and was retiring, and I was given

6    this to review upon his retirement.

7    Q.   So you were reviewing the contract in response to this

8    case here?

9    A.   Yeah.  I believe that we were preparing to meet with

10   attorneys for both sides, and I was just going to give GPO's

11   interpretation, and there were some questions on our

12   procurement policies and practices that I was trying to answer.

13   Q.   And then what did your review for -- that you were just

14   discussing now, what did that entail?

15   A.   Well, basically, I was told that there were questions

16   concerning the billing and the interpretation of the contract,

17   so I reviewed the contract.  I reviewed the invoices; there

18   were two invoices in particular that were in question.  I

19   reviewed those invoices.

20       I was looking -- this had been reviewed multiple times

21   before.  Our financial management area had reviewed it; a

22   director in our financial management area had reviewed it.  The

23   director who I was taking over had reviewed it.  I believe our

24   inspector general had reviewed it several times.

25       So I was just one final review to familiarize myself

1    before I sat down with the attorneys, but I was just looking

2    for any improper billing or anything wrong with the way the

3    contract was written.

4    Q.    Did you find anything wrong with any of the billings under

5    that contract?

6    A.    No.  The invoices that I looked at were billed correctly.

7    I believed that the contract was interpreted clearly by the

8    contractor and GPO.  There was a meeting of the minds, and I

9    did not see any irregularities.

10   Q.    So Record Press did not -- did Record Press, excuse me --

11   did Record Press overcharge the GPO in those two invoices for

12   collating, trimming to size, and binding?

13   A.    No.  In my review, it revealed that they billed exactly

14   according to the contract.

15   Q.    Okay.  I'd like you to refer what was previously marked as

16   Plaintiff's Exhibit A.  I don't know if it's on the witness

17   stand or if we can have the clerk hand you the --

18              THE COURT:  There's a copy of Exhibit A there.

19              MR. LOMAS:  It was previously moved --

20              THE DEPUTY CLERK:  I don't have any exhibits --

21              THE COURT: Mr.  Sullivan, are you able to read what

22   was just posted on the screen?

23              THE WITNESS:  Let me try with my glasses on.  I'm

24   sorry.  Uh, yes.

25   BY MR. LOMAS:

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000755

1    Q.   Okay.  And this was previously marked as Plaintiff's

2    Exhibit A, and if you look on the pages marked RP-52, is this

3    the contract that you reviewed?

4    A.   I have a copy of a bid form in front of me.

5            MR. LOMAS:  Can I hand you another copy?  I handed

6    the clerk another copy of --

7            THE COURT:  Oh, you're getting a hard copy of the

8    exhibit now.

9            MR. LOMAS:  Yes; okay.  Again, that's the exhibit

10   that was previously entered as Plaintiff's Exhibit A.

11   BY MR. LOMAS:

12   Q.   Now, Mr. Sullivan, is that the contract that you

13   reviewed?

14   A.   Yes, it is.

15   Q.   How was this contract formed?

16   A.   The -- our basic contracting, we're responsible as an

17   organization for procuring printing for all of the agencies

18   within the federal government, legislative, executive, and

19   judicial.  We usually get a request from the agency; it might

20   be Treasury or Internal Revenue Service or the U.S. Attorney's

21   Office to write a contract.  We develop an invitation for bid.

22   Most of these contracts are handled as sealed bids.

23       So we would develop an invitation for bid; that bid would

24   normally be distributed to approximately 20 to 40 contractors.

25   It would be posted online, and then there would be a public bid

1    opening in which the bids were read.

2        We would then -- it would go to a printing specialist who

3    would review the actual bids, check them for price

4    reasonableness, verify that the low contractor was capable of

5    actually producing the product, and we also maintain detailed

6    performance history on all of our vendors.

7        So we would review performance history and just to make

8    sure that we were awarding to the low responsive, responsible

9    contractor.  Award would then be made based through a purchase

10    order issued to the contractor, the low contractor.

11   Q.   Was there -- are there any documents that are sent with

12   the request for bid to potential contractors, at least -- let

13   me rephrase that.  Excuse me.

14        Were there any documents sent with this particular

15   invitation for bid to potential contract vendors?

16   A.   I believe the previous abstract, which is the last page of

17   this document I am looking at, was sent along with this

18   contract.

19   Q.   On the screen, if we could go to Page 69 of Plaintiff's

20   Exhibit A, and is the page that you're talking about, the

21   abstract, is that the page that's marked at the bottom, RP-69?

22   A.   Yes.

23   Q.   And could you tell us about -- could you tell the Court

24   about what this is, this abstract is?

25   A.   Basically, this abstract, when we go out for bid on a term

1    contract, we're not sure exactly what products we're going to

2    be buying, and there's a range of products.  So we'll break

3    down the product by various line items, either pages or covers,

4    or whether it drills or not drills and receive prices for those

5    individual line items, and we develop a basis of award.

6         This abstract, basically, we take the bids that come in

7    for the individual line items from the various printing

8    companies, enter them into this abstract, which would give us a

9    total dollar value for a year estimated on our basis of award

10   figures.  We use it for comparing line items across -- like if

11   I had 10 contractors bidding, I could look at an individual

12   line item across and pick out any discrepancies or

13   abnormalities in the pricing.

14   Q.   So do the line items on this spreadsheet match the line

15   items that are in the invitation for bid?

16   A.   Well, in this particular case, the abstract, this

17   abstract, would be a copy of the previous contract.  In other

18   words, it was -- this abstract -- there was a contract prior to

19   this.  I don't know how many years, but this abstract would

20   include all of the prices from the previous contract.

21        So it's possible that there were some changes in this

22   contract.  I don't believe there were.

23   Q.   So the abstract reflects bids -- are you saying the

24   abstract reflects bids that were made under the prior term of

25   this contract?

1    A.    This particular abstract I'm looking at now does, yes.

2    Q.    And so why would this abstract be sent by the GPO to the

3    vendors that were bidding on the new contract?

4    A.    There's multiple reasons:  One is we want them to know --

5    our goal is to get the best possible prices we can for our

6    customers.  We tend -- our bid prices tend to be very

7    competitive.  A lot of times, we'll have new vendors coming in.

8         By attaching this abstract, they know right away who their

9    competition is, who bid on this last time, how the prices are

10    running, whether they are capable of competing with them or not

11    competing and would also clear up any, you know, exactly how

12    we're going to be pricing that, any interpretation issues.

13    Q.    So when you say that the bidding is very competitive, and

14    it sort of helps -- did you say it sort of helps identify

15    whether -- helps vendors identify whether they're able to

16    compete on the bid?

17    A.    Sure.

18    Q.    And so, for instance, -- so could you explain that?  Does

19    that mean, for instance, that the vendor might not be able to

20    have a price that low enough to make the bid?

21    A.    Right.  A lot of times we'll find that vendors want to

22    compete, but once they see the pricing that we're getting,

23    they'll either make a decision, okay, I'm not -- I can't

24    compete in that printing vendor.

25         Some of them compete on price.  Some of them compete more

00000759

```
 1    on service.  You know, so it depends on the particular
 2    contract, but, yes, we save ourselves a lot of trouble and also
 3    the printing firms a lot of trouble if they can see what the
 4    competition pool is up front.
 5    Q.    Now, I'd like to refer you to the section on this
 6    spreadsheet that has a group of line items under the Roman
 7    Numeral II on the left column, and if you look on the screen,
 8    it's kind of been blown up for you a little bit so you can see
 9    more clearly.
10          You mentioned, I think, that the spreadsheet gives some
11    information about how the GPO accepts -- expects there to be
12    prices for certain of the line items.  Does this portion here
13    provide that information?
14    A.    Yes.
15    Q.    And so what does this say -- what information does this
16    communicate to potential vendors about the line item to a
17    complete cover?
18    A.    Complete cover will be price per 10 copies.
19    Q.    Then what does it communicate to a potential vendor about
20    line item 2-B, text per page?
21    A.    The exact same thing, will be priced per 10 copies.
22    Q.    How about with respect to line item "C", pressure
23    sensitive cover stock?
24    A.    Cover stock will be per 100 leaves.
25    Q.    Then what about with respect to line item 2-D, collating,
```

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    trimming to size, and binding?

2    A.    That would be per 100 page.

3    Q.    So would a per-10-copy running rate also apply to the line

4    item 2-D, collating, trimming to size, and binding?

5    A.    No, obviously not.

6    Q.    Okay.  If you could flip back to the page marked RP-67 of

7    Plaintiff's Trial Exhibit A.

8    A.    (Witness complies.)  Okay.

9    Q.    Okay.  And then do you see on that page, RP-67, is there a

10   line item there for collating, trimming to size, and binding?

11   A.    Yes.

12   Q.    What is the price that's in this bid for that line item?

13   A.    $12.25 per 100 pages.

14   Q.    Does the per-10-copy running rate apply to that price?

15   A.    No.

16   Q.    Which line items does the per-10-copy running rate apply

17   to on this page?

18   A.    On this page, it would apply to the complete cover and the

19   text per page.

20   Q.    And how do you know that?

21   A.    Well, there's multiple reasons:  One, if you're looking at

22   "C", leaves, and C-1 and C-2, obviously, that already has per

23   100 leaves "D" has per 100 pages; "A" and "B" do not.  The

24   running per copy or the running rate is normally something that

25   we use to apply to a machine production.  It's -- in most

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    printing, most of our printing contracts, we have a make ready

2    charge.

3        It costs a certain amount of money to prepare a piece of

4    equipment to get it ready to run something, but once it starts

5    running, that cost, the running rate, is different.  So the

6    larger the runs, the cheaper it will be, and that's the way we

7    would normally price printing.

8        Here, we're looking at copying; because it's copying, we

9    don't have a make-ready, but we're still using the term

10   "running rate".

11   Q.   Okay.  So would other individuals in the printing

12   industry, vendors and so forth, know that a running rate would

13   not apply to things like the pressure sensitive cover stock,

14   and collating, trimming to size, and binding?

15   A.   Sure.  That would be common knowledge in the printing

16   industry, and particularly in our -- we have a very restricted

17   community of bidders.  We have maybe 10,000 printers nationwide

18   that bid strictly on government work, so it's a small

19   community, and one of the advantages that we have in our

20   procurement operations, one of the reasons we get such

21   effective pricing is that there is -- the communication

22   between us, we have people that are experts in printing buying

23   printing from these people, so everybody understands what we're

24   talking about.

25       It reduces the risk to the printer because they know that

1    we have evaluated this and that we're telling them all of the

2    attributes that are going to be purchased under this contract.

3    Q.   I'd like to refer you now to what was marked as

4    Plaintiff's Exhibit D.  Do you have a copy of that to hand the

5    witness?  Or --

6              THE DEPUTY CLERK:  I don't have any copies.

7              THE COURT: Are you able to read the copy on the

8    screen?

9              THE WITNESS:  Yes.  With some difficulty, but I can

10   read it.

11             MR. LOMAS:  Oh, okay.  Well, if you can read the copy

12   on the screen --

13   BY MR. LOMAS:

14   Q.   All right.  So this is the invoice that's A-71700 and was

15   previously entered in as Plaintiff's Trial Exhibit D with the

16   reference RP-659 at the bottom.

17        Mr. Sullivan, is this one of the invoices that you

18   mentioned you reviewed earlier in response to this case?

19   A.   Yes.

20   Q.   And do you see in the middle of the page, is there a

21   charge there for collating, trimming to size, and binding?

22   A.   Yes, there is.

23   Q.   And what was the price -- what was the amount charged

24   there?

25   A.   The amount charged is $372.40.

00000763

1    Q.    And what was the price that was charged?

2    A.    The price listed here is -- let's see if I can -- somebody

3    just put something up in front of me that --

4    Q.    Let me ask that question, again:    What is the price for

5    the collating, trimming to size, and binding charge that's

6    listed on this invoice

7    A.    The total price is -- it keeps bouncing around.  The total

8    price is -- are we done?  Okay.  The total price is $372.40.

9    Q.    What was the rate that was charged for collating, trimming

10   to size, and binding on this invoice?

11   A.    It looks like they have that broken down here as 12.25 per

12   100 pages.

13   Q.    And is that the contract price?

14   A.    Yes.

15   Q.    So is the charge here that Record Press billed the --

16   excuse me -- is the charge for collating, trimming to size, and

17   binding that Record Press billed the GPO for this case correct?

18   A.    Yes.

19   Q.    Now, I'd like to refer you to what was marked as

20   Plaintiff's Exhibit C, and, hopefully, we'll bring that up on

21   the screen for you.  Okay.  So on the screen you should see a

22   copy of what is titled Invoice A-71701, which was previously

23   marked as Plaintiff's Exhibit C and has the production number

24   at the bottom, RP-660; is this the second invoice that you

25   reviewed when you -- in response to this matter?

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

```
1    A.   Yes.

2    Q.   And is there a charge for collating, trimming to size, and

3    binding on this invoice?

4    A.   Yes, there is.

5    Q.   And what is the amount that Record Press billed for

6    collating, trimming to size, and binding in this invoice?

7    A.   $1,386.70.

8    Q.   And what was the price rate that Record Press charged?

9    A.   12.25 per 100 pages.

10   Q.   And was that the contract price?

11   A.   Yes.

12   Q.   And is this -- is the amount that Record Press charged

13   for collating, trimming to size, and binding in this invoice

14   the correct amount pursuant to the contract?

15   A.   Yes, it is.

16   Q.   Now, if a running rate per-10-copy would apply to this

17   line item, what would it do to the amount?

18   A.   It would divide them by 10, and part of my review of this

19   thing when you -- if you took that logic, these prices would

20   become unreasonable.

21   Q.   So when you say you would divide it by 10, would the price

22   then be just 10 percent of what it is, the amount be just 10

23   percent of what it is on this invoice?

24   A.   Correct.

25   Q.   And so just roughly, is that a reduction of a little bit
```

1  over a thousand dollars; is that right?

2  A.   I'm not sure I can do the math that quick in my head.  I

3  don't --

4  Q.   Fair enough.  In any event, you said such a reduction

5  would be -- what was your word, unreasonable?

6  A.   I think it's unreasonable when you try to apply that to

7  the other line items, in particular, one of the things I'm

8  looking at here would be pressure sensitive cover stock, which

9  is $12.50 per 100 leaves.  If you applied the 10-copy-rate to

10  that, then you'd be down to $1.25 for a hundred leaves of

11  pressure sensitive cover stock, which I would determine

12  unreasonable.

13  Q.   If the per-10-copy running rate applied and the amount for

14  collating, trimming to size, and binding would be reduced by 90

15  percent, would the GPO be able to find a contractor that could

16  do this work for that amount of money?

17  A.   Well, I don't believe anybody would bid those types of

18  prices.  If I saw those prices that low, I would question it as

19  far as whether or not there had been an error made in the bid

20  process.

21  Q.   Now, Mr. Sullivan, did you provide the results of your

22  review, this information we're just discussing, to Mr. Burke

23  or his counsel?

24  A.   I believe that I met with previous counsel.  Again, I

25  think that was in September of '09, yes.

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000766

1   Q.   And did you explain what you just testified here today?

2   A.   I did.

3   Q.   Did you provide a copy of -- or did you provide any

4   documentary evidence?

5   A.   I don't believe so.

6         MR. LOMAS:  I'm handing to the clerk and ask that it

7   be marked as Defendant's Exhibit 1 and if you could pass to the

8   witness?

9         THE DEPUTY CLERK:  Thank you.

10  BY MR. LOMAS:

11  Q.   Mr. Sullivan, you've been handed what has been marked as

12  Defendant's Exhibit 1.  If you could take a moment to look at

13  this document and see if it helps you remember if you provided

14  anything to -- any documents to Mr. Burke's counsel during

15  that September 2009 meeting?

16  A.   Yes.  Yes.  This was provided.

17  Q.   And what is this document?

18  A.   This is a copy of the abstract from the current contract.

19  Q.   So the contract that we discussed earlier which was marked

20  as Plaintiffs's Exhibit A, the Record Press/GPO contract?

21  A.   Correct.

22  Q.   If I can refer you to the portion again with Roman numeral

23  II, that identifies the different line items, and,

24  specifically, line item 2-D, the collating, trimming to size,

25  and binding line item; what does this abstract say about that

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    line item?

2    A.   Per 100 pages.

3    Q.   And is Record Press' price under the contract indicated

4    there?

5    A.   Yes; $12.25.

6    Q.   And is $12.25 per 100 pages the contract price?

7    A.   Yes.

8    Q.   And does the per-10-copy running rate apply to that line

9    item?

10   A.   No, it does not.

11          MR. LOMAS:  Your Honor, at this time, I'd like to

12   move this exhibit, Defendant's Exhibit 1, into evidence.

13          THE COURT: Is that without objection, Mr. King?

14          MR. KING:  No objection.

15          THE COURT: Very well.  Defendant's Exhibit 1 will be

16   admitted without objection.

17   BY MR. LOMAS:

18   Q.   Mr. Sullivan, despite Mr. Burke's lawsuit, does the GPO

19   still contract with Record Press?

20   A.   Yes, we do.  This was a one year contract with four option

21   years, and the final option year was exercised I believe in

22   November of 2010.

23   Q.   So the GPO exercised their option again?

24   A.   Yes.

25   Q.   And is the price in this contract still $12.25 per 100

1    pages for the collating, trimming to size, and binding line

2    item?

3    A.    Yes, it is.

4    Q.    And does the per-10-copy running rate still not apply?

5    A.    Yes.

6          MR. LOMAS:  Thank you.  I have no further questions.

7          THE COURT:  Thank you, Mr. Lomas.  Mr. King, you

8    may cross-examine.

9    **CROSS-EXAMINATION BY MR. KING:**

10    Q.    Good afternoon, Mr. Sullivan.  Thank you for your time

11    today.

12    A.    Good afternoon.

13    Q.    If you take a look at the exhibit that defendant's just

14    offered you, it's Defendant's Exhibit 1.  It's this abstract.

15    If you take a look at the column labeled "Basis of Award" --

16    have you identified that column?

17    A.    Yes.

18    Q.    What does the basis of award refer to?

19    A.    Let's see if I can explain this simply.  We -- when an

20    agency would come to us for the establishment of a new

21    contract, say the very first time they come to setup a contract

22    and say it's for briefs or something like that, what we try to

23    determine is how much work is going to be placed on that

24    contract.

25          So we would ask them, okay, how many orders are you going

1    to place; how many pages are each order going to be; how many
2    of the orders are going to have proofs; how many orders are
3    going to be on this type of stock or this particular trim size,
4    and that estimate is what we use as a basis of award.
5         And then that is entered into the invitation for bid, and
6    on this -- when the bids come back, those basis numbers are
7    multiplied by the unit item prices to give us an estimate for
8    the total dollar value of that contract for a year.
9         And that is actually what we base our award on, would be
10   the contractor that came up with the lowest dollar figure, on
11   that basis of award, but it's a -- the simplest way I can put
12   it, it's our best guess of what is going to happen on that
13   contract for the next year for each of those line items.
14   Q.   Then is it the case that if -- well, let's look directly
15   at it, then, for line item 2-D under this abstract, the basis
16   of award is 14?
17   A.   Uh-huh.
18   Q.   Does that refer to 14 pages or 14 copies or 14 jobs or,
19   you know, what --
20   A.   That would refer to 1,400 pages.
21   Q.   That would refer to 1,400 pages.
22   A.   You have a per-100-page price, and we're saying that's --
23   our guess was that's going to happen 14 times.  So, basically,
24   over the term of this contract, we were estimating that that
25   would be 1,400 pages.

1    Q.   Okay.  You stated also that the way basis of award is used

2    to provide that total estimate is that you take that basis of

3    award of 14, you multiple it by the unit rate, and the unit

4    rate is the price that the contracting partner -- party

5    submits; you multiply those two together, and you get your

6    total costs; is that correct?

7    A.   Correct.

8    Q.   Now, if you -- if the basis of award of 14 means it's

9    1,400 pages, why isn't that factored into the costs?

10             MR. LOMAS:  Objection.  Vague.

11   BY MR. KING:

12   Q.   Why isn't the rate of per 100 pages factored into the

13   costs?

14             THE COURT: Objection withdrawn?

15             MR. LOMAS:  No.  I still believe it's vague, but --

16             THE COURT: What is your objection, Mr. Lomas?

17             MR. LOMAS:  Well, I just don't understand what the

18   question he's asking, so I don't know if the witness -- but it

19   seems vague to me.

20             THE COURT: May I ask you to rephrase your question,

21   please, Mr. King?

22             MR. KING:  Yes.

23   BY MR. KING:

24   Q.   You said that -- I asked you what does 14 refer to; does

25   it refer to copies, pages, et cetera, right?  And so, again,

1  what was your answer to that question?

2  A.   The 14 would -- in this particular case that we're talking

3  about -- we're getting a price per 100 pages, and so we're

4  trying to make an estimate over the next year how many times

5  that's going to happen or what's the total bulk of this line

6  item.

7      So what we're using here is this is 14 -- somebody made a

8  guess that this was going to be 14; so you'd be 14 times 100

9  pages.  So the quantity that we're talking about there would be

10  1,400 pages, and the dollar figure would be $171.50 if that's

11  what that says.

12  Q.   Okay.  Now, I'm having difficulty understanding your

13  calculations because you're referring to 14 times 100 pages,

14  but then you refer to the cost of $171.50; but that calculation

15  is based on 14 times the unit rate of $12.25.

16      So is it the case that $171.50 is based on the basis of

17  award times the unit rate or is it the case that $171.50, the

18  cost, is based on the basis of award times the per-page-amount

19  of 100 per page?

20  A.   I'm not totally sure I understand what you're asking; the

21  171 is 14 times 12.25.

22  Q.   That's right.  Is the per-100-pages' rate for this line

23  item reflected at all in the cost of $171.50?

24  A.   Yeah, I believe the per-100-page rate is $12.25.  So we're

25  multiplying that times 14; so, yes, it is -- in that, it is in

1    that calculation which gets us to the 171.50.

2    Q.    And where is it in that calculation?

3    A.    I'm not -- I'm not sure how I can be more clear; 14 times

4    12.25 equals 171.50; 12.25 is the unit rate, correct?

5    Q.    Yeah.  That's -- so you just stated the formula, but I did

6    not hear you say 100 pages.  So where in that formula does the

7    100 pages --

8    A.    $12.25 is per 100 pages.

9    Q.    So you multiply 12.25 per 100 pages?

10   A.    No.

11           MR. LOMAS:  Objection, Your Honor.

12           THE COURT:  Overruled.

13           MR. LOMAS:  Mischaracterizes testimony in asking this

14   question in a number of different ways, and he's answered it.

15           THE COURT:  The objection's overruled.

16   BY MR. KING:

17   Q.    The -- okay.  You just stated the formula, 14 --

18           THE COURT:  Well, are you withdrawing the question

19   that occasioned the objection?  I overruled the objection.

20           MR. KING:  I was waiting for an answer.  I wasn't

21   getting an answer.  So I thought I might --

22           THE COURT:  So are you going to ask another question?

23           MR. KING:  Could you answer the question?

24           THE WITNESS:  At this point, I'm not sure what the

25   question was.

1    BY MR. KING:

2    Q.   Okay.  Do you agree that the number $171.50 is a product

3    of the two numbers, 14 times $12.25?

4    A.   Yes, I do.

5    Q.   Okay.  Do you also agree then that $171.50 does not

6    include the per-100-page rate?

7    A.   I do not agree with that statement.

8    Q.   Okay.  How does that number reflect the per-100-page rate?

9    A.   If you have a something that you're trying to buy, and

10   it's $12.25 per 100, okay, and you're going to buy 14 of them,

11   you're going to end up with 1,400.  In this case, 1,400 pages,

12   and you're going to pay $171.50.

13   Q.   Okay.  I think I understand what you're saying now.

14   You're saying that $171.50 really represents a per-100-page

15   amount?

16   A.   No.

17   Q.   No?  Are you sure?

18   A.   Yes. $12.25 is the per-100-page rate; 171 represents 14

19   times that, which was our estimate of the total number of pages

20   that would be procured under this for a year.

21   Q.   Okay.  Then $171.50, does that represent a per page

22   amount?

23   A.   No.

24   Q.   Why?

25   A.   Why?   Again, I'm not sure what question you're asking.  I

1    don't know -- I'm struggling how to make this any clearer.

2    Q.    Let me rephrase the question.  I asked you if $171.50

3    represents a per-100-page amount, and you said, no.  And then I

4    asked you does $171.50 represent a per page amount, and you say

5    no.  And so if it doesn't represent either per 100 pages or per

6    page, what does it represent?

7    A.    It represents the cost of 1,400 pages.

8    Q.    At --

9    A.    It's a sum of other rates, unit -- it is a sum of the per

10   page unit rate times a quantity.

11   Q.    How is it possible mathematically for that to represent an

12   amount corresponding to 1,400 pages when you've only multiplied

13   it by 14?

14   A.    The 14 is multiplied by the per-100-page rate.  So there

15   is --

16   Q.    Okay.  Where in this chart is 14 multiplied by 100?

17   A.    Where in this chart -- it's not in this chart.

18   Q.    That's right.

19   A.    I mean as far as being specifically directed in there.

20   Q.    That's right.  That rate of per-100-pages is not applied

21   in this chart.

22   A.    Incorrect.

23            MR. LOMAS:  Objection.  Mischaracterizes testimony.

24            THE COURT: Sustained.

25   BY MR. KING:

```
1   Q.   That per-100-page is not multiplied at all in this chart,
2   is it?
3           MR. LOMAS:  Objection.  Mischaracterizes his
4   testimony.
5           THE COURT: The objection is sustained.
6   BY MR. KING:
7   Q.   If we go now up to the top, 2-A, this also has a value for
8   basis of award; do you see that value there?
9   A.   Which line?
10  Q.   Line item 2-A?
11  A.   For complete cover?
12  Q.   Yes; for complete cover?
13  A.   Is that what we're referring to?
14  Q.   Yes.  And can you identify the number there for basis of
15  award?
16  A.   1,327.
17  Q.   Okay.  That's what I see, as well.  Now, if you follow the
18  row over to the cost, is it true that the cost is a value that
19  is equal to the basis of award times the unit rate?
20  A.   Correct.
21  Q.   And, in this case, what does the basis of award represent?
22  A.   The basis of award would represent, again, our anticipated
23  quantity, which would be 1,327, times -- in this case, we're
24  talking 10 copies.
25  Q.   So it's a quantity of what?
```

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    A.   The total quantity would be --

2    Q.   I'm saying it's a -- what is it a quantity of, pages;

3    copies --

4    A.   Covers.

5    Q.   It's a quantity of what?

6    A.   Complete covers.

7    Q.   Okay. And when you are calculating the costs here, you

8    testified earlier that you do apply this per-10-copy rate here,

9    but does this chart apply the per-10-copy rate?

10   A.   It applies it in the same way that the previous line item

11   we were talking about applies it.

12   Q.   Does it multiply the rate at all in the chart?

13   A.   You'd have to rephrase that question for me.

14   Q.   When you say "apply", what do you mean by "apply"?  You

15   said that it applies the rate; what do you mean by "applies the

16   rate"?

17   A.   The calculations are based -- for this particular line

18   item, we're talking complete cover per-10-copies.  That works

19   the same way as the line item before we were talking about

20   collating per 100 pages, and I don't think I ever -- we ever

21   communicated or I ever got to the point where there was an

22   understanding, but -- of how those line items worked, but they

23   work, but they both work identically.

24   Q.   Uh-huh.  When you say that the line item in this chart

25   applied the per-10-copy rate, you're not saying that that rate

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    is actually used as a multiplier in this line item, are you?

2              MR. O'BRIEN: Objection. Vague.

3              THE COURT: Sustained.

4    BY MR. KING:

5    Q.   Do you know what I mean by -- you know what I mean by

6    multiplying, right?

7              MR. O'BRIEN: Objection.

8              THE WITNESS: I believe I do.

9    BY MR. KING:

10   Q.   Okay. Is the per-10-copies rate here in line item 2-A

11   used in terms of multiplying it against the basis of award, the

12   unit rate or the cost?

13   A.   No, it is not.

14   Q.   Okay. The cost there of, the total cost -- I'm reading it

15   as 7,962; do you also see that?

16   A.   Yes.

17   Q.   Okay. That total cost there, then, that refers to copies

18   or covers or pages or what?

19   A.   That is the estimated value for a number -- the basis of

20   award number of covers for the year.

21   Q.   Okay.

22   A.   In this case, it would be -- and again I'm having trouble

23   seeing this, but 13,270 covers are what we estimated for the

24   year. That dollar figure represents what it would cost for

25   this particular vendor to supply that number of covers for one

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000778

```
 1    year.
 2    Q.   Again, when you stated earlier that the rate in this
 3    abstract corresponds to the contract, and you had reviewed the
 4    contract and you reviewed the paragraph II, Roman numeral II,
 5    and below there was the line item D that referred to collating,
 6    trimming to size, and binding, and you determined that the
 7    running rate did not apply to that item, that line item --
 8              THE COURT:  I'm not certain that the record is clear
 9    that Mr.  Sullivan agrees with your characterization of his
10    testimony.  So before you ask a question predicated upon an
11    agreement, let me ask you to inquire whether Mr.  Sullivan
12    agrees that your summary is accurate.
13              MR. KING:  Thank you, Your Honor.
14    BY MR. KING:
15    Q.   Is that an accurate reflection of what you had stated
16    before?
17    A.   Could you give that to me again?  It was quite a bit.
18    Q.   Yes.  I'm sorry.  You had testified --
19              THE COURT:  Do you wish assistance from the court
20    reporter to read the question back?
21              MR. KING:  I don't think that's necessary.  I'll just
22    make the point that you testified earlier about the application
23    of the running rate to those various line items in the contract
24    itself; in the contract as opposed to this abstract.
25              THE WITNESS:  Yes, I did.
```

1   BY MR. KING:

2   Q.   Okay.  And in that testimony, you made distinctions

3   between applying the running rate to certain line items and

4   others.

5   A.   I did make those distinctions on the running per-10-copy

6   rate at the top of those columns, yes.

7   Q.   Uh-huh.  And the basis was that the running rate would

8   apply to A and B, but it did not apply to D?

9   A.   The running per-10-copies, that's correct.

10  Q.   Did -- had you discussed this interpretation with Mr.

11  Wilmot or anyone with Record Press prior to this contract

12  having been executed?

13  A.   I have never met or had any discussions with Mr.  Wilmot.

14  Q.   Okay.  Did you ever have an opportunity to review whether

15  or not the basis of award reflected in this abstract actually

16  corresponded to the proportion of the work actually done?

17  A.   Yes, I did.

18  Q.   And what did you find?  Did you find that they were, that

19  this basis of award is accurate?

20  A.   No.  There are figures in the basis of award that are not

21  accurate based on the -- again, it was an estimate up front

22  looking at the invoices.  It was not totally accurate, which in

23  some cases would have been a concern for me.

24       But in this particular instance, since there was only one

25  bidder, again, that basis of award had no -- it served no

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

```
1    function as far as awarding this contract.  One of the main
2    functions of the basis of award would be to determine bidders'
3    ranking, and there was only a single bidder on this contract.
4              MR. KING:  Okay.  No further questions.  Thank you.
5              THE COURT: Thank you, Mr.  King.  Mr.  Lomas, do you
6    have redirect?
7              MR. LOMAS:  We do not, Your Honor.  Thank you.
8              THE COURT:  Very well.  Thank you very much, Mr.
9    Sullivan.  You may step down.  And, Mr.  Valdez, I'll ask you
10   to please return to the area outside the well of the court.
11   Thank you.
12             It is now approximately 20 minutes until five.  My
13   intention was to recess no later than five.  If you believe,
14   Mr.  Lomas, that you can make your motion and complete your
15   argument on it in 15 minutes, I will hear it now.  Otherwise --
16   and I will permit you to respond tomorrow, Mr.  King, after you
17   have had an opportunity to prepare to respond because your
18   response would go beyond the time that we must recess for the
19   day.
20             Alternatively, we will simply adjourn for the day now
21   and resume tomorrow, and it will be in the afternoon, I am
22   reminded, because of a scheduling conflict in the morning.  In
23   other words, we will resume tomorrow at 2:00 p.m. for
24   arguments.
25             MR. KING:  Your Honor, if I may, I do have a matter
```

00000781

1    pending in another jurisdiction tomorrow that's very far away.

2    It is at 12 o'clock.  I would not be able to return by two.  I

3    can try to reschedule it, but the next day, the following day,

4    is great.

5            THE COURT: Bear with me one moment, please, while I

6    confer with the deputy clerk.

7            (Whereupon, there was a brief pause in the

8    proceedings.)

9            May I suggest later tomorrow; would you be available

10   tomorrow, Mr. King?  For example, at 3:30 or even 4:00?

11           MR. KING:  If I hurry, I could be here by four.  I am

12   -- you know, --

13           THE COURT: Let me ask you to return to the podium,

14   please.

15           MR. KING:  Your Honor, the Court is I think a little

16   bit over three hours away, Salsbury, Maryland, and the hearing

17   is at 12.  I can try to have the hearing moved up to an earlier

18   time, and I would be happy to do so.  And I would be happy to

19   rush back here for four o'clock, but I just do want you to know

20   that it involves a long drive that could interfere with that

21   time.

22           THE COURT: How soon will you be able to determine

23   whether you would be able to advance the time of the matter

24   tomorrow?

25           MR. KING:  In the morning, I would be able to make a

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

```
1    determination about that, but, at this time, because it's after
2    four o'clock, the other parties are -- basically, their office
3    is closed after four, so I wouldn't be able to get a response
4    today.
5              THE COURT: Perhaps, we better look at Wednesday
6    morning.  Ms.  Miller?
7              THE DEPUTY CLERK:  I'm sorry.
8              THE COURT: Bear with us just one moment.  Wednesday
9    at 9:30?
10             MR. LOMAS:  If I may, Your Honor, the motion is very
11   simple, and it would only take a few moments to go through, so
12   if Mr.  King could respond afterwards today, I mean, in the
13   time that we have left -- can I offer that as a suggestion?
14             THE COURT:  Is everyone ready to continue at this
15   point?
16             MR. KING:  I'm not opposed to continuing at this
17   point.
18             THE COURT:  Very well.  I believe we can proceed,
19   then.
20             MR. LOMAS:  Thank you, Your Honor.  So Record Press
21   would like to move -- respectfully moves for judgment pursuant
22   to Rule 52(c), which states that if a party has been fully
23   heard on an issue during a non-jury trial, and the Court finds
24   against the party on that issue, the Court may enter judgment
25   against the party on a claim or defense that cannot -- that can
```

1   be -- that under the controlling law can be maintained or

2   defeated only with a favorable finding on that issue.

3          Now, this morning I read you a quote from another

4   False Claims Act case:  If both the contractor and the

5   government interpret the contract one way throughout the

6   contract's history, it is unthinkable that the contractor's

7   billings which followed these common interpretation could

8   constitute a false claim.

9          THE COURT: What is the citation to the case?

10          MR. LOMAS:  Yes, Your Honor.  That's U.S. Ex rel

11   McCoy v. Seaward Marine Services, 972 F 2d 344.  The evidence

12   at trial today, Your Honor, demonstrates that both Record Press

13   and the Government Printing Office, the only two parties to the

14   contract, understood that the collating, trimming to size, and

15   binding price was $12.25 per 100 pages throughout the entire

16   term of the contract.

17          The contract was entered in when the GPO sent an

18   invitation for bid to Record Press.  The invitation for bid was

19   attached -- there was a spreadsheet attached to that invitation

20   for bids that stated that the price for collating, trimming to

21   size, and binding should be billed on a per-100-page basis.

22          You heard the GPO witness, Mr.  Sullivan, and you

23   heard from Mr.  Wilmot from Record Press that both confirmed

24   that.  You heard from Mr. Wilmot today from Record Press that

25   Record Press submitted a bit of $12.25 per 100 pages for that

00000784

```
1    line item.  And then you heard from both Record Press and the
2    Government Printing Office, again, the only two parties to that
3    contract, that the government accepted that bid.
4            Mr. Sullivan specifically stated that there was a
5    meeting of the minds between the parties and that the contract
6    price for collating, trimming to size, and binding was $12.25
7    per 100 pages.  There was no dispute that the invoices clearly
8    state that Record Press charged $12.25 per 100 pages.
9            Mr. Burke is not contesting that they aren't; he is
10   only contesting that the contract price is not $12.25 per 100
11   pages, but it's fundamental contract law.  The contract means
12   what the two parties to that contract say it means.
13           For example, this Court, in Youngblood versus
14   Vistrionics, Civil Action no. 05-21, and the case cite there
15   is 2006 Westlaw 209-2636.  This is just the case from --
16           THE COURT: 209 --
17           MR. LOMAS:  Yes; 209-2636.  This is a case in this
18   district from 2006.  It is axiomatic that contracts should be
19   construed to a impart to party's intent.  Clearly so, when as
20   in the instant case, neither party disputes that intent.
21           And, Your Honor, you heard today from both parties to
22   the contract, Record Press and the GPO -- there's never been
23   any doubt between those two parties as to what the contract
24   price was.  It's clearly $12.25 per 100 pages.
25           You heard today that even after Mr. Burke raised this
```

1    claim and challenged the price that the GPO investigated,

2    reviewed the contract, reviewed the invoices, found that --

3    confirmed that the contract price was $12.25 per 100 pages,

4    confirmed that there was no overcharging, and confirmed that

5    there was no fraud.

6           Remember, this is not just a contract's case, this is

7    a fraud case.  The allegation here is that Record Press lied to

8    the government, is defrauding the government.  So what Mr.

9    Burke would have you find -- would have the Court find, excuse

10   me, is that when -- a party lying to the other party, when both

11   parties agree on the same thing, that the contract price is

12   $12.25 per 100 pages.

13          Mr.  Burke offered no evidence suggesting that the

14   contract price is anything otherwise.  Again, we heard from the

15   only two parties to the contract and about the formation; that

16   we had a bid of the $12.25 per 100 price and an acceptance.

17          We heard from Mr.  Sullivan that said that those in

18   the printing industry would know that a per-10-copy running

19   rate would not apply to a line item such as the line item 2-D

20   for collating, trimming to size, and binding.  It already had

21   the per-100-page aspect to it.

22          So all we're left here is the opinion, apparently, of

23   Mr.  Burke that he doesn't like the price or that the price is

24   wrong.

25          And, Your Honor, this Court has rejected finding any

```
 1    false claim liability on the opinion of a non-party, a
 2    non-party to a contract.  Actually, I'd like to read you a --
 3              THE COURT: -- the opinion cited at -- reported at
 4    2006 Westlaw --
 5              MR. LOMAS:  No.  Actually, I'm going to give you
 6    another quote there, and the Court -- this Court said:  It need
 7    not -- and this was in another False Claims Act case, and that
 8    opinion was U.S. Ex rel Herbert "v" National Academy of
 9    Sciences.  That was Civil Action 90-2568; the cite is 1992
10    Westlaw 247587, and that was September 1992.
11              And this Court said:  It need not address the dubious
12    proposition that plaintiff's personal opinion can be the basis
13    of a fraud suit, especially when the purported victim disagrees
14    with that legal opinion.
15              Well, you heard today from the Government Printing
16    Office, the alleged victim here, there was no fraud.  The
17    Government Printing Office reviewed the contract, reviewed the
18    invoices, confirmed that there was no fraud; that Record Press
19    had billed the correct contract price.
20              You heard from Mr. Sullivan with his 30 years of
21    experience in the industry say that it was clear to him by
22    looking at the contract that the contract price was $12.25 per
23    100 pages.
24              And then after Burke raised this issue, what did the
25    GPO do?  Reviewed, showed it was -- you know, found no fraud,
```

1    and then renewed the contract two more times.  They continue to
2    work with Record Press.  They continue to pay Record Press
3    $12.25 per 100 pages for the collating, trimming to size, and
4    binding line item because that is what the parties agreed to
5    do.
6        So there is no finding -- there can be no finding of
7    the elements of a False Claim Act.  There can be no falsity
8    because the contract price is $12.25 per 100 pages.  There can
9    be no knowing falsity because Record Press had always
10   understood that the contract price was $12.25 per 100 pages.
11       And there can be no materiality, there can be no --
12   it didn't make a difference even if Mr. Burke's interpretation
13   was correct because the GPO has heard Mr. Burke's
14   interpretation, rejected it, and continued to pay the invoices
15   to this day.
16       Thank you, Your Honor.
17       THE COURT: Thank you, Mr. Lomas.  Mr. King?
18       MR. KING:  Your Honor, the only evidence before the
19   Court on the GPO's meeting of the minds in this contract is the
20   testimony of Mr. Sullivan, who testified that he did not talk
21   to Mr. Wilmot or anyone with Record Press at the time that the
22   contract was formed.  The testimony of Mr. Adgerson involved
23   admissions that the GPO does misinterpret its contracts.  He
24   testified that --
25       MR. LOMAS:  Objection, Your Honor.  Object to that

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000788

1    characterization of Mr. Adgerson's testimony. I don't recall

2    any time where he said that there was any issue --

3            THE COURT: I don't contemplate objections at this

4    point. I was actually preparing to ask you, Mr. King, what is

5    the testimony of Mr. Adgerson on that point to which you

6    refer?

7            MR. KING: It was the testimony that had to do with

8    Mr. Adgerson's role in what he does, And he testified to the

9    fact that part of his job is to deal with times when they have

10   -- when they have incorrectly interpreted a contract.

11           And, moreover, when Mr. Adgerson testified, he

12   testified that there was a question in his mind after he spoke

13   with Mr. Burke as to whether or not the contract had been

14   interpreted correctly, and the point is that, of all of the

15   testimony that's given today, none of it has to do with a

16   person who's going to testify and say that I was with Mr.

17   Wilmot when he signed the contract. I had negotiations with

18   him about it, and we agreed that these terms were going to mean

19   this particular thing.

20           THE COURT: Well, do we agree that it would have been

21   -- do you acknowledge that it would have been incumbent upon

22   the plaintiff to prove the plaintiff's case that some other

23   interpretation of the contract should have been operative?

24           MR. KING: Yes. The plaintiff has proved that the

25   contract interpretation which involves application of the

00000789

1   running rate to a particular line item is the only

2   interpretation that's reasonable.

3           The -- this suggestion that the GPO disagrees with

4   that interpretation and, in fact, agrees with Record Press'

5   interpretation is based on evidence about what they say after

6   the fact.

7           In order for Record Press to succeed in this argument

8   that there was -- both parties, you know, agree on what the

9   intent is, there would have to be some evidence that that

10  intent was manifested prior to the time that the contract was

11  --

12          THE COURT:  But the burden of showing that would have

13  been on the plaintiff, wouldn't it?  In other words, this case

14  was brought by the plaintiff, and the plaintiff has the burden

15  of proof.

16          MR. KING:  No.  But the plaintiff certainly does --

17          THE COURT: You don't dispute that, do you, that the

18  plaintiff has the burden of proof?

19          MR. KING:  The plaintiff certainly has the burden of

20  proof to show that those invoices charged for an amount that

21  does not reflect what the contract says and that he has done.

22  What Mr.  -- what Record Press' defense is is that Record Press

23  is stating that they have proved that the GPO interpreted the

24  contract in the same way that Record Press has, but --

25          THE COURT: Aren't those the only two parties to the

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000790

1    contract?

2        MR. KING:  The two parties to the contract are Record

3    Press and GPO, but the defense that is being raised is this

4    defense that the -- there can be no liability when the two

5    interpretations are the same.

6        But the point is that the only evidence of the

7    interpretation that is being provided is -- the evidence that

8    is being provided of their interpretation does not relate to

9    the interpretation as it existed at the time the contract was

10   formed, and it is only the intent of the parties at the time

11   the contract is formed which is going to be relevant to how the

12   contract should be interpreted.

13       THE COURT: What has -- what evidence do you believe

14   you have offered with regard to some other interpretation of

15   the contract?

16       MR. KING:  The contract itself is the most important

17   example of the evidence of its interpretation.  The contract

18   itself says that the running rate applies to that line item.

19   When -- if you listen closely to the testimony of the -- of the

20   witnesses here today, you will have seen that, for example,

21   when asked the question, why doesn't that running rate apply to

22   that line item, the -- Mr. Adgerson did not state that there

23   was some -- that the GPO spreadsheet, for example, he did not

24   testify that the GPO spreadsheet is used to interpret the

25   contract.

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1          The question was asked to Mr. Wilmot two times; the

2   first time he didn't mention the GPO spreadsheet.  He just

3   mentioned the fact that line item D refers to per 100 pages,

4   and the other ones don't.  The second time he was asked, he did

5   refer to the spreadsheet. but when asked about the spreadsheet,

6   the emphasis was placed on the contract totals and not the line

7   items.

8          The point is that -- and there are other examples of

9   how the question of whether or not you apply the line item --

10  for any witness here today who says that the line item, that

11  the running rate does not apply to the line item in answering

12  why that is, they base it on some information outside of the

13  contract.

14         THE COURT: Which witnesses -- to which witnesses do

15  you refer when you say any witness who testified to something

16  --

17         MR. KING:  The -- Mr. Wilmot and Mr. Sullivan.

18  Both testify about this spreadsheet.  And the fact that the

19  spreadsheet is somehow indicative of what the contract say, but

20  there is only one contract, and it says what it says.  It is

21  the proof of its meaning.

22         THE COURT: Now, it was you who called Mr. Wilmot, do

23  you agree?

24         MR. KING:  Yes.

25         THE COURT:  I'll return to the question I asked

1   earlier then:  What evidence has the plaintiff offered with

2   respect to any other interpretation of the contract?

3           In other words, the witness that you called,

4   witnesses, the first two witnesses you called, both testified

5   that they were in agreement regarding the interpretation of the

6   contract provision.

7           Would you agree that that is a fair characterization

8   of the testimony of Mr. Wilmot and Mr. Adgerson?

9           MR. KING:  Yes.

10          THE COURT: What evidence is there then that the

11  plaintiff has offered that the Court should disregard that

12  testimony and make a finding that the contract -- the parties

13  intended something different?

14          MR. KING:  Well, first of all, again, Mr.  Adgerson

15  was not -- was not involved in the contract negotiation and

16  making.

17          THE COURT: That is who you called in your case,

18  though, is that -- do you acknowledge that that is so?

19          MR. KING:  Well, the parties stipulated to admitting

20  the contract.  The contract is evidence.  The contract speaks

21  for itself.  The contract has a running rate; it clearly

22  applies to each of the line items that are in the corresponding

23  Roman numeral.

24          The rest of the testimony does nothing to change

25  that.  The -- you know, self-serving statements of Record Press

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000793

1    that their interpretation is correct are not corroborated by
2    any GPO testimony that reflects manifestation of intent at the
3    time the contract was formed.
4            The only GPO testimony regarding their interpretation
5    and the fact that it corroborates Mr. Wilmot's has to do with
6    their reflections after the fact, and there is no evidence in
7    the record at this time that shows what the GPO's intent was at
8    the time of entering into the contract except for the contract
9    itself, and the contract itself is very clear.
10           THE COURT: You may continue.
11           MR. KING:  Mr. Burke also called an expert.  The
12   expert had offered his assessment of the damages.  The expert
13   had an opportunity to review this spreadsheet that forms the
14   basis for the GPO's interpretation.  The expert testified that
15   it was not reliable in his -- as a way for him to assess the
16   damages.
17           There is testimony that the GPO, the evidence shows
18   that the GPO receives a markup or a percentage, interest -- or
19   interest on each of these bills.  Obviously, the GPO does not
20   want Mr. Burke's interpretation to be the correct
21   interpretation because it would mean that they had also been
22   involved in this to the extent that overcharges are reflected
23   in their amount.
24           THE COURT:  You agree that there is no allegation in
25   the complaint with respect to the matter to which you just

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1    referred?

2              MR. KING:  No.  The matter to which I'm referring has

3    to do with an inference regarding the intent of the parties.

4    The idea that -- essentially, the idea is that the more Record

5    Press charges, the more GPO makes.  If Record Press' invoices

6    reflect a higher amount than they should, then that is good for

7    the GPO.  And that's -- it's not surprising that the GPO would

8    offer testimony today that supports Record Press'

9    interpretation because the fact is that the GPO profits from

10   Record Press' increased charges.

11             And to respond with some case law regarding this

12   issue, United States Ex rel Tyson v. Amerigroup Three, Inc, 48

13   F. Supp 2d 719, citing United States Ex rel Ash v. Teller, 2004

14   Westlaw 1093784, is the quote:  Mere acquiescence would not --

15   would preclude False Claims Act liability any time a government

16   employee and a defendant were in cahoots.

17             The idea is that just bringing in a government

18   official who is going to concede to the charges is not enough

19   to escape liability.

20             Another case, the United States v. Southern

21   Management Corp, 326 F. 3d 669, stands for the proposition that

22   this government knowledge defense is based upon the effect the

23   government's knowledge has on the defendant's mental state.

24             Again, the point is that the question is not:  What

25   does the government say today about its interpretation in

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

00000795

1    looking back; the question is: What evidence is there that the

2    defendant knew what the government was going to interpret the

3    contract as at the time that the contract was signed.

4              There's no evidence that's been presented today to

5    suggest that Mr. Wilmot or Record Press knew what the

6    government was going to say today or after the fact about their

7    contract. The idea is that the defendant needs to be aware of

8    whatever interpretation is being offered before the contract is

9    formed.

10             One more case: A county water agency, 929 F. 2d

11   1416, stands for the proposition that the -- that the

12   government knowledge alone does not provide an absolute

13   defense.

14             And, again, just to wrap up, Your Honor, the point is

15   that the argument being made that today both parties have

16   testified that their interpretation is the same does not get

17   them to the point of overcoming the fact that it is really a

18   question of what they knew at the time the contract was formed

19   and not what they're saying in hindsight. Thank you.

20             THE COURT: Thank you, Mr. King. Mr. Lomas?

21             MR. LOMAS: Your Honor, the False Claims Act has

22   three elements that we spoke about today. There has to be

23   false claim; there has to be a knowledge on that on the part of

24   the defendant; and there has to be materiality. And it's the

25   burden of proof -- it's Mr. Burke's burden of proof on all

00000796

1    three of those points.

2          On the falsity issue, he's asking the Court to assume

3    falsity based on their -- based on Mr. Burke's understanding

4    and opinion of a contract.  This Court has rejected that in the

5    case that I referenced earlier.  All the evidence that was

6    presented today, all of it, confirms that the only two parties

7    to this contract understood from the first moment that Record

8    Press submitted a bid, all the way through to this day, today,

9    two years after, three years after Mr.  Burke filed his claim,

10   that they understood the collating, trimming to size, and

11   binding term is $12.25 per 100 pages.

12         We're hearing this new conspiracy argument where

13   they're suggesting that government witnesses are in cahoots

14   with Record Press.  You have a 35-year veteran of the GPO who's

15   testified on the stand today.  I mean attacking, essentially,

16   his character based on this assumption without any evidence,

17   without any discussion of that on the stand.

18         Now, with respect to the knowledge element, he has --

19   it is Mr.  Burke's burden to prove that Record Press knew that

20   their interpretation of the -- their understanding of the

21   contract was wrong, and in this -- again, in this court,

22   Massachusetts Housing Finance, the Court said that:  That it's

23   only where a contractor's purported interpretation of the

24   contract borders on the frivolous and is so plainly lacking in

25   merit that the requisite state of mind can be inferred.  That's

```
 1    Massachusetts Housing Finance, 456 F. Supp 2d.

 2              You heard today again that the only --

 3              THE COURT: F. Supp 2d --

 4              MR. LOMAS:  Oh, I'm sorry.  I apologize.  I didn't

 5    give you the full cite, did I?  Sixty-two.

 6              THE COURT: Thank you.  You may continue.

 7              MR. LOMAS:  Again, you heard the only evidence that

 8    was offered by either party today confirmed that the two

 9    parties to the contract had always understood the contract to

10    have the same meaning.  How Record Press' interpretation could

11    be considered frivolous on that basis is just -- it just

12    doesn't make any sense.

13              And now with respect to some of the statements that

14    Mr. King made about some of the testimony today, Mr.  -- with

15    respect to the expert, he did not testify about the reliability

16    of the spreadsheet.  He testified that it didn't change his

17    opinion about the amount of damages.

18              Again, Mr.  Gocial was only here to testify on the

19    amounts of damages, assuming liability.  So the fact that this

20    spreadsheet -- you know, he didn't use that spreadsheet, of

21    course he wouldn't use that spreadsheet.  All he needed to do

22    to calculate damages was the contract and the invoices, and,

23    again, the GPO reviewed those contracts and the invoices and

24    confirmed that the invoices matched the contract.

25              And the discussion at the end of Mr. King's argument
```

1    with respect to the government knowledge defense, again, that's

2    a defense, an affirmative offense, after the plaintiff is able

3    to prove his burden on showing falsity, knowledge, and then

4    materiality.  He has known -- there is no evidence to satisfy

5    any of those elements.  So the government knowledge defense

6    doesn't even come into play until after the fact.

7            But in none of those cases that Mr. Burke cited was

8    the government, the alleged victim, the Government Printing

9    Office, confirming that there was no fraud.  That's not the

10   issue that was in those cases.

11           Here you have the alleged victim confirming that

12   there was no fraud, and, again, this is a fraud case.  There

13   are civil penalties involved in -- I mean this is -- Record

14   Press is being accused of lying to the government.  And the

15   person or the organization that he is being accused of lying to

16   is confirming that they never were lied to and that everything

17   -- that Record Press has always operated properly under the

18   contract.

19           So Mr. Burke has not met his burden on any of the

20   required elements, and, in fact, the evidence proves the

21   opposite of each of the elements that he needs to show in this

22   case.  Thank you, your Honor.

23           THE COURT:  Counsel, thank you very much.  The Court

24   will take the Rule 52 motion under advisement and rule by way

25   of a written memorandum, opinion and order.

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1          To the extent that further proceedings are indicated

2    as a consequence of the Court's determination of the Rule 52(c)

3    motion, you will be notified when such further proceedings will

4    take place.  At this time, the Court is prepared to take the

5    Rule 52(c) motion under advisement.

6          Now, is there anything further with respect to this

7    matter at this time, Mr.  King?

8              MR. KING:  No, Your Honor.

9              THE COURT: Mr.  Lomas or Mr.  O'Brien?

10             MR. LOMAS:  No, Your Honor.  Thank you.

11             THE COURT: Very well.  Thank you very much.  The

12   Court has the copies of the exhibits that counsel provided to

13   the Court.  I will ask you to maintain, you, counsel, all of

14   you, to maintain the remaining copies.

15             Very well.  Anything further before we recess?

16             Thank you very much.

17             MR. KING:  Thank you, Your Honor.

18             MR. LOMAS:  Thank you, Your Honor.

19             MR. O'BRIEN:  Thank you, Your Honor.

20             (Whereupon, these proceedings concluded at 5:20 P.M.)

21

22

23

24

25

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1

2                          C E R T I F I C A T E

3

4              I, Wendy C. Ricard, Official United States Court

5      Reporter in and for the District of Columbia, do hereby

6      certify that the foregoing proceedings were taken down by

7      me in shorthand at the time and place aforesaid,

8      transcribed under my personal direction and supervision,

9      and that the preceding pages represent a true and correct

10     transcription, to the best of my ability and understanding.

11

12

13

14                              _____

15                              Wendy C. Ricard, RPR, CCR

16                              Official U.S. Court Reporter

17

18

19

20

21

22

23

24

25

00000801

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRIAN BURKE,

              Plaintiff / Counter-Defendant,

      v.

RECORD PRESS, INC.,

             Defendant / Counter-Claimant.

Civil Action No. 08-0364
DAR

### MEMORANDUM OPINION

Plaintiff, as relator in a *qui tam* action commenced pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, alleged that Defendant Record Press, Inc., overcharged the United States Government Printing Office (hereinafter "government" or "GPO") for the printing of briefs in a matter then pending in the United States Court of Appeals for the Second Circuit. More specifically, Plaintiff alleged that two invoices submitted by Defendant to the GPO "[were] fraudulent as they contravene[d] the express language of GPO's contract with Record Press[]"; that "Record Press charged the Government ten times the contract rate for collating, trimming and binding briefs and appendices"; and that "it is Record Press's standard practice to charge the Government ten times the contract rate for this service." Joint Report Pursuant to Rule 16.3(d) ("Joint Report") (Document No. 16) at 1-2; *see also* Verified Complaint ("Complaint") (Document No. 1) ¶¶ 10-24.

After the United States declined to intervene, *see* United States' Notice of Election to Decline Intervention (Document No. 5), the court (Sullivan, J.) ordered, *inter alia*, that the

Burke v. Record Press, Inc.                                                                 2

complaint be unsealed, and that Plaintiff serve it upon Defendant, *see* Order (Document No. 6).

Defendant filed its answer in accordance with the court's scheduling order.  Answer to Plaintiff's

Verified Complaint ("Answer") (Document No. 10); *see also* 07/17/2008 Minute Order.

Defendant asserted "that the bills it submitted are fully in accordance with its contract with

GPO," and that "the [contract and invoices] plainly show that no fraud has occurred."  Joint

Report at 2.  In addition, Defendant pled as a counterclaim tortious interference with prospective

economic advantage, *see* Answer at 7-8, an allegation which Plaintiff denied, *see* Answer to

Defendant's Counterclaim (Document No. 13).

    With the consent of the parties, trial of Plaintiff's claims against Defendant proceeded to

trial before this court.  *See* Notice, Consent, and Reference of a Civil Action to a Magistrate

Judge (Document Nos. 48, 88); 11/01/2010 Minute Order; 02/11/2011 Minute Order (denying

Defendant's Motion for Summary Judgment); 02/14/2011 Minute Entry (bench trial commenced

and concluded).  Plaintiff offered the testimony of three witness, and testified before he rested.

Plaintiff's first witness, Hugh Wilmot, Jr., the president of Defendant Record Press, Inc.,

identified the contract between Record Press and the GPO, and the two invoices at issue.  Mr.

Wilmot testified that the invoices were "billed consistently" with the applicable provisions of the

contract between Record Press and GPO.  Transcript of Bench Trial (Document No. 89) 36:20,

46:3-4, 55:1-12, 55:19-22; 56:9.  Plaintiff's second witness, Calvin Adgerson, Branch Chief of

the GPO Commercial Billing and Examination Section, testified that after investigation of

Plaintiff's inquiry regarding the rate at which he was billed for the services of Record Press, "[i]t

was determined that we had been processing the invoices correctly, and that there were no issues

in the way we were processing them."  Tr. 77:24-78:1.

Burke v. Record Press, Inc.                                                                3

Plaintiff testified that he first inquired about a line item on an invoice for the services of

Record Press "[because] I believe[d] as I do today [that this] is an outrageous charge." Tr.

(Document No. 90) 23:6-8; *see also* Tr. 25:17-20 ("some of the costs seemed quite competitive,

per page costs, and the collating, trimming, and binding costs were this outrageous charge, and it

certainly didn't - - it defied logic to me . . . .").[1]  Plaintiff acknowledged that he never worked for

either Record Press or the GPO, and that he did not participate in the drafting of the contract

between those two entities.  Tr. 31:1-10.

At the close of Plaintiff's case, Defendant moved for judgment pursuant to Rule 52(c) of

the Federal Rules of Civil Procedure.  *See* Tr. (Document No. 90) 59:21-23.  Both parties were

heard on the record with respect to said motion, and neither asked for an opportunity to file

written submissions.  *See* Tr. 59:21-60:4, 92:10-109:20.[2]

## APPLICABLE STANDARDS

### *False Claims Act*

Congress, through the False Claims Act, "created a cause of action against anyone who

---

[1] The testimony of Plaintiff's remaining witness, Morris Gocial, was confined to damages.  Mr. Gocial opined that Plaintiff's damages were the difference between the rate at which Defendant billed the government, and the rate which Plaintiff thought was applicable.  Tr. (Document No. 90) 12:11-16, 16:7-9 (Plaintiff's damages are "the difference between $37.24 and $372.40," and "the difference between $138.67 and the $1,386.70."); *see also* Plaintiff Brian Burke's Pretrial Statement (Document No. 51) at 2 ("Mr. Burke seeks damages for Record Press's overcharges under its contracts with the GPO.  The damages are equal to the amount charged in line item II(d) minus the amount which should have been charged by prorating the charge per 10 copies.").  *But see* Plaintiff Brian Burke's Second Supplemental Pretrial Statement (Document No. 55) at 4 ("invoices for which the disputed line item was charged . . . demonstrates total damages of $527,122.10.").

[2] The parties, as a convenience to the court, agreed that Defendant would call one of its witnesses, who had "been patiently waiting" throughout the day.  Tr. (Document No. 90) at 59:21-90:11.  As the court bases its consideration of Defendant's motion for judgment on partial findings solely upon the evidence offered by Plaintiff, the court has no occasion to address herein the testimony of the witness called by Defendant.

Burke v. Record Press, Inc.                                                                 4

'knowingly presents, or causes to be presented, to an officer or employee of the United States

Government . . . a false or fraudulent claim for payment or approval[.]'"  *United States v. DRC,*

*Inc.*, 856 F. Supp. 2d 159, 167 (D.D.C. 2012) (footnote omitted) (quoting 31 U.S.C. § 3729(a)(1)

(2000)).  "A proper False Claims Act claim has three elements: (1) the defendant presented a

claim for payment or approval to the government, (2) the claim was 'false or fraudulent,' and (3)

the defendant acted knowing that the claim was false."  *United States ex rel. Folliard v.*

*Govplace*, No. 07-719, 2013 WL 1092859, at *3 (D.D.C. Mar. 18, 2013) (citation omitted); *see*

*also DRC, Inc.*, 856 F. Supp. 2d at 167 (citation omitted).  A "claim" is broadly defined "to

include 'any request or demand, whether under contract or otherwise, for money or property

which is made to a contractor, grantee, or other recipient if the United States Government

provides any portion of the money . . . or if the Government will reimburse . . . any portion of the

money.'"  *United States ex rel. Brown v. Aramark Corp.*, 591 F. Supp. 2d 68, 73 (D.D.C. 2008)

(citation omitted).  Thus, the Act "essentially creates liability for 'all fraudulent attempts to cause

the Government to pay out sums of money.'"  *Id.* (citations omitted) (internal quotation marks

omitted); *see also United States ex rel. Hood v. Satory Global, Inc.*, No. 11-774, 2013 WL

2274798, at *8 (D.D.C. May 23, 2013) (citation omitted) ("The [False Claims Act's] 'chief

purpose . . . is to prevent the commission of fraud against the federal government and to provide

for the restitution of money that was taken from the federal government by fraudulent means.'").

       "A claim may be false under the [False Claims Act] if it is either factually or legally

false."  *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 45 (D.D.C. 2011) (citation omitted).

"A claim can be 'factually false if it invoices for services that were not rendered' or incorrectly

describes goods or services provided."  *Id.* (citation omitted).  "A claim may be 'legally false' if

00000805

it represents falsely that the party submitting the claim has complied with an applicable federal statute or regulation, or with a contractual term." *DRC, Inc.*, 856 F. Supp. 2d at 167 (citation omitted); *cf. Toyobo Co.*, 811 F. Supp. 2d at 45 (citation omitted) ("One way to plead a false claim under this theory is to plead 'that the contractor withheld information about its noncompliance with material contractual requirements.'"). Claims "alleged[ly] . . . submitted under a contract procured by fraud can be actionable" even in the absence of allegations that the claims were factually or legally false. *Toyobo Co.*, 811 F. Supp. 2d at 46 (citation omitted); *see also DRC, Inc.*, 856 F. Supp. 2d. at 168 (citation omitted) ("Claims for payment submitted under a contract procured by fraud also may be actionable.").

The False Claims Act includes a scienter requirement; thus, the relator must demonstrate that the defendant presented a false claim "knowingly, which entails having 'actual knowledge of the information[,]' acting 'in deliberate ignorance of the truth or falsity of the information[,]' or acting 'in reckless disregard of the truth or falsity of the information.'" *DRC, Inc.*, 856 F. Supp. 2d. at 168 (quoting 31 U.S.C. § 3729(b)). "Strict enforcement of the [False Claims Act's] scienter requirement will . . . help to ensure that ordinary breaches of contract are not converted into [False Claims Act] liability." *Id.* (citation omitted) (internal quotation marks omitted).

In order to prevail on a claim brought pursuant to the False Claims Act, a plaintiff must prove all elements of the cause of action by a preponderance of the evidence. *See, e.g.*, *Grand Acadian, Inc. v. United States*, 105 Fed. Cl. 447, 457 (Fed. Cl. 2012) (citations omitted).

### *Rule 52(c)*

Rule 52(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that

Burke v. Record Press, Inc.                                                              6

> [i]f a party has been fully heard on an issue during a nonjury trial and
> the court finds against the party on that issue, the court may enter
> judgment against the party on a claim or defense that, under the
> controlling law, can be maintained or defeated only with a favorable
> finding on that issue.

Fed. R. Civ. P. 52(c); *see also Nkpado v. Standard Fire Ins. Co.*, 697 F. Supp. 2d 94, 98 n.4

(D.D.C. 2010) (quoting Advisory Committee Notes to Rule 52(c)) (1991 amendment to the rule

"authorizes the court[] to enter judgment at any time that it can appropriately make a dispositive

finding of fact on the evidence.").

      In its determination of a motion made in accordance with Rule 52(c), "a district court may

not draw any special inferences in favor of the non-movant"; rather, "the court must weigh the

evidence, resolve any conflicts in it, and decide where the preponderance lies." *United States ex*

*rel. Ervin & Assocs. v. Hamilton Secs. Grp., Inc.*, 298 F. Supp. 2d 91, 92-93 (D.D.C. 2004)

(citations omitted). In so doing, the trier of fact "retains, the authority, if not the obligation, to

draw reasonable inferences from the facts found." *Id.* at 93 n.3.


**FINDINGS OF FACT**

      Upon consideration of the evidence adduced by Plaintiff and all reasonable inferences to

be drawn therefrom, the court finds that Plaintiff has demonstrated, at most, that he believes that

Defendant Record Press overcharges the government for its services. However, the court finds

that Plaintiff's subjective concern falls far short of a showing, by a preponderance of the

evidence, that Defendant presented "false or fraudulent claims for payment or approval,"

Complaint ¶ 26 (Count I), or that Defendant "knowingly made [or] used . . . false or fraudulent

records or statements[] to get false or fraudulent claims paid or approved by the Government," *id.*

00000807

¶ 28 (Count II).

The gravamen of Plaintiff's complaint is that Defendant overcharged the government for the services it provided pursuant to its contract with the United States Government Printing Office.  Complaint ¶ 3 ("Mr. Burke investigated and discovered that Defendant was overcharging the Government nearly 10 times the rate specified by its contract with [the Government Printing Office]."); *see also id.* ¶ 22 ("In Relator's litigation alone, Record Press overbilled the Government approximately $1,700.00, nearly ten times the amount it was authorized to charge under the GPO contract."); *id.* ¶ 24 ("[A]pplying this overcharge to GPO's estimated requirements in the RFP, Record Press overcharged the Government more than $280,000.00 in one contract year.  Because Record Press is a long-time GPO contractor, the total overbilling is likely many times greater than the one-year estimate.").  However, both the President of Defendant Record Press and the Branch Chief of GPO's Commercial Billing and Examination Section, called by Plaintiff in his case-in-chief, testified that the rate at which Defendant billed the government was indeed the rate for which the contract between Defendant and the government provided, and that Defendant submitted its invoices in accordance with the terms of the contract.

Moreover, the evidence offered by Plaintiff demonstrates that Defendant and the government had a meeting of the minds with respect to rates which Defendant would charge for services provided pursuant to the contract.  Indeed, the alleged victim, through the agency official who appeared in Plaintiff's case-in-chief, testified that there was no fraud.  Plaintiff offered no evidence to the contrary.

In so finding, the court need not address the credibility of Plaintiff, as his testimony was

Burke v. Record Press, Inc.                                                              8

largely confined to his belief that the costs he was assessed by the United States Court of Appeals

for the Second Circuit were "outrageous."  *See, e.g.*, Tr. (Document No. 90) at 23:8.  However,

even fully crediting Plaintiff's testimony, the undersigned finds that no inference that Defendant

submitted a false claim is warranted.

**CONCLUSIONS OF LAW**

        On the basis of the foregoing findings, the court concludes that Plaintiff's claims cannot

be maintained under controlling law.  Accordingly, Defendant's motion for judgment on partial

findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure will be granted by

separate order, and the Clerk of the Court will be directed to enter judgment in favor of

Defendant.[3]

                                                    _____/s/_____
        June 12, 2013                               DEBORAH. A. ROBINSON
                                                    United States Magistrate Judge

---

        [3] After the trial, Defendant moved to dismiss its counterclaim, *see* Record Press Inc.'s Motion to
Voluntarily Dismiss its Counterclaim (Document No. 72); the court, by minute order, granted the motion, *see*
05/21/2013 Minute Order.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BRIAN BURKE,

            Plaintiff / Counter-Defendant,

    v.

RECORD PRESS, INC.,

            Defendant / Counter-Claimant.

Civil Action No. 08-0364
DAR

**ORDER**

      For the reasons stated in the accompanying Memorandum Opinion (Document No. 91),

Defendant's motion for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules

of Civil Procedure is **GRANTED**.  Accordingly, the Clerk of the Court shall enter judgment in

favor of Defendant.

      It is, this 12th day of June, 2013,

      **SO ORDERED**.

                              _____/s/_____
                              DEBORAH. A. ROBINSON
                              United States Magistrate Judge

Case 1:08-cv-00364-DAR   Document 93   Filed 06/13/13   Page 1 of 1

AO 450 (Rev 01/09, DC-03/10)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| BRIAN BURKE | ) |
| *Plaintiff* | ) |
| v. | )        Civil Action No.  08-0364 |
| RECORD PRESS, INC., | ) |
| *Defendant* | ) |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐  the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus postjudgment interest at the rate of _____ %, along with costs.

☑ ¹ The plaintiff recover nothing and the action to be dismissed on the merits . _____
_____ recover costs from the plaintiff *(name)* _____
_____

☐  other:


This action was *(check one)*:

☐  tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐  tried by Judge _____ without a jury and the above decision
was reached.

☑  decided by Judge  DEBORAH A. ROBINSON _____ on a motion for
JUDGEMENT ON PARTIAL FINDINGS PURSUANT TO RULE 52 (C)


Date:  *June 12, 2013*

ANGELA D. CAESAR, CLERK OF COURT

*Signature of Clerk or Deputy Clerk*

00000811

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES ex rel.
BRIAN BURKE,
                    Plaintiff,

vs.                                                    Civil Action No. 1:08-CV-00364-DAR

RECORD PRESS, INC.,

                    Defendant.

**DECLARATION OF WILLIAM T. O'BRIEN IN SUPPORT OF RECORD PRESS,**
**INC.'S MOTION FOR ATTORNEY FEES AND EXPENSES**

I, William T. O'Brien, declare under penalty of perjury as follows:

     1.  I am over the age of 18 and make this declaration based on personal knowledge and if

called as a witness, could competently testify to the facts stated in this declaration.  I am a partner

in the Washington, DC office of McKenna Long & Aldridge LLP ("MLA").  My firm and I have

represented Record Press, Inc. in the above captioned matter since July 2008.  I make this

declaration in support of Record Press's motion for attorney fees and expenses incurred in this

litigation.

     2.  I received my undergraduate degree in 1987 from Boston University and my law

degree in 1994 from The Catholic University of America Columbus School of Law.  I have

extensive experience over the court of nineteen years litigating before numerous U.S. courts and

major international arbitral institutions involving, among other issues, defense against allegations

of fraud or corruption and breach of contract disputes.  I also actively counsel clients and

conduct investigations on matters concerning U.S. Export Laws and Regulations and the Foreign

Corrupt Practices Act ("FCPA") involving audits, compliance programs, classification and

licensing issues, voluntary disclosures, and governmental actions.  I have been recognized by

*Chambers USA*.  I am admitted to practice in the United States Supreme Court; the United States

Courts of Appeals for the District of Columbia, Ninth, and Eleventh Circuits; the United States

00000812

District Court for the District of Columbia, the United States Court of International Trade; and the highest courts of the District of Columbia and Maryland.

3. My customary and market billable rate is presently $600 and was $480/hour in 2008, $505/hour in 2009, $530/hour in 2010, and $550/hour in 2011. MLA has always billed Record Press at my customary market rate. My work on this matter primarily involved handling the overall supervision of the case; interfacing with the client; developing litigation strategies and positions; communicating and negotiating with opposing counsel; handling hearings and status conferences with the Court; reviewing and editing briefing in support of Record Press's motions and in opposition to Plaintiff's motions; preparing witnesses for deposition and trial; cross-examining Plaintiff and his expert witness at trial.

4. My partner John G. Horan, Esq., from MLA's Washington D.C. office, also worked on this matter. Mr. Horan received his undergraduate degree in 1982 from Rutgers University and his law degree in 1986 from Georgetown University. Mr. Horan more than twenty-five years of litigation experience, and concentrates his practice in government contracts, civil fraud, and white-collar criminal defense. Mr. Horan currently serves as General Counsel to the National Contract Management Association, a national, nonprofit, membership-based, professional society for both government and commercial contract managers and procurement professionals. Mr. Horan contributes to a monthly column, *Legal Forum,* in *Contract Management* magazine, and currently serves as a member of the Editorial Board of the *Public Contract Law Journal*. He has also been quoted on government contracts issues in *International Business Times*, *FederalTimes.com*, and *Government Executive.com*, among other on-line and print publications. Mr. Horan is a former Assistant U.S. Attorney for the District of Columbia.

5. MLA's customary and market rate for Mr. Horan's time in the years that he billed time for work on this matter was $600/hour in 2008, $630/hour in 2009, and $695/hour in 2011. MLA has always billed Record Press for Mr. Horan's time at his and customary market rate. Mr. Horan's work on this matter primarily involved providing developing strategy and providing strategic advice for trial preparation and motions practice.

-2-

6.   My associate John W. Lomas, Jr., Esq., from MLA's Washington D.C. office, also worked on this matter.  Mr. Lomas received his undergraduate degree in 1998 from the University of Richmond and his law degree and a master's degree in 2006 from Duke University. My firm has recognized Mr. Lomas as one of our very best associates.  Mr. Lomas has substantial experience litigating matters in federal and state courts across the country, and before the International Trade Commission, the American Arbitration Association, and JAMS.  Mr. Lomas is admitted to practice in the United States Courts of Appeals for the District of Columbia and Federal Circuits; the United States District Courts for the District of Columbia, Eastern District of Virginia, and Eastern District of Texas; and the highest courts of the District of Columbia and Virginia.

7.   MLA's customery billable and market rate for Mr. Lomas's time is presently $555/hour and was $405/hour in 2010 and $450/hour in 2011.  MLA billed Record Press at his customary and market rate for Mr. Lomas's work on this matter.  Mr. Lomas's work on this matter primarily involved interfacing with the client; developing litigation strategies and positions; researching relevant legal issues; supervising paralegal and support staff work; propounding and responding to discovery requests; communicating and negotiating with opposing counsel; drafting motions and responses to motions, including summary judgment; handling oral argument; preparing witnesses for deposition and trial; defending Record Press's witness at deposition; deposing Plaintiff/Relator; and handling cross-examinations of certain of Plaintiff's witnesses, direct examinations of Record Press's witnesses, and arguments at trial.

8.   Valerie Lam, formerly a paralegal from MLA's Washington D.C. office, also worked on this matter.  Ms. Lam has nine years of paralegal and legal practice consulting experience. MLA's customary and market billable rate for Ms. Lam's time when she worked on this matter was $210/hour in 2008, $220/hour in 2009, and $250/hour in 2011.   MLA billed Record Press for Ms. Lam's time on this matter at her customary and market rate.  Ms. Lam's work on this matter primarily involved providing paralegal support with the preparation of pleadings,

-3-

00000814

motions, and other filings, and for trial preparation and at trial, including preparing trial exhibits and assisting with technological aspects of Record Press's trial presentation.

9.    Tara Eberhart, MLA's Senior Firm-Wide Paralegal Manager, also worked on this matter. Ms. Eberhart has more than fourteen years of paralegal experience. Ms. Eberhart is also an Adjunct Professor in the Paralegal Studies Program at The George Washington University where she teaches the Litigation capstone course for the Masters in Paralegal Studies program. MLA's customary and market billable rate for Ms. Eberhart's time when she worked on this matter was $230/hour in 2008, $240/hour in 2009, and $260/hour in 2010. MLA always billed Record Press for Ms. Eberhart's time on this matter at her customary and market rate. Ms. Eberhart's work on this matter primarily involved providing paralegal support with the preparation of pleadings, motions, and other filings, coordinating litigation support for document processing and production, maintaining pleadings files, and various other tasks.

10. Jeannie Johnson, formerly a paralegal from MLA's Washington D.C. office, also worked on this matter. Ms. Johnson has more than five years of paralegal experience. MLA's customary and market billable rate for Ms. Johnson's time in 2008 when she worked on this matter was $220/hour. MLA always billed Record Press for Ms. Johnson's time on this matter at her customary and market rate. Ms. Johnson's work on this matter primarily involved providing paralegal support with the preparation of pleadings, motions, and other filings, maintaining pleadings files, and various other tasks.

11.    MLA is one of the preeminent government contracts firms in the country with deep expertise handling and litigation false claims act cases. The rates MLA charged Record Press are commensurate with the rates charged by other comparable Washington D.C. law firms. For example, the following chart reflects the average rates charged by large Washington D.C. law firms as reported by the National Law Journal Annual Billing Survey:

00000815

| Year | Partner Average Rate Range | Partner Average Rate | Associate Average Rate Range | Associate Average Rate |
|------|---------------------------|---------------------|------------------------------|------------------------|
| 2008 | $392-$890 | $595 | $227-$523 | $375 |
| 2009 | $425-$932 | $629 | $230-$508 | $389 |
| 2010 | $405-$901 | $598 | $237-$507 | $367 |
| 2011 | $417-$962 | $623 | $213-$537 | $380 |

True and correct copies of excerpts of the National Law Journal Billing Surveys for the years 2008-2011 are attached as Exhibit A.

12. The rates MLA charged for attorneys from its Washington D.C. office are also commensurate with the rates for Washington D.C. attorneys as reported by the current version of the Updated *Laffey* Matrix developed by Dr. Michael Kavanaugh, which this Court has approved for use in federal court litigation in the District of Columbia. *E.g.*, *Ricks v. Barnes*, Civ. A. No. 05-1756 HHK/DAR, 2007 WL 956940, at *3 n.3 (D.D.C. Mar. 28, 2007) (Robinson, J.) (granting attorney fee award based on rates from the Updated *Laffey* Matrix developed by Dr. Kavanaugh and acknowledging the Updated *Laffey* Matrix is approved for use in federal court litigation in the District of Columbia); *Smith v. District of Columbia*, 466 F. Supp. 2d 151, 156 (D.D.C. 2006) ("use of the updated *Laffey* Matrix is reasonable and consistent with previous precedent from our Court of Appeals, as well as from this Court in *Salazar*"); *Salazar v. District of Columbia*, 123 F. Supp. 2d 8, 13 (D.D.C. 2000) ("the Court concludes that the updated *Laffey* matrix [developed by Michael Kavanaugh] more accurately reflects the prevailing rates for legal services in the D.C. community"). A true and correct copy of the Updated *Laffey* Matrix is attached as Exhibit B.

13. As shown in Exhibit B, the Updated Laffey Matrix rates for Washington D.C. attorneys with more than twenty years of experience, such as Mr. Horan, are $671/hour for June 1, 2008 through May 31, 2009, $686/hour for June 1, 2009 through May 31, 2010, and $709/hour for June 1, 2010 through May 31, 2011. The Updated Laffey Matrix rates for Washington D.C. attorneys with eleven to nineteen years of experience, such as myself, are

-5-

00000816

$557/hour for June 1, 2008 through May 31, 2009, $569/hour for June 1, 2009 through May 31, 2010, and $589/hour for June 1, 2010 through May 31, 2011. The Updated Laffey Matrix rates for Washington D.C. attorneys with four to seven years of experience, such as Mr. Lomas, are $349/hour for June 1, 2009 through May 31, 2010 and $361/hour for June 1, 2010 through May 31, 2011.

14. Attached as Exhibit C are true and correct copies of the cover page of each monthly invoice that MLA issued to Record Press for work on this matter, which summarize the hours, fees, and expenses incurred for work on this litigation on a monthly basis. The following table provides a summary of those records:

| Invoice Date | Invoice No. | Fees | Costs | Total |
|---|---|---|---|---|
| 8/22/2008 | 610016 | 5,608.00 | 1.56 | 5,609.56 |
| 9/8/2008 | 612105 | 2,334.00 | 2.18 | 2,336.18 |
| 10/6/2008 | 616891 | 10,892.00 | 4.21 | 10,896.21 |
| 11/10/2008 | 622873 | 8,194.00 | 203.93 | 8,397.93 |
| 12/1/2008 | 626595 | 4,596.00 | 24.61 | 4,620.61 |
| 1/13/2009 | 632021 | 3,772.00 | 337.76 | 4,109.76 |
| 2/11/2009 | 636815 | 0.00 | 17.95 | 17.95 |
| 3/12/2009 | 641320 | 0.00 | 70.60 | 70.60 |
| 5/8/2009 | 650175 | 0.00 | 0.00 | 0.00 |
| 7/6/2009 | 659905 | 8,502.50 | 402.27 | 8,904.77 |
| 8/11/2009 | 665684 | 0.00 | 206.86 | 206.86 |
| 9/8/2009 | 670033 | 505.00 | 2.90 | 507.90 |
| 10/5/2009 | 673917 | 3,278.50 | 20.81 | 3,299.31 |
| 11/5/2009 | 678716 | 4,301.50 | 4.33 | 4,305.83 |
| 12/2/2009 | 682467 | 1,060.50 | 29.75 | 1,090.25 |
| 2/12/2010 | 691985 | 4,598.50 | 234.12 | 4,832.62 |
| 3/5/2010 | 695082 | 1,763.50 | 2.56 | 1,766.06 |
| 4/7/2010 | 699452 | 2,754.00 | 15.60 | 2,769.60 |
| 5/10/2010 | 704256 | 12,717.50 | 71.09 | 12,788.59 |
| 6/9/2010 | 708809 | 17,105.50 | 114.72 | 17,220.22 |
| 7/8/2010 | 712624 | 27,654.50 | 712.33 | 28,366.83 |
| 8/10/2010 | 717267 | 13,538.50 | 422.17 | 13,960.67 |
| 9/7/2010 | 721091 | 0.00 | 11.14 | 11.14 |
| 10/11/2010 | 725577 | 202.50 | 1.20 | 203.70 |
| 11/8/2010 | 729734 | 8,590.00 | 1.60 | 8,591.60 |
| 12/2/2010 | 733375 | 18,535.00 | 223.61 | 18,758.61 |
| 1/11/2011 | 738005 | 25,997.50 | 1,406.54 | 27,404.04 |
| 2/7/2011 | 741494 | 20,066.50 | 206.97 | 20,273.47 |

00000817

| Invoice Date | Invoice No. | Fees | Costs | Total |
|---|---|---|---|---|
| 3/10/2011 | 745900 | 66,630.50 | 902.82 | 67,533.32 |
| 4/11/2011 | 749973 | 7,290.00 | 2,764.36 | 10,054.36 |
| 5/9/2011 | 754263 | 3,525.00 | 4.80 | 3,529.80 |
| 6/13/2011 | 759992 | 90.00 | 15.00 | 105.00 |
| 7/13/2011 | 763838 | 27.00 | 0.00 | 27.00 |
| | TOTALS | $284,130.00 | $8,440.35 | $292,570.35 |

15.   I have kept contemporaneous time records of the legal work that I did in this case, as did all of the MLA attorneys, paralegal, and support staff who billed time to this matter. Those records are protected by the attorney-client and attorney-work-product privileges, but Record Press is amenable to providing those time records to the Court for an *in-camera* inspection should the Court wish to review them.

16. The hours MLA billed on this matter were reasonable and necessary, particularly in light of the litigation strategy and tactics employed by Plaintiff and his counsel.  At the time the work was performed, the attorneys at MLA working on this matter reasonably believed the work should be performed to obtain a successful outcome.  MLA worked efficiently by having an associate handle the bulk of the responsibilities from discovery through trial, relying on a project assistant in lieu of paralegals when possible, and taking advantage of MLA's deep institutional expertise and prior work product in the FCA area.

17. The total lodestar calculation for the services of the attorneys and the paralegals who did legal work through my firm (reflecting an average rate for each timekeeper given the rate changes during the course of the litigation) for which Record Press is seeking reimbursement is as follows:

| Timekeeper | Hours | Average Rate | Lodestar Value |
|---|---|---|---|
| William T. O'Brien, Esq. | 160.5 | $513.76 | $82,458.50 |
| John Horan, Esq. | 9.0 | $633.17 | $5,698.50 |
| John Lomas, Esq. | 407.9 | $415.93 | $169,659.00 |
| Tara Eberhart | 17.0 | $235.59 | $4,005.00 |
| Valerie Lam | 48.7 | $247.00 | $12,029.00 |
| Jeannie Johnson | 24.6 | $220.00 | $5,412.00 |
| **Total** | | | **$279,262.00** |

-7-

00000818

18. The total lodestar calculation for the services of attorneys, librarian, litigation support specialist, paralegal, and project assistant who did legal work through my firm (reflecting an average rate for each timekeeper given the rate changes during the course of the litigation) that Record Press has excluded from the amount for which it is seeking reimbursement is as follows:

| Timekeeper | Hours | Average Rate | Lodestar Value |
|---|---|---|---|
| Lisa Norrett Himes, Esq. | 2.7 | $460.00 | $1,242.00 |
| Timothy Halloran, Esq. | 0.4 | $390.00 | $156.00 |
| Stephanie Ellis, Esq. | 3.2 | $285.00 | $912.00 |
| Carol Wagner | 1.0 | $255.00 | $255.00 |
| Douglas Malbera | 1.5 | $125.00 | $187.50 |
| Erik Bolte | 0.5 | $165.00 | $82.50 |
| Henry Kegan | 23.9 | $85.06 | $2,033.00 |
| **Total** | | | **$4,868.00** |

19.    As shown in Exhibit C, our firm also billed Record Press for costs and expenses reasonably incurred defending this litigation during the period from July 2008 through June 2011.  As shown in Exhibit D, Record Press also reasonably incurred a litigation support vendor expense that was directly sent to Record Press, rather than billed through MLA.  The costs and expenses, for which Record Press is seeking reimbursement, are summarized by category in the following table:

| Expense Description | Amount |
|---|---|
| Copying | $594.75 |
| Deposition Transcripts | $788.85 |
| Taxis/Mileage/Parking (local travel) | $302.70 |
| Long Distance and Conference Call Telephone Charges | $134.54 |
| Delivery/Messenger charges (for correspondence and document production to client, opposing counsel, and plaintiff/relator) | $521.65 |
| Federal Court Pacer charges | $83.68 |
| Litigation support vendor costs (processing of document production, etc.) | $744.73 |
| Witness Fee | $50.00 |
| Westlaw/Lexis Legal Research | $5,658.04 |
| **Total** | **$8,878.94** |

The categories of expenses Record Press claims are typical of the expenses that law firms incur in this type of litigation, and expenses that law firms reasonably charge to their clients, separately, and not part of their overhead expenses.

-8-

00000819

20.     A true and correct copy of my June 24, 2010 letter to Tyler Jay King, Esq. with attachments, as set via e-mail by John Lomas, Esq., is attached as Exhibit E.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 27th day of June, 2013.

_____
William T. O'Brien

-9-

00000820

# Exhibit A

00000821

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 11 of 118


incisive Legal
intelligence

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Adams and Reese | New Orleans | $425 | $240 | $300 | $175 | $209 | $318 | $257 | $205 | $310 | $265 |
| 2008 | Akerman Senterfitt | Miami | | | | | | | | | | |
| 2008 | Akin Gump Strauss Hauer & Feld | Washington | | | | | | | | | | |
| 2008 | Allen Matkins Leck Gamble Mallory & Natsis | Los Angeles | | | | | | | | | | |
| 2008 | Andrews Kurth | Houston | | | | | | | | | | |
| 2008 | Arent Fox | Washington | $710 | $410 | $465 | $260 | | | | | | |
| 2008 | Armstrong Teasdale | St. Louis | $450 | $295 | $300 | $175 | | | | | | |
| 2008 | Arnold & Porter | Washington | | | | | | | | | | |
| 2008 | Baker & Hostetler | Cleveland | | | | | | | | | | |
| 2008 | Baker Botts | Houston | | | | | | | | | | |
| 2008 | Baker, Donelson, Bearman, Caldwell & Berkowitz | Memphis, Tenn. | $525 | $230 | $300 | $120 | $218 | $339 | $295 | $220 | $330 | $290 |
| 2008 | Balch & Bingham | Birmingham, Ala. | $600 | $295 | $280 | $200 | | | | | | |
| 2008 | Ballard Spahr Andrews & Ingersoll, LLP | Philadelphia | | | | | | | | | | |
| 2008 | Bass, Berry & Sims | Nashville, Tenn. | $575 | $240 | $310 | $180 | $245 | $408 | $378 | $245 | $408 | $378 |
| 2008 | Bell, Boyd & Lloyd | Chicago | | | | | | | | | | |
| 2008 | Best Best & Krieger | Riverside, Calif. | $550 | $300 | $365 | $175 | $245 | $410 | $307 | $240 | $420 | $300 |
| 2008 | Bingham McCutchen | Boston | | | | | | | | | | |
| 2008 | Blank Rome | Philadelphia | $785 | $425 | $485 | $245 | $332 | $525 | $400 | | | |
| 2008 | Bond, Schoeneck & King | Syracuse, N.Y. | $450 | $210 | $250 | $150 | $187 | $308 | $268 | $185 | $310 | $275 |
| 2008 | Bowman and Brooke | Minneapolis | | | | | | | | | | |
| 2008 | Bracewell & Giuliani | Houston | | | | | | | | | | |
| 2008 | Bradley Arant Rose & White | Birmingham, Ala. | $550 | $260 | $310 | $170 | | | | | | |
| 2008 | Briggs and Morgan | Minneapolis | $580 | $300 | $290 | $195 | $229 | $420 | $368 | $225 | $425 | $390 |

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Brinks Hofer Gilson & Lione | Chicago | $700 | $320 | $435 | $180 | $281 | $499 | $392 | $275 | $500 | $390 |
| 2008 | Broad and Cassel | Orlando, Fla. | $475 | $290 | $320 | $175 | $245 | $378 | $314 | $248 | $375 | $310 |
| 2008 | Brown Rudnick | Boston | | | | | | | | | | |
| 2008 | Brownstein Hyatt Farber Schreck | Denver | $750 | $275 | $285 | $160 | $234 | $424 | $340 | $240 | $400 | $325 |
| 2008 | Bryan Cave | St. Louis | $750 | $340 | $510 | $370 | $314 | $525 | $424 | $310 | $510 | $405 |
| 2008 | Buchalter Nemer | Los Angeles | $600 | $260 | $450 | $225 | $283 | $448 | $384 | $275 | $450 | $375 |
| 2008 | Buchanan Ingersoll & Rooney | Pittsburgh | $1,020 | $300 | $520 | $100 | | | | | | |
| 2008 | Bullivant Houser Bailey | Portland, Ore. | $525 | $275 | $325 | $190 | | | | | | |
| 2008 | Burr & Forman | Birmingham, Ala. | $495 | $210 | $305 | $165 | $235 | $352 | $271 | $230 | $350 | $295 |
| 2008 | Butzel Long | Detroit | $650 | $300 | $290 | $180 | | | | | | |
| 2008 | Cadwalader, Wickersham & Taft | New York | | | | | | | | | | |
| 2008 | Cahill Gordon & Reindel | New York | | | | | | | | | | |
| 2008 | Carlton Fields | Tampa, Fla. | $650 | $305 | $335 | $195 | $267 | $435 | $334 | $265 | $435 | $325 |
| 2008 | Chapman and Cutler | Chicago | | | | | | | | | | |
| 2008 | Cleary Gottlieb Steen & Hamilton | New York | | | | | | | | | | |
| 2008 | Cooley Godward Kronish | Palo Alto, Calif. | $980 | $525 | $570 | $285 | | | | | | |
| 2008 | Covington & Burling | Washington | | | | | | | | | | |
| 2008 | Cozen O'Connor | Philadelphia | $840 | $240 | $650 | $205 | $342 | $457 | $397 | $325 | $455 | $385 |
| 2008 | Crowell & Moring | Washington | | | | | | | | | | |
| 2008 | Curtis, Mallet-Prevost, Colt & Mosle | New York | $785 | $675 | $575 | $290 | $434 | $730 | $520 | $435 | $730 | $515 |
| 2008 | Davis Polk & Wardwell | New York | | | | | | | | | | |
| 2008 | Davis Wright Tremaine | Seattle | $710 | $300 | $405 | $190 | $260 | $455 | $385 | $280 | $450 | $395 |
| 2008 | Day Pitney | Florham Park, N.J. | $710 | $295 | $450 | $220 | | | | | | |
| 2008 | Debevoise & Plimpton | New York | | | | | | | | | | |
| 2008 | Dewey & LeBoeuf | New York | | | | | | | | | | |
| 2008 | Dickinson Wright | Detroit | $550 | $275 | $300 | $180 | | | | | | |

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Dickstein Shapiro | Washington | $895 | $475 | $475 | $250 | $378 | $607 | $493 | $395 | $605 | $485 |
| 2008 | Dinsmore & Shohl | Cincinnati | $495 | $220 | $305 | $160 | $202 | $347 | $284 | $198 | $338 | $275 |
| 2008 | DLA Piper | London | | | | | | | | | | |
| 2008 | Dorsey & Whitney | Minneapolis | $1,180 | $235 | $820 | $170 | $301 | $505 | $407 | $335 | $510 | $430 |
| 2008 | Drinker Biddle & Reath | Philadelphia | | | | | | | | | | |
| 2008 | Duane Morris | Philadelphia | $755 | $340 | $510 | $230 | $326 | $490 | $449 | $350 | $505 | $450 |
| 2008 | Dykema Gossett | Detroit | $650 | $265 | $435 | $170 | $277 | $415 | | | | |
| 2008 | Edwards Angell Palmer & Dodge | Boston | $755 | $325 | $480 | $170 | | | | | | $450 |
| 2008 | Epstein Becker & Green | New York | $850 | $350 | $450 | $175 | $312 | $501 | $406 | $300 | $495 | $400 |
| 2008 | Faegre & Benson | Minneapolis | | | | | | | | | | |
| 2008 | Fenwick & West | Mountain View, Calif. | | | | | | | | | | |
| 2008 | Fish & Richardson | Boston | | | | | | | | | | |
| 2008 | Fisher & Phillips | Atlanta | $505 | $330 | $380 | $195 | | | | | | |
| 2008 | Fitzpatrick, Cella, Harper & Scinto | New York | | | | | | | | | | |
| 2008 | Foley & Lardner | Milwaukee | $985 | | | $185 | $405 | $596 | $508 | $386 | $585 | $520 |
| 2008 | Foley Hoag | Boston | | | | | | | | | | |
| 2008 | Ford & Harrison | Atlanta | $585 | $325 | $405 | $245 | | | | | | |
| 2008 | Fowler White Boggs Banker | Tampa, Fla. | $525 | $175 | $325 | $160 | $222 | $360 | $314 | $220 | $350 | $325 |
| 2008 | Fox Rothschild | Philadelphia | $590 | $250 | $395 | $215 | $275 | $443 | $378 | $260 | $450 | $375 |
| 2008 | Fredrikson & Byron | Minneapolis | $590 | $250 | $315 | $150 | $237 | $402 | $340 | $225 | $395 | $340 |
| 2008 | Fried, Frank, Harris, Shriver & Jacobson | New York | | | | | | | | | | |
| 2008 | Frost Brown Todd | Cincinnati | $490 | $225 | $260 | $145 | $188 | $317 | $272 | $180 | $310 | $270 |
| 2008 | Fulbright & Jaworski | Houston | | | | | | | | | | |

00000824

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Gardere Wynne Sewell | Dallas | $750 | $380 | $450 | $210 | $306 | $502 | $374 | $300 | $550 | $390 |
| 2008 | Gibbons | Newark, N.J. | $700 | $375 | $415 | $220 | | | | | | |
| 2008 | Gibson, Dunn & Crutcher | Los Angeles | | | | | | | | | | |
| 2008 | Godfrey & Kahn | Milwaukee | | | | | | | | | | |
| 2008 | Gordon & Rees | San Francisco | | | | | | | | | | |
| 2008 | Goulston & Storrs | Boston | | | | | | | | | | |
| 2008 | GrayRobinson | Orlando, Fla. | $650 | $200 | $275 | $125 | $164 | $310 | $239 | $167 | $285 | $252 |
| 2008 | Greenberg Traurig | New York | $850 | $335 | $525 | $175 | $323 | $520 | $426 | $325 | $535 | $425 |
| 2008 | Harris Beach | Rochester, N.Y. | $475 | $250 | $275 | $140 | | | | | | |
| 2008 | Herrick, Feinstein | New York | | | | | | | | | | |
| 2008 | Hiscock & Barclay | Syracuse, N.Y. | $650 | $190 | $430 | $145 | $235 | $361 | $319 | $224 | $359 | $322 |
| 2008 | Hodgson Russ | Buffalo, N.Y. | $665 | $240 | $450 | $165 | $230 | $355 | $303 | $235 | $350 | $300 |
| 2008 | Hogan & Hartson | Washington | $900 | $375 | $550 | $150 | $410 | $660 | $525 | $400 | $650 | $525 |
| 2008 | Holland & Hart | Denver | $615 | $295 | $355 | $175 | $269 | $414 | $350 | $275 | $405 | $345 |
| 2008 | Holland & Knight | Tampa, Fla. | | | | | | | | | | |
| 2008 | Holme Roberts & Owen | Denver | $635 | $285 | $525 | $160 | $294 | $415 | $355 | $265 | $410 | $345 |
| 2008 | Honigman Miller Schwartz and Cohn | Detroit | | | | | | | | | | |
| 2008 | Howard Rice Nemerovski Canady Falk & Rabkin | San Francisco | $795 | $515 | $510 | $275 | | | | | | |
| 2008 | Hughes Hubbard & Reed | New York | $875 | $625 | $600 | $270 | | | | | | |
| 2008 | Hunton & Williams | Richmond, Va. | | | | | | | | | | |
| 2008 | Husch Blackwell Sanders | St. Louis | $740 | $205 | $380 | $150 | $218 | $352 | $302 | $215 | $340 | $300 |
| 2008 | Ice Miller | Indianapolis, Ind. | | | | | | | | | | |
| 2008 | Irell & Manella | Los Angeles | | | | | | | | | | |

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 15 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Jackson Kelly | Charleston, W. Va. | $435 | $200 | $335 | $135 | $155 | $238 | $214 | $151 | $247 | $212 |
| 2008 | Jackson Lewis | White Plains, N.Y. | $595 | $250 | $405 | $180 | | | | | | |
| 2008 | Jenner & Block | Chicago | $1,000 | $525 | $495 | $325 | $393 | $616 | | $375 | $575 | |
| 2008 | Jones Day | Cleveland | | | | | | | | | | |
| 2008 | Jones, Walker, Waechter, Poitevent, Carrere & Denegre | New Orleans | $620 | $225 | $250 | $140 | $186 | $332 | $277 | $180 | $325 | $275 |
| 2008 | Katten Muchin Rosenman | Chicago | | | | | | | | | | |
| 2008 | Kaye Scholer | New York | | | | | | | | | | |
| 2008 | Kelley Drye & Warren | New York | $850 | $430 | $520 | $255 | | | | | | |
| 2008 | Kenyon & Kenyon | New York | | | | | | | | | | |
| 2008 | Kilpatrick Stockton | Atlanta | $695 | $310 | $400 | $225 | $290 | $485 | $400 | $275 | $475 | $395 |
| 2008 | Kirkland & Ellis | Chicago | | | | | | | | | | |
| 2008 | Kirkpatrick & Lockhart Preston Gates Ellis | Pittsburgh | | | | | | | | | | |
| 2008 | Knobbe, Martens, Olson & Bear | Irvine, Calif. | $660 | $375 | $430 | $245 | $287 | $473 | | $275 | $450 | $362 |
| 2008 | Kramer Levin Naftalis & Frankel | New York | | | | | | | | | | |
| 2008 | Lane Powell | Seattle | $550 | $325 | $325 | $195 | $270 | $405 | $327 | $275 | $400 | $350 |
| 2008 | Latham & Watkins | Los Angeles | | | | | | | | | | |
| 2008 | Lathrop & Gage | Kansas City, Mo. | $490 | $255 | $265 | $180 | | | | | | |
| 2008 | LeClairRyan | Richmond, Va. | | | | | | | | | | |
| 2008 | Leonard, Street and Deinard | Minneapolis | $530 | $310 | $315 | $200 | | | | | | |
| 2008 | Lewis and Roca | Phoenix | | | | | | | | | | |
| 2008 | Lewis Brisbois Bisgaard & Smith | Los Angeles | | | | | | | | | | |
| 2008 | Lewis, Rice & Fingersh | St. Louis | $440 | $225 | $305 | $140 | $218 | $367 | $309 | $210 | $375 | $330 |
| 2008 | Lindquist & Vennum | Minneapolis | $450 | $280 | $295 | $180 | | | | | | |
| 2008 | Littler Mendelson | San Francisco | | | | | | | | | | |
| 2008 | Locke Lord Bissell & Liddell | Dallas | $975 | $375 | $450 | $225 | $313 | $527 | $433 | $300 | $525 | $450 |

Case 1:08-cv-00364-DAR　Document 94-1　Filed 06/27/13　Page 16 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Loeb & Loeb | New York | $925 | $450 | $500 | $260 | $422 | $651 | $534 | $425 | $650 | $500 |
| 2008 | Lowenstein Sandler | Roseland, N.J. | $765 | $400 | $405 | $220 | | | | | | |
| 2008 | Luce, Forward, Hamilton & Scripps | San Diego | $650 | $350 | $460 | $235 | $293 | $483 | $397 | $280 | $483 | $400 |
| 2008 | Manatt, Phelps & Phillips | Los Angeles | $850 | $495 | $505 | $290 | $407 | $626 | $553 | $410 | $620 | $550 |
| 2008 | Marshall, Dennehey, Warner, Coleman & Goggin | Philadelphia | $400 | $135 | $300 | $120 | | | | | | |
| 2008 | McCarter & English | Newark, N.J. | $635 | $325 | $396 | $215 | $280 | $435 | $353 | $285 | $440 | $345 |
| 2008 | McDonnell Boehnen | Chicago | | | | | | | | | | |
| 2008 | McElroy, Deutsch, Mulvaney & Carpenter | Morristown, N.J. | $450 | $295 | $225 | $135 | $180 | $250 | $195 | $165 | $235 | $215 |
| 2008 | McKee Nelson | New York | $995 | $665 | $630 | $395 | | | | | | |
| 2008 | McKenna Long & Aldridge | Atlanta | $750 | $570 | $450 | $220 | $274 | $454 | | | | |
| 2008 | Michael Best & Friedrich | Milwaukee | $620 | $235 | $330 | $190 | $252 | $391 | $340 | $245 | $375 | $305 |
| 2008 | Miles & Stockbridge | Baltimore, Md. | | | | | | | | | | |
| 2008 | Miller & Martin | Chattanooga, Tenn. | $610 | $210 | $305 | $180 | $210 | $354 | $316 | $205 | $360 | $330 |
| 2008 | Miller, Canfield, Paddock and Stone | Detroit | $620 | $275 | $375 | $165 | $240 | $425 | $347 | $240 | $425 | $355 |
| 2008 | Montgomery, McCracken, Walker & Rhoads | Philadelphia | $585 | $360 | $365 | $195 | $270 | $440 | $360 | | | |
| 2008 | Moore & Van Allen | Charlotte, N.C. | $770 | $280 | $365 | $180 | $256 | $425 | $238 | $250 | $410 | $273 |
| 2008 | Morgan, Lewis & Bockius | Philadelphia | | | | | | | | | | |
| 2008 | Morrison & Foerster | San Francisco | | | | | | | | | | |
| 2008 | Munger, Tolles & Olson | Los Angeles | | | | | | | | | | |
| 2008 | Neal, Gerber & Eisenberg | Chicago | | | | | | | | | | |
| 2008 | Nelson Mullins Riley & Scarborough | Columbia, S.C. | | | | | | | | | | |
| 2008 | Nexsen Pruet | Columbia, S.C. | $450 | $250 | $250 | $170 | | | | | | |
| 2008 | Nixon Peabody | Boston | $845 | $565 | $350 | $230 | $370 | $570 | $468 | $365 | $590 | $430 |
| 2008 | O'Melveny & Myers | New York | | | | | | | | | | |

00000827

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 17 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Ogletree, Deakins, Nash, Smoak & Stewart | Greenville, S.C. | $600 | $275 | $380 | $185 | $266 | $367 | $325 | | | |
| 2008 | Parker Poe Adams & Bernstein | Charlotte, N.C. | | | | | | | | | | |
| 2008 | Patton Boggs | Washington | $990 | $360 | $535 | $244 | $372 | $586 | $440 | $385 | $570 | $465 |
| 2008 | Paul, Hastings, Janofsky & Walker | Los Angeles | | | | | | | | | | |
| 2008 | Paul, Weiss, Rifkind, Wharton & Garrison | New York | | | | | | | | | | |
| 2008 | Pepper Hamilton | Philadelphia | $765 | $385 | $395 | $240 | $329 | $498 | | | | |
| 2008 | Perkins Coie | Seattle | $765 | $260 | $515 | $165 | | | | | | |
| 2008 | Phelps Dunbar | New Orleans | $450 | $170 | $260 | $130 | $171 | $256 | $213 | $165 | $250 | $205 |
| 2008 | Phillips Lytle | Buffalo, N.Y. | $475 | $250 | $355 | $155 | $230 | $334 | $288 | $220 | $330 | $300 |
| 2008 | Pillsbury | New York | | | | | | | | | | |
| 2008 | Plunkett & Cooney | Bloomfield Hills, Mich. | | | | | | | | | | |
| 2008 | Polsinelli Shalton Flanigan Suelthaus | Kansas City, Mo. | $600 | $250 | $275 | $175 | | | | | | |
| 2008 | Proskauer Rose | New York | | | | | | | | | | |
| 2008 | Quarles & Brady | Milwaukee | $625 | $280 | $375 | $200 | $252 | $419 | $347 | $245 | $420 | $342 |
| 2008 | Reed Smith | Pittsburgh | $900 | $375 | $580 | $235 | $423 | $626 | $441 | $390 | $585 | $425 |
| 2008 | Reinhart Boerner Van Deuren | Milwaukee | | | | | | | | | | |
| 2008 | Robinson & Cole | Hartford, Conn. | $650 | $320 | $350 | $210 | $276 | $436 | $346 | $275 | $440 | $350 |
| 2008 | Roetzel & Andress | Akron, Ohio | $500 | $225 | $295 | $170 | $219 | $333 | $292 | $215 | $325 | $300 |
| 2008 | Ruden McClosky | Fort Lauderdale, Fla. | | | | | | | | | | |
| 2008 | Rutan & Tucker | Costa Mesa, Calif. | $635 | $315 | $370 | $220 | | | | | | |
| 2008 | Saul Ewing | Philadelphia | $800 | $295 | $535 | $205 | $285 | $441 | $372 | $255 | $430 | $380 |
| 2008 | Schiff Hardin | Chicago | | | | | | | | | | |

00000828

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 18 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Schnader Harrison Segal & Lewis | Philadelphia | $625 | $275 | $375 | $160 | | | | | | |
| 2008 | Schulte Roth & Zabel | New York | $895 | $695 | $650 | $255 | $495 | $770 | $550 | $510 | $755 | $530 |
| 2008 | Sedgwick, Detert, Moran & Arnold | San Francisco | $650 | $295 | $390 | $185 | $262 | $398 | $318 | $260 | $380 | $300 |
| 2008 | Seward & Kissel | New York | | | | | | | | | | |
| 2008 | Sherman & Sterling | New York | | | | | | | | | | |
| 2008 | Sheppard, Mullin, Richter & Hampton | Los Angeles | $765 | $475 | $580 | $275 | | | | | | |
| 2008 | Sherman & Howard | Denver | | | | | | | | | | |
| 2008 | Shook, Hardy & Bacon | Kansas City, Mo. | | | | | | | | | | |
| 2008 | Shughart Thomson & Kilroy | Kansas City, Mo. | $500 | $240 | $245 | $185 | | | | | | |
| 2008 | Shumaker, Loop & Kendrick | Toledo, Ohio | $500 | $225 | $380 | $185 | $227 | $329 | $297 | $225 | $325 | $315 |
| 2008 | Shutts & Bowen | Miami | $540 | $190 | $240 | $190 | | | | | | |
| 2008 | Sills Cummis & Gross | Newark, N.J. | $725 | $395 | $425 | $215 | | | | | | |
| 2008 | Simpson Thacher & Bartlett | New York | | | | | | | | | | |
| 2008 | Skadden, Arps, Slate, Meagher & Flom | New York | | | | | | | | | | |
| 2008 | Smith, Gambrell & Russell | Atlanta | $595 | $260 | $335 | $155 | | | | | | |
| 2008 | Snell & Wilmer | Phoenix | $725 | $300 | $420 | $170 | $271 | $444 | $354 | | | |
| 2008 | Squire, Sanders & Dempsey | Cleveland | | | | | | | | | | |
| 2008 | Steptoe & Johnson LLP | Washington | $895 | $350 | $685 | $210 | $384 | $591 | $477 | $395 | $580 | $470 |
| 2008 | Steptoe & Johnson PLLC | Clarksburg, W. Va. | $325 | $200 | $250 | $170 | | | | | | |
| 2008 | Stevens & Lee | Reading, Pa. | | | | | | | | | | |
| 2008 | Stinson Morrison Hecker | Kansas City, Mo. | $680 | $275 | $290 | $190 | $224 | $363 | $293 | $228 | $373 | $275 |
| 2008 | Stites & Harbison | Louisville, Ky. | | | | | | | | | | |
| 2008 | Stoel Rives | Portland, Ore. | $550 | $290 | $365 | $170 | | | | | | |
| 2008 | Strasburger & Price | Dallas | $580 | $300 | $395 | $185 | | | $334 | | | |
| 2008 | Sullivan & Worcester | Boston | $775 | $450 | $490 | $270 | $343 | $603 | $465 | $330 | $600 | $495 |

00000829

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Sutherland Asbill & Brennan | Atlanta | $750 | $395 | $450 | $240 | $316 | $543 | $379 | $300 | $530 | $380 |
| 2008 | Taft Stettinius & Hollister | Cincinnati | $475 | $200 | $325 | $165 | $217 | $354 | $294 | $195 | $355 | $295 |
| 2008 | Thompson & Knight | Dallas | $785 | $410 | $500 | $250 | $334 | $545 | $463 | $345 | $530 | $450 |
| 2008 | Thompson Coburn | St. Louis | $555 | $295 | $400 | $170 | | | | | | |
| 2008 | Thompson Hine | Cleveland | $740 | $275 | $510 | $185 | $240 | $425 | $330 | $235 | $420 | $325 |
| 2008 | Townsend and Townsend and Crew | San Francisco | | | | | | | | | | |
| 2008 | Troutman Sanders | Atlanta | | | | | | | | | | |
| 2008 | Ulmer & Berne | Cleveland | $495 | $230 | $310 | $175 | $205 | $319 | $262 | | | |
| 2008 | Vedder Price | Chicago | $685 | $310 | $390 | $235 | $290 | $456 | $385 | $290 | $445 | $390 |
| 2008 | Venable | Washington | $950 | $380 | $425 | $250 | $329 | $530 | $440 | $320 | $525 | $440 |
| 2008 | Vinson & Elkins | Houston | | | | | | | | | | |
| 2008 | Vorys, Sater, Seymour and Pease | Columbus, Ohio | | | | | | | | | | |
| 2008 | Weil, Gotshal & Manges | New York | | | | | | | | | | |
| 2008 | White & Case | New York | $1,260 | $550 | $920 | $160 | $456 | $747 | $513 | | | |
| 2008 | White and Williams | Philadelphia | | | | | | | | | | |
| 2008 | Wiggin and Dana | New Haven, Conn. | $600 | $360 | $375 | $215 | | | | | | |
| 2008 | Wildman, Harrold, Allen & Dixon | Chicago | | | | | | | | | | |
| 2008 | Wiley Rein | Washington | | | | | | | | | | |
| 2008 | Williams Mullen | Richmond, Va. | $625 | $300 | $355 | $170 | $260 | $401 | $344 | $205 | $380 | $350 |
| 2008 | Wilkie Farr & Gallagher | New York | | | | | | | | | | |
| 2008 | Winstead | Dallas | $655 | $365 | $385 | $215 | $282 | $465 | $390 | | | |
| 2008 | Winston & Strawn | Chicago | $975 | $400 | $625 | $210 | $376 | $622 | $448 | | | |
| 2008 | Wolf, Block, Schorr and Solis-Cohen | Philadelphia | | | | | | | | | | |
| 2008 | Womble Carlyle Sandridge & Rice | Winston-Salem, N.C. | $750 | $285 | $370 | $140 | $275 | $448 | $248 | $275 | $450 | $200 |
| 2008 | Wyatt Tarrant & Combs | Louisville, Ky. | $450 | $225 | $255 | $180 | $210 | $340 | $300 | $210 | $345 | $310 |

00000830

Case 1:08-cv-00364-DAR　Document 94-1　Filed 06/27/13　Page 20 of 118



| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | Adams and Reese LLP | New Orleans, LA | $500 | $245 | $310 | $185 | $220 | $333 | $252 | $215 | $325 | $255 |
| 2009 | Adorno & Yoss | Miami, FL | $525 | $225 | $300 | $155 | $255 | $354 | $308 | $225 | $350 | $300 |
| 2009 | Allen Matkins Leck Gamble Mallory & Natsis LLP | City, ST | | | | | | | | | | |
| 2009 | Alston & Bird LLP | Atlanta, GA | $860 | $450 | $555 | $265 | $388 | $602 | $491 | $385 | $590 | $485 |
| 2009 | Arent Fox LLP | Washington, DC | $755 | $420 | $485 | $260 | | | | | | |
| 2009 | Armstrong Teasdale LLP | St. Louis, MO | $450 | $320 | $315 | $175 | | | | | | |
| 2009 | Baker & Daniels LLP | Indianapolis, | | | | | | | | | | |
| 2009 | Baker & Hostetler | Cleveland, OH | | | | | | | | | | |
| 2009 | Baker, Donelson, Bearman, Caldwell & Berkowitz, PC | Memphis, TN | $595 | $236 | $315 | $160 | $218 | $349 | $302 | $215 | $340 | $295 |
| 2009 | Balch & Bingham LLP | City, ST | | | | | | | | | | |
| 2009 | Barnes & Thornburg LLP | Indianapolis, IN | $615 | $375 | $390 | $210 | $246 | $396 | $345 | $240 | $395 | $350 |
| 2009 | Bass, Berry & Sims PLC | Nashville, TN | | | | | | | | | | |
| 2009 | Best Best & Krieger LLP | Riverside, CA | $550 | $310 | $380 | $185 | $245 | $421 | $310 | $245 | $425 | $300 |
| 2009 | Bond, Schoeneck & King, PLLC | Syracuse, NY | $465 | $200 | $275 | $150 | $191 | $319 | $278 | $195 | $320 | $290 |
| 2009 | Bowman and Brooke | Minneapolis, MN | $500 | $250 | | | | | | | | |
| 2009 | Briggs and Morgan, Professional Association | Minneapolis, MN | $600 | $290 | $315 | $210 | $240 | $437 | $373 | $235 | $440 | $390 |
| 2009 | Brinks Hofer Gilson & Lione | Chicago, IL | $725 | $335 | $425 | $190 | $292 | $530 | $407 | $280 | $550 | $405 |
| 2009 | Broad and Cassel | Orlando, FL | $475 | $260 | $350 | $175 | $242 | $372 | $307 | $248 | $375 | $295 |
| 2009 | Brown Rudnick LLP | Boston, MA | | | | | | | | | | |

00000831

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 21 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | Brownstein Hyatt Farber Schreck, LLP | Denver, CO | $795 | $280 | $340 | $185 | $247 | $446 | $377 | $250 | $425 | $370 |
| 2009 | Bryan Cave LLP | St. Louis, MO | $765 | $355 | $550 | $160 | $331 | $541 | $448 | $330 | $530 | $430 |
| 2009 | Buchalter Nemer | Los Angeles, CA | $625 | $270 | $430 | $195 | $311 | $467 | $399 | $300 | $475 | $400 |
| 2009 | Buchanan Ingersoll & Rooney PC | Pittsburgh, PA | $1,020 | $310 | $580 | $200 | | | | | | |
| 2009 | Burr & Forman LLP | Birmingham, AL | $490 | $275 | $335 | $200 | $247 | $352 | $314 | $300 | $350 | $325 |
| 2009 | Butzel Long A Professional Corporation | Detroit, MI | $700 | $285 | $396 | $200 | | | | | | |
| 2009 | Carlton Fields, P.A. | Tampa, FL | $750 | $325 | $365 | $195 | $278 | $457 | $393 | $285 | $455 | $395 |
| 2009 | Clark Hill | Detroit, MI | | | | | | | | | | |
| 2009 | Cozen O'Connor, A Professional Corporation | Philadelphia, PA | $880 | $500 | $695 | $220 | $325 | $488 | $415 | $320 | $460 | $390 |
| 2009 | Crowell & Moring LLP | Washington, DC | | | | | | | | | | |
| 2009 | Curtis, Mallet-Prevost, Colt & Mosle LLP | New York, NY | $785 | $675 | $575 | $290 | $434 | $730 | $522 | $435 | $730 | $515 |
| 2009 | Davis Wright Tremaine LLP | Seattle, WA | $775 | $310 | $445 | $210 | $300 | $474 | $346 | $305 | $465 | $355 |
| 2009 | Day Pitney LLP | New York, NY | $750 | $385 | $465 | $230 | $310 | $507 | $411 | $295 | $495 | |
| 2009 | Dickinson Wright PLLC | Detroit, MI | $575 | $275 | $325 | $185 | | | | | | |
| 2009 | Dickstein Shapiro LLP | Washington, DC | $950 | $500 | $515 | $265 | $403 | $633 | $520 | $415 | $630 | $518 |
| 2009 | Dinsmore & Shohl LLP | Cincinnati, OH | $525 | $200 | $295 | $165 | $204 | $345 | $286 | $200 | $340 | $270 |
| 2009 | DLA Piper US | New York, NY | | | | | | | | | | |
| 2009 | Dorsey and Whitney LLP | Minneapolis, MN | $795 | $245 | $545 | $165 | $315 | $520 | $335 | $300 | $520 | $310 |
| 2009 | Duane Morris LLP | Philadelphia, PA | $795 | $325 | $450 | $225 | $335 | $527 | $463 | $338 | $515 | $473 |
| 2009 | Dykema Gossett PLLC | Detroit, MI | $595 | $295 | $440 | $200 | $290 | $440 | | | | |

00000832

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 22 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | Edwards Angell Palmer & Dodge LLP | Boston, MA | $750 | $325 | $495 | $170 | $321 | $547 | $447 | $305 | $545 | $450 |
| 2009 | Epstein Becker & Green, P.C. | New York, NY | $855 | $350 | $475 | $180 | $332 | $523 | $434 | $325 | $500 | $425 |
| 2009 | Fenwick & West LLP | Mountain View, CA | | | | | | | | | | |
| 2009 | Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P. | Washington, DC | | | | | | | | | | |
| 2009 | Fish & Richardson P.C. | Boston, MA | | | | | | | | | | |
| 2009 | Fitzpatrick, Cella, Harper & Scinto | New York, NY | $810 | | | $275 | | | | $385 | | |
| 2009 | Foley & Lardner LLP | Milwaukee, WI | $1,035 | $470 | $440 | $275 | $422 | $631 | $530 | $400 | $620 | $540 |
| 2009 | Ford & Harrison LLP | Atlanta, GA | $595 | $340 | $370 | $245 | $296 | $466 | $391 | $308 | $468 | $420 |
| 2009 | Fowler White Boggs P.A. | Tampa, FL | $535 | $295 | $325 | $195 | $240 | $378 | $325 | $238 | $370 | $325 |
| 2009 | Fox Rothschild LLP | Philadelphia, PA | $675 | $310 | $400 | $225 | $276 | $451 | $383 | $265 | $450 | $395 |
| 2009 | Fredrikson & Byron, P.A. | Minneapolis, MN | | | | | | | | | | |
| 2009 | Frost Brown Todd LLC | Cincinnati, OH | $490 | $200 | $245 | $160 | $191 | $317 | $274 | $185 | $310 | $275 |
| 2009 | Fulbright & Jaworski L.L.P. | Houston, TX | | | | | | | | | | |
| 2009 | Gardere Wynne Sewell LLP | Dallas, TX | $775 | $380 | $445 | $210 | $310 | $512 | $400 | $302 | $500 | $400 |
| 2009 | Gibbons P.C. | Newark, NJ | $700 | $365 | $425 | $220 | | | | | | |
| 2009 | Godfrey & Kahn, S.C. | Milwaukee, WI | $485 | $310 | $300 | $180 | | | | | | |
| 2009 | GrayRobinson, P.A. | Orlando, FL | $750 | $170 | $150 | $300 | | | | | | |
| 2009 | Greenberg Traurig, LLP | International | $850 | $345 | $575 | $200 | $328 | $534 | $442 | $340 | $545 | $450 |
| 2009 | Greenbaum Doll & McDonald PLLC | Louisville, KY | $505 | $225 | $235 | $150 | $170 | $300 | $252 | $195 | $365 | $330 |
| 2009 | Harris Beach PLLC | Rochester, NY | $475 | $250 | $275 | $140 | | | | | | |
| 2009 | Hiscock & Barclay, LLP | Syracuse, NY | $650 | $195 | $430 | $150 | $235 | $352 | $313 | $217 | $347 | $311 |

00000833

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 23 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | Hodgson Russ LLP | Buffalo, NY | $665 | $225 | $450 | $165 | $233 | $365 | $318 | $225 | $360 | $310 |
| 2009 | Hogan & Hartson LLP | Washington, DC | $990 | $385 | $550 | $150 | $420 | $675 | $540 | $405 | $660 | |
| 2009 | Holland & Hart LLP | Denver, CO | $615 | $295 | $390 | $175 | $266 | $412 | $349 | $268 | $405 | $345 |
| 2009 | Holland & Knight LLP | New York, NY | | | | | | | | | | |
| 2009 | Holme Roberts & Owen LLP | Denver, CO | $635 | $285 | $530 | $170 | $295 | $415 | $355 | $265 | $410 | $345 |
| 2009 | Honigman Miller Schwartz and Cohn LLP | Detroit, MI | | | | | | | | | | |
| 2009 | Husch Blackwell Sanders LLP | Kansas City and St. Louis, MO | $777 | $220 | $399 | $168 | $220 | $376 | $319 | $205 | $368 | $318 |
| 2009 | Ice Miller LLP | Indianapolis, IN | | | | | | | | | | |
| 2009 | Irell & Manella LLP | Los Angeles, CA | | | | | | | | | | |
| 2009 | Jackson Kelly PLLC | Charleston, WV | $445 | $220 | $250 | $145 | $180 | $289 | $250 | $180 | $285 | $250 |
| 2009 | Jackson Lewis LLP | White Plains, NY | $715 | $245 | $425 | $150 | $282 | $425 | $360 | $275 | $425 | $350 |
| 2009 | Jenner & Block LLP | Chicago, IL | $1,000 | $525 | $535 | $325 | $409 | $655 | | $400 | $625 | |
| 2009 | Jones Day | New York, NY | | | | | | | | | | |
| 2009 | Jones, Walker, Waechter, Poitevent, Carrere & Denegre L.L.P. | New Orleans, LA | $620 | $185 | $260 | $170 | | | | | | |
| 2009 | Kelley Drye & Warren LLP | New York, NY | $875 | $450 | $545 | $265 | | | | | | |
| 2009 | Kilpatrick Stockton LLP | Atlanta, GA | $700 | $375 | $425 | $225 | $310 | $515 | $425 | $295 | $495 | $425 |
| 2009 | Knobbe, Martens, Olson & Bear, LLP | Irvine, CA | $680 | $390 | $380 | $270 | $308 | $492 | | $295 | $480 | |
| 2009 | Kramer Levin Naftalis & Frankel LLP | New York, NY | | | | | | | | | | |
| 2009 | Lane Powell Moss & Miller | Seattle, WA | $575 | $340 | $350 | $225 | $272 | $420 | $337 | $280 | $415 | $365 |
| 2009 | Lathrop & Gage LLP | Kansas City, MO | $490 | $255 | $265 | $180 | | | | | | |
| 2009 | LeClairRyan | Richmond, VA | | | | | | | | | | |
| 2009 | Lewis, Rice & Fingersh | St. Louis, MO | $450 | $250 | $210 | $140 | | | | | | |
| 2009 | Lindquist & Vennum PLLP | Minneapolis, MN | $600 | $275 | $300 | $200 | $236 | $386 | $320 | $225 | $390 | $340 |

00000834

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 24 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | Littler Mendelson, A Professional Corporation | San Francisco, CA | $685 | $270 | $435 | $125 | $278 | $433 | $361 | $275 | $425 | $340 |
| 2009 | Locke Lord Bissell & Liddell LLP | Dallas, TX | $1,045 | $375 | $525 | $200 | $310 | $563 | $458 | $295 | $560 | $480 |
| 2009 | Loeb & Loeb LLP | New York, NY and Los Angeles, CA | $950 | $475 | $650 | $285 | $400 | $667 | $566 | $425 | $650 | $575 |
| 2009 | Lowenstein Sandler PC | Roseland, NJ | $765 | $425 | $500 | $230 | | | | | | |
| 2009 | Luce, Forward, Hamilton & Scripps LLP | San Diego, CA | $650 | $360 | $540 | $240 | $304 | $496 | $410 | $290 | $490 | $420 |
| 2009 | Manatt, Phelps & Phillips, LLP | Los Angeles, CA | $850 | $495 | $505 | $290 | $383 | $626 | $531 | $410 | $620 | $550 |
| 2009 | Marshall, Dennehey, Warner, Coleman & Goggin | Philadelphia, PA | $400 | $140 | $310 | $125 | | | | | | |
| 2009 | Mcandrews Held & Malloy | Chicago, IL | $625 | $310 | $290 | $220 | | | | | | |
| 2009 | McCarter & English, LLP | Newark, NJ | $700 | $350 | $395 | $205 | $307 | $472 | $396 | $315 | $468 | $395 |
| 2009 | McDonnell Boehnen | Chicago, IL | $670 | $295 | $270 | $225 | | | | | | |
| 2009 | McElroy, Deutsch, Mulvaney & Carpenter, LLP | Morristown, NJ | $500 | $295 | $250 | $145 | $185 | $275 | $200 | $170 | $250 | $215 |
| 2009 | McKenna Long & Aldridge LLP | Atlanta, GA | $775 | $350 | $470 | $220 | $284 | $471 | | | | |
| 2009 | Michael Best & Friedrich LLP | Milwaukee, WI | $620 | $235 | $305 | $190 | $235 | $383 | $305 | $225 | $375 | $300 |
| 2009 | Miller & Martin PLLC | Chattanooga, Tennessee | $610 | $220 | $315 | $180 | $235 | $330 | $305 | $230 | $375 | $350 |
| 2009 | Miller, Canfield, Paddock and Stone, PLLC. | Detroit, MI | $640 | $240 | $400 | $175 | $254 | $431 | $368 | $245 | $440 | $375 |
| 2009 | Montgomery, McCracken, Walker & Rhoads | Philadelphia, PA | $505 | $370 | $375 | $215 | $266 | $452 | $396 | | | |
| 2009 | Moore & Van Allen PLLC | Charlotte, NC | $770 | $265 | $355 | $180 | $259 | $437 | $389 | $250 | $420 | $350 |
| 2009 | Morris, Manning & Martin, LLP | Atlanta, GA | $760 | $365 | $425 | $200 | $353 | $492 | $424 | $360 | $490 | $415 |
| 2009 | Morrison & Foerster LLP | San Francisco, CA | | | | | | | | | | |
| 2009 | Nelson Mullins Riley & Scarborough LLP | Columbia, SC | $850 | $275 | $405 | $190 | $248 | $394 | $340 | $245 | $380 | $325 |
| 2009 | Nexsen Pruet | Columbia, SC | $500 | $220 | $250 | $175 | | | | | | |

00000835

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | Nixon Peabody LLP | New York, NY | $865 | $455 | $570 | $230 | $386 | $583 | $436 | $370 | $600 | $435 |
| 2009 | O'Melveny & Myers LLP | Los Angeles, CA | | | | | | | | | | |
| 2009 | Ogletree, Deakins, Nash, Smoak & Stewart, P.C. | National | $625 | $400 | $290 | $195 | $281 | $386 | $347 | | | |
| 2009 | Patton Boggs LLP | Washington, DC | $990 | $400 | $540 | $200 | $396 | $650 | $521 | $400 | $625 | $520 |
| 2009 | Paul, Hastings, Janofsky & Walker LLP | New York, NY | | | | | | | | | | |
| 2009 | Pepper Hamilton LLP | Philadelphia, PA | $820 | $420 | $450 | $240 | | | | | | |
| 2009 | Perkins Coie LLP | Seattle, WA | $815 | $265 | $525 | $195 | $337 | $518 | $424 | | $515 | |
| 2009 | Phelps Dunbar LLP | New Orleans, LA | $450 | $170 | $260 | $130 | $170 | $256 | $213 | $165 | $355 | $253 |
| 2009 | Phillips Lytle LLP | Buffalo, NY | $475 | $240 | $415 | $150 | $235 | $340 | $250 | $230 | $335 | $255 |
| 2009 | Plunkett & Cooney | Bloomfield Hills, NY | | | | | | | | | | |
| 2009 | Polsinelli Shughart PC | Kansas City, MO | $600 | $250 | $275 | $185 | | | | | | |
| 2009 | Proskauer Rose LLP | New York, NY | | | | | | | | | | |
| 2009 | Quarles & Brady LLP | Milwaukee, WI | $625 | $285 | $375 | $200 | $252 | $422 | $353 | $245 | $425 | $365 |
| 2009 | Reed Smith LLP | Pittsburgh, PA | | | | | | | | | | |
| 2009 | Reinhart Boerner Van Deuren s.c. | City, | | | | | | | | | | |
| 2009 | Robinson & Cole LLP | Hartford, CT | $650 | $320 | $525 | $210 | $262 | $449 | $325 | $360 | $450 | $360 |
| 2009 | Roetzel & Andress, A Legal Professional Association | Akron, OH | $550 | $250 | $300 | $180 | $227 | $347 | $307 | $230 | $350 | $319 |
| 2009 | Ruden McClosky | Fort Lauderdale, FL | | | | | | | | | | |
| 2009 | Rutan & Tucker | Costa Mesa, CA | $635 | $335 | $400 | $225 | $294 | | | $260 | | |
| 2009 | Saul Ewing LLP | Philadelphia, PA | $800 | $315 | $585 | $205 | | $464 | $387 | | $450 | $375 |
| 2009 | Schulte Roth & Zabel LLP | New York, NY | $880 | $715 | $670 | $265 | $260 | $410 | $305 | $250 | $400 | $300 |
| 2009 | Schwabe Williamson & Wyatt | Portland, OR | $540 | $290 | $440 | $195 | | | | | | |

00000836

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 26 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | Sedgwick, Detert, Moran & Arnold LLP | San Francisco, CA | $670 | $315 | $555 | $225 | $302 | $418 | $343 | $295 | $415 | $335 |
| 2009 | Sheppard, Mullin, Richter & Hampton LLP | Los Angeles, CA | $715 | $495 | $525 | $285 | | | | | | |
| 2009 | Shook, Hardy & Bacon L.L.P. | Kansas City, MO | | | | | | | | | | |
| 2009 | Shumaker, Loop & Kendrick, LLP | Toledo, OH | $515 | $235 | $395 | $165 | $231 | $341 | $309 | $235 | $340 | $330 |
| 2009 | Sills Cummis & Gross P.C. | Newark, NJ | | | | | | | | | | |
| 2009 | Smith, Gambrell & Russell, LLP | Atlanta, GA | $740 | $325 | $440 | $195 | $1,604 | $1,402 | | | | |
| 2009 | Snell & Wilmer L.L.P. | Phoenix, AZ | $775 | $315 | $480 | $175 | $300 | $473 | $381 | | | |
| 2009 | Steptoe & Johnson LLP | Washington, DC | | | | | | | | | | |
| 2009 | Stevens & Lee, A Professional Corporation | Reading, PA | | | | | | | | | | |
| 2009 | Stinson Morrison Hecker LLP | Kansas City, MO | $680 | $275 | $305 | $195 | $232 | $391 | $333 | $228 | $380 | $345 |
| 2009 | Stoel Rives LLP | Portland, OR | $600 | $310 | $375 | $190 | $267 | $430 | $369 | $265 | $425 | $375 |
| 2009 | Strasburger & Price, LLP | Dallas, TX | $610 | $325 | $365 | $210 | | | $331 | | | |
| 2009 | Sullivan & Worcester LLP | Boston, MA | $800 | $470 | $560 | $285 | $373 | $629 | $520 | $365 | $618 | $525 |
| 2009 | Sutherland Asbill & Brennan LLP | Atlanta, GA and Washington, D.C. | $800 | $420 | $480 | $220 | $332 | $563 | $403 | $320 | $550 | $390 |
| 2009 | Taft Stettinius & Hollister LLP | Cincinnati, OH | $475 | $200 | $370 | $160 | $212 | $346 | | | | |
| 2009 | Thompson & Knight LLP | Dallas, TX | $825 | $410 | $500 | $265 | $358 | $560 | $471 | $365 | $560 | $468 |
| 2009 | Thompson Coburn LLP | St. Louis, MO | $595 | $320 | $390 | $190 | | | | | | |
| 2009 | TOWNSEND and TOWNSEND and CREW LLP | San Francisco, CA | $750 | $480 | $460 | $260 | $360 | $530 | $351 | $360 | $560 | $360 |
| 2009 | Ulmer & Berne LLP | Cleveland, OH | $550 | $245 | $320 | $180 | $215 | $340 | $285 | | | |
| 2009 | Vedder Price, P.C. | Chicago, IL | $700 | $375 | $450 | $245 | $312 | $469 | $406 | $300 | $455 | $410 |

00000837

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 27 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | Venable LLP | Washington, DC | $975 | $420 | $450 | $275 | $336 | $556 | $457 | $325 | $550 | $460 |
| 2009 | Wiggin and Dana | New Haven, CT | $650 | $360 | $410 | $220 | | | | | | |
| 2009 | Wiley Rein LLP | Washington, DC | | | | | | | | | | |
| 2009 | Williams Mullen | Richmond, VA | $710 | $315 | $380 | $220 | $274 | $417 | | | | |
| 2009 | Wilmer Cutler Pickering Hale and Dorr LLP | Boston, MA | | | | | | | | | | |
| 2009 | Winstead PC | Dallas, TX | $655 | $350 | $385 | $215 | $285 | $462 | $395 | | | |
| 2009 | Winston & Strawn LLP | Chicago, IL | $995 | $400 | $670 | $210 | $372 | $638 | $498 | $345 | $630 | $480 |
| 2009 | Womble Carlyle Sandridge & Rice | Winston-Salem, NC | $750 | $300 | $415 | $140 | $285 | $462 | $213 | $281 | $465 | $130 |
| 2009 | Wyatt, Tarrant & Combs, LLP | Louisville, KY | $475 | $250 | $265 | $190 | $218 | $350 | $284 | $220 | $355 | $305 |

00000838


ALM
An Integrated Media Company

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | Adams and Reese | New Orleans | $550 | $250 | $290 | $195 | $229 | $344 | $265 | $235 | $340 | $270 |
| 2010 | Akerman Senterfitt | Miami | | | | | | | | | | |
| 2010 | Akin Gump Strauss Hauer & Feld | Washington | | | | | | | | | | |
| 2010 | Allen Matkins Leck Gamble Mallory & Natsis | Los Angeles | | | | | | | | | | |
| 2010 | Alston & Bird | Atlanta | $865 | $450 | $590 | $270 | $405 | $627 | $515 | $405 | $615 | $505 |
| 2010 | Andrews Kurth | Houston | | | | | | | | | | |
| 2010 | Archer & Greiner | Haddonfield, NJ | $560 | $305 | $340 | $175 | | | | | | |
| 2010 | Arent Fox | Washington | $765 | $400 | $475 | $240 | | | | | | |
| 2010 | Armstrong Teasdale | St. Louis | $475 | $300 | $325 | $200 | | | | | | |
| 2010 | Arnold & Porter | Washington | | | | | | | | | | |
| 2010 | Baker & Daniels | Indianapolis | | | | | | | | | | |
| 2010 | Baker & Hostetler | Cleveland | | | | | | | | | | |
| 2010 | Baker Botts L.L.P | Houston | | | | | | | | | | |
| 2010 | Baker, Donelson, Bearman, Caldwell & Berkowitz | Memphis, TN | $595 | $255 | $320 | $165 | $231 | $357 | $312 | $230 | $348 | $305 |
| 2010 | Ballard Spahr | Philadelphia | | | | | | | | | | |
| 2010 | Barnes & Thornburg | Indianapolis | $613 | $298 | $356 | $225 | $261 | $416 | $367 | $260 | $415 | $375 |
| 2010 | Bass, Berry & Sims | Nashville, TN | | | | | | | | | | |
| 2010 | Benesch, Friedlander, Coplan & Aronoff | Cleveland | $575 | $350 | $360 | $195 | $245 | $335 | $315 | | | |
| 2010 | Best Best & Krieger | Riverside Calif. | $550 | $310 | $396 | $225 | | | | | | |
| 2010 | Bingham McCutchen | Boston | | | | | | | | | | |
| 2010 | Blank Rome | Philadelphia | $895 | $440 | $550 | $250 | $361 | $615 | $510 | $353 | $625 | $495 |
| 2010 | Bond, Schoeneck & King | Syracuse, NY | $475 | $220 | $280 | $160 | $208 | $309 | $280 | $210 | $330 | $255 |
| 2010 | Briggs and Morgan | Minneapolis, MN | $600 | $290 | $315 | $210 | $240 | $437 | $373 | $235 | $440 | $390 |
| 2010 | Brinks Hofer Gilson & Lione | | $725 | $345 | $420 | $185 | $308 | $541 | $435 | $288 | $560 | $435 |
| 2010 | Broad and Cassel | Orlando, Fl | $475 | $280 | $350 | $175 | $242 | $372 | $307 | $248 | $375 | $295 |
| 2010 | Brown Rudnick | Boston | | | | | | | | | | |
| 2010 | Brownstein Hyatt Farber Schreck | Denver | $810 | $295 | $390 | $220 | $256 | $463 | $391 | $255 | $448 | $380 |
| 2010 | Bryan Cave | St. Louis | $790 | $370 | $550 | $185 | $344 | $553 | $464 | $345 | $540 | $450 |
| 2010 | Buchalter Nemer | Los Angeles | $625 | $270 | $450 | $195 | $328 | $490 | $415 | $310 | $495 | $415 |
| 2010 | Buchanan Ingersoll & Rooney | Pittsburgh | $900 | $310 | $406 | $210 | | | | | | |
| 2010 | Burr & Forman | Birmingham, AL | $500 | $210 | $335 | $200 | $250 | $361 | $328 | $250 | $365 | $330 |
| 2010 | Butzel Long | Detroit | $750 | $300 | $375 | $200 | | | | | | |
| 2010 | Cadwalader, Wickersham & Taft LLP | New York | | | | | | | | | | |
| 2010 | Cahill Gordon Reindel LLP | New York | | | | | | | | | | |
| 2010 | Carlton Fields | Tampa, FL | $775 | $325 | $375 | $195 | $268 | $455 | $388 | $270 | $455 | $390 |
| 2010 | Chadbourne & Parke | New York | $995 | $390 | $625 | $110 | $442 | $769 | $456 | $455 | $785 | $450 |
| 2010 | Chapman and Cutler | Chicago | | | | | | | | | | |
| 2010 | Clark Hill | Detroit | | | | | | | | | | |
| 2010 | Cooley | Palo Alto, CA | | | | | | | | | | |
| 2010 | Covington & Burling | Washington | | | | | | | | | | |
| 2010 | Cozen O'Connor | Philadelphia | $880 | $310 | $585 | $225 | $326 | $497 | $422 | $320 | $475 | $390 |
| 2010 | Crowell & Moring | Washington | | | | | | | | | | |
| 2010 | Curtis, Mallet-Prevost, Colt & Mosle | New York | $785 | $675 | $575 | $290 | $365 | $609 | $489 | $350 | $675 | $480 |
| 2010 | Davis Wright Tremaine | Seattle | $795 | $320 | $435 | $210 | $304 | $486 | $355 | $305 | $480 | $365 |
| 2010 | Day Pitney | Florham Park, NJ | | | | | | | | | | |
| 2010 | Dewey & LeBoeuf LLP | New York | | | | | | | | | | |
| 2010 | Dickinson Wright | Detroit | $575 | $355 | $275 | $195 | | | | | | |
| 2010 | Dickstein Shapiro | Washington | $950 | $525 | $530 | $265 | $426 | $656 | $546 | $450 | $650 | $530 |
| 2010 | Dinsmore & Shohl | Cincinnati | $590 | $220 | $300 | $175 | $222 | $360 | $302 | $218 | $355 | $290 |

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | DLA Piper | Chicago | | | | | | | | | | |
| 2010 | Dorsey & Whitney | Minneapolis | $795 | $440 | $290 | $180 | $285 | $515 | $410 | $270 | $515 | $395 |
| 2010 | Duane Morris | Philadelphia | $850 | $240 | $480 | $135 | $349 | $550 | $483 | $350 | $545 | $483 |
| 2010 | Dykema Gossett | Detroit | $635 | $360 | $450 | $225 | $325 | $495 | $445 | $320 | $515 | $450 |
| 2010 | Eckert Seamans Cherin & Mellott | Pittsburgh | $625 | $250 | $320 | $150 | | | | | $575 | $450 |
| 2010 | Edwards Angell Palmer & Dodge | Boston | $780 | $345 | $610 | $200 | $323 | $571 | $451 | $303 | $575 | $450 |
| 2010 | Epstein Becker & Green | New York | $850 | $350 | $450 | $180 | $325 | $520 | $429 | $320 | $500 | $425 |
| 2010 | Faegre & Benson LLP | Minneapolis | | | | | | | | | | |
| 2010 | Finnegan, Henderson, Farabow, Garrett & Dunner | Washington | | | | | | | | | | |
| 2010 | Fish & Richardson | Boston | | | | | | | | | | |
| 2010 | Fisher & Phillips | Atlanta | $505 | $340 | $360 | $220 | | | | | | |
| 2010 | Fitzpatrick, Cella, Harper & Scinto | New York | $730 | $460 | $440 | $275 | $426 | $654 | $554 | $325 | $640 | $570 |
| 2010 | Foley & Lardner | Milwaukee | $1,035 | | | $255 | | | | $410 | | |
| 2010 | Foley Hoag | Boston | | | | | | | | | | |
| 2010 | Ford & Harrison | Atlanta, GA | $620 | $375 | $390 | $250 | $250 | $400 | $350 | $255 | $388 | $370 |
| 2010 | Fowler White Boggs | Tampa, FL | $575 | $325 | $315 | $205 | $298 | $473 | $407 | $290 | $470 | $415 |
| 2010 | Fox Rothschild | Philadelphia | $690 | $315 | $475 | $235 | | | | | | $280 |
| 2010 | Frost Brown Todd | Cincinnati | $515 | $200 | $250 | $150 | $189 | $326 | $279 | $190 | $325 | $280 |
| 2010 | Fulbright & Jaworski | Houston | | | | | | | | | | |
| 2010 | Gardere Wynne Sewell | Dallas | $815 | $380 | $445 | $195 | $311 | $531 | $445 | $310 | $525 | $450 |
| 2010 | Gibbons | Newark, NJ | $790 | $390 | $450 | $250 | $288 | $479 | $404 | $275 | $475 | $410 |
| 2010 | Gibson, Dunn & Crutcher LLP | Los Angeles | | | | | | | | | | |
| 2010 | Godfrey & Kahn | Milwaukee | $495 | $325 | $340 | $180 | | | | | | |
| 2010 | Goodwin Procter | Boston | | | | | | | | | | |
| 2010 | Gordon & Rees | San Francisco, CA | | | | | | | | | | $480 |
| 2010 | GrayRobinson | Orlando, FL | $750 | $225 | $315 | $150 | | | | | | |
| 2010 | Greenberg Traurig | New York | $875 | $355 | $610 | $200 | $332 | $550 | $463 | $350 | $580 | $480 |
| 2010 | Harris Beach | Rochester, NY | $500 | $275 | $250 | $140 | | | | | | |
| 2010 | Haynes and Boone | Dallas | | | | | | | | | | |
| 2010 | Hinshaw & Culbertson | Chicago | | | | | | | | | | |
| 2010 | Hiscock & Barclay | Syracuse, NY | $650 | $195 | $440 | $150 | $234 | $348 | $311 | $195 | $305 | $275 |
| 2010 | Hodgson Russ | Buffalo, NY | $665 | $230 | $410 | $175 | $238 | $374 | $328 | $230 | $370 | $320 |
| 2010 | Hogan Lovells | Washington | | | | | | | | | | |
| 2010 | Holland & Hart LLP | Washington | | | | | | | | | | |
| 2010 | Holland & Knight | Washington | $850 | $300 | $480 | $185 | $288 | $499 | $418 | $280 | $496 | $425 |
| 2010 | Holme Roberts & Owen | Denver | $635 | $285 | $530 | $170 | $296 | $415 | $365 | $285 | $410 | $345 |
| 2010 | Honigman Miller Schwartz and Cohn | Detroit | | | | | | | | | | |
| 2010 | Hughes Hubbard & Reed LLP | New York | $804 | $230 | $415 | $171 | $220 | $357 | $329 | $205 | $375 | $331 |
| 2010 | Hunton & Williams | Richmond, VA | | | | | | | | | | |
| 2010 | Husch Blackwell | St. Louis | | | | | | | | | | |
| 2010 | Ice Miller LLP | Indianapolis | $495 | $245 | $275 | $155 | | | | | | |
| 2010 | Irell & Manella | Los Angeles | $715 | $260 | $440 | $150 | | | | | | |
| 2010 | Jackson Kelly | Charleston, WV | | | | | | | | | | |
| 2010 | Jackson Lewis | White Plains, NY | | | | | $282 | $428 | $364 | $275 | $430 | $300 |
| 2010 | Jones Day | Washington | | | | | | | | | | |
| 2010 | Jones, Walker, Waechter, Poitevent, Carrère & Denègre | New Orleans | $620 | $195 | $275 | $140 | | | | | | |
| 2010 | K&L Gates | Pittsburgh | | | | | | | | | | |
| 2010 | Kelley Drye & Warren | New York | $900 | $465 | $565 | $275 | | | $425 | | $520 | $425 |
| 2010 | Kenyon & Kenyon LLP | New York | $730 | $375 | $465 | $225 | $320 | $527 | $425 | $320 | $520 | $415 |
| 2010 | Kilpatrick Stockton | Atlanta | | | | | | | | | | |
| 2010 | Kirkland & Ellis | Chicago | $710 | $395 | $490 | $285 | $332 | $511 | $432 | $335 | $485 | $415 |
| 2010 | Knobbe Martens Olson & Bear | Irvine, CA | | | | | | | | | | |
| 2010 | Kramer Levin Naftalis & Frankel | New York | | | | | | | | | | |
| 2010 | Lane Powell | Seattle | $600 | $310 | $350 | $230 | $278 | $431 | $349 | $275 | $430 | $380 |
| 2010 | Lathrop & Gage | Kansas City | $490 | $255 | $265 | $180 | | | | | | |

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 30 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | LeClairRyan, Professional Corporation | Richmond, VA | | | | | | | | | | |
| 2010 | Leonard, Street and Deinard | Minneapolis | | | | | | | | | | |
| 2010 | Lewis and Roca | Phoenix, AZ | | | | | | | | | | |
| 2010 | Lewis Brisbois Bisgaard & Smith | Los Angeles | | | | | | | | | | |
| 2010 | Lewis, Rice & Fingersh | St. Louis | $460 | $260 | $315 | $150 | | | | | | |
| 2010 | Lindquist & Vennum | Minneapolis | | | | | | | | | | |
| 2010 | Littler Mendelson | San Francisco | $650 | $290 | $480 | $210 | $235 | $415 | $330 | $230 | $410 | $350 |
| 2010 | Locke Lord Bissell & Liddell | Dallas | $1,120 | $400 | $525 | $215 | $296 | $445 | $372 | $285 | $435 | $355 |
| 2010 | Loeb & Loeb | New York | $975 | $475 | $575 | $275 | $320 | $599 | $486 | $300 | $600 | $515 |
| 2010 | Lowenstein Sandler | Roseland, NJ | $825 | $440 | $575 | $235 | | | | | | |
| 2010 | Luce Forward Hamilton & Scripps | San Diego | $670 | $350 | $445 | $245 | | | | | | |
| 2010 | Manatt, Phelps & Phillips | Los Angeles | $850 | $525 | $525 | $200 | $405 | $651 | $568 | $410 | $650 | $590 |
| 2010 | Marshall, Dennehey, Warner, Coleman & Goggin | Philadelphia | $410 | $145 | $320 | $130 | | | | | | |
| 2010 | Maynard, Cooper & Gale | Birmingham, AL | $600 | $325 | $295 | $235 | | | | | | |
| 2010 | McAfee & Taft, Held & Malloy | Chicago | $675 | $260 | $350 | $225 | | | | | | |
| 2010 | Mccarter & English | Newark, NJ | $625 | $360 | $405 | $215 | $313 | $498 | $355 | $315 | $485 | $400 |
| 2010 | McElroy, Deutsch, Mulvaney & Carpenter | Morristown, N.J. | $550 | $295 | $275 | $150 | $190 | $280 | $210 | $185 | $260 | $225 |
| 2010 | McGuireWoods | Richmond, Va. | $830 | $325 | $600 | $220 | $355 | $543 | $455 | $350 | $535 | $450 |
| 2010 | McKenna Long & Aldridge | Atlanta | $775 | $375 | $490 | $220 | $366 | $540 | $455 | $355 | $525 | $410 |
| 2010 | Michael Best & Friedrich | Milwaukee | $550 | $235 | $320 | $160 | $239 | $400 | $346 | $230 | $390 | $345 |
| 2010 | Miles & Stockbridge | Baltimore | $695 | $325 | $370 | $220 | | | | | | |
| 2010 | Miller & Martin | Chattanooga, TN | $610 | $235 | $275 | $180 | $218 | $361 | $328 | $210 | $365 | $335 |
| 2010 | Miller, Canfield, Paddock and Stone | Detroit | | | | | | | | | | |
| 2010 | Montgomery, McCracken, Walker & Rhoads | Philadelphia | $625 | $380 | $395 | $205 | $284 | $461 | | | | |
| 2010 | Moore & Van Allen | Charlotte N.C. | | | | | | | | | | |
| 2010 | Morgan, Lewis & Bockius | Philadelphia | $785 | $265 | $350 | $180 | $257 | $441 | $364 | $250 | $425 | $350 |
| 2010 | Morris, Manning & Martin | Atlanta | $760 | $425 | $545 | $225 | $353 | $492 | $424 | $360 | $490 | $415 |
| 2010 | Morrison & Foerster | San Francisco, CA | | | | | | | | | | |
| 2010 | Munger, Tolles & Olson | Los Angeles | | | | | | | | | | |
| 2010 | Neal, Gerber & Eisenberg | Chicago | | | | | | | | | | |
| 2010 | Nelson Mullins Riley & Scarborough | Columbia, SC | $850 | $245 | $335 | $185 | $248 | $399 | $347 | $240 | $385 | $340 |
| 2010 | Nossen Pruet | Columbia, SC | $525 | $230 | $250 | $160 | | | | | | |
| 2010 | Nixon Peabody | New York | $905 | $375 | $580 | $195 | $388 | $613 | $429 | $395 | $625 | $430 |
| 2010 | O'Melveny & Myers | Los Angeles | | | | | | | | | | |
| 2010 | Ogletree, Deakins, Nash, Smoak & Stewart | National | $575 | $300 | $390 | $195 | $285 | $389 | $351 | | | |
| 2010 | Orrick, Herrington & Sutcliffe | San Francisco, CA | | | | | | | | | | |
| 2010 | Parker Poe Adams & Bernstein LLP | Charlotte N.C. | | | | | | | | | | |
| 2010 | Patton Boggs | Washington | $990 | $355 | $550 | $215 | $399 | $645 | $482 | $400 | $625 | $485 |
| 2010 | Paul, Hastings, Janofsky & Walker | New York | | | | | | | | | | |
| 2010 | Paul, Weiss, Rifkind Wharton & Garrison LLP | New York | | | | | | | | | | |
| 2010 | Pepper Hamilton | Philadelphia | $825 | $420 | $465 | $230 | $329 | $547 | $326 | | | |
| 2010 | Perkins Cole | Seattle | $825 | $275 | $570 | $200 | $354 | $534 | $447 | | $530 | |
| 2010 | Phelps Dunbar | New Orleans | $385 | $180 | $240 | $145 | $183 | $272 | $226 | $180 | $265 | $215 |
| 2010 | Phillips Lytle | Buffalo, NY | $535 | $260 | $450 | $150 | $283 | $352 | $255 | $230 | $350 | $280 |
| 2010 | Pillsbury Winthrop Shaw Pittman | New York | | | | | | | | | | |
| 2010 | Polsinelli Shughart | Kansas City, MO | $600 | $250 | $325 | $185 | | | | | | |
| 2010 | Quarles & Brady | Milwaukee | $660 | $290 | $400 | $210 | $260 | $438 | $364 | $245 | $435 | $360 |
| 2010 | Reed Smith | Pittsburgh | | | | | | | | | | |
| 2010 | Reinhart Boerner Van Deuren | Milwaukee | | | | | | | | | | |
| 2010 | Roetzel & Andress | Akron, OH | $525 | $225 | $325 | $165 | $243 | $357 | $317 | $245 | $350 | $325 |
| 2010 | Rutan & Tucker | Costa Mesa, CA | $650 | $355 | $450 | $225 | | | | | | |

00000841

Case 1:08-cv-00364-DAR   Document 94-1   Filed 06/27/13   Page 31 of 118

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | Seal Ewing | Philadelphia | $600 | $320 | $475 | $225 | $310 | $491 | $412 | $285 | $478 | $425 |
| 2010 | Schiff Hardin LLP | Chicago | | | | | | | | | | |
| 2010 | Schnader Harrison Segal & Lewis | Philadelphia | | | | | | | | | | |
| 2010 | Schulte Roth & Zabel | New York | $895 | $735 | $690 | $275 | | | | | | |
| 2010 | Schwabe, Williamson & Wyatt | Portland, OR | $540 | $310 | $450 | $200 | $260 | $415 | $360 | $250 | $410 | $340 |
| 2010 | Sedgwick, Detert, Moran & Arnold | San Francisco | | | | | | | | | | |
| 2010 | Seyfarth Shaw | Chicago | $770 | $335 | $535 | $185 | $325 | $505 | $377 | $320 | $503 | $375 |
| 2010 | Sheppard Mullin | Los Angeles | $820 | $495 | $620 | $270 | | | | | | |
| 2010 | Sherman & Howard | New York | | | | | | | | | | |
| 2010 | Shook, Hardy & Bacon | Kansas City, MO | | | | | | | | | | |
| 2010 | Shumaker, Loop & Kendrick | Toledo, OH | $540 | $250 | $315 | $185 | $246 | $366 | $331 | $235 | $365 | $350 |
| 2010 | Skadden, Arps, Slate, Meagher & Flom | New York | | | | | | | | | | |
| 2010 | Smith, Gambrell & Russell | Atlanta | $740 | $325 | $440 | $195 | | | | | | |
| 2010 | Snell & Wilmer | Phoenix, AZ | $795 | $315 | $550 | $175 | $282 | $486 | $338 | $205 | $475 | $325 |
| 2010 | Squire, Sanders & Dempsey | Cleveland | | | | | | | | | | |
| 2010 | Steptoe & Johnson LLP | Washington | | | | | | | | | | |
| 2010 | Stevens & Lee | Reading, PA | | | | | | | | | | |
| 2010 | Stinson Morrison Hecker | Kansas City, MO | | | | | | | | | | |
| 2010 | Stites & Harbison | Louisville, KY | | | | | | | | | | |
| 2010 | Stoel Rives | Portland, OR | $600 | $315 | $390 | $190 | $270 | $441 | $381 | $205 | $443 | $395 |
| 2010 | Strasburger & Price | Dallas | $617 | $250 | $506 | $194 | $243 | $372 | $336 | $245 | $393 | $351 |
| 2010 | Sullivan & Worcester | Boston | $830 | $475 | $535 | $290 | $383 | $647 | $537 | $370 | $623 | $543 |
| 2010 | Sutherland Asbill & Brennan | Atlanta | | | | | | | | | | |
| 2010 | Taft Stettinius & Hollister | Cincinnati | $500 | $220 | $365 | $165 | $227 | $358 | $315 | $225 | $350 | $315 |
| 2010 | Thompson & Knight | Dallas | $825 | $410 | $440 | $265 | | | | | | |
| 2010 | Thompson Coburn | St. Louis | $610 | $300 | $395 | $190 | | | | | | |
| 2010 | Townsend and Townsend and Crew | San Francisco, CA | $750 | $470 | $460 | $260 | $345 | $563 | $320 | $325 | $550 | $290 |
| 2010 | Troutman Sanders | Atlanta | | | | | | | | | | |
| 2010 | Ulmer & Berne | Cleveland | $565 | $260 | $375 | $185 | $326 | $483 | $425 | $325 | $470 | $425 |
| 2010 | Vedder Price | Chicago | $720 | $370 | $505 | $255 | $353 | $590 | $484 | $330 | $585 | $465 |
| 2010 | Venable | Washington | $990 | $445 | $500 | $280 | | | | | | |
| 2010 | Vorys, Sater, Seymour and Pease | Columbus, OH | | | | | | | | | | |
| 2010 | Wachtell, Lipton, Rosen & Katz | New York | | | | | | | | | | |
| 2010 | Weil, Gotshal & Manges LLP | New York | | | | | | | | | | |
| 2010 | White and Williams | Philadelphia | | | | | | | | | | |
| 2010 | Wildman, Harrold, Allen & Dixon LLP | Chicago | | | | | | | | | | |
| 2010 | Wiley Rein | Washington | | | | | | | | | | |
| 2010 | Williams Mullen | Richmond, Va | $645 | $315 | $370 | $230 | $279 | $428 | $368 | $280 | $395 | $340 |
| 2010 | Wilkie Farr & Gallagher LLP | New York | | | | | | | | | | |
| 2010 | Wilmer Cutler Pickering Hale and Dorr | Washington | | | | | | | | | | |
| 2010 | Winstead | Dallas | $655 | $340 | $390 | $215 | $291 | $462 | $395 | | | |
| 2010 | Winston & Strawn | Chicago | $1,075 | $475 | $610 | $250 | $393 | $670 | $486 | $375 | $660 | $490 |
| 2010 | Womble Carlyle Sandridge & Rice | Winston-Salem, NC | $625 | $300 | $445 | $210 | $291 | $461 | $372 | $285 | $465 | $375 |
| 2010 | Wyatt, Tarrant & Combs | Louisville, KY | $500 | $245 | $285 | $180 | | | | | | |

# nationwide sampling of law firm billing ra

*National Law Journal* asked the respondents to its 2011 survey of the nation's 250 largest law firms to pr range of hourly billing rates. Firms that supplied the information are listed in alphabetical order.

| Firm (partial) | PRINCIPAL OR LARGEST OFFICE | AVERAGE FULL-TIME EQUIVALENT ATTORNEYS* | FIRMWIDE | | PARTNER | | | | A | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | AVERAGE | MEDIAN | HIGH | LOW | AVERAGE | MEDIAN | HIGH | LOW |
| Bearman, Caldwell & Berkowitz | Memphis, Tenn. | 527 | $311 | $310 | $595 | $250 | $357 | $345 | $315 | $16 |
| er | Riverside, Calif. | 195 | $358 | $360 | $575 | $275 | $417 | $420 | $375 | $20 |
| an | Minneapolis | 185 | | | $625 | $325 | | | $305 | $23 |
| | Orlando, Fla. | 160 | $377 | $350 | $575 | $295 | $435 | $395 | $350 | $18 |
| | St. Louis | 908 | $475 | $460 | $795 | $375 | $565 | $553 | $540 | $20 |
| | Detroit | 176 | | | $700 | $325 | $440 | | $425 | $22 |
| | Tampa, Fla. | 270 | $397 | $400 | $815 | $320 | $470 | $470 | $380 | $19 |
| | Philadelphia | 504 | $439 | $410 | $900 | $305 | $510 | $490 | $550 | $22 |
| | Parsippany, N.J. | 324 | $447 | $450 | $960 | $380 | $537 | $525 | $470 | $23 |
| | Detroit | 229 | | | $600 | $325 | | | $320 | $20 |
| | Washington | 335 | $560 | $550 | $1,000 | $540 | $680 | $670 | $545 | $22 |
| | Cincinnati | 407 | $308 | $295 | $630 | $150 | $373 | $370 | $310 | $13 |
| | New York | 3,348 | $585 | $615 | $1,120 | $530 | $747 | $730 | $730 | $32 |
| ey | Minneapolis | 567 | $426 | $405 | $810 | $295 | $526 | $525 | $465 | $19 |
| | Philadelphia | 629 | $503 | $500 | $875 | $375 | $575 | $570 | $530 | $22 |
| | Detroit | 333 | $406 | $400 | $665 | $310 | $482 | $485 | $395 | $26 |
| : Green | New York | 300 | $428 | $425 | $850 | $350 | $519 | $500 | $550 | $19 |
| , Harper & Scinto | New York | 168 | | | $730 | $460 | | $525 | $440 | $27 |
| d | Philadelphia | 450 | $413 | $420 | $725 | $325 | $486 | $483 | $455 | $19 |
| Sewell | Cincinnati | 401 | $296 | $295 | $515 | $205 | $340 | $340 | $265 | $15 |
| | Dallas | 265 | $435 | $450 | $815 | $380 | $550 | $550 | $500 | $22 |
| | Newark, N.J. | 199 | $505 | $450 | $725 | $400 | $563 | $505 | $475 | $28 |
| | Rochester, N.Y. | 176 | | | $390 | $275 | | | $260 | $16 |
| y | Syracuse, N.Y. | 174 | $269 | $240 | $750 | $195 | $304 | $265 | $350 | $15 |
| | Buffalo, N.Y. | 199 | | | $685 | $240 | $378 | $360 | $420 | $18 |
| t | Washington | 910 | $445 | $455 | $895 | $300 | $530 | $520 | $495 | $17 |
| l & Reed | New York | 300 | $633 | $615 | $990 | $625 | $828 | $800 | $695 | $27 |
| | St. Louis | 551 | $341 | $340 | $850 | $225 | $395 | $390 | $425 | $17 |
| | Charleston, W.Va. | 170 | $275 | $275 | $505 | $255 | $319 | $325 | $260 | $15 |
| | New York | 425 | $661 | $665 | $1,080 | $685 | $831 | $835 | $705 | $31 |
| arren | New York | 321 | $474 | $400 | $925 | $480 | $634 | $645 | $595 | $27 |
| s, Olson & Bear | Irvine, Calif. | 268 | $439 | $415 | $735 | $415 | $525 | $500 | $495 | $29 |
| | Seattle | 180 | $405 | $425 | $645 | $340 | $460 | $450 | $360 | $23 |
| | Kansas City, Mo. | 281 | $337 | $340 | $735 | $275 | $390 | $390 | $410 | $20 |



| | PRINCIPAL OR LARGEST OFFICE | AVERAGE FULL-TIME EQUIVALENT ATTORNEYS | FIRMWIDE | | PARTNER | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | AVERAGE | MEDIAN | HIGH | LOW | AVERAGE | MEDIAN | HIGH | L |
| | Washington | 512 | $546 | $540 | $990 | $410 | $659 | $645 | $570 | $ |
| ...on | Philadelphia | 459 | | | $825 | $380 | $557 | - | $460 | $ |
| | Seattle | 693 | $462 | | $875 | $285 | $550 | $545 | $590 | $ |
| | New Orleans | 280 | $236 | $225 | $465 | $190 | $281 | $275 | $245 | $ |
| ...hart | Kansas City, Mo. | 466 | | | $630 | $275 | | | $335 | $ |
| | Philadelphia | 220 | $431 | $450 | $750 | $350 | $502 | $490 | $495 | $ |
| ...Zabel | New York | 406 | $615 | $630 | $935 | $770 | $846 | $840 | $675 | $ |
| | Chicago | 702 | $437 | $425 | $790 | $355 | $528 | $525 | $505 | $ |
| ...in, Richter & Hampton | Los Angeles | 465 | | | $860 | $505 | | | $635 | $ |
| ...p & Kendrick | Toledo, Ohio | 208 | $345 | $365 | $555 | $265 | $364 | $375 | $320 | $ |
| | Portland, Ore. | 373 | $385 | $395 | $625 | $320 | $451 | $450 | $500 | $ |
| ...Price | Dallas | 181 | $363 | $362 | $630 | $211 | $395 | $397 | $332 | $ |
| ...Knight | Dallas | 319 | $520 | $520 | $875 | $440 | $594 | $585 | $460 | $ |
| ...ourn | St. Louis | 325 | | | $750 | $315 | | | $445 | $ |
| | Cleveland | 179 | $316 | | $585 | $280 | $405 | | $390 | $ |
| | Chicago | 246 | $445 | $445 | $735 | $295 | $500 | $490 | $520 | $ |
| | Dallas | 265 | $406 | | $680 | $365 | $477 | | $410 | $ |
| ...own | Chicago | 868 | $557 | $550 | $1,130 | $580 | $713 | $700 | $600 | $ |
| ...& Combs | Louisville, Ky. | 181 | $312 | $350 | $500 | $240 | $325 | $375 | $275 | $ |

...are from NLJ 250 published in April 2011.



lt on Experience,
...ding with Excellence

...one Advisory Group's e-discovery practice, offers a full suite of electronic discovery ...s including:

- ...mation Management
- ...tification
- ...ervation

- ⬎ Processing
- ⬎ Review Management and Hosting
- ⬎ Computer Forensic Analysis

NEW
212

NEW
201

WAS
202

00000844

# s report using alternatives to the billable

a listing of law firms, in alphabetical order, that reported use of alternative billing methods. We asked firms to rep
s of revenue obtained through variations on the billable hour and true alternatives. 2010 percentages appear wh

| | PRINCIPAL OR LARGEST OFFICE | AVERAGE FULL-TIME EQUIVALENT ATTORNEYS* | REVENUE BREAKDOW | | |
|---|---|---|---|---|---|
| | | | PERCENTAGE OF FIRM'S REVENUE OBTAINED THROUGH VARIATIONS ON THE BILLABLE HOUR | | PERCENTAGE OF THROUGH ALTE |
| | | | 2011 | 2010 | 2011 |
| | Houston | 355 | 78 | 15 | 10 |
| . Bearman, Caldwell & Berkowitz | Memphis, Tenn. | 527 | 5 | 35 | 20 |
| ger | Riverside, Calif. | 195 | 25 | 5 | 7 |
| chen | Boston | 901 | 5 | 5 | 5 |
| an | Minneapolis | 185 | 90 | | |
| | St. Louis | 908 | | | 20 |
| | Detroit | 176 | 24 | | 8 |
| kersham & Taft | New York | 481 | 27 | | 25 |
| r | Philadelphia | 504 | | | 21 |
| | Parsippany, N.J. | 324 | 46 | | 7 |
| hl | Cincinnati | 407 | 49 | | 5 |
| | New York | 3,348 | 95 | | 3.5 |
| ey | Minneapolis | 567 | 5 | 5 | 5 |
| | Philadelphia | 629 | 5 | 4 | 6 |
| | Detroit | 333 | 84 | 83 | |
| | Atlanta | 173 | 24 | 20 | 9 |
| d | Cincinnati | 401 | 74 | 76 | 2.8 |
| Sewell | Dallas | 265 | 15 | 20 | 5 |
| | Newark, N.J. | 199 | 20 | 20 | 10 |
| ay | Syracuse, N.Y. | 174 | 46 | | 21 |
| | Buffalo, N.Y. | 199 | 22 | | 4 |
| nt | Washington | 910 | | | 9 |
| ms | Richmond, Va. | 855 | 12 | | 7.4 |
| | St. Louis | 551 | 95 | 95 | 5 |
| | White Plains, N.Y. | 614 | 95 | 30 | 13 |
| | New York | 425 | | | 20 |
| | Seattle | 180 | 50 | 50 | 10 |
| ns | New York | 1,931 | | | 2.8 |
| | Kansas City, Mo. | 281 | 80 | | 10 |
| & Phillips | Los Angeles | 322 | 82 | 66 | 12 |

00000845

| | PRINCIPAL OR LARGEST OFFICE | AVERAGE FULL-TIME EQUIVALENT ATTORNEYS* | REVENUE BREAKDOWN | | |
| --- | --- | --- | --- | --- | --- |
| | | | PERCENTAGE OF FIRM'S REVENUE OBTAINED THROUGH VARIATIONS ON THE BILLABLE HOUR | | PERCENTAGE OF FI THROUGH ALTERN |
| | | | 2011 | 2010 | 2011 |
| | Kansas City, Mo. | 466 | 15 | 15 | 15 |
| | Pittsburgh | 1,449 | 5 | 10 | 10 |
| | Philadelphia | 220 | 40 | 35 | 5 |
| | San Francisco | 345 | 16 | 16 | 1 |
| | Chicago | 702 | 83 | | 17 |
| Richter & Hampton | Los Angeles | 465 | 15 | 13 | 15 |
| Kendrick | Toledo, Ohio | 208 | 10 | 10 | 5 |
| LLP | Washington | 408 | | | 16 |
| | Dallas | 181 | 80 | 30 | 20 |
| ht | Dallas | 319 | 30 | 30 | 3 |
| | Cleveland | 179 | 45 | | 15 |
| | Chicago | 246 | 10 | | 3 |
| s | Philadelphia | 216 | | | 20 |
| | Washington | 270 | 35 | 25 | 4 |
| ering Hale and Dorr | Washington | 890 | 50 | | 15 |
| | Dallas | 265 | 10 | 6 | 3 |
| ombs | Louisville, Ky. | 181 | 30 | | 10 |

om NLJ 250 published in April 2011.



ur wish list is our to-do list.

re not just listening to your comments and criticisms.
We're acting on them.

e are some of the suggestions we've recently implemented — with more to con

!    **FREE** quarterly electronic newsletter providing information on upcoming

*NEW!*    More books online, including more regional content

00000846

# IIS report their billing rates by associate

Below is a sampling of hourly rates charged by law firms that establish billing rates based on associate cl...
Firms that supplied this information are listed in alphabetical order.

| | PRINCIPAL OR LARGEST OFFICE | AVERAGE FTE ATTORNEYS | 1ST YEAR | 2D YEAR | 3D YEAR | 4TH YEAR | 5TH YEAR | 6TH YEAR | |
|---|---|---|---|---|---|---|---|---|---|
| | St. Louis | 908 | $200-$365 | $200-$355 | $250-$385 | $225-$420 | $300-$430 | $335-$455 | $ |
| | Detroit | 176 | $225 | | | | | | |
| | Tampa, Fla. | 270 | $195-$210 | $210-$225 | $210-$225 | $225-$240 | $250-$265 | $255-$315 | |
| or | Philadelphia | 504 | $225-$290 | $225-$290 | $235-$320 | $245-$360 | $245-$340 | $265-$350 | |
| | Parsippany, N.J. | 324 | $244 | $275 | $295 | $291 | $301 | $335 | |
| ght | Detroit | 229 | $195 | $205 | $210 | $220 | $235 | $245 | |
| ro | Washington | 335 | $225-$290 | $275-$385 | $330-$440 | $345-$465 | $360-$490 | $390-$510 | $ |
| ohl | Cincinnati | 407 | $185 | $195 | $210 | $225 | $235 | $245 | |
| | New York | 3,348 | $345 | $395 | $455 | $520 | $580 | $620 | |
| ney | Minneapolis | 567 | $238 | $253 | $260 | $297 | $305 | $336 | |
| | Philadelphia | 629 | $280 | $305 | $320 | $335 | $350 | $370 | |
| a, Harper & Scinto | New York | 168 | $275 | $300 | $325 | $350 | $370 | $385 | |
| | Philadelphia | 450 | $220-$235 | $230-$265 | $240-$285 | $240-$285 | $245-$300 | $270-$455 | $1 |
| ld | Cincinnati | 401 | $150 | $165-$185 | $175-$185 | $180-$235 | $190-$230 | $190-$240 | $1 |
| Sewell | Dallas | 265 | $225 | $260 | $290 | $320 | $350 | $370 | |
| | Rochester, N.Y. | 176 | $160 | $175 | $200 | $215 | $215 | $235 | |
| ay | Syracuse, N.Y. | 174 | $175 | $175 | $195 | $195 | $205 | $205 | |
| d & Reed | New York | 300 | $350 | $450 | $510 | $540 | $570 | $600 | |
| | Charleston, W.Va. | 170 | $180 | $195 | $205 | $215 | $225 | $240 | |
| | New York | 425 | $320 | $410 | $475 | $525 | $570 | $595 | |
| arren | New York | 321 | $305 | $305 | $350 | $380 | $420 | $450 | |
| s, Olson & Bear | Irvine, Calif. | 268 | $295 | $320 | $345 | $370 | $395 | | |
| | Seattle | 180 | $250 | $260 | $260-$340 | $260-$305 | $260-$325 | $265-$340 | $3 |
| | Kansas City, Mo. | 281 | $205 | $210 | $220 | $230 | $250 | $255 | |
| h, Mulvaney & Carpenter | Morristown, N.J. | 272 | $185 | $195 | $215 | $225 | $235 | $250 | |
| k Aldridge | Atlanta | 425 | $275 | $280 | $317 | $346 | $354 | $371 | |
| riedrich | Milwaukee | 208 | $210 | $205-$230 | $210-$250 | $220-$300 | $225-$260 | $240-$295 | $2 |
| iley & Scarborough | Columbia, S.C. | 399 | $170-$265 | $210-$345 | $215-$295 | $225-$325 | $195-$335 | $205-$350 | $2 |
| | Washington | 512 | $300 | $325 | $355 | $385 | $415 | $445 | |
| | Seattle | 693 | $264 | $273 | $284 | $291 | $321 | $337 | |
| | Philadelphia | 220 | | $245-$255 | $250-$280 | $275-$300 | $275-$340 | $275-$310 | $2 |

# Exhibit B

00000848

# LAFFEY MATRIX

History

Case Law

Expert Opinions

**See the Matrix**

Contact us

Home

Links

| | | | Years Out of Law School * | | | | |
|---|---|---|---|---|---|---|---|
| Year | Adjustmt Factor** | Paralegal/ Law Clerk | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95-5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94-5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g., McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000).

* "Years Out of Law School" is calculated from June 1 of each year, when most law students

years out of law school. Graduated doctors are ? of their year, with most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

# Exhibit C

00000851



Albany            New York
Atlanta           Philadelphia
Brussels          San Diego
Denver            San Francisco
Los Angeles       Washington, DC

McKenna Long
& Aldridge LLP
Attorneys at Law
Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                        ATTORNEY-CLIENT PRIVILEGED
                                        TAX ID NO. 52-1237458


     Record Press, Inc.
     Attn: Hugh  Wilmot
     229 West 36th Street, 8th Fl.
     New York, , NY 10018



     Client No.: 030620              Invoice No. 610016
     Matter No.: 030620.00001        Invoice Date: August 22, 2008
     ===================================================================

        FOR PROFESSIONAL SERVICES RENDERED through July 31, 2008
        RE: QUI TAM


     * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                              Hours          Billed              Bill
     Name                     Worked       Per Hour            Amount
     ----------------------   --------     ---------      ------------
     W. O'Brien                 7.40         480.00          3,552.00
     L. Norrett Himes           2.70         460.00          1,242.00
     J. Johnson                 3.70         220.00            814.00
     ======================   ========     =========      ============
     Total                     13.80                         5,608.00


     TOTAL FEES:                                         $  5,608.00

     EXPENSES:

        COPY CHARGES                          1.20
        LONG DISTANCE TELEPHONE               0.36

     TOTAL EXPENSES:                                     $      1.56

     T O T A L   T H I S   S T A T E M E N T:            $  5,609.56
```

00000852

# McKenna Long
## & Aldridge LLP
Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                ATTORNEY-CLIENT PRIVILEGED
                                TAX ID NO. 52-1237458


          Record Press, Inc.
          Attn: Hugh  Wilmot
          229 West 36th Street, 8th Fl.
          New York, , NY 10018


          Client No.: 030620              Invoice No. 612105
          Matter No.: 030620.00001        Invoice Date: September 8, 2008
          ================================================================

              FOR PROFESSIONAL SERVICES RENDERED through August 31, 2008
              RE: QUI TAM


          * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                                   Hours         Billed              Bill
          Name                     Worked       Per Hour           Amount
          ---------------------    --------    ----------    ------------
          J.G. Horan                 0.20        600.00            120.00
          W. O'Brien                 4.20        480.00          2,016.00
          J. Johnson                 0.90        220.00            198.00
          =====================    ========    =========    ============
          Total                      5.30                        2,334.00


          TOTAL FEES:                                       $  2,334.00

          EXPENSES:

              LONG DISTANCE TELEPHONE              2.18

          TOTAL EXPENSES:                                   $      2.18

          T O T A L   T H I S   S T A T E M E N T:          $  2,336.18
```



## McKenna Long
### & Aldridge LLP
Attorneys at Law

Albany          New York
Atlanta         Philadelphia
Brussels        San Diego
Denver          San Francisco
Los Angeles     Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                    ATTORNEY-CLIENT PRIVILEGED
                                    TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018


        Client No.: 030620              Invoice No. 616891
        Matter No.: 030620.00001        Invoice Date: October 6, 2008
        ================================================================

            FOR PROFESSIONAL SERVICES RENDERED through September 30, 2008
            RE: QUI TAM


        * * * * * * * * * * *  SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                                 Hours         Billed             Bill
        Name                    Worked       Per Hour           Amount
        ---------------------   --------     ---------     ------------
        J.G. Horan                0.50        600.00           300.00
        W. O'Brien               19.50        480.00         9,360.00
        J. Johnson                5.60        220.00         1,232.00
        ====================    ========     =========     ============
        Total                    25.60                      10,892.00

        TOTAL FEES:                                        $ 10,892.00

        EXPENSES:

            COPY CHARGES                         2.40
            LONG DISTANCE TELEPHONE              1.81

        TOTAL EXPENSES:                                    $      4.21

        T O T A L   T H I S   S T A T E M E N T:           $ 10,896.21
```

00000854



# McKenna Long
## & Aldridge LLP
Attorneys at Law

Albany          New York
Atlanta         Philadelphia
Brussels        San Diego
Denver          San Francisco
Los Angeles     Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

ATTORNEY-CLIENT PRIVILEGED
TAX ID NO. 52-1237458

Record Press, Inc.
Attn: Hugh  Wilmot
229 West 36th Street, 8th Fl.
New York, , NY 10018


Client No.: 030620                Invoice No. 622873
Matter No.: 030620.00001          Invoice Date: November 10, 2008
================================================================

    FOR PROFESSIONAL SERVICES RENDERED through October 31, 2008
    RE: QUI TAM


* * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

|                       | Hours Worked | Billed Per Hour | Bill Amount |
|-----------------------|--------------|-----------------|-------------|
| Name                  |              |                 |             |
| J.G. Horan            | 0.30         | 600.00          | 180.00      |
| W. O'Brien            | 10.00        | 480.00          | 4,800.00    |
| T.K. Halloran         | 0.40         | 390.00          | 156.00      |
| J. Johnson            | 13.90        | 220.00          | 3,058.00    |
| Total                 | 24.60        |                 | 8,194.00    |

TOTAL FEES:                                       $  8,194.00

EXPENSES:

    COPY CHARGES                     38.70
    DELIVERY SERVICE/MESSENGER      137.35
    LONG DISTANCE TELEPHONE          22.12
    PACER SEARCHES                    5.76

TOTAL EXPENSES:                                   $   203.93

T O T A L   T H I S   S T A T E M E N T :         $  8,397.93

# McKenna Long
## & Aldridge LLP
### Attorneys at Law

Albany
Atlanta
Brussels
Denver
Los Angeles

New York
Philadelphia
San Diego
San Francisco
Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

ATTORNEY-CLIENT PRIVILEGED
TAX ID NO. 52-1237458

Record Press, Inc.
Attn: Hugh  Wilmot
229 West 36th Street, 8th Fl.
New York, , NY 10018


Client No.: 030620                Invoice No. 626595
Matter No.: 030620.00001          Invoice Date: December 1, 2008
================================================================

     FOR PROFESSIONAL SERVICES RENDERED through November 28, 2008
     RE: QUI TAM


* * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

| Name | Hours Worked | Billed Per Hour | Bill Amount |
|------|-------------|-----------------|-------------|
| W. O'Brien | 7.10 | 480.00 | 3,408.00 |
| T.K. Eberhart | 3.50 | 230.00 | 805.00 |
| J. Johnson | 0.50 | 220.00 | 110.00 |
| V.T. Lam | 1.30 | 210.00 | 273.00 |
| Total | 12.40 | | 4,596.00 |

TOTAL FEES:                                 $  4,596.00

EXPENSES:

     COPY CHARGES                    0.45
     LONG DISTANCE TELEPHONE         6.16
     OTHER                          18.00

TOTAL EXPENSES:                             $     24.61

T O T A L   T H I S   S T A T E M E N T:    $  4,620.61

00000856



Albany          New York
Atlanta         Philadelphia
Brussels        San Diego
Denver          San Francisco
Los Angeles     Washington, DC

## McKenna Long
### & Aldridge LLP
*Attorneys at Law*

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018



        Client No.: 030620              Invoice No. 632021
        Matter No.: 030620.00001        Invoice Date: January 13, 2009
        ================================================================

            FOR PROFESSIONAL SERVICES RENDERED through December 31, 2008
            RE: QUI TAM


        * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                                    Hours          Billed            Bill
        Name                        Worked       Per Hour          Amount
        ---------------------       --------     ---------     ------------
        W. O'Brien                     4.50        480.00         2,160.00
        T.K. Eberhart                  5.00        230.00         1,150.00
        V.T. Lam                       2.20        210.00           462.00
        ======================      ========     =========     ============
        Total                         11.70                       3,772.00


        TOTAL FEES:                                          $   3,772.00


        EXPENSES:

            COPY CHARGES                             79.35
            DELIVERY SERVICE/MESSENGER               13.00
            LEXIS SEARCHES                          198.57
            LOCAL TRAVEL                             20.00
            LONG DISTANCE TELEPHONE                   5.80
            PACER SEARCHES                           21.04

        TOTAL EXPENSES:                                      $     337.76

        T O T A L   T H I S   S T A T E M E N T:             $   4,109.76
```

00000857

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

## McKenna Long
## & Aldridge LLP
### Attorneys at Law

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                    ATTORNEY-CLIENT PRIVILEGED
                                    TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018



        Client No.: 030620              Invoice No. 636815
        Matter No.: 030620.00001        Invoice Date: February 11, 2009
        ================================================================

            FOR PROFESSIONAL SERVICES RENDERED through January 31, 2009
            RE: QUI TAM

        EXPENSES:

            COPY CHARGES                        4.95
            DELIVERY SERVICE/MESSENGER         13.00

        TOTAL EXPENSES:                             $     17.95

        T O T A L   T H I S   S T A T E M E N T:    $     17.95
```

00000858



## McKenna Long & Aldridge LLP
### Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


      Record Press, Inc.
      Attn: Hugh  Wilmot
      229 West 36th Street, 8th Fl.
      New York, , NY 10018


      Client No.: 030620            Invoice No. 641320
      Matter No.: 030620.00001      Invoice Date: March 12, 2009
      ================================================================

          FOR PROFESSIONAL SERVICES RENDERED through February 28, 2009
          RE: QUI TAM

      EXPENSES:

          LEXIS SEARCHES                     70.60

      TOTAL EXPENSES:                                  $      70.60

      T O T A L   T H I S   S T A T E M E N T:         $      70.60
```

00000859



# McKenna Long
# & Aldridge LLP
### Attorneys at Law

| Albany | New York |
|---|---|
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                ATTORNEY-CLIENT PRIVILEGED
                                TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018



        Client No.: 030620                Invoice No. 659905
        Matter No.: 030620.00001          Invoice Date: July 6, 2009
        ================================================================

              FOR PROFESSIONAL SERVICES RENDERED through June 30, 2009
              RE: QUI TAM


        * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                                    Hours          Billed              Bill
        Name                        Worked        Per Hour            Amount
        ----------------------     --------      ---------        ------------
        J.G. Horan                    4.80          630.00            3,024.00
        W. O'Brien                    8.10          505.00            4,090.50
        T.K. Eberhart                 5.60          240.00            1,344.00
        V.T. Lam                      0.20          220.00               44.00
        ======================     ========      =========        ============
        Total                        18.70                            8,502.50


        TOTAL FEES:                                            $  8,502.50

        EXPENSES:

              COPY CHARGES                     22.20
              DELIVERY SERVICE/MESSENGER        6.50
              LONG DISTANCE TELEPHONE           0.36
              PACER SEARCHES                   13.44
              WESTLAW RESEARCH                359.77

        TOTAL EXPENSES:                                        $     402.27

        T O T A L   T H I S   S T A T E M E N T :             $  8,904.77
```

00000860



## McKenna Long & Aldridge LLP

Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

ATTORNEY-CLIENT PRIVILEGED
TAX ID NO. 52-1237458

Record Press, Inc.
Attn: Hugh  Wilmot
229 West 36th Street, 8th Fl.
New York, , NY 10018


Client No.: 030620              Invoice No. 665684
Matter No.: 030620.00001       Invoice Date: August 11, 2009
================================================================

    FOR PROFESSIONAL SERVICES RENDERED through July 31, 2009
    RE: QUI TAM

EXPENSES:

    COPY CHARGES                    10.20
    LEXIS SEARCHES                 150.27
    LOCAL TRAVEL                    42.76
    LONG DISTANCE TELEPHONE          3.63

TOTAL EXPENSES:                          $    206.86

T O T A L   T H I S   S T A T E M E N T:  $    206.86

00000861



Albany          New York
Atlanta         Philadelphia
Brussels        San Diego
Denver          San Francisco
Los Angeles     Washington, DC

McKenna Long
& Aldridge LLP
Attorneys at Law

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                        ATTORNEY-CLIENT PRIVILEGED
                                        TAX ID NO. 52-1237458


     Record Press, Inc.
     Attn: Hugh  Wilmot
     229 West 36th Street, 8th Fl.
     New York, , NY 10018


     Client No.: 030620            Invoice No. 670033
     Matter No.: 030620.00001      Invoice Date: September 8, 2009
     ================================================================
          FOR PROFESSIONAL SERVICES RENDERED through August 31, 2009
          RE: QUI TAM


     * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                               Hours         Billed              Bill
     Name                      Worked      Per Hour            Amount
     ---------------------     --------    ---------      ------------
     W. O'Brien                  1.00        505.00            505.00
     =====================     ========    =========      ============
     Total                       1.00                          505.00


     TOTAL FEES:                                         $    505.00

     EXPENSES:

          LONG DISTANCE TELEPHONE            2.90

     TOTAL EXPENSES:                                     $      2.90

     T O T A L   T H I S   S T A T E M E N T :           $    507.90
```

00000862



**McKenna Long**
**& Aldridge** LLP
*Attorneys at Law*

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


     Record Press, Inc.
     Attn: Hugh  Wilmot
     229 West 36th Street, 8th Fl.
     New York, , NY 10018


     Client No.: 030620              Invoice No. 673917
     Matter No.: 030620.00001        Invoice Date: October 5, 2009
     ===============================================================

         FOR PROFESSIONAL SERVICES RENDERED through September 30, 2009
         RE: QUI TAM


     * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                             Hours         Billed             Bill
     Name                    Worked      Per Hour           Amount
     ---------------------   --------    ---------      ------------
     J.G. Horan                2.30         630.00         1,449.00
     W. O'Brien                3.10         505.00         1,565.50
     T.K. Eberhart             1.10         240.00           264.00
     =====================   ========    =========      ============
     Total                     6.50                       3,278.50

     TOTAL FEES:                                      $   3,278.50

     EXPENSES:

         LOCAL TRAVEL                         19.00
         LONG DISTANCE TELEPHONE               1.81

     TOTAL EXPENSES:                                  $      20.81

     T O T A L  T H I S  S T A T E M E N T:           $   3,299.31
```

00000863



McKenna Long
& Aldridge LLP
Attorneys at Law

Albany          New York
Atlanta         Philadelphia
Brussels        San Diego
Denver          San Francisco
Los Angeles     Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                    ATTORNEY-CLIENT PRIVILEGED
                                    TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018


        Client No.: 030620              Invoice No. 678716
        Matter No.: 030620.00001        Invoice Date: November 5, 2009
        ================================================================

           FOR PROFESSIONAL SERVICES RENDERED through October 31, 2009
           RE: QUI TAM


        * * * * * * * * * * *  SUMMARY OF ACTIVITY * * * * * * * * * * * *

                                     Hours         Billed              Bill
        Name                         Worked      Per Hour            Amount
        ----------------------      --------    ---------      ------------
        W. O'Brien                      7.90       505.00          3,989.50
        T.K. Eberhart                   1.30       240.00            312.00
        ======================      ========    =========      ============
        Total                           9.20                       4,301.50


        TOTAL FEES:                                         $  4,301.50

        EXPENSES:

           COPY CHARGES                         1.80
           LONG DISTANCE TELEPHONE              2.53

        TOTAL EXPENSES:                                     $      4.33

        T O T A L   T H I S   S T A T E M E N T:            $  4,305.83
```

00000864

# McKenna Long
## & Aldridge LLP
### Attorneys at Law

Albany        New York
Atlanta       Philadelphia
Brussels      San Diego
Denver        San Francisco
Los Angeles   Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                 ATTORNEY-CLIENT PRIVILEGED
                                 TAX ID NO. 52-1237458


     Record Press, Inc.
     Attn: Hugh  Wilmot
     229 West 36th Street, 8th Fl.
     New York, , NY 10018


     Client No.: 030620              Invoice No. 682467
     Matter No.: 030620.00001        Invoice Date: December 2, 2009
     ================================================================

        FOR PROFESSIONAL SERVICES RENDERED through November 30, 2009
        RE: QUI TAM


     * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                               Hours        Billed              Bill
     Name                      Worked      Per Hour           Amount
     ---------------------    --------    ---------      ------------
     W. O'Brien                   2.10       505.00          1,060.50
     =====================    ========    =========      ============
     Total                        2.10                       1,060.50


     TOTAL FEES:                                       $   1,060.50

     EXPENSES:

        COPY CHARGES                          1.50
        LOCAL TRAVEL                         28.25

     TOTAL EXPENSES:                                   $      29.75

     T O T A L   T H I S   S T A T E M E N T :         $   1,090.25
```

# McKenna Long
## & Aldridge LLP
Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


         Record Press, Inc.
         Attn: Hugh  Wilmot
         229 West 36th Street, 8th Fl.
         New York, , NY 10018


         Client No.: 030620              Invoice No. 691985
         Matter No.: 030620.00001        Invoice Date: February 12, 2010
         ================================================================

              FOR PROFESSIONAL SERVICES RENDERED through January 31, 2010
              RE: QUI TAM


         * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                                    Hours         Billed            Bill
         Name                      Worked       Per Hour          Amount
         ----------------------    --------     ---------     ------------
         W. O'Brien                   7.30        505.00         3,686.50
         S.L. Ellis                   3.20        285.00           912.00
         ======================    ========     =========     ============
         Total                       10.50                       4,598.50


         TOTAL FEES:                                         $  4,598.50

         EXPENSES:

              COPY CHARGES                    10.50
              LEXIS SEARCHES                  12.19
              LOCAL TRAVEL                    39.50
              LONG DISTANCE TELEPHONE          3.98
              PACER SEARCHES                   3.84
              WESTLAW RESEARCH               164.11

         TOTAL EXPENSES:                                     $    234.12

         T O T A L  T H I S  S T A T E M E N T:              $  4,832.62
```

00000866



## McKenna Long
### & Aldridge LLP
Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

ATTORNEY-CLIENT PRIVILEGED
TAX ID NO. 52-1237458

Record Press, Inc.
Attn: Hugh  Wilmot
229 West 36th Street, 8th Fl.
New York, , NY 10018

Client No.: 030620                 Invoice No. 695082
Matter No.: 030620.00001           Invoice Date: March 5, 2010
================================================================

      FOR PROFESSIONAL SERVICES RENDERED through February 28, 2010
      RE: QUI TAM

      * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

| Name | Hours Worked | Billed Per Hour | Bill Amount |
|------|--------------|-----------------|-------------|
| W. O'Brien | 0.50 | 530.00 | 265.00 |
| J.W. Lomas Jr. | 3.70 | 405.00 | 1,498.50 |
| Total | 4.20 | | 1,763.50 |

TOTAL FEES:                                     $  1,763.50

EXPENSES:

      COPY CHARGES                       0.75
      LONG DISTANCE TELEPHONE            1.81

TOTAL EXPENSES:                                 $      2.56

T O T A L   T H I S   S T A T E M E N T:        $  1,766.06

00000867



Albany            New York

Atlanta           Philadelphia

Brussels          San Diego

Denver            San Francisco

Los Angeles       Washington, DC

*Attorneys at Law*

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


      Record Press, Inc.
      Attn: Hugh  Wilmot
      229 West 36th Street, 8th Fl.
      New York, , NY 10018


      Client No.: 030620            Invoice No. 699452
      Matter No.: 030620.00001      Invoice Date: April 7, 2010
      ================================================================

          FOR PROFESSIONAL SERVICES RENDERED through March 31, 2010
          RE: QUI TAM


      * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                                Hours          Billed            Bill
      Name                     Worked        Per Hour          Amount
      ---------------------    --------      ---------     ------------
      J.W. Lomas Jr.             6.80         405.00           2,754.00
      =====================    ========      =========     ============
      Total                      6.80                          2,754.00


      TOTAL FEES:                                         $   2,754.00

      EXPENSES:

          COPY CHARGES               15.60

      TOTAL EXPENSES:                                     $      15.60

      T O T A L   T H I S   S T A T E M E N T :           $   2,769.60
```



# McKenna Long
## & Aldridge LLP

*Attorneys at Law*

Albany          New York
Atlanta         Philadelphia
Brussels        San Diego
Denver          San Francisco
Los Angeles     Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                    ATTORNEY-CLIENT PRIVILEGED
                                    TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018


        Client No.: 030620              Invoice No. 704256
        Matter No.: 030620.00001        Invoice Date: May 10, 2010
        =================================================================

            FOR PROFESSIONAL SERVICES RENDERED through April 30, 2010
            RE: QUI TAM


        * * * * * * * * * * *  SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                                    Hours           Billed              Bill
        Name                        Worked        Per Hour            Amount
        ----------------------     --------      ----------      ------------
        W. O'Brien                     2.00          530.00          1,060.00
        J.W. Lomas Jr.                28.00          405.00         11,340.00
        T.K. Eberhart                  0.50          260.00            130.00
        D.T. Malerba                   1.50          125.00            187.50
        ======================     ========      =========      ============
        Total                         32.00                         12,717.50


        TOTAL FEES:                                             $ 12,717.50

        EXPENSES:

            DELIVERY SERVICE/MESSENGER            30.00
            LONG DISTANCE TELEPHONE                6.90
            WESTLAW RESEARCH                      34.19

        TOTAL EXPENSES:                                   $      71.09

        T O T A L   T H I S   S T A T E M E N T :          $ 12,788.59
```

00000869



McKenna Long
& Aldridge LLP
Attorneys at Law

Albany          New York
Atlanta         Philadelphia
Brussels        San Diego
Denver          San Francisco
Los Angeles     Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018



        Client No.: 030620              Invoice No. 708809
        Matter No.: 030620.00001        Invoice Date: June 9, 2010
        ================================================================

            FOR PROFESSIONAL SERVICES RENDERED through May 31, 2010
            RE: QUI TAM


        * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                                 Hours          Billed              Bill
        Name                     Worked       Per Hour            Amount
        ---------------------    --------     ---------      ------------
        W. O'Brien                 6.40         530.00          3,392.00
        J.W. Lomas Jr.            33.30         405.00         13,486.50
        E.W. Bolte                 0.50         165.00             82.50
        H. Kegan                   1.70          85.00            144.50
        =====================    ========     =========      ============
        Total                     41.90                        17,105.50


        TOTAL FEES:                                        $ 17,105.50

        EXPENSES:

            COPY CHARGES                         2.25
            LONG DISTANCE TELEPHONE             24.70
            WESTLAW RESEARCH                    87.77

        TOTAL EXPENSES:                             $     114.72

        T O T A L  T H I S  S T A T E M E N T:      $ 17,220.22
```



McKenna Long
& Aldridge LLP
Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


     Record Press, Inc.
     Attn: Hugh  Wilmot
     229 West 36th Street, 8th Fl.
     New York, , NY 10018



     Client No.: 030620              Invoice No. 712624
     Matter No.: 030620.00001        Invoice Date: July 8, 2010
     ================================================================

        FOR PROFESSIONAL SERVICES RENDERED through June 30, 2010
        RE: QUI TAM


     * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                              Hours         Billed            Bill
     Name                     Worked      Per Hour          Amount
     ---------------------    --------    ---------    ------------
     W. O'Brien                 6.00        530.00        3,180.00
     J.W. Lomas Jr.            58.50        405.00       23,692.50
     C. Wagner                  1.00        255.00          255.00
     H. Kegan                   6.20         85.00          527.00
     =====================    ========    =========    ============
     Total                     71.70                     27,654.50


     TOTAL FEES:                                       $ 27,654.50

     EXPENSES:

        COPY CHARGES                     84.75
        DELIVERY SERVICE/MESSENGER       61.00
        LONG DISTANCE TELEPHONE           1.09
        MEALS                            49.83
        PACER SEARCHES                   13.92
        WESTLAW RESEARCH                501.74

     TOTAL EXPENSES:                               $     712.33

     T O T A L   T H I S   S T A T E M E N T :     $ 28,366.83
```

00000871

# McKenna Long
## &Aldridge LLP
### Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                    ATTORNEY-CLIENT PRIVILEGED
                                    TAX ID NO. 52-1237458


     Record Press, Inc.
     Attn: Hugh  Wilmot
     229 West 36th Street, 8th Fl.
     New York, , NY 10018


     Client No.: 030620             Invoice No. 717267
     Matter No.: 030620.00001       Invoice Date: August 10, 2010
     ================================================================
         FOR PROFESSIONAL SERVICES RENDERED through July 31, 2010
         RE: QUI TAM


     * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                              Hours          Billed              Bill
     Name                     Worked       Per Hour            Amount
     ---------------------    --------     ---------       ------------
     W. O'Brien                  3.90        530.00           2,067.00
     J.W. Lomas Jr.             27.80        405.00          11,259.00
     H. Kegan                    2.50         85.00             212.50
     =====================    ========     =========       ============
     Total                      34.20                         13,538.50

     TOTAL FEES:                                         $ 13,538.50

     EXPENSES:

         COPY CHARGES                        0.15
         LONG DISTANCE TELEPHONE             3.99
         PACER SEARCHES                      1.28
         WESTLAW RESEARCH                  416.75

     TOTAL EXPENSES:                                     $    422.17

     T O T A L   T H I S   S T A T E M E N T:            $ 13,960.67
```

00000872

# McKenna Long
## & Aldridge LLP
Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

ATTORNEY-CLIENT PRIVILEGED
TAX ID NO. 52-1237458

Record Press, Inc.
Attn: Hugh  Wilmot
229 West 36th Street, 8th Fl.
New York, , NY 10018


Client No.: 030620                 Invoice No. 721091
Matter No.: 030620.00001           Invoice Date: September 7, 2010
================================================================

      FOR PROFESSIONAL SERVICES RENDERED through August 31, 2010
      RE: QUI TAM

EXPENSES:

      PACER SEARCHES                      0.40
      WESTLAW RESEARCH                   10.74

TOTAL EXPENSES:                                  $    11.14

T O T A L  T H I S  S T A T E M E N T:           $    11.14


00000873



Albany        New York
Atlanta       Philadelphia
Brussels      San Diego
Denver        San Francisco
Los Angeles   Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


      Record Press, Inc.
      Attn: Hugh  Wilmot
      229 West 36th Street, 8th Fl.
      New York, , NY 10018


      Client No.: 030620            Invoice No. 725577
      Matter No.: 030620.00001      Invoice Date: October 11, 2010
      ================================================================

           FOR PROFESSIONAL SERVICES RENDERED through September 30, 2010
           RE: QUI TAM


      * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                                 Hours          Billed             Bill
      Name                       Worked       Per Hour           Amount
      --------------------       --------     ---------      ------------
      J.W. Lomas Jr.               0.50        405.00            202.50
      ====================       ========     =========      ============
      Total                        0.50                          202.50


      TOTAL FEES:                                        $     202.50

      EXPENSES:

           PACER SEARCHES                      1.20

      TOTAL EXPENSES:                                    $       1.20

      T O T A L   T H I S   S T A T E M E N T :          $     203.70
```

# McKenna Long
## & Aldridge LLP
### Attorneys at Law

Albany          New York
Atlanta         Philadelphia
Brussels        San Diego
Denver          San Francisco
Los Angeles     Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                         ATTORNEY-CLIENT PRIVILEGED
                                         TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018



        Client No.: 030620             Invoice No. 729734
        Matter No.: 030620.00001       Invoice Date: November 8, 2010
        ================================================================

            FOR PROFESSIONAL SERVICES RENDERED through October 31, 2010
            RE: QUI TAM


        * * * * * * * * * * *  SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                                     Hours          Billed               Bill
        Name                         Worked        Per Hour             Amount
        ----------------------      --------      ---------        ------------
        W. O'Brien                      2.30        530.00            1,219.00
        J.W. Lomas Jr.                 18.20        405.00            7,371.00
        ======================      ========      =========        ============
        Total                          20.50                          8,590.00


        TOTAL FEES:                                           $   8,590.00

        EXPENSES:

            PACER SEARCHES                         1.60

        TOTAL EXPENSES:                                       $       1.60

        T O T A L   T H I S   S T A T E M E N T :             $   8,591.60
```

00000875



# McKenna Long
## & Aldridge LLP
Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


   Record Press, Inc.
   Attn: Hugh  Wilmot
   229 West 36th Street, 8th Fl.
   New York, , NY 10018


   Client No.: 030620            Invoice No. 733375
   Matter No.: 030620.00001      Invoice Date: December 2, 2010
   ================================================================

      FOR PROFESSIONAL SERVICES RENDERED through November 30, 2010
      RE: QUI TAM


   * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                            Hours          Billed              Bill
   Name                     Worked        Per Hour           Amount
   ---------------------    --------      ---------      ------------
   W. O'Brien                  3.30         530.00          1,749.00
   J.W. Lomas Jr.             41.30         405.00         16,726.50
   H. Kegan                    0.70          85.00             59.50
   =====================    ========      =========      ============
   Total                      45.30                        18,535.00


   TOTAL FEES:                                          $ 18,535.00

   EXPENSES:

       COPY CHARGES                       18.15
       LOCAL TRAVEL                       22.00
       LONG DISTANCE TELEPHONE             2.18
       PACER SEARCHES                      1.20
       WESTLAW RESEARCH                  180.08

   TOTAL EXPENSES:                                      $    223.61

   T O T A L   T H I S   S T A T E M E N T:             $ 18,758.61
```

00000876

# McKenna Long
## &Aldridge LLP
### Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


     Record Press, Inc.
     Attn: Hugh  Wilmot
     229 West 36th Street, 8th Fl.
     New York, , NY 10018



     Client No.: 030620              Invoice No. 738005
     Matter No.: 030620.00001        Invoice Date: January 11, 2011
     ================================================================

         FOR PROFESSIONAL SERVICES RENDERED through December 31, 2010
         RE: QUI TAM


     * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                            Hours          Billed              Bill
     Name                   Worked       Per Hour            Amount
     ---------------------  --------     ---------      ------------
     W. O'Brien                 7.50        530.00          3,975.00
     J.W. Lomas Jr.            51.90        405.00         21,019.50
     H. Kegan                  11.80         85.00          1,003.00
     =====================  ========     =========      ============
     Total                     71.20                       25,997.50

     TOTAL FEES:                                         $ 25,997.50

     EXPENSES:

         COPY CHARGES                        39.60
         LEXIS SEARCHES                      84.45
         LOCAL TRAVEL                        20.00
         LONG DISTANCE TELEPHONE              9.07
         PACER SEARCHES                       8.72
         WESTLAW RESEARCH                 1,194.70
         WITNESS FEES                        50.00

     TOTAL EXPENSES:                                     $  1,406.54

     T O T A L   T H I S   S T A T E M E N T :           $ 27,404.04
```

00000877



## McKenna Long & Aldridge LLP
### Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018


        Client No.: 030620              Invoice No. 741494
        Matter No.: 030620.00001        Invoice Date: February 7, 2011
        ================================================================

            FOR PROFESSIONAL SERVICES RENDERED through January 31, 2011
            RE: QUI TAM


        * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                                Hours           Billed            Bill
        Name                    Worked        Per Hour          Amount
        ----------------------  --------      ---------      ------------
        W. O'Brien                 8.10         530.00          4,293.00
        J.W. Lomas Jr.            38.80         405.00         15,714.00
        H. Kegan                   0.70          85.00             59.50
        ======================  ========      =========      ============
        Total                     47.60                        20,066.50

        TOTAL FEES:                                         $ 20,066.50

        EXPENSES:

            COPY CHARGES                         20.25
            LITIGATION SUPPORT VENDORS          103.58
            LONG DISTANCE TELEPHONE              28.28
            MEALS                                54.86

        TOTAL EXPENSES:                                     $    206.97

        T O T A L   T H I S   S T A T E M E N T:            $ 20,273.47
```

# McKenna Long
## & Aldridge LLP
### Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                    ATTORNEY-CLIENT PRIVILEGED
                                    TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018


        Client No.: 030620              Invoice No. 745900
        Matter No.: 030620.00001        Invoice Date: March 10, 2011
        ================================================================

            FOR PROFESSIONAL SERVICES RENDERED through February 28, 2011
            RE: QUI TAM


        * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * *

                              Hours         Billed            Bill
        Name                  Worked       Per Hour         Amount
        ----------------------  --------    ---------    ------------
        J.G. Horan               0.90        695.00          625.50
        W. O'Brien              30.50        550.00       16,775.00
        J.W. Lomas Jr.          84.40        450.00       37,980.00
        V.T. Lam                45.00        250.00       11,250.00
        ======================  ========    =========    ============
        Total                  160.80                     66,630.50


        TOTAL FEES:                                    $ 66,630.50

        EXPENSES:

            COPY CHARGES                      240.00
            DELIVERY SERVICE/MESSENGER        200.80
            DEPOSITION TRANSCRIPTS            391.00
            LOCAL TRAVEL                       39.00
            LONG DISTANCE TELEPHONE             0.72
            MEALS                              28.42
            PACER SEARCHES                      2.88

        TOTAL EXPENSES:                                $    902.82

        T O T A L   T H I S   S T A T E M E N T :      $ 67,533.32
```

00000879

# McKenna Long
## & Aldridge LLP
### Attorneys at Law

Albany
Atlanta
Brussels
Denver
Los Angeles

New York
Philadelphia
San Diego
San Francisco
Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                ATTORNEY-CLIENT PRIVILEGED
                                TAX ID NO. 52-1237458


Record Press, Inc.
Attn: Hugh  Wilmot
229 West 36th Street, 8th Fl.
New York, , NY 10018


Client No.: 030620                   Invoice No. 749973
Matter No.: 030620.00001             Invoice Date: April 11, 2011
=================================================================

    FOR PROFESSIONAL SERVICES RENDERED through March 31, 2011
    RE: ***** INTERNAL INVOICE ONLY ****
        ***** SEE DOC. NO. DC 50769866 *****


* * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                          Hours        Billed            Bill
Name                     Worked      Per Hour          Amount
----------------------   --------   ---------   -------------
W. O'Brien                 5.40        550.00        2,970.00
J.W. Lomas Jr.             9.60        450.00        4,320.00
======================   ========   =========   =============
Total                     15.00                      7,290.00


TOTAL FEES:                                      $  7,290.00

EXPENSES:

    DELIVERY SERVICE/MESSENGER         45.00
    DEPOSITION TRANSCRIPTS            397.85
    LEXIS SEARCHES                   166.68
    LOCAL TRAVEL                      60.00
    LONG DISTANCE TELEPHONE            3.61
    MEALS                            50.00
    PACER SEARCHES                    3.60
    WESTLAW RESEARCH               2,037.62

TOTAL EXPENSES:                                  $  2,764.36

T O T A L  T H I S  S T A T E M E N T :          $ 10,054.36
```

00000880

# McKenna Long
## & Aldridge LLP
### Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018



        Client No.: 030620              Invoice No. 754263
        Matter No.: 030620.00001        Invoice Date: May 9, 2011
        =================================================================

            FOR PROFESSIONAL SERVICES RENDERED through April 30, 2011
            RE: QUI TAM


        * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                                   Hours          Billed             Bill
        Name                      Worked        Per Hour           Amount
        ----------------------   --------      ----------      ------------
        W. O'Brien                  2.40          550.00          1,320.00
        J.W. Lomas Jr.              4.90          450.00          2,205.00
        ======================   ========      =========      ============
        Total                       7.30                          3,525.00


        TOTAL FEES:                                        $   3,525.00

        EXPENSES:

            PACER SEARCHES                       4.80

        TOTAL EXPENSES:                                    $       4.80

        T O T A L   T H I S   S T A T E M E N T :          $   3,529.80
```

00000881

# McKenna Long
## & Aldridge LLP

Attorneys at Law

| | |
|---|---|
| Albany | New York |
| Atlanta | Philadelphia |
| Brussels | San Diego |
| Denver | San Francisco |
| Los Angeles | Washington, DC |

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                              ATTORNEY-CLIENT PRIVILEGED
                              TAX ID NO. 52-1237458


     Record Press, Inc.
     Attn: Hugh  Wilmot
     229 West 36th Street, 8th Fl.
     New York, , NY 10018


     Client No.: 030620              Invoice No. 759992
     Matter No.: 030620.00001        Invoice Date: June 13, 2011
     ================================================================

          FOR PROFESSIONAL SERVICES RENDERED through May 31, 2011
          RE: QUI TAM


     * * * * * * * * * * * SUMMARY OF ACTIVITY * * * * * * * * * * * * *

                               Hours          Billed               Bill
     Name                      Worked        Per Hour             Amount
     ---------------------    --------      ---------       ------------
     J.W. Lomas Jr.               0.20         450.00              90.00
     =====================    ========      =========       ============
     Total                        0.20                            90.00


     TOTAL FEES:                                         $        90.00

     EXPENSES:

          DELIVERY SERVICE/MESSENGER            15.00

     TOTAL EXPENSES:                                     $        15.00

     T O T A L   T H I S   S T A T E M E N T:            $       105.00
```

00000882

Albany     New York



# McKenna Long
## & Aldridge LLP
*Attorneys at Law*

Atlanta     Philadelphia
Brussels    San Diego
Denver      San Francisco
Los Angeles  Washington, DC

Tel: 404.527.4000
www.mckennalong.com

*Remittance Address:*
P.O. Box 116573, Atlanta, GA 30368

*Wire Transfer Instructions*
Bank Name: SunTrust Bank
Bank Address: 25 Park Place, 26th Floor, Atlanta, GA 30303
ABA Number: 061000104
Swift Code/Bank Code: SNTRUS3A
Account Name: McKenna Long & Aldridge LLP
Account Number: 8800918057

```
                                    ATTORNEY-CLIENT PRIVILEGED
                                    TAX ID NO. 52-1237458


        Record Press, Inc.
        Attn: Hugh  Wilmot
        229 West 36th Street, 8th Fl.
        New York, , NY 10018


        Client No.: 030620            Invoice No. 763838
        Matter No.: 030620.00001      Invoice Date: July 13, 2011
        ================================================================

            FOR PROFESSIONAL SERVICES RENDERED through June 30, 2011
            RE: QUI TAM


        * * * * * * * * * * *  SUMMARY OF ACTIVITY * * * * * * * * * * * *

                              Hours        Billed             Bill
        Name                  Worked     Per Hour           Amount
        ---------------------- --------   ---------       ------------
        H. Kegan                0.30        90.00             27.00
        ====================== ========   =========       ============
        Total                   0.30                          27.00


        TOTAL FEES:                                   $       27.00


        T O T A L  T H I S  S T A T E M E N T:        $       27.00
```

00000883

# Exhibit D

00000884

# McKenna Long
# & Aldridge LLP
#### Attorneys at Law

Albany
Atlanta
Brussels
Denver
Los Angeles

New York
Philadelphia
Sacramento
San Diego
San Francisco
Washington, D.C.

1900 K Street, NW • Washington, DC 20006-1108
Tel: 202.496.7500 • Fax: 202.496.7756
www.mckennalong.com

WILLIAM T. O'BRIEN
(202) 496-7107

EMAIL ADDRESS
wobrien@mckennalong.com

October 15, 2010

**Via Email**

Mr. Hugh Wilmot
229 W. 36th Street, 8th FL
New York, NY  10018

　　　　Re:　　Brian Burke v. Record Press Inc.

Dear Hugh:

　　　　Enclosed please find an invoice from Case Driven in the amount of $641.15 for processing and preparing Record Press' documents for production to Mr. Burke.

　　　　　　　　　　　Best regards,

　　　　　　　　　　　William T. O'Brien

WTO/sv

Enclosure

cc:　　Malcolm I. Lewin, Esq.
　　　　Jeffrey P. Englander, Esq.

DC:50730740.1

00000885



1915 Eye Street, N.W.
Suite 600
Washington, D.C. 20006
202-742-5286

# Invoice

| Federal Tax I.D 20-4826769 | Invoice Date: | Invoice #: |
|---|---|---|
| | 5/25/2010 | 2004_685 |

| Bill To: |
|---|
| McKenna Long & Aldridge LLP<br>John W. Lomas Jr.<br>1900 K Street, NW<br>Washington, D.C. 20006 |

| Deliver To: |
|---|
| McKenna Long & Aldridge LLP<br>John W. Lomas Jr.<br>1900 K Street, NW<br>Washington, D.C. 20006 |

| Client Matter # | Case Name | Terms | Due Date: | Rep | Order Date | Delivered Date |
|---|---|---|---|---|---|---|
| 30620.0001 | 30620.0001 | Net 30 | 6/24/2010 | AB | 5/21/2010 | 05/24/2010 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 2,708 | Light Litigation S... | Light Litigation Scanning- Per RH - Special Pricing | 0.06 | 162.48T |
| 2,708 | OCR | Optical Character Recognition - Per RH | 0.025 | 67.70T |
| 2,708 | Electronic Branding | Electronic Endorsing- Per RH | 0.01 | 27.08T |
| 5,460 | Single File Forma... | Blowback-Single File Format | 0.06 | 327.60T |
| 2 | CD Delivery | CD Delivery Non Searchable PDF's | 10.00 | 20.00T |
| | | Client Matter : 30620.0001 | | |
| | | Sales Tax | 6.00% | 36.29 |

| Total | $641.15 |
|---|---|
| Payments/Credits | $0.00 |
| Balance Due | $641.15 |

Payment must be submitted within 30 days of invoice date. If payment is not received on time, it becomes subject to a 1.5% late fee. Please make checks payable to "CaseDriven Technologies, Inc."

00000886

# Exhibit E

00000887

_____

**From:** Lomas, John
**Sent:** Thursday, June 24, 2010 5:05 PM
**To:** 'Tyler King'
**Cc:** O'Brien, William
**Subject:** Burke v. Record Press

Tyler,

Please see the attached letter of this date from Will with attachments.

Also, your binder was found at offices.  You can pick it up at our reception desk.

Regards,

John

        

June 24 2010 Ltr     US ex rel Cooper     US ex rel Ubl v IIF
to Tyler King...      v Bernard Hod...       Data Solut...

**John W. Lomas, Jr. l Associate**
**McKenna Long & Aldridge LLP**
1900 K Street NW l Washington, DC  20006
Tel: 202.496.7183 l Fax: 202.496.7756 l jlomas@mckennalong.com

00000888

# McKenna Long
## &Aldridge<sub>LLP</sub>
### Attorneys at Law

Albany
Atlanta
Brussels
Denver
Los Angeles

New York
Philadelphia
San Diego
San Francisco
Washington, D.C.

1900 K Street, NW • Washington, DC 20006-1108
Tel: 202.496.7500 • Fax: 202.496.7756
www.mckennalong.com

WILLIAM T. O'BRIEN
(202) 496-7107

EMAIL ADDRESS
wobrien@mckennalong.com

June 24, 2010

**BY EMAIL**

Tyler Jay King, Esq.
1420 N Street NW
Suite 706
Washington, DC 20005
tyler@tylerkinglaw.com

Re:    *Brian Burke v. Record Press, Inc. - Case No. 1:08-CV-00364 (EGS)*

Dear Tyler:

Per our discussions, please find attached two recent United States District Court decisions, one from the District of Columbia and one from the Eastern District of Virginia, awarding False Claim Act defendants their attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d)(4) under circumstances that exist in this case.

Mr. Burke continues to pursue this frivolous and vexatious case, and to publicly accuse Record Press of fraud despite all the direct evidence to the contrary, evidence repeatedly provided to Mr. Burke by the Government and by Record Press since the inception of this case more than two years ago. Indeed, the Government confirmed to Mr. Burke, in a September 2009 meeting with Mr. Burke's counsel, that Record Press had properly billed the Government Printing Office throughout their long contracting relationship. All of the evidence taken during discovery further confirmed the frivolousness of Mr. Burke's lawsuit.

Please be advised that we fully intend to move for an award of Record Press's attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d)(4). We also reserve the right to seek any other relief available to Record Press.

Sincerely yours,

William T. O'Brien

00000889

Westlaw.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

C

United States District Court,
District of Columbia.
UNITED STATES of America, ex rel. J. COOPER &
ASSOCIATES, INC., Plaintiff,
v.
BERNARD HODES GROUP, INC., Cass Communi-
cations, Inc., and J. Walter Thompson Co., Defen-
dants.
**Civ.A. No. 03-2436 (RMU).**

March 23, 2006.

**Background:** Qui tam plaintiff brought action
against government contractors, alleging that they
misrepresented themselves as small or disadvantaged
businesses in violation of False Claims Act (FCA) to
obtain orders from Immigration and Naturalization
Service (INS) for advertising and public relations
services. Contractors moved to dismiss and for award
of attorney fees and expenses.

**Holdings:** The District Court, Urbina, J., held that:
(1) media reports about contractors' size and scope
triggered FCA provision depriving district courts of
jurisdiction to hear FCA actions based upon public
disclosure of allegations or transactions;
(2) plaintiff did not come within original source ex-
ception to FCA's jurisdictional bar against qui tam
actions based on public disclosures; and
(3) contractors were entitled, as prevailing defen-
dants, to award of attorney fees and expenses under
FCA.

Motion granted.

West Headnotes

**[1] United States 393 ⌐30122**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions Therefor.
Most Cited Cases

"Qui tam action" allows private parties to initiate suit
to enforce the laws in the government's stead and
awards victorious plaintiffs part of the recovery as
bounty.

**[2] Federal Courts 170B ⌐30**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction, De-
termination and Waiver
                170Bk30 k. Power and Duty of Court.
Most Cited Cases
Courts should consider challenges based on subject
matter jurisdiction before motions to dismiss for fail-
ure to state claim. Fed.Rules Civ.Proc.Rule 12(b)(1,
6), 28 U.S.C.A.

**[3] Federal Courts 170B ⌐5**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk3 Jurisdiction in General; Nature and
Source
                170Bk5 k. Limited Jurisdiction; De-
pendent on Constitution or Statutes. Most Cited
Cases

**Federal Courts 170B ⌐34**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction, De-
termination and Waiver
                170Bk34 k. Presumptions and Burden
of Proof. Most Cited Cases
Federal courts are courts of limited jurisdiction, and
the law presumes that a cause lies outside this limited
jurisdiction.

**[4] Federal Courts 170B ⌐31**

170B Federal Courts
    170BI Jurisdiction and Powers in General

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

170BI(A) In General
170Bk29 Objections to Jurisdiction, Determination and Waiver
170Bk31 k. Waiver or Consent. Most Cited Cases
Because subject matter jurisdiction is an Article III requirement as well as a statutory requirement, no action of the parties can confer subject matter jurisdiction upon a federal court. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[5] Federal Courts 170B ⟜34**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk29 Objections to Jurisdiction, Determination and Waiver
170Bk34 k. Presumptions and Burden of Proof. Most Cited Cases
On a motion to dismiss for lack of subject matter jurisdiction, plaintiff bears the burden of establishing that the court has subject matter jurisdiction. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[6] Federal Courts 170B ⟜33**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk29 Objections to Jurisdiction, Determination and Waiver
170Bk33 k. Affidavits and Evidence in General. Most Cited Cases
Court may dismiss a complaint for lack of subject matter jurisdiction only if it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[7] Federal Courts 170B ⟜33**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk29 Objections to Jurisdiction, Determination and Waiver
170Bk33 k. Affidavits and Evidence in General. Most Cited Cases
Inasmuch as subject matter jurisdiction focuses on

court's power to hear claim, court must give plaintiff's factual allegations closer scrutiny when resolving motion to dismiss for lack of subject matter jurisdiction than would be required for motion to dismiss for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(1, 6), 28 U.S.C.A.

**[8] Federal Courts 170B ⟜33**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk29 Objections to Jurisdiction, Determination and Waiver
170Bk33 k. Affidavits and Evidence in General. Most Cited Cases
Court deciding motion to dismiss for lack of subject matter jurisdiction is not limited to the allegations contained in the complaint, and may consider materials outside the pleadings. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[9] United States 393 ⟜120.1**

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
393k120.1 k. In General. Most Cited Cases
False Claims Act (FCA) attaches liability to claim for payment, not to underlying activity. 31 U.S.C.A. § 3729.

**[10] United States 393 ⟜122**

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
393k122 k. Penalties and Actions Therefor. Most Cited Cases
In action under False Claims Act (FCA), plaintiff has the burden of establishing jurisdiction. 31 U.S.C.A. § 3729 et seq.

**[11] United States 393 ⟜122**

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

00000891

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

Claims and Other Offenses Relating to Claims
       393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Court has no duty to accept factual allegations as true, especially sweeping, conclusory statements, in deciding case under False Claims Act (FCA). 31 U.S.C.A. § 3729 et seq.

**[12] United States 393 🗝122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Statement in report by Department of Justice's Office of the Inspector General (OIG) which indicated that government contractors which were alleged to have received "small business" status, even though they did not meet requirements of small business, had verified their small business status verbally did not, standing alone, raise specter of foul play, and therefore existence of report in the public domain did not divest district court of subject matter jurisdiction over qui tam action under False Claims Act (FCA), alleging that government contractors had misrepresented themselves as small or disadvantaged businesses to obtain orders from Immigration and Naturalization Service (INS) for advertising and public relations services. 31 U.S.C.A. § 3729 et seq.

**[13] United States 393 🗝122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Qui tam action under False Claims Act (FCA) cannot proceed when all the material elements of the fraudulent transaction are already in the public domain, even if plaintiff comes forward with additional evidence incriminating defendant; however, when only one element of the fraudulent transaction is in the public domain, qui tam plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud or allegations of fraud itself. 31 U.S.C.A. § 3729 et seq.

**[14] United States 393 🗝122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Media reports that documented size and scope of government contractors before qui tam plaintiff commenced action under False Claims Act (FCA) alleging that contractors had misrepresented themselves as small or disadvantaged businesses to obtain orders from Immigration and Naturalization Service (INS) for advertising and public relations services triggered FCA provision depriving district courts of jurisdiction to hear FCA actions based upon publicly disclosed allegations or transactions, inasmuch as plaintiff's assertion that contractors were large businesses not entitled to small business preferences merely repeated what the public already knew, and information in media reports, combined with information in report by Department of Justice's Office of the Inspector General (OIG) about contractors' small business status, was sufficient to alert government to alleged fraud. 31 U.S.C.A. § 3730(e).

**[15] United States 393 🗝122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Jurisdictional bar of False Claims Act (FCA) precludes actions by individuals who base any part of their allegations on publicly disclosed information. 31 U.S.C.A. § 3730(e).

**[16] United States 393 🗝122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Qui tam plaintiff failed to show that it had direct and independent knowledge of alleged misrepresentations made by government contractors to obtain small

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

business contracts despite their ineligibility, so as to come within original source exception to jurisdictional bar, under False Claims Act (FCA), against qui tam actions based on publicly disclosed information, inasmuch as vague allegations of fraud included in plaintiff's letter to Department of Justice's Office of the Inspector General (OIG) did not demonstrate that plaintiff had any knowledge of alleged wrongdoing by particular contractors, nor did letter show that any independent knowledge that plaintiff had of alleged fraud was direct. 31 U.S.C.A. § 3730(e)(4)(B).

**[17] United States 393 ☞122**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Provision of False Claims Act (FCA) granting district court jurisdiction to hear qui tam action that is based on public disclosure of allegations or transactions if plaintiff is original source of information on which allegations are based requires qui tam plaintiff to possess direct and independent knowledge of the information underlying the allegation, rather than direct and independent knowledge of the transaction itself. 31 U.S.C.A. § 3730(e)(4)(B).

**[18] United States 393 ☞122**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Under provision of False Claims Act (FCA) granting district court jurisdiction to hear qui tam action based on public disclosure of allegations or transactions if plaintiff is original source of information on which allegations are based, plaintiff can surmount FCA's jurisdictional bar on actions based on public disclosures by demonstrating direct and independent knowledge of any essential element of underlying fraud transaction. 31 U.S.C.A. § 3730(e)(4)(B).

**[19] United States 393 ☞122**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Even if letters sent by qui tam plaintiff to Small Business Administration (SBA) and Department of Justice's Office of the Inspector General (OIG) prompted OIG's investigation into whether government contractors had misrepresented themselves as small or disadvantaged businesses to obtain contracts with Immigration and Naturalization Service (INS), that fact alone did not establish that plaintiff came within original source exception to jurisdictional bar, under False Claims Act (FCA), against qui tam actions based on public disclosures, given that OIG uncovered, through its investigation, identities of alleged perpetrators and exact circumstances of their allegedly fraudulent acts, such that plaintiff was not original source of that information. 31 U.S.C.A. § 3730(e)(4)(B).

**[20] Federal Civil Procedure 170A ☞2769**

170A Federal Civil Procedure
    170AXX Sanctions
        170AXX(B) Grounds for Imposition
            170Ak2767 Unwarranted, Groundless or Frivolous Papers or Claims
                170Ak2769 k. Reasonableness or Bad Faith in General; Objective or Subjective Standard.
Most Cited Cases
Before imposing sanctions under statute allowing court to assess attorney fees against attorney who frustrates the progress of judicial proceedings, court must evaluate whether attorney's conduct has been at least reckless. 28 U.S.C.A. § 1927.

**[21] Federal Civil Procedure 170A ☞2829**

170A Federal Civil Procedure
    170AXX Sanctions
        170AXX(E) Proceedings
            170Ak2829 k. Evidence. Most Cited Cases
Party moving for sanctions and fees under statute allowing court to assess attorney fees against attorney who frustrates the progress of judicial proceedings bears the burden of showing that opposing counsel acted recklessly. 28 U.S.C.A. § 1927.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

**[22] Federal Civil Procedure 170A ☜2771(2)**

170A Federal Civil Procedure
    170AXX Sanctions
       170AXX(B) Grounds for Imposition
         170Ak2767 Unwarranted, Groundless or
Frivolous Papers or Claims
           170Ak2771 Complaints, Counterclaims
and Petitions
             170Ak2771(2) k. Particular Types of
Cases. Most Cited Cases
Allegations that qui tam plaintiff's claim under False
Claims Act (FCA) was frivolous and vexatious did
not support sanctions under statute allowing court to
assess attorney fees against attorney who frustrated
the progress of judicial proceedings, given absence of
allegations that attorney acted recklessly. 28
U.S.C.A. § 1927.

**[23] United States 393 ☜122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.
Most Cited Cases
In deciding whether to award attorney fees and ex-
penses to prevailing defendant under False Claims
Act (FCA), court must determine whether plaintiff's
suit falls within any of the three enumerated catego-
ries. 31 U.S.C.A. § 3730(d)(4).

**[24] United States 393 ☜122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.
Most Cited Cases
In applying provision of False Claims Act (FCA)
allowing court to award reasonable attorney fees and
expenses to prevailing defendant in qualifying case, it
is important that court resist the understandable temp-
tation to engage in post hoc reasoning by concluding
that, because plaintiff did not ultimately prevail, his
action must have been unreasonable or without foun-
dation. 31 U.S.C.A. § 3730(d)(4).

**[25] United States 393 ☜122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Court can only base an award of attorney fees and
expenses to prevailing defendant in action under
False Claims Act (FCA) upon a finding that plain-
tiff's action was frivolous, unreasonable, or without
foundation. 31 U.S.C.A. § 3730(d)(4).

**[26] United States 393 ☜122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.
Most Cited Cases
District court should review the entire course of the
litigation in determining whether action under False
Claims Act (FCA) was frivolous, unreasonable, or
without foundation and warrants award of attorney
fees and expenses to prevailing defendant. 31
U.S.C.A. § 3730(d)(4).

**[27] United States 393 ☜122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.
Most Cited Cases
Claim is "frivolous," within meaning of provision of
False Claims Act (FCA) authorizing award of attor-
ney fees and costs to prevailing defendant, if it is
utterly lacking in legal merit and evidentiary support.
31 U.S.C.A. § 3730(d)(4).

**[28] United States 393 ☜122**

393 United States
    393VIII Claims Against United States
       393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

00000894

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

Most Cited Cases

In the context of statute authorizing award of attorney fees and costs to prevailing defendant in action under False Claims Act (FCA), evidence of vexatiousness or an intent to harass on plaintiff's part includes, but is not limited to, actions that deliberately delay the proceedings, attempts to relitigate a previously decided claim against same defendant, the raising of new allegations in an effort to circumvent the arguments in defendant's motion to dismiss, and the inclusion of counts for which the available evidence defeats any inference of a false claim. 31 U.S.C.A. § 3730(d)(4).

**[29]** United States 393 ⬅122

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions Therefor.
Most Cited Cases

Government contractors were prevailing parties for purposes of attorney fee award under False Claims Act (FCA), even though qui tam action against them was dismissed for lack of subject matter jurisdiction, inasmuch as the evidence showed that federal agency was aware that contractors were not small or disadvantaged businesses when it offered them disputed contracts, negating claims that contractors received contracts as a result of making false representations about the size and scope of their businesses. 31 U.S.C.A. § 3730(d)(4).

**[30]** United States 393 ⬅122

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions Therefor.
Most Cited Cases

Claim is "frivolous" and "vexatious" within meaning of provision of False Claims Act (FCA) authorizing award of attorney fees and costs to prevailing defendant if the government's awareness of the circumstances constituting the alleged transgression makes any legal claim of fraud untenable. 31 U.S.C.A. § 3730(d)(4).

**[31]** United States 393 ⬅122

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions Therefor.
Most Cited Cases

Qui tam plaintiff filed "frivolous" and "vexatious" lawsuit when it brought action against government contractors under False Claims Act (FCA) based on allegations that they obtained government contracts by misrepresenting themselves as small or disadvantaged businesses, despite knowing that government agency was aware of contractors' true business status at the time contracts were issued, and therefore contractors were entitled, as prevailing defendants, to award of attorney fees and expenses under FCA. 31 U.S.C.A. § 3730(d)(4).

**\*229** Cyrus E. Phillips, IV, Washington, DC, for Plaintiff.

**\*230** Kenneth Lee Blalack, II, O'Melveny & Myers LLP, Washington, DC, for Defendants.

Brian J. Sonfield, Export-Import Bank of the United States Office of the General Counsel, Washington, DC, for Movant.

### *MEMORANDUM OPINION*

URBINA, District Judge.

### GRANTING THE DEFENDANTS' MOTION TO DISMISS AND FOR ATTORNEYS' FEES AND EXPENSES

### I. INTRODUCTION

This case comes before the court on the defendants' motion to dismiss and for attorneys' fees and expenses. The plaintiff alleges that the defendants misrepresented themselves as small or disadvantaged businesses in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.,* to obtain orders from the Immigration and Naturalization Service ("INS") for advertising and public relations services. Because the plaintiff's claims are based on publicly disclosed information, of which the plaintiff is not the original source, the court grants the defendants' motion to dismiss for lack of subject-matter jurisdiction.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

In addition, because the plaintiff's lawsuit qualifies as frivolous and vexatious, the court awards the defendants attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d)(4).

## II. BACKGROUND

### A. Factual Background

Plaintiff J. Cooper and Associates, Inc. is a small, disadvantaged vendor eligible to participate in the Small Business Administration's ("SBA") Section 8(a) program.FN1 Am. Compl. ¶ 3. In July 1995, the INS awarded the plaintiff a contract under the Section 8(a) program to perform advertising and public relations services to support the INS's initiative to significantly increase the size of its workforce. *Id.* ¶ 8; Defs.' Mot. at 4. In November 1995, however, the INS began issuing orders to other vendors to fulfill its advertising needs. Defs.' Mot. at 5-6. Specifically, the INS placed advertising orders with defendants Bernard Hodes Group, Inc. ("Hodes") and Cass Communications, Inc. ("Cass") in November 1995, and with defendant J. Walter Thompson Co. ("JWT") in February 1996.FN2 *Id.* at 7.

> FN1. Under the Small Business Administration's ("SBA") Section 8(a) program, government agencies can award contracts to small businesses. 15 U.S.C. § 637(a)(1)(B). The small business then enters into a tripartite contract with the contracting agency and the SBA and performs the specified work as a subcontractor to the SBA. *Id.*

> FN2. The INS also issued orders to another advertising agency, Abramson, Ehrlich, and Manes, which is not a party to this lawsuit. Am. Compl. ¶ 13; Am. Compl., Attach. 2 at 6547.

On January 7, 1997, after the plaintiff's contract terminated, the plaintiff sent a letter to the United States Department of Justice's Office of the Inspector General ("OIG") stating that "several large white firms misrepresented themselves as being 'small and disadvantaged' in order to obtain contracts with the [INS]," and that, "this fraud took place with the INS' [sic] contract and program people's knowledge." FN3 Defs.' Mot. at 6; Am. Compl. ¶ 9; Pl.'s Opp'n, Attach. 1 ("Cooper Decl."), Ex. L.

> FN3. The plaintiff sent a similar letter to the SBA on the same date. Defs.' Mot. at 6; Am. Compl. ¶ 9; Pl.'s Opp'n, Attach. 1 ("Cooper Decl."), Ex. M. The SBA informed the plaintiff by mail that it had referred the plaintiff's letter to the Department of Justice, Office of the Inspector General ("OIG") for review. Am. Compl. ¶ 9.

**\*231** On August 7, 1997, the OIG issued a report ("the OIG Report") of an investigation regarding allegations that the INS "commingled advertising funds that were earmarked for a specific 8(a) or small and disadvantaged advertising contract." Am. Compl. ¶ 12; Am. Compl., Attach. 2 at 6538; Defs.' Mot. at 10. Attached to the OIG Report was a Memorandum of Investigation ("MOI") summarizing a July 15, 1997 interview with an INS employee discussing "allegations that certain businesses had received 'small business' status, when these companies did not meet the requirements as 'small businesses.' " Defs.' Mot. at 10-11 (citing Am. Compl., Attach. 2 at 6546). During the interview, the INS employee stated that each of the defendant vendors "verified their 'small business' status verbally" when questioned by the INS. Am. Compl., Attach. 2 at 6547.

On December 8, 1997, the plaintiff filed suit in the United States Court of Federal Claims against the INS, alleging that the SBA and the INS violated their statutory and contractual obligations by discontinuing the contract with the plaintiff and issuing advertising orders related to the INS's hiring initiative to other businesses. Am. Compl. ¶ 10; Defs.' Mot. at 8. The Court of Federal Claims dismissed the suit without prejudice to allow the plaintiff to exhaust administrative remedies. *J. Cooper & Assocs., Inc. v. United States*, 47 Fed.Cl. 280 (2000). On May 31, 2000, the plaintiff filed another complaint against the INS for breach of contract and breach of the implied covenant of good faith and fair dealing. Am. Compl. ¶ 10. The Court of Federal Claims dismissed the plaintiff's complaint with prejudice on July 12, 2002. *J. Cooper & Assocs., Inc. v. United States*, 53 Fed.Cl. 8 (2002); Defs.' Mot. at 9. The plaintiff appealed to the Court of Appeals for the Federal Circuit, which affirmed the lower court's decision. *J. Cooper & Assocs., Inc. v. United States*, 65 Fed.Appx. 731 (2003).

### B. Procedural Background

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

[1] Before ruling on the pending motion, the court takes a step back to review the somewhat tangled procedural posture of this case. On November 25, 2003, the plaintiff filed this *qui tam*[FN4] lawsuit on behalf of the United States against the defendants. Compl ¶¶ 1, 2. On April 18, 2005, the defendants filed a motion to dismiss the complaint and for attorneys' fees, costs, and expenses. Stipulation and Order Dismissing Pl.'s Unjust Enrichment Claim and Defining Papers to be Considered on Defs.' Mot. to Dismiss the Am. Compl. ("Stipulation") at 1. On May 12, 2005, the plaintiff filed a brief and affidavit in opposition to the defendants' motion to dismiss, and subsequently filed an amended complaint which added, *inter alia*, a claim for unjust enrichment. *Id.* at 1-2. As a result of this filing, confusion arose among the parties regarding which motions and corresponding documents remained at issue. To clarify for the court the relevant documents in resolving the defendants' motion to dismiss the amended complaint, the parties stipulated and agreed that: (1) the unjust enrichment count is dismissed with prejudice, (2) the defendants' motion to dismiss the original complaint is withdrawn, (3) the only motion before the court is the defendants' motion to dismiss the amended complaint.[FN5] *232 *Id.* at 2-3. The court now turns to the defendants' motion.

> FN4. A *qui tam* action "allow[s] private parties to initiate suit to enforce the laws in the government's stead and award[s] victorious plaintiffs part of the recovery as bounty." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 647 n. 1 (D.C.Cir.1994).

> FN5. The documents in docket entry number 20 are deemed to comprise the defendants' motion to dismiss the amended complaint. Stipulation and Order Dismissing Pl.'s Unjust Enrichment Claim and Defining Papers to be Considered on Defs.' Mot. to Dismiss the Am. Compl. ("Stipulation") at 3. The documents in docket entry number 18 comprise the plaintiff's papers in opposition to the defendants' motion to dismiss. *Id.* Finally, the defendants' reply to the plaintiff's opposition is docket entry number 23. *Id.*

### III. ANALYSIS

[2] The defendants move to dismiss the plaintiff's amended complaint under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, Federal Rule of Civil Procedure 12(b)(6). Defs.' Mot. at 1. Courts should consider Rule 12(b)(1) jurisdictional challenges before Rule 12(b)(6) challenges. *United States ex rel. Settlemire v. Dist. of Columbia,* 198 F.3d 913, 920 (D.C.Cir.1999) (citing *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,* 985 F.2d 1148, 1155-56 (2d Cir.1993)). Accordingly, the court addresses the defendants' Rule 12(b)(1) challenge first.

### A. Legal Standards

#### 1. Legal Standard for a Motion to Dismiss Pursuant to Rule 12(b)(1)

[3] Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288-89, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *see also Gen. Motors Corp. v. Envtl. Prot. Agency,* 363 F.3d 442, 448 (D.C.Cir.2004) (noting that "[a]s a court of limited jurisdiction, we being, and end, with an examination of our jurisdiction").

[4][5][6] Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.' " *Akinseye v. Dist. of Columbia,* 339 F.3d 970, 971 (D.C.Cir.2003) (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)). On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The court may dismiss a complaint for lack of subject-matter jurisdiction only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.,* 315 F.3d 338, 343 (D.C.Cir.2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

[7][8] Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States,* 334 F.3d 61, 64, 69 (D.C.Cir.2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13 (D.D.C.2001). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *United States ex rel. Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 197 (D.C.Cir.1992).

**\*233 2. Legal Standard for the False Claims Act**

[9] The FCA imposes liability for civil penalties and treble damages on anyone who submits or causes false claims to be submitted to the federal government. 31 U.S.C. § 3729. The FCA defines "claim" to include a request for payment made to a contractor, grantee, or other recipient if the federal government provides any portion of the money or property that is requested or demanded, or if the federal government will reimburse such contractor, grantee, or other recipient for any portion of the money or property that is requested or demanded. 31 U.S.C. § 3729(c). Further, the statute proscribes only false claims, that is, actual demands for money or property, and false records or statements used to induce such claims. 31 U.S.C. § 3729(a)(2). The FCA attaches liability to the claim for payment, not to the underlying activity. *United States ex rel. Totten v. Bombardier Corp.,* 286 F.3d 542, 551 (D.C.Cir.2002).

In a *qui tam* lawsuit brought under the FCA, private persons acting on behalf of the government may sue those who defraud the government and may share in any proceeds ultimately recovered. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 647 (D.C.Cir.1994). *Qui tam* provisions thus create incentives to supplement government enforcement by exposing fraud of which the government was previously unaware. *Id.* at 649; *United States ex rel. Findley v. F.P.C.-Boron Employees' Club,* 105 F.3d 675, 678 (D.C.Cir.1997).

The FCA includes a jurisdictional provision barring certain types of suits, including *qui tam* suits that are "based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news" FN6 31 U.S.C. § 3730(e); *see also Springfield,* 14 F.3d at 651. A court, however, has jurisdiction to hear a suit based on the public disclosure of allegations or transactions if the plaintiff is the "original source" of the information, that is, if the plaintiff "has direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B); *see also Springfield,* 14 F.3d at 651; *Wang v. FMC Corp.,* 975 F.2d 1412, 1416 (9th Cir.1992).

> FN6. Congress included the public disclosure exemption in the 1986 amendments to the FCA in order "to ensure that *qui tam* actions would not be brought by 'concerned' citizens combing courthouse and agency records." *United States ex rel. Herbert v. Nat'l Acad. of Scis,* 1992 WL 247587, at \*4, 1992 U.S. Dist. LEXIS 14063, at \*11 (D.D.C. Sept. 15, 1992).

[10][11] Under the FCA, the plaintiff has the burden of establishing jurisdiction. *United States ex rel. Herbert v. Nat'l Acad. of Scis.,* 1992 WL 247587, at \*3-4, 1992 U.S. Dist. LEXIS 14063, at \*9 (D.D.C. Sept. 15, 1992) (citing *Moir v. Greater Cleveland Regional Transit Auth.,* 895 F.2d 266, 269 (6th Cir.1990)), *aff'd,* 974 F.2d 192 (D.C.Cir.1992). In addition, the court has no duty to accept factual allegations as true, especially sweeping, conclusory statements. *Id.,* 1992 WL 247587, at \*4, 1992 U.S. Dist. LEXIS 14063, at \*10 (citing *Thigpen v. United States,* 800 F.2d 393, 396 (4th Cir.1986)). This jurisdictional limitation represents Congress's effort to achieve "the golden mean between adequate incentives for whistleblowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *Springfield,* 14 F.3d at 649.

**\*234 B. The Court Lacks Subject-Matter Jurisdiction**

**1. The Plaintiff's Claim is Based on Transactions**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

#### and Allegations in Public Disclosures

[12] The defendants argue that the plaintiff's suit is based on allegations that were publicly disclosed in the OIG Report.[FN7] Defs.' Mot. at 14. The OIG Report investigated allegations that some businesses received "small business" status when they did not meet the requirements of a small business. Am. Compl., Attach. 2 at 6546. The OIG's MOI then states that the defendants "verified their small business status verbally" when contacted by the INS. *Id.* at 6547. Because the plaintiff's suit alleges that the defendants were, in fact, not small business, the defendants argue that the plaintiff's suit is based on allegations contained in the OIG Report. Defs.' Mot. at 16.

> FN7. The defendants argue, and the plaintiff does not dispute, that the OIG Report is a "public report" of an investigation that "falls squarely within the language and purpose of the term 'public disclosure' in the FCA's jurisdictional bar." Defs.' Mot. at 14; *see also* Defs.' Mot, Ex. R (explaining that "the Inspector General ... enforces criminal and civil laws, regulations and ethical standards within DOJ by investigating individuals and organizations who allegedly are involved in financial, contractual or criminal misconduct in DOJ programs and operations").

[13] The D.C. Circuit explained the significance of the terms "allegation" and "transaction" in the FCA's jurisdictional provision by using the following formula: X (misrepresented state of facts) + Y (true state of facts) = Z (fraud). *Springfield,* 14 F.3d at 654; *see also Findley,* 105 F.3d at 687. A *qui tam* action cannot proceed when "all the material elements of the fraudulent transaction are already in the public domain" (*i.e.,* X and Y are in the public domain), even if the plaintiff "comes forward with additional evidence incriminating the defendant." *Springfield,* 14 F.3d at 655.[FN8] However, where only one element of the fraudulent transaction is in the public domain (*e.g.,* X), the *qui tam* plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud (*e.g.,* Y) or allegations of fraud itself (*e.g.,* Z). *Springfield,* 14 F.3d at 655.

> FN8. The rationale behind this limitation on *qui tam* suits is that, "when the publicly disclosed transaction is sufficient to raise the inference of fraud, there is 'little need for *qui tam* actions, which tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue.' " *United States ex rel. Findley v. F.P.C.-Boron Employees' Club,* 105 F.3d 675, 687 (D.C.Cir.1997) (quoting *Springfield,* 14 F.3d at 654).

Contrary to the defendants' argument, the OIG Report's statement that the defendants verified their small business status verbally does not rise to the level of an "allegation" as defined by the D.C. Circuit. The statement constitutes only the misrepresented state of facts (*i.e.,* X) in the fraudulent transaction. *Springfield,* 14 F.3d at 654. In other words, the MOI standing alone is "innocuous" and does not "raise the specter of foul play." *Id.; Findley,* 105 F.3d at 687 (internal quotation marks omitted). The existence of the OIG Report in the public domain, therefore, does not divest the court of jurisdiction; theoretically, the plaintiff could still meet the jurisdictional requirement by offering information regarding the true state of facts (*i.e.,* Y) or an allegation of fraud itself (*i.e.,* Z). *Springfield,* 14 F.3d at 655.

[14][15] The court, however, does not have jurisdiction to hear the present case because information revealing the true state of facts already exists in the public *235 domain in another form. Specifically, media reports documenting the size and scope of the defendants' businesses existed long before the plaintiff filed its *qui tam* suit. *See, e.g.,* Defs.' Mot., Ex. S (Philip H. Dougherty, *2 Units to Merge At Doyle Dane,* N.Y. TIMES, Feb. 21, 1985 at D25) (reporting that Hodes joined a business with "$20 million in billings"); *Id.,* Ex. T (James L. Rowe Jr., *J. Walter Thompson Plans to Buy Hill & Knowlton,* WASH. POST,, Feb. 11, 1980 at D7) (noting that JWT had "worldwide billings of nearly $1.5 billion in 1978"); *Id.,* Ex. W (*MorganWorks.com Appoints Four New Executives to Senior Management Team,* PR NEWSWIRE, March 30, 2000) (describing Cass as a "$30 million company"). The plaintiff's statement that each defendant is "a large business not entitled to any preference as a small business, or a small, disadvantaged business," Am. Compl. ¶ 2, merely "repeats what the public already knows," *Findley,* 105 F.3d at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

683. Moreover, because the information disclosed in the OIG Report and the numerous media reports on the defendants would suffice to "set government investigators on the trail of fraud," there is little need for a *qui tam* lawsuit based on this set of facts.[FN9] *Springfield,* 14 F.3d at 655; *see also* Settlemire, 198 F.3d at 919 (advising that "there is no requirement ... that the relevant public disclosures irrefutably prove a case of fraud. It is sufficient that the 'publicly disclosed transaction is sufficient to raise the inference of fraud' ") (quoting *Findley,* 105 F.3d at 687); *Findley,* 105 F.3d at 688 (concluding that "[i]f a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a *qui tam* action cannot proceed"). Having concluded that the plaintiff's claim is based on allegations in public disclosures,[FN10] the court now proceeds to the original source inquiry.

> FN9. Indeed, there are several indications offered by the plaintiff itself that suggest that the Immigration and Naturalization Service ("INS") knew that the defendants were each large businesses. In January 1997, the plaintiff wrote to the OIG claiming that "several large white firms misrepresented themselves ... with the INS' contract and program people's knowledge." Cooper Decl., Ex. L. Months later, in its suit against the INS, the plaintiff explicitly claimed that the INS knowingly issued contracts to "non-8(a) companies" and "improperly designated them as disadvantaged businesses" on various work orders. Defs.' Mot., Ex. D ¶ 26.

> FN10. The court rejects the plaintiff's argument that its *qui tam* claim is not "based upon" information in the OIG Report merely because the Report does not mention actual payments or claims for payment. Pl.'s Opp'n at 19. The FCA's jurisdictional bar precludes suits by "individuals who base *any part of their allegations* on publicly disclosed information." *United States ex rel. Schwedt v. Planning Research Corp., Inc.,* 39 F.Supp.2d 28, 34 (D.D.C.1999) (citing *United States ex rel. McKenzie v. BellSouth Telecom., Inc.,* 123 F.3d 935, 940 (6th Cir.1997), *cert. denied,* 522 U.S. 1077, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998)) (empha-

sis in original); *see also* United States ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 552 (10th Cir.1992) (concluding that a *qui tam* suit "even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transactions," because to hold otherwise "would impermissibly expand federal jurisdiction by allowing *qui tam* plaintiffs to avoid the more exacting 'original source' requirement simply by asserting an additional count").

**2. The Plaintiff is Not an Original Source of Any Information Underlying the Allegation**

[16][17][18] The defendants argue that the plaintiff did not have "first-hand knowledge of any of alleged misrepresentations." Defs.' Mot. at 17. The FCA requires a *qui tam* plaintiff to possess direct and independent knowledge of the " 'information' **236** underlying the allegation, rather than direct and independent knowledge of the 'transaction' itself." *Springfield,* 14 F.3d at 656. Accordingly, the plaintiff can surmount the FCA's jurisdictional bar by demonstrating direct and independent knowledge of "*any* essential element of the underlying fraud transaction (*e.g.,* Y)." *Id.* at 657 (emphasis in original). In other words, the plaintiff can establish subject-matter jurisdiction by proving that it is the original source of either the information concerning the alleged misrepresentations or the information indicating that the defendants are all large businesses.[FN11]

> FN11. Therefore, the defendants' contention that, "to qualify as an 'original source' able to bring a *qui tam* action, the private plaintiff must have first hand, independent knowledge of the misrepresented state of facts as well as the true state of facts," Defs.' Mot. at 17, is a misinterpretation of this circuit's FCA jurisprudence.

[19] The plaintiff fails to show direct and independent knowledge of either type of information. With respect to the information found in the OIG Report, the plaintiff first argues that it "voluntarily provided the information prior to any public disclosure, ... had first-hand knowledge of the information (by reason of [the plaintiff's] performance under its tripartite Letter Contract)," and that its "knowledge does not depend

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

or rely upon the later public disclosures." [FN12] Pl.'s Opp'n at 20. Although the plaintiff did write to the OIG in January 1997 that "several large white firms misrepresented themselves ... in order to obtain contracts with the [INS]," this vague statement fails to demonstrate that the plaintiff had any knowledge of alleged wrongdoing by the particular defendants. [FN13] *United States ex rel. Kinney v. Stoltz,* 327 F.3d 671, 675 (8th Cir.2003) (stating that knowledge of fraudulent practices in general is not sufficient to overcome the FCA's jurisdictional bar, and that a plaintiff must demonstrate direct and independent knowledge of the role played by the particular defendants).

> FN12. Curiously, the plaintiff does not make any effort to explain or support this conclusory statement. The court, however, surmises that the plaintiff is referring to its January 1997 letters to the Department of Justice's Office of the Inspector General ("OIG") and the SBA. *See* Cooper Decl., Exs. L, M.

> FN13. It is also possible that the plaintiff's letters to the OIG and the SBA provided the impetus for the OIG investigation. Defs.' Mot. at 18. This fact alone, however, does not assist the plaintiff in meeting the burden of establishing the court's subject-matter jurisdiction. Although the plaintiff may have communicated vague suspicions of fraudulent practices by unnamed entities, it was the OIG that uncovered, through its own investigations, the identities of the alleged perpetrators and the exact circumstances of their allegedly fraudulent acts. *Id.* Therefore, the plaintiff is not the original source of the information at issue. *United States ex rel. Dhawan v. N.Y. Med. Coll.,* 252 F.3d 118, 121 n. 3 (2d Cir.2001) (remarking that, even if the government would not have performed an audit "*but for* plaintiff's request ..., this allegation would not suffice to show that they were the source of the core information") (emphasis in original); *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1163 (10th Cir.1999) (concluding that where "most of the core information contained in the complaint came from [a third party's] independent research and investigation," the plaintiff's claim that

it "provided the initial impetus for [the third party's] investigation" did not demonstrate direct and independent knowledge).

Assuming *arguendo* that the plaintiff's letter to the OIG sufficed to show that the plaintiff had knowledge of the defendants' alleged wrongdoings prior to the release of the OIG Report (*i.e.,* that the plaintiff had independent knowledge of the alleged fraud), the letter would still not establish that the plaintiff's knowledge was direct. *See* **\*237***United States ex rel. Aflatooni v. Kitsap Physicians Servs.,* 163 F.3d 516, 526 (9th Cir.1999) (reasoning that "the purposes of the [FCA] would not be served by allowing a relator to maintain a *qui tam* suit based on pure speculation or conjecture"). The court, therefore, cannot accept the plaintiff's conclusory and unsupported statement that it is the original source of the information contained in the OIG Report.

In addition, the plaintiff does not argue that it is the original source of the information regarding the size and wealth of the defendant businesses that was disclosed in various media reports. [FN14] Further, there is no evidence in the record that the plaintiff provided- or could have provided-any media outlets with this information. Because the plaintiff has failed to meet its burden of establishing subject-matter jurisdiction, the court grants the defendants' Rule 12(b)(1) motion to dismiss. [FN15]

> FN14. In fact, the plaintiff makes no mention in its opposition of the D.C. Circuit's (and the defendants') use of the "X + Y = Z" formula.

> FN15. Accordingly, the court will not address the arguments made by the defendants pursuant to Federal Rule of Civil Procedure 12(b)(6).

**C. The Court Grants the Defendants' Request for Attorneys' Fees and Expenses**

[20][21][22] The defendants request that the court award them attorneys' fees and expenses under the FCA's fees provision. 31 U.S.C. § 3730(d)(4) [FN16] Defs.' Mot. at 28. They argue that the plaintiff's claims are "untimely and otherwise meritless." *Id.* at 29. In addition, the defendants assert that the plaintiff added "a new and wholly frivolous unjust enrichment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

claim for no apparent reason other than to harass [the d]efendants." *Id.* The plaintiff does not offer any arguments opposing the defendants' request for fees. Because the plaintiff's complaint is frivolous and vexatious, the court grants the defendants' request for attorneys' fees and expenses.

> **FN16.** The defendants also argue that they are entitled to sanctions and attorneys' fees under 28 U.S.C. § 1927, which allows a court to "assess attorneys' fees against an attorney who frustrates the progress of judicial proceedings." *United States v. Wallace,* 964 F.2d 1214, 1218 (D.C.Cir.1992). Before imposing sanctions under this provision, the court must evaluate whether the attorney's conduct has been "*at least* reckless." *Id.* at 1217 (emphasis in original). The party moving for sanctions and fees bears the burden of showing that opposing counsel acted recklessly. *Healey v. Labgold,* 231 F.Supp.2d 64, 68 (D.D.C.2002). Here, the defendants only allege that the plaintiff's claim is frivolous and vexatious, but they do not make any allegations that the plaintiff's attorney acted recklessly.

**1. Legal Standard for Awarding Attorneys' Fees and Expenses Under Section 3730(d)(4) of the FCA**

[23][24][25][26] Section 3730(d)(4) of the FCA provides:

> the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for the purposes of harassment.

31 U.S.C. § 3730(d)(4). In deciding whether to award attorneys' fees and expenses, the court must determine whether the plaintiff's suit falls within any of the three enumerated categories.[FN17] Applying **\*238** the statute, "it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Christiansburg Garment Co. v. Equal Employment Opportunity*

*Comm'n,* 434 U.S. 412, 421-22, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) (section 1988 context). The court can only base an award of attorneys' fees and expenses "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation" [FN18] *Id.; see also Houston v. Norton,* 215 F.3d 1172, 1174 (10th Cir.2000) (holding that, "a plaintiff should not be assessed his opponent's attorney[s'] fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so ...").

> **FN17.** Case law interpreting the attorneys' fees and expenses provision of the FCA is scant at best. *United States ex rel. Mikes v. Straus,* 98 F.Supp.2d 517, 527 (S.D.N.Y.2000). But, because the FCA's legislative history indicates that "the standard of § 3730(d)(4) is analogous to that used for claims for attorney[s'] fees brought under 42 U.S.C. § 1988 [the Civil Rights Attorney's Fees Awards Act]," section 1988 cases are instructive in determining when awarding such fees is appropriate. *United States ex rel. Grynberg v. Praxair, Inc.,* 389 F.3d 1038, 1055 (10th Cir.2004); *see also Pfingston v. Ronan Eng'g Co.,* 284 F.3d 999, 1006 (9th Cir.2002); *Mikes,* 98 F.Supp.2d at 527. In some instances, courts applying the attorneys' fees and expenses provision of the FCA also look to the sanction provision of Federal Rule of Civil Procedure 11, which allows the court to impose sanctions "when a suit is 'interposed' for any improper purpose, such as to harass or to cause unnecessary delay[,]" *Herbert,* 1992 WL 247587, at *7, 1992 U.S. Dist. LEXIS 14063, at *19; *see, e.g., Mikes,* 98 F.Supp.2d at 527 (citing *LeBlanc-Sternberg v. Fletcher,* 143 F.3d 765, 770 (2d Cir.1998) (internal citations omitted)).

> **FN18.** A district court should review "the entire course of the litigation" in making this determination. *Grynberg,* 389 F.3d at 1059 (citing *Christiansburg Garment Co. v. Equal Employment 0pportunity Comm'n,* 434 U.S. 412, 421-22, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)).

[27][28] A claim is frivolous if it is utterly lacking in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

legal merit and evidentiary support. *United States ex rel. Mikes v. Straus,* 98 F.Supp.2d 517, 526-27, 528 (S.D.N.Y.2000) (noting that a claim is not frivolous if the plaintiff produces "some evidence" to support it). *See also Gerena-Valentin v. Koch,* 739 F.2d 755, 756-57 (2d Cir.1984) (awarding fees under 42 U.S.C. § 1988 to a prevailing defendant when the plaintiff failed to "produce any evidence whatsoever in support of his retaliation and conspiracy claim"). Evidence of vexatiousness or an intent to harass on the part of a plaintiff includes, but is not limited to, actions that deliberately delay the proceedings, attempts to relitigate a previously decided claim against the same defendant, the raising of new allegations in an effort to circumvent the arguments in a defendant's motion to dismiss, *Herbert,* 1992 WL 247587, at *8, 1992 U.S. Dist. LEXIS 14063, at *21-22, and the inclusion of counts for which the available evidence "defeat[s] any inference of a false claim."[FN19] *Mikes,* 98 F.Supp.2d at 527.

> [FN19.](FN19.) The distinction between vexatious conduct and harassment stems from the intentions of the plaintiff. Although the word "harassment" suggests bad faith on the part of the plaintiff, "the term 'vexatious' in no way implies that the plaintiff's subjective bad faith is a necessary prerequisite to a fee award against him." *Christiansburg Garment Co.,* 434 U.S. at 421, 98 S.Ct. 694; *see also Washington Hosp. Ctr. v. Serv. Employees Int'l Union,* 746 F.2d 1503, 1509 (D.C.Cir.1984) (concluding that a claim can be vexatious "even though [it is not] brought in subjective bad faith").

### 2. The Plaintiff's Complaint is Frivolous and Vexatious

[29][30] The defendants are "prevailing parties" for FCA purposes in this case even though the court's dismissal is for lack of jurisdiction. *United States ex rel. Stewart v. Fleet Fin. Group,* 1999 U.S. Dist. LEXIS 13624, at *20 (W.D.Mich.1999), *aff'd,* 229 F.3d 1154 (6th Cir.2000). The evidence in this case shows that the INS was aware that the defendants were **\*239** not small and or disadvantaged businesses and offered them advertising and public relations contracts anyway. A claim is frivolous and vexatious if the government's awareness of the circumstances constituting the alleged transgression makes any legal claim of fraud untenable. *Herbert,* 1992 WL 247587, at *7, 1992 U.S. Dist. LEXIS 14063, at *19, *20 (stating that the government's knowledge and approval of the defendants' use of documents despite possible copyright infringement "negat[es] any claim of fraud"); *see also United States ex rel. Minna Ree Winer Children's Class Trust v. Regions Bank of La.,* 1996 WL 264981 at *7-8, 1996 U.S. Dist. LEXIS 7142 at *24 (E.D.La. May 16, 1996) (concluding that the plaintiff's claim was frivolous and vexatious because the government's awareness and approval of the details of the plaintiff's property transactions negated a claim of fraud).

The plaintiff claims that the defendants received orders from the INS "as a result of" their false representations about the size and scope of their businesses. Am. Compl. ¶¶ 2, 15. During the course of the plaintiff's suit against the government, however, the INS explicitly admitted that it "obtained, with the concurrence of SBA, some advertising services from other vendors outside the section 8(a) program" and even named defendant JWT as one such vendor. Defs.' Mot., Ex. D, ¶ 26; Defs.' Mot., Ex. E. ¶ 26; Defs.' Mot., Ex. F ¶ 44; Defs.' Mot., Ex. G ¶ 44. The documents that the plaintiff submits in support of its opposition to the defendants' motion to dismiss include, *inter alia,* a May 1996 message from the INS to the SBA declaring the INS's intention to meet its advertising requirements by issuing contracts to a non-8(a) business because "numerous 8(a) firms were assessed, with no company possessing the qualifications appropriate for this requirement." Cooper Decl., Ex. H at 426. Even in this January 1997 letter to the OIG, the plaintiff alleged that the defendants' "fraud took place *with the INS'* [sic.] *contract and program people's knowledge." Id.,* Ex. L (emphasis added).

[31] The government's decision to award contracts to the defendants, despite its knowledge that the defendants were not small or disadvantaged businesses, negates any claim of fraud against the defendants.[FN20] The plaintiff examined the above-cited documents and even acknowledged the INS's awareness of the defendants' true business status in its letter to the OIG. Cooper Decl., Ex. L. Nevertheless, it decided to file the present suit, lodging claims that fly in the face of the available evidence. The court therefore concludes that the plaintiff filed a frivolous and vexatious lawsuit and awards the defendants attorneys' fees and expenses.[FN21]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

422 F.Supp.2d 225
**(Cite as: 422 F.Supp.2d 225)**

FN20. The defendants' statements to the INS employee confirming their small or disadvantaged business status and the designation of the defendants as "Disadvantaged" on the government-issued orders is admittedly curious. Am. Compl., Attach. 2 at 6547; Am. Compl., Attach. 1.

FN21. The defendants also argue for the awarding of attorneys' fees and expenses based on the untimeliness of the plaintiff's claim. Because the court has awarded attorneys' fees and expenses on other grounds, however, it declines at this time to decide whether the untimeliness of the plaintiff's claim qualifies it as frivolous, vexatious or for the purpose of harassment within the meaning of the FCA. The court also rejects the defendants' allegation that the plaintiff added a claim of unjust enrichment to its amended complaint for the purpose of harassing the defendants, Defs.' Mot. at 29, because the plaintiff later stipulated to the dismissal of the claim, Stipulation and Order at 2.

### IV. CONCLUSION

For the foregoing reasons, the court grants the defendants' motion to dismiss **\*240** and for attorneys' fees and expenses. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 23rd day of March, 2006.

D.D.C.,2006.
U.S. ex rel. J. Cooper & Associates, Inc. v. Bernard Hodes Group, Inc.
422 F.Supp.2d 225

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES *ex rel.* | ) | |
| THOMAS M. UBL | ) | |
| | ) | |
| Relator, | ) | |
| | ) | |
| v. | ) | Civil No. 1:06-cv-641 |
| | ) | |
| IIF DATA SOLUTIONS, and | ) | |
| CHARLES PATTEN, SR. | ) | |
| | ) | |
| Defendants. | ) | |

## Memorandum Opinion

This matter comes before the Court on Defendants IIF Data Solutions and Charles Patten, Sr.'s Motion to Establish Liability for Attorneys' Fees (Dkt. no. 341). The Court heard oral arguments on the matter on November 20, 2009. The parties have now submitted supplemental briefs pursuant to this Court's December 4, 2009 Order establishing Relator's liability for fees from March 24, 2009 and October 27, 2009.

### I.      Background

This motion for fees arises out of a *qui tam* action against Defendants filed under the False Claims Act ("FCA"). Relator, Thomas M. Ubl ("Ubl"), is a former employee of Defendant IIF Data Solutions ("IIF"). The allegations in the Complaint were supposedly premised on Ubl's experiences as an IIF employee and his observations of fraud on the government perpetrated by IIF and Charles Patten, IIF's founder and President. The case proceeded down a long and tumultuous procedural path, ending with a seven-day trial before this Court. After deliberation, the jury returned a verdict in Defendants' favor on all counts.

1

00000905

After prevailing at trial, Defendants moved for fees under 31 U.S.C. § 3730(d)(4) ("§ 3730(d)(4)"),[1] which provides for an award of reasonable attorneys' fees and expenses in cases which prove to be "clearly frivolous, clearly vexatious, or brought primarily for the purposes of harassment." In granting Defendants' motion for fees, the Court recognized this as a rare case in which "when the evidence in the record is viewed objectively," the Relator's claim "clearly had no reasonable chance of success." *See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 356 (4th Cir. 2009). As such, the Court determined that Defendants are entitled to recover a portion of their attorneys' fees and expenses.

## II.   Analysis

### a.   Identification of Frivolous Claims

#### i.   Section 3730(d)(4)'s Standard for Awarding Attorneys' Fees

In its December 4, 2009 Order (the "December 4 Order"), the Court ruled that at least some of Relator's claims were clearly frivolous or vexatious, and hence § 3730(d)(4) authorizes an award of attorneys' fees to the prevailing Defendants. Dec. 4 Order at 2.

In its entirety, § 3730(d)(4) provides that:

> If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

---

[1] Defendants also moved for fees pursuant 28 U.S.C. § 1927; the Court denied that Motion in its December 4, 2009 Order.

2

00000906

Here, Defendants clearly prevailed in this action. Our circuits have defined the "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment" standard contemplated by the FCA with subtle differences.

In *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 356 (4th Cir. 2009), the Fourth Circuit applied a standard which asks whether a Relator's claims "clearly have no reasonable chance of success" drawn from *Mikes v. Straus,* 274 F.3d 687, 704 (2d Cir. 2001). The Fourth Circuit, however, limited this understanding of § 3730(d)(4)'s standard "[f]or purposes of [that] appeal only."[2]

In interpreting § 3730(d)(4), several other Circuits have relied upon the Supreme Court's definition of frivolous found in the Title VII and 42 U.S.C § 1988 contexts. *See, e.g.*, *U.S. ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1058 (10th Cir. 2004)(citing *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412 (1978)); *see also Hughes v. Rowe*, 449 U.S. 5 (1980). Under this definition, an award is justified when a relator's claims are "groundless or without foundation, rather than simply that the [relator] has ultimately lost his case." *Christiansburg*, 434 U.S. 412 (1978). Put another way, "[a] successful defendant. . . must demonstrate that the plaintiff has misused his statutory privilege and distorted the intent of the legislation." *Grynberg*, 389 F.3d at 1058 n. 22.[3]

A number of courts have recognized alternatively that "the government's [prior] awareness of the circumstances constituting the alleged transgression makes any legal claim of fraud" frivolous or vexatious for the purposes of § 3730(d)(4). *U.S. ex rel. J. Cooper & Associates, Inc. v. Bernard Hodes Group, Inc.*, 422 F.Supp.2d 225, 239

---

[2] As the Relator notes, the Fourth Circuit has defined the term "frivolous" in other contexts as "patently without substance." *See Ogundipe v. Mukasey*, 541 F.3d 257, 259 (4th Cir. 2008).

[3] Furthermore, a showing of a relator's bad faith is not a prerequisite to an award under § 3730(d)(4). *Id.* at 1058 (citing *Houston v. Norton*, 215 F.3d 1172, 1174 (10th Cir. 2000)).

3

00000907

(D.D.C. 2006); *see also United States ex rel. Bane v. Breathe Easy Pulmonary Services, Inc.,* 2009 WL 1148632, at *5 (M.D.Fla. 2009) (noting that courts have recognized claims of fraud are vexatious "where the government's undisputed prior knowledge of information alleged to constitute fraud defeated any inference of a false claim"); *U.S. ex rel. J. Cooper & Associates, Inc. v. Bernard Hodes Group, Inc.*, 422 F.Supp.2d 225, 239 (D.D.C. 2006) ("The government's decision to award contracts to the defendants, despite its knowledge that the defendants were not small or disadvantaged businesses, negates any claim of fraud against the defendants."); *United States ex rel. Minna Ree Winer Children's Trust v. Regions Bank of Louisiana,* 1996 WL 264981, at *7 (E.D.La. 1996). In other words, and as was the case here, when a company works closely with the government, and the government is well aware of particular aspects of a company's practices, a claim for fraud premised on those practices proves groundless.

The Court finds that under each of the tests identified above concerning frivolity and vexatiousness under § 3730(d)(4), Ubl's claims were sufficiently baseless to warrant an award of attorneys' fees to the prevailing Defendants.

### ii. The Frivolous and Vexatious Nature of Ubl's Claims

In evaluating the frivolity of Ubl's claims, the Court is careful to first focus on what any relator must prove to establish an FCA inducement claim, namely: (1) that the defendant made objectively false statements to the Government; (2) that those statements were made with the requisite scienter; and (3) that those statements were material. *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008). Ubl's allegations proved consistently baseless, particularly with regard to the objective falsity and scienter elements required by any FCA claim. Puzzlingly, despite this Court's

4

December 4 Order establishing Ubl's liability for fees under § 3730(d)(4), Ubl's counsel devotes considerable space in their supplemental brief urging the Court to deny fees and costs altogether. Thus, though the Court declines to rehash the entire litigation in this Opinion, the Court will address a few of the more prevalent examples of the frivolous nature of Ubl's case for the sake of clarity.

First, with regard to Relator's claims concerning the "fraudulent" nature of IIF's labor categories, the testimony at trial, both by IIF employees and employees of the GSA and NGB, demonstrated that IIF's labor categories were reasonable. Moreover, as Defendants note, it appeared that it was NGB which "had the responsibility for determining whether a particular employee met the relevant qualifications." Def. First Brief at 9-10. Ubl proffered no basis for the notion that IIF's representations in those labor categories rose to the level of fraud, and if anything, the evidence submitted at trial proved that these definitions carried neither objective falsity nor the requisite intent necessary to substantiate an FCA claim. Relator's lawyers' deposition of Katherine Jocoy of the GSA should have alerted them to this defect well before trial.

Second, Relator's allegations regarding IIF's putative knowing submission of a fraudulent commercial price list was similarly baseless. Like Ms. Jocoy's deposition, Relator's lawyers' deposition of Ms. Van Tran of the GSA should have alerted Relator to the defects in his claim premised on the commercial price list, as the commercial price list is not typically relied upon and it is commonplace in the industry for a contracting company to list labor categories in their price lists even if they have not sold all of those categories previously.

00000909

Third, Relator claimed that IIF fraudulently represented that there were hourly rates "on" particular purchase orders in its IT Schedule application. The evidence at trial indicated that the work IIF did for Amerind implicated hourly rates even if the purchase orders failed to specifically list those rates. Even if this act were construed to be a mistake on IIF's part, elevating it further to the level of fraud is simply implausible. Rather, Ubl's claims proved to be premised on Ubl's own hypertechnical construction of whether IIF listed rates "on" purchase orders, rather than any objectively persuasive evidence.

Lastly, Relator's claims regarding the falsity of IIF's representations about TMCI's authorization of a 60-hour work week, the "negotiated" discounts with TMCI, and IIF's reporting of labor categories and rates it had sold to TMCI all proved groundless. At most, some of these allegations proved to be oversights on IIF's part, but Relater demonstrated no basis for the assertion that any of these acts rose to the level of knowingly fraudulent behavior.

Not only did his case result in an unfavorable jury verdict, Ubl's failings as a *qui tam* relator ran much deeper. The evidence submitted at trial overwhelmingly demonstrated that his groundless claims clearly had no reasonable chance of success. The evidence consistently indicated that Mr. Patten's extensive background in government service and his ongoing close relationship with the governmental entities with which IIF contracted were such that the government consistently knew exactly what it was paying for when it contracted with Defendants. Regardless of whatever technical defects might have existed in Defendants' contracting practices, there was never any basis for Ubl's allegations of *fraud* in this case. Rather, this case was "based entirely on [Ubl's] own personal opinion, supposition and speculation," which were all tellingly without support, rendering his claims clearly

6

00000910

frivolous or vexatious under § 3730(d)(4). *Minna Ree Winer Children's Trust,* 1996 WL 264981, at *7.

    iii. **Tailoring the Award**

    Noting that "a defendant is entitled [under § 3730(d)(4)] to attorneys' fees for only those particular claims of a plaintiff deemed to be frivolous," *Mikes v. Straus*, 274 F.3d 687, 705 (2d Cir. 2001), the Court's December 4 Order required Defendants to provide further briefing "isolating each frivolous claim and itemizing the amount of fees due, to the extent practicable, in defending those claims." Thus, the Court has endeavored to constrain the award of fees solely to those claims meeting the standard demanded by § 3730(d)(4), and exclusively for the time period during which it was apparent that Ubl's claims were unreasonably groundless.

    After receiving further briefing on the matter, it is apparent that the material elements of scienter and objective falsity were at issue in each of the claims premised on the three GSA schedule contracts, and defense counsel's efforts were accordingly directed with equal vigor at each of these claims. Thus, as Defendants argue, the efforts of defense counsel are not easily "fragmented" in such a way that this Court can further parse frivolous claims from the non-frivolous. Rather, as became exceedingly apparent throughout the course of trial, Ubl's allegations were equally baseless as to each of these accusations.

    The more salient means by which the Court limits its award of fees in this case is by limiting the time frame for which Defendants' fees may be awarded and tailoring the award so that Defendants are awarded fees solely undertaken in response to Ubl's frivolous claims. In aid of that goal, Defendants have voluntarily abstained from seeking

00000911

fees associated with: the motion to dismiss adjudicated during April and May of 2009, the subsequent settlement conference with Magistrate Judge Jones, defending against the motion to enforce the settlement agreement, the time spent pursuing their counterclaim against Ubl, and any time spent pursuing the present motion for attorneys' fees and expenses. Also, as noted, the Court's December 4 Order limited the applicable time period for an award of fees to March 24, 2009 through October 27, 2009.

Bearing in mind this narrowed scope, the Court now shifts to its analysis of the reasonableness of fees and expenses sought by Defendants under § 3730(d)(4).

### b. Reasonableness of the Fees Sought

The party seeking attorneys' fees bears the burden of demonstrating the reasonableness of the fees it seeks to recover. *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990). "In calculating an award of attorney's fees, a court must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Info. Servs.*, 560 F.3d 235, 243 (4th Cir. 2009) (citing *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008)). "In deciding what constitutes a 'reasonable' number of hours and rate, we have instructed that a district court's discretion should be guided by the following twelve factors:

> (1) the time and labor expended;
> (2) the novelty and difficulty of the questions raised;
> (3) the skill required to properly perform the legal services rendered;
> (4) the attorney's opportunity costs in pressing the instant litigation;
> (5) the customary fee for like work;
> (6) the attorney's expectations at the outset of the litigation;
> (7) the time limitations imposed by the client or circumstances;
> (8) the amount in controversy and the results obtained;
> (9) the experience, reputation and ability of the attorney;
> (10) the undesirability of the case within the legal community in which the suit arose;

8

00000912

(11) the nature and length of the professional relationship between attorney and client; and
(12) attorneys' fees awards in similar cases."

*Robinson*, 560 F.3d at 243-44 (citing *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n. 28

(4th Cir.1978) (adopting twelve factors set forth in *Johnson v. Ga. Highway Express,*

*Inc.*, 488 F.2d 714 (5th Cir.1974), *abrogated on other grounds by Blanchard v. Bergeron*,

489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989))).[4]

 Defendants seek to recover fees paid to: 1) the law firm of McKenna, Long, and

Aldridge ("McKenna"); 2) Mr. Robert Cynkar; 3) Mr. Christopher Kachouroff; and 4)

Mr. James Duane. In support of their motion for attorneys' fees, Defendants submit

affidavits from each of these defense attorneys, in addition to a declaration made by John

E. Coffey, a member of the Virginia Bar and partner at the law firm of Redmon, Peyton

& Braswell in Alexandria, Virginia. Mr. Coffey has over thirty years of experience in

complex commercial litigation in the Northern Virginia and metropolitan D.C. area and is

the former President of the Northern Virginia Chapter of the Federal Bar Association.

*i. Analysis of Johnson Factors*

(1) <u>The time and labor required</u>:

 As noted, this was a *qui tam* action filed under the auspices of the FCA, alleging

numerous instances of fraud on the government perpetrated by Defendants. Defending

this action required an understanding not only of the statutory framework of the FCA

under which this case proceeded, but also of the government contracting industry in

which the alleged fraud took place.

---

[4] In addition to these factors, an opposing party's ability to pay also has a bearing on a Court's fee assessment. *Chaplin v. DuPont Advance Fiber Sys.*, 303 F.Supp.2d. 766, 775-76 (E.D.Va. 2004). The Court keeps this additional factor in mind as it proceeds with its review of Defendants' fee request and endeavors to account for Relator's ability to pay in fixing the reasonable amount of fees to be awarded here.

00000913

Defending this case also required an extensive commitment of time and labor, and the time actually spent by defense counsel in defending this case was reasonable in light of this undertaking. As established in their affidavits in support of their Motion, defense counsel spoke to some sixty persons in connection with this case and worked to reduce over 900 multi-page trial exhibits, totaling over 20,000 pages, down to less than 100 exhibits for trial. Counsel also engaged in pretrial motions practice, in addition to taking *de bene esse* depositions. Counsel also engaged in the expected preparations for trial, including the preparation of arguments, witness outlines, and jury instructions.

Defendants seek $286,396.00 in fees paid to McKenna; $319,531.25 paid to Cynkar; $59,955.00 paid to Duane; and a flat fee of $75,000.00 paid to Kachouroff. Defendants, save Mr. Duane and Mr. Kachouroff,[5] do not appear to summarize the actual number of hours expended by each attorney on the case, but do offer their billing rates as follows: Cynkar states his billing rate is $625 per hour; Mr. Kachouroff states that his typical fee is $350 per hour (but agreed to a flat, non-contingent rate in this case); Mr. Duane billed $525 per hour; and McKenna billed Workmaster at $460 per hour and Ms. Susan Hill a first-year associate at McKenna at $285 per hour. Thus, in order to determine the number of hours worked by the other attorneys in this case, the Court divided the total fee charged by each attorney by the hourly rates mentioned above. This results in the following number of hours for each attorney: 511.25 hours by Mr. Cynkar, approximately 616 hours by Mr. Workmaster, and approximately 10 hours by Ms. Hill.[6]

---

[5] Mr. Coffey's declaration asserts that Mr. Duane worked 114.2 hours on this case, while Mr. Kachouroff worked "almost 1,700 hours."

[6] A chart submitted by Defendants indicates only a total amount of fees of $286,396.00 sought for all McKenna attorneys. Mr. Coffey's declaration indicates that Ms. Hill did "less than 10 hours of work" on this case. Thus, the Court subtracted ten hours worth of fees from the total amount to reach 616 hours for Mr. Workmaster.

10

00000914

As noted, Defendants have voluntarily reduced the number of hours for which they seek reimbursement, eliminating fees associated with, *inter alia*, litigating the motion to dismiss adjudicated during April and May of 2009 and defending against the motion to enforce the settlement agreement. The Court also endeavored to carefully review the itemized billing records submitted in support of Defendants' motion which list the specific types of work for which defense counsel billed their time. Though the majority of the time entries indicate reasonable and necessary activities, the Court finds that an excessive number of hours were dedicated to "meetings" and "conferences" with co-counsel. While conferences just before and during trial are certainly reasonable, earlier in a case they should be kept to a minimum. Thus, the Court finds that a ten percent (10%) reduction of the hours submitted by Defendants properly accounts for the unnecessary meetings which should not be taxed to Plaintiff. *See Jackson v. Estelle Place, LLC*, 2009 WL 1321506, at *4 (E.D.Va. May 8, 2009) ("Hours that are excessive, redundant, or unnecessary should not be included in a fee award.").

After factoring in this reduction, and given the nature of the case and the amount of work necessitated by some of counsel's late entry into the case, the amount of time and labor expended by counsel were reasonable. Therefore, this factor supports the reasonableness of the hours expended by Defendants' attorneys, though the Court will address in due course the billing rates charged by each attorney.

(2) The novelty and difficulty of the questions raised:

As mentioned in the analysis of Factor 1 above, this case was somewhat complex by virtue of the documentary evidence at play and the nature of the industry in which the alleged fraud transpired. The actual questions of law under the statutory framework of

11

the FCA were not anomalously complex, but understanding the nature of government contracting work requires an attorney with a degree of specialization in the field. Therefore, this factor supports the reasonableness of the hours expended by defense counsel and the corresponding billing rates established below.

(3) The skill required to perform the legal service properly:

As mentioned, several of the substantive issues presented in this case called for attorneys with a background in the field of government contracting, which Mr. Workmaster possesses. The remainder of counsel's skills were oriented toward the ability to successfully present and try a case at trial. As noted in their declarations, Messrs. Cynkar and Duane alone have approximately sixty years of trial and legal experience between them. Mr. Cynkar presents significant experience in litigating complex civil matters and Mr. Duane has significant experience in trial work and also presents a substantial expertise in the field of evidence, having researched, written, and taught on the subject extensively.

(4) The attorneys' opportunity costs in pressing the instant litigation:

This factor is perhaps most relevant in the present case to Mr. Kachouroff, who worked on this case under a fixed fee arrangement. On one hand, a fixed fee arrangement greatly reduces the opportunity cost borne by an attorney, as his income is guaranteed regardless of the disposition of the case. On the other hand, in his affidavit, Mr. Kachouroff attests to agreeing to take the case for a fixed fee of $100,000, which he now reduces to $75,000 for purposes of the time period established above, and states that he dedicated the "majority" of his time and attention to this case. He further states that he interviewed approximately 60 people in preparation of the case and reviewed over 20,000

12

00000916

pages of documents. Mr. Coffey's declaration also indicates that Mr. Kachouroff worked

nearly 1,700 hours on this case between March 24, 2009 and October 27, 2009. The

Court takes the foregoing as a significant indication of the extent to which Mr.

Kachouroff's involvement in this case worked to the exclusion of other potential business

at his firm. A similar logic applies to the remainder of Defendants' attorneys. Each

billed at an hourly rate, and thus were guaranteed payment for the time they expended

regardless of the outcome of the trial. Nonetheless, the Court notes that the extensive

time spent by counsel, particularly on the eve of trial, potentially worked to the exclusion

of addressing other matters.

(5) <u>The customary fee for like work</u>:

     As noted, Defendants seek an award of fees at the following hourly rates: $625

per hour for Mr. Cynkar; $525 per hour for Mr. Duane; $460 per hour for Mr.

Workmaster; and $285 per hour for Ms. Susan Hill a first-year associate at McKenna.

Mr. Kachouroff was retained on a flat, non-contingent rate in this case.

     In order to carry its burden on this factor, Defendants must present the Court with

adequate evidence of the prevailing rates in the relevant market. *Plyler*, 902 F.2d at 277.

"In addition to the attorney's own affidavits, the fee applicant must produce satisfactory

specific evidence of the prevailing market rates in the relevant community for the type of

work for which he seeks an award." *Id.* (internal quotation marks omitted). As the

Fourth Circuit reaffirmed in *Rum Creek Coal Sales v. Caperton*, 31 F.3d 169 (4th Cir.

1994), "[t]he relevant market for determining the prevailing rate is ordinarily the

00000917

community in which the court where the action is prosecuted sits." *Id.* at 175 (citing

*National Wildlife Federation v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988)).[7]

In this case, Defendants rely on several sources of support for the rates asserted:

1) the affidavits of their own attorneys; 2) the declaration of Mr. Coffey; and 3) the

"Adjusted Laffey Matrix."[8]

As noted, merely relying upon an attorney's own affidavit is insufficient to

establish an acceptable market rate for attorneys' fees under this factor. However, the

Court does look to the rates an attorney has charged in the past and information in the

affidavits regarding their relevant experience as helpful information at the outset of this

inquiry.

As to Mr. Coffey's declaration, among the accepted types of evidence which are

satisfactory to establish the prevailing market rates are "affidavits of other local lawyers

who are familiar both with the skills of the fee applicants and more generally with the

type of work in the relevant community." *Robinson*, 560 F.3d at 245. As noted, Mr.

Coffey has extensive experience in litigating complex civil matters in this area. He

attests to having the opportunity throughout his career to observe the rates charged by

"DC area" law firms in complex civil litigation. He further bases his opinion on his

experience in the same area of practice and on his discussions with attorneys at other

complex civil litigation firms in the area. He also attests to becoming familiar with the

work and skill of each of the defense attorneys by reviewing their work in this case. In

---

[7] Though the Fourth Circuit also noted that rates from other markets may be considered when a case is of such complexity or difficulty that no adequate local counsel is available, indicating that the party's choice of an out-of-market attorney was reasonable. *Id.*

[8] The "Laffey Matrix," is statement of market attorneys' fee rates for the Washington-Baltimore area published and periodically updated by the United States Attorney's Office for the District of Columbia. *See Robinson*, 560 F.3d at 244. The Laffey Matrix "is not binding upon the United States District Court for the Eastern District of Virginia," *Robinson*, 560 F.3d at 244 (citations omitted), but can provide a useful cross reference for the Court.

00000918

Mr. Coffey's opinion, the rates asserted by defense counsel "fall well within the prevailing market rates in the Washington metropolitan area."

However, Mr. Coffey's broad reference to the prevailing rates in the "Washington metropolitan area" raises concerns about the accuracy of his declaration as it applies to this market. As noted, the relevant market for determining the appropriate prevailing rate for fees is the "community in which the court where the action is prosecuted sits," *Rum Creek,* 31 F. 3d at 175, indicating that greater emphasis should be placed on the prevailing rates specifically in Northern Virginia rather than then entire "Washington metropolitan area." In doing so, "courts in this district have repeatedly recognized that hourly rates charged in Washington, D.C. are usually higher than hourly rates charged in the Eastern District of Virginia." *Jackson,* 2009 WL 1321506 at *3 (citing *Am. Canoe Ass'n v. EPA,* 138 F.Supp.2d 722, 740-42 (E.D.Va.2001)). Thus, an award at the full hourly rate recommended by Mr. Coffey is unsupported given the Court's obligation to focus on the proper relevant market.

Finally, regarding the Laffey Matrix, and as Mr. Coffey notes, there are actually two Laffey Matrixes in existence, one published by the United States Attorney's Office for the District of Columbia and one known as the "Adjusted Laffey Matrix."[9] Mr. Coffey argues that the latter is the more accurate representation of prevailing market rates in the Northern Virginia/Washington, D.C. area.[10] The two Matrixes are provided below:

---

[9] The Court will refer to the former as the "Unadjusted" Laffey Matrix and the latter as the "Adjusted" Laffey Matrix.

[10] Though Mr. Coffey is correct that a recent Fourth Circuit case references this "Adjusted Laffey Matrix," *Newport News Shipbuilding and Dry Dock Co. v. Holiday,* 591 F.3d 219, 229 n.11 (4th Cir. 2009), the Fourth Circuit was likewise careful to note that "the Laffey matrix is a useful starting point to determine fees, not a required referent." *Id.* at 229.

15

00000919

"Unadjusted" Laffey Matrix

| | Years | 03-04 | 04-05 | 05-06 | 06-07 | 07-08 | 08-09 |
|---|---|---|---|---|---|---|---|
| Experience | | | | | | | |
| 20+ years | | 380 | 390 | 405 | 425 | 440 | 465 |
| 11-19 years | | 335 | 345 | 360 | 375 | 390 | 410 |
| 8-10 years | | 270 | 280 | 290 | 305 | 315 | 330 |
| 4-7 years | | 220 | 225 | 235 | 245 | 255 | 270 |
| 1-3 years | | 180 | 185 | 195 | 205 | 215 | 225 |
| Paralegals & Law Clerks | | 105 | 110 | 115 | 120 | 125 | 130 |

"Adjusted" Laffey Matrix

| | | EXPERIENCE | | | | |
|---|---|---|---|---|---|---|
| Year | Paralegal/ Law Clerk | 1 to 3 Years | 4 to 7 Years | 8-10 Years | 11-19 Years | 20 + Years |
| 6/01/09- 5/31/10 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | $130 | $239 | $293 | $423 | $476 | $574 |

The Fourth Circuit, in *Grissom*, looked to the Unadjusted Laffey Matrix in evaluating fees in the Northern Virginia area and recognized that although the Matrix has been considered a "useful starting point" by some courts in evaluating fee requests, it is ultimately "insufficient to carry [the moving party's] burden of proof" on its own. 549 F.3d at 323.[11]  Rather, the *Grissom* court adjusted the applicable market rates as indicated in the table provided below:

---

[11] Furthermore, reliance on the Laffey Matrix is also constrained by the fact that, as recognized above, hourly rates charged in Washington, D.C. are usually higher than those rates charged in this District. *Jackson*, 2009 WL 1321506 at *3.

16

00000920

| Title | Years of Experience | Hourly Rate |
|---|---|---|
| Partner | 18-19+ | $335.00-$380.00 |
| Associate | 6-7 | $250.00 |
| Associate | 5-6 | $250.00 |
| Associate | 2-3 | $200.00 |
| Associate | 1 | $180.00 |

*Grissom*, 549 F.3d at 323 (hereafter the "Grissom Table").

As this Court recently noted, *Grissom* provides a useful benchmark for the present case, as it is a recent Fourth Circuit decision (2008) involving complex civil litigation and reputable attorneys practicing in the Northern Virginia market. Accordingly, the Court makes the following findings with respect to each attorney bearing in mind each of these resources, but giving the greatest heed to the Fourth Circuit's guidance in *Grissom*.

    i.    <u>Mr. Cynkar</u>

As noted, Defendants seek fees in the amount of $625 per hour for Mr. Cynkar's services. Mr. Cynkar has over thirty years of experience in commercial litigation. According to the Unadjusted Laffey Matrix, the hourly rate for a partner with over twenty years of experience is $465 for the applicable period of time in this case, while the Adjusted Matrix puts that figure at $686. Presumably, the Grissom Table would put Mr. Cynkar's hourly rate at $380 or more. Clearly, an hourly rate of $625 per hour exceeds both the Unadjusted Laffey Matrix and the Grissom Table. Though the Court gives great deference to the considered opinion of Mr. Coffey, a figure of $625 per hour presents too significant a departure from the guidance presently available to the Court. As such, and in consideration of the record presently in front of the Court, an hourly rate of $400 is appropriate for Mr. Cynkar's time.

00000921

ii.    Mr. Duane

Next, Defendants seek fees in the amount of $525 per hour for Mr. Duane's services.  Though the exhibits submitted by Defendants do not indicate the number of years of experience Mr. Duane has spent in practice, the Court notes that Mr. Duane's CV indicates that he entered private practice in 1987 and moved to academia from 1991 through the present.  Accordingly, the Court is confident that Mr. Duane falls in a similar category of over twenty years of experience, indicating $465 under the Unadjusted Laffey Matrix, $686 under the Adjusted Matrix, and $380 on the Grissom Table.  Given the foregoing analysis, the Court finds that a rate of $400 per hour is also appropriate for the fees incurred for Mr. Duane's work in the case.

iii.    Mr. Workmaster and Ms. Hill

Defendants seek fees in the amount of $460 per hour for Mr. Workmaster and $285 per hour for Ms. Susan Hill.  Mr. Workmaster has almost ten years of experience, "including significant commercial litigation experience," while Ms. Hill is a first-year associate.  The Grissom Table leaves a gap regarding attorneys at the experience level presented by Mr. Workmaster. *See Grissom*, 549 F.3d at 323 (gap between Associate with six to seven years of experience and Partner with eighteen to nineteen years of experience).  However, after analyzing the rate at which the hourly rates in the Grissom Table increase in relation to years of experience, the Court finds that a billing rate of $360 is reasonable for Mr. Workmaster.  The two Laffey Matrixes and the Grissom Table puts the applicable rate for an attorney with Ms. Hill's experience between $180 and $285 per hour.  In light of the foregoing, the Court deems $200 to be a reasonable hourly fee for Ms. Hill's services.

18

00000922

iv.   Mr. Kachouroff

Though Mr. Kachouroff was compensated in this case on a flat-fee basis ($75,000 for the applicable period of time), the Court briefly addresses the reasonableness of his fee in this case.  Mr. Kachouroff attests that he regularly bills clients at a rate of $ 350-400 per hour.  According to Mr. Coffey's declaration, Mr. Kachouroff worked over 1,700 hours on this case between March 24, 2009 and October 27, 2009, which equates to an hourly rate of only approximately $44 per hour.  Given the foregoing discussion, the Court deems Mr. Kachouroff's fee to be reasonable.

To summarize, the Court provides the following table indicating the reasonable hourly rate it awards for each defense attorney in this case:

**TABLE 1**

| Title | Years of Experience | Hourly Rate |
|---|---|---|
| Mr. Cynkar | 30+ | $ 400 |
| Mr. Duane | 20+ | $ 400 |
| Mr. Workmaster | 10 | $ 360 |
| Ms. Hill | 1 | $ 200 |
| Mr. Kachouroff | 10 | N/A |

 (6) The attorneys' expectations at the outset of the litigation:

This factor provides no additional support for an award of attorneys' fees, since the fee arrangement was fixed for each attorney, either on an hourly or flat-rate business.

(7) The time limitations imposed by the client or circumstances:

The record contains no evidence that Defendants' attorneys were under abnormal time limitations beyond those typically imposed in this Division.  Though the Court would note that a majority of Defendants' "trial" team began working in earnest around

00000923

the time the $8.9 settlement fell through, there was nothing exceptional about client demands or the circumstances of this case which bear significant relevance under this factor. Thus, this factor provides no additional guidance regarding an award of attorneys' fees.

(8) The amount in controversy and the results obtained:

"[T]he degree of success obtained by the plaintiff is the 'most critical factor' in determining the reasonableness of a fee award." *Lilienthal v. City of Suffolk*, 322 F. Supp. 2d 667, 675 (E.D. Va. 2005) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436-437 (1983)). This case presented significant risks for Defendants. The Amended Complaint sought damages of $140 million, potentially trebled under the FCA. Further, IIF ran the risk of debarment, which would have rendered it incapable of bidding on and receiving further government contracts, a death knell for a company in the government contracting industry. Thus, as Defendants argue, this case amounted to a "bet the company" litigation.

Given the high stakes of the case from the outset of trial, the results obtained by defense counsel were a significant success. As noted, the jury rendered a verdict in favor of Defendants on all counts, exposing Defendants to no liability whatsoever for the allegations put forth in the Amended Complaint. Given this case's procedural posture, which included a near $8.9 million settlement, the result obtained by defense counsel certainly proved their value to their client. As such, this factor strongly weighs in favor of the award of fees, as reduced under factors 1 and 5 above. *See* § II.b.i.(5), *supra*.

(9) The experience, reputation and ability of the attorney:

20

00000924

As mentioned above in the Factor 5 analysis, Defendants' attorneys, with the exception of Ms. Hill, are all experienced in the field of government contracting or trial work. Messrs. Cynkar and Duane alone have approximately sixty years of trial and legal experience between them. Mr. Kachouroff and Mr. Workmaster have approximately eight and ten years of relevant experience, respectively. This experience supports a finding that the rates charged by these attorneys, as adjusted, were reasonable.

(10) <u>The undesirability of the case within the legal community in which the suit arose</u>:

This factor provides no additional support for an award of attorneys' fees, as Defendants do not contend that this case was undesirable.

(11) <u>The nature and length of the professional relationship between attorney and client</u>:

This factor applies most pertinently to Mr. Kachouroff, as he is the only attorney with a prior relationship with Defendants. Mr. Kachouroff has a long-standing relationship with IIF and Mr. Patten personally. Mr. Kachouroff asserts that this relationship compelled him to take the case on a flat fee basis, which, as discussed above, amounted to a low fee when broken down by the number of hours actually worked. As Mr. Coffey notes, the remainder of Defendants' attorneys had no prior relationship with IIF or Mr. Patten, and their retention and fees were negotiated in an arm's length manner.

(12) <u>Attorneys' fees awards in similar cases</u>:

Neither party submits case law from similar cases for the Court's consideration under this factor. Nonetheless, the Court endeavored to locate similar cases which analyzed an award of attorneys' fees in similar circumstances. In one such case, *U.S. ex rel. Vuyyuru v. Jadhav*, 2007 WL 2471087 (E.D.Va. August 237, 2007), *aff'd* 555 F.3d 337 (4th Cir. 2009), this District, albeit in the Richmond Division, awarded attorneys'

21

00000925

fees in a False Claims Act case under § 3730(d)(4). In that case, the Court found, and the Fourth Circuit later confirmed, that rates of $310 and $400 per hour were reasonable. The Court finds this to be strong confirmation of the reasonableness of the fees awarded in the instant case. *See also Quantum Systems Integrators, Inc. v. Sprint Nextel Corp.* 2009 WL 3423848, at *5 (E.D.Va. October 16, 2009)(finding rate of $300 per hour reasonable for attorneys with fourteen to twenty-eight years of experience); *Alford v. Martin & Gass, Inc.*, 2009 WL 2447936, at *4 (E.D. Va. August 3, 2009 (awarding fees at range of $60-$350 per hour); *Jackson*, 2009 WL 1321506, at *3 (awarding rates of $350 per hour for partners with between eleven and nineteen years experience; $170 for an associate with one to three years of experience; and $60 for a legal assistant); *Burns v. Anderson*, 2006 WL 2456372, at *9 (E.D.Va. August 22, 2006)(prevailing party sought rates ranging from $664 to $695 per hour for partners in major firm which the court reduced to $265 to $278 per hour).

Therefore, this factor also supports the reasonableness of the attorneys' fees charged by Defendants' attorneys, as reduced above.

Balancing:

Reviewing the Court's analysis above of the *Johnson* factors, numbers 1-5, 8, 9, 11, and 12 support the reasonableness of the fee award here. Factors 6, 7, and 10 provide no additional support in Defendants' favor. However, as discussed, factor 5 supports a reduction of the hourly rate awarded to each attorney, as the rates proffered exceed the customary fees in this jurisdiction. In sum, consideration of the *Johnson* factors supports the reasonableness of the fee award here, as adjusted.

*ii. Lodestar figure*

22

"Guided by [the *Johnson*] factors, the court should determine how many hours

were reasonably spent on the litigation and the rate at which that work should be

compensated." *Toolchex, Inc. v. Trainor*, 2009 WL 224486 at *6 (E.D. Va. July 24,

2009) (citing *McDonnell v. Miller Oil Co.,* 134 F.3d 638, 640 (4th Cir.1998)). "On the

basis, the court can determine a 'lodestar figure,' which may be adjusted further." *Id.*

Table 1 provides a summary of the hours billed, which the Court has already found

reasonable, at the reasonable rates established above, as follows:

**TABLE 2**

| Date | Hours Worked[12] | Rate | Total |
|------|------------------|------|-------|
| 03/24/2009 – 10/27/2009 | Robert Cynkar = 460.125 | $400/hr | $184,050 |
| | James Duane = 102.78 | $400/hr | $41,112 |
| | Christopher Kachouroff = ~1,700 | - | $75,000 |
| | Jason Workmaster = 554.40 | $360/hr | $199,584 |
| | Susan Hill = 9.00 | $200/hr | $1,800 |
| | **Total Hours = 1,251 @ hourly rate/ 2,951 total** | | **Total Fees = $501,546** |

*iii. Lodestar Reduction*

   In many cases, the Court is to consider a reduction of the fees awarded based

upon the degree of success obtained in the litigation and should reduce an award to

account for any unsuccessful claims. *See Lilienthal*, 322 F. Supp. 2d at 675 (quoting

*Hensley,* 461 U.S. at 436-37.) ("[b]ecause the degree of success obtained by the plaintiff

---

[12] The figures in the "Hours Worked" column reflect the ten percent (10%) reduction in recoverable hours discussed above. *See supra* at § ll(b)(i)(1).

00000927

is the 'most critical factor' in determining the reasonableness of a fee award, the district court 'may simply reduce the award to account for the limited success.'"). However, given the Court's discussion above in *Johnson* factor 8, the Court finds no basis for a further reduction of the award. Defense counsel attained a complete victory for their client, warranting no reduction of the fees beyond those already noted.

### c. Expenses

Defendants also seek reimbursement $5,201.97 in expenses. These expenses all relate to defense counsel's stay at the Westin Hotel in Alexandria, in close proximity to the courthouse, from October 16, 2009 through October 28, 2009.[13] Defense counsel argues that although Messrs. Workmaster and Cynkar have offices in Washington, D.C., the use of a central location in Alexandria for trial preparation was necessary and actually saved expenses throughout trial. Counsel do not seek expenses for food or telephone usage at the hotel, and thus only seek reimbursement for a portion of the Westin bill submitted as Defendants' Exhibit I, which results in a $1,872.65 deduction from the bill's total of $7,074.62, equaling the $5,201.97 sought by Defendants.

After careful consideration, the Court does not find these expenses to be reasonable. Given that several defense attorneys have offices in reasonably close proximity to the courthouse, the use of the Westin was not reasonably necessary and counsel had less expensive alternatives at their disposal. Thus, the Court declines to award the $5,201.97 in expenses sought by Defendants.

---

[13] Defendants' Exhibit I is an itemized bill from the Alexandria Westin, reflecting charges from October 16, 2009 through October 28, 2009, categorized as charges for "Room & Tax," "Food and Bev.," "Telephone," "Misc." (which Defendants identify as parking charges), and "Other" (which Defendants identify as occupancy and tourism taxes).

24

00000928

## III.    Conclusion

For the foregoing reasons, the Court hereby awards Defendants $501,546.00 in attorneys' fees and denies the expenses sought by Defendants.

An appropriate order shall issue.

Alexandria, Virginia
April 28, 2010

/s/
Liam O'Grady
United States District Judge

25

00000929

AO 133   (Rev. 12/09) Bill of Costs

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| Brian Burke, Plaintiff | ) |
| | ) |
| v. | ) Case No.: 1:08-cv-00364-DAR |
| | ) |
| Record Press, Inc., Defendant | ) |
| | ) |

## BILL OF COSTS

Judgment having been entered in the above entitled action on ___06/13/2013___ against ___Brian Burke, Plainitff___ ,
<br>                                                                                          *Date*

the Clerk is requested to tax the following as costs:

| | |
|---|---|
| Fees of the Clerk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ _____ |
| Fees for service of summons and subpoena . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ |
| Fees for printed or electronically recorded transcripts necessarily obtained for use in the case . . . . . | 2,192.85 |
| Fees and disbursements for printing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ |
| Fees for witnesses *(itemize on page two)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50.00 |
| Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ |
| Docket fees under 28 U.S.C. 1923 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30.00 |
| Costs as shown on Mandate of Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ |
| Compensation of court-appointed experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ |
| Compensation of interpreters and costs of special interpretation services under 28 U.S.C. 1828 . . . . . | _____ |
| Other costs *(please itemize)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ |
| TOTAL | $ 2,272.85 |

*SPECIAL NOTE:* Attach to your bill an itemization and documentation for requested costs in all categories.

### Declaration

I declare under penalty of perjury that the foregoing costs are correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed.  A copy of this bill has been served on all parties in the following manner:

☐ Electronic service          ☐ First class mail, postage prepaid

☑ Other: ___See attached Certificate of Service___

s/ Attorney: ___John William Lomas, Jr.___

Name of Attorney: ___John William Lomas, Jr., McKenna Long & Aldridge, LLP___

For: ___Defendant Record Press, Inc.___          Date: ___07/03/2013___
<br>       *Name of Claiming Party*

### Taxation of Costs

Costs are taxed in the amount of _____ and included in the judgment.

By: _____

| | | |
|---|---|---|
| *Clerk of Court* | *Deputy Clerk* | *Date* |

00000930

AO 133 (Rev. 12/09) Bill of Costs

# UNITED STATES DISTRICT COURT

| Witness Fees (computation, cf. 28 U.S.C. 1821 for statutory fees) | | | | | | | |
|---|---|---|---|---|---|---|---|
| NAME , CITY AND STATE OF RESIDENCE | ATTENDANCE | | SUBSISTENCE | | MILEAGE | | Total Cost Each Witness |
| | Days | Total Cost | Days | Total Cost | Miles | Total Cost | |
| Calvin Adgerson, 2905 Upland Ave., Forestville, MD 20747 | 1 | 40.00 | | | 20 | 10.00 | $50.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | TOTAL | $50.00 |

## NOTICE

**Section 1924, Title 28, U.S. Code (effective September 1, 1948) provides:**
"Sec. 1924. Verification of bill of costs."
    "Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed."

**See also Section 1920 of Title 28, which reads in part as follows:**
    "A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree."

**The Federal Rules of Civil Procedure contain the following provisions:**
**RULE 54(d)(1)**

Costs Other than Attorneys' Fees.
    Unless a federal statute, these rules, or a court order provides otherwise, costs — other than attorney's fees — should be allowed to the prevailing party. But costs against the United States, its officers, and its agencies may be imposed only to the extent allowed by law. The clerk may tax costs on 14 day's notice. On motion served within the next 7 days, the court may review the clerk's action.

**RULE 6**

(d) Additional Time After Certain Kinds of Service.

    When a party may or must act within a specified time after service and service is made under Rule5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a).

**RULE 58(e)**

Cost or Fee Awards:

    Ordinarily, the entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees. But if a timely motion for attorney's fees is made under Rule 54(d)(2), the court may act before a notice of appeal has been filed and become effective to order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59.

Case 1:08-cv-00364-DAR   Document 95-1   Filed 07/03/13   Page 1 of 5

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

*BURKE v. RECORD PRESS*
*Civil Action No. 1:08-cv-00364-DAR*

**ATTACHMENT TO BILL OF COSTS**
**ITEMIZED TRANSCRIPT COSTS**

| Vendor/Court Reporter | Transcript | Transcript Cost | Exhibit Cost | Shipping Cost | Total |
|---|---|---|---|---|---|
| Henderson Legal Services | Deposition of Hugh Wilmot | $ 277.50 | $ 19.25 | $ - | $ 296.75 |
| Henderson Legal Services | Deposition of Brian Burke* | $ 1,044.00 | $ 38.25 | $ 25.00 | $ 1,107.25 |
| Rebecca Stonestreet | Trial Transcript Morning Session | $ 391.00 | | | $ 391.00 |
| Wendy C. Richard | Trial Transcript Afternoon Session | $ 397.85 | | | $ 397.85 |
| **Total** | | | | | **$ 2,192.85** |

*To avoid disputes, Record Press has not included costs for rough transcripts or the video recording of the Brian Burke deposition.

**Henderson Legal Services, Inc.**

An Affiliate of National Depo
1015 15th Street, NW , Suite 525
Washington, DC 20005
Tel: 202-220-4158
Fax: 202-220-4162

| | | | |
|---|---|---|---|
| **Bill To:** | John W. Lomas, Esq. | **Invoice #:** | DC30655 |
| | McKenna, Long & Aldridge | **Invoice Date:** | 06/04/2010 |
| | 1900 K Street NW | **Balance Due:** | $ 0.00 |
| | Washington, DC 20006 | | |

| | |
|---|---|
| **Case:** Burke v. Record Press | **Client Billing** |
| **Job #:** 11961  \|  Job Date: 5/25/2010  \|  Delivery:  Expedited | **Matter Number** |
| **Billing Atty: John W. Lomas, Esq.** | |
| **Location:** McKenna, Long & Aldridge | |
| 1900 K Street NW \| Conf Room 2-B \| Washington, DC 20006 | |
| **Sched Atty:** William O'Brien, Esq. | |

| Item | Witness | Description | Units | Qty | Price | Amount |
|---|---|---|---|---|---|---|
| 1 | Hugh Wilmot, Jr. | Transcript - copy/copies | Page | 111.00 | $2.50 | $277.50 |
| 2 | | Exhibits | Per page | 77.00 | $0.25 | $19.25 |
| 3 | Brian Burke | Transcript - Original & 1 copy | Page | 174.00 | $6.00 | $1,044.00 |
| 4 | | Transcript - Rough ASCII | Page | 174.00 | $1.55 | $269.70 |
| 5 | | Exhibits | Per page | 153.00 | $0.25 | $38.25 |
| 6 | | Video - setup and 1st hour | 1 | 1.00 | $275.00 | $275.00 |
| 7 | | Video - Additional hours | Hour | 3.50 | $95.00 | $332.50 |
| 8 | | Video-Burn to DVD | Hour | 2.50 | $25.00 | $62.50 |
| 9 | | Shipping & handling | Package | 1.00 | $25.00 | $25.00 |

Make check payable to:  **National Depo**

☐ Visa  ☐ MC  ☐ Amex  ☐ Discover  ☐ Lock Box

_____          _____
**Credit Card #**                          **Exp. Date**

SIGNATURE (AS IT APPEARS ON CREDIT CARD)

PRINT NAME (AS IT APPEARS ON CREDIT CARD)

DAYTIME PHONE

*PAID*

**Invoice #: DC30655**
**Job #:  11961**
**Invoice Date: 06/04/2010**

**Balance : $ 0.00**

Please remit payment to:
**National Depo**
**P.O. Box 404743**
**Atlanta, Ga 30384-4743**

Page 1 of 2

## Henderson Legal Services, Inc.

An Affiliate of National Depo
1015 15th Street, NW , Suite 525
Washington, DC 20005
Tel: 202-220-4158
Fax: 202-220-4162

| | |
|---|---|
| **Bill To:** John W. Lomas, Esq.<br>McKenna, Long & Aldridge<br>1900 K Street NW<br>Washington, DC 20006 | **Invoice #:** DC30655<br>**Invoice Date:** 06/04/2010<br>**Balance Due:** $ 0.00 |

| | |
|---|---|
| **Case:** Burke v. Record Press<br>**Job #:** 11961  \|  Job Date: 5/25/2010  \|  Delivery: Expedited<br>**Billing Atty: John W. Lomas, Esq.**<br>**Location:** McKenna, Long & Aldridge<br>              1900 K Street NW \| Conf Room 2-B \| Washington, DC 20006<br>**Sched Atty:** William O'Brien, Esq. | **Client Billing<br>Matter Number** |

| Item | Witness | Description | Units | Qty | Price | Amount |
|---|---|---|---|---|---|---|
| **Notes:** | Original transcript of Burke, expedited 3 business day delivery.<br>Transcript copy of Wilmot, regular delivery. | | | | **Invoice Total:**<br>**Payment:**<br>**Credits:** | **$2,343.70**<br>($2,343.70) |
| Fed. Tax ID: 20-3132569 | | Term: Due Upon Receipt | | | **Balance Due:** | **$0.00** |

TERMS:   Payable upon receipt. Accounts unpaid after 90 days agree to pay all collection costs, including reasonable attorney's fees.
Contact us to correct payment errors. No adjustments or refunds will be made after 90 days.



| | |
|---|---|
| Make check payable to:    **National Depo**<br><br>☐ Visa ☐ MC ☐ Amex   ☐ Discover ☐   Lock Box<br><br><br>⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯     ⎯⎯⎯⎯⎯⎯⎯<br>Credit Card #                    Exp. Date<br><span style="font-size:small">SIGNATURE (AS IT APPEARS ON CREDIT CARD)</span><br><br><span style="font-size:small">PRINT NAME (AS IT APPEARS ON CREDIT CARD)</span><br><br><span style="font-size:small">DAYTIME PHONE</span> | **Invoice #: DC30655**<br>**Job #: 11961**<br>**Invoice Date: 06/04/2010**<br><br>**Balance : $ 0.00**<br><br><br>**Please remit payment to:**<br>**National Depo**<br>**P.O. Box 404743**<br>**Atlanta, Ga 30384-4743** |

Page 2 of 2

Record Press  30620.0001

AO44
(Rev 11/07)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INVOICE NO: 20080401

**MAKE CHECKS PAYABLE TO:**

John Lomas
McKenna Long & Aldridge, LLP
1900 K Street, NW
Washington, DC 20006

Phone: (202) 496-7483

svalentine@mckennalong.com

REBECCA STONESTREET
Official Court Reporter
333 Constitution Avenue, NW
RM 6511
Washington, DC 20001

Phone: (202) 354-3249

Tax ID: 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
kingreporter2@verizon.net

| | DATE ORDERED: | DATE DELIVERED: |
|---|---|---|
| ☐ CRIMINAL   ☒ CIVIL | 02-16-2011 | 02-25-2011 |

Case Style: CA 08-364, Brian Burke v Record Press, Inc.

```
Transcript of bench trial, morning session, held on February 14, 2011
before Magistrate Judge Robinson.
```

| CATEGORY | ORIGINAL | | | 1ST COPY | | | 2ND COPY | | | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|---|---|---|
| | PAGES | PRICE | SUBTOTAL | PAGES | PRICE | SUBTOTAL | PAGES | PRICE | SUBTOTAL | |
| Ordinary | | | | | | | | | | |
| 14-Day | 92 | 4.25 | 391.00 | | | | | | | 391.00 |
| Expedited | | | | | | | | | | |
| Daily | | | | | | | | | | |
| Hourly | | | | | | | | | | |
| Realtime | | | | | | | | | | |

| Misc. Desc. | MISC. CHARGES: | |
|---|---|---|
| | TOTAL: | 391.00 |
| | LESS DISCOUNT FOR LATE DELIVERY: | |
| | TAX (If Applicable): | |
| | LESS AMOUNT OF DEPOSIT: | |
| | TOTAL REFUND: | |
| Date Paid:     Amt: | TOTAL DUE: | $391.00 |

**ADDITIONAL INFORMATION**
· Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the ordinary delivery rate.

**CERTIFICATION**
I certify that the transcript fees charged and page format used comply with the requirements of this court and the Judicial Conference of the United States.

SIGNATURE

DATE    02-25-2011

(All previous editions of this form are
cancelled and should be destroyed)

PDF created with pdfFactory trial version www.pdffactory.com

00000935

AO 44 (Rev. 03/08)

# UNITED STATES DISTRICT COURT

for the District of Columbia

| INVOICE | NUMBER 03-16-11 |
|---|---|

| | |
|---|---|
| TO: Henry Kogan<br>McKenna Long & Aldridge, LLP.<br>1900 K-Street n.w.<br>Washington DC. 20006<br><br>PHONE:<br>FAX: 202-496-7426 | MAKE CHECK PAYABLE TO:<br>Wendy C. Ricard<br>333 Constitution Avenue, N.W.<br>#6718<br>PHONE: Washington DC. 20001<br>202-354-3111 |

| ☐ CRIMINAL  ☑ CIVIL | DATE ORDERED 2-16-11 | DATE DELIVERED 3-16-11 |
|---|---|---|

IN THE MATTER OF (CASE NUMBER AND TITLE)
Burke v. Record Press    08-CV-00364
                          08-CV-00364

| CATEGORY | ORIGINAL | | | 1ST COPY | | | ADDITIONAL COPIES | | | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|---|---|---|
| | PAGES | PRICE @ | SUB TOTAL | PAGES | PRICE @ | SUB TOTAL | PAGES | PRICE @ | SUB TOTAL | |
| Ordinary | 109 | 3.65 | | | | | | | | 397.85 |
| 14-Day | | | | | | | | | | |
| Expedited | | | | | | | | | | |
| Daily | | | | | | | | | | |
| Hourly | | | | | | | | | | |
| Realtime | | | | | | | | | | |

| For proceedings on (Date): 2-14-11 (pm) | | |
|---|---|---|
| | TOTAL | 397.85 |
| | LESS DISCOUNT FOR LATE DELIVERY | |
| | LESS TAX (If Applicable) | |
| | LESS AMOUNT OF DEPOSIT | |
| | TOTAL REFUNDED | |
| | TOTAL DUE | 397.85 |

## ADDITIONAL INFORMATION

Full price may be changed only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within (7) calendar days, payment would be at the 14-day *delivery* rate, and if not completed and delivered within 14 days, payment would be at the ordinary delivery rate.

## CERTIFICATION

I certify that the transcript fees charged and page format used comply with the requirements of this court and the Judicial Conference of the United States.

| SIGNATURE OF OFFICIAL COURT REPORTER Wendy C. Ricard | DATE 3-16-11 |
|---|---|

DISTRIBUTION:    TO PARTY (2 copies - 1 to be returned with payment)    COURT REPORTER    COURT REPORTER SUPERVISOR

00000936

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

*BURKE v. RECORD PRESS*
*Civil Action No. 1:08-cv-00364-DAR*


## ATTACHMENT TO BILL OF COSTS
## ITEMIZED DOCKET FEES

| Category | Amount |
|---|---|
| Trial/Final Hearing | $20 |
| Discontinuance of Civil Action | $5 |
| Motion for Judgment | $5 |
| **Total** | **$30** |

00000937

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, ex rel.<br>BRIAN BURKE,<br><br>           PLAINTIFF,<br><br>     v.<br><br><br>RECORD PRESS, INC.,<br><br>           DEFENDANT | CASE NO. 1:08-cv-364(DAR) |

**PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT**


     Plaintiff, Relator, Brian Burke ("Mr. Burke"), by and through its undersigned counsel, respectfully submits this Motion to Alter or Amend Judgment.  In support thereof Plaintiff incorporates by this reference the facts and arguments contained in Brian Burke's affidavit attached hereto and to Morris Gocial's affidavit attached hereto.


WHEREFORE:  Plaintiff respectfully requests that this honorable
Court grant this Motion, and enter judgment in favor of Plaintiff
in this matter, and award such other an further relief as this
Court deems appropriate.

DATED:  July 11, 2013

                              Respectfully Submitted,

                              **/s/**
                              _____
                              Tyler Jay King, Esq.
                              Bar No. 979592
                              1407 Nicholson Street, N.W.
                              Washington, DC  20011
                              (202) 436-2641

00000938

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this July 11, 2013, a copy of the foregoing was served by email to:

Darrell C. Valdez

John W. Lomas, Jr.

William T. O'Brien


Respectfully Submitted,

**/s/**
_____
Tyler Jay King, Esq.

00000939

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES *ex rel.* BRIAN BURKE

                Plaintiff,

      -versus-

RECORD PRESS, INC.,

                Defendant.

**Case No.** 1:08-cv-364(EGS)(DAR)

**Judge:** Deborah A. Robinson

### AFFIDAVIT:
### "I declare and certify, verify, and state under penalty of perjury that the foregoing is true and correct. Executed on July 11, 2013:

This is Relator's Affidavit by BRIAN BURKE in support of Plaintiff's Motion for Amended Judgment, Fed. R. Civ. P. 59(e). Defendant, by counsel, has misstated evidence, used misdirection, misquoted, obfuscated, etc. in order to prevail and now retaliate and destroy this blue collar whistleblowing Civil Servant financially via ruinous fines/fees. This Court ruled in favor of Relator in regard to Defendant's 'frivolous' Rule 11 motion and Summary Judgment Motion(s). Then there is the Counterclaim. There are outstanding issues of Law and Fact, as the People are requesting an Amended Judgment on all issues. If this is not granted, an appeal to D.C. Circuit will be filed to review and/or reverse the new case law changing precedent and damaging Remedy under Federal False Claims Act. Please see also Relator's Affidavit attached to Opposition to Defendant's Motion for Attorney's Fees and Expenses.

### MEETING OF MINDS

Let us start with the first quote within Movant's Motion for Attorney's Fees and Expenses (Doc. 94, pg. 8) paragraph 2. ""the evidence offered by Plaintiff demonstrates

1

00000940

that Defendant and the government had a meeting of the minds with respect to rates

which Defendant would charge for services provided pursuant to the contract." (Dkt. #91,

at 7.)". Relator will show that this conclusion of Fact and/or Law by the Court contradicts

all previous case law with regard to when any 'meeting of minds' must occur. See also

Plaintiff's Statement of Points and Authorities within Motion for Amended Judgment.

Under any case law regarding Defendant's Government Knowledge Defense (which

incredibly they claim to not be using!?), this 'meeting of minds' must occur **PRIOR** to

submitted false claim. "On appeal, the United States Court of Appeals for the Ninth

Circuit reversed. The court determined that the time to test the falsity of a claim is the

date when it is submitted. Accordingly, every one of the invoices prior to [when the

contracting officer learned of the mislabeling] was false when made." Further, although

the contracting officer has the authority to modify a contract, a retroactive modification

under such circumstances was "void as against public policy." The court continued: "In

such palming off as we have here we do not believe that the Congress ever intended that

contracting officers should have the power to vitiate the False Claims statute."[*United

States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956]"*see *THE GOVERNMENT

KNOWLEDGE DEFENSE TO THE CIVIL FALSE CLAIMS ACT: A MISNOMER BY

ANY OTHER NAME DOES NOT SOUND AS SWEET* Author MICHAEL J. DAVIDSON

45 Idaho L. Rev. 41(att.). See *United States ex rel. Costner v. United States*, 317 F.3d

883, 887 (8th Cir. 2003) ("'If the government knows and approves of the particulars of a

claim for payment *before* that claim is presented . . . .'" (emphasis added) (altercation

omitted) (quoting *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305

F.3d 542, 543 (7th Cir. 1999))); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282

<div align="right">2</div>

00000941

F.3d 787, 811 (10th Cir. 2002) ("The defendant . . . may be able to cast doubt on whether he 'knowingly' submitted a false claim by showing that the Government itself was already aware of the facts underlying the FCA claim when the allegedly fraudulent claim was submitted." (citing *United States ex rel. Butler v. Hughes Helicopters, Inc.,* 71 F.3d 321, 326-27 (9th Cir. 1995*))); United States ex rel. Durcholz v. FKW, Inc.,* 189 F.3d 542, 545 (7th Cir. 1999)("before [the] claim is presented"); see also *United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.,* 491 F.3d 254, 263 (5th Cir. 2007) ("before that claim is presented" (citing *Durcholz,* 189 F.3d at 545)); *United States ex rel. Humphrey v. Franklin-Williamson Human Servs., Inc.,* 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002) ("before [the] claim is presented") citing *Durcholz,* 189 F.3d. at 545)); *United States ex rel. Maxwell v. Kerr-McGee Chem. Worldwide, LLC*, No. 04-CV-01224-PSF-CBS, 2006 WL 2869515, at *16 (D. Colo. Oct. 6, 2006); *cf. United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the government's knowledge came 'too late in the process'" (quoting *Durcholz,* 189 F.3d at 544-45)); *United States v. Shasta Servs., Inc., 440 F. Supp. 2d 1108, 1113-14 (E.D. Cal. 2006*) (applying the defense to California's FCA). See also "Additionally, an FCA defendant should not benefit if someone from the government learns of the falsity and simply does nothing about it. The Seventh Circuit has held that mere governmental acquiescence is insufficient to sustain a government knowledge defense. The government **must both know of, and approve, the particular claim before it is submitted**. The opinions of other circuit courts appear to have adopted a similar standard. Unless that person is someone with the requisite level of authority and

3

00000942

approves or otherwise indicates to the defendant that its conduct is permissible, then the defendant's scienter remains unaffected. Additionally, "mere acquiescence would preclude FCA liability any time a government employee and a defendant were in cahoots."" Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct."(*236 F.2d 944 (9th Cir. 1956)*).

## MR. ADGERSON

BRIAN BURKE, as an admitted whistle-blower, is quite saddened to have to inform the Court of Perjury (*TITLE 18 PART I CHAPTER 79 § 1621*) as well as likely Subornation of same (*18 U.S.C.A. § 1622*). Mr. Adgerson, to whom Relator would like to apologize for any misspelling of name in Complaint etc., has, unfortunately, availed himself of this unlawful practice. Mr. King has informed me this is his first case wherein a witness has performed this on a material issue. On July 5, 2007, date of stipulated conversation with witness, the other Party to the conversation declared under Oath in Second Circuit Pleading "Plaintiff reported to Lloyd Rawls of GPO's Inspector General Office on July 5, 2007 that fraud was being committed by Record Press against the GPO, U.S. Attorney's Office, U.S. Taxpayers and, potentially, plaintiff. They are charging the government, *et al.,* exactly TEN TIMES the correct amount for "collating & trimming" than allowed in said 2231-S contract. This was ascertained in conversation with Calvin Aderson[*sic*], FiscalManager at GPO."

The U.S. Attorney's Office, whether it investigated or not, chose not to dispute this Opposition, despite every reason to do so, thus stipulating to same. The Second Circuit granted Relator's Relief based on this Contemporaneous Account. Now years later, via recovered memory?, Witness Adgerson places before the Court an entirely different

4

account of our conversation. This is the Perjury, intended to Obstruct Justice (*TITLE 18 PART I CHAPTER 73*) for the People. This Perjury consisted mainly of two parts; First the Canard (lie) about Relator's misrepresentation, which is intended to defame and attack personal credibility and/or the People's case, Second the more harmful, and even more nonsensical, Lie/Perjury about what was said to Petitioner about the Running Rate (Per 10 Copies) application to the issue at hand, Line D. First the misrepresentation never happened, other than in the testilying of witness. Petitioner spoke to at least a dozen employees of GPO that day and there was no allegation of misrepresentation. Why Adgerson? Because he would not have given the information otherwise? Is it the GPO's position they only work for and serve 'Their' Contractors (Sullivan's Testimony), or who pays them, the People and Congress? No, because it did not happen. Counterclaim Defendant understands the Court would prefer not to rule on a "He said he said" that was not recorded. Petitioner's statement(s) on the Record since the day of the conversation have been consistent. More importantly, for triers of fact, Mr. Adgerson's version **COULD NOT HAVE HAPPENED**. There was absolutely NO WAY Movant could have gleaned information about the Running Rates application to Line D otherwise. Mr Adgerson was represented, by his boss, as the Chief Contract Person on this matter and was quite helpful. He had the Contract/RFP and Relator had the Invoices (albeit including GPO's 7% "Profit" on the False Claim, which presumably informs their credibility on deciding whether same occurred). As Plaintiff stated, repeatedly, under oath, and without ever seeing 2231-S, Mr Adgerson was asked why the "binding costs" were so high, when other costs were quite competitive. He stated emphatically that it was because the $12.25 (he actually said $12.50, an amount including GPO's 'tip', leading to this whistle-blower

5

using that figure in that days Opposition and FCA Complaint) "per 100 pages" applied to

the Running Rate (10), i.e. per 1,000 pages. He was quite adamant & vociferous and

stated how clear it is. He said that the words "Note: RUNNING RATE IS PER 10

COPIES" was in bold, capitalized, underlined and repeated. He stated clearly that

Running Rate applied to all lines in paragraph II. Clearly, years later, in planning defense

of instant FCA Case it was seen that this position by the senior Contract

Supervisor/Manager would be fatal. Thus the obvious Subornation. Who Suborned Mr.

Adgerson, admittedly, Relator can only guess at this time, but it it clearly a circumscribed

group with incentive to do same. How was it done, we have either Gold or Lead, i.e.

Consideration or Extortion/Threat. Was he forced to retire, was his pension threatened, or

charges/discipline dangled? Speculation ripe for Investigation by appropriate Authorities

without a Conflict of Interest. Affiant requests for a Referral by Court for appropriate

entity to investigate Perjury, Subornation & Conspiracy to Perform same, Obstruction of

Justice & Conspiracy to Perform same and Conspiracy to Defraud the United States.

Affiant believe qualified hearsay exceptions would be controlling here under Fed. R. Ev.

801(d)(1) & (2)(B),(C)(E).

## MR SULLIVAN

___Relator requests the Court ignore, Prospectively & Retrospectively, all

Testimony/Evidence by Mr. Sullivan related to any unsupported testimony regarding

"industry practice", Record Press's need for "profit", whether any specific price points

result in same or, in fact any testimony/evidence which would or could be admitted by an

Expert Witness, such as Mr. Gocial. Mr. Sullivan, however much time he worked at GPO

he was not certified, or asked to be considered as an expert witness. Even as a fact

6

witness, his testimony/evidence is Prejudicial and potentially incorrect (see above regarding Mr. Adgerson's Subornation). This defense witness acknowledged no prior discussion constituting "meeting of minds" or in fact any Ex Post Facto (to 2231-S/1272-S signing/bids) conversation regarding IFB 2231-S/1272-S and proper invoicing vis-à-vis Record Press. Affiant acknowledges it is "GPO"s, or at least Mr. Sullivan's, Testimony that Record Press invoiced the correct amount, or at least that 'his contractor' could use the money to go toward their profit, which he apparently prefers the government/Taxpayer guarantee.

<u>**PRIOR MEETING OF MINDS**</u>

As to our affirmative evidence of no **PRIOR** "meeting of minds" we have Mr. Sullivan's testimony during February 14, 2011 Bench Trial and Mr. Wilmot's Deposition testimony. Please see Document 90 page 89 lines 10-13." Mr. King; Q. "Did -- had you discussed this interpretation [whether running rate applies BRIAN BURKE, as an admitted whistle-blower, is quite saddened to have to inform the Court of Perjury (*TITLE 18 PART I CHAPTER 79 § 1621*) as well as likely Subornation of same (*18 U.S.C.A. § 1622).* Mr. Adgerson, to whom Relator would like to apologize for any misspelling of name in Complaint etc., has, unfortunately, availed himself of this unlawful practice. Mr. King has informed me this is his first case wherein a witness has performed this on a material issue. On July 5, 2007, date of stipulated to conversation with witness, the other Party to the conversation declared under Oath in Second Circuit Pleading "Plaintiff reported to Lloyd Rawls of GPO's Inspector General Office on July 5, 2007 that fraud was being committed by Record Press against the GPO, U.S. Attorney's Office, U.S. Taxpayers and, potentially, plaintiff. They are charging the government, *et al.,* exactly

7

00000946

TEN TIMES the correct amount for "collating & trimming" than allowed in said 2231-S

contract. This was ascertained in conversation with Calvin Aderson[*sic*], FiscalManager

at GPO."

The U.S. Attorney's Office, whether it investigated or not, chose not to dispute this

Opposition, despite every reason to do so, thus stipulating to same. The Second Circuit

granted Relator's Relief based on this Contemporaneous Account. Now years later, via

recovered memory?, Witness Adgerson places before the Court an entirely different

account of our conversation. This is the Perjury, intended to Obstruct Justice (*TITLE 18*

*PART I CHAPTER 73*) for the People. This Perjury consisted mainly of two parts; First

the Canard (lie) about Relator's misrepresentation, which is intended to defame and attack

personal credibility and/or the People's case, Second the more harmful, and even more

nonsensical, Lie/Perjury about what was said to Petitioner about the Running Rate (Per

10 Copies) application to the issue at hand, Line D. First the misrepresentation never

happened, other than in the testilying of witness. Petitioner spoke to at least a dozen

employees of GPO that day and there was no allegation of misrepresentation. Why

Adgerson? Because he would not have given the information otherwise? Is it the GPO's

to line II(d)] with Mr. Wilmot or anyone with Record Press prior to this contract having

been executed? [Mr. Sullivan] A. I have never met or had any discussions with Mr.

Wilmot." Please see also Wilmot Deposition Page 75 line 9- page 77 from line 15

attached as Exhibit A (pages 71- 91). "BY MR. KING: Q. Does the GPO and Record

Press engage in any preliminary discourse regarding the definitions or meanings of any of

the terms in the contract? **A.** [Mr. Wilmot] **I have never seen that**.[emphasis in original]

Q. [Mr. King] So Record Press does not, and the GPO does not discuss what any of this

8

00000947

means before it's awarded? ……… A. [Mr. Wilmot] I have never seen that.  Page 76 line 14 BY MR. KING: Q. And when you speak with Mr. Fishken, do you discuss the meaning of any of these contracts? …….. THE WITNESS: [Mr. Wilmot] No. When I speak to Ira, it's generally on performance issues such as if a U.S. Attorney may have a particular issue on the – a job or so on and so forth, or the timeliness period. **Never on contract terms** [emphasis added]. The contracts I submitted by the GPO are unambiguous, period. And if there were any changes to a particular contract or something you do not understand, it is a written submission process. BY MR KING: Q. "After this case was filed, did you speak with him about this particular contract or about this particular case? ………. THE WITNESS: [Mr. Wilmot] Not at all. Can I add something for the record? Q. [Mr. King] Yes. Please. A. [Mr. Wilmot] Record Press's invoices are submitted to Washington, D.C. along with Philadelphia, GPO's office. Washington does not pay our invoices unless GPO in Philadelphia approves of them. So that means they must be in compliance before they are paid, so there is a dual auditing going on on our invoices."

Defendant appears to proceed under the erroneous assumption that if the false claim is paid it becomes legitimate. This logic appears to be shared by Defendant's Counsel. If that were true, the False Claims Act would be mooted. There was no evidence of any "auditing" by the Government prior to case unsealing. The only "Auditor" to testify was Mr. Gocial. See SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272 ("But the Committee does believe the civil False Claims Act should recognize that those doing business with the Government have an obligation to

9

00000948

make a limited inquiry to ensure the claims they submit are accurate.") see also *Crane Helicopter Servs., Inc. v. United States*, 45 Fed. Cl. 410, 433 (1999) ("[The FCA's knowing standard was designed to address] 'the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know'" and to reach "those who ignore obvious warning signs.") (citation omitted). We agree with Defendant that the relevant contract is unambiguous. See the Affidavit of the (only) expert witness, Mr. Gocial, page 4:

(1) Page 12 of 15, Section 4 – Schedule of Prices, refers to "**fractional parts of 10 will be prorated**" which supports our position that where a running rate of 10 copies is referenced that rates charged are per 10 copies. (*Exhibit B Doc. 67*)
(2) Page 14 of 15, Section 4, II – Complete Product, specifically states "**Note: Running rate is per 10 copies**" which covers parts (a), (b), (c), and (d). *This further supports our position that the rates charged in this section are for every 10 copies rather than for each copy. (Exhibit C Doc. 67)*

## ACTUAL VICTIM

As to the next quote, "the alleged victim, through the agency official who appeared in Plaintiff's case-in-chief, testified there was no fraud". To start, we have the sharpest possible disagreement regarding "the alleged victim" or the actual victim. *Qui tam pro domino rege quam pro se ipso in hac parte sequitur*, (who as much for [our] lord the king as for himself in this action pursues), a.k.a. False Claims Act, 31 U.S.C. §§ 3729–3733, suing in the name of the King (or State etc.) is an old law which by definition implies that Contracting Officers and/or those tasked with paying claims have failed to perform their fiduciary responsibility. Thus this necessity to grant cause of action to individual citizens who have evidence of false claims. Affiant is a Shop Steward of 8 years, Safety Representative, and Civil Servant for 12 ½ years. I am tasked as a Shop Steward with defending fellow Civil Servants accused of wrongdoing. Occasionally he or she commits

00000949

an error due to overwork, fatigue, lack of information, or lack of training, *etc.*. The assumption regarding said error is that a natural tendency to justify, cover-up or otherwise defend error is a result of inherent bias against being so confronted (with error). The testimony, or evidence is considered self-serving and is not limited to 'lower' titles. So we have this "alleged victim". So what is a 'victim'? One who is harmed? If by accusing an individual, or an agency, of failing to perform fiduciary responsibility they become a 'victim' than GPO is a victim. If the accusation, or evidence, does not confer victimhood then GPO is not a 'victim'. The court was correct in conferring the title "Alleged Victim" upon the GPO. The fact that the GPO was not deprived of monies by the instant False Claims is not disputed. In fact, it is not disputed that the GPO 'profited' off of said claims due to its own 7% overhead charge on same. This fact is used to hammer and defame Relator!! The actual victim, as a matter of law (statute), is the People (taxpayers) of the United States, who paid these claims, admittedly plus the GPO's 7% 'cut'. Defendant has a right to dislike the Federal False Claims Act, and it admittedly is not meant to serve their interest as a Contractor, but the taxpayer requires an advocate. Numerous laws have been passed and signed that protect us taxpayers from corrupt, indolent or indifferent Contracting Officers that fail to perform their 'honest services' and attempt to cover up same. This is called a Moral Hazard when one's financial or other interests lie in one direction and yet are implied to lie in its apostate. GPO would not recover any monies from its admitted friend Record Press, damages would be returned to the General Fund. Would the GPO be on the hook for the $513,793.91 X .07(%)= $35,965.57? An interesting conundrum, but not promising to elicit testimony contrary to interest. The Courts reliance on this Morally Hazardous,

11

00000950

biased Testimony from the GPO's 30(b)6 witness is what we are requesting (see Motion

for Amended Judgment) be revisited as contrary to the interest of justice. See also *United*

*States v. United Techs. Corp*., No. 5:92-CV-375 (EBB), 1996 WL 653620, at *2 (D.

Conn. Oct. 11, 1996) ("The statute's restriction on the authority of agency heads should

be read as encompassing their subordinates."); *cf. Contract Disputes Act of 1978,* S. REP.

NO. 95-1118, at 19 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5235, 5253 ("[I]t is not

the intent of this section to authorize Agency heads, contracting officers, or agency

boards to settle or compromise claims independent of their legal or contractual merits . . .

."). *Nat'l Wholesalers,* 236 F.2d at 950; see also *United States ex rel. McCray Sanitation*

*Serv. v. Midwest Container Co*., 7 F.3d 1046, at *2 (10th Cir. 1993) (unpublished table

decision) ("[Contracting agency cannot] 'ratify' any previous fraud by [contractor].").

Significantly, government employees, including procurement officials, lack the authority

to waive fraudulent conduct. Accordingly, the FCA is violated when a contractor submits

a false claim even when the contractor informs the government of the claim's falsity

before submission. Further, once false claims are received, a contracting officer may not

modify the contract, or take other action, to waive past false claims. The Federal

Acquisition Regulation (FAR) also contains express limitations on contracting officer

authority when a claim is suspected to be false or tainted by fraud. Pursuant to FAR

33.210(b), (the FAR is codified in Title 48 of the United States Code of Federal

Regulations. It is issued pursuant to the Office of Federal Procurement Policy Act of

1974 (Pub. L. 93-400 and Title 41 of the United States Code), Chapter 7.) the contracting

officer has no authority to settle, compromise, pay or adjust "any claim involving fraud."

Similarly, section 605(a) of the Contract Disputes Act (41 U.S.C. § 605**)** removes any

12

00000951

authority from the head of an agency "to settle, compromise, pay, or otherwise adjust any

claim involving fraud." This statutory restriction on agency heads extends downward to

subordinate agency procurement officials." MICHAEL J. DAVIDSON, 45 Idaho L. Rev.

41(att.).

### SPREADSHEET, RP000069, EXPLANATION

Regarding "Spreadsheets". While clearly a 'statement against interest' by Record Press,

it was not explicitly made a part of the 2231-S/1272-S Contract, whether attached or not,

or produced later. Non-movant clearly proffers these documents as Dispositive, and they

may very well be correct. Defendant, like the Wizard behind the curtain, or the naked

Emperor, would prefer the Court view the section of the document(s) they deem

important. The Court must instead, in order to obtain the Truth (*Veritas*) Justice and

Remedy for the abused Taxpayer, rely on and deconstruct the relevant parts of the

'spreadsheets'. It is not disputed that Respondent has attempted to parse the most

irrelevant part(s) of these documents and has run panicking from the actual numbers in

said exhibits. Defendant clearly state that because the relevant line margins undisputed,

say, respectively, IIa COMPLETE COVER PER 10 COPIES ; IIb TEXT PER PAGE

PER 10 COPIES and skipping, for now IIc,; IId COLLATING, TRIMMING TO SIZE

AND BINDING PER 100 PAGE, the case is over. Slamdunk. Problem. The actual

numbers do not agree with Defendant's theory. As Mr. Wilmot basically eschewed and

distanced himself and his firm from this 'dispositive' document in his Deposition and

Relator doesn't blame him, and only acknowledged "reviewing" same on the stand,

presumably ex post facto and on advise of Counsel, Relator would request using

otherwise irrelevant testimony by Mr. Sullivan, the only individual with apparent

13

00000952

knowledge about same. Mr. Sullivan was asked about the highly relevant "BASIS OF AWARD". These numbers came right out of the 2231-S/1272-S contract. Witness claimed these numbers derived from a former contract and are used, very importantly, to compare various bids and find lowest competent bidder, in the interest of the Taxpayer/People, as required. Excellent, and fully within their Fiduciary duty to us Taxpayers. But there's that little problem within this 'dispositive' document. The numbers do not come within magnitudes of agreeing with Defendant's, or for that matter, Mr. Sullivan's, spin on what the Contract 'actually' says. It may disappoint the Court to have to state that this 'best' document which s allegedly exculpatory for Defendant also bars Relator's version. An assumption was made by Relator & Mr. Adgerson(pre Perjury) and Murphy Anderson LLP and Mr. King and Mr. Gocial that Record Press is at least allowed to charge something for line IId incases such as the admitted invoices. According to the 'dispositive' 'spreadsheet' Mr. Sullivan, and presumably Defendant's Counsel, support, this is incorrect. The argument as to whether 'PER10 COPIES' RUNNING RATE apply to line IId maybe all but moot and the Court maybe ruling on the incorrect issue. Instead, according to the 'spreadsheet'/'dispositive' Exhibit and the Contract the issue is should Record Press be invoicing at all under II(d) in circumstances such as *Burke v. Evans.* Relator contends that Defendant acted with intent, but nevertheless, this hurdle is not required for FCA. Relator requests only this 'dispositive' document make sense, and it does. Honing in on the three most relevant lines, we start with II(a). COMPLETE COVER PER 10 COPIES. and the "BASIS OF AWARD" 1327, from the Contract. Mr. Sullivan suggested we multiply 1327 times "PER 10 COPIES", i.e 13,270 books. Then we have Record Press's Bid/Offerof $6.00 per ten rap-around covers and the

14

entirely correct amount, under both parties theories, of $7,962.00. Excellent. Next II(b)

we have and TEXT PER PAGE PER 10 COPIES with a "BASIS OF AWARD" of

165,996, i.e. 1,659,960 pages. and the Bid/Offer of $.35. PER 10 COPIES to get

$58,098.60. Entirely correct and consistent with all parties theories. As II(c) was not part

of the admitted invoices, we will skip for now. Saving the best for last we have the

penultimate line, II(d) COLLATING, TRIMMING TO SIZE AND BINDING PER 100

PAGES. "BASIS OF AWARD" is 14? and from the 2231-S/1272-S Contract. Mr.

Sullivan stated, under oath, that these are actual numbers from a previous contract, that

they are used to find the lowest cost competent bidder, and further that they should be

and were? used to direct successful bidders as to correct billing & invoice practice, in

order to presumably conform with the False Claims Act and not 'Overbill'. Upon

questioning by Mr. King, Mr. Sullivan stated this "BASIS OF AWARD" of 14*[sic]*

should be multiplied by the stated "PER 100 PAGES" in order to arrive at 1400

pages?*[sic]*. This number would be consistent with their theory. Ours would be 14,000

pages*[sic]*. Regardless, let's move on. Multiplying 1400 (their theory) by $12.25 and

dividing(again) by PER 100 PAGES equals the correct $171.50. With Relator's theory,

you would multiply 14 by 1,000 (i.e. PER 10 COPIES, PER 100 PAGES=1,000) and by

the admitted accepted bid/offer of $12.25 per? divided again by 1,000 to equal 171.50. In

other words, both theories result in an equality, i.e. correct answer. If Relator were to be

so bold as to supply implied algebraic definition, we have for IId 14x pages X $12.25

divided by x = $171.50. The problem is that x can be either 100(defendant's position) or

1,000(Relators/Taxpayers) and we have gotten no closer to the Truth(*Veritas*), or

assisting the Court in deciding Case. So what is x, 100 or 1,000? Well, let's compare to

15

the above lines for some Truth, as presumably the number of bindings should conform to the number of books. We have, as stipulated to, 13,270 books. 14,000 comes a lot closer to 13,270 than 1,400, but admittedly not identical. A rounding error perhaps, or were there some additional bindings in another category? Problem, Mr. Sullivan stated , under oath that the 1,400 was pages? and not books, which according to lines IIa & IIb average 125 pages for both Appendices and Briefs. Instead, according to agreement, we have 1,659,960 pages, an entirely reasonable number. How do we fit 1400 bound pages into 1,659,960 pages and 13,270 books, or for that matter 14,000 pages. We cannot. Occam's Razor (i.e. the simplest explanation that explains all the facts) suggests our answer. IId has nothing to do with IIa or IIb. Record Press is allowed to bill for/through line IIa and IIb **OR** IId but not both. Let us go back to the 2231-S/1272-S contract and page 6 paragraph 8 which states 'Occasionally the Government will supply preprinted 8-1/2 x 11" pages which the contractor will be required to collate, typeset a cover trim to finished size and bind. " This is what IId is for, and not the usual order created from PDF or CD, if the 'spreadsheets' are correct. They were proffered by defense and are a statement against interest. Of course, under the only rational interpretation of the 'spreadsheet' Record Press was not allowed to charge the Government at all in the vast majority of invoices. In our original theory in Complaint, Defendant charged 10 times too much for line IId but were certainly allowed to bill something. Either way, they charged the People/Taxpayer at least $500,000 too much over the non-statutorily limited time span for IId. The 'overbilling' is just slightly larger under this axiom conforming with both the 'spreadsheet'(s), i.e. previous billing practice, and 2231-S/1272-S.

 Being so bold as to anticipate Defendant's likely and most logical defense, and hoping

16

00000955

the court does not view this as a Straw Man, let us throw out all the numbers on line 11d, and assume Contractor is allowed to charge on line IId for all "TEXT PER PAGE", as is now Record Press practice. If we plug in the numbers on lines IIa &IIb, which appear entirely correct and logical, into the now blank IId, we get a magnitude of difference in this "Old Bid/bill/contract/spreadsheet". Back to the "new" line IId we have a "BASIS OF AWARD" of either 1,659x(Relator version) or 16,599x(Defendant's)pages. First, with 16599.6x wherein x is 1,000(PER 10 COPIES X PER 100 PAGES) times 12.25 and divided again by 1,000= $20,334.5. With Defendant's Straw Man? we have $203,349.51. This "correct" and consistent number, if we accept record press's position that they are allowed to charge under IIa, IIb & IId simultaneously would more than double Record Press's Bid/Invoice/Payment, if the winning bider/Contractor. But they would lose as their bid would be substantially higher. Other potential contractors bid less than half Record Press's $12.25 per 1,000 or per 100 pages. Two bid $5.00 and one bid $6.50. Another contractor would have won the bid. Thus, under any possible theory they are either violating the FCA or not the Contractor.

**RELATOR'S EVIDENCE**

Now as to the next quote from decision, '"Plaintiff offered *no evidence to the contrary*" (Id. (emphasis added))". The evidence submitted by Relator is extensive and dispositive, or should be, for Plaintiff's case and include all court papers, "Expert Report", the IFB 2231-S/1272-S, testimony, and the 'spreadsheets' submitted by GPO/Record Press, Inc. This case cannot be simpler, Record Press billed the United States at least 10 times too much for Collating, Trimming to Size and Binding briefs and appendixes. Everything else is smoke and mirrors. Mr. Adgerson told Relator on July 5,

17

00000956

2007 that Record Press was charging 10 times too much for same by not applying clearly

written "**Note: Running rate is per 10 copies**" and "RUNNING PER 10 COPIES"

above line II(d). His 'battlefield' conversion is perjury, as previously stated in

Counterclaim Defendant's Omnibus Motion(Dct. 70), etc. It is certainly acknowledged

that Relator's "beliefs" and  "subjective concern" are far from dispositive and admittedly

legally biased in the interest of the People. Relator's 'opinion/subjective concern' means

nothing, the 'contract' means everything. This is our gravamen. Relator's 'opinion' is

identical to that of the young boy who stated that "The Emperor has no clothes", the

difference being, I, unlike the boy, will be forced to work to the age of 85 or more

operating a train in order to pay Record Press for the admitted crime of attempting

Remedy for the United States in recovering damages as a Whistleblower. We believe the

Defendant has no basis for Recovery, as a matter of fact and law. It is in fact

Counterclaim Defendant with the strongest argument for Fees and Expenses for

Counterclaim that Defendant demanded the Court dismiss after service of Omnibus

Motion to Dismiss/For Summary Judgment. Please see arguments in the admittedly

'mooted' papers submitted by Counterclaim Defendant (Dcts.70,74,76,77,82,85).

Counterclaim Defendant has not submitted Motion for Fees under any rule due to this

pending Motion for Amended Judgment and the right for Defendant to reinitiate

Counterclaim, which, as predicted, they have apparently done within this Motion for

Attorney Fees and Expenses. Can it be that Defendant is actually seeking Fees &

Expenses for their own 5 year frivolous and vexatious Dismissed Counterclaim? We also

request any fees or expenses incurred investigating Relator, Mr. King, Mr. Hanna,

subpoenaed witness, etc. be quashed. Defendant mentions the Rule 11 Motion filed by

00000957

*pro se* Plaintiff in *Burke v. Evans* but forgot to mention their own Rule 11 Motion in their

32 page soliloquy(dct. 94-main). Why is that? **Because Defendant lost**. Yet they seek

payment from Relator for same. Defendant mentions one of their defeated Motion(s) for

Summary Judgment only to state on page 22 "More than half of Record Press's fees were

incurred after Record Press filed its June 24, 2010 motion for summary judgment." Their

implied logic is that United States *ex rel*. Brian Burke should have performed what

Record Press did after Counterclaim Defendant's own Motion for Summary Judgment, a

Fed. R. Civ. P. 41(a)(2) Motion for Voluntary Dismissal. Perhaps Defendant could

inform the Court and Relator when this was done in the history of Jurisprudence after

<u>WINNING</u> same Summary Judgment motion. It is not clear how much Record Press

spent after losing their infinitely more relevant Rule 11 Motion (as juxtaposed to Burke's

Rule 11 Motion in another case) or how much was spent in losing three dispositive

motions but clearly they want Relator to pay for same. Defendant, by Counsel, as always,

seeks to have their cake and eat it too. While they claim to be of one mind with an Order

they admittedly prevailed on (Relator is requesting Amended Judgment by this Motion,

an action that generally stays Motion for Fees and Tolling on time to file Notice of

Appeal, i.e. this Motion is premature at best) they are forcing this Court to rewrite same

Decision. This Court studiously and purposely, after its 2 ¼ year Deliberation, chose not

to use the words "frivolous' or "vexatious" in its Decision/Order. That time for the Court

to perform its lawful function is also being taxed to Relator in Defendant's suggestion

Plaintiff deliberately dragged out or prolonged proceedings. Record Press was not clear

where or in what irrelevant case a Court has used the word "frivolous" or for that matter

"vexatious" but base their incorrect opinion on the fact that Brian Burke *pro se* lost. In

00000958

Document 90, PM Transcript of Bench Trial, page 41 lines 8-14 "…….but that the Court would find no relevance or probative value, with all due respect to other judges, in a mere determination that there was insufficient evidence.. MR. O'BRIEN: Understood, Your Honor. THE COURT:---that do not have any bearing upon Mr. Burke's credibility. Mr. O'BRIEN: No, I understand, Your Honor." This Ruling was 'understood' but not followed. On pages 45, 46 of same Document 90 Lines 25-5 MR. KING: "I would point out that the Rule 11 motion has been filed accusing Mr. Burke of filing frivolously; that motion had already been decided and overruled. It seems like this is another opportunity to try to bring up whether or not that motion should be granted, when it's already been denied." Highly prescient. Here we are again.

## BETWEEN SCYLLA AND CHARYBDIS

We are not attempting to defame Mr. Sullivan, or for that matter Mr. Wilmot. We are aware both these gentlemen were given a Hobson's Choice. In Mr. Sullivan's case he was clearly taxed with covering-up GPO's faults by his superior, as an admitted lifelong employee. The previous employee stuck with this unrewarding task chose to retire instead (Doc. 90 pg. 63). Mr. Sullivan was apparently promoted for his yeoman work on this case. So what would be the outcome if Mr. Sullivan testified for example "a clear reading of the contract for program 2231-S shows Record Press has been billing 10 times too much for collating trimming to size and binding government briefs and appendices." We believe he would have been fired or demoted or transferred or otherwise retaliated against. It is clear that GPO's official position has been formed on the instant case prior to Mr. Sullivan's dilemma(*id*. pg. 63). Were he to 'whistleblow' prior to testimony he would simply have been replaced as 30(b)6 witness and retaliated against. Were he to do

20

00000959

as former employee Mr. Adgerson and simply 'flip the script', but in this case against the interest of his boss, on the Stand, we can only imagine the outcome. While Relator would certainly welcome any testimony in the interest of the People, this heroism is not required to enforce the False Claims Act.  Now we have Mr. Wilmot. The 'false claims' (the word fraud has been employed, but see *United States ex rel. Quirk v. Madonna Towers, Inc*., 278 F.3d 765, 767 (8th Cir. 2002) ("No proof of specific intent to defraud the government is required." (citing 31 U.S.C. § 3729(b))).) clearly started before Mr. Wilmot's tenure at Record Press, Inc.. So what was, or is, Mr. Wilmot to do when he noticed the instant false claims? Whistleblow on his own company? Would he ever be hired again? Unknown. It is not required that contractor whistleblow on itself for FCA to be enforced, or for that matter an employee of 'allegedly' defrauded agency do the same. Of course, we have an agency that itself was not defrauded but instead pocketed 7% on the false claims, it was the United States treasury that was defrauded. If it is required that a Relator have the 'allegedly', or actually, defrauded agency testify in their behalf or interest we clearly have not surmounted that hurdle and the case is deservedly Dismissed. This hurdle is not required. It does not exist. We acknowledge case law wherein a **PRIOR** 'meeting of minds' may mitigate or defend against a False Claim Action, but, as shown, this did not occur within instant case. Full stop. As my admittedly sexist ancestor informed me well before my birth "The only thing necessary for evil to triumph is for good men to do nothing" (Edmond Burke). The United States is $15 Trillion in debt and requires someone to advance it's fiduciary interest, thus we have the False Claims Act. We respectfully request the Court not hamstring, cripple, 'moot', restrict, or end same act. We respectfully request that the Court not require the gentlemen, Mr. Sullivan or Mr.

21

Wilmot, to act contrary to interest. Upton Sinclair "It is difficult to get a man to understand something, when his salary depends on his not understanding it".

### RP000069 AND IFB FOR PROGRAM 2231-S/1272-S

Now again to the core of the case. In Defendant's Document 94 page 12 we have a small piece of a document both parties believe is Dispositive. There was testimony that RP000069, or was it the 'page 1 of 1', was attached to the Request For Bids for Program 2231-S and/or 1272-S. It is agreed that Relator, in the Complaint, relied upon the 'four corners' of what became the 'contract' (IFP with Record Press's winning bids (albeit with GPO's 7% 'profit')). There does not appear to be any evidence, or testimony, other than that a plain reading of said contract can only lead to the conclusion that Record Press was charging the United States 10 times too much for line II(D) COLLATING, TRIMMING TO SIZE AND BINDING, due to ignoring "**Note: Running rate is per 10 copies**" and "RUNNING PER 10 COPIES" written clearly above lines (a), (b), (c), and (d). Defendant acknowledges this 'running rate' applies to, and they appeared to bill correctly, lines (a), and (b). So why does it not apply to line (d)? Witnesses Sullivan and Wilmot claim to believe this is obvious, without explanation. It is obvious. A clear, and only possible, reading and application of IFB 2231-S/1272-S would apply 'running rate' to COLLATING, TRIMMING TO SIZE AND BINDING. What the four corners of the contract could be more clear on is whether or not contractor should be charging at all for a particular book under line II(d). We assumed that Record Press, or another winning contractor, was allowed to charge $12.25, (or even our initial $12.50), per 10 copies per 100 pages for programs 2231-S/1272-S, for all books. Defendant's only actual written evidence submitted to the contrary, RP000069 and/or similar 'page 1 of 1' (attached)

22

admittedly show something different. While the 'running rate' applies to lines (c) and (d) (see Relator's Opposition to Defendant's Motion for Attorney's fess and Expenses Affidavit), it is absolutely dispositive, legally conclusive and crystal clear on our initial assumption. With apologies to the Court, we were wrong, *mea culpa*. That is to say, and again Defendant submitted these documents as dispositive (including within instant motion (Dct. 94 pg. 12)), **Record Press is not to charge <u>AT ALL</u> for COLLATING, TRIMMING TO SIZE AND BINDING**, other than for delivered pre-printed documents (see IFB 2231-S page 6 paragraph 8 "Occasionally the Government will supply preprinted 8-1/2 x 11" pages which the contractor will be required to collate, typeset a cover trim to finished size and bind."), or petitions for a writ of certiorari, which require 'Pressure Sensitive Cover Stock' and substantial trimming. For this conclusion, the only possible, we go back to those 'spreadsheets' (RP00069 and 'page 1 of 1' both attached). Mr. Lomas, as during the trial, etc., admittedly in order to make his case, concentrated on the left side margins of said document(s) and purposely chose, and continues to chose to, demand the Court view and decide based only upon that section. Lets call it the face and hands of the spreadsheet. The problem is that for parties, or the Court, to determine whether or not this 'emperor' has clothes, we must view THE WHOLE DOCUMENT, INCLUDING THE BODY! As Expert Witness Mr. Gocial could explain much better than myself, Relator's accounting background is more modest, the margin of any spreadsheet is used only to explain and assist in analyzing the actual data to the right of the margin. RECORD PRESS CONTINUES TO SHOW NO DATA WITHIN THESE DOCUMENTS. Why? Because they would lose. Again full stop. Please see Relator's Affidavit attached to our Motion for Amended Judgment, in order to

23

not be repetitive. We have alleged Bid-Rigging, again see Relator's Motion for Amended Judgment Affidavit attached.

## JURISDICTIONAL BAR

As previously stated, we believe opinions on the relevant contract's interpretation by Mr. Sullivan, or for that matter Mr. Adgerson, should be discounted not just for the inherent bias, but as a matter of Jurisdiction. Mr. Sullivan, Government Printing Office's 30(b)(6) witness, was required to testify, for Relator's *prima facie*, to the facts that Record Press was a winning Contractor for the United States, that they (otherwise) Performed, that the Claims at issue were paid, that they are an ongoing Contractor, etc.. The Jurisdictional Bar, which was inadvertently breached, is in regard to the GPO witness's testimony as to the **Falsity of the Claims itself** being accepted by Court as Dispositive, or at all**.** We believe they are, or were, testifying on behalf of the Agency Head and/or as Contracting Officers. Please see again "In such palming off as we have here we do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute."[*United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956]"* and section 605(a) of the Contract Disputes Act, which removes any authority from the head of an agency "to settle, compromise, pay, or otherwise adjust any claim involving fraud." Please see also again Federal Acquisition Regulation 33.210(b), wherein the contracting officer has no authority to settle, compromise, pay or adjust "any claim involving fraud." These Statues appear to bar any Court Jurisdictionally from reliance on Agency Head or Procurement or Contracting Officers and Jurisdictionally proscribe their opining on whether any particular claim was

24

00000963

false.  If a Court were to rely on testimony by agency heads and/or subordinates, in order to decide falsity these Statutes (Black Letter Law) would be rendered void. We believe this is not the intent of the Court. There is certainly the acknowledged exception wherein a PREVIOUS 'meeting of the minds' (between Contractor and Contractee), as per case law quoted above, is potentially exculpatory evidence against falsity. In the instant case there was not a prior 'meeting of the minds' as sworn testimony and Deposition show (see above). This Court does appear to prefer some testimony as to what the proper contract interpretation should be. Relator's and Defendant's opinion as to falsity were reasonably construed as containing a legal bias, and we clearly request that GPO witnesses testimony as to falsity be discounted Jurisdictionally and for Bias. Record Press pretends to feign shock as to Relator challenging the veracity of the GPO witnesses and clearly believe, or want to believe, that GPO officers are allowed to resolve a false claim *ex post facto* without a prior meeting of minds. They cannot. We know what Congress intended with the above Statutes; to remove Agency employees Jurisdictionally from resolving False Claims. Why? Because they (Congress) believe the contrary would allow a Moral Hazard. Mr. Sullivan is certainly allowed his opinion on any subject, via the 1st Amendment, but by Statue and Case law it cannot be used to resolve falsity. We ask, in order to assist the Court and referencing this pending Motion for Amended Judgment, that Expert Witness Mr. Gocial be allowed to testify as to proper contract interpretation and the implications of the 'spreadsheets'. The alternative, that the Court decide, within Amended Judgment, on the 'four corners' of the IFB program 2231-S/1272-S and our explanation of the **whole** spreadsheet (RP00069, ex.2), which is the only explanation in the Record.

25

00000964

## STATEMENT OF MATERIAL FACTS

It is acknowledged that Defendant Record Press holds, and has held Contractor status as winning bidder on contract 2231-S with the Government Printing Office to print Briefs & Appendix for SDNY US Attorney's Office. It is agreed that Record Press is charging the correct amount on the line II(b) "Text Per Page" "Per 10 Copies" $.35 and II(a) "Complete Cover" "Per 10 Copies" $6.00. We have at issue, whether, within four corners of the contract, the line(s) RUNNING RATE PER 10 COPIES apply to line II(d) Collating, trimming to size and binding per 100 pages $ 12.25. We now, in addition, have documents, the spreadsheets, which indicate Record Press, or any other winning contractor, should not be charging on line II(d) at all, other than in rare circumstances, such as preprinted documents or writs of certiorari, which require 'Pressure Sensitive Stock' and substantial trimming. Mr. Gocial's attached Expert Report is included as a Material Statement of Facts and is Subsumed within instant Statement Of Material Facts by designation. A plain reading of the four corners of contact 2231-S leads one to conclude that winning contractor must charge the People no more than $12.25 per 10 Running Rate Copies Per 100 Pages, i.e. per 1000 pages for relevant line II(d). Record Press chose to ignore clear **NOTE: RUNNING RATE IS PER 10 COPIES** and again above all bid lines in section II "Running Per 10 Copies"

## FOR ADDITIONAL CONSIDERATION

Upon Information & Belief, Relator is informed that Record Press has been involved in Bid-Rigging. This is a violation of the Sherman Antitrust Act, 2/30/1890, ch. 647, 26 Stat. 209, 15 U.S.C. § 1–7 See *att.*. The Conspiratorial parties, atypically, were not otherwise lawfully competing printers, but Record Press and one or more employees, or

00000965

former employees, of G.P.O.. Petitioner offers the following evidence. Start with IFB 2231-S/1272-S. As Stipulated, one party contends the relevant line IId should be read as "Per 10 Copies, Per 100 Pages", and the other "Per Copy, Per 100 Pages". Why not write that? Is it to create Plausible Deniability? We shall see. Record Press contends it has been contracting with GPO for 30 years and in existence for 65, to which Petitioner Stipulates. In this time a Company and/or its Officers would presumably make many friends. Not a crime. Defendant acknowledges bidding on 2231-S and for years at questions, winning same. There could be no Overcharge/False Claim/Fraud without winning same. How to do so? Craft, or have crafted, a contract to "fit your needs" as potential Contractor. You want to make an unnatural rate of return, a.k.a. 'profit', but still win bid. How? Create, or have drafter create, a 'special gimmick' that only you and GPO insider(s) know(s). Virtually an act of genius, this 2231-S/1272-S attempts the all but impossible. To dissuade legitimate bidders from correctly bidding their interest, due to this secret or trick, and losing the bid. Of course us taxpayers also lose out. Record Press won its bid by unlawful insider knowledge and/or conspiracy. We have on the II(d) line the now famous "Basis of Award" of 14*[sic]*. Defendant, with its insider knowledge, bids more than double the other bidders on this, to other bidders trivial line. On the 'major' lines II(a) & II(b) it bids competitively. As Record Press acknowledged under Oath, their "Profit" existed on that line only with their bid. If the other bidders had the "secret" of the bid, that the vast majority of the revenue would ensue on that line (if II(d) is per 100 pages but not per 10 copies per 100 pages **AND** they are allowed by their insider friends to charge II(d) for magnitudes greater pages & books than stated in RFP) they would bid appropriately, i.e. like Record Press. Another bidder who divined the scam would bid

27

00000966

even higher on line II(d), why not $15 or $20, and only slightly lower on lines II(a) & II(b) such as $.32 per ten pages text per page. They would beat Defendant and Conspirator(s) at their own game. That winning bidder would have even more "Profit" and win the rigged bid. Didn't happen because the other bidders are not in on the scam. Why share when you can keep all the ill gotten gains for yourself? It's nice to have friends. Record Press charged GPO, who charged DOJ, i.e. current and future Taxpayers, $70 per binding for a book of 283 'leaves' (566 double sided pages). Binding and pages had the appearance of a smallish phone book. If The Yellow Pages were charged $70 for a binding that cost $.01 of glue, or less, they would go broke. If the People were charged $12.25 per book per 100 pages for binding alone for printing the Federal Budget the United States would go (more) broke. Of course, there was not one scintilla even one other GPO printer, or the GPO itself, ever charged this 'Kings Ransom' for binding glue, which should be deemed inculpatory. On July 5, 2007, Relator contacted FedEx Kinko's, whom the SDNY US Attorney's Office has a contract with, and asked what they charge for 'perfect' binding. They quoted a price of $4 per book for small orders and up to 50% off ($2) for larger orders, for any number of pages. They charge $.07 'text per page' for small orders with up to 50% off for large ($.035 same as Record Press).

## MITIGATION

So both parties appear to acknowledge that Record Press cannot pay the damages required under 31 USC § 3729, what would be the outcome if they had lost, or were to lose? We do not know. Would the United States (receiving 70-85% of recovery) own Record Press? Does it want to? Maybe not. Is that a fact the courts have, or this Court will, take into account? Relator affirms that lack of ability to pay damages/fines under 31

28

00000967

USC § 3729 should not mitigate falsity. As to 'small, employee-owned'(id. pg. 11), we are informed that employees of Record Press receive some of their pay in stock, but we are unclear whether any stock has ever been distributed to or voted by same, or any earnings have been distributed, or what class of stock is involved (see Wilmot Deposition). As to 'small' maybe, there are different standards. We again request, or request clarification, as to whether Record Press intends the Court see this, and 'employee-ownership', as a potential mitigation. We request an Amended Judgment to allow this court to overturn or revise what we consider to be a precedent that will rend the civil Federal False Claims Act. Mr. Lomas, in his Memorandum of Points and Authorities uses 'Wilmot Deposition' to make their *prima facie* case for fee shifting, (Dct. 94-main, pg.11) "Ex. 1, Transcript of Deposition of Hugh Wilmot, Jr. ("Wilmot Dep. Tr.") 6:17-7:3.)".  We agree that Mr. Wilmot is the sole decision maker regarding contract interpretation for Record Press since the initiation of his presidency. We acknowledge the fraud (actually 'false claims') started prior to said tenure, and Mr. Wilmot is perhaps underpaid to have to deal with his inherited 'rock and a hard place', but again request clarification as to whether this fact is or will be considered mitigation. Unfair maybe, but we must enforce the False Claims Act to deny companies large and, yes, small from unlawfully grabbing tax-payer monies. Perhaps Congress could amend the law to make the fines affordable, but that arguably has not been their intent. Mr. Wilmot stated clearly under oath that there was never any meeting of minds regarding contract terms, no discussion period. Perhaps he believed (via Counsel?[1]) we were required to prove intent?

---

[1] 'Though he had no basis for it, Burke alleged that Record Press had defrauded – *knowingly lied* – to the United States government.'(dct. 94-main, pg. 29)

00000968

This is not the case, as shown previously. So we have the Contract. The Contract shows that the winning contractor for IFB program 2231-S/1272-S must apply 'running rate' to 'collating, trimming to size and binding'. Simple. Record Press has succeeded in muddying the waters (with all due respect to America's greatest musician, McKinley Morganfield) and temporarily out-lawyering us.  Mr. Lomas, and Record Press, have succeeded in confusing the court through half-truths, prestidigitation, willful misstatements, misdirection and obfuscation, as shown. Mr. Lomas & co. forgot about the Motion *In Limine*, which they lost (Dct. 59, filed 12/16/2010, Terminated 02/03/2011) thus allowing Relator to speak as to contract interpretation at Trial. This appears to have been overlooked within June 12, 2013 Memorandum and Order and instant motion. As to their defeated motion, "Mr. Burke, who is not offered as an expert, may not offer any opinion testimony concerning the interpretation of any Record Press-GPO contract."(Dct. #59 pg.3). This, of course, holds true for Mr. Sullivan, not offered as an expert. Have your cake and eat it too. So in the instant case and June 12, 2013 Memorandum & Order we have a sea change in the definition of 'meeting of minds', which we believe was not the courts intent. The People are clearly requesting an Amended Judgment to 'un-muddy' the waters and restore the rights of the United States and the jurisdiction of the Federal False Claims Act. McKenna Long & Aldridge LLP, renowned litigators against the FCA (See dct.#94-1,pg.1, etc.) have achieved an overwhelming victory by prevailing at all, however temporarily, given their inability to retain even one expert witness to testify on their behalf [2], their loss on four or more

---

[2] Mr. Gocial was apparently barred from contract interpretation testimony, an issue we will request be reviewed or allowed within Amended Judgment.

00000969

dispositive motions and most importantly the undeniable, but avoided, fact that a plain

reading of relevant contract shows their client defrauded the United States more than they

can afford to pay back. Law students will be studying their victorious gimmicks.The best,

and perhaps prevailing, gimmick is certainly the 'spreadsheets'. Mr. Wilmot stated that

he did not rely on this document for his contract interpretation but instead the 'four

corners' of the contract[3]. (Ex. 1,Wilmot depo. Pg. 84 lines 16-18) "**Record Press is not**

**responsible for any numbers that enters into this particular table and the**

**interpretation of this particular table**[RP000069][emphasis added]". Record Press, by

counsel, again has it's cake and eats it too, this is also known as cognitive dissonance.

Mr. Wilmot eschewed this document in his deposition because it shows the intent we are

not required to prove under False Claims Act. Certainly he is aware, and we have shown,

**that Record Press should not be billing at all for Collating, Trimming to Size and**

**Binding!** McKenna Long's 'muddying the waters' by demanding, without logic, the

court view a tiny snippet of the spreadsheet Mr. Wilmot swore he did not use. A great

victory yes, but also a death of a thousand cuts for the False Claims Act, rendering it

---

[3] Ex. 1 pg.#83 line2-84line21 "BY MR. KING: Q. Do you – do you recognize this
document?[RP000069, ex. 2] A. **Yes, I Do.** Q. And what type of document is this? **A.
This document is a breakdown that generally accompanies the RFP submitted by
the GPO to every vendor or potential contractor for this particular
program.**[emphasis in original] Q.  Okay. And if you look down there for Record Press,
and you go down to where it says collating, trimming to size, and binding per 100 pages,
the basis of the order 14, the unit rate of 12.25, do you see that that's written there? …..
THE WITNESS: [Mr. Wilmot] Correct. I see it. BY MR KING: Q. And is it – is it your
testimony that these particular entries under Record Press's column are entries
corresponding to the RFP that Record Press submitted?.......THE WITNESS: I don't
know. BY MR KING: Q. Okay. So Mr. Wilmot, you didn't prepare the document? A.
**That's correct.** ……THE WITNESS: The previous question was, did I prepare this
document being this spreadsheet layout, no. Record Press did not create this. This is not a
Record  Press product. **Record Press is not responsible for any numbers  that enters
into this particular table and the interpretation of this particular table** [emphasis
added]……

31

00000970

moot. This is unfortunate and we again pray the court grant an Amended Judgment and

deny fees and stay Bill of Costs (dct. 95) until case is finally decided.

Brian Burke, Relator

145 east 23rd street #4R

Dated July 11, 2013                              New York, NY 10010

32

00000971

This document is available in two formats: this web page (for browsing content) and PDF (comparable to original document formatting). To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.

# Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For

## *An Antitrust Primer*

This primer briefly describes the most common antitrust violations and outlines those conditions and events that indicate anticompetitive collusion.

## Introduction[1]

American consumers have the right to expect the benefits of free and open competition — the best goods and services at the lowest prices. Public and private organizations often rely on a competitive bidding process to achieve that end. The competitive process only works, however, when competitors set prices honestly and independently. When competitors collude, prices are inflated and the customer is cheated. Price fixing, bid rigging, and other forms of collusion are illegal and are subject to criminal prosecution by the Antitrust Division of the United States Department of Justice.

In recent years, the Antitrust Division has successfully prosecuted regional, national, and international conspiracies affecting construction, agricultural products, manufacturing, service industries, consumer products, and many other sectors of our economy. Many of these prosecutions resulted from information uncovered by members of the general public who reported the information to the Antitrust Division. Working together, we can continue the effort to protect and promote free and open competition in the marketplaces of America.

This primer contains an overview of the federal antitrust laws and the penalties that may be imposed for their violation. It briefly describes the most common antitrust violations and outlines those conditions and events that indicate anticompetitive collusion so that you might better identify and report suspicious activity.

## Federal Antitrust Enforcement

Enacted in 1890, the Sherman Act is among our country's most important and enduring pieces of economic legislation. The Sherman Act prohibits any agreement among competitors to fix prices, rig bids, or engage in other anticompetitive activity. Criminal prosecution of Sherman Act violations is the responsibility of the Antitrust Division of the United States Department of Justice.

Violation of the Sherman Act is a felony punishable by a fine of up to $10 million for corporations, and a fine of up to $350,000 or 3 years imprisonment (or both) for individuals, if the offense was committed before June 22, 2004. If the offense was

00000972

committed on or after June 22, 2004, the maximum Sherman Act fine is $100 million for corporations and $1 million for individuals, and the maximum Sherman Act jail sentence is 10 years. Under some circumstances, the maximum potential fine may be increased above the Sherman Act maximums to twice the gain or loss involved. In addition, collusion among competitors may constitute violations of the mail or wire fraud statute, the false statements statute, or other federal felony statutes, all of which the Antitrust Division prosecutes.

In addition to receiving a criminal sentence, a corporation or individual convicted of a Sherman Act violation may be ordered to make restitution to the victims for all overcharges. Victims of bid-rigging and price-fixing conspiracies also may seek civil recovery of up to three times the amount of damages suffered.

**Forms of Collusion**

Most criminal antitrust prosecutions involve price fixing, bid rigging, or market division or allocation schemes. Each of these forms of collusion may be prosecuted criminally if they occurred, at least in part, within the past five years. Proving such a crime does not require us to show that the conspirators entered into a formal written or express agreement. Price fixing, bid rigging, and other collusive agreements can be established either by direct evidence, such as the testimony of a participant, or by circumstantial evidence, such as suspicious bid patterns, travel and expense reports, telephone records, and business diary entries.

Under the law, price-fixing and bid-rigging schemes are per se violations of the Sherman Act. This means that where such a collusive scheme has been established, it cannot be justified under the law by arguments or evidence that, for example, the agreed-upon prices were reasonable, the agreement was necessary to prevent or eliminate price cutting or ruinous competition, or the conspirators were merely trying to make sure that each got a fair share of the market.

*Price Fixing*

Price fixing is an agreement among competitors to raise, fix, or otherwise maintain the price at which their goods or services are sold. It is not necessary that the competitors agree to charge exactly the same price, or that every competitor in a given industry join the conspiracy. Price fixing can take many forms, and any agreement that restricts price competition violates the law. Other examples of price-fixing agreements include those to:

- Establish or adhere to price discounts.

- Hold prices firm.

- Eliminate or reduce discounts.

- Adopt a standard formula for computing prices.

- Maintain certain price differentials between different types, sizes, or quantities of

00000973

products.

- Adhere to a minimum fee or price schedule.
- Fix credit terms.
- Not advertise prices.

In many cases, participants in a price-fixing conspiracy also establish some type of policing mechanism to make sure that everyone adheres to the agreement.

***Bid Rigging***

Bid rigging is the way that conspiring competitors effectively raise prices where purchasers — often federal, state, or local governments — acquire goods or services by soliciting competing bids.

Essentially, competitors agree in advance who will submit the winning bid on a contract being let through the competitive bidding process. As with price fixing, it is not necessary that all bidders participate in the conspiracy.

Bid rigging also takes many forms, but bid-rigging conspiracies usually fall into one or more of the following categories:

**Bid Suppression**: In bid suppression schemes, one or more competitors who otherwise would be expected to bid, or who have previously bid, agree to refrain from bidding or withdraw a previously submitted bid so that the designated winning competitor's bid will be accepted.

**Complementary Bidding:** Complementary bidding (also known as "cover" or "courtesy" bidding) occurs when some competitors agree to submit bids that either are too high to be accepted or contain special terms that will not be acceptable to the buyer. Such bids are not intended to secure the buyer's acceptance, but are merely designed to give the appearance of genuine competitive bidding. Complementary bidding schemes are the most frequently occurring forms of bid rigging, and they defraud purchasers by creating the appearance of competition to conceal secretly inflated prices.

**Bid Rotation:** In bid rotation schemes, all conspirators submit bids but take turns being the low bidder. The terms of the rotation may vary; for example, competitors may take turns on contracts according to the size of the contract, allocating equal amounts to each conspirator or allocating volumes that correspond to the size of each conspirator company. A strict bid rotation pattern defies the law of chance and suggests collusion is taking place.

**Subcontracting:** Subcontracting arrangements are often part of a bid-rigging scheme. Competitors who agree not to bid or to submit a losing bid frequently receive subcontracts or supply contracts in exchange from the successful low bidder. In some schemes, a low bidder will agree to withdraw its bid in favor of the next low bidder in exchange for a lucrative subcontract that divides the illegally obtained higher price

between them.

Almost all forms of bid-rigging schemes have one thing in common: an agreement among some or all of the bidders which predetermines the winning bidder and limits or eliminates competition among the conspiring vendors.

### *Market Division*

Market division or allocation schemes are agreements in which competitors divide markets among themselves. In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves. For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers. In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors. In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies.

### Detecting Bid Rigging, Price Fixing, And Other Types Of Collusion

Bid rigging, price fixing, and other collusion can be very difficult to detect. Collusive agreements are usually reached in secret, with only the participants having knowledge of the scheme. However, suspicions may be aroused by unusual bidding or pricing patterns or something a vendor says or does.

### *Bid or Price Patterns*

Certain patterns of bidding or pricing conduct seem at odds with a competitive market and suggest the possibility of collusion:

### Bids

- The same company always wins a particular procurement. This may be more suspicious if one or more companies continually submit unsuccessful bids.

- The same suppliers submit bids and each company seems to take a turn being the successful bidder.

- Some bids are much higher than published price lists, previous bids by the same firms, or engineering cost estimates.

- Fewer than the normal number of competitors submit bids.

- A company appears to be bidding substantially higher on some bids than on other bids, with no apparent cost differences to account for the disparity.

- Bid prices drop whenever a new or infrequent bidder submits a bid.

- A successful bidder subcontracts work to competitors that submitted unsuccessful

00000975

bids on the same project.

- A company withdraws its successful bid and subsequently is subcontracted work by the new winning contractor.

**Prices**

- Identical prices may indicate a price-fixing conspiracy, especially when:

- Prices stay identical for long periods of time.

- Prices previously were different.

- Price increases do not appear to be supported by increased costs.

- Discounts are eliminated, especially in a market where discounts historically were given.

- Vendors are charging higher prices to local customers than to distant customers. This may indicate local prices are fixed.

### *Suspicious Statements or Behavior*

While vendors who collude try to keep their arrangements secret, occasional slips or carelessness may be a tip-off to collusion. In addition, certain patterns of conduct or statements by bidders or their employees suggest the possibility of collusion. Be alert for the following situations, each of which has triggered a successful criminal antitrust prosecution:

- The proposals or bid forms submitted by different vendors contain irregularities (such as identical calculations or spelling errors) or similar handwriting, typeface, or stationery. This may indicate that the designated low bidder may have prepared some or all of the losing vendor's bid.

- Bid or price documents contain white-outs or other physical alterations indicating last-minute price changes.

- A company requests a bid package for itself and a competitor or submits both its and another's bids.

- A company submits a bid when it is incapable of successfully performing the contract (likely a complementary bid).

- A company brings multiple bids to a bid opening and submits its bid only after determining (or trying to determine) who else is bidding.

- A bidder or salesperson makes:

- Any reference to industry-wide or association price schedules.

00000976

- Any statement indicating advance (non-public) knowledge of competitors' pricing.

- Statements to the effect that a particular customer or contract "belongs" to a certain vendor.

- Statements that a bid was a "courtesy," "complementary," "token," or "cover" bid.

- Any statement indicating that vendors have discussed prices among themselves or have reached an understanding about prices.

### *A Caution About Indicators of Collusion*

While these indicators may arouse suspicion of collusion, they are not proof of collusion. For example, bids that come in well above the estimate may indicate collusion or simply an incorrect estimate. Also, a bidder can lawfully submit an intentionally high bid that it does not think will be successful for its own independent business reasons, such as being too busy to handle the work but wanting to stay on the bidders' list. Only when a company submits an intentionally high bid because of an agreement with a competitor does an antitrust violation exist. Thus, indicators of collusion merely call for further investigation to determine whether collusion exists or whether there is an innocent explanation for the events in question.

### Conditions Favorable To Collusion

While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

- Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are "fringe" sellers who control only a small fraction of the market.

- The probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured.

- The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.

- Repetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts provide the opportunity for competitors to share the work.

- Collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting

00000977

employment from one company to another.

- Bidders who congregate in the same building or town to submit their bids have an easy opportunity for last-minute communications.

**What You Can Do**

Antitrust violations are serious crimes that can cost a company hundreds of millions of dollars in fines and can send an executive to jail for up to ten years. These conspiracies are by their nature secret and difficult to detect. The Antitrust Division needs your help in uncovering them and bringing them to our attention.

If you think you have a possible violation or just want more information about what we do, contact the Citizen Complaint Center of the Antitrust Division:

**E-mail:** *antitrust.complaints@usdoj.gov*

**Phone:** 1-888-647-3258 (toll-free in the U.S. and Canada) or 1-202-307-2040

**Address:**

Citizen Complaint Center
Antitrust Division, U.S. Dept. of Justice
950 Pennsylvania Ave. NW, Suite 3322
Washington, DC 20530

---

**FOOTNOTES**

1. This Primer provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. No limitations are hereby placed on otherwise lawful investigative and litigation prerogatives of the Department of Justice.

00000978



LEXSEE 45 IDAHO L. REV. 41


Copyright (c) 2008 Idaho Law Review
Idaho Law Review


2008


45 Idaho L. Rev. 41


**LENGTH:** 14916 words

ARTICLE: THE GOVERNMENT KNOWLEDGE DEFENSE TO THE CIVIL FALSE CLAIMS ACT: A MISNOMER BY ANY OTHER NAME DOES NOT SOUND AS SWEET

**NAME:** MICHAEL J. DAVIDSON*

**BIO:**

> * B.S., U.S. Military Academy, 1982; J.D., College of William & Mary, 1988; LL.M. (Military Law), The Army's Judge Advocate General's School, 1994; LL.M. (Government Procurement Law), George Washington University (GWU) School of Law, 1998; S.J.D., GWU, 2007. The author is a federal attorney. The opinions contained in this article are those of the author and do not reflect the position of any federal agency or the United States Government.

**SUMMARY:**
 ... A Phoenix Rises from the Ashes: The Development of the Government Knowledge Defense In 1986, in addition to eliminating the government knowledge-based jurisdictional bar, Congress clarified the FCA's scienter element, making it clear that the United States need not prove specific intent in order to establish that the defendant acted knowingly when it submitted a false claim or statement to the United States. ... Citing several dated cases, the court pointed out that " b ecause FCA liability requires an element of fraud or falsity, courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false." ... Hagood In Hagood, a qui tam relator brought suit alleging that the water agency had presented false cost allocation information to the United States to obtain an Army Corps of Engineers contract. ... The contractor in this scenario is still attempting to defraud the United States, and that fact remains unchanged even when the contracting officer or some other relevant acquisition official discovers the misconduct. ... The Tenth Circuit noted that the court in Butler had rejected the position that only a contracting officer's knowledge was relevant for purposes of determining whether a defendant had acted knowingly. ... For purposes of this defense, the legally relevant authority extends beyond that possessed by contracting officers to other procurement officials "with authority to act under the contract." ... Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct. ... Further, contractors will be held responsible for knowing the limitations on the authority of government contracting officials when such limitations were contained in published laws or regulations. ... Finding the regulators satisfactory, the Army's Contracting Officer accepted them as "equal" to the Delco-Remy regulators, and the contractor furnished the remaining regulators.

00000979

45 Idaho L. Rev. 41

**TEXT:**
I. INTRODUCTION

The Civil False Claims Act  n1 (FCA) serves as the United States Government's preeminent tool for addressing fraud.  n2 The FCA's application  has expanded beyond its initial focus on defense procurement fraud to embrace most federally funded government programs.  n3 The largest recoveries under the FCA are currently obtained in health care fraud cases.  n4 As a fraud fighting tool, the FCA has proven extremely successful, at least in terms of the fraud-related monetary recoveries. Since 1986, the United States has recovered more than $ 20 billion under the FCA.  n5

In response to the government's aggressive use of the FCA, the defense bar has developed several defenses to FCA claims.  n6 One such defense that has enjoyed a measure of success is the inappropriately named "government knowledge defense." The government knowledge defense is a misnomer to the extent the term implies that government knowledge of alleged wrongdoing, by itself, affords a complete defense to an FCA lawsuit. Indeed, the scope of the defense is much narrower. To the extent knowledge of wrongdoing by government officials constitutes a defense at all, such knowledge serves as a defense to the FCA's scienter element; that is, the alleged misconduct was not committed knowingly. In other words, the defendant could not have knowingly violated the FCA because the government knew about the conduct and authorized it, either explicitly or tacitly; or, at the very minimum, the defendant reasonably believed that the government was aware of, and in agreement with, the challenged conduct.

This article will examine the government knowledge defense, reviewing its development and examining its present state. Part II first provides an overview of the FCA. Part III then examines the development of the defense, distinguishing between the pre-1986 jurisdictional bar generated by government knowledge of misconduct and the post-1986 development of what has become known as the government knowledge defense. The article posits that the modern government knowledge defense traces its lineage to the Ninth Circuit's seminal decision in *United States ex rel. Hagood v. Sonoma County Water Agency*.  n7 Reviewing reported decisions, Part IV discusses the defense as it has developed into its modern form and attempts to articulate the defense's basic elements. Although the FCA has been applied to address fraud in the vast  majority of federally funded programs, this article will focus primarily on its application to government contracts.

II. HISTORICAL BACKGROUND OF THE FALSE CLAIMS ACT

The False Claims Act was enacted during the Civil War as a statutory tool to combat widespread fraud found among defense contractors.  n8 The Union Army reported instances of being charged multiple times for the same horse, finding "boots made of cardboard rather than leather,"  n9 and discovering sawdust substituted for gunpowder in ammunition crates and muskets in rifle crates.  n10 Civil War contractors had billed the United States "for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war."  n11 In its original form, the FCA allowed private persons to initiate lawsuits  n12 and provided for both criminal and civil penalties, but Congress eventually removed the FCA's criminal component and placed it elsewhere.  n13

Except for brief flurries of activity associated with America's entry into war, with concomitant increases in defense spending and defense contractor fraud, the FCA was infrequently used.  n14 However, during the early 1980s, federal agencies reported a steady increase in fraud investigations. The Department of Defense (DoD) reported that it conducted 2311 such investigations in 1984.  n15 The following year, the DoD Inspector  General "testified that 45 of the 100 largest defense contractors, including 9 of the top 10, were under investigation for multiple fraud offenses."  n16 Further, the Department of Justice reported to Congress that, within the proceeding year, it had achieved convictions of four major defense companies and had indicted another.  n17

The procurement fraud scandals of the early 1980s gave rise to various legislative initiatives designed to strengthen the government's ability to deal with rampant fraud within the defense industry,  n18 including significant revisions to the FCA.  n19 The 1986 amendments increased the maximum penalty from $ 2000 to $ 10,000 and provided for treble damages,  n20 added "reverse false claims"  n21 and anti-retaliation provisions,  n22 eliminated the exclusion for

45 Idaho L. Rev. 41

members of the armed forces, n23 clarified the scienter element n24 and the standard of proof, n25 and lengthened the statute of limitations. n26

In its current form, the FCA provides for civil liability against any person who engages in one of seven forms of misconduct. n27 The most common FCA causes of action are submitting a false claim and making or using false records to support a false claim. n28

An FCA action may be brought initially by either the United States or by an individual on behalf of the United States. n29 When suit is brought by an individual (a relator), the case is known as a qui tam. n30 "The basic idea [behind a qui tam suit] is that a private citizen with personal knowledge of such fraud may bring suit on the government's behalf in return for a cut of the proceeds should the suit prevail." n31 The United States may assume control over a qui tam lawsuit or it may decline to intervene and permit the relator to pursue the case. n32

A defendant found to have violated the FCA may be held liable for treble damages and a civil penalty of $ 5500 to $ 11,000 per false claim. n33 FCA damages "typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'" n34 Additionally, recovery of penalties is not dependent upon the United States proving actual damages. n35 In successful qui tam cases, the relator is entitled to a share of the government's recovery. This share may range up to thirty percent of the amount the United States recovers, depending upon the relator's contribution to the successful resolution of the case. n36

### III. THE DEVELOPMENT OF THE GOVERNMENT KNOWLEDGE DEFENSE

#### A. Demise of the Government Knowledge Jurisdictional Bar

Prior to 1986, government knowledge of the factual basis for a qui tam suit served as a jurisdictional bar to potential relators. n37 This bar reflected Congress's efforts during World War II to eliminate parasitic lawsuits. n38 Such lawsuits were being brought "'by parties having no information of their own to contribute, but who merely plagiarized information in indictments returned to the courts, newspaper stories or congressional investigations.'" n39 The FCA's prior government knowledge provision had been strictly interpreted so as to "preclud[e] any *qui tam* suit based on information in the Government's possession, despite the source." n40 Some courts have precluded qui tam lawsuits based on information in the government's possession even when the relator was the source of that information. n41 Corrupt contractors found an unintended safe harbor. As one legal treatise noted: "Defense contractors seeking to avoid liability or governmental officials who resented *qui tam* actions were almost always able to find some Government official somewhere who had *some* knowledge of the fraudulent activities involved." n42

Believing that such a draconian jurisdictional bar could lead to inequitable results n43 and seeking to encourage potential relators to bring suit, n44 Congress eliminated the jurisdictional bar and instead substituted a public disclosure standard: "[A] *qui tam* suit will be barred only if it is based on information that was 'publicly disclosed' at various hearings, in certain types of reports, or by the media." n45 Under this standard, "[i]nformation that the government 'has,' but that was never publicly disclosed, does not bar a *qui tam* suit." n46

In the event of a public disclosure, the qui tam relator's action is not barred so long as the relator was the original source of the information giving rise to the lawsuit. n47 The "original source" requirement is jurisdictional. n48 The FCA defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under [the FCA] which is based on the information." n49

The prior government knowledge-based jurisdictional bar and the current government knowledge defenses are analytically distinct concepts. The former focused on the government's knowledge of the fraud to preclude the relator from bringing suit; n50 the latter focuses on the effect the government's knowledge has on the defendant's mental state in order to determine if the defendant acted knowingly. n51 Further, the earlier jurisdictional language was removed from the FCA in 1986 n52 and replaced with the public disclosure/original source language found in § 3730(e)(4). n53

45 Idaho L. Rev. 41

Accordingly, to the extent that the possession of information forming the basis of a relator's FCA lawsuit served as a jurisdictional bar, that form of government knowledge defense no longer exists. However, "[o]nce public disclosure became the linchpin of the jurisdictional scheme, the effect of government knowledge on the viability of an FCA claim was thrown to the courts to decide." n54

B. A Phoenix Rises from the Ashes: The Development of the Government Knowledge Defense

In 1986, in addition to eliminating the government knowledge-based jurisdictional bar, Congress clarified the FCA's scienter element, making it clear that the United States need not prove specific intent in order to establish that the defendant acted knowingly when it submitted a false claim or statement to the United States. n55 In doing so, Congress intended to reach "the increasingly familiar 'ostrich-like' conduct of corporate officers, who had been able to insulate themselves from FCA liability for false claims submitted by unwitting subordinates." n56

By the plain terms of the FCA's statutory language, the scienter requirement is that the defendant acted knowingly for all FCA claims except those enumerated in sections 3729(a)(3), (a)(4) and (a)(5). n57 Currently, the FCA defines "knowing" and "knowingly" to "mean that a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information . . . ." n58

In other words, the "defendant must 'know' that a claim or statement is false or fraudulent, that is, he must (1) have actual knowledge that it is false, (2) act in deliberate ignorance of its truth or falsity or (3) act in reckless disregard of its truth or falsity." n59 The United States, or a relator acting on its behalf, is not required to prove that the defendant acted with the specific intent to defraud. n60

1. *Boisjoly:* A Failed First Attempt

The first reported post-1986 amendment case to address the government knowledge defense was *Boisjoly v. Morton Thiokol, Inc.* n61 In *Boisjoly,* an engineer working for the defendant filed a qui tam following the Challenger disaster, alleging that Morton Thiokol provided NASA with defective solid rocket motors (SRM), n62 that the defendant's role in the launch decision constituted a false claim, and that the company requested and received a bonus from NASA despite the shuttle disaster and the company's failure to meet contract specifications. n63

The court granted the defendant's motion to dismiss the first cause of action, noting that the complaint itself indicated that NASA knew of the alleged SRM defects. n64 Citing several dated cases, n65 the court pointed out that "[b]ecause FCA liability requires an element of fraud or falsity, courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false." n66 The court then posited, "only if the government gets something less than or different from that which it expected can it be said to have suffered the kind of injury necessary to invoke FCA liability." n67 The court held "that if the complaint itself alleges that the government knew of those very facts or characteristics which allegedly make the claim false, no claim has been stated." n68

Further, the court determined that the remaining causes of action did not state an FCA claim. n69 The court found that the defendant had certified the safety of the SRMs only after disclosing its concerns to NASA and after being pressured by the government to submit the certification. n70 The court held that such "circumstances are simply not the kind against which the FCA is meant to protect" and "negate[] any element of falsity or fraud that might otherwise exist." n71

With respect to that portion of the opinion addressing the government knowledge defense, the court's decision has been criticized n72 and effectively overruled to the extent *Boisjoly* suggests that government knowledge constitutes an absolute defense. n73 In *Shaw v. AAA Engineering & Drafting, Inc.,* the United States Court of Appeals for the Tenth Circuit specifically rejected the notion that government knowledge constituted an absolute defense to an FCA case. n74 Instead, the court noted that "there may still be occasions when the government's knowledge of or cooperation with a

contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA." n75 Further, as subsequent case law has shown, government knowledge may serve as a defense to the FCA's scienter element, rather than to the falsity of the claim. n76

   2. *Hagood:* The Ninth Circuit Sets the Standard

   The seminal and most often cited case to address the government knowledge defense since the 1986 amendments to the FCA is *United States ex rel. Hagood v. Sonoma County Water Agency.* n77 Indeed, the *Hagood* decision has been cited with approval by several circuit courts, including the Second, n78 Sixth, n79 Seventh, n80 and Tenth, n81 by the U.S. Court of Federal Claims, n82 and by district court decisions in other circuits. n83

      a. *Hagood*

   In *Hagood,* a *qui tam* relator n84 brought suit alleging that the water agency had presented false cost allocation information to the United States to obtain an Army Corps of Engineers contract. n85 The district court dismissed the suit "for failure to state a claim for which relief could be granted." n86

   The district court believed that Hagood's complaint was "essentially self-contradictory" because it both alleged that the water agency had committed fraud and that "'the high government officials responsible for taking the action' knew of the facts that made the complaint false." n87 Further, the district court found that Hagood failed to sufficiently plead fraudulent intent for purposes of Fed. R. Civ. P. 9(b) and that the government's knowledge of the alleged falsity made it "impossible to say that the government had suffered the kind of injury necessary to impose liability under the False Claims Act." n88 Elaborating, the district court mused, "it is difficult to see how any damages to the United States are caused by false statements when officials, with full knowledge of the falsity of the statements, proceed to take an action depriving the government of funds notwithstanding the false statements." n89

   On appeal, the United States Court of Appeals for the Ninth Circuit reversed and remanded. n90 The appellate court found that Hagood's complaint was not self-contradicting. n91 Reviewing the FCA's requirement that the alleged misconduct be knowing, the court noted that the scienter element required more than mere negligence or innocent mistake but did not require the government to prove specific intent to deceive. n92 In terms of intent, the United States had to establish "the knowing presentation of what is known to be false." n93

   With respect to government knowledge of the falsity, the court acknowledged that such knowledge could be "highly relevant"; it could "show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." n94 However, the court also posited that government knowledge did not alone provide an absolute defense--"[t]hat the relevant government officials know of the falsity is not in itself a defense." n95 In short, the court found evidence of government knowledge potentially relevant to the FCA's scienter element, but not to the issue of falsity. n96

   The court left the question of whether government knowledge may preclude an award of damages unanswered. n97 However, the court pointed out that the United States need not prove damages in order to recover penalties and costs, suggesting that even if government knowledge provided a causal defense against an award of damages, such knowledge did not insulate the defendant from the imposition of penalties. n98

   Finally, the court rejected an estoppel defense. Reiterating the well-established law that "estoppel will not lie against the United States 'on the same terms as any other litigant,'" under the facts alleged in this case, the court posited that "[t]he defendant's 'inability to retain money that it should never have received in the first place' is not the kind of detrimental reliance that justifies estoppel against the government." n99 Finding that Hagood's allegations constituted a valid cause of action, the court further admonished: "'Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of the law . . . . [T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.'" n100

00000983

b. *Hagood's* Progenies: *Wang & Butler*

The Ninth Circuit's decisions in *Wang* and *Butler* amplified its original decision in *Hagood*. In *Wang ex rel. United States v. FMC Corp.*, n101 a qui tam relator, who had alleged that FMC defrauded the United States on four defense contracts including a contract involving a lightweight howitzer, unsuccessfully appealed the district court's grant of summary judgment to FMC. n102 In support of his claim, Wang alleged "that FMC's engineering work was of 'low quality,' and that the design for the lightweight howitzer was 'faulty.'" n103 Wang's sole piece of evidence to support his allegations concerning the howitzer contract was an FMC "lessons learned" memorandum written after the contract had been cancelled. n104 Significantly, "all of the issues discussed in the memorandum were first raised and considered in meetings with the Army." n105

Analyzing the FCA's scienter requirement, the court noted that the Army knew about "FMC's mistakes and limitations, and that FMC was open with the government about them . . . ." n106 Accordingly, the court opined that Wang's evidence was insufficient to survive summary judgment, the memorandum suggesting only "that while FMC might have been groping for solutions, it was not cheating the government in the effort." n107 To be knowingly false, there must be something more than a mere scientific untruth, there must be "a lie." n108

Following *Wang*, the Ninth Circuit again addressed the issue of government knowledge in an FCA case. In *United States ex rel. Butler v. Hughes Helicopter, Inc.*, n109 a qui tam relator, who alleged that the defendant had made false statements and submitted false claims "related to several aspects of the testing of the avionics and navigation subsystems" of the Apache attack helicopter, appealed an adverse directed verdict. n110 At trial, the defendant argued, in relevant part, that Army technical representatives approved deviations from the required specifications and that Army technical representatives were also present during relevant equipment tests. n111 As part of its findings of fact, the district court noted "the Army's knowledge of and access to the modifications in the testing of the subsystems . . . ." n112 Further, the district court's decision relied on its conclusion that the Army and defendant enjoyed a "pattern of cooperation" in which "information flowed freely," and "all information upon which [Butler] bases his case was not only available to the Army, but in the Army's possession." n113

On appeal, Butler did not challenge the district court's findings of fact, but instead argued "that the *wrong* Army personnel knew, that is, that only a contracting officer had the power to modify a government contract to allow the deviations the Army allowed in the testing." n114 The court first noted that government knowledge is not an automatic defense to an FCA action and that courts must evaluate the significance of such knowledge on a case-by-case basis. n115 Relying on *Hagood* and *Wang*, the court then determined that the scope of its review focused on the evidence "that [the defendant] and the Army had so completely cooperated and shared all information during the testing that [the defendant] did not 'knowingly' submit false claims," in which case the court would affirm the directed verdict. n116 With respect to the government knowledge defense, the court did not directly confront Butler's argument, but instead found that test changes were discussed between the defendant and Army representatives, that Army technical representatives knew of and approved these changes, and, accordingly, that the allegedly noncompliant test could not have been a "knowingly false statement[]." n117

IV. THE CURRENT STATE OF THE DEFENSE

The vast majority of cases have determined that government knowledge is not an absolute defense to an FCA action. n118 In other words, the mere fact that government officials know of the falsity does not, standing alone, constitute a defense. n119 While relevant, "the Government's knowledge is . . . not necessarily dispositive . . . ." n120 The significance of the government's knowledge is determined on a case by case basis. n121

Since the 1986 FCA amendments, several courts have addressed the government knowledge defense, providing an emerging, but sufficiently well defined, body of law to map out the parameters of this defense. In order for government knowledge of defendant's alleged wrongdoing to serve as a defense to an FCA action, the defendant must satisfy several elements. First, the defendant can use the government's knowledge of his conduct to defend against the FCA's scienter

45 Idaho L. Rev. 41

element to establish that he did not knowingly commit a violation of the FCA. Second, the defendant must establish that the government had knowledge of the specific conduct that forms the basis of the FCA claim. Third, the defendant cannot merely show that someone in the government had knowledge of the challenged conduct; rather, the defendant must prove that a relevant government official was aware of the challenged conduct and approved it, either explicitly or tacitly. Finally, the defendant must also prove that the relevant government official had knowledge of the specific conduct at issue *before* the defendant presented a claim.

   A. Defendant's Scienter Was Affected

   The courts have applied the government knowledge defense to the scienter element of the FCA. n122 As originally explained by the United States Court of Appeals for the Ninth Circuit in *Hagood,* the requisite intent in an FCA case is "the knowing presentation of what is known to be false." n123 Accordingly, "[t]hat the relevant government officials know of the falsity is not in itself a defense." n124 "[T]he knowledge possessed by officials of the United States may be . . . relevant. . . . [to] show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." n125 The focus of the defense is not on what the government knew; rather, the defense focuses on whether the defendant acted knowingly, examining the effect of the government's knowledge on the defendant.

   Interpreting the FCA to provide an absolute defense based on government knowledge of the specific falsity at issue, without a concomitant effect on the defendant's mental state, would lead to absurd results. To illustrate, assume that a contractor knowingly submits a false claim--indeed does so with the specific intent to defraud the United States--but a federal employee learns of the falsity unbeknownst to the corrupt contractor, either before or after the claim is submitted. Is the claim any less false, or was it submitted any less knowingly, merely because someone in the government became aware of it? The answer, of course, is no. n126 Nor does the answer change if the federal employee who discovers the falsity is the cognizant contracting officer. n127 The contractor in this scenario is still attempting to defraud the United States, and that fact remains unchanged even when the contracting officer or some other relevant acquisition official discovers the misconduct.

   In *Shaw v. AAA Engineering & Drafting Inc.,* n128 the United States Court of Appeals for the Tenth Circuit rejected a government knowledge defense based on knowledge of misconduct provided to the government by the qui tam relator, who had formerly been employed by the defendant. While still an employee of the defendant, Shaw reported certain environmental misconduct to the government's Quality Assurance Evaluator, who in turn relayed the information to the contracting officer. n129 In rejecting the defense the court posited:

      Assuming some level of government knowledge would negate the intent requirement under the FCA
      as a matter of law, the level of government knowledge in the present case does not do so. It was the
      plaintiff, Shaw, and not the individual defendants or other AAA employees, who told the government
      about the failure to practice silver recovery. n130

   The unsuitability of government knowledge as an absolute defense is highlighted further when the knowledgeable federal employee is not merely a passive recipient of information, but instead is a participant in a scheme to defraud the United States. n131 Clearly, the defendant should not escape liability merely because it found a willing participant--a coconspirator--within the government.

   Additionally, an FCA defendant should not benefit if someone from the government learns of the falsity and simply does nothing about it. The Seventh Circuit has held that mere governmental acquiescence is insufficient to sustain a government knowledge defense. n132 The government must both know of, and approve, the particular claim before it is submitted. n133 The opinions of other circuit courts appear to have adopted a similar standard. n134 Unless that person is someone with the requisite level of authority and approves or otherwise indicates to the defendant that its conduct is permissible, then the defendant's scienter remains unaffected. Additionally, "mere acquiescence would preclude FCA liability any time a government employee and a defendant were in cahoots." n135

00000985

45 Idaho L. Rev. 41

Even though the government has not affirmatively approved a particular claim or its underlying factual basis when such is in contention, apparently some courts have imposed a less demanding standard that permits the defense when government knowledge is coupled with acquiescence.  n136 Such a standard would seem defensible so long as the defendant could establish that the particular facts and circumstances surrounding the government's receipt of relevant information, and subsequent acquiescence, reasonably affected the defendant's mental state. In those jurisdictions adopting such a standard, the critical focus would remain on the defendant's scienter, that is, did the defendant knowingly submit a false claim.

B. Specific Falsity at Issue

In order for government knowledge to serve as a defense, the United States must also have known of the specific falsity at issue. Both the Fifth and Seventh Circuits have posited: '"[I]f the government knows and approves of *the particulars* of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim."'  n137 Other courts applying the defense have  articulated a similar standard n138 or have noted that the specific falsity at issue was known to the government.  n139 Logically, this element should be met if the defendant has fully disclosed all relevant facts leading up to the presentment of a claim, or followed the government's specific instructions when presenting the claim, such that it is apparent that the government knew and approved of the defendant's course of action.  n140 Under this standard, it is insufficient that the Government becomes aware of contractual or programmatic irregularities not amounting to fraud or becomes aware of other, unrelated fraud.

C. Relevant Government Officials

Merely establishing that someone within the government possessed knowledge of the defendant's wrongdoing does not, by itself, satisfy this element of the government knowledge defense. Albeit few cases have squarely addressed the issue, several opinions have suggested a limitation on the defense, requiring that the knowledge be possessed by relevant government employees.  n141 Other court opinions applying the defense, but not addressing the relevant pool of government officials, have noted complete or extensive knowledge by the government of the alleged misconduct, n142 suggesting that this limited body of relevant or responsible  officials also had the requisite knowledge. If such a limitation did not exist, then a defendant could escape liability simply by finding someone within the government who possessed some knowledge of the challenged conduct, regardless of that person's authority or relationship with the underlying program or activity.

The United States Court of Appeals for the Tenth Circuit was one of the few courts to directly address this issue in the federal procurement context. In *United States ex rel. Stone v. Rockwell International Corp.,* n143 the Tenth Circuit reviewed a challenge to the district court's jury instruction, "charging the jury that they could consider the knowledge of all 'government employees with authority to act under the contract."'  n144 Noting that the instruction had not limited the jury's consideration of knowledge possessed only by the government's contracting officers, but rather that such authority extended to "a broader range of individuals," the appellate court held that the district court's instruction was not in error.  n145

Further, the court rejected the appellant's argument that upholding the lower court's jury instruction would conflict with *United States ex rel. Butler v. Hughes Helicopters, Inc.* n146 The Tenth Circuit noted that the court in *Butler* had rejected the position that only a contracting officer's knowledge was relevant for purposes of determining whether a defendant had acted knowingly.  n147 Instead, the Ninth Circuit had included "technical representatives" within the pool of relevant government officials.  n148

As the *Stone* decision correctly indicates, for purposes of this defense, the legal significance of the government's knowledge in the federal  procurement context is linked to the authority of the employee in possession of the information. That authority does not reside with all employees merely because they are somehow associated with the procurement; nor, on the other hand, is such authority embodied solely in the contracting officer. For purposes of this defense, the legally relevant authority extends beyond that possessed by contracting officers to other procurement

45 Idaho L. Rev. 41

officials "with authority to act under the contract." n149

Unfortunately the courts have failed to provide a clear standard for determining relevant officials--those with the requisite level of authority--specifically for purposes of the government knowledge defense. However, although the two bodies of law are not synonymous, established principles of general federal procurement law addressing the authority of federal acquisition officials to bind the government offer guidance for FCA cases. Under these legal principles, application of the government knowledge defense should be limited to knowledge possessed by government employees acting with actual contractual authority, depending upon the facts of the case. n150

1. Actual Authority, Express or Implied, Is Required

As a general rule, the United States is bound only by the conduct of its employees acting with actual authority. n151 Similarly, as a general rule in the procurement context, "[o]nly persons with contracting authority can bind the Government." n152 In the procurement context, cognizant contracting officers have actual authority to bind the government. n153 Once they receive the requisite grant of authority, contracting officers may "enter into, administer, or terminate contracts and make related determinations and findings." n154 Further, contracting officers possess authority "to execute contract modifications on behalf of the Government." n155

Limits on the contracting officer's authority are provided to that official in writing and such limitations are known, or readily subject to determination, by contractors and other federal officials. Contracting officers are appointed in writing with a Certificate of Appointment (called a "warrant") containing any limitations on their authority. n156 Information concerning the limitations on the contracting officer's authority is readily available to the public. n157 Indeed, some contracting officers even post their warrants on their office wall for contractor review. n158

Contracting officers may delegate portions of their authority to other government employees. n159 Accordingly, with respect to federal procurements, the "relevant" pool of actors for the government knowledge defense should normally include the contracting officer overseeing the particular contract, who usually possesses the "authority to enter into, administer, or terminate contracts and make related determinations and findings." n160 Also, the relevant pool could include those subordinate contracting officials whom the contracting officer expressly delegates actual authority to perform various contracting functions. n161 Typical government officials falling into this category may include the Administrative Contracting Officer (ACO), n162 Terminating Contracting Officer (TCO), n163 and certain "formally designated representatives who act on behalf of the Government during contract administration." n164 Such representatives could include the "contracting officer representative (COR), contracting officer technical representative (COTR), Government Technical Representative (GTR), or Government Technical Evaluator (GTE)." n165

For contractors, authority issues may become confusing in federal procurements because they frequently deal with government employees with varying levels of authority, who may possess titles or exercise related duties that suggest a greater level of authority. n166 As one treatise notes:

Within contracting offices, personnel with official-sounding titles such as contract specialist, negotiators, and administrators work for contracting officers and handle the day-to-day contracting activity of the government, but such personnel generally do not have authority to order additional work or to commit the government by virtue of their position. Contractors are expected to recognize this lack of authority. n167

In order to provide relief to contractors, various courts and boards have relied on the court-created theory of "implied" actual authority to bind the United States. n168 Accordingly, in some limited circumstances, "[t]he authority of a Government official . . . may . . . arise from 'implied actual authority.'" n169 A government employee may be found to possess the "implied authority to bind the Government in contract 'when such authority is considered to be an integral part of the duties assigned to [the] government employee." n170 In this context "integral" means '"essential or necessary to form a whole."' n171 However, implied authority only exists when *some* authority has been properly

45 Idaho L. Rev. 41

delegated to a government employee. n172 A government procurement official lacking any actual authority, cannot be deemed to possess implied actual authority. n173

Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct. n174 Accordingly, the FCA is violated when a contractor submits a false claim even when the contractor informs the government of the claim's falsity before submission. n175 Further, once false claims are received, a contracting officer may not modify the contract, or take other action, to waive past false claims. n176

The Federal Acquisition Regulation (FAR) also contains express limitations on contracting officer authority when a claim is suspected to be false or tainted by fraud. Pursuant to FAR 33.210(b), the contracting officer has no authority to settle, compromise, pay or adjust "any claim involving fraud." n177 Similarly, section 605(a) of the Contract Disputes Act removes any authority from the head of an agency "to settle, compromise, pay, or otherwise adjust any claim involving fraud." n178 This statutory restriction on agency heads extends downward to subordinate agency procurement officials. n179

However, the fact that a contracting officer, or other authorized procurement official, resolved a bona fide pre-claim dispute that later forms the basis of an FCA lawsuit may give rise to a triable issue. n180 Although they may not waive false or fraudulent claims, contracting officers may resolve legitimate contract disputes. n181 Indeed, as a matter of policy, the federal government encourages resolution of contractual disputes at the contracting officer level. n182 As one court explained this distinction: "[T]he fact of a settlement, while not dispositive, is relevant insofar as it supports an inference that the defendant was involved in a contract dispute with the government, not that a government officer knew of a fraud and nonetheless decided to settle." n183

2. Knowledge and the Duty to Inquire

A second, significant body of law exists placing a duty of inquiry on a contractor when dealing with the United States. This duty is rooted in the unique status of the United States as a sovereign and draws upon the legal principle that persons are charged with constructive knowledge of published laws and regulations. n184 As the United States Supreme Court has admonished: "'Men must turn square corners when they deal with the Government . . . .'" n185

Within the realm of federal procurement law, courts have placed the burden on contractors to ensure that they are "dealing with a Government employee with contracting authority." n186 Further, contractors will be held responsible for knowing the limitations on the authority of government contracting officials when such limitations were contained in published laws or regulations. n187 Additionally, when the limitations on delegations of authority are expressly made known to contractors by including authority limitations as contract clauses, contractors will be held to those limitations. n188

Various courts have applied the "square corners" rule to the FCA. n189 Further, the legislative history from the 1986 amendments to the FCA reflects a congressional desire that a duty of inquiry be placed on contractors who deal with the government. n190 Furthermore, the FCA's legislative history indicates that the Act's "knowing" definition reflects, at least in part, the constructive knowledge standard. n191 The incorporation of a constructive knowledge standard into the FCA was designed to place at least a limited duty of inquiry upon the defendant in order "to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries that would alert him that false claims are being submitted." n192

Given the existence of this body of law, with its application to both federal procurement law concerning the authority of federal acquisition officials and to the FCA, any government knowledge defense must also be scrutinized to determine if the defendant contractor knew, or should have known, of the authority limitations on the government official alleged to possess knowledge of contractor wrongdoing. Clearly, if the FCA defendant has actual knowledge of such limitations because of contractual clauses articulating the authority of the government's officials, then federal employees falling outside the scope of those clauses should not constitute relevant officials for purposes of this defense.

00000988

45 Idaho L. Rev. 41

Similarly, if contractual authority limitations are contained in publicly available statutes or regulations (for example, FAR), then the contractor should be charged with the constructive knowledge of those limitations and the defense should fail. Finally, some form of limited duty of inquiry should be placed on the contractor to determine the authority of the government official with whom the contractor is providing information.

3. Timing Does Matter

The falsity of the claim is measured at the time it is submitted to the United States. n193 Accordingly, a necessary prerequisite to any defense based on government knowledge of the falsity is that the relevant government officials knew of the challenged conduct *before* the false statement or claim was presented to the United States. Several courts have recognized this limitation on a government knowledge defense. n194 Although not directly addressing the issue, other cases applying the government knowledge defense contain fact patterns in which the government was aware of the challenged conduct before a claim was presented. n195

Such a temporal requirement is consistent with the basic premise underlying the defense--that the contractor did not knowingly engage in misconduct because it believed the government knew of its conduct and approved, either explicitly or tacitly. Also, this prerequisite to the government knowledge defense is consistent with the authority limitations placed on the contracting officer, as well as any other potentially relevant government official that a contractor may reasonably expect to deal with during a federal procurement. As noted earlier, government procurement officials cannot waive or ratify false or fraudulent claims. n196

The following FCA case illustrates this point. In *United States v. National Wholesalers*, n197 the defendant was awarded a contract to provide 6000 proprietary Delco-Remy vehicle regulators to the Army. n198 The bid proposal permitted either Delco-Remy regulators or "equals," but National Wholesalers offered to provide the actual Delco-Remy regulators, and the contract was awarded on that basis. n199 Unable to provide conforming Delco-Remy regulators, the defendant manufactured its own regulators--which the district found to be equal to the brand regulators--but then printed and affixed false Delco-Remy labels to the regulators n200

Unaware of the mislabeling, the Army accepted seventeen shipments of the mislabeled parts, for a total of 4086 regulators. n201 Additionally, the contractor submitted seventeen invoices for payment. n202 Upon discovering the contractor's misconduct, the Army issued a "stop order" on future deliveries and tested the manufactured regulators. n203 Finding the regulators satisfactory, the Army's Contracting Officer accepted them as "equal" to the Delco-Remy regulators, and the contractor furnished the remaining regulators. n204

Subsequently, the United States Attorneys Office filed suit under the False Claims Act, based on the seventeen invoices submitted prior to the contracting officer having learned of the mislabeling. n205 The district court found for the defendants, determining in part that the regulators were "equals" and that the contracting officer had the authority to resolve contract disputes, which he had done here. n206

On appeal, the United States Court of Appeals for the Ninth Circuit reversed. The court determined that the time to test the falsity of a claim is the date when it is submitted. n207 Accordingly, "every one of the invoices prior to [when the contracting officer learned of the mislabeling] was false when made." n208 Further, although the contracting officer has the authority to modify a contract, a retroactive modification under such circumstances was "void as against public policy." n209 The court continued: "In such palming off as we have here we do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute." n210

V. CONCLUSION

As one federal court has correctly noted, the government knowledge defense is "inaptly-named." n211 The fact that someone in the government possessed knowledge of the misconduct that forms the basis of a False Claims Act lawsuit, by itself, does not constitute a legal defense. Depending upon the circumstances, government knowledge may be highly relevant evidence to negate the FCA defendant's scienter. In other words, government knowledge may

00000989

45 Idaho L. Rev. 41

establish that the defendant did not act knowingly, that it did not act with actual knowledge, in deliberate ignorance, or with reckless disregard.

The modern-day government knowledge defense developed slowly in the wake of the 1986 amendments to the False Claims Act. Beginning with the seminal case of *United States ex rel. Hagood v. Sonoma County Water Agency,* n212 the courts have gradually defined the defense's contours and criteria. The vast majority of cases have held that government knowledge may serve as a defense to the FCA's knowing scienter element. Further, the courts require that a relevant government official possess knowledge of the specific falsity at issue before the defendant presents a claim and approve of that conduct. Although not fully mature, the government knowledge defense is sufficiently well developed to provide courts and practitioners with solid guideposts for applying it in FCA litigation.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
GovernmentsState & Territorial GovernmentsClaims By & AgainstLabor & Employment LawEmployer LiabilityFalse Claims ActCoverage & DefinitionsJurisdictional BarLabor & Employment LawEmployer LiabilityFalse Claims ActCoverage & DefinitionsQui Tam Actions

**FOOTNOTES:**

n1 31 U.S.C. §§ 3729-3733 (2000).

n2 United States *ex rel.* Roby v. Boeing Co., 302 F.3d 637, 641 (6th Cir. 2002) ("The FCA has since become the primary means by which the Government combats and deters fraud."); Ron R. Hutchinson, *The Government's Audit and Investigative Powers over Commercial Item Contracts and Subcontracts,* 27 PUB. CONT. L.J. 263, 286 (1998) ("The Civil False Claims Act is the Government's primary vehicle for pursuing civil fraud . . . .").

n3 JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS 1-3 (Supp. 1999) ("combating fraud in virtually every program involving federal funds").

n4 Press Release, U.S. Dep't of Justice, Justice Department Recovers $ 2 Billion for Fraud Against the Government in FY 2007; More Than $ 20 Billion Since 1986 (Nov. 1, 2007), http://www.usdoj.gov/opa/pr/2007/November/07_civ_873.html.

n5 *Id.*

n6 *See, e.g.,* United States v. Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 768-74 (N.D. Tex. 2002) (addressing several defenses).

45 Idaho L. Rev. 41

n7 929 F.2d 1416 (9th Cir. 1991).

n8 SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5273 ("The False Claims Act was adopted in 1863 and signed into law by President Abraham Lincoln in order to combat rampant fraud in Civil War defense contracts."); *see also* United States *ex rel*. Wilkins v. N. Am. Constr. Corp., 173 F. Supp. 2d 601, 619 (S.D. Tex. 2001) ("The False Claims Act is a statutory cause of action intended from its inception to combat fraud against the government.").

n9 JAMES B. HELMER, JR., ANN LUGBILL, & ROBERT C. NEFF, JR., FALSE CLAIMS ACT: WHISTLEBLOWER LITIGATION §2-4, at Inside America's Biggest Defense Scandal 28 (2d ed. 1999).

n10 *Id.;* ANDY PASZTOR, WHEN THE PENTAGON WAS FOR SALE 11 (1995).

n11 United States v. McNinch, 356 U.S. 595, 599 (1958).

n12 S. REP. NO. 99-345, at 10 ("The original False Claims Act also contained a provision allowing private persons, or 'relators,' to bring suit under the act.").

n13 BOESE, *supra* note 3, at 1-10 n.27. False claims are now prosecuted criminally pursuant to 18 U.S.C. § 287. *Id.*

n14 *See* John P. Robertson, *The False Claims Act,* 26 ARIZ. ST. L.J. 899, 901 (1994) ("[T]he Act lay essentially dormant until World War II broke out and fraud on the government by defense contractors increased."); *see* BOESE, *supra* note 3, at 1-11 ("There are few reported [FCA] decisions prior to 1930."); *Id*. at 1-14 ("The dramatic increases in government spending during and after World War II triggered an upsurge in the number of FCA cases brought by the Government; the number of such cases rose again during the military buildup of the Vietnam War . . . .").

n15 S. REP. NO. 99-345, at 2 ("up 30 percent from 1982"). The Department of Health and Human Services also reported a significant increase in entitlement program fraud. *Id.*

n16 *Id.*

00000991

45 Idaho L. Rev. 41

n17 *Id*. at 2-3.

n18 In 1986, Congress also passed the Anti-Kickback Act, 41 U.S.C. §§ 51-58 (2000), a prohibited employment statute, 10 U.S.C. § 2408 (2006), and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812 (2000). *See* Vt. Agency of Natural Res. v. United States *ex rel*. Stevens, 529 U.S. 765, 786 n.17 (2000) ("PFCRA was designed to operate in tandem with the FCA. . . . [and was] enacted at virtually the same time as the FCA was amended in 1986 . . . its scope is virtually identical to that of the FCA."). For a discussion of the prohibited employment statute, see generally Michael J. Davidson, *10 U.S.C. § 2408: An Unused Weapon in the Procurement Fraud Wars*, 26 PUB. CONT. L.J. 181 (1997).

Additionally, in 1986 the FBI initiated a major investigation into defense procurement fraud, known as Operation Ill Wind. Dick Thornburgh, *Foreword, Sixth Survey of White Collar Crime*, 28 AM. CRIM. L. REV. 383, 385-86 (1991). By April 1991, the government had achieved convictions of twenty-seven of the largest defense contractors for defrauding the United States. *Id*. at 386. Similar investigative efforts by the Defense Criminal Investigative Service generated an increase in procurement fraud-related convictions, "with 283 convictions in 1990 alone." *Id*.

n19 *See* S. REP. NO. 99-345, at 2.

n20 *Id*. at 17. The earlier version of the FCA provided for double damages. *Id*.

n21 *Id*. at 18; *see* 31 U.S.C. § 3729(a)(7). A reverse false claim is a claim "to avoid a payment to the government." S. REP. NO. 99-345, at 18.

n22 *Id*. at 13 ("afforded protection from retaliation for his actions"); *see also* 31 U.S.C. § 3730(h).

n23 S. REP. NO. 99-345, at 18. The military exclusion, which had existed since 1863, was removed because Congress believed "that military code remedies [were] inadequate to ensure full recoveries for fraudulent acts by servicepersons and such persons should therefore not be exempt from False Claims Act coverage." *Id*. at 15.

n24 *Id*. at 20-21; *see also* BOESE, *supra* note 3, at 1-16 ("[T]he 1986 Amendments resolved this dispute [concerning the meaning of the statutory requirement that the person act knowingly] by explicitly eliminating the need to prove specific intent to defraud.").

n25 S. REP. NO. 99-345, at 7. Previously, some courts "required that the United States prove a violation [of the FCA] by clear and convincing, or even clear, unequivocal and convincing evidence . . . ." *Id*. In 1986, Congress clarified the standard of proof as being a preponderance of the evidence. *Id*. at 13, 30-31. *See also* 31 U.S.C. §

3731(c) ("In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.").

n26 S. REP. NO. 99-345, at 8 ("[T]he subcommittee added a modification of the statute of limitations to permit the Government to bring an action within 6 years of when the false claim is submitted (current standard) or within 3 years of when the Government learned of a violation, whichever is later."); *see also* 31 U.S.C. § 3731(b).

n27 31 U.S.C. § 3729(a)(1-7).

n28 *See generally id.* § 3729(a)(1), (2).

n29 31 U.S.C. § 3730(a), (b).

n30 Vt. Agency of Natural Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 768 (2000). "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Id.* n.1. However, "[i]n practice, the phrase means 'an action under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive.'" United States v. Kitsap Physicians Servs., 314 F.3d 995, 997 n.1 (9th Cir. 2002) (quoting Bryan Garner, A DICTIONARY OF MODERN LEGAL USAGE 728 (2d Ed. 1995)).

n31 United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1016 (7th Cir. 1999).

n32 *Vt. Agency of Natural Res.,* 529 U.S. at 769. Under either scenario, the relator normally receives a share of the government's recovery. *Id.* at 769-70; 31 U.S.C. § 3730(d) (2000).

n33 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(9) (2008).

n34 United States *ex rel.* Compton v. Midwest Specialties, Inc., 142 F.3d 296, 304 (6th Cir. 1998) (quoting United States *ex rel.* Marcus v. Hess, 317 U.S. 537, 549 (1943)).

n35 *See Kitsap Physicians Servs.,* 314 F.3d at 1002; Varljen v. Cleveland Gear Co., 250 F.3d 426, 429 (6th Cir. 2001) ("[R]ecovery under the FCA is not dependent upon the government's sustaining monetary damages."); United States *ex rel.* Bettis v. Odebrecht Contractor of Cal., Inc., 297 F. Supp. 2d 272, 278 (D.D.C. 2004) ("even

45 Idaho L. Rev. 41

if the government has suffered no loss").

n36 31 U.S.C. § 3730(d). Further, the court may award reasonable expenses, attorney's fees and costs to the relator to be paid by the defendant. *Id*.

n37 *See* United States *ex rel*. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 n.5 (4th Cir. 2002); United States *ex rel*. Grynberg v. Praxair, Inc., 207 F. Supp. 2d 1163, 1181 (D. Colo. 2001) (citing 31 U.S.C. § 3730(b)(4) (1982) (current version at 31 U.S.C. § 3730(b)(4) (2000)). In contrast, "[t]he government itself, of course, could still bring suit for such a violation; only private parties were barred from seeking recovery." United States *ex rel*. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 408 (3d Cir. 1999).

n38 HELMER, LUGBILL & NEFF, *supra* note 9, § 2-5, at 36, 39, § 2-6(b)(2), at 46; *see also* SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5273.

n39 CLAIRE M. SYLVIA, THE FALSE CLAIMS ACT: FRAUD AGAINST THE GOVERNMENT § 27, at 47 (Andrea G. Nadel et al. eds.) (2004) (quoting United States v. Burmah Oil Co., 558 F.2d 43, 46 n.1 (2d Cir. 1977).

n40 S. REP. NO. 99-345, at 12; *see also* Wang Chen-Cheng *ex rel*. United States v. FMC Corp., 975 F.2d 1412, 1419 (9th Cir. 1992) ("Courts read the amended Act as prohibiting all *qui tam* suits where the government already possessed the information, even where the relator had independently uncovered fraud against the government and the government knew of that fraud only because the relator had been decent enough to tell the government about it.").

n41 SYLVIA, *supra* note 39, §29, at 53.

n42 HELMER, LUGBILL & NEFF, *supra* note 9, §2-5, at 40.

n43 S. REP. NO. 99-345, at 12-13.

n44 *Id*. at 8 ("encourage assistance from the private citizenry").

n45 United States *ex rel*. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 408 (3d Cir. 1999) (citing 31 U.S.C. §

00000994

45 Idaho L. Rev. 41

3730(e)(4)(A) (1994)). The public disclosure must have occurred "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media . . . ." 31 U.S.C. § 3730(e)(4)(A).

n46 *Cantekin*, 192 F.3d at 408.

n47 *Id.* at 408-09; *see also* 31 U.S.C. § 3730(e)(4)(A) ("unless . . . the person bringing the action is an original source of the information").

n48 Rockwell Int'l Corp. v. United States, 549 U.S. 457,    , 127 S. Ct. 1397, 1406 (2007).

n49 31 U.S.C. § 3730(e)(4)(B).

n50 *See* Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1419 (9th Cir. 1992); SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 12 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5277 ("That jurisdictional bar . . . has been applied only to private *qui tam* suits, and not those suits taken over by the Government.").

n51 United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991); *see also* United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false . . . ."); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519 (10th Cir. 2000).

n52 *Shaw*, 213 F.3d at 534 ("language was removed in 1986"); *Hagood*, 929 F.2d at 1420 ("language disappeared from the statute with the 1986 amendments").

n53 31 U.S.C. § 3730(e)(4).

n54 United States *ex rel.* Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) (citing United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326 (9th Cir. 1995), *aff'd* 168 F.3d 1013 (7th Cir. 1999)); *see also Butler*, 71 F.3d at 326 ("The 1986 amendments eliminated this language, however, leaving open what would be the effect of government knowledge of the facts underlying a suit.").

45 Idaho L. Rev. 41

n55 *See* S. REP. NO. 99-345, at 7.

n56 *Lamers,* 998 F. Supp. at 987 (citing S. REP. NO. 99-345, at 7); *see also* S. REP. NO. 99-345, at 7 ("Currently, in judicial districts observing an 'actual knowledge' standard, the Government is unable to hold responsible those corporate officers who insulate themselves from knowledge of false claims submitted by lower-level subordinates."); *id.* at 21 ("[T]he constructive knowledge definition attempts to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted."); United States v. NHC Healthcare Corp., 115 F. Supp. 2d 1149, 1153 (W.D. Mo. 2000) ("The purpose of this particular definition of 'knowing' was to avoid the claimants who bury their heads in the sand and purposefully submit in ignorance a false claim.").

n57 31 U.S.C. § 3729(a)(3) (conspiring to defraud); *id.* § 3729(a)(4) (intending to defraud by delivering less property than in the defendant's possession); *id.* § 3729(a)(5) (intending to defraud by making or delivering a receipt certifying receipt of property "without completely knowing that the information on the receipt is true"); *see also* HELMER, LUGBILL & NEFF., *supra* note 9, § 3-15, at 110 ("With the exception of claims brought under 31 U.S.C. § 3729(a)(3), (a)(4), and (a)(5), the [FCA's] only 'scienter' requirement is a 'knowing violation.'").

n58 31 U.S.C. § 3729(b).

n59 United States *ex rel.* Humphrey v. Franklin-Williamson Human Servs., Inc., 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002); *see also* United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 439 (E.D.N.Y. 1995) ("[T]he government need not prove an intent to defraud, but only that the violations were committed knowingly, that is with willful blindness to the existence of a fact or reckless disregard for the truth." (citing United States v. Foster Wheeler Corp., 316 F. Supp. 963, 967 (S.D.N.Y. 1970))).

n60 31 U.S.C. § 3729(b); *see also* United States *ex rel.* Quirk v. Madonna Towers, Inc., 278 F.3d 765, 767 (8th Cir. 2002) ("No proof of specific intent to defraud the government is required." (citing 31 U.S.C. § 3729(b))).

n61 706 F. Supp. 795 (D. Utah 1988).

n62 *Id.* at 799. A government commission that investigated the Challenger disaster attributed the cause of the explosion to a gas leak in a joint's seal, which was located between two portions of one of the solid rocket motors. *Id.* at 798. The plaintiff's employment for Morton Thiokol involved work with the solid rocket motors. *Id.* at 799.

45 Idaho L. Rev. 41

n63 *Id*. at 803. In addition to his *qui tam*, Boisjoly pursued unsuccessfully several statutory and common law claims. *Id*. at 799-807.

n64 *Id*. at 809-10.

n65 *Id*. at 809 (citing United States v. Fox Lake State Bank, 366 F.2d 962, 965 (7th Cir. 1966); Woodbury v. United States, 232 F. Supp. 49, 54-55 (D. Or. 1964), *modified*, 359 F.2d 370 (9th Cir. 1966); and United States v. Schmidt, 204 F. Supp. 540 (E.D. Wis. 1962)). Although proceeding under different legal theories, the courts relied on the government's knowledge to rule in favor of the FCA defendants. *Fox Lake State Bank,* 366 F.3d at 965-66 (applying an estoppel theory); *Woodbury*, 232 F. Supp. at 54-55 (finding no intent to defraud); *Schmidt*, 204 F. Supp. at 544 (finding no intent to commit fraud or violate the FCA). Although these pre-1986 cases are of limited applicability because of the changes in the law, they and others like them provided an equitable rationale similar to that reflected in the modern government knowledge defense. *See* United States *ex rel*. Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("[T]he equitable rationale behind the defense has an impressive pedigree in this circuit." (discussing *Schmidt*, 204 F. Supp. at 540; *Fox Lake State Bank*, 366 F.2d at 962)).

n66 *Boisjoly*, 706 F. Supp. at 809.

n67 *Id*.

n68 *Id*. at 810.

n69 *Id*.

n70 *Id*. at 810-11.

n71 *Id*. at 811.

n72 *See* United States *ex rel*. Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) ("We agree that *[Boisjoly]* is an unreliable guide." (agreeing with United States *ex rel*. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991))); *Hagood,* 929 F.2d at 1421 (9th Cir. 1991) (*"Boisjoly* may be defensible on its facts; its dicta are an unreliable guide."); *cf*. Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 59 (1993) ("This court discerns several problems with *Boisjoly*.").

45 Idaho L. Rev. 41

n73 *See* Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534-35 (10th Cir. 2000).


n74 *Id*. at 534 ("[G]overnment knowledge of a contractor's wrongdoing is no longer an automatic defense . . . .").


n75 *Id*.


n76 *See infra* note 119 and accompanying text.


n77 929 F.2d 1416 (9th Cir. 1991).


n78 United States *ex rel*. Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) ("[W]e agree with *Hagood*.").


n79 Varljen v. Cleveland Gear Co., 250 F.3d 426, 430 (6th Cir. 2001).


n80 United States *ex rel*. Durcholz v. FKW, Inc., 189 F.3d 542, 544-45 (7th Cir. 1999).


n81 Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000).


n82 *See* Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 59 (1993).


n83 *See* United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); United States *ex rel*. Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995); United States *ex rel*. Milam v. Regents of Univ. of Cal., 912 F. Supp. 868, 888-89 (D. Md. 1995); X Corp. v. Doe, 816 F. Supp. 1086, 1094 (E.D. Va. 1993).


n84 The United States declined to intervene in the case beyond moving to dismiss certain individual defendants. United States *ex rel*. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1418 (9th Cir. 1991) ("Hagood proceeded as the sole plaintiff . . . .").


n85 *Id*.

45 Idaho L. Rev. 41

n86 *Id.*

n87 *Id.*

n88 *Id.* The district court relied on reasoning under similar facts in *Boisjoly v. Morton Thiokol, Inc.,* 706 F. Supp. 795, 808-10 (D. Utah 1988).

n89 *Hagood,* 929 F.2d at 1419 (internal quotation marks omitted).

n90 *Id.* at 1422.

n91 *Id.* at 1420.

n92 *Id.* at 1422. Further, the court noted that in order for the defendant "[t]o take advantage of a disputed legal question . . . [it could] be neither deliberately ignorant nor recklessly disregardful." *Id.* at 1421.

n93 *Id.* (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981).

n94 *Id.*

n95 *Id.*

n96 *See* BOESE, *supra* note 3, at 2-78 ("The 'government knowledge' defense to 'falsity' was dealt a further blow by the Ninth Circuit's first decision in *[Hagood]*."). *Id.*

n97 *Hagood,* 929 F.2d at 1421 ("It may be, as the district court observed, that no damages were suffered when officers of the United States knowledgeably decided to proceed with the contract.").

n98 *Id.* ("No damages need be shown in order to recover the penalty." (citing Rex Trailer Co. v. United States,

45 Idaho L. Rev. 41

350 U.S. 148, 153 n.5 (1956))).

n99 *Id*. at 1421-22 (quoting Heckler v. Cmty. Health Servs., 467 U.S. 51, 60, 61 (1984)).

n100 *Id*. at 1422 (quoting *Heckler,* 467 U.S. at 63).

n101 975 F.2d 1412 (9th Cir. 1992).

n102 *Id*. at 1414.

n103 *Id*. at 1421.

n104 *Id*. at 1416.

n105 *Id*. The memorandum "was part of a dialogue with the Army." *Id*. at 1421.

n106 *Id.*

n107 *Id.*

n108 *Id*. Hardly the model of clarity, the court's use of the concept of a scientifically untrue statement was equated with "scientific error[]" or a scientific theory not fully embraced within the scientific community, as opposed to an outright falsehood, one that was morally wrong. *Id.; see* United States *ex rel*. Harris v. Bernad, 275 F. Supp. 2d 1, 6 (D.D.C. 2003) ("[M]ere disagreements over scientific opinion, methodology, and judgments do not amount to claims under the FCA." (citing *Wang Chen-Cheng,* 975 F.2d at 1420-21)).

n109 71 F.3d 321 (9th Cir. 1995).

n110 *Id*. at 324, 325.

45 Idaho L. Rev. 41

n111 *Id*. at 325.

n112 *Id*.

n113 *Id*. at 326 (alteration in original).

n114 *Id*.

n115 *Id*.

n116 *Id*. at 328.

n117 *Id*. at 329.

n118 Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000) ("[G]overnment knowledge of a contractor's wrongdoing is no longer an automatic defense." (citing United States *ex rel*. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1420 (9th Cir. 1991); 31 U.S.C. §§ 3729-3733 (2000))); *see also* Varljen v. Cleveland Gear Co., 250 F.3d 426, 430 (6th Cir. 2001) ("[E]ven the government's knowledge of a fraud does not necessarily absolve a contractor from liability under the FCA." (citing *Hagood*, 929 F.2d at 1421)); United States *ex rel*. Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) (concurring with *Hagood*, which "expressly rejected the contention that government knowledge of the falsity of a claim automatically bars an FCA action") citing *Hagood*, 929 F.2d at 1416)); United States *ex rel*. Longhi v. Lithium Power Techs., Inc., 513 F. Supp. 2d 866, 883-84 (S.D. Tex. 2007); United States *ex rel*. Bettis v. Odebrecht Contractors of Cal., 297 F. Supp. 2d 272, 294 (D.D.C. 2004) ("[T]he government's knowledge, while perhaps not a complete defense, is not 'irrelevant.'"); United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); United States *ex rel*. Milam v. Regents of Univ. of Cal., 912 F. Supp. 868, 888 (D. Md. 1995) ("not an absolute defense" (citing Kriendler, 985 F.2d at 1156-57)).

n119 *Hagood*, 929 F.2d at 1421 ("That the relevant government officials know of the falsity is not in itself a defense." (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981))); *see also* United States *ex rel*. Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995) ("[I]f the defendants knowingly presented or caused to be presented false or fraudulent claims, then it is not a defense that the government officials also knew the claims were false but continued to pay the claims." (citing *Kriendler*, 985 F.2d at 1156)); JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 168-69 (3d ed. 1998) ("[T]he fact that the germane Government officials knew of a claim's falsity is not a defense." (citing *Hagood*, 929 F.2d 1416)).

00001001

45 Idaho L. Rev. 41

n120 United States *ex rel.* A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 455 n.21 (6th Cir. 2005) (citing *Kriendler,* 985 F.2d at 1156; *Hagood,* 929 F.2d at 1421).

n121 *See* United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326 (9th Cir. 1995) ("[C]ourts have had to decide case by case whether a FCA claim based on information in the government's possession can succeed.").

n122 *See generally* United States *ex rel.* Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 491 F.3d 254, 262-63 (5th Cir. 2007) (finding Lockheed did not act knowingly); United States *ex rel.* Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003) ("[The government's] knowledge . . . bears on whether the defendants had the requisite intent under the Act." (citing United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002))); *Becker,* 305 F.3d at 289 ("can negate the scienter required for an FCA violation" (citing United States v. Southland Mgmt. Corp., 288 F.3d 665, 686 (5th Cir. 2002))); *Shaw,* 213 F.3d at 534; *Kriendler,* 985 F.2d at 1157; *Hagood,* 929 F.2d at 1421)); United States *ex rel.* Stone v. Rockwell Int'l Corp., 282 F.3d 787, 811 (10th Cir. 2002) ("cast doubt on whether he 'knowingly' submitted a false claim" (citing *Butler,* 71 F.3d at 326-27)), *rev'd in part on other grounds,* 549 U.S. 457 (2007); *Shaw,* 213 F.3d at 534 ("[Contractor may not] possess the requisite state of mind" (citing *Butler,* 71 F.3d at 327; Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992))); United States *ex rel.* Durcholz v. FKW, Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("cannot be said to have knowingly presented a fraudulent or false claim" (citing United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999); Hindo v. Univ. of Health Scis./Chicago Med. Sch., 65 F.3d 608, 613-14 (7th Cir. 1995))); *Kriendler,* 985 F.2d at 1156, 1157 ("may show that the contractor has not 'knowingly' submitted a false claim" (citing *Hagood,* 929 F.2d at 1421)); *Hagood,* 929 F.2d at 1421 ("Such knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth."); *Longhi,* 513 F. Supp. 2d at 883 ("can rebut scienter"); *Bettis,* 297 F. Supp. 2d at 294 ("serves to negate a finding of scienter"). *But cf. Costner,* 317 F.3d at 887 (noting that government knowledge may also serve as a defense to the FCA's materiality element).

n123 929 F.2d at 1421.

n124 *Id.* (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981)).

n125 *Id.*

n126 *See* United States v. Southland Mgmt. Corp., 326 F.3d 669, 682-83 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false . . . ." (citing *Durcholz,* 189 F.3d at 544-45)).

45 Idaho L. Rev. 41

n127 *Id*. at 682.

n128 213 F.3d 519 (10th Cir. 2000).

n129 *Id*. at 527. The contract required AAA to provide equipment to remove trace silver from the photography development process and to properly dispose of various chemicals in compliance with federal standards. *Id*. Instead, AAA managers directed that the chemicals be deposited in the drain, and various employees complied with that directive. *Id*. When questioned by government contracting officials, AAA management was evasive about meeting their environmental contractual obligations until the Air Force Office of Special Investigations closed AAA's main photography laboratory. *Id*. at 527-28.

n130 *Id*. at 534.

n131 *See Southland Mgmt. Corp*., 326 F.3d at 682 n.9 (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the claimant was colluding with the government employee to submit a false claim . . . ." (citing *Durcholz,* 189 F.3d at 544-45)).

n132 *Durcholz,* 189 F.3d at 546.

n133 *Id*. at 545; *see also* United States *ex rel*. Tyson v. Amerigroup Ill., Inc., No. 02 C-6074, 2005 WL 3111972, at *6 (N.D. Ill. Oct. 21, 2005) ("The Court of Appeals' conjunctive phrasing--'if the government knows *and* approves'--would appear to have been purposeful and intended to signal that mere knowledge alone of illegality would not enable those who defraud the government from being able to draw a conjurer's circle around their illegality and insulate themselves from condign punishment.").

n134 *See* United States *ex rel*. Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003); United States *ex rel*. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002); *see also* Am. Contract Servs. v. Allied Mold & Die, Inc., 114 Cal. Rptr. 2d 773, 779-80 (Cal. Ct. App. 2001).

n135 United States *ex rel*. Tyson v. Amerigroup Ill., Inc., 488 F. Supp. 2d 719, 730 (N.D. Ill. 2007) (citing United States *ex rel*. Asch v. Teller, Levit & Silverstrust, P.C., No. 00-C-3289, 2004 WL 1093784, at *3 (N.D. Ill. May 7, 2004)).

n136 *See Southland Mgmt. Corp*., 326 F.3d at 682 (noting that in many cases government knowledge and acquiescence "was 'highly relevant' to show that the contractor did not submit payment claims in deliberate

45 Idaho L. Rev. 41

ignorance or reckless disregard of their truth or falsity" (citation omitted)). However, for this position the court in *Southland* cited *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir. 1991). *Id.* A fair reading of that opinion fails to reveal the articulation of any such definitive standard. *See Hagood,* 929 F.2d at 1421.

n137 United States *ex rel.* Laird v. Lockheed Martin Eng'g & Sci. Servs., Co., 491 F.3d 254, 263 (5th Cir. 2007) (emphasis added) (quoting *Durcholz,* 189 F.3d at 545); *accord Tyson,* 488 F. Supp. 2d at 729-30.

n138 *See* United States *ex rel.* Englund v. Los Angeles County, No. Civ. S-04-282-LKK/JFM, 2006 WL 3097941, at *8 (E.D. Cal. Oct. 31, 2006) ("when responsible government officials have been fully apprised of all relevant information" (citing United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999))).

n139 *See, e.g.,* United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326, 328 (9th Cir. 1995) (noting that the government knew and approved the specific testing method at issue); X Corp. v. Doe, 816 F. Supp. 1086, 1093 (E.D. Va. 1993) ("X Corp. *disclosed* to the government that computer equipment supplied under the MASC contract might contain remanufactured components."); Boisjoly v. Morton Thiokol, Inc., 706 F. Supp. 795, 810 (D. Utah 1988) ("informed NASA . . . of these concerns and their basis").

n140 *See infra* note 142 and accompanying text.

n141 *Hagood,* 929 F.2d at 1421 ("relevant government officials"); United States *ex rel.* Gudur v. Deloitte Consulting LLP, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007) ("[N]o violation exists where relevant government officials are informed of the alleged falsity . . . ."); United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); *see also* United States *ex rel.* Werner v. Fuentez Sys. Concepts, Inc., 115 Fed. App'x 127, 128 (4th Cir. 2004) ("the OSC officials responsible for managing their contracts"); United States *ex rel.* Grynberg v. Praxair, Inc., 207 F. Supp. 2d 1163, 1178 (D. Colo. 2001) ("known to and approved by the responsible government authorities"); United States *ex rel.* Durcholz v. FKW, Inc., 997 F. Supp. 1143, 1156 (S.D. Ind. 1998) ("many, if not all, of the relevant Navy officials did know"), *aff'd,* 189 F.3d 542 (7th Cir. 1999); United States *ex rel.* Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("responsible government officials"), *aff'd,* 168 F.3d 1013 (7th Cir. 1999); CIBINIC & NASH, *supra* note 119, at 168 ("germane Government officials knew"); *cf.* United States *ex rel.* Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) (concurring with *Hagood*).

n142 United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002) ("DOE's *full knowledge* of the material facts underlying any representations implicit in Westinghouse's conduct negates any knowledge that Westinghouse had regarding the truth or falsity of those representations." (emphasis added)); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000) ("Nevertheless, there may still be occasions when the government's knowledge of or cooperation with a contractor's actions is *so extensive* that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA."

(citing *Butler*, 71 F.3d at 327; Wang Chen-Cheng *ex rel*. United States v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992)) (emphasis added)); *Wang Chen-Cheng*, 975 F.2d at 1421 ("FMC was open with the government . . . ."); United States v. Prabhu, 442 F. Supp. 2d 1008, 1030 (D. Nev. 2006) ("complied with Government instructions regarding the claims" (citing 31 U.S.C. § 3729(b) (2000))); United States *ex rel*. Werner v. Fuentez Sys. Concepts, Inc., 319 F. Supp. 2d 682, 685 (N.D.W. Va. 2004) ("full knowledge of the defendants' billing practices" by the "Coast Guard officials responsible for handling the contracts"), *aff'd*, 115 F. App'x 127 (4th Cir. 2004); United States *ex rel*. Bettis v. Odebrecht Contractors of Cal., 297 F. Supp. 2d 272, 297 (D.D.C. 2004) (*"fully aware* of and approved of the way that defendant calculated its claims for progress payments" (emphasis added)).

n143 282 F.3d 787, 812 (10th Cir. 2002), *rev'd in part on other grounds*, 549 U.S. 457 (2007).

n144 *Id.*

n145 *Id.* & n.11. The court appeared to suggest that this broader range of individuals included "certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer." *Id.* n.11.

n146 71 F.3d 321 (9th Cir. 1995); *Stone*, 282 F.3d at 812 n.12.

n147 *See Stone*, 282 F.3d at 812 n.12 (*"Butler* rejected the argument that for purposes of determining whether the defendant 'knowingly' submitted a false claim to the Government, only contracting officers' knowledge is relevant.").

n148 *Id.*

n149 *Id.* at 812 n.11.

n150 Under agency law, there exists the concept of "apparent" authority. "An agent has 'apparent' authority . . . where the principal has held out the agent as having such authority or has permitted the agent to represent that he has such authority." United States v. Schaltenbrand, 930 F.2d 1554, 1560 (11th Cir. 1991). However, in government procurement law, the United States cannot be bound under the theory of apparent authority. JOHN CIBINIC, JR., RALPH C. NASH, JR. & JAMES F. NAGLE, ADMINISTRATION OF GOVERNMENT CONTRACTS 31 (4th ed. 2006) ("Recognizing the importance of effective government control over the conduct of its agents, the courts and boards have rejected the apparent authority rule, holding that *actual authority* is required to bind the government."); *see also* Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006) (noting that apparent authority is insufficient to bind the government); Am. Anchor & Chain Corp. v.

00001005

45 Idaho L. Rev. 41

United States, 331 F.2d 860, 861-62 (Ct. Cl. 1964) (noting that conduct of employee with apparent authority binds a contractor, but only actual authority of a government employee will bind the United States).

n151 Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947); Starflight Boats v. United States, 48 Fed. Cl. 592, 597-98 (2001); *see also* Ralph C. Nash & John Cibinic, *Contracting Authority of Government Employees: Handle with Care!,* in 12 NASH AND CIBINIC REPORT 9, P50, at 138 (1998) ("The rule is clear that the Government is only bound by the acts of its employees that are within the scope of their *actual authority*.*")* [hereinafter NASH & CIBINIC REPORT].

n152 Real Estate Technical Advisors, Inc., 03-1 B.C.A. (CCH) P32,074 at 158,507 (A.S.B.C.A. Nov. 18, 2002).

n153 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007); *see* CIBINIC, NASH & NAGLE, *supra* note 150, at 31 ("Contracting officers have the sole authority to legally bind the government to contracts and contract modifications."); *see also* 48 C.F.R. § 1.601(a) (2007) ("Contracts may be entered into and signed on behalf of the Government only by contracting officers."). The Federal Acquisition Regulation is contained in 48 C.F.R. Chapter 1. Contracting officers' authority "flows from the head of the agency." CIBINIC, NASH & NAGLE, *supra* note 150, at 33.

n154 48 C.F.R. § 1.602-1(a).

n155 *Id*. § 43.102(a).

n156 *Id*. § 1.603-3(a); *see also id*. § 1.602-1(a) (requiring clear written instructions concerning the limits of their authority); NASH & CIBINIC REPORT, *supra* note 151, P50, at 138 ("The scope of a CO's authority can generally be found by looking at the internal document granting the authority.").

n157 48 C.F.R. § 1.602-1(a) ("Information on the limits of the contracting officers' authority shall be readily available to the public and agency personnel.").

n158 NASH & CIBINIC REPORT, *supra* note 151, P50, at 141.

n159 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007) ("When authorized, the contracting officer may delegate some of its authority to certain designated representatives, who act on behalf of the government during contract administration." (citing CIBINIC, NASH & NAGLE, *supra* note 150, at 39)).

00001006

45 Idaho L. Rev. 41

n160 48 C.F.R. § 1.602-1(a); *see also id*. § 2.101(b)). However, contracting officers may bind the government only to the extent that authority has been delegated to them to do so. *Id*. § 1.602-1(a).

n161 The contracting officer may delegate authority to his/her authorized representatives. *Id*. § 2.101(b); *see also* CIBINIC, NASH & NAGLE, *supra* note 150, at 37 (contracting officers may be granted authority to appoint subsidiary contracting officers or other representatives).

n162 The ACO is a type of contracting officer that administers a contract after it has been awarded. 48 C.F.R. § 2.101(b). Contracting officers who award the contract are known as procuring contracting officers (PCO) who may also retain some or all authority for administering the contract. CIBINIC, NASH & NAGLE, *supra* note 150, at 37. Indeed, "[a] single contracting officer may be responsible for duties in any or all of these areas." 48 C.F.R. § 2.101(b) (referring to the procuring, administration, and termination of a contract).

n163 The TCO is a type of contracting officer who settles terminated contracts. 48 C.F.R. § 2.101(b).

n164 CIBINIC, NASH & NAGLE, *supra* note 150, at 39.

n165 *Id*.

n166 *Id*. at 30-31. Government employees other than contracting officers may be delegated authority to perform various contract-related functions. *Id*. at 31.

n167 *Id*. at 33.

n168 *Id*. at 43.

n169 Real Estate Technical Advisors, Inc., 03-1 B.C.A. (CCH) P32,074 at 158,507 (A.S.B.C.A. Nov. 18, 2002).

n170 Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 120 (2006) (alteration in original) (quoting H. Landau & Co. v United States, 886 F.2d 322, 324 (Fed. Cir. 1989)); *see also* Brunner v. United States, 70 Fed. Cl. 623, 640-41 (2006); Real Estate Technical Advisors, Inc., 03-1 B.C.A. P32,074, at 158,507; CIBINIC, NASH & NAGLE, *supra* note 150, at 44.

45 Idaho L. Rev. 41

n171 Confidential Informant v. United States, 46 Fed. Cl. 1, 7 (2000) (quoting Roy v. United States, 38 Fed. Cl. 184, 189 (1997)).

n172 CIBINIC, NASH & NAGLE, *supra* note 150, at 43; *see also Brunner,* 70 Fed. Cl. at 641 ("This implied authority to contract must be based upon 'at the least, some limited, related authority.'" (citing Cal. Sand & Gravel, Inc., v. United States, 22 Cl. Ct. 19, 27 (1990))).

n173 *See* Starflight Boats v. United States, 48 Fed. Cl. 592, 599 (2001) ("Although Brian was involved in the administration of this contract, a person with no actual authority can not acquire actual authority 'through the court-made rule of implied actual authority.'" (quoting Cal. Sand & Gravel, Inc., 22 Cl. Ct. at 27)).

n174 *See* United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956) ("[W]e do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute."); *see also* United States v. Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 771 (N.D. Tex. 2002) ("A violation of the rights of the United States may not be waived or ratified by the unauthorized acts of its agents."); United States *ex rel*. Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995) ("[A] government officer cannot authorize a contractor to violate federal regulations."); United States v. Cripps, 460 F. Supp. 969, 973-74 (E.D. Mich. 1978) (stating that a federal employee who urges someone to defraud the government acts ultra vires). Because they lack the authority to waive fraud, acquisition officials cannot "ratify" such conduct. *See* CIBINIC, NASH & NAGLE, *supra* note 150, at 48 ("[I]llegal actions cannot be ratified because officials lack the authority to enter into illegal agreements."); *cf*. Winter v. Cath-DR/Balti Joint Venture, 497 F.3d 1339, 1347 (Fed. Cir. 2007) (noting that authority is a prerequisite to ratification).

n175 *Mayman,* 894 F. Supp at 223 ("A contractor who tells a government contracting officer that a claim is false still violates the statute when the false claim is submitted." (citing United States *ex rel*. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 2001))); *Cripps,* 460 F. Supp. at 973 ("To the extent that defendant is urging that someone at HUD authorized him to engage in this conduct to defraud HUD and submit false claims and derive a benefit therefrom, such assertion even if true is no defense to plaintiff's [FCA] claim."); *cf. Hagood,* 929 F.2d at 1421 ("That the relevant government officials know of the falsity is not in itself a defense." (citing United States v. Ehrlich, 643 F.2d, 638-39 (9th Cir. 1981))); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995) ("Defendants knowingly caused false claims to be presented and that, after the government became aware of the underlying scheme, it continued to pay claims only because it had already become contractually bound to make those payments as a result of the defendant's fraudulent course of conduct.").

n176 *Nat'l Wholesalers,* 236 F.2d at 950; *see also* United States *ex rel*. McCray Sanitation Serv. v. Midwest Container Co., 7 F.3d 1046, at *2 (10th Cir. 1993) (unpublished table decision) ("[Contracting agency cannot] 'ratify' any previous fraud by [contractor].").

n177 48 C.F.R. § 33.210(b) (2007).

45 Idaho L. Rev. 41

n178 41 U.S.C. § 605(a) (2000).

n179 *See* United States v. United Techs. Corp., No. 5:92-CV-375 (EBB), 1996 WL 653620, at *2 (D. Conn. Oct. 11, 1996) ("The statute's restriction on the authority of agency heads should be read as encompassing their subordinates."); *cf. Contract Disputes Act of 1978*, S. REP. NO. 95-1118, at 19 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5235, 5253 ("[I]t is not the intent of this section to authorize Agency heads, contracting officers, or agency boards to settle or compromise claims independent of their legal or contractual merits . . . .").

n180 *See* United States *ex rel.* A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 455 n.21 (6th Cir. 2005) ("[Government knowledge may be] used to demonstrate that what the defendant submitted was not actually false but rather conformed to a modified agreement . . . ."); United States *ex rel.* Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993) ("In some cases, the fact that government officials knew of the contractor's actions may show that the contract has been modified or that its intent has been clarified, and therefore that the claim submitted by the contractor was not 'false.'").

n181 48 C.F.R. § 33.210 (noting that contracting officers are authorized to resolve and decide contractual claims).

n182 48 C.F.R. § 33.204 ("The Government's policy is to try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level.").

n183 United States *ex rel.* Bettis v. Odebrecht Contractors of Cal., Inc., 297 F. Supp. 2d 272, 294 (D.D.C. 2004); *cf.* United States *ex rel.* Stebner v. Stewart & Stephenson Servs., Inc., 144 F. App'x 389, 394 (5th Cir. 2005) (applying government knowledge defense when "the Government negotiated contract modifications in response to the well-documented corrosion problem.").

n184 *See* Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." (citing Federal Register Act, ch. 417, sec. 7, 49 stat. 500, 502 (1935))); Nobles v. Rural Cmty. Ins. Servs., 303 F. Supp. 2d 1292, 1303 (M.D. Ala. 2004) ("[charged] with notice of the provisions in the Code of Federal Regulations" (citing *Merrill,* 332 U.S. at 384-85)); *In re* Doe I, 969 F. Supp. 561, 563 (D. Ariz. 1996).

n185 *Merrill,* 332 U.S. at 385 (quoting Rock Island, Ark. & La. R.R. Co. v. United States, 254 U.S. 141, 143 (1920)).

45 Idaho L. Rev. 41

n186 NASH & CIBINIC REPORT, *supra* note 151, P50, at 139 (citation omitted).

n187 Brunner v. United States, 70 Fed. Cl. 623, 644 (2006) ("[P]ublicly-accessible laws or regulations can limit the contracting authority that would otherwise be implied by a government agent's related powers, for potential contractors are on notice of such restrictions."); NASH & CIBINIC REPORT, *supra* note 151, P50, at 139 ("Agency regulations may also contain limitations on authority and such regulations will be binding on contractors if they are published.").

n188 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1346 (Fed. Cir. 2007) ("[C]ould not have had the implicit authority to authorize contract modifications because the contract language and the government regulation it incorporates by reference explicitly state that only the contracting officer had the authority to modify the contract.") (emphasis omitted).

n189 United States *ex rel*. Compton v. Midwest Specialties, Inc., 142 F.3d 296, 302 n.4 (6th Cir. 1998) ("[T]he 'square-corners' rule applies fully in the False Claims Act context." (citing United States v. Aerodex, Inc., 469 F.2d 1003, 1007 (5th Cir. 1972))); *but cf*. United States *ex rel*. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 446 (6th Cir. 2005) (holding that the "natural tendency" standard was proper for determining whether a false statement was material under the FCA).

n190 SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272 ("But the Committee does believe the civil False Claims Act should recognize that those doing business with the Government have an obligation to make a limited inquiry to ensure the claims they submit are accurate.").

n191 *Id*. at 14-15, 17, 21.

n192 *Id*. at 21; *see also* Crane Helicopter Servs., Inc. v. United States, 45 Fed. Cl. 410, 433 (1999) ("[The FCA's knowing standard was designed to address] 'the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know'" and to reach "those who ignore obvious warning signs.") (citation omitted).

n193 United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956).

n194 *See* United States *ex rel*. Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003) ("'If the government knows and approves of the particulars of a claim for payment *before* that claim is presented . . . .'" (emphasis added) (alteration omitted) (quoting United States *ex rel*. Becker v. Westinghouse Savannah River Co., 305 F.3d 542, 543 (7th Cir. 1999))); United States *ex rel*. Stone v. Rockwell Int'l Corp., 282 F.3d 787, 811 (10th Cir.

45 Idaho L. Rev. 41

2002) ("The defendant . . . may be able to cast doubt on whether he 'knowingly' submitted a false claim by showing that the Government itself was already aware of the facts underlying the FCA claim when the allegedly fraudulent claim was submitted." (citing United States *ex rel*. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326-27 (9th Cir. 1995)); United States *ex rel*. Durcholz v. FKW, Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("before [the] claim is presented"); *see also* United States *ex rel*. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 491 F.3d 254, 263 (5th Cir. 2007) ("before that claim is presented" (citing *Durcholz,* 189 F.3d at 545)); United States *ex rel*. Humphrey v. Franklin-Williamson Human Servs., Inc., 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002) ("before [the] claim is presented") citing *Durcholz,* 189 F.3d. at 545)); United States *ex rel*. Maxwell v. Kerr-McGee Chem. Worldwide, LLC, No. 04-CV-01224-PSF-CBS, 2006 WL 2869515, at *16 (D. Colo. Oct. 6, 2006); *cf*. United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the government's knowledge came 'too late in the process'" (quoting *Durcholz,* 189 F.3d at 544-45)); United States v. Shasta Servs., Inc., 440 F. Supp. 2d 1108, 1113-14 (E.D. Cal. 2006) (applying the defense to California's FCA).


n195 *See, e.g., Becker,* 305 F.3d at 287-89; X Corp. v. Doe, 816 F. Supp. 1086, 1093 (E.D. Va. 1993) (finding government notification in defendant's proposal).


n196 *See supra* notes 173, 175, and accompanying text.


n197 236 F.2d 944 (9th Cir. 1956).


n198 *Id*. at 945.


n199 *Id*. at 945-96.


n200 *Id*. at 946.


n201 *Id*. at 946 & n.3.


n202 *Id*. at 948.


n203 *Id*. at 946.

00001011

45 Idaho L. Rev. 41

n204 *Id*. at 946, 948.

n205 *Id*. at 948.

n206 *Id*. at 949-50. The district court also erroneously determined that the contract permitted "equals." *Id*. at 949.

n207 *Id*. at 950.

n208 *Id*.

n209 *Id*.

n210 *Id*.

n211 United States *ex rel*. Gudur v. Deloitte Consulting LLP, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007).

n212 929 F.2d 1416 (9th Cir. 1991).

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES *ex rel.* BRIAN BURKE

                        Plaintiff,

          -versus-

RECORD PRESS, INC.,

                    Defendant.

**Case No.** 1:08-cv-364(EGS)(DAR)

**Judge:** Deborah A. Robinson

## *AFFIDAVIT:*

## *"I declare and certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 10, 2013:*

Affiant, Morris Gocial, CPA/CFF, CVA, CrFA, DAFBA

Your Honor, G3 of PA LLC , formerly Gold Gocial Gerstein LLC has been engaged by Tyler Jay King, Esquire, to

determine the amount of damages suffered, if any, by United States *ex rel.* Brian Burke

("Burke") due to the wrongful interpretation by defendant of terms defined in the

Invitation for Bid ("IFB") between the Government Printing Office ("GPO") and Record

Press, Inc. ("Defendant").

    It is my opinion that the damages sustained by the plaintiff approximate those

damages as calculated at the request of the law office of Tyler Jay King, Esquire, in the

amount of $513, 793.91.

    All opinions contained in this report are rendered and expressed with a reasonable

degree of accounting certainty.

BACKGROUND

    Brian Burke was the plaintiff in a lawsuit, *Brian Burke v. Donald L. Evans, Secretary,*

00001013

*United States Department of Commerce*, in the United States District Court of the

Southern District of New York. The case was ruled in the Department of Commerce's

favor and Burke appealed the decision in the United States Court of Appeals for the

Second Circuit. The appeals case was ruled in the Department of Commerce's favor.

Burke was then served by the U.S. Attorney's Office with an Itemized and Verified Bill

of Costs pursuant to an action in which he was a *pro se* litigant before the U.S. Court of

Appeals for the Second Circuit. Upon receiving the bill, which summarized charges to

the Government for printing and binding appellate briefs and appendices, Burke

investigated and discovered that the Defendant was overcharging the Government nearly

10 times the rate specified by its contract with GPO as it pertains to line item II(d).

    In the course of investigating the charges listed in the Itemized and Verified Bill of

Costs, Burke was provided with an IFB for Program 2231-S (formerly 1272-S) dated

October 18, 2006 effective November 1, 2006 and ending October 31, 2007 with option

for renewal for four annual terms. The IFB provides general terms, conditions, and

specifications of the single award for the procurement of appeals briefs.

    Burke reviewed the IFB and noted that on Page 14 of 15, under Section 4 – Schedule

of Prices, II. Complete Product, there is an underlined indication reflecting "**Note:**

**Running Rate is per 10 copies**". However, upon review of Itemized and Verified Bill of

Costs, it appears that Collating, Trimming to Size and Binding costs noted at II(d) were

charged at $12.25 per 100 pages.  Burke believes the United States has been overcharged

by Record Press because they charged this line item for every copy of each brief or

appendix prepared, rather than per 10 copies as specified in the contract.

    Our calculation of damages was supported, in part, by review of IFB for Program

00001014

2231-S, as well as review of IFB for Program 1272-S effective August 2001. We also received Record Press, Inc. invoices and reviewed for proper contract terms application. Additionally, we reviewed the depositions/declarations of the following individuals: Hugh Wilmot (President of Record Press, Inc.), and Raymond Thomas Sullivan (Director, Major APS Acquisitions of the United States Government Printing Office). We noted through their sworn testimony that it is the position of both Record Press, Inc. and GPO that the invoices submitted and paid are accurate and in accordance with the terms of the respective IFB in place at time services were performed. **We disagree with their interpretation of the terms of the IFB as outlined in this report**.

We also consulted an industry expert, Robert Dworski ("Dworski"). Dworski has 38 years (1971 to 2009) of experience in the printing and publishing industry beginning with his sales and marketing position with Packard Press. His role was to expand the sales and publishing efforts of The Legal Intelligencer and those of the Financial Printing Division. His exposure and training put him in contact with both the manufacturing and administrative areas of the process. Dworski became the sales manager for the company and secured contracts from the Commonwealth of Pennsylvania and other government entities. This position also facilitated involvement in the pricing and management of contracts. Dworski's conclusion based on review of information provided supports our position that there is misleading terminology in referencing of services provided on Record Press invoices and inconsistencies in rates charged for similar services on numerous invoices which are inconsistent with the terms of the IFB.

PROCEDURES PERFORMED AND FINDINGS

00001015

(1) Based on review of IFB 2231-S and IFB 1272-S (*exhibit A Doc. 67*), and identified as "Basis of Award" on the accompanying schedule to the IFB, *it appears there may have been a lack of oversight and attention to detail by the GPO in preparation of the IFB.*

(2) Page 12 of 15, Section 4 – Schedule of Prices, refers to "**fractional parts of 10 will be prorated**" which supports our position that where a running rate of 10 copies is referenced that rates charged are per 10 copies. (*Exhibit B Doc. 67*)

(3) Page 14 of 15, Section 4, II – Complete Product, specifically states "**Note: Running rate is per 10 copies**" which covers parts (a), (b), (c), and (d). *This further supports our position that the rates charged in this section are for every 10 copies rather than for each copy. (Exhibit C Doc. 67)*

With respect to our review of the invoices the following was performed:

We received 1710 invoices as listed on an accompanying excel spreadsheet (*Exhibit D Doc. 67*) prepared at the request of the law office of Tyler Jay King, Esquire, attorney for Burke. The spreadsheet outlined the calculated damages as they related to line item II(d) Collating, Trimming to Size and Binding only. As we are relying on the accuracy of the spreadsheet received, we determined our testing could be completed on a sample basis. As such we performed testing of 100 invoices selected as follows:

|  |  |
|---|---|
| 40 invoices | Top highest damages calculated |
| 60 invoices | Random selection from remaining population |
| 100 invoices | Total Tested |

From the spreadsheet, we sorted by damages amount in descending order and selected the top 40 items that reflected the highest damages based only on line II(d) discrepancies. We then recalculated all line items referenced on each of these invoices and recomputed damages, according to our understanding of the IFB terms.

We then randomly selected 60 additional items from the remaining population and performed recalculation of all line items for each invoice and recomputed damages, according to our understanding of the IFB terms.

00001016

Our review of the above-mentioned invoices yielded the following information:

a)  Of the 100 invoices tested, which represented approximately 5.8% of invoices received, the damages computed equals $113,972.64, or approximately 22% of total damages calculated on the spreadsheet.

b)  Our review detected inaccuracies in charges of other line items as defined in the IFB besides line item II(d) which we did not consider in our damages calculation.

c)  Our review detected other errors such as inconsistent rates charged for "Crack and Peel Covers" and "Page Text", as well as, misleading terminology utilized in line items referencing the services provided, amongst several invoices which we did not consider in our damages calculation.

The errors we found in our test sampling demonstrates that Record Press did not bill for services performed according to the contract and the personnel at GPO apparently were not diligent in reviewing the invoices as submitted for compliance to contract terms as written. This fact disputes the declaration of Raymond Thomas Sullivan that "7. Record Press, Inc. properly charged for services for GPO program 2231-S for the printing of briefs, and fully abided its contractual obligations to GPO. I have found no evidence of fraud or overcharging by Record Press, Inc. in connection with this matter." (*Exhibit E Doc. 67*)

CONCLUSION

Based upon the procedures performed and results obtained thereto, it is my professional opinion within a reasonable degree of accounting certainty that the amount of damages suffered by the United States approximates those damages as calculated on the spreadsheets in Exhibit D in the amount of $513,793.91 for the period January 2001

00001017

through April 2010. My opinion is based on my many years of experience of reviewing

contracts in my capacity as a certified public accountant as well as my experience as a

forensic accountant. I reserve the right to amend or supplement this Affidavit/Declaration

should additional information become available.


Morris Gocial, CPA/CFF, CVA, CrFA, DAFBA

Dated July 10, 2013

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES *ex rel.* BRIAN BURKE

                    Plaintiff,

        -versus-

RECORD PRESS, INC.,

                    Defendant.

**Case No.** 1:08-cv-364(EGS)(DAR)

**Judge:** Deborah A. Robinson

### [PROPOSED] ORDER

WHEREFORE, upon consideration of Plaintiff United States *ex rel.* Brian Burke's

Motion for Amended Judgment, and the parties submissions related thereto, it is hereby

ORDERED that the Motion be GRANTED in all parts.

and ORDERED that judgment is entered in favor of Plaintiff and against the Defendants.

and ORDERED that

_____.

_____

Honorable Deborah A. Robinson

United States District Judge

Dated: _____

00001019

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, ex rel.<br>BRIAN BURKE,<br><br>          PLAINTIFF,<br><br>     v.<br><br><br>RECORD PRESS, INC.,<br><br>          DEFENDANT | CASE NO. 1:08-cv-364(DAR) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR ATTORNEY FEES AND EXPENSES**

     Plaintiff, Relator, Brian Burke ("Mr. Burke"), by and through its undersigned counsel, respectfully submits this Opposition to Defendant's Motion for Award of Attorney Fees.  In support thereof Plaintiff incorporates by this reference the facts and arguments contained in Brian Burke's affidavit attached hereto and to Morris Gocial's affidavit attached hereto.

DATED:  July 11, 2013

                               Respectfully Submitted,

                               **/s/**
                               _____
                               Tyler Jay King, Esq.
                               Bar No. 979592
                               1407 Nicholson Street, N.W.
                               Washington, DC  20011
                               (202) 436-2641

00001020

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this July 11, 2013, a copy of the foregoing was served by email to:

Darrell C. Valdez

John W. Lomas, Jr.

William T. O'Brien


Respectfully Submitted,

**/s/**

_____
Tyler Jay King, Esq.

00001021

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES *ex rel.* BRIAN BURKE

                        Plaintiff,          **Case No.**  1:08-cv-364(EGS)(DAR)

            -versus-                        **Judge:**  Deborah A. Robinson

RECORD PRESS, INC.,

                        Defendant.

### *AFFIDAVIT:*
### *"I declare and certify, verify, and state under penalty of perjury that the foregoing is true and correct. Executed on July 10, 2013:*

   This is Relator's Affidavit by BRIAN BURKE Opposing Record Press's Motion for

Attorney's Fees and Expenses (Dct. 94). Defendant, by counsel, has misstated evidence,

used misdirection, misquoted, obfuscated, etc. in order to prevail and now retaliate and

destroy this blue collar whistleblowing Civil Servant financially via ruinous fines/fees.

Where to start? This Court never used the term frivolous with regard to Relator's case. To

the contrary this Court ruled in favor of Relator in regard to Defendant's 'frivolous' Rule

11 motion and Summary Judgment Motion(s). Then there is the Counterclaim. There are

outstanding issues of Law and Fact, as the People will be requesting an Amended

Judgment on all issues. If this is not granted, an appeal to D.C. Circuit will be filed to

review and/or reverse the new case law changing precedent and damaging Remedy under

Federal False Claims Act. Please see also Relator's Affidavit attached to Plaintiff's

Motion for Amended Judgment, Fed. R. Civ. P. 59(e).

### MEETING OF MINDS

   Let us start with the first quote within Movant's Motion for Attorney's Fees and

1

00001022

Expenses (Doc. 94, pg. 8) paragraph 2. ""the evidence offered by Plaintiff demonstrates that Defendant and the government had a meeting of the minds with respect to rates which Defendant would charge for services provided pursuant to the contract." (Dkt. #91, at 7.)". Relator will show that this conclusion of Fact and/or Law by the Court contradicts all previous case law with regard to when any 'meeting of minds' must occur. See also Plaintiff's Statement of Points and Authorities within Motion for Amended Judgment. Under any case law regarding Defendant's Government Knowledge Defense (which incredibly they claim to not be using!?), this 'meeting of minds' must occur **PRIOR** to submitted false claim. "On appeal, the United States Court of Appeals for the Ninth Circuit reversed. The court determined that the time to test the falsity of a claim is the date when it is submitted. Accordingly, every one of the invoices prior to [when the contracting officer learned of the mislabeling] was false when made." Further, although the contracting officer has the authority to modify a contract, a retroactive modification under such circumstances was "void as against public policy." The court continued: "In such palming off as we have here we do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute."[*United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956]*"see *THE GOVERNMENT KNOWLEDGE DEFENSE TO THE CIVIL FALSE CLAIMS ACT: A MISNOMER BY ANY OTHER NAME DOES NOT SOUND AS SWEET* Author MICHAEL J. DAVIDSON 45 Idaho L. Rev. 41(att.). See *United States ex rel. Costner v. United States*, 317 F.3d 883, 887 (8th Cir. 2003) ("'If the government knows and approves of the particulars of a claim for payment *before* that claim is presented . . . .'" (emphasis added) (altercation omitted) (quoting *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305

2

00001023

F.3d 542, 543 (7th Cir. 1999))); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 811 (10th Cir. 2002) ("The defendant . . . may be able to cast doubt on whether he 'knowingly' submitted a false claim by showing that the Government itself was already aware of the facts underlying the FCA claim when the allegedly fraudulent claim was submitted." (citing *United States ex rel. Butler v. Hughes Helicopters, Inc.,* 71 F.3d 321, 326-27 (9th Cir. 1995*)))*; *United States ex rel. Durcholz v. FKW, Inc.,* 189 F.3d 542, 545 (7th Cir. 1999)("before [the] claim is presented"); see also *United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.,* 491 F.3d 254, 263 (5th Cir. 2007) ("before that claim is presented" (citing *Durcholz,* 189 F.3d at 545)); *United States ex rel. Humphrey v. Franklin-Williamson Human Servs., Inc.,* 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002) ("before [the] claim is presented") citing *Durcholz,* 189 F.3d. at 545)); *United States ex rel. Maxwell v. Kerr-McGee Chem. Worldwide, LLC,* No. 04-CV-01224-PSF-CBS, 2006 WL 2869515, at *16 (D. Colo. Oct. 6, 2006); *cf. United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the government's knowledge came 'too late in the process'" (quoting *Durcholz,* 189 F.3d at 544-45)); *United States v. Shasta Servs., Inc., 440 F. Supp. 2d 1108, 1113-14 (E.D. Cal. 2006*) (applying the defense to California's FCA). See also "Additionally, an FCA defendant should not benefit if someone from the government learns of the falsity and simply does nothing about it. The Seventh Circuit has held that mere governmental acquiescence is insufficient to sustain a government knowledge defense. The government **must both know of, and approve, the particular claim before it is submitted**. The opinions of other circuit courts appear to have adopted a

3

00001024

similar standard. Unless that person is someone with the requisite level of authority and approves or otherwise indicates to the defendant that its conduct is permissible, then the defendant's scienter remains unaffected. Additionally, "mere acquiescence would preclude FCA liability any time a government employee and a defendant were in cahoots."" Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct."(*236 F.2d 944 (9th Cir. 1956)*)).

<u>**PRIOR MEETING OF MINDS**</u>

As to our affirmative evidence of no **PRIOR** "meeting of minds" we have Mr. Sullivan's testimony during February 14, 2011 Bench Trial and Mr. Wilmot's Deposition testimony. Please see Document 90 page 89 lines 10-13." Mr. King; Q. "Did -- had you discussed this interpretation [whether running rate applies to line II(d)] with Mr. Wilmot or anyone with Record Press prior to this contract having been executed? [Mr. Sullivan] A. I have never met or had any discussions with Mr. Wilmot." Please see also Wilmot Deposition Page 75 line 9- page 77 from line 15 attached as Exhibit A (pages 71- 91). "BY MR. KING: Q. Does the GPO and Record Press engage in any preliminary discourse regarding the definitions or meanings of any of the terms in the contract? **A.** [Mr. Wilmot] **I have never seen that**.[emphasis in original] Q. [Mr. King] So Record Press does not, and the GPO does not discuss what any of this means before it's awarded? ……… A. [Mr. Wilmot] I have never seen that. Page 76 line 14 BY MR. KING: Q. And when you speak with Mr. Fishken, do you discuss the meaning of any of these contracts? …….. THE WITNESS: [Mr. Wilmot] No. When I speak to Ira, it's generally on performance issues such as if a U.S. Attorney may have a particular issue on the – a job or so on and so forth, or the timeliness period. **Never on contract terms**

4

[emphasis added]. The contracts I submitted by the GPO are unambiguous, period. And if there were any changes to a particular contract or something you do not understand, it is a written submission process. BY MR KING: Q. "After this case was filed, did you speak with him about this particular contract or about this particular case? ………. THE WITNESS: [Mr. Wilmot] Not at all. Can I add something for the record? Q. [Mr. King] Yes. Please. A. [Mr. Wilmot] Record Press's invoices are submitted to Washington, D.C. along with Philadelphia, GPO's office. Washington does not pay our invoices unless GPO in Philadelphia approves of them. So that means they must be in compliance before they are paid, so there is a dual auditing going on on our invoices."

 Defendant appears to proceed under the erroneous assumption that if the false claim is paid it becomes legitimate. This logic appears to be shared by Defendant's Counsel. If that were true, the False Claims Act would be mooted. There was no evidence of any "auditing" by the Government prior to case unsealing. The only "Auditor" to testify was Mr. Gocial. See SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272 ("But the Committee does believe the civil False Claims Act should recognize that those doing business with the Government have an obligation to make a limited inquiry to ensure the claims they submit are accurate.") see also *Crane Helicopter Servs., Inc. v. United States*, 45 Fed. Cl. 410, 433 (1999) ("[The FCA's knowing standard was designed to address] 'the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know'" and to reach "those who ignore obvious warning signs.") (citation omitted). We

5

00001026

agree with Defendant that the relevant contract is unambiguous. See the Affidavit of the (only) expert witness, Mr. Gocial, page 4:

(1) Page 12 of 15, Section 4 – Schedule of Prices, refers to "**fractional parts of 10 will be prorated**" which supports our position that where a running rate of 10 copies is referenced that rates charged are per 10 copies. (*Exhibit B Doc. 67*)
(2) Page 14 of 15, Section 4, II – Complete Product, specifically states "**Note: Running rate is per 10 copies**" which covers parts (a), (b), (c), and (d). *This further supports our position that the rates charged in this section are for every 10 copies rather than for each copy. (Exhibit C Doc. 67)*

<u>**ACTUAL VICTIM**</u>

As to the next quote, "the alleged victim, through the agency official who appeared in Plaintiff's case-in-chief, testified there was no fraud". To start, we have the sharpest possible disagreement regarding "the alleged victim" or the actual victim. *Qui tam pro domino rege quam pro se ipso in hac parte sequitur*, (who as much for [our] lord the king as for himself in this action pursues), a.k.a. False Claims Act, 31 U.S.C. §§ 3729–3733, suing in the name of the King (or State etc.) is an old law which by definition implies that Contracting Officers and/or those tasked with paying claims have failed to perform their fiduciary responsibility. Thus this necessity to grant cause of action to individual citizens who have evidence of false claims. Affiant is a Shop Steward of 8 years, Safety Representative, and Civil Servant for 12 ½ years. I am tasked as a Shop Steward with defending fellow Civil Servants accused of wrongdoing. Occasionally he or she commits an error due to overwork, fatigue, lack of information, or lack of training, *etc.*. The assumption regarding said error is that a natural tendency to justify, cover-up or otherwise defend error is a result of inherent bias against being so confronted (with error). The testimony, or evidence is considered self-serving and is not limited to 'lower' titles. So we have this "alleged victim". So what is a 'victim'? One who is harmed? If by

6

00001027

accusing an individual, or an agency, of failing to perform fiduciary responsibility they become a 'victim' than GPO is a victim. If the accusation, or evidence, does not confer victimhood then GPO is not a 'victim'. The court was correct in conferring the title "Alleged Victim" upon the GPO. The fact that the GPO was not deprived of monies by the instant False Claims is not disputed. In fact, it is not disputed that the GPO 'profited' off of said claims due to its own 7% overhead charge on same. This fact is used to hammer and defame Relator!! The actual victim, as a matter of law (statute), is the People (taxpayers) of the United States, who paid these claims, admittedly plus the GPO's 7% 'cut'. Defendant has a right to dislike the Federal False Claims Act, and it admittedly is not meant to serve their interest as a Contractor, but the taxpayer requires an advocate. Numerous laws have been passed and signed that protect us taxpayers from corrupt, indolent or indifferent Contracting Officers that fail to perform their 'honest services' and attempt to cover up same. This is called a Moral Hazard when one's financial or other interests lie in one direction and yet are implied to lie in its apostate. GPO would not recover any monies from its admitted friend Record Press, damages would be returned to the General Fund. Would the GPO be on the hook for the $513,793.91 X .07(%)= $35,965.57? An interesting conundrum, but not promising to elicit testimony contrary to interest. The Courts reliance on this Morally Hazardous, biased Testimony from the GPO's 30(b)6 witness is what we are requesting (see Motion for Amended Judgment) be revisited as contrary to the interest of justice. See also *United States v. United Techs. Corp.*, No. 5:92-CV-375 (EBB), 1996 WL 653620, at *2 (D. Conn. Oct. 11, 1996) ("The statute's restriction on the authority of agency heads should be read as encompassing their subordinates."); *cf. Contract Disputes Act of 1978,* S. REP.

7

00001028

NO. 95-1118, at 19 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5235, 5253 ("[I]t is not the intent of this section to authorize Agency heads, contracting officers, or agency boards to settle or compromise claims independent of their legal or contractual merits . . . ."). *Nat'l Wholesalers,* 236 F.2d at 950; see also *United States ex rel. McCray Sanitation Serv. v. Midwest Container Co*., 7 F.3d 1046, at *2 (10th Cir. 1993) (unpublished table decision) ("[Contracting agency cannot] 'ratify' any previous fraud by [contractor]."). Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct. Accordingly, the FCA is violated when a contractor submits a false claim even when the contractor informs the government of the claim's falsity before submission. Further, once false claims are received, a contracting officer may not modify the contract, or take other action, to waive past false claims. The Federal Acquisition Regulation (FAR) also contains express limitations on contracting officer authority when a claim is suspected to be false or tainted by fraud. Pursuant to FAR 33.210(b), (the FAR is codified in Title 48 of the United States Code of Federal Regulations. It is issued pursuant to the Office of Federal Procurement Policy Act of 1974 (Pub. L. 93-400 and Title 41 of the United States Code), Chapter 7.) the contracting officer has no authority to settle, compromise, pay or adjust "any claim involving fraud." Similarly, section 605(a) of the Contract Disputes Act (41 U.S.C. § 605**)** removes any authority from the head of an agency "to settle, compromise, pay, or otherwise adjust any claim involving fraud." This statutory restriction on agency heads extends downward to subordinate agency procurement officials." MICHAEL J. DAVIDSON, 45 Idaho L. Rev. 41(att.).

## RELATOR'S EVIDENCE

8

Now as to the next quote from decision, '"Plaintiff offered *no evidence to the contrary*" (Id. (emphasis added))". The evidence submitted by Relator is extensive and dispositive, or should be, for Plaintiff's case and include all court papers, "Expert Report", the IFB 2231-S/1272-S, testimony, and the 'spreadsheets' submitted by GPO/Record Press, Inc. This case cannot be simpler, Record Press billed the United States at least 10 times too much for Collating, Trimming to Size and Binding briefs and appendixes. Everything else is smoke and mirrors. Mr. Adgerson told Relator on July 5, 2007 that Record Press was charging 10 times too much for same by not applying clearly written "**Note: Running rate is per 10 copies**" and "RUNNING PER 10 COPIES" above line II(d). His 'battlefield' conversion is perjury, as previously stated in Counterclaim Defendant's Omnibus Motion(Dct. 70), etc. It is certainly acknowledged that Relator's "beliefs" and  "subjective concern" are far from dispositive and admittedly legally biased in the interest of the People. Relator's 'opinion/subjective concern' means nothing, the 'contract' means everything. This is our gravamen. Relator's 'opinion' is identical to that of the young boy who stated that "The Emperor has no clothes", the difference being, I, unlike the boy, will be forced to work to the age of 85 or more operating a train in order to pay Record Press for the admitted crime of attempting Remedy for the United States in recovering damages as a Whistleblower. We believe the Defendant has no basis for Recovery, as a matter of fact and law. It is in fact Counterclaim Defendant with the strongest argument for Fees and Expenses for Counterclaim that Defendant demanded the Court dismiss after service of Omnibus Motion to Dismiss/For Summary Judgment. Please see arguments in the admittedly 'mooted' papers submitted by Counterclaim Defendant (Dcts.70,74,76,77,82,85).

9

00001030

Counterclaim Defendant has not submitted Motion for Fees under any rule due to

pending Motion for Amended Judgment and the right for Defendant to reinitiate

Counterclaim, which, as predicted, they have apparently done within this Motion for

Attorney Fees and Expenses. Can it be that Defendant is actually seeking Fees &

Expenses for their own 5 year frivolous and vexatious Dismissed Counterclaim? We also

request any fees or expenses incurred investigating Relator, Mr. King, Mr. Hanna,

subpoenaed witness, etc. be quashed. Defendant mentions the Rule 11 Motion filed by

*pro se* Plaintiff in *Burke v. Evans* but forgot to mention their own Rule 11 Motion in their

32 page soliloquy(dct. 94-main). Why is that? **Because Defendant lost**. Yet they seek

payment from Relator for same. Defendant mentions one of their defeated Motion(s) for

Summary Judgment only to state on page 22 "More than half of Record Press's fees were

incurred after Record Press filed its June 24, 2010 motion for summary judgment." Their

implied logic is that United States *ex rel*. Brian Burke should have performed what

Record Press did after Counterclaim Defendant's own Motion for Summary Judgment, a

Fed. R. Civ. P. 41(a)(2) Motion for Voluntary Dismissal. Perhaps Defendant could

inform the Court and Relator when this was done in the history of Jurisprudence after

WINNING same Summary Judgment motion. It is not clear how much Record Press

spent after losing their infinitely more relevant Rule 11 Motion (as juxtaposed to Burke's

Rule 11 Motion in another case) or how much was spent in losing three dispositive

motions but clearly they want Relator to pay for same. Defendant, by Counsel, as always,

seeks to have their cake and eat it too. While they claim to be of one mind with an Order

they admittedly prevailed on (Relator is requesting an Amended Judgment by Motion, an

action that generally stays Motion for Fees and Tolling on time to file Notice of Appeal,

10

i.e. this Motion is premature at best) they are forcing this Court to rewrite same Decision. This Court studiously and purposely, after its 2 ¼ year Deliberation, chose not to use the words "frivolous" or "vexatious" in its Decision/Order. That time for the Court to perform its lawful function is also being taxed to Relator in Defendant's suggestion Plaintiff deliberately dragged out or prolonged proceedings. Record Press was not clear where or in what irrelevant case a Court has used the word "frivolous" or for that matter "vexatious" but base their incorrect opinion on the fact that Brian Burke *pro se* lost. In Document 90, PM Transcript of Bench Trial, page 41 lines 8-14 "…….but that the Court would find no relevance or probative value, with all due respect to other judges, in a mere determination that there was insufficient evidence.. MR. O'BRIEN: Understood, Your Honor. THE COURT:---that do not have any bearing upon Mr. Burke's credibility. Mr. O'BRIEN: No, I understand, Your Honor." This Ruling was 'understood' but not followed. On pages 45, 46 of same Document 90 Lines 25-5 MR. KING: "I would point out that the Rule 11 motion has been filed accusing Mr. Burke of filing frivolously; that motion had already been decided and overruled. It seems like this is another opportunity to try to bring up whether or not that motion should be granted, when it's already been denied."  Highly prescient. Here we are again.

<u>**BETWEEN SCYLLA AND CHARYBDIS**</u>

We are not attempting to defame Mr. Sullivan, or for that matter Mr. Wilmot. We are aware both these gentlemen were given a Hobson's Choice. In Mr. Sullivan's case he was clearly taxed with covering-up GPO's faults by his superior, as an admitted lifelong employee. The previous employee stuck with this unrewarding task chose to retire instead (Doc. 90 pg. 63). Mr. Sullivan was apparently promoted for his yeoman work on

11

00001032

this case. So what would be the outcome if Mr. Sullivan testified for example "a clear reading of the contract for program 2231-S shows Record Press has been billing 10 times too much for collating trimming to size and binding government briefs and appendices." We believe he would have been fired or demoted or transferred or otherwise retaliated against. It is clear that GPO's official position has been formed on the instant case prior to Mr. Sullivan's dilemma(*id*. pg. 63). Were he to 'whistleblow' prior to testimony he would simply have been replaced as 30(b)6 witness and retaliated against. Were he to do as former employee Mr. Adgerson and simply 'flip the script', but in this case against the interest of his boss, on the Stand, we can only imagine the outcome. While Relator would certainly welcome any testimony in the interest of the People, this heroism is not required to enforce the False Claims Act.  Now we have Mr. Wilmot. The 'false claims' (the word fraud has been employed, but see *United States ex rel. Quirk v. Madonna Towers, Inc*., 278 F.3d 765, 767 (8th Cir. 2002) ("No proof of specific intent to defraud the government is required." (citing 31 U.S.C. § 3729(b))).) clearly started before Mr. Wilmot's tenure at Record Press, Inc.. So what was, or is, Mr. Wilmot to do when he noticed the instant false claims? Whistleblow on his own company? Would he ever be hired again? Unknown. It is not required that contractor whistleblow on itself for FCA to be enforced, or for that matter an employee of 'allegedly' defrauded agency do the same. Of course, we have an agency that itself was not defrauded but instead pocketed 7% on the false claims, it was the United States treasury that was defrauded. If it is required that a Relator have the 'allegedly', or actually, defrauded agency testify in their behalf or interest we clearly have not surmounted that hurdle and the case is deservedly Dismissed. This hurdle is not required. It does not exist. We acknowledge case law wherein a **PRIOR** 'meeting of

12

minds' may mitigate or defend against a False Claim Action, but, as shown, this did not occur within instant case. Full stop. As my admittedly sexist ancestor informed me well before my birth "The only thing necessary for evil to triumph is for good men to do nothing" (Edmond Burke). The United States is $15 Trillion in debt and requires someone to advance it's fiduciary interest, thus we have the False Claims Act. We respectfully request the Court not hamstring, cripple, 'moot', restrict, or end same act. We respectfully request that the Court not require the gentlemen, Mr. Sullivan or Mr. Wilmot, to act contrary to interest. Upton Sinclair "It is difficult to get a man to understand something, when his salary depends on his not understanding it".

### RP000069 AND IFB FOR PROGRAM 2231-S/1272-S

Now again to the core of the case. In Defendant's Document 94 page 12 we have a small piece of a document both parties believe is Dispositive. There was testimony that RP000069, or was it the 'page 1 of 1', was attached to the Request For Bids for Program 2231-S and/or 1272-S. It is agreed that Relator, in the Complaint, relied upon the 'four corners' of what became the 'contract' (IFP with Record Press's winning bids (albeit with GPO's 7% 'profit')). There does not appear to be any evidence, or testimony, other than that a plain reading of said contract can only lead to the conclusion that Record Press was charging the United States 10 times too much for line II(D) COLLATING, TRIMMING TO SIZE AND BINDING, due to ignoring "**Note: Running rate is per 10 copies**" and "RUNNING PER 10 COPIES" written clearly above lines (a), (b), (c), and (d). Defendant acknowledges this 'running rate' applies to, and they appeared to bill correctly, lines (a), and (b). So why does it not apply to line (d)? Witnesses Sullivan and Wilmot claim to believe this is obvious, without explanation. It is obvious. A clear, and

13

only possible, reading and application of IFB 2231-S/1272-S would apply 'running rate' to COLLATING, TRIMMING TO SIZE AND BINDING. What the four corners of the contract could be more clear on is whether or not contractor should be charging at all for a particular book under line II(d). We assumed that Record Press, or another winning contractor, was allowed to charge $12.25, (or even our initial $12.50), per 10 copies per 100 pages for programs 2231-S/1272-S, for all books. Defendant's only actual written evidence submitted to the contrary, RP000069 and/or similar 'page 1 of 1' (attached) admittedly show something different. While the 'running rate' applies to lines (c) and (d) (see Relator Motion for Amended Judgement Affidavit), it is absolutely dispositive, legally conclusive and crystal clear on our initial assumption. With apologies to the Court, we were wrong, *mea culpa*. That is to say, and again Defendant submitted these documents as dispositive (including within instant motion (Dct. 94 pg. 12)), **Record Press is not to charge <u>AT ALL</u> for COLLATING, TRIMMING TO SIZE AND BINDING**, other than for delivered pre-printed documents (see IFB 2231-S page 6 paragraph 8 "Occasionally the Government will supply preprinted 8-1/2 x 11" pages which the contractor will be required to collate, typeset a cover trim to finished size and bind."), or petitions for a writ of certiorari, which require 'Pressure Sensitive Cover Stock' and substantial trimming. For this conclusion, the only possible, we go back to those 'spreadsheets' (RP00069 and 'page 1 of 1' both attached). Mr. Lomas, as during the trial, etc., admittedly in order to make his case, concentrated on the left side margins of said document(s) and purposely chose, and continues to chose to, demand the Court view and decide based only upon that section. Lets call it the face and hands of the spreadsheet. The problem is that for parties, or the Court, to determine whether or not this

14

00001035

'emperor' has clothes, we must view THE WHOLE DOCUMENT, INCLUDING THE

BODY! As Expert Witness Mr. Gocial could explain much better than myself, Relator's

accounting background is more modest, the margin of any spreadsheet is used only to

explain and assist in analyzing the actual data to the right of the margin. RECORD

PRESS CONTINUES TO SHOW NO DATA WITHIN THESE DOCUMENTS. Why?

Because they would lose. Again full stop. Please see Relator's Affidavit attached to our

Motion for Amended Judgment, in order to not be repetitive. We have alleged Bid-

Rigging, again see Relator's Motion for Amended Judgment Affidavit attached.

## <u>NON-RELEVANT CASES</u>

As to Mr. Lomas's tortured parsing of Plaintiff's previous *pro se*[1] *(Dct. 70 pg.2,3)*

documents submitted in other cases, one can say no more than that they are irrelevant to

---

[1] **Movant requests Court construe Pleadings liberally.** "The court must construe the pleadings liberally, Pro se litigants' court submissions are to be construed liberally and held to less stringent standards than submissions of lawyers. If the court can reasonably read the submissions, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with rule requirements. *Boag v. MacDougall, 454 U.S. 364, 102 S.Ct. 700, 70 L.Ed.2d 551 (1982); Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)*(quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); McDowell v. Delaware State Police, 88 F.3d 188, 189 (3rd Cir. 1996); United States v. Day, 969 F.2d 39, 42 (3rd Cir. 1992)*(holding pro se petition cannot be held to same standard as pleadings drafted by attorneys); *Then v. I.N.S., 58 F.Supp.2d 422, 429 (D.N.J. 1999).* The courts provide pro se parties wide latitude when construing their pleadings and papers. When interpreting pro se papers, the Court should use common sense to determine what relief the party desires. *S.E.C. v. Elliott, 953 F.2d 1560, 1582 (11th Cir. 1992).* See also, *United States v. Miller, 197 F.3d 644, 648 (3rd Cir. 1999)* (Court has special obligation to construe pro se litigants' pleadings liberally); *Poling v. K. Hovnanian Enterprises, 99 F.Supp.2d 502, 506-07 (D.N.J. 2000).* Defendant has the right to submit pro se briefs on appeal, even though they may be in artfully drawn but the court can reasonably read and understand them. See, *Vega v. Johnson, 149 F.3d 354 (5th Cir. 1998).* Courts will go to particular pains to protect pro se litigants against consequences of technical errors if injustice would otherwise result. *U.S. v. Sanchez, 88 F.3d 1243 (D.C. Cir.1996).* Moreover, "the court is under a duty to examine the complaint to

15

00001036

instant case, as this Court has previously ruled. As previously stated, Mr. Lomas has

misstated, misquoted, misdirected, etc., in order to prevail. In all cases against my

landlord (actually the Managing Agent) I have prevailed as a *pro se* Respondent,

including a 62% rent abatement by Civil Court jury trial and a Reverse and Remand in

my favor by the Second Circuit. I acknowledge in my first case against them, as

respondent, I was represented, I lost. To update Mr. Lomas, last year as Defendant *pro se*

I again Prevailed (dismissed) and in District Court (SDNY) I Prevailed as a represented

Plaintiff (by settlement, sealed). There are unfortunately many issues outstanding, but I

applaud Mr. Lomas's interest, as perhaps a potential *pro bono* Counsel? Mr. Lomas

certainly has a right to object to my writing style as a non-attorney and I accept his

implied criticism, but please, a few points. His quote, for example, "giving blood and

taking blood in the lobby". I share his shock at this violation of my and others 'quiet use

and enjoyment' etc., but this in fact occurred. Petitioner did not deny this or other facts

and subsequently halted this activity due to my Submissions. Again, thank you for your

interest. Burke's claims were not dismissed, I was the Defendant. Respondent *pro se*

Prevailed, as previously stated. Only one of Mr. Lomas's untruths. As to the 'Taylor

Law' case I have attached a letter which I believe explains outcome. I had temporary

agreement for *pro bono* representation by a renowned Labor Law Professor (Rutgers),

who opted out due to the dispute between Local 100 and the International (See ex. 2). I

---

determine if the allegations provide for relief on any possible theory." *Bonner v. Circuit Court of St. Louis, 526 F.2d 1331, 1334 (8th Cir. 1975)* (quoting *Bramlet v. Wilson, 495 F.2d 714, 716 (8th Cir. 1974))*. Thus, if this court were to entertain any motion to dismiss this court would have to apply the standards of *White v. Bloom*. Furthermore, if there is any possible theory that would entitle the Plaintiff to relief, even one that the Plaintiff hasn't thought of, the court cannot dismiss this case."

16

00001037

was given credit for forcing the initiation of our International Labor Organization case

wherein we prevailed. Apologies if the Court finds this last paragraph irrelevant.

### JURISDICTIONAL BAR

As previously stated, we believe opinions on the relevant contract's interpretation by

Mr. Sullivan, or for that matter Mr. Adgerson, should be discounted not just for the

inherent bias, but as a matter of Jurisdiction. Mr. Sullivan, Government Printing Office's

30(b)(6) witness, was required to testify, for Relator's *prima facie*, to the facts that

Record Press was a winning Contractor for the United States, that they (otherwise)

Performed, that the Claims at issue were paid, that they are an ongoing Contractor, etc..

The Jurisdictional Bar, which was inadvertently breached, is in regard to the GPO

witness's testimony as to the **Falsity of the Claims itself** being accepted by Court as

Dispositive, or at all**.** We believe they are, or were, testifying on behalf of the Agency

Head and/or as Contracting Officers. Please see again "In such palming off as we have

here we do not believe that the Congress ever intended that contracting officers should

have the power to vitiate the False Claims statute."[*United States v. Nat'l Wholesalers,*

*236 F.2d 944, 950 (9th Cir. 1956]"* and section 605(a) of the Contract Disputes Act,

which removes any authority from the head of an agency "to settle, compromise, pay, or

otherwise adjust any claim involving fraud." Please see also again Federal Acquisition

Regulation 33.210(b), wherein the contracting officer has no authority to settle,

compromise, pay or adjust "any claim involving fraud." These Statues appear to bar any

Court Jurisdictionally from reliance on Agency Head or Procurement or Contracting

Officers and Jurisdictionally proscribe their opining on whether any particular claim was

false.  If a Court were to rely on testimony by agency heads and/or subordinates, in order

17

00001038

to decide falsity these Statutes (Black Letter Law) would be rendered void. We believe
this is not the intent of the Court. There is certainly the acknowledged exception wherein
a PREVIOUS 'meeting of the minds' (between Contractor and Contractee), as per case
law quoted above, is potentially exculpatory evidence against falsity. In the instant case
there was not a prior 'meeting of the minds' as sworn testimony and Deposition show
(see above). This Court does appear to prefer some testimony as to what the proper
contract interpretation should be. Relator's and Defendant's opinion as to falsity were
reasonably construed as containing a legal bias, and we clearly request that GPO
witnesses testimony as to falsity be discounted Jurisdictionally and for Bias. Record Press
pretends to feign shock as to Relator challenging the veracity of the GPO witnesses and
clearly believe, or want to believe, that GPO officers are allowed to resolve a false claim
*ex post facto* without a prior meeting of minds. They cannot. We know what Congress
intended with the above Statutes; to remove Agency employees Jurisdictionally from
resolving False Claims. Why? Because they (Congress) believe the contrary would allow
a Moral Hazard. Mr. Sullivan is certainly allowed his opinion on any subject, via the 1st
Amendment, but by Statue and Case law it cannot be used to resolve falsity. We ask, in
order to assist the Court and referencing our pending Motion for Amended Judgment, that
Expert Witness Mr. Gocial be allowed to testify as to proper contract interpretation and
the implications of the 'spreadsheets'. The alternative, that the Court decide, within
Amended Judgment, on the 'four corners' of the IFB program 2231-S/1272-S and our
explanation of the **whole** spreadsheet (RP00069, ex.2), which is the only explanation in
the Record.

## COUNTERCLAIM

00001039

Defendant served and filed a Counterclaim against Counterclaim Defendant Brian Burke (but not The United States) incorporated within Answer on June 28, 2008 (Dct. 10). Defendant requested, and was granted, an extension of time to answer claim beyond Statue 20 days (Dct. 9). Relator's agreement with Murphy Anderson plc., hopefully not violating confidentiality, did not include a reciprocal obligation they represent Burke for any counterclaim. Nevertheless, Murphy Anderson generously chose to represent Counterclaim Defendant Brian Burke. A motion for attorney's fees and expenses has not yet been filed by Counterclaim Defendant. A Motion for Attorneys Fees and Expenses by Counterclaim Defendant will be filed and served after tolling of now pending motions and/or Notice of Appeal. Counterclaim Defendant filed an Omnibus Motion to Dismiss/For Summary Judgment a week after 02/14/11 Bench Trial for Liability. The instant case was bifurcated and Counterclaim Defendant *pro se* was barred from entering evidence or examining or cross-examining witnesses at Trial. Instead of addressing merits of Counterclaim Defendant's Omnibus Motion for Summary Judgment(Dct. 70), Record Press moved for Voluntary Dismissal under Fed. R. Civ. P. 41(a)2. The Court Granted Counterclaimant's Dismissal on May, 21 2013. This had the effect of 'mooting' Counterclaimant's pending motions and thus no Judgment on the merits of the Counterclaim. Counterclaimant understands that there is presumption in Law and/or Case Law that the Movant of a Granted Voluntary Dismissal is not the Prevailing Party, the Non-Movant is. There is a fee shifting presumption, in that case, for non-movant and recovery is pre-ordained. Counterclaimant, within Served and Filed and Recorded Motions Affidavits and Exhibits, stated said Counterclaim was Frivolous, Vexatious and

19

Harassing (See dct. 77 pg. 3[2] & 74[3] ). The Common Law Counterclaim was for "Tortious Interference with Prospective Economic Advantage"(Dct. 10). There has been extensive evidence and Testimony, including within instant motion, that Record Press's contractual relationship has continued unabated with GPO and that there is (false claims aside) satisfaction with their performance. There admittedly appears to be no hostility or dispute at any time between contractor and contractee, albeit we still insist there was no actual 'meeting of minds' until Trial or after (see above). So where is or was the 'tort' within the 'tortious interference'? Who was victimized? Counterclaimant, by Record Press admittedly harassing prior Counsel for the People, Murphy Anderson plc., off the case and their clear attempt to do the same with Mr. King now (see instant motion). This is 'tortious interference', proven harm. McKenna Long is seeking fee shifting for an amount allegedly billed to defend against Claim, and Prosecute Counterclaim. So how much of alleged billing was for Counterclaim? 50%? If they claim it was 0%, then they have affirmed their **FAILURE TO PROSECUTE COUNTERCLAIM**! Failure to

---

[2] "**Fed. R. Civ. P. 41(a)(2)** Defendant, acting in Bad Faith, is attempting to Dismiss it's "*clearly frivolous, clearly vexatious, or brought primarily for the purposes of harassment" (see § 3730(d)(4))* Counterclaim in order to Prejudice Petitioner *pro se* (see Plaintiff's Reply to Opposition [dct. 74 pg 3] " **I. MR. BURKE'S MOTION IS NOT MOOT**")" [emphasis in original].

[3] "**I. MR. BURKE'S MOTION IS NOT MOOT** Defendant/Feasor, in attempting its 'having your cake and eat it too' Defense (not to be confused with Government Knowledge Defense, see Omnibus attachment [Dct. 70]), like 2231-S Bid-rigging, tries its Cognitive Dissonance. Defendant appears to concede all facts in Omnibus Motion by Omission (see above) in Documents 72 & 73 without explicitly conceding case. Record Press is attempting to vacate it's "clearly frivolous, clearly vexatious, or brought primarily for the purposes of harassment" (see § 3730(d)(4)) Counterclaim as a 'Queen Sacrifice' to save Record Press from Liability, as admitted. Like with the Queen Sacrifice, Defendant reserves the right to re-litigate (Resurrect) Counter-claim, perhaps with some forum shopping. Counterclaimant is attempting, through prestidigitation, to end Plaintiff's Due Process Rights to defend against pending Counterclaim and block the Court from accessing Verified Facts & Law within pending Omnibus Motion [Dct. 70]."

20

00001041

prosecute a claim, or counterclaim, is the <u>VERY DEFINITION OF VEXATIOUS,</u>

<u>HARASSING AND FRIVOLOUS!</u> Mr. Lomas, no doubt an intelligent man, will attempt

the impossible in walking us through the looking glass. The implied premise is that this

Counterclaim, or any counterclaim, is a free shot at Claimant, without taxable costs or

Remedy, regardless of outcome. He will suggest they performed no work on

Counterclaim while equally suggesting they prosecuted, or at least intended to prosecute,

same. Cake and eat it too. Sweet. He will equally suggest that Murphy Anderson plc. and

Counterclaimant *pro se*, spent no time on Counterclaim Defense, with no proof. Relator

has been informed that Murphy Anderson plc. spent approximately $200,000 on properly

prosecuting Claim and defending Counterclaim. Like McKenna Long, they have not yet

released details on what was spent on each. Mr. Lomas will suggest the Court tax Relator

for their work on both. By the same argument Murphy Anderson should collect for their

work on Claim and Counterclaim, as Counterclaimant Prevailed on May 21, 2013. Mr.

Lomas may choose to persuade the Court that they failed to prosecute Counterclaim due

to their epic and actionable lack of evidence, or any slight facts, and their failure to state a

(counter)claim. Murphy Anderson and Relator/Counterclaim Defendant believed that

Record Press's admittedly substantial (in size, pgs. 116, not merit) Rule 11 Motion (Dct.

#27) was actually part of the Counterclaim as it was clearly against Brian Burke

individually and included the same fallacious and frivolous arguments as instant motion.

Nevertheless, McKenna Long lost that motion and they are seeking the cost of the lost

motion against Counterclaimant. They also lost two (substantial in size but not merit)

Motions for Summary Judgment (Dct.#17pgs.106, dct.#44pgs. 229), again apparently to

be taxed against Relator. See also Fed. R. Civ. P, § 41(d). Rule 41(d) provides that: "If a

00001042

plaintiff who has once dismissed an action in any court commences an action based upon

or including the same claim against the same defendant, the court may make such order

for the payment of costs of the action previously dismissed as it may deem proper and

may stay the proceedings in the action until the plaintiff has complied with the order."

The instant Motion for Attorney's Fees and Costs is considered an independent action

(see *White v. New Hamsphire. Dep't of Employment Sec.*, 455 U.S. 445, 451, 102 S. Ct.

1162, 71 L. Ed. 2d 325 (1982); *Obin v. International Ass'n of Machinists & Aerospace*

*Workers*, 651 F.2d 574, 584 (8th Cir. 1981). and is clearly a re-initiation of Dismissed

Counterclaim. See Counterclaim Defendant's Opposition to Record Press, Inc.'s Motion

for Voluntary Dismissal (dkt.74 pgs.3,4) "Defendant has not even waived, however

temporarily, their Counterclaim, even without Prejudice. See Opposition, [Dkt. 73] page

4 pg3 "The only remaining matters are ........... and any subsequent proceedings related to

that decision, such as, for example, a motion for fees and costs." Plaintiff will be serving

a Motion for Fees & Costs for now admitted Frivolous, Vexatious & Harassing

Counterclaim. Defendant would be simply be making "an improper attempt to reargue the

merits and delay final resolution" of Counterclaim." Record Press is attempting to

reargue the merits of the Claim in order to force this Court to change Decision from that

of their merely prevailing (we acknowledge the Court, at this time, believes our evidence

insufficient to prevail (pending Amended Judgment request)) to that of 'Frivolous,

Vexatious and Harassing'(31 USC § 3730) standard it acknowledges is required for

instant motion. Thus, in the interest of justice, an Amended Judgment(see Plaintiff's

pending Motion for Amended Judgment) should be ordered.

## TO DEFER CONSIDERATION OF THE CLAIM OF FEES

22

00001043

Within Fed. R. Civ. P. 58, ENTERING JUDGMENT Notes of Advisory Committee
on Rules—1993 Amendment "Particularly if the claim for fees involves substantial issues
or is likely to be affected by the appellate decision, the district court may prefer to defer
consideration of the claim for fees until after the appeal is resolved." (law.cornel.edu).
We concur and note Relator has filed contemporaneous Notice of Appeal (att.).

## **LEGAL PRECEDENT**

The False Claims Act provides at 31 U.S.C. §3730(d)(4) that "[i]f the Government
does not proceed with the action and the person bringing the action conducts the action,
the court may award to the defendant its reasonable attorneys' fees and expenses if the
defendant prevails in the action and the court finds that the claim of the person bringing
the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of
harassment." "The Fourth Circuit recently addressed this issue. *United States ex rel. Ubl
v. IIF Data Solutions et al.*, (No. 09-2280, April 19, 2011). In *Ubl,* the district court
ordered the relator to pay the defendant attorney's fees in excess of $500,000. The
district court made that order notwithstanding the following facts: 1) The relator and the
defendant had entered into a settlement for almost nine million dollars that fell apart only
because the government refused to approve it; 2) the district court twice denied
defendant's motions to dismiss; 3) the district court denied defendant's motion for
summary judgment. The Fourth Circuit reversed the district court's award of attorney's
fees to the defendant and held that the legal standard must be whether the relator's
"claims objectively had any reasonable chance of success." Id, at 22. Although the
Fourth Circuit upheld the jury's verdict in favor of the defendant, it found that the
relator's claims did have a reasonable chance of success, and reversed the district court's

23

award of fees to the defendant."[4] In the instant case we can work backward, 3) our district court did not deny one motion for summary judgment but **TWO**, document 17, filed 10/01/2008, Terminated 06/24/2009,106 pages, and document 44, filed on the one year anniversary of their previous defeat, 06/24/2010, Terminated 02/11/2011, pages 229.

   2). We have a Motion to Dismiss wherein Defendant prevailed, their **MOTION TO VOLUNTARILY DISMISS THEIR FRIVOLOUS, NO EVIDENCE, FREE SHOT, VEXATIOUS, HARASSING COUNTERCLAIM!** Should that count? We think so. Then there is Record Press's substantial (in terms of pages) Motion for Sanctions (Fed. R. Civ. P. 11) document 27, filed 12/04/2008, Terminated on the same day as first summary judgment motion, 06/24/2009, pages 106. Lets call it two summary judgment motions and two motions to dismiss they lost. So what about 1)? Well as we see within instant motion (pg. 29) "Given the thousands of invoices Burke claimed to be fraudulent, civil penalties could have totaled approximately $15 million. *Id*." Record Press could not settle this claim AS THEY DO NOT HAVE THE MONEY! Thus they are required to fight until the Petition for Writ of Certiorari.

<div align="center">

**MITIGATION**

</div>

   So both parties appear to acknowledge that Record Press cannot pay the damages required under 31 USC § 3729, what would be the outcome if they had lost, or were to lose? We do not know. Would the United States (receiving 70-85% of recovery) own Record Press? Does it want to? Maybe not. Is that a fact the courts have, or this Court will, take into account? Relator affirms that lack of ability to pay damages/fines under 31 USC § 3729 should not mitigate falsity. As to 'small, employee-owned'(id. pg. 11), we

---

[4] http://www.wyche.com/article/recoveries-and-protections-for-whistleblowers-under-the-false-claims-act

00001045

are informed that employees of Record Press receive some of their pay in stock, but we are unclear whether any stock has ever been distributed to or voted by same, or any earnings have been distributed, or what class of stock is involved (see Wilmot Deposition). As to 'small' maybe, there are different standards. We again request, or request clarification, as to whether Record Press intends the Court see this, and 'employee-ownership', as a potential mitigation. We are requesting an Amended Judgment to allow this court to overturn or revise what we consider to be a precedent that will rend the civil Federal False Claims Act. Mr. Lomas, in his Memorandum of Points and Authorities uses 'Wilmot Deposition' to make their *prima facie* case for fee shifting, (Dct. 94-main, pg.11) "Ex. 1, Transcript of Deposition of Hugh Wilmot, Jr. ("Wilmot Dep. Tr.") 6:17-7:3.)".  We agree that Mr. Wilmot is the sole decision maker regarding contract interpretation for Record Press since the initiation of his presidency. We acknowledge the fraud (actually 'false claims') started prior to said tenure, and Mr. Wilmot is perhaps underpaid to have to deal with his inherited 'rock and a hard place', but again request clarification as to whether this fact is or will be considered mitigation. Unfair maybe, but we must enforce the False Claims Act to deny companies large and, yes, small from unlawfully grabbing tax-payer monies. Perhaps Congress could amend the law to make the fines affordable, but that arguably has not been their intent. Mr. Wilmot stated clearly under oath that there was never any meeting of minds regarding contract terms, no discussion period. Perhaps he believed (via Counsel?[5]) we were required to prove intent? This is not the case, as shown previously. So we have the

---

[5] 'Though he had no basis for it, Burke alleged that Record Press had defrauded – *knowingly lied* – to the United States government.'(dct. 94-main, pg. 29)

25

00001046

Contract. The Contract shows that the winning contractor for IFB program 2231-S/1272-S must apply 'running rate' to 'collating, trimming to size and binding'. Simple. Record Press has succeeded in muddying the waters (with all due respect to America's greatest musician, McKinley Morganfield) and temporarily out-lawyering us.  Mr. Lomas, and Record Press, have succeeded in confusing the court through half-truths, prestidigitation, willful misstatements, misdirection and obfuscation, as shown. Mr. Lomas & co. forgot about the Motion *In Limine*, which they lost (Dct. 59, filed 12/16/2010, Terminated 02/03/2011) thus allowing Relator to speak as to contract interpretation at Trial. This appears to have been overlooked within June 12, 2013 Memorandum and Order and instant motion. As to their defeated motion, "Mr. Burke, who is not offered as an expert, may not offer any opinion testimony concerning the interpretation of any Record Press-GPO contract."(Dct. #59 pg.3). This, of course, holds true for Mr. Sullivan, not offered as an expert. Have your cake and eat it too. So in the instant case and June 12, 2013 Memorandum & Order we have a sea change in the definition of 'meeting of minds', which we believe was not the courts intent. The People are clearly requesting an Amended Judgment to 'un-muddy' the waters and restore the rights of the United States and the jurisdiction of the Federal False Claims Act. McKenna Long & Aldridge LLP, renowned litigators against the FCA (See dct.#94-1,pg.1, etc.) have achieved an overwhelming victory by prevailing at all, however temporarily, given their inability to retain even one expert witness to testify on their behalf [6], their loss on four or more dispositive motions and most importantly the undeniable, but avoided, fact that a plain

---

[6] Mr. Gocial was apparently barred from contract interpretation testimony, an issue we will request be reviewed or allowed within Amended Judgment.

00001047

reading of relevant contract shows their client defrauded the United States more than they

can afford to pay back. Victory is sweet. Law students will be studying their victorious

gimmicks for the next century or more. The best, and perhaps prevailing, gimmick is

certainly the 'spreadsheets'. Mr. Wilmot stated that he did not rely on this document for

his contract interpretation but instead the 'four corners' of the contract[7]. (Ex. 1,Wilmot

depo. Pg. 84 lines 16-18) "**<u>Record Press is not responsible for any numbers that</u>**

**<u>enters into this particular table and the interpretation of this particular</u>**

**<u>table</u>**[RP000069][emphasis added]". Record Press, by counsel, again has it's cake and

eats it too, this is also known as cognitive dissonance. Mr. Wilmot eschewed this

document in his deposition because it shows the intent we are not required to prove under

False Claims Act. Certainly he is aware, and we have shown, **that Record Press should**

**not be billing at all for Collating, Trimming to Size and Binding!** McKenna Long's

'muddying the waters' by demanding, without logic, the court view a tiny snippet of the

spreadsheet Mr. Wilmot swore he did not use. A great victory yes, but also a death of a

thousand cuts for the False Claims Act, rendering it moot. This is unfortunate and we

---

[7] Ex. 1 pg.#83 line2-84line21 "BY MR. KING: Q. Do you – do you recognize this document?[RP000069, ex. 2] A. **Yes, I Do.** Q. And what type of document is this? **A. This document is a breakdown that generally accompanies the RFP submitted by the GPO to every vendor or potential contractor for this particular program.**[emphasis in original] Q. Okay. And if you look down there for Record Press, and you go down to where it says collating, trimming to size, and binding per 100 pages, the basis of the order 14, the unit rate of 12.25, do you see that that's written there? ….. THE WITNESS: [Mr. Wilmot] Correct. I see it. BY MR KING: Q. And is it – is it your testimony that these particular entries under Record Press's column are entries corresponding to the RFP that Record Press submitted?.......THE WITNESS: I don't know. BY MR KING: Q. Okay. So Mr. Wilmot, you didn't prepare the document? A. **That's correct.** ……THE WITNESS: The previous question was, did I prepare this document being this spreadsheet layout, no. Record Press did not create this. This is not a Record Press product. **<u>Record Press is not responsible for any numbers  that enters into this particular table and the interpretation of this particular table</u>** [emphasis added]……

00001048

again pray the court grant an Amended Judgment and deny fees and stay Bill of Costs

(dct. 95) until case is finally decided.

## LCvR 54.2

### (b) DETERMINATION OF ATTORNEYS FEES PENDING APPEAL.

If a status conference described in paragraph (a) is held, the court shall ascertain

whether an appeal is being taken by either party, and if so, whether the appeal is on all

or fewer than all issues. If a party has not finally decided whether to appeal, the court

may allow the party reasonable additional time to reach such a decision. After a

decision has been made that there will be an appeal, the court shall make a specific

determination as to whether, in the interest of justice, the fee issues, in whole or in part,

should be considered or be held in abeyance pending the outcome of the appeal.

### DEFENDANT'S OWN CASE LAW

Defendant was kind enough inform the Court and Plaintiff about two Decisions,

apparently the only two they could find out of thousands of filed FCA actions, wherein

the courts shifted fees to relator, *United States ex rel. Cooper v. Bernard Hodes Group,*

*Inc.,* 422 F.Supp.2d 225, 238 (D. D.C.. 2006), and again, see above, *U.S. ex rel. Ubl v.*

*IIF Data Solutions*, 650 F.3d 445. We will try to be brief. As can be imagined, there are

vastly different fact and applicable case law structures in every FCA case. Some prevail,

some are defeated and a tiny percentage are ruled "frivolous, vexatious or harassing". We

acknowledge a claim (or counterclaim) may in fact be used solely to harass, vex, or be

deemed frivolous, in fact, we have contended this all along for the no evidence

Counterclaim, and by their actions Defendant concurs. In *Ubl v. IIF Data* we have a

successful 'Government Knowledge' defense. See attached *Fourth Circuit Reinforces*

28

00001049

*Significance Of 'Government Knowledge' Defense In FCA Cases* David M. Nadler and Justin A. Chiarodo, "The Fourth Circuit rejected Ubl's narrow interpretation of the Government knowledge defense. The Court found "no reason" why the Government's knowledge would be irrelevant simply because the Government employees with knowledge did not happen to pay the contractor's invoices." See also *Fourth Circuit Issues Significant Opinion on "Government Knowledge Defense" in False Claims Act Case* McKenna Long & Aldridge, attached "The court soundly rejected the argument and affirmed the trial court, finding: "Evidence that the government knew about the facts underlying an allegedly false claim can serve to distinguish between the knowing submission of a false claim, which generally is actionable under the FCA, and the submission of a claim that turned out to be incorrect, which generally is not actionable under the FCA. That is, "the government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation…… *IIF*, No. 09-2280, slip op. at 13 (4th Cir. Apr. 19, 2011) (citations omitted)."" And "It is not uncommon for relators and sometimes even the government itself to argue that "government knowledge" is no defense to an FCA case or that only the knowledge of some select group of government employees is relevant to such a defense. The *IIF* ruling will provide great assistance to defendants in rebutting such arguments." We concede that PRIOR KNOWLEDGE (sorry for the shouting) would constitute a viable and/or successful defense. **Not *ex post facto*!** If the courts now believe that a relator's awareness of prior knowledge between Government and Contractor constitutes a frivolous, vexatious or harassing claim than in the contrary when a defendant states (under oath in deposition) there was no Prior Knowledge or Meeting of Minds their

00001050

defense, and specifically their instant motion, **must be deemed frivolous**! See "In

interpreting § 3730(d)(4), several other Circuits have relied upon the Supreme Court's

definition of frivolous found in the Title VII and 42 U.S.C § 1988 contexts. See, e.g.,

*U.S. ex rel. Grynberg v. Praxair, Inc*., 389 F.3d 1038, 1058 (10th Cir. 2004)(citing

*Christiansburg Garment Co. v. E.E.O.C*, 434 U.S. 412 (1978)); see also *Hughes v. Rowe*,

449 U.S. 5 (1980). Under this definition, an award is justified when a relator's claims are

"groundless or without foundation, rather than simply that the [relator] has ultimately lost

his case." *Christiansburg*, 434 U.S. 412 (1978). Put another way, "[a] successful

defendant... must demonstrate that the plaintiff has misused his statutory privilege and

distorted the intent of the legislation." *Grynberg*, 389 F.3d at 1058 n. 22.3." (Dct. 94-1,

pg. 96 UBL v. IFF, Memorandum Opinion, motion for fees)

   *Cooper v. Hodes* was cited twice within same Order (Id pg. 96) "A number of courts

have recognized alternatively that "the government's [prior] awareness of the

circumstances constituting the alleged transgression makes any legal claim of fraud"

frivolous or vexatious for the purposes of § 3730(d)(4). *U.S. ex rel. J. Cooper &

Associates, Inc. v. Bernard Hodes Group, Inc.*, 422 F.Supp.2d 225, 239. (D.D.C. 2006);

see also *United States ex rel Bane v. Breathe Easy Pulmonary Services, Inc*., 2009 WL

1148632, at *5 (M.D.Fla. 2009) (noting that courts have recognized claims of fraud are

vexatious "where the government's undisputed prior knowledge of alleged to constitute

fraud defeated any inference of a false claim"); *U.S. ex rel. J. Cooper & Associates, Inc.

v. Bernard Hodes Group, Inc.,* All F.Supp.2d 225,239 (D.D.C. 2006) ("The government's

decision to award contracts to the defendants, despite its knowledge that the defendants

were not small or disadvantaged businesses, negates any claim of fraud against the

00001051

defendants."); *United States ex rel. Minna Ree Winer Children's Trust v. Regions Bank of Louisiana,* 1996 WL 264981, at *7 (E.D.La. 1996). In other words, and as was the case here, when a company works closely with the government, and the government is well aware of particular aspects of a company's practices, a claim for fraud premised on those practices proves groundless." I guess that's that. **In the instant Claim we have NO PRIOR KNOWLEDGE** (again sorry for the shouting) and thus a new issue of frivolousness, harassment and vexatiousness, Defendant's instant motion! **Record Press had/has no basis to bring this independent action according to their own cited case law and evidence and were/are aware of this**! We welcome a *sua sponte* ruling from this Court awarding Relator attorney's fees and expenses for Defendant's Frivolous Vexatious and Harassing Motion for Attorney's Fees and Expenses, Denial of Motion and pray grant us an Amended Judgment on our favor.

Brian Burke, Relator

145 east 23rd street #4R

Dated July 10, 2013                    New York, NY 10010

31

00001052

"We Move America"

JAMES C. LITTLE
International President

HARRY LOMBARDO
International Executive Vice
President

JOSEPH C. GORDON
International Secretary-Treasurer

GARY E. MASLANKA
Administrative Vice President
Railroad Division Director

JEFFREY L. BROOKS, SR.
Administrative Vice President
Transit, Universities, Utilities,
and Services Division Director

JOHN M. CONLEY
International Vice President
Administrative Assistant to the
International President

TRANSPORT WORKERS
UNION OF AMERICA
AFL-CIO

International Headquarters
& Offices of the Railroad
Division & Transit Utility,
Universities and Service
Division
501 3rd Street NW, 9th Floor
Washington, DC 20001
202.719.3900

Regional Headquarters Air
Transport Division
1791 Hurstview Dr.
Hurst, TX 76054
817.282.2544

www.TWU.org

December 13, 2011

John Samuelsen
TWU Local 100, President
1700 Broadway, 2nd Floor
New York, NY 10019

RE: Brian Burke's challenge to the Taylor Law

Dear John:

As you know, we correctly predicted that Brian Burke's appeal to the 2nd circuit from the dismissal of his *pro se* lawsuit on the Taylor Law would be unsuccessful and create bad precedent, and we asked the Local not to support it. Now I have been informed by someone outside TWU that Local 100 is considering asking its General Counsel to submit an amicus brief in support of Burke's petition for the United States Supreme Court to review the decision of the 2nd Circuit dismissing his case.

Seeking Supreme Court review of this decision would not help our efforts to modify the Taylor Law and implement the case we won in the ILO protecting the right to strike, as the Supreme Court would almost certainly deny review, giving the stamp of finality to the decision of the 2nd Circuit. It is not in the interest of TWU or its members to seek Supreme Court review, and I ask that you instruct your Counsel not to support this effort.

We are working on a strategy to give effect to our recent victory in the ILO, which as you know found the Taylor Law to be in violation of international law protecting freedom of association and the right to strike. I ask that the Local direct its efforts to supporting that strategy.

In solidarity,

James C. Little
International President
JCL:tt
opelu-153

c:      Harry Lombardo            Joseph C. Gordon
        Gary E. Maslanka          Jeffrey L. Brooks, Sr.
        David Rosen               Larry Cary, Local 100 General Counsel

00001053

ther use without the permission of West is prohibited. For further information about this publication, please visit *www.west.thomson.com / store*, or call 800.328.9352.

# THE GOVERNMENT CONTRACTOR®

## WEST®

Information and Analysis on Legal Aspects of Procurement

**Vol. 53, No. 23**          **June 15, 2011**

## *Focus*

¶ 191

### FEATURE COMMENT: Fourth Circuit Reinforces Significance Of 'Government Knowledge' Defense In FCA Cases

*U.S. ex rel. Ubl v. IIF Data Solutions, 2011 WL 1474783 (4th Cir. April 19, 2011)*

On April 19, 2011, the U.S. Court of Appeals for the Fourth Circuit affirmed the complete defense verdict in *U.S. ex rel. Ubl v. IIF Data Solutions*. The appeal followed a trial in the Eastern District of Virginia in which the jury found for the defendant on all counts in a False Claims Act lawsuit brought in connection with the award and performance of the defendant's General Services Administration schedule contracts. *Ubl* provides useful guidance on the enforceability of settlement agreements in FCA actions if the Government does not intervene. More notably, *Ubl* reinforces the significance and viability of the "Government knowledge" defense in FCA cases.

Under the "Government knowledge" defense or inference, the Government's awareness of the facts underlying an alleged false claim or statement can negate the scienter required to establish that a defendant knowingly submitted a false claim. Because the FCA is not designed to punish "honest mistakes," courts have looked to Government officials' knowledge to evaluate whether a defendant acted with requisite intent—the knowing submission of what is known to be false. The Court in *Ubl* thoughtfully summarized one illustration of the defense:

> if the government with full knowledge of the relevant facts directed a contractor to file a claim that was later challenged as false, the

fact that the contractor did what the government told it to do would go a long way towards establishing that the contractor did not knowingly file a claim known to be false.

*Ubl* shows that the defense remains viable for contractors accused of FCA violations.

IIF Data Solutions was a small GSA contractor with a Federal Supply Schedule contract for information technology services. Its contract included six labor categories, including positions for analysts, programmers and related IT functions. As is typical of GSA schedules for services, the labor categories included descriptions of the education, experience and skills required for employees to be assigned to the categories. IIF received millions of dollars in task orders under its IT schedule, the majority coming from the National Guard Bureau (Guard Bureau).

Relator Thomas Ubl, a former IIF employee, filed an FCA action alleging a variety of frauds perpetrated by IIF both before and after obtaining its GSA schedule contracts. Ubl alleged that IIF misrepresented its pricing and discounting practices as part of its initial schedule application (for example, by fabricating its commercial price list). Ubl further alleged that IIF billed for employees in labor categories that were not consistent with their education and experience, and improperly billed the Government for work not performed. The Government declined to intervene in the case.

After two years of discovery, IIF and Ubl agreed to settle the case in May 2008, with IIF to pay $8.9 million dollars to Ubl over several years. The settlement agreement stated that it was void without Government approval. Unfortunately for Ubl, the Government raised numerous objections to the proposed settlement. The Government objected to the percentage of the relators' share, the allocation of proposed settlement proceeds to the relator's so-called "personal claims," and the defendant's ability to pay. Two days after communicating its initial concerns, the Government informed the parties that it "would never consent" to the initial agreement.

© 2011 Thomson Reuters

The parties continued to work towards a settlement. In a mediation before a magistrate judge, IIF offered to settle Ubl's claims for $2.7 million. Ubl rejected that offer, and continued to seek the Government's approval for the initial $8.9 million offer. In September 2009, Ubl ultimately obtained the Government's agreement in principle to the May 2008 settlement agreement. IIF maintained that the Government had clearly repudiated the May 2008 settlement, and the agreement was void by its terms. Ubl was unable to enforce the settlement agreement with the district court and lost at trial on all counts.

On appeal, Ubl argued that the district court erred in refusing to enforce the initial $8.9 million settlement agreement. Ubl maintained that he had satisfied the condition in the agreement—Government consent— that was necessary to bind IIF. The Fourth Circuit rejected Ubl's argument, noting that the settlement agreement was contingent on Government approval, consistent with the FCA requirement that the Government consent to the dismissal of an FCA claim brought by a private party. See 31 USCA § 3730(b)(1). The Court found that the Government definitively rejected the agreement in correspondence with the parties in July 2008, citing the Government's statement that it "would never consent" to the May agreement as originally drafted. This meant that the Government no longer had the power to accept the May agreement and it was void by its own terms.

More notable than the Court's ruling on the repudiated settlement was its decision on evidence admitted at trial supporting a "Government knowledge" defense. At the start of the trial, Ubl sought unsuccessfully to preclude evidence that the Guard Bureau could alter the terms of GSA contracts or that the Guard Bureau approved of the personnel assigned to its projects and was satisfied with their performance. Ubl argued that the personnel IIF provided did not meet the labor category requirements in IIF's schedule, and that the Guard Bureau was unable to alter the terms of that schedule as a matter of law. Ubl further argued that any "Government knowledge" defense was not available to IIF because no GSA personnel were aware of the facts related to IIF's labor billing practices and claims. Only GSA officials were sent (and paid) invoices for IIF's work for the Guard Bureau.

The Fourth Circuit rejected Ubl's narrow interpretation of the Government knowledge defense. The Court found "no reason" why the Government's knowledge would be irrelevant simply because the Government employees with knowledge did not happen to pay the contractor's invoices. Further, IIF's close working relationship with Guard Bureau employees on its various contracts meant that the Bureau's knowledge was relevant to whether IIF acted with the requisite intent. In support of its finding, the court cited *U.S. ex rel. Bulbaw v. Orenduff*, 548 F.3d 931, 951–54 (10th Cir. 2008), in which the Tenth Circuit considered the knowledge of Department of Education employees in its analysis of the Government knowledge defense related to a Defense Department contract. *Ubl* suggests that the Government knowledge defense should be construed broadly, based on the totality of the facts related to contract award and performance.

*Ubl* underscores the significance and viability of the Government knowledge defense in an FCA case. Ubl sought to prevent the jury from hearing evidence that the Government approved of the employees assigned to Guard Bureau task orders, and evidence that the Government was pleased with the defendant's work. The total defense verdict following Ubl's unsuccessful efforts to exclude such evidence demonstrates how strongly Government knowledge resonates with fact-finders, and how helpful Government knowledge can be to a defense against FCA allegations. The Fourth Circuit's decision not to limit the Government knowledge defense to only those individuals who pay claims is sensible and consistent with the fact that the FCA was not designed to punish "honest mistakes" with punitive FCA liability. *Ubl* serves as a continued reminder that the Government knowledge defense is alive and well.



*This* FEATURE COMMENT *was written for* THE GOVERNMENT CONTRACTOR *by* David M. Nadler, *a partner, and* Justin A. Chiarodo, *an associate, with Dickstein Shapiro LLP, specializing in Government contracts matters, including the False Claims Act and compliance matters. Mr. Nadler may be contacted at NadlerD@dicksteinshapiro. com, and Mr. Chiarodo may be contacted at ChiarodoJ@dicksteinshapiro.com.*

The Government Contractor © 2011 Thomson Reuters

00001055

mckennalong.com


McKenna Long
& Aldridge LLP
Attorneys at Law



## Government Contracts Advisory

APRIL 27, 2011

### CONTACTS

For further information regarding the topic discussed in this update, please contact one of the professionals below, or the attorney or public policy advisor with whom you regularly work.

**John G. Horan**
202.496.7215

**Jason N. Workmaster**
202.496.7422

**Timothy K. Halloran**
202.496.7352

## Fourth Circuit Issues Significant Opinion on "Government Knowledge Defense" in False Claims Act Case

Last week, the U.S. Court of Appeals for the Fourth Circuit issued its most recent pro-defense ruling in a civil False Claims Act ("FCA") *qui tam* case, ***United States ex rel. Ubl v. IIF Data Solutions, Inc., et al.,* No. 09-2280**. At the appellate level, the case involved a number of challenges by Ubl, the *qui tam* relator, to the jury verdict in favor of the defendants that had followed an extensive trial in the U.S. District Court for the Eastern District of Virginia. The appellate court rejected all of these challenges—including, perhaps most significantly, Ubl's assertion that the trial judge had improperly admitted certain evidence relating to the government's knowledge of the facts and circumstances giving rise to the allegedly false claims. Consequently, the court's opinion could be of value to future defendants seeking to rely upon what is commonly known as the "government knowledge defense" to an FCA claim. MLA served as co-counsel in the case, both at trial and in the appeal.

The *IIF* case involved allegations by Ubl that IIF had fraudulently induced the award of three separate GSA Schedule contracts and then had provided unqualified or under-qualified personnel to its main government customer, the National Guard Bureau ("NGB"), under task orders issued under those Schedule contracts. At the beginning of trial, Ubl asked the district court to preclude IIF from presenting any evidence regarding NGB's satisfaction with the quality of the personnel IIF provided. Ubl argued that this evidence was inadmissible because only GSA had the contractual authority to alter the terms of IIF's Schedule contracts. Thus, he asserted, the government knowledge defense would only be available to IIF if GSA employees had knowledge of the facts relating to IIF's claims for payment. The trial judge rejected Ubl's argument and allowed IIF to present evidence that demonstrated that NGB had been pleased with the work performed by specific IIF employees and with IIF's work overall.

In the Fourth Circuit, Ubl renewed its argument regarding the admissibility of the NGB evidence. The court soundly rejected the argument and affirmed the trial court, finding:

> Evidence that the government knew about the facts underlying an allegedly false claim can serve to distinguish between the knowing submission of a false claim, which generally is actionable under the FCA, and the submission of a claim that turned out to be incorrect, which generally is not actionable under the FCA. That is, "the government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation."

> ***

> We see no reason why the government's knowledge would become irrelevant simply because the employees with the knowledge do not

the federal government, was IIF's customer, and IIF worked closely with [NGB] employees when performing its various contracts. Because IIF was working closely with the [NGB] on the very contracts that are the subject of this FCA action, we believe that the [NGB's] knowledge of IIF's performance under the contracts was relevant to the question of whether IIF acted with the requisite intent.

*IIF*, No. 09-2280, slip op. at 13 (4th Cir. Apr. 19, 2011) (citations omitted).

It is not uncommon for relators and sometimes even the government itself to argue that "government knowledge" is no defense to an FCA case or that only the knowledge of some select group of government employees is relevant to such a defense. The *IIF* ruling will provide great assistance to defendants in rebutting such arguments.

ALBANY | ATLANTA | BRUSSELS | DENVER | LOS ANGELES | NEW YORK | PHILADELPHIA | SAN DIEGO | SAN FRANCISCO | WASHINGTON, DC

**About McKenna Long & Aldridge LLP** | McKenna Long & Aldridge LLP is an international law firm with 475 attorneys and public policy advisors. The firm provides business solutions in the areas of complex litigation, corporate, environmental, energy and climate change, finance, government contracts, health care, intellectual property and technology, international law, public policy and regulatory affairs, and real estate. To learn more about the firm and its services, log on to **www.mckennalong.com**.

If you would like to be added to, or removed from this mailing list, please email **information@mckennalong.com**. Requests to unsubscribe from a list are honored within 10 business days.

© 2010 MCKENNA LONG & ALDRIDGE LLP, 1900 K STREET, NW, WASHINGTON DC, 20006. All Rights Reserved.

*This Advisory is for informational purposes only and does not constitute specific legal advice or opinions. Such advice and opinions are provided by the firm only upon engagement with respect to specific factual situations. This communication is considered Attorney Advertising.



LEXSEE 45 IDAHO L. REV. 41

Copyright (c) 2008 Idaho Law Review
Idaho Law Review

2008

45 Idaho L. Rev. 41

**LENGTH:** 14916 words

ARTICLE: THE GOVERNMENT KNOWLEDGE DEFENSE TO THE CIVIL FALSE CLAIMS ACT: A MISNOMER BY ANY OTHER NAME DOES NOT SOUND AS SWEET

**NAME:** MICHAEL J. DAVIDSON*

**BIO:**

* B.S., U.S. Military Academy, 1982; J.D., College of William & Mary, 1988; LL.M. (Military Law), The Army's Judge Advocate General's School, 1994; LL.M. (Government Procurement Law), George Washington University (GWU) School of Law, 1998; S.J.D., GWU, 2007. The author is a federal attorney. The opinions contained in this article are those of the author and do not reflect the position of any federal agency or the United States Government.

**SUMMARY:**
... A Phoenix Rises from the Ashes: The Development of the Government Knowledge Defense In 1986, in addition to eliminating the government knowledge-based jurisdictional bar, Congress clarified the FCA's scienter element, making it clear that the United States need not prove specific intent in order to establish that the defendant acted knowingly when it submitted a false claim or statement to the United States. ... Citing several dated cases, the court pointed out that " b ecause FCA liability requires an element of fraud or falsity, courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false." ... Hagood In Hagood, a qui tam relator brought suit alleging that the water agency had presented false cost allocation information to the United States to obtain an Army Corps of Engineers contract. ... The contractor in this scenario is still attempting to defraud the United States, and that fact remains unchanged even when the contracting officer or some other relevant acquisition official discovers the misconduct. ... The Tenth Circuit noted that the court in Butler had rejected the position that only a contracting officer's knowledge was relevant for purposes of determining whether a defendant had acted knowingly. ... For purposes of this defense, the legally relevant authority extends beyond that possessed by contracting officers to other procurement officials "with authority to act under the contract." ... Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct. ... Further, contractors will be held responsible for knowing the limitations on the authority of government contracting officials when such limitations were contained in published laws or regulations. ... Finding the regulators satisfactory, the Army's Contracting Officer accepted them as "equal" to the Delco-Remy regulators, and the contractor furnished the remaining regulators.

00001058

45 Idaho L. Rev. 41

**TEXT:**
 I. INTRODUCTION

   The Civil False Claims Act  n1 (FCA) serves as the United States Government's preeminent tool for addressing fraud.  n2 The FCA's application  has expanded beyond its initial focus on defense procurement fraud to embrace most federally funded government programs.  n3 The largest recoveries under the FCA are currently obtained in health care fraud cases.  n4 As a fraud fighting tool, the FCA has proven extremely successful, at least in terms of the fraud-related monetary recoveries. Since 1986, the United States has recovered more than $ 20 billion under the FCA.  n5

   In response to the government's aggressive use of the FCA, the defense bar has developed several defenses to FCA claims.  n6 One such defense that has enjoyed a measure of success is the inappropriately named "government knowledge defense." The government knowledge defense is a misnomer to the extent the term implies that government knowledge of alleged wrongdoing, by itself, affords a complete defense to an FCA lawsuit. Indeed, the scope of the defense is much narrower. To the extent knowledge of wrongdoing by government officials constitutes a defense at all, such knowledge serves as a defense to the FCA's scienter element; that is, the alleged misconduct was not committed knowingly. In other words, the defendant could not have knowingly violated the FCA because the government knew about the conduct and authorized it, either explicitly or tacitly; or, at the very minimum, the defendant reasonably believed that the government was aware of, and in agreement with, the challenged conduct.

   This article will examine the government knowledge defense, reviewing its development and examining its present state. Part II first provides an overview of the FCA. Part III then examines the development of the defense, distinguishing between the pre-1986 jurisdictional bar generated by government knowledge of misconduct and the post-1986 development of what has become known as the government knowledge defense. The article posits that the modern government knowledge defense traces its lineage to the Ninth Circuit's seminal decision in *United States ex rel. Hagood v. Sonoma County Water Agency*.  n7 Reviewing reported decisions, Part IV discusses the defense as it has developed into its modern form and attempts to articulate the defense's basic elements. Although the FCA has been applied to address fraud in the vast  majority of federally funded programs, this article will focus primarily on its application to government contracts.

   II. HISTORICAL BACKGROUND OF THE FALSE CLAIMS ACT

   The False Claims Act was enacted during the Civil War as a statutory tool to combat widespread fraud found among defense contractors.  n8 The Union Army reported instances of being charged multiple times for the same horse, finding "boots made of cardboard rather than leather,"  n9 and discovering sawdust substituted for gunpowder in ammunition crates and muskets in rifle crates.  n10 Civil War contractors had billed the United States "for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war."  n11 In its original form, the FCA allowed private persons to initiate lawsuits  n12 and provided for both criminal and civil penalties, but Congress eventually removed the FCA's criminal component and placed it elsewhere.  n13

   Except for brief flurries of activity associated with America's entry into war, with concomitant increases in defense spending and defense contractor fraud, the FCA was infrequently used.  n14 However, during the early 1980s, federal agencies reported a steady increase in fraud investigations. The Department of Defense (DoD) reported that it conducted 2311 such investigations in 1984.  n15 The following year, the DoD Inspector  General "testified that 45 of the 100 largest defense contractors, including 9 of the top 10, were under investigation for multiple fraud offenses."  n16 Further, the Department of Justice reported to Congress that, within the proceeding year, it had achieved convictions of four major defense companies and had indicted another.  n17

   The procurement fraud scandals of the early 1980s gave rise to various legislative initiatives designed to strengthen the government's ability to deal with rampant fraud within the defense industry,  n18 including significant revisions to the FCA.  n19 The 1986 amendments increased the maximum penalty from $ 2000 to $ 10,000 and provided for treble damages,  n20 added "reverse false claims"  n21 and anti-retaliation provisions,  n22 eliminated the exclusion for

00001059

members of the armed forces, n23 clarified the scienter element n24 and the standard of proof, n25 and lengthened the statute of limitations. n26

   In its current form, the FCA provides for civil liability against any person who engages in one of seven forms of misconduct. n27 The most common FCA causes of action are submitting a false claim and making or using false records to support a false claim. n28

   An FCA action may be brought initially by either the United States or by an individual on behalf of the United States. n29 When suit is brought by an individual (a relator), the case is known as a qui tam. n30 "The basic idea [behind a qui tam suit] is that a private citizen with personal knowledge of such fraud may bring suit on the government's behalf in return for a cut of the proceeds should the suit prevail." n31 The United States may assume control over a qui tam lawsuit or it may decline to intervene and permit the relator to pursue the case. n32

   A defendant found to have violated the FCA may be held liable for treble damages and a civil penalty of $ 5500 to $ 11,000 per false claim. n33 FCA damages "typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'" n34 Additionally, recovery of penalties is not dependent upon the United States proving actual damages. n35 In successful qui tam cases, the relator is entitled to a share of the government's recovery. This share may range up to thirty percent of the amount the United States recovers, depending upon the relator's contribution to the successful resolution of the case. n36

   III. THE DEVELOPMENT OF THE GOVERNMENT KNOWLEDGE DEFENSE

   A. Demise of the Government Knowledge Jurisdictional Bar

   Prior to 1986, government knowledge of the factual basis for a qui tam suit served as a jurisdictional bar to potential relators. n37 This bar reflected Congress's efforts during World War II to eliminate parasitic lawsuits. n38 Such lawsuits were being brought '"by parties having no information of their own to contribute, but who merely plagiarized information in indictments returned to the courts, newspaper stories or congressional investigations.'" n39 The FCA's prior government knowledge provision had been strictly interpreted so as to "preclud[e] any *qui tam* suit based on information in the Government's possession, despite the source." n40 Some courts have precluded qui tam lawsuits based on information in the government's possession even when the relator was the source of that information. n41 Corrupt contractors found an unintended safe harbor. As one legal treatise noted: "Defense contractors seeking to avoid liability or governmental officials who resented *qui tam* actions were almost always able to find some Government official somewhere who had *some* knowledge of the fraudulent activities involved." n42

   Believing that such a draconian jurisdictional bar could lead to inequitable results n43 and seeking to encourage potential relators to bring suit, n44 Congress eliminated the jurisdictional bar and instead substituted a public disclosure standard: "[A] *qui tam* suit will be barred only if it is based on information that was 'publicly disclosed' at various hearings, in certain types of reports, or by the media." n45 Under this standard, "[i]nformation that the government 'has,' but that was never publicly disclosed, does not bar a *qui tam* suit." n46

   In the event of a public disclosure, the qui tam relator's action is not barred so long as the relator was the original source of the information giving rise to the lawsuit. n47 The "original source" requirement is jurisdictional. n48 The FCA defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under [the FCA] which is based on the information." n49

   The prior government knowledge-based jurisdictional bar and the current government knowledge defenses are analytically distinct concepts. The former focused on the government's knowledge of the fraud to preclude the relator from bringing suit; n50 the latter focuses on the effect the government's knowledge has on the defendant's mental state in order to determine if the defendant acted knowingly. n51 Further, the earlier jurisdictional language was removed from the FCA in 1986 n52 and replaced with the public disclosure/original source language found in § 3730(e)(4). n53

Accordingly, to the extent that the possession of information forming the basis of a relator's FCA lawsuit served as a jurisdictional bar, that form of government knowledge defense no longer exists. However, "[o]nce public disclosure became the linchpin of the jurisdictional scheme, the effect of government knowledge on the viability of an FCA claim was thrown to the courts to decide." n54

   B. A Phoenix Rises from the Ashes: The Development of the Government Knowledge Defense

   In 1986, in addition to eliminating the government knowledge-based jurisdictional bar, Congress clarified the FCA's scienter element, making it clear that the United States need not prove specific intent in order to establish that the defendant acted knowingly when it submitted a false claim or statement to the United States. n55 In doing so, Congress intended to reach "the increasingly familiar 'ostrich-like' conduct of corporate officers, who had been able to insulate themselves from FCA liability for false claims submitted by unwitting subordinates." n56

   By the plain terms of the FCA's statutory language, the scienter requirement is that the defendant acted knowingly for all FCA claims except those enumerated in sections 3729(a)(3), (a)(4) and (a)(5). n57 Currently, the FCA defines "knowing" and "knowingly" to "mean that a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information . . . ." n58

   In other words, the "defendant must 'know' that a claim or statement is false or fraudulent, that is, he must (1) have actual knowledge that it is false, (2) act in deliberate ignorance of its truth or falsity or (3) act in reckless disregard of its truth or falsity." n59 The United States, or a relator acting on its behalf, is not required to prove that the defendant acted with the specific intent to defraud. n60

   1. *Boisjoly:* A Failed First Attempt

   The first reported post-1986 amendment case to address the government knowledge defense was *Boisjoly v. Morton Thiokol, Inc.* n61 In *Boisjoly,* an engineer working for the defendant filed a qui tam following the Challenger disaster, alleging that Morton Thiokol provided NASA with defective solid rocket motors (SRM), n62 that the defendant's role in the launch decision constituted a false claim, and that the company requested and received a bonus from NASA despite the shuttle disaster and the company's failure to meet contract specifications. n63

   The court granted the defendant's motion to dismiss the first cause of action, noting that the complaint itself indicated that NASA knew of the alleged SRM defects. n64 Citing several dated cases, n65 the court pointed out that "[b]ecause FCA liability requires an element of fraud or falsity, courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false." n66 The court then posited, "only if the government gets something less than or different from that which it expected can it be said to have suffered the kind of injury necessary to invoke FCA liability." n67 The court held "that if the complaint itself alleges that the government knew of those very facts or characteristics which allegedly make the claim false, no claim has been stated." n68

   Further, the court determined that the remaining causes of action did not state an FCA claim. n69 The court found that the defendant had certified the safety of the SRMs only after disclosing its concerns to NASA and after being pressured by the government to submit the certification. n70 The court held that such "circumstances are simply not the kind against which the FCA is meant to protect" and "negate[] any element of falsity or fraud that might otherwise exist." n71

   With respect to that portion of the opinion addressing the government knowledge defense, the court's decision has been criticized n72 and effectively overruled to the extent *Boisjoly* suggests that government knowledge constitutes an absolute defense. n73 In *Shaw v. AAA Engineering & Drafting, Inc.,* the United States Court of Appeals for the Tenth Circuit specifically rejected the notion that government knowledge constituted an absolute defense to an FCA case. n74 Instead, the court noted that "there may still be occasions when the government's knowledge of or cooperation with a

45 Idaho L. Rev. 41

contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA." n75 Further, as subsequent case law has shown, government knowledge may serve as a defense to the FCA's scienter element, rather than to the falsity of the claim. n76

2. *Hagood:* The Ninth Circuit Sets the Standard

The seminal and most often cited case to address the government knowledge defense since the 1986 amendments to the FCA is *United States ex rel. Hagood v. Sonoma County Water Agency.* n77 Indeed, the *Hagood* decision has been cited with approval by several circuit courts, including the Second, n78 Sixth, n79 Seventh, n80 and Tenth, n81 by the U.S. Court of Federal Claims, n82 and by district court decisions in other circuits. n83

a. *Hagood*

In *Hagood,* a *qui tam* relator n84 brought suit alleging that the water agency had presented false cost allocation information to the United States to obtain an Army Corps of Engineers contract. n85 The district court dismissed the suit "for failure to state a claim for which relief could be granted." n86

The district court believed that Hagood's complaint was "essentially self-contradictory" because it both alleged that the water agency had committed fraud and that "'the high government officials responsible for taking the action' knew of the facts that made the complaint false." n87 Further, the district court found that Hagood failed to sufficiently plead fraudulent intent for purposes of Fed. R. Civ. P. 9(b) and that the government's knowledge of the alleged falsity made it "impossible to say that the government had suffered the kind of injury necessary to impose liability under the False Claims Act." n88 Elaborating, the district court mused, "it is difficult to see how any damages to the United States are caused by false statements when officials, with full knowledge of the falsity of the statements, proceed to take an action depriving the government of funds notwithstanding the false statements." n89

On appeal, the United States Court of Appeals for the Ninth Circuit reversed and remanded. n90 The appellate court found that Hagood's complaint was not self-contradicting. n91 Reviewing the FCA's requirement that the alleged misconduct be knowing, the court noted that the scienter element required more than mere negligence or innocent mistake but did not require the government to prove specific intent to deceive. n92 In terms of intent, the United States had to establish "the knowing presentation of what is known to be false." n93

With respect to government knowledge of the falsity, the court acknowledged that such knowledge could be "highly relevant"; it could "show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." n94 However, the court also posited that government knowledge did not alone provide an absolute defense--"[t]hat the relevant government officials know of the falsity is not in itself a defense." n95 In short, the court found evidence of government knowledge potentially relevant to the FCA's scienter element, but not to the issue of falsity. n96

The court left the question of whether government knowledge may preclude an award of damages unanswered. n97 However, the court pointed out that the United States need not prove damages in order to recover penalties and costs, suggesting that even if government knowledge provided a causal defense against an award of damages, such knowledge did not insulate the defendant from the imposition of penalties. n98

Finally, the court rejected an estoppel defense. Reiterating the well-established law that "estoppel will not lie against the United States 'on the same terms as any other litigant,'" under the facts alleged in this case, the court posited that "[t]he defendant's 'inability to retain money that it should never have received in the first place' is not the kind of detrimental reliance that justifies estoppel against the government." n99 Finding that Hagood's allegations constituted a valid cause of action, the court further admonished: "'Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of the law . . . . [T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.'" n100

b. *Hagood's* Progenies: *Wang & Butler*

The Ninth Circuit's decisions in *Wang* and *Butler* amplified its original decision in *Hagood*. In *Wang ex rel. United States v. FMC Corp.*, n101 a qui tam relator, who had alleged that FMC defrauded the United States on four defense contracts including a contract involving a lightweight howitzer, unsuccessfully appealed the district court's grant of summary judgment to FMC. n102 In support of his claim, Wang alleged "that FMC's engineering work was of 'low quality,' and that the design for the lightweight howitzer was 'faulty.'" n103 Wang's sole piece of evidence to support his allegations concerning the howitzer contract was an FMC "lessons learned" memorandum written after the contract had been cancelled. n104 Significantly, "all of the issues discussed in the memorandum were first raised and considered in meetings with the Army." n105

Analyzing the FCA's scienter requirement, the court noted that the Army knew about "FMC's mistakes and limitations, and that FMC was open with the government about them . . . ." n106 Accordingly, the court opined that Wang's evidence was insufficient to survive summary judgment, the memorandum suggesting only "that while FMC might have been groping for solutions, it was not cheating the government in the effort." n107 To be knowingly false, there must be something more than a mere scientific untruth, there must be "a lie." n108

Following *Wang*, the Ninth Circuit again addressed the issue of government knowledge in an FCA case. In *United States ex rel. Butler v. Hughes Helicopter, Inc.*, n109 a qui tam relator, who alleged that the defendant had made false statements and submitted false claims "related to several aspects of the testing of the avionics and navigation subsystems" of the Apache attack helicopter, appealed an adverse directed  verdict. n110 At trial, the defendant argued, in relevant part, that Army technical representatives approved deviations from the required specifications and that Army technical representatives were also present during relevant equipment tests. n111 As part of its findings of fact, the district court noted "the Army's knowledge of and access to the modifications in the testing of the subsystems . . . ." n112 Further, the district court's decision relied on its conclusion that the Army and defendant enjoyed a "pattern of cooperation" in which "information flowed freely," and "all information upon which [Butler] bases his case was not only available to the Army, but in the Army's possession." n113

On appeal, Butler did not challenge the district court's findings of fact, but instead argued "that the *wrong* Army personnel knew, that is, that only a contracting officer had the power to modify a government contract to allow the deviations the Army allowed in the testing." n114 The court first noted that government knowledge is not an automatic defense to an FCA action and that courts must evaluate the significance of such knowledge on a case-by-case basis. n115 Relying on *Hagood* and *Wang*, the court then determined that the scope of its review focused on the evidence "that [the defendant] and the Army had so completely cooperated and shared all information during the testing that [the defendant] did not 'knowingly' submit false claims," in which case the court would affirm the directed verdict. n116 With respect to the government knowledge defense, the court did not directly confront Butler's argument, but instead found that test changes were discussed between the defendant and Army representatives, that Army technical representatives knew of and approved these changes, and, accordingly, that the allegedly noncompliant test could not have been a "knowingly false statement[]." n117

IV. THE CURRENT STATE OF THE DEFENSE

The vast majority of cases have determined that government knowledge is not an absolute defense to an FCA action. n118 In other words, the  mere fact that government officials know of the falsity does not, standing alone, constitute a defense. n119 While relevant, "the Government's knowledge is . . . not necessarily dispositive . . . ." n120 The significance of the government's knowledge is determined on a case by case basis. n121

Since the 1986 FCA amendments, several courts have addressed the government knowledge defense, providing an emerging, but sufficiently well defined, body of law to map out the parameters of this defense. In order for government knowledge of defendant's alleged wrongdoing to serve as a defense to an FCA action, the defendant must satisfy several elements. First, the defendant can use the government's knowledge of his conduct to defend against the FCA's scienter

element to establish that he did not knowingly commit a violation of the FCA. Second, the defendant must establish that the government had knowledge of the specific conduct that forms the basis of the FCA claim. Third, the defendant cannot merely show that someone in the government had knowledge of the challenged conduct; rather, the defendant must prove that a relevant government official was aware of the challenged conduct and approved it, either explicitly or tacitly. Finally, the defendant must also prove that the relevant government official had knowledge of the specific conduct at issue *before* the defendant presented a claim.

   A. Defendant's Scienter Was Affected

   The courts have applied the government knowledge defense to the scienter element of the FCA. n122 As originally explained by the United States Court of Appeals for the Ninth Circuit in *Hagood,* the requisite intent in an FCA case is "the knowing presentation of what is known to be false." n123 Accordingly, "[t]hat the relevant government officials know of the falsity is not in itself a defense." n124 "[T]he knowledge possessed by officials of the United States may be . . . relevant. . . . [to] show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." n125 The focus of the defense is not on what the government knew; rather, the defense focuses on whether the defendant acted knowingly, examining the effect of the government's knowledge on the defendant.

   Interpreting the FCA to provide an absolute defense based on government knowledge of the specific falsity at issue, without a concomitant effect on the defendant's mental state, would lead to absurd results. To illustrate, assume that a contractor knowingly submits a false claim--indeed does so with the specific intent to defraud the United States--but a federal employee learns of the falsity unbeknownst to the corrupt contractor, either before or after the claim is submitted. Is the claim any less false, or was it submitted any less knowingly, merely because someone in the government became aware of it? The answer, of course, is no. n126 Nor does the answer change if the federal employee who discovers the falsity is the cognizant contracting officer. n127 The contractor in this scenario is still attempting to defraud the United States, and that fact remains unchanged even when the contracting officer or some other relevant acquisition official discovers the misconduct.

   In *Shaw v. AAA Engineering & Drafting Inc.,* n128 the United States Court of Appeals for the Tenth Circuit rejected a government knowledge defense based on knowledge of misconduct provided to the government by the qui tam relator, who had formerly been employed by the defendant. While still an employee of the defendant, Shaw reported certain environmental misconduct to the government's Quality Assurance Evaluator, who in turn relayed the information to the contracting officer. n129 In rejecting the defense the court posited:

> Assuming some level of government knowledge would negate the intent requirement under the FCA as a matter of law, the level of government knowledge in the present case does not do so. It was the plaintiff, Shaw, and not the individual defendants or other AAA employees, who told the government about the failure to practice silver recovery. n130

   The unsuitability of government knowledge as an absolute defense is highlighted further when the knowledgeable federal employee is not merely a passive recipient of information, but instead is a participant in a scheme to defraud the United States. n131 Clearly, the defendant should not escape liability merely because it found a willing participant--a coconspirator--within the government.

   Additionally, an FCA defendant should not benefit if someone from the government learns of the falsity and simply does nothing about it. The Seventh Circuit has held that mere governmental acquiescence is insufficient to sustain a government knowledge defense. n132 The government must both know of, and approve, the particular claim before it is submitted. n133 The opinions of other circuit courts appear to have adopted a similar standard. n134 Unless that person is someone with the requisite level of authority and approves or otherwise indicates to the defendant that its conduct is permissible, then the defendant's scienter remains unaffected. Additionally, "mere acquiescence would preclude FCA liability any time a government employee and a defendant were in cahoots." n135

45 Idaho L. Rev. 41

Even though the government has not affirmatively approved a particular claim or its underlying factual basis when such is in contention, apparently some courts have imposed a less demanding standard that permits the defense when government knowledge is coupled with acquiescence.  n136 Such a standard would seem defensible so long as the defendant could establish that the particular facts and circumstances surrounding the government's receipt of relevant information, and subsequent acquiescence, reasonably affected the defendant's mental state. In those jurisdictions adopting such a standard, the critical focus would remain on the defendant's scienter, that is, did the defendant knowingly submit a false claim.

B. Specific Falsity at Issue

In order for government knowledge to serve as a defense, the United States must also have known of the specific falsity at issue. Both the Fifth and Seventh Circuits have posited: '"[I]f the government knows and approves of *the particulars* of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim."'  n137 Other courts applying the defense have  articulated a similar standard n138 or have noted that the specific falsity at issue was known to the government.  n139 Logically, this element should be met if the defendant has fully disclosed all relevant facts leading up to the presentment of a claim, or followed the government's specific instructions when presenting the claim, such that it is apparent that the government knew and approved of the defendant's course of action.  n140 Under this standard, it is insufficient that the Government becomes aware of contractual or programmatic irregularities not amounting to fraud or becomes aware of other, unrelated fraud.

C. Relevant Government Officials

Merely establishing that someone within the government possessed knowledge of the defendant's wrongdoing does not, by itself, satisfy this element of the government knowledge defense. Albeit few cases have squarely addressed the issue, several opinions have suggested a limitation on the defense, requiring that the knowledge be possessed by relevant government employees.  n141 Other court opinions applying the defense, but not addressing the relevant pool of government officials, have noted complete or extensive knowledge by the government of the alleged misconduct, n142 suggesting that this limited body of relevant or responsible  officials also had the requisite knowledge. If such a limitation did not exist, then a defendant could escape liability simply by finding someone within the government who possessed some knowledge of the challenged conduct, regardless of that person's authority or relationship with the underlying program or activity.

The United States Court of Appeals for the Tenth Circuit was one of the few courts to directly address this issue in the federal procurement context. In *United States ex rel*. *Stone v*. *Rockwell International Corp*.,  n143 the Tenth Circuit reviewed a challenge to the district court's jury instruction, "charging the jury that they could consider the knowledge of all 'government employees with authority to act under the contract."'  n144 Noting that the instruction had not limited the jury's consideration of knowledge possessed only by the government's contracting officers, but rather that such authority extended to "a broader range of individuals," the appellate court held that the district court's instruction was not in error.  n145

Further, the court rejected the appellant's argument that upholding the lower court's jury instruction would conflict with *United States ex rel*. *Butler v*. *Hughes Helicopters, Inc*.  n146 The Tenth Circuit noted that the court in *Butler* had rejected the position that only a contracting officer's knowledge was relevant for purposes of determining whether a defendant had acted knowingly.  n147 Instead, the Ninth Circuit had included "technical representatives" within the pool of relevant government officials.  n148

As the *Stone* decision correctly indicates, for purposes of this defense, the legal significance of the government's knowledge in the federal  procurement context is linked to the authority of the employee in possession of the information. That authority does not reside with all employees merely because they are somehow associated with the procurement; nor, on the other hand, is such authority embodied solely in the contracting officer. For purposes of this defense, the legally relevant authority extends beyond that possessed by contracting officers to other procurement

00001065

officials "with authority to act under the contract." n149

Unfortunately the courts have failed to provide a clear standard for determining relevant officials--those with the requisite level of authority--specifically for purposes of the government knowledge defense. However, although the two bodies of law are not synonymous, established principles of general federal procurement law addressing the authority of federal acquisition officials to bind the government offer guidance for FCA cases. Under these legal principles, application of the government knowledge defense should be limited to knowledge possessed by government employees acting with actual contractual authority, depending upon the facts of the case. n150

1. Actual Authority, Express or Implied, Is Required

As a general rule, the United States is bound only by the conduct of its employees acting with actual authority. n151 Similarly, as a general rule in the procurement context, "[o]nly persons with contracting authority can bind the Government." n152 In the procurement context, cognizant contracting officers have actual authority to bind the government. n153 Once they receive the requisite grant of authority, contracting officers may "enter into, administer, or terminate contracts and make related determinations and findings." n154 Further, contracting officers possess authority "to execute contract modifications on behalf of the Government." n155

Limits on the contracting officer's authority are provided to that official in writing and such limitations are known, or readily subject to determination, by contractors and other federal officials. Contracting officers are appointed in writing with a Certificate of Appointment (called a "warrant") containing any limitations on their authority. n156 Information concerning the limitations on the contracting officer's authority is readily available to the public. n157 Indeed, some contracting officers even post their warrants on their office wall for contractor review. n158

Contracting officers may delegate portions of their authority to other government employees. n159 Accordingly, with respect to federal procurements, the "relevant" pool of actors for the government knowledge defense should normally include the contracting officer overseeing the particular contract, who usually possesses the "authority to enter into, administer, or terminate contracts and make related determinations and findings." n160 Also, the relevant pool could include those subordinate contracting officials whom the contracting officer expressly delegates actual authority to perform various contracting functions. n161 Typical government officials falling into this category may include the Administrative Contracting Officer (ACO), n162 Terminating Contracting Officer (TCO), n163 and certain "formally designated representatives who act on behalf of the Government during contract administration." n164 Such representatives could include the "contracting officer representative (COR), contracting officer technical representative (COTR), Government Technical Representative (GTR), or Government Technical Evaluator (GTE)." n165

For contractors, authority issues may become confusing in federal procurements because they frequently deal with government employees with varying levels of authority, who may possess titles or exercise related duties that suggest a greater level of authority. n166 As one treatise notes:

> Within contracting offices, personnel with official-sounding titles such as contract specialist, negotiators, and administrators work for contracting officers and handle the day-to-day contracting activity of the government, but such personnel generally do not have authority to order additional work or to commit the government by virtue of their position. Contractors are expected to recognize this lack of authority. n167

In order to provide relief to contractors, various courts and boards have relied on the court-created theory of "implied" actual authority to bind the United States. n168 Accordingly, in some limited circumstances, "[t]he authority of a Government official . . . may . . . arise from 'implied actual authority.'" n169 A government employee may be found to possess the "implied authority to bind the Government in contract 'when such authority is considered to be an integral part of the duties assigned to [the] government employee." n170 In this context "integral" means '"essential or necessary to form a whole."' n171 However, implied authority only exists when *some* authority has been properly

delegated to a government employee. n172 A government procurement official lacking any actual authority, cannot be deemed to possess implied actual authority. n173

Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct. n174 Accordingly, the FCA is violated when a contractor submits a false claim even when the contractor informs the government of the claim's falsity before submission. n175 Further, once false claims are received, a contracting officer may not modify the contract, or take other action, to waive past false claims. n176

The Federal Acquisition Regulation (FAR) also contains express limitations on contracting officer authority when a claim is suspected to be false or tainted by fraud. Pursuant to FAR 33.210(b), the contracting officer has no authority to settle, compromise, pay or adjust "any claim involving fraud." n177 Similarly, section 605(a) of the Contract Disputes Act removes any authority from the head of an agency "to settle, compromise, pay, or otherwise adjust any claim involving fraud." n178 This statutory restriction on agency heads extends downward to subordinate agency procurement officials. n179

However, the fact that a contracting officer, or other authorized procurement official, resolved a bona fide pre-claim dispute that later forms the basis of an FCA lawsuit may give rise to a triable issue. n180 Although they may not waive false or fraudulent claims, contracting officers may resolve legitimate contract disputes. n181 Indeed, as a matter of policy, the federal government encourages resolution of contractual disputes at the contracting officer level. n182 As one court explained this distinction: "[T]he fact of a settlement, while not dispositive, is relevant insofar as it supports an inference that the defendant was involved in a contract dispute with the government, not that a government officer knew of a fraud and nonetheless decided to settle." n183

2. Knowledge and the Duty to Inquire

A second, significant body of law exists placing a duty of inquiry on a contractor when dealing with the United States. This duty is rooted in the unique status of the United States as a sovereign and draws upon the legal principle that persons are charged with constructive knowledge of published laws and regulations. n184 As the United States Supreme Court has admonished: "'Men must turn square corners when they deal with the Government . . . .'" n185

Within the realm of federal procurement law, courts have placed the burden on contractors to ensure that they are "dealing with a Government employee with contracting authority." n186 Further, contractors will be held responsible for knowing the limitations on the authority of government contracting officials when such limitations were contained in published laws or regulations. n187 Additionally, when the limitations on delegations of authority are expressly made known to contractors by including authority limitations as contract clauses, contractors will be held to those limitations. n188

Various courts have applied the "square corners" rule to the FCA. n189 Further, the legislative history from the 1986 amendments to the FCA reflects a congressional desire that a duty of inquiry be placed on contractors who deal with the government. n190 Furthermore, the FCA's legislative history indicates that the Act's "knowing" definition reflects, at least in part, the constructive knowledge standard. n191 The incorporation of a constructive knowledge standard into the FCA was designed to place at least a limited duty of inquiry upon the defendant in order "to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries that would alert him that false claims are being submitted." n192

Given the existence of this body of law, with its application to both federal procurement law concerning the authority of federal acquisition officials and to the FCA, any government knowledge defense must also be scrutinized to determine if the defendant contractor knew, or should have known, of the authority limitations on the government official alleged to possess knowledge of contractor wrongdoing. Clearly, if the FCA defendant has actual knowledge of such limitations because of contractual clauses articulating the authority of the government's officials, then federal employees falling outside the scope of those clauses should not constitute relevant officials for purposes of this defense.

Similarly, if contractual authority limitations are contained in publicly available statutes or regulations (for example, FAR), then the contractor should be charged with the constructive knowledge of those limitations and the defense should fail. Finally, some form of limited duty of inquiry should be placed on the contractor to determine the authority of the government official with whom the contractor is providing information.

3. Timing Does Matter

The falsity of the claim is measured at the time it is submitted to the United States. n193 Accordingly, a necessary prerequisite to any defense based on government knowledge of the falsity is that the relevant government officials knew of the challenged conduct *before* the false statement or claim was presented to the United States. Several courts have recognized this limitation on a government knowledge defense. n194 Although not directly addressing the issue, other cases applying the government knowledge defense contain fact patterns in which the government was aware of the challenged conduct before a claim was presented. n195

Such a temporal requirement is consistent with the basic premise underlying the defense--that the contractor did not knowingly engage in misconduct because it believed the government knew of its conduct and approved, either explicitly or tacitly. Also, this prerequisite to the government knowledge defense is consistent with the authority limitations placed on the contracting officer, as well as any other potentially relevant government official that a contractor may reasonably expect to deal with during a federal procurement. As noted earlier, government procurement officials cannot waive or ratify false or fraudulent claims. n196

The following FCA case illustrates this point. In *United States v. National Wholesalers,* n197 the defendant was awarded a contract to provide 6000 proprietary Delco-Remy vehicle regulators to the Army. n198 The bid proposal permitted either Delco-Remy regulators or "equals," but National Wholesalers offered to provide the actual Delco-Remy regulators, and the contract was awarded on that basis. n199 Unable to provide conforming Delco-Remy regulators, the defendant manufactured its own regulators--which the district found to be equal to the brand regulators--but then printed and affixed false Delco-Remy labels to the regulators. n200

Unaware of the mislabeling, the Army accepted seventeen shipments of the mislabeled parts, for a total of 4086 regulators. n201 Additionally, the contractor submitted seventeen invoices for payment. n202 Upon discovering the contractor's misconduct, the Army issued a "stop order" on future deliveries and tested the manufactured regulators. n203 Finding the regulators satisfactory, the Army's Contracting Officer accepted them as "equal" to the Delco-Remy regulators, and the contractor furnished the remaining regulators. n204

Subsequently, the United States Attorneys Office filed suit under the False Claims Act, based on the seventeen invoices submitted prior to the contracting officer having learned of the mislabeling. n205 The district court found for the defendants, determining in part that the regulators were "equals" and that the contracting officer had the authority to resolve contract disputes, which he had done here. n206

On appeal, the United States Court of Appeals for the Ninth Circuit reversed. The court determined that the time to test the falsity of a claim is the date when it is submitted. n207 Accordingly, "every one of the invoices prior to [when the contracting officer learned of the mislabeling] was false when made." n208 Further, although the contracting officer has the authority to modify a contract, a retroactive modification under such circumstances was "void as against public policy." n209 The court continued: "In such palming off as we have here we do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute." n210

V. CONCLUSION

As one federal court has correctly noted, the government knowledge defense is "inaptly-named." n211 The fact that someone in the government possessed knowledge of the misconduct that forms the basis of a False Claims Act lawsuit, by itself, does not constitute a legal defense. Depending upon the circumstances, government knowledge may be highly relevant evidence to negate the FCA defendant's scienter. In other words, government knowledge may

45 Idaho L. Rev. 41

establish that the defendant did not act knowingly, that it did not act with actual knowledge, in deliberate ignorance, or with reckless disregard.

The modern-day government knowledge defense developed slowly in the wake of the 1986 amendments to the False Claims Act. Beginning with the seminal case of *United States ex rel. Hagood v. Sonoma County Water Agency,* n212 the courts have gradually defined the defense's contours and criteria. The vast majority of cases have held that government knowledge may serve as a defense to the FCA's knowing scienter element. Further, the courts require that a relevant government official possess knowledge of the specific falsity at issue before the defendant presents a claim and approve of that conduct. Although not fully mature, the government knowledge defense is sufficiently well developed to provide courts and practitioners with solid guideposts for applying it in FCA litigation.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
GovernmentsState & Territorial GovernmentsClaims By & AgainstLabor & Employment LawEmployer LiabilityFalse Claims ActCoverage & DefinitionsJurisdictional BarLabor & Employment LawEmployer LiabilityFalse Claims ActCoverage & DefinitionsQui Tam Actions

**FOOTNOTES:**

n1 31 U.S.C. §§ 3729-3733 (2000).

n2 United States *ex rel.* Roby v. Boeing Co., 302 F.3d 637, 641 (6th Cir. 2002) ("The FCA has since become the primary means by which the Government combats and deters fraud."); Ron R. Hutchinson, *The Government's Audit and Investigative Powers over Commercial Item Contracts and Subcontracts,* 27 PUB. CONT. L.J. 263, 286 (1998) ("The Civil False Claims Act is the Government's primary vehicle for pursuing civil fraud . . . .").

n3 JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS 1-3 (Supp. 1999) ("combating fraud in virtually every program involving federal funds").

n4 Press Release, U.S. Dep't of Justice, Justice Department Recovers $ 2 Billion for Fraud Against the Government in FY 2007; More Than $ 20 Billion Since 1986 (Nov. 1, 2007), http://www.usdoj.gov/opa/pr/2007/November/07_civ_873.html.

n5 *Id.*

n6 *See, e.g.,* United States v. Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 768-74 (N.D. Tex. 2002) (addressing several defenses).

45 Idaho L. Rev. 41

n7 929 F.2d 1416 (9th Cir. 1991).

n8 SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5273 ("The False Claims Act was adopted in 1863 and signed into law by President Abraham Lincoln in order to combat rampant fraud in Civil War defense contracts."); *see also* United States *ex rel*. Wilkins v. N. Am. Constr. Corp., 173 F. Supp. 2d 601, 619 (S.D. Tex. 2001) ("The False Claims Act is a statutory cause of action intended from its inception to combat fraud against the government.").

n9 JAMES B. HELMER, JR., ANN LUGBILL, & ROBERT C. NEFF, JR., FALSE CLAIMS ACT: WHISTLEBLOWER LITIGATION §2-4, at Inside America's Biggest Defense Scandal 28 (2d ed. 1999).

n10 *Id.;* ANDY PASZTOR, WHEN THE PENTAGON WAS FOR SALE 11 (1995).

n11 United States v. McNinch, 356 U.S. 595, 599 (1958).

n12 S. REP. NO. 99-345, at 10 ("The original False Claims Act also contained a provision allowing private persons, or 'relators,' to bring suit under the act.").

n13 BOESE, *supra* note 3, at 1-10 n.27. False claims are now prosecuted criminally pursuant to 18 U.S.C. § 287. *Id*.

n14 *See* John P. Robertson, *The False Claims Act,* 26 ARIZ. ST. L.J. 899, 901 (1994) ("[T]he Act lay essentially dormant until World War II broke out and fraud on the government by defense contractors increased."); *see* BOESE, *supra* note 3, at 1-11 ("There are few reported [FCA] decisions prior to 1930."); *Id*. at 1-14 ("The dramatic increases in government spending during and after World War II triggered an upsurge in the number of FCA cases brought by the Government; the number of such cases rose again during the military buildup of the Vietnam War . . . .").

n15 S. REP. NO. 99-345, at 2 ("up 30 percent from 1982"). The Department of Health and Human Services also reported a significant increase in entitlement program fraud. *Id*.

n16 *Id*.

00001070

45 Idaho L. Rev. 41

n17 *Id*. at 2-3.

n18 In 1986, Congress also passed the Anti-Kickback Act, 41 U.S.C. §§ 51-58 (2000), a prohibited employment statute, 10 U.S.C. § 2408 (2006), and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812 (2000). *See* Vt. Agency of Natural Res. v. United States *ex rel*. Stevens, 529 U.S. 765, 786 n.17 (2000) ("PFCRA was designed to operate in tandem with the FCA. . . . [and was] enacted at virtually the same time as the FCA was amended in 1986 . . . its scope is virtually identical to that of the FCA."). For a discussion of the prohibited employment statute, see generally Michael J. Davidson, *10 U.S.C. § 2408: An Unused Weapon in the Procurement Fraud Wars,* 26 PUB. CONT. L.J. 181 (1997).

  Additionally, in 1986 the FBI initiated a major investigation into defense procurement fraud, known as Operation Ill Wind. Dick Thornburgh, *Foreword, Sixth Survey of White Collar Crime,* 28 AM. CRIM. L. REV. 383, 385-86 (1991). By April 1991, the government had achieved convictions of twenty-seven of the largest defense contractors for defrauding the United States. *Id*. at 386. Similar investigative efforts by the Defense Criminal Investigative Service generated an increase in procurement fraud-related convictions, "with 283 convictions in 1990 alone." *Id*.

n19 *See* S. REP. NO. 99-345, at 2.

n20 *Id*. at 17. The earlier version of the FCA provided for double damages. *Id*.

n21 *Id*. at 18; *see* 31 U.S.C. § 3729(a)(7). A reverse false claim is a claim "to avoid a payment to the government." S. REP. NO. 99-345, at 18.

n22 *Id*. at 13 ("afforded protection from retaliation for his actions"); *see also* 31 U.S.C. § 3730(h).

n23 S. REP. NO. 99-345, at 18. The military exclusion, which had existed since 1863, was removed because Congress believed "that military code remedies [were] inadequate to ensure full recoveries for fraudulent acts by servicepersons and such persons should therefore not be exempt from False Claims Act coverage." *Id*. at 15.

n24 *Id*. at 20-21; *see also* BOESE, *supra* note 3, at 1-16 ("[T]he 1986 Amendments resolved this dispute [concerning the meaning of the statutory requirement that the person act knowingly] by explicitly eliminating the need to prove specific intent to defraud.").

n25 S. REP. NO. 99-345, at 7. Previously, some courts "required that the United States prove a violation [of the FCA] by clear and convincing, or even clear, unequivocal and convincing evidence . . . ." *Id*. In 1986, Congress clarified the standard of proof as being a preponderance of the evidence. *Id*. at 13, 30-31. *See also* 31 U.S.C. §

00001071

3731(c) ("In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.").

n26 S. REP. NO. 99-345, at 8 ("[T]he subcommittee added a modification of the statute of limitations to permit the Government to bring an action within 6 years of when the false claim is submitted (current standard) or within 3 years of when the Government learned of a violation, whichever is later."); *see also* 31 U.S.C. § 3731(b).

n27 31 U.S.C. § 3729(a)(1-7).

n28 *See generally id.* § 3729(a)(1), (2).

n29 31 U.S.C. § 3730(a), (b).

n30 Vt. Agency of Natural Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 768 (2000). "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Id.* n.1. However, "[i]n practice, the phrase means 'an action under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive.'" United States v. Kitsap Physicians Servs., 314 F.3d 995, 997 n.1 (9th Cir. 2002) (quoting Bryan Garner, A DICTIONARY OF MODERN LEGAL USAGE 728 (2d Ed. 1995)).

n31 United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1016 (7th Cir. 1999).

n32 *Vt. Agency of Natural Res.,* 529 U.S. at 769. Under either scenario, the relator normally receives a share of the government's recovery. *Id.* at 769-70; 31 U.S.C. § 3730(d) (2000).

n33 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(9) (2008).

n34 United States *ex rel.* Compton v. Midwest Specialties, Inc., 142 F.3d 296, 304 (6th Cir. 1998) (quoting United States *ex rel.* Marcus v. Hess, 317 U.S. 537, 549 (1943)).

n35 *See Kitsap Physicians Servs.,* 314 F.3d at 1002; Varljen v. Cleveland Gear Co., 250 F.3d 426, 429 (6th Cir. 2001) ("[R]ecovery under the FCA is not dependent upon the government's sustaining monetary damages."); United States *ex rel.* Bettis v. Odebrecht Contractor of Cal., Inc., 297 F. Supp. 2d 272, 278 (D.D.C. 2004) ("even

45 Idaho L. Rev. 41

if the government has suffered no loss").

n36 31 U.S.C. § 3730(d). Further, the court may award reasonable expenses, attorney's fees and costs to the relator to be paid by the defendant. *Id*.

n37 *See* United States *ex rel*. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 n.5 (4th Cir. 2002); United States *ex rel*. Grynberg v. Praxair, Inc., 207 F. Supp. 2d 1163, 1181 (D. Colo. 2001) (citing 31 U.S.C. § 3730(b)(4) (1982) (current version at 31 U.S.C. § 3730(b)(4) (2000)). In contrast, "[t]he government itself, of course, could still bring suit for such a violation; only private parties were barred from seeking recovery." United States *ex rel*. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 408 (3d Cir. 1999).

n38 HELMER, LUGBILL & NEFF, *supra* note 9, § 2-5, at 36, 39, § 2-6(b)(2), at 46; *see also* SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5273.

n39 CLAIRE M. SYLVIA, THE FALSE CLAIMS ACT: FRAUD AGAINST THE GOVERNMENT § 27, at 47 (Andrea G. Nadel et al. eds.) (2004) (quoting United States v. Burmah Oil Co., 558 F.2d 43, 46 n.1 (2d Cir. 1977).

n40 S. REP. NO. 99-345, at 12; *see also* Wang Chen-Cheng *ex rel*. United States v. FMC Corp., 975 F.2d 1412, 1419 (9th Cir. 1992) ("Courts read the amended Act as prohibiting all *qui tam* suits where the government already possessed the information, even where the relator had independently uncovered fraud against the government and the government knew of that fraud only because the relator had been decent enough to tell the government about it.").

n41 SYLVIA, *supra* note 39, §29, at 53.

n42 HELMER, LUGBILL & NEFF, *supra* note 9, §2-5, at 40.

n43 S. REP. NO. 99-345, at 12-13.

n44 *Id*. at 8 ("encourage assistance from the private citizenry").

n45 United States *ex rel*. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 408 (3d Cir. 1999) (citing 31 U.S.C. §

3730(e)(4)(A) (1994)). The public disclosure must have occurred "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media . . . ." 31 U.S.C. § 3730(e)(4)(A).

n46 *Cantekin*, 192 F.3d at 408.

n47 *Id.* at 408-09; *see also* 31 U.S.C. § 3730(e)(4)(A) ("unless . . . the person bringing the action is an original source of the information").

n48 Rockwell Int'l Corp. v. United States, 549 U.S. 457,    , 127 S. Ct. 1397, 1406 (2007).

n49 31 U.S.C. § 3730(e)(4)(B).

n50 *See* Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1419 (9th Cir. 1992); SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 12 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5277 ("That jurisdictional bar . . . has been applied only to private *qui tam* suits, and not those suits taken over by the Government.").

n51 United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991); *see also* United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false . . . ."); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519 (10th Cir. 2000).

n52 *Shaw*, 213 F.3d at 534 ("language was removed in 1986"); *Hagood*, 929 F.2d at 1420 ("language disappeared from the statute with the 1986 amendments").

n53 31 U.S.C. § 3730(e)(4).

n54 United States *ex rel.* Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) (citing United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326 (9th Cir. 1995), *aff'd* 168 F.3d 1013 (7th Cir. 1999)); *see also Butler*, 71 F.3d at 326 ("The 1986 amendments eliminated this language, however, leaving open what would be the effect of government knowledge of the facts underlying a suit.").

00001074

45 Idaho L. Rev. 41

n55 *See* S. REP. NO. 99-345, at 7.

n56 *Lamers*, 998 F. Supp. at 987 (citing S. REP. NO. 99-345, at 7); *see also* S. REP. NO. 99-345, at 7 ("Currently, in judicial districts observing an 'actual knowledge' standard, the Government is unable to hold responsible those corporate officers who insulate themselves from knowledge of false claims submitted by lower-level subordinates."); *id*. at 21 ("[T]he constructive knowledge definition attempts to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted."); United States v. NHC Healthcare Corp., 115 F. Supp. 2d 1149, 1153 (W.D. Mo. 2000) ("The purpose of this particular definition of 'knowing' was to avoid the claimants who bury their heads in the sand and purposefully submit in ignorance a false claim.").

n57 31 U.S.C. § 3729(a)(3) (conspiring to defraud); *id*. § 3729(a)(4) (intending to defraud by delivering less property than in the defendant's possession); *id*. § 3729(a)(5) (intending to defraud by making or delivering a receipt certifying receipt of property "without completely knowing that the information on the receipt is true"); *see also* HELMER, LUGBILL & NEFF., *supra* note 9, § 3-15, at 110 ("With the exception of claims brought under 31 U.S.C. § 3729(a)(3), (a)(4), and (a)(5), the [FCA's] only 'scienter' requirement is a 'knowing violation.'").

n58 31 U.S.C. § 3729(b).

n59 United States *ex rel*. Humphrey v. Franklin-Williamson Human Servs., Inc., 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002); *see also* United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 439 (E.D.N.Y. 1995) ("[T]he government need not prove an intent to defraud, but only that the violations were committed knowingly, that is with willful blindness to the existence of a fact or reckless disregard for the truth." (citing United States v. Foster Wheeler Corp., 316 F. Supp. 963, 967 (S.D.N.Y. 1970))).

n60 31 U.S.C. § 3729(b); *see also* United States *ex rel*. Quirk v. Madonna Towers, Inc., 278 F.3d 765, 767 (8th Cir. 2002) ("No proof of specific intent to defraud the government is required." (citing 31 U.S.C. § 3729(b))).

n61 706 F. Supp. 795 (D. Utah 1988).

n62 *Id*. at 799. A government commission that investigated the Challenger disaster attributed the cause of the explosion to a gas leak in a joint's seal, which was located between two portions of one of the solid rocket motors. *Id*. at 798. The plaintiff's employment for Morton Thiokol involved work with the solid rocket motors. *Id*. at 799.

00001075

45 Idaho L. Rev. 41

n63 *Id*. at 803. In addition to his *qui tam*, Boisjoly pursued unsuccessfully several statutory and common law claims. *Id*. at 799-807.


n64 *Id*. at 809-10.


n65 *Id*. at 809 (citing United States v. Fox Lake State Bank, 366 F.2d 962, 965 (7th Cir. 1966); Woodbury v. United States, 232 F. Supp. 49, 54-55 (D. Or. 1964), *modified*, 359 F.2d 370 (9th Cir. 1966); and United States v. Schmidt, 204 F. Supp. 540 (E.D. Wis. 1962)). Although proceeding under different legal theories, the courts relied on the government's knowledge to rule in favor of the FCA defendants. *Fox Lake State Bank,* 366 F.3d at 965-66 (applying an estoppel theory); *Woodbury*, 232 F. Supp. at 54-55 (finding no intent to defraud); *Schmidt*, 204 F. Supp. at 544 (finding no intent to commit fraud or violate the FCA). Although these pre-1986 cases are of limited applicability because of the changes in the law, they and others like them provided an equitable rationale similar to that reflected in the modern government knowledge defense. *See* United States *ex rel*. Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("[T]he equitable rationale behind the defense has an impressive pedigree in this circuit." (discussing *Schmidt*, 204 F. Supp. at 540; *Fox Lake State Bank*, 366 F.2d at 962)).


n66 *Boisjoly*, 706 F. Supp. at 809.


n67 *Id*.


n68 *Id*. at 810.


n69 *Id*.


n70 *Id*. at 810-11.


n71 *Id*. at 811.


n72 *See* United States *ex rel*. Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) ("We agree that *[Boisjoly]* is an unreliable guide." (agreeing with United States *ex rel*. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991))); *Hagood,* 929 F.2d at 1421 (9th Cir. 1991) (*"Boisjoly* may be defensible on its facts; its dicta are an unreliable guide."); *cf*. Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 59 (1993) ("This court discerns several problems with *Boisjoly*.")

n73 *See* Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534-35 (10th Cir. 2000).

n74 *Id.* at 534 ("[G]overnment knowledge of a contractor's wrongdoing is no longer an automatic defense . . . .").

n75 *Id.*

n76 *See infra* note 119 and accompanying text.

n77 929 F.2d 1416 (9th Cir. 1991).

n78 United States *ex rel.* Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) ("[W]e agree with *Hagood.*").

n79 Varljen v. Cleveland Gear Co., 250 F.3d 426, 430 (6th Cir. 2001).

n80 United States *ex rel.* Durcholz v. FKW, Inc., 189 F.3d 542, 544-45 (7th Cir. 1999).

n81 Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000).

n82 *See* Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 59 (1993).

n83 *See* United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); United States *ex rel.* Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995); United States *ex rel.* Milam v. Regents of Univ. of Cal., 912 F. Supp. 868, 888-89 (D. Md. 1995); X Corp. v. Doe, 816 F. Supp. 1086, 1094 (E.D. Va. 1993).

n84 The United States declined to intervene in the case beyond moving to dismiss certain individual defendants. United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1418 (9th Cir. 1991) ("Hagood proceeded as the sole plaintiff . . . .").

n85 *Id.*

00001077

45 Idaho L. Rev. 41

n86 *Id*.

n87 *Id*.

n88 *Id*. The district court relied on reasoning under similar facts in *Boisjoly v. Morton Thiokol, Inc.,* 706 F. Supp. 795, 808-10 (D. Utah 1988).

n89 *Hagood,* 929 F.2d at 1419 (internal quotation marks omitted).

n90 *Id*. at 1422.

n91 *Id*. at 1420.

n92 *Id*. at 1422. Further, the court noted that in order for the defendant "[t]o take advantage of a disputed legal question . . . [it could] be neither deliberately ignorant nor recklessly disregardful." *Id*. at 1421.

n93 *Id*. (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981).

n94 *Id*.

n95 *Id*.

n96 *See* BOESE, *supra* note 3, at 2-78 ("The 'government knowledge' defense to 'falsity' was dealt a further blow by the Ninth Circuit's first decision in *[Hagood]*."). *Id*.

n97 *Hagood,* 929 F.2d at 1421 ("It may be, as the district court observed, that no damages were suffered when officers of the United States knowledgeably decided to proceed with the contract.").

n98 *Id*. ("No damages need be shown in order to recover the penalty." (citing Rex Trailer Co. v. United States,

45 Idaho L. Rev. 41

350 U.S. 148, 153 n.5 (1956))).

n99 *Id*. at 1421-22 (quoting Heckler v. Cmty. Health Servs., 467 U.S. 51, 60, 61 (1984)).

n100 *Id*. at 1422 (quoting *Heckler,* 467 U.S. at 63).

n101 975 F.2d 1412 (9th Cir. 1992).

n102 *Id*. at 1414.

n103 *Id*. at 1421.

n104 *Id*. at 1416.

n105 *Id*. The memorandum "was part of a dialogue with the Army." *Id*. at 1421.

n106 *Id*.

n107 *Id*.

n108 *Id*. Hardly the model of clarity, the court's use of the concept of a scientifically untrue statement was equated with "scientific error[]" or a scientific theory not fully embraced within the scientific community, as opposed to an outright falsehood, one that was morally wrong. *Id*.; *see* United States *ex rel*. Harris v. Bernad, 275 F. Supp. 2d 1, 6 (D.D.C. 2003) ("[M]ere disagreements over scientific opinion, methodology, and judgments do not amount to claims under the FCA." (citing *Wang Chen-Cheng,* 975 F.2d at 1420-21)).

n109 71 F.3d 321 (9th Cir. 1995).

n110 *Id*. at 324, 325.

00001079

45 Idaho L. Rev. 41

n111 *Id*. at 325.

n112 *Id*.

n113 *Id*. at 326 (alteration in original).

n114 *Id*.

n115 *Id*.

n116 *Id*. at 328.

n117 *Id*. at 329.

n118 Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000) ("[G]overnment knowledge of a contractor's wrongdoing is no longer an automatic defense." (citing United States *ex rel*. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1420 (9th Cir. 1991); 31 U.S.C. §§ 3729-3733 (2000))); *see also* Varljen v. Cleveland Gear Co., 250 F.3d 426, 430 (6th Cir. 2001) ("[E]ven the government's knowledge of a fraud does not necessarily absolve a contractor from liability under the FCA." (citing *Hagood*, 929 F.2d at 1421)); United States *ex rel*. Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) (concurring with *Hagood*, which "expressly rejected the contention that government knowledge of the falsity of a claim automatically bars an FCA action") citing *Hagood*, 929 F.2d at 1416)); United States *ex rel*. Longhi v. Lithium Power Techs., Inc., 513 F. Supp. 2d 866, 883-84 (S.D. Tex. 2007); United States *ex rel*. Bettis v. Odebrecht Contractors of Cal., 297 F. Supp. 2d 272, 294 (D.D.C. 2004) ("[T]he government's knowledge, while perhaps not a complete defense, is not 'irrelevant.'"); United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); United States *ex rel*. Milam v. Regents of Univ. of Cal., 912 F. Supp. 868, 888 (D. Md. 1995) ("not an absolute defense" (citing Kriendler, 985 F.2d at 1156-57)).

n119 *Hagood*, 929 F.2d at 1421 ("That the relevant government officials know of the falsity is not in itself a defense." (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981))); *see also* United States *ex rel*. Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995) ("[I]f the defendants knowingly presented or caused to be presented false or fraudulent claims, then it is not a defense that the government officials also knew the claims were false but continued to pay the claims." (citing *Kriendler*, 985 F.2d at 1156)); JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 168-69 (3d ed. 1998) ("[T]he fact that the germane Government officials knew of a claim's falsity is not a defense." (citing *Hagood*, 929 F.2d 1416)).

45 Idaho L. Rev. 41

n120 United States *ex rel.* A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 455 n.21 (6th Cir. 2005) (citing *Kriendler*, 985 F.2d at 1156; *Hagood*, 929 F.2d at 1421).

n121 *See* United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326 (9th Cir. 1995) ("[C]ourts have had to decide case by case whether a FCA claim based on information in the government's possession can succeed.").

n122 *See generally* United States *ex rel.* Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 491 F.3d 254, 262-63 (5th Cir. 2007) (finding Lockheed did not act knowingly); United States *ex rel.* Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003) ("[The government's] knowledge . . . bears on whether the defendants had the requisite intent under the Act." (citing United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002))); *Becker*, 305 F.3d at 289 ("can negate the scienter required for an FCA violation" (citing United States v. Southland Mgmt. Corp., 288 F.3d 665, 686 (5th Cir. 2002))); *Shaw*, 213 F.3d at 534; *Kriendler*, 985 F.2d at 1157; *Hagood*, 929 F.2d at 1421)); United States *ex rel.* Stone v. Rockwell Int'l Corp., 282 F.3d 787, 811 (10th Cir. 2002) ("cast doubt on whether he 'knowingly' submitted a false claim" (citing *Butler*, 71 F.3d at 326-27)), *rev'd in part on other grounds*, 549 U.S. 457 (2007); *Shaw*, 213 F.3d at 534 ("[Contractor may not] possess the requisite state of mind" (citing *Butler*, 71 F.3d at 327; Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992))); United States *ex rel.* Durcholz v. FKW, Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("cannot be said to have knowingly presented a fraudulent or false claim" (citing United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999); Hindo v. Univ. of Health Scis./Chicago Med. Sch., 65 F.3d 608, 613-14 (7th Cir. 1995))); *Kriendler*, 985 F.2d at 1156, 1157 ("may show that the contractor has not 'knowingly' submitted a false claim" (citing *Hagood*, 929 F.2d at 1421)); *Hagood*, 929 F.2d at 1421 ("Such knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth."); *Longhi*, 513 F. Supp. 2d at 883 ("can rebut scienter"); *Bettis*, 297 F. Supp. 2d at 294 ("serves to negate a finding of scienter"). *But cf. Costner*, 317 F.3d at 887 (noting that government knowledge may also serve as a defense to the FCA's materiality element).

n123 929 F.2d at 1421.

n124 *Id*. (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981)).

n125 *Id*.

n126 *See* United States v. Southland Mgmt. Corp., 326 F.3d 669, 682-83 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false . . . ." (citing *Durcholz*, 189 F.3d at 544-45)).

45 Idaho L. Rev. 41

n127 *Id.* at 682.


n128 213 F.3d 519 (10th Cir. 2000).


n129 *Id.* at 527. The contract required AAA to provide equipment to remove trace silver from the photography development process and to properly dispose of various chemicals in compliance with federal standards. *Id.* Instead, AAA managers directed that the chemicals be deposited in the drain, and various employees complied with that directive. *Id.* When questioned by government contracting officials, AAA management was evasive about meeting their environmental contractual obligations until the Air Force Office of Special Investigations closed AAA's main photography laboratory. *Id.* at 527-28.


n130 *Id.* at 534.


n131 *See Southland Mgmt. Corp.,* 326 F.3d at 682 n.9 (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the claimant was colluding with the government employee to submit a false claim . . . ." (citing *Durcholz,* 189 F.3d at 544-45)).


n132 *Durcholz,* 189 F.3d at 546.


n133 *Id.* at 545; *see also* United States *ex rel.* Tyson v. Amerigroup Ill., Inc., No. 02 C-6074, 2005 WL 3111972, at *6 (N.D. Ill. Oct. 21, 2005) ("The Court of Appeals' conjunctive phrasing--'if the government knows *and* approves'--would appear to have been purposeful and intended to signal that mere knowledge alone of illegality would not enable those who defraud the government from being able to draw a conjurer's circle around their illegality and insulate themselves from condign punishment.").


n134 *See* United States *ex rel.* Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003); United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002); *see also* Am. Contract Servs. v. Allied Mold & Die, Inc., 114 Cal. Rptr. 2d 773, 779-80 (Cal. Ct. App. 2001).


n135 United States *ex rel.* Tyson v. Amerigroup Ill., Inc., 488 F. Supp. 2d 719, 730 (N.D. Ill. 2007) (citing United States *ex rel.* Asch v. Teller, Levit & Silvertrust, P.C., No. 00-C-3289, 2004 WL 1093784, at *3 (N.D. Ill. May 7, 2004)).


n136 *See Southland Mgmt. Corp.,* 326 F.3d at 682 (noting that in many cases government knowledge and acquiescence "was 'highly relevant' to show that the contractor did not submit payment claims in deliberate

45 Idaho L. Rev. 41

ignorance or reckless disregard of their truth or falsity" (citation omitted)). However, for this position the court in *Southland* cited *United States ex rel*. *Hagood v*. *Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991). *Id*. A fair reading of that opinion fails to reveal the articulation of any such definitive standard. *See Hagood*, 929 F.2d at 1421.

n137 United States *ex rel*. Laird v. Lockheed Martin Eng'g & Sci. Servs., Co., 491 F.3d 254, 263 (5th Cir. 2007) (emphasis added) (quoting *Durcholz*, 189 F.3d at 545); *accord Tyson*, 488 F. Supp. 2d at 729-30.

n138 *See* United States *ex rel*. Englund v. Los Angeles County, No. Civ. S-04-282-LKK/JFM, 2006 WL 3097941, at *8 (E.D. Cal. Oct. 31, 2006) ("when responsible government officials have been fully apprised of all relevant information" (citing United States *ex rel*. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999))).

n139 *See, e.g.*, United States *ex rel*. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326, 328 (9th Cir. 1995) (noting that the government knew and approved the specific testing method at issue); X Corp. v. Doe, 816 F. Supp. 1086, 1093 (E.D. Va. 1993) ("X Corp. *disclosed* to the government that computer equipment supplied under the MASC contract might contain remanufactured components."); Boisjoly v. Morton Thiokol, Inc., 706 F. Supp. 795, 810 (D. Utah 1988) ("informed NASA . . . of these concerns and their basis").

n140 *See infra* note 142 and accompanying text.

n141 *Hagood*, 929 F.2d at 1421 ("relevant government officials"); United States *ex rel*. Gudur v. Deloitte Consulting LLP, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007) ("[N]o violation exists where relevant government officials are informed of the alleged falsity . . . ."); United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); *see also* United States *ex rel*. Werner v. Fuentez Sys. Concepts, Inc., 115 Fed. App'x 127, 128 (4th Cir. 2004) ("the OSC officials responsible for managing their contracts"); United States *ex rel*. Grynberg v. Praxair, Inc., 207 F. Supp. 2d 1163, 1178 (D. Colo. 2001) ("known to and approved by the responsible government authorities"); United States *ex rel*. Durcholz v. FKW, Inc., 997 F. Supp. 1143, 1156 (S.D. Ind. 1998) ("many, if not all, of the relevant Navy officials did know"), *aff'd*, 189 F.3d 542 (7th Cir. 1999); United States *ex rel*. Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("responsible government officials"), *aff'd*, 168 F.3d 1013 (7th Cir. 1999); CIBINIC & NASH, *supra* note 119, at 168 ("germane Government officials knew"); *cf*. United States *ex rel*. Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) (concurring with *Hagood*).

n142 United States *ex rel*. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002) ("DOE's *full knowledge* of the material facts underlying any representations implicit in Westinghouse's conduct negates any knowledge that Westinghouse had regarding the truth or falsity of those representations." (emphasis added)); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000) ("Nevertheless, there may still be occasions when the government's knowledge of or cooperation with a contractor's actions is *so extensive* that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA."

(citing *Butler,* 71 F.3d at 327; Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992)) (emphasis added)); *Wang Chen-Cheng,* 975 F.2d at 1421 ("FMC was open with the government . . . ."); United States v. Prabhu, 442 F. Supp. 2d 1008, 1030 (D. Nev. 2006) ("complied with Government instructions regarding the claims" (citing 31 U.S.C. § 3729(b) (2000))); United States *ex rel.* Werner v. Fuentez Sys. Concepts, Inc., 319 F. Supp. 2d 682, 685 (N.D.W. Va. 2004) ("full knowledge of the defendants' billing practices" by the "Coast Guard officials responsible for handling the contracts"), *aff'd,* 115 F. App'x 127 (4th Cir. 2004); United States *ex rel.* Bettis v. Odebrecht Contractors of Cal., 297 F. Supp. 2d 272, 297 (D.D.C. 2004) (*"fully aware* of and approved of the way that defendant calculated its claims for progress payments" (emphasis added)).

n143 282 F.3d 787, 812 (10th Cir. 2002), *rev'd in part on other grounds,* 549 U.S. 457 (2007).

n144 *Id.*

n145 *Id.* & n.11. The court appeared to suggest that this broader range of individuals included "certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer." *Id.* n.11.

n146 71 F.3d 321 (9th Cir. 1995); *Stone,* 282 F.3d at 812 n.12.

n147 *See Stone,* 282 F.3d at 812 n.12 (*"Butler* rejected the argument that for purposes of determining whether the defendant 'knowingly' submitted a false claim to the Government, only contracting officers' knowledge is relevant.").

n148 *Id.*

n149 *Id.* at 812 n.11.

n150 Under agency law, there exists the concept of "apparent" authority. "An agent has 'apparent' authority . . . where the principal has held out the agent as having such authority or has permitted the agent to represent that he has such authority." United States v. Schaltenbrand, 930 F.2d 1554, 1560 (11th Cir. 1991). However, in government procurement law, the United States cannot be bound under the theory of apparent authority. JOHN CIBINIC, JR., RALPH C. NASH, JR. & JAMES F. NAGLE, ADMINISTRATION OF GOVERNMENT CONTRACTS 31 (4th ed. 2006) ("Recognizing the importance of effective government control over the conduct of its agents, the courts and boards have rejected the apparent authority rule, holding that *actual authority* is required to bind the government."); *see also* Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006) (noting that apparent authority is insufficient to bind the government); Am. Anchor & Chain Corp. v.

00001084

45 Idaho L. Rev. 41

United States, 331 F.2d 860, 861-62 (Ct. Cl. 1964) (noting that conduct of employee with apparent authority binds a contractor, but only actual authority of a government employee will bind the United States).

n151 Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947); Starflight Boats v. United States, 48 Fed. Cl. 592, 597-98 (2001); *see also* Ralph C. Nash & John Cibinic, *Contracting Authority of Government Employees: Handle with Care!*, in 12 NASH AND CIBINIC REPORT 9, P50, at 138 (1998) ("The rule is clear that the Government is only bound by the acts of its employees that are within the scope of their *actual authority*.") [hereinafter NASH & CIBINIC REPORT].

n152 Real Estate Technical Advisors, Inc., 03-1 B.C.A. (CCH) P32,074 at 158,507 (A.S.B.C.A. Nov. 18, 2002).

n153 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007); *see* CIBINIC, NASH & NAGLE, *supra* note 150, at 31 ("Contracting officers have the sole authority to legally bind the government to contracts and contract modifications."); *see also* 48 C.F.R. § 1.601(a) (2007) ("Contracts may be entered into and signed on behalf of the Government only by contracting officers."). The Federal Acquisition Regulation is contained in 48 C.F.R. Chapter 1. Contracting officers' authority "flows from the head of the agency." CIBINIC, NASH & NAGLE, *supra* note 150, at 33.

n154 48 C.F.R. § 1.602-1(a).

n155 *Id*. § 43.102(a).

n156 *Id*. § 1.603-3(a); *see also id*. § 1.602-1(a) (requiring clear written instructions concerning the limits of their authority); NASH & CIBINIC REPORT, *supra* note 151, P50, at 138 ("The scope of a CO's authority can generally be found by looking at the internal document granting the authority.").

n157 48 C.F.R. § 1.602-1(a) ("Information on the limits of the contracting officers' authority shall be readily available to the public and agency personnel.").

n158 NASH & CIBINIC REPORT, *supra* note 151, P50, at 141.

n159 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007) ("When authorized, the contracting officer may delegate some of its authority to certain designated representatives, who act on behalf of the government during contract administration." (citing CIBINIC, NASH & NAGLE, *supra* note 150, at 39)).

45 Idaho L. Rev. 41

n160 48 C.F.R. § 1.602-1(a); *see also id*. § 2.101(b). However, contracting officers may bind the government only to the extent that authority has been delegated to them to do so. *Id*. § 1.602-1(a).

n161 The contracting officer may delegate authority to his/her authorized representatives. *Id*. § 2.101(b); *see also* CIBINIC, NASH & NAGLE, *supra* note 150, at 37 (contracting officers may be granted authority to appoint subsidiary contracting officers or other representatives).

n162 The ACO is a type of contracting officer that administers a contract after it has been awarded. 48 C.F.R. § 2.101(b). Contracting officers who award the contract are known as procuring contracting officers (PCO) who may also retain some or all authority for administering the contract. CIBINIC, NASH & NAGLE, *supra* note 150, at 37. Indeed, "[a] single contracting officer may be responsible for duties in any or all of these areas." 48 C.F.R. § 2.101(b) (referring to the procuring, administration, and termination of a contract).

n163 The TCO is a type of contracting officer who settles terminated contracts. 48 C.F.R. § 2.101(b).

n164 CIBINIC, NASH & NAGLE, *supra* note 150, at 39.

n165 *Id*.

n166 *Id*. at 30-31. Government employees other than contracting officers may be delegated authority to perform various contract-related functions. *Id*. at 31.

n167 *Id*. at 33.

n168 *Id*. at 43.

n169 Real Estate Technical Advisors, Inc., 03-1 B.C.A. (CCH) P32,074 at 158,507 (A.S.B.C.A. Nov. 18, 2002).

n170 Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 120 (2006) (alteration in original) (quoting H. Landau & Co. v United States, 886 F.2d 322, 324 (Fed. Cir. 1989)); *see also* Brunner v. United States, 70 Fed. Cl. 623, 640-41 (2006); Real Estate Technical Advisors, Inc., 03-1 B.C.A. P32,074, at 158,507; CIBINIC, NASH & NAGLE, *supra* note 150, at 44.

45 Idaho L. Rev. 41

n171 Confidential Informant v. United States, 46 Fed. Cl. 1, 7 (2000) (quoting Roy v. United States, 38 Fed. Cl. 184, 189 (1997)).

n172 CIBINIC, NASH & NAGLE, *supra* note 150, at 43; *see also Brunner,* 70 Fed. Cl. at 641 ("This implied authority to contract must be based upon 'at the least, some limited, related authority.'" (citing Cal. Sand & Gravel, Inc., v. United States, 22 Cl. Ct. 19, 27 (1990))).

n173 *See* Starflight Boats v. United States, 48 Fed. Cl. 592, 599 (2001) ("Although Brian was involved in the administration of this contract, a person with no actual authority can not acquire actual authority 'through the court-made rule of implied actual authority.'" (quoting Cal. Sand & Gravel, Inc., 22 Cl. Ct. at 27)).

n174 *See* United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956) ("[W]e do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute."); *see also* United States v. Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 771 (N.D. Tex. 2002) ("A violation of the rights of the United States may not be waived or ratified by the unauthorized acts of its agents."); United States *ex rel.* Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995) ("[A] government officer cannot authorize a contractor to violate federal regulations."); United States v. Cripps, 460 F. Supp. 969, 973-74 (E.D. Mich. 1978) (stating that a federal employee who urges someone to defraud the government acts ultra vires). Because they lack the authority to waive fraud, acquisition officials cannot "ratify" such conduct. *See* CIBINIC, NASH & NAGLE, *supra* note 150, at 48 ("[I]llegal actions cannot be ratified because officials lack the authority to enter into illegal agreements."); *cf.* Winter v. Cath-DR/Balti Joint Venture, 497 F.3d 1339, 1347 (Fed. Cir. 2007) (noting that authority is a prerequisite to ratification).

n175 *Mayman,* 894 F. Supp at 223 ("A contractor who tells a government contracting officer that a claim is false still violates the statute when the false claim is submitted." (citing United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 2001))); *Cripps,* 460 F. Supp. at 973 ("To the extent that defendant is urging that someone at HUD authorized him to engage in this conduct to defraud HUD and submit false claims and derive a benefit therefrom, such assertion even if true is no defense to plaintiff's [FCA] claim."); *cf. Hagood,* 929 F.2d at 1421 ("That the relevant government officials know of the falsity is not in itself a defense." (citing United States v. Ehrlich, 643 F.2d, 638-39 (9th Cir. 1981))); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995) ("Defendants knowingly caused false claims to be presented and that, after the government became aware of the underlying scheme, it continued to pay claims only because it had already become contractually bound to make those payments as a result of the defendant's fraudulent course of conduct.").

n176 *Nat'l Wholesalers,* 236 F.2d at 950; *see also* United States *ex rel.* McCray Sanitation Serv. v. Midwest Container Co., 7 F.3d 1046, at *2 (10th Cir. 1993) (unpublished table decision) ("[Contracting agency cannot] 'ratify' any previous fraud by [contractor].").

n177 48 C.F.R. § 33.210(b) (2007).

45 Idaho L. Rev. 41

n178 41 U.S.C. § 605(a) (2000).

n179 *See* United States v. United Techs. Corp., No. 5:92-CV-375 (EBB), 1996 WL 653620, at *2 (D. Conn. Oct. 11, 1996) ("The statute's restriction on the authority of agency heads should be read as encompassing their subordinates."); *cf. Contract Disputes Act of 1978*, S. REP. NO. 95-1118, at 19 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5235, 5253 ("[I]t is not the intent of this section to authorize Agency heads, contracting officers, or agency boards to settle or compromise claims independent of their legal or contractual merits . . . .").

n180 *See* United States *ex rel*. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 455 n.21 (6th Cir. 2005) ("[Government knowledge may be] used to demonstrate that what the defendant submitted was not actually false but rather conformed to a modified agreement . . . ."); United States *ex rel*. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993) ("In some cases, the fact that government officials knew of the contractor's actions may show that the contract has been modified or that its intent has been clarified, and therefore that the claim submitted by the contractor was not 'false.'").

n181 48 C.F.R. § 33.210 (noting that contracting officers are authorized to resolve and decide contractual claims).

n182 48 C.F.R. § 33.204 ("The Government's policy is to try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level.").

n183 United States *ex rel*. Bettis v. Odebrecht Contractors of Cal., Inc., 297 F. Supp. 2d 272, 294 (D.D.C. 2004); *cf*. United States *ex rel*. Stebner v. Stewart & Stephenson Servs., Inc., 144 F. App'x 389, 394 (5th Cir. 2005) (applying government knowledge defense when "the Government negotiated contract modifications in response to the well-documented corrosion problem.").

n184 *See* Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." (citing Federal Register Act, ch. 417, sec. 7, 49 stat. 500, 502 (1935))); Nobles v. Rural Cmty. Ins. Servs., 303 F. Supp. 2d 1292, 1303 (M.D. Ala. 2004) ("[charged] with notice of the provisions in the Code of Federal Regulations" (citing *Merrill,* 332 U.S. at 384-85)); *In re* Doe I, 969 F. Supp. 561, 563 (D. Ariz. 1996).

n185 *Merrill,* 332 U.S. at 385 (quoting Rock Island, Ark. & La. R.R. Co. v. United States, 254 U.S. 141, 143 (1920)).

00001088

n186 NASH & CIBINIC REPORT, *supra* note 151, P50, at 139 (citation omitted).


n187 Brunner v. United States, 70 Fed. Cl. 623, 644 (2006) ("[P]ublicly-accessible laws or regulations can limit the contracting authority that would otherwise be implied by a government agent's related powers, for potential contractors are on notice of such restrictions."); NASH & CIBINIC REPORT, *supra* note 151, P50, at 139 ("Agency regulations may also contain limitations on authority and such regulations will be binding on contractors if they are published.").


n188 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1346 (Fed. Cir. 2007) ("[C]ould not have had the implicit authority to authorize contract modifications because the contract language and the government regulation it incorporates by reference explicitly state that only the contracting officer had the authority to modify the contract.") (emphasis omitted).


n189 United States *ex rel.* Compton v. Midwest Specialties, Inc., 142 F.3d 296, 302 n.4 (6th Cir. 1998) ("[T]he 'square-corners' rule applies fully in the False Claims Act context." (citing United States v. Aerodex, Inc., 469 F.2d 1003, 1007 (5th Cir. 1972))); *but cf.* United States *ex rel.* A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 446 (6th Cir. 2005) (holding that the "natural tendency" standard was proper for determining whether a false statement was material under the FCA).


n190 SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272 ("But the Committee does believe the civil False Claims Act should recognize that those doing business with the Government have an obligation to make a limited inquiry to ensure the claims they submit are accurate.").


n191 *Id.* at 14-15, 17, 21.


n192 *Id.* at 21; *see also* Crane Helicopter Servs., Inc. v. United States, 45 Fed. Cl. 410, 433 (1999) ("[The FCA's knowing standard was designed to address] 'the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know'" and to reach "those who ignore obvious warning signs.") (citation omitted).


n193 United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956).


n194 *See* United States *ex rel.* Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003) ("'If the government knows and approves of the particulars of a claim for payment *before* that claim is presented . . . .'" (emphasis added) (altercation omitted) (quoting United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 542, 543 (7th Cir. 1999))); United States *ex rel.* Stone v. Rockwell Int'l Corp., 282 F.3d 787, 811 (10th Cir.

00001089

45 Idaho L. Rev. 41

2002) ("The defendant . . . may be able to cast doubt on whether he 'knowingly' submitted a false claim by showing that the Government itself was already aware of the facts underlying the FCA claim when the allegedly fraudulent claim was submitted." (citing United States *ex rel*. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326-27 (9th Cir. 1995))); United States *ex rel*. Durcholz v. FKW, Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("before [the] claim is presented"); *see also* United States *ex rel*. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 491 F.3d 254, 263 (5th Cir. 2007) ("before that claim is presented" (citing *Durcholz,* 189 F.3d at 545)); United States *ex rel*. Humphrey v. Franklin-Williamson Human Servs., Inc., 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002) ("before [the] claim is presented") citing *Durcholz,* 189 F.3d. at 545)); United States *ex rel*. Maxwell v. Kerr-McGee Chem. Worldwide, LLC, No. 04-CV-01224-PSF-CBS, 2006 WL 2869515, at *16 (D. Colo. Oct. 6, 2006); *cf*. United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the government's knowledge came 'too late in the process'" (quoting *Durcholz,* 189 F.3d at 544-45)); United States v. Shasta Servs., Inc., 440 F. Supp. 2d 1108, 1113-14 (E.D. Cal. 2006) (applying the defense to California's FCA).

n195 *See, e.g., Becker*, 305 F.3d at 287-89; X Corp. v. Doe, 816 F. Supp. 1086, 1093 (E.D. Va. 1993) (finding government notification in defendant's proposal).

n196 *See supra* notes 173, 175, and accompanying text.

n197 236 F.2d 944 (9th Cir. 1956).

n198 *Id*. at 945.

n199 *Id*. at 945-96.

n200 *Id*. at 946.

n201 *Id*. at 946 & n.3.

n202 *Id*. at 948.

n203 *Id*. at 946.

45 Idaho L. Rev. 41

n204 *Id*. at 946, 948.

n205 *Id*. at 948.

n206 *Id*. at 949-50. The district court also erroneously determined that the contract permitted "equals." *Id*. at 949.

n207 *Id*. at 950.

n208 *Id*.

n209 *Id*.

n210 *Id*.

n211 United States *ex rel*. Gudur v. Deloitte Consulting LLP, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007).

n212 929 F.2d 1416 (9th Cir. 1991).

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES *ex rel.* BRIAN BURKE

                     Plaintiff,

        -versus-

RECORD PRESS, INC.,

                  Defendant.

**Case No.** 1:08-cv-364(EGS)(DAR)

**Judge:** Deborah A. Robinson

### *AFFIDAVIT:*
### *"I declare and certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 10, 2013:*

Affiant, Morris Gocial, CPA/CFF, CVA, CrFA, DAFBA

Your Honor, G3 of PA LLC , formerly Gold Gocial Gerstein LLC has been engaged by Tyler Jay King, Esquire, to

determine the amount of damages suffered, if any, by United States *ex rel.* Brian Burke

("Burke") due to the wrongful interpretation by defendant of terms defined in the

Invitation for Bid ("IFB") between the Government Printing Office ("GPO") and Record

Press, Inc. ("Defendant").

    It is my opinion that the damages sustained by the plaintiff approximate those

damages as calculated at the request of the law office of Tyler Jay King, Esquire, in the

amount of $513, 793.91.

    All opinions contained in this report are rendered and expressed with a reasonable

degree of accounting certainty.

BACKGROUND

    Brian Burke was the plaintiff in a lawsuit, *Brian Burke v. Donald L. Evans, Secretary,*

00001092

*United States Department of Commerce*, in the United States District Court of the

Southern District of New York. The case was ruled in the Department of Commerce's

favor and Burke appealed the decision in the United States Court of Appeals for the

Second Circuit. The appeals case was ruled in the Department of Commerce's favor.

Burke was then served by the U.S. Attorney's Office with an Itemized and Verified Bill

of Costs pursuant to an action in which he was a *pro se* litigant before the U.S. Court of

Appeals for the Second Circuit. Upon receiving the bill, which summarized charges to

the Government for printing and binding appellate briefs and appendices, Burke

investigated and discovered that the Defendant was overcharging the Government nearly

10 times the rate specified by its contract with GPO as it pertains to line item II(d).

In the course of investigating the charges listed in the Itemized and Verified Bill of

Costs, Burke was provided with an IFB for Program 2231-S (formerly 1272-S) dated

October 18, 2006 effective November 1, 2006 and ending October 31, 2007 with option

for renewal for four annual terms. The IFB provides general terms, conditions, and

specifications of the single award for the procurement of appeals briefs.

Burke reviewed the IFB and noted that on Page 14 of 15, under Section 4 – Schedule

of Prices, II. Complete Product, there is an underlined indication reflecting "**Note:**

**Running Rate is per 10 copies**". However, upon review of Itemized and Verified Bill of

Costs, it appears that Collating, Trimming to Size and Binding costs noted at II(d) were

charged at $12.25 per 100 pages.  Burke believes the United States has been overcharged

by Record Press because they charged this line item for every copy of each brief or

appendix prepared, rather than per 10 copies as specified in the contract.

Our calculation of damages was supported, in part, by review of IFB for Program

2231-S, as well as review of IFB for Program 1272-S effective August 2001. We also received Record Press, Inc. invoices and reviewed for proper contract terms application. Additionally, we reviewed the depositions/declarations of the following individuals: Hugh Wilmot (President of Record Press, Inc.), and Raymond Thomas Sullivan (Director, Major APS Acquisitions of the United States Government Printing Office). We noted through their sworn testimony that it is the position of both Record Press, Inc. and GPO that the invoices submitted and paid are accurate and in accordance with the terms of the respective IFB in place at time services were performed. **We disagree with their interpretation of the terms of the IFB as outlined in this report**.

We also consulted an industry expert, Robert Dworski ("Dworski"). Dworski has 38 years (1971 to 2009) of experience in the printing and publishing industry beginning with his sales and marketing position with Packard Press. His role was to expand the sales and publishing efforts of The Legal Intelligencer and those of the Financial Printing Division. His exposure and training put him in contact with both the manufacturing and administrative areas of the process. Dworski became the sales manager for the company and secured contracts from the Commonwealth of Pennsylvania and other government entities. This position also facilitated involvement in the pricing and management of contracts. Dworski's conclusion based on review of information provided supports our position that there is misleading terminology in referencing of services provided on Record Press invoices and inconsistencies in rates charged for similar services on numerous invoices which are inconsistent with the terms of the IFB.

PROCEDURES PERFORMED AND FINDINGS

00001094

(1) Based on review of IFB 2231-S and IFB 1272-S (*exhibit A Doc. 67*), and identified as "Basis of Award" on the accompanying schedule to the IFB, *it appears there may have been a lack of oversight and attention to detail by the GPO in preparation of the IFB.*

(2) Page 12 of 15, Section 4 – Schedule of Prices, refers to "**fractional parts of 10 will be prorated**" which supports our position that where a running rate of 10 copies is referenced that rates charged are per 10 copies. (*Exhibit B Doc. 67*)

(3) Page 14 of 15, Section 4, II – Complete Product, specifically states "**Note: Running rate is per 10 copies**" which covers parts (a), (b), (c), and (d). *This further supports our position that the rates charged in this section are for every 10 copies rather than for each copy. (Exhibit C Doc. 67)*

With respect to our review of the invoices the following was performed:

We received 1710 invoices as listed on an accompanying excel spreadsheet (*Exhibit D Doc. 67*) prepared at the request of the law office of Tyler Jay King, Esquire, attorney for Burke. The spreadsheet outlined the calculated damages as they related to line item II(d) Collating, Trimming to Size and Binding only. As we are relying on the accuracy of the spreadsheet received, we determined our testing could be completed on a sample basis. As such we performed testing of 100 invoices selected as follows:

| | |
|---|---|
| 40 invoices | Top highest damages calculated |
| 60 invoices | Random selection from remaining population |
| 100 invoices | Total Tested |

From the spreadsheet, we sorted by damages amount in descending order and selected the top 40 items that reflected the highest damages based only on line II(d) discrepancies. We then recalculated all line items referenced on each of these invoices and recomputed damages, according to our understanding of the IFB terms.

We then randomly selected 60 additional items from the remaining population and performed recalculation of all line items for each invoice and recomputed damages, according to our understanding of the IFB terms.

00001095

Our review of the above-mentioned invoices yielded the following information:

a)   Of the 100 invoices tested, which represented approximately 5.8% of invoices

received, the damages computed equals $113,972.64, or approximately 22% of

total damages calculated on the spreadsheet.

b)   Our review detected inaccuracies in charges of other line items as defined in the

IFB besides line item II(d) which we did not consider in our damages calculation.

c)   Our review detected other errors such as inconsistent rates charged for "Crack and

Peel Covers" and "Page Text", as well as, misleading terminology utilized in line

items referencing the services provided, amongst several invoices which we did

not consider in our damages calculation.

The errors we found in our test sampling demonstrates that Record Press did not bill

for services performed according to the contract and the personnel at GPO apparently

were not diligent in reviewing the invoices as submitted for compliance to contract terms

as written. This fact disputes the declaration of Raymond Thomas Sullivan that "7.

Record Press, Inc. properly charged for services for GPO program 2231-S for the printing

of briefs, and fully abided its contractual obligations to GPO. I have found no evidence of

fraud or overcharging by Record Press, Inc. in connection with this matter." (*Exhibit E*

*Doc. 67*)

CONCLUSION

Based upon the procedures performed and results obtained thereto, it is my

professional opinion within a reasonable degree of accounting certainty that the amount

of damages suffered by the United States approximates those damages as calculated on

the spreadsheets in Exhibit D in the amount of $513,793.91 for the period January 2001

00001096

through April 2010. My opinion is based on my many years of experience of reviewing

contracts in my capacity as a certified public accountant as well as my experience as a

forensic accountant. I reserve the right to amend or supplement this Affidavit/Declaration

should additional information become available.


_____

Morris Gocial, CPA/CFF, CVA, CrFA, DAFBA

Dated July 10, 2013

00001097

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BRIAN BURKE,

               Plaintiff / Counter-Defendant,

     v.

RECORD PRESS, INC.,

               Defendant / Counter-Claimant.

Civil Action No. 08-0364
DAR

**ORDER**

      The Court entered judgment on partial findings in favor of Defendant Record Press, Inc.

on June 13, 2013. Judgment (Document No. 93); *see also* Memorandum Opinion (Document

No. 91); Order (Document No. 92). In doing so, the Court concluded that "Plaintiff's claims

cannot be maintained under controlling law" and made no further findings with respect to

Plaintiff's conduct in this litigation. *See* Memorandum Opinion at 8. Defendant, in moving for

judgment, based its request on Plaintiff's insufficient evidentiary showing. Trial Transcript,

February 14, 2011 (Document No. 90) at 108. Thereafter, Defendant moved for an award of

attorneys' fees in the amount of $279,262.00, and "reasonable costs expenses" in the amount of

$8,878.94. Defendant Record Press, Inc.'s Motion for Attorney Fees and Expenses (Document

No. 94). Plaintiff filed a memorandum in opposition to the motion (Document No. 97), and,

apparently in further response to Defendant's motion, moved to alter or amend the judgment.

Plaintiff's Motion to Alter or Amend Judgment (Document No. 96). Both Plaintiff and

Defendant filed a reply memorandum (Document Nos. 99, 100).

00001098

Burke v. Record Press, Inc.                                                                                     2

Upon consideration of the full extent of the written submissions, in the context of the entire record herein, the Court finds that neither request for relief is warranted under the applicable authorities. More specifically, the Court finds that both Plaintiff and Defendant invite the Court either to undertake an entirely new course of litigation regarding issues wholly collateral to the *qui tam* action which now has been litigated and decided, *see, e.g.*, Defendant Record Press, Inc.'s Memorandum of Points and Authorities in Support of its Motion for Attorney Fees and Expenses at 13 (regarding an action for alleged discrimination brought by Plaintiff in the Southern District of New York in 2004), or to make findings with respect to ad hominum attacks on the opposing party, *see, e.g.*, Plaintiff's Motion to Alter or Amend Judgment, Exhibit 1 at 1 ("Defendant, by counsel, has misstated evidence, used misdirection, misquoted, obfuscated, etc. in order to prevail and now retaliate and destroy this blue collar whistleblowing Civil Servant financially via ruinous fines/fees."). No construction of any federal statute or rule warrants the conclusion that the Court, under the guise of an award of fees and costs, or relief from judgment, must intervene in the ongoing animosity between the parties. *See, e.g.*, *Slate v. Am. Broad. Cos.*, No. 09-1761, 2013 WL 6713178, at *2 (D.D.C. Dec. 20, 2013) (litigants may not use Rule 59 either to repeat unsuccessful arguments or relitigate old matters); *cf. Robertson v. Cartinhour*, 883 F. Supp. 2d 121, 125 (D.D.C. 2012) (citation omitted) (internal quotation marks omitted) (noting, in the context of a request for attorneys' fees pursuant to 28 U.S.C. § 1927, "that, to warrant such a sanction, the attorney's conduct must be *at least* reckless"), *aff'd*, No. 12-7100, 2014 WL 590507 (D.C. Cir. Jan. 22, 2014); *U.S. ex rel. J. Cooper & Assocs. v. Bernard Hodes Grp., Inc.*, 422 F. Supp. 2d 225, 238 (D.D.C. 2006) (citations omitted) (observing, in the context of request for fees pursuant to 31 U.S.C. § 3730(d)(4), that

00001099

Burke v. Record Press, Inc.                                                                                         3

"[t]he court can only base an award of attorneys' fees and expenses 'upon a finding that the

plaintiff's action was frivolous, unreasonable, or without foundation'").  It is, therefore, hereby

**ORDERED** that both motions are **DENIED**.

It is, this 31st day of March, 2014,

**SO ORDERED**.

_____/s/_____
DEBORAH A. ROBINSON
United States Magistrate Judge

[Attorney Names]
[Attorneys' Business Address]

## UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

UNITED STATES *ex rel.* BRIAN BURKE,  ) Case No.: 1:08-cv-000364(DAR)
                                       )
*Plaintiff/Counter-Defendant,*         ) **JOINT NOTICE OF APPEAL**
                                       )
vs.                                    )
                                       )
RECORD PRESS, INC.,                    )
                                       )
*Defendant/Counter-Plaintiff*          )
_____)

**_PLAINTIFF_/COUNTER-DEFENDANT'S JOINT NOTICE OF APPEAL FROM MARCH 31 2014 ORDER DENYING MOTION TO ALTER OR AMEND JUDGEMENT AND JUNE 13 2013 JUDGEMENT DENYING COUNTER-DEFENDANT'S OMNIBUS MOTION TO DISMISS WITH PREJUDICE.**

## NOTICE OF APPEAL

Notice is hereby given that *Plaintiff*/Counter-Defendant United States *ex rel.* Brian Burke and Brian Burke *pro se* in the above captioned matter hereby appeal to the United States Court of Appeals for the District of Columbia from the District court's Order of March 31, 2014 regarding Motion to Alter or Amend Judgment and Judgment of June 13, 2013 regarding Counter-Defendant's Omnibus Motion to Dismiss with Prejudice.

Dated this 25 of April, 2014

_____
Tyler Jay King *esq. /S/*
TYLER KING LAW FIRM
1420 N Street NW, Suite 706

JOINT NOTICE OF APPEAL - 1

Case 1.08-cv-00364-DAR   Document 103   Filed 04/30/14   Page 2 of 3



1    Washington, D.C. 20005
     Phone (202)436-2641
2    Bar # 979592
     Email Tyler@TylerKingLaw.com
3    Attorney for *Plaintiff*

4    Brian Burke, *pro se*
     Self-Represented Counter-Defendant
5    145 East 23rd Street Apt. 4R
     New York, NY 10010
6    Phone 646-434-8513
     Email briantburke@gmail.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                    JOINT NOTICE OF APPEAL - 2

00001102

# **REPRESENTATION STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 12(b), the names, addresses and phone numbers of Appellant's Counsel.

1) Appellant/*Plaintiff* United States *ex rel*. Brian Burke by Tyler Jay King *esq.* 1420 N Street NW, Suite 706 Washington D.C. 20005 Phone (202)436-2641 Email Tyler@TylerKingLaw.com Bar# 979592.

2) Appellant/Counter-Defendant Brian Burke by Brian Burke *pro se* 145 East 23rd Street apt. 4R New York, NY 10010. Phone 646-434-8513 Email briantburke@gmail.com

00001103



**RECORD PRESS INC.**
Decades of Experience    Cutting Edge Technology
*Since 1945*
229 West 36th Street, New York, NY 10018
Phone (212) 619-4949    Fax (212) 220-2767
e-mail:  accounting@recordpress.com
Federal I.D. Number  13-5654060

**INVOICE A68902**

Refer To Invoice # with Payment

PAID

**SOLD TO:**
COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| INVOICE DATE |
|---|
| 1/23/2006 |
| **CUSTOMER PHONE** |
| JACKET No. 604-036 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
|  | 01835 | 2/22/2006 | Net 30 | H | 2214-S | 15041C |

**USA v. Burns**

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
|  | RE: USA v. Desmond Burns | | 0.00 |
|  | Docket No. 04-3081-cr(L) / Print Order No. 01835 | | |
|  | For printing and binding 14 copies of the above Joint | | |
|  | Appendix: | | |
| 1 | Printing of 14 Covers @ | 42.00 | 42.00 |
| 1,487 | Pages Text @ | 1.40 | 2,081.80 |
| 1 | Party Served and Filed @ | 15.00 | 15.00 |
| 1 | Electronic Filing and Service of Brief @ | 30.00 | 30.00 |
|  | | | 2,168.80 |
| 1 | Postage @ | 10.60 | 10.60 |

*WE ACCEPT ALL MAJOR CREDIT CARDS
AND WIRE TRANSFERS*

| SUBTOTAL | $2,179.40 |
|---|---|
| TAX (0.0%) | $0.00 |
| TOTAL | $2,179.40 |
| MONEY ON ACC'T | $-2,179.40 |
| BALANCE DUE | $0.00 |

**Thank you for your business.**

Thank you for your business.

**RP000444**

00001104



## INVOICEA69079

Refer To Invoice # with Payment

**229 West 36th Street, New York, NY 10018**
Phone (212) 619-4949    Fax (212) 220-2767
e-mail:  accounting@recordpress.com
Federal I.D. Number  13-5654060

PAID

| SOLD TO: | COMPTROLLER - STOP FMCE (ED) <br> OFFICE OF FINANCIAL MGMT. <br> US GOVERNMENT PRINTING OFFICE <br> WASHINGTON, DC 20401 |
|---|---|

| INVOICE DATE |
|---|
| 1/31/2006 |
| **CUSTOMER PHONE** |
| JACKET No. 604-036 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
|  | 01851 | 3/2/2006 | Net 30 | H | 2885-S | 15234 |

**USA v. Grae**

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
|  | RE: USA v. Grae, Rybicki & Partners, P.C. <br> Docket No. 05-5097-cr(L) / Print Order No. 01851 <br> For printing and binding 20 copies of the above Brief for <br> the U.S.: |  |  |
| 1 | Printing of 20 Covers @ | 60.00 | 60.00 |
| 19 | Pages Text @ | 2.00 | 38.00 |
| 1 | Party Served and Filed @ | 15.00 | 15.00 |
| 1 | Electronic Filing and Service of Brief @ | 30.00 | 30.00 |
|  |  |  | 143.00 |
| 1 | Postage @ | 4.20 | 4.20 |

*WE ACCEPT ALL MAJOR CREDIT CARDS*
*AND WIRE TRANSFERS*

| SUBTOTAL | $147.20 |
|---|---|
| TAX (0.0%) | $0.00 |
| TOTAL | $147.20 |
| MONEY ON ACC'T | $-147.20 |
| BALANCE DUE | $0.00 |

## Thank you for your business.

Thank you for your business.

**RP000447**

00001105



# *RECORD PRESS INC.*
Decades of Experience        Cutting Edge Technology
*Since 1945*

**INVOICE A69080**

Refer To Invoice # with Payment

229 West 36th Street, New York, NY 10018
Phone (212) 619-4949     Fax (212) 220-2767
e-mail: accounting@recordpress.com
Federal I.D. Number 13-5654060

**PAID**

**SOLD TO:**
COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| INVOICE DATE | |
|---|---|
| 1/31/2006 | |
| **CUSTOMER PHONE** | |
| JACKET No. 604-036 | |
| **CUSTOMER FAX** | |
| 202 512-0992 | |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| | 01852 | 3/2/2006 | Net 30 | H | 2885-S | 15235C |

**USA v. Grae**

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | RE: USA v. Grae, Rybicki & Partners, P.C. Docket No. 05-5097-cr(L) / Print Order No. 01852 For printing and binding 14 copies of the above Appendix for the U.S.: | | |
| 1 | Printing of 14 Covers @ | 42.00 | 42.00 |
| 69 | Pages Text @ | 1.40 | 96.60 |
| | | | 138.60 |

*WE ACCEPT ALL MAJOR CREDIT CARDS AND WIRE TRANSFERS*

| SUBTOTAL | $138.60 |
|---|---|
| TAX (0.0%) | $0.00 |
| TOTAL | $138.60 |
| MONEY ON ACC'T | $-138.60 |
| BALANCE DUE | $0.00 |

## Thank you for your business.
Thank you for your business.

**RP000448**

00001106



**RECORD PRESS** INC.
Decades of Experience | Cutting Edge Technology
Since 1945

**INVOICEA71449**

Refer To Invoice # with Payment

229 West 36th Street, New York, NY 10018
Phone (212) 619-4949    Fax (212) 220-2767
e-mail: accounting@recordpress.com
Federal I.D. Number 13-5654060

PAID

**SOLD TO:**

**COMPTROLLER-STOP FMCE (SD)**
**OFFICE OF FINANCIAL MANAGEMENT**
**U.S. GOVERNMENT PRINTING OFFICE**
**WASHINGTON, DC 20401**

| INVOICE DATE |
|---|
| 11/28/2006 |
| **CUSTOMER PHONE** |
| JACKET No. 604-044 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| | B0534 | 12/28/2006 | Net 30 | H | | 17866C |

**Enron v Luzenac**

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 40 | RE: Enron Power Marketing v Luzenac America, Inc Docket No. 06-1452-cr(L) / Print Order # 65180 For printing 40 Crack-n-Peel Covers for the above Petition for the United States:<br><br>Printing of 40 Crack-n-Peel Covers @ | 12.50 | 500.00<br>500.00 |

*WE ACCEPT ALL MAJOR CREDIT CARDS AND WIRE TRANSFERS*

| | |
|---|---|
| SUBTOTAL | $500.00 |
| TAX (0.0%) | $0.00 |
| TOTAL | $500.00 |
| MONEY ON ACC'T | $-500.00 |
| BALANCE DUE | $0.00 |

## Thank you for your business.

Thank you for your business.

**RP000618**

00001107

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 4/26/2006 | A69669 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2231-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Yves Gelin v. John W. Snow | | | |
| Docket No. 05-6043-cv / Print Order No. 65116 | | | |
| For printing and binding 40 copies of the above Brief for | | | |
| Defendant-Appellee: | | | |
| | | | |
| Typeset Cover @ $10.00 Per Page | 1 | 10.00 | 10.00 |
| Covers Printed @ $0.55 Per Cover | 40 | 0.55 | 22.00 |
| Pages Text Printed x 40 Copies @ $0.03 Per Page | 2,240 | 0.03 | 67.20 |
| Collating, Trimming to Size and Binding Charge 2,240 Pages @ | 1 | 268.80 | 268.80 |
| $12.00 Per 100 Pages | | | |
| Party Served and Filed @ | 1 | 50.00 | 50.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 448.00 |
| Postage @ | 1 | 5.15 | 5.15 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $453.15 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $453.15 |
| **Payments/Credits** | $-453.15 |
| **Balance Due** | $0.00 |

**RP001864**



# INVOICE A71708

Refer To Invoice # with Payment

**Decades of Experience**     **Cutting Edge Technology**

*Since 1945*

**229 West 36th Street, New York, NY 10018**
Phone (212) 619-4949     Fax (212) 220-2767
e-mail:  accounting@recordpress.com
Federal I.D. Number  13-565406

PAID

| | |
|---|---|
| **SOLD TO:** | **COMPTROLLER-STOP FMCE (SD)**<br>**OFFICE OF FINANCIAL MANAGEMENT**<br>**U.S. GOVERNMENT PRINTING OFFICE**<br>**WASHINGTON, DC 20401** |

| INVOICE DATE |
|---|
| 12/26/2006 |
| **CUSTOMER PHONE** |
| JACKET No. 604-044 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| | B0608 | 1/25/2007 | Net 30 | H | | 18195C |

**Simeonov v Brd of Immigration**

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | RE: Andrei Simeonov v Alberto Gonzales<br>Docket No. 06-1224-ag / Print Order # 02-045<br>For printing and binding 20 copies of the above Brief for<br>the Respondent: | | |
| 1 | Printing of 20 Covers @ | 60.00 | 60.00 |
| 44 | Pages Text @ | 2.00 | 88.00 |
| 1 | Party Served and Filed @ | 15.00 | 15.00 |
| 1 | Electronic Filing and Service of Brief @ | 30.00 | 30.00 |
| | | | 193.00 |
| 1 | Postage @ | 4.20 | 4.20 |

| | |
|---|---|
| *WE ACCEPT ALL MAJOR CREDIT CARDS AND WIRE TRANSFERS* | |

| | |
|---|---|
| SUBTOTAL | $197.20 |
| TAX (0.0%) | $0.00 |
| TOTAL | $197.20 |
| MONEY ON ACC'T | $-197.20 |
| BALANCE DUE | $0.00 |

## Thank you for your business.

Thank you for your business.

**RP000667**



# RECORD PRESS INC.
Decades of Experience · Cutting Edge Technology
*Since 1945*

## INVOICE A74177

Refer To Invoice # with Payment

229 West 36th Street, New York, NY 10018
Phone (212) 619-4949    Fax (212) 220-2767
e-mail:  accounting@recordpress.com
Federal I.D. Number  13-5654060

**PAID**

**SOLD TO:**
COMPTROLLER-STOP FMCE (SD)
OFFICE OF FINANCIAL MANAGEMENT
U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| INVOICE DATE |
|---|
| 10/31/2007 |
| **CUSTOMER PHONE** |
| JACKET No. 604-044 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| | | 11/30/2007 | Net 30 | H | | 20228C |

### In Re United States

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | For printing 40 copies of the above referenced BRIEF COVER | | |
| 1 | Typeset Cover @ $10.00 Per Page | 10.00 | 10.00 |
| 40 | Covers Printed @ $0.60 Per Cover | 0.60 | 24.00 |
| | Subtotal | | 34.00 |

*WE ACCEPT ALL MAJOR CREDIT CARDS AND WIRE TRANSFERS*

| | |
|---|---|
| **SUBTOTAL** | $34.00 |
| **TAX (0.0%)** | $0.00 |
| **TOTAL** | $34.00 |
| **MONEY ON ACC'T** | $-34.00 |
| **BALANCE DUE** | $0.00 |

## Thank you for your business.

Thank you for your business.

**RP001006**

00001110



# RECORD PRESS INC.

Decades of Experience     Cutting Edge Technology

*Since 1945*

## INVOICE A74382

Refer To Invoice # with Payment

**229 West 36th Street, New York, NY 10018**

Phone (212) 619-4949     Fax (212) 220-2767

e-mail:  accounting@recordpress.com

Federal I.D. Number  13-5654060

**PAID**

| | |
|---|---|
| **SOLD TO:** | **COMPTROLLER-STOP FMCE (SD)**<br>**OFFICE OF FINANCIAL MANAGEMENT**<br>**U.S. GOVERNMENT PRINTING OFFICE**<br>**WASHINGTON, DC 20401** |

| INVOICE DATE |
|---|
| 11/30/2007 |
| **CUSTOMER PHONE** |
| JACKET No. 604-044 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| B0608 | 02213 | 12/30/2007 | Net 30 | H | | 20852 |

### US vs. VALVERDE-SOLANO

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | For printing and binding 20 copies of the above referenced 85 pages: BRIEF/APPENDIX | | |
| 20 | Printing of 20 Covers @ | 3.00 | 60.00 |
| 85 | 36-Pages Text @ | 2.00 | 170.00 |
| 1 | Party Served and Filed @ | 15.00 | 15.00 |
| 1 | Electronic Filing and Service of Brief @ | 30.00 | 30.00 |
| | Subtotal | | 275.00 |
| | Economic Price Adjustment (11/1/2007-10/31/2008) | 2.40% | 6.60 |
| | Subtotal | | 281.60 |
| 1 | Postage @ | 4.60 | 4.60 |

| | |
|---|---|
| *WE ACCEPT ALL MAJOR CREDIT CARDS AND WIRE TRANSFERS* | |

| | |
|---|---|
| **SUBTOTAL** | $286.20 |
| **TAX (0.0%)** | $0.00 |
| **TOTAL** | $286.20 |
| **MONEY ON ACC'T** | $-286.20 |
| **BALANCE DUE** | $0.00 |

## Thank you for your business.

Thank you for your business.

**RP001041**

00001111



**RECORD PRESS** INC.
Decades of Experience    Cutting Edge Technology
*Since 1945*

**INVOICEA77160**

Refer To Invoice # with Payment

229 West 36th Street, New York, NY 10018
Phone (212) 619-4949    Fax (212) 220-2767
e-mail:  accounting@recordpress.com
Federal I.D. Number 13-5654060

**PAID**

SOLD TO:

**COMPTROLLER-STOP FMCE (SD)**
**OFFICE OF FINANCIAL MANAGEMENT**
**U.S. GOVERNMENT PRINTING OFFICE**
**WASHINGTON, DC 20401**

| INVOICE DATE |
|---|
| 12/16/2008 |
| **CUSTOMER PHONE** |
| JACKET No. 604-044 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| B0601 | 65378 | 1/15/2009 | Net 30 | H | 2231 | 23588 |

**SONG vs. POTTER**

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 20 | Covers Printed @ $0.60 Per Cover | 0.60 | 12.00 |
| 47 | Page Numbers Inserted in Table of Contents @ $0.25 | 0.25 | 11.75 |
| 12,400 | 620 Pages Text Printed x 20 Copies @ $0.035 Per Page | 0.035 | 434.00 |
| 12,400 | Collating, Trimming to Size and Binding Charge Pages @ $12.25 Per 100 Pages | 0.1225 | 1,519.00 |
| 1 | Text Page @ $10.00 Per Page | 10.00 | 10.00 |
|  |  |  | 4,371.50 |

*WE ACCEPT ALL MAJOR CREDIT CARDS*
*AND WIRE TRANSFERS*

| | |
|---|---|
| SUBTOTAL | $4,371.50 |
| TAX (0.0%) | $0.00 |
| TOTAL | $4,371.50 |
| MONEY ON ACC'T | $-4,371.50 |
| BALANCE DUE | $0.00 |

Thank you for your business.

Page 2

**RP001409**

00001112

# RECORD ⚖ PRESS INC.

Decades of Experience      Cutting Edge Technology

*Since 1945*

**INVOICE A77880**

Refer To Invoice # with Payment

229 West 36th Street, New York, NY 10018
Phone (212) 619-4949    Fax (212) 220-2767
e-mail:  accounting@recordpress.com
Federal I.D. Number  13-5654060

*PAID*

**SOLD TO:**

**COMPTROLLER-STOP FMCE (SD)**
**OFFICE OF FINANCIAL MANAGEMENT**
**U.S. GOVERNMENT PRINTING OFFICE**
**WASHINGTON, DC 20401**

| INVOICE DATE |
|---|
| 3/31/2009 |
| **CUSTOMER PHONE** |
| JACKET No. 604-044 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| B0601 | 73536 | 4/30/2009 | Net 30 | H | 2231 | 24248 |

**US vs. LABBE**

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | For typesetting cover of the above referenced:<br>SUPPLEMENTAL APPENDIX<br>United States Court of Appeals for the Second Circuit | | |
| 1 | Typeset Cover @ $10.00 Per Page | 10.00 | 10.00<br>10.00 |

*WE ACCEPT ALL MAJOR CREDIT CARDS*
*AND WIRE TRANSFERS*

| | |
|---|---|
| SUBTOTAL | $10.00 |
| TAX (0.0%) | $0.00 |
| TOTAL | $10.00 |
| MONEY ON ACC'T | $-10.00 |
| BALANCE DUE | $0.00 |

## Thank you for your business.

RP001504

00001113



# *RECORD* ⚖ *PRESS* INC.

Decades of Experience     Cutting Edge Technology

*Since 1945*

**229 West 36th Street, New York, NY 10018**

Phone (212) 619-4949     Fax  (212) 220-2767

e-mail:  accounting@recordpress.com

Federal I.D. Number  13-5654060

## INVOICE A78147

Refer To Invoice # with Payment

*PAID*

**SOLD TO:**

**COMPTROLLER-STOP FMCE (SD)**
**OFFICE OF FINANCIAL MANAGEMENT**
**U.S. GOVERNMENT PRINTING OFFICE**
**WASHINGTON, DC 20401**

| INVOICE DATE |
|---|
| 5/8/2009 |
| **CUSTOMER PHONE** |
| JACKET No. 604-044 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| B0601 | 65409 | 6/7/2009 | Net 30 | H | 2231 | 24692 |

### ADEKOYA v F.B. OF PRISIONS

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | For printing and binding 12 copies of the above referenced 13 pages: LETTER BRIEF United States Court of Appeals for the Second Circuit | | |
| 156 | 13 Pages Text Printed x 12 Copies @ $0.035 Per Page | 0.035 | 5.46 |
| 156 | Stapling of 13 Pages @ $12.25 Per 100 Pages | 0.1225 | 19.11 |
| 1 | Party Served and Filed @ | 50.00 | 50.00 |
| 1 | Electronic Filing and Service of Brief @ | 30.00 | 30.00 |
| 4 | Hours of Authorized Overtime @ | 95.00 | 380.00 |
| | SUB-TOTAL | | 484.57 |
| 1 | Postage @ | 6.05 | 6.05 |

*WE ACCEPT ALL MAJOR CREDIT CARDS AND WIRE TRANSFERS*

| | |
|---|---|
| **SUBTOTAL** | $490.62 |
| **TAX (0.0%)** | $0.00 |
| **TOTAL** | $490.62 |
| **MONEY ON ACC'T** | $-490.62 |
| **BALANCE DUE** | $0.00 |

**Thank you for your business.**

**RP001540**

00001114

# RECORD PRESS INC.
Decades of Experience    Cutting Edge Technology
*Since 1945*

**229 West 36th Street, New York, NY 10018**
Phone (212) 619-4949    Fax (212) 220-2767
e-mail: accounting@recordpress.com
Federal I.D. Number 13-5654060

PAID

## INVOICE EA78370

Refer To Invoice # with Payment

**SOLD TO:**
COMPTROLLER-STOP FMCE (SD)
OFFICE OF FINANCIAL MANAGEMENT
U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| INVOICE DATE |
|---|
| 6/16/2009 |
| **CUSTOMER PHONE** |
| JACKET No. 604-044 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| B0601 | 73589 | 7/16/2009 | Net 30 | H | 2231 | 24822 |

### US vs. CHOULLAM

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | For 40 crack and peel cover only of the above referenced: BRIEF United States Court of Appeals for the Second Circuit | | |
| 40 | Crack-n-Peel Covers @ | 3.00 | 120.00 |
| | SUB-TOTAL | | 120.00 |
| 1 | Postage @ | 1.05 | 1.05 |

*WE ACCEPT ALL MAJOR CREDIT CARDS AND WIRE TRANSFERS*

| | |
|---|---|
| SUBTOTAL | $121.05 |
| TAX (0.0%) | $0.00 |
| TOTAL | $121.05 |
| MONEY ON ACC'T | $-121.05 |
| BALANCE DUE | $0.00 |

## Thank you for your business.

RP001566

00001115



**RECORD ✦ PRESS** INC.
Decades of Experience    Cutting Edge Technology
*Since 1945*

## INVOICEA78604

Refer To Invoice # with Payment

229 West 36th Street, New York, NY 10018
Phone (212) 619-4949    Fax (212) 220-2767
e-mail: accounting@recordpress.com
Federal I.D. Number 13-5654060

PAID

| | |
|---|---|
| SOLD TO: | **COMPTROLLER-STOP FMCE (SD)**<br>**OFFICE OF FINANCIAL MANAGEMENT**<br>**U.S. GOVERNMENT PRINTING OFFICE**<br>**WASHINGTON, DC 20401** |

| INVOICE DATE |
|---|
| 7/30/2009 |
| **CUSTOMER PHONE** |
| JACKET No. 604-044 |
| **CUSTOMER FAX** |
| 202 512-0992 |

| PURCHASE ORDER | PRINT ORDER No. | Due Date | NET TERMS | ACCT ... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| **B0601** | **65426** | **8/29/2009** | Net 30 | H | **2231** | **25135** |

### GARLAND-SASH vs. LEWIS

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 30 | For correcting 30 covers of the above reference: BRIEF United States Court of Appeals for the Second Circuit<br><br>Crack-n-Peel Covers @ | 3.00 | 90.00 |

*WE ACCEPT ALL MAJOR CREDIT CARDS AND WIRE TRANSFERS*

| | |
|---|---|
| SUBTOTAL | $90.00 |
| TAX (0.0%) | $0.00 |
| TOTAL | $90.00 |
| MONEY ON ACC'T | $-90.00 |
| BALANCE DUE | $0.00 |

## Thank you for your business.

**RP001612**

00001116

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/23/2006 | A68903 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

*PAID*

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Yu Zhu Ni v. John Ashcroft | | | |
| Docket No. 04-5025-ag / Print Order No. 68015 | | | |
| For printing and binding 21 copies of the above Brief for the | | | |
| Respondent: | | | |
| | | | |
| Printing of 21 Covers @ | 1 | 63.00 | 63.00 |
| Pages Text @ | 31 | 2.10 | 65.10 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 173.10 |
| Postage @ | 1 | 3.85 | 3.85 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $176.95 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $176.95 |
| **Payments/Credits** | $-176.95 |
| **Balance Due** | $0.00 |

RECORD PRESS, INC.

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

# Invoice

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68966 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Surinder Kaur v. U.S. Immigration and Naturalization Service Docket No. 03-4806-ag / Print Order No. 01841 For printing and binding 20 copies of the above Brief for the Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 34 | 2.00 | 68.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 173.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $177.05 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $177.05 |
| **Payments/Credits** | $-177.05 |
| **Balance Due** | $0.00 |

**RP001806**

00001118

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68967 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Xu Ping Dong v. Alberto Gonzales | | | |
| Docket No. 04-6049-ag / Print Order No. 68018 | | | |
| For printing and binding 20 copies of the above Brief for the | | | |
| Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 29 | 2.00 | 58.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 163.00 |
| Postage @ | 1 | 3.27 | 3.27 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $166.27 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $166.27 |
| **Payments/Credits** | $-166.27 |
| **Balance Due** | $0.00 |

**RP001807**

00001119

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68968 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Gregson Joseph v. Donna E. Shalala<br>Docket No. 05-3348-cv / Print Order No. 68016<br>For printing and binding 20 copies of the above Brief for the<br>Defendant-Appellee: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 48 | 2.00 | 96.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 201.00 |
| Postage @ | 1 | 6.15 | 6.15 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $207.15 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $207.15 |
| **Payments/Credits** | $-207.15 |
| **Balance Due** | $0.00 |

**RP001808**

00001120

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68969 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Gregson Joseph v. Donna E. Shalala | | | |
| Docket No. 05-3348-cv / Print Order No. 68017 | | | |
| For printing and binding 13 copies of the above Appendix for the | | | |
| Defendant-Appellee: | | | |
| | | | |
| Printing of 13 Covers @ | 1 | 39.00 | 39.00 |
| Pages Text @ | 686 | 1.30 | 891.80 |
| | | | 930.80 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $930.80 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $930.80 |
| **Payments/Credits** | $-930.80 |
| **Balance Due** | $0.00 |

**RP001809**

00001121

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68970 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

*PAID*

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Henry Anati | | | |
| Docket No. 05-3800-cr / Print Order No. 01840 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 29 | 2.00 | 58.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 163.00 |
| Postage @ | 1 | 3.27 | 3.27 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $166.27 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $166.27 |
| **Payments/Credits** | $-166.27 |
| **Balance Due** | $0.00 |

**RP001810**

00001122

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68971 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Jose Bernal-Ibanos | | | |
| Docket No. 05-0379-cr / Print Order No. 01838 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 38 | 2.00 | 76.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 181.00 |
| Postage @ | 1 | 3.95 | 3.95 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $184.95 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $184.95 |
| **Payments/Credits** | $-184.95 |
| **Balance Due** | $0.00 |

**RP001811**

00001123

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|---|---|
| 1/30/2006 | A68972 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|---|---|---|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| RE: USA v. Stanley Burrell | | | |
| Docket No. 05-2945-cr / Print Order No. 01837 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 22 | 2.00 | 44.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 149.00 |
| Postage @ | 1 | 2.67 | 2.67 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $151.67 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $151.67 |
| **Payments/Credits** | $-151.67 |
| **Balance Due** | $0.00 |

**RP001812**

00001124

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68973 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Olabiyi Mohammed Blaize<br>Docket No. 05-2116-cr / Print Order No. 01848<br>For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 28 | 2.00 | 56.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 161.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $165.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $165.20 |
| **Payments/Credits** | $-165.20 |
| **Balance Due** | $0.00 |

**RP001813**

00001125

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68974 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Olabiyi Mohammed Blaize | | | |
| Docket No. 05-2116-cr / Print Order No. 01849 | | | |
| For printing and binding 14 copies of the above Government's | | | |
| Appendix: | | | |
| | | | |
| Printing of 14 Covers @ | 1 | 42.00 | 42.00 |
| Pages Text @ | 86 | 1.40 | 120.40 |
| | | | 162.40 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $162.40 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $162.40 |
| **Payments/Credits** | $-162.40 |
| **Balance Due** | $0.00 |

**RP001814**

00001126

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68975 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. James Argentina | | | |
| Docket No. 05-1560-cr / Print Order No. 01842 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 64 | 2.00 | 128.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 233.00 |
| Postage @ | 1 | 5.60 | 5.60 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $238.60 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $238.60 |
| **Payments/Credits** | $-238.60 |
| **Balance Due** | $0.00 |

**RP001815**

00001127

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68976 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. James Argentina<br>Docket No. 05-1560-cr / Print Order No. 01843<br>For printing and binding 14 copies of the above Government's<br>Appendix: | | | |
| Printing of 14 Covers @ | 1 | 42.00 | 42.00 |
| Pages Text @ | 306 | 1.40 | 428.40 |
| | | | 470.40 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $470.40 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $470.40 |
| **Payments/Credits** | $-470.40 |
| **Balance Due** | $0.00 |

**RP001816**

00001128

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68977 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Rafael Tejada-Hiliano | | | |
| Docket No. 05-4414-cr / Print Order No. 01845 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 21 | 2.00 | 42.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 147.00 |
| Postage @ | 1 | 2.55 | 2.55 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $149.55 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $149.55 |
| **Payments/Credits** | $-149.55 |
| **Balance Due** | $0.00 |

**RP001817**

00001129

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68978 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Christopher Thomas | | | |
| Docket No. 03-1603 / Print Order No. 01847 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 27 | 2.00 | 54.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 159.00 |
| | | | |
| Postage @ | 1 | 3.03 | 3.03 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $162.03 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $162.03 |
| **Payments/Credits** | $-162.03 |
| **Balance Due** | $0.00 |

**RP001818**

00001130

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68979 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. William A. Bell | | | |
| Docket No. 05-2008-cr / Print Order No. 01846 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 27 | 2.00 | 54.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 159.00 |
| Postage @ | 1 | 3.03 | 3.03 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $162.03 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $162.03 |
| **Payments/Credits** | $-162.03 |
| **Balance Due** | $0.00 |

**RP001819**

00001131

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/30/2006 | A68980 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Quang Hui Dong v. Bureau of Citizenship and Immigration Services | | | |
| Docket No. 03-40478-ag / Print Order No. 01844 | | | |
| For printing and binding 20 copies of the above Brief for the Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 41 | 2.00 | 82.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 187.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $191.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $191.20 |
| **Payments/Credits** | $-191.20 |
| **Balance Due** | $0.00 |

**RP001820**

00001132

RECORD PRESS, INC.

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

# Invoice

| Date | Invoice # |
|------|-----------|
| 1/31/2006 | A69071 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Mohammed Farad Pasha<br>Docket No. 04-0541-cr(L) / Print Order No. 01857<br>For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 32 | 2.00 | 64.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 169.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $173.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $173.05 |
| **Payments/Credits** | $-173.05 |
| **Balance Due** | $0.00 |

RECORD PRESS, INC.

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

# Invoice

| Date | Invoice # |
|------|-----------|
| 1/31/2006 | A69072 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Min Xia He v. John Ashcroft | | | |
| Docket No. 05-0133-ag / Print Order No. 01858 | | | |
| For printing and binding 20 copies of the above Brief for the | | | |
| Respondents: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 48 | 2.00 | 96.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 201.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| Subtotal | $205.20 |
| Sales Tax  (0.0%) | $0.00 |
| Total | $205.20 |
| Payments/Credits | $-205.20 |
| Balance Due | $0.00 |

**RP001822**

00001134

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/31/2006 | A69073 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Ling-Ling Zhu v. U.S. Department of Justice | | | |
| Docket No. 04-5949-ag / Print Order No. 01856 | | | |
| For printing and binding 20 copies of the above Brief for the | | | |
| Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 27 | 2.00 | 54.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 159.00 |
| Postage @ | 1 | 3.27 | 3.27 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $162.27 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $162.27 |
| **Payments/Credits** | $-162.27 |
| **Balance Due** | $0.00 |

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/31/2006 | A69074 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Ibrahima Diallo<br>Docket No. 05-2472-cr / Print Order No. 01839<br>For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| Printing of 20 Covers @ | 2 | 60.00 | 120.00 |
| Pages Text @ | 16 | 2.00 | 32.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 197.00 |
| Postage @ | 1 | 4.28 | 4.28 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $201.28 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $201.28 |
| **Payments/Credits** | $-201.28 |
| **Balance Due** | $0.00 |

**RP001824**

00001136

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/31/2006 | A69075 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Ibrahim Qunbar | | | |
| Docket No. 05-4738-cr / Print Order No. 01854 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 15 | 2.00 | 30.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 135.00 |
| Postage @ | 1 | 5.00 | 5.00 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $140.00 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $140.00 |
| **Payments/Credits** | $-140.00 |
| **Balance Due** | $0.00 |

**RP001825**

00001137

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|---|---|
| 1/31/2006 | A69076 |

**PAID**

| Bill To |
|---|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|---|---|---|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| RE: USA v. Ibrahim Qunbar<br>Docket No. 05-4738-cr / Print Order No. 01855<br>For printing and binding 14 copies of the above Appendix for the U.S.: | | | |
| Printing of 14 Covers @ | 1 | 42.00 | 42.00 |
| Pages Text @ | 391 | 1.40 | 547.40 |
| | | | 589.40 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $589.40 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $589.40 |
| **Payments/Credits** | $-589.40 |
| **Balance Due** | $0.00 |

**RP001826**

00001138

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/31/2006 | A69077 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Mabel Salinas De Pereira | | | |
| Docket No. 05-4497-cr / Print Order No. 01853 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 18 | 2.00 | 36.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 141.00 |
| Postage @ | 1 | 2.31 | 2.31 |

Thank you for your business.

| | |
|--|--|
| **Subtotal** | $143.31 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $143.31 |
| **Payments/Credits** | $-143.31 |
| **Balance Due** | $0.00 |

**RP001827**

00001139

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 1/31/2006 | A69078 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Fa Gui Ni v. Bd. of Immigration Appeals<br>Docket No. 04-3787-ag / Print Order No. 01850<br>For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 30 | 2.00 | 60.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 165.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $169.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $169.05 |
| **Payments/Credits** | $-169.05 |
| **Balance Due** | $0.00 |

**RP001828**

00001140

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 2/10/2006 | A69084 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Hong Sheng Huang v. Bureau of Citizenship and Immigration Services<br>Docket No. 04-4161-ag / Print No. 01861<br>For printing and binding 20 copies of the above Brief for the Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 44 | 2.00 | 88.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 193.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $197.20 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $197.20 |
| **Payments/Credits** | $-197.20 |
| **Balance Due** | $0.00 |

**RP001829**

00001141

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 2/10/2006 | A69085 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Shay Liberman v. Jo Anne B. Barnhart | | | |
| Docket No. 05-5591-cv / Print No. 68021 | | | |
| For printing and binding 20 copies of the above Brief for the | | | |
| Defendant-Appellee: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 25 | 2.00 | 50.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 155.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $159.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $159.20 |
| **Payments/Credits** | $-159.20 |
| **Balance Due** | $0.00 |

**RP001830**

00001142

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|---|---|
| 2/10/2006 | A69086 |

**PAID**

Bill To

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|---|---|---|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| RE: Shay Liberman v. Jo Anne B. Barnhart | | | |
| Docket No. 05-5591-cv / Print No. 68022 | | | |
| For printing and binding 18 copies of the above Appendix for | | | |
| Defendant-Appellee: | | | |
| | | | |
| Printing of 18 Covers @ | 1 | 54.00 | 54.00 |
| Pages Text @ | 170 | 1.80 | 306.00 |
| | | | 360.00 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $360.00 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $360.00 |
| **Payments/Credits** | $-360.00 |
| **Balance Due** | $0.00 |

**RP001831**

00001143

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 2/10/2006 | A69087 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Merlicka & Kaloshi v. US Department of Justice Docket No. 05-5443-ag(L) / Print No. 68020 For printing and binding 20 copies of the above Brief for the Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 47 | 2.00 | 94.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 199.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $203.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $203.05 |
| **Payments/Credits** | $-203.05 |
| **Balance Due** | $0.00 |

**RP001832**

00001144

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 2/10/2006 | A69088 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Azmond Ali v. John Ashcroft<br>Docket No. 04-4584-ag / Print No. 68019<br>For printing and binding 20 copies of the above Brief for the<br>Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 34 | 2.00 | 68.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 173.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $177.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $177.20 |
| **Payments/Credits** | $-177.20 |
| **Balance Due** | $0.00 |

**RP001833**

00001145

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 2/10/2006 | A69089 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Everton Spence | | | |
| Docket No. 05-3038-cr / Print No. 01859 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 19 | 2.00 | 38.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 143.00 |
| Postage @ | 1 | 3.03 | 3.03 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $146.03 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $146.03 |
| **Payments/Credits** | $-146.03 |
| **Balance Due** | $0.00 |

**RP001834**

00001146

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 2/10/2006 | A69090 |

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Everton Spence<br>Docket No. 05-3038-cr / Print No. 01860<br>For printing and binding 13 copies of the above Government's<br>Appendix: | | | |
| Printing of 13 Covers @ | 1 | 39.00 | 39.00 |
| Pages Text @ | 11 | 1.30 | 14.30 |
| | | | 53.30 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $53.30 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $53.30 |
| **Payments/Credits** | $-53.30 |
| **Balance Due** | $0.00 |

**RP001835**

00001147

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|---|---|
| 2/16/2006 | A69146 |

| Bill To |
|---|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

**PAID**

| P.O. No. | Terms | Project |
|---|---|---|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| RE: USA v. Gerard Cavera<br>Docket No. 05-4591-cr(L) / Print Order No. 01862<br>For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 31 | 2.00 | 62.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 167.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $171.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $171.05 |
| **Payments/Credits** | $-171.05 |
| **Balance Due** | $0.00 |

**RP001836**

00001148

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 2/16/2006 | A69147 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Mandel Fogel v. Secretary of the Air Force Docket No. 05-0470-cv) / Print Order No. 68023 For printing and binding 20 copies of the above Memorandum for the Defendants-Appellees: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 12 | 2.00 | 24.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 129.00 |
| Postage @ | 1 | 3.27 | 3.27 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $132.27 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $132.27 |
| **Payments/Credits** | $-132.27 |
| **Balance Due** | $0.00 |

**RP001837**

00001149

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 2/16/2006 | A69148 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Mandel Fogel v. Secretary of the Air Force Docket No. 05-0470-cv) / Print Order No. 68024 For printing and binding 13 copies of the above Appendix for the Defendants-Appellees: | | | |
| Printing of 13 Covers @ | 1 | 39.00 | 39.00 |
| Pages Text @ | 64 | 1.30 | 83.20 |
| | | | 122.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $122.20 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $122.20 |
| **Payments/Credits** | $-122.20 |
| **Balance Due** | $0.00 |

**RP001838**

00001150

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 2/23/2006 | A69186 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Danilo Ortiz v. Alberto R. Gonzales | | | |
| Docket No. 04-1477-ag / Print Order No. 68025 | | | |
| For printing and binding 20 copies of the above Brief for the | | | |
| Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 34 | 2.00 | 68.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 173.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $177.05 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $177.05 |
| **Payments/Credits** | $-177.05 |
| **Balance Due** | $0.00 |

**RP001839**

00001151

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 2/28/2006 | A69242 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2885-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Heng Qiu Ruan v. Alberto Gonzales | | | |
| Docket No. 03-40315-ag / Print No. 68026 | | | |
| For printing and binding 20 copies of the above Brief for the | | | |
| Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 26 | 2.00 | 52.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 157.00 |
| Postage @ | 1 | 3.03 | 3.03 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $160.03 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $160.03 |
| **Payments/Credits** | $-160.03 |
| **Balance Due** | $0.00 |

**RP001840**

00001152

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/10/2006 | A69347 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Li Juan Zhao v. U.S. Department of Justice<br>Docket No. 04-3862-ag / Prinit Order No. 01863<br>For printing and binding 20 copies of the above Brief for the<br>Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 20 | 2.00 | 40.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 145.00 |
| Postage @ | 1 | 2.55 | 2.55 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $147.55 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $147.55 |
| **Payments/Credits** | $-147.55 |
| **Balance Due** | $0.00 |

**RP001841**

00001153

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/10/2006 | A69348 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Yu Yong Zheng v. Alberto R. Gonzales | | | |
| Docket No. 04-4489-ag / Print Order No. 01865 | | | |
| For printing and binding 20 copies of the above Brief for the Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 37 | 2.00 | 74.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 179.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|--|--|
| **Subtotal** | $183.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $183.05 |
| **Payments/Credits** | $-183.05 |
| **Balance Due** | $0.00 |

**RP001842**

00001154

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/10/2006 | A69349 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

*PAID*

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Jacob Zedner | | | |
| Docket No. 05-5896-cr / Print Order No. 01867 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 15 | 2.00 | 30.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 135.00 |
| Postage @ | 1 | 2.07 | 2.07 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $137.07 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $137.07 |
| **Payments/Credits** | $-137.07 |
| **Balance Due** | $0.00 |

**RP001843**

00001155

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/10/2006 | A69350 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Mohammed Khalil v. USA<br>Docket No. 05-4426-cr(L) / Print Order No. 01866<br>For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 66 | 2.00 | 132.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 237.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $241.20 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $241.20 |
| **Payments/Credits** | $-241.20 |
| **Balance Due** | $0.00 |

**RP001844**

00001156

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/10/2006 | A69351 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Ibinga Bertin v. USA | | | |
| Docket No. 05-4503-cv / Print Order No. 68027 | | | |
| For printing and binding 21 copies of the above Brief for the | | | |
| Defendant-Appellee: | | | |
| | | | |
| Printing of 21 Covers @ | 1 | 63.00 | 63.00 |
| Pages Text @ | 20 | 2.10 | 42.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 150.00 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $150.00 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $150.00 |
| **Payments/Credits** | $-150.00 |
| **Balance Due** | $0.00 |

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/10/2006 | A69352 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Ibinga Bertin v. USA | | | |
| Docket No. 05-4503-cv / Print Order No. 68028 | | | |
| For printing and binding 15 copies of the above Appendix for the | | | |
| Defendant-Appellee: | | | |
| | | | |
| Printing of 15 Covers @ | 1 | 45.00 | 45.00 |
| Pages Text @ | 67 | 1.50 | 100.50 |
| | | | 145.50 |

Thank you for your business.

| | |
|--|--|
| **Subtotal** | $145.50 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $145.50 |
| **Payments/Credits** | $-145.50 |
| **Balance Due** | $0.00 |

**RP001846**

00001158

RECORD PRESS, INC.

<u>229 West 36th Street, 8th Floor</u>
<u>New York, N.Y. 10018-8019</u>

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/31/2006 | A69566 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Tarsem Lal Vasudeva v. Board of Immigration<br>Docket No. 05-3991-ag / Print Order No. 68030<br>For printing and binding 20 copies of the above Brief for the<br>Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 36 | 2.00 | 72.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 177.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $181.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $181.05 |
| **Payments/Credits** | $-181.05 |
| **Balance Due** | $0.00 |

**RP001847**

00001159

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/31/2006 | A69567 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Vincent Lopez v. USA | | | |
| Docket No. 04-5095-pr / Print Order No. 01869 | | | |
| For printing and binding 20 copies of the above Brief and Appendix | | | |
| for the United States: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 35 | 2.00 | 70.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 175.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $179.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $179.05 |
| **Payments/Credits** | $-179.05 |
| **Balance Due** | $0.00 |

**RP001848**

00001160

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/31/2006 | A69568 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Michael Singletary | | | |
| Docket No. 05-5332-cr / Print Order No. 01875 | | | |
| For printing and binding 20 copies of the above Brief and | | | |
| Addendum for the United States: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 43 | 2.00 | 86.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 191.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $195.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $195.20 |
| **Payments/Credits** | $-195.20 |
| **Balance Due** | $0.00 |

**RP001849**

00001161

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/31/2006 | A69569 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Ali Cherif Debbi v. INS<br>Docket No. 05-5-5546-ag / Print Order No. 01878<br>For printing and binding 20 copies of the above Brief for the<br>Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 28 | 2.00 | 56.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 161.00 |
| Postage @ | 1 | 3.27 | 3.27 |

| | |
|---|---|
| Thank you for your business. | |

| | |
|---|---|
| **Subtotal** | $164.27 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $164.27 |
| **Payments/Credits** | $-164.27 |
| **Balance Due** | $0.00 |

**RP001850**

00001162

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|---|---|
| 3/31/2006 | A69570 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|---|---|---|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| RE: Zani Elezovski v. Secretary of Dept. of Homeland Security Docket No. 05-0450ag / Print Order No. 01874 For printing and binding 20 copies of the above Brief for the Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 38 | 2.00 | 76.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 181.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $185.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $185.05 |
| **Payments/Credits** | $-185.05 |
| **Balance Due** | $0.00 |

**RP001851**

00001163

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/31/2006 | A69571 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Fatmira Veljovic v. Alberto Gonzales<br>Docket No. 04-5909-ag / Print Order No. 01873<br>For printing and binding 20 copies of the above Brief for the<br>Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 44 | 2.00 | 88.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 193.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| Subtotal | $197.20 |
| Sales Tax  (0.0%) | $0.00 |
| Total | $197.20 |
| Payments/Credits | $-197.20 |
| Balance Due | $0.00 |

**RP001852**

00001164

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/31/2006 | A69572 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Yosep Rihi v. Alberto Gonzales<br>Docket No. 05-4533-ag / Print Order No. 01864<br>For printing and binding 20 copies of the above Brief for the<br>Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 29 | 2.00 | 58.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 163.00 |
| | | | |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|--|--|
| **Subtotal** | $167.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $167.05 |
| **Payments/Credits** | $-167.05 |
| **Balance Due** | $0.00 |

**RP001853**

00001165

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/31/2006 | A69573 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Gady Pichardo Hilario | | | |
| Docket No. 05-3972-cr / Print Order No. 01881 | | | |
| For printing and binding 20 copies of the above Brief for the United States: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 43 | 2.00 | 86.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 191.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $195.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $195.20 |
| **Payments/Credits** | $-195.20 |
| **Balance Due** | $0.00 |

**RP001854**

00001166

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/31/2006 | A69574 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. James Vargo<br>Docket No. 05-0617-cr / Print Order No. 01871<br>For printing and binding 20 copies of the above Brief for the United States: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 86 | 2.00 | 172.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 277.00 |
| Postage @ | 1 | 5.60 | 5.60 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $282.60 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $282.60 |
| **Payments/Credits** | $-282.60 |
| **Balance Due** | $0.00 |

**RP001855**

00001167

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/31/2006 | A69575 |

**PAID**

Bill To

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. James Vargo | | | |
| Docket No. 05-0617-cr / Print Order No. 01872 | | | |
| For printing and binding 14 copies of the above The Government's | | | |
| Appendix: | | | |
| | | | |
| Printing of 14 Covers @ | I | 42.00 | 42.00 |
| Pages Text @ | 305 | 1.40 | 427.00 |
| | | | 469.00 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $469.00 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $469.00 |
| **Payments/Credits** | $-469.00 |
| **Balance Due** | $0.00 |

**RP001856**

00001168

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 3/31/2006 | A69578 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

*PAID*

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Gady Pichardo Hilario | | | |
| Docket No. 05-3972-cr / Print Order No. 01882 | | | |
| For printing and binding 14 copies of the above Appendix for the United States: | | | |
| | | | |
| Printing of 14 Covers @ | 1 | 42.00 | 42.00 |
| Pages Text @ | 55 | 1.40 | 77.00 |
| | | | 119.00 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $119.00 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $119.00 |
| **Payments/Credits** | $-119.00 |
| **Balance Due** | $0.00 |

**RP001857**

00001169

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 4/12/2006 | A69607 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2231-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Oleg Mashkov v. Alberto Gonzales | | | |
| Docket No. 05-4148-cv / Print Order No. 68035 | | | |
| For printing and binding 21 copies of the above Brief for the | | | |
| Respondent: | | | |
| | | | |
| Printing of 21 Covers @ | 1 | 63.00 | 63.00 |
| Pages Text @ | 58 | 2.10 | 121.80 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 229.80 |
| | | | |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|--|--|
| **Subtotal** | $234.00 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $234.00 |
| **Payments/Credits** | $-234.00 |
| **Balance Due** | $0.00 |

**RP001858**

00001170

RECORD PRESS, INC.

**Invoice**

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 4/12/2006 | A69617 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Kai You Jing v. Alberto R. Gonzales | | | |
| Docket No. 05-3517-ag/ Print Order No. 01894 | | | |
| For printing and binding 20 copies of the above Brief for the | | | |
| Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 41 | 2.00 | 82.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 187.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $191.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $191.20 |
| **Payments/Credits** | $-191.20 |
| **Balance Due** | $0.00 |

**RP001859**

00001171

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 4/12/2006 | A69618 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Muhammad Iqbal v. Alberto R. Gonzales | | | |
| Docket No. 04-6606-ag/ Print Order No. 01893 | | | |
| For printing and binding 20 copies of the above Brief for the | | | |
| Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 36 | 2.00 | 72.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 177.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $181.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $181.05 |
| **Payments/Credits** | $-181.05 |
| **Balance Due** | $0.00 |

**RP001860**

00001172

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 4/21/2006 | A69645 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

*PAID*

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Bernard Olushina | | | |
| Docket No. 03-1517 / Print Order No. 01888 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 22 | 2.00 | 44.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 149.00 |
| Postage @ | 1 | 2.79 | 2.79 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $151.79 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $151.79 |
| **Payments/Credits** | $-151.79 |
| **Balance Due** | $0.00 |

**RP001861**

00001173

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 4/21/2006 | A69652 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: IHM Ajantha Badara Herath v. Alberto Gonzales Docket No. 04-4776-ag / Print Order No. 68039 For printing and binding 20 copies of the above Brief for the Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 43 | 2.00 | 86.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 191.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $195.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $195.20 |
| **Payments/Credits** | $-195.20 |
| **Balance Due** | $0.00 |

**RP001862**

00001174

RECORD PRESS, INC.

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/25/2006 | A69661 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Binder & Binder, P.C. v. Jo Anne B. Barnhart<br>Docket No. 05-6794-cv / Print Order No. 68040<br>For printing and binding 20 copies of the above Brief for the<br>Defendant-Appellee: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 48 | 2.00 | 96.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 201.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $205.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $205.20 |
| **Payments/Credits** | $-205.20 |
| **Balance Due** | $0.00 |

**RP001863**

00001175

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 4/28/2006 | A69766 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Muhammad Iqbal v. Alberto R. Gonzales | | | |
| Docket No. 04-6606-ag / Print Order No. 01899 | | | |
| For printing and binding 20copies of the above Brief for the | | | |
| Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 0.00 | 0.00 |
| Pages Text @ | 34 | 0.00 | 0.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 45.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $49.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $49.05 |
| **Payments/Credits** | $-49.05 |
| **Balance Due** | $0.00 |

**RP001865**

00001176

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69817 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Alex Mingo | | | |
| Docket No. 05-5736-cr / Print Order No. 01900 | | | |
| For printing and binding 20 copies of the above Brief for the US: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 23 | 2.00 | 46.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 151.00 |
| Postage @ | 1 | 2.79 | 2.79 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $153.79 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $153.79 |
| **Payments/Credits** | $-153.79 |
| **Balance Due** | $0.00 |

**RP001866**

00001177

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69818 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Chong Shun Chen v. John Ashcroft<br>Docket No. 03-4314 / Print Order No. 01897<br>For printing and binding 20 copies of the above Brief for the<br>Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 40 | 2.00 | 80.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 185.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $189.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $189.20 |
| **Payments/Credits** | $-189.20 |
| **Balance Due** | $0.00 |

**RP001867**

00001178

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69822 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Michael Bearam | | | |
| Docket No. 05-2823-cr / Print Order No. 01896 | | | |
| For printing and binding 20 copies of the above Brief and Appendix | | | |
| for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 50 | 2.00 | 100.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 205.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $209.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $209.20 |
| **Payments/Credits** | $-209.20 |
| **Balance Due** | $0.00 |

**RP001868**

00001179

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69823 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Julio Armando Arce-Aldana | | | |
| Docket No. 05-6549-cr / Print Order No. 01901 | | | |
| For printing and binding 20 copies of the above Brief and for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 23 | 2.00 | 46.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 151.00 |
| Postage @ | 1 | 2.79 | 2.79 |

Thank you for your business.

| | |
|---|---|
| Subtotal | $153.79 |
| Sales Tax (0.0%) | $0.00 |
| Total | $153.79 |
| Payments/Credits | $-153.79 |
| Balance Due | $0.00 |

**RP001869**

00001180

RECORD PRESS, INC.

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

# Invoice

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69824 |

PAID

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Cecil Simon v. USA<br>Docket No. 05-1716-pr(L) / Print Order No. 01902<br>For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 35 | 2.00 | 70.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 175.00 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $175.00 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $175.00 |
| **Payments/Credits** | $-175.00 |
| **Balance Due** | $0.00 |

**RP001870**

00001181

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69826 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Robert Roper<br>Docket No. 05-6213-cr) / Print Order No. 01904<br>For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 27 | 2.00 | 54.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 159.00 |
| Postage @ | 1 | 3.03 | 3.03 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $162.03 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $162.03 |
| **Payments/Credits** | $-162.03 |
| **Balance Due** | $0.00 |

**RP001871**

00001182

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69827 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. James Wilson | | | |
| Docket No. 05-6648-cr / Print Order No. 01905 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 30 | 2.00 | 60.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 165.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $169.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $169.05 |
| **Payments/Credits** | $-169.05 |
| **Balance Due** | $0.00 |

**RP001872**

00001183

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69828 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Philip Anthony Moe<br>Docket No. 05-3864-cr / Print Order No. 01906<br>For printing and binding 20 copies of the above Brief and Appendix<br>for the U.S.: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 32 | 2.00 | 64.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 169.00 |
| Postage @ | 1 | 3.27 | 3.27 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $172.27 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $172.27 |
| **Payments/Credits** | $-172.27 |
| **Balance Due** | $0.00 |

**RP001873**

00001184

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69829 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Prince Kayode Adekoya | | | |
| Docket No. 05-3637-cr / Print Order No. 01907 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 64 | 2.00 | 128.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 233.00 |
| Postage @ | 1 | 5.00 | 5.00 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $238.00 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $238.00 |
| **Payments/Credits** | $-238.00 |
| **Balance Due** | $0.00 |

**RP001874**

00001185

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|---|---|
| 5/12/2006 | A69830 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|---|---|---|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| RE: USA v. Prince Kayode Adekoya
Docket No. 05-3637-cr / Print Order No. 01908
For printing and binding 13 copies of the above Government's
Appendix: | | | |
| Printing of 13 Covers @ | 1 | 39.00 | 39.00 |
| Pages Text @ | 146 | 1.30 | 189.80 |
| | | | 228.80 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $228.80 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $228.80 |
| **Payments/Credits** | $-228.80 |
| **Balance Due** | $0.00 |

RECORD PRESS, INC.

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

# Invoice

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69831 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Ennio Nemesio Esteban-Gomez | | | |
| Docket No. 05-5639-cr / Print Order No. 01910 | | | |
| For printing and binding 20 copies of the above Brief for the U.S.: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 27 | 2.00 | 54.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 159.00 |
| Postage @ | 1 | 3.03 | 3.03 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $162.03 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $162.03 |
| **Payments/Credits** | $-162.03 |
| **Balance Due** | $0.00 |

**RP001876**

00001187

RECORD PRESS, INC.

**Invoice**

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/12/2006 | A69838 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

*PAID*

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Mon-Leang Mui | | | |
| Docket No. 05-3512-cr / Print Order No. 01909 | | | |
| For printing and binding 40 copies of the above Brief and Appendix | | | |
| of the USA: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 92 | 2.00 | 184.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 289.00 |
| Postage @ | 1 | 5.00 | 5.00 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $294.00 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $294.00 |
| **Payments/Credits** | $-294.00 |
| **Balance Due** | $0.00 |

**RP001877**

00001188

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/16/2006 | A69876 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Marron & Marron v. Alberto Gonzales | | | |
| Docket No. 05-3470 / Print Order No. 68044 | | | |
| For printing and binding 20 copies of the above Brief for the | | | |
| Respondent: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 39 | 2.00 | 78.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 183.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $187.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $187.20 |
| **Payments/Credits** | $-187.20 |
| **Balance Due** | $0.00 |

**RP001878**

00001189

RECORD PRESS, INC.

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

# Invoice

| Date | Invoice # |
|------|-----------|
| 5/17/2006 | A69880 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Mohammad Khan | | | |
| Docket No. 05-6522-cv / Print Order No. 68046 | | | |
| For printing and binding 22 copies of the above Brief for the | | | |
| Plaintiff-Appellee: | | | |
| | | | |
| Printing of 22 Covers @ | 1 | 66.00 | 66.00 |
| Pages Text @ | 76 | 2.20 | 167.20 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 278.20 |
| Postage @ | 1 | 8.40 | 8.40 |
| | | | |
| Thank you for your business. | | | |

| | |
|---|---|
| **Subtotal** | $286.60 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $286.60 |
| **Payments/Credits** | $-286.60 |
| **Balance Due** | $0.00 |

**RP001879**

00001190

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/31/2006 | A70048 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Khalid Nouider v. Thomas Ridge | | | |
| Docket No. 05-5519-ag / Print Order No. 68041 | | | |
| For printing and binding 20 copies of the above Brief for the | | | |
| Respondents: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 29 | 2.00 | 58.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 163.00 |
| Postage @ | 1 | 4.05 | 4.05 |

Thank you for your business.

| | |
|--|--|
| **Subtotal** | $167.05 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $167.05 |
| **Payments/Credits** | $-167.05 |
| **Balance Due** | $0.00 |

**RP001880**

00001191

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 5/31/2006 | A70052 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Xue Qi Lin v. Alberto Gonzales<br>Docket No. 05-2537-ag / Print Order No. 68047<br>For printing and binding 20 copies of the above Brief for the<br>Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 21 | 2.00 | 42.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 147.00 |
| Postage @ | 1 | 2.55 | 2.55 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $149.55 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $149.55 |
| **Payments/Credits** | $-149.55 |
| **Balance Due** | $0.00 |

**RP001881**

00001192

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/12/2006 | A70097 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Derwin McFarlane<br>Docket No. 05-0227-cr(L) / Print Order No. 01879<br>Printing and binding 20 copies of the above Brief for the United<br>States: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 68 | 2.00 | 136.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 241.00 |
| Postage @ | 1 | 10.35 | 10.35 |

Thank you for your business.

| | |
|--|--|
| **Subtotal** | $251.35 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $251.35 |
| **Payments/Credits** | $-251.35 |
| **Balance Due** | $0.00 |

**RP001882**

00001193

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/12/2006 | A70098 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Derwin McFarlane<br>Docket No. 05-0227-cr(L) / Print Order No. 01880<br>Printing and binding 14 copies of the above Government's<br>Appendix: | | | |
| Printing of 14 Covers @ | 1 | 42.00 | 42.00 |
| Pages Text @ | 661 | 1.40 | 925.40 |
| | | | 967.40 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $967.40 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $967.40 |
| **Payments/Credits** | $-967.40 |
| **Balance Due** | $0.00 |

**RP001883**

00001194

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/12/2006 | A70099 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Robert v. Department of Justice | | | |
| Docket No. 05-1773cv/ Print Order No. 68036 | | | |
| Printing and binding 21 copies of the above Supplemental Letter | | | |
| Brief: | | | |
| | | | |
| Pages Text @ | 18 | 2.10 | 37.80 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 82.80 |
| Postage @ | 1 | 2.07 | 2.07 |

Thank you for your business.

| | |
|--|--|
| **Subtotal** | $84.87 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $84.87 |
| **Payments/Credits** | $-84.87 |
| **Balance Due** | $0.00 |

**RP001884**

00001195

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/12/2006 | A70100 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Cecilio Reyes | | | |
| Docket No. 05-6110-cr / Print Order No. 01876 | | | |
| Printing and binding 20 copies of the above Brief for the United | | | |
| States: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 29 | 2.00 | 58.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 163.00 |
| Postage @ | 1 | 9.20 | 9.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $172.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $172.20 |
| **Payments/Credits** | $-172.20 |
| **Balance Due** | $0.00 |

**RP001885**

00001196

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|---|---|
| 6/12/2006 | A70101 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|---|---|---|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| RE: *Zhi Kang Gao v. John Ashcroft*<br>Docket No. 04-6592-ag / Print Order No. 01884<br>Printing and binding 20 copies of the above Brief for the<br>Respondents: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 25 | 2.00 | 50.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 155.00 |
| Postage @ | 1 | 3.03 | 3.03 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $158.03 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $158.03 |
| **Payments/Credits** | $-158.03 |
| **Balance Due** | $0.00 |

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/12/2006 | A70102 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. James Vargo | | | |
| Docket No. 05-3751-cv / Print Order No. 68037 | | | |
| Printing and binding 20 copies of the above Brief for the United States: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 85 | 2.00 | 170.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 275.00 |
| Postage @ | 1 | 5.00 | 5.00 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $280.00 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $280.00 |
| **Payments/Credits** | $-280.00 |
| **Balance Due** | $0.00 |

**RP001887**

00001198

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/12/2006 | A70103 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Charles A. Urrego v. USA | | | |
| Docket No. 05-3751-cv / Print Order No. 68037 | | | |
| Printing and binding 20 copies of the above Brief for the | | | |
| Defendants-Appellees: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 49 | 2.00 | 98.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 203.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $207.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $207.20 |
| **Payments/Credits** | $-207.20 |
| **Balance Due** | $0.00 |

**RP001888**

00001199

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/12/2006 | A70104 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Elizabeth Mateo Depena<br>Docket No. 05-5092-cr / Print Order No. 01870<br>Printing and binding 20 copies of the above Brief for the United States: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 91 | 2.00 | 182.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 287.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|--|--|
| **Subtotal** | $291.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $291.20 |
| **Payments/Credits** | $-291.20 |
| **Balance Due** | $0.00 |

**RP001889**

00001200

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/12/2006 | A70106 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

*PAID*

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Frantz Bouloute | | | |
| Docket No. 05-2981-cr / Print Order No. 01885 | | | |
| Printing and binding 20 copies of the above Brief for the United | | | |
| States: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 50 | 2.00 | 100.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 205.00 |
| Postage @ | 1 | 10.40 | 10.40 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $215.40 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $215.40 |
| **Payments/Credits** | $-215.40 |
| **Balance Due** | $0.00 |

**RP001890**

00001201

RECORD PRESS, INC.

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

# Invoice

| Date | Invoice # |
|------|-----------|
| 6/12/2006 | A70107 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Frantz Bouloute | | | |
| Docket No. 05-2981-cr / Print Order No. 01886 | | | |
| Printing and binding 14 copies of the above Government's | | | |
| Appendix: | | | |
| | | | |
| Printing of 14 Covers @ | 1 | 42.00 | 42.00 |
| Pages Text @ | 636 | 1.40 | 890.40 |
| | | | 932.40 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $932.40 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $932.40 |
| **Payments/Credits** | $-932.40 |
| **Balance Due** | $0.00 |

**RP001891**

00001202

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/19/2006 | A70183 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

*PAID*

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Albert Pashaj v. Alberto Gonzales Docket No. 05-0899-ag / Print Order No. 68053 For printing and binding 20 copies of the above Brief for the Respondent: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 46 | 2.00 | 92.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 197.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $201.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $201.20 |
| **Payments/Credits** | $-201.20 |
| **Balance Due** | $0.00 |

**RP001892**

00001203

RECORD PRESS, INC.

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

# Invoice

| Date | Invoice # |
|------|-----------|
| 6/21/2006 | A70194 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Rodolfo Sosa v. Michael Chertoff | | | |
| Docket No. 05-5035-ag / Print Order No. 68054 | | | |
| For printing and binding 21 copies of the above Brief for the | | | |
| Respondents: | | | |
| | | | |
| Printing of 21 Covers @ | 1 | 63.00 | 63.00 |
| Pages Text @ | 26 | 2.10 | 54.60 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 162.60 |
| Postage @ | 1 | 3.03 | 3.03 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $165.63 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $165.63 |
| **Payments/Credits** | $-165.63 |
| **Balance Due** | $0.00 |

**RP001893**

00001204

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/21/2006 | A70197 |

**PAID**

| Bill To |
|---------|
| COMPTROLLER - STOP FMCE (ED)<br>OFFICE OF FINANCIAL MGMT.<br>US GOVERNMENT PRINTING OFFICE<br>WASHINGTON, DC 20401 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2231-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: Jennifer Joshua v. Attorney General of the U.S.<br>Docket No. 03-41052-ag / Print No. 68052<br>For printing and binding 21 copies of the above Brief for the<br>Respondent: | | | |
| Printing of 21 Covers @ | 1 | 63.00 | 63.00 |
| Pages Text @ | 22 | 2.10 | 46.20 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 154.20 |
| Postage @ | 1 | 2.55 | 2.55 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $156.75 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $156.75 |
| **Payments/Credits** | $-156.75 |
| **Balance Due** | $0.00 |

**RP001895**

00001205

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|---|---|
| 6/21/2006 | A70203 |

**PAID**

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

| P.O. No. | Terms | Project |
|---|---|---|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| RE: John P. Barnes v. USA<br>Docket No. 04-6609-cv(L) / Print Order No. 68049<br>For printing and binding 20 copies of the above Brief for the<br>Defendants-Appellees: | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 55 | 2.00 | 110.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 215.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $219.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $219.20 |
| **Payments/Credits** | $-219.20 |
| **Balance Due** | $0.00 |

**RP001896**

00001206

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/29/2006 | A70279 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

*PAID*

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Kareem A. Ford | | | |
| Docket No. 05-6668-cr/ Print Order No. 01923 | | | |
| For printing and binding 20 copies of the above Brief and Appendix | | | |
| for the United States: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 51 | 2.00 | 102.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 207.00 |
| Postage @ | 1 | 6.05 | 6.05 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $213.05 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $213.05 |
| **Payments/Credits** | $-213.05 |
| **Balance Due** | $0.00 |

**RP001897**

00001207

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/29/2006 | A70280 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

PAID

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. John Drayton | | | |
| Docket No. 05-4991-cr/ Print Order No. 01922 | | | |
| For printing and binding 20 copies of the above Brief for the United | | | |
| States: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 41 | 2.00 | 82.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 187.00 |
| Postage @ | 1 | 4.20 | 4.20 |

Thank you for your business.

| | |
|--|--|
| **Subtotal** | $191.20 |
| **Sales Tax  (0.0%)** | $0.00 |
| **Total** | $191.20 |
| **Payments/Credits** | $-191.20 |
| **Balance Due** | $0.00 |

**RP001898**

00001208

RECORD PRESS, INC.

# Invoice

229 West 36th Street, 8th Floor
New York, N.Y. 10018-8019

| Date | Invoice # |
|------|-----------|
| 6/29/2006 | A70281 |

**Bill To**

COMPTROLLER - STOP FMCE (ED)
OFFICE OF FINANCIAL MGMT.
US GOVERNMENT PRINTING OFFICE
WASHINGTON, DC 20401

**PAID**

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2214-S | Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| RE: USA v. Oleg Verkhoglyad | | | |
| Docket No. 05-4210-cr/ Print Order No. 01920 | | | |
| For printing and binding 20 copies of the above Brief for the United | | | |
| States: | | | |
| | | | |
| Printing of 20 Covers @ | 1 | 60.00 | 60.00 |
| Pages Text @ | 21 | 2.00 | 42.00 |
| Party Served and Filed @ | 1 | 15.00 | 15.00 |
| Electronic Filing and Service of Brief @ | 1 | 30.00 | 30.00 |
| | | | 147.00 |
| Postage @ | 1 | 3.27 | 3.27 |

Thank you for your business.

| | |
|---|---|
| **Subtotal** | $150.27 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $150.27 |
| **Payments/Credits** | $-150.27 |
| **Balance Due** | $0.00 |

**RP001899**

00001209